## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Jointly Administered** |
| | : | **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION,** | : | |
| **a Delaware corporation, et al.,** | : | **Chapter 11** |
| | : | |
| **Debtors.** | : | **Re: Docket No. 7312; Agenda Item No. 1** |
| | : | **Hearing Date: 01/09/06 @ 9:00 a.m.** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE SECOND AMENDED JOINT PLAN OF REORGANIZATION OF KAISER ALUMINUM CORPORATION, KAISER ALUMINUM & CHEMICAL CORPORATION AND CERTAIN OF THEIR DEBTOR AFFILIATES, AS MODIFIED

DLI-5970550v4

# TABLE OF CONTENTS

**Page**

I.     FINDINGS OF FACT..................................................................................................... 7

    A.     JURISDICTION AND VENUE ............................................................................ 7

    B.     MODIFICATIONS TO THE PLAN ...................................................................... 8

    C.     COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF
          THE BANKRUPTCY CODE................................................................................. 9

         1.     Section 1129(a)(1) — Compliance of the Plan with Applicable
              Provisions of the Bankruptcy Code ......................................................... 9

         2.     Section 1129(a)(2) — Compliance with Applicable Provisions of
              the Bankruptcy Code................................................................................. 17

         3.     Section 1129(a)(3) –– Proposal of the Plan in Good Faith...................... 17

         4.     Section 1129(a)(4) — Court Approval of Certain Payments as
              Reasonable ............................................................................................... 18

         5.     Section 1129(a)(5) — Disclosure of Identity of Proposed
              Management, Compensation of Insiders and Consistency of
              Management Proposals with the Interests of Creditors and Public
              Policy ....................................................................................................... 19

         6.     Section 1129(a)(6) — Approval of Rate Changes.................................... 20

         7.     Section 1129(a)(7) –– Best Interests of Holders of Claims and
              Interests.................................................................................................... 20

         8.     Section 1129(a)(8) — Acceptance of the Plan by Each Impaired
              Class......................................................................................................... 20

         9.     Section 1129(a)(9) — Treatment of Claims Entitled to Priority
              Pursuant to Section 507(a) of the Bankruptcy Code................................ 21

         10.     Section 1129(a)(10) — Acceptance By at Least One Impaired,
              Non-Insider Class .................................................................................... 22

         11.     Section 1129(a)(11) — Feasibility of the Plan ........................................ 23

         12.     Section 1129(a)(12) — Payment of Bankruptcy Fees ............................. 23

         13.     Section 1129(a)(13) –– Retiree Benefits.................................................. 23

         14.     Section 1129(b) — Confirmation of the Plan Over the
              Nonacceptance of Impaired Classes ........................................................ 24

         15.     Section 1129(d) — Purpose of Plan......................................................... 25

    D.     THE ASBESTOS PI TRUST AND THE ASBESTOS PI CHANNELING
          INJUNCTION COMPLY WITH SECTION 524(g) OF THE
          BANKRUPTCY CODE..................................................................................... 26

**TABLE OF CONTENTS**
(continued)

Page

|   |   |   |   |
|---|---|---|---|
| | 1. | The Asbestos PI Trust Satisfies the Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code | 26 |
| | 2. | The Asbestos PI Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code | 27 |
| | 3. | The Extension of the Asbestos PI Channeling Injunction to Third Parties Is Appropriate | 29 |
| | 4. | Entry of the Asbestos PI Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants | 32 |
| E. | | THE SILICA, CTPV AND NIHL PI CHANNELING INJUNCTIONS AND THE CHANNELED PI INSURANCE ENTITY INJUNCTION EACH SATISFY THE REQUIREMENTS OF SECTION 105(a) OF THE BANKRUPTCY CODE | 33 |
| F. | | SATISFACTION OF CONDITIONS TO CONFIRMATION | 39 |
| G. | | SUBSTANTIVE CONSOLIDATION | 42 |
| II. | | CONCLUSIONS OF LAW | 43 |
| A. | | JURISDICTION AND VENUE | 43 |
| B. | | MODIFICATIONS TO THE PLAN | 44 |
| C. | | EXEMPTIONS FROM SECURITIES LAWS | 44 |
| D. | | EXEMPTIONS FROM TAXATION | 45 |
| E. | | COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE | 45 |
| F. | | COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE | 45 |
| G. | | OBJECTIONS TO THE PLAN | 45 |
| | 1. | The Insurers' Objections | 45 |
| | 2. | Law Debenture's Objection | 46 |
| | 3. | Other Objections | 46 |
| H. | | TRANSFER OF BOOKS AND RECORDS TO THE FUNDING VEHICLE TRUST AND RETENTION OF KACC'S FORMER COUNSEL | 46 |
| I. | | APPROVAL OF THE RELEASES PROVIDED UNDER THE PLAN | 47 |
| J. | | ASSUMPTIONS, ASSUMPTIONS AND ASSIGNMENTS AND REJECTIONS OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 47 |

## INTRODUCTION

WHEREAS, Kaiser Aluminum Corporation ("KAC"), Kaiser Aluminum &

Chemical Corporation ("KACC"), Akron Holding Corporation, Kaiser Aluminum & Chemical

Investment, Inc., Kaiser Aluminium International, Inc., Kaiser Aluminum Properties, Inc., Kaiser

Aluminum Technical Services, Inc., Kaiser Bellwood Corporation, Kaiser Micromill Holdings,

LLC, Kaiser Texas Micromill Holdings, LLC, Kaiser Sierra Micromills, LLC, Kaiser Texas

Sierra Micromills, LLC, Oxnard Forge Die Company, Inc., Alwis Leasing LLC, Kaiser Center,

Inc., KAE Trading, Inc. ("Kaiser Trading"), Kaiser Aluminum & Chemical Investment Limited

(Canada), Kaiser Aluminum & Chemical of Canada Limited (Canada), Kaiser Bauxite Company

("KBC"), Kaiser Center Properties, Kaiser Export Company and Texada Mines Ltd. (Canada)

(collectively, the "Reorganizing Debtors" and, as reorganized entities after emergence, the

"Reorganized Debtors"), twenty-two of the above-captioned debtors and debtors in possession,

proposed the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation,

Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates, dated

September 7, 2005, as modified (as it may be further modified, the "Plan");[1]

WHEREAS the Court, on September 8, 2005, entered its Order (A) Approving

Proposed Disclosure Statement, (B) Establishing Procedures for Solicitation and Tabulation of

---

[1]    Unless otherwise specified, capitalized terms and phrases used herein have the meanings
assigned to such terms and phrases in the Plan. The rules of interpretation set forth in
Section 1.2.a of the Plan shall apply to these Findings of Fact and Conclusions of Law
(the "Findings and Conclusions"). In addition, in accordance with Section 1.1 of the
Plan, any term used in the Plan or these Findings and Conclusions that is not defined in
the Plan or herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall
have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as
applicable.

A copy of the Plan (without the exhibits thereto) is attached to the Confirmation Order as
Exhibit A and incorporated herein by reference.

DLI-5970550v4

Votes to Accept or Reject Proposed Joint Plan of Reorganization and (C) Scheduling a Hearing on Confirmation of Proposed Joint Plan of Reorganization and Approving Related Notice Procedures (D.I. 7320) (the "Disclosure Statement Order"), by which the Court, among other things, approved the Reorganizing Debtors' proposed disclosure statement (the "Disclosure Statement"), established procedures for the solicitation and tabulation of votes to accept or reject the Plan and scheduled a hearing to consider Confirmation of the Plan for January 9, 2006 at 9:00 a.m., to be continued on January 10, 2006 if necessary (the "Confirmation Hearing");

WHEREAS affidavits of service executed by Kathleen M. Logan with respect to the mailing of notice of the Confirmation Hearing and solicitation materials in respect of the Plan in accordance with the Disclosure Statement Order (collectively, the "Affidavits of Service") and were filed with the Court on September 19, 2005 (D.I. 7390-93), October 14, 2005 (D.I. 7514, 7516, 7522-26) and November 10, 2005 (D.I. 7686);

WHEREAS the Affidavit of Andrew Novak (D.I. 7773) (the "Publication Affidavit") was filed with the Court on November 21, 2005, regarding the publication of the Notice of (A) Deadline for Casting Votes to Accept or Reject Proposed Joint Plan of Reorganization, (B) Hearing to Consider Confirmation of Proposed Joint Plan of Reorganization and (C) Related Matters in certain magazines and newspapers as set forth in the Disclosure Statement Order;

WHEREAS, Logan & Company, Inc., the Court-appointed solicitation and tabulation agent in respect of the Plan, filed the Declaration of Kathleen M. Logan Certifying the Methodology for the Tabulation of Votes on, and the Results of Voting with Respect to, the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates (D.I. 7812) (the

-2-

"Voting Declaration") on November 29, 2005, attesting to the results of the tabulation of the properly executed and timely received Ballots for the Plan as follows:

**Subclass 2A Claimants.** The Reorganizing Debtors received 279 acceptances out of 286 votes from holders of Claims under Subclass 2A (Senior Note and 7-3/4% SWD Revenue Bond Convenience Claims), with Subclass 2A claimants who voted in favor of the Plan holding Claims in the amount of $2,317,000 for voting purposes, such acceptances being 97.55 percent in number and 97.07 percent in principal amount of all ballots received from holders of Subclass 2A Claims (Voting Decl. ¶¶ 18-19);

**Subclass 2B Claimants.** The Reorganizing Debtors received 530 acceptances out of 571 votes from holders of Claims under Subclass 2B (Other Convenience Class Claims) with Subclass 2B claimants who voted in favor of the Plan holding Claims in the amount of $2,289,307 for voting purposes, such acceptances being 92.82 percent in number and 92.49 percent in principal amount of all ballots received from holders of Subclass 2B Claims (Voting Decl. ¶¶ 18-19);

**Class 4 Claimants.** The Reorganizing Debtors received 1 acceptance out of 1 vote from holders of Claims under Class 4 (Canadian Debtor PBGC Claims) with Class 4 claimants who voted in favor of the Plan holding Claims in the amount of $616,000,000 for voting purposes, such acceptances being 100 percent in number and 100 percent in principal amount of all ballots received from holders of Class 4 Claims (Voting Decl. ¶¶ 18-19);

**Class 5 Claimants.** The Reorganizing Debtors received 197,820 acceptances out of 198,127 votes from holders of Claims under Class 5 (Asbestos Personal Injury Claims) with Class 5 claimants who voted in favor of the Plan holding Claims in the amount of $993,949,450

for voting purposes, such acceptances being 99.84 percent in number and 99.97 percent in principal amount of all ballots received from holders of Class 5 Claims (Voting Decl. ¶¶ 18-19);

**Class 6 Claimants.** The Reorganizing Debtors received 296 acceptances out of 296 votes from holders of Claims under Class 6 (CTPV Personal Injury Claims) with Class 6 claimants who voted in favor of the Plan holding Claims in the amount of $296 for voting purposes, such acceptances being 100 percent in number and 100 percent in principal amount of all ballots received from holders of Class 6 Claims (Voting Decl. ¶¶ 18-19);

**Class 7 Claimants.** The Reorganizing Debtors received 1,764 acceptances out of 1,773 votes from holders of Claims under Class 7 (NIHL Personal Injury Claims) with Class 7 claimants who voted in favor of the Plan holding Claims in the amount of $1,764 for voting purposes, such acceptances being 99.49 percent in number and 99.49 percent in principal amount of all ballots received from holders of Class 7 Claims (Voting Decl. ¶¶ 18-19);

**Class 8 Claimants.** The Reorganizing Debtors received 2,667 acceptances out of 2,674 votes from holders of Claims under Class 8 (Silica Personal Injury Claims) with Class 8 claimants who voted in favor of the Plan holding Claims in the amount of $2,667 for voting purposes, such acceptances being 99.74 percent in number and 99.74 percent in principal amount of all ballots received from holders of Class 8 Claims (Voting Decl. ¶¶ 18-19);

**Subclass 9B Claimants.** The Reorganizing Debtors received 345 acceptances out of 372 votes from holders of Claims under Subclass 9B (Other Unsecured Claims) with Subclass 9B claimants who voted in favor of the Plan holding Claims in the amount of $1,153,864,132 for voting purposes, such acceptances being 92.74 percent in number and 99.26 percent in principal amount of all ballots received from holders of Subclass 9B Claims (Voting Decl. ¶¶ 18-19);

WHEREAS objections to Confirmation of the Plan (collectively, the

"Objections") were filed by (a) the official committee of retired employees (the "Retirees'

Committee") (D.I. 7699), (b) the United States of America, on behalf of the Internal Revenue

Service (the "IRS") (D.I. 7705), (c) the Comptroller of Public Accounts of the State of Texas (the

"Texas Comptroller") (D.I. 7706), (d) Law Debenture Trust Company of New York ("Law

Debenture") (D.I. 7707), (e) the Public Utility District No. 1 of Clark County d/b/a Clark Public

Utilities ("Clark") (D.I. 7711), (f) Santown Limited Partnership ("Santown") (D.I. 7714), (g) the

United States Trustee (the "U.S. Trustee") (D.I. 7715), (h) Elizabeth Black (D.I. 7743), (i) Patty

Greiner (D.I. 7830) and (j) certain insurance companies (collectively, the "Insurers") (D.I. 7834,

7836, 7839, 7840, 7843, 7847, 7851,8046);

WHEREAS the Objections of the Retirees' Committee, the IRS, the Texas

Comptroller and Santown were each resolved prior to the Confirmation Hearing;

WHEREAS the United States Department of Justice, on behalf of certain federal

agencies, raised an informal Objection to Confirmation of the Plan, which was resolved by the

parties by the inclusion of certain language in the Confirmation Order;

WHEREAS Sherwin Alumina, L.P. filed a reservation of rights and conditional

Objection to Confirmation of the Plan (D.I. 8033), which it withdrew at the Confirmation

Hearing;

WHEREAS the U.S. Trustee withdrew its Objection (D.I. 7960);

WHEREAS the Objection of Santown was resolved by the inclusion of certain

language in the Confirmation Order;

WHEREAS the Creditors' Committee filed a Pre-Hearing Brief in Support of the

Plan (D.I. 7961) (the "Creditors' Committee's Brief") and a reply to Sherwin's conditional

objection (D.I. 8056), the Reorganizing Debtors filed a memorandum of law in support of

Confirmation of the Plan and in response to certain of the Objections (D.I. 7967) (the

"Memorandum of Law") and a reply to Sherwin's conditional objection to the Plan (D.I. 8068),

the Reorganizing Debtors and the official committee of asbestos claimants (the "Asbestos

Committee") filed a joint memorandum of law in response to the Insurers' Objections (D.I. 7966)

(the "Joint Response") and Anne M. Ferazzi, the legal representative for future silica and coal tar

pitch volatile claimants (the "Silica and CTPV Representative"), and Martin J. Murphy, the legal

representative for future asbestos claimants (the "Asbestos Representative"), each filed a joinder

to the Joint Response (D.I. 7962, 7968);

WHEREAS the Insurers filed three replies (D.I. 8057, 8058, 8060) in support of

their Objections;

WHEREAS the declarations of Edward F. Houff (D.I. 8066), Blake O'Dowd (D.I.

8067), Anne M. Ferazzi (D.I. 8063) and Martin J. Murphy (D.I. 8065) were submitted in support

of the Plan (collectively, the "Declarations") and received into evidence without objection, and

although all parties and participants were afforded an opportunity to conduct cross-examination

at the hearing, no one elected to do so (Tr. of Jan. 9, 2006 Hr'g at 20-24);

WHEREAS the Court has reviewed the Plan, the Disclosure Statement, the

Disclosure Statement Order, the Voting Declaration and the Declaration of Kathleen M. Logan

filed on January 6, 2006 (D.I. 8097), the Affidavits of Service, the Publication Affidavit, the

Objections, the Memorandum of Law, the Joint Response, the Creditors' Committee's Brief, the

Insurers' replies in further support of their Objections, the Declarations and the other papers

before the Court in connection with the Confirmation of the Plan;

WHEREAS the Court heard the statements of counsel in support of and in opposition to Confirmation at the Confirmation Hearing, as reflected in the record made at the Confirmation Hearing;

WHEREAS the Court has considered all evidence presented at the Confirmation Hearing;

WHEREAS the Court has taken judicial notice of the papers and pleadings on file in these chapter 11 cases;

WHEREAS the Court, after due deliberation and for sufficient cause, finds that the evidence admitted in support of the Plan at the Confirmation Hearing is persuasive and credible;

NOW, THEREFORE, the Court hereby enters the following Findings of Fact and Conclusions of Law with respect to Confirmation of the Plan.[2]

## I.    FINDINGS OF FACT.

### A.    JURISDICTION AND VENUE.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has jurisdiction to enter a final order with respect thereto, except to the extent of the requirements of Section 524(g) of the Bankruptcy Code for issuance or affirmance of the Confirmation Order by the United States District Court for the District of Delaware (the "District Court").

---

[2]    These Findings and Conclusions constitute the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable herein by Bankruptcy Rules 7052 and 9014. Any finding of fact shall constitute a finding of fact even if it is referred to as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is referred to as a finding of fact. Citations to the Bankruptcy Code and Rules are to the sections and rules as numbered and in effect prior to October 17, 2005.

## B.      MODIFICATIONS TO THE PLAN.

The Reorganizing Debtors filed three sets of modifications to the Plan, which are

set forth in: (a) the Motion for Entry of Stipulation and Agreed Order Regarding Plan

Modifications and Potential Confirmation Objections by Certain Insurance Companies (D.I.

7659) (the "First Modifications"); (b) the Motion for Entry of an Order (I) Approving Settlement

with Sherwin Alumina, L.P. and (II) Authorizing Related Modifications to Second Amended

Joint Plan of Reorganization (D.I. 7796) (the "KBC Modifications"); and (c) the Amended

Notice of Filing of Third Modification to the Second Amended Joint Plan of Reorganization of

Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their

Debtor Affiliates (D.I. 7965) (the "Third Modifications" and, together with the First

Modifications and the KBC Modifications, the "Modifications"). The Court approved the First

Modifications pursuant to the Stipulation and Agreed Order entered on November 15, 2005 (D.I.

7718). On December 19, 2005, the Court approved the KBC Modifications (D.I. 7993), but

directed the Reorganizing Debtors to serve on general unsecured creditors in Subclass 9B a

notice describing the impact of the KBC Modifications on Subclass 9B creditors and providing

such creditors with an opportunity to object to confirmation of the Plan on the basis that the Plan

includes the KBC Modifications and providing those creditors who timely submitted a vote in

Subclass 9B to accept the Plan with an opportunity to change their votes. On December 21,

2005, the Reorganizing Debtors filed their Notice of Filing and Service on Holders of Subclass

9B General Unsecured Claims of Notice of: (A) Modifications to Second Amended Joint Plan of

Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation

and Certain of Their Debtor Affiliates, as Modified; and (B) Deadline for Changing Previous

Votes on Plan and Objecting to Modifications Filed by Kaiser Aluminum Corporation (D.I.

8002). On December 27, 2005, the Reorganizing Debtors filed the affidavit of Kathleen M.

Logan (D.I. 8027) (the "KBC Affidavit of Service"), evidencing service of the KBC

Modifications Notice on Subclass 9B creditors, which took place on December 21 and December

22, 2005. No objections to the KBC Modifications have been filed. And on January 6, 2006, the

Reorganizing Debtors filed the Declaration of Kathleen M. Logan (D.I. 8097) (the "Voting

Change Declaration"), evidencing that no creditor who timely submitted a vote in Subclass 9B to

accept the Plan elected to change such vote. Accordingly, the Modifications, including the KBC

Modifications, may be approved as part of the confirmation process. (See Tr. of Jan. 9, 2006

Hr'g at 30.)

## C.    COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

### 1.    Section 1129(a)(1) — Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.

The Plan complies with all applicable provisions of the Bankruptcy Code, as

required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the

Bankruptcy Code. (Houff Decl. ¶¶ 39-49.) The Plan fully complies with each requirement of

section 1123(a) of the Bankruptcy Code. (Houff Decl. ¶ 43.) Article II of the Plan designates

fifteen classes of Claims and Interests. (Plan art. II; Houff Decl. ¶43.) Section 3.2 of the Plan

specifies that Classes 1, 3, 10 and 15 are not impaired under the Plan. (Plan § 3.2; Houff Decl.

¶ 43.) Section 3.3 of the Plan specifies that Claims and Interests in Classes 2, 4, 5, 6, 7, 8, 9, 11,

12, 13 and 14 are impaired and describes the treatment of each such Class. (Plan § 3.3; Houff

Decl. ¶ 43.) Further, the treatment of each Claim or Interest within a Class is the same as the

treatment of each other Claim or Interest in such Class, unless the holder of a Claim or Interest

agrees to less favorable treatment on account of its Claim or Interest. (Houff Decl. ¶ 43.)

### a. Sections 1122 and 1123(a)(1)-(4) — Classification and Treatment of Claims and Interests.

i. The Plan constitutes a separate plan of reorganization for each of the Reorganizing Debtors. The Plan meets the classification requirements of section 1122(a) of the Bankruptcy Code. Article II of the Plan classifies Claims and Interests into fifteen separate categories. (Plan art. II; Houff Decl. ¶ 43.) In particular, Article II of the Plan segregates into separate Classes Unsecured Priority Claims (Class 1), Convenience Claims (Class 2), Secured Claims (Class 3), Canadian Debtor PBGC Claims (Class 4), Asbestos Personal Injury Claims (Class 5), CTPV Personal Injury Claims (Class 6), NIHL Personal Injury Claims (Class 7), Silica Personal Injury Claims (Class 8), General Unsecured Claims (Class 9), Canadian Debtor Claims (Class 10), Intercompany Claims (Class 11), KAC Old Stock Interests (Class 12), Kaiser Trading Old Stock Interests (Class 13), KACC Old Stock Interests (Class 14) and Other Old Stock Interests (Class 15). (Id.) The groupings reflect the diverse characteristics of those Claims and Interests, and the legal rights under the Bankruptcy Code of each of the holders of Claims or Interests within a particular Class are substantially similar to other holders of Claims or Interests within that Class. (Houff Decl. ¶¶ 39-42.)

ii. Due to their entitlement to priority status under section 507 of the Bankruptcy Code, Unsecured Priority Claims have been separately classified in Class 1. (Plan § 2.1; Houff Decl. ¶40.) In accordance with section 1122(b) of the Bankruptcy Code, Convenience Claims (consisting of every unsecured claim, except any Claim in respect of 6-1/2% RPC Revenue Bonds or Senior Subordinated Notes, that falls below the applicable threshold amount) have been separately classified in Class 2 for administrative convenience. (Plan § 2.2; Houff Decl. ¶ 40.) Specifically, Subclass 2A (Senior Note and 7-3/4% SWD Revenue Bond Convenience Claims) includes all Senior Note Claims and 7-3/4% SWD Revenue

Bond Claims for which the stated principal amount of the securities underlying the allowed amount of each such Claim is either equal to or less than $15,000, and Subclass 2B includes all Unsecured Claims other than Senior Note Claims, 7-3/4% SWD Revenue Bond Claims, 6-1/2% RPC Revenue Bonds and Senior Subordinated Note Claims for which (a) with respect to 7.60% SWD Revenue Bond Claims, the stated principal amount of the securities underlying the allowed amount of each such Claim is either equal to or less than $30,000 or (b) with respect to any such Claim other than a 7.60% SWD Revenue Bond Claim, the allowed amount of such Claim is equal to or less than $30,000. (Id.)

       iii.  Based on their secured status, Secured Claims have been separately classified in Class 3. (Plan § 2.3; Houff Decl. ¶ 41.) Unsecured Claims in Class 4 (Canadian Debtor PBGC Claims) and Class 10 (Canadian Debtor Claims) have been separately classified because such Claims have been asserted against the Canadian Debtors, which are not being substantively consolidated with the other Reorganizing Debtors for purposes of implementing the Plan, and the Plan classifies the Canadian Debtor PBGC Claims separately from the other Canadian Debtor Claims based on the fact that the PBGC Claims are allowed against each of the Reorganizing Debtors and are receiving the treatment negotiated in the PBGC Settlement Agreement. (Plan § 2.4; Houff Decl. ¶ 41.) Asbestos Personal Injury Claims, CTPV Personal Injury Claims, NIHL Personal Injury Claims and Silica Personal Injury Claims have been separately classified in, respectively, Classes 5, 6, 7 and 8 due to the distinctive bases for such claims. (Plan § 2.5-2.8; Houff Decl. ¶ 41.) Moreover, due to their unique nature, Class 11 Intercompany Claims have been classified separately from the Class 9 general Unsecured Claims. (Plan § 2.9, 2.11; Houff Decl. ¶ 41.)

DLI-5970550v4

-11-

iv.    Finally, the four Classes of Interests are comprised of

(a) the Interests and Claims in respect of the KAC Old Stock (Class 12), (b) the Interests and Claims in respect of the Old Stock of Kaiser Trading (Class 13), (c) the Interests and Claims in respect of the Old Stock of KACC (Class 14) and (d) the Interests in any Debtor other than the Interests in Classes 12, 13 or 14 (Class 15). (Plan § 2.12-2.15; Houff Decl. § 42.) The Interests in the Debtors have been segregated into these four Classes according to the differing nature of such Interests. (Houff Decl. ¶ 42.)

### b.    Section 1123(a)(5) — Adequate Means for Implementation of the Plan.

i.    Article IV of the Plan and various other provisions of the

Plan provide adequate means for the Plan's implementation, including: (a) except as otherwise provided in the Plan and subject to the Restructuring Transactions, the continued corporate existence of the Reorganizing Debtors and the vesting of assets in the Reorganized Debtors under Section 4.1 of the Plan; (b) the consummation of the Restructuring Transactions in connection with Section 4.2 of the Plan; (c) the creation of, and transfer of certain assets to, the Funding Vehicle Trust for the benefit of the PI Trusts and the appointment of the Funding Vehicle Trustees according to Section 5.1 of the Plan; (d) the creation of the PI Trusts, the transfer of certain assets to the Asbestos PI Trust and the Silica PI Trust and the appointment of the PI Trusts' respective Trustees and Trust Advisory Committees, as detailed in Sections 5.2 through 5.5 of the Plan; (e) the issuance of New Common Stock in Reorganized KAC for distribution in satisfaction of certain Claims under Section 4.3.d of the Plan; (f) the preservation of rights of action by, and release of certain rights of action against, the Reorganized Debtors, as described in Section 4.5 of the Plan; (g) the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases to which any Reorganizing Debtor is a party, as

-12-

stated in Article VI of the Plan; (h) the cancellation of the Senior Note Indentures and the discharge of obligations thereunder, subject to certain rights of the Indenture Trustees that will remain in effect, as detailed in Section 4.12 of the Plan; and (i) the substantive consolidation of KAC, KACC, Akron Holding Corporation, Kaiser Aluminum & Chemical Investment, Inc., Kaiser Aluminium International, Inc., Kaiser Aluminum Properties, Inc., Kaiser Aluminum Technical Services, Inc., Bellwood, Kaiser Micromill Holdings, LLC, Kaiser Texas Micromill Holdings, LLC, Kaiser Sierra Micromills, LLC, Kaiser Texas Sierra Micromills, LLC, Oxnard Forge Die Company, Inc., Alwis Leasing LLC, Kaiser Center, Inc., Kaiser Trading, Kaiser Center Properties and Kaiser Export Company, as provided in Sections 1.1(195), 9.1 and 9.2 of the Plan. (Plan art. VI, §§ 4.1, 4.2, 4.3.d, 4.5, 4.12, 5.1, 5.2-5.5, 1.1(195), 9.1, 9.2; Houff Decl. ¶ 44.) In accordance with the KBC Modifications, the Plan also provides for the substantive consolidation of KBC with the Substantively Consolidated Debtors solely for the limited purpose of treating any Unsecured Claims against KBC as Claims in Subclass 9B for purposes of distributions to be made under the Plan. (KBC Modification at 2; Houff Decl. ¶ 44.)

   **c. Section 1123(a)(6) — Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities.**

    Section 4.3.a(i) of the Plan provides that the Certificates of Incorporation of Reorganized KAC, Reorganized Kaiser Trading and each other Reorganized Debtor will, among other things, prohibit the issuance of nonvoting equity securities to the extent required under section 1123(a) of the Bankruptcy Code. (Plan § 4.3.a(i); Houff Decl. ¶ 45.) This prohibition is reflected in Article IV, Section 1 of the Amended and Restated Articles of Incorporation of Reorganized KAC and the Amended and Restated Articles of Incorporation of Reorganized Kaiser Trading, which are Plan Exhibits 4.3a(i) and (ii). (Plan Ex. 4.3.a(i), 4.3.a(ii); Houff Decl. ¶ 45.)

**d.      Section 1123(a)(7) — Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Security Holders and Public Policy.**

i.      The Plan ensures that the selections of the officers and

directors of Reorganized KAC, Reorganized Kaiser Trading and the other Reorganized Debtors is consistent with the interests of creditors and equity security holders and with public policy. (Houff Decl. ¶ 46.) Sections 1.1(176) and 4.3.b of the Plan provide that the initial board of directors for Reorganized KAC will be comprised of the following: (a) the chief executive officer; (b) four persons designated by the USW; and (c) five persons designated by the Search Committee. (Plan § 1.1(176), 4.3.b; Houff Decl. ¶ 46.) The Search Committee consisted of two persons designated by the Reorganizing Debtors, two persons designated by the Creditors' Committee and one person designated jointly by the Asbestos Committee, the Asbestos Representative and the Silica and CTPV Representative. (Plan § 1.1(176); Houff Decl. ¶ 46.) Accordingly, nine of the ten initial directors of Reorganized KAC were selected by creditor representatives or a committee the majority of which is comprised of creditor representatives. (Houff Decl. ¶ 46.) In addition, Section 4.3.b of the Plan provides that the initial members of the board of directors and initial officers of Reorganized Kaiser Trading will be selected jointly by the Asbestos Committee, the Asbestos Representative and the Silica and CTPV Representative. (Plan § 4.3.b; Houff Decl. ¶ 46.)

ii.      In light of the foregoing, the manner of selection of the

initial directors, managers, trustees and officers of the Reorganized Debtors, as set forth in the certificates of incorporation and bylaws or similar constituent documents of the applicable Reorganized Debtor and applicable state law, are consistent with the interests of the holders of Claims and Interests and public policy.

-14-

### e.    Section 1123(b)(1)-(2) — Impairment of Claims and Interests and Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases.

In accordance with section 1123(b)(1) of the Bankruptcy Code, Article III of the Plan provides for the impairment of certain classes of Claims and Interests, while leaving other Classes unimpaired. (Plan art. III; Houff Decl. ¶ 47.) The Plan thus modifies the rights of the holders of certain Claims and Interests and leaves the rights of others unaffected. (Houff Decl. ¶ 47.) In accordance with section 1123(b)(2) of the Bankruptcy Code, Article VI of the Plan provides for the assumption, assumption and assignment or rejection of certain Executory Contracts and Unexpired Leases to which the Reorganized Debtors are parties; *provided, however,* that the Debtors or Reorganized Debtors reserve the right, at any time prior to the Effective Date, to add or delete any Executory Contract or Unexpired Lease to be assumed, assumed and assigned or rejected to or from the applicable exhibit to the Plan. (Plan art. VI; Houff Decl. ¶ 47.)

### f.    Section 1123(b)(3) — Retention, Enforcement and Settlement of Claims Held by the Debtors.

In accordance with section 1123(b)(3) of the Bankruptcy Code, Section 4.5 of the Plan provides for the retention and enforcement of possible claims or causes of action by the Reorganized Debtors. (Plan § 4.5; Houff Decl. ¶ 47.)

### g.    Section 1123(b)(5) — Modification of the Rights of Holders of Claims.

Article III of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of each class of Claims and Interests. (Plan art. III; Houff Decl. ¶ 47.)

### h.   Section 1123(b)(6) — Other Provisions Not Inconsistent with Applicable Provisions of the Bankruptcy Code.

In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code, including: (a) the provisions of Article VII of the Plan governing distributions on account of Allowed Claims; (b) the provisions of Article V of the Plan providing for (i) the creation of the Funding Vehicle Trust and the PI Trusts and (ii) the appointment of the Funding Vehicle Trustees and the PI Trusts' respective Trustees and Trust Advisory Committees; (c) the provisions of Article VIII of the Plan establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved; (d) the provisions of Article XII of the Plan regarding the release of Claims, the termination of Interests and injunctions against certain actions; (e) the provisions of Article IX of the Plan regarding the substantive consolidation of certain of the Reorganizing Debtors; and (f) the provisions of Article XIII of the Plan regarding retention of jurisdiction by the Court over certain matters after the Effective Date. (Plan art. V, VII, IX, XII, XIII; Houff Decl. ¶ 48.)

### i.   Section 1123(d) — Cure of Defaults.

Article VI of the Plan provides for the satisfaction of Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. (Plan art. VI.) Additionally, in accordance with Section 3.2.b of the Plan, certain Claims will be Reinstated. (Plan § 3.2.b.) All Cure Amount Claims and Reinstated Claims will be determined in accordance with the underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established herein or, to extent applicable, any separate orders of the Court.

## 2. Section 1129(a)(2) — Compliance with Applicable Provisions of the Bankruptcy Code.

The Reorganizing Debtors have complied with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018. The Disclosure Statement and the procedures by which the Ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018 and the Disclosure Statement Order. (Houff Decl. ¶¶ 50-51.) Consistent with Section 14.2 of the Plan, the Debtors, the Reorganized Debtors, the DIP Lenders, the Indenture Trustees, the Creditors' Committee, the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, the PBGC, and the Retirees' Committee and their respective directors, managers, trustees, officers, employees, agents, members and professionals, as applicable, have all acted in "good faith," within the meaning of section 1125(e) of the Bankruptcy Code.

## 3. Section 1129(a)(3) — Proposal of the Plan in Good Faith.

The Reorganizing Debtors proposed the Plan in good faith and not by any means forbidden by law. In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the formulation of the Plan. (See Houff Decl. ¶¶ 18-37, 55; O'Dowd Decl. ¶¶ 4-7; Murphy Aff. ¶ 15-17; Ferrazi Decl. ¶ 25.) Based on the evidence presented at the Confirmation Hearing, the Court finds and concludes that the Plan has been proposed with the legitimate and honest purpose of reorganizing the business affairs of each of the Reorganizing Debtors and maximizing the returns available to creditors. (Houff Decl. ¶ 54; O'Dowd Decl. ¶ 8.) Consistent with the overriding purpose of chapter 11 of the Bankruptcy Code, the Plan is designed to allow the Reorganizing Debtors to reorganize by

DLI-5970550v4                    -17-

resolving certain pending disputes and proceedings and providing the Reorganized Debtors with a capital structure that will allow them to satisfy their obligations with sufficient liquidity and capital resources and to fund necessary capital expenditures and otherwise conduct their businesses. (Houff Decl. ¶ 37; O'Dowd Decl. ¶ 8-10.) Moreover, the Plan itself and the arms' length negotiations among the Reorganizing Debtors, the Creditors' Committee, the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, the PBGC, the Retirees' Committee, the Unions and the Debtors' other constituencies leading to the Plan's formulation, as well as the overwhelming support of creditors for the Plan, provide independent evidence of the Reorganizing Debtors' good faith in proposing the Plan. (Houff Decl. ¶ 36; Voting Decl. at 6.)

### 4.  Section 1129(a)(4) — Court Approval of Certain Payments as Reasonable.

a.  In accordance with section 1129(a)(4) of the Bankruptcy Code, all fees to which parties may be entitled in connection with the Bankruptcy Cases, including Professionals' Fee Claims, are subject to the approval of the Court. (Houff Decl. ¶ 56.) Section 3.1 of the Plan provides for the payment of Allowed Administrative Claims, including Professionals' Fee Claims, and makes all such payments subject to Court approval and the standards of the Bankruptcy Code. (Plan § 3.1.a; Houff Decl. ¶ 56.) The Court has authorized the interim payment of the fees and expenses incurred by Professionals in connection with the Bankruptcy Cases. (See Revised Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (D.I. 1122) at 6; Houff Decl. ¶ 56.) All such fees and expenses, however, remain subject to final review for reasonableness by the Court. (Id.)

b. In connection with the foregoing, Article XIII of the Plan provides

that the Court will retain jurisdiction after the Effective Date to hear and determine all

applications for allowance of compensation or reimbursement of expenses authorized pursuant to

the Bankruptcy Code or the Plan. (Plan art. XIII; Houff Decl. ¶ 56.)

### 5. Section 1129(a)(5) — Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy.

In the Disclosure Statement, Notice of Filing by Debtors and Debtors in

Possession Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and

Certain of Their Debtor Affiliates of Certain Information Regarding the Initial Board of

Directors of Reorganized Kaiser Aluminum Corporation in Accordance with the Second

Amended Joint Plan of Reorganization and Section 1129(a)(5) of the Bankruptcy Code (D.I.

7651) and Exhibit 4.3.b to the Plan, the Reorganizing Debtors have disclosed all necessary

information regarding the Reorganized Debtors' officers and directors, including their names,

ages, positions, affiliations and qualifications and, for the officers of Reorganized KAC, who

may constitute insiders, the compensation paid or to be paid.[3] (Houff Decl. ¶ 57.) In addition,

the names of the individuals expected to serve as the initial directors and officer of Reorganized

Kaiser Trading have been disclosed in the Notice of Filing By Debtors and Debtors in Possession

Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their

Debtor Affiliates of Certain Information Regarding the Initial Board of Directors of Reorganized

Kaiser Trading in Accordance with the Second Amended Joint Plan of Reorganization and

Section 1129(a)(5) of the Bankruptcy Code (D.I. 8042), dated December 29, 2005. (Id.) The

---

[3] As noted on the record at the Confirmation Hearing, a director designated by the USW, George Becker, has asked to be replaced but has agreed to serve until his replacement has been identified. (See Tr. of Jan. 9, 2006 Hr'g at 17.)

appointment or continuance of the proposed directors and officers is consistent with the interests

of the holders of Claims and Interests and with public policy.

### 6.    Section 1129(a)(6) — Approval of Rate Changes.

The Debtors' current businesses do not involve the establishment of rates over

which any regulatory commission has or will have jurisdiction after Confirmation. (Houff Decl.

¶ 59.)

### 7.    Section 1129(a)(7) — Best Interests of Holders of Claims and Interests.

With respect to each impaired Class of Claims or Interests for each Reorganizing

Debtor, each holder of a Claim or Interest in such impaired Class has accepted or is deemed to

have accepted the Plan or, as demonstrated by the liquidation analyses included as Exhibit II to

the Disclosure Statement, will receive or retain under the Plan on account of such Claim or

Interest property of a amount, as of the Effective Date, that is not less than the value such holder

would receive or retain if the Reorganizing Debtors were liquidated on the Effective Date under

chapter 7 of the Bankruptcy Code. (Houff Decl. ¶¶ 60-61; O'Dowd Decl. ¶¶ 12-20.)

### 8.    Section 1129(a)(8) — Acceptance of the Plan by Each Impaired Class.

a.    Pursuant to section 1129(a)(8) of the Bankruptcy Code, all classes

of Claims and Interests, other than Subclass 9A and Classes 12 and 14, have either accepted the

Plan or are unimpaired. (Houff Decl. ¶ 62; Voting Decl. at 6.) Specifically, Subclasses 2A, 2B

and 9B and Classes 4, 5, 6, 7 and 8, the only classes entitled to vote on the Plan, each

overwhelmingly voted to accept the Plan. (Id.) Classes 1, 3, 10 and 15 are unimpaired under the

Plan and, therefore, are deemed to have accepted the Plan. (Plan § 3.2; Houff Decl ¶ 62;

Disclosure Statement Order ¶ H.) In addition, although the holders of Class 11 Claims will

receive or have received the treatment set forth in the Intercompany Claims Settlement and

holders of Class 13 Claims and Interests will receive or retain no property on account of their Claims and Interests, as applicable, the holders of Claims and Interests in Classes 11 and 13 are deemed to have accepted the Plan pursuant to its express terms because those classes are comprised solely of the Reorganizing Debtors and the Other Debtors. (Plan § 3.3.h, 3.3.j; Houff Decl. ¶ 62; Disclosure Statement Order ¶ H.) Accordingly, section 1129(a)(8) of the Bankruptcy Code has been satisfied with respect to all Classes of Claims and Interests other than Subclass 9A and Classes 12 and 14. (Houff Decl. ¶ 62.)

b. Under the Plan, holders of Claims and Interests in Subclass 9A, Class 12 or Class 14 will receive or retain no property on account of their Claims and Interests. (Plan § 3.3.g, 3.3.i, 3.3.k; Houff Decl. ¶ 63.) Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, Subclass 9A and Classes 12 and 14 are deemed to have rejected the Plan. (Id.) Nonetheless, as explained in Section I.C.14 below, the Plan satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code necessary to obtain confirmation of the Plan, notwithstanding the deemed rejection of the Plan by Subclass 9A and Classes 12 and 14.

## 9. Section 1129(a)(9) — Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.

a. The Plan also meets the requirements regarding the payment of Administrative Claims, Priority Claims and Priority Tax Claims, as set forth in section 1129(a)(9) of the Bankruptcy Code. (Houff Decl. ¶ 64.)

b. Section 3.1.a(i) of the Plan provides that, subject to certain Bar Dates and unless otherwise agreed by the holder of an Administrative Claim and the applicable Reorganizing Debtor or Reorganized Debtor, all Allowed Administrative Claims will be paid in full in cash: (a) on the Effective Date or (b) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes allowed by a

-21-

Final Order or a Stipulation of Amount and Nature of Claim. (Plan § 3.1.a(i); Houff Decl. ¶ 64.) Pursuant to Plan Section 3.1.a(iii), Administrative Claims based on liabilities incurred by a Reorganizing Debtor in the ordinary course of its business — including Administrative Trade Claims and Administrative Claims of governmental units for Taxes, including Tax audit Claims related to tax years commencing after the Petition Date, and Allowed Administrative Claims arising from the contracts and leases of the kind described in Section 6.6 of the Plan — will be paid by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims. (Id.) Section 3.1.a(iv) of the Plan provides that, unless otherwise agreed by the DIP Lenders, pursuant to the DIP Financing Facility, Allowed Administrative Claims under or evidenced by the DIP Financing Facility will be paid in full in Cash on or before the Effective Date. (Plan § 3.1.a(iv); Houff Decl. ¶ 64.)

        c.     Section 3.1.b(i) of the Plan provides that, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Reorganizing Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, deferred Cash payments over a period not exceeding six years from the date of assessment of such Priority Tax Claim on the terms set forth in the Plan. (Plan § 3.1.b(i); Houff Decl. ¶ 65.) In addition, section 3.1.b(i) of the Plan permits the Reorganized Debtors to pay any Allowed Priority Tax Claim, or any remaining balance of such Priority Tax Claim, in full at any time on or after the Effective Date, without premium or penalty. (Id.)

### 10.    Section 1129(a)(10) — Acceptance By at Least One Impaired, Non-Insider Class.

As indicated in the Voting Declaration and as reflected in the record of the Confirmation Hearing, at least one Class of Claims that is impaired under the Plan has voted to

-22-

accept the Plan, determined without including the acceptance by any insider, with respect to all Reorganized Debtors under the Plan. (Voting Decl. at 6; Houff Decl. ¶ 66.)

### 11.   Section 1129(a)(11) — Feasibility of the Plan.

Although the Reorganizing Debtors' businesses operate in highly competitive industries and markets, and although it is impossible to predict with certainty the precise future profitability of the Reorganizing Debtors' businesses or the industries and markets in which the Reorganizing Debtors operate, as demonstrated by the Reorganizing Debtors' financial projections contained in the Disclosure Statement and the evidence in the record, Confirmation of the Plan is not likely to be followed by the liquidation of, or the need for further financial reorganization of the Reorganizing Debtors, the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan. (Disclosure Statement at 195; Houff Decl. ¶ 67-69; O'Dowd Decl. ¶ 21-28.) Upon the Effective Date, the Reorganized Debtors will have sufficient operating cash and liquidity to meet their financial obligations under the Plan and to fund ongoing business operations. (O'Dowd Decl. ¶ 28; Houff Decl. ¶ 32.)

### 12.   Section 1129(a)(12) — Payment of Bankruptcy Fees.

Section 3.1.a(ii) of the Plan provides for the payment in full in Cash on or before the Effective Date of the fees due to the U.S. Trustee, in accordance with section 1129(a)(12) of the Bankruptcy Code. (Plan § 3.1.a(ii); Houff Decl. ¶ 70.)

### 13.   Section 1129(a)(13) — Retiree Benefits.

The Plan satisfies the requirements of 1129(a)(13) of the Bankruptcy Code, which requires that a plan provide for the payment of retiree benefits, as such benefits may have been modified pursuant to section 1114 of the Bankruptcy Code. (Houff Decl. ¶ 71.) The Plan continues the implementation of certain settlement agreements, which, among other things, modified retiree benefits pursuant to section 1114 of the Bankruptcy Code. (Houff Decl. ¶ 71;

-23-

O'Dowd Decl. ¶ 6(b); Disclosure Statement at 48-50.)  Pursuant to Section 3.1.a.(vi) of the Plan,

on the Effective Date, Reorganized KAC will contribute (a) to the Union VEBA 11,439,900

shares of New Common Stock plus cash equal to the initial contributions, if any, and (b) to the

Salaried VEBA 1,940,100 shares of New Common Stock plus cash equal to the initial VEBA

contributions, if any.  (Plan § 3.1.a(vi); Houff Decl. ¶ 71.)  Thereafter, Reorganized KAC will

make the applicable profit-sharing contributions to the Union VEBA and the Salaried VEBA.

(Id.)

### 14.    Section 1129(b) — Confirmation of the Plan Over the Nonacceptance of Impaired Classes.

a.      Pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan

may be confirmed notwithstanding that Subclass 9A and Classes 12 and 14 are impaired and

deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  11 U.S.C.

§ 1129(b)(1).  First, the Plan satisfies the "fair and equitable" requirements of section

1129(b)(2)(C) with respect to Subclass 9A because:  (a) no holder of any Claim or Interest that is

junior to the Senior Subordinated Note Claims of creditors in Subclass 9A will receive or retain

any property under the Plan on account of such junior claim or interest; and (b) as evidenced by

the valuations and estimates contained in the Disclosure Statement, no Class of Claims or

Interests senior to the Senior Subordinated Note Claims in Subclass 9A will receive more than

full payment on account of the Claims or Interests in such Class.  (See Plan art. III; Houff Decl. ¶

72.)  The Plan also satisfies the standards of section 1129(b) with respect to Classes 12 and 14

because:  (a) no Claim or Interest junior to, as applicable, the KAC Old Stock Interests in Class

12 or the KACC Old Stock Interests in Class 14 will receive or retain any property under the

Plan on account of such junior Claim or Interest; and (b) as evidenced by the valuations and

estimates contained in the Disclosure Statement, no Class of Claims or Interests senior to, as

applicable, the KAC Old Stock Interests in Class 12 or the KACC Old Stock Interests in Class 14 will receive more than full payment on account of the Claims or Interests of such Class. (Id.)

        b.     Second, under the circumstances of these cases, the Plan does not unfairly discriminate against the holders of Claims in Subclass 9A or the holders of Interests in Classes 12 and 14. The Senior Subordinated Note Claims in Subclass 9A are legally distinct from other Claims and Interests and are properly classified in a separate Subclass in light of the contractual subordination provisions contained in the Senior Subordinated Indenture. (Plan § 3.3.g; Houff Decl. ¶ 73.) In fact, no distributions can be made to holders of Senior Subordinated Note Claims because, in accordance with the contractual subordination provisions of the Senior Subordinated Note Indenture, the aggregate amount of consideration that would otherwise be payable to the holders of Senior Subordinated Note Claims must be distributed to holders of Allowed Senior Note Claims, who, pursuant to the 7-3/4% SWD Revenue Bond Settlement, agreed to share a portion of such consideration with holders of Allowed 7-3/4% SWD Revenue Bond Claims. (Id.) Likewise, the KAC Old Stock Interests and the KACC Old Stock Interests in Classes 12 and 14, respectively, are legally distinct from other Claims and Interests and are properly classified in separate classes. (Plan § 3.3.i, 3.3.k; Houff Decl. ¶ 73.) Equity interests, the KAC Old Stock Interests and the KACC Old Stock Interests are not entitled to any distributions unless all creditors of KAC and KACC are satisfied in full or otherwise agree, and no such agreement exists. (Houff Decl. ¶ 73.) Accordingly, the requirements of section 1129(b) are satisfied with respect to Subclass 9A and Classes 12 and 14.

### 15.    Section 1129(d) — Purpose of Plan.

The principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act, and there has been no request filed by any governmental unit asserting such avoidance.

## D.    THE ASBESTOS PI TRUST AND THE ASBESTOS PI CHANNELING INJUNCTION COMPLY WITH SECTION 524(g) OF THE BANKRUPTCY CODE.

The Plan comports with the Bankruptcy Code's requirements for issuance of an injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in respect of asbestos-related claims or demands against the Reorganized Debtors.

### 1.    The Asbestos PI Trust Satisfies the Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code.

a.    The Asbestos PI Channeling Injunction is to be implemented in connection with the establishment of the Asbestos PI Trust and is essential to the Plan and the Reorganizing Debtors' reorganization efforts. (Houff Decl. ¶104.)

b.    Pursuant to Section 5.2 of the Plan, on the Effective Date, the Asbestos PI Trust will assume all liability and responsibility for all Asbestos Personal Injury Claims. (Plan § 5.2.e; Houff Decl. ¶ 81; Murphy Aff. ¶ 20.) As set forth in the Disclosure Statement and reflected in the record of the Confirmation Hearing, as of the Petition Date, approximately 104,000 unresolved Asbestos Personal Injury Claims were pending against Reorganizing Debtor KACC. (Disclosure Statement at 67; Houff Decl. ¶ 81.)

c.    Section 5.2 of the Plan provides that the Asbestos PI Trust will be funded in part by the securities of two of the Reorganized Debtors under the Plan: (i) 94 percent of the common stock of Kaiser Trading, one of the Reorganizing Debtors under the Plan and (ii) the *pro rata* distribution of New Common Stock in Reorganized KAC on account of the Asbestos PI Trust's interests in 70.5 percent of the KFC Claim (which is an Allowed General Unsecured Claim in Subclass 9B). (Plan § 5.2.d; Houff Decl. ¶ 82.) As a result, with respect to Reorganized Kaiser Trading, the Asbestos PI Trust will own a majority of Reorganized Kaiser Trading's common stock and, with respect to Reorganized KAC and Reorganized KACC, the

-26-

DLI-5970550v4

Asbestos PI Trust will own a majority of the common stock of a subsidiary. (Houff Decl. ¶ 83.) Additionally, as set forth in Exhibits 4.3.a(i) and 4.3.a(ii) to the Plan, the Asbestos PI Trust will also have all rights to receive dividends or other distributions on account of the Asbestos PI Trust's ownership of the securities in Kaiser Trading and Reorganized KAC described above. (Plan Ex. 4.3.a(i), 4.3.a.(ii); Houff Decl. ¶ 82.)

           d.      Section 5.2 of the Plan also provides that the Asbestos PI Trust will use its assets to pay and satisfy Asbestos Personal Injury Claims in accordance with the Plan, the PI Trust Funding Agreement and the Asbestos PI Trust Agreement. (Plan § 5.2.a(i); Houff Decl. ¶ 84.)

## 2. The Asbestos PI Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code.

           a.      As set forth in the Disclosure Statement and reflected in the record of the Confirmation Hearing, between 1970 and the Petition Date, approximately 247,000 asbestos-related personal injury lawsuits were asserted against KACC, and approximately 104,000 Asbestos Personal Injury Claims remained unresolved as of the Petition Date. (Houff Decl. ¶ 87; Disclosure Statement at 67.) The Reorganizing Debtors' asbestos-related liabilities arise from former operations of KACC, almost entirely from KACC's former Kaiser Refractories division. (Id.) Based on the long latency period of asbestos-related diseases and the substantial number of asbestos-related personal injury lawsuits that had been asserted in the past and that remained unresolved on the Petition Date, KACC will likely be subject to substantial future Demands for payment arising from the same conduct or events that gave rise to the Asbestos Personal Injury Claims. (Houff Decl. ¶ 87.)

           b.      Moreover, due to the long latency period for asbestos-related diseases and the substantial number of asbestos-related personal injury lawsuits that had been

-27-

asserted in the past and that remained unresolved on the petition date, the Reorganizing Debtors are unable to determine the actual amounts, numbers and timing of future Demands against KACC in respect of alleged asbestos-related personal injuries. (Houff Decl. ¶ 87.)

      c.     If the holders of asbestos-related Demands are able to pursue such Demands outside of the Asbestos Distribution Procedures, the holders of such Demands would have to liquidate their claims through settlements or the tort system on an individual basis, which, because of the vagaries inherent in litigation, could produce inconsistent awards. (Houff Decl. ¶ 89; Murphy Aff. ¶ 24.) Moreover, with ever-diminishing funds available to pay asbestos-related Demands, there is a risk that Demands would initially all be paid in full as they are settled or liquidated in the tort system but that, at some point in the future, Demands would go unsatisfied. (Houff Decl. ¶ 89.) Accordingly, the pursuit of asbestos-related Demands against KACC outside the Asbestos Distribution Procedures contemplated by the Plan would likely threaten the Plan's purpose to deal equitably with Asbestos Personal Injury Claims, including future asbestos-related Demands. (Houff Decl. ¶ 89.)

      d.     Further, as part of the confirmation process in these cases, the Reorganizing Debtors included the terms of the Asbestos PI Channeling Injunction, including provisions therein barring actions against any Protected Party, in both the Plan and the Disclosure Statement. (Plan § 1.1(36); Disclosure Statement at 115; Houff Decl. ¶ 90.) The Reorganizing Debtors also designated a separate class, Class 5 under the Plan, for all Asbestos Personal Injury Claims, and of the holders of Asbestos Personal Injury Claims in Class 5 that voted, 99.84 percent of such holders voted in favor of the Plan. (Plan § 2.5; Voting Decl. at 6; Houff Decl. ¶ 90.)

e.      Also, as set forth in Section 5.2.a(i) of the Plan, the Asbestos PI

Trust will pay Asbestos Personal Injury Claims in accordance with the Asbestos Distribution

Procedures, which contain mechanisms that provide reasonable assurance that the Asbestos PI

Trust will value, and be in a financial position to pay, present Asbestos Personal Injury Claims

and future asbestos-related Demands that involve similar claims in substantially the same

manner. (Plan § 5.2.a(i); Houff Decl. ¶ 91-92; Murphy Aff. ¶ 28-29.)

### 3.      The Extension of the Asbestos PI Channeling
### Injunction to Third Parties Is Appropriate.

a.      Sections 1.1(36) and 10.2 of the Plan contemplates that the

Asbestos PI Channeling Injunction will be extended to protect the following:

i.      any entity that, pursuant to the Plan or after the Effective

Date, becomes a direct or indirect transferee of, or successor to, any assets of the Reorganizing

Debtors, the Other Debtors, the Reorganized Debtors, other Kaiser Companies, the Funding

Vehicle Trust or a PI Trust (but only to the extent that liability is asserted to exist as a result of

its becoming such a transferee or successor) (Plan § 1.1(161)c; Houff Decl. ¶ 94.a); and

ii.      any entity that, pursuant to the Plan or after the Effective

Date, makes a loan to any of the Reorganizing Debtors, the Reorganized Debtors, the Other

Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust or to a successor to, or

transferee of any of the respective assets of, the Reorganizing Debtors, the Other Debtors, the

Reorganized Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust (but only

to the extent that liability is asserted to exist by reason of such entity's becoming such a lender or

to the extent any pledge of assets made in connection with such a loan is sought to be upset or

impaired) (Plan § 1.1(161)d; Houff Decl. 94.b).

b.    The Plan also provides that the Asbestos PI Channeling Injunction

will bar certain actions against any Protected Party. (Houff Decl. ¶ 95.) Each Protected Party

under the Plan is either identifiable from the definition or is a member of an identifiable group.

(See Plan § 1.1(161); Houff Decl. ¶95.) In addition to the groups identified in paragraphs 3.a.i

and 3.a.ii above, the Reorganizing Debtors, the Reorganized Debtors and the other Kaiser

Companies, the Plan defines Protected Party to include the following —

i.    as to Channeled Personal Injury Claims, each Settling

Insurance Company; and

ii.    each entity to the extent he, she or it is alleged to be

directly or indirectly liable for the conduct of, Claims against or Demands on any Reorganizing

Debtor, Other Debtor, Reorganized Debtor or PI Trust on account of Channeled Personal Injury

Claims by reason of one or more of the following:

> a)    such entity's ownership of a financial interest in any
> Reorganizing Debtor, Other Debtor or Reorganized
> Debtor or any past or present affiliate (collectively,
> "Affiliates") or predecessor in interest (collectively,
> "Predecessors") of any of the foregoing;
>
> b)    such entity's involvement in the management of any
> Reorganizing Debtor, Other Debtor, Reorganized
> Debtor, Affiliate or Predecessor;
>
> c)    such entity's service as a director, officer, employee,
> accountant (including an independent certified
> public accountant), advisor, attorney, investment
> banker, underwriter, consultant or other agent of
> any Reorganizing Debtor, Other Debtor,
> Reorganized Debtor, Affiliate or Predecessor or any
> entity that owns or at any time has owned a
> financial interest in any Reorganizing Debtor, Other
> Debtor or Reorganized Debtor, Affiliate or
> Predecessor; or
>
> d)    such entity's involvement in a transaction changing
> the corporate structure, or in a loan or other

> financial transaction affecting the financial condition, of any Reorganizing Debtor, Other Debtor, Reorganized Debtor, Affiliate or Predecessor or any entity that owns or at any time has owned a financial interest in any Reorganizing Debtor, Other Debtor, Reorganized Debtor, Affiliate or Predecessor.

(Plan § 1.1(161); Houff Decl. ¶ 95.)

        c.      Accordingly, consistent with section 524(g)(4)(A)(ii) of the Bankruptcy Code, the Asbestos PI Channeling Injunction bars actions against third parties only where such parties are alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the Debtors by reason of:

        i.      the third party's ownership of a financial interest in any Reorganizing Debtor, Other Debtor, Reorganized Debtor, or past or present affiliate or predecessor in interest of any Reorganizing Debtor, Other Debtor or Reorganized Debtor;

        ii.      the third party's involvement in the management of the Debtors or a predecessor in interest to one or more of the Debtors or service as an officer, director or employee of (i) the Debtors, (ii) a past or present affiliate of the Debtors, (iii) a predecessor in interest to the Debtors, or (iv) an entity that owned a financial interest in the Debtors or their past or present affiliates or predecessors in interest;

        iii.      the third party's provision of insurance to the Debtors or a related party; or

        iv.      the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtors or a related party. (Houff Decl. ¶ 96.)

        d.      The extension of the Asbestos PI Channeling Injunction to third parties is consistent with the Bankruptcy Code. Consistent with section 524(g)(4)(A)(ii) of the

-31-

DLI-5970550v4

Bankruptcy Code, the Asbestos PI Channeling Injunction bars actions against third parties only where such parties are alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on, the Debtors.

## 4.    Entry of the Asbestos PI Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants.

a.    The Reorganizing Debtors, on behalf of the Protected Parties, are contributing $13 million plus the PI Insurance Assets to the Funding Vehicle Trust. (Plan §§ 1.1(151), 5.1.d(i); Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) The Asbestos PI Trust will be entitled to receive from the Funding Vehicle Trust 94 percent of the cash received by the Funding Vehicle Trust net of expenses of the Funding Vehicle Trust and certain amounts payable pursuant to the Plan and the PI Trust Funding Agreement to the other PI Trusts. (Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) The PI Insurance Assets are comprised of "the rights to receive proceeds from Included PI Trust Insurance Policies in respect of Channeled Personal Injury Claims" as well as "any Cash paid or to be paid pursuant to settlement agreements with any PI Insurance Company entered into prior to the Effective Date in respect of Included PI Trust Insurance Policies and allocable to payment of Channeled Personal Injury Claims." (Plan § 1.1(145); Houff Decl. ¶ 98.) The Debtors have received approximately $14 million in cash from settlements consummated with certain Insurance Companies prior to 2005 regarding coverage for Channeled Personal Injury Claims. (Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) In addition, in 2005 the Reorganizing Debtors reached settlements, for an aggregate of more than $375 million, payable over time, but subject to certain termination conditions, with certain other insurance companies. (Id.) The face value of the Included PI Trust Insurance Policies for which a settlement has not yet been reached aggregates more than $1 billion. (Id.)

b.    In addition, the Reorganizing Debtors are contributing to the

Asbestos PI Trust 94 shares of common stock of Reorganized Kaiser Trading, which constitutes 94 percent of the outstanding equity interest in such entity, and 70.5 percent of the KFC Claim in accordance with the Intercompany Claims Settlement. (Plan § 5.2.d; Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) In light of the substantial contributions to be made to the Asbestos PI Trust on behalf of the Protected Parties, entry of the Asbestos PI Channeling Injunction, and the naming of the Protected Parties therein, is fair and equitable with respect to persons that might subsequently assert future asbestos-related Demands.

## E.    THE SILICA, CTPV AND NIHL PI CHANNELING INJUNCTIONS AND THE CHANNELED PI INSURANCE ENTITY INJUNCTION EACH SATISFY THE REQUIREMENTS OF SECTION 105(a) OF THE BANKRUPTCY CODE.

1.    In conjunction with the resolution of the Reorganizing Debtors' Silica,

CTPV, and NIHL tort liabilities and the establishment of the PI Trusts, the Plan provides for the issuance of (a) the Silica PI Channeling Injunction, (b) the CTPV PI Channeling Injunction and (c) the NIHL PI Channeling Injunction, which will enjoin certain suits, claims, and actions against Protected Parties. (Houff Decl. ¶ 100; Ferazzi Decl. ¶ 35.) The issuance of the Silica, CTPV and NIHL Channeling Injunctions and the extension of those injunctions to non-debtor Protected Parties are essential to the implementation of the Plan and the resolution of the Debtors' tort liabilities, including the resolution of asbestos-related liabilities. (Houff Decl. ¶ 100; Ferazzi Decl. ¶ 39.) Additionally, the Plan provides for a Channeled PI Insurance Entity Injunction. (Plan § 12.2.c; Houff Decl. ¶ 100.) The Channeled PI Insurance Entity Injunction enjoins all entities (except the Funding Vehicle Trust, the PI Trusts or the Reorganized Debtors) that hold or assert, now or in the future, a Channeled Personal Injury Claim from taking any actions to collect or recover on such a claim against a PI Insurance Company. (Id.) The

DLI-5970550v4                                -33-

Channeled PI Insurance Entity Injunction will not be issued for the benefit of any PI Insurance Company and no PI Insurance Company will be a third-party beneficiary of the Channeled PI Insurance Entity Injunction. (Plan § 12.2.c; Houff Decl. ¶ 100.) The Channeled PI Insurance Entity Injunction does not relieve any non-debtor third party of liability and is necessary solely to facilitate the Plan's provisions for the satisfaction of Channeled Personal Injury Claims. (Houff Decl. ¶ 100.)

2.    The channeling injunctions and each PI Trust's portion of the total funding to be provided to the PI Trusts under the Plan were the product of extensive negotiations among the Debtors, the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, counsel for certain present holders of Silica Personal Injury Claims, counsel for certain present holders of CTPV Personal Injury Claims and counsel for certain present holders of NIHL Personal Injury Claims. (Houff Decl. ¶ 101; Ferazzi Decl. ¶¶ 24-25; Murphy Aff. ¶¶ 15-16.) The success of these negotiations is evidenced by the overwhelming support for the Plan by holders of Channeled Personal Injury Claims. (Voting Decl. at 6; Houff Decl. ¶ 101.) No creditor or holder of a Channeled Personal Injury Claim has objected to the Silica, CTPV and NIHL PI Channeling Injunctions or the extension of those injunctions to the non-debtor Protected Parties. (Houff Decl. ¶ 101.) In addition, holders of Silica and NIHL Personal Injury Claims voted in favor of the Plan by more than 99 percent in both number and amount of claims voted and 100 percent of the holders of CTPV Personal Injury Claims that cast a Ballot voted to accept the Plan. (Voting Decl. at 6; Houff Decl. ¶ 101.)

3.    There is a shared identity of interests between the Reorganizing Debtors and the Protected Parties. (Houff Decl. ¶ 102.) In addition to the Settling Insurance Companies, the nondebtor Protected Parties generally include affiliates of the Reorganizing Debtors,

predecessors in interest of the Debtors, entities that currently own or formerly owned a financial interest in the Reorganizing Debtors, past or present directors, officers, employees, professionals or agents of the Debtors or their affiliates and entities that were involved in a financial transaction affecting the financial condition of the Reorganizing Debtors or their affiliates. (Plan § 1.1(161); Houff Decl. ¶ 102.) There is a shared identity of interests between the Reorganizing Debtors and these nondebtor Protected Parties because a lawsuit against any of these non-debtor parties seeking to hold them liable in respect of the Reorganizing Debtors' alleged liability for a Channeled Personal Injury Claim would either give rise to some form of claim for indemnity against the Reorganizing Debtors or deplete the Reorganizing Debtors' insurance coverage. (Houff Decl. ¶ 102.)

        4.       The Silica PI Trust, the CTPV PI Trust and the NIHL PI Trust will be funded through substantial financial and other contributions by or on behalf of the non-debtor Protected Parties. (Houff Decl. ¶ 103.) The Silica PI Trust will be funded by 6 percent of the stock of Reorganized Kaiser Trading, 4.5 percent of the KFC Claim and 6 percent of the PI Insurance Assets minus expenses and certain other amounts. (Houff Decl. ¶ 103; Ferazzi Decl. ¶¶ 31-32.) The CTPV PI Trust will receive the lesser of $8,488,000 or an amount based on the number of allowed present CTPV Claims. (Houff Decl. ¶ 103; Ferazzi Decl. ¶ 33.) The NIHL PI Trust will receive a minimum of $19,512,000 and may receive additional amounts depending on the number of allowed CTPV Claims and other factors. (Houff Decl. ¶ 103.) There were extensive negotiations among the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, counsel for certain holders of present Silica Personal Injury Claims, certain holders of present CTPV Personal Injury Claims and certain holders of NIHL Personal

-35-

Injury Claims regarding the allocation of the PI Trust Assets and the NIHL PI Trust. (Id.; Ferazzi Decl. ¶¶ 24-25; Murphy Aff. ¶¶ 15-16.)

      5.     The channeling injunctions are essential to the implementation of the Plan and the resolution of the Reorganizing Debtors' tort liabilities. (Houff Decl. ¶ 104; Ferazzi Decl. ¶ 39.) Present and future silica claimants and most asbestos injury claimants have recourse to the Reorganizing Debtors' products liability insurance coverage, and CTPV, NIHL and certain asbestos injury claimants have recourse to the Reorganizing Debtors' premises insurance coverage. (Houff Decl. ¶ 104.) For this reason, among others, the Silica, CTPV and NIHL Channeling Injunctions are necessary to address all of the Reorganizing Debtors' mass tort liabilities on an equitable basis. (Id.) In the absence of the PI Channeling Injunctions, the holders of Silica, CTPV and NIHL Personal Injury Claims could litigate their claims in the tort system and separately pursue the available insurance coverage, which would not only result in inconsistent awards among similarly situated claimants (e.g., similarly situated silica claimants) but also the depletion of insurance coverage, which must be shared among various types of personal injury claimants, in favor one or more of these tort creditor groups. (Id.; Ferazzi Decl. ¶ 38.) Similarly, the Channeled PI Insurance Entity Injunction is necessary to preserve the PI Trust Assets and to protect the Funding Vehicle Trust so that it can pursue the insurance coverage litigation and negotiate settlements with insurers for the benefit of the PI Trusts and all holders of Channeled Personal Injury Claims. (Id.) Absent the Channeled PI Insurance Entity Injunction, individual claimants could separately assert claims against PI Insurance Companies, thereby depleting the available insurance that must be shared among the PI Trusts and impeding the Funding Vehicle Trusts' ability to negotiate settlements. (Id.)

    -36-

6.      As noted above, the Debtors have received approximately $14 million in
cash from settlements consummated with certain Insurance Companies prior to 2005 regarding
coverage for Channeled Personal Injury Claims. (Houff Decl. ¶ 98; Murphy Aff. ¶ 22.)  In
addition, in 2005 the Reorganizing Debtors reached settlements, for an aggregate of more than
$375 million, payable over time, but subject to certain termination conditions, with certain other
insurance companies. (Id.)  Pursuant to the Plan, these settlement proceeds will be contributed to
the Funding Vehicle Trust for the benefit of the PI Trusts. (Plan § 5.1.d.)  Each of the PI
Channeling Injunctions is essential in obtaining the substantial funds these settlements provide
for the benefit of the PI Trusts and to facilitate any additional potential settlements with other
insurance companies. (Houff Decl. ¶ 105; Ferazzi Decl. ¶ 37.)

7.      The Classes impacted by the issuance of the channeling injunctions have
voted overwhelmingly in support of the Plan. (Voting Decl. at 6; Houff Decl. ¶ 106.)  No
creditor or holder of a Channeled Personal Injury Claim objected to the channeling injunctions or
the extension of those injunctions to the non-debtor Protected Parties, and holders of Silica,
CTPV and NIHL Personal Injury Claims have voted overwhelming in favor of the Plan. (Id.)
One hundred percent of CTPV Personal Injury Claims (Class 6) and over 99 percent of NIHL
Personal Injury Claims (Class 7) and Silica Personal Injury Claims (Class 8), both in amount of
Claims and in number of Claim holders that cast Ballots, have voted to accept the Plan. (Id.)
Additionally, the Reorganizing Debtors fully disclosed the scope of the proposed channeling
injunctions and described in detail the entities that would be protected by the injunctions. (Houff
Decl. ¶ 106; Disclosure Statement at 114-19; Ferazzi Decl. ¶ 38.)

8.      The Plan establishes trust distribution procedures ("TDPs") for each of
Silica, CTPV and NIHL claims. (Plan § 5.3.a, 5.4.a, 5.5.a; Houff Decl. ¶ 107; Ferazzi Decl.

¶¶ 40, 58.) The TDPs provide for the equitable treatment of all present and future claimants. (Houff Decl. ¶ 107; Ferazzi Decl. ¶¶ 40, 58.) The TDPs establish procedures for processing and paying Channeled Personal Injury Claims on an impartial, first-in-first-out basis, with the intention of paying all claimants over time as equivalent a share as possible of the value their claims. (Houff Decl. ¶ 107; Ferazzi Decl. ¶¶ 44, 60.) Once liquidated, each Channeled Personal Injury Claim will be paid by the appropriate trust. (Houff Decl. ¶ 107.)

9. Furthermore, the distribution procedures for each of these Classes of Channeled Personal Injury Claims permit the holder of such a Claim, including an Indirect Channeled Personal Injury Claim, to institute a lawsuit in the tort system against the applicable PI Trust, subject to certain conditions, procedures and limitations set forth in the applicable distribution procedures, if the dispute cannot be resolved in non-binding arbitration. (Houff Decl. ¶ 108; Plan Ex. 1.1(34) § 5.11; Plan Ex. 1.1(66) § 5.7; Plan Ex. 1.1(129) § 5.7; Plan Ex. 1.1(186) § 5.11.) Each of the PI Trust's distribution procedures contemplate that non-settling claimants that litigate their claims in the tort system may present any judgment obtained to the applicable PI Trust for payment. (Houff Decl. ¶ 108; Plan Ex. 1.1(34) § 7.7; Plan Ex. 1.1(66) § 7.7; Plan Ex. 1.1(129) § 7.7; Plan Ex. 1.1(186) § 7.7.) The funding of the PI Trusts and the allocation of those funds were the result of extensive negotiations among the Debtors, the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, counsel for certain holders of present Silica Personal Injury Claims, counsel for certain holders of present CTPV Personal Injury Claims and counsel for certain holders of NIHL Personal Injury Claims. (Id.) Thus, the Plan not only provides the necessary mechanisms for paying Claims in each of the Classes of Channeled Personal Injury Claims (including separate trusts, trustees, and

DLI-5970550v4

-38-

distribution procedures), but also implements an allocation of funds to each of the PI Trusts that is adequate and fair.

10.     For all the foregoing reasons, the issuance of the Silica, CTPV and NIHL Channeling Injunctions and the Channeled PI Insurance Entity Injunction, as well as the treatment of Silica, CTPV and NIHL Personal Injury Claims, including future silica and CTPV Demands, is appropriate under the Bankruptcy Code.

## F.     SATISFACTION OF CONDITIONS TO CONFIRMATION.

1.     Section 10.1 of the Plan contains conditions precedent to Confirmation that must be satisfied or duly waived pursuant to Section 10.3 of the Plan. The conditions precedent set forth in Sections 10.1.a. through 10.1.c of the Plan have been satisfied.

2.     Concerning the establishment of the Funding Vehicle Trust, the PI Trusts and issuance of the PI Channeling Injunctions, the Court specifically finds:

a.     The PI Channeling Injunctions are to be implemented in connection with the establishment of the PI Trusts (Plan art. V; Houff Decl. at 38-52);

b.     As of the Petition Date, certain of the Reorganizing Debtors had been named as defendants in personal injury or wrongful death damage actions seeking recovery for damages in respect of Channeled Personal Injury Claims (Houff Decl. ¶ 87; Disclosure Statement at 67);

c.     On the Effective Date, each PI Trust shall assume the liabilities of the Reorganizing Debtors with respect to applicable Channeled Personal Injury Claims (Plan §§ 5.2.e, 5.3.e, 5.4.d, 5.5.d);

d.     The Asbestos PI Trust will be funded in part by 94 percent of the common stock of Kaiser Trading, and all rights to receive dividends or other distributions on account of such common stock (Plan § 5.2.d; Houff Decl. ¶ 98; Murphy Aff. ¶ 22);

e. The Silica PI Trust will be funded in part by 6 percent of the common stock of Kaiser Trading, and all rights to receive dividends or other distributions on account of such common stock (Houff Decl. ¶ 103; Ferazzi Decl. ¶¶ 31);

f. Each PI Trust will use its assets or income to pay applicable Channeled Personal Injury Claims (Plan §§ 5.2.a(i), 5.3.a(i), 5.4.a(i), 5.5.a(i));

g. The Reorganizing Debtors are likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims, the CTPV Personal Injury Claims and the Silica Personal Injury Claims, that are addressed by the respective PI Channeling Injunctions (Houff Decl. ¶ 87; Ferazzi Decl. ¶ 38);

h. The actual amounts, numbers and timing of future Demands cannot be determined (Houff Decl. ¶ 88, Ferazzi Decl. ¶ 22);

i. Pursuit of Channeled Personal Injury Claims, including Demands, outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands (Houff Decl. ¶ 89; Ferazzi Decl. ¶ 38);

j. The terms of the PI Channeling Injunctions, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement (Plan §§ 1.1(36), (68), (131), (188), (161); Disclosure Statement at 114-19.)

k. Other than with respect to NIHL Personal Injury Claims, which do not include Demands, pursuant to Court orders or otherwise, each PI Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of applicable Channeled

Personal Injury Claims or other comparable mechanisms that provide reasonable assurance that such Trust will value, and be in a financial position to pay, applicable present Channeled Personal Injury Claims and future Channeled Personal Injury Claims and Demands that involve similar Claims in substantially the same manner (Houff Decl. ¶¶ 91-93, 107; Murphy Aff. ¶ 28; Ferazzi Decl. ¶¶ 57, 63);

l.      Each of the Asbestos Representative and the Silica and CTPV Representative was appointed by this Court as part of the proceedings leading to the issuance of the respective PI Channeling Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in such Injunction, and transferred to and assumed by the applicable PI Trust (Murphy Aff. ¶ 5; Ferazzi Decl. ¶ 1);

m.      The inclusion of each Reorganizing Debtor or beneficiary within the protection afforded by the respective PI Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against each such Reorganized Debtor or beneficiary in light of the benefits provided, or to be provided, to the applicable PI Trust on behalf of such Reorganized Debtor or such beneficiary (Houff Decl. ¶ 98-99; Ferazzi Decl. ¶ 39);

n.      The Plan complies with section 524(g) of the Bankruptcy Code in all respects (Houff Decl. at 38-46; Tr. of Jan. 9, 2006 Hr'g at 124);

o.      The transfer of rights to proceeds from the Included PI Trust Insurance Policies to the Funding Vehicle Trust for the benefit of the PI Trusts is valid and enforceable and transfers such rights under the Included PI Trust Insurance Policies as the Reorganizing Debtors may have, subject to any and all PI Insurer Coverage Defenses. (Tr. of

Jan. 9, 2006 Hr'g at 58, 60-68, 86-88, 91, 110-12.) The discharge and release of the

Reorganizing Debtors and Reorganized Debtors from all Claims, and the injunctive protection

provided to the Reorganizing Debtors, Reorganized Debtors and Protected Parties with respect to

Demands as provided in the Plan, these Findings and Conclusions and the Confirmation Order

shall not affect the liability of any PI Insurance Company except (i) to the extent that any such

insurance company is also a Settling Insurance Company or (ii) that all PI Insurer Coverage

Defenses are preserved; and

> p.      The PI Channeling Injunctions are essential to the Plan and the

Reorganizing Debtors' reorganization efforts (Houff Decl. ¶ 104; Ferazzi Decl. ¶ 39).

### G.    SUBSTANTIVE CONSOLIDATION.

There are no pending objections to (i) the substantive consolidation of the

Substantively Consolidated Debtors or (ii) the substantive consolidation of the Estates of KBC

and the Substantively Consolidated Debtors solely in order to treat any Unsecured Claims

agaiust KBC as Claims in Subclass 9B for purposes of distributions to be made under the Plan,

as set forth in the KBC Modifications. Substantive consolidation as provided under Article IX of

the Plan, as modified, is solely for the purpose of implementing the Plan, including for purposes

of voting, Confirmation and distributions to be made under the Plan. (Plan § 9.1.) The proposed

substantive consolidation of the Substantively Consolidated Debtors is consistent with the

Intercompany Claims Settlement, section 5 of which specifically permitted the substantive

consolidation of certain of the Debtors. (Houff Decl. ¶ 75.) Moreover, all of the Substantively

Consolidated Debtors are interrelated companies operating under KAC and KACC, which

entities are the Substantively Consolidated Debtors' ultimate parent companies for tax and

business purposes, and the deemed substantive consolidation will promote efficiency and

decrease costs in the implementation of the Plan. (Id.) In addition, with respect to the

substantive consolidation of KBC with the Substantively Consolidated Debtors solely in order to treat any Unsecured Claims against KBC as Claims in Subclass 9B for purposes of distributions to be made under the Plan, the only two creditors of KBC's estate, the PBGC and Sherwin, have specifically consented to the provisions regarding the limited substantive consolidation of KBC with the Substantively Consolidated Debtors. (Houff Decl. ¶ 76.) Furthermore, notice of the KBC Modifications and an opportunity to object thereto and to change the creditor's vote on the Plan was given to all known creditors in Subclass 9B of the Plan. (KBC Aff. of Serv. ¶3.) No creditor objected to the KBC Modifications, and no creditor who timely submitted a vote in Subclass 9B to accept the Plan elected to change such vote. (Voting Change Decl. ¶ 5.) In the absence of any creditor objection to the deemed substantive consolidation, and in light of the overwhelming creditor support for the Plan, the deemed substantive consolidation of the Substantively Consolidated Debtors and the limited substantive consolidation of the Estates of KBC and the Substantively Consolidated Debtors is consensual. And for the foregoing reasons, the substantive consolidation provided for in the Plan, as modified, is in the best interests of the Reorganizing Debtors' Estates and creditors.

## II.    CONCLUSIONS OF LAW.

### A.    JURISDICTION AND VENUE.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Reorganizing Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code. Venue of the Reorganization Cases in the United States Court for the District of Delaware was proper as of the Petition Date, pursuant to 28 U.S.C. § 1408, and continues to be proper.

**B.      MODIFICATIONS TO THE PLAN.**

The Modifications (1) do not adversely change, in any material respect, the treatment under the Plan of any Claims or Interests, (2) comply in all respects with Bankruptcy Rule 3019 and (3) to the extent the KBC Modifications do not comply with Bankruptcy Rule 3019, they comply with section 1127(d) of the Bankruptcy Code. (Tr. of Jan. 9, 2006 Hr'g at 30.) Accordingly, pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims that have accepted or are conclusively presumed to have accepted the Plan as filed on September 8, 2005 are deemed to have accepted the Plan, as modified by the Modifications.

**C.      EXEMPTIONS FROM SECURITIES LAWS.**

1.      Pursuant to section 1125(e) of the Bankruptcy Code, the Reorganizing Debtors' transmittal of solicitation materials, their solicitation of acceptances of the Plan and their offering, issuance and distribution of the New Common Stock pursuant to the Plan are not, and will not be, governed by or subject to any otherwise applicable law, rule or regulation governing the solicitation of acceptance of a plan of reorganization or the offer, issuance, sale or purchase of securities.

2.      Pursuant to section 1145(a)(1) of the Bankruptcy Code, the offering, issuance and distribution of the New Common Stock pursuant to the Plan, including without limitation Section 7.8.e thereof, are, and will be, exempt from section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer or underwriter of, or broker or dealer in, a security.

3.      Pursuant to, and to the fullest extent permitted under, section 1145 of the Bankruptcy Code, the resale of any New Common Stock will be exempt from section 5 of the

Securities Act and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer or underwriter or, or broker or dealer in, a security.

## D.    EXEMPTIONS FROM TAXATION.

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security contemplated by the Plan, or the making or delivery of any instrument of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

## E.    COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.

As set forth in Section I.C above, the Plan complies in all respects with the applicable requirements of section 1129 of the Bankruptcy Code.

## F.    COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE.

As set forth in Section I.D above, the Plan complies in all respects with the applicable requirements of section 524(g) of the Bankruptcy Code.

## G.    OBJECTIONS TO THE PLAN.

### 1.    The Insurers' Objections.

The Insurers object to the Reorganizing Debtors' transfer of their rights to proceeds from the Included PI Trust Insurance Policies to the Funding Vehicle Trust for the benefit of the PI Trusts and also argue that the manner in which the Asbestos PI Trust will be funded under the Plan does not comply with the funding requirements under section 524(g) of the Bankruptcy Code. As referenced above, the Court concludes that the transfer of rights to proceeds from the Included PI Trust Insurance Policies to the Funding Vehicle Trust for the benefit of the PI Trusts is valid and enforceable and transfers such rights under the Included PI Trust Insurance Policies as the Reorganizing Debtors may have, subject to any and all PI Insurer Coverage Defenses. (Tr. of Jan. 9, 2006 Hr'g at 58, 60-68, 86-88, 91, 110-12.) Section 1123(a)(5) of the Bankruptcy Code expressly permits the transfer of the Reorganizing Debtors'

rights to proceeds from the Included PI Trust Insurance Policies under the Plan and preempts any anti-assignment provisions of the Included PI Trust Insurance Policies. (Tr. of Jan. 9, 2006 Hr'g at 110-12.) Additionally, the Court concludes that, as discussed above, the Plan complies with the funding requirements of section 524(g). (Tr. of Jan. 9, 2006 Hr'g at 123-24.) Accordingly, the Court finds that the Insurers' Objections should be overruled. (Tr. of Jan. 9, 2006 Hr'g at 88, 91, 111-12, 124.)

### 2. Law Debenture's Objection.

Law Debenture's Objection is overruled for the reasons the Court articulated on the record at the Confirmation Hearing and on the record at the May 2, 2005 hearing relating to confirmation of the Alumina Subsidiary Plans. (Tr. of Jan. 9, 2006 Hr'g at 40-41, 43, 46-48, 51-55; Tr. of Jan. 10, 2006 Hr'g at 27-31; Tr. of May 2, 2005 Hr'g at 47-49, 53-57.)

### 3. Other Objections.

The Court concludes that all other objections to the Plan not otherwise withdrawn at or prior to the Confirmation Hearing should be overruled for the reasons the Court articulated on the record at the Confirmation Hearing (see Tr. of Jan. 9, 2006 Hr'g at 32, 33, 35-37) and/or set forth in the Reorganizing Debtors' Memorandum of Law in support of confirmation of the Plan.

## H.    TRANSFER OF BOOKS AND RECORDS TO THE FUNDING VEHICLE TRUST AND RETENTION OF KACC'S FORMER COUNSEL.

Plan Section 5.1(d)(ii) provides that Reorganized KACC will transfer the books and records of the Debtors that pertain to Channeled Personal Injury Claims to the Funding Vehicle Trust, which may re-transfer or supply copies of such books and records to the PI Trusts. In addition, the Funding Vehicle Trust may retain the professional services of KACC's former counsel. The transfer of these materials is essential to implementation of the Funding Vehicle

Trust and the preservation of its assets. (Houff Decl. ¶ 78.) The transfer of books and records

from the Reorganizing Debtors to the Funding Vehicle Trust and its retention of KACC's former

counsel shall not waive or destroy any privilege pertaining to such books, records and

professional services. The Reorganizing Debtors and the Funding Vehicle Trust and PI Trusts

share common if not identical legal interests, and the surrender of any privileged documents or

the retention of former counsel does not terminate or waive any privileges related to those

interests.

### I.    APPROVAL OF THE RELEASES PROVIDED UNDER THE PLAN.

The releases set forth in Section 4.5 of the Plan, including the releases of

nondebtor parties pursuant to the general releases in Section 4.5(b), are (a) integral to the terms,

conditions and settlements contained in the Plan, (b) appropriate in connection with the

Reorganization of the Reorganizing Debtors and (c) supported by reasonable consideration. In

light of all of the circumstances, the releases in Section 4.5 of the Plan are fair to the releasing

parties.

### J.    ASSUMPTIONS, ASSUMPTIONS AND ASSIGNMENTS AND REJECTIONS OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

Each pre- or post-Confirmation assumption, assumption and assignment or

rejection of an Executory Contract or Unexpired Lease pursuant to Article VI of the Plan,

including any pre- or post-Confirmation assumption, assumption and assignment or rejection

effectuated as a result of any amendment to Exhibits 6.1 of 6.3 to the Plan, as contemplated by

Article VI of the Plan, shall be legal, valid and binding upon the applicable Debtor or

Reorganized Debtor and all nondebtor parties to such Executory Contract or Unexpired Lease,

all to the same extent as if such assumption, assumption and assignment or rejection had been

effectuated pursuant to an appropriate authorizing order of the Court entered before the

Confirmation Date under section 365 of the Bankruptcy Code.

Dated:  Feb. 6  , 2006       _Judith K Fitzgerald_____
                             UNITED STATES BANKRUPTCY COURT JUDGE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          . Case No. 02-10429(JKF)
                                .
                                .
 KAISER ALUMINUM CORPORATION,   . USX Tower - 54th Floor
   et al.,                      . 600 Grant Street
                                . Pittsburgh, PA 15219
                Debtors.    .
                                . January 9, 2006
. . . . . . . . . . . . . . . . . 9:09 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For Debtors:                Jones Day
                            By:  DANIEL P. WINIKKA, ESQ.
                                 GREGORY GORDON, ESQ.
                                 DANIEL PRIETO, ESQ.
                                 RICHARD A. CHESLEY, ESQ.
                            2727 North Harwood Street
                            Dallas, TX  75201

                            Heller Ehrman White & McAuliffe,
                             LLP
                            By:  LAWRENCE A. HOBEL, ESQ.
                            333 Bush Street
                            San Francisco, CA  94194


Audio Operator:             Cathy Younker

 Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

```
APPEARANCES (Cont'd.):

For the Debtors:              Dickstein Shapiro Morin &
                               Oshinsky, LLP
                             By:  DEBORAH GREENSPAN, ESQ.
                             2101 L Street, N.W.
                             Washington, DC  20037-1526

                             Wharton Levin Ehrmantraut &
                              Klein
                             By:  JOHN D. KLEIN, ESQ.
                             104 West Street, P.O. Box 551
                             Annapolis, Maryland 21404-0551


For Law Debenture Trust      Pryor Cashman Sherman & Flynn LLP
Trust Co. of New York:       By:  TINA MOSS, ESQ.
                             10 Park Avenue
                             New York, NY  10022


For Anne M. Ferazzi:         Stutzman, Bromberg, Esserman
                               & Plifka, PC
                             By:  SANDY ESSERMAN, ESQ.
                                  STEVEN FELSENTHAL, ESQ.
                             2323 Bryan Street
                             Suite 2200
                             Dallas, TX  75201

                             Haynes & Boone, LLP
                             By:  STEVEN A. BUXBAUM, ESQ.
                             1 Houston Center
                             1221 McKinney, Suite 2100
                             Houston, Texas 77010


For PBGC:                    Office of the General Counsel
                             Pension Benefit Guaranty Corp.
                             By: MICHAEL C. MILLER, ESQ.

For Martin J. Murphy, Legal  Young Conaway Stargatt & Taylor,
Representative for Future     LLP
Asbestos Claimants:          By:  SHARON ZIEG, ESQ.
                                  JAMES PATTON, ESQ.
                                  MARTIN J. MURPHY, ESQ.
                             The Brandywine Building
                             1000 West Street
                             17th Floor
                             P.O. Box 391
                             Wilmington, DE  19899
```

```
APPEARANCES (Cont'd.):

For Official Committee of        Akin, Gump, Strauss, Hauer &
Unsecured Creditors:              Feld, L.L.P.
                                 By:  LISA G. BECKERMAN, ESQ.
                                      BRIAN KILMER, ESQ.
                                 590 Madison Avenue
                                 New York, NY  10022


                                 Ashby & Geddes
                                 By:  WILLIAM P. BOWDEN, ESQ.
                                 222 Delaware Avenue
                                 17th Floor
                                 Wilmington, DE  19899

For the ACC:                     Caplin & Drysdale, Chartered
                                 By:  PETER VAN N. LOCKWOOD, ESQ.
                                 One Thomas Circle, N.W.
                                 Washington, DC  20005


                                 Campbell & Levine, LLC
                                 By:  MARK T. HURFORD, ESQ.
                                 800 N. King Street
                                 Suite 300
                                 Wilmington, DE  19801

For U.S. Bank, as Trustee:       Maslon, Edelman, Borman & Brand,
                                  LLP
                                 By:  CLARK T. WHITMORE, ESQ.
                                      TINA SMITH, ESQ.
                                 3300 Wells Fargo Center
                                 90 South Seventh Street
                                 Minneapolis, Minnesota  55402

For Bear Stearns & Co.,          Gibbons, Del Deo, Dolan,
Citadel Equity Fund Limited,      Griffinger & Vecchione
& Citadel Trading Co.:           By:  DAVID N. CRAPO, ESQ.
                                 One Riverfront Plaza
                                 Newark, NJ  07102

For Selected Hearing Loss
and Present Coal Tar Pitch
claimants:                       JAMES McGEE, ESQ.

For United Steel Workers:        ROBIN GEIS, ESQ.
```

4

APPEARANCES (Cont'd.):

For ACE Insurers:              Stevens & Lee
                               By:  LEONARD P. GOLDBERGER, ESQ.
                               1818 Market Street
                               Philadelphia, PA  19103

For Assoc. Ins. Co.:           Traub Eglin Lieberman Straus
                               By:  JANET E. CRAWFORD, ESQ.
                               Mid-Westchester Executive Park
                               7 Skyline Drive
                               Hawthorne, NY  10532

For Republic Indemnity &       Duane Morris LLP
Transport Company:             By:  RUSSELL W. ROTEN, ESQ.
                                    RICHARD RILEY, ESQ.
                               633 West 5th Street, Suite 4600
                               Los Angeles, CA  90071-2065

For Certain AIG Member Cos.:   Zeichner Ellman & Krause LLP
                               By:  JANTRA VAN ROY, ESQ.
                               575 Lexington Avenue
                               New York, NY  10022

For Clark Public Utilities:    Thacher, Proffitt & Wood, LLP
                               By:  PHILIP A. BEZANSON, ESQ.
                               World Financial Center
                               New York, New York 10281

For Retirees Committee:        Orrick, Herrington & Sutcliffe,
                                LLP
                               By:  FREDERICK D. HOLDEN,JR.,ESQ.
                               Old Federal Reserve Bank Building
                               400 Sansome Street
                               San Francisco, CA  94111

For Sherwin Alumina:           Seyfarth Shaw, LLP
                               By:  PAUL BAISIER, ESQ.
                               One Peachtree Pointe, Suite 700
                               1545 Peachtree Street, N.E.
                               Atlanta, Georgia 30309-2401

```
APPEARANCES (Cont'd.):

For Deutsche Bank Trust Co.:   Gardner, Carton & Douglas, LLP
                               By:  MARK HEBBELN, ESQ.
                               191 North Wacker Drive, Suite3700
                               Chicago, Illinois 60606-1698


For CNA Service Mark Cos.:     McDermott, Will & Emery, PC
                               By:  JASON J. DeJONKER, ESQ.
                                    DAVID C. CHRISTIAN II, ESQ.
                               227 West Monroe
                               Chicago, IL  60606

For TIG Insurance Co.:         Steptoe & Johnson PLLC
                               By:  GEORGE R. CALHOUN, ESQ.
                               1330 Connecticut Avenue, NW
                               Washington, DC  20023
```

1          THE CLERK:  All rise.

2          THE COURT:  Good morning.  Please be seated.  This is

3  the matter of Kaiser Aluminum, bankruptcy number 02-10429, and

4  this is the time set for the plan confirmation hearing.  Will

5  you enter your appearances, please?

6          MR. WINIKKA:  Good morning, Your Honor.  Dan Winikka

7  at Jones Day.  Also Greg Gordon, Rick Gordon, Rick Chesley, and

8  Dan Prieto from Jones Day as well for the debtors.

9          MS. BECKERMAN:  Good morning, Your Honor.  Lisa

10 Beckerman and Brian Kilmer from Akin Gump and Bill Bowden from

11 Ashby and Geddes on behalf of the Creditors Committee.

12         MR. BEZANSON:  Good morning.  Phil Bezanson from

13 Thatcher??, Proffitt, and Wood for Clark Public Utilities.

14         MR. PATTON:  Good morning, Your Honor.  Jim Patton

15 with Sharon Zieg from Young, Conaway, Stargatt, and Taylor for

16 the Future Claimants Rep, and also in the courtroom today is

17 Mr. Marty Murphy, the Future Claimants Rep.

18         THE COURT:  Thank you.  Good morning.

19         MR. FELSENTHAL:  Good morning, Judge.  Steven

20 Felsenthal and Sandy Esserman from Stutzman, Bromberg,

21 Esserman, and Plifka for Anne Ferazzi the Silica and Coal Tar

22 Futures Rep.  Ms. Ferazzi is present as is Steve Buxbaum from

23 the firm of Haynes and Boone.

24         THE COURT:  All right.  Thank you.

25         MR. HOLDEN:  Good morning, Your Honor.  Frederick

7

1  Holden for the Retirees Committee.

2          MR. LOCKWOOD:  Your Honor, Peter Lockwood for the

3  ACC, and with me today is Mr. Mark Hurford from Campbell and

4  Levine, also for the ACC.

5          THE COURT:  All right.  Thank you.

6          MR. McGEE:  Good morning, Your Honor.  James McGee

7  representing the Selected Hearing Loss and Present Coal Tar

8  Pitch claimants.

9          MR. CRAPO:  Godd morning, Your Honor.  My name is

10 David Crappo, Gibbons, DelDeo, Dolan, Griffinger, and

11 Vecchione, representing Bear Sterns and Company, Citadel Equity

12 Fund Limited, and Citadel Credit Trading.

13         MR. HEBBELN:  Good morning, Your Honor.  Mark Hebbeln

14 n behalf of Deutsche Bank Trust Company as Indentured Trustee.

15         MR. WHITMORE:  Good morning, Your Honor.  Clark

16 Whitmore on behalf of U.S. Bank and on behalf of the Ten and

17 Seven Eighths Percent Senior Note Holders as Indentured

18 Trustee.

19         MR. BAISIE:  Good morning, Your Honor.  Paul Baisie

20 with Seyfarth?? Shaw on behalf of Sherwin Alumina.

21         MS. GEIS:  Good morning.  Robin Geis, Con?? and

22 Simon, for the United Steel Workers.

23         MR. CALHOUN:  Good morning, Your Honor.  George

24 Calhoun of Steptoe and Johnson on behalf of TIG Insurance

25 Company.

1          THE COURT:  I'm sorry.  For which?  TIG?

2          MR. CALHOUN:  TIG, T-I-G.

3          THE COURT:  Thank you.

4          MR. DeJONKER:  Good morning, Your Honor.  Jason

5   DeJonker and David Christian on behalf of the CNA Service Mark

6   Companies.

7          MR. MORSE:  Good morning, Your Honor.  Duane Morse,

8   Wilmer, Cutler, Pickering, Hale, and Dorr, on behalf of the

9   Hartford Insurers.

10          MS. VAN ROY:  Good morning.  Jantra Van Roy of

11  Zeichner, Ellman, and Krause, on behalf of AIG Member

12  Companies.

13          MR. GOLDBERGER:  Good morning, Your Honor.  Leonard

14  P. Goldberger on behalf of Century Indemnity Company and Other

15  ACE-Related Insurers.

16          THE COURT:  Good morning.

17          MR. ROTEN:  Good morning, Your Honor.  Russell Roten

18  from Duane Morris on behalf of Republic Indemnity and Transport

19  Insurance Company.

20          THE COURT:  Mr. Winikka.

21          MR. WINIKKA:  With Your Honor's permission, I'd

22  actually like to just take up briefly agenda item 2, Your

23  Honor, which was a motion to approve amended and restated

24  agreement.

25          THE COURT:  I instructed my staff this morning to

9

1  enter that order on the CNO that was filed, Mr. Winikka.  It

2  hasn't hit the docket yet.

3          MR. WINIKKA:  Okay.

4          THE COURT:  Okay.

5          MR. WINIKKA:  That's fine, Your Honor.  I'll turn the

6  podium over to Mr. Gordon.

7          THE COURT:  Good morning.

8          MR. GORDON:  Good morning, Your Honor.  Greg Gordon,

9  Jones Day, on behalf of the debtors.  And we ask you to do the

10 same thing with respect to confirmation.

11                          (Laughter)

12         THE COURT:  You file the CNO.  I'll enter the order.

13         MR. GORDON:  It never hurts to ask I guess.  Your

14 Honor, I thought I'd begin first with an introduction to set

15 the stage, and then I will jump into this.  I'm fairly

16 confident that we can complete this hearing in a pretty rapid

17 manner, but I guess we'll see about that as the hearing goes,

18 since I'm not fully in control of that, but I've done the best

19 I could.

20         Your Honor, this hearing is the culmination of almost

21 four years of hard work by the parties before you today and

22 many others who are not here as well.  When 15 of the debtors

23 filed for Chapter 11 all the way back in February of 2002, they

24 were beset with a number of very serious financial

25 difficulties.  Among other things, they had substantially

                    **J&J COURT TRANSCRIBERS, INC.**

1 underfunded pension plans as a result of poor stock market

2 performance and a decline in interest rates.  They had massive

3 retiree medical costs that were projected to increase

4 substantially in future years.  They had substantial

5 environmental liabilities.  They were pending over 100,000

6 asbestos lawsuits, and they had other tort lawsuits and

7 liabilities as well.

8        They were suffering from a weak global economy and

9 the lingering effects of the September 11, 2001 terroristic

10 attacks, and they were under pressure from -- the debtors were

11 under pressure from near term debt maturities.  The Nine and

12 Seven Eights Senior Notes were actually set to mature on

13 February 15th, 2002, and then the Senior Subordinated Notes

14 were due to mature about one year later on February 1, 2003.

15        Although the debtors prior to the February filings

16 had pursued certain efforts to restructure out of court, given

17 this wide range of difficulties and the complexities of these

18 difficulties, it became apparent very early on that an out-of-

19 court restructuring was simply not in the cards, and the

20 debtors accordingly were forced to file for Chapter 11 in

21 February.  Once in Chapter 11, Your Honor, the debtors almost

22 immediately began tacklng a number of these issues, and there

23 was a sequence to all of this, so I'm not going to belabor

24 this, but just ticking off some of the actions that were taken

25 shortly after the filing and then thereafter.

1       They started -- we started right away on the

2   formulation of a business plan.  Your Honor may recall that.

3   That resulted in a plan that where it was determined to focus

4   on the fabricated products operations of the business and to

5   shed the so-called commodities businesses, and that plan has

6   been implemented through various motions filed in this court to

7   sell assets during the course of the case.  There were very

8   significant cost cutting measures that were undertaken

9   virtually at the outset of the case and for months and months

10  thereafter, in fact, throughout the case, because the company

11  was suffering from substantial negative cash flow, as Your

12  Honor may recall.

13      Negotiations began every early on with a number of

14  the environmental agencies involved with the debtors'

15  properties and former properties including the EPA, state

16  agencies, Indian tribes, and the like, and those negotiations

17  culminated in a number of settlements of environment

18  liabilities that have been approved by the Court throughout the

19  course of the case.  Negotiations were commenced with the

20  United Steel Workers who represents the lion's share of the

21  company's hourly retirees, also with the Salaried Retirees

22  Committee, and other unions to resolve the company's pension

23  and retiree medical liabilities.

24      Later, Your Honor, after we had success in resolving

25  most of those liabilities we began negotiations with the

1  Unsecured Creditors Committee of a resolution of the inter-

2  company claims that existed in the case between and among the

3  26 debtors in the case, and those negotiations involve billions

4  of dollars of claims and in many cases billion dollar plus

5  claims between individual companies.

6         In connection with the inter-company settlement

7  agreement, once we had reached a settlement agreement, that

8  then spawned negotiations with the representatives of the tort

9  constituencies on the outline of a plan term sheet to resolve

10 asbestos liabilities, silica liabilities, coal tar pitch

11 liabilities, and noise-induced hearing loss liabilities.

12        And then thirdly, Your Honor, we also had

13 negotiations with the Pension Benefit Guaranty Corporation

14 related to liabilities, and in particular, the termination of

15 the largest of the companies' pension plans approval by --

16 approval or sign off by the PBGC of replacement, defined

17 contribution plans, and other plans, and resolution of the

18 claims of PBGC, including PBGC's administrative claims as well

19 as its unsecured pre-petition claims.  Having done all those

20 things, Your Honor, we were then in a position to put together

21 a plan of reorganization, and because of all the work that was

22 done by all the parties here leading up to the point of

23 reorganization, that plan of reorganization is fully

24 consensual, and it's fully consensual on a very large case and

25 in a very complex case and a number of very difficult

1  liabilities.  It created a number of chicken and egg issues

2  that had to be solved during the course of the case.

3          Among others, Your Honor, the plan is supported by

4  the Unsecured Creditors Committee, and it's important to note I

5  think that that Committee's members include the United Steel

6  Workers and include the Pension Benefit Guaranty Corporation.

7  The Committee includes representatives of the bond holders in

8  the case.  It's supported by the Asbestos Claimants Committee.

9  It's supported by the Asbestos Future Claimants Representative.

10  It's supported by the Future Claimants Representative for the

11  Coal Tar Pitch and Silica Claimants.  I apologize, Your Honor.

12  And It's supported by the Salaried Retirees Committee as well.

13          In addition, Your Honor, the plan has been

14  overwhelmingly approved by the creditors, and it's been

15  accepted by each class of creditors who is entitled to vote on

16  the plan.  Each class voted in faovr of the plan by a wide

17  margin.  In every case it's at least 92 percent by number and

18  amount, and in many cases it's upwards of 99 percent in both

19  amount and number.

20          Notwitstanding, Your Honor, the size and complkexity

21  of the case, only a handful or maybe two handfuls of objections

22  have been filed.  There was an objection filed by the Retirees

23  Committee.  The United States filed an objection on behalf of

24  the Internal Revenue Service.  The Comptroller of Public

25  Accounts of Texas filed an objection.  Law Debenture, the

1  Indentured Trustee for the Senior Subordinated Notes, objected.

2  Clark Public Utilities filed an objection.  Santown Limited

3  Partnership filed an objection.  The U.S. Trustee filed.  I

4  think she denominated our responses I recall.  There were two

5  individuals, Elizabeth Black and Patty Greiner, who filed

6  objections.  Sherwin Alumina filed a conditional objection,

7  which we'll deal with shortly.  And then we have objections

8  filed by various insurers who are represented here today.

9         Now, with respect to these objections, Your Honor,

10  the good news is that we've resolved those filed by the

11  Retirees Committee, the United States on behalf of the IRS, the

12  Texas Comptroller, and the Santown Limited Partnership, and

13  you'll hear a bit more about that from Mr. Winikka with the

14  details of some of the more recent settlements.

15         Moreover, the Department of Justice raised informal

16  objections with us.  We neogitated with the Department of

17  Justice over a number of weeks, and those objections have been

18  resolved as well.  And the Sherwin Alumina conditional

19  objection will be resolved provided the Court approves the

20  modifications, which we'll address again shortly with Your

21  Honor.  And I should point out that the U.S. Trustee withdrew

22  her objection to the plan.

23         As a result of this, Your Honor, you have before you

24  a group of debtors that are ready to emerge.  During the course

25  of these Chapter 11 cases, these debtors have streamlined their

15

business operations.  They've substntially improved their

operations and the efficiency of those operations.  These

debtors are proposing a plan that converts virtually all of the

debt that the debtors came into Chapter 11 with into equity.

The debtors have now resolved all of their serious liabiities

that caused the filing in the first place or contributed to the

filing including the pension liabilities, retiree medical

liabilities, environmental liabilties.  They've also resolved

inter-comapny claims.

       With respect to the tort liabilities of this entity

or these entities, the plan proposes trusts for the benefit of

the asbestos claimants, present and future, silica claimants,

present and future, coal tar pitch, present and future, and

then the current noise-induced hearing loss claimants.  These

trusts will be funded with substnatial assets, Your Honor --

$13 million in cash, $14 million in settlements that have

already been approved by this Court, and the cash has already

been received.

       There's another set of settlements that have either

-- they've all been approved by the Court I think except with

one exception as I recall.  They provide for additioanl cash

payments over time of over 375 million.  Now there are some

contingencies in those, but $375 million over time.  And then

also these trusts will receive an assignment of the debtors'

rights to proceeds undre the remaining policies, and the face

1   amount of those policies is in excess of one billion dollars.

2          The other thing that we were able to do, Your Honor

3   -- I shouldn't overlook this, and we'll talk more about this

4   latter -- is we also reached a -- what I would characterize as

5   a partial settlement with the insurance carriers in this case,

6   which Your Honor may recall from -- I can't remember now if it

7   was the November hearing or the December hearing.  We were able

8   to reach an agreement based on modifications to the plan that

9   clarified issues that the insurers were concerned about.  It

10  substantially narrowed the scope of the issues that the

11  insurers could even raise in connection with confirmation.  So

12  as a result of that, we think the hearing will be much more

13  streamlined, and those agreements also address discovery issues

14  in evidence and the like and substantially streamline

15  everything.

16         On emergence, Your Honor, this company will have well

17  over $100 million in liquidity.  At most, it will only have $50

18  million in debt.  Eight hundred and fifty million dollars in

19  unsecured debt will have been eliminated under the terms of the

20  plan.  In the end, Your Honor, the evidence we believe will

21  conclusively show that all requirements of the Bankruptcy Code

22  with respect to confirmation have been satisfied, and the plan

23  should be confirmed.

24         Now, what I'd like to do at this point, Your Honor,

25  is I'd like to make a disclosure about something that's changed

17

1   since filings we've made with the Court, including even the

2   declaration of Mr. Houff, the Chief Restructuring Officer of

3   the company.  The Court may recall that we've disclosed that

4   the company will have a new board that will consist of ten

5   members, and four of those members, pursuant to settlement

6   agreement each with the United Steel Workers would be selected

7   by the United Steel Workers.  Five were selected after a search

8   process conducted by a search committee comprised of various

9   estate representatives, and then the tenth was a member of

10  management, and that person is going to be the Chief Executive

11  Officer, Jack Hockema.

12          We were advised late last week that George Becker,

13  who is one of the steelworker designees, has asked to be

14  replaced for health reasons.  We will work with the

15  steelworkers to select a replacement as soon as possible, but I

16  did want the Court to know that.  I also want the Court to know

17  that Mr. Becker has agreed to serve until his replacement is

18  identified.  So he will be there to the extent we need him, but

19  I wanted the Court to know that, notwithstanding our filings,

20  that change will occur.

21          THE COURT:  All right.

22          MR. GORDON:  Now, what I'd like to do briefly, Your

23  Honor, is just touch on the evidence that's been submitted to

24  Your Honor in connection with confirmation, and at the

25  conclusion of this I'd also like to find out -- because it'll

1  help us prepare or decide how to proceed.  I'd like to find out

2  whether any party is intending to conduct cross examiantion of

3  any of these witnesses.

4        There have been six declarations by my count, Your

5  Honor, that have been filed in support of confirmation.  Two

6  have been filed by or on behalf of Logan and Cmpany, who is the

7  claims agent in the case.  The first is the type of declaration

8  Your Honor typically sees which sets forth the voting results

9  in the case.  As I indicated, it shows that all classes

10  entitled to vote voted in favor of the plans, and, in fact,

11  Your Honor, to be more specific, I'll give you the details,

12  because it's really very short.

13        Subclass 2A, which is a convenience class of senior

14  bondholders voted in favor by a count of 97.55 percent in

15  number and 97.07 percent in amount.  Subclass 2B, the other

16  convenience class members, voted in favor 92.82 percnet in

17  number and 92.49 percent in amount.  Class 4, which, as I

18  recall, is the PBGC class, 100 percent in number, 100 percent

19  in amount.  Class 5, the asbestos claimants, 99.84 percnet in

20  number and 99.97 percent in amount.  Class 6, silica, 100

21  percent in number, 100 percent in amount.  Class 7, CTPV, or

22  coal tar pitch, 99.49 percent in number and 99.49 percent in

23  amount.  Class 8, noise-induced hearing loss, 99.74 percnet in

24  number, and 99.74 percent in amount, and then Subclass 9B,

25  general unsecured creditors, 92.74 percent in number and 99.26

19

1  percent in amount.

2       Your Honor, the second Logan declaration reflects the

3  results from the re-noticing to unsecured creditors that was

4  done in connection with the Sherwin plan modifications.  Your

5  Honor directed that re-noticing with respect to those

6  modifications at the last hearing.  That declaration reflects

7  that as a result of the re-noticing, we received only three

8  responses.  Two were by creditors who rejected the plan before,

9  and they wanted to let us know that they still rejected the

10  plan.  And then the third was by a creditor whose vote -- who

11  did vote before, but his vote was late -- his or her vote was

12  late and was not counted.  So the declaration indicates there

13  were no changes in votes of creditors whose votes were tallied

14  in favor of the plan.

15       Your Honor, next there's been a -- we filed a

16  declaration on behalf of Mr. Houff.  Mr. Houff is sitting over

17  by the wall on the right.  I think Your Honor recalls Mr.

18  Houff.  Mr. Houff and I have had a good time over the last four

19  years.  Not really.  Mr. Houff is currently the Chief

20  Restructuring Officer of Kaiser.  He's held other positions

21  during the course of the case as well including the General

22  Counsel position and Executive Vice President position.

23       Just in terms of a very brief overview of what's in

24  his declaration, I'm sure Your Honor's had a chance to look at

25  it.  His declaration contains substantial background facts.  It

**J&J COURT TRANSCRIBERS, INC.**

20

includes many of the facts that I highlighted in my opening

remarks.  He discusses the commencement of the cases and the

facts surrounding the commencement.  He addresses the

operations of the debtors during the course of the Chapter 11.

He focuses on many of the key events that occurred during the

Chapter 11.  He talks about the formulation of the

reorganization plan, and then most importantly his declaration

addresses each of the Section 1129 requirements, and we believe

provides all the substantiation necessary to show that those

requirements have been satisfied.  He also discusses in deatil

the plan's compliance with Section 524(g) and its requirements,

including with respect to the channeling injunctions.  And then

he also addresses the treatment of the other tort claims -- the

non-asbestos tort claims including the channeling injunctions

proposed with respect to that.

Next, Your Honor, we submitted an affidavit of Mr.

Blake O'Dowd.  Mr. O'Dowd is sitting in the front row there

with that loud tie.  Your Honor may recall Mr. O'Dowd from the

-- I think the PBGC termination hearing.  I think that's the

last time he's been here, if I recall correctly.  Oh, inter-

company settlement hearing as well.

Mr. O'Dowd's the Managing Director in the

restructuring group at Lazard.  He's been involved in the

restructuring and with the restructuring since the inception of

the cases, and, in fact, before.  He and I go way back as well.

1   His declaration addresses in particular the best interest test.

2   He discusses in detail the liquidation analysis that's

3   contained in the disclosure statement.  He also addresses

4   feasibility as well, Your Honor.  His declaration talks about

5   the future business operations.  He addresses the projections,

6   the projected balance sheet, liquidity, and the like, and we

7   think his declaration clearly demonstrates that both the best

8   interest tests and feasibility are satisfied here.

9         And lastly, Your Honor, his declaration provides some

10  additional information on the assets of what we refer to as

11  Kaiser Trading.  The entity -- the 100 percent of whose shares

12  will go to the asbestos PI trust and the silica PI trust.  He

13  provides some detail about those assets, what they consist of,

14  the cash flow, and even a valuation of those assets as well.

15        Next, Your Honor, there's been an affidavit of Martin

16  J. Murphy.  I think Mr. Murphy was introduced before by Mr.

17  Patton.  He is the asbestos future claimants representative.

18  His affiavit describes in detail extensive due diligence that

19  Mr. Murphy and his professionals conducted in connection with

20  their assessment of the plans, treatment of future asbestos

21  demands.  He discussed the development of plan, treatment of

22  asbestos claims and demands, as well as the other tort claims

23  and demands.  He provides inforation regarding the asbestos

24  trust distribution procedures and his conclusions that those

25  proceures are fair and will protect the interests of future

1 claimants, and, finally, Your Honor, his declaration provides

2 information as to the trustees, who will manage the asbestos

3 personal injury trust on a going forward basis.

4        And then lastly, Your Honor, is the declaration from

5 Anne Ferazzi.  Ms. Ferazzi is the future claimants

6 representative for silica and coal tar pitch claims.  Her

7 declaration discusses at length the analysis that she performed

8 with the assistance of her professioanls regarding silica and

9 coal tar pitch claims.  Her declaration provides extensive

10 information regarding her findings.  She discusses her analysis

11 of available resources to satisfy silica and coal tar pitch

12 claims including the work that she and her professionals did

13 regarding the available insurance coverage.  She discusses the

14 plan treatment of silica and coal tar pitch claims including

15 the channeling injunctions and then provides details about the

16 workings of the two trusts, the silica trust and the coal tar

17 pitch trust.

18        That is the sum and substance of the evidence that's

19 been offered by the plan proponents, Your Honor.  I guess I

20 would ask at this time for purposes of planning at the moment

21 whether there are any parties in the courtroom who would intend

22 to cross examine any of these witnesses, all of whom are

23 present in the courtroom.

24        THE COURT:  All of these witnesses identified by the

25 debtors' counsel are present.  Does anyone wish to cross

23

1  examine any of the witnesses?  Any requests for cross

2  examination of any of the five or six I guess witnesses?

3                    (No verbal response)

4        THE COURT:  All right.  There's no request for cross

5  examination, so I will accept into evidence the six

6  declarations.

7        MR. GORDON:  Okay.  Thank you, Your Honor.  What I'd

8  like to do at this point, Your Honor, with your permission is

9  turn the podium over to Mr. Winikka then who will take up,

10  first of all, the Sherwin conditional objection to see if we

11  can close that out, and then he'll deal with the objections

12  filed by Clark Public Utilities and the two individuals.  And

13  then thereafter, Your Honor, assuming Ms. Moss is here -- she

14  was coming in later.  She is the counsel for Law Debenture.

15  We'd take up the Law Debenture objection and then the insurers

16  objections.  If for some reason she's not here, we've told her

17  we'll hold until she gets here, and we'd proceed to the

18  insurers' objections.  Thank you.

19        THE COURT:  Mr. Winikka.

20        MR. WINIKKA:  I'd like to start, Your Honor, actually

21  just briefly covering those objections that have been resolved

22  that Mr. Gordon mentioned.  We did receive a total of 10

23  objections from -- that were not insurance company objections,

24  five of which have been resolved.  As Mr. Gordon mentioned,

25  there was an objection filed by the IRS that raised issues

1  regarding setoff.  We did resolve that objection, Your Honor,

2  pursuant to a stipulation and agreed order with the IRS.  It

3  was filed under certification of counsel which in turn deems

4  that objection withdrawn.

5       There was an objection filed by the Texas

6  Comptroller, again also raising setoff issues.  This was

7  resolved, Your Honor, by entering into a letter agreement with

8  the Texas Comptroller's Office relating to the allowance and

9  payment of their priority tax claim as well as any potential

10  future claim by the debtors for a refund and then also by

11  including language in the confirmation order referring to that

12  letter agreement.

13       There was an objection filed by the Retirees

14  Committee, as Mr. Gordon mentioned.  That's been resolved

15  pursuant to the amended and restated agreement that's been

16  entered into with the Retires Committee.  As Mr. Gordon

17  mentioned, there was a response filed by the U.S. Trustee's

18  Office raising an issue about the substantive consolidation

19  under the plan.  The U.S. Trustee has withdrawn that objection

20  following discussions with us, Your Honor, and after it became

21  -- excuse me -- after it became clear that no creditor was

22  objecting or no creditor objected to the substantive

23  consolidation, and, in fact, creditors overwhelmingly voted in

24  favor of the plan.

25       And then fifth, Your Honor, is the objection of

1  Santown Limited Partnership which -- you know, is a lessor, the

2  facility in Commerce, California.  They had raised issues

3  relating to the assumption of that lease pursuant to the plan.

4  And specifically, Your Honor, there were issued related to

5  whether or not certain repairs were necessary at the facility

6  under the lease.

7          We have resolved that objection, and we resolved that

8  after we filed the confirmation order -- the proposed

9  confirmation order and proposed findings of fact last Tuesday,

10  but the gist of the resolution is we simply agreed, Your Honor,

11  that Santown's -- any cure amojnt claims that Santown may have

12  relating to repairs or maintenance of the proeprty will simply

13  be unaffected by the confirmation order and the plan even if

14  the repairs maybe accrued prior to the effective date.

15          And then cure amount claims relating to any other

16  obligations under the lease, whether it's rental payments or

17  taxes and the like, will be determined pursuant to the cure

18  amount procedures proposed in the plan.  So we've agreed to

19  include language to that effect in the proposed confirmation

20  order that resolves that objection.

21          I should also mention, Your Honor, that there was an

22  informal objection raised by the Department of Justice on

23  behalf of the Bonneville Power Administration which was

24  resolved before the need for the filing of an objection, but as

25  a result of that, we have included -- and this is reflected in

26

1  the proposed confirmation order that was filed last Tuesday.

2  We did include some language in the order again relating to

3  potential setoff rights of the Bonneville Power Association.

4  We did include some proposed language in the confirmation order

5  that resolved that informal objection.

6        So that then leaves us, Your Honor, putting aside the

7  insurer company objections, with five unresolved objections,

8  and the one I'd like to take up first as mentioned by Mr.

9  Gordon is actually the conditional objection of Sherwin Alumina

10 in the hopes that we can put that one to bed as well.  Your

11 Honor may recall that Sherwin's a party to an alumina boxite

12 agreement with the debtor, Kaiser Boxite Company, and Your

13 Honor had approved this settlement agreement we had entered

14 into with Sherwin.  Your Honor had approved that settlement

15 back at the December omnibus hearing.  As you may recall, the

16 settlement contemplates that Sherwin be allowed or given an

17 allowed unsecured claim in respect of rejection damages on the

18 contract of approximately $42 million against KBC.  KBC would

19 then be added to the plan, and KBC would be substantively

20 consolidated with the other debtors that are being

21 substantively consolidated under the plan for the limited

22 purpose of treating any unsecured claims and Subclass 9B -- or

23 any unsecured claims against KBC in Subclass 9B under the plan.

24       We had also requested -- and I'm sure Your Honor

25 remembers -- that the Court also determine at that time back in

1  December that under Rule -- Bankruptcy Rule 3019 that the plan

2  as modified by these proposed modifications would be deemed

3  accepted by those creditors who previously accepted it, and

4  Your Honor had raised some due process concerns, specifcally

5  because we were adding a debtor to the plan and directed us to

6  send further notice to creditors and 9B -- Subclass 9B giving

7  them the opportunity to change their vote.

8          We did, in fact, Your Honor serve a notice of voting.

9  We served a notice on December 21st and 22nd.  That notice

10 specifically informed all known creditors and Subclass 9B of

11 the Sherwin settlement and the related modifications and

12 specifically pointed out that the allowance of this

13 approximately $42 million claim in Subclass 9B would result in

14 a de minimis dilution of projected recoveries.  And given --

15 assuming everything else remained the same, the projection --

16 the estimated recoveries based on the projected total amount of

17 allowed claims and the projected value of the stock we did tell

18 those creditors that -- assuming all those other things

19 remained the same, that that would result in the estimated

20 projected recoveries declining from 2.9 percent -- an estimated

21 2.9 percent to an estimated 2.86 percent.  It was a very small

22 but a diluted effect.

23         That notice, Your Honor, also included a form for

24 creditors to fill out their vote if they wanted to do so and

25 sipmly check the box and submit that back to the voting agent.

1  And it also informed all those creditors in that class that if

2  they wanted to now file an objection to confirmation of the

3  plan on the basis that it was going to include these

4  modifications, that they would have the right to do that.  And

5  we gave all those creditors a deadline of January 6th, last

6  Friday.

7          We received no objections, Your Honor, to the

8  inclusion of these modifications in the plan.  Our voting agent

9  also -- we filed a declaration after the close of business on

10  Friday certifying, as Mr. Gordon mentioned, that there are only

11  three changes in vote forms that were even received, none of

12  which changed any votes that were previously counted to accept.

13          So given that, Your Honor, although the debtors

14  continue to believe that we do meet the reqwuirements under

15  Bankruptcy Rule 3019, regardless of whether we would qualify

16  under that rule or not, we would submit that in light of this

17  notice given as Your Honor required and the opportunity to

18  change votes and object, that the modifications related to the

19  Sherwin settlement be approved, and that votes to accept the

20  plan previously be deemed to accept the plan now including the

21  Sherwin modifications.

22          THE COURT:  Does anyone have an objection?  I'm not

23  aware that any objections were filed, and I do have a

24  declaration that indicates that there were no votes changed in

25  that class.

1                    (No verbal response)

2           THE COURT:  All right.  No one is objecting or

3  wishing to be heard, so I believe at this point the debtor has

4  satisfied the due process requirements and the modifications

5  can be approved as part of the confirmation process.

6           MR. WINIKKA:  Okay, Your Honor.  I believe that would

7  then resolve the conditional objection of Sherwin.  The other

8  thing I should mention is Your Honor did require that we submit

9  a ballot or send a ballot to Sherwin --

10          THE COURT:  Yes.

11          MR. WINIKKA:  -- to fill out, and we've done that,

12 and we understand from Sherwin's counsel that it is their

13 intent to vote that ballot in favor, and I also understand from

14 counsel to Sherwin that they intended to bring -- actually

15 bring that ballot today to court.  So I don't know if counsel

16 for Sherwin maybe can confirm that they've submitted that

17 ballot if he would like.

18          MR. BAISIE:  Your Honor, based on that

19 presentation --

20          THE CLERK:  Your name again, please?

21          MR. BAISIE:  I'm sorry.  Paul Baisie with Seyfarth

22 Shaw on behalf of Sherwin Aluminia.  Based on that presentation

23 and the Court's ruling, we do withdraw our objection.  I have

24 the ballot with me.  It's not completed, but Sherwin would

25 intent to vote its $42 million claim in favor of the plan.

1          THE COURT:  Okay.  I think it's an irrelevancy with

2    respect to this class anyway.  Isn't it?

3          MR. BAISIE:  I agree.

4          THE COURT:  Okay.  All right.  Fine.  I'll accept the

5    ballot on behalf of Sherwin in favor of the plan but note for

6    the record that it's irrelevant.  It won't change the voting

7    requirements in any way in any event.

8          MR. WINIKKA:  Okay.  Thank you, Your Honor.  That

9    then leaves our four unresolved, non-insurer objections.  As

10   Mr. Gordon mentioned, two were filed by individuals, an

11   Elizabeth Black and a Patty Greiner.  Ms. Black, Your Honor,

12   submitted two letters to the Court.  Your Honor may have seen

13   them.

14         THE COURT:  I did.

15         MR. WINIKKA:  One objected to the, "Release of any

16   liability or claims against any of the parties or insurance

17   entities."  And the other letter also filed on the same day, I

18   think around November 12th, requested an extension of time to

19   file a claim if needed, quote, and says that she may be

20   entitled to the claim.  That was back on November 12th, Your

21   Honor, and to date Mrs. Black has not filed a claim, so it's

22   unclear to us I guess whether she even still has an objection.

23   To the extent she's still asserting this vague objection, Your

24   Honor, we would request that it be overruled, because she has

25   not filed a claim nor articulated any basis for a claim.  So if

31

1  for no other reason, we don't think she would have standing in

2  any event, so --

3         THE COURT:  Well, if she has a claim that's related

4  to a tort injury, then I think the process and the time for her

5  to file hasn't yet expired, and I will not overrule that type

6  of objection, because I dno't frankly know what the basis for

7  her claim is.  To the extent that it's something else, then

8  yes, at this point it appears to be untimely.  But, certainly,

9  this ruling does not prejudice her from, in the event the plan

10  is confirmed, pursuing whatever claim she may have against the

11  relevant trust.

12         MR. WINIKKA:  Yes, Your Honor, and with that

13  clarification, then we would request that to the extent she

14  still has a pending objection, it be overruled.

15         THE COURT:  Yes, and I don't see a basis for an

16  extension.  At this point the letters that she sent in really

17  don't identify the nature of the claim.  So I really am not

18  even in a position to know whether an extension is appropriate.

19  But again this is without prejudice to her pursuing whatever

20  trust claim she may have if the plan is confirmed.

21         MR. WINIKKA:  Moving then, Your Honor, to Ms. Patty

22  Greiner.  She had written a letter to the Court actually on

23  behalf of her father.  I'm sure Your Honor's probably seen that

24  one as well.

25         THE COURT:  I did.

1          MR. WINIKKA:  Holder of subordinated notes obviously

2     expressing dissatisfaction with the fact that no recoveries

3     will go to the subordinated noteholders.  But as Your Honor is

4     well aware, there are contractual subordination provisions in

5     the indenture that would be enforced pursuant to the plan, and

6     these debtors, even the indentured trustee for the

7     subordinated, is not contesting the fact that those notes are

8     contractually subordinated.  So to the extent Ms. Greiner's

9     letter does constitute an objection, we would ask that one be

10    overruled as well.

11         THE COURT:  Yes, Ms. Greiner's objection is probably

12    the most gentle objection I have ever seen to a plan, and in

13    that basis I appreciate the spirit with which it was produced

14    before this Court.  Nonetheless, it does not appear to have any

15    merit on the -- any basis to the merits of the objection, and

16    so the objection is overruled on that basis.

17         MR. WINIKKA:  Thank you, Your Honor.  I'd then like

18    to move to the protective objection of Clark Public Utilities.

19    As Your Honor is aware, Clark has filed two claims that are

20    currently the subject of the claims objection.  It's actually

21    scheduled for summary judgment argument later this week.

22    Clark's protective objection, Your Honor, raised two issues

23    that are the basis for objection.  One relates to the plan's

24    retention of jurisdiction.  Specifically, Clark indicated that

25    they were concerned that the plan, quote, may divest other

33

1  adjudicative bodies of their exclusive jurisdiction and prevent

2  Clark from seeking relief from the FERC.

3       As we pointed out in our brief, Your Honor, Article

4  13 of the plan only provides that the Court will retain such

5  jurisdiction over these cases after the effective date as is

6  legally permissible.  So the plan merely preserves whatever

7  jurisdiction this Court currently has after the effective date

8  and does not divest any other adjudicative body including the

9  FERC of any jurisdiction.

10       The second basis for Clark's objection, Your Honor,

11  is Clark objects to the fact that the plan does not provide for

12  a reserve for claims that are disallowed but that later may be

13  revived pursuant to a motion for reconsideration.

14  Specifically, Clark wants to a reserve to be held for their

15  claims even after they may be disallowed.

16       As we pointed out in our brief, however, Your Honor,

17  Clark's claims at this point have not been disallowed, and

18  pursuant to the plan, the plan requires that we reserve

19  disputed claims in a full face amount.  So standing here today

20  Clark is fully protected, and the plan reserves their claims at

21  the full face amount.  Andin the context of hte claims

22  objection, which will be before Your Honor later this week, if

23  the Court does determine to disallow the claims at that time,

24  Clark can request a stay in an attempt to continue their

25  reserve, if that's what they want to do, but it seems to us

1  that this issue ought to be taken up in that context and not

2  today as part of a confirmation objection.  So we would request

3  that Clark's protective objection be overruled.

4          THE COURT:  All right.

5          MR. BEZANSON:  Phil Bezanson from Thatcher, Proffitt,

6  and Wood for Clark Public Utilities.  First of all, thank you

7  for the clarification on the first issue that Clark's objected

8  to.  I think Clark's fine with that to the extent that the

9  objection is covered and addressed by Kaiser's brief.  So we're

10 happy with that.

11         THE COURT:  With the jurisdiction of retention.

12         MR. BEZANSON:  The jurisdiction retention.

13         THE COURT:  All right.

14         MR. BEZANSON:  Yes.  However, the brief that Kaiser

15 submitted did raise an issue that we'd like to see clarified on

16 the pro rata share within the unsecured claims reserve.  On

17 page 83 of Kaiser's brief, it's explained that if Clark's claim

18 and potentially any other unsecured claim is disallowed, that

19 the creditor would then be required to move to stay the Court's

20 ruling in order to continue the reserve.

21         Now, what we're concerned about is that it seems to

22 contradict the definition of a disputed claim and how a

23 disputed claim is resolved by the plan, and disputed claims are

24 really resolved in three ways.  The claim is either allowed,

25 it's withdrawn, or it's denied by a final order.  It's the

1  final order that -- component that we're concerned with.

2  Whereas Clark suggested in its brief that a creditor will need

3  to seek a stay potentially immediately in an effort to continue

4  to preserve the pro rata share in the claims reserve, final

5  order, as defined by the plan, says that a claim isn't

6  completely disallowed until time to appeal or move to rehear

7  and reargue has lapsed, or the appeal or re-argument has been

8  resolved.  So on that issue we'd like to get a clarification

9  from Kaiser that there's no need to file a stay immediately or

10 shortly thereafter a court's ruling on a disallowance in order

11 to preserve the share of the pro rata on the claims reserve.

12             THE COURT:  Mr. Winikka.

13             MR. WINIKKA:  Your Honor, we would agree with that.

14 I'm looking in the plan.  There is the final order requirement

15 in here, so I don't think there's any -- would be any dispute

16 about that.  The plan provides what it does with respect to the

17 disputed claims and then reserve, so --

18             THE COURT:  So what the debtor is saying is that no

19 distribution is going to be made that will prejudice Clark

20 until there is a final order that confirms the plan and also

21 disallows the claim.  There are two things going on at the same

22 time.  Because the plan provides for no distribution until the

23 claim is finally allowed.  Correct?

24             MR. WINIKKA:  That's correct.

25             THE COURT:  So you have to hold the funds in abeyance

1  until there is a final order that disallows the claim.

2          MR. WINIKKA:  That is correct, Your Honor.

3          THE COURT:  So essentially there is no need for a

4  motion to stay.

5          MR. WINIKKA:  That would be correct, Your Honor.

6          THE COURT:  All right.  The debtor is withdrawing its

7  request that you file a motion to stasy the distribution to

8  other creditors that would be Clark's pro rata share pending

9  the outcome of a determination of the claims allowance

10 proceeding.  So if you are allowed a claim, you'll get a

11 distribution.  If you're not, once that order is final, then

12 the debtor will distribute to whoever is entitled to the

13 distributions in that class.

14         MR. BEZANSON:  Right.  Our only concern was that it

15 reaches the final order rather than simply the Court say

16 disallowing a claim and --

17         THE COURT:  Right.  It's a final order requirement.

18         MR. BEZANSON:  -- then having to cut off -- okay.

19 Then we're fine.  Thank you.

20         THE COURT:  Okay.  I think you can do -- in the event

21 that the plan is confirmed, I think we can take care of that

22 issue by language in the confirmation order, so you can work

23 with the debtor to be sure that Clark is satisfied in that

24 respect.  Okay.

25         MR. BEZANSON:  Thank you very much.

1          MR. WINIKKA:  Your Honor, I'll turn the podium back

2     over to Mr. Gordon at this point.

3          MR. GORDON:  Your Honor, it looks like Ms. Moss is

4     here on behalf of Law Debenture.  I would propose we take up

5     that objection next, and it probably makes sense, with Your

6     Honor's permission, that Ms. Moss would go first --

7          THE COURT:  Oh, that's fine.

8          MR. GORDON:  -- and we'll respond.  Thank you.

9          THE COURT:  Good morning.

10          MS. MOSS:  Good morning, Your Honor.  Tina Moss of

11     Prior Cashman on behalf Law Debenture Trust Company of New York

12     as Indentured Trustee.  Just to refresh the Court's

13     recollection, with respect to the plan pending before the

14     Court, the KAC plan, Law Debenture is the Indentured Trustee

15     for the subordinates notes, and under the plan there is no

16     distribution to the holders of those notes on the basis that

17     the notes are fully subordinated at the KAC level.  However,

18     Your Honor, in connection with Law Debenture's fees and

19     expenses, we filed a limited objection to the plan on the basis

20     that it does not provide for payment of the fees and expenses

21     from the distribution to the senior note holders, the holders

22     of the 1994 and 1996 bonds prior to distribution to those

23     holders.

24          Your Honor, procedurally this is just a little bit

25     complicated, so I wanted to just go over exactly what the

38

posture is procedurally vis-a-vis the confirmation of the
Alumina estate plans.  At the confirmation hearing initially of
the Alumina estate plans there was lengthy argument on this
very issue before the Court by Evan Flaschen from Bingham
McCutchen, and Your Honor considered the arguments at that time
and subsequently rendered, as you know, a written decision that
is now subject to a motion for reconsideration which I believe
will be heard tomorrow.

        THE COURT:  Yes.

        MS. MOSS:  The arguments that are made in connection
with this objection are identical to the arguments that are
made in connection with the Alumina estate plans except that in
addition, of course, with respect to the Alumina estate plans
we have always maintained the position that a distribution is
due to the note holders there.  But the interpretation I think
of the language of the indenture and the arguments with respect
to that interpretation are not different in connection with the
two plans.

        So my -- I guess my thinking was that because this
issue is really being presented again to the Court procedurally
in connection with the motion for reconsideration, that either
the disposition of this objection needs to await that
determination tomorrow in connection with that motion or can be
taken under advisement by the Court at this time.  I'm not
really certain how the Court wishes to proceed.

1          THE COURT:  Well, the reason I didn't rule on the

2   feel issue with respect to the subsidiary plans was, because I

3   thought that there was a -- I've forgotten the section of the

4   plan.  I apologize.  But there was a section of the revised

5   documents that were submitted while I was on the bench that I

6   haven't seen that I thought addressed the fee issue.  But you

7   correctly I think in your motion for reconsideration point out

8   that it addressed the fee issue with respect to the senior

9   subordinated but not with respect to the 1993 notes.  So I

10  actually was prepared to make a ruling in that regard anyway,

11  but I didn't, because I thought that the plan had addressed it,

12  and now that I see that it hasn't, I think I need to take that

13  issue up tomorrow with respect to those plans.

14          Although the language of the indentures are the same,

15  I think that the indentures provide a claim for Law Debenture

16  as the Indentured Trustee regardless of the case at the moment.

17  Let's just focus on today's case and deal with tomorrow's

18  issues tomorrow.  That with respect to this case, it appears

19  that there is a claim, but I don't see that there's anything

20  other than a general unsecured claim by Law Debenture for

21  whatever those fees may be.  I don't see that there is a

22  requirement that they be paid in advance of the distributions

23  of the senior subordinated notes.

24          To the extent that there would be a distribution to

25  the indenture holders represented by Law Debenture, then I

40

1  think your charging lien argument is clearly appropriate.  You

2  would be able to take the fees against that distribution

3  pursuant to your charging lien, and the debtor in turn has an

4  independent obligation to satisfy those claims, but it appears

5  to be an unsecured obligation.  The two provisions of the

6  indenture don't seem to work exactly the same in that respect.

7  So I think as to this case Law Debenture has a claim for fees,

8  but I don't think it's entitled to a distribution ahead of the

9  senior subordinated note disstributions.  I think it's simply a

10 claim.

11         MS. MOSS:  Your Honor, if I could just clarify the

12 argument, becasue I'm nto sure that the argument that we've

13 made is that we're entitled to a distribution ahead of the

14 senior subordinated note holders.

15         THE COURT:  Okay.

16         MS. MOSS:  We're not saying that we have a claim that

17 is ahead of their claim.  We're saying that a portion of their

18 distribution to the senior note holders is being made on

19 account of the subordination provisions in the indenture that

20 would otherwise go to our holders.  So there is a contractual

21 relationship between our holders and the senior holders.  So if

22 there was no such contractual subordination provision, there is

23 no capital -- in the capital structure of the company there's

24 no subordination per se.  That subordination is contractual

25 between those parties.  So when that provision operates, it

1  says, well, the subordinated note holders would be entitled

2  here let's say to $100, and the seniors would be entitled to

3  $100, so we're going to take the subordinated note holders $100

4  and turn it over to the seniors.  All we're saying is that

5  before you turn our note holders' money over to the seniors,

6  you must pass it through the Indentured Trustee for the

7  subordinated note holders who then has the right to exercise

8  its charging lien as against that distribution.

9            THE COURT:  I don't have that -- I don't have the

10 indenture here.  I'm sorry.  I just didn't bring it here.  But

11 I don't recall anything that says in that indenture that the

12 distributions that would go to the senior notes have to be

13 passed through Law Debenture.  Why would there be two separate

14 indenture trustees involved in a disstribution to the senior

15 notes?

16           MS. MOSS:  No, Your Honor, our argument, it really

17 doesn't even refer to the indenture per se.  Our argument

18 relies upon Bankruptcy Rules 3003 and 3021.

19           THE COURT:  But you don't represent the note holders

20 of the senior subordinated debt.  You represent the 1993

21 indentures.  And to the --

22           MS. MOSS:  Which is -- I'm sorry.  Which is the

23 senior subordinated debt.

24           THE COURT:  I'm sorry.

25           MS. MOSS:  The 1993 indenture is the senior

42

1  subordinated debt.

2           THE COURT:  Okay.  To the extent that the indenture

3  holders that you represent are not getting a distribution

4  directly, then I don't see how the fees for making a

5  distribution are appropriate as to Law Debenture.  The

6  distribution that would go to the appropriate Indenture Trustee

7  and then passed on to the clients represented by that Indenture

8  Trustee certainly would be subject to that Indentured Trustee's

9  charging lien for making that distribution to its note holders,

10  but Law Debenture doesn't represent those note holders.

11           MS. MOSS:  Your Honor, the Bankruptcy Rules provide

12  that an indentured trustee may file a proof of claim on behalf

13  of its holders --

14           THE COURT:  Right.

15           MS. MOSS:  -- which we have done here.

16           THE COURT:  Yes.

17           MS. MOSS:  If that proof of claim had not been filed,

18  the senior note holders, unless they have filed the protective

19  claim themselves for that amount, okay, would not even be

20  entitled to that distribution.  It is on account of the filing

21  of a proof of claim by Law Debenture that that distribution

22  becomes operative.  That that --

23           THE COURT:  But that doesn't mean --

24           MS. MOSS:  -- claim is alive in this case.

25           THE COURT:  That may be, but that doesn't make you

43

1   the indentured trustee for those note holders.

2            MS. MOSS:  And I'm not -- I don't think we need to be

3   the indentured trustee for those note holders in order to --

4   for Bankruptcy Rule 3021 to apply.  I mean it says that,

5   "Distribution shall be made to the indentured trustees who have

6   filed claims under Rule 3003(c)(5) --"

7            THE COURT:  Right.

8            MS. MOSS:  "-- that have been allowed."  Law

9   Debenture's claim has been allowed in this case.  Payment of

10  the claim is what is being sent to the senior note holders, but

11  the claim itself has been allowed on behalf of the senior

12  subordinated note holders, and --

13           THE COURT:  Well --

14           MS. MOSS:  -- putsuant to a contractual provision,

15  the distribution is being paid over to the senior note holders.

16           THE COURT:  So you're going to make the distribution

17  not the Indentured Trustee, for the senior note holders.

18           MS. MOSS:  No, in this case the plan provides that

19  the distribution will go directly to the senior note holders --

20           THE COURT:  Well, then you're not entitled to fees.

21           MS. MOSS:  -- to Indentured Trustee.  Well, I'm

22  saying that that's improper.  That the plan is improper,

23  because it does not provide for that money to go through Law

24  Debenture as the Indentured Trustee, who filed the proof of

25  claim in this case, who became -- which claim became operative,

44

1  and is being allowed and paid to the senior note holders.

2           THE COURT:  Well, I think one indentured trustee is

3  entitled to fees, and perhaps you and the other Indentured

4  Trustee need to duke it out.  I don't know.  But two indentured

5  trustees are not going to be paid for making one distribution

6  to note holders.

7           MS. MOSS:  Your Honor, it's not being paid for making

8  the distribution, respectfully.  It's being paid on behalf of

9  the services that were provided under this indenture to the

10 note holders --

11          THE COURT:  To file a claim?

12          MS. MOSS:  No, not to file a claim.  All of the fees

13 and expenses of the Indentured Trustee are compensable under

14 Section 806 of the indenture -- all fees and expenses incurred

15 in connection with that indenture against any funds that those

16 note holders would ahve otherwise been entitled to but for the

17 contractual subordination provision.

18          THE COURT:  Okay.  I need to see how this is going to

19 work with respect to the indenture, because I really don't have

20 -- you've said that it's not an indenture issue.  It's a

21 contract issue.  I have -- I am not aware of what documents

22 provide this language --

23          MS. MOSS:  Oh, no, Your Honor --

24          THE COURT:  -- and so I can't resolve it.

25          MS. MOSS:  -- I'm talking -- when I say contractual

1   issue, I'm talking about the indenture.  I'm saying that it is

2   not -- it is not a bankruptcy priority scheme distribution

3   issue.  It's a contractual --

4                THE COURT:  Then it's one --

5                MS. MOSS:  -- subordination issue.

6                THE COURT:  One indentured trustee will be paid.  The

7   contract between you and whoever the other indentured trustee

8   is that subordinates these issues ought to spell it out.  I'm

9   not aware of what it is.  Somebody needs to give it to me, and

10  when I see it, I'll make a ruling as to who's entitled to it.

11               MS. MOSS:  All right.  Your Honor, we have laid out

12  all the -- I'd be happy to go through the particular sections

13  of the indenture that we have laid out, or it is all in our --

14  we have briefed it thoroughly.  It's in this motion.  It is --

15  I'm sorry.  It's a limited objection.  It is in the papers that

16  were filed in connection with the motion for tomorrow, which is

17  -- it's appended to the motion for reconsideration -- the

18  original arguments that were made in all of the indenture --

19  relevant indenture sections that apply

20               THE COURT:  Okay.  I -- with respect to the

21  information for tomorrow, I've read your brief.  I did not look

22  at the appendices.  Frankly, I just didn't have time to get

23  there, so I'll take a look at that tonight.  I'm not sure

24  though as with regard to this case -- the one that's for

25  confirmation today -- KAC case.  I'm still not clear how if the

46

1  -- if there is not going to be a distribution, and Law

2  Debenture agrees that its clients are not entitled to a

3  distribution for this case, how you get fees when you're client

4  is entitled -- is not entitled to the distribution.  It seems

5  that you may have a claim in the case in which your clients may

6  have a claim even though it's been subordinated pursuant to my

7  ruling, but I don't see it here.  I'm --

8           MS. MOSS:  Well, I guess, Your Honor, maybe it's a

9  question of semantics.  When we say not entitled to a

10 distribution, what we're saying is that we concede that the

11 contractual subordination provisions with respect to payments

12 of principal and interest on these notes that we represent are

13 subordinated.  So any distribution that would go to our holders

14 on account of the principal and interest payments on that proof

15 of claim have to be turned over to the senior note holders.

16 But what we're saying is that that does not affect the payment

17 of Law Debenture's fees and expenses under the indenture.

18          THE COURT:  But you're only in -- under the

19 indenture --

20          MS. MOSS:  That payment is not subordinated is the

21 point.

22          THE COURT:  Well, I -- but I don't see how, because

23 the only payments you're entitled to under the indenture, as I

24 recall from having looked at it a couple weeks ago, are with

25 respect to actions that you take on behalf of your own clients

1    and with respect to distributions that you make to your own

2    clients.  Now, if somehow in the documents, which I don't

3    recall, there is something that says that to the extent that

4    there's a subordinated indentured trustee who is going to get a

5    distribution that otherwise would've gone to Law Debenture but

6    for the subordination, and that that constitutes a distribution

7    through Law Debenture on behalf of that other indentured

8    trustee, then maybe you're entitled to fees, but I don't

9    remember seeing anything that created that kind of a pass

10   through.

11           MS. MOSS:  Well, what we rely upon is Section 703 of

12   the indenture --

13           THE COURT:  All right.

14           MS. MOSS:  -- which basically says that, "Any monies

15   that are collected by Law Debenture in this instance pursuant

16   to Section 702 of the indenture shall be applied --

17           THE COURT:  Right.

18           MS. MOSS:  -- to all amounts due to Law Debenture."

19           THE COURT:  Right.  I don't disagree --

20           MS. MOSS:  Okay.  Pursuant to --

21           THE COURT:  -- but you're not collecting any money

22   here.

23           MS. MOSS:  I'm sorry?

24           THE COURT:  I don't disagree with that, but you're

25   not collecting any money here.

1          MS. MOSS:  We're not collecting any money, because

2     the debtors' plan violates Section -- Bankruptcy Rule 3021.

3          THE COURT:  But I --

4          MS. MOSS:  That's our argument.

5          THE COURT:  -- don't see how it does, because you

6     don't represent the other note holders who are entitled to the

7     distribution, therefore, it can't.  Just because you -- you may

8     have a claim for filing a proof of claim -- a claim for fees

9     for filing a proof of cliam.  There might be the equivalent of

10    a 506 action that you can bring against the other Indentured

11    Trustee for having protected its clients rights, but I don't

12    see how the debtor is responsible for paying two indentured

13    trustee fees.  The debtor is responsible for paying the fees of

14    the indentured trustee that has to make the distribution to its

15    own clients.  That's not Law Debenture in this instance.

16         MS. MOSS:  No, and again, Your Honor, we don't

17    maintain that the debtor is responsible for payment of the

18    fees.  What we maintain is that the debtor is responsible to

19    see that the distribution gets into the proper hands.

20         THE COURT:  Right, and that would be the Indentured

21    Trustee of the entities that are supposed to get the

22    distribution not some other entity.  If the debtor made --

23         MS. MOSS:  Well, that's the point I think we disagree

24    on.

25         THE COURT:  Well, okay.  I want to see something in

49

1  the document that says that Law Debenture has become the

2  Indentured Trustee for the Indentured Trustee of the note

3  holders who are entitled to the distribution --

4           MS. MOSS:  Right.  We --

5           THE COURT:  -- because but for that -- or the agent

6  of that fee.  But for that you have no connection with the

7  other Indentured Trustee or its clients.

8           MS. MOSS:  Your Honor, we're -- with respect to that

9  issue, we rely upon the bankruptcy rules that we believe

10 support our position that if an indentured trustee files a

11 proof of claim, it says, "The distribution shall be made to

12 that indentured trustee."  We are that Indentured Trustee.

13          THE COURT:  To the claims -- to creditors whose

14 claims have been allowed.  Okay.

15          MS. MOSS:  Which this claim has been allowed, and it

16 will be recognized and paid --

17          THE COURT:  It's allowed and subordinated --

18          MS. MOSS:  Yes.

19          THE COURT:  -- and to the extent that it is -- there

20 is ever a distribution to the subordinated note holders, you're

21 correct.  You will be paid.

22          MS. MOSS:  Wlel, I -- there is a distribution on

23 account of the subordinated notes, and that distribution is

24 being paid over to the senior holders.

25          THE COURT:  All right.  Rule 3021 says, "Except as

1 provided in Rule 3020(e), after a plan is confirmed

2 distribution shall be made to creditors whose claims have been

3 allowed to interest holders and to indentured trustees who have

4 filed claims under Rule 3003(c)(5) that have been allowed."

5        MS. MOSS: Yes.

6        THE COURT: Okay. It doesn't say anything for

7 payments on account of that. It simply says, "for payments

8 whose claims have been allowed." Your client's claims are

9 allowed but subordinated. When and if there is a distribution

10 to the subordinated creditors, your status as an indentured

11 trustee entitled to fees for making that distribution have the

12 same status as the claims which you will be distributing. So

13 at that point I agree you'd be allowed a fee, but there will

14 not be a distribution to those creditors, and under the

15 indenture you are only entitled to a distribution for -- I'm

16 sorry. You are only entitled to a fee for distributions that

17 have been made and for some other general administrative costs.

18        Now, with respect to the fee on the distribution

19 that's made, there isn't going to be a distribution, so you're

20 not entitled to a fee. With respect to the other

21 administrative fees that you are entitled to under the

22 indenture, you have a claim. I agree you have a claim, but it

23 is not bumped up on priority that I could see through the

24 indenture. I'll go back tonight and take a look at those two

25 sections again, 7.02 and 3, but I believe those sections talk

51

1    about your charging lien on distributions that you make, and

2    there's something later in the indenture, as I recall, that

3    talks about your general administrative claim.

4              MS. MOSS:  Right.  Well, Your Honor, those are the

5    sections we rely upon and also the sections of Article 16, the

6    subordination provisions, which we do lay out in the objection

7    as well --

8              THE COURT:  All right.

9              MS. MOSS:  -- that we believe support the argument

10   that we're making here today.

11             THE COURT:  Okay.  I will take a look at it again

12   tonight in preparation for tomorrow's hearing, and I'll simply

13   defer ruling on this issue in this case until I have a chance

14   to put the whole thing in context and look at the documents

15   until tomorrow.

16             MS. MOSS:  Thank you very much, Your Honor.

17             THE COURT:  Okay.

18             MR. GORDON:  Your Honor, if I could just spend a

19   minute on this or two just to help Your Honor a bit?  I know

20   it's tough refreshing recollections on matters that are several

21   months old.  I have the same --

22             THE COURT:  It's refreshing a recollection in this

23   instance.  It's trying to understand this indenture and the

24   language in the provisions --

25             MR. GORDON:  Right.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  -- without having it in front of me.

2            MR. GORDON:  Right.

3            THE COURT:  It's a pretty complex document.

4            MR. GORDON:  Well, I certainly had to refresh mine.

5   Let me just point out a couple of things to you.  In connection

6   with the liquidating plans, of course, the whole dispute was

7   over whether there -- are the senior subordinated notes

8   actually subordinated at the subsidiary level, and we had,

9   obviously, argument, and the Court just ruled on that.

10           The Law Debenture was also arguing as well, well,

11  even if the notes are subordinated, fees that are owed to us

12  are not subordinated based on 7.03.  In other words, they were

13  trying to draw a distinction between payments on the note and

14  payments for services provided by Law Debenture as the

15  Indentured Trustee.  What Law Debenture has always overlooked

16  -- and you're hearing it again today -- is the subordination

17  provisions themselves.  And Your Honor focused on this at the

18  hearing, and I have the transcript which I can give Your Honor

19  or we can give Your Honor tomorrow that -- where you actually

20  lay out the reasons why their argument doesn't work.

21           You have to look at in this, because we're the parent

22  company, and at the parent there's no dispute that the

23  subordinated notes are subordinated.  You have to look at

24  Sections 3.01 and 3.02(b) of the indenture.  Those are the key,

25  and in particular, 3.02(b) -- and I'm sure Your Honor's going

53

1  to recall this when I just read this short excerpt from

2  3.02(b).  "Any direct or indirect payment or distribution of

3  assets or securities of the company of any kind or character,

4  whether in cash, property, or securities, to which the holders

5  of the notes or the trustee would be entitled, except for the

6  provisions of this Article 3, shall be paid by the company or

7  by any liquidating trustee or agent or other person making such

8  payment or distribution, whether a trustee in bankruptcy, a

9  receiver, or liquidating trustee, or otherwise, directly to the

10  holders of the senior indebtedness of the company or their

11  representatives."

12           That's the subordination provisions.  There's no

13  carve out for indentured trustee fees, which is what the

14  argument has always been that's made by Law Debenture.  They

15  rely on 7.03.  You should look at that, Your Honor.  The

16  problem with 7.03, it only applies in an instance where funds

17  are actually paid.

18           THE COURT:  Right.  That's my recollection.  That --

19           MR. GORDON:  That's exactly right, and that's

20  overridden by 3.02(b) which clearly and unequivocally says the

21  funds cannot be paid whether to the note holders or the

22  trustee.  They -- the company is under a mandate to pay them

23  directly to the senior note holders, and that's what the plan

24  provides.

25           THE COURT:  All right.  I'll take a look at those

54

1  provisions tonight.

2          MR. GORDON:  Okay, and for the same reason,

3  Bankruptcy Rule 3021 doesn't apply either, because the

4  Indentured Trustee or the subordinated note holders aren't

5  entitled to any distributions as a result of the subordination

6  provisions.

7          THE COURT:  Well, that's what I think I just said on

8  the record --

9          MR. GORDON:  Right.

10         THE COURT:  -- and I agree with that.  Okay.

11         MS. BECKERMAN:  Your Honor, I agree with everything

12 Mr. Gordon said.  It's in our brief as well.  I just wanted to

13 call your attention to two other things as well when you

14 consider this tonight.  One is in addition to 3.01 and 3.02(b),

15 also 3.02(a) I believe is relevant as well wen you look at the

16 indenture.  And even if Your Honor found that the -- if Your

17 Honor found that the indenture, as we're arguing I think is

18 very clear, and I think your decision, if you go back and read

19 your transcript of May 2nd when Your Honor -- particularly page

20 47, Your Honor, where you articulated your reasons as to why

21 you didn't think the argument was appropriate in connection

22 with the Alumina estate plans, you'll see I think that the same

23 arguments apply here.

24         In addition to that, even if there were some

25 conflicts somehow beween 3021 and the rules -- the Bankruptcy

55

1    Code Section 510(a), which requires the enforcement of

2    subordination, it's our view, as we've articulated in our

3    brief, that 510(a) would trump that and require that the

4    provisions of the indenture and the contractual subordination

5    be enforced even if you could read 3021 in the way that Ms.

6    Moss has suggested.  So we would suggest that for those

7    reasons, the reasons Mr. Gordon stated, and the reasons

8    articulated in our brief in support of confirmation that you

9    look at the language and ultimately, hopefully overrule the

10   objection.

11            THE COURT:  Okay.  I'll take a look at that tonight,

12   too.

13            MR. GORDON:  Your Honor, I do have -- Greg Gordon

14   again.  I do have with me a copy of the transcript from the May

15   hearing where this issue is addressed.  Would it be helpful for

16   Your Honor to have this?

17            THE COURT:  Yes, I'll take it.  I think I have it in

18   connection with the pleadings for tomorrow, but, yes, if you've

19   got an extra one, I'll take it.  It'll make it easier than

20   searching.

21            MR. GORDON:  May I approach?

22            THE COURT:  Please.  In fact, I think it's attached

23   to somebody's -- thank you -- papers.  Okay.  I'll defer this

24   issue until tomorrow.  Does anyone else wish to be heard on

25   this matter until tomorrow?

1                    (No verbal resposne)

2              THE COURT:  Okay.  Thank you.

3              MR. GORDON:  Greg Gordon again, Your Honor.  That

4   takes us then to the insurers' objections, and again I would

5   propose that we begin with argument by the insurers.

6              THE COURT:  All right.  Who would like to begin?

7   Good morning.

8              MR. RILEY:  Good morning, Your Honor.  Richard Riley

9   from Duane Morris.  I am local counsel and Russell Roten, who

10  is in Duane Morris' Los Angeles office now.  Last week we filed

11  a pro hac motion for Mr. Roten.  He was previously pro hac when

12  he was at Coudert Brothers.  Now with Duane Morris, I've re-

13  filed it, and I would just ask that it be granted.

14             THE COURT:  I haven't seen it yet, but, yes, I'll

15  enter it when I get it.  Thank you.

16             MR. ROTEN:  Good morning, Your Honor.

17             THE COURT:  Good morning.

18             MR. ROTEN:  I'm going to address the preemption

19  argument.  Other lawyers for the insurers will be addressing

20  the 524(g) argument, and I'll confine my argument to preemption

21  under 1123(a)(5).

22             I think the best way to begin this discussion is to

23  consider what is it that's being assigned here today or under

24  this plan, Your Honor.  And the thing that's being assigned is

25  the thing entitled PI Insurance Assets, and the PI Insurance

57

Assets are made up of two parts.  Part A are rights to receive proceeds from included PI trust insurance policies in respect to channel personal injury claims.  In other words, it's the right to receive proceeds of claims made under the relevant insurance policies in the future.  There is also cash.

THE COURT:  I'm not sure that that's true, and I guess that's maybe we ought to focus on that issue.  Because it seems to me that if there is a right to receive proceeds from a policy whose term has expired, it's there.  It may be I guess contingent in the sense that all of the actions that are necessary to prove the amount of the proceeds that are entitled to be paid over to the debtort pusuant to the claims that will be submitted haven't been taken yet, but the right is there.  It's still a contract right.  It exists as of the date of filing.  I don't see a preemption argument.

MR. ROTEN:  Your Honor, I completely disagree with Your Honor on that point.

THE COURT:  I know.  Unfortunatley, Mr. Roten, we're in the position of you're always completely disagreeing with me, but you know -- but I just -- I just don't see how a contract right isn't a contract right, just because it has not become finite in that the proceeds are not in an account doesn't mean that the right to receive those proceeds doesn't exist on the date of filing.

MR. ROTEN:  Well, Your Honor, I think they got the PI

58

1 assets definition partially right --

2         THE COURT:  Okay.

3         MR. ROTEN:  -- so I can't say I completely disagree

4 with Your Honor.  I'll say I partially disagree with, Your

5 Honor.

6         THE COURT:  Okay.  We're making progress here.

7         MR. ROTEN:  Certainly, the second part of the PI

8 insurance assets is the cash that has come from insurers who

9 have already settled, and that's what proceeds are.  Proceeds

10 are a payment by an insurer to an insured to eliminate its

11 liability under its insurance contract.

12        THE COURT:  No doubt about that, but rights to

13 proceeds are different things.  Their contract rights are

14 intangibles or something which are fixed on the date -- and

15 property of the estate on the date of the filing.

16        MR. ROTEN:  Your Honor, the -- I have no question

17 that what we're talking about is insurance rights.  The

18 question is not whether or not the rights exist.  The question

19 is whether or not the property exists.  What is actually meant

20 by the right to receive proceeds?  What they're actually saying

21 is the right to sue the insurance companies to recover

22 proceeds.

23        THE COURT:  Well, they had that right on the date of

24 filing as to insurance policies that -- whose term has expired.

25        MR. ROTEN:  The debtors had the right --

**J&J COURT TRANSCRIBERS, INC.**

59

1            THE COURT:  Right.

2            MR. ROTEN:  -- under the policies.

3            THE COURT:  Yes.

4            MR. ROTEN:  There's no question that the -- well, I

5    won't say there's no question, but I would say it's generally

6    accepted that the policies go from the -- with the creation of

7    th estate from the pre-petition company which becomes the

8    debtor to the debtor's estate.

9            But the question here is not the policies, and the

10   question here is not the existent proceeds.  The question here

11   is about the right to sue for proceeds in the future.  Claims

12   that don't exist and claims --

13           THE COURT:  But they do exist.

14           MR. ROTEN:  The claims do not exist.

15           THE COURT:  They do exist.  We just don't know who

16   they are.  That doesn't mean that they don't exist.  The claims

17   for policy periods which have expired clearly exist.  The

18   problem is that in some instances all of the contingent aspects

19   of those claims hasn't been fixed.  Somebody may not yet know

20   that he or she is ill, but that doesn't mean that he or she

21   hasn't been subjected to the underlying events that would

22   prompt the insurance rights of the debtor to come into fruition

23   at a later date.

24           So it -- to the extent -- somebody talked about a

25   rising asset.  Some of my law studnets ilke to call them

60

1  contingent assets.  I'm never sure exactly how an asset is

2  contingent, but frankly, in this instance it kind of summarizes

3  I think what you're suggesting, which is that there may be a

4  right to proceeds in the future based on policies that are

5  property of the estate.  All of the steps to show whether or

6  not the insurance companies will be liable haven't been

7  undertaken yet, but they will be in the future, and if they're

8  undertaken and successful, the right to those proceeds already

9  exist.  It's based on an insurance policy, all of which actions

10  the debtor has undertaken in the past to make sure that it has

11  the right to claim proceeds when all of the events take place

12  that make that asset arise.  I can't see a preemption issue.

13        MR. ROTEN:  Your Honor, the flaw in the argument is

14  that you're assuming that these -- that there will be claims

15  that will be made against the debtor, which is step one.  That

16  those claims will be adjudicated in favor of the claimants,

17  which is step two.

18        THE COURT:  Actually, I'm not.  What I'm assuming is

19  that there is an insurance policy in existence which gives the

20  debtor the right to make a claim for proceeds when the debtor

21  has been determined to be liable to somebody who is the

22  beneficiary of that policy, and that policy does exist.  It

23  existed on the date of the petition.  It's an asset of this

24  estate, and it gives the debtor whatever rights that policy

25  provides.

1          MR. ROTEN:  They're not --

2          THE COURT:  One of which is to make a claim against

3  the insurance companies if and when the debtor has a

4  determination of liability.

5          MR. ROTEN:  They're not assigning the policies.

6          THE COURT:  I agree they're not assiging the

7  policies.  They're assigning the right to proceeds.

8          MR. ROTEN:  And my position on that, Your Honor, is

9  there are no proceeds.  They cannot assign proceeds now.

10          THE COURT:  But they're not assigning proceeds.

11  They're assigning the rights to proceeds.

12          MR. ROTEN:  But they cannot assign the rights to

13  proceeds, because there is no right to proceeds.

14          THE COURT:  Well, but there is a right to proceeds,

15  because there's an insurance contractual right that the -- the

16  insurance company contracted with the debtor to provide the

17  debtor proceeds in the event that certain actions came to

18  fruition.  That right existed on the date of the filing of the

19  bankruptcy.  The debtor did everything it had to do, i.e., it

20  paid the premiums, and the policy period expired.  So now all

21  the debtor is waiting to see is whether claims are made in that

22  policy term for which the debtor is liable.  And if and when

23  that happens, the debtor has the right at that point to make

24  the claim against its right to proceeds, and then the

25  litigation will go on to determine whether the insurance

1  companies actually have to pay.  But that's a different issue.

2       The only issue today is does the right exist on the

3  date of the filing of the bankruptcy.  It clearly does, because

4  the insurance policy existed on the right of -- on the day of

5  the filing, and at some point, you know, in the future, even if

6  there were no bankruptcy, could the debtor make a claim against

7  those policies, and the answer is yes, it could.  So the

8  bankruptcy doesn't prohibit the debtor from making those

9  claims.  It doesn't give the debtor anymore rights to make

10 those claims.  That right existed on the date of the filing,

11 and it exists today, and it will exist in the future.

12      MR. ROTEN:  Your Honor, in an abstract way I would

13 agree with you, but in a real way I do not agree with Your

14 Honor.  What is being assigned is the right to sue insurance

15 companies for proceeds that do not exist.  In order to do that

16 there has to be a priority determination that there is

17 liability of the debtor to a claimant and a subsequent

18 determination that there's a liability of the insurer to the

19 insured and to the debtor.

20      THE COURT:  But none of -- but that's not a

21 bankruptcy issue.  That's an issue that's going to come up with

22 or without the bankruptcy.  It happened in the past with

23 respect to claims that have already been adjudicated.  It

24 happened on -- before the date filing with respect to pending

25 claims that are in the process, and it's going to happen in the

1  future until all of the claimants who have been subject to

2  asbestos or silica or coal tar pitch are dead, and there are no

3  claims anymore.  So the right existed under the policies.  I

4  don't see a preemption issue.

5       MR. ROTEN:  Well, Your Honor, all I -- I can just

6  state my position for Your Honor.  My position is that until

7  there's an adjudication of the liability of the debtor and an

8  adjudication of the liability of the insurer to the insured,

9  there's nothing to assign.  The situation that Your Honor just

10  discussed, those cases that have been settled or tried pre-

11  petition are not assignment issues.  Those were not assigned.

12  Those were rights of the debtor and claims that have already

13  been made.

14       THE COURT:  Yes, and the debtor had the right, if it

15  chose to, to assign proceeds that it hadn't yet collected from

16  those policies.

17       MR. ROTEN:  We're not talking about assignment of

18  proceeds.

19       THE COURT:  It's the same thing.  It's the right to

20  collect those proceeds.  The insurance companies have no

21  interest in what the debtor does with proceeds that it's

22  entitled to collect.  It's -- the insurance companies issues

23  are whether or not the debtor can prove that under its policies

24  the insurance companies are liable to it for whatever the

25  insurance company insured.  That's what the insurance company

64

1    has the right to defend against.

2            If the debtor is hypothetically entitled to collect

3    $100 from that insurance policy as a proceed, and the debtor

4    decides to assign that right to collect $100 to another entity,

5    the insurance companies aren't interested in that matter.  It

6    doesn't matter who you --

7            MR. ROTEN:  They are --

8            THE COURT:  -- to whom the debtor ultimately pays the

9    money.

10           MR. ROTEN:  No, Your Honor.  I would disagree with

11   Your Honor on that point.  The insurance companies are not at

12   risk once it is clear that the loss has occurred --

13           THE COURT:  Right.

14           MR. ROTEN:  -- and the insurance companies are

15   obligated to pay.

16           THE COURT:  Well, no, it's -- they're not at risk

17   once the --

18           MR. ROTEN:  There's no proceeds until then.

19           THE COURT:  But your risk is not with respect to

20   proceeds.  Your risk is with respect to whether or not the

21   actions that lead to your liability have been fixed.  And in

22   this instance they have, because the policy period has already

23   ended.  So to the extent that we're simply waiting for claims

24   to come in, their liability will be determined based on those

25   claims as they're filed.

65

1          MR. ROTEN:  No, Your Honor, there's no liability of

2 any insurers until those claims are adjudicated.

3          THE COURT:  Well, I agree.

4          MR. ROTEN:  Not until they just come filing -- come

5 flowing in.

6          THE COURT:  Well, your liability to pay, that's

7 correct, is not -- let me state it affirmatively.  The

8 insurance company's liability to pay obviously doesn't arise

9 until there is a settlement or a judgment that says you're

10 liable to pay.  But that doesn't mean that the debtor -- we're

11 talking about the debtor's rights here not the insurance

12 company's right.  The debtor's right to file a claim against

13 that policy arises as soon as the debtor is notified that

14 somebody is saying that the debtor is liable.  So the debtor's

15 rights are fixed based on the policy period.  These policy

16 periods were pre-petition policy periods.  The debtor's right

17 under those policies is fixed.

18          Now, all of the claims against those policies are not

19 yet known, therefore, the insurance company may not know

20 ultimatley how much it has to pay.  But to the extent that the

21 insurers assured a risk for a given year, that risk is now

22 known.  It's fixed.  You're just waiting for the claims to come

23 in.  You're not going to be at risk for a different policy

24 period.  You're only at risk for the policy periods for which

25 you issued insurance.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ROTEN:  Your Honor, we're not talking about

2    policy periods.  What we're talking about is  whether or not

3    there is a property interest that exists when there are no

4    claims filed that have been adjudicated against the insured,

5    and the insured has received neither an adjudication or a

6    settlement from the insurer.

7          THE COURT:  The debtor's property rights aren't

8    dependent on claims coming in.  The property rights are based

9    on assets.  The debtor has an asset.  It has an insurance

10   policy that provides certain rights to it.  One of which is to

11   file a claim against the insurance company in the event that

12   certain contingencies accrue.

13          MR. ROTEN:  But, Your Honor, that --

14          THE COURT:  And that right is fixed on the date of

15   filing.

16          MR. ROTEN:  They're not assigning the policies.

17   They're retaining the policies --

18          THE COURT:  But ultimately --

19          MR. ROTEN:  -- therefore, they're retaining that

20   right.

21          THE COURT:  Fine, so they retain that right, and

22   ultimately -- in the debtor's view, ultimately, there is going

23   to be an adjudication that says that the insurance companies

24   either are or are not responsible for paying a particular

25   claim, and if the debtor is successful in showing that the

67

1  insurance companies are liable for paying a particular claim,

2  the debtor has agreed to assign the proceeds applicable to that

3  claim to a trust.  The insurance companies are not impacted in

4  that decision one way or the other.

5       MR. ROTEN:  Your Honor, if the proceeds are existent,

6  once there's been a determination that there is such a thing

7  called proceeds, then once they -- once the debtor has the

8  proceeds, what the debtor has to do with the proceeds is up to

9  the debtor and the claimants.

10      THE COURT:  Exactly.

11      MR. ROTEN:  But before there are proceeds, there is

12  no right.  There's nothing that can be assigned.

13      THE COURT:  I can't -- I -- we're just -- we're

14  talking at different ends of the spectrum.  I cannot agree with

15  that premise, because if I accepted the logical conclusion to

16  your premise, there would never be proceeds, because there's

17  not a right to collect those proceeds, because the debtor can't

18  make a claim.  I mean ultimately there's an insurance policy

19  that provides the debtor with a source of money to pay claims.

20  That's why the debtor purchases insurance, and until all the

21  claims against -- all of the events that fix the claim,

22  including somebody notifying the debtor that it -- he or she

23  thinks the debtor is liable take place, the debtor can't file a

24  claim against the insurance company.  But that doesn't mean the

25  debtor doesn't have the right to do it.  It just means that all

68

1  the contingencies haven't been satisfied, and that right

2  clearly exists on the date of filing.

3          So there is a right to proceeds.  How much proceeds?

4  That's yet to be determined, but the right to proceeds, it's

5  clearly there based on the terms of the insurance policy that's

6  an asset on the date of filing.  There is no preemption issue,

7  and I don't see a problem with the debtor assigning the rights

8  to proceeds.

9          MR. ROTEN:  Your Honor, I think there's no point in

10  us continuing to talk past each other, so I'll leave that.

11          THE COURT:  All right.

12          MR. ROTEN:  I want to go to the preemption argument

13  now.  Basically, our position is 1123(a)(5) does not authorize

14  a blanket preemption of all state law.  Eleven 23(a)(5), the

15  way that the plan proponents read it, would basically allow a

16  debtor to come into a Bankruptcy Court, write a plan that

17  supersedes all state laws relative to whatever it wants to do,

18  and have that plan confirmed.  There's nothing in the

19  Bankruptcy Code that indicates that that was the intention of

20  Congress at any time.

21          The section of the Code that allows the use and sale

22  of property is Section 363.  Section 363(l) specifically deals

23  with the transfer of property, and it -- the limitation is

24  notwithstanding any state law or any other law to the contrary,

25  but the same restriction that we see consistently throughout

1  the Bankruptcy Code having to do with laws or provisions

2  concerning financial condition of the debtor, the ipso facto

3  clause.  That is the -- there is no reason to believe that

4  Congress intended by allowing in 1123(a)(5), which states what

5  the contents of a plan are supposed to be, that Congress

6  intended to completely override the restrictions on 363(l) and

7  create another separate law to -- with much broader, vaguer

8  provisions that would essentially read 363(l) in -- to be

9  meaningless.

10          The -- 1123(a)(5), Your Honor, the -- I think the

11  relevant language of 1123(a)(5) is the section that deals with

12  "A plan shall," and then there are a number of subsections, and

13  Subsection 5 says, "Provide adequate means for the plan's

14  implementation."  So a plan has to provide adequate means for

15  its implementation.  And in Subsection 5 there is a listing, a

16  such as listing of things that can be done to provide adequate

17  means for the plan's implementation, and adequate means of that

18  is to sell property or transfer property or to assign property,

19  property of the estate.  There is nothing in 1123(a)(5) that

20  says, and by the way we're overriding Section 363(l), which is

21  the general provision authorizing the transfer of property.  It

22  is simply a listing of things that can be done in a plan that

23  must be considered in a plan, and Section 5 simply is a listing

24  of provisions allowing for the implementation of the plan.

25          Your Honor, the case I think that we would rely on

**J&J COURT TRANSCRIBERS, INC.**

70

1   most is the Ninth Circuit case, the <u>PG&E</u> case.  We argued

2   sections both of the -- Judge Montali's Bankruptcy Court

3   decision and the Ninth Circuit's decision as well.  As far as I

4   know, this is the only case that really gets down in anything

5   close to the context we're in and really analyzes the

6   legislative history and so forth of 1123(a)(5), and there's a

7   lot of argument on Page -- I think it's 40, 39 and 40, about

8   the legislative history of 1123 and 1142.  Basically both of

9   those statutes were enacted under the 1978 Bankruptcy Code.

10  The statute 1142, which is the statute that covers plan

11  implementation, had the same kind of -- notwithstanding any

12  other provision to the contrary, ipso facto clause as appears

13  virtually everywhere else in the code.  And it says that state

14  laws or provisions that have to do with the debtor's financial

15  condition can be overridden, but --

16              THE COURT:  1123.

17              MR. ROTEN:  Pardon me?

18              THE COURT:  1123.

19              MR. ROTEN:  Eleven twenty -- well, Your Honor,

20  1142(a)

21              THE COURT:  1142 doesn't mention financial -- I'm

22  sorry, 1142 mentions financial condition notwithstanding any

23  otherwise --

24              MR. ROTEN:  Right.

25              THE COURT:  -- applicable non-bankruptcy rule or

71

1  regulation relating to financial condition.

2          MR. ROTEN:  Yes, yes.

3          THE COURT:  Okay.

4          MR. ROTEN:  That's what 1142 says, and that was put

5  into the Code, in 1142, in 1978 when 1142 was enacted.  1123(a)

6  did not have that provision in 1978.  Then in 1984 there were

7  amendments to the Code, and 1123(a) was amended to add the

8  provision that now reads, "Notwithstanding any other bankruptcy

9  law to the contrary."  It was inserted six years after 1142.

10         There was no indication that the revisions that were

11 made in 1984 were intended to be substantive.  In fact, the

12 language, the committee report, specifically stated, Your

13 Honor, that with respect to the proposed amendment of 1123(a),

14 the amendment makes it clear that the rules governing what is

15 to be contained in the reorganization are those specified in

16 this section, deletes a redundant word, and makes several

17 stylistic changes.  That's all it did -- stylistic changes, a

18 redundant word, and to make it clear that 1123(a) controlled

19 what was to be contained in the -- in a plan.

20         THE COURT:  Okay, and I don't disagree that that's

21 what the legislative history says.  What I have a problem with

22 with the Ninth Circuit PG&E case is that it assumes that all of

23 1123(a)(5) provisions are financial, and frankly I can't read

24 1123(a)(5) that way.  How, for example, is the amendment of the

25 debtor's charter a financial condition?

72

1          MR. ROTEN:  Well, Your Honor, most states have a law

2    that if the state is -- if the corporation is insolvent or if

3    the corporation is not paying its taxes, its franchise taxes,

4    it will become inactive.  It's administratively incapable of

5    doing anything, and so the charter is either suspended or -- no

6    action can be taken until those taxes are paid the corporation

7    is brought back to life.  That's an example of how that could

8    affect financial condition.

9          THE COURT:  Well, maybe.  There are lots of reasons

10   to amend charters, including, for example, to indicate that

11   because of the plan the debtor can't issue voting securities,

12   non-voting securities.

13         MR. ROTEN:  And that would not relate to financial

14   condition --

15         THE COURT:  Right.

16         MR. ROTEN:  -- and therefore that would not be

17   prohibited.  But the part that did relate to financial

18   condition, that is what would be prohibited.  And so what

19   happened is, when they changed the law from '78 to '84, and

20   they said these are stylistic changes, they added that

21   particular language.  Now, is that a stylistic change, Your

22   Honor?  The position we take is that 1142(a), the usual ipso

23   facto type restriction, should be the -- what 1123(a)(5) says.

24   That's what Congress meant.  That's what it should be -- how it

25   should be read, the same way PG&G read the language in the

1  Ninth Circuit.  If that were the case, then the anti-assignment

2  laws and the anti-assignment provisions of the policy would not

3  be overridden by the plan --

4          THE COURT:  But -- I'm confused about the insurer's

5  argument I think, because is there an agreement at this point

6  that all that the debtor is attempting to transfer to the trust

7  is the right to proceeds?  It's not an issue about attempting

8  to transfer the policies.  The debtor is not attempting to

9  transfer policies --

10          MR. ROTEN:  That's right.

11          THE COURT:  -- only the rights to proceeds.

12          MR. ROTEN:  That's right.

13          THE COURT:  Okay.  Then the problem I think is that

14  -- what I tried to articulate earlier.  The insurance companies

15  don't have any issue in what the debtor -- or interest in what

16  the debtor does with its proceeds once they're collected, and

17  --

18          MR. ROTEN:  Yes, but, Your Honor, what you're

19  assuming is there are already proceeds or proceeds that will

20  inevitably be collected.

21          THE COURT:  No, I'm --

22          MR. ROTEN:  What is actually --

23          THE COURT:  Well, to the extent that there are no

24  proceeds ever collected, it's an irrelevancy.  So it's only

25  relevant if there are proceeds that are collected.

74

1         MR. ROTEN:  No, Your Honor.  It's relevant.  It's

2    very relevant when the trust replaces the debtor in attempting

3    to enforce the right to the proceeds.  That's the point.

4         THE COURT:  Where does the plan say that the trust is

5    going to substitute for the debtor in collecting or in doing

6    the -- whatever the policy requires the debtor to do.

7         MR. ROTEN:  The whole assignment of the PI insurance

8    assets is to the trust.

9         THE COURT:  But the PI insurance assets are limited

10   to cash and the rights to proceeds, by definition.

11        MR. ROTEN:  The cash is not on the table as far as

12   we're concerned.

13        THE COURT:  Okay, fine, then that makes it easier.

14   So the PI insurance assets at issue are limited to the rights

15   to proceeds, not to policies, not the debtor's obligations

16   under the policies, only the rights to proceeds.

17        MR. ROTEN:  Yes.

18        THE COURT:  Okay.

19        MR. ROTEN:  The right to sue to collect the proceeds.

20        THE COURT:  That's not what the PI insurance trust

21   asset says.  It says the rights to proceeds.  I looked at this

22   definition last night.  I'm not sure I have the plan out.

23        MR. ROTEN:  Well, Your Honor, I'll be the first to

24   agree that in this case, as in every other one of these cases

25   I've been in, the definition of the insurance assets that are

75

1  being transferred to the trust are intentionally vague.

2           THE COURT:  Well, I don't think it's intentionally

3  vague.  It says the rights to proceeds.  I think that's pretty

4  specific.

5           MR. ROTEN:  So is it Your Honor's interpretation of

6  the plan then that the trust has no right to sue to collect

7  proceeds?

8           THE COURT:  I think there's a provision in the plan

9  that indicates that the debtor, at least until the trust is up

10 and running, retains those rights, and at the point in time

11 when the trust indicates that it can take over those rights

12 that it may -- it may pursue the rights to proceeds, but I

13 don't recall the specific language as to whether or not it's

14 substituting itself on behalf of the debtor.  What it doesn't

15 do, the plan that is doesn't do, is take away any of the

16 obligations of the debtor to "cooperate" with the insurance

17 companies to do whatever it takes to show that the claims

18 either are or are not valid.

19          MR. ROTEN:  Yes, but, Your Honor, think about that.

20 I mean, that's -- think about the reality of that.  First of

21 all, at some point in time the trust will step into the shoes

22 and start suing the insurance company, and that's -- that is

23 very significant to us, and I think Your Honor --

24          THE COURT:  Well, I need to see the language of the

25 plan.  Can somebody give me the right section.  Mr. Gordon, do

1    you know the section?

2          MR. GORDON:  I believe it's 521(g) is what you're

3    referring to, Your Honor.

4                          (Pause)

5          MR. GORDON:  Page 37, Your Honor.

6          THE COURT:  Okay.  This talks about PI insurance

7    coverage action.  "Any PI insurance coverage action and the

8    claims and causes of action asserted or to be asserted therein

9    shall be preserved for the benefit of the funding vehicle trust

10   for prosecution either by reorganized KACC or the funding

11   vehicle trustees, as mutually agreed by such parties,

12   subsequent to the effective date and in accordance with the

13   funding vehicle trust agreement."  And then it goes on.  So,

14   your issue --

15         MR. ROTEN:  So the trust would be in a position of

16   suing the insurers.

17         THE COURT:  Okay.  So your issue is not about the

18   fact that the proceeds and rights to proceeds are being

19   transferred.  Your issue is that who is going to sue the

20   insurance companies is being transferred.

21         MR. ROTEN:  Your Honor, there's a host of issues that

22   are all related to the same thing -- of course who is going to

23   be suing the insurance company.  The trust, the party that is

24   suing the insurance company and taking the benefits for itself,

25   have no financial interest in keeping those awards -- keeping

77

1  the payments down that they are ultimately going to be making

2  to the claimants.  The entire insurance relationship, the duty

3  of cooperation and assistance, everything is totally and

4  completely changed when the identity of the other party to the

5  insurance agreement goes from the debtors to the trust.  That's

6  really significant and it's really important, and it's not just

7  one or two things.

8         And, Your Honor, the point I was making is the

9  difference in the '78 and '84 Act.  If it's true that Congress

10  didn't intend any change, any substantive change, then how

11  could they have worked such a huge substantive change by adding

12  that notwithstanding any other non-bankruptcy law?  If you

13  accept that language, Your Honor, if you accept the plan

14  proponents' position that that language absolutely gives them

15  the right to override any state law, period, broadly, not even

16  mentioning specific state laws, not limiting it to particular

17  statutes, not even different subject areas, but gives them the

18  right to override any state law, that is a huge leap from the

19  pre-1984 law, where they -- there was no provision to that

20  effect in 1123(a)(5) at all and where the only provision was

21  the 1142(a) provision that limited it to ipso facto type

22  clauses.

23         So either the plan proponents are right and there was

24  an enormous change between '78 and '84, or what the committee

25  report said is just completely wrong and bogus and meaningless.

1  It's got to be one of the two.  There is no way you can make

2  those two changes jibe.  It doesn't work.  I cannot believe,

3  Your Honor, and I think the Ninth Circuit got it exactly right

4  when it said that 1123(a)(5) was mean to be coextensive with

5  1142(a).  They did that not only because of the legislative

6  history of 1123(a)(5) and 1142(a), but they also did it because

7  of the general structure of the Code.  1142 controls

8  implementation of a plan.  1123(a) is the contents of a plan.

9  What's in a plan and what -- or how the plan is implemented

10  should be the same thing.  They should be handled in the same

11  way.  It makes no sense to have -- give the -- a right to a

12  debtor to put a provision in a plan under 1123(a)(5) that

13  broadly overrides state law when 1142 does not give the debtor

14  the right to implement such a plan.  The only -- the only plan

15  the debtor can implement under 1142 is limited to the ipso

16  facto clause type language.  It makes no sense.

17         This -- from the legislative history it seems clear

18  that 1123(a)(5) should be read the same as 1142(a).  It should

19  have the same restriction.  This is a common restriction.  You

20  see it throughout the Code.  There is no indication in the

21  legislative history.  There is no congressional intent.  There

22  is nothing to indicate that Congress intended to just

23  completely blow up 1123 to allow it to override all state law

24  without any limitation whatsoever.  I cannot believe that

25  Congress intended for that.  I can't believe Congress intended

1  to give Bankruptcy Courts the authority to just blatantly

2  override all state law that the Courts want to override or

3  debtors in Bankruptcy Courts to come in and seek to simply

4  override all state law.

5       In both Montali's opinion and in the Ninth Circuit

6  there were some excellent discussions of the absurd kind of

7  results that could be reached by allowing this sort of thing to

8  happen without restriction, and I just don't believe it's what

9  Congress intended or that it's even conceivable.

10      Montali, in -- get my notes here -- Montali said that

11 the Court at the argument where the plan proponents were

12 submitting this construction of 1123(a) that it had utterly

13 unlimited power, the Court questioned whether a plan could

14 provide for a debtor to sell liquor to minors notwithstanding

15 state laws to the contrary, or trade with foreign enemies

16 notwithstanding federal statutes to the contrary, or dump toxic

17 wastes notwithstanding environmental law and Supreme Court

18 precedent, or merge with competitors to create a monopoly or

19 gain some other competitive advantage in violation of state and

20 federal antitrust laws.  There are no satisfactory answers.

21      You don't have to go that far.  1123(a)(5), Your

22 Honor, has provisions in it that -- for example, Subsection E,

23 which allows for the satisfaction or modification of a lien.

24 Well, if 1123(a)(5) overrides all state law, they can just

25 modify the lien anyway they want to.  They don't have to attach

80

1  collateral to it.  They don't have to do anything with it.

2  Sure, there are other provisions in the Bankruptcy Code that

3  deal with that, but there's another provision in the Bankruptcy

4  Code, 363(l), that deals with this, and they're not paying any

5  attention to that.  So why should they pay attention to those

6  restrictions?

7          1123(a)(5)(a) allows for the debtor to retain

8  property of the estate.  Why not retain all the property of the

9  estate?  Why not retain 50 percent of the property of the

10 estate?  Why not pay off some creditors and get them to vote

11 for the plan and cram down the plan on the other creditors who

12 have all their property retained by the estate?

13 (Indiscernible) makes any sense.  It's a nonsense result.  It

14 was never intended to go that far.  The Court shouldn't read it

15 that way.  The Court should not give the debtors powers to

16 override state law, blanket overriding of state law.  They --

17         THE COURT:  I don't think the debtor has a blanket

18 power to override all state law, but I think the debtor does

19 have, under the federal preemption, opportunities in a

20 confirmed plan to override some provisions of state law, and

21 curing defaults, for example, is one of them.  And it's

22 specific in this instance in Section 1123(a)(5).  The debtor

23 can cure a default whether or not state law would permit the

24 debtor to cure a default or waive the default, whether or not

25 state law would permit it, and it's there in the statute.  So

81

1  the debtor obviously does have some federal preemption rights.

2          MR. ROTEN:  Your Honor, I wouldn't disagree with

3  that.  I think that the debtor has a right to transfer assets,

4  subject to 363(l), the relevant provision in the Code that

5  restricts that, but Section 1123 itself does not create a broad

6  right for the debtor to transfer the properties under no

7  restrictions whatsoever.  There have to be restrictions.  There

8  is a restriction that's in 363(l).  Therefore, Your Honor, the

9  Court should not allow the debtors in this case to transfer

10  these insurance rights, whatever they may be, rights to sue for

11  future proceeds, because they don't have the right to do that

12  under state law, and there is no specific preemption of that.

13  Your Honor, the federal government has left the regulation of

14  insurance companies to the states in the McCarran-Ferguson Act.

15          THE COURT:  This isn't a regulation of insurance

16  company issue.  The debtor is not attempting to transfer the

17  regulation of insurance under this plan to anybody else.

18          MR. ROTEN:  I agree.  I agree.  But the federal

19  government has clearly indicated it wants to stay out of the

20  insurance business.

21          THE COURT:  Oh, now, wait.  Regulation of insurance

22  businesses and determining who has rights under specific

23  insurance policies are a whole different ball of wax.  I don't

24  think the McCarran-Ferguson Act in any way attempts to say that

25  the regulation of insurance business gets down to the level of

82

1  a contract dispute between the insured and its insurance

2  company.

3          MR. ROTEN:  But what they're relying upon to allow

4  assignment doesn't either.  What they're relying on to -- what

5  they're relying on to allow assignment is not in reference to a

6  particular state contract law at all.  State contract law

7  prevents the assignment.

8          THE COURT:  Well, I think to the extent that the

9  Combustion Engineering opinion definitely talked about the fact

10 that the debtor has insurance contract rights on the date of

11 filing and that they can be transferred to a trust.  Rights to

12 proceeds can be transferred.  Whether or not the debtor can

13 also transfer who is the plaintiff in an action against the

14 insurance company may be a different issue.  Maybe the plan has

15 to be tweaked to say that whoever that -- the entity is who's

16 doing the suing is acting on behalf of the named insured, but

17 I'm not sure that that's an issue that can't be tweaked to

18 satisfy that problem.

19         To the extent that it's a coverage issue, i.e.,

20 whether the trust has the standing to sue, this plan currently

21 provides that the insurance company can raise that as a

22 defense.  So you're not prejudiced in that sense because if the

23 wrong entity is suing and you get out of your liability based

24 on the fact that the wrong entity sued, then you've got that

25 defense in the coverage action.

1          MR. ROTEN:  Well, not really, Your Honor, because the

2    plan also says the assignment -- the courts have determined

3    that the assignment is valid by virtue of plan approval.

4          THE COURT:  The assignment of the insurance rights.

5          MR. ROTEN:  Yes.

6          THE COURT:  This issue about insurance coverage

7    action and the plan's definition of the covered insurance

8    assets are different issues.  Well, let me go back to the

9    definition again.

10                        (Pause)

11         THE COURT:  The PI trust assets are included -- are

12   defined to include the PI insurance assets.  The PI insurance

13   assets are defined in Subsection 145 as rights to receive

14   proceeds from included PI trust insurance policies in respect

15   of channeled personal injury claims and then the cash which

16   we've agreed is not relevant today.  That's all, just the right

17   to receive proceeds.  The PI insurance coverage action is

18   separately defined in Subsection 147 as any claim, cause of

19   action, or right of the debtor, or any of them, under laws of

20   any jurisdiction, against any PI insurance company arising from

21   or related to (a) the PI insurance company's failure or refusal

22   to provide or pay under an included PI trust insurance policy,

23   et cetera, (b) failure or refusal of any PI insurance company

24   to compromise and settle, et cetera, or (c) the interpretation

25   or enforcement of the terms of any included PI trust insurance

1  policy in respect of a channeled personal injury claim.

2  They're not the same.

3          MR. ROTEN:  No, they're not the same --

4

5          THE COURT:  Okay.

6          MR. ROTEN:  -- but what happens is -- what the plan

7  does is it gives the trust the right to sue the insurers to

8  recover, and, Your Honor --

9          THE COURT:  Which is a different issue from the

10 transfer of the proceeds.

11         MR. ROTEN:  And, Your Honor, the plan says that the

12 court's approval of the assignment is effective and binding on

13 the parties.

14         THE COURT:  I think the plan's approval of the right

15 -- of the assignment of the rights to proceeds would be binding

16 --

17         MR. ROTEN:  And --

18         THE COURT:  -- and I think Combustion Engineering

19 says that it can be binding --

20         MR. ROTEN:  Your Honor --

21         THE COURT:  -- but who sues, under the definition of

22 the coverage action, is a different matter from what assets are

23 being transferred.

24         MR. ROTEN:  Your Honor, Combustion Engineering

25 doesn't talk about assignment to a trust.  It talks about

1  assignment to the estate.

2        THE COURT:  Well, it talks about the fact that there

3  are assets of the estate on the date of creation.  But 1123

4  provides as a means of implementation -- or as something that

5  the plan can do the fact that it can transfer assets either to

6  a debtor or to an entity created either pre or post-petition.

7        MR. ROTEN:  Well, Your Honor, Combustion Engineering

8  specifically talks about proceeds being transferred to the

9  estate.

10       THE COURT:  Right.

11       MR. ROTEN:  That was the discussion and it didn't

12  have anything to do with a trust, and it came up in the context

13  of London, the basic and voluminous non-debtor parties and all

14  that sort of thing specifically discussed in Combustion

15  Engineering, but the word "trust" doesn't even appear during

16  that discussion at any point, and it was not a discussion of

17  the right to sue to get proceeds or the right to receive

18  proceeds.

19       THE COURT:  I'm not --

20       MR. ROTEN:  This is purely a discussion of proceeds.

21       THE COURT:  I don't disagree with respect to the

22  right to sue.  With respect to the right to transfer property

23  of the estate, 1123(a)(5)(b) is clear that estate property can

24  be transferred in whole or in part to one or more entities,

25  whether organized before or after the confirmation of the plan.

1  1123(a)(5) is clear that assets of this estate can be

2  transferred pursuant to the plan.  I don't see any problem with

3  the debtor transferring the rights to proceeds.  There may be a

4  different issue about who can sue, but that's a coverage issue

5  that may get you out of total liability.

6          MR. ROTEN:  Yes, but it's being affected by what the

7  Court is doing here.  What the Court is doing here --

8          THE COURT:  It's not being affected.  All I'm doing

9  is transferring rights to proceeds.  That's all the objection

10 says.  You say that the right to proceeds can't be transferred.

11 I say they can, and I think 1123(a)(5)(b) specifically provides

12 for that.

13         MR. ROTEN:  Yes, but, Your Honor, you're allowing --

14 by approving the plan, you're allowing the estate, excuse me,

15 the trust, to sue to enforce the right to proceeds, and they're

16 --

17         THE COURT:  That's not an objection -- that objection

18 is a different objection from whether or not the rights to

19 proceeds themselves can be transferred.

20         MR. ROTEN:  Your Honor, we are not arguing as to the

21 cash, as there is cash --

22         THE COURT:  I understand that.  No, the issue as to

23 who can sue is a different issue from whether or not the rights

24 to proceeds can be transferred.  One talks about obligations

25 under a policy.  The other talks about an asset.  The asset can

**J&J COURT TRANSCRIBERS, INC.**

1  be transferred.  Whether the right to sue can also be

2  transferred is a different objection that, frankly, no one's

3  raised.

4          MR. ROTEN:  Well, that's what we're raising.

5          THE COURT:  Okay.

6          MR. ROTEN:  It's precisely what we're raising, and

7  it's in our brief.

8          THE COURT:  Okay.  the brief talks about the rights

9  to proceeds, and the rights to proceeds, I overrule that

10 objection.  I think that objection is not well founded.  The

11 debtor can transfer the rights to proceeds.  The insurance

12 companies have no interest in whatever the debtor does with

13 proceeds that it acquires after the effective date or before

14 the effective date from the insurance companies.  The insurance

15 company does have an interest in making sure that the debtor

16 carries out its obligations under the policies.

17         MR. ROTEN:  Well, it can't carry out its obligations

18 under the policies under the plan, Your Honor, because once

19 this -- if the plan goes effective and every -- all the

20 transactions that are planned under the plan occur, then the

21 debtor is gone.  The debtor has no interest in cooperating with

22 anybody.  The debtor is gone and away from this.  They're going

23 to transfer everything to the trust.  The trust is going to sue

24 the insurers, and that's where the fight will be, and the trust

25 is not only not capable of cooperating with the insurers, Your

1 Honor, because the trust doesn't have any historical

2 information, has not been involved in these plans, didn't

3 provide the -- procure the policies in the first place, but the

4 trust interest is to opposite, not cooperating and helping in

5 the defense.  The trust interest is paying the claims according

6 to the TDPs.

7        THE COURT:  Well, it's paying the valid claims,

8 that's correct.

9        MR. ROTEN:  According to the TDPs covers many claims

10 which are not valid.

11        THE COURT:  Well, that's a determination that at some

12 point in time may be a coverage defense --

13        MR. ROTEN:  Maybe.

14        THE COURT:  -- if it pays an invalid claim, but the

15 trust's obligation is to pay valid claims, not invalid claims,

16 and to the extent the trust pays an invalid claim, the

17 insurance company will defend against it and win.

18        MR. ROTEN:  Well, we have another disagreement, Your

19 Honor, on that point, but I go back to the scope of preemption,

20 the -- notwithstanding any other non-bankruptcy law, the

21 discussion from -- that I went through on legislative history,

22 I come back to the point that it was not -- it certainly --

23 there is no indication in the record, there's no indication

24 anywhere, that in making that change to the '78 Act that

25 Congress intended to give so much power and authority to a

1  Bankruptcy Court as part of the contents of a plan to

2  completely override state law.

3       THE COURT:  And I don't disagree that Congress

4  doesn't want state law completely overridden.  Okay.

5       MR. ROTEN:  Well, we do have a federal society, Your

6  Honor, and states do have powers not given to the government,

7  so, I mean -- the federal government, so --

8       THE COURT:  And I agree that that dual society is the

9  one in which we operate, so I don't think Congress is

10 attempting to abrogate all of the state's rights.

11      MR. ROTEN:  No, Your Honor, but the interpretation

12 that the plan proponents want you to give them by accepting

13 their -- notwithstanding any other non-bankruptcy law is

14 precisely that, no limits on what they can do.  They have --

15      THE COURT:  Well, I don't accept that.  As a

16 proposition, I don't accept the debtors are unlimited in what

17 they can do in a plan.  So, if that's the issue, on that one,

18 Mr. Roten, we're in agreement.

19      MR. ROTEN:  It's one of the rare times, Your Honor.

20 Thank you.

21      THE COURT:  Okay.  Why don't we take a five minute

22 recess, and then we'll start with the next insurance company

23 argument.

24              (Recess)

25      THE COURT:  Mr. Gordon?

90

1          MR. GORDON:  Your Honor, Greg Gordon on behalf of the

2    debtors.  I just rise.  I had a question.  You heard argument

3    on the preemption issue.  I thought I heard you say towards the

4    end that you're overruling that objection, but I didn't know if

5    you wanted to hear from us.  I know Mr. Lockwood is prepared to

6    address preemption as well.

7          THE COURT:  No, I'm overruling the issue with respect

8    to the assignment of the rights to proceeds.  Okay.  Whether or

9    not the PI coverage action can be approved as part of this

10   plan, which is Section 5.1G on Page 37 of plan, I think there's

11   a preemption -- maybe not a preemption.  I think there's an

12   issue for confirmation with respect to that provision of the

13   plan.  But with respect to the assignment of the rights to

14   proceeds, I don't see that there is (a) a preemption issue, or

15   (b) that's not appropriate under the plan.

16         MR. GORDON:  Well, I guess with respect to  5.1G,

17   Your Honor, does Your Honor want to hear from us on that issue

18   now, or do you want to defer until after the 524(g) issues?

19         THE COURT:  I don't have a preference.  Whichever way

20   you want to do it is fine.

21         MR. GORDON:  Well, why don't we go ahead and -- well,

22   Mr. Lockwood, do you have a preference?

23         MR. CALHOUN:  I have -- I have a few more points on

24   preemption.

25         MR. GORDON:  Oh, I thought -- I thought only one

**J&J COURT TRANSCRIBERS, INC.**

1    lawyer -- I thought only one of you was arguing preemption.

2            MR. CALHOUN:  I just have a few brief --

3            THE COURT:  Go ahead.

4            MR. CALHOUN:  Excuse me, Your Honor.  George Calhoun

5    of Steptoe & Johnson on behalf of TIG.  I just wanted to make a

6    couple of points, Your Honor.  One, as you know, we had a

7    stipulation dealing with the arguments that the insurers would

8    make, and this issue is a very limited issue dealing with is

9    there the preemption of otherwise applicable state law.  A lot

10   of what we ended up talking about in some sense deals with what

11   would the State Court decide, and I think that's an issue that

12   is properly before the State Court if you find that there is

13   not preemption.  The issues of whether or not it's appropriate

14   to assign proceeds before that action becomes choate is really

15   a state law issue.

16           THE COURT:  No, that I disagree with.  It think

17   that's an 1123(a)(5) issue, clear and simple.  The Code says

18   that the debtor can transfer assets to an entity.  This is an

19   asset.  The debtor is transferring it to an entity, and that is

20   preempted.

21           MR. CALHOUN:  That's fine, Your Honor.  That's one

22   we'd clarify.  The ruling is preemption.  And the next point I

23   wanted to make is in our view the issue of who gets to bring

24   the claim is an issue that could give rise to coverage claim.

25   It is not the same issue as whether or not a -- right to

92

proceeds once that becomes choate may be assigned.  So we just

wanted to make that clear, that to the extent there was any

confusion the debtors have said all that they're assigning is

proceeds, and that's an issue where we've argued about

assignability and preemption -- excuse me, we've argued about

preemption.  The issue of whether or not the trust can step in

and attempt to essentially take over the debtor's obligations

is an issue that may give rise to coverage -- and that's

something that's been preserved for State Court, and we just

wanted to clarify your comments earlier that that is a live

issue and it's not something that's being ruled on on a

preemption basis, because it's not before the Court.

        THE COURT:  Okay.  I thought Mr. Roten just told me

that it is, that that's his argument.  That's why I was

confused about what the insurance companies are arguing.

        MR. CALHOUN:  Well, to the extent they're arguing

that proceeds includes they've -- the right -- and maybe we'll

need to hear from the debtor -- that proceeds includes the

right to assign the right to bring causes of action, that's I

think a different issue than whether there's a right to money

from the insurers, that that money can then be delivered to the

trust.  That's I think a different issue.  And to the extent

that that's what they're saying, I agree with Mr. Roten.  To

the extent that that's a separate issue, I think I can agree

with Your Honor that that could provide a coverage defense, and

1  that's something that we can argue about before the State Court

2  judge.  And that's the issue that we want to make sure was

3  clear, that all those coverage defenses have been preserved,

4  all the parties have expressly negotiated in long and

5

6  kind or arduous negotiations, but all of those coverage

7  defenses have been preserved, and approval of this plan does

8  not otherwise negate those coverage defenses.

9          THE COURT:  Right, that -- my understanding was just

10 what you've articulated, that with respect to the proceeds,

11 that issue is a Bankruptcy Court issue which is being

12 determined here and is binding.  With -- that is the assignment

13 of the right to proceeds.  With respect to who can bring an

14 action in the State Court with respect to coverage under the

15 policies and the insurers' ability to defend against that is

16 not a preemption issue.  It's not being argued in that context,

17 and it is preserved to whatever the appropriate court is that

18 will hear the coverage litigation.  That was my understanding

19 of the plan, but then I thought Mr. Roten told me that he was

20 arguing --

21         MR. CALHOUN:  That was my understanding also, Your

22 Honor.  That's why I just wanted to make sure that that was

23 clear so that we didn't have a muddy record or something that

24 was confusing.

25         THE COURT:  Well, we do have a muddy record that's

94

1  confusing because now I don't know what the insurers are

2  arguing.  If you're arguing that that is coverage defense

3  that's preserved to the State Courts, I agree.  I think that's

4  what the plan says.

5          MR. ROTEN:  Yes, Your Honor.  That's our position.

6          THE COURT:  Okay.

7          MR. ROTEN:  But the problem is that the way that the

8  plan is written, the plan inherently approves the assignment.

9  Approval of the plan is approval of the assignment.  If there

10 is an assignment, then whoever the assignee is has the right to

11 bring the action.  But --

12         MR. CALHOUN:  This may be an issue where, as you

13 suggest, that --

14         THE CLERK:  Speak into a mic.  They're not going to

15 pick you up.

16         MR. CALHOUN:  I'm sorry.  I'm sorry, Your Honor.

17 This may be an issue where you suggest that we could tweak the

18 order, and that may be what needs to be done.

19         MR. ROTEN:  But our intention is to preserve those

20 rights to the State Court coverage case, Your Honor.  That's

21 our position.

22         THE COURT:  Okay, well I think --

23         MR. ROTEN:  That's not how we understand what's going

24 on here --

25         THE COURT:  All right, then --

95

1          MR. ROTEN:  -- but that's our position.

2          THE COURT:  -- maybe I should hear from one of the

3   plan proponents as to what's going on, because that was -- my

4   understanding was that that issue was a coverage defense issue

5   that was preserved.  Mr. Lockwood?

6          MR. LOCKWOOD:  Your Honor, the issue of -- well,

7   first, let's back up a minute here.  We do not regard this as

8   an assignment at all of these proceeds.  We regard this as a

9   property right of the debtor, as the Court stated.  After all,

10  in our first year property course we all learn that property is

11  a bundle of rights.  Mr. Roten would have you believe that it's

12  -- that you could sort of identify a single piece of right and

13  say that's not property, and he cites no bankruptcy law for

14  that proposition, only state insurance cases having to do with

15  the accrual of a cause of action on an assigned cause -- in an

16  assigned claim against an insurer situation.

17         Here, as Your Honor pointed out earlier, the Third

18  Circuit, in dealing with an appeal from this very court

19  addressed the question of an assignment.  Mr. Roten attempted

20  to kind of blow this off by saying, oh, well, all that was at

21  issue there was whether the property went into the estate, and

22  that had to do with basic (indiscernible).  That's just simply

23  not true.  The -- there was no issue, as you know, Your Honor,

24  because you were there, about whether or not insurance rights,

25  whatever those rights might be, got into the debtor's estate.

1 Nobody was contesting that.

2          What -- the purpose of the -- what the Third Circuit

3 did at Page 218 to 219 of its decision in Footnote 27 was to

4 show that even a contractual provision could not prevent assets

5 of a debtor from going into the estate, and that's preemption.

6 That's hard core preemption.

7          And then the question is, okay, the assets are in the

8 estate, what happens to them?  The insurers -- there's only two

9 -- focusing on this notion of insurance rights for the moment,

10 as opposed to policies, it's my position the debtor could have

11 assigned the policies as well, because they're assets of the

12 debtor estate, and they pass to the -- from the debtor to the

13 estate under 541.  So they're in the estate.  What happens

14 next?  We've got a bankruptcy case going on here.  We're in

15 Chapter 11.  There's only two places that the assets in the

16 estate can go.  One of them is back to the debtor, and the

17 other is to somebody else.  The insurers would effectively have

18 you read the Bankruptcy Code as requiring the assets to go back

19 to the estate under, I guess, 1141(b) of the Code, except that

20 1141(b) specifically says, except as otherwise provided in the

21 plan, the confirmation of the plan revests the property of the

22 estate in the debtor.

23          What does 1123(a) then say that the plan shall do?

24 1123(a)(5)(a) says the plan shall provide whether the property

25 is going back to the debtor.  1123(a)(5)(b) provides that the

97

1  plan shall provide whether it's going to go to some other

2  entity that's a successor of the debtor.

3          We've heard a lot of talk from Mr. Roten about the

4  broad, sweeping preemption arguments that are being made here.

5  That's just poppycock.  We're not making broad, sweeping

6  preemption arguments here.  We're focusing on a plan that

7  creates a trust which is a successor entity to the debtor.  It

8  assumes a portion of the debtor's liabilities for various --

9  here it's multiple trusts because there are several different

10 types of tort liability.  And it is -- under the insurers'

11 view, the assets could never get back out of the estate, the

12 insurance assets, because 1141(b) doesn't say notwithstanding

13 applicable state law the property of the estate revests in the

14 debtor.  It just says the -- except -- the plan and will revest

15 in the estate debtor.  Under the -- Mr. Roten's argument, once

16 it's in the estate, presumably it's got to stay there and

17 presumably this Court would have to then preside over the

18 estate's liquidation of all of these claims, because now the

19 estate has the insurance, the claims are insured or not,

20 depending on other coverage defenses, and if the insurance

21 asset has to stay in the estate, then only this Court can

22 decide, in effect, how that asset is going to be used.

23          If you think about what's going on here, this debtor

24 pre-petition, as Your Honor noted earlier, purchased liability,

25 third-party liability insurance, to pay tort claims, among

other things.  Why did it do that?  It did it to protect its

other assets from going to the tort creditors.  Now you're in

bankruptcy.  The debtor is attempting to parcel out its assets

among its creditors.  It's got this insurance that it's bought,

and it's available to use to pay these kinds of creditors

instead of using assets that could go to other creditors, like

commercial creditors, bondholders, what have you, being used to

pay those claims.

          The insurers would have you believe, in effect,

notwithstanding the provisions in their own policies that we

cite in our brief in Note 20 that say that the insolvency of

the debtor does not free the insurer of its obligations and

notwithstanding 524(e) of the Bankruptcy Code that says the

discharge of a debtor doesn't free anybody else from liability

on the same claim, they're basically -- let's not kid

ourselves.  This is an exercise on the part of the insurers to

try and create a situation in which because this debtor went

into bankruptcy they get to walk away from their policy

obligations.  And they -- we, in the stipulation we entered

into, as Mr. Calhoun pointed out, have in an effort -- we, the

tort claimants in an effort to accommodate this debtor so that

it wouldn't have to stay in bankruptcy for time immemorial

trying to resolve all these estate insurance rights and claims

against the estate as to whether they are or are not covered by

those rights, we agreed with the insurers that we would reserve

1   to subsequent State Court litigation what we call the coverage

2   defenses.  And included in those coverage defenses are many of

3   the things that Mr. Roten keeps asserting the insurers are

4   being deprived of by this plan, such as the right to insist on

5   cooperation.  That's a separate clause in the policy, the right

6   to cooperation.  And if the -- if the debtor and the trust

7   either can't or won't cooperate under -- as required by these

8   policies in the defense of claims later on, that's a coverage

9   defense that the insurers can raise when, as, and if somebody

10  shows up on their door with a claim and says pay it.  But we're

11  not here today to determine whether the insurers have an

12  obligation to pay a penny.

13          Similarly, the stuff about payment of invalid claims,

14  there's a separate set of provisions in the policies that deal

15  with claims handling.  The insurers' rights to contend that the

16  TDPs, if they pay -- if the trust recognizes claims under them

17  and seeks reimbursement for those payments to -- from an

18  insurer, they can raise the coverage defense, that they've been

19  denied their claims handling rights.  They could raise a

20  coverage defense that the settlement by the trust is

21  unreasonable.  That's all preserved to them by the stipulation

22  that all these insurers have signed, that all the plan

23  proponents have signed, and that has been approved by this

24  Court.

25          So what is it that we're arguing about here?  We're

1  arguing about whether or not, under the Bankruptcy Code, in

2  this fairly unique situation where, notwithstanding all this,

3  talks about 1984 was just stylistic and we're asking for huge

4  changes in the law.  There were no pre-1984 channeling

5  injunctions, other than the Manville and UNR cases, which were

6  at their incipiency, and the Manville plan wasn't even adopted

7  until after 1984, similarly UNR, and so they can't cite a

8  single court that said that 1123, even before the preamble was

9  put it, wouldn't have permitted the creation of a successor

10 entity trust to assume liabilities that are insured and to have

11 the benefit of the insurance to cover those insured

12 liabilities.

13         Now, the insurers, before today, have never raised as

14 a separate issue the question of whether or not the trust to

15 whom the insurance rights are being transferred under this plan

16 would or would not have the right to actually sue in the State

17 Court coverage litigation to obtain the benefit of those

18 rights.  And so there's no objection to the plan pending on

19 that point, which by itself ought to be enough to resolve the

20 issue.

21         But I would make one observation here, because while

22 the State Court coverage litigation reserves the forum where

23 various issues are going to get litigated, including coverage

24 defenses, it doesn't prescribe either the law that's going to

25 be applied by the State Court judge or the outcome.  And among

1  the law that State Courts have to apply is federal law, and

2  there is a provision in the Bankruptcy Code, under Section

3  1123, which is 1123(b)(3)(b), and this is one of the permissive

4  provisions of the Bankruptcy Code, and it's a plan may provide

5  for the retention and enforcement by a representative of the

6  estate appointed for such purpose of any claim or interest

7  belonging to the debtor or the estate.  And what we're now

8  talking about here for the first time is whether or not the

9  trust should be viewed as an estate representative, since it

10  has after all assumed many of the liabilities of the estate

11  under this plan, for the purpose of allowing it to sue in its

12  own name as opposed to, for example, having the debtor be a

13  co-plaintiff or the trust suing in the name of and in the right

14  of the debtor, which is another way which causes of action are

15  frequently asserted in assignment situations.

16         My view is, Your Honor, that while I agree with Mr.

17  Calhoun that the issue -- that this issue has not heretofore

18  been raised and that it may well surface in the coverage

19  litigation, the preemption issue before Your Honor is, has this

20  debtor the right to assign to a trust which assumes its

21  liabilities for a variety of claims, including but not limited

22  to asbestos, the right to have the creditors -- remember this

23  is a bankruptcy case.  We're talking about creditors.  The

24  insurers aren't creditors.  My clients are creditors, and

25  they're looking to this insurance under this plan for the

1    recovery of their share of the debtor's assets available to pay

2    all creditors, and their share has been identified by agreement

3    as insurance.  And the insurers' basic position is that this

4    Court can't do that because of a parade of horribles that they

5    dream up about broad preemption and dealing with the PG&E case,

6    which is inconsistent with Combustion Engineering, and which

7    violates the Supreme Court's rule about you don't read language

8    into statutes that doesn't exist like the Lamey case, for

9    example, in determining who gets paid in a Chapter 7 case,

10   where the Supreme Court acknowledged there was a drafting

11   oversight, et cetera, but said this is what the language of the

12   statute says, and we can't rewrite it because we think Congress

13   got it wrong.  Well, if Mr. Roten's right, which I doubt,

14   nevertheless, there is no reason to believe that the Supreme

15   Court is going to allow the Ninth Circuit to rewrite 1123(a)(5)

16   by reading in a relating to financial condition point anymore

17   than the Supreme Court allowed it in Lamey or going to violate

18   the rule of Ron Pear Enterprises.

19         And so the bottom line here is that this simply --

20   this question of who's got the right to sue hasn't been

21   briefed, hasn't been the subject of objection, is being made

22   the subject of free form argument sort of on the spot here,

23   when nobody's ever really kind of focused on the issue before,

24   and my view is, frankly, that it is sort of an inherent

25   attribute of the right to benefit from this insurance, that --

103

because the trust, after all, has these liabilities, and if it

doesn't have the ability to access that insurance, then it

doesn't have very much in the way of rights associated with it.

But at the end of the day, I suspect that that's a question of

form over substance, because I don't think that a State Court

under these circumstances is likely to accept the notion of

you've got the rights, but you can't sue.  But in any event, I

suggest that if the insurers wanted to raise this as an

objection to confirmation of this plan, it's way late in the

day to do it now, and as -- and it's inconsistent with the

stipulation that was entered into and the briefing that's been

done on this point.

MR. CHRISTIAN:  Excuse me, Your Honor.  David

Christian on behalf of CNA.  I think Mr. Lockwood's

1123(b)(3)(b) argument is adequately resolved and reserved

pursuant to our stipulation and the way the plan now reads, and

I just want to put that on the record so that if somebody else

in the room, including Your Honor, reads the plan differently,

we can make sure that we either figure out how we disagree or

figure out how we agree about that.

Your Honor quite rightly noted in your exchange with

Mr. Roten that who is suing the insurance companies may indeed

give rise to a coverage issue, but that that's not what's

before you and that's not what you're deciding.  And indeed

Section 5.1G of the plan, after citing Section 1123(b)(3) and

1  making reference to the possibility that the funding vehicle

2  trust may be appointed as an estate representative, goes on to

3  note as follows:  "Such PI insurance coverage action shall be

4  so vested free and clear of all liens, security interests, and

5  other claims or causes of action, except for PI insurance

6  coverage defenses or as otherwise provided in the plan."

7            Consistent with that, our stipulation approved by

8  the Court and Section 5.6 of the amended plan provides as

9  follows:  "Nothing in the plan, any exhibit to the plan, the

10  confirmation order, any finding of fact and/or conclusion of

11  law with respect to the confirmation of the plan shall limit

12  the right of any PI insurance company in any PI insurance

13  coverage action to assert any PI insurance coverage defense."

14            I think those matters, taken together, adequately

15  reserve our argument that if the plaintiffs or a trust

16  controlled by the plaintiffs or a trust allowing claims

17  pursuant to procedures that are inconsistent with our insurance

18  contracts and applicable non-bankruptcy law gives rise to a

19  coverage defense, we are free to argue that, and this plan and

20  the confirmation order don't prejudice that argument under

21  applicable non-bankruptcy law.  You know, and if Mr. Lockwood

22  wants to argue, or somebody else wants to argue, in that forum

23  at that time that those defenses have been taken away, by

24  operation of law somehow I suppose they can do that, but that's

25  not being adjudicated by this plan or by Your Honor.

1          THE COURT:  Well, that was my understanding, too.

2          MR. CHRISTIAN:  Thank you, Your Honor.

3          THE COURT:  Okay.  Mr. Gordon?

4          MR. GORDON:  I rise, Your Honor, because I want to

5    clarify something here.  This is very frustrating for me to

6    listen to this because this is all -- not only is this an

7    objection that was not raised before, it's not permitted by the

8    stipulation.  We spent literally hours negotiating with the

9    insurers a stipulation that really did two fundamental things.

10   It clarified the plan in a number of respects which made them

11   feel better that the plan was insurance neutral, although we

12   felt it was insurance neutral from the beginning.  But rather

13   than fight about that and go through discovery and waste this

14   Court's time, we said, fine, we'll make changes -- and I want

15   to go over some of the changes -- we'll make changes to the

16   plan to make it absolutely crystal clear, but at the same time

17   we also want clarity as to what issues this Court should

18   consider as part of confirmation and what issues should be

19   reserved for the coverage litigation, because neither side

20   wants to be in a position where there is some uncertainty as to

21   what gets litigated where.  And that stipulation was very

22   comprehensive, Your Honor.

23          And I think that one of the keys here that people are

24   just ignoring completing and they're making arguments that are

25   completely inconsistent, is Paragraph 3 of the stipulation,

1  which Your Honor approved.  It's signed off by everybody who's

2  here.  And it says that "The insurers' objections, if any, to

3  the plan shall be limited to the following legal issues:  (a)

4  whether under the Bankruptcy Code, as a matter of law, the

5  assignment is valid and enforceable against the insurers,

6  notwithstanding the anti-assignment provisions of the policies

7  and applicable state law," and then two is whether the plan

8  complies with Bankruptcy Code Sections 524(g)(2)(b)(1)(2) and

9  then (3).  There's nothing in here about objecting to Section

10  5.1.G of the plan or anything about --

11        THE COURT:  Well, Mr. Gordon, I think I raised that

12  because I didn't understand Mr. Roten's argument with respect

13  to -- I just didn't understand where the argument was going.  I

14  don't see the assignment of the right to proceeds to be the

15  same as the issue of who has the beneficial interest so as to

16  be a real party in interest in pursuing litigation, and --

17        MR. GORDON:  My --

18        THE COURT:  Okay.  So --

19        MR. GORDON:  And I understand.  My only point is, we

20  are where we are -- I mean the consequences from their actions

21  or inactions in terms of what happens in the State Court are

22  whatever they are, and we shouldn't be trying to have a

23  re-litigation or re-argument about what issues are decided

24  here, what issues aren't.  They were limited to that legal

25  issue with respect to the transfer.  They have briefed that.

1  We have responded.  We thought their arguments had no merit,

2  and Your Honor, as I understand it, has overruled that

3  objection, and if they want to go into State Court, it seems to

4  me, and say that even though the trust is responsible

5  ultimately for sending proceeds to the claimants, and under the

6  plan that trust was given the authority to prosecute the

7  coverage litigation, if they want to go into State Court and

8  say that notwithstanding that for some reason that trust isn't

9  a plaintiff, they're right, there's nothing in here that says

10 they can't do that.  For the life of me, I don't know why a

11 court would sanction that kind of argument.  But it's not

12 addressed.

13         I mean, this stipulation is very specific.  The plan

14 changes are very specific.  We covered things, Your Honor, that

15 you had raised, issues about UNR, Fuller-Austin.  We expressly

16 provided for how the plan would relate to issues like that.

17 It's very, very clear now.

18         And I just rise to say, Your Honor, we just should

19 not be trying to reargue that or changing this understanding in

20 anyway.  It is whatever it is.  They're objections were

21 limited, and that will have whatever effect it has in terms of

22 the State Court litigation.

23         THE COURT:  All right.  Mr. Roten?

24         MR. ROTEN:  Thank you, Your Honor.  I have a very

25 brief response to my friend, Mr. Lockwood.  His

1  characterization of my argument as poppycock just made me have

2  to get up and say something.  We have never argued at any point

3  that it isn't possible to move anything out of the estate.  We

4  have never argued that once in the estate, always in the

5  estate.  We've never -- we didn't -- I didn't say that today.

6  It's not in our papers.  We don't interpret Combustion

7  Engineering to say that.

8          We are not, as Mr. Lockwood said, just trying to lock

9  everything up and stop this confirmation and not let these

10  insurance proceeds be moved or anything like that.  That's not

11  even what we're here for today.

12          Why are we here?  We're talking about preemption

13  under 1123(a)(5).  That's the subject matter today.  Does the

14  Bankruptcy Code preempt it and does, therefore, 1123(a)(5)

15  allow assignment in the teeth of the anti-assignment provision?

16  We say no, there's no preemption.  That's all we say.  It

17  doesn't -- we're not saying that therefore this Court should go

18  on and make a finding under state law as to whether or not the

19  policies are assignable.  That's why his characterization as

20  poppycock is nothing but poppycock.

21          We want the State Court to decide.  That's the whole

22  point.  Judge, this was on summary judgment -- on for summary

23  judgment in the State Court case.  It would have already been

24  decided by now, except they came in and stayed it because they

25  don't want the State Court to rule because they think they're

1  going to --

2       THE COURT:  Well, frankly, I don't think the State

3  Court can rule because to that extent, to the extent that the

4  issue is whether or not the Federal Bankruptcy Court in Section

5  1123(a)(5) permits the debtor to transfer assets of the estate

6  to a third party created after the estate was formed, I think

7  that's a federal issue.  It's clearly driven by 1123(a)(5).  To

8  the extent that I said I don't see a preemption issue, I guess

9  what I mean is I don't see anything in the statute that could

10 be more clear that this is a federal issue that should be

11 determined during a plan confirmation process because it's a

12 requirement of the plan.  Frankly, I don't think the State

13 Court has jurisdiction to make that determination when there is

14 a Chapter 11 case going to confirmation.

15      MR. ROTEN:  I'm not making that argument.  All I'm

16 saying is, we are not resisting the eventual determination of

17 what happens to these insurance policy rights.  We're not

18 resisting that.  We're just saying this Court shouldn't make

19 that determination.

20      THE COURT:  Okay.

21      MR. ROTEN:  We're saying the Bankruptcy Code does not

22 give this Court the authorization to make that, because the --

23 of the limitations that we've made in our argument.  So we're

24 not saying what Mr. Lockwood said.  We're just saying the wrong

25 judge is making the determination.  It's a State Court issue,

110

1  and a Bankruptcy Court doesn't have the authority to override

2  state law.

3          THE COURT:  All right.

4          MR. ROTEN:  That's our argument.

5          THE COURT:  With respect to that, I think it's a

6  Bankruptcy Court issue as to which the State Court does not

7  have jurisdiction because it deals with property of the estate

8  of which this court has both original and exclusive

9  jurisdiction, based on the fact --

10          MR. ROTEN:  I'm not arguing --

11          THE COURT:  -- that there is --

12          MR. ROTEN:  I'm not opposing that, Your Honor.

13          THE COURT:  Okay.  And therefore, since it's a

14  property of the estate issue and 1123(a)(5) talks about what

15  the debtor in a plan shall do with its property, one of the

16  things of which is that it may transfer some of that property

17  to another entity, that is a federal issue set forth clearly in

18  1123(a)(5) as part of a bankruptcy process, and in that respect

19  is properly within the core jurisdiction of this court and no

20  other.  So, I am overruling the objection on that basis as

21  well.

22          MR. ROTEN:  I understand, Your Honor.

23          THE COURT:  Okay.  All right, I think this issue has

24  been determined.  The issue as I see it was whether or not the

25  assignment of -- no, pardon me.  I don't want to use the word

1  "assignment."  Let me go back to the definition.  Whether under

2  the definition in Subsection 145 of EI, Insurance Assets, which

3  is defined in Part A to include the rights to receive proceeds,

4  can be put into the trust as part of the trust funding, and I

5  find under 1123(a)(5) that it certainly is an appropriate thing

6  for the debtor to do.  So let's get on to the 524 issues.

7          MR. DeJONKER:  Good morning, Your Honor, Jason

8  DeJonker again for the CNA Service Mark Companies.  I'm going

9  to keep my comments fairly short because I think our briefs,

10  both the original objection and the reply, adequately address

11  our positions with respect to 524(g) issues.  I think these are

12  issues that were specifically preserved by the stipulation

13  which has been the subject of much discussion this morning.  I

14  think the standing argument is kind of a red herring in this

15  case.  Your Honor has to make these findings whether or not the

16  plan complies with Section 524(g) irregardless of whether or

17  not we have standing, as Mr. Lockwood would say, on that issue.

18          I don't think there's any real disagreement on the

19  facts and on the substance of what's being contributed here,

20  and I don't think that -- I think that the real issue here is

21  -- well, there are really two issues here.  First, it's the

22  idea or the interpretation of the term "each such debtor" as

23  it's contained in Subsection 3, Romanette 3, of the Section

24  524(g) provision, and whether this plan complies with the

25  congressional intent behind section 524(g) Subsection 2 and

112

Subsection 3.  As I think we state ad nauseam in our briefs,

this plan does not comply with the intent from the insurers'

standpoint.  It doesn't provide an Evergreen source of funding.

It doesn't provide the goose that laid the golden egg, as

discussed in the congressional record in enacting Section

524(g).  And I would also say that this plan doesn't provide a

contribution that complies with Subpart 3 to the extent that

each such debtor refers to all of the debtors here that are

seeking Section 524(g) relief.

Generally, the contribution that's being made here,

the Kaiser Trading contribution, has been engineered in this

case so as to comply with Section 524(g).  Again, I don't think

the debtors will disagree with that, and I don't the ACC will

disagree with that.  The entity didn't have assets before the

case was filed, or it had minimal assets.  The assets that are

being transferred to it, which is property located in

Louisiana, have some value.  I don't disagree that there is

some value and that they may provide a small Evergreen source

of funding going forward, but the 3.5 to $3.7 million that is

being contributed by that asset pales in comparison to the

proposed asbestos liability for the debtors, which I believe is

in excess of a billion dollars according to the ACC.

So for those reasons, Your Honor, we don't believe

that the contributions being proposed here comply with Section

524(g).

**J&J COURT TRANSCRIBERS, INC.**

113

1            THE COURT:  Okay.

2            MR. DeJONKER:  Do you have any -- did you have any

3    questions?

4            THE COURT:  No, I understood your argument.  Thank

5    you.

6            MR. DeJONKER:  Okay, thank you.

7            MR. GORDON:  Greg Gordon again on behalf of the

8    debtors.  Your Honor, first of all, with respect to the issue

9    of standing, I don't understand by Mr. DeJonker would indicate

10   that that's a red herring argument.  I did see in the brief

11   that there was a suggestion that by entering into the

12   stipulation the parties basically stipulated in effect that the

13   insurers had standing to raise the issue, and that's a gross

14   misreading of the words of the stipulation.  That's entirely

15   contrary to the intent of the stipulation.  All the stipulation

16   intended to do was to set the outer boundaries of what

17   objections can be pursued and no others.  I did not address at

18   all what defenses could or could not be made by the plan

19   proponents or asserted by the plan proponents with respect to

20   those issues.  And it's -- to me it's unequivocal that the

21   insurers lack standing to come into this court and challenge

22   the nature of contributions being made to the trust for benefit

23   -- for the benefit of claimants.  They're not entitled.  They,

24   the insurers, are not entitled to any distributions from those

25   trusts, and under a variety of standards, Your Honor, we've

1 laid them all out in detail in the briefs.  They simply do not

2 have standing.

3         In <u>Combustion Engineering</u>, the Third Circuit, right

4 near the end of the opinion, said exactly the same thing with

5 respect to the insurers when it raised the going concern

6 requirement.  The court said these insurers do not have

7 standing to raise that issue.  And it's the same here, Your

8 Honor, with respect to these subsections of 524(g) as well.  I

9 mean, I'm prepared to discuss that issue in more detail, Your

10 Honor, and I'll go on and address the substance as well, but,

11 to me, there is just no question that they lack standing.  They

12 have absolutely no economic or pecuniary interest whatsoever in

13 the amount of contributions to the trust that the

14 representatives of the claimants, who are the ultimate

15 recipients of those funds, are willing to accept.  They

16 overwhelmingly accepted the plan.  The individuals who voted

17 overwhelmingly accepted the plan.  There were no -- there was

18 not a single objection filed by a claimant with respect to any

19 aspect of the plan, including the contributions to the trust,

20 and I don't think the insurers have any right whatsoever to

21 raise arguments like that on behalf of claimants when the

22 claimants could have raised those arguments themselves and did

23 not.

24         Now, in terms of 524(g) itself, Your Honor, I think

25 as our brief points out, we literally comply with the terms of

1  the two subsections that the insurers are focused on.  I always

2  have to have my code with me on this one because 524(g) gives

3  me a headache.  And, you know, whether that's engineered as

4  not, as indicated by Mr. DeJonker, I don't know, but certainly

5  we considered when we put together the structure of the plan in

6  conjunction with the representatives of the tort claimants

7  whether what we were proposing would comply with the literal

8  terms of 524(g).  So in that respect, yes, we did engineer the

9  plan.  I guess that's what we were intending to do was

10  literally meet the requirements.  And if you look at the

11  subsections in issue, 524(g)(2)(b)(1), first it's Roman Numeral

12  2, "The trust is to be funded in whole or in part by the

13  securities of one or more debtors involved in such plan and by

14  the obligation of such debtor or debtors to make future

15  payments, including dividends."  Well, we've done just that.

16  We're proposing to contribute 94 percent of the stock of Kaiser

17  Trading and approximately six percent of the stock of

18  reorganized KAC.  Those are two debtors that are participating

19  in the plan.  They are both funding the trust with securities.

20  We have one or more debtors involved in such plan, and those

21  shares obviously carry with them rights to dividends, as shares

22  typically do.  To the extent that dividends are declared in the

23  future, they would have to be paid in connection with the

24  ownership of those shares.  So, from our perspective, there is

25  absolutely no question whatsoever that we literally comply with

1 Section 2.

2       Now, the insurers have made arguments about, well,

3 the stock, the value of the stock is de minimis compared to the

4 asbestos liabilities and the like, and you heard it to a

5 certain extent today, but there is no language in here, in the

6 statute, that suggests there has to be any minimum valuation

7 amount or requirement.  Congress could have put something in

8 this section.  It could have said something about the relative

9 size of the value of the stock versus the sizing of the

10 liabilities.  It says no such thing.

11       The more practical point, however, Your Honor, I

12 think is from my way of thinking it doesn't make sense just to

13 focus on one component of the overall funding of the trust.  As

14 we've said a number of times today, there are other components

15 of the consideration.  There is the $13 million in cash.  There

16 is the cash from the settlements.  There's $14 million already

17 in place.  There are settlements lined up to bring in another

18 $375 million over time, and then there are the rights to

19 proceeds to the remaining insurance policies whose face amount

20 aggregates over a billion dollars.

21       Contrast that, Your Honor, to what the unsecured

22 creditors are getting in the case.  They're basically getting

23 shares of equity in reorganized KAC, and what's the value --

24 what's the expected reorganization value of KAC -- or expected

25 actually equity value?  It's $380 million.  So $380 million

117

1    that's going to those constituents.  Here we're talking about a

2    total package of consideration for the asbestos claimants and

3    other tort claimants substantially in excess of that.  So even

4    if there were some sort of valuation requirement, a minimum

5    value requirement, I would submit that it's satisfied under any

6    measure you could think of that would be a reasonable measure.

7         And then, Your Honor, when you go on to the next

8    subsection, Roman Numeral 3, it says the trust is to own, or by

9    the exercise of rights granted under such plan would be

10   entitled to own, if specified contingencies occur, a majority

11   of the voting shares of each such debtor -- in the case of

12   Kaiser Trading that's 94 percent -- the parent corporation of

13   such debtor, a subsidiary of each such debtor.  In the case of

14   KAC, again, it's 94 percent of Kaiser Trading, which is a

15   subsidiary of KAC.  So, again, as we look at Section 3, as we

16   did with Section 2, the plan literally complies in every

17   respect with those sections.

18        That really is the sum and substance of the argument,

19   Your Honor.  You know, obviously, there were points raised by

20   the insurers about the assets included with Kaiser Trading.  We

21   tried to provide specificity to the Court in Mr. O'Dowd's

22   affidavit is to precisely what those assets are, what cash is

23   generated, what the estimated value of those assets is, and we

24   think we literally complied with the words.  We think we've

25   addressed any other concerns about minimal value and the like,

1 and otherwise we comply in all respects with 524(g).

2          THE COURT:  Okay.  I think the only issue that I can

3 recall offhand that you have not addressed, and maybe it was in

4 the creditors' committee's response, is about whether or not

5 the fact that this is an indirect subsidiary as opposed to a

6 subsidiary is relevant.

7          MR. GORDON:  I didn't address that, Your Honor, but I

8 think the response is there is nothing in 524(g) that says it

9 has to be a direct subsidiary, and I don't know what the

10 functional difference would be.  Kaiser Trading is a direct

11 subsidiary of Kaiser Aluminum & Chemical Corporation, which is

12 a direct subsidiary of Kaiser Aluminum Corporation.  You know,

13 the insurers had proposed that basically all debtors have to

14 issue securities or issue stock in respect of -- you know, to

15 meet these requirements, which would -- that would contemplate

16 breaking down the entire corporate structure, which doesn't

17 make sense.  That's the corporate structure that the company

18 has.  It is a subsidiary.  I don't see any requirement in the

19 Code that indicates it has to be a direct subsidiary.

20          THE COURT:  Okay.

21          MR. GORDON:  Thank you, Your Honor.

22          THE COURT:  Ms. Beckerman?

23          MS. BECKERMAN:  I'm just going to supplement a little

24 bit of what Mr. Gordon said, because I think he covered most of

25 the points.  Your Honor, first thing is we were not a party to

1   that stipulation, as Your Honor knows, and therefore if there

2   -- we did raise the standing issue, Your Honor, in our papers.

3   I don't think even if you read the stipulation the way that the

4   insurers are reading it, we're precluded from raising the

5   standing issue.

6        So, I just wanted to note that, Your Honor, I agree

7   with the remarks Mr. Gordon made about what <u>Combustion</u>

8   <u>Engineering</u> says about who has standing to raise this issue.

9   I, you know, personally believe that the -- only the parties

10  that would be affected by the 524(g) process would be the

11  parties to raise that.  None of those parties, as Mr. Gordon

12  said, have raised it.  And in addition, I would draw Your

13  Honor's attention to the <u>ABI</u> case, which also had the same

14  issue, and similarly determined that there was no standing for

15  the insurers.  So I don't believe that even if the insurers are

16  right that the debtor was precluded from raising this.  We

17  weren't, and we've raised it, and therefore we don't think they

18  have standing.  But nevertheless I am going to address the

19  merits of the argument.

20       Your Honor, I agree with Mr. Gordon's statements that

21  there is nothing here that requires anything beyond the fact

22  that the stock that's being contributed for KAC and Kaiser

23  Trading to the asbestos PI trust provide anything beyond

24  dividends.  It doesn't require some ongoing Evergreen, large

25  amounts of payments that have to come in.  The statute

**J&J COURT TRANSCRIBERS, INC.**

120

1   literally is very clear, and it includes dividends as one of

2   those possibilities.  We're talking about two entities that

3   will have -- will have cash flow are operating entities.

4           This not the same situation here in both cases that

5   you're discussing with the Combustion Engineering decision,

6   Your Honor.  Here we have -- there's also stock of KAC that's

7   going into it.  Your Honor knows KAC is a large corporation.

8   It has 12 operating plants.  It has significant employees.

9   It's a going concern, and it obviously has real value.  In

10  addition, the Kaiser Trading entity has a lease.  It has cash

11  flow.  It's an operating entity.

12          And, again, Your Honor, we think that this is not a

13  situation where the company has designed a plan that in any way

14  does not fit the standards of 524(g)(2)(b)(1)(2).  I don't

15  think there's a valuation requirement, but I agree with Mr.

16  Gordon's remarks, and our papers have actually addressed that

17  point, that if actually compare the recoveries that unsecured

18  creditors are getting under this plan, which for the general

19  unsecured trade creditors in this case is 2.9 cents, I think it

20  would be hard to argue that there isn't significant value going

21  into the trust or that when you look at the whole of what's

22  being distributed in the plan what's going to the trust isn't

23  fair.

24          Your Honor, with respect to the issue that was raised

25  on 524(g)(2)(b)(1)(3), which I think Mr. Gordon has also

**J&J COURT TRANSCRIBERS, INC.**

1  largely addressed our comments, you raised a point about what

2  was in our papers.  I think what we were pointing out to Your

3  Honor is that we actually think that the plan complies both

4  with 524(g)(2)(b)(1)(3), arguably AA and also CC, because what

5  we were saying is that in this case we have consideration

6  that's actually coming from two debtors here.  We have the

7  stock that's coming, majority of shares of KAE Trading, and

8  that in addition that Kaiser Trading Corporation is also

9  falling under the CC because it is a subsidiary of the debtor.

10 So, in other words, it is a debtor itself, and in addition it

11 is a subsidiary of the debtor that's -- who is also giving

12 addition shares, i.e., KAC, the main reorganizing parent

13 company, and it is an indirect subsidiary.  We agree with Mr.

14 Gordon's remarks but we don't think that the subsidiary has to

15 be a direct subsidiary.  The insurers are arguing that

16 basically it has to be either every entity or arguably

17 everybody has to be a subsidiary of KAC for that to work, and I

18 don't believe that's what Congress intended, and that was

19 really the point of our argument, that it falls under -- in

20 connection with several provisions of the statute, that we

21 think that the company's plan actually satisfies several

22 provisions because you could read it to fall within either of

23 those two provisions, and that was really the point that we are

24 making.

25        In addition, we obviously agree that Mr. Gordon's

**J&J COURT TRANSCRIBERS, INC.**

122

1   view of the statute and the way that this process was designed

2   is correct.  We certainly did -- all the parties involved

3   negotiate to make sure we were proposing a plan that we felt

4   satisfied all the provisions, and I think for the reasons that

5   I've articulated on the record, and Mr. Gordon has articulated

6   it, satisfies both those provisions of the statute, and

7   therefore I think the insurers' objection should be overruled.

8          THE COURT:  Okay.  Well, with respect to the issue

9   about what each such debtor means, Romanette 3 says, "Is to

10  own, or by the exercise of rights granted under such plan,

11  would be entitled to own, if specified contingencies occur, a

12  majority of the voting shares of" -- AA is each such debtor, BB

13  is the parent corporation of each such debtor, and then it

14  says, "Or CC, a subsidiary of each such debtor that is also a

15  debtor, and" -- and then it goes on to other Romanettes.

16         MS. BECKERMAN:  That's correct.

17         THE COURT:  So, I think it's an "or," it's not an

18  "and," --

19         MS. BECKERMAN:  That's correct, Your Honor.  We are

20  just suggesting that it could -- it satisfies, in our opinion,

21  arguably even two provisions of that or, and therefore we are

22  saying that it clearly satisfies the standard of the Code.

23         THE COURT:  Okay.  Well, I don't --

24         MS. BECKERMAN:  That was really our argument.

25         THE COURT:  I don't think that the Code requires that

**J&J COURT TRANSCRIBERS, INC.**

123

1   each such debtor contribute because the statute specifically

2   says that it can be each such debtor or the parent or a

3   subsidiary.

4           MS. BECKERMAN:  You're correct, Your Honor, of

5   course.

6           THE COURT:  Mr. Gordon?

7           MR. GORDON:  Your Honor, if I could clarify that?

8   Remember that in two there are two debtors --

9           THE COURT:  Yes.

10          MR. GORDON:  -- that are issuing securities, and so

11  we need to meet that requirement in three as to each of those

12  two debtors.

13          THE COURT:  Oh, yes.

14          MR. GORDON:  And so double A would apply to Kaiser

15  Trading, and Double C would apply to Kaiser Aluminum

16  Corporation.  That's why we are both saying we've complied with

17  both Double A and Double C, because we have two entities for

18  which we have to meet that requirement.

19          THE COURT:  Okay, yes.  I understood that, but thank

20  you for clarifying the record.  Anyone else?  Okay.  I think

21  the objection has to be overruled for the reasons which I've

22  just articulated.  I think the debtor and the creditors'

23  committee's interpretation of the statute is the correct

24  interpretation.  Mr. Gordon?

25          MR. GORDON:  Those are all the objections, Your

**J&J COURT TRANSCRIBERS, INC.**

124

1   Honor, and we would request that the Court confirm the plan.

2          THE COURT:  Okay.  Well, I need to consider the Law

3   Debenture objection tomorrow --

4          MR. GORDON:  Right.

5          THE COURT:  -- which I will do.  With respect to

6   proposed findings and the confirmation order, none of either

7   the order or the proposed findings cite to the record in

8   anyplace, not the affidavit -- declarations or anything, and

9   frankly that's not going to do much good.  I need you to redo

10  the proposed findings and the confirmation order with the

11  citations to record, and frankly I think it would be good,

12  where appropriate, to get the transcript from today and cite to

13  that as well.

14         MR. GORDON:  Your Honor, in that respect, we actually

15  have already prepared a nother version that cites to the

16  declarations.  Obviously, we don't have the transcript yet, but

17  we can do that.

18         THE COURT:  Okay.  But, again, I need to get through

19  the Law Debenture objection tomorrow.  I'm not sure that the

20  Law Debenture objection will have to prohibit confirmation.  It

21  seems that if the Law Debenture objection is well founded,

22  there has to be a different distribution scheme perhaps than

23  the debtor has proposed with respect to who gets the fees at

24  the outset, but I'm not sure that that prohibits confirmation

25  of this plan.  Am I --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GORDON:  I think that's right, because I think if

2     there objection were sustained then what it would mean is is

3     that a distribution to unsecured creditors -- to the senior

4     subordinated noteholders that right now the plan provides goes

5     directly to the senior noteholders would instead pass through

6     the indenture trustee for the senior subordinated noteholders,

7     and presumably their charging lien would be applied, and I

8     imagine that would all be used up.  But it would just be a

9     matter of adjusting the distribution mechanism.

10          THE COURT:  Okay.  So maybe we're in a position -- is

11     --

12          MS. MOSS:  Your Honor, we have no objection t the

13     entry of an order.  I think the issue is preserved.

14          THE CLERK:  You need to put that on the mic, please.

15          MS. MOSS:  I'm sorry.

16          THE COURT:  Ms. Moss?

17          MS. MOSS:  Thank you, Your Honor.  We have no

18     objection to the entry of the confirmation order.  I think the

19     issue is preserved as well, the distribution issue.

20          THE COURT:  Okay.  Then maybe you folks can work on

21     the findings of fact and conclusions of law and an order that

22     will confirm the plan with citations to record, and we -- I can

23     still address this issue tomorrow.  I'm sure -- well, I'm not

24     sure, but it's not likely you're going to have those things

25     filed by tomorrow anyway.

**J&J COURT TRANSCRIBERS, INC.**

126

1          MR. GORDON:  Okay.  Well, I guess we'll have to make

2     arrangements to try to get the transcript as quickly as we can

3     so we can do that.

4          THE COURT:  Okay.  Okay.  Are there any other

5     objections that I have not addressed?

6          MR. WINIKKA:  Your Honor, Dan Winikka for the record

7     again.  There was one other issue raised by one of the

8     insurance companies, Insurance Company of North America,

9     related to their rights under a reinsurance agreement with

10    another insurance company.  I think we've reached an agreement

11    on how to resolve that, but we haven't yet fully vetted it with

12    the asbestos committee, so I would expect that after we

13    conclude here today we can do that and probably just include

14    the sentence in a confirmation order that will resolve that, if

15    that's okay with counsel for the Insurance Company of North

16    America.

17         THE COURT:  Okay.  Well, why don't you let me know

18    what that is tomorrow?

19         MR. WINIKKA:  Yes, we can do that, Your Honor.

20         THE COURT:  Okay.  Anything else?  Well, I bet when I

21    first got assigned all these asbestos cases that if there was

22    one case that wasn't going to get confirmed because of the

23    financial condition of the debtor, it was going to be this one.

24    So, congratulations.  You've done a smashing job.  I'm very

25    pleased that the case is coming out and will actually be an

**J&J COURT TRANSCRIBERS, INC.**

127

1  ongoing concern.  So, I think you did a wonderful job getting

2  the issues resolved.  Some of them were very significant.  And

3  that applies to everybody, so -- even the insurance companies.

4       Okay, I'll take on the issue of Law Debenture with

5  the distribution sequence tomorrow and see what we can do, but

6  I will enter an order that confirms the plan, but I think I've

7  given you your marching orders.  Okay, what time do you want to

8  start tomorrow?

9       MS. BECKERMAN:  I think it's scheduled to start with

10  9:00, and there are other people coming for the stay argument,

11  Your Honor, at that time.  So I think we need to keep to that.

12       THE COURT:  All right.  And you're not going to need

13  the 11th then, correct?

14       MS. BECKERMAN:  No.

15       THE COURT:  Okay.  Good.  We're adjourned.  Thank

16  you.

17       UNIDENTIFIED ATTORNEYS:  Thank you, Your Honor.

18       MR. GORDON:  Oh, I'm sorry.  The 11th was another

19  day.  Was that an additional day --

20       THE COURT:  In case we needed it.

21       MR. GORDON:  -- for the matters tomorrow?

22       THE COURT:  Yes.

23       MR. GORDON:  Because we also have that telephonic

24  hearing on the 12th.

25       THE COURT:  Yes.

**J&J COURT TRANSCRIBERS, INC.**

1          UNIDENTIFIED ATTORNEY:  Yes, we know that.

2          MR. GORDON:  Although we have a hearing in District

3   Court in Wilmington you may be aware of where Clark sought a

4   stay with respect to that, so we'll have to let Your Honor know

5   what happens in Delaware.

6          THE COURT:  Okay.  Well, with respect to the argument

7   on the 12th, if you want to do it tomorrow, if you can get the

8   parties lined up, I don't think your -- I don't think the

9   proceedings tomorrow will --

10         UNIDENTIFIED ATTORNEY:  Clark's counsel left, Your

11  Honor, so I don't think that's possible.  He's --

12         THE COURT:  Okay.

13         MR. GORDON:  Your Honor, we'd love to do it tomorrow,

14  but they filed a motion for stay in the District Court, and the

15  District Court has set the argument on that stay for Wednesday

16  morning.

17         THE COURT:  Oh, I'm sorry.  I thought you were saying

18  that the argument was Thursday and so there was going to be a

19  problem with the argument on the --

20         MR. GORDON:  The argument with you is Thursday.

21         THE COURT:  Is Thursday, right.

22         MR. GORDON:  But there's an argument Wednesday in the

23  District Court in Delaware as to whether we can proceed on

24  Thursday with the --

25         THE COURT:  Oh, okay, fine.  Maybe they'll decide

129

1 not.

2          MR. GORDON:  So we'll let you know on Wednesday as

3 soon as we know, Your Honor.

4          THE COURT:  Okay, thank you.

5                      * * * * *

6                C E R T I F I C A T I O N

7          We, PATRICIA REPKO and DENISE M. O'DONNELL, court

8 approved transcribers, certify that the foregoing is a correct

9 transcript from the official electronic sound recording of the

10 proceedings in the above-entitled matter, to the best of our

11 ability.

12

13 /s/ Patricia Repko

14 Patricia Repko

15

16 /s/ Denise M. O'Donnell

17 DENISE M. O'DONNELL

18 J&J COURT TRANSCRIBERS, INC.        Date:  January 12, 2005

19

20

21

22

23

24

25

                 **J&J COURT TRANSCRIBERS, INC.**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 02-10429(JKF)
                                .
                                .
 KAISER ALUMINUM CORPORATION,   . USX Tower - 54th Floor
   et al.,                      . 600 Grant Street
                                . Pittsburgh, PA 15219
                   Debtors.     .
                                . May 2, 2005
. . . . . . . . . . . . . . . . 9:12 a.m.


TRANSCRIPT OF TELEPHONIC HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For Debtors:                 Richards, Layton & Finger, P.A.
                             By:  DANIEL DeFRANCESCHI, ESQ.
                                  EDWARD HUFF, ESQ.
                             One Rodney Square
                             920 N. King Street
                             P.O. Box 551
                             Wilmington, DE 19899

                             Jones Day
                             By:  DANIEL P. WINIKKA, ESQ.
                                  GREGORY GORDON, ESQ.
                             2727 North Harwood Street
                             Dallas, TX  75201


Audio Operator:              Janet Kozloski


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

2

```
APPEARANCES (Cont'd.):

For the Debtors:            Weil, Gotshal & Manges LLP
                            By:  GEORGE A. DAVIS, ESQ.
                            767 Fifth Avenue
                            New York, NY  10153

For Law Debenture Trust     Monzack and Monaco, P.A.
Trust Co. of New York:      By:  FRANK A. MONACO, ESQ.
                            400 Commerce Center
                            Twelfth & Orange Streets
                            Wilmington, DE  19899

                            Pryor Cashman Sherman & Flynn LLP
                            By:  TINA MOSS, ESQ.
                                 SALLY SICONOLFI, ESQ.
                            10 Park Avenue
                            New York, NY  10022

                            Bingham McCutchen, LLP
                            By:  EVAN D. FLASCHEN, ESQ.
                                 GEORGE NYE, ESQ.
                            One State Street
                            Hartford, THE COURT: 06103

For The Liverpool Limited   Stutman, Treister & Glatt
Partnership:                By:  K. JOHN SHAFFER, ESQ.
                            3699 Wilshire Blvd., Suite 900
                            Los Angeles, CA  90010

                            Potter, Anderson & Corroon, LLP
                            By: DAVID J. BALDWIN, ESQ.
                            Hercules Plaza
                            1313 North Market Street
                            Wilmington, DE 19801

For Anne M. Ferazzi:        Stutzman, Bromberg, Esserman
                              & Plifka, PC
                            By:  PETER C. D'APICE, ESQ.
                                 JACOB NEWTON, ESQ.
                            2323 Bryan Street
                            Suite 2200
                            Dallas, TX  75201
```

3

APPEARANCES (Cont'd.):

```
For Martin J. Murphy, Legal      Young Conaway Stargatt & Taylor,
Representative for Future         LLP
Asbestos Claimants:              By:  SHARON ZIEG, ESQ.
                                 The Brandywine Building
                                 1000 West Street
                                 17th Floor
                                 P.O. Box 391
                                 Wilmington, DE  19899

For Official Committee of        Akin, Gump, Strauss, Hauer &
Unsecured Creditors:              Feld, L.L.P.
                                 By:  LISA G. BECKERMAN, ESQ.
                                 590 Madison Avenue
                                 New York, NY  10022

For Personal Injury              Caplin & Drysdale, Chartered
Committee:                       By:  RONALD E. REINSEL, ESQ.
                                 One Thomas Circle, N.W.
                                 Washington, DC  20005

                                 Campbell & Levine, LLC
                                 By:  MARK T. HURFORD, ESQ.
                                 800 N. King Street, Suite 300
                                 Wilmington, DE  19801

For HSBC Bank:                   Kelley Drye & Warren LLP
                                 By:  DEBRA SUDOCK, ESQ.
                                 101 Park Avenue
                                 New York, NY  10178

For FM Insurance Co.:            Sonenschein Nath & Rosenthal
                                 By:  ANDREW LEDERMAN, ESQ.
                                 1221 Avenue of the Americas
                                 New York, NY  10020

For Alcan Aluminum:              Morris, James, Hitchens &
                                  Williams, LLP
                                 By:  CARL N. KUNZ, III, ESQ.
                                 PNC Bank Center
                                 222 Delaware Avenue
                                 10th Floor
                                 P.O. Box 2306
                                 Wilmington, DE  19899
```

4

```
APPEARANCES (Cont'd.):

For U.S. Bank, as Trustee:       Maslon, Edelman, Borman & Brand,
                                   LLP
                                 By:  CLARK T. WHITMORE, ESQ.
                                 3300 Wells Fargo Center
                                 90 South Seventh Street
                                 Minneapolis, Minnesota  55402


For NIHL/CTPV Claimants:         Baldwin & Haspel, L.L.C.
                                 By:  MICHAEL AIKEN, ESQ.
                                 2200 Energy Centre
                                 1100 Poydras Street
                                 New Orleans, LA  70163-2200


For Official Committee of        Akin Gump Strauss Hauer &
Unsecured Creditors:               Feld L.L.P.
                                 By:  BRIAN KILMER, ESQ.
                                 1 Louisiana Street
                                 44th Floor
                                 Houston, TX  77002


For Credit Suisse:               King & Spalding LLP
                                 By:  KIMBERLY M. SCHMID, ESQ.
                                 1185 Avenue of the Americas
                                 New York, NY  10036


For Seneca Capital:              JAMES CURRY, ESQ.

For Deutsche Bank:               Gardner Carton & Douglas
                                 By:  KRISTIN GOING, ESQ.
                                      MARK HEBBEIN, ESQ.


For Murray Capital Mgt.:         SCOTT BEECHERT, ESQ.

For Ace Insurance Co.:           White and Williams LLP
                                 By:  MARC S. CASARINO, ESQ.
                                 824 North Market Street
                                 Suite 902
                                 Wilmington, DE  19801


For J.P. Morgan Trust:           Jones, Walker, Waechter,
                                 Poitevent, Carrère & Denègre,
                                   L.L.P.
                                 By: ELIZABETH JONES FUTRELL, ESQ.
                                 201 St. Charles Avenue
                                 New Orleans, LA 70170
```

5

```
APPEARANCES (Cont'd.):

For Official Committee of      Ashby & Geddes
Unsecured Creditors:           By:  WILLIAM P. BOWDEN, ESQ.
                               222 Delaware Avenue
                               17th Floor
                               Wilmington, DE  19899

For Bear Stearns & Co.:        JAMES GEREGHTY, ESQ.

                               Gibbons, Del Deo, Dolan,
                                Griffinger & Vecchione
                               By:  DAVID N. CRAPO, ESQ.
                                    E. EVANS WOHLFORTH, JR.,ESQ.
                               One Riverfront Plaza
                               Newark, NJ  07102
```

6

1          THE COURT:  Good morning.  This is the matter of

2    Kaiser Aluminum, bankruptcy number 02-10429.  This is the

3    continuation of the plan confirmation hearing certain

4    objections to the plan by Law Debenture.  This is all by

5    telephone, and the participants I have listed are as follows:

6              Francis Monaco, Gregory Gordon, Ronald Reinsel, Mark

7    Hurford, James Gereghty, Elizabeth Futrell, David Crapo, Brian

8    Kilmer, Sally Siconolfi, Tina Moss, Edward Huff, Michael Aiken,

9    Andrew Lederman, Clark Whitmore, Dan DeFranceschi, Carl Kunz,

10   David Baldwin, Kimberly Schmidt, James Curry, Kristin Going,

11   Mark Hebbein, Scott Beechert, Peter D'Apice, Marc Casarino,

12   George Davis, William Bowden, John Schaffer, Sharon Zeig, Lisa

13   Beckerman, Gregory Nye, Evan Flaschen, Daniel Winikka, and

14   Debra Sudock.

15         MR. WOHLFORTH:  Your Honor, this is Evans Wohlforth

16   from Gibbons Del Deo.  I'm here with David Crapo for certain of

17   the Gramercy bondholders.

18         THE COURT:  All right.  Thank you.  Okay.  Who's

19   going to make the argument from Law Debenture, since it's your

20   objection?

21         MR. FLASCHEN:  Good morning, Your Honor.  Evan

22   Flaschen and Gregory Nye of Bingham, McCutchen for Law --

23         THE COURT:  Wait a minute, Mr. Flaschen.  I can't

24   hear you.  We need to turn the system up.  If anybody's on a

25   speaker phone who is going to speak, you need to be on a

7

1  handset, please.  Jan, how do you turn this up?  I can't hear

2  them.  Mr. Flaschen, would you try it again?

3          MR. FLASCHEN:  Good morning, Your Honor.  Evan

4  Flaschen and Gregory Nye of Bingham, McCutchen.  Can you hear

5  me okay?

6          THE COURT:  Yes, sir.  Thank you.

7          MR. FLASCHEN:  We're special counsel to Law Debenture

8  Trust Company of New York.  Right now we're going to address

9  our specific objection to the plan's treatment of the

10 Indentured Trustee's fees and expenses under the 1993 --

11         THE COURT:  Mr. Flaschen, you're fading out.  Are you

12 on a speaker phone?

13         MR. FLASCHEN:  No, I'm speaking right into the

14 receiver of the phone.

15         THE COURT:  Jan, we have to turn the system up.  Then

16 because --

17         MS. KOZLOSKI:  We can't turn it up anymore, because

18 then it'll start screeching.

19         THE COURT:  Well --

20         MS. KOZLOSKI:  And I think that's what happens with

21 the phone system.  It just fades in and our, and I don't know

22 why.  I don't want to --

23         MR. FLASCHEN:  I will speak louder.

24         THE COURT:  Okay.  Well, I guess try it, Mr.

25 Flaschen.  If I can't hear you, I'll unfortunately have to

**J&J COURT TRANSCRIBERS, INC.**

1  interrupt you.

2          MR. FLASCHEN:  Okay.  This is our objection

3  concerning the plan's treatment of the fees and expenses for

4  the 1993 Indentured Trustee.  Your Honor should have in front

5  of you a copy of the 1993 indenture, which is I believe

6  debtors' exhibit D-4.

7          THE COURT:  All right.

8          MR. FLASCHEN:  I want to start in general terms.  The

9  three types of obligation due under the indenture.  First

10 there's the notes themselves including principal and interest

11 and so forth.  Second is the Indentured Trustee's fees and

12 expenses.  Third are the issuer's obligations to the Indentured

13 Trustee by way of indemnification.  And the question for today

14 is that even if all payments to the bondholders on the notes

15 are subordinated, what about the payment for fees, and what

16 about the payments for indemnification?  Are those also

17 subordinated?  And our view is that they are not.

18          I want to take a step back and talk about why we even

19 have creatures called Indentured Trustees, if you will, because

20 this legislative background is important to understanding the

21 non-subordination of fees.  In the U.S. an issuer of public

22 debt securities can only issue those securities pursuant to a

23 trust indenture qualified under the Trust Indenture Act of

24 1939, and the Trust Indenture Act, the TIA, requires the issuer

25 to appoint an indentured trustee to administer the trust

1   indenture.  So as a matter of law, you have to have an

2   indentured trustee when you have public debt securities.

3        Under an indenture an indentured trustee has three

4   basis roles which are administrative, distributive, and

5   representative.  By administrative I mean does things like

6   maintain the lists of holders, a repository for notices and

7   certificates, signs supplemental indentures, and other

8   mechanical tasks, if you will.  By distributive, self-evident.

9   Issuer makes payments to the indentured trustee.  It is then

10  the responsibility of the indentured trustee to distribute

11  those payments to the bondholders at the time.

12       The third area is representative.  Prior to default

13  indentured trustee really only has administrative and

14  distributive obligations.  As we indicated in the other

15  hearing, both under the Trust Indenture Act and the indenture

16  itself, the Trustee does not have other duties.  It takes a

17  notice, but it doesn't read it, things like that.  But after a

18  default, Section 77000(c) of the Trust Indenture Act provides,

19  "The indentured trustee shall exercise in case of default,

20  paren, as such term is defined in such indenture, close paren,

21  such of the rights and powers vested in it by such indenture

22  and to use the same degree of care and skill in their exercise

23  as a prudent man would exercise or use under the circumstances

24  in the conduct of his own affairs."

25       So by law the indentured trustee has these duties and

10

1   responsibilities post-default.  The trust indenture is required

2   to reflect that, and this trust indenture does, as does every

3   trust indenture I've ever seen.  What that standard says in

4   essence is after a default an indentured trustee has to fulfill

5   its duties and responsibilities consistent with the prudent man

6   standard.

7          Applying all this to the Kaiser Chapter 11.  To

8   generalize a bit, Law Debenture has engaged in five discreet

9   activities.  First, general monitoring of the case.  Second,

10  serve on the Unsecured Creditors Committee.  And as you can

11  tell Law Debenture has combined one and two.  Through their

12  service on the Committee, they are doing their monitoring of

13  the case among other things.

14         Three, Law Debenture has engaged in the PBGC

15  litigation.  Four, Law Debenture has engaged in the Gramercy

16  Bonds litigation.  Five, Law Debenture has engaged in the

17  guaranty subordination litigation.  It begs the question under

18  the TIA what would a prudent man do as a representative of the

19  1993 note holders.

20         Implicit in the debtors' view here -- and I should

21  note only the debtors have responded to our objection.  Neither

22  the Unsecured Committee nor the Seniors nor the Senior Trustee

23  responded to your objection on the fees.  Debtors' basic view

24  is that because there's no recovery for the 1993 notes if they

25  succeed in the subordination litigation, in essence Law

1  Debenture did not have to do anything.  Why should it do

2  anything if there's nothing to recover.  However, we believe

3  that a prudent man standard will require Law Debenture to

4  engage in the exact same five activities which we did, and here

5  is why, combining one and two, monitoring of the case and

6  service on the Committee.

7          At the beginning of these Chapter 11 cases there was

8  a realistic prospect that there would be enough value such that

9  the 1993 notes would receive a distribution even if the

10 guaranties are subordinated, thus, a prudent man would have

11 monitored the case and sought to serve on the UCC, and that's

12 what Law Debenture did.

13         Next, recovery prospects are not just a function of

14 asset values but also of the claims pool.  If you look at

15 today's asset values and the claims pool, if the PBGC claim

16 were allowed based on a market discount rate rather than the

17 PBGC's regulation discount rate, or the rate implicitly agreed

18 to by the parties other than Law Debenture in their settlement,

19 it would make a big difference.  If you apply the market

20 discount rate -- and there is authority in other circuits.  The

21 majority case law says you do apply the market discount rate,

22 this would have reduced the PBGC's claim down to a level that

23 there would have been a recovery on the 1993 notes even if the

24 guaranties are subordinated.  On that basis a prudent man

25 would've objected to the PBGC's claim and challenged

1  settlement, and that's what Law Debenture did.

2         Next, the Gramercy bondholder dispute, that's an easy

3  one.  The Gramercy bond trustee sued Law Debenture.  That's how

4  that started.  A prudent man would've defended the lawsuit, and

5  that's what Law Debenture did.

6         And finally, the guaranty litigation dispute.  Self-

7  evidently, if successful, the 1993 note holders would recover

8  -- would receive a recovery under any scenario.  As we've

9  talked about in the litigation and as Rule 7 -- I forget -- the

10 Adversary Proceeding Rules provide, it's the burden of the

11 parties seeking to enforce subordination to come forward.  Even

12 so, to make the litigation as inexpensive and quick as

13 possible, after unsuccessful meetings with the debtor and the

14 seniors, Law Debenture back in August filed a simple bankruptcy

15 rule 3020, 3020 classification motion, meaning, "Dear Judge,

16 Please determine the proper classes under a plan."  That motion

17 was scheduled for hearing on the merits in mid-October.

18 Inexpensive, quick, would not delay anything.

19        Instead, the debtors and the seniors and the Senior

20 Trustee decided to sue Law Debenture to enforce subordination.

21 They commenced an adversary proceeding against Law Debenture,

22 then they decided to delay that litigation, so that they could

23 pursue a cram down plan that incorporated their view of

24 subordination.  I think it's self-evident that a prudent man

25 would have defended against the litigation brought by the

1  seniors and would have objected to the plan, and that's what

2  Law Debenture did.

3      All of this activity triggered two distinct types of

4  obligations owing under the indenture.  The first is the fees

5  and expenses incurred in monitoring the case serving on the

6  Unsecured Committee and objecting to the PBGC's claims.  Second

7  is indemnification.  When I get to the sections, I'll show you

8  how they're different.  Indemnification obligations of the

9  debtor to Law Debenture, because Law Debenture was compelled to

10 defend, the Gramercy bonds litigation and the subordination

11 litigation and the cram down plan.  At the end of the day,

12 after all appeals are exhausted, it may end up being that

13 there's no recovery on the 1993 notes, although we respectfully

14 believe there should be, because these guaranties are not

15 subordinating.  Then again it may well end up that there is a

16 recovery, because this court or an appellate court does

17 determine the guaranties are not subordinated.

18     Thus, not only would a prudent man have done what Law

19 Debenture has done, but Law Debenture could have risked being

20 sued by bondholders if it didn't act as it did act and as it

21 has acted.  So what's the answer under these circumstances if

22 the Indentured Trustee cannot be reimbursed for fees?  Really

23 only three possibilities.  The Indentured Trustee can resign.

24 The answer is actually no, Law Debenture can't resign.  Under

25 the indenture, as is typical, Law Debenture or the company must

first find a successor indenture trustee willing to step in.
You can't leave your bondholders in the lurch after a default.
Well, if Law Debenture can't get its fees paid, no indenture
trustee is going to step in without getting their fees paid, so
option one is not realistic.  We can't just resign.

        Second, could we, Law Debenture, require the
bondholders to fund our expenses?  First, how does one require
bondholders to do it?  You can't force them.  You can't sue
them to do it.  And what if you do find some bondholders, but
they don't fund the litigation?  That does not remove your
duties under the Trust Indenture Act or the Indentured Trustee
to act as a prudent man would act.  And even if there are some
bondholders willing to fund, the Indentured Trustee has to act
on behalf of all bondholders not just a committee of them.  So
it doesn't relieve the Indentured Trustee of obligations.

        For example, if the Ad Hoc Committee of 1993 note
holders decided to participate in the various litigations in
this case, it would not have relieved Law Debenture of its
rights and obligations, because they are owed, as I said, to
all bondholders, and the Ad Hoc Committee does not represent
all bondholders.  You never do get 100 percent when it's a
public debt instrument.

        By way of comparison, the Senior Ad Hoc Bondholder
Committee has engaged in the various disputes throughout the
case including the guaranty litigation dispute, and a

representative of that Committee has served on the Unsecured

Creditors Committee, but that has not stopped the Senior

Indentured Trustee also from being very active in the

litigation, also from serving on the Unsecured Creditors

Committee, presumably because the Senior Indentured Trustee

feels it has a duty to protect the interests of all

bondholders, and the Ad Hoc Committee could not fulfill that

duty on the Senior Trustee's behalf.

Third possibility, require the Indentured Trustee to

take the risk.  If there's no recovery for subordinated, you

don't get paid.  Too bad for you.  Pretty tough position,

particularly when the Indentured Trustee isn't even fighting

over its own money.  It's just acting as a representative of

the bondholders.  This third possibility would say wait until

the end of the case.  If you're right, there is a recovery,

whether because of the guaranteed subordination dispute or

because of ultimate asset values or because of reduction of the

PBGC claim.  If one of those dominos falls into place, you get

paid at the very end of the case.  If they don't, too bad for

you.  You've spent all this money, and you have to swallow it.

As a public policy matter, that's a real tough one.

At a minimum a standard such as that you would think would

require indentured trustees to increase their regular fees

substantially, because in the event any indentured goes in

default, they're at the risk of having to incur far more than

1  normal indentured trustee's fees potentially without

2  reimbursement.  So it would affect issuers like Kaiser before

3  default and any other issuer public debt.

4          That's all background and public policy, and that's

5  all well and good, but we still have to deal with the case law

6  and with the indenture itself.  So what does the case law say?

7  The debtors, who are the only ones who responded, do not cite a

8  single case of any kind, not for any proposition period.  It's

9  just discussion of the indenture.

10         MR. CRAPO:  Your Honor --

11         MS. BECKERMAN:  Your Honor, I'm sorry.  It's Lisa

12  Beckerman.  I don't want to interrupt Mr. Flaschen, but,

13  obviously, he hasn't read our reply very carefully.  We

14  responded in paragraph 14 of our reply as well his objection.

15  So I will be speaking later on, since I did file a written

16  response to his objection.

17         MR. FLASCHEN:  If it is, then I missed it.  My

18  apology.

19         MR. CRAPO:  And, Your Honor, David Crapo.  The

20  Gramercy bondholders also replied to the fee app -- to the --

21  to Mr. Flaschen's arguments on the fees.

22         MR. FLASCHEN:  Then let me limit my --

23         THE COURT:  Okay.  That's fine.  Let Mr. Flaschen

24  finish, please, and then hear from all of you.

25         MR. FLASCHEN:  Okay.  Let me limit my comment then to

1    the debtors' brief.  And now if I turn -- all right.  Turning

2    to paragraph 14 of the Unsecured Committee's brief as well,

3    there are no cases cited, but I don't say that in order to

4    gloat over the situation, because while our objection does cite

5    12, 13, 14 cases, the truth is none of our cases really address

6    the current situation either.  There's just no case law out

7    there pro or con on the subject of indentured trustee fees and

8    indemnification when they represent an issue of notes that may

9    or may not receive a recovery.

10          In my own experience, which has been a few years, I

11   think the reason for this is that indentured trustee fees are

12   always paid pursuant to a plan.  I do not recall a single plan

13   involving public debt securities that did not have a provision

14   saying indentured trustee fees, senior or junior, whatever the

15   class of indentured trustees -- indentured trust notes there

16   are, will be paid as part of the plan until the Kaiser plan.

17   This is the first one I've ever seen that does not pay those

18   fees.  As a result, I'm not surprised there isn't any case law

19   out there.  I doubt the issue has come up, or if it has, it has

20   been resolved consensually without the need for this type of

21   litigation.

22          This problem I think is compounded by the fact that

23   the debtors' estate is paying for the fees of the debtors and

24   the Unsecured Creditors Committee in the guaranty subordination

25   litigation.  I'm not addressing the merits of whether they

1 should participate, although I'm not sure they should.  But

2 even if they should, the debtors' estates are paying those fees

3 for both those entities even though all they should care about

4 is getting a confirmed plan.  Neither of them should care once

5 a plan is confirmed who gets the money, seniors or

6 subordinates.

7          With that I want to turn to the indenture itself.

8 Starting in Section 8.06 which, at least in my copy, is on page

9 78.  I'd like to break 8.06 into three -- let's see -- several

10 provisions in 8.06 as I look at my notes.  The first is the

11 very first sentence.  One, two, three, four, five lines down it

12 talks about reasonable expenses and disbursements.  In other

13 words, the first sentence says, "The company pays the fees and

14 expenses of the Indentured Trustee."  No one disputes that.

15          The second sentence is where the indemnification

16 obligation comes in.  So one about there are straight fees and

17 expenses, too, is the separate obligation to indemnify the

18 Indentured Trustee unless we've acted in negligence or bad

19 faith.  And right at the very top of page 79 it specifically

20 says, "including the costs and expenses of defending itself."

21 So as I said, we've been sued in the Gramercy litigation, and

22 whether pursuant to the adversary proceeding of the plan itself

23 in effect we've been sued in the guaranty subordination

24 litigation.

25          The third and final sentence of 8.06 says the

obligations of the company under this 8.06 -- and now I'm

quoting -- "shall constitute additional indebtedness hereunder

and shall survive the satisfaction and discharge of this

indenture or resignation or removal of the Trustee." From that

sentence I reached the conclusion that fees and expenses and

indemnity are different than payments on the notes. Fees and

expenses and indemnity are additional indebtedness. And the

only thing it could be in addition to is the amounts owing on

the notes, and significantly, those obligations survive the

discharge of the indenture. So the indenture could go away

entirely. Those obligations are still owing. So they are a

separate item.

          That takes me to Section 7.02 on the indenture. It's

on my page 72. I direct you to the end of the first paragraph

which just talks about, "In addition thereto --" meaning in

addition to amounts owing on the notes -- "you also have to pay

costs and expenses of collection of the Indentured Trustee."

So it's another place where it says in addition to obligations

on the notes you also have to pay fees.

          You go all the way to the bottom of page 72, one line

up, it talks about a trustee can file claims and so forth. At

the end of that one line up from the bottom, "As may be

necessary or advisable in order to have the claims of the

trustee and of the note holders," meaning again the claims of

the Trustee for fees indemnification are separate from the

1    claims of the note holders.  What's 7.02 -- let's see.

2         All right, so that turns me to Section 7.03 now.  All

3    we need is the first sentence, before we get to the colon and

4    what comes after.  "Any monies --" and I'm quoting.  "Any

5    monies collected by the Trustee pursuant to Section 7.02 shall

6    be applied to the payment of all amounts due the Trustee

7    pursuant to Section 8.06 and thereafter subject to Article 3

8    and Article 16 in the order below."  And the order below is

9    just a normal priority, fees, interest, and so forth.

10        Putting all this together, 8.06 said you get your

11   fees.  Eight point 0 six says you get your indemnification over

12   additional indebtedness.  Seven point 0 three says the Trustee

13   gets those amounts before you get to Articles 3 and 16, which

14   are the subordination provisions.  The catch, and where the

15   debtors I think are focusing their argument, is that Section

16   7.03 only applies to monies collected pursuant to Section 7.02,

17   meaning if there's money that comes through the Indentured

18   Trustee, whether pursuant to the plan, or because of damages,

19   or because of lawsuits or whatever, that money first goes to

20   fees, and the debtors' basic response is too bad.  The plan

21   doesn't provide any money going to the Indentured Trustee, so

22   there is no fund out of which you could take your fees and

23   expenses and your indemnification, because the plan says

24   everything is subordinated.

25        It gets right back to where we started.  These are

1   separate claims than the claims on the notes.  Even if the

2   notes and the guaranties are subordinated, where does it say

3   these claims are subordinated.  Seven point 0 three says

4   they're not, but you have to get money into 7.02, but that begs

5   the question if under 7.03 these are not subordinated, then the

6   plan can't not make a distribution to the Indentured Trustee on

7   these claims.  It can't just say I'm going to go around this

8   and distribute it all to the Senior Note Trustee.  It can only

9   distribute to the Senior Note Trustee payments on subordinated

10  amounts, and the fees are not subordinated under 7.03.

11          The final section I want to take you to is Section

12  3.01, one we've all gone over extensively.  We probably don't

13  even have to turn to the page.  While it is clear Your Honor is

14  far from making a decision on the senior subordinated

15  litigation, my sense from the oral argument is the provision

16  Your Honor is going to focus the most on is Section 3.01 and

17  its comment about all direct or indirect payments or

18  distributions on it with respect to the notes.  The question

19  being is a payment on the guaranty an indirect payment on the

20  note?

21          For the purposes of today's argument, even if a

22  payment on a guaranty is an indirect payment on a note, a

23  payment on fees and indemnity is not an indirect on the notes.

24  We've already established those are independent obligations

25  that survive even if the indenture is entirely discharged, so

1 there's no notes left.  So even if everything is subordinated,

2 even if all payments on the notes and guaranties are

3 subordinated, Section 3.01 says it is payments on the notes.

4 It doesn't say payments on the notes and on the Trustee's

5 claims.  So adding all that up we think pursuant to the

6 indenture distributions need to be made to the Indentured

7 Trustee even if otherwise subordinated to the extent of the

8 fees and the indemnification.

9         The final section I want to talk about in the

10 indenture is 3.01(b), which says in essence any distributions

11 under a bankruptcy plan that would otherwise go to the

12 Indentured Trustee can instead be paid directly to the

13 Indentured Trustee for senior indebtedness.  So if the notes

14 and guaranties are fully subordinated, 3.02(b) says the debtor

15 can make payment directly to the Senior Trustee.  But again

16 that only begs the question what is subordinated, and since

17 Section 3.01 governs all of Article 3, it has that phrase we've

18 talked about, "to the extent and in the manner hereinafter set

19 forth."  It has to be subordinated under 3.01 before you can

20 make direct payment under 3.02(b).

21         The final provision I want to talk about is under the

22 bankruptcy rules -- Rule 3021, three zero two one.  It's a

23 pretty bland provision.  It says -- this is not a quote.  It's

24 a paraphrase.  Distributions with respect to allowed claims on

25 public debt securities shall be made to the Indentured Trustee.

1 On a benign sense, that makes sense.  The Indentured Trustee is

2 the one who knows who the bondholders are and who makes the

3 distributions to them.  So, of course, you would make

4 distributions to the Indentured Trustee.  But beyond that it

5 does say if you have an allowed claim, you shall make it to the

6 Indentured Trustee.  No one has disputed that the 1993 notes

7 and the 1993 note guaranties are allowed claims.

8          Rule 3021 uses the word shall not may.  So we would

9 argue even if the indenture can somehow be read that you don't

10 have to pay the money through the Indentured Trustee, that Rule

11 3021 trumps that and says payments still have to go through the

12 Indentured Trustee.

13          With all that, Your Honor, again, what we're talking

14 about are two distinct obligations, fees and expenses and

15 indemnification, and we believe both that Law Debenture was

16 required to incur all that pursuant to the Trust Indenture Act

17 and if it had not, it risked being sued.  That as a practical

18 matter it makes sense to pursue those, because it never has

19 been and at the moment it still is not clear that there's no

20 value to distribute on the subordinated notes.  Before that

21 hinged a bit on asset values and on the PBGC claim, but now it

22 hinges on the results of the guaranty litigation dispute which

23 is still very much active.

24          And the alternative to all this is saying too bad.

25 If there's no recovery on notes, there's no recovery to you I

24

1  think is chaotic.  I think it is a damage to public markets.  I

2  think it causes indentured trustee fees to increase

3  substantially, and another effect, often, as you know, there is

4  a default before bankruptcy.  I would think any indentured

5  trustee who could is going to resign before the bankruptcy, so

6  they don't get into this mess unless they're 100 percent sure

7  before bankruptcy that under any possible scenario there will

8  be a distribution on their notes, and, therefore, that their

9  fees and expenses will be covered.  Thank you, Your Honor.

10          THE COURT:  All right.  Thank you.  For the debtor?

11          MR. GORDON:  Greg Gordon, Your Honor.  Can you hear

12  me okay?

13          THE COURT:  I can.  Thank you.

14          MR. GORDON:  Okay.  Your Honor, I'd like to note at

15  the outset that Mr. Flaschen spent considerable time talking

16  about the Trust Indenture Act.  He spent considerable time

17  talking about what a prudent man would do, and, of course, I

18  would say what a prudent person would do.  But those are really

19  -- those arguments really are beside the point.  The question

20  here really is a matter of what the indenture provides, and, ,

21  unfortunately, in this case the indenture doesn't provide what

22  Law Debenture is suggesting that it does.

23          And, Your Honor, what I'd like to do is just walk you

24  through the applicable provisions of the indenture and point

25  out why it is that a Law Debenture would not be entitled to its

1  fees and expenses in the event that you rule that the

2  subordinated notes are, in fact, subordinated in all respects.

3  Your Honor, first of all, if you start with Section 8.06 of the

4  indenture, which I believe is the section that Mr. Flaschen

5  started with, that is the section of the indenture that, in

6  fact, grants Law Debenture a claim against the company for

7  reasonable compensation and reimbursement of expenses.  The way

8  it reads, the issuer, which is KACC, is solely responsible for

9  fees and expenses, but pursuant to Section 16.01 of the

10  indenture the liquidating debtors guaranteed the obligations of

11  KACC to holders of the subordinated notes as well as

12  obligations to Law Debenture under the indenture.

13          Then, Your Honor, what you have to do is you have to

14  then look at the subordination provisions of the indenture

15  themselves, and, obviously, you've heard Law Debenture spend a

16  great deal of time during the course of these arguments

17  focusing on various provisions and Article 16 of the indenture.

18  And one simply has to look at Section 16.02 of the indenture as

19  well as 16.03(b) of the indenture.  Sixteen point 0 two, which

20  is on page 104 of the indenture, provides that, "Each

21  subsidiary guarantor for itself, its successors and assigns,

22  covenants and agrees, and the Trustee and each holder of the

23  notes by his acceptance thereof likewise covenants and agrees

24  for the benefit of all present and future holders of senior

25  indebtedness of such subsidiary guarantor.  That all payments

1  pursuant to the guaranty by such subsidiary guarantor are

2  hereby expressly subordinated to the extent and in the manner

3  hereinafter set forth and right of payment to the prior payment

4  in full of all senior indebtedness of such subsidiary

5  guarantor."  And as you can see, Your Honor, in that section

6  there is simply no carve out for fees and expenses that may

7  have been incurred by the Indentured Trustee for the

8  subordinated notes.

9         Similarly, Your Honor, if you were to look at -- if

10  you look at 16.03(b) of the indenture, which is on page 105,

11  that provides that any direct or indirect payment or

12  distribution of assets of the subsidiary guarantor of any kind

13  or character, and importantly, to which the holders of the

14  notes or the Trustee would be entitled shall -- and I'm

15  paraphrasing here, Your Honor -- shall be paid by such

16  subsidiary guarantor directly to the holders of senior

17  indebtedness of such subsidiary guarantor.  The language is

18  very clear, Your Honor.  This is the subordination provision.

19  It makes clear that any direct or indirect payments which are

20  required to be made either to the holders or to the Trustee are

21  subordinated.

22         If you turn back, Your Honor, to Article 3 to which

23  Mr. Flaschen also referred as well, the language is virtually

24  identical as it relates to the company KACC.  In that case you

25  have Section 3.01.  That appears on page 36 of the indenture.

1   That has again the direct or indirect language and makes clear

2   that all direct or indirect payments or distributions on or

3   with respect to the notes, whether pursuant to the terms of the

4   notes or upon acceleration or otherwise are expressly

5   subordinated to the extent and in the manner hereinafter set

6   forth.

7           If you turn to Section 3.02(b) -- this appears on

8   page 37 -- you again find that the same language -- the

9   language that appears in 16.03(b) -- of any direct or indirect

10  payment or distribution to which the holders or the Trustee

11  would be entitled, those payments are expressly subordinated.

12          So, Your Honor, contrary to the argument of Mr.

13  Flaschen, there simply is no carve out from the subordination

14  provisions for fees and expenses owing to the Indentured

15  Trustee.  And if you then turn, Your Honor, to Section 7.03,

16  which is the section on which Mr. Flaschen primarily relied,

17  you can see from its very designation -- it's designated or

18  titled, "Application of Monies Collected by Trustee."  And the

19  problem for Law Debenture is that pursuant to the sections I've

20  just referred you to of the indenture, the ones in Article 16

21  and Article 3, monies are simply not ever collected by the

22  Trustee in the event there's full subordination and nothing

23  left over for the benefit of the subordinated note holders.

24  And that's the situation we would find ourselves in.

25          Now I'd like to turn to a couple of other arguments

1    that Mr. Flaschen made, Your Honor.  One was he referred to

2    Rule 3021 of the bankruptcy rules as the basis for his argument

3    that Law Debenture is entitled to fees and expenses even if the

4    subordination provisions would otherwise bar a recovery, and as

5    he pointed out, there is no case law that he's cited that would

6    support his argument here.  All Rule 3021 does is require that

7    distribution to holders be made to the indentured trustees who

8    filed claims.  That's a very simple proposition.  It normally

9    would have application in cases where distributions would be

10   made to holders of notes who are represented by indentured

11   trustees who file proofs of claim.

12          Here, however, under the applicable indenture, the

13   applicable contract, no distributions, in fact, would be owed,

14   and this rule simply is not implicated.  Now to the extent that

15   Mr. Flaschen is suggesting that this rule somehow overrides the

16   indenture, then that argument is simply misplaced, because that

17   would be inconsistent, Your Honor, with Section 510 of the

18   Bankruptcy Code, which, as the Court knows I'm sure, provides

19   that a subordination agreement is enforceable in a case to the

20   same extent that such agreement is enforceable under non-

21   bankruptcy law.  That's Section 510.  And so again if the

22   argument here is that somehow Rule 3021 provides otherwise,

23   then you're basically reading out of the Code Section 510.

24          Now, Mr. Flaschen's also made public policy arguments

25   here this morning.  He made them in his brief as well.  He's

1  suggesting that if Law Debenture cannot be paid its fees and

2  expenses in this circumstance that that will upset the markets,

3  the indentured trustees won't take the positions, they'll be

4  forced to resign and the like, because they simply don't take

5  any type of financial risk, and that's simply not true, Your

6  Honor.  They do take a risk.  They take less risks than the

7  holders of the notes, because they have charging liens, and Law

8  Debenture has a charging lien here.  But an indentured trustee,

9  for example, is always subject to a solvency risk with respect

10  to an issuer, with respect to guarantors.

11         If there were no recovery to unsecured creditors in a

12  case, the Indentured Trustee would have a risk.  It's no

13  different here.  It's just that in this case the risk also

14  arises by virtue of subordination provisions, and on the fees

15  and expenses I think those provisions are very clear.

16         Now one other thing I wanted to point out, Your

17  Honor, is that, you know, Law Debenture is not without a remedy

18  here.  I think the argument you primarily heard from Mr.

19  Flaschen is really a substantial contribution-type argument.

20  And as Your Honor well knows, Section 503(b)(5) of the

21  Bankruptcy Code provides for payment of fees and expenses to an

22  indentured trustee if an indentured trustee can, in fact,

23  demonstrate that it made a substantial contribution to the

24  case.

25         Now admittedly, Your Honor, that's a high standard,

1  but it is the standard that Congress built into the Bankruptcy

2  Code, and the standard was particularly -- was put in

3  specifically to address the issue of fees and expenses for

4  indentured trustees.  So even in the case where subordination

5  might otherwise bar payment, or there may be issues as to any

6  recovery to unsecured creditors, Congress provided that

7  indentured trustees can nonetheless be paid if they can meet

8  this standard of a substantial contribution.  These plans that

9  we filed provide for payment of administrative expenses.

10  Nothing in the plans bar Law Debenture from seeking -- from

11  filing an application for a substantial contribution, and that

12  could be done.

13          Your Honor, we believe for all these reasons the

14  objection should be overruled.

15          THE COURT:  All right.  Thank you.  The Creditors

16  Committee.

17          MS. BECKERMAN:  Thank you, Your Honor.  Your Honor,

18  I'm not going to repeat obviously Mr. Gordon's arguments,

19  because, of course, I agree with his reading and his taking you

20  through the indenture.  I would just add a couple of additional

21  points to his arguments.

22          First of all, I think what Mr. Flaschen is making is

23  a very technical argument here.  What he's saying is that even

24  if Your Honor finds, which is really the circumstance where

25  this argument would be relevant, that the subordinated notes

 1  are -- senior subordinated notes are, in fact, subordinated,

 2  whether it's under Article 16 or Article 3 or both, if Your

 3  Honor were to find that way, that notwithstanding xx's finding

 4  on the subordination and construing that to mean either

 5  payments on account of guaranties filed within Section 3.01 or

 6  the senior indebtedness definition encompasses the guaranties

 7  of the senior notes under 16 -- under the definition of senior

 8  indebtedness, and, therefore, it falls under 16.02 that those

 9  are -- that those guaranties are subordinated, that

10  notwithstanding either of those things, that because there are

11  provisions for indemnification and payment of fees, that

12  somehow those don't fall within those provisions, because those

13  are not payments either on account of the guaranties or

14  payments on account of the notes, whether indirect or directly.

15          That is obviously a very highly technical reading of

16  the indenture that clearly the debtors and the Committee don't

17  agree with.  But, Your Honor, I think that if that were, in

18  fact, correct, and that really were the intent of the parties,

19  as Mr. Flaschen was bringing to bear from his experience,

20  obviously, I too have been practicing quite a while and have

21  represented lots of noteholders as well as lots of unsecured

22  creditors committees and read my share of indentures, and I've

23  never seen an indenture where there was a carve out for the

24  indentured trustee fees that was expressly carved out of the

25  subordination, and I don't believe that that's what the import

1  of the language of the sections that we cited to to Your Honor

2  in the indenture or, quite frankly, the intent of the parties

3  was here.  And if it was, I think that that would've been

4  clearly delineated in ways other than the technical reading

5  that Mr. Flaschen has offered on behalf of his client here

6  today, because these senior notes would need to understand that

7  under any circumstances, even where they thought that the

8  subordination was going to be enforceable, this would true for

9  the senior note holders or, quite frankly, the bank here as

10  well, Your Honor, or our credit agreement outside of bankruptcy

11  that existed, you know, at the time these notes were issued, as

12  we've discussed before.

13        That any of the senior indebtedness was subject in

14  essence to not receiving a subordination in full because of the

15  need for the payment of the Trustee fees, and I just don't

16  believe that that's what the language of the indenture clearly

17  delineates or that that was the intent of the parties.  And

18  that's why unfortunately we respectfully disagree with Mr.

19  Flaschen's argument.  Obviously, the Committee has no argument

20  whatsoever with what Law Debenture's been doing on behalf of

21  its client.  It is very understandable.  I'm not going to spend

22  any time addressing that, but I don't think in any way our

23  comments about disagreements on the technical reading of the

24  indenture should in any way be read to mean that we disagree

25  with anything that Law Debenture felt it needed to do on behalf

1  of its client.  But we simply don't believe that

2  notwithstanding that Law Debenture is obviously doing what it

3  believes to protect its client and taking stands that are

4  protective of the subordinating notes, which I think is

5  understandable.  Mr. Flaschen said both were legal concerns as

6  well as its duties to a client and its client group of the

7  bondholders.

8          I don't think that notwithstanding that, that that

9  can negate or ignore the import of the language of the

10  indenture, and, that, therefore, I don't believe that there's a

11  carve out under the language of 3.01 or 16.02 in the

12  subordination that allows for payment of those fees over and

13  above.  I also agree with what Mr. Gordon said about the

14  indenture in Section, specifically, 16.03(b) and 3.02(b) where

15  it was clear whether Your Honor were -- ultimately, if Your

16  Honor were to find that the senior subordinated notes were

17  subordinated either because of Article 16 or Article 3, there

18  is language that clearly contemplates that a liquidating

19  trustee, as in this case where we are going to have one, can

20  make distributions and should make distributions directly to

21  the senior notes on account of the subordination and the

22  enforceability of funds that would come from that

23  subordination.

24          So it is, of course, in keeping with the language of

25  the indenture that the distributions are not going directly to

34

1  Law Debenture in the event, of course, that Your Honor were to

2  find the senior subordinated notes are, in fact, subordinated.

3  Obviously, if the Court were not to find that there would be

4  distributions, then this argument would be moot, because there

5  would be funds to pay Law Debenture's fees out of the

6  distributions going to its own holders.

7          The issue of the Bankruptcy Code I also -- we also

8  have addressed in our pleading and notwithstanding Mr.

9  Flaschen's comments that we didn't cite to any case is that's

10 simply not correct.  In our footnote eight we have, in fact,

11 cited to two cases that I think are relevant to the issue at

12 hand, and those cases relate to situations where there's a

13 conflict between the rules and the Code.  In fact, these cases

14 have actually been cited to by Law Debenture previously in some

15 of its pleadings in connection with the PBGC litigation.

16         Your Honor, we don't believe that there is a conflict

17 between 3021 and 510(a), because I think Mr. Gordon's reading

18 of 3021 and 510(a) is the right reading of those provisions of

19 the Bankruptcy Code which is that under 510(a) the Court has to

20 enforce the provisions of subordination agreements and

21 subordination rights as if there wasn't a bankruptcy proceeding

22 pending and in accordance with the terms of the contract.  And

23 I think 3021, as Mr. Gordon has correctly pointed out, just is

24 a mechanical provision that makes clear that if you're going to

25 be making distributions to a group, that the distributions are

1  made to the group where the -- or the party that filed the

2  proof of claim on behalf of that group, and here there that

3  would, of course, be the Indentured Trustee for the senior

4  subordinated notes.

5       But because 510(a) says that you have to enforce the

6  subordination provisions, and our reading of the subordination

7  provisions would mean that obviously the proceeds that would be

8  entitled to otherwise be distributed to the senior subordinated

9  notes would have to be distributed in full under 3.01 and 3.02,

10 or for that matter, 16.02 or 16.03 of the indenture and would,

11 therefore, not be a situation where a distribution would be

12 either mandated or, in fact, under -- as I've cited to you

13 before, Your Honor, under 13.02(b) or 16.03(b) required to be

14 made to Law Debenture, and, therefore, there is no conflict

15 between 3021 and 510(a).  But if somehow Your Honor were to

16 believe that there was a conflict between 3021 and 510(a), then

17 I would commend Your Honor to those cases that say that in a

18 case where there is a conflict like that that those would have

19 to prompt the rule provision, and, therefore, I don't believe

20 that the Bankruptcy Code somehow mandates something different

21 than what the terms of the contract or the subordination

22 arrangements in the indenture would require outside of the

23 bankruptcy cases pending, and, therefore, I think that takes

24 Your Honor again back to the readings of 3.01, 3.02, or 16.02

25 and 16.03.

**J&J COURT TRANSCRIBERS, INC.**

1           And it's only if Your Honor reads those provisions

2    first -- either all or some of those provisions in a way that

3    first the Court -- the argument that the senior subordinated

4    notes are, in fact, subordinated.  But then reads the language

5    in those provisions in a way that's notwithstanding the

6    interpretation that Your Honor has found for purposes of

7    determining this seniority or the lack of seniority of the

8    senior note guaranties under those provisions of the indenture

9    would have to read those provisions of the indenture in a

10   different way -- in a narrow way as Mr. Flaschen is arguing to

11   exclude in some way the fee obligations under 8.06, 7.02, and

12   7.03, and we just simply don't agree with that reading of the

13   indenture.

14           I also would note, Your Honor, that I agree with what

15   Mr. Gordon said about the substantial contribution right.  I

16   would also note that the Code has another provision that

17   relates for payment of fees with respect to creditors committee

18   members also in that same section, and, obviously, that's

19   something that we're going to be seeking, as Your Honor knows,

20   have provided expressly that we can seek in connection with the

21   inter-company claims settlement, for example.  So I don't think

22   that that right would either be foreclosed from Law Debenture

23   for other fees and expenses in addition to the substantial

24   contribution remedy.

25           And I would say that from my experience, you know, I

37

1  think what Mr. Flaschen also fails to note from a public policy

2  point of view in addition to the fact that there are other

3  remedies under the Bankruptcy Code in these types of

4  situations, as Mr. Gordon pointed out and I've just pointed

5  out, an additional remedy, for example, for a part of Law

6  Debenture's fees, that, in fact, Your Honor, there are

7  thousands of public note indentures floated, you know, every

8  year, Your Honor, and the default rate is, in fact, quite low.

9       And so what Your Honor has to consider I think, you

10  know, from a public policy perspective -- you know, I agree,

11  you know, with many of Mr. Flaschen's arguments that it would

12  be great if somehow Congress had provided for a remedy where --

13  or either under the Trust Indenture Act where indentured

14  trustees' fees always get paid no matter what.  But,

15  unfortunately, I think that the Code has certain remedies.  The

16  indenture itself has certain remedies.  The Trust Indenture Act

17  has certain remedies, and none of them are all perfect.  And,

18  in fact, obviously, there is a situation theoretically, both in

19  the situation of insolvency, as Mr. Gordon has provided and

20  noted before, or in other circumstances where if you don't fall

21  within -- the Court determines you don't fall within some of

22  these provisions of the Code where there are risks.

23       And I think, in fact, the fact that there's such a

24  low default rate generally for notes, Your Honor, for all, you

25  know, we know without getting outside of this process, you

know, the market has to factor that in as well.  And I just
think that if Mr. Flaschen is somehow arguing that the market
must have always factored in, then in every circumstance
indentured trustee fees always get paid in any situation no
matter what.  And as Mr. Gordon has pointed out, you wouldn't
need these remedies in the Code.  You wouldn't have the
situation where there were just companies that go out of
business and liquidate, unfortunately.  There has to be some
view that there are circumstances, unfortunately, where, you
know, creditors don't get paid, and trustees don't get paid
either, and in those circumstances like this, unfortunately,
because of the subordination enforceability, you know, Congress
has provided them with certain remedies to look at under the
Bankruptcy Code that aren't available to the creditors, for
example, in those circumstances necessarily.  And the reason
that Congress has done that is obviously an additional layer of
protection for indentured trustees.

It's not full proof or bulletproof.  I sympathize
highly with Mr. Flaschen's plan.  I obviously wish the Code
were different.  My interactions as Committee counsel as well
as sometimes even representing note holders with the U.S.
Trustee for the Third Circuit in particular is that there has
been a shift, Your Honor, in recent years from my own
experience where traditionally Mr. Flaschen is correct that
often times he would see payments of indentured trustee fees

1  even in circumstances of liquidating plans separate and apart

2  from the payment to those constituencies, but the Trustee

3  itself has taken a very hard role -- look at that, and I

4  personally have been subject to several cases in the last years

5  where there were objections that were filed to plans that did

6  provide for that and didn't situations like this where it's

7  only if constituencies are getting distributions that the

8  Indentured Trustee fees are going to be paid out of those

9  distributions.

10          And so while I'm extremely sympathetic to Mr.

11  Flaschen's client's situation, and I obviously wish the Code

12  were different, and the indenture were different, I don't think

13  that either the reading of the indenture or the Code

14  unfortunately supports his argument, which is why I would

15  respectfully request that the Court overrule his objection.

16          THE COURT:  Okay.  Gramercy bonds.

17          MR. CRAPO:  Your Honor, this is David Crapo

18  representing the Gramercy bondholders.  We have nothing to add

19  to what Mr. Gordon and Ms. Beckerman had to say, and for the

20  reasons they have stated, we would request Your Honor to

21  overrule the objection of LDTC.

22          THE COURT:  All right.  Has anyone else -- does

23  anyone else wish to be heard?

24          MR. DAVIS:  Your Honor, it's George Davis of Weil

25  Gotshal.  May I be heard for a moment, please?

40

1    1        THE COURT:  Who are you representing?

2            MR. DAVIS:  The senior note holders.

3            THE COURT:  Yes, sir.

4            MR. DAVIS:  Your Honor, we did not file a written

5    objection.  We had discussed with Mr. Gordon and Ms. Beckerman

6    the issue when it first arose when Law Debenture raised this

7    issue in terms of -- and we got comfortable that their reading

8    of the indenture is the correct reading, and for that reason,

9    and because in connection with this confirmation process enough

10   trees have died.  We didn't feel it appropriate or necessary to

11   file our own written objection.

12           I would say that we support fully the reading of the

13   indenture that Mr. Gordon and Ms. Beckerman have explained to

14   Your Honor.  I would say in my experience I too have read many,

15   many indentures, and I have never seen an indenture where the

16   Indentured Trustees fees or the provisions that relate to them

17   are carved out of the general subordination provisions.  This

18   indenture is no different.  The language that Mr. Gordon had

19   read into the record this morning makes it quite clear that in

20   this case they are not.  They're treated the same way.

21           There was -- Mr. Flaschen had argued that there has

22   never been a situation where indentured trustees or in his

23   experience he has seen a plan that didn't provide for payment

24   of indentured trustees' fees.  My experience is different than

25   that.  I think that you often see that where you have a

41

1  situation where there are recoveries to note holders, and the

2  plan, rather than having the indentured trustees file a

3  substantial contribution application or seek to assert their

4  charging rights under the indenture, to avoid all of that the

5  plan provides for payment of the fees, you know, in the plan

6  distribution provisions, and then they're vote on and

7  ultimately usually supported by the majority of note holders.

8          One example, and just simply one that I've recently

9  been involved in, and I'm sure this is typical of many other

10  situations, where you have a group of note holders that is

11  because of either structural subordination or in this case both

12  structural subordination and contractual subordination just

13  simply out of the money would be the Sunbeam -- Sunbeam Chapter

14  11 cases.  In that situation the Indentured Trustee simply --

15  you know, there was no payment provisions in the plan, and the

16  Trustee didn't receive a distribution, and in my experience

17  that is more typical where you're dealing with an issue that is

18  either structurally or contractually subordinated to the extent

19  that there will be no recovery to the note holders.  There's

20  simply no basis to treat the Trustee any different certainly

21  under the indenture itself or under applicable law, and

22  specifically, you know, 503 which requires that there be an

23  application made for substantial contribution.

24          So for all of those reasons, Your Honor, we support

25  what we -- the reading of the indenture that Mr. Gordon has put

42

1    forth.  We think it is quite clear, and there's just simply no

2    basis to provide a recovery to the Indentured Trustee other

3    than the right to pursue a substantial contribution application

4    and to have its fees and expenses judged on that basis.  Thank

5    you, Your Honor.

6          THE COURT:  Anyone else before I turn back to Mr.

7    Flaschen?

8                      (No verbal response)

9          THE COURT:  Okay.  Mr. Flaschen.

10          MR. FLASCHEN:  Can you hear me okay, Your Honor?

11          THE COURT:  Yes, sir.

12          MR. FLASCHEN:  Good.  I think at best what the

13    parties have set up is an apparent conflict in the indenture,

14    and I also believe the indenture resolves that conflict.  On

15    the one side of the conflict are the two provisions I've cited,

16    Section 8.06, which makes it clear that both fees and

17    indemnifications are additional indebtedness, and they survive

18    the indenture, meaning they are not related to the notes.  They

19    are separate.  And then I've also cited Section 7.03, which

20    says you get your Section 8.06 fees and indemnifications before

21    you go to Articles 3 and Article 16 to the extent there's money

22    in your possession.  The main provisions they have argued are

23    in conflict with that are Sections 3.02(b) and 16.03(b), which

24    are basically the same provisions saying the debtors can make

25    payments directly to the holders of senior indebtedness.

1          I want to go back to what I said about Section 3.01,

2    which says all of the subordination in Article 3 applies to any

3    direct or indirect payment on the notes, therefore, 3.02(b)

4    could not apply, because 3.01 does not subordinate fees and

5    indemnity.  The main event here appears to be 16.03(b).

6    Sixteen point 0 three starts on page 104.  Before I address

7    (b), I want to address (a) and (c), because you've heard me

8    many times talk about surrounding circumstances meaning the

9    whole document.  Here it is quite true as well.

10          Section 16.03(a).  Third and fourth line talks about

11   payments to the holders of the notes or the Trustee on behalf

12   of the note holders, and then it goes on to say any direct or

13   indirect payment or distribution on or with respect to the

14   notes.   The 16.03(a) only applies to payments or distributions

15   on or with respect to the notes.  It also acknowledges that

16   payment on or with respect to the notes can be made to the note

17   holders or to the Trustee on their behalf.

18          Sixteen point 0 three (c) says the same thing.  If

19   there are any payments received by the Trustee or any holder of

20   the note, whether pursuant to the terms of the note or upon

21   acceleration or otherwise, meaning to accelerate the notes and

22   you go money, otherwise, meaning that you have a claim in the

23   bankruptcy, and you get paid that way.  So 16.03(c) says the

24   same two things.  It only applies to payments with respect to

25   the notes, and the Trustee can receive payments with respect to

44

1  the notes not just the holders.

2         So now let's zero in on 16.03(b).  The phrase that

3  they're taking out of context is in the third line.  It talks

4  about payments to which the holders of the notes or the Trustee

5  would be entitled except for provisions of this Article 16.  In

6  the context of (a) and (c) at a minimum that is ambiguous.  The

7  debtors would like it to mean any payment to which the Trustee

8  is entitled including with respect to its own additional

9  indebtedness, I would argue that (a) and (c) make it clear

10  these are just payments that the Trustee receives on behalf of

11  the note holders.  These should not be any broader than (a) or

12  (c).  So (b) also applies, distributions with respect to the

13  notes, whether received by the note holders or the Trustee.

14         Three point 0 two (b) says the same thing, by the

15  way, so this argument applies to both of those even if 3.01 did

16  not knock out the Article 3 subordination as to the fees.  But

17  as I said, at best that's ambiguous.  One could argue or the

18  Trustee means either, the Trustee on behalf of the note holders

19  or the Trustee on its own behalf.

20         How this ambiguity is resolved.  In both Article 16

21  and Article 3.  Let's start with Article 16, page 106, the full

22  paragraph on that page.  It's probably just the second

23  sentence, because indentures have such long sentences.  It's

24  maybe ten lines down, the sentence that starts with the phrase,

25  "It is understood that."  I'll wait for you to get to that

45

1    sentence.

2            THE COURT:  I have it.

3            MR. FLASCHEN:  And I'm quoting.  "It is understood

4    that the provisions of this Article 16 are and are intended

5    solely for the purpose of defining the relative rights of the

6    holders of the notes, on the one hand, and the holders of

7    senior indebtedness of each subsidiary guarantor on the other

8    hand."  The Trustee is not a holder of the notes.  Its fees and

9    indemnities are not payment on, with respect to, directly, or

10   indirectly with respect to the notes.  But even if 16.03(b) is

11   arguably ambiguous when it says, "or the Trustee," this

12   sentence on page 106, which applies to all of Article 16, makes

13   it clear Article 16 is only defined through relationship

14   between note holders and senior indebtedness holders.  It does

15   not define the relationship as to the Trustee in its own

16   independent claims, but gets you right back to 8.06 and 7.03,

17   which talk about those claims coming before you get to Articles

18   3 and Article 16.

19           One final point on substantial contribution.  I was

20   pleased to hear that everyone will support our application 100

21   percent for all fees and expenses and indemnification occurred.

22   Greg Nye is shaking his head when I say that, but we can't rely

23   on the U.S. Trustee doing the same, so on that basis we think

24   pursuant to the terms of the indenture itself, regardless of

25   all the public policy that they poo poo'd, Indentured Trustee

1  fees and Indentured Trustee indemnifications are not subsumed

2  within the subordination provisions under Article 16 or Article

3  3.  Thank you.

4          THE COURT:  Okay.  One second.  I'd like to read this

5  sentence.

6                          (Pause)

7          THE COURT:  I'm sorry, Mr. Flaschen.  I've read the

8  sentence on page 106 that's in the first paragraph.  I'm not

9  seeing, just based on this language, why the Trustee fees and

10  expenses are somehow different from the rest of the obligation

11  under this paragraph.

12          MR. FLASCHEN:  That it says, "The provisions of this

13  Article 16, the subordination provisions, are intended solely

14  for the purpose to define the relative rights of the holders of

15  the notes."

16          THE COURT:  Right.

17          MR. FLASCHEN:  Then you compare the holders to senior

18  indebtedness.

19          THE COURT:  Right.

20          MR. FLASCHEN:  It doesn't say define the relative

21  rights of the holders of the notes and of the Trustee.

22          THE COURT:  Well, of course, it doesn't.  I mean the

23  -- that wouldn't seem to me to be -- to make sense.  I mean the

24  trustees don't have independent rights with respect to

25  collection of fees that aren't related to their obligations in

47

1   administering and the other -- distributing and monitoring this

2   indenture.  The Indentured Trustee's rights arise solely

3   because it has duties under this indenture.

4          MR. FLASCHEN:  And in Section 8.06 it says

5   explicitly, "These fees and these indemnification obligations

6   shall constitute additional indebtedness."

7          THE COURT:  Right.  That's I think just an effort to

8   make sure that the issuer knows that the Trustee is going to

9   have a claim in addition to what the debtor owes on the bonds

10  themselves or on the notes themselves for the fees and

11  expenses, to make it clear that the fees and expenses are not

12  intended to come out of the pocket of the note holders but are

13  intended to come out of the pocket of the issuer.  That's

14  totally consistent throughout this document that the issuer and

15  the guarantors are responsible for making -- for paying

16  directly or indirectly the notes including the fees and

17  expenses that it takes to administer those notes, and then the

18  question is what's subordinated, and reading this document as a

19  whole, I don't see a carve out for the Trustee.

20         I just -- I did look at this in preparation for this

21  argument this morning.  I do not see a carve out for the

22  Trustee, and it would seem that if there were going to be a

23  carve out, that would be something that would be explicit.  The

24  Trustee would probably even want to know that there was a carve

25  out.

48

1           MR. FLASCHEN:  Your Honor, I -- respectfully, I think

2    it's the other way around.  I don't see where trustees' fees

3    are included.  Direct or indirect payment on the notes can't

4    be --

5           THE COURT:  Well, the Trustee doesn't have a right to

6    a payment except pursuant to its obligations under the

7    indenture.

8           MR. FLASCHEN:  And those --

9           THE COURT:  So I mean why isn't that a -- a payment

10   on the note, especially to the extent that it's defined in 8.06

11   is additional indebtedness.  That's clearly either a direct or

12   an indirect payment with respect to the note, because but for

13   the note, the issuer doesn't have any responsibility to pay the

14   Indentured Trustee's fees.

15          MR. FLASCHEN:  I respectfully disagree with that.

16   Eight point 0 six says this additional indebtedness survives

17   the discharge of the entire indenture.

18          THE COURT:  Right.  It -- that's also --

19          MR. FLASCHEN:  It cannot be out there independently.

20          THE COURT:  Yes, that's also --

21          MR. FLASCHEN:  -- if the notes have gone away.

22          THE COURT:  I'm sorry.

23          MR. FLASCHEN:  Once the indenture is discharged, it

24   must mean the notes have gone away, yet the debtor still owes

25   this additional indebtedness.  A payment on the notes --

49

1          THE COURT:  Of course, because the additional

2    indebtedness may not be totally known until after the final

3    distributions on the notes are made.  So it's like a fee

4    application.  You don't always know what you're total fees are

5    going to be.  You might have a projection, but you don't know

6    the exact amount until you've satisfied your obligations in my

7    example under the Bankruptcy Code and your example under the

8    note.  I don't see anything inconsistent.  It seems to be a

9    structurally very sound way to make things work.

10          The issuer knows that it has an obligation to pay the

11    notes including the fees and the expenses, and to the extent

12    that there was ever any doubt about whose obligation it is,

13    it's defined as additional indebtedness, and it's made to

14    survive the payment on the notes themselves, so that the issuer

15    and the guarantors are responsible for making those payments

16    that are incurred in connection with the Trustee's duties under

17    the notes.  In this instance, I think this document is

18    internally consistent and makes sense.

19          MR. FLASCHEN:  Then, Your Honor, let me refer to

20    something specific, which is the note itself --

21          THE COURT:  All right.

22          MR. FLASCHEN:  -- because the only holders of the

23    notes are the note holders.  The Indentured Trustee does not

24    hold a note.

25          THE COURT:  Right.

                    **J&J COURT TRANSCRIBERS, INC.**

50

1          MR. FLASCHEN:  Any payment on the notes -- there is

2  no obligation under the indenture to pay the fees of a holder

3  of a note.  That's why you have an indentured trustee.  The

4  form of note itself is on page what looks to be one.

5          THE COURT:  I'm sorry, Mr. Flaschen, I couldn't hear

6  you.  The form of note what?

7          MR. FLASCHEN:  The form of note itself is on page 1

8  and 2 --

9          THE COURT:  All right.  Just a --

10          MR. FLASCHEN:  -- and the note itself only refers the

11  principal and interest.  It does not talk about the fees of the

12  Trustee.

13          THE COURT:  Okay.  Just a second.

14          MR. FLASCHEN:  Yes.

15                              (Pause)

16          THE COURT:  I'm actually missing page one, which I

17  didn't realize until just now.

18          MR. FLASCHEN:  Do you have page two?

19          THE COURT:  I do.

20          MR. FLASCHEN:  Okay.  The other side of the note is

21  page 1, and the other parties will have it in front of them, so

22  they can disagree if I do not state this correctly, but it

23  says, "Kaiser shall pay the following amount."  Let's see.  So,

24  "The principal amount and to pay the registered holder hereof

25  as hereinafter provided interest on --"

1          THE COURT:  Wait.  Wait.  I see the problem now, Mr.

2   Flaschen.  I'm not with you.  I'm sorry.  What I'm looking at

3   is page -- the indenture itself not the note, and I am missing

4   page one of the indenture.  Page two -- unless it's not

5   numbered.

6          MR. FLASCHEN:  Yes, page one of the indenture starts

7   the form of note, and page two finishes the form of note.

8          THE COURT:  All right.  I do not have the beginning.

9   Oh, wait.  Maybe I have it out of order.  Okay.  I see what

10  happened.  I have this indenture dated as of the first day of

11  February is actually out of order with the rest of the note.

12  Okay.

13         MR. FLASCHEN:  Okay.

14         THE COURT:  All right.  I'm with that.  Go ahead.

15         MR. FLASCHEN:  Well the face of the note itself is an

16  obligation to pay principal and interest.  It's not an

17  obligation to pay indentured trustee fees or indemnifications,

18  because they're not owed to the holder of the note.  The note

19  doesn't owe any of that.  Also, the note doesn't have to pay

20  the Indentured Trustee.

21         THE COURT:  But it also provides specifically, as you

22  pointed out earlier, that in compliance with the Trust

23  Indenture Act it requires under the note Kaiser to appoint a

24  trustee and as an attorney in fact for purpose of taking such

25  actions as are necessary or appropriate to effectuate the

52

1   subordination in this instance.  That's a specific paragraph on

2   page three.

3          MR. FLASCHEN:  So that any individual note holder can

4   sue for fees and indemnity?

5          THE COURT:  No, on page three, the third full

6   paragraph that begins, "The indebtedness evidenced by the notes

7   is to the extent provided in the indenture subordinate and

8   subject to right of payment to the prior payment in full of

9   all," etcetera, etcetera.  That paragraph requires the company

10  -- we talked about this paragraph before -- to appoint the

11  Trustee with respect to obligations to enforce the

12  subordination so --

13         MR. FLASCHEN:  And where in that paragraph does it

14  refer to the indentured trustee's fees or indemnification?  It

15  gives him --

16         THE COURT:  It says, "The company shall not make any

17  direct or indirect payments or distribution on or with respect

18  to the notes, including by way of account of a claim as defined

19  in the indenture, or the payment of principal of premium, if

20  any, change of control purchase price, asset sale purchase

21  price or interest as applicable on any of the notes while the

22  company is in default," and so forth.

23         MR. FLASCHEN:  I apologize for being belligerent, but

24  not one of those encompasses fees or indemnity.  It's not in

25  the note.  It's not a claim, which is a securities law by

53

definition -- securities law-type claim.  It's not principal.

It's not premium.  It's not --

THE COURT:  But, Mr. Flaschen, it says, "The company

shall not make any direct or indirect payments or distributions

on or with respect to the notes."  The only way that the

Indentured Trustee can possibly claim a fee is with respect to

the notes.  He has no obligation but for the notes.  He doesn't

have an independent claim, because he's not appointed to do

anything but to administer the notes.  So his fees have to be

on or with -- his distributions have to be on or with respect

to the notes, because there is no independent claim.  If he

doesn't have obligations under the notes, he has -- he's not

the Indentured Trustee.

MR. FLASCHEN:  Then, respectfully, we disagree,

because the note is the note.  The fees are different.  Let's

talk about outside of bankruptcy for a moment.  The issuer has

the obligation you make semi-annual interest payments.

Eventually, you have to repay principal at maturity.

Separately, the issue pays what's typically an annual -- it

could be a monthly -- administrative fee to an indentured

trustee.  That's a payment of a fee.  That's not a payment on

the note.  If you didn't pay the fee, the note holder is still

paid what it's owed, and the note holder doesn't have a claim.

The Indentured Trustee would, because the Indentured Trustee

wasn't paid its independent fee pursuant to the issuer's

54

1  independent obligation.

2          THE COURT:  Well, I don't disagree that with respect

3  to the obligation it's defined as an additional obligation.

4  Where I disagree is that it isn't on or with respect to the

5  notes, because although it's not a fee that will pay down

6  principal and interest, it is a fee that pays down the

7  administrative cost of issuing those notes that's required by

8  the Trust Indenture Act.  You can't -- I mean no one can assume

9  that you're going to get a Trustee under the Trust Indenture

10 Act without having some fees that will be attributed to it.

11 And since the Trust Indenture Act requires that in order to

12 have an indenture you have to have a trustee, of course, you

13 have to pay the fees.  But how else are they anything other

14 than related to the indentured notes, because but for the

15 indentured notes, there wouldn't be an indentured trustee or an

16 obligation to pay those fees.

17         I think we're just simply arguing about what the

18 scope of the on or with respect to the notes language means.  I

19 view it more broadly I believe than you view it.  It seems to

20 me that it's an integral part of administering the notes, and

21 although you agree that it's an integral part of administering

22 the notes, say that it's a separate obligation not related to

23 the notes, and I think it's related to the notes.

24         MR. FLASCHEN:  If I may then refer you to one more

25 section we --

55

1          THE COURT:  All right.

2          MR. FLASCHEN:  -- haven't discussed, and then I'll be

3  quiet, which is the events of default.  It starts on page 69.

4          THE COURT:  Under the indenture?

5          MR. FLASCHEN:  Yes.

6          THE COURT:  Page what?

7          MR. FLASCHEN:  It starts on page 69 and carries over

8  to page 70.

9          THE COURT:  All right.  Just a second.  Okay.

10          MR. FLASCHEN:  (a) and (b) deal with payments on the

11  notes.  Again, nowhere in there does it say the failure to pay

12  indentured trustee fees or indemnification is a default on the

13  notes.  (a) is principal on the notes -- I'm sorry -- is

14  interest on the notes, and (b) is the rest of these types of

15  things -- change of control, purchase price, and so forth, if

16  any, on the notes.  It could very easily have said including

17  indentured trustee fees under 8.06 or 7.02.  It doesn't --

18          THE COURT:  Well, it also says though in (c),

19  "Failure on the part of the company duly to observe or perform

20  in any material respect any other of the covenants or

21  agreements on the part of the company in the notes or in this

22  indenture," etcetera.  It clearly -- it requires notices.  I

23  mean there's a process set up, but nonetheless, it defines as a

24  default the failure by the company to perform any other

25  material covenant.  And the payment of the fees, as you've

1  already pointed out, in 8.06 is a material covenant.  It's

2  defined as an additional indebtedness.

3          MR. FLASCHEN:  My last sentence, then I will be

4  quiet.  I think you've just made the same point I did, which is

5  (a) and (b) deal with any payments with respect to the notes,

6  (c) recognizes payment of fees, and these other things are

7  independent obligations.  They are not payments on the notes,

8  otherwise, it would come under (a) and (b).  With that, Your

9  Honor, thank you.

10          THE COURT:  Okay.  Mr. Flaschen, I want to be clear.

11  I agree it's not a payment on the notes.  It's not defined as

12  principal interest.  It's defined as additional indebtedness,

13  but it is a payment with respect to the note, because but for

14  the note, you wouldn't have this indebtedness.  So that's the

15  point.  I don't disagree that it's not a payment on the note,

16  but I do disagree that it isn't payment with respect to the

17  note.

18          MR. FLASCHEN:  Thank you, Your Honor.

19          THE COURT:  Okay.  Anyone else?

20              (No verbal response)

21          THE COURT:  Okay.  This too I think is simply another

22  objection to the plan, and again, I have not yet determined

23  whether or not the 1993 indentures are subordinated.  To the

24  extent that I find that they are not subordinated, then I

25  believe the Indentured Trustee is indeed entitled to fees and

57

1 | expenses under this note.  If, in fact, the indenture is fully

2 | subordinated, however, my view is that the Indentured Trustee's

3 | fees and expenses are part of that full subordination.  So that

4 | issue I haven't determined.

5 | All I'm saying for today is that if I determine that

6 | the notes are fully subordinated, then as part of that ruling,

7 | I believe Law Debenture's objection that its fees and expenses

8 | are not also subordinated has to be overruled.  And again I'll

9 | just ask all the parties to make sure that if we get to a plan

10 | confirmation order, that that is incorporated as an overruling

11 | of the objection if I find that the plan is confirmable as

12 | stated.  Anything more for today?

13 | MR. GORDON:  Nothing from the debtors, Your Honor.

14 | THE COURT:  Okay.  We're adjourned.  Thank you.

15 | MR. GORDON:  Thank you.

16 | MR. FLASCHEN:  Thank you.

17 | * * * * *

18 | **CERTIFICATION**

19 | I, PATRICIA C. REPKO, court approved transcriber,

20 | certify that the foregoing is a correct transcript from the

21 | official electronic sound recording of the proceedings in the

22 | above-entitled matter.

23 |

24 | _____        Date:  May 9, 2005

25 | PATRICIA C. REPKO

26 | J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**