## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Jointly Administered** |
| | : | **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION,** | : | |
| **a Delaware corporation, et al.,** | : | **Chapter 11** |
| | : | |
| **Debtors.** | : | **Re: Docket No. 7312; Agenda Item No. 1** |
| | : | **Hearing Date: 01/09/06 @ 9:00 a.m.** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE SECOND AMENDED JOINT PLAN OF REORGANIZATION OF KAISER ALUMINUM CORPORATION, KAISER ALUMINUM & CHEMICAL CORPORATION AND CERTAIN OF THEIR DEBTOR AFFILIATES, AS MODIFIED

## TABLE OF CONTENTS

Page

I.   FINDINGS OF FACT...................................................................................................... 7

     A.    JURISDICTION AND VENUE ............................................................................. 7

     B.    MODIFICATIONS TO THE PLAN ...................................................................... 8

     C.    COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF
           THE BANKRUPTCY CODE.................................................................................. 9

           1.    Section 1129(a)(1) — Compliance of the Plan with Applicable
                 Provisions of the Bankruptcy Code ........................................................... 9

           2.    Section 1129(a)(2) — Compliance with Applicable Provisions of
                 the Bankruptcy Code................................................................................. 17

           3.    Section 1129(a)(3) –– Proposal of the Plan in Good Faith...................... 17

           4.    Section 1129(a)(4) — Court Approval of Certain Payments as
                 Reasonable ................................................................................................ 18

           5.    Section 1129(a)(5) — Disclosure of Identity of Proposed
                 Management, Compensation of Insiders and Consistency of
                 Management Proposals with the Interests of Creditors and Public
                 Policy ........................................................................................................ 19

           6.    Section 1129(a)(6) — Approval of Rate Changes..................................... 20

           7.    Section 1129(a)(7) –– Best Interests of Holders of Claims and
                 Interests..................................................................................................... 20

           8.    Section 1129(a)(8) — Acceptance of the Plan by Each Impaired
                 Class.......................................................................................................... 20

           9.    Section 1129(a)(9) — Treatment of Claims Entitled to Priority
                 Pursuant to Section 507(a) of the Bankruptcy Code................................ 21

           10.   Section 1129(a)(10) — Acceptance By at Least One Impaired,
                 Non-Insider Class ..................................................................................... 22

           11.   Section 1129(a)(11) — Feasibility of the Plan ......................................... 23

           12.   Section 1129(a)(12) — Payment of Bankruptcy Fees .............................. 23

           13.   Section 1129(a)(13) –– Retiree Benefits.................................................. 23

           14.   Section 1129(b) — Confirmation of the Plan Over the
                 Nonacceptance of Impaired Classes ........................................................ 24

           15.   Section 1129(d) — Purpose of Plan.......................................................... 25

     D.    THE ASBESTOS PI TRUST AND THE ASBESTOS PI CHANNELING
           INJUNCTION COMPLY WITH SECTION 524(g) OF THE
           BANKRUPTCY CODE....................................................................................... 26

## TABLE OF CONTENTS
(continued)

Page

    1.    The Asbestos PI Trust Satisfies the Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code .................................................. 26

    2.    The Asbestos PI Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code ................................................. 27

    3.    The Extension of the Asbestos PI Channeling Injunction to Third Parties Is Appropriate ............................................................................ 29

    4.    Entry of the Asbestos PI Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants ........................... 32

E.    THE SILICA, CTPV AND NIHL PI CHANNELING INJUNCTIONS AND THE CHANNELED PI INSURANCE ENTITY INJUNCTION EACH SATISFY THE REQUIREMENTS OF SECTION 105(a) OF THE BANKRUPTCY CODE .................................................................................. 33

F.    SATISFACTION OF CONDITIONS TO CONFIRMATION ........................... 39

G.    SUBSTANTIVE CONSOLIDATION ................................................................ 42

II.    CONCLUSIONS OF LAW ........................................................................................ 43

A.    JURISDICTION AND VENUE ......................................................................... 43

B.    MODIFICATIONS TO THE PLAN .................................................................. 44

C.    EXEMPTIONS FROM SECURITIES LAWS ................................................... 44

D.    EXEMPTIONS FROM TAXATION ................................................................. 45

E.    COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE ...... 45

F.    COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE ............................................................................................................... 45

G.    OBJECTIONS TO THE PLAN ......................................................................... 45

    1.    The Insurers' Objections ......................................................................... 45

    2.    Law Debenture's Objection ..................................................................... 46

    3.    Other Objections ..................................................................................... 46

H.    TRANSFER OF BOOKS AND RECORDS TO THE FUNDING VEHICLE TRUST AND RETENTION OF KACC'S FORMER COUNSEL ......................................................................................................... 46

I.    APPROVAL OF THE RELEASES PROVIDED UNDER THE PLAN ............. 47

J.    ASSUMPTIONS, ASSUMPTIONS AND ASSIGNMENTS AND REJECTIONS OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................................................................................................ 47

## INTRODUCTION

WHEREAS, Kaiser Aluminum Corporation ("KAC"), Kaiser Aluminum &

Chemical Corporation ("KACC"), Akron Holding Corporation, Kaiser Aluminum & Chemical

Investment, Inc., Kaiser Aluminium International, Inc., Kaiser Aluminum Properties, Inc., Kaiser

Aluminum Technical Services, Inc., Kaiser Bellwood Corporation, Kaiser Micromill Holdings,

LLC, Kaiser Texas Micromill Holdings, LLC, Kaiser Sierra Micromills, LLC, Kaiser Texas

Sierra Micromills, LLC, Oxnard Forge Die Company, Inc., Alwis Leasing LLC, Kaiser Center,

Inc., KAE Trading, Inc. ("Kaiser Trading"), Kaiser Aluminum & Chemical Investment Limited

(Canada), Kaiser Aluminum & Chemical of Canada Limited (Canada), Kaiser Bauxite Company

("KBC"), Kaiser Center Properties, Kaiser Export Company and Texada Mines Ltd. (Canada)

(collectively, the "Reorganizing Debtors" and, as reorganized entities after emergence, the

"Reorganized Debtors"), twenty-two of the above-captioned debtors and debtors in possession,

proposed the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation,

Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates, dated

September 7, 2005, as modified (as it may be further modified, the "Plan");[1]

WHEREAS the Court, on September 8, 2005, entered its Order (A) Approving

Proposed Disclosure Statement, (B) Establishing Procedures for Solicitation and Tabulation of

[1] Unless otherwise specified, capitalized terms and phrases used herein have the meanings
assigned to such terms and phrases in the Plan. The rules of interpretation set forth in
Section 1.2.a of the Plan shall apply to these Findings of Fact and Conclusions of Law
(the "Findings and Conclusions"). In addition, in accordance with Section 1.1 of the
Plan, any term used in the Plan or these Findings and Conclusions that is not defined in
the Plan or herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall
have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as
applicable.

A copy of the Plan (without the exhibits thereto) is attached to the Confirmation Order as
Exhibit A and incorporated herein by reference.

Votes to Accept or Reject Proposed Joint Plan of Reorganization and (C) Scheduling a Hearing on Confirmation of Proposed Joint Plan of Reorganization and Approving Related Notice Procedures (D.I. 7320) (the "Disclosure Statement Order"), by which the Court, among other things, approved the Reorganizing Debtors' proposed disclosure statement (the "Disclosure Statement"), established procedures for the solicitation and tabulation of votes to accept or reject the Plan and scheduled a hearing to consider Confirmation of the Plan for January 9, 2006 at 9:00 a.m., to be continued on January 10, 2006 if necessary (the "Confirmation Hearing");

WHEREAS affidavits of service executed by Kathleen M. Logan with respect to the mailing of notice of the Confirmation Hearing and solicitation materials in respect of the Plan in accordance with the Disclosure Statement Order (collectively, the "Affidavits of Service") and were filed with the Court on September 19, 2005 (D.I. 7390-93), October 14, 2005 (D.I. 7514, 7516, 7522-26) and November 10, 2005 (D.I. 7686);

WHEREAS the Affidavit of Andrew Novak (D.I. 7773) (the "Publication Affidavit") was filed with the Court on November 21, 2005, regarding the publication of the Notice of (A) Deadline for Casting Votes to Accept or Reject Proposed Joint Plan of Reorganization, (B) Hearing to Consider Confirmation of Proposed Joint Plan of Reorganization and (C) Related Matters in certain magazines and newspapers as set forth in the Disclosure Statement Order;

WHEREAS, Logan & Company, Inc., the Court-appointed solicitation and tabulation agent in respect of the Plan, filed the Declaration of Kathleen M. Logan Certifying the Methodology for the Tabulation of Votes on, and the Results of Voting with Respect to, the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates (D.I. 7812) (the

DLI-5970550v4                                                          -2-

"Voting Declaration") on November 29, 2005, attesting to the results of the tabulation of the properly executed and timely received Ballots for the Plan as follows:

**Subclass 2A Claimants.** The Reorganizing Debtors received 279 acceptances out of 286 votes from holders of Claims under Subclass 2A (Senior Note and 7-3/4% SWD Revenue Bond Convenience Claims), with Subclass 2A claimants who voted in favor of the Plan holding Claims in the amount of $2,317,000 for voting purposes, such acceptances being 97.55 percent in number and 97.07 percent in principal amount of all ballots received from holders of Subclass 2A Claims (Voting Decl. ¶¶ 18-19);

**Subclass 2B Claimants.** The Reorganizing Debtors received 530 acceptances out of 571 votes from holders of Claims under Subclass 2B (Other Convenience Class Claims) with Subclass 2B claimants who voted in favor of the Plan holding Claims in the amount of $2,289,307 for voting purposes, such acceptances being 92.82 percent in number and 92.49 percent in principal amount of all ballots received from holders of Subclass 2B Claims (Voting Decl. ¶¶ 18-19);

**Class 4 Claimants.** The Reorganizing Debtors received 1 acceptance out of 1 vote from holders of Claims under Class 4 (Canadian Debtor PBGC Claims) with Class 4 claimants who voted in favor of the Plan holding Claims in the amount of $616,000,000 for voting purposes, such acceptances being 100 percent in number and 100 percent in principal amount of all ballots received from holders of Class 4 Claims (Voting Decl. ¶¶ 18-19);

**Class 5 Claimants.** The Reorganizing Debtors received 197,820 acceptances out of 198,127 votes from holders of Claims under Class 5 (Asbestos Personal Injury Claims) with Class 5 claimants who voted in favor of the Plan holding Claims in the amount of $993,949,450

DLI-5970550v4

-3-

for voting purposes, such acceptances being 99.84 percent in number and 99.97 percent in principal amount of all ballots received from holders of Class 5 Claims (Voting Decl. ¶¶ 18-19);

**Class 6 Claimants.** The Reorganizing Debtors received 296 acceptances out of 296 votes from holders of Claims under Class 6 (CTPV Personal Injury Claims) with Class 6 claimants who voted in favor of the Plan holding Claims in the amount of $296 for voting purposes, such acceptances being 100 percent in number and 100 percent in principal amount of all ballots received from holders of Class 6 Claims (Voting Decl. ¶¶ 18-19);

