UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE | : | Jointly Administered |
| | : | Case No. 02-10429 (JKF) |
| Kaiser Aluminum Corporation, | : | |
| a Delaware corporation, et al., | : | Chapter 11 |
| Debtors. | : | |
| | : | |
| (Kaiser Aluminum Corporation) | : | (Case No. 02-10429 (JKF)) |
| (Kaiser Aluminum & Chemical Corporation) | : | (Case No. 02-10430 (JKF)) |
| (Akron Holding Corporation) | : | (Case No. 02-10431 (JKF)) |
| (Kaiser Aluminum & Chemical Investment, Inc.) | : | (Case No. 02-10433 (JKF)) |
| (Kaiser Aluminium International, Inc.) | : | (Case No. 02-10434 (JKF)) |
| (Kaiser Aluminum Properties, Inc.) | : | (Case No. 02-10435 (JKF)) |
| (Kaiser Aluminum Technical Services, Inc.) | : | (Case No. 02-10436 (JKF)) |
| (Kaiser Bellwood Corporation) | : | (Case No. 02-10437 (JKF)) |
| (Kaiser Micromill Holdings, LLC) | : | (Case No. 02-10439 (JKF)) |
| (Kaiser Texas Micromill Holdings, LLC) | : | (Case No. 02-10440 (JKF)) |
| (Kaiser Sierra Micromills, LLC) | : | (Case No. 02-10441 (JKF)) |
| (Kaiser Texas Sierra Micromills, LLC) | : | (Case No. 02-10442 (JKF)) |
| (Oxnard Forge Die Company, Inc.) | : | (Case No. 02-10443 (JKF)) |
| (Alwis Leasing, LLC) | : | (Case No. 02-10818 (JKF)) |
| (Kaiser Center, Inc.) | : | (Case No. 02-10819 (JKF)) |
| (KAE Trading, Inc.) | : | (Case No. 03-10145 (JKF)) |
| (Kaiser Aluminum & Chemical Investment | : | (Case No. 03-10146 (JKF)) |
| Limited (Canada)) | : | |
| (Kaiser Aluminum & Chemical Of Canada | : | (Case No. 03-10147 (JKF)) |
| Limited (Canada)) | : | |
| (Kaiser Center Properties) | : | (Case No. 03-10149 (JKF)) |
| (Kaiser Export Company) | : | (Case No. 03-10150 (JKF)) |
| (Texada Mines Ltd. (Canada)) | : | (Case No. 03-10152 (JKF)) |

DISCLOSURE STATEMENT
PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE
~~FIRST~~SECOND AMENDED JOINT PLAN OF REORGANIZATION OF
KAISER ALUMINUM CORPORATION, KAISER ALUMINUM & CHEMICAL CORPORATION
AND CERTAIN OF THEIR DEBTOR AFFILIATES

Gregory M. Gordon (TX 08435300)
Henry L. Gompf (TX 08116400)
Troy B. Lewis (TX 12308650)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

Daniel J. DeFranceschi (DE 2732)
Kimberly D. Newmarch (DE 4340)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

Dated: ~~August 24,~~September 7, 2005

DISCLOSURE STATEMENT, DATED ~~AUGUST 24,~~SEPTEMBER 7, 2005

SOLICITATION OF VOTES
WITH RESPECT TO THE
~~FIRST~~SECOND AMENDED JOINT PLAN OF REORGANIZATION OF
KAISER ALUMINUM CORPORATION, KAISER ALUMINUM & CHEMICAL CORPORATION
AND CERTAIN OF THEIR DEBTOR AFFILIATES

———————————

THE BOARDS OF DIRECTORS OR COMPARABLE GOVERNING BODIES OF KAISER ALUMINUM CORPORATION (*i.e.*, KAC), KAISER ALUMINUM & CHEMICAL CORPORATION (*i.e.*, KACC) AND THEIR DEBTOR AFFILIATES LISTED ON THE COVER PAGE TO THIS DISCLOSURE STATEMENT (COLLECTIVELY WITH KAC AND KACC, THE "DEBTORS") BELIEVE THAT THE ~~FIRST~~SECOND AMENDED JOINT PLAN OF REORGANIZATION, DATED ~~AUGUST 24,~~SEPTEMBER 7, 2005 AND ATTACHED HERETO AS EXHIBIT I (*i.e.*, THE PLAN), IS IN THE BEST INTERESTS OF CREDITORS, INCLUDING HOLDERS OF ASBESTOS PERSONAL INJURY CLAIMS AND HOLDERS OF OTHER CHANNELED PERSONAL INJURY CLAIMS. ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE URGED TO VOTE IN FAVOR THEREOF. A SUMMARY OF THE VOTING INSTRUCTIONS IS SET FORTH ON PAGE ~~188~~190 OF THIS DISCLOSURE STATEMENT. MORE DETAILED INSTRUCTIONS ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO CREDITORS ENTITLED TO VOTE ON THE PLAN AND ON EXHIBIT III TO THIS DISCLOSURE STATEMENT. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY 5:00 P.M., EASTERN TIME, ON {————},NOVEMBER 14, 2005 OR SUCH OTHER DATE IDENTIFIED ON YOUR BALLOT (*i.e.*, THE VOTING DEADLINE), UNLESS EXTENDED.

{THE CREDITORS' COMMITTEE HAS INDEPENDENTLY CONCLUDED THAT THE PLAN IS IN THE BEST INTERESTS OF UNSECURED CREDITORS AND URGES CREDITORS TO VOTE IN FAVOR OF THE PLAN.}

{THE ASBESTOS CLAIMANTS' COMMITTEE HAS INDEPENDENTLY CONCLUDED THAT THE PLAN IS IN THE BEST INTERESTS OF ASBESTOS CLAIMANTS AND URGES ASBESTOS CLAIMANTS TO VOTE IN FAVOR OF THE PLAN.}

{THE FUTURE ASBESTOS CLAIMANTS' REPRESENTATIVE HAS INDEPENDENTLY CONCLUDED THAT THE PLAN IS IN THE BEST INTERESTS OF FUTURE ASBESTOS-RELATED CLAIMANTS. SIMILARLY, THE FUTURE SILICA AND CTPV CLAIMANTS' REPRESENTATIVE HAS INDEPENDENTLY CONCLUDED THAT THE PLAN IS IN THE BEST INTERESTS OF FUTURE SILICA-RELATED AND COAL TAR PITCH VOLATILE (*i.e.*, CTPV) - RELATED CLAIMANTS.}

*[NOTE: THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.]*

———————————

THE CONFIRMATION AND EFFECTIVENESS OF THE PROPOSED PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. SEE "ANSWERS TO CERTAIN QUESTIONS ABOUT THE PLAN AND DISCLOSURE STATEMENT — WHAT MUST HAPPEN BEFORE THE PLAN CAN BECOME EFFECTIVE?" AND "VOTING AND CONFIRMATION OF THE PLAN — CONFIRMATION — ACCEPTANCE OR CRAMDOWN." THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

———————————

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation, other than as contained in this Disclosure Statement or incorporated by reference or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized by any of the Debtors. The delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time subsequent to the date hereof. The Debtors will make available to creditors entitled to vote on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline.

**ALL CREDITORS, INCLUDING HOLDERS OF ASBESTOS PERSONAL INJURY CLAIMS AND HOLDERS OF OTHER CHANNELED PERSONAL INJURY CLAIMS, ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ATTACHED HERETO AS EXHIBIT I, PRIOR TO SUBMITTING A BALLOT PURSUANT TO THIS SOLICITATION.**

---

The summaries of the Plan and each other document contained in this Disclosure Statement are qualified by reference to the full text of such documents. See "Additional Information."

---

The information contained in this Disclosure Statement, including the information regarding the history, business and operations of the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

**FORWARD-LOOKING STATEMENTS: THIS DISCLOSURE STATEMENT INCLUDES FORWARD-LOOKING STATEMENTS BASED LARGELY ON THE CURRENT EXPECTATIONS OF THE DEBTORS ABOUT FUTURE EVENTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER THE CAPTION "NEW COMMON STOCK — RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR AND ACTUAL EVENTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. THE DEBTORS UNDERTAKE NO OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.**

---

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION, NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

---

**IF YOU HAVE ANY QUESTIONS REGARDING VOTING ON THE PLAN OR THE BALLOT OR BALLOTS (IF ANY) THAT YOU HAVE RECEIVED, PLEASE CONTACT THE DEBTORS' VOTING AGENT, LOGAN & COMPANY, AT (973) 509-3190.**

---

**All capitalized terms in this Disclosure Statement not otherwise defined herein have the meanings given to them in the Plan.**

# TABLE OF CONTENTS

Page

INTRODUCTION......................................................................................................................................1

ANSWERS TO CERTAIN QUESTIONS ABOUT THE PLAN AND DISCLOSURE STATEMENT......................5

OVERVIEW OF THE PLAN .................................................................................................................13

    Introduction....................................................................................................................................13

    Classes and Treatment of Claims and Interests...........................................................................13

    Sources and Uses of Cash ............................................................................................................19

    Distributions of New Common Stock ..........................................................................................20

    Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling
        Injunctions ............................................................................................................................20

    Agreements with Labor Regarding Pension and Retiree Medical Benefits .................................22

    PBGC Settlement Agreement.......................................................................................................22

    Intercompany Claims Settlement .................................................................................................23

    Payment of Administrative Claims ..............................................................................................24

    Payment of Priority Tax Claims...................................................................................................26

CERTAIN EVENTS PRECEDING THE DEBTORS' CHAPTER 11 FILINGS ...........................................27

    Historical Business Strategy and Operations ..............................................................................27

    Capital Structure as of the Petition Date .....................................................................................27

    Events Leading up to the Debtors' Chapter 11 Filings................................................................29

    The Debtors' Prepetition Attempts to Resolve Their Financial Issues ........................................30

OPERATIONS DURING THE REORGANIZATION CASES ...................................................................31

    Introduction....................................................................................................................................31

    First Day Relief.............................................................................................................................31

    The Additional Debtors and the Canadian Proceeding ...............................................................34

    Postpetition Financing...................................................................................................................35

    Stipulation and Agreed Order with MAXXAM ...........................................................................35

    Key Employee Retention Program................................................................................................36

    Appointment of the Committees and Future Claimants' Representatives ...................................37

    Rejection of Certain Executory Contracts and Unexpired Leases...............................................40

    Claims Process and Bar Dates......................................................................................................42

    Exclusivity ....................................................................................................................................42

    Curtailment and Sale of Washington Smelters............................................................................43

    Strategic Plan to Sell Commodities Assets .................................................................................43

    Additional Asset Sales .................................................................................................................46

    Agreements with Labor Regarding Pension and Retiree Medical Benefits .................................47

    PBGC Settlement Agreement.......................................................................................................49

**TABLE OF CONTENTS**
(continued)

Page

Certain Asbestos-Related Insurance Coverage Litigation.................................................51

Certain Other Litigation and Settlements During the Reorganization Cases .................................53