**Class 7 Claimants.** The Reorganizing Debtors received 1,764 acceptances out of 1,773 votes from holders of Claims under Class 7 (NIHL Personal Injury Claims) with Class 7 claimants who voted in favor of the Plan holding Claims in the amount of $1,764 for voting purposes, such acceptances being 99.49 percent in number and 99.49 percent in principal amount of all ballots received from holders of Class 7 Claims (Voting Decl. ¶¶ 18-19);

**Class 8 Claimants.** The Reorganizing Debtors received 2,667 acceptances out of 2,674 votes from holders of Claims under Class 8 (Silica Personal Injury Claims) with Class 8 claimants who voted in favor of the Plan holding Claims in the amount of $2,667 for voting purposes, such acceptances being 99.74 percent in number and 99.74 percent in principal amount of all ballots received from holders of Class 8 Claims (Voting Decl. ¶¶ 18-19);

**Subclass 9B Claimants.** The Reorganizing Debtors received 345 acceptances out of 372 votes from holders of Claims under Subclass 9B (Other Unsecured Claims) with Subclass 9B claimants who voted in favor of the Plan holding Claims in the amount of $1,153,864,132 for voting purposes, such acceptances being 92.74 percent in number and 99.26 percent in principal amount of all ballots received from holders of Subclass 9B Claims (Voting Decl. ¶¶ 18-19);

WHEREAS objections to Confirmation of the Plan (collectively, the

"Objections") were filed by (a) the official committee of retired employees (the "Retirees' Committee") (D.I. 7699), (b) the United States of America, on behalf of the Internal Revenue Service (the "IRS") (D.I. 7705), (c) the Comptroller of Public Accounts of the State of Texas (the "Texas Comptroller") (D.I. 7706), (d) Law Debenture Trust Company of New York ("Law Debenture") (D.I. 7707), (e) the Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities ("Clark") (D.I. 7711), (f) Santown Limited Partnership ("Santown") (D.I. 7714), (g) the United States Trustee (the "U.S. Trustee") (D.I. 7715), (h) Elizabeth Black (D.I. 7743), (i) Patty Greiner (D.I. 7830) and (j) certain insurance companies (collectively, the "Insurers") (D.I. 7834, 7836, 7839, 7840, 7843, 7847, 7851,8046);

WHEREAS the Objections of the Retirees' Committee, the IRS, the Texas Comptroller and Santown were each resolved prior to the Confirmation Hearing;

WHEREAS the United States Department of Justice, on behalf of certain federal agencies, raised an informal Objection to Confirmation of the Plan, which was resolved by the parties by the inclusion of certain language in the Confirmation Order;

WHEREAS Sherwin Alumina, L.P. filed a reservation of rights and conditional Objection to Confirmation of the Plan (D.I. 8033), which it withdrew at the Confirmation Hearing;

WHEREAS the U.S. Trustee withdrew its Objection (D.I. 7960);

WHEREAS the Objection of Santown was resolved by the inclusion of certain language in the Confirmation Order;

WHEREAS the Creditors' Committee filed a Pre-Hearing Brief in Support of the Plan (D.I. 7961) (the "Creditors' Committee's Brief") and a reply to Sherwin's conditional

DLI-5970550v4                                    -5-

objection (D.I. 8056), the Reorganizing Debtors filed a memorandum of law in support of

Confirmation of the Plan and in response to certain of the Objections (D.I. 7967) (the

"Memorandum of Law") and a reply to Sherwin's conditional objection to the Plan (D.I. 8068),

the Reorganizing Debtors and the official committee of asbestos claimants (the "Asbestos

Committee") filed a joint memorandum of law in response to the Insurers' Objections (D.I. 7966)

(the "Joint Response") and Anne M. Ferazzi, the legal representative for future silica and coal tar

pitch volatile claimants (the "Silica and CTPV Representative"), and Martin J. Murphy, the legal

representative for future asbestos claimants (the "Asbestos Representative"), each filed a joinder

to the Joint Response (D.I. 7962, 7968);

WHEREAS the Insurers filed three replies (D.I. 8057, 8058, 8060) in support of

their Objections;

WHEREAS the declarations of Edward F. Houff (D.I. 8066), Blake O'Dowd (D.I.

8067), Anne M. Ferazzi (D.I. 8063) and Martin J. Murphy (D.I. 8065) were submitted in support

of the Plan (collectively, the "Declarations") and received into evidence without objection, and

although all parties and participants were afforded an opportunity to conduct cross-examination

at the hearing, no one elected to do so (Tr. of Jan. 9, 2006 Hr'g at 20-24);

WHEREAS the Court has reviewed the Plan, the Disclosure Statement, the

Disclosure Statement Order, the Voting Declaration and the Declaration of Kathleen M. Logan

filed on January 6, 2006 (D.I. 8097), the Affidavits of Service, the Publication Affidavit, the

Objections, the Memorandum of Law, the Joint Response, the Creditors' Committee's Brief, the

Insurers' replies in further support of their Objections, the Declarations and the other papers

before the Court in connection with the Confirmation of the Plan;

WHEREAS the Court heard the statements of counsel in support of and in opposition to Confirmation at the Confirmation Hearing, as reflected in the record made at the Confirmation Hearing;

WHEREAS the Court has considered all evidence presented at the Confirmation Hearing;

WHEREAS the Court has taken judicial notice of the papers and pleadings on file in these chapter 11 cases;

WHEREAS the Court, after due deliberation and for sufficient cause, finds that the evidence admitted in support of the Plan at the Confirmation Hearing is persuasive and credible;

NOW, THEREFORE, the Court hereby enters the following Findings of Fact and Conclusions of Law with respect to Confirmation of the Plan.[2]

## I. FINDINGS OF FACT.

### A. JURISDICTION AND VENUE.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has jurisdiction to enter a final order with respect thereto, except to the extent of the requirements of Section 524(g) of the Bankruptcy Code for issuance or affirmance of the Confirmation Order by the United States District Court for the District of Delaware (the "District Court").

---

[2]     These Findings and Conclusions constitute the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable herein by Bankruptcy Rules 7052 and 9014. Any finding of fact shall constitute a finding of fact even if it is referred to as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is referred to as a finding of fact. Citations to the Bankruptcy Code and Rules are to the sections and rules as numbered and in effect prior to October 17, 2005.

## B.    MODIFICATIONS TO THE PLAN.

The Reorganizing Debtors filed three sets of modifications to the Plan, which are

set forth in: (a) the Motion for Entry of Stipulation and Agreed Order Regarding Plan

Modifications and Potential Confirmation Objections by Certain Insurance Companies (D.I.

7659) (the "First Modifications"); (b) the Motion for Entry of an Order (I) Approving Settlement

with Sherwin Alumina, L.P. and (II) Authorizing Related Modifications to Second Amended

Joint Plan of Reorganization (D.I. 7796) (the "KBC Modifications"); and (c) the Amended

Notice of Filing of Third Modification to the Second Amended Joint Plan of Reorganization of

Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their

Debtor Affiliates (D.I. 7965) (the "Third Modifications" and, together with the First

Modifications and the KBC Modifications, the "Modifications"). The Court approved the First

Modifications pursuant to the Stipulation and Agreed Order entered on November 15, 2005 (D.I.

7718). On December 19, 2005, the Court approved the KBC Modifications (D.I. 7993), but

directed the Reorganizing Debtors to serve on general unsecured creditors in Subclass 9B a

notice describing the impact of the KBC Modifications on Subclass 9B creditors and providing

such creditors with an opportunity to object to confirmation of the Plan on the basis that the Plan

includes the KBC Modifications and providing those creditors who timely submitted a vote in

Subclass 9B to accept the Plan with an opportunity to change their votes. On December 21,

2005, the Reorganizing Debtors filed their Notice of Filing and Service on Holders of Subclass

9B General Unsecured Claims of Notice of:  (A) Modifications to Second Amended Joint Plan of

Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation

and Certain of Their Debtor Affiliates, as Modified; and (B) Deadline for Changing Previous

Votes on Plan and Objecting to Modifications Filed by Kaiser Aluminum Corporation (D.I.

8002). On December 27, 2005, the Reorganizing Debtors filed the affidavit of Kathleen M.

Logan (D.I. 8027) (the "KBC Affidavit of Service"), evidencing service of the KBC

Modifications Notice on Subclass 9B creditors, which took place on December 21 and December

22, 2005. No objections to the KBC Modifications have been filed. And on January 6, 2006, the

Reorganizing Debtors filed the Declaration of Kathleen M. Logan (D.I. 8097) (the "Voting

Change Declaration"), evidencing that no creditor who timely submitted a vote in Subclass 9B to

accept the Plan elected to change such vote. Accordingly, the Modifications, including the KBC

Modifications, may be approved as part of the confirmation process. (See Tr. of Jan. 9, 2006

Hr'g at 30.)

## C.    COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

### 1.    Section 1129(a)(1) — Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.

The Plan complies with all applicable provisions of the Bankruptcy Code, as

required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the

Bankruptcy Code. (Houff Decl. ¶¶ 39-49.) The Plan fully complies with each requirement of

section 1123(a) of the Bankruptcy Code. (Houff Decl. ¶ 43.) Article II of the Plan designates

fifteen classes of Claims and Interests. (Plan art. II; Houff Decl. ¶43.) Section 3.2 of the Plan

specifies that Classes 1, 3, 10 and 15 are not impaired under the Plan. (Plan § 3.2; Houff Decl.

¶ 43.) Section 3.3 of the Plan specifies that Claims and Interests in Classes 2, 4, 5, 6, 7, 8, 9, 11,

12, 13 and 14 are impaired and describes the treatment of each such Class. (Plan § 3.3; Houff

Decl. ¶ 43.) Further, the treatment of each Claim or Interest within a Class is the same as the

treatment of each other Claim or Interest in such Class, unless the holder of a Claim or Interest

agrees to less favorable treatment on account of its Claim or Interest. (Houff Decl. ¶ 43.)

**a.  Sections 1122 and 1123(a)(1)-(4) — Classification and Treatment of Claims and Interests.**

i.  The Plan constitutes a separate plan of reorganization for each of the Reorganizing Debtors. The Plan meets the classification requirements of section 1122(a) of the Bankruptcy Code. Article II of the Plan classifies Claims and Interests into fifteen separate categories. (Plan art. II; Houff Decl. ¶ 43.) In particular, Article II of the Plan segregates into separate Classes Unsecured Priority Claims (Class 1), Convenience Claims (Class 2), Secured Claims (Class 3), Canadian Debtor PBGC Claims (Class 4), Asbestos Personal Injury Claims (Class 5), CTPV Personal Injury Claims (Class 6), NIHL Personal Injury Claims (Class 7), Silica Personal Injury Claims (Class 8), General Unsecured Claims (Class 9), Canadian Debtor Claims (Class 10), Intercompany Claims (Class 11), KAC Old Stock Interests (Class 12), Kaiser Trading Old Stock Interests (Class 13), KACC Old Stock Interests (Class 14) and Other Old Stock Interests (Class 15). (Id.) The groupings reflect the diverse characteristics of those Claims and Interests, and the legal rights under the Bankruptcy Code of each of the holders of Claims or Interests within a particular Class are substantially similar to other holders of Claims or Interests within that Class. (Houff Decl. ¶¶ 39-42.)

ii.  Due to their entitlement to priority status under section 507 of the Bankruptcy Code, Unsecured Priority Claims have been separately classified in Class 1. (Plan § 2.1; Houff Decl. ¶40.) In accordance with section 1122(b) of the Bankruptcy Code, Convenience Claims (consisting of every unsecured claim, except any Claim in respect of 6-1/2% RPC Revenue Bonds or Senior Subordinated Notes, that falls below the applicable threshold amount) have been separately classified in Class 2 for administrative convenience. (Plan § 2.2; Houff Decl. ¶ 40.) Specifically, Subclass 2A (Senior Note and 7-3/4% SWD Revenue Bond Convenience Claims) includes all Senior Note Claims and 7-3/4% SWD Revenue

Bond Claims for which the stated principal amount of the securities underlying the allowed amount of each such Claim is either equal to or less than $15,000, and Subclass 2B includes all Unsecured Claims other than Senior Note Claims, 7-3/4% SWD Revenue Bond Claims, 6-1/2% RPC Revenue Bonds and Senior Subordinated Note Claims for which (a) with respect to 7.60% SWD Revenue Bond Claims, the stated principal amount of the securities underlying the allowed amount of each such Claim is either equal to or less than $30,000 or (b) with respect to any such Claim other than a 7.60% SWD Revenue Bond Claim, the allowed amount of such Claim is equal to or less than $30,000. (Id.)