Guaranty Subordination Dispute.................................................~~58~~59

7-3/4% SWD Revenue Bond Dispute .................................................~~60~~61

Intercompany Claims Settlement .................................................62

PI TRUSTS AND DISTRIBUTION PROCEDURES .................................................66

Background .................................................66

Funding Vehicle Trust.................................................71

Asbestos PI Trust .................................................75

Silica PI Trust.................................................~~79~~80

CTPV PI Trust .................................................~~83~~84

NIHL PI Trust .................................................~~86~~87

PI Trust Funding Agreement.................................................90

Insurance Neutrality .................................................~~91~~92

PI Trust Distribution Procedures.................................................~~92~~93

Certain Risks Associated with the PI Trusts .................................................~~110~~111

PI Channeling Injunctions .................................................~~111~~112

Channeled PI Insurance Entity Injunction.................................................~~115~~117

REORGANIZED KAISER .................................................~~118~~119

Restructuring Transactions.................................................~~118~~119

Description of Business.................................................~~119~~120

Strategic Plan .................................................~~123~~124

Liquidity and Capital Resources .................................................~~123~~124

Exit Financing Facility.................................................124

Selected Historical Financial Information.................................................~~125~~126

Projected Financial Information.................................................~~125~~126

Projections.................................................130

Board of Directors.................................................~~137~~139

Management.................................................~~142~~144

Certain Corporate Governance Matters.................................................~~151~~153

NEW COMMON STOCK .................................................~~156~~158

Estimated Reorganization Value.................................................~~156~~158

General Description of New Common Stock.................................................~~158~~160

Restrictions on Transfer .................................................~~159~~161

Risk Factors.................................................~~160~~162

**TABLE OF CONTENTS**
(continued)

Page

GENERAL INFORMATION CONCERNING THE PLAN ............................................................. ~~168~~170

    Substantive Consolidation................................................................................ ~~168~~170

    Discharge, Termination and Injunction.............................................................. ~~168~~170

    Preservation of Rights of Action Held by the Debtors and the Reorganized Debtors.......................... ~~169~~171

    Limitation of Liability...................................................................................... ~~170~~172

    Releases ...................................................................................................... ~~170~~172

    Executory Contracts and Unexpired Leases......................................................... ~~171~~173

    Collective Bargaining Agreements .................................................................... ~~172~~174

    Insurance Policies and Agreements.................................................................... ~~172~~174

    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors ........................... ~~173~~175

    Restructuring Transactions............................................................................... ~~173~~175

    Certificates of Incorporation and Bylaws............................................................ ~~173~~175

    Directors and Officers of the Reorganized Debtors .............................................. ~~174~~176

    New Employment, Retirement, Indemnification and Other Related Agreements and Incentive
        Compensation Programs........................................................................... ~~174~~176

    Transfers of Funds Among the Debtors .............................................................. ~~175~~177

    Corporate Action.......................................................................................... ~~175~~177

    Registration Rights Agreement and Stock Transfer Restriction Agreement........................ ~~175~~177

    Cancellation of KAC Old Stock........................................................................ ~~175~~177

    Release of Liens........................................................................................... ~~175~~177

    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes................ ~~176~~178

    Dissolution of Committees.............................................................................. ~~176~~178

    Canadian Proceeding.................................................................................... ~~176~~178

    Certain Provisions Relating to KAC Old Stock Interests......................................... ~~176~~178

    Effect of Plan on Certain Indentures ................................................................. 179

    Modification or Revocation of the Plan .............................................................. ~~177~~180

DISTRIBUTIONS UNDER THE PLAN ............................................................................... ~~178~~181

    Distributions for Claims Allowed as of the Effective Date....................................... ~~178~~181

    Method of Distributions to Holders of Claims...................................................... ~~178~~181

    Compensation and Reimbursement for Services Related to Distributions........................... ~~178~~181

    Unsecured Claims Reserve ............................................................................. ~~178~~182

    Delivery of Distributions and Undeliverable or Unclaimed Distributions........................... ~~179~~182

    Distribution Record Date ............................................................................... ~~181~~184

    Means of Cash Payments ............................................................................... ~~181~~184

    Timing and Calculation of Amounts To Be Distributed .......................................... ~~181~~184

TABLE OF CONTENTS
(continued)

Page

Application of Distributions.................................................................................................~~183~~186

Setoffs  ...............................................................................................................................~~183~~186

Surrender of Cancelled Securities .......................................................................................~~183~~186

Special ~~Provision~~Provisions Relating to Environmental ~~Settlement Agreement~~..........................~~184~~Matters  187

Prosecution of Objections to Claims....................................................................................~~184~~188

Liquidation and Payment of Tort Claims.............................................................................~~185~~188

Treatment of Disputed Claims .............................................................................................~~185~~189

Distributions on Account of Disputed Claims Once They Are Allowed .............................~~185~~189

Tax Requirements for Income Generated by Unsecured Claims Reserve............................~~185~~189

VOTING AND CONFIRMATION OF THE PLAN .................................................................~~187~~190

General  ................................................................................................................................~~187~~190

Voting Procedures and Requirements ...................................................................................~~187~~190

Confirmation Hearing ..........................................................................................................~~189~~192

Confirmation .......................................................................................................................~~189~~192

Alternatives to Confirmation and Consummation of the Plan ............................................~~191~~194

CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN............~~193~~196

General  ................................................................................................................................~~193~~196

U.S. Federal Income Tax Consequences to the Debtors ......................................................~~193~~196

U.S. Federal Income Tax Consequences to Holders of Claims............................................~~196~~199

Certain Other Tax Considerations for Holders of Claims ....................................................~~197~~200

Importance of Obtaining Professional Tax Assistance.........................................................~~199~~202

APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS .......................~~200~~203

General  ................................................................................................................................~~200~~203

Bankruptcy Code Exemptions from Registration Requirements...........................................~~200~~203

Certain Transactions by Stockbrokers..................................................................................~~202~~205

Registration Rights Agreement ............................................................................................~~202~~205

RECOMMENDATION AND CONCLUSION ..........................................................................~~204~~207

**TABLE OF EXHIBITS**

Exhibit I    —    ~~First~~<u>Second</u> Amended Joint Plan of Reorganization ~~of the Debtors~~

Exhibit II   —   Liquidation Analysis

Exhibit III —   Voting Procedures

## ADDITIONAL INFORMATION

Any statement in this Disclosure Statement concerning the provisions of any document is not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as Exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement or because such documents have not yet been filed with the Bankruptcy Court. All of the Exhibits to the Plan (once Filed with the Bankruptcy Court) may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court. This Disclosure Statement and the Exhibits hereto, the Plan and the Exhibits thereto, and certain other documents and information described or referred to herein are or will be available to the public over the Internet on the Document Website (www.kaiseraluminum.com). Holders of Claims against or Interests in one or more of the Debtors may also obtain a copy of the Exhibits to the Plan (once Filed with the Bankruptcy Court), as well as a copy of the Plan and this Disclosure Statement, from KAC by a written request sent to the following address: Kaiser Aluminum Corporation, 27422 Portola Parkway, Suite 350, Foothill Ranch, California 92610, Attn: General Counsel.

In addition, KAC files reports and other documents with the SEC in accordance with the requirements of the Exchange Act. KAC's filings with the SEC, including its Annual Report on Form 10-K for the year ended December 31, 2004 (the "KAC 2004 Form 10-K") and its Quarterly Report on Form 10-Q for the quarter ended June 30, 2005 (the "KAC 2005 Q2 Form 10-Q"), are available to the public over the Internet on the SEC's website at www.sec.gov. Such filings may also be inspected at the SEC's Public Reference Room at 100 F Street, N.E., Room 1580, Washington, DC 20549. Information regarding the operation of the Public Reference Room may be obtained by calling the SEC at 1-800-SEC-0330. The KAC 2004 Form 10-K, the KAC 2005 Q2 Form 10-Q and other filings made by KAC with the SEC are also available on the Document Website.

## INTRODUCTION

The Debtors are seeking approval of the Plan, a copy of which is attached hereto as Exhibit I. This Disclosure Statement is submitted by the Debtors in connection with the solicitation of acceptances of the Plan.

The confirmation of a plan of reorganization, which is the vehicle for satisfying the rights of holders of claims against and interests in a debtor, is the overriding purpose of a chapter 11 case.

The primary objectives of the Plan are to:

- alter the Debtors' debt and capital structures to permit them to emerge from their Reorganization Cases with viable capital structures;

- maximize the value of the ultimate recoveries to all creditor groups on a fair and equitable basis; and

- settle, compromise or otherwise dispose of certain claims and interests on terms that the Debtors believe to be fair and reasonable and in the best interests of their respective Estates and creditors, including holders of claims relating to asbestos and certain other personal injuries.

In furtherance of such objectives, the Plan provides for, among other things:

- the classification and treatment of Claims and Interests;

- the creation of the PI Trusts and the related Funding Vehicle Trust and the entry of the PI Channeling Injunctions;

- the cancellation of the currently outstanding common stock of KAC;

- the contribution of New Common Stock and Cash to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust; and

- the distribution of New Common Stock to the PBGC and other holders of Allowed General Unsecured Claims.

If the Plan is confirmed and consummated in accordance with its terms, among other things:

- The PI Trusts will be established for the benefit of the holders of Channeled Personal Injury Claims (*i.e.*, Asbestos Personal Injury Claims (Class 5), CTPV Personal Injury Claims (Class 6), NIHL Personal Injury Claims (Class 7) and Silica Personal Injury Claims (Class 8)) and certain of the PI Trust Assets (*i.e.*, the common stock of Reorganized Kaiser Trading and the 75% of the KFC Claim) will be transferred to the Asbestos PI Trust and the Silica PI Trust. The Funding Vehicle Trust will be established to hold and manage the remaining PI Trust Assets (*i.e.*, the PI Insurance Assets (including rights to proceeds of insurance) and $13 million of Cash) and make payments to the PI Trusts in accordance with the PI Trust Funding Agreement. In exchange for the PI Trust Assets to be transferred to the Asbestos PI Trust and the Silica PI Trust pursuant to the Plan and the PI Trust Funding Agreement, the PI Trusts will assume all liability and responsibility for Channeled Personal Injury Claims. Channeled Personal Injury Claims will be determined and paid in accordance with the terms, provisions and procedures of the applicable PI Trust Agreement and PI Trust Distribution Procedures. Holders of Channeled Personal Injury Claims will be permanently enjoined from pursuing their claims against the Reorganized Debtors and other Protected Parties. See "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunctions" and "PI Trusts and Distribution Procedures."