                        iii.      Based on their secured status, Secured Claims have been separately classified in Class 3. (Plan § 2.3; Houff Decl. ¶ 41.) Unsecured Claims in Class 4 (Canadian Debtor PBGC Claims) and Class 10 (Canadian Debtor Claims) have been separately classified because such Claims have been asserted against the Canadian Debtors, which are not being substantively consolidated with the other Reorganizing Debtors for purposes of implementing the Plan, and the Plan classifies the Canadian Debtor PBGC Claims separately from the other Canadian Debtor Claims based on the fact that the PBGC Claims are allowed against each of the Reorganizing Debtors and are receiving the treatment negotiated in the PBGC Settlement Agreement. (Plan § 2.4; Houff Decl. ¶ 41.) Asbestos Personal Injury Claims, CTPV Personal Injury Claims, NIHL Personal Injury Claims and Silica Personal Injury Claims have been separately classified in, respectively, Classes 5, 6, 7 and 8 due to the distinctive bases for such claims. (Plan § 2.5-2.8; Houff Decl. ¶ 41.) Moreover, due to their unique nature, Class 11 Intercompany Claims have been classified separately from the Class 9 general Unsecured Claims. (Plan § 2.9, 2.11; Houff Decl. ¶ 41.)

-11-

iv.    Finally, the four Classes of Interests are comprised of

(a) the Interests and Claims in respect of the KAC Old Stock (Class 12), (b) the Interests and Claims in respect of the Old Stock of Kaiser Trading (Class 13), (c) the Interests and Claims in respect of the Old Stock of KACC (Class 14) and (d) the Interests in any Debtor other than the Interests in Classes 12, 13 or 14 (Class 15). (Plan § 2.12-2.15; Houff Decl. § 42.) The Interests in the Debtors have been segregated into these four Classes according to the differing nature of such Interests. (Houff Decl. ¶ 42.)

**b.    Section 1123(a)(5) — Adequate Means for Implementation of the Plan.**

i.    Article IV of the Plan and various other provisions of the

Plan provide adequate means for the Plan's implementation, including: (a) except as otherwise provided in the Plan and subject to the Restructuring Transactions, the continued corporate existence of the Reorganizing Debtors and the vesting of assets in the Reorganized Debtors under Section 4.1 of the Plan; (b) the consummation of the Restructuring Transactions in connection with Section 4.2 of the Plan; (c) the creation of, and transfer of certain assets to, the Funding Vehicle Trust for the benefit of the PI Trusts and the appointment of the Funding Vehicle Trustees according to Section 5.1 of the Plan; (d) the creation of the PI Trusts, the transfer of certain assets to the Asbestos PI Trust and the Silica PI Trust and the appointment of the PI Trusts' respective Trustees and Trust Advisory Committees, as detailed in Sections 5.2 through 5.5 of the Plan; (e) the issuance of New Common Stock in Reorganized KAC for distribution in satisfaction of certain Claims under Section 4.3.d of the Plan; (f) the preservation of rights of action by, and release of certain rights of action against, the Reorganized Debtors, as described in Section 4.5 of the Plan; (g) the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases to which any Reorganizing Debtor is a party, as

-12-

stated in Article VI of the Plan; (h) the cancellation of the Senior Note Indentures and the discharge of obligations thereunder, subject to certain rights of the Indenture Trustees that will remain in effect, as detailed in Section 4.12 of the Plan; and (i) the substantive consolidation of KAC, KACC, Akron Holding Corporation, Kaiser Aluminum & Chemical Investment, Inc., Kaiser Aluminium International, Inc., Kaiser Aluminum Properties, Inc., Kaiser Aluminum Technical Services, Inc., Bellwood, Kaiser Micromill Holdings, LLC, Kaiser Texas Micromill Holdings, LLC, Kaiser Sierra Micromills, LLC, Kaiser Texas Sierra Micromills, LLC, Oxnard Forge Die Company, Inc., Alwis Leasing LLC, Kaiser Center, Inc., Kaiser Trading, Kaiser Center Properties and Kaiser Export Company, as provided in Sections 1.1(195), 9.1 and 9.2 of the Plan. (Plan art. VI, §§ 4.1, 4.2, 4.3.d, 4.5, 4.12, 5.1, 5.2-5.5, 1.1(195), 9.1, 9.2; Houff Decl. ¶ 44.) In accordance with the KBC Modifications, the Plan also provides for the substantive consolidation of KBC with the Substantively Consolidated Debtors solely for the limited purpose of treating any Unsecured Claims against KBC as Claims in Subclass 9B for purposes of distributions to be made under the Plan. (KBC Modification at 2; Houff Decl. ¶ 44.)

c.   **Section 1123(a)(6) — Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities.**

Section 4.3.a(i) of the Plan provides that the Certificates of Incorporation of Reorganized KAC, Reorganized Kaiser Trading and each other Reorganized Debtor will, among other things, prohibit the issuance of nonvoting equity securities to the extent required under section 1123(a) of the Bankruptcy Code. (Plan § 4.3.a(i); Houff Decl. ¶ 45.) This prohibition is reflected in Article IV, Section 1 of the Amended and Restated Articles of Incorporation of Reorganized KAC and the Amended and Restated Articles of Incorporation of Reorganized Kaiser Trading, which are Plan Exhibits 4.3a(i) and (ii). (Plan Ex. 4.3.a(i), 4.3.a(ii); Houff Decl. ¶ 45.)

-13-

DLI-5970550v4

**d. Section 1123(a)(7) — Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Security Holders and Public Policy.**

i. The Plan ensures that the selections of the officers and directors of Reorganized KAC, Reorganized Kaiser Trading and the other Reorganized Debtors is consistent with the interests of creditors and equity security holders and with public policy. (Houff Decl. ¶ 46.) Sections 1.1(176) and 4.3.b of the Plan provide that the initial board of directors for Reorganized KAC will be comprised of the following: (a) the chief executive officer; (b) four persons designated by the USW; and (c) five persons designated by the Search Committee. (Plan § 1.1(176), 4.3.b; Houff Decl. ¶ 46.) The Search Committee consisted of two persons designated by the Reorganizing Debtors, two persons designated by the Creditors' Committee and one person designated jointly by the Asbestos Committee, the Asbestos Representative and the Silica and CTPV Representative. (Plan § 1.1(176); Houff Decl. ¶ 46.) Accordingly, nine of the ten initial directors of Reorganized KAC were selected by creditor representatives or a committee the majority of which is comprised of creditor representatives. (Houff Decl. ¶ 46.) In addition, Section 4.3.b of the Plan provides that the initial members of the board of directors and initial officers of Reorganized Kaiser Trading will be selected jointly by the Asbestos Committee, the Asbestos Representative and the Silica and CTPV Representative. (Plan § 4.3.b; Houff Decl. ¶ 46.)

ii. In light of the foregoing, the manner of selection of the initial directors, managers, trustees and officers of the Reorganized Debtors, as set forth in the certificates of incorporation and bylaws or similar constituent documents of the applicable Reorganized Debtor and applicable state law, are consistent with the interests of the holders of Claims and Interests and public policy.

DL1-5970550v4 -14-

      **e.**    **Section 1123(b)(1)-(2) — Impairment of Claims and Interests and Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases.**

In accordance with section 1123(b)(1) of the Bankruptcy Code, Article III of the

Plan provides for the impairment of certain classes of Claims and Interests, while leaving other

Classes unimpaired. (Plan art. III; Houff Decl. ¶ 47.) The Plan thus modifies the rights of the

holders of certain Claims and Interests and leaves the rights of others unaffected. (Houff Decl.

¶ 47.) In accordance with section 1123(b)(2) of the Bankruptcy Code, Article VI of the Plan

provides for the assumption, assumption and assignment or rejection of certain Executory

Contracts and Unexpired Leases to which the Reorganized Debtors are parties; *provided,*

*however,* that the Debtors or Reorganized Debtors reserve the right, at any time prior to the

Effective Date, to add or delete any Executory Contract or Unexpired Lease to be assumed,

assumed and assigned or rejected to or from the applicable exhibit to the Plan. (Plan art. VI;

Houff Decl. ¶ 47.)

      **f.**    **Section 1123(b)(3) — Retention, Enforcement and Settlement of Claims Held by the Debtors.**

In accordance with section 1123(b)(3) of the Bankruptcy Code, Section 4.5 of the

Plan provides for the retention and enforcement of possible claims or causes of action by the

Reorganized Debtors. (Plan § 4.5; Houff Decl. ¶ 47.)

      **g.**    **Section 1123(b)(5) — Modification of the Rights of Holders of Claims.**

Article III of the Plan modifies or leaves unaffected, as the case may be, the rights

of holders of each class of Claims and Interests. (Plan art. III; Houff Decl. ¶ 47.)

### h. Section 1123(b)(6) — Other Provisions Not Inconsistent with Applicable Provisions of the Bankruptcy Code.

In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code, including: (a) the provisions of Article VII of the Plan governing distributions on account of Allowed Claims; (b) the provisions of Article V of the Plan providing for (i) the creation of the Funding Vehicle Trust and the PI Trusts and (ii) the appointment of the Funding Vehicle Trustees and the PI Trusts' respective Trustees and Trust Advisory Committees; (c) the provisions of Article VIII of the Plan establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved; (d) the provisions of Article XII of the Plan regarding the release of Claims, the termination of Interests and injunctions against certain actions; (e) the provisions of Article IX of the Plan regarding the substantive consolidation of certain of the Reorganizing Debtors; and (f) the provisions of Article XIII of the Plan regarding retention of jurisdiction by the Court over certain matters after the Effective Date. (Plan art. V, VII, IX, XII, XIII; Houff Decl. ¶ 48.)

### i. Section 1123(d) — Cure of Defaults.

Article VI of the Plan provides for the satisfaction of Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. (Plan art. VI.) Additionally, in accordance with Section 3.2.b of the Plan, certain Claims will be Reinstated. (Plan § 3.2.b.) All Cure Amount Claims and Reinstated Claims will be determined in accordance with the underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established herein or, to extent applicable, any separate orders of the Court.