- The Union VEBA Trust will receive 11,439,900 shares of New Common Stock (*i.e.*, 57.2% of the New Common Stock to be issued pursuant to the Plan) and Cash in an amount equal to the Initial VEBA Contribution payable to the Union VEBA Trust, if any, and the Retired Salaried Employee VEBA Trust will receive 1,940,100 shares of New Common Stock (*i.e.*, 9.7% of the New Common Stock to be issued pursuant to the Plan) and Cash in an amount equal to the Initial VEBA Contribution payable to the Retiree Salaried Employee VEBA Trust, if any; it is currently estimated that, assuming the Effective Date occurs on December 31, 2005, the Debtors will not be required to make either Initial VEBA Contribution. Following the Effective Date, depending on the financial performance of Reorganized KAC, the Union VEBA Trust and the Retired Salaried Employee VEBA Trust may receive additional Cash contributions (*i.e.*, Variable VEBA Contributions). See "Overview of the Plan — Agreements with Labor Regarding Pension and Retiree Medical Benefits" and "Operations During the Reorganization Cases — Agreements with Labor Regarding Pension and Retiree Medical Benefits."

- Unless otherwise agreed by the holder of a General Unsecured Claim and the applicable Debtor and except as otherwise provided in the Environmental Settlement Agreement with respect to Additional Sites (as such term is defined therein) (see "Operations During the Reorganization Cases — Certain Other Litigation and Settlements During the Reorganization Cases — Environmental Settlement Agreement"), each Holder of an Allowed General Unsecured Claim (Class 9) will receive its Pro Rata Share of 4,460,000 shares of New Common Stock. Notwithstanding the foregoing, in accordance with the contractual subordination provisions of the Senior Subordinated Note Indenture and paragraph 4 of the 7-3/4% SWD Revenue Bond Settlement, the aggregate amount of consideration that would otherwise be payable to the holders of Senior Subordinated Note Claims in the absence of the contractual subordination provisions of the Senior Subordinated Note Indenture will be distributed to holders of Allowed Senior Note Claims and holders of Allowed 7-3/4% SWD Revenue Bond Claims on a pro rata basis. It is anticipated that the Asbestos PI Trust and the Silica PI Trust will together receive an aggregate of 1,275,714 shares of New Common Stock (*i.e.*, 6.4% of the New Common Stock to be issued pursuant to the Plan) on account of their 75% of the KFC Claim (which is an Allowed General Unsecured Claim in Class 9), with the Asbestos PI Trust receiving 1,199,171 of such shares and the Silica PI Trust receiving 76,543 of such shares. See "Overview of the Plan — Distributions of New Common Stock," "Operations During the Reorganization Cases — ~~Bankruptcy~~Guaranty Subordination Dispute" and "Operations During the Reorganization Cases — 7-3/4% SWD Revenue Bond Dispute."

- In addition to the 947,366 shares of New Common Stock the PBGC is expected to receive as the holder of an Allowed General Unsecured Claim (Class 9) and the 136,067 shares of New Common Stock the PBGC, as the holder of an allowed general unsecured claim against KFC, is expected to receive pursuant to the Alumina Subsidiary Plan for KAAC and KFC as the PBGC's proportionate share of the New Common Stock to be distributed on account of KFC's 25% of the KFC Claim (which is an Allowed General Unsecured Claim in Class 9) (see "Overview of the Plan — Distributions of New Common Stock," "Overview of the Plan — PBGC Settlement Agreement" and "Operations During the Reorganization Cases — PBGC Settlement Agreement"), the PBGC, as the holder of the Canadian Debtor PBGC Claims (Class 4), will receive (a) 2,160,000 shares of New Common Stock and (b) $2.5 million in Cash. Accordingly, it is anticipated that the PBGC will receive an aggregate of 3,243,433 shares of New Common Stock (*i.e.*, 16.2% of the New Common Stock to be issued pursuant to the Plan) on account of its Class 9 Claim, its Claims 4 Claims and its general unsecured claim against KFC.

- Except as otherwise provided in the Plan, each holder of a Senior Note Claim or a 7-3/4% SWD Revenue Bond Claim that would otherwise be a General Unsecured Claim (Class 9) except that the stated principal amount of the securities underlying the allowed amount of such Claim is either equal to or less than $15,000 (*i.e.*, a Subclass 2A Convenience Claim) will receive Cash equal to 5.8% of the allowed amount of such Claim.

- Except as otherwise provided in the Plan, each holder of a 7.60% SWD Revenue Bond Claim that would otherwise be a General Unsecured Claim (Class 9) except that the stated principal amount

of the securities underlying the allowed amount of such Claim is either equal to or less than $30,000 or an Unsecured Claim other than a Public Note Claim that would otherwise be a General Unsecured Claim (Class 9) except that the allowed amount of such Claim is equal to or less than $30,000 (*i.e.*, a Subclass 2B Convenience Claim) will receive Cash equal to 2.9% of the allowed amount of such Claim.

*Please refer to the chart beginning on page 14̶13 of this Disclosure Statement for a summary of the proposed treatment of each class of Claims and Interests.*

AS OF THE EFFECTIVE DATE, IN CONSIDERATION FOR THE OBLIGATIONS OF THE DEBTORS AND THE REORGANIZED DEBTORS UNDER THE PLAN AND THE CASH, NEW COMMON STOCK AND CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS AND DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THE PLAN, EACH HOLDER OF A CLAIM, OTHER THAN A HOLDER OF A CHANNELED PERSONAL INJURY CLAIM, THAT VOTES IN FAVOR OF THE PLAN WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE DEBTORS' OR THE REORGANIZED DEBTORS' OBLIGATIONS UNDER THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS AND DOCUMENTS DELIVERED THEREUNDER), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO A DEBTOR, THE REORGANIZATION CASES OR THE PLAN THAT SUCH ENTITY HAS, HAD OR MAY HAVE AGAINST ANY DEBTOR OR OTHER KAISER COMPANY, THE CREDITORS' COMMITTEE OR MEMBERS THEREOF, THE ASBESTOS CLAIMANTS' COMMITTEE OR MEMBERS THEREOF, THE RETIREES' COMMITTEE OR MEMBERS THEREOF, THE FUTURE ASBESTOS CLAIMANTS' REPRESENTATIVE, THE FUTURE SILICA AND CTPV CLAIMANTS' REPRESENTATIVE, ANY DIP LENDER, ANY INDENTURE TRUSTEE OR ANY OF THEIR RESPECTIVE PRESENT OR FORMER DIRECTORS, OFFICERS, EMPLOYEES, ACCOUNTANTS (INCLUDING INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS), ADVISORS, ATTORNEYS, INVESTMENT BANKERS, UNDERWRITERS, CONSULTANTS OR OTHER AGENTS OR SHAREHOLDERS, ACTING IN SUCH CAPACITY (WHICH RELEASE WILL BE IN ADDITION TO THE DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS PROVIDED IN THE PLAN AND UNDER THE CONFIRMATION ORDER AND THE BANKRUPTCY CODE), EXCEPT FOR THOSE CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES BASED ON: (A) ACTS OR OMISSIONS OF ANY SUCH PERSON CONSTITUTING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; (B) IF THE HOLDERS OF THE SENIOR SUBORDINATED NOTES ARE OR WERE DETERMINED BY THE ORDER CONTEMPLATED BY SECTIONS 2.4(c)(i)(B) AND 2.4(c)(ii)(B) OF EITHER OR BOTH OF THE ALUMINA SUBSIDIARY PLANS TO BE ENTITLED TO A DISTRIBUTION UNDER EITHER OR BOTH OF THE ALUMINA SUBSIDIARY PLANS, ACTS OR OMISSIONS OF ANY SUCH PERSON RELATED TO OR GIVING RISE TO THE CIRCUMSTANCES UNDERLYING ANY OF THE CONTRACTUAL SUBORDINATION DISPUTES; OR (C) CONTRACTUAL OBLIGATIONS OF, OR LOANS OWED BY, ANY SUCH PERSON TO A DEBTOR. NOTHING IN PROVISIONS OF THE PLAN DESCRIBED IN THIS PARAGRAPH WILL LIMIT IN ANY WAY THE SCOPE OR APPLICABILITY OF ANY PI CHANNELING INJUNCTION. SEE "GENERAL INFORMATION CONCERNING THE PLAN — RELEASES — GENERAL RELEASES."

*[NOTE: THIS PARAGRAPH IS TO BE INCLUDED AFTER THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT: BY AN ORDER OF THE BANKRUPTCY COURT DATED [_____], 2005, THIS DISCLOSURE STATEMENT HAS BEEN APPROVED AS CONTAINING "ADEQUATE INFORMATION" FOR CREDITORS OF THE DEBTORS IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE. THE BANKRUPTCY CODE DEFINES "ADEQUATE INFORMATION" AS "INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND THE HISTORY OF THE*

*DEBTOR AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN . . . ." 11 U.S.C. § 1125(a)(1).]*

**THE DEBTORS' BOARDS OF DIRECTORS OR COMPARABLE GOVERNING BODIES BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS, INCLUDING HOLDERS OF ASBESTOS PERSONAL INJURY CLAIMS AND HOLDERS OF OTHER CHANNELED PERSONAL INJURY CLAIMS. ALL CREDITORS, INCLUDING HOLDERS OF CHANNELED PERSONAL INJURY CLAIMS, ENTITLED TO VOTE ARE URGED TO VOTE IN FAVOR OF THE PLAN BY NO LATER THAN 5:00 P.M., EASTERN TIME, ON [———————],NOVEMBER 14, 2005 OR SUCH OTHER TIME OR DATE IDENTIFIED ON THEIR BALLOT.**

The requirements for Confirmation of the Plan under the Bankruptcy Code, including the vote of creditors to accept the Plan and certain of the statutory findings that must be made by the Bankruptcy Court, are described in "Voting and Confirmation of the Plan." Confirmation of the Plan and the occurrence of the Effective Date are also subject to a number of significant conditions, which are set forth in the Plan and summarized in "Answers To Certain Questions About The Plan And Disclosure Statement — What must happen before the Plan can be consummatedbecome effective?" There is no assurance that these conditions will be satisfied or waived.

4

### ANSWERS TO CERTAIN QUESTIONS ABOUT THE PLAN AND DISCLOSURE STATEMENT

*The information presented in the answers to the questions set forth below is qualified in its entirety by reference to the full text of this Disclosure Statement, including the Plan attached hereto as Exhibit I.* **All creditors, including holders of Asbestos Personal Injury Claims and other Channeled Personal Injury Claims, entitled to vote on the Plan are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan attached hereto as Exhibit I, prior to submitting a Ballot to accept or reject the Plan.**

#### What is this document and why am I receiving it?

On February 12, 2002, KAC, KACC and certain of their affiliates filed petitions for relief under chapter 11 of the Bankruptcy Code and, on each of March 15, 2002 and January 14, 2003, additional affiliates of KAC and KACC also filed petitions for such relief. The reasons KAC, KACC and those affiliates filed for chapter 11 protection are described under "Certain Events Preceding the Debtors' Chapter 11 Filings." In connection with their proposed reorganization in accordance with chapter 11, the Debtors have prepared the ~~First~~Second Amended Joint Plan of Reorganization attached as Exhibit I to this Disclosure Statement (*i.e.*, the Plan), which sets forth in detail the proposed treatment of the Claims of the Debtors' creditors and Interests of the Debtors' equity interest holders. This Disclosure Statement describes the terms of, and certain other material information relating to, the Plan.