-16-

## 2. Section 1129(a)(2) — Compliance with Applicable Provisions of the Bankruptcy Code.

The Reorganizing Debtors have complied with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018. The Disclosure Statement and the procedures by which the Ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018 and the Disclosure Statement Order. (Houff Decl. ¶¶ 50-51.) Consistent with Section 14.2 of the Plan, the Debtors, the Reorganized Debtors, the DIP Lenders, the Indenture Trustees, the Creditors' Committee, the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, the PBGC, and the Retirees' Committee and their respective directors, managers, trustees, officers, employees, agents, members and professionals, as applicable, have all acted in "good faith," within the meaning of section 1125(e) of the Bankruptcy Code.

## 3. Section 1129(a)(3) — Proposal of the Plan in Good Faith.

The Reorganizing Debtors proposed the Plan in good faith and not by any means forbidden by law. In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the formulation of the Plan. (See Houff Decl. ¶¶ 18-37, 55; O'Dowd Decl. ¶¶ 4-7; Murphy Aff. ¶ 15-17; Ferrazi Decl. ¶ 25.) Based on the evidence presented at the Confirmation Hearing, the Court finds and concludes that the Plan has been proposed with the legitimate and honest purpose of reorganizing the business affairs of each of the Reorganizing Debtors and maximizing the returns available to creditors. (Houff Decl. ¶ 54; O'Dowd Decl. ¶ 8.) Consistent with the overriding purpose of chapter 11 of the Bankruptcy Code, the Plan is designed to allow the Reorganizing Debtors to reorganize by

-17-

resolving certain pending disputes and proceedings and providing the Reorganized Debtors with a capital structure that will allow them to satisfy their obligations with sufficient liquidity and capital resources and to fund necessary capital expenditures and otherwise conduct their businesses. (Houff Decl. ¶ 37; O'Dowd Decl. ¶ 8-10.) Moreover, the Plan itself and the arms' length negotiations among the Reorganizing Debtors, the Creditors' Committee, the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, the PBGC, the Retirees' Committee, the Unions and the Debtors' other constituencies leading to the Plan's formulation, as well as the overwhelming support of creditors for the Plan, provide independent evidence of the Reorganizing Debtors' good faith in proposing the Plan. (Houff Decl. ¶ 36; Voting Decl. at 6.)

### 4. Section 1129(a)(4) — Court Approval of Certain Payments as Reasonable.

a. In accordance with section 1129(a)(4) of the Bankruptcy Code, all fees to which parties may be entitled in connection with the Bankruptcy Cases, including Professionals' Fee Claims, are subject to the approval of the Court. (Houff Decl. ¶ 56.) Section 3.1 of the Plan provides for the payment of Allowed Administrative Claims, including Professionals' Fee Claims, and makes all such payments subject to Court approval and the standards of the Bankruptcy Code. (Plan § 3.1.a; Houff Decl. ¶ 56.) The Court has authorized the interim payment of the fees and expenses incurred by Professionals in connection with the Bankruptcy Cases. (See Revised Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (D.I. 1122) at 6; Houff Decl. ¶ 56.) All such fees and expenses, however, remain subject to final review for reasonableness by the Court. (Id.)

b. In connection with the foregoing, Article XIII of the Plan provides

that the Court will retain jurisdiction after the Effective Date to hear and determine all

applications for allowance of compensation or reimbursement of expenses authorized pursuant to

the Bankruptcy Code or the Plan. (Plan art. XIII; Houff Decl. ¶ 56.)

### 5.   Section 1129(a)(5) — Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy.

In the Disclosure Statement, Notice of Filing by Debtors and Debtors in

Possession Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and

Certain of Their Debtor Affiliates of Certain Information Regarding the Initial Board of

Directors of Reorganized Kaiser Aluminum Corporation in Accordance with the Second

Amended Joint Plan of Reorganization and Section 1129(a)(5) of the Bankruptcy Code (D.I.

7651) and Exhibit 4.3.b to the Plan, the Reorganizing Debtors have disclosed all necessary

information regarding the Reorganized Debtors' officers and directors, including their names,

ages, positions, affiliations and qualifications and, for the officers of Reorganized KAC, who

may constitute insiders, the compensation paid or to be paid.[3] (Houff Decl. ¶ 57.) In addition,

the names of the individuals expected to serve as the initial directors and officer of Reorganized

Kaiser Trading have been disclosed in the Notice of Filing By Debtors and Debtors in Possession

Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their

Debtor Affiliates of Certain Information Regarding the Initial Board of Directors of Reorganized

Kaiser Trading in Accordance with the Second Amended Joint Plan of Reorganization and

Section 1129(a)(5) of the Bankruptcy Code (D.I. 8042), dated December 29, 2005. (Id.) The

---

[3]     As noted on the record at the Confirmation Hearing, a director designated by the USW, George Becker, has asked to be replaced but has agreed to serve until his replacement has been identified. (See Tr. of Jan. 9, 2006 Hr'g at 17.)

appointment or continuance of the proposed directors and officers is consistent with the interests

of the holders of Claims and Interests and with public policy.

> **6.      Section 1129(a)(6) — Approval of Rate Changes.**

The Debtors' current businesses do not involve the establishment of rates over

which any regulatory commission has or will have jurisdiction after Confirmation. (Houff Decl.

¶ 59.)

> **7.      Section 1129(a)(7) — Best Interests of Holders of Claims and
> Interests.**

With respect to each impaired Class of Claims or Interests for each Reorganizing

Debtor, each holder of a Claim or Interest in such impaired Class has accepted or is deemed to

have accepted the Plan or, as demonstrated by the liquidation analyses included as Exhibit II to

the Disclosure Statement, will receive or retain under the Plan on account of such Claim or

Interest property of a amount, as of the Effective Date, that is not less than the value such holder

would receive or retain if the Reorganizing Debtors were liquidated on the Effective Date under

chapter 7 of the Bankruptcy Code. (Houff Decl. ¶¶ 60-61; O'Dowd Decl. ¶¶ 12-20.)

> **8.      Section 1129(a)(8) — Acceptance of the Plan by Each Impaired Class.**

a.      Pursuant to section 1129(a)(8) of the Bankruptcy Code, all classes

of Claims and Interests, other than Subclass 9A and Classes 12 and 14, have either accepted the

Plan or are unimpaired. (Houff Decl. ¶ 62; Voting Decl. at 6.) Specifically, Subclasses 2A, 2B

and 9B and Classes 4, 5, 6, 7 and 8, the only classes entitled to vote on the Plan, each

overwhelmingly voted to accept the Plan. (Id.) Classes 1, 3, 10 and 15 are unimpaired under the

Plan and, therefore, are deemed to have accepted the Plan. (Plan § 3.2; Houff Decl ¶ 62;

Disclosure Statement Order ¶ H.) In addition, although the holders of Class 11 Claims will

receive or have received the treatment set forth in the Intercompany Claims Settlement and

holders of Class 13 Claims and Interests will receive or retain no property on account of their Claims and Interests, as applicable, the holders of Claims and Interests in Classes 11 and 13 are deemed to have accepted the Plan pursuant to its express terms because those classes are comprised solely of the Reorganizing Debtors and the Other Debtors. (Plan § 3.3.h, 3.3.j; Houff Decl. ¶ 62; Disclosure Statement Order ¶ H.) Accordingly, section 1129(a)(8) of the Bankruptcy Code has been satisfied with respect to all Classes of Claims and Interests other than Subclass 9A and Classes 12 and 14. (Houff Decl. ¶ 62.)

    b.    Under the Plan, holders of Claims and Interests in Subclass 9A, Class 12 or Class 14 will receive or retain no property on account of their Claims and Interests. (Plan § 3.3.g, 3.3.i, 3.3.k; Houff Decl. ¶ 63.) Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, Subclass 9A and Classes 12 and 14 are deemed to have rejected the Plan. (Id.) Nonetheless, as explained in Section I.C.14 below, the Plan satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code necessary to obtain confirmation of the Plan, notwithstanding the deemed rejection of the Plan by Subclass 9A and Classes 12 and 14.

### 9.    Section 1129(a)(9) — Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.

    a.    The Plan also meets the requirements regarding the payment of Administrative Claims, Priority Claims and Priority Tax Claims, as set forth in section 1129(a)(9) of the Bankruptcy Code. (Houff Decl. ¶ 64.)

    b.    Section 3.1.a(i) of the Plan provides that, subject to certain Bar Dates and unless otherwise agreed by the holder of an Administrative Claim and the applicable Reorganizing Debtor or Reorganized Debtor, all Allowed Administrative Claims will be paid in full in cash: (a) on the Effective Date or (b) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes allowed by a

Final Order or a Stipulation of Amount and Nature of Claim. (Plan § 3.1.a(i); Houff Decl. ¶ 64.) Pursuant to Plan Section 3.1.a(iii), Administrative Claims based on liabilities incurred by a Reorganizing Debtor in the ordinary course of its business — including Administrative Trade Claims and Administrative Claims of governmental units for Taxes, including Tax audit Claims related to tax years commencing after the Petition Date, and Allowed Administrative Claims arising from the contracts and leases of the kind described in Section 6.6 of the Plan — will be paid by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims. (Id.) Section 3.1.a(iv) of the Plan provides that, unless otherwise agreed by the DIP Lenders, pursuant to the DIP Financing Facility, Allowed Administrative Claims under or evidenced by the DIP Financing Facility will be paid in full in Cash on or before the Effective Date. (Plan § 3.1.a(iv); Houff Decl. ¶ 64.)

                    c.      Section 3.1.b(i) of the Plan provides that, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Reorganizing Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, deferred Cash payments over a period not exceeding six years from the date of assessment of such Priority Tax Claim on the terms set forth in the Plan. (Plan § 3.1.b(i); Houff Decl. ¶ 65.) In addition, section 3.1.b(i) of the Plan permits the Reorganized Debtors to pay any Allowed Priority Tax Claim, or any remaining balance of such Priority Tax Claim, in full at any time on or after the Effective Date, without premium or penalty. (Id.)

### 10.    Section 1129(a)(10) — Acceptance By at Least One Impaired, Non-Insider Class.

As indicated in the Voting Declaration and as reflected in the record of the Confirmation Hearing, at least one Class of Claims that is impaired under the Plan has voted to

accept the Plan, determined without including the acceptance by any insider, with respect to all Reorganized Debtors under the Plan. (Voting Decl. at 6; Houff Decl. ¶ 66.)

### 11.    Section 1129(a)(11) — Feasibility of the Plan.

Although the Reorganizing Debtors' businesses operate in highly competitive industries and markets, and although it is impossible to predict with certainty the precise future profitability of the Reorganizing Debtors' businesses or the industries and markets in which the Reorganizing Debtors operate, as demonstrated by the Reorganizing Debtors' financial projections contained in the Disclosure Statement and the evidence in the record, Confirmation of the Plan is not likely to be followed by the liquidation of, or the need for further financial reorganization of the Reorganizing Debtors, the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan. (Disclosure Statement at 195; Houff Decl. ¶ 67-69; O'Dowd Decl. ¶ 21-28.) Upon the Effective Date, the Reorganized Debtors will have sufficient operating cash and liquidity to meet their financial obligations under the Plan and to fund ongoing business operations. (O'Dowd Decl. ¶ 28; Houff Decl. ¶ 32.)