This Disclosure Statement is being delivered to you because you are the holder of, or have otherwise asserted, either a Claim or Claims against, or an Interest or Interests in, one or more of the Debtors. This Disclosure Statement is intended to provide you with information sufficient to make an informed decision as to whether to vote to accept or reject the Plan (to the extent you are eligible to do so).

#### Am I eligible to vote to accept or reject the Plan?

You are entitled to vote to accept or reject the Plan only if you hold an Allowed Claim (or a Claim that has been temporarily allowed for voting purposes) in one or more of the following Classes:

- Subclass 2A (Senior Note and 7-3/4% SWD Revenue Bond Convenience Claims)

- Subclass 2B (Other Convenience Claims)

- Class 4 (Canadian Debtor PBGC Claims)

- Class 5 (Asbestos Personal Injury Claims)

- Class 6 (CTPV Personal Injury Claims)

- Class 7 (NIHL Personal Injury Claims)

- Class 8 (Silica Personal Injury Claims)

- Subclass 9B (Other Unsecured Claims)

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes, and if you are a holder of an Administrative Claim or Priority Tax Claim, you are not eligible to vote with respect to the Plan as a holder of such Claim. If you hold an Allowed Claim in Class 1 (Unsecured Priority Claims) or Class 3 (Secured Claims), because you are either receiving Cash equal to the allowed amount of such Claim or, in the case of a Secured Claim, your Claim is being Reinstated, you are deemed to have accepted the Plan and you may not vote with respect to it as a holder of such Claim. If you hold an Allowed Claim in Subclass 9A (Senior Subordinated Note Claims), an Allowed Interest in Class 12 (KAC Old Stock Interests) or an Allowed Interest in Class 14 (KACC Old Stock Interests), because you will not recover or retain anything on account of such Claim or Interest, you are deemed to have rejected the Plan and will not be entitled to vote with respect to it as a holder of such Claim or Interest. If you hold an Allowed Claim in Class 10 (Canadian Debtor Claims), because you are being paid in full in accordance with the terms of such Claim, you are

deemed to have accepted the Plan and may not vote with respect to it as a holder of such Claim. The Debtors or affiliates of the Debtors are the holders of all of the Claims in Class 11 (Intercompany Claims) and all of the Interests in Class 13 (Kaiser Trading Old Stock Interests), as well as certain Interests in Class 14 (KACC Old Stock Interests), and are deemed to have consented to the Plan and, thus, to have accepted it. See "Voting and Confirmation of the Plan — Voting Procedures and Requirements." Please refer to the chart beginning on page 11,13 of this Disclosure Statement for a summary of the classification of Claims and Interests.

### *Why should I vote to accept the Plan?*

In connection with the formulation and negotiation of the Plan, the Debtors have evaluated numerous alternatives to the Plan, including consummating an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, delaying the adoption of any plan of reorganization and liquidating the Debtors. The Debtors have concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims. See "Voting and Confirmation of the Plan — Alternatives to Confirmation and Consummation of the Plan."

Furthermore, the Plan has been negotiated by and among the Debtors and representatives of the Debtors' most significant creditors, including the Creditors' Committee (a committee appointed by the Bankruptcy Court to represent the interests of the Debtors' unsecured creditors), the Asbestos Claimants' Committee (a committee appointed by the Bankruptcy Court to represent the interests of the asbestos claimants), the Future Asbestos Claimants' Representative (an individual appointed by the Bankruptcy Court to represent the interests of future asbestos-related claimants) and the Future Silica and CTPV Claimants' Representative (an individual appointed by the Bankruptcy Court to represent the interests of future silica-related and CTPV-related claimants). The Debtors' Boards of Directors or comparable governing bodies have concluded that the Plan is in the best interests of creditors, including the holders of Channeled Personal Injury Claims. ‖In addition, the Creditors' Committee has independently concluded that the Plan is in the best interests of unsecured creditors; the Asbestos Claimants' Committee has independently concluded that the Plan is in the best interests of asbestos claimants; the Future Asbestos Claimants' Representative has independently concluded that the Plan is in the best interests of future asbestos-related claimants; and the Future Silica and CTPV Claimants' Representative has independently concluded that the Plan is in the best interests of future silica-related and CTPV-related claimants.‖

### *How do I vote to accept or reject the Plan?*

If you are entitled to vote on the Plan because you are the holder of a Claim in Subclass 2A, Subclass 2B, Class 4, Class 5, Class 6, Class 7, Class 8 and/or Subclass 9B that is allowed or has been temporarily allowed for voting purposes, as the case may be, unless you are a holder of a Public Note Claim held through a nominee or unless you are the holder of a Channeled Personal Injury Claim and have authorized your attorney to vote on your behalf, you must complete, sign and return your Ballot or Ballots in accordance with the instructions to Logan & Company, Inc., 546 Valley Road, Upper Montclair, New Jersey 07043 (unless another address is set forth on the preaddressed envelope provided to you) on or prior to 5:00 P.M. Eastern Time, on [_____],November 14, 2005 (unless another time or date is identified on the Ballot). If your vote is not received by that time and date, it will not be counted. If you are the holder of a Public Note Claim held in the name of a broker, dealer, commercial bank, trust company or other nominee, you must complete and deliver to such nominee the Ballot or Ballots provided to you in order to vote on the Plan; we urge you to deliver such Ballot or Ballots to your nominee holder or holders no later than the date identified on such Ballot or Ballots in order to ensure that your vote will be counted. If you are the holder of a Channeled Personal Injury Claim in Class 5, Class 6, Class 7 or Class 8, your attorney may be authorized to vote on your behalf. Please see Exhibit III to this Disclosure Statement for more information regarding the voting of Channeled Personal Injury Claims. If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the Debtors' voting agent, Logan & Company, at (973) 509-3190. See "Voting and Confirmation of the Plan — Voting Procedures and Requirements."

### *What if I'm entitled to vote to accept or reject the Plan and don't?*

In general, within any particular class of Claims, only those holders of Claims who actually vote to accept or to reject the Plan will affect whether the Plan is accepted by the requisite holders of Claims in such Class. In order for the Plan to be accepted by Class 5 (Asbestos Personal Injury Claims), the holders representing at least two-thirds in dollar amount and 75% of the number of the Claims in Class 5 that have been temporarily allowed for voting purposes and that are held by holders of such Claims who actually vote to accept or to reject the Plan must

vote to accept the Plan. In order for the Plan to be accepted by each of Subclass 2A (Senior Note and 7-3/4% SWD Revenue Bond Convenience Claims), Subclass 2B (Other Convenience Claims), Class 4 (Canadian Debtor PBGC Claims), Class 6 (CTPV Personal Injury Claims), Class 7 (NIHL Personal Injury Claims), Class 8 (Silica Personal Injury Claims) and Subclass 9B (Other Unsecured Claims), the holders representing at least two-thirds in dollar amount and a majority in number of the Claims in such Class that are allowed or have been temporarily allowed for voting purposes, as the case may be, and that are held by holders of such Claims who actually vote to accept or to reject the Plan must vote to accept the Plan. Thus, if you hold a Claim in Subclass 2A, Subclass 2B, Class 5, Class 6, Class 7, Class 8 or Subclass 9B, your failure to vote in respect of such Claim will count as neither a vote for acceptance nor a vote for rejection of the Plan. See "Voting and Confirmation of the Plan — Confirmation — Acceptance or Cramdown."

### What happens if the Plan is not accepted by each Class entitled to vote on the Plan?

If the holders of each Class of Claims entitled to vote on the Plan (*i.e.*, Subclass 2A, Subclass 2B, Classes 4, Class 5, Class 6, Class 7, Class 8 and Subclass 9B) vote to reject the Plan, the Plan will not be confirmed or consummated in its present form. However, as long as the requisite holders of Claims in Class 5 (Asbestos Personal Injury Claims) vote to accept the Plan, the Debtors may seek Confirmation pursuant to the "cramdown" provisions of the Bankruptcy Code (which will require a determination by the Bankruptcy Court that that the Plan is "fair and equitable" and "does not discriminate unfairly" as to each impaired Class that does not accept the Plan or is deemed to have rejected it). ("Cramdown" is not available with respect to Class 5; if the requisite holders of Claims in Class 5 do not vote to accept the Plan, it cannot be confirmed.) The Debtors believe that the Plan satisfies the "cramdown" provisions of the Bankruptcy Code and, in any case, have reserved the right to modify the Plan to the extent that Confirmation thereunder requires modification. See "Voting and Confirmation of the Plan — Confirmation — Acceptance or Cramdown."

### What will I receive on account of my Claim if the Plan is confirmed and becomes effective?

If you are the holder of a Claim against a Debtor, what you will actually receive, if anything, on account of such Claim will depend on the classification of that Claim. For detailed information about the classification and treatment of creditors under the Plan, see "Overview of the Plan — Classes and Treatment of Claims and Interests."

The holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Unsecured Priority Claims (Class 1), Allowed Secured Claims (Class 3) or Allowed Canadian Debtor Claims (Class 10) against the Debtors will receive Cash or other property equal to 100% of the allowed amount of their Claims or will have their Claims Reinstated, as the case may be, pursuant to the Plan. Holders of Allowed Convenience Claims (Class 2), Allowed Canadian Debtor PBGC Claims (Class 4), Asbestos Personal Injury Claims (Class 5), CTPV Personal Injury Claims (Class 6), NIHL Personal Injury Claims (Class 7), Silica Personal Injury Claims (Class 8) or Allowed General Unsecured Claims (Class 9) will receive the following treatment:

#### Holders of Allowed Convenience Claims

A holder of an Allowed Claim in Subclass 2A (Senior Note and 7-3/4% SWD Revenue Bond Convenience Claims) will be entitled to receive in satisfaction of such Claim Cash equal to 5.8% of the allowed amount of such Claim and a holder of an Allowed Claim in Subclass 2B (Other Convenience Class Claims) will be entitled to receive in satisfaction of such Claim Cash equal to 2.9% of the allowed amount of such Claim. Holders of 6-1/2% RPC Revenue Bond Claims and holders of Senior Subordinated Note Claims are not entitled to a treatment in Class 2.

#### Holder of Allowed Canadian Debtor PBGC Claims

The PBGC, as the holder of the Allowed Canadian Debtor PBGC Claims (Class 4), will be entitled to receive in satisfaction of such Claims (a) 2,160,000 shares of New Common Stock and (b) $2.5 million in Cash. See "Overview of the Plan — PBGC Settlement Agreement" and "Operations During the Reorganization Cases — PBGC Settlement Agreement."

### Holders of Asbestos Personal Injury Claims

The Asbestos PI Trust is being established to address Asbestos Personal Injury Claims (Class 5). Asbestos Personal Injury Claims will be determined and paid in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement (which is attached to the Plan as Exhibit 1.1(39) thereto) and the Asbestos Distribution Procedures (which are attached to the Plan as Exhibit 1.1(34) thereto). See "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunctions" and "PI Trusts and Distribution Procedures."