### 12.    Section 1129(a)(12) — Payment of Bankruptcy Fees.

Section 3.1.a(ii) of the Plan provides for the payment in full in Cash on or before the Effective Date of the fees due to the U.S. Trustee, in accordance with section 1129(a)(12) of the Bankruptcy Code. (Plan § 3.1.a(ii); Houff Decl. ¶ 70.)

### 13.    Section 1129(a)(13) — Retiree Benefits.

The Plan satisfies the requirements of 1129(a)(13) of the Bankruptcy Code, which requires that a plan provide for the payment of retiree benefits, as such benefits may have been modified pursuant to section 1114 of the Bankruptcy Code. (Houff Decl. ¶ 71.) The Plan continues the implementation of certain settlement agreements, which, among other things, modified retiree benefits pursuant to section 1114 of the Bankruptcy Code. (Houff Decl. ¶ 71;

DLI-5970550v4                                   -23-

O'Dowd Decl. ¶ 6(b); Disclosure Statement at 48-50.)  Pursuant to Section 3.1.a.(vi) of the Plan,

on the Effective Date, Reorganized KAC will contribute (a) to the Union VEBA 11,439,900

shares of New Common Stock plus cash equal to the initial contributions, if any, and (b) to the

Salaried VEBA 1,940,100 shares of New Common Stock plus cash equal to the initial VEBA

contributions, if any.  (Plan § 3.1.a(vi); Houff Decl. ¶ 71.)  Thereafter, Reorganized KAC will

make the applicable profit-sharing contributions to the Union VEBA and the Salaried VEBA.

(Id.)

## 14.     Section 1129(b) — Confirmation of the Plan Over the Nonacceptance of Impaired Classes.

a.      Pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan

may be confirmed notwithstanding that Subclass 9A and Classes 12 and 14 are impaired and

deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. 11 U.S.C.

§ 1129(b)(1).  First, the Plan satisfies the "fair and equitable" requirements of section

1129(b)(2)(C) with respect to Subclass 9A because:  (a) no holder of any Claim or Interest that is

junior to the Senior Subordinated Note Claims of creditors in Subclass 9A will receive or retain

any property under the Plan on account of such junior claim or interest; and (b) as evidenced by

the valuations and estimates contained in the Disclosure Statement, no Class of Claims or

Interests senior to the Senior Subordinated Note Claims in Subclass 9A will receive more than

full payment on account of the Claims or Interests in such Class.  (See Plan art. III; Houff Decl. ¶

72.)  The Plan also satisfies the standards of section 1129(b) with respect to Classes 12 and 14

because:  (a) no Claim or Interest junior to, as applicable, the KAC Old Stock Interests in Class

12 or the KACC Old Stock Interests in Class 14 will receive or retain any property under the

Plan on account of such junior Claim or Interest; and (b) as evidenced by the valuations and

estimates contained in the Disclosure Statement, no Class of Claims or Interests senior to, as

applicable, the KAC Old Stock Interests in Class 12 or the KACC Old Stock Interests in Class 14 will receive more than full payment on account of the Claims or Interests of such Class. (Id.)

               b.      Second, under the circumstances of these cases, the Plan does not unfairly discriminate against the holders of Claims in Subclass 9A or the holders of Interests in Classes 12 and 14. The Senior Subordinated Note Claims in Subclass 9A are legally distinct from other Claims and Interests and are properly classified in a separate Subclass in light of the contractual subordination provisions contained in the Senior Subordinated Indenture. (Plan § 3.3.g; Houff Decl. ¶ 73.) In fact, no distributions can be made to holders of Senior Subordinated Note Claims because, in accordance with the contractual subordination provisions of the Senior Subordinated Note Indenture, the aggregate amount of consideration that would otherwise be payable to the holders of Senior Subordinated Note Claims must be distributed to holders of Allowed Senior Note Claims, who, pursuant to the 7-3/4% SWD Revenue Bond Settlement, agreed to share a portion of such consideration with holders of Allowed 7-3/4% SWD Revenue Bond Claims. (Id.) Likewise, the KAC Old Stock Interests and the KACC Old Stock Interests in Classes 12 and 14, respectively, are legally distinct from other Claims and Interests and are properly classified in separate classes. (Plan § 3.3.i, 3.3.k; Houff Decl. ¶ 73.) Equity interests, the KAC Old Stock Interests and the KACC Old Stock Interests are not entitled to any distributions unless all creditors of KAC and KACC are satisfied in full or otherwise agree, and no such agreement exists. (Houff Decl. ¶ 73.) Accordingly, the requirements of section 1129(b) are satisfied with respect to Subclass 9A and Classes 12 and 14.

### 15.    Section 1129(d) — Purpose of Plan.

               The principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act, and there has been no request filed by any governmental unit asserting such avoidance.

-25-

## D. THE ASBESTOS PI TRUST AND THE ASBESTOS PI CHANNELING INJUNCTION COMPLY WITH SECTION 524(g) OF THE BANKRUPTCY CODE.

The Plan comports with the Bankruptcy Code's requirements for issuance of an injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in respect of asbestos-related claims or demands against the Reorganized Debtors.

### 1. The Asbestos PI Trust Satisfies the Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code.

a. The Asbestos PI Channeling Injunction is to be implemented in connection with the establishment of the Asbestos PI Trust and is essential to the Plan and the Reorganizing Debtors' reorganization efforts. (Houff Decl. ¶104.)

b. Pursuant to Section 5.2 of the Plan, on the Effective Date, the Asbestos PI Trust will assume all liability and responsibility for all Asbestos Personal Injury Claims. (Plan § 5.2.e; Houff Decl. ¶ 81; Murphy Aff. ¶ 20.) As set forth in the Disclosure Statement and reflected in the record of the Confirmation Hearing, as of the Petition Date, approximately 104,000 unresolved Asbestos Personal Injury Claims were pending against Reorganizing Debtor KACC. (Disclosure Statement at 67; Houff Decl. ¶ 81.)

c. Section 5.2 of the Plan provides that the Asbestos PI Trust will be funded in part by the securities of two of the Reorganized Debtors under the Plan: (i) 94 percent of the common stock of Kaiser Trading, one of the Reorganizing Debtors under the Plan and (ii) the *pro rata* distribution of New Common Stock in Reorganized KAC on account of the Asbestos PI Trust's interests in 70.5 percent of the KFC Claim (which is an Allowed General Unsecured Claim in Subclass 9B). (Plan § 5.2.d; Houff Decl. ¶ 82.) As a result, with respect to Reorganized Kaiser Trading, the Asbestos PI Trust will own a majority of Reorganized Kaiser Trading's common stock and, with respect to Reorganized KAC and Reorganized KACC, the

Asbestos PI Trust will own a majority of the common stock of a subsidiary. (Houff Decl. ¶ 83.) Additionally, as set forth in Exhibits 4.3.a(i) and 4.3.a(ii) to the Plan, the Asbestos PI Trust will also have all rights to receive dividends or other distributions on account of the Asbestos PI Trust's ownership of the securities in Kaiser Trading and Reorganized KAC described above. (Plan Ex. 4.3.a(i), 4.3.a.(ii); Houff Decl. ¶ 82.)

                d.      Section 5.2 of the Plan also provides that the Asbestos PI Trust will use its assets to pay and satisfy Asbestos Personal Injury Claims in accordance with the Plan, the PI Trust Funding Agreement and the Asbestos PI Trust Agreement. (Plan § 5.2.a(i); Houff Decl. ¶ 84.)

### 2. The Asbestos PI Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code.

                a.      As set forth in the Disclosure Statement and reflected in the record of the Confirmation Hearing, between 1970 and the Petition Date, approximately 247,000 asbestos-related personal injury lawsuits were asserted against KACC, and approximately 104,000 Asbestos Personal Injury Claims remained unresolved as of the Petition Date. (Houff Decl. ¶ 87; Disclosure Statement at 67.) The Reorganizing Debtors' asbestos-related liabilities arise from former operations of KACC, almost entirely from KACC's former Kaiser Refractories division. (Id.) Based on the long latency period of asbestos-related diseases and the substantial number of asbestos-related personal injury lawsuits that had been asserted in the past and that remained unresolved on the Petition Date, KACC will likely be subject to substantial future Demands for payment arising from the same conduct or events that gave rise to the Asbestos Personal Injury Claims. (Houff Decl. ¶ 87.)

                b.      Moreover, due to the long latency period for asbestos-related diseases and the substantial number of asbestos-related personal injury lawsuits that had been

asserted in the past and that remained unresolved on the petition date, the Reorganizing Debtors are unable to determine the actual amounts, numbers and timing of future Demands against KACC in respect of alleged asbestos-related personal injuries. (Houff Decl. ¶ 87.)

           c.     If the holders of asbestos-related Demands are able to pursue such Demands outside of the Asbestos Distribution Procedures, the holders of such Demands would have to liquidate their claims through settlements or the tort system on an individual basis, which, because of the vagaries inherent in litigation, could produce inconsistent awards. (Houff Decl. ¶ 89; Murphy Aff. ¶ 24.) Moreover, with ever-diminishing funds available to pay asbestos-related Demands, there is a risk that Demands would initially all be paid in full as they are settled or liquidated in the tort system but that, at some point in the future, Demands would go unsatisfied. (Houff Decl. ¶ 89.) Accordingly, the pursuit of asbestos-related Demands against KACC outside the Asbestos Distribution Procedures contemplated by the Plan would likely threaten the Plan's purpose to deal equitably with Asbestos Personal Injury Claims, including future asbestos-related Demands. (Houff Decl. ¶ 89.)

           d.     Further, as part of the confirmation process in these cases, the Reorganizing Debtors included the terms of the Asbestos PI Channeling Injunction, including provisions therein barring actions against any Protected Party, in both the Plan and the Disclosure Statement. (Plan § 1.1(36); Disclosure Statement at 115; Houff Decl. ¶ 90.) The Reorganizing Debtors also designated a separate class, Class 5 under the Plan, for all Asbestos Personal Injury Claims, and of the holders of Asbestos Personal Injury Claims in Class 5 that voted, 99.84 percent of such holders voted in favor of the Plan. (Plan § 2.5; Voting Decl. at 6; Houff Decl. ¶ 90.)

e.        Also, as set forth in Section 5.2.a(i) of the Plan, the Asbestos PI

Trust will pay Asbestos Personal Injury Claims in accordance with the Asbestos Distribution

Procedures, which contain mechanisms that provide reasonable assurance that the Asbestos PI

Trust will value, and be in a financial position to pay, present Asbestos Personal Injury Claims

and future asbestos-related Demands that involve similar claims in substantially the same

manner. (Plan § 5.2.a(i); Houff Decl. ¶ 91-92; Murphy Aff. ¶ 28-29.)