### Holders of CTPV Personal Injury Claims

The CTPV PI Trust is being established to address CTPV Personal Injury Claims (Class 6) and certain other Channeled Personal Injury Claims. CTPV Personal Injury Claims will be determined and paid in accordance with the terms, provisions and procedures of the CTPV PI Trust Agreement (which is attached to the Plan as Exhibit 1.1(71) thereto) and the CTPV Trust-Distribution Procedures (which are attached to the Plan as Exhibit 1.1(66) thereto). See "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunctions" and "PI Trusts and Distribution Procedures."

### Holders of NIHL Personal Injury Claims

The NIHL PI Trust is being established to address NIHL (*i.e.*, noise induced hearing loss) Personal Injury Claims (Class 7) and certain other Channeled Personal Injury Claims. NIHL Personal Injury Claims will be determined and paid in accordance with the terms, provisions and procedures of the NIHL PI Trust Agreement (which is attached to the Plan as Exhibit 1.1(134) thereto) and the NIHL Distribution Procedures (which are attached to the Plan as Exhibit 1.1(129) thereto). See "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunctions" and "PI Trusts and Distribution Procedures."

### Holders of Silica Personal Injury Claims

The Silica PI Trust is being established to address Silica Personal Injury Claims (Class 8) and certain other Channeled Personal Injury Claims. Silica Personal Injury Claims will be determined and paid in accordance with the terms, provisions and procedures of the Silica PI Trust Agreement (which is attached to the Plan as Exhibit 1.1(191) thereto) and the Silica Distribution Procedures (which are attached to the Plan as Exhibit 1.1(186) thereto). See "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunctions" and "PI Trusts and Distribution Procedures."

### Holders of General Unsecured Claims

Unless otherwise agreed by the holder of such Claim and the applicable Debtor and except as otherwise provided in the Environmental Settlement Agreement with respect to Additional Sites (as such term is defined therein) (see "Operations During the Reorganization Cases — Certain Other Litigation and Settlements During the Reorganization Cases — Environmental Settlement Agreement"), a holder of an Allowed General Unsecured Claim (Class 9) will be entitled to receive in satisfaction of such Claim a Pro Rata Share of 4,460,000 shares of New Common Stock, subject, in the case of the Senior Notes, the 7-3/4% SWD Revenue Bonds and the Senior Subordinated Notes, to the application of the contractual subordination provisions of the Senior Subordinated Note Indenture and paragraph 4 of the 7-3/4% SWD Revenue Bond Settlement. For purposes of the Plan, the term "Pro Rata Share" means, when used with reference to a distribution to a holder of an Allowed General Unsecured Claim, that share of the property to be distributed on account of all Allowed General Unsecured Claims so that the ratio of (a)(i) the amount of such property distributed on account of the particular Allowed General Unsecured Claim to (ii) the amount of such Claim is the same as the ratio of (b)(i) the aggregate amount of such property distributed on account of all Allowed General Unsecured Claims to (ii) the aggregate amount of all Allowed General Unsecured Claims.

Notwithstanding the foregoing, in accordance with the contractual subordination provisions of the Senior Subordinated Note Indenture and paragraph 4 of the 7-3/4% SWD Revenue Bond Settlement, the aggregate amount of consideration that would otherwise be payable to the holders of Senior Subordinated Note Claims in the absence of the contractual subordination provisions of the Senior Subordinated Note Indenture will be distributed to holders

of Allowed Senior Note Claims and holders of Allowed 7-3/4% SWD Revenue Bond Claims on a pro rata basis, based upon the relative allowed amounts of such Claims against KACC, as set forth in Section 2.16 of the Plan (which is described below under "Overview of the Plan — Classes and Treatment of Claims and Interests — Allowed Amount of Certain Claims"). As a consequence, nothing will be distributed to the holders of Senior Subordinated Note Claims on account of such Claims.

### *What will I receive if my Claim is Disputed?*

No distributions will be made on account of any Claim that is a Disputed Claim unless and until that Claim becomes an Allowed Claim in accordance with the procedures for resolving Disputed Claims set forth in the Plan. See "Distributions Under the Plan — Treatment of Disputed Claims; Reserves and Estimations." Channeled Personal Injury Claims will be treated differently than other Claims in that they will be determined in accordance with the terms, provisions and procedures set forth in the applicable PI Trust Agreement and PI Trust Distribution Procedures, rather than the procedures for resolving Disputed Claims set forth in the Plan. See "PI Trusts and Distribution Procedures."

### *Is there a particular record date for determining who will be entitled to receive distributions under the Plan on account of a Claim?*

Under the distribution procedures set forth in the Plan, distributions on account of an Allowed Claim will be made only to the holder of that Claim as of the close of business on the Distribution Record Date (which is a date to be announced by the Debtors that is not more than five Business Days preceding the then-anticipated Effective Date). No purported transfer of a Claim following the Distribution Record Date will be recognized. The Channeled Personal Injury Claims will be treated differently than other Claims in that they will be paid in accordance with the terms, provisions and procedures set forth in the applicable PI Trust Agreement and PI Trust Distribution Procedures, rather than the distribution procedures set forth in the Plan. See "PI Trusts and Distribution Procedures."

### *If I am entitled to receive a distribution pursuant to the Plan, when will I receive it?*

#### *Holders of Claims other than Channeled Personal Injury Claims in Classes 5, 6, 7 and 8 and Claims in Class 9*

If you are the holder of an Administrative Claim, a Priority Tax Claim, an Unsecured Priority Claim (Class 1), a Convenience Claim (Class 2), a Secured Claim (Class 3) or a Canadian Debtor Claim (Class 10) that is allowed on the Effective Date or the Canadian Debtor PBGC Claims (Class 4), you will receive the distribution to which you are entitled under the Plan on account of such Claim on or promptly after the Effective Date. If you are the holder of an Administrative Claim, a Priority Tax Claim, an Unsecured Priority Claim (Class 1), a Convenience Claim (Class 2), a Secured Claim (Class 3) or a Canadian Debtor Claim (Class 10) that is a Disputed Claim as of the Effective Date, to the extent such Claim becomes an Allowed Claim after the Effective Date, you should receive the distribution to which you are entitled under the Plan on or promptly after the Quarterly Distribution Date next following that date on which such Claim is allowed.

#### *Holders of Channeled Personal Injury Claims in Classes 5, 6, 7 and 8*

Channeled Personal Injury Claims will be determined and paid in accordance with the terms, provisions and procedures of the applicable PI Trust Agreement and PI Trust Distribution Procedures. See "PI Trusts and Distribution Procedures."

#### *Holders of Claims in Class 9*

If you are the holder of a General Unsecured Claim (Class 9) that is allowed as of the Effective Date and you are entitled under the Plan to a distribution in respect thereof (*i.e.*, you hold an Allowed Subclass 9B Claim), you will receive an initial distribution on account of such Claim on or promptly after the Effective Date. The number of shares of New Common Stock comprising the initial distribution to be made to holders of General Unsecured Claims that are allowed as of the Effective Date will be calculated as if each Disputed General Unsecured Claim were an Allowed General Unsecured Claim in its Face Amount as of the Effective Date. If you

are the holder of an Other Unsecured Claim that is a Disputed Claim as of the Effective Date, to the extent such Claim becomes an Allowed Claim after the Effective Date, you should receive an initial distribution of shares of New Common Stock on account of such Claim on or promptly after the Quarterly Distribution Date next following the date on which such Claim was allowed. In addition, on or promptly after each Quarterly Distribution Date, if you are the holder of an Other Unsecured Claim and have already received your initial distribution on account of such Claim, you may receive an additional distribution of shares of New Common Stock on account of such Claim in an amount equal to (a) the number of shares of New Common Stock that you would have been entitled to receive pursuant to the Plan if such Claim and all other General Unsecured Claims allowed prior to such Quarterly Distribution Date had been allowed as of the Effective Date, minus (b) the aggregate number of shares of New Common Stock previously distributed to you on account of such Claim. See "Distributions Under the Plan — Timing and Calculation of Amounts To Be Distributed."

Notwithstanding the foregoing, if you are the holder of an Allowed Public Note Claim, the distributions to which you are entitled on account of such Claim, if any, will be made to the applicable Indenture Trustee, which will thereafter forward any such distributions to you in due course in accordance with and subject to the terms of the applicable Prepetition Indenture.

### If I hold a Channeled Personal Injury Claim and the Plan is confirmed and becomes effective, how are my rights against the Debtors affected?

As of the Effective Date, liability for all Channeled Personal Injury Claims will automatically and without further act, deed or court order be assumed by the PI Trusts in accordance with and to the extent set forth in Article V of the Plan (which is described below under "PI Trusts and Distribution Procedures"). Each Channeled Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the applicable PI Trust Agreement and PI Trust Distribution Procedures. As further provided in Article V of the Plan, the sole recourse of the holder of a Channeled Personal Injury Claim on account of such Claim will be to the applicable PI Trust and such holder will have no right whatsoever at any time to assert its Channeled Personal Injury Claim against the Reorganized Debtors or any other Protected Party.

### What will my tax consequences be if the Plan is consummated?

For a summary of certain potential federal income tax consequences of the Plan, see "Certain Federal Income Tax Consequences of Consummation of the Plan." The summary contained in this Disclosure Statement does not contain any information with respect to potential state, local or foreign Tax consequences to creditors or equity holders of the Debtors. For these reasons and others, including because Tax consequences are in many cases uncertain and may vary depending on a creditor's individual circumstances, the discussion of the federal income tax consequences of the Plan contained in this Disclosure Statement is not intended in any way to be Tax advice — or otherwise to be a substitute for careful Tax planning with a professional. You are urged to consult with your own tax advisor regarding the federal, state, local and foreign Tax consequences of the Plan.

### What must happen before the Plan can become effective?

In order for the Plan to become effective, certain events must occur. The Plan contains conditions to both the Confirmation of the Plan and the effectiveness of the Plan.

#### Confirmation

Before the Bankruptcy Court can confirm the Plan, the following conditions must be satisfied (or waived in accordance with the Plan):

- The Confirmation Order must have been entered on the docket of the Clerk of the Bankruptcy Court in form and substance satisfactory to the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative and certain findings, most of which are related to the statutory requirements of section 524(g) of the Bankruptcy Code, must be contained in all substantial respects in the Confirmation Order, as set forth in further detail in Section 10.1.a of the Plan;

- The Debtors must have received a commitment for the Exit Financing Facility from the Exit Financing Facility Agent Bank on terms and conditions satisfactory to (a) the Debtors and (b) the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative and such commitment must then be in effect, except that a person in clause (b) may object to such terms and conditions only to the extent (x) they differ materially from those contained in the Commitment Letter, dated January 14, 2005, with J.P. Morgan Securities Inc. and The CIT Group/Business Credit, Inc. (see "Reorganized Kaiser — Exit Financing Facility") and (y) they conflict with the terms of the Plan or are materially less favorable to the Debtors than those then generally available to companies that are comparable to the Debtors.; and

- All Exhibits to the Plan must be in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee and the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative.