### 3.    The Extension of the Asbestos PI Channeling
###       Injunction to Third Parties Is Appropriate.

a.        Sections 1.1(36) and 10.2 of the Plan contemplates that the

Asbestos PI Channeling Injunction will be extended to protect the following:

i.        any entity that, pursuant to the Plan or after the Effective

Date, becomes a direct or indirect transferee of, or successor to, any assets of the Reorganizing

Debtors, the Other Debtors, the Reorganized Debtors, other Kaiser Companies, the Funding

Vehicle Trust or a PI Trust (but only to the extent that liability is asserted to exist as a result of

its becoming such a transferee or successor) (Plan § 1.1(161)c; Houff Decl. ¶ 94.a); and

ii.       any entity that, pursuant to the Plan or after the Effective

Date, makes a loan to any of the Reorganizing Debtors, the Reorganized Debtors, the Other

Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust or to a successor to, or

transferee of any of the respective assets of, the Reorganizing Debtors, the Other Debtors, the

Reorganized Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust (but only

to the extent that liability is asserted to exist by reason of such entity's becoming such a lender or

to the extent any pledge of assets made in connection with such a loan is sought to be upset or

impaired) (Plan § 1.1(161)d; Houff Decl. 94.b).

DLI-5970550v4                                                    -29-

b.     The Plan also provides that the Asbestos PI Channeling Injunction

will bar certain actions against any Protected Party. (Houff Decl. ¶ 95.) Each Protected Party

under the Plan is either identifiable from the definition or is a member of an identifiable group.

(See Plan § 1.1(161); Houff Decl. ¶95.) In addition to the groups identified in paragraphs 3.a.i

and 3.a.ii above, the Reorganizing Debtors, the Reorganized Debtors and the other Kaiser

Companies, the Plan defines Protected Party to include the following —

i.     as to Channeled Personal Injury Claims, each Settling

Insurance Company; and

ii.     each entity to the extent he, she or it is alleged to be

directly or indirectly liable for the conduct of, Claims against or Demands on any Reorganizing

Debtor, Other Debtor, Reorganized Debtor or PI Trust on account of Channeled Personal Injury

Claims by reason of one or more of the following:

> a)    such entity's ownership of a financial interest in any
>       Reorganizing Debtor, Other Debtor or Reorganized
>       Debtor or any past or present affiliate (collectively,
>       "Affiliates") or predecessor in interest (collectively,
>       "Predecessors") of any of the foregoing;
>
> b)    such entity's involvement in the management of any
>       Reorganizing Debtor, Other Debtor, Reorganized
>       Debtor, Affiliate or Predecessor;
>
> c)    such entity's service as a director, officer, employee,
>       accountant (including an independent certified
>       public accountant), advisor, attorney, investment
>       banker, underwriter, consultant or other agent of
>       any Reorganizing Debtor, Other Debtor,
>       Reorganized Debtor, Affiliate or Predecessor or any
>       entity that owns or at any time has owned a
>       financial interest in any Reorganizing Debtor, Other
>       Debtor or Reorganized Debtor, Affiliate or
>       Predecessor; or
>
> d)    such entity's involvement in a transaction changing
>       the corporate structure, or in a loan or other

DLI-5970550v4                          -30-

> financial transaction affecting the financial
> condition, of any Reorganizing Debtor, Other
> Debtor, Reorganized Debtor, Affiliate or
> Predecessor or any entity that owns or at any time
> has owned a financial interest in any Reorganizing
> Debtor, Other Debtor, Reorganized Debtor,
> Affiliate or Predecessor.

(Plan § 1.1(161); Houff Decl. ¶ 95.)

c. Accordingly, consistent with section 524(g)(4)(A)(ii) of the

Bankruptcy Code, the Asbestos PI Channeling Injunction bars actions against third parties only where such parties are alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the Debtors by reason of:

i. the third party's ownership of a financial interest in any

Reorganizing Debtor, Other Debtor, Reorganized Debtor, or past or present affiliate or predecessor in interest of any Reorganizing Debtor, Other Debtor or Reorganized Debtor;

ii. the third party's involvement in the management of the

Debtors or a predecessor in interest to one or more of the Debtors or service as an officer, director or employee of (i) the Debtors, (ii) a past or present affiliate of the Debtors, (iii) a predecessor in interest to the Debtors, or (iv) an entity that owned a financial interest in the Debtors or their past or present affiliates or predecessors in interest;

iii. the third party's provision of insurance to the Debtors or a

related party; or

iv. the third party's involvement in a transaction changing the

corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtors or a related party. (Houff Decl. ¶ 96.)

d. The extension of the Asbestos PI Channeling Injunction to third parties is consistent with the Bankruptcy Code. Consistent with section 524(g)(4)(A)(ii) of the

Case 1:06-mc-00041-JJF   Document 1   Filed 03/08/06   Page 35 of 51 PageID #: 221

Bankruptcy Code, the Asbestos PI Channeling Injunction bars actions against third parties only where such parties are alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on, the Debtors.

### 4.   Entry of the Asbestos PI Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants.

a.    The Reorganizing Debtors, on behalf of the Protected Parties, are contributing $13 million plus the PI Insurance Assets to the Funding Vehicle Trust. (Plan §§ 1.1(151), 5.1.d(i); Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) The Asbestos PI Trust will be entitled to receive from the Funding Vehicle Trust 94 percent of the cash received by the Funding Vehicle Trust net of expenses of the Funding Vehicle Trust and certain amounts payable pursuant to the Plan and the PI Trust Funding Agreement to the other PI Trusts. (Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) The PI Insurance Assets are comprised of "the rights to receive proceeds from Included PI Trust Insurance Policies in respect of Channeled Personal Injury Claims" as well as "any Cash paid or to be paid pursuant to settlement agreements with any PI Insurance Company entered into prior to the Effective Date in respect of Included PI Trust Insurance Policies and allocable to payment of Channeled Personal Injury Claims." (Plan § 1.1(145); Houff Decl. ¶ 98.) The Debtors have received approximately $14 million in cash from settlements consummated with certain Insurance Companies prior to 2005 regarding coverage for Channeled Personal Injury Claims. (Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) In addition, in 2005 the Reorganizing Debtors reached settlements, for an aggregate of more than $375 million, payable over time, but subject to certain termination conditions, with certain other insurance companies. (Id.) The face value of the Included PI Trust Insurance Policies for which a settlement has not yet been reached aggregates more than $1 billion. (Id.)

DLI-5970550v4                                           -32-

b.      In addition, the Reorganizing Debtors are contributing to the

Asbestos PI Trust 94 shares of common stock of Reorganized Kaiser Trading, which constitutes 94 percent of the outstanding equity interest in such entity, and 70.5 percent of the KFC Claim in accordance with the Intercompany Claims Settlement. (Plan § 5.2.d; Houff Decl. ¶ 98; Murphy Aff. ¶ 22.) In light of the substantial contributions to be made to the Asbestos PI Trust on behalf of the Protected Parties, entry of the Asbestos PI Channeling Injunction, and the naming of the Protected Parties therein, is fair and equitable with respect to persons that might subsequently assert future asbestos-related Demands.

## E.      THE SILICA, CTPV AND NIHL PI CHANNELING INJUNCTIONS AND THE CHANNELED PI INSURANCE ENTITY INJUNCTION EACH SATISFY THE REQUIREMENTS OF SECTION 105(a) OF THE BANKRUPTCY CODE.

1.      In conjunction with the resolution of the Reorganizing Debtors' Silica,

CTPV, and NIHL tort liabilities and the establishment of the PI Trusts, the Plan provides for the issuance of (a) the Silica PI Channeling Injunction, (b) the CTPV PI Channeling Injunction and (c) the NIHL PI Channeling Injunction, which will enjoin certain suits, claims, and actions against Protected Parties. (Houff Decl. ¶ 100; Ferazzi Decl. ¶ 35.) The issuance of the Silica, CTPV and NIHL Channeling Injunctions and the extension of those injunctions to non-debtor Protected Parties are essential to the implementation of the Plan and the resolution of the Debtors' tort liabilities, including the resolution of asbestos-related liabilities. (Houff Decl. ¶ 100; Ferazzi Decl. ¶ 39.) Additionally, the Plan provides for a Channeled PI Insurance Entity Injunction. (Plan § 12.2.c; Houff Decl. ¶ 100.) The Channeled PI Insurance Entity Injunction enjoins all entities (except the Funding Vehicle Trust, the PI Trusts or the Reorganized Debtors) that hold or assert, now or in the future, a Channeled Personal Injury Claim from taking any actions to collect or recover on such a claim against a PI Insurance Company. (Id.) The

Channeled PI Insurance Entity Injunction will not be issued for the benefit of any PI Insurance Company and no PI Insurance Company will be a third-party beneficiary of the Channeled PI Insurance Entity Injunction. (Plan § 12.2.c; Houff Decl. ¶ 100.) The Channeled PI Insurance Entity Injunction does not relieve any non-debtor third party of liability and is necessary solely to facilitate the Plan's provisions for the satisfaction of Channeled Personal Injury Claims. (Houff Decl. ¶ 100.)

2. The channeling injunctions and each PI Trust's portion of the total funding to be provided to the PI Trusts under the Plan were the product of extensive negotiations among the Debtors, the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, counsel for certain present holders of Silica Personal Injury Claims, counsel for certain present holders of CTPV Personal Injury Claims and counsel for certain present holders of NIHL Personal Injury Claims. (Houff Decl. ¶ 101; Ferazzi Decl. ¶¶ 24-25; Murphy Aff. ¶¶ 15-16.) The success of these negotiations is evidenced by the overwhelming support for the Plan by holders of Channeled Personal Injury Claims. (Voting Decl. at 6; Houff Decl. ¶ 101.) No creditor or holder of a Channeled Personal Injury Claim has objected to the Silica, CTPV and NIHL PI Channeling Injunctions or the extension of those injunctions to the non-debtor Protected Parties. (Houff Decl. ¶ 101.) In addition, holders of Silica and NIHL Personal Injury Claims voted in favor of the Plan by more than 99 percent in both number and amount of claims voted and 100 percent of the holders of CTPV Personal Injury Claims that cast a Ballot voted to accept the Plan. (Voting Decl. at 6; Houff Decl. ¶ 101.)

3. There is a shared identity of interests between the Reorganizing Debtors and the Protected Parties. (Houff Decl. ¶ 102.) In addition to the Settling Insurance Companies, the nondebtor Protected Parties generally include affiliates of the Reorganizing Debtors,

DLI-5970550v4                                                    -34-

predecessors in interest of the Debtors, entities that currently own or formerly owned a financial interest in the Reorganizing Debtors, past or present directors, officers, employees, professionals or agents of the Debtors or their affiliates and entities that were involved in a financial transaction affecting the financial condition of the Reorganizing Debtors or their affiliates. (Plan § 1.1(161); Houff Decl. ¶ 102.) There is a shared identity of interests between the Reorganizing Debtors and these nondebtor Protected Parties because a lawsuit against any of these non-debtor parties seeking to hold them liable in respect of the Reorganizing Debtors' alleged liability for a Channeled Personal Injury Claim would either give rise to some form of claim for indemnity against the Reorganizing Debtors or deplete the Reorganizing Debtors' insurance coverage. (Houff Decl. ¶ 102.)