In addition, there are a number of substantial confirmation requirements under the Bankruptcy Code that must be satisfied for the Plan to be confirmed, including either the acceptance of the Plan by the requisite holders of Claims in Class 5 in accordance with section 524(g) of the Bankruptcy Code (*i.e.*, acceptance by holders of at least two-thirds in dollar amount and 75% of the number of Claims held by holders actually voting), and by the requisite holders of Claims in each of Subclass 2A, Subclass 2B, Class 4, Class 6, Class 7, Class 8 and Subclass 9B in accordance with section 1129 of the Bankruptcy Code (*i.e.*, acceptance by holders of at least two-thirds in dollar amount and a majority in number of Claims held by holders actually voting) or, if the Plan is not accepted by each of Subclass 2A, Subclass 2B, Class 4, Class 5, Class 6, Class 7, Class 8, and Subclass 9B, the acceptance of the Plan by the requisite holders of Claims in at least Class 5 and the determination by the Bankruptcy Court that the Plan is "fair and equitable" and "does not discriminate unfairly" as to each nonaccepting Class, including Subclass 9A and Classes 12 and 14, which are each deemed to have rejected the Plan. See "Voting and Confirmation of the Plan — Confirmation — Acceptance or Cramdown."

### *Effectiveness*

Before the Plan can become effective, the following conditions must be satisfied (or waived in accordance with the Plan):

- The Confirmation Order must have become a Final Order;

- The documents effectuating the Exit Financing Facility must have been executed and delivered by Reorganized KAC, the Exit Financing Facility Agent Bank and the financial institutions named therein;

- The shares of New Common Stock to be issued pursuant to the Plan must have been registered under the Exchange Act;

- The New Common Stock must have been designated as NASDAQ National Market or NASDAQ SmallCap Market securities by The Nasdaq Stock Market, Inc. or authorized for listing on or accepted for quotation through any exchange registered pursuant to Section 6(a) of the Exchange Act, subject to official notice of issuance;

- The Bankruptcy Court must have entered an order (contemplated to be part of the Confirmation Order), in form and substance acceptable to the Debtors, approving and authorizing the Debtors and the Reorganized Debtors to take all actions necessary, appropriate or desirable to implement the Plan, including completion of the Restructuring Transactions and the other transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, releases and other agreements or documents to be entered into or delivered in connection with the Plan;

- The Bankruptcy Court and/or the District Court, as required, must have entered each of the PI Channeling Injunctions (which may be included in the Confirmation Order), with each containing terms satisfactory to the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative;

- The PI Channeling Injunctions must be in full force and effect;

- The Funding Vehicle Trust Agreement and each PI Trust Agreement must have been executed by the parties thereto;

- Concurrently with the Effective Date, 70.5% of the KFC Claim must have been transferred to the Asbestos PI Trust and 4.5% of the KFC Claim must have been transferred to the Silica PI Trust;

- The Canadian Proceeding must have been dismissed or terminated; and

- All other actions, documents, consents and agreements necessary to implement the Plan must have been effected, obtained and/or executed.

### *Waiver of Conditions to Confirmation or the Effective Date*

The conditions to Confirmation and the conditions to the Effective Date may be waived in whole or part by the Debtors at any time and without an order of the Bankruptcy Court with the consent of the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative. In the event the Retirees' Committee fails to consent and all other such consents have been given, a condition may be waived pursuant to an order of the Bankruptcy Court.

## *When will the Plan be confirmed? When will the Plan be effective?*

### *Confirmation*

A hearing in the Bankruptcy Court relating to the Confirmation of the Plan is currently scheduled for |————————|.January 9 and 10, 2005. This hearing may be continued or adjourned, however, and even if it is held, there is no guaranty that the Bankruptcy Court will find that the requirements of the Bankruptcy Code with respect to Confirmation have been met. See "Voting and Confirmation of the Plan — Confirmation Hearing" and "Voting and Confirmation of the Plan — Confirmation." In addition, the additional conditions to Confirmation set forth in the Plan must be satisfied or waived in accordance with the Plan before the Plan can be confirmed. Thus, while the Debtors expect the Plan to be confirmed on |————————|.in early January 2005, there is no way to predict with any certainty when, if ever, Confirmation will actually occur.

### *Effective Date*

Even if the Plan is confirmed on |————————|.in early January 2005, there are a number of additional conditions that must be satisfied or waived before the Plan can become effective. While the Debtors have assumed an Effective Date of December 31, 2005 for purposes of this Disclosure Statement, the Effective Date will not occur until after the Plan has been confirmed and no assurance can be given as to if or when the Effective Date will actually occur.

### *What happens if the Plan isn't confirmed or doesn't become effective?*

The Debtors expect that all of the conditions to Confirmation and effectiveness of the Plan will be satisfied (or waived in accordance with the Plan). However, there is no guaranty that the Plan will become effective. Although the Debtors intend to take all acts reasonably necessary to satisfy the conditions to the Confirmation and effectiveness of the Plan that are within the Debtors' control if, for any reason, the Plan is not confirmed or does not become effective, the Debtors may be forced to propose an alternative plan or plans of reorganization under chapter 11 of the Bankruptcy Code. If no plan of reorganization can be confirmed, the Debtors may have to convert

the Reorganization Cases to liquidation cases under chapter 7 of the Bankruptcy Code. See "Voting and Confirmation of the Plan — Alternatives to Confirmation and Consummation of the Plan."

## OVERVIEW OF THE PLAN

### Introduction

The following is a brief overview of certain material provisions of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached as Exhibit I, and the Exhibits thereto, as amended, modified or supplemented from time to time, which are or will be available for inspection over the Internet on the Document Website (www.kaiseraluminum.com). See "Additional Information." For a description of certain other significant terms and provisions of the Plan, see "General Information Concerning the Plan" and "Distributions Under the Plan."

### Classes and Treatment of Claims and Interests

#### Summary Classification and Treatment Table

The table below summarizes: (a) the classification and treatment of Claims and Interests; (b) the estimated aggregate amount of Allowed Claims in each of Class 1, Class 2, Class 3, Class 9 and Class 10; (c) the actual aggregate amount of Allowed Claims in Class 4; (d) the aggregate amount and nature of distributions to, or other treatment of, holders of Claims or Interests in each Class; (e) the actual percentage recovery for Class 2; and (f) the estimated percentage recovery for each of Class 3 and Class 9. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes. For a discussion of certain additional matters related to Administrative Claims and Priority Tax Claims, see "— Payment of Administrative Claims" and "— Payment of Priority Tax Claims."

*Each "Estimated Aggregate Claims Amount" shown in the table is based upon the Debtors' review of Claims Filed and the Debtors' books and records and reflects the Debtors' current estimate of the maximum aggregate amount of such Claims that will be allowed upon resolution of all Disputed Claims in such Class, which estimate may be substantially revised in the course of the ongoing Claims reconciliation process. See "Operations During the Reorganization Cases — Claims Process and Bar Dates." Furthermore, a number of Disputed Claims are expected to be material and the amount of any Disputed Claim that ultimately is allowed by the Bankruptcy Court may be significantly more or less than the estimated amount of such Claim included in the applicable "Estimated Aggregate Claims Amount." As a consequence, the actual aggregate amount of Allowed Claims in each of Class 1, Class 2, Class 3, Class 9, and Class 10 may differ significantly from the "Estimated Aggregate Claims Amount" for such Class set forth below.*

*Each "Estimated Percentage Recovery" shown in the table is the quotient of the estimated value of the New Common Stock to be distributed to all holders of Allowed Claims in the applicable Class (and, in the case of Class 4, such value plus an additional $2.5 million) divided by the estimated or actual aggregate amount of Allowed Claims in that Class. For purposes of this calculation, it is assumed that the New Common Stock to be distributed under the Plan will have an aggregate value of approximately $380 million, or approximately $19.00 per share, as of the Effective Date, based upon the midpoint of the range for the estimated reorganization equity value of Reorganized KAC excluding the theoretical value of certain anticipated tax attributes of the Reorganized Debtors. See "New Common Stock — Estimated Reorganization Value" for a description of the manner in which the New Common Stock was valued for purposes of the Plan. The actual recoveries for the PBGC on account of its Allowed Claims in Class 4 and the holders of Allowed Claims in Class 9 entitled to a distribution in respect thereof (i.e., holders of Allowed Claims in Subclass 9B) will vary depending on the actual value of the New Common Stock. See "New Common Stock — Risk Factors" for a discussion of various factors that could materially affect the value of the New Common Stock. In addition, the actual recoveries for holders of Allowed Claims in Class 9 will vary depending on the ultimate aggregate amount of Allowed General Unsecured Claims because all holders of Allowed General Unsecured Claims entitled to a distribution in respect thereof will share in the Unsecured Claims Reserve, to which 4,460,000 shares of New Common Stock will be deposited irrespective of the ultimate aggregate amount of Allowed General Unsecured Claims and any deviation thereof from the estimated aggregate amount of Allowed Claims in Class 9.*

*Although the Debtors' management believes that the assumptions used to estimate the value of the New Common Stock as of the Effective Date are reasonable, there is no assurance that the New Common Stock will have the value assumed herein. See "New Common Stock — Risk Factors." The estimated value of the New*

*Common Stock used in this Disclosure Statement is not intended as a prediction of post-Effective Date trading prices of the New Common Stock, and the New Common Stock may trade at substantially higher or lower prices because of a number of factors, including those discussed in "New Common Stock — Risk Factors." The trading price of securities issued under a plan of reorganization, such as the New Common Stock, is subject to many unforeseeable circumstances and therefore cannot be predicted. In addition, there will be substantial limitations on the ability of certain holders of New Common Stock to trade New Common Stock. See "New Common Stock — Restrictions on Transfer." Moreover, as discussed above, there is no assurance that the actual aggregate amount of Allowed Claims in Class 9 will not differ significantly from the "Estimated Aggregate Claims Amount" for Class 9 shown in the table below. Accordingly, no representation can be or is being made that the "Estimated Percentage Recovery" shown in the table below for either Class 4 or Class 9 actually will be realized.*