           4.        The Silica PI Trust, the CTPV PI Trust and the NIHL PI Trust will be funded through substantial financial and other contributions by or on behalf of the non-debtor Protected Parties. (Houff Decl. ¶ 103.) The Silica PI Trust will be funded by 6 percent of the stock of Reorganized Kaiser Trading, 4.5 percent of the KFC Claim and 6 percent of the PI Insurance Assets minus expenses and certain other amounts. (Houff Decl. ¶ 103; Ferazzi Decl. ¶¶ 31-32.) The CTPV PI Trust will receive the lesser of $8,488,000 or an amount based on the number of allowed present CTPV Claims. (Houff Decl. ¶ 103; Ferazzi Decl. ¶ 33.) The NIHL PI Trust will receive a minimum of $19,512,000 and may receive additional amounts depending on the number of allowed CTPV Claims and other factors. (Houff Decl. ¶ 103.) There were extensive negotiations among the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, counsel for certain holders of present Silica Personal Injury Claims, certain holders of present CTPV Personal Injury Claims and certain holders of NIHL Personal

-35-

Injury Claims regarding the allocation of the PI Trust Assets and the NIHL PI Trust. (Id.;
Ferazzi Decl. ¶¶ 24-25; Murphy Aff. ¶¶ 15-16.)

        5.      The channeling injunctions are essential to the implementation of the Plan
and the resolution of the Reorganizing Debtors' tort liabilities. (Houff Decl. ¶ 104; Ferazzi Decl.
¶ 39.) Present and future silica claimants and most asbestos injury claimants have recourse to the
Reorganizing Debtors' products liability insurance coverage, and CTPV, NIHL and certain
asbestos injury claimants have recourse to the Reorganizing Debtors' premises insurance
coverage. (Houff Decl. ¶ 104.) For this reason, among others, the Silica, CTPV and NIHL
Channeling Injunctions are necessary to address all of the Reorganizing Debtors' mass tort
liabilities on an equitable basis. (Id.) In the absence of the PI Channeling Injunctions, the
holders of Silica, CTPV and NIHL Personal Injury Claims could litigate their claims in the tort
system and separately pursue the available insurance coverage, which would not only result in
inconsistent awards among similarly situated claimants (e.g., similarly situated silica claimants)
but also the depletion of insurance coverage, which must be shared among various types of
personal injury claimants, in favor one or more of these tort creditor groups. (Id.; Ferazzi Decl.
¶ 38.) Similarly, the Channeled PI Insurance Entity Injunction is necessary to preserve the PI
Trust Assets and to protect the Funding Vehicle Trust so that it can pursue the insurance
coverage litigation and negotiate settlements with insurers for the benefit of the PI Trusts and all
holders of Channeled Personal Injury Claims. (Id.) Absent the Channeled PI Insurance Entity
Injunction, individual claimants could separately assert claims against PI Insurance Companies,
thereby depleting the available insurance that must be shared among the PI Trusts and impeding
the Funding Vehicle Trusts' ability to negotiate settlements. (Id.)

6.     As noted above, the Debtors have received approximately $14 million in
cash from settlements consummated with certain Insurance Companies prior to 2005 regarding
coverage for Channeled Personal Injury Claims. (Houff Decl. ¶ 98; Murphy Aff. ¶ 22.)  In
addition, in 2005 the Reorganizing Debtors reached settlements, for an aggregate of more than
$375 million, payable over time, but subject to certain termination conditions, with certain other
insurance companies.  (Id.)  Pursuant to the Plan, these settlement proceeds will be contributed to
the Funding Vehicle Trust for the benefit of the PI Trusts.  (Plan § 5.1.d.)  Each of the PI
Channeling Injunctions is essential in obtaining the substantial funds these settlements provide
for the benefit of the PI Trusts and to facilitate any additional potential settlements with other
insurance companies.  (Houff Decl. ¶ 105; Ferazzi Decl. ¶ 37.)

7.     The Classes impacted by the issuance of the channeling injunctions have
voted overwhelmingly in support of the Plan.  (Voting Decl. at 6; Houff Decl. ¶ 106.)  No
creditor or holder of a Channeled Personal Injury Claim objected to the channeling injunctions or
the extension of those injunctions to the non-debtor Protected Parties, and holders of Silica,
CTPV and NIHL Personal Injury Claims have voted overwhelming in favor of the Plan.  (Id.)
One hundred percent of CTPV Personal Injury Claims (Class 6) and over 99 percent of NIHL
Personal Injury Claims (Class 7) and Silica Personal Injury Claims (Class 8), both in amount of
Claims and in number of Claim holders that cast Ballots, have voted to accept the Plan.  (Id.)
Additionally, the Reorganizing Debtors fully disclosed the scope of the proposed channeling
injunctions and described in detail the entities that would be protected by the injunctions.  (Houff
Decl. ¶ 106; Disclosure Statement at 114-19; Ferazzi Decl. ¶ 38.)

8.     The Plan establishes trust distribution procedures ("TDPs") for each of
Silica, CTPV and NIHL claims.  (Plan § 5.3.a, 5.4.a, 5.5.a; Houff Decl. ¶ 107; Ferazzi Decl.

¶¶ 40, 58.) The TDPs provide for the equitable treatment of all present and future claimants. (Houff Decl. ¶ 107; Ferazzi Decl. ¶¶ 40, 58.) The TDPs establish procedures for processing and paying Channeled Personal Injury Claims on an impartial, first-in-first-out basis, with the intention of paying all claimants over time as equivalent a share as possible of the value their claims. (Houff Decl. ¶ 107; Ferazzi Decl. ¶¶ 44, 60.) Once liquidated, each Channeled Personal Injury Claim will be paid by the appropriate trust. (Houff Decl. ¶ 107.)

        9.      Furthermore, the distribution procedures for each of these Classes of Channeled Personal Injury Claims permit the holder of such a Claim, including an Indirect Channeled Personal Injury Claim, to institute a lawsuit in the tort system against the applicable PI Trust, subject to certain conditions, procedures and limitations set forth in the applicable distribution procedures, if the dispute cannot be resolved in non-binding arbitration. (Houff Decl. ¶ 108; Plan Ex. 1.1(34) § 5.11; Plan Ex. 1.1(66) § 5.7; Plan Ex. 1.1(129) § 5.7; Plan Ex. 1.1(186) § 5.11.) Each of the PI Trust's distribution procedures contemplate that non-settling claimants that litigate their claims in the tort system may present any judgment obtained to the applicable PI Trust for payment. (Houff Decl. ¶ 108; Plan Ex. 1.1(34) § 7.7; Plan Ex. 1.1(66) § 7.7; Plan Ex. 1.1(129) § 7.7; Plan Ex. 1.1(186) § 7.7.) The funding of the PI Trusts and the allocation of those funds were the result of extensive negotiations among the Debtors, the Asbestos Committee, the Asbestos Representative, the Silica and CTPV Representative, counsel for certain holders of present Silica Personal Injury Claims, counsel for certain holders of present CTPV Personal Injury Claims and counsel for certain holders of NIHL Personal Injury Claims. (Id.) Thus, the Plan not only provides the necessary mechanisms for paying Claims in each of the Classes of Channeled Personal Injury Claims (including separate trusts, trustees, and

distribution procedures), but also implements an allocation of funds to each of the PI Trusts that is adequate and fair.

10. For all the foregoing reasons, the issuance of the Silica, CTPV and NIHL Channeling Injunctions and the Channeled PI Insurance Entity Injunction, as well as the treatment of Silica, CTPV and NIHL Personal Injury Claims, including future silica and CTPV Demands, is appropriate under the Bankruptcy Code.

## F. SATISFACTION OF CONDITIONS TO CONFIRMATION.

1. Section 10.1 of the Plan contains conditions precedent to Confirmation that must be satisfied or duly waived pursuant to Section 10.3 of the Plan. The conditions precedent set forth in Sections 10.1.a. through 10.1.c of the Plan have been satisfied.

2. Concerning the establishment of the Funding Vehicle Trust, the PI Trusts and issuance of the PI Channeling Injunctions, the Court specifically finds:

a. The PI Channeling Injunctions are to be implemented in connection with the establishment of the PI Trusts (Plan art. V; Houff Decl. at 38-52);

b. As of the Petition Date, certain of the Reorganizing Debtors had been named as defendants in personal injury or wrongful death damage actions seeking recovery for damages in respect of Channeled Personal Injury Claims (Houff Decl. ¶ 87; Disclosure Statement at 67);

c. On the Effective Date, each PI Trust shall assume the liabilities of the Reorganizing Debtors with respect to applicable Channeled Personal Injury Claims (Plan §§ 5.2.e, 5.3.e, 5.4.d, 5.5.d);

d. The Asbestos PI Trust will be funded in part by 94 percent of the common stock of Kaiser Trading, and all rights to receive dividends or other distributions on account of such common stock (Plan § 5.2.d; Houff Decl. ¶ 98; Murphy Aff. ¶ 22);

e.   The Silica PI Trust will be funded in part by 6 percent of the
common stock of Kaiser Trading, and all rights to receive dividends or other distributions on
account of such common stock (Houff Decl. ¶ 103; Ferazzi Decl. ¶¶ 31);

f.   Each PI Trust will use its assets or income to pay applicable
Channeled Personal Injury Claims (Plan §§ 5.2.a(i), 5.3.a(i), 5.4.a(i), 5.5.a(i));

g.   The Reorganizing Debtors are likely to be subject to substantial
future Demands for payment arising out of the same or similar conduct or events that gave rise to
the Asbestos Personal Injury Claims, the CTPV Personal Injury Claims and the Silica Personal
Injury Claims, that are addressed by the respective PI Channeling Injunctions (Houff Decl. ¶ 87;
Ferazzi Decl. ¶ 38);

h.   The actual amounts, numbers and timing of future Demands cannot
be determined (Houff Decl. ¶ 88, Ferazzi Decl. ¶ 22);

i.   Pursuit of Channeled Personal Injury Claims, including Demands,
outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal
equitably with Claims and future Demands (Houff Decl. ¶ 89; Ferazzi Decl. ¶ 38);

j.   The terms of the PI Channeling Injunctions, including any
provisions barring actions against third parties, are set out in conspicuous language in the Plan
and in the Disclosure Statement (Plan §§ 1.1(36), (68), (131), (188), (161); Disclosure Statement
at 114-19.)

k.   Other than with respect to NIHL Personal Injury Claims, which do
not include Demands, pursuant to Court orders or otherwise, each PI Trust shall operate through
mechanisms such as structured, periodic or supplemental payments, pro rata distributions,
matrices or periodic review of estimates of the numbers and values of applicable Channeled

Personal Injury Claims or other comparable mechanisms that provide reasonable assurance that such Trust will value, and be in a financial position to pay, applicable present Channeled Personal Injury Claims and future Channeled Personal Injury Claims and Demands that involve similar Claims in substantially the same manner (Houff Decl. ¶¶ 91-93, 107; Murphy Aff. ¶ 28; Ferazzi Decl. ¶¶ 57, 63);

l. Each of the Asbestos Representative and the Silica and CTPV Representative was appointed by this Court as part of the proceedings leading to the issuance of the respective PI Channeling Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in such Injunction, and transferred to and assumed by the applicable PI Trust (Murphy Aff. ¶ 5; Ferazzi Decl. ¶ 1);

m. The inclusion of each Reorganizing Debtor or beneficiary within the protection afforded by the respective PI Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against each such Reorganized Debtor or beneficiary in light of the benefits provided, or to be provided, to the applicable PI Trust on behalf of such Reorganized Debtor or such beneficiary (Houff Decl. ¶ 98-99; Ferazzi Decl. ¶ 39);

n. The Plan complies with section 524(g) of the Bankruptcy Code in all respects (Houff Decl. at 38-46; Tr. of Jan. 9, 2006 Hr'g at 124);

o. The transfer of rights to proceeds from the Included PI Trust Insurance Policies to the Funding Vehicle Trust for the benefit of the PI Trusts is valid and enforceable and transfers such rights under the Included PI Trust Insurance Policies as the Reorganizing Debtors may have, subject to any and all PI Insurer Coverage Defenses. (Tr. of

Jan. 9, 2006 Hr'g at 58, 60-68, 86-88, 91, 110-12.)  The discharge and release of the

Reorganizing Debtors and Reorganized Debtors from all Claims, and the injunctive protection

provided to the Reorganizing Debtors, Reorganized Debtors and Protected Parties with respect to

Demands as provided in the Plan, these Findings and Conclusions and the Confirmation Order

shall not affect the liability of any PI Insurance Company except (i) to the extent that any such

insurance company is also a Settling Insurance Company or (ii) that all PI Insurer Coverage

Defenses are preserved; and

                  p.      The PI Channeling Injunctions are essential to the Plan and the

Reorganizing Debtors' reorganization efforts (Houff Decl. ¶ 104; Ferazzi Decl. ¶ 39).