*Because each holder of an Allowed Unsecured Priority Claim (Class 1), Allowed Secured Claim (Class 3) or Allowed Canadian Debtor Claim (Class 10) will receive Cash or other property equal to 100% of the allowed amount of such Claim, will have such Claim Reinstated or will be paid in full in accordance with its terms, as the case may be, pursuant to the Plan and, accordingly, such Claim is unimpaired, the table does not include an estimate of the recoveries of such holders. While the Channeled Personal Injury Claims (Classes 5, 6, 7 and 8) are impaired, the table does not include an estimate of the aggregate amount of such Claims or the recoveries of holders of such Claims in respect thereof because it is impractical to do so. For a discussion of the determination and payment of Channeled Personal Injury Claims, see "PI Trusts and Distribution Procedures — PI Trust Distribution Procedures."*

| Description and Amount of Claims or Interests | Treatment |
|---|---|
| *Class 1 (Unsecured Priority Claims):*<br><br>Priority Claims that are entitled to priority in payment under section 507(a)(3) or 507(a)(4) of the Bankruptcy Code.<br><br>Estimated Aggregate Claims Amount: $0 | Unimpaired; on the later of the Effective Date and the date on which the Claim is allowed, each holder of an Allowed Claim in Class 1 will be entitled to receive in satisfaction of its Allowed Class 1 Claim Cash equal to the allowed amount of such Claim against the applicable Debtor. |
| *Class 2 (Convenience Claims):*<br><br>• Subclass 2A (Senior Note and 7-3/4% SWD Revenue Bond Convenience Claims):<br><br>Subject to the provisions of Section 7.5.a(ii) of the Plan (see "Distributions Under the Plan — Delivery of Distributions and Undeliverable or Unclaimed Distributions"), Senior Note Claims and 7-3/4% SWD Revenue Bond Claims that otherwise would be included in Class 9 except that the stated principal amount of the securities underlying the allowed amount of each such Claim is either equal to or less than $15,000.<br><br>• Subclass 2B (Other Convenience Class Claims):<br><br>Subject to the provisions of Section 7.5.a(ii) of the Plan (see "Distributions Under the Plan — Delivery of Distributions and Undeliverable or Unclaimed Distributions"), Unsecured Claims other than Senior Note Claims, 7-3/4% SWD Revenue Bond Claims, 6-1/2% RPC Revenue Bond Claims and Senior Subordinated Note Claims that otherwise would be included in Class 9 except that (i) as to any 7.60% SWD Revenue Bond Claim, the stated principal amount of the securities underlying the allowed amount of such Claim is either equal to or less than $30,000 and (ii) as to any such Claim other than a 7.60% SWD Revenue Bond Claim, the allowed amount of such Claim is equal to or less than $30,000. | Impaired; on the later of the Effective Date and the date on which the Claim is allowed, (a) each holder of an Allowed Claim in Subclass 2A will be entitled to receive in satisfaction of its Allowed Subclass 2A Claim Cash equal to 5.8% of the allowed amount of such Claim against the applicable Debtor and (b) each holder of an Allowed Claim in Subclass 2B will be entitled to receive in satisfaction of its Allowed Subclass 2A Claim Cash equal to 2.9% of the allowed amount of such Claim. |

| Description and Amount of Claims or Interests | Treatment |
|---|---|
| For purposes of determining eligibility for treatment under Class 2, multiple Claims of a holder in respect of the same series of Public Notes or, as to Claims other than Public Note Claims, arising in a series of similar or related transactions between a Debtor and the original holder of such Claims will be treated as a single Claim and no splitting of Claims will be recognized.<br><br>Estimated Aggregate Claims Amount: $20 million | Percentage Recovery: 5.8% in the case of Subclass 2A and 2.9% in the case of Subclass 2B |
| *Class 3 (Secured Claims):*<br><br>Secured Claims.<br><br><br><br><br><br><br><br><br><br><br><br>Estimated Aggregate Claims Amount: $5 million | Unimpaired; except as otherwise agreed by the holder of a Class 3 Claim and the applicable Debtor or Reorganized Debtor, on the later of the Effective Date and the date on which the Claim is allowed, each holder of an Allowed Claim in Class 3 will be treated in accordance with Option A or B below, at the election of the applicable Debtor. The applicable Debtor will be deemed to have elected Option B, except with respect to any Allowed Claims as to which the applicable Debtor elects Option A in a certification Filed no later than 15 days prior to the commencement of the Confirmation Hearing.<br><br>Option A: Each holder of an Allowed Claim in Class 3 with respect to which the applicable Debtor or Reorganized Debtor elects Option A will receive in satisfaction of its Allowed Class 3 Claim Cash equal to the allowed amount of such Claim.<br><br>Option B: Each Allowed Claim in Class 3 with respect to which the applicable Debtor or Reorganized Debtor elects or is deemed to have elected Option B will be Reinstated. |
| *Class 4 (Canadian Debtor PBGC Claims):*<br><br>Unsecured PBGC Claims against the Canadian Debtors.<br><br><br>Aggregate Allowed Claims Amount: $616 million | Impaired; on the Effective Date, the PBGC, as the holder of the Allowed Claims in Class 4, will be entitled to receive in satisfaction of all of its Allowed Class 4 Claims against the Canadian Debtors (a) 2,160,000 shares of New Common Stock and (b) $2.5 million in Cash.<br><br>Estimated Percentage Recovery: 7.1%* |
| *Class 5 (Asbestos Personal Injury Claims):*<br><br>Asbestos Personal Injury Claims. A detailed definition of "Asbestos Personal Injury Claims" is set forth in Section 1.1(35) of the Plan. | Impaired; each Asbestos Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement and the Asbestos Distribution Procedures. See "PI Trusts and Distribution Procedures — PI Trust Distribution Procedures." |
| *Class 6 (CTPV Personal Injury Claims):*<br><br>CTPV Personal Injury Claims. A detailed definition of "CTPV Personal Injury Claims" is set forth in Section 1.1(67) of the Plan. | Impaired; each CTPV Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the CTPV PI Trust Agreement and the CTPV ~~Trust~~ Distribution Procedures. See "PI Trusts and Distribution Procedures — PI Trust Distribution Procedures." |
| *Class 7 (NIHL Personal Injury Claims):*<br><br>NIHL Personal Injury Claims. A detailed definition of "NIHL Personal Injury Claims" is set forth in Section 1.1(130) of the Plan. | Impaired; each NIHL Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the NIHL PI Trust Agreement and the NIHL Distribution Procedures. See "PI Trusts and Distribution Procedures — PI Trust Distribution Procedures." |
| *Class 8 (Silica Personal Injury Claims):*<br><br>Silica Personal Injury Claims. A detailed definition of "Silica Personal Injury Claims" is set forth in Section 1.1(187) of the Plan. | Impaired; each Silica Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the Silica PI Trust Agreement and the Silica Distribution Procedures. See "PI Trusts and Distribution |

| Description and Amount of Claims or Interests | Treatment |
|---|---|
| | Procedures — PI Trust Distribution Procedures." |
| *Class 9 (General Unsecured Claims)*:<br><br>Unsecured Claims not otherwise classified under the Plan, subclassified as follows:<br><br>• Subclass 9A (Senior Subordinated Note Claims):<br><br>Claims against KACC and the Debtor Guarantors under or in respect of the Senior Subordinated Notes<br><br>• Subclass 9B (Other Unsecured Claims):<br><br>Unsecured Claims (*i.e.*, Claims that are not Administrative Claims, Cure Amount Claims, Channeled Personal Injury Claims, Equity Claims, Priority Claims, Priority Tax Claims, Secured Claims or Intercompany Claims) that are not classified in Class 4, Subclass 9A or Class 10 (including (a) Claims against KACC and the Debtor Guarantors under or in respect of the 9-7/8% Senior Notes, the 10-7/8% Senior Notes, (b) Claims against KACC under or in respect of the 6-1/2% RPC Revenue Bonds or appurtenant coupons, the 7-3/4% SWD Revenue Bonds and the 7.60% SWD Revenue Bonds, (c) the unsecured portion of any other Claims, which, if such Claims were fully secured, would have been classified in Class 3 and as to which the applicable Debtor will have elected Option A treatment under Section 3.2.b of the Plan (which is described above in the summary of the treatment of Class 3 Claims), (d) Tort Claims, (e) Unsecured PBGC Claims against the Substantively Consolidated Debtors, and (f) the prepetition Claims of KFC against KACC in the amount of \$1.106 billion). | Impaired; unless otherwise agreed by the holder of an Allowed Claim in Class 9 and the applicable Debtor and except as otherwise provided in the Environmental Settlement Agreement with respect to Additional Sites (as such term is defined therein) (see "Operations During the Reorganization Cases — Certain Other Litigation and Settlements During the Reorganization Cases — Environmental Settlement Agreement"), on the later of the Effective Date and the date on which such Claim is allowed, each holder of an Allowed Claim in Class 9 will be entitled to receive in satisfaction of its Allowed Class 9 Claim a Pro Rata Share of 4,460,000 shares of New Common Stock (*i.e.*, the Reserved Shares), together with any Cash or other property pursuant to Section 7.8.c(i) of the Plan (which is described below under "Distributions Under the Plan — Timing and Calculation of Amounts To Be Distributed — Distributions of New Common Stock"), if applicable.<br><br>Notwithstanding the foregoing, in accordance with the contractual subordination provisions of the Senior Subordinated Note Indenture and paragraph 4 of the 7-3/4% SWD Revenue Bond Settlement, the aggregate amount of consideration that would otherwise be payable to the holders of Senior Subordinated Note Claims in the absence of the contractual subordination provisions of the Senior Subordinated Note Indenture will be distributed to holders of Allowed Senior Note Claims and holders of Allowed 7-3/4% SWD Revenue Bond Claims on a pro rata basis, based upon the relative allowed amounts of such Claims against KACC, as set forth in the table below (see " — Allowed Amount of Certain Claims"). |
| Estimated Aggregate Claims Amount:  \$2.9 billion (with the Estimated Aggregate Claims Amount being \$427.0 million for Subclass 9A and being \$2.473 billion for Subclass 9B).  For computational purposes, the aggregate allowed amount of Senior Subordinated Note Claims included in Class 9 will be reduced by the aggregate amount of such Claims allocable to Senior Note Claims and 7-3/4% SWD Revenue Bond Claims included in Subclass 2A in order to make distributions in respect thereof in accordance with the contractual subordination provisions of the Senior Subordinated Note Indenture and paragraph 4 of the 7-3/4% SWD Revenue Bond Settlement. | Estimated Percentage Recovery:  2.9% (subject, in the case of the Senior Notes, the 7-3/4% SWD Revenue Bonds and the Senior Subordinated Notes, to the application of the contractual subordination provisions of the Senior Subordinated Note Indenture and the terms of the 7-3/4% SWD Revenue Bond Settlement; after giving effect to both in accordance with the Plan, the Estimated Percentage Recovery for the holders of Senior Notes is 5.8%, for the holders of 7-3/4% SWD Revenue Bonds is 5.8% and for the holders of the Senior Subordinated Notes is 0%)* |
| *Class 10 (Canadian Debtor Claims)*:<br><br>Claims (excluding Channeled Personal Injury Claims, PBGC Claims and Intercompany Claims) against a Canadian Debtor.<br><br>Estimated Aggregate Claims Amount:  \$0 | Unimpaired; except as otherwise agreed by the holder of a Class 10 Claim and the applicable Debtor, each Allowed Class 10 Claim, to the extent not paid prior to the Effective Date, will be paid in full in accordance with its terms. |
| *Class 11 (Intercompany Claims)*:<br><br>Claims by a Debtor or Other Debtor against any Debtor. | Impaired; on or before the Effective Date, each holder of an Intercompany Claim will receive the treatment as set forth in the Intercompany Claims Settlement.  In accordance with the Intercompany Settlement Agreement, the KFC Claim will be included in Class 9. |
| *Class 12 (KAC Old Stock Interests)*:<br><br>Interests and Claims in respect of the KAC Old Stock. | Impaired; no property will be distributed to or retained by the holders of Allowed Interests in Class 12. |