        **G.**     **SUBSTANTIVE CONSOLIDATION.**

              There are no pending objections to (i) the substantive consolidation of the

Substantively Consolidated Debtors or (ii) the substantive consolidation of the Estates of KBC

and the Substantively Consolidated Debtors solely in order to treat any Unsecured Claims

agaiust KBC as Claims in Subclass 9B for purposes of distributions to be made under the Plan,

as set forth in the KBC Modifications.  Substantive consolidation as provided under Article IX of

the Plan, as modified, is solely for the purpose of implementing the Plan, including for purposes

of voting, Confirmation and distributions to be made under the Plan.  (Plan § 9.1.)  The proposed

substantive consolidation of the Substantively Consolidated Debtors is consistent with the

Intercompany Claims Settlement, section 5 of which specifically permitted the substantive

consolidation of certain of the Debtors.  (Houff Decl. ¶ 75.)  Moreover, all of the Substantively

Consolidated Debtors are interrelated companies operating under KAC and KACC, which

entities are the Substantively Consolidated Debtors' ultimate parent companies for tax and

business purposes, and the deemed substantive consolidation will promote efficiency and

decrease costs in the implementation of the Plan.  (Id.)  In addition, with respect to the

substantive consolidation of KBC with the Substantively Consolidated Debtors solely in order to treat any Unsecured Claims against KBC as Claims in Subclass 9B for purposes of distributions to be made under the Plan, the only two creditors of KBC's estate, the PBGC and Sherwin, have specifically consented to the provisions regarding the limited substantive consolidation of KBC with the Substantively Consolidated Debtors. (Houff Decl. ¶ 76.) Furthermore, notice of the KBC Modifications and an opportunity to object thereto and to change the creditor's vote on the Plan was given to all known creditors in Subclass 9B of the Plan. (KBC Aff. of Serv. ¶3.) No creditor objected to the KBC Modifications, and no creditor who timely submitted a vote in Subclass 9B to accept the Plan elected to change such vote. (Voting Change Decl. ¶ 5.) In the absence of any creditor objection to the deemed substantive consolidation, and in light of the overwhelming creditor support for the Plan, the deemed substantive consolidation of the Substantively Consolidated Debtors and the limited substantive consolidation of the Estates of KBC and the Substantively Consolidated Debtors is consensual. And for the foregoing reasons, the substantive consolidation provided for in the Plan, as modified, is in the best interests of the Reorganizing Debtors' Estates and creditors.

## II.     CONCLUSIONS OF LAW.

### A.     JURISDICTION AND VENUE.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Reorganizing Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code. Venue of the Reorganization Cases in the United States Court for the District of Delaware was proper as of the Petition Date, pursuant to 28 U.S.C. § 1408, and continues to be proper.

-43-

**B.     MODIFICATIONS TO THE PLAN.**

The Modifications (1) do not adversely change, in any material respect, the

treatment under the Plan of any Claims or Interests, (2) comply in all respects with Bankruptcy

Rule 3019 and (3) to the extent the KBC Modifications do not comply with Bankruptcy Rule

3019, they comply with section 1127(d) of the Bankruptcy Code. (Tr. of Jan. 9, 2006 Hr'g at

30.) Accordingly, pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019,

all holders of Claims that have accepted or are conclusively presumed to have accepted the Plan

as filed on September 8, 2005 are deemed to have accepted the Plan, as modified by the

Modifications.

**C.     EXEMPTIONS FROM SECURITIES LAWS.**

1.     Pursuant to section 1125(e) of the Bankruptcy Code, the Reorganizing

Debtors' transmittal of solicitation materials, their solicitation of acceptances of the Plan and

their offering, issuance and distribution of the New Common Stock pursuant to the Plan are not,

and will not be, governed by or subject to any otherwise applicable law, rule or regulation

governing the solicitation of acceptance of a plan of reorganization or the offer, issuance, sale or

purchase of securities.

2.     Pursuant to section 1145(a)(1) of the Bankruptcy Code, the offering,

issuance and distribution of the New Common Stock pursuant to the Plan, including without

limitation Section 7.8.e thereof, are, and will be, exempt from section 5 of the Securities Act of

1933, as amended (the "Securities Act"), and any state or local law requiring registration for

offer or sale of a security or registration or licensing of an issuer or underwriter of, or broker or

dealer in, a security.

3.     Pursuant to, and to the fullest extent permitted under, section 1145 of the

Bankruptcy Code, the resale of any New Common Stock will be exempt from section 5 of the

Securities Act and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer or underwriter or, or broker or dealer in, a security.

### D. EXEMPTIONS FROM TAXATION.

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security contemplated by the Plan, or the making or delivery of any instrument of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

### E. COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.

As set forth in Section I.C above, the Plan complies in all respects with the applicable requirements of section 1129 of the Bankruptcy Code.

### F. COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE.

As set forth in Section I.D above, the Plan complies in all respects with the applicable requirements of section 524(g) of the Bankruptcy Code.

### G. OBJECTIONS TO THE PLAN.

#### 1. The Insurers' Objections.

The Insurers object to the Reorganizing Debtors' transfer of their rights to proceeds from the Included PI Trust Insurance Policies to the Funding Vehicle Trust for the benefit of the PI Trusts and also argue that the manner in which the Asbestos PI Trust will be funded under the Plan does not comply with the funding requirements under section 524(g) of the Bankruptcy Code. As referenced above, the Court concludes that the transfer of rights to proceeds from the Included PI Trust Insurance Policies to the Funding Vehicle Trust for the benefit of the PI Trusts is valid and enforceable and transfers such rights under the Included PI Trust Insurance Policies as the Reorganizing Debtors may have, subject to any and all PI Insurer Coverage Defenses. (Tr. of Jan. 9, 2006 Hr'g at 58, 60-68, 86-88, 91, 110-12.) Section 1123(a)(5) of the Bankruptcy Code expressly permits the transfer of the Reorganizing Debtors'

rights to proceeds from the Included PI Trust Insurance Policies under the Plan and preempts any anti-assignment provisions of the Included PI Trust Insurance Policies. (Tr. of Jan. 9, 2006 Hr'g at 110-12.) Additionally, the Court concludes that, as discussed above, the Plan complies with the funding requirements of section 524(g). (Tr. of Jan. 9, 2006 Hr'g at 123-24.) Accordingly, the Court finds that the Insurers' Objections should be overruled. (Tr. of Jan. 9, 2006 Hr'g at 88, 91, 111-12, 124.)

### 2.    Law Debenture's Objection.

Law Debenture's Objection is overruled for the reasons the Court articulated on the record at the Confirmation Hearing and on the record at the May 2, 2005 hearing relating to confirmation of the Alumina Subsidiary Plans. (Tr. of Jan. 9, 2006 Hr'g at 40-41, 43, 46-48, 51-55; Tr. of Jan. 10, 2006 Hr'g at 27-31; Tr. of May 2, 2005 Hr'g at 47-49, 53-57.)

### 3.    Other Objections.

The Court concludes that all other objections to the Plan not otherwise withdrawn at or prior to the Confirmation Hearing should be overruled for the reasons the Court articulated on the record at the Confirmation Hearing (see Tr. of Jan. 9, 2006 Hr'g at 32, 33, 35-37) and/or set forth in the Reorganizing Debtors' Memorandum of Law in support of confirmation of the Plan.

## H.    TRANSFER OF BOOKS AND RECORDS TO THE FUNDING VEHICLE TRUST AND RETENTION OF KACC'S FORMER COUNSEL.

Plan Section 5.1(d)(ii) provides that Reorganized KACC will transfer the books and records of the Debtors that pertain to Channeled Personal Injury Claims to the Funding Vehicle Trust, which may re-transfer or supply copies of such books and records to the PI Trusts. In addition, the Funding Vehicle Trust may retain the professional services of KACC's former counsel. The transfer of these materials is essential to implementation of the Funding Vehicle

DLI-5970550v4                                  -46-

Trust and the preservation of its assets. (Houff Decl. ¶ 78.) The transfer of books and records from the Reorganizing Debtors to the Funding Vehicle Trust and its retention of KACC's former counsel shall not waive or destroy any privilege pertaining to such books, records and professional services. The Reorganizing Debtors and the Funding Vehicle Trust and PI Trusts share common if not identical legal interests, and the surrender of any privileged documents or the retention of former counsel does not terminate or waive any privileges related to those interests.

I.      **APPROVAL OF THE RELEASES PROVIDED UNDER THE PLAN.**

The releases set forth in Section 4.5 of the Plan, including the releases of nondebtor parties pursuant to the general releases in Section 4.5(b), are (a) integral to the terms, conditions and settlements contained in the Plan, (b) appropriate in connection with the Reorganization of the Reorganizing Debtors and (c) supported by reasonable consideration. In light of all of the circumstances, the releases in Section 4.5 of the Plan are fair to the releasing parties.

J.      **ASSUMPTIONS, ASSUMPTIONS AND ASSIGNMENTS AND REJECTIONS OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

Each pre- or post-Confirmation assumption, assumption and assignment or rejection of an Executory Contract or Unexpired Lease pursuant to Article VI of the Plan, including any pre- or post-Confirmation assumption, assumption and assignment or rejection effectuated as a result of any amendment to Exhibits 6.1 of 6.3 to the Plan, as contemplated by Article VI of the Plan, shall be legal, valid and binding upon the applicable Debtor or Reorganized Debtor and all nondebtor parties to such Executory Contract or Unexpired Lease, all to the same extent as if such assumption, assumption and assignment or rejection had been

effectuated pursuant to an appropriate authorizing order of the Court entered before the

Confirmation Date under section 365 of the Bankruptcy Code.

Dated:  _Jel. 6_ , 2006      _Judith K Fitzgerald_
                             UNITED STATES BANKRUPTCY COURT JUDGE