| Description and Amount of Claims or Interests | Treatment |
|---|---|
| *Class 13 (Kaiser Trading Old Stock Interests):*<br><br>Interests and Claims in respect of the Old Stock of Kaiser Trading. | Impaired; no property will be distributed to or retained by the holder of Allowed Class 13 Interests and Claims. On the Effective Date, 100 shares of common stock of Reorganized Kaiser Trading, constituting 100% of the issued and outstanding shares of common stock of such company, will be issued to the Asbestos PI Trust and Silica PI Trust in accordance with Sections 5.2.d and 5.3.d of the Plan (which are described below under "PI Trusts and Distribution Procedures — Asbestos PI Trust — Transfer of Certain Property to the Asbestos PI Trust" and "PI Trusts and Distribution Procedures — Silica PI Trust — Transfer of Certain Property to the Silica PI Trust," respectively). |
| *Class 14 (KACC Old Stock Interests):*<br><br>Interests and Claims in respect of the Old Stock of KACC, including Claims relating to the shares of the Series 1985 A and Series 1985 B Cumulative Preference Stock of KACC noticed for redemption in 2001 but not tendered for payment prior to the Petition Date. | Impaired; subject to the Restructuring Transactions, no property will be distributed to or retained by the holders of Allowed Class 14 Interests and Claims. |
| *Class 15 (Other Old Stock Interests):*<br><br>Interests in any Debtor other than Interests in Class 12, 13 or 14. | Unimpaired; on the Effective Date, subject to the Restructuring Transactions, Allowed Interests in Class 15 will be Reinstated. |

\*      As indicated above, the Estimated Percentage Recovery for Classes 4 and 9 has been calculated assuming that the New Common Stock to be distributed under the Plan will have an aggregate value of approximately $380 million, or approximately $19.00 per share, as of the Effective Date, based upon the midpoint of the range for the estimated reorganization equity value of Reorganized KAC excluding the theoretical value of certain anticipated tax attributes of the Reorganized Debtors. If such value were included in the calculation of the reorganization equity value of Reorganized KAC, such equity value could be higher by as much as $65 to $85 million, or $3.25 to $4.25 per share of New Common Stock. The incremental value represents the theoretical present value of estimated tax savings as a result of the anticipated tax attributes of the Reorganized Debtors as of the Effective Date. See "New Common Stock — Estimated Reorganization Value" for a description of the manner in which the New Common Stock was valued for purposes of the Plan, including the reasons no value was included in respect of the anticipated tax attributes of the Reorganized Debtors.

### Allowed Amount of Certain Claims

The following table indicates for each category of Claims listed the aggregate allowed amount of such Claims for purposes of the Plan.

| Claim | Aggregate Allowed Amount |
|---|---|
| **Claims Against KACC and the Debtor Guarantors:** | |
| 9-7/8% Senior Note Claims | $  181,168,828.96 |
| 10-7/8% Senior Note Claims (Series B) | 181,185,156.27 |
| 10-7/8% Senior Note Claims (Series D) | 51,767,187.50 |
| Senior Subordinated Note Claims | 427,200,000.00 |
| **Claims Against KACC:** | |
| 6-1/2% RPC Revenue Bond Claims | $    12,760,461.11 |
| 7-3/4% SWD Revenue Bond Claims | 20,051,666.67 |
| 7.60% SWD Revenue Bond Claims | 18,045,788.89 |
| KFC Claim | 1,106,000,000.00 |

| Claim | Aggregate Allowed Amount |
|---|---|
| **PBGC Claims Against Each Debtor:** | |
| PBGC Claims................................................................................. | $ 616,000,000.00 |

*Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims*

The classification and treatment of Allowed Claims under the Plan take into consideration all Secondary Liability Claims and no distributions on account of any Secondary Liability Claims will be made.

**Sources and Uses of Cash**

The following table sets forth a summary of the principal sources and uses of Cash expected to be available to the Reorganized Debtors on the Effective Date. For purposes of the following table, the Effective Date is assumed to occur on December 31, 2005. All amounts shown are estimates. There can be no assurance that there will not be material variances between such estimates and the actual amounts of Cash available or required to effectuate the Plan.

(Dollars in Millions)
(Rounded to the Nearest Million)

*Sources of Cash*

| | |
|---|---:|
| Cash on hand as of the Effective Date[1] | $ 29 |
| Cash borrowed under the term loan component of the Exit Financing Facility | $ 50 |
| Receipts from KAAC and AJI/KJC pursuant to the Intercompany Settlement Agreement[2] | $ 26 |
| Total Sources | $ 105 |

*Uses of Cash*[3]

| | |
|---|---:|
| Cash distributions on account of Priority Tax Claims | $ 3 |
| Cash distributions on account of Convenience Class (Class 2) | $ 1 |
| Cash distributions on account of Secured Claims (Class 3) | $ 5 |
| Cash distributions on account of Canadian Debtor PBGC Claims (Class 4) | $ 3 |
| Cash to pay Administrative Claims, costs associated with the Exit Financing Facility and other reorganization expenses[4] | $ 56 |
| Minimum Cash utilized by operations in the ordinary course of business | $ 5 |
| Excess Cash | $ 32 |
| Total Uses | $ 105 |

---

(1)   Assumes $4 million currently held in escrow in connection with a prepetition settlement agreement relating to certain asbestos claims is released or turned over to the Debtors (see "PI Trusts and Distribution Procedures — Background — Asbestos Personal Injury Claim Settlement Processing Agreements").

(2)   Assumes the receipt of $25 million from KAAC and $1 million from AJI and KJC on the Effective Date pursuant to the Intercompany Claim Settlement, in addition to approximately $43 million already received pursuant thereto (see "— Intercompany Claims Settlement" and "Operations During the Reorganization Cases — Intercompany Claims Settlement").

(3)   Assumes (a) that each of the aggregate amount of cure payments in connection with the assumption of Executory Contracts and Unexpired Leases and the aggregate distributions on account of Unsecured Priority Tax Claims in Class 1 is negligible and (b) that the Debtors will not be required to make an Initial VEBA Contribution to either the Union VEBA Trust or the Retired Salaried Employee VEBA Trust (see "Operations During the Reorganization Cases — Agreements with Labor Regarding Pension and Retiree Medical Benefits").

(4)   Includes, among other things, (a) legal, accounting, financial advisory and other professional fees associated with the implementation of the Plan to be paid after the Effective Date, (b) the payment of Cash to the Funding Vehicle Trust on the Effective Date, (c) the Administrative Claims of the PBGC allowed pursuant to the PBGC Settlement Agreement, (d) Claims of Indenture Trustees to be satisfied after the Effective Date, (e) payments to be made under the Debtors' Key Employee Retention Program after the Effective Date, and (f) fees associated with the Exit Financing Facility, reduced by an assumed amount of reimbursements from AJI, KJC and KAAC in respect of professional fees incurred in connection with their chapter 11 cases.

**Distributions of New Common Stock**

Under the Plan, an aggregate of 20.0 million shares of New Common Stock will be issued on the Effective Date to or for the benefit of the Union VEBA Trust, the Retired Salaried Employee VEBA Trust and holders of Allowed Claims in Classes 4 and 9. See "— Classes and Treatment of Claims and Interests." The following table sets forth, for each person expected to own beneficially more than 5% of the shares of New Common Stock outstanding immediately following the Effective Date, (a) the number of shares of New Common Stock such person is currently expected to receive pursuant to the Plan and (b) the percentage of the total number of shares to be issued pursuant to the Plan such shares would represent.

| Name of Beneficial Owner | Number of Shares | Percent |
|---|---|---|
| Union VEBA Trust[1] | 11,439,900 | 57.2% |
| PBGC[2] | 3,243,442 | 16.2% |
| Retired Salaried Employee VEBA Trust[1] | 1,940,100 | 9.7% |
| Asbestos PI Trust[3] | 1,199,171 | 6.0% |

(1)  Reflects the number of shares to be issued in accordance with the Legacy Liability Agreements. See "— Agreements with Labor Regarding Pension and Retiree Medical Benefits."

(2)  Reflects the number of shares currently expected to be issued to the PBGC on account of both its Class 4 and Class 9 Claims and the shares the PBGC, as the holder of an allowed general unsecured claim against KFC, is currently expected to receive pursuant to the Alumina Subsidiary Plan for KAAC and KFC as the PBGC's proportionate share of the New Common Stock to be distributed on account of KFC's 25% of the KFC Claim (which is an Allowed Class 9 Claim). See "— PBGC Settlement Agreement."

(3)  Reflects the aggregate number of shares currently expected to be issued on account of the 70.5% of the KFC Claim that is to be transferred to the Asbestos PI Trusts on the Effective Date. See "— Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunctions" and "— Intercompany Claims Settlement." Pursuant to the Plan, 4.5% of the KFC Claim will be transferred to the Silica PI Trust; accordingly, it is anticipated that the Silica PI Trust will receive 76,543 shares of New Common Stock (i.e., 0.4% of the New Common Stock to be issued pursuant the Plan).

There can be no assurance that there will not be material variances between the number of shares of New Common Stock that each of the PBGC, the Asbestos PI Trust and the Silica PI Trust is currently expected to receive and the number of shares it actually receives. The actual distributions to the PBGC on account of its Class 9 Claim and its general unsecured claim against KFC and to the PI Trusts on account of the KFC Claim will vary to the extent the ultimate aggregate amount of Allowed General Unsecured Claims deviates from the Debtors' current estimate of such Claims, as the number of shares of New Common Stock available for distribution to holders of Allowed General Unsecured Claims is fixed at 4,460,000 irrespective of the aggregate allowed amount of such Claims. See "— Classes and Treatment of Claims and Interests — Summary Classification and Treatment Table" for detail regarding the Debtors' assumptions underlying such estimates.

In addition to the 20.0 million shares of New Common Stock to be issued pursuant to the Plan and outstanding as of the Effective Date, 2,222,222 shares of New Common Stock will be available for issuance pursuant to the Equity Incentive Plan. See "Reorganized Kaiser — Management — Executive Compensation — New Plans and Arrangements to be Implemented in Connection with the Effective Date — Equity Incentive Plan." Further, the Environmental Settlement Agreement and the Plan contemplate that additional shares of New Common Stock could be issued in the future to satisfy certain environmental liabilities that have not yet been identified and liquidated. See "Operations During the Reorganization Cases — Certain Other Litigation and Settlements During the Reorganization Cases — Environmental Settlement Agreement."

**Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunctions**

In accordance with the Plan, on the Effective Date each of the Funding Vehicle Trust, the Asbestos PI Trust the CTPV PI Trust, the NIHL PI Trust and the Silica PI Trust will be created. Immediately thereafter, PI Trust