Assets will be issued or transferred to each of the Funding Vehicle Trust, the P1 Asbestos PI Trust and the Silica PI Trust in accordance with the Plan. For purposes of the Plan, the term "PI Trust Assets" means:

- the PI Insurance Assets (*i.e.*, (a) rights to receive proceeds from the insurance policies described in Exhibit 1.1(107) to the Plan in respect of Channeled Personal Injury Claims and (b) the Cash paid or to be paid pursuant to settlement agreements with any PI Insurance Company entered into prior to the Effective Date in respect of such insurance policies and allocable to payment of Channeled Personal Injury Claims, including but not limited to the Insurance Settlement Escrow Funds (*i.e.*, an aggregate of approximately $14 million, as of June 30, 2005, held in accordance with escrow agreements created to hold funds paid after the Petition Date in respect of insurance settlements for the benefit of holders of any Channeled Personal Injury Claims, including (i) the settlement agreement, dated as of April 9, 2003, between KACC and Employers Surplus Lines Insurance Company, (ii) the settlement agreement, dated as of March 14, 2003, between KACC and Kingscroft Insurance Company Limited, Walbrook Insurance Company Limited, El Paso Insurance Company Limited, Lime Street Insurance Company Limited, Mutual Reinsurance Company Limited, The Bermuda Fire & Marine Insurance Company Limited, In Liquidation, Bryanston Insurance Company Limited and Southern American Insurance Company, (iii) the settlement agreement, dated as of April 8, 2003, between KACC and National Casualty Company and (iv) the settlement agreement, dated as of November 11, 2004, between KACC and Insurance Company of the West)) (see "Operations During the Reorganization Cases — Certain Asbestos-Related Insurance Coverage Litigation");

- 100 shares of common stock of Reorganized Kaiser Trading, constituting 100% of the outstanding equity interests of such company, the assets of which will be approximately 145 acres of real property located in Louisiana and the rights as a lessor under a lease agreement pursuant to which such real property is leased to the Defense National Stockpile Center for the storage of bauxite in return for $50,800 per year, which lease agreement has an initial term which expires in 2008, is renewable for an additional year at the option of the lessee and is terminable by either party prior to the end of the term in certain circumstances;

- Cash in an amount equal to $13 million; and

- the 75% of the KFC Claim (*i.e.*, the prepetition Claim of KFC against KACC in the amount of $1.106 billion) that is to be transferred on the Effective Date to the PI Trusts in accordance with Section 4.2.f of the Intercompany Claims Settlement (see "— Intercompany Claims Settlement).

In accordance with the Plan, the PI Insurance Assets and the $13 million of Cash will be transferred to the Funding Vehicle Trust and the common stock of Reorganized Kaiser Trading and the 75% of the KFC Claim will be transferred to the Asbestos PI Trust and the Silica PI Trust, with the Asbestos PI Trust receiving 94% of the common stock of Reorganized Kaiser Trading and 70.5% of the KFC Claim and the Silica PI Trust receiving the remaining 6% of the common stock of Reorganized Kaiser Trading and 4.5% of the KFC Claim. The Funding Vehicle Trust will use its assets to make payments to the PI Trusts pursuant to the terms of the PI Trust Funding Agreement. See "PI Trusts and Distribution Procedures — PI Trust Funding Agreement." The Asbestos PI Trust will use its assets (which will include Cash it receives pursuant to the Funding Vehicle Trust Agreement) to satisfy Asbestos Personal Injury Claims, the CTPV PI Trust will use its assets (*i.e.*, Cash it receives pursuant to the Funding Vehicle Trust Agreement) to satisfy CTPV Personal Injury Claims, the NIHL PI Trust will use its assets (*i.e.*, Cash it receives pursuant to the Funding Vehicle Trust Agreement) to satisfy NIHL Personal Injury Claims, and the Silica PI Trust will use its assets (which will include Cash it receives pursuant to the Funding Vehicle Trust Agreement) to satisfy Silica Personal Injury Claims.

The PI Trusts will assume all liability and responsibility for all Channeled Personal Injury Claims and the Funding Vehicle Trust will assume all liability and responsibility of the Debtors, the Reorganized Debtors and the other Kaiser Companies for all premiums, deductibles, retrospective premium adjustments, reinsurance, security or collateral arrangements and other charges, costs, fees or expenses (if any) that become due to any insurer in connection with pursuit or recovery of the PI Insurance Assets as a result of Channeled Personal Injury Claims or Trust Expenses of the Funding Vehicle Trust or of any PI Trust. See "PI Trusts and Distribution Procedures." It is a condition to the occurrence of the Effective Date that the PI Channeling Injunctions, which will prohibit any person

from pursuing any Channeled Personal Injury Claims against any Reorganized Debtor and other Protected Parties have been entered and are in full force and effect. See "Answers to Certain Questions About the Plan and Disclosure Statement — What must happen before the Plan can be consummated?"become effective?"

**Agreements with Labor Regarding Pension and Retiree Medical Benefits**

In early 2004, KACC reached negotiated agreements regarding pension and retiree medical benefits (collectively, the "Legacy Liability Agreements") with the United Steel Workers of America, AFL-CIO, CLC, the International Association of Machinists and Aerospace Workers (the "IAM") and the official committee of retired salaried employees (*i.e.*, the Retirees' Committee). (For purposes of this Disclosure Statement, the term "USW" means, prior to April 12, 2005, the United Steelworkers of America, AFL-CIO, CLC, and on and after such date, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.) For a detailed discussion of the Legacy Liability Agreements and related matters, see "Operations During the Reorganization Cases — Agreements with Labor Regarding Pension and Retiree Medical Benefits."

In accordance with the Legacy Liability Agreements, the Plan provides, among other things, that:

- Contributions of New Common Stock. On the Effective Date, Reorganized KAC will contribute to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust an aggregate of 13,380,000 shares of New Common Stock (representing 75% of KACC's remaining value after taking into account (a) the satisfaction of Administrative Claims, Priority Tax Claims, Unsecured Priority Claims (Class 1) and Secured Claims (Class 3), (b) contributions to the PI Trusts and related Funding Vehicle Trust, (c) the Equity Incentive Plan, and (d) the satisfaction of the Canadian Debtor PBGC Claims), with 85.5%, or 11,439,900, of such shares being contributed to the Union VEBA Trust and 14.5%, or 1,940,100, of such shares being contributed to the Retired Salaried Employee VEBA Trust.

- Initial Contributions of Cash. On the Effective Date, Reorganized KAC will contribute to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust Cash in the aggregate equal to (a) the excess of the Initial Availability Amount above $50 million, but in no event more than $36 million less (b) the aggregate of all amounts contributed to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust prior to the Effective Date other than the $1 million contributed to the Union VEBA Trust on March 31, 2005 (*i.e.*, the Initial VEBA Contributions). For purposes of the Plan, the term "Initial Availability Amount" means, as calculated as of the Effective Date, the sum of (a) the consolidated cash balance of Reorganized KAC plus (b) the available liquidity under the revolving credit facility component of the Exit Financing Facility, in each case after giving effect to (i) the Initial VEBA Contributions and all other Cash payments (including accruals or reserves in respect thereof) required in connection with the Plan, (ii) the initial availability amount required under the revolving credit facility component of the Exit Financing Facility, and (iii) any availability blocks required under the revolving credit facility component of the Exit Financing Facility. The Debtors currently estimate that, assuming the Effective Date occurs on December 31, 2005, the aggregate amount of such Cash contributions will be zero.

- Variable Contributions of Cash. Following the Effective Date, Reorganized KAC will periodically contribute to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust Cash in accordance with agreements entered into pursuant to section 1114 of the Bankruptcy Code, as such agreements have been or may be modified, amended or supplemented (*i.e.*, the Variable VEBA Contributions). For additional information regarding projected Cash contributions to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust, see "Reorganized KACKaiser — Projected Financial Information."

**PBGC Settlement Agreement**

In the fall of 2004, KACC and the PBGC entered into an agreement regarding Claims of the PBGC against the Debtors arising from or related to the pension plans that were or are maintained by certain Debtors and

guaranteed in part by the PBGC (*i.e.*, the PBGC Settlement Agreement). For a detailed discussion of the PBGC Settlement Agreement and related matters, see "Operations During the Reorganization Cases — PBGC Settlement Agreement."

In accordance with the PBGC Settlement Agreement, the Plan provides, among other things, that:

- Allowed Unsecured Claims. The PBGC will have an Allowed Canadian Debtor PBGC Claim (Class 4) against each of the Canadian Debtors and an Allowed General Unsecured Claim (Class 9) against each of the Debtors other than the Canadian Debtors in the aggregate amount of $616 million.

- Administrative Claims. To the extent not previously paid in accordance with the Intercompany Claims Settlement and the PBGC Settlement Agreement, the Administrative Claims of the PBGC allowed in an aggregate amount of $14 million will be paid in Cash on the Effective Date. (For purposes of this Disclosure Statement, it is assumed that KACC will pay such Claims in full on the Effective Date.)

The PBGC was also allowed general unsecured claims against the Other Debtors pursuant to the PBGC Settlement Agreement. As such, pursuant to the Alumina Subsidiary Plan for KAAC and KFC, the PBGC will also receive a portion of the New Common Stock to be distributed to KFC on account of the 25% of the KFC Claim to be retained by KFC after the transfer of 75% thereof to the PI Trusts pursuant to the Intercompany Claims Settlement. See "— Intercompany Claims Settlement."

**Intercompany Claims Settlement**

In the fall of 2004, the Debtors, the Other Debtors and the Creditors' Committee entered into a settlement and release agreement relating to the treatment of claims of the Debtors and the Other Debtors against another Debtor or Other Debtor that arose prior to and after the Petition Date (*i.e.*, the Intercompany Claims Settlement). For a detailed discussion of the Intercompany Claims Settlement and related matters, see "Operations During the Reorganization Cases — Intercompany Claims Settlement."

The Intercompany Claims Settlement contemplates, among other things, that:

- KFC Claim. Subject to certain limitations not applicable if the Plan is consummated, KFC or its successor would have an Allowed General Unsecured Claim (Class 9) against KACC in the aggregate amount of $1.106 billion (*i.e.*, the KFC Claim), of which 75% would be assigned by KFC to the PI Trusts on the Effective Date (with KFC or its successor retaining the remaining 25% of such Claim). See "— Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling ~~Injunction~~Injunctions."

- Standalone Plan for AJI and KJC. AJI and KJC would file a standalone plan under chapter 11 of the Bankruptcy Code and such plan would provide for certain payments to KACC upon its effectiveness. On February 25, 2005, AJI and KJC filed their third amended joint plan of liquidation (*i.e.*, one of the Alumina Subsidiary Plans), together with a corresponding disclosure statement, which proposes to distribute to the creditors of AJI and KJC the proceeds of the sale of the interests of AJI and KJC in and related to Alumina Partners of Jamaica ("Alpart") and the proceeds allocable to KBC from the sale of its interests in and related to Kaiser Jamaica Bauxite Company ("KJBC") and KACC's alumina refinery located on the Mississippi River in Gramercy, Louisiana ("Gramercy") received by AJI and KJC pursuant to the Intercompany Claims Settlement. The Bankruptcy Court approved that disclosure statement on February 28, 2005. For information regarding the status of confirmation of the joint plan of liquidation for AJI and KJC, see "Operations During the Reorganization Cases — Strategic Plan to Sell Commodities Assets — The Sale of the Alpart Interests and Liquidation of AJI and KJC." For purposes of this Disclosure Statement, it is assumed that the Alumina Subsidiary Plan for AJI and KJC will be confirmed and become effective immediately prior to the effectiveness of the Plan and that, on the Effective Date, KACC will receive $1 million pursuant to such Alumina Subsidiary Plan, which will be in

addition to the approximately $43 million already received by KACC upon the sale of Alpart pursuant to the Intercompany Claims Settlement.

- Standalone Plan for KAAC and KFC. KAAC and KFC would file a standalone plan under chapter 11 of the Bankruptcy Code and such plan would provide for certain payments to KACC upon its effectiveness. On February 25, 2005, KAAC and KFC filed their third amended joint plan of liquidation (i.e., the other Alumina Subsidiary Plan), together with a corresponding disclosure statement, which proposes to distribute to the creditors of KAAC and KFC the proceeds of the sale of KAAC's interests in and related to Queensland Alumina Limited ("QAL") and any property received in respect of the 25% of the KFC Claim retained by the distribution trust established in connection with such plan. For information regarding the confirmation of the joint plan of liquidation for KAAC and KFC, see "Operations During the Reorganization Cases — Strategic Plan to Sell Commodities Assets — The Sale of the QAL Interests and Liquidation of KAAC and KFC." For purposes of this Disclosure Statement, it is assumed that the Alumina Subsidiary Plan for KAAC will be confirmed and become effective immediately prior to the effectiveness of the Plan and that, on the Effective Date, KACC will receive $25 million pursuant to such Alumina Subsidiary Plan.

- PBGC Administrative Claims. KACC would pay the Allowed Administrative Claims of the PBGC on the earlier of the Effective Date or the effective date of a plan of liquidation for KAAC (which, for purposes of this Disclosure Statement, is assumed to be the same day).

## Payment of Administrative Claims

### Administrative Claims in General

Except as provided in the Plan or unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative Claim will receive from Reorganized KAC or the applicable Reorganized Debtor, in full satisfaction of its Administrative Claim, Cash equal to the allowed amount of such Administrative Claim either (a) on the Effective Date or (b) if the Administrative Claim is not allowed as of the Effective Date, within 30 days after the date on which (x) an order allowing such Administrative Claim becomes a Final Order or (y) a Stipulation of Amount and Nature of Claim is executed by the applicable Reorganized Debtor and the holder of the Administrative Claim.

Administrative Claims include Claims for costs and expenses of administration allowed under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of each Debtor, including Claims based on liabilities incurred by such Debtor in the ordinary course of its business and Claims under the DIP Financing Facility; (b) Professional Fee Claims; (c) US Trustee Fees; (d) Claims for reclamation allowed in accordance with section 546(c)(2) of the Bankruptcy Code and Section 2-702 of the Uniform Commercial Code; and (e) unpaid Administrative Claims of the PBGC allowed pursuant to the PBGC Settlement Agreement. Except as otherwise provided in the Intercompany Claims Settlement, no Intercompany Claim will constitute an Administrative Claim.

### US Trustee Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid by the applicable Debtor or Reorganized Debtor in Cash equal to the amount of such Administrative Claims. All fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Reorganized Debtors in accordance therewith until the closing of the Reorganization Cases pursuant to section 350(a) of the Bankruptcy Code.

### Ordinary Course Liabilities

Allowed Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business (including Administrative Trade Claims, Administrative Claims of governmental units for Taxes, including Tax audit Claims related to tax years commencing after the Petition Date, and Allowed Administrative Claims

arising from those contracts and leases of the kind described in Section 6.6 of the Plan (*i.e.*, contracts and leases entered into after the Petition Date)) will be paid by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims.

### Claims Under the DIP Financing Facility

On or before the Effective Date, unless otherwise agreed by the DIP Lenders pursuant to the DIP Financing Facility, Allowed Administrative Claims under or evidenced by the DIP Financing Facility will be paid in full in Cash. See "Operations During the Reorganization Cases — Postpetition Financing" for a description of the DIP Financing Facility.

### PBGC Administrative Claims

To the extent not previously paid, the Administrative Claims of the PBGC allowed pursuant to paragraph 10 of the PBGC Settlement Agreement will be paid in Cash on the Effective Date. For purposes of this Disclosure Statement, it is assumed that KACC will pay $14 million in full satisfaction of such Claims on the Effective Date. See "Operations During the Reorganization Cases — PBGC Settlement Agreement" and "Operations During the Reorganization Cases — Intercompany Claims Settlement" for descriptions of the PBGC Claims and Intercompany Claims Settlement, respectively.

### Union VEBA Trust and Retired Salaried Employee VEBA Trust

On the Effective Date, Reorganized KAC will contribute (a) to the Union VEBA Trust, 11,439,900 shares of New Common Stock and Cash in an amount equal to the Initial VEBA Contribution payable to the Union VEBA Trust, if any, and (b) to the Retired Salaried Employee VEBA Trust, 1,940,100 shares of New Common Stock and Cash in an amount equal to the Initial VEBA Contribution payable to the Retired Salaried Employee VEBA Trust, if any. Thereafter, Reorganized KAC will make the applicable Variable VEBA Contributions to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust in accordance with agreements entered into pursuant to section 1114 of the Bankruptcy Code, as such agreements have been or may be modified, amended or supplemented. See "Operations During the Reorganization Cases — Agreements with Labor Regarding Pension and Retiree Medical Benefits." For more information regarding projected Cash contributions to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust, see "Reorganized ~~KAC~~Kaiser — Projected Financial Information."

### Bar Dates for Administrative Claims

Except as otherwise set forth in the Plan or in the Intercompany Claims Settlement, requests for payment of Administrative Claims must be Filed by the Administrative Claim Bar Date and served pursuant to the procedures specified in the Administrative Claim Bar Date Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by such date will be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or the property of any of them and such Administrative Claims will be deemed waived and released as of the Effective Date. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 90 days after the Effective Date and (b) 30 days after the Filing of the applicable request for payment of Administrative Claims. See "Operations During the Reorganization Cases — Claims Process and Bar Dates" for information on the Administrative Claim Bar Date Order.

Subject to any applicable provisions of the Intercompany Claims Settlement, Professionals or other entities asserting a Professional Fee Claim for services rendered to the Debtors before the Effective Date must File and serve on the Reorganized Debtors and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claims no later than 60 days after the Effective Date, except that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order. Objections to any Professional Fee Claims, including any objections by the US Trustee, must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 90 days after the Effective Date and (b) 30 days

after the Filing of the applicable request for payment of the Professional Fee Claims. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court, including the Fee Order, regarding the payment of Professional Fee Claims (other than the Intercompany Claims Settlement Order).

Holders of Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Trade Claims, Administrative Claims of governmental units for Taxes (including Tax audit Claims arising after the Petition Date) and Administrative Claims arising from those contracts and leases of the kind described in Section 6.6 of the Plan (*i.e.*, contracts and leases entered into after the Petition Date), will not be required to File or serve any request for payment of such Administrative Claims. Such Administrative Claims will be satisfied pursuant to Section 3.1.a(iii) of the Plan (which is described above under "— Ordinary Course Liabilities").

Holders of Administrative Claims under or evidenced by the DIP Financing Facility will not be required to File or serve any request for payment of such Claims. Such Administrative Claims will be satisfied pursuant to Section 3.1.a(iv) of the Plan (which is described above under "— Claims Under the DIP Financing Facility").

The PBGC as the holder of the Administrative Claims of the PBGC will not be required to File or serve any request for payment of such Claims. Such Administrative Claims will be satisfied pursuant to Section 3.1.a(v) of the Plan (which is described above under "— PBGC Administrative Claims").

**Payment of Priority Tax Claims**

Pursuant to section 1129(a)(9)(c) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, deferred Cash payments over a period not exceeding six years from the date of assessment of such Priority Tax Claim. Payments will be made in equal quarterly installments of principal (commencing on the later of the Effective Date and the first Quarterly Distribution Date following the date such Claim becomes an Allowed Claim), plus simple interest accruing from the Effective Date at the rate publicly quoted on the Confirmation Date by The Wall Street Journal as the "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks" on the unpaid portion of each Allowed Priority Tax Claim (or upon such other terms determined by the Bankruptcy Court to provide the holders of Priority Tax Claims with deferred Cash payments having a value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claims). The Reorganized Debtors will have the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Priority Tax Claim, in full at any time on or after the Effective Date, without premium or penalty. The Debtors estimate that the aggregate amount of Allowed Priority Tax Claims will be approximately $3 million.

Notwithstanding the provisions of the Plan described in the immediately preceding paragraph (*i.e.*, Section 3.1.b(i) of the Plan), the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty (a) will be subject to treatment in Class 9 and (b) the holder of an Allowed Priority Tax Claim will not be entitled to assess or attempt to collect such penalty from the Reorganized Debtors or their property (other than as the holder of a Class 9 Claim).

## CERTAIN EVENTS PRECEDING THE DEBTORS' CHAPTER 11 FILINGS

**Historical Business Strategy and Operations**

Historically, the Debtors and their affiliates (*i.e.*, the Kaiser Companies) have collectively been one of the leading international producers and marketers of alumina, primary aluminum and fabricated aluminum products, operating worldwide in all principal aspects of the aluminum industry. Prior to the Petition Date, these operations were conducted through four business units: (a) Bauxite and Alumina, which primarily involved the mining of bauxite and the refining of bauxite into alumina; (b) Primary Aluminum, which primarily involved the smelting of alumina into primary aluminum; (c) Flat-Rolled Products, which primarily involved the manufacture of heat-treat sheet and plate and other flat-rolled products for the aerospace, transportation, industrial and beverage container markets; and (d) Engineered Products, which primarily involved the manufacture of extruded products and forged parts for a variety of industrial markets. The business units operated on an integrated basis, with the Bauxite and Alumina business unit supplying alumina to the Primary Aluminum business unit, as well as third-party customers, and the Primary Aluminum business unit, in turn, supplying aluminum to the Flat-Rolled Products and Engineered Products business units, as well as third-party customers.

In fiscal year 2001, the year preceding the initial chapter 11 filings, the Kaiser Companies generated net sales exceeding $1.7 billion. As of December 31, 2001, the Kaiser Companies had approximately $3.3 billion in assets and $3.1 billion in liabilities on a consolidated basis and employed approximately 5,800 full-time and part-time employees.

As described in more detail below, as a result of recent divestitures, the Debtors' assets which comprised its Bauxite and Alumina business unit have been divested. Additionally, with the exception of the Debtors' interests in and related to Anglesey Aluminium Limited ("Anglesey"), a joint venture which owns and operates a smelter located in the United Kingdom, the Debtors' assets which comprised its Primary Aluminum business have been divested. See "Operations During the Reorganization Cases — Strategic Plan to Sell Commodities Assets."

**Capital Structure as of the Petition Date**

*Prepetition Credit Facility*

Pursuant to a Credit Agreement, dated as of February 15, 1994, between KACC, as borrower, KAC, as guarantor, and a syndicate of lenders led by BankAmerica Business Credit, Inc. (in its individual capacity and as administrative agent) (collectively, the "Bank Group"), KACC had a $250 million senior secured credit facility (the "Prepetition Credit Facility"). From time to time prior to the Petition Date, the Debtors and the Bank Group amended the Prepetition Credit Facility, and on the Petition Date, the Prepetition Credit Facility consisted of a revolving credit facility of up to $100 million. As of the Petition Date, the Debtors had no borrowings under the Prepetition Credit Facility and approximately $45 million in the aggregate available to be drawn under all letters of credit outstanding thereunder. The Debtors arranged for the Prepetition Credit Facility to be retired and the letters of credit were replaced pursuant to the DIP Financing Facility. See "Operations During the Reorganization Cases — Postpetition Financing."

*Public Notes*

As of the Petition Date, KACC had an aggregate of approximately $901 million in principal amount of bonds and notes outstanding:

- Industrial Revenue Bonds. KACC issued and sold three series of industrial revenue bonds through state or municipal development board or authorities — the 6-1/2% RPC Revenue Bonds, issued and sold on March 1, 1978 in the aggregate principal amount of $14 million, the 7-3/4% SWD Revenue Bonds, issued and sold on December 1, 1992 in the aggregate principal amount of $20 million, and the 7.60% SWD Revenue Bonds, issued and sold on March 1, 1997 in the aggregate principal amount of $19 million (collectively, the "Industrial Revenue Bonds"). As of the Petition Date, the aggregate principal amount outstanding under the Industrial Revenue Bonds was approximately $51.4 million. On June 6, 2005, the secured portion of the Claims in respect of the 7.60% SWD Revenue Bonds, in the amount of $1.6 million, was satisfied. All of KACC's

28

remaining obligations in respect of the Industrial Revenue Bonds are unsecured and are not guaranteed.

- _9-7/8% Senior Notes Due 2002_.  On February 17, 1994, KACC issued and sold, and each of the Debtor Guarantors and the Alumina Subsidiary Debtors (_i.e._, AJI, KJC, KAAC and KFC), guaranteed, $225 million in principal amount of 9-7/8% Senior Notes.  Prior to the Petition Date, KACC purchased approximately $52 million of the 9-7/8% Senior Notes, leaving approximately $173 million in principal amount of the 9-7/8% Senior Notes outstanding as of the Petition Date.  The 9-7/8% Senior Notes are unsecured obligations of KACC and rank _pari passu_ with the 10-7/8% Senior Notes.

- _10-7/8% Senior Notes Due 2006_.  Two series of 10-7/8% Senior Notes were issued by KACC and guaranteed by each of the Debtor Guarantors and the Alumina Subsidiary Debtors: (a) on October 23, 1996, KACC issued and sold $175 million in principal amount of 10-7/8% Series B Senior Notes; and (b) on December 23, 1996, KACC issued and sold $50 million in principal amount of 10-7/8% Series D Senior Notes, all of which remained outstanding as of the Petition Date.  The 10-7/8% Senior Notes are unsecured obligations of KACC and rank _pari passu_ with the 9-7/8% Senior Notes.

- _Senior Subordinated Notes Due 2003_.  On February 1, 1993, KACC issued and sold, and each of the Debtor Guarantors and the Alumina Subsidiary Debtors guaranteed, $400 million in principal amount of Senior Subordinated Notes, all of which remained outstanding as of the Petition Date.  The Senior Subordinated Notes are unsecured obligations of KACC and are subordinate to all obligations of KACC under the Prepetition Credit Facility and the Senior Notes.

All of these bonds and notes are Public Notes within the meaning of the Plan, and Claims against KACC in respect of any of them are classified in Class 9.  For a discussion of the treatment of such Claims, see "Overview of the Plan — Classes and Treatment of Claims and Interests."

The relative priority of the guaranties of the Debtor Guarantors and the Alumina Subsidiary Debtors in respect of the 9-7/8% Senior Notes, the 10-7/8% Senior Notes and the Senior Subordinated Notes is the subject of dispute.  See "Operations During the Reorganization Cases — Guaranty Subordination Dispute."  Also see "Operations During the Reorganization Cases — 7-3/4% SWD Revenue Bond Dispute."

### _Stock in KAC and KACC_

As of the Petition Date, 80,793,554 shares of common stock, par value $0.01 per share, of KAC were issued and outstanding, approximately 62% of which were owned by MAXXAM Inc. and one of its wholly owned subsidiaries and the remainder of which were publicly held.  Interests and Claims in respect of such stock are classified in Class 12.  For a discussion of the treatment of such Interests and Claims, see "Overview of the Plan — Classes and Treatment of Claims and Interests."

As of the Petition Date, 46,171,365 shares of common stock, par value $0.33-1/3 per share, of KACC were issued and outstanding, all such shares being held by KAC.  In addition, KACC has four outstanding series of preference stock, par value $100 per share: 4-1/8 Cumulative Convertible Preference Stock, 4-3/4 Cumulative Convertible (1957 Series) Preference Stock, 4-3/4 Cumulative Convertible (1959 Series) Preference Stock and 4-3/4 Cumulative Convertible (1966 Series) Preference Stock.  An aggregate of 8,669 shares of such preference stock were issued and outstanding as of the Petition Date, held by approximately 225 individuals (which group did not include KAC).  Interests and Claims in respect of all such stock, including Claims relating to the shares of the Series 1985 A and Series 1985 B Cumulative Preference Stock noticed for redemption in 2001 but not tendered for payment prior to the Petition Date, are classified in Class 14.  For a discussion of the treatment of such Interests and Claims, see "Overview of the Plan — Classes and Treatment of Claims and Interests."

**Events Leading up to the Debtors' Chapter 11 Filings**

### *Intense Pressure from Significant Near-Term Debt Maturities*

As of the Petition Date, the Debtors were experiencing intense pressure as a result of significant near-term debt maturities, including the maturity of the 9-7/8% Senior Notes on February 15, 2002 and the Senior Subordinated Notes on February 1, 2003. The Debtors' ability to resolve these near-term maturities was significantly impaired by liquidity problems brought about by weak industry and economic conditions, as well as pension and retiree medical obligations and certain tort liabilities, each of which is discussed below.

### *Weak Industry and Economic Conditions*

The deteriorating economy caused a severe contraction in the Debtors' liquidity, as falling metal prices and weak demand in general for aluminum products negatively affected the Debtors' financial performance. The Debtors' liquidity problems were exacerbated in the aftermath of the September 11, 2001 terrorist attacks due to the substantial decline in demand for aerospace products.

### *Pension and Retiree Medical Obligations*

Poor stock market performance during 2001 resulted in lower rates of return on investments and, accordingly, a decline in value of the assets held by the Debtors' pension plans. Interest rates also declined and, accordingly, the value of the plans' liability increased. The net effect of these two factors created a significant increase in the Debtors' projected future contributions to its pension plans.

At the same time, the Debtors, like other companies with post-retirement medical obligations, experienced a significant increase in healthcare costs for retirees. The Debtors projected that this obligation would continue to increase substantially in future years due to a variety of factors, including double-digit percentage increases in medical and prescription drug costs and increased life expectancies of the covered individuals. Because they substantially reduced available cash flow, the Debtors' obligations to retirees hampered the Debtors' efforts to restructure their obligations outside of chapter 11 of the Bankruptcy Code.

### *Certain Tort Liabilities*

Although KACC has not sold any products containing asbestos for more than 25 years, as of KACC's Petition Date, there were more than 100,000 asbestos-related lawsuits filed against the Debtors in which the plaintiffs allege that certain of their injuries were caused by, among other things, exposure to asbestos during, and as a result of, their employment or association with KACC or exposure to products containing asbestos produced or sold by KACC.

Prior to KACC's Petition Date, approximately 75% of the asbestos-related defense and settlement costs incurred by the Debtors were being offset by insurance recoveries. Nonetheless, asbestos liabilities continually affected the Debtors' liquidity and cash flows because of the shortfall in insurance recoveries and the contentions made by some insurers that coverage for the claims was not legally enforceable due to various policy defenses. In addition, the continuing pace of new asbestos Claims and the year over year increase in the required amounts to settle claims further strained the Debtors' liquidity. These factors, coupled with the uncertainty associated with these claims and the chapter 11 filings by numerous other companies with asbestos liabilities, contributed substantially to the Debtor's already impaired ability to access the capital markets as a means to refinance their near-term maturities and avoid chapter 11.

In addition, KACC faces a significant number of non-asbestos tort claims, including claims relating to alleged injuries caused by exposure to products containing silica produced or sold by KACC, claims relating to alleged injuries caused by exposure to CTPV during, and as a result of, a claimant's employment with KACC and claims relating to alleged injuries caused by exposure to excess occupational noise during, and as a result of, a claimant's employment with KACC.

Each tort claim, to the extent ultimately determined to be a Channeled Personal Injury Claim, will be subject to treatment in Classes 5, 6, 7 or 8, as the case may be. See "Overview of the Plan — Classes and Treatment

of Claims and Interests." For additional background regarding tort claims against the Debtors, see "PI Trusts and Distribution Procedures — Background."

**The Debtors' Prepetition Attempts to Resolve Their Financial Issues**

In September 2001, KACC sold approximately 8.3% of its interest in QAL to Comalco Limited ("Comalco") for total consideration of $189 million, including approximately $159 million in cash. The sale temporarily improved the Debtors' liquidity and their potential ability to refinance or restructure the 9-7/8% Senior Notes and the Debtors purchased some of them on the open market with cash from the sale in anticipation that the 9-7/8% Senior Notes would be retired at their maturity date. However, once the Debtors began to compile their fourth quarter 2001 financial results and to receive forecasts from the business units in December 2001 and early January 2002, it became apparent that the retirement or restructuring of the 9-7/8% Senior Notes outside of chapter 11 was no longer feasible.

In light of these facts, the Board of Directors of KACC determined not to make the February 1, 2002 interest payment due on the 12-3/4% Notes. KACC's Board of Directors also determined that the Debtors would be unable to make the February 15, 2002 principal payment due on the 9-7/8% Senior Notes. Given the foregoing combination of circumstances, and to allow the Debtors to have sufficient time in which to determine an appropriate capital structure, the Boards of Directors of KAC and KACC concluded that the Filing of Reorganization Cases would be the best alternative for KAC and KACC to preserve their value for the benefit of their stakeholders and, therefore, authorized the chapter 11 Filings of KAC, KACC and certain of their subsidiaries.

## OPERATIONS DURING THE REORGANIZATION CASES

**Introduction**

KAC, KACC and 15 subsidiaries (the "Original Debtors") Filed separate voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code in the first quarter of 2002. Nine additional subsidiaries, including the Canadian Debtors (the "Additional Debtors") Filed petitions in the first quarter of 2003. The chapter 11 cases of the Original Debtors and the Additional Debtors are being administered jointly in the United States Bankruptcy Court for the District of Delaware under *In re Kaiser Aluminum Corporation, et al.*, Case No. 02-10429 (JKF).

**First Day Relief**

*General*

At the beginning of the Reorganization Cases, the Original Debtors Filed a number of motions (the "First Day Motions") designed to allow the Original Debtors to continue their and their non-Debtor subsidiaries' operations in chapter 11 while minimizing disruption and loss of productivity and maintaining the confidence and support of customers, employees and suppliers. The First Day Motions included:

- motions relating to administration of the cases;

- motions relating to payment of prepetition wages and other benefits to the Original Debtors' employees;

- motions relating to honoring prepetition obligations to customers and payment of certain vendors and service providers vital to the Original Debtors' uninterrupted operations;

- a motion relating to the continued use of the Original Debtors' cash management system, bank accounts, business forms and investment and deposit guidelines;

- a motion to continue funding transactions with certain joint venture affiliates;

- a motion to obtain debtor-in-possession financing in an aggregate amount of $300 million; and

- a motion for an injunction to protect the assets of certain non-Debtor subsidiaries that were critical to the Original Debtors' operations.

All of the Original Debtors' First Day Motions were ultimately granted and certain of the relief is described below.

*Employee Wages and Benefits*

The Original Debtors Filed a motion seeking authorization to: (a) pay certain prepetition employee and independent contractor wages, salaries, contractual compensation, sales and performance incentives, sick pay, vacation pay, holiday pay, commissions and other accrued compensation; (b) reimburse prepetition employee and independent contractor business expenses (including travel, lodging, moving, closing costs and other relocation expenses); (c) make payments for which employee payroll deductions were made; (d) make prepetition contributions and pay benefits under employee benefits plans; and (e) pay all costs and expenses incident to the foregoing payments and contributions (including payroll-related taxes and processing costs).

### Workers' Compensation

The Original Debtors sought authorization to continue their workers' compensation programs for the benefit of (a) employees in 22 states and the District of Columbia and (b) longshore and harbor employees (collectively, "Longshore Workers") and to pay prepetition workers' compensation claims arising thereunder and related costs. The Original Debtors have maintained a high-deductible workers' compensation program (the "Insured Program") with Old Republic Insurance Company ("Old Republic") that covers employees in 19 states and Longshore Workers. To secure the Original Debtors' obligations under the Insured Program, the Original Debtors posted collateral, in the form of an irrevocable letter of credit for the benefit of Old Republic, the current amount available to be drawn under which is $9.6 million. The Original Debtors also operate as self-insured employers in the states of Louisiana, Ohio and Washington and maintain self-insured workers' compensation programs in those states (collectively, the "Self-Insured Programs"). To cover part of the Original Debtors' exposure under the Self-Insured Programs, the Original Debtors maintain a separate high-retention excess workers' compensation program with Old Republic (the "Excess Coverage"). To secure the Original Debtors' obligations under the Self-Insured Programs, the Original Debtors were required to (a) establish a Cash escrow account in the State of Washington, which currently has a balance of approximately $14 million, and (b) post an irrevocable letter of credit for the benefit of each of the State of Louisiana and the State of Ohio, the current amount available to be drawn under which is $3.25 million and $371,000, respectively. The Original Debtors pay annual premiums for the Insured Program and Excess Coverage, and insurance coverage is provided for all losses up to the applicable statutory workers' compensation liability limit under the Insured Program and for all losses up to $100 million per occurrence under the Self-Insured Programs with the Excess Coverage, with a $1 million deductible per occurrence.

At different times between 1960 and 2000, one or more of the Original Debtors operated self-insured workers' compensation programs for employees located in nine states and for Longshore Workers (collectively, the "Former Self-Insured Programs"). Under the Former Self-Insured Programs, the Original Debtors paid claims directly through claims agents. To secure the Original Debtors' obligations under the Former Self-Insured Programs, the Original Debtors were required to post the following collateral with four of the nine states: (a) an irrevocable letter of credit for the benefit of the State of West Virginia, the requirement for which, along with the letter of credit, was eliminated in February 2005; (b) an irrevocable letter of credit for the benefit of the State of California, the current amount available to be drawn under which is $220,000; (c) an irrevocable letter of credit for the benefit of the State of Florida, the current amount available to be drawn under which is $455,000; and (d) an irrevocable letter of credit for the benefit of the State of Oklahoma, the current amount available to be drawn under which is $300,000. With respect to the Former Self-Insured Programs for former Longshore Workers, for the State of West Virginia and for states not requiring letters of credit (namely, Illinois, Maryland, Missouri, Pennsylvania and Rhode Island), the Original Debtors did not seek or obtain authority to pay workers' compensation claims under those programs beyond a 90-day transition period. Rather, the Original Debtors sought authority to waive, in their sole discretion, the protections granted by the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to permit the applicable federal or state workers' compensation agency to take such actions as are necessary to pay the workers' compensation claims under those Former Self-Insured Programs.

### Trust Fund Taxes

In the ordinary course of their business, the Debtors collect or withhold certain trust fund taxes, including certain sales and use taxes and employment-related taxes (such as income, FICA and Medicare taxes), which are then held for a period of time before being remitted to the appropriate federal, state, provincial or local taxing authority. The Original Debtors sought and received authority to pay the trust fund taxes collected or withheld prior to the commencement of their Reorganization Cases but not then remitted to the applicable taxing authority.

### Customer and Critical Vendor Claims

The Original Debtors sought authority to honor or pay any obligations incurred for or on behalf of their customers prior to the Petition Date. These marketing, sales and other customer-targeted obligations included: (a) discount programs, refunds and credits; (b) deposits for goods or services not yet delivered or provided to customers; and (c) warranty-related payments to replace nonconforming or otherwise unacceptable products to the Original Debtors' customers. The Original Debtors also sought authority to pay prepetition Claims of certain vendors and service providers critical to their business (collectively, the "Critical Vendors"). Claims of Critical Vendors included: (a) Claims from businesses that ~~perform~~performed essential specialized maintenance for certain

33

of the Debtor's facilities; (b) Claims from vendors that ~~are~~were the only available source for certain chemicals and materials necessary to the Original Debtors' operations; and (c) Claims from specialized goods or services providers for whom the Original Debtors ~~are~~were the primary or exclusive customer. Approximately $3.6 million was paid to Critical Vendors in 2002.

### *Fee Order and Ordinary Course Professionals Order*

The Original Debtors requested approval of the Fee Order, an administrative order to establish procedures for interim compensation and reimbursement of expenses of professionals that would be retained in connection with the administration of the Reorganization Cases. On April 22, 2002, the Bankruptcy Court entered the Fee Order, which required all Professionals to File monthly notices of fees and expenses as well as periodic interim applications for approval of compensation and reimbursement of expenses incurred during the applicable period. In June 2002, the Bankruptcy Court appointed a fee auditor to act as a special consultant to the Bankruptcy Court for professional fee and expense review and analysis. The Bankruptcy Court subsequently revised the Fee Order to clarify the administrative fee procedures.

The Original Debtors also sought authority to retain, employ and pay certain professionals in the ordinary course of their business. These "ordinary course professionals" are not involved in the administration of the Reorganization Cases in any material way, but instead provide services in connection with the Original Debtors' normal ongoing business operations. On March 19, 2002, the Bankruptcy Court entered the Ordinary Course Professionals Order, which set certain monetary caps for fees and expenses charged by ordinary course professionals. The Ordinary Course Professionals Order was subsequently modified to adjust the monetary caps.

### *Cash Management Order*

Prior to the Filing of the Original Debtors' Cases, the Original Debtors utilized certain centralized cash management systems in the day-to-day operation of their business. These cash management systems included an overall centralized cash management system maintained by KACC, as well as certain cash management subsystems maintained by certain of their subsidiaries and business units. These cash management systems provided well-established mechanisms for the collection, concentration, management and disbursement of funds used in the Original Debtors' business.

On February 13, 2002, the Bankruptcy Court entered an interim order authorizing the Original Debtors to continue to maintain these systems on a postpetition basis and, on July 23, 2002, entered a Final Order authorizing the continued use and maintenance of the centralized cash management system (the "Cash Management Order"). In addition, the Cash Management Order authorized the Original Debtors to continue their ordinary course transactions with, and transfers of Cash to, their non-Debtor affiliates. In connection with this relief, the Cash Management Order accorded superpriority status to any Claims of the Debtors or Other Debtors against the Original Debtors and their non-Debtor affiliates that arose after the Petition Date as a result of the intercompany transactions made through the Original Debtors' cash management system.

### *Joint Venture Order*

As of the Petition Date, much of the bauxite, alumina and primary aluminum utilized by KACC and its subsidiaries was produced at overseas facilities owned through five non-Debtor joint venture affiliates, of which KACC held, directly or indirectly, less than a 100% ownership interest (collectively, the "Joint Ventures"). Certain of the Original Debtors were obligated to purchase products from the Joint Ventures and to fund the Joint Ventures' cash costs for raw materials, labor and other operational costs, as well as capital expenditures, Taxes, debt service and working capital. Failure to purchase products from, or fund the costs of, a Joint Venture would have been a default under the relevant agreements governing the Joint Venture, which, in turn, could have led to the forfeiture of the Original Debtors' interests in and related to the Joint Venture. As a consequence, the Original Debtors sought and obtained an interim order dated February 13, 2002 authorizing them to continue ordinary course transactions with, and pay prepetition claims of, the Joint Ventures and, on July 23, 2002, obtained a Final Order authorizing them to do so (the "Joint Venture Order"). With the exception of the Debtors' interest in Anglesey, the interests of the Debtors in and related to the Joint Ventures have been sold. See "— Strategic Plan to Sell Commodities Assets."

### *Injunction to Protect AJI and KJC*

AJI and KJC were among the guarantors of the 9-7/8% Senior Notes, the 10-7/8% Senior Notes and the Senior Subordinated Notes, the indentures for which provided that if KACC filed for bankruptcy protection all obligations would automatically be accelerated and the indenture trustees could immediately proceed to collect on the debts against AJI and KJC. The Original Debtors Filed a motion seeking a temporary restraining order and preliminary injunction to enjoin the indenture trustees and holders of the Senior Notes or Senior Subordinated Notes from taking any actions to enforce the guarantees because enforcement actions would irreparably damage the Original Debtors' overall ability to conduct business. The Bankruptcy Court entered a temporary restraining order on February 13, 2002, and later approved an agreed stipulation (the "AJI and KJC Stipulation") among the parties for an injunction that would allow AJI, KJC and the Original Debtors to continue operations. AJI and KJC subsequently filed chapter 11 petitions in January 2003 (and are thus among the Additional Debtors).

## The Additional Debtors and the Canadian Proceeding

### *General*

The cases Filed by the Additional Debtors were commenced, among other reasons, to protect the assets held by the Additional Debtors against possible statutory liens that might have arisen and been enforced by the PBGC against them, as members of KACC's "controlled group," as a result of KACC's failure to make a $17 million contribution to its salaried employee retirement plan in January 2003 as required under ERISA. In connection with the Additional Debtors' Filings, they requested that certain relief granted to the Original Debtors under the First Day Motions be extended to them. The Bankruptcy Court granted such request and, in addition, authorized KACOCL, which maintains an aluminum extrusion facility in London, Ontario and is the only Canadian Debtor with active operations, to continue to make payments in the normal course of business (including any prepetition amounts).

### *Injunction to Protect Trochus and Valco*

Concurrent with the commencement of the Additional Debtors' Reorganization Cases, KACC Filed an adversary proceeding against the PBGC to extend the protections granted by the automatic stay in the Reorganization Cases to two affiliates of the Debtors unable to commence reorganization cases under chapter 11 of the Bankruptcy Code, Trochus Insurance Co., Ltd. ("Trochus") and Volta Aluminium Company Limited ("Valco"), and thereby prevent the statutory creation and attachment of liens against the property of such affiliates. The Bankruptcy Court granted interim relief and subsequently approved an agreed stipulation between KACC and the PBGC pursuant to which the automatic stay was extended to Trochus and Valco. Additionally, as protection for the relief to which the PBGC agreed, Trochus and Valco were granted a superpriority Administrative Claim against any Debtor for the amount of any transfers by Trochus or Valco to that Debtor, junior only to the superpriority Administrative Claims of the original post-Petition Date lenders. (The Debtors subsequently sold their interests in and related to Valco with the consent of the PBGC. See "— Strategic Plan to Sell Commodities Assets.") The Sale of the Valco Interests.")

### *Canadian Proceeding*

Concurrently with the filing of their respective Reorganization Cases, the Canadian Debtors filed an ancillary proceeding for limited relief under Section 18.6 of the Canadian Companies' Creditors Arrangement Act, R.S.C. 1985 c. C-36, as amended in the Superior Court of Justice for Ontario, Canada (*i.e.*, the Canadian Proceeding). The Canadian court granted the requested relief, which included: (a) an order and declaration that the Reorganization Cases before the Bankruptcy Court be recognized individually and collectively as a "foreign proceeding" for the purposes of Section 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.B-3; (b) an order staying and enjoining any claims, rights, liens or proceedings against the Canadian Debtors by the PBGC; and (c) an order restraining the right of any person to assert, enforce or exercise any right, option or remedy in Canada arising as a result of the making or filing of the Reorganization Cases. The dismissal or termination of the Canadian Proceeding is a condition to the Effective Date. See "Answers to Certain Questions About The Plan and Disclosure Statement — What must happen before the Plan can be consummatedbecome effective? — Effectiveness." In connection with such dismissal or termination, the Debtors may seek an order from the Canadian Court recognizing the releases and injunctions contained in the Plan and the Confirmation Order.

**Postpetition Financing**

On February 12, 2002, the Original Debtors entered into a postpetition financing agreement arranged by Bank of America, N.A. and, in March 2003, the Additional Debtors were added as co-guarantors. That financing facility was amended seven times and, as so amended, provided for a secured, revolving line of credit in the principal amount of $200 million through the earliest of February 13, 2005, the effective date of a plan of reorganization for the Debtors and the Other Debtors and the voluntary termination of the financing facility by the Debtors and the Other Debtors. On February 11, 2005, the Bankruptcy Court approved the termination of the original postpetition financing arrangement and approved a replacement financing agreement for the Debtors (*i.e.*, the DIP Financing Facility). (Because the Other Debtors have liquidated their assets and have no working operations, they are not parties to the DIP Financing Facility.)

The DIP Financing Facility was arranged by J.P. Morgan Securities Inc. and The CIT Group/Business Credit, Inc., and JPMorgan Chase Bank, National Association is the administrative agent. The DIP Financing Facility provides for a secured, revolving line of credit through the earliest of February 11, 2006, the effective date of a plan of reorganization for the Debtors, the voluntary termination of the DIP Financing Facility by the Debtors and the acceleration of the Debtors' obligations under such facility in accordance with its terms. Under the DIP Financing Facility, the Debtors that are borrowers under such facility can borrow up to an aggregate principal amount equal to the lesser of (a) $200 million and (b) a borrowing base relating to eligible accounts receivable, eligible inventory and an amortizing fixed asset component, as reduced by certain reserves, of which $60 million may be in the form of letters of credit and $17.5 million may be swingline loans. This amount available under the DIP Financing Facility will be reduced by $20 million if borrowing availability falls below $40 million. Borrowings under the DIP Financing Facility bear interest at a rate per annum, at KACC's option, equal to either: (a) a base rate, based on the greater of (i) the prime rate of the DIP Financing Facility's Administrative Agent, and (ii) the federal funds effective rate plus 0.50%, in each case plus 0.50%; or (b) the adjusted London Interbank Offered Rate plus 2.25%. All of the borrowers' obligations under the DIP Financing Facility are guaranteed by all of their existing and future subsidiaries other than the Other Debtors and certain foreign subsidiaries. All of the Debtors' obligations under the DIP Financing Facility are entitled to superpriority administrative claim status in the Reorganization Cases and are secured by liens on substantially all of the Debtors' tangible and intangible, real and personal property with the priority set forth in the DIP Financing Facility, all subject to a limited "carve-out" for the reasonable fees and expenses incurred by professionals retained in the Reorganization Cases. The DIP Financing Facility contains covenants of the type typically found in a debtor-in-possession financing facility and places restrictions on the ability of the Debtors and their significant subsidiaries to, among other things, incur debt and liens, make investments, pay dividends, sell assets, undertake transactions with affiliates and enter into unrelated lines of business. Amounts owing under the DIP Financing Facility may be accelerated upon the occurrence of certain events of default set forth therein, including but not limited to the failure to make principal or interest payments due thereunder and breaches of certain covenants, representations and warranties set forth therein. As of June 9, 2005, the Debtors had no borrowings outstanding under the DIP Financing Facility and approximately $16.5 million in the aggregate available to be drawn under all letters of credit outstanding thereunder.

In connection with providing the DIP Financing Facility, each of The CIT Group/Business Credit, Inc. and JPMorgan Chase Bank, National Association committed to providing an equal share of the entire amount of the Exit Financing Facility, subject to the satisfaction of certain terms and conditions set forth in the commitment letter for such facility. See "Reorganized Kaiser — Exit Financing Facility."

**Stipulation and Agreed Order with MAXXAM**

On July 23, 2002, a Stipulation and Agreed Order was entered pursuant to which the Bankruptcy Court barred MAXXAM from disposing of their stock in KAC, including through a sale, transfer or exchange of the stock in KAC or by treating any of the stock in KAC as worthless for federal income tax purposes, prior to a hearing on the Motion of Debtors and Debtors-in-Possession for an Order Prohibiting Disposition of Kaiser Aluminum Corporation Stock Without Prior Bankruptcy Court Approval filedFiled April 12, 2002, so as to preserve the Debtors' valuable Tax attributes by preventing an ownership change of KAC prior to implementation of the Plan. The Plan provides that, on the Effective Date, this Stipulation and Agreed Order will be superseded in all respects by the Plan provisions described in this paragraph. The Plan provides that, on the Effective Date, the KAC Old Stock will be canceled, all rights of equity security holders with respect thereto will be terminated and, as a consequence, the KAC Old Stock will be rendered "worthless" within the meaning of section 165(g)(1) of the IRC. The Plan

further provides that MAXXAM will therefore only be entitled to claim a loss under section 165(g)(1) of the IRC for their tax year in which the Effective Date occurs and will not be able to assert ~~such loss for any tax year prior to the beginning of such tax year. Additionally, the Plan bars MAXXAM from taking any other action in respect of KAC Old Stock that would impair or jeopardize in any way the ability of any Reorganized Debtor or successor thereto to utilize any Tax attributes of the Reorganized Debtor, its successor or its consolidated group that are in existence as of~~ any loss with respect to the KAC Old Stock for any time prior to the Effective Date. Upon being superseded by these provisions, the Stipulation and Agreed Order will be of no further force and effect. The Plan provisions clarify that the cancellation of the KAC Old Stock pursuant to the Plan is the event causing the "worthlessness" of the KAC Old Stock within the meaning of section 165(g)(1) of the IRC, and continue the protection of the Reorganized Debtors' Tax attributes, including net operating losses, previously afforded by the Stipulation and Agreed Order. See "General Information Concerning the Plan — Certain Provisions Relating to KAC Old Stock Interests."

**Key Employee Retention Program**

To stabilize executive employment, the Original Debtors developed a key employee retention program (the "KERP"), which was approved by the Bankruptcy Court in September 2002. The KERP was designed to, among other things, provide certain executive employees critical to the Original Debtors' reorganization efforts with sufficient financial incentives and adequate protection to remain with the Original Debtors and fulfill their responsibilities as key employees through the successful conclusion of the Reorganization Cases. See "Reorganized Kaiser — Management — Executive Compensation — Existing Plans and Agreements to Be Retained after the Effective Date — Key Employee Retention Program."

**Appointment of the Committees and Future Claimants' Representatives**

### *Creditors' Committee*

On February 25, 2002, the US Trustee appointed the Creditors' Committee. The Creditors' Committee acts as such in all of the chapter 11 cases of the Debtors and the Other Debtors. The membership of the Creditors' Committee has been amended three times during the chapter 11 cases; the current members of, and advisors to, the Creditors' Committee are:

**Committee Members:**

Law Debenture Trust Company of New York,
as Indenture Trustee
767 Third Avenue, 31st Floor
New York, NY 10017

U.S. Bank National Association, as Indenture Trustee
180 East 5th Street
St. Paul, MN 55101

United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial Service
Workers International Union
Five Gateway Center
Pittsburgh, PA 15222

Pension Benefit Guaranty Corporation
1200 K Street, N.W.
Washington, DC 20005

J.P. Morgan Trust Company, N.A., as Indenture Trustee
6525 West Campus Oval Road
New Albany, OH 43054

Deutsche Bank National Trust Company (ex officio)
222 South Riverside Plaza
Chicago, IL 60606

**Counsel:**

Lisa G. Beckerman, Esq.
Akin, Gump, Strauss, Hauer & Feld, LLP
590 Madison Avenue
New York, NY 10022

William P. Bowden, Esq.
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

**Financial Advisors:**

Andrew B. Miller
Amit R. Patel
Houlihan Lokey Howard & Zukin
1930 Century Park West
Los Angeles, CA 90067

**Asbestos Claims Evaluation Consultants:**

Charles E. Bates
Bates White & Ballantine
2001 K Street, N.W., Suite 700
Washington, DC 20006

### *Asbestos Claimants' Committee*

On February 25, 2002, the US Trustee appointed the Asbestos Claimants' Committee. The current members of, and advisors to, the Asbestos Claimants' Committee are:

**Committee Members:**

Lawson Bergeron
c/o Silber Pearlman, LLP
Attn: Steven T. Baron/J. Todd Kale
2711 North Haskell Avenue, 5th Floor, LB 32
Dallas, TX 75204

Estate of Robert Carder
c/o Kelly & Ferraro, LLP
Attn: Michael V. Kelley, Esq.
1300 East Ninth Street
1901 Penton Media Building
Cleveland, OH 44114

Thomas Craig
c/o Cooney & Conway
Attn: John D. Cooney, Esq.
120 North LaSalle, 30th Floor
Chicago, IL 60602

Joseph Gaitor, Jr.
c/o Brayton & Purcell
Attn: Christina C. Skubic, Esq.
222 Rush Landing Road
Novato, CA 94948

John and Linda Henderson
c/o Waters & Kraus, LLP
Attn: Michelle Norton, Esq.
3219 McKinney Avenue, Suite 3000
Dallas, TX 75204

Dick Holt, Personal Representative of the Estate of
  Travis Baldwin
c/o Bergman, Senn, Pageler & Frockt
Attn: Matthew P. Bergman
P.O. Box 94
Creswell, OR 97426

Alvin Nelson
c/o Kazan, McClain, Edises, Abrams, Fernandez,
  Lyons & Farrise
Attn: Steven Kazan, Esq.
171 Twelfth Street, Third Floor
Oakland, CA 94607

Daniel J. Stipek
c/o Law Offices of Peter G. Angelos
Attn: Paul Matheny, Esq.
5905 Harford Road
Baltimore, MD 21214

Maria Wagner, as the Administratrix for the Estate of
  Thomas Wagner
c/o Weitz & Luxenberg, P.C.
Attn: Sanders McNew
180 Maiden Lane
New York, NY 10038

**Counsel:**

Elihu Inselbuch, Esq.
Caplin & Drysdale, Chartered
399 Park Avenue, 27th Floor
New York, NY 10022

Marla Eskin, Esq.
Campbell & Levine LLC
800 North King Street, Suite 300
Wilmington, DE 19801

**Financial Advisors:**

Loretto Tersigni
L. Tersigni Consulting, P.C.
1010 Summer Street, Suite 201
Stamford, CT 06905

**Asbestos Claims Evaluation Consultants:**

Mark A. Peterson
Legal Analysis Systems, Inc.
970 Calle Arroyo
Thousand Oaks, CA 91360

***Future Asbestos Claimants' Representative***

On January 27, 2003, the Bankruptcy Court appointed Martin J. Murphy, Esq., Davis & Young, 1700 Midland Bldg., 101 Prospect Ave. West, Cleveland, OH 44115, as the Future Asbestos Claimants' Representative. The current advisors to the Future Asbestos Claimants' Representative are:

**Counsel:**

James Patton, Esq.
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899

**Financial Advisors:**

David Abell
PricewaterhouseCoopers Corporate Finance, LLC
1177 Avenue of the Americas
New York, NY 10036

**Counsel for Insurance Matters:**

Donald W. Brown, Esq.
Covington & Burling
One Front Street
San Francisco, CA 94111

**Asbestos Claims Evaluation Consultants:**

B. Thomas Florence
Analysis, Research & Planning Corporation
1220 19th Street, N.W., Suite 700
Washington, DC 20036

***Retirees' Committee***

On July 23, 2002, the Bankruptcy Court entered an order appointing the Retirees' Committee, and on August 26, 2003, the Bankruptcy Court entered an order reappointing the Retirees' Committee. The current members of, and advisors to, the Retirees' Committee are:

**Committee Members:**

John E. Daniel
Jesse D. Erickson
Timothy F. Preece
James B. Hobby
David L. Perry

**Counsel:**

Frederick Holden, Esq.
Orrick, Herrington & Sutcliff LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105

Frederick Rosner, Esq.
Jaspan Schlesinger Hoffman LLP
913 Market Street, 12th Floor
Wilmington, DE 19801

40

### Future Silica and CTPV Claimants' Representative

On June 22, 2004, the Bankruptcy Court appointed Anne M. Ferazzi, Esq., 11923 Winwood, Houston, TX 77024, as the Future Silica and CTPV Claimants' Representative. The current advisors to the Future Silica and CTPV Claimants' Representative are:

**Counsel:**

Sander Esserman, Esq.
Stutzman, Bromberg, Esserman & Plifka
2323 Bryan Street, Suite 2200
Dallas, TX 75201

Daniel K. Hogan, Esq.
The Hogan Firm
1311 Delaware Avenue
Wilmington, DE 19806

**Insurance Coverage Consultant:**

David P. Anderson
Risk International Services, Inc.
4199 Kinross Lakes Parkway, Suite 220
Richfield, OH 44286

**Silica-Related Claims Evaluation Consultant:**

Dr. James N. Dertouzos
P.O. Box 2138
Santa Monica, CA 90407

**Counsel for Corporate, Financial and Documentation Matters:**

Steven A. Buxbaum, Esq.
Haynes & Boone, LLP
1 Houston Center
1221 McKinney St., Suite 2100
Houston, TX 77010

### Rejection of Certain Executory Contracts and Unexpired Leases

#### General

As debtors in possession, the Debtors have the right under section 365 of the Bankruptcy Code, subject to the approval of the Bankruptcy Court, to assume, assume and assign or reject executory contracts and unexpired leases. Section 365 of the Bankruptcy Code provides generally that a debtor may assume, assume and assign or reject an executory contract at any time before the confirmation of a plan of reorganization, but the Bankruptcy Court, on the request of a party in interest, may order the debtor to determine whether to assume or reject a particular executory contract within a specified period of time. In addition, section 365 of the Bankruptcy Code further provides that a debtor is given until 60 days after the date of commencement of its bankruptcy to decide whether to assume, assume and assign or reject an unexpired lease of nonresidential real property. This period may be extended for "cause."

On April 11, 2002, the Bankruptcy Court entered an order granting the Original Debtors' motion to extend the time within which they may assume, assume and assign or reject unexpired leases of nonresidential property until the confirmation of a plan of reorganization for them (including the Plan) to allow them to further evaluate their executory contracts and unexpired leases. On April 17, 2003, the Bankruptcy Court entered an order granting the same relief to the Additional Debtors.

Certain Debtors have Filed motions to reject certain burdensome Executory Contracts or Unexpired Leases, the most significant of which are described below. The Debtors anticipate that they may File additional motions to reject burdensome Executory Contracts or Unexpired Leases prior to the Confirmation Date. In addition, other Executory Contracts and Unexpired Leases will be assumed, assumed and assigned, or rejected in accordance with the Plan. See "General Information Concerning the Plan — Executory Contracts and Unexpired Leases."

#### Rejection of BPA Power Contract

During October 2000, KACC signed a power contract with the Bonneville Power Administration (the "BPA") under which the BPA, starting October 1, 2001, was to provide the KACC's operations in the State of Washington with power through September 2006. The contract provided KACC with sufficient power to fully operate its rolling mill in Trentwood, Washington, as well as approximately 40% of the combined capacity of the

Mead and Tacoma aluminum smelting operations, which had been curtailed since the last half of 2000. As a part of the reorganization process, KACC concluded that it was in its best interest to reject the BPA contract as permitted by the Bankruptcy Code. In September 2002, the Bankruptcy Court authorized the rejection of the BPA power contract. The BPA subsequently Filed a Claim for approximately $75 million in respect of the contract rejection. No amount in respect of such Claim has been included in the estimated aggregate claims amount for Class 9 set forth in this Disclosure Statement. See "Overview of the Plan — Classes and Treatment of Claims and Interests." The Debtors intend to object to such Claim.

### Rejection of Certain Site Participation Agreements

Prior to the Filing of its Reorganization Case, KACC entered into certain environmental site participation agreements pursuant to which the parties thereto agreed to share in the costs of the investigation and cleanup of conditions at certain specific properties not owned by KACC. With respect to each of these sites, the United States Environmental Protection Agency (the "EPA") asserted that each of the parties to the relevant site participation agreement is jointly and severally liable as a "potentially responsible party" pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and/or similar state laws. In connection with such site participation agreements, KACC also typically entered into other related contracts with the other potentially responsible parties which are party to the relevant site participation agreement and certain third parties, including trust and escrow agreements to facilitate the funding of work related to the site and service agreements with consultants to perform testing or other work at each site. In January 2003, the Bankruptcy Court authorized KACC to reject certain site participation agreements and related contracts applicable to six sites.

### Sherwin Contract Rejection Damage Claim Against KBC and Sherwin's Subsequent Threatened Litigation

KBC and Sherwin Alumina, L.P. ("Sherwin") were parties to a 2001 purchase agreement, pursuant to which KBC agreed to provide bauxite to Sherwin through December 31, 2009, at certain tonnage amounts and minimum prices. In September 2004, KBC sold its Jamaican bauxite mining interests (see "— Strategic Plan to Sell Commodities Assets — The Sale of the KJBC Interests and Gramercy Facility") and KBC rejected the purchase agreement with Sherwin. In October 2004, Sherwin Filed a proof of claim against KBC describing anticipated contract rejection damages and reserved the right to amend the claim once Sherwin secured a replacement supply of bauxite. In May 2005, Sherwin entered into a replacement bauxite supply contract with a third party and, in June 2005, Sherwin sought Bankruptcy Court approval to amend its proof of claim. In July 2005, the Bankruptcy Court granted Sherwin permission to amend its proof of claim and, on August 2, 2005, Sherwin Filed an amended proof of claim asserting an unsecured rejection damage claim against KBC in the amount of $68.6 million. KBC has not yet determined whether or not it will object to the amended proof of claim.

KBC is not among the Debtors or the Alumina Subsidiary Debtors and, to date, KBC has not filed a plan of liquidation or plan of reorganization. The only creditors of KBC are Sherwin and the PBGC, and the PBGC has an unsecured claim in the amount of $616 million (see " — PBGC Settlement Agreement.").

Since July 2005, KBC, the Debtors and the Creditors' Committee have responded to numerous information requests by Sherwin regarding the Intercompany Claims Settlement (see " — Intercompany Claims Settlement"), the sale of KBC's assets and other matters. Although Sherwin (a) was served with the motion to approve the Intercompany Claims Settlement and multiple notices regarding the motion and the hearing thereon and (b) nonetheless failed to object to or otherwise appear in connection with the motion, Sherwin now alleges that the Intercompany Claims Settlement unfairly treated KBC and should be vacated as to KBC. On August 19, 2005, Sherwin Filed an objection to the Plan and Disclosure Statement which, among other things, ~~alleges~~alleged that: (i) the Plan was not proposed in good faith because the Intercompany Claims Settlement, which was assertedly unfair to KBC, is the foundation of the Plan and the Intercompany Claims Settlement and the Plan may be tainted by conflicts of interest and (ii) there is no basis for the substantive consolidation proposed in the Plan. Sherwin also ~~states~~stated in its objection that it expects to file a motion to vacate approval of the Intercompany Claims Settlement with respect to KBC or, in the alternative, for appointment of a chapter 11 trustee in the KBC bankruptcy case. The Debtors believe that Sherwin's allegations are wholly without merit and intend to vigorously defend against Sherwin's objection to the Plan and Disclosure Statement and against any actions to vacate the Intercompany Claims Settlement or seek the appointment of a chapter 11 trustee for KBC.

**Claims Process and Bar Dates**

In May 2002, the Original Debtors Filed their Schedules, identifying the assets and liabilities of their respective Estates. These Schedules have been amended from time to time subsequent to these initial Filings. In March 2003, the Additional Debtors Filed their respective Schedules. The Bankruptcy Court took the following actions with respect to the establishment of bar dates for the Filing of proofs of Claim in these Reorganization Cases: (a) on October 29, 2002, the Bankruptcy Court entered an order setting January 31, 2003 as the last date by which holders of prepetition Claims against the Original Debtors (other than Asbestos Personal Injury Claims, NIHL Personal Injury Claims and CTPV Personal Injury Claims) could File their Claims (the "General Bar Date"); (b) on March 17, 2003, the Bankruptcy Court entered an order setting May 15, 2003 as the last date by which holders of prepetition Claims against the Additional Debtors (other than Asbestos Personal Injury Claims, NIHL Personal Injury Claims and CTPV Personal Injury Claims) could File their Claims (the "Second General Bar Date") and setting July 14, 2003 as the last date by which governmental units holding prepetition Claims against the Additional Debtors could File their Claims (the "Additional Debtors Governmental Bar Date"); and (c) on December 16, 2003, the Bankruptcy Court entered an amended order setting February 29, 2004 as the last date by which holders of prepetition NIHL Personal Injury Claims and CTPV Personal Injury Claims against the Debtors must File their Claims (the "NIHL/CTPV Bar Date").

More than 9,000 Claims, not including Asbestos Personal Injury Claims, NIHL Personal Injury Claims and CTPV Personal Injury Claims, were scheduled by, or Filed against, the Original Debtors on or before the General Bar Date, approximately 3,900 of which were Silica Personal Injury Claims. Fewer than 100 Claims, not including Asbestos Personal Injury Claims, NIHL Personal Injury Claims and CTPV Personal Injury Claims, were scheduled by, or filed against, the Additional Debtors on or before the Second General Bar Date, none of which were Silica Personal Injury Claims. Only one Claim was filed against the Additional Debtors by a governmental unit on or before the Additional Debtors Governmental Bar Date. In addition, approximately 3,400 NIHL Personal Injury Claims and approximately 300 CTPV Personal Injury Claims were Filed against the Debtors on or before the NIHL/CTPV Bar Date. Since the General Bar Date, the Debtors have engaged in the lengthy process of reviewing and reconciling the proofs of Claim asserted against the Debtors, and to date have Filed and prosecuted 22 omnibus objections to Claims. As a result of these efforts, the Debtors estimate that they have reconciled more than half of the Claims that have been Filed, and approximately 1,800 duplicative or otherwise invalid Claims have been disallowed by the Bankruptcy Court. In addition, approximately 800 Claims that were either scheduled by, or Filed against, the Debtors have been withdrawn.

The Asbestos Personal Injury Claims are treated differently than the other Claims (including the other Channeled Personal Injury Claims) in that there will be no bar date applicable. Instead, a motion will be Filed to approve the procedures for voting on the Plan and, in connection with the Bankruptcy Court order approving such procedures, Claims in Class 5 will be deemed to be temporarily allowed for voting purposes. As of August 2005, more than 100,000 Asbestos Personal Injury Claims were scheduled by, or Filed against, KACC, approximately 7,000 such Claims were scheduled by, or Filed, against KAC and approximately 100 such Claims were scheduled by, or Filed, against the other Original and Additional Debtors.

It is anticipated that the Confirmation Order will establish the Administrative Claim Bar Date, thereby serving as the Administrative Claim Bar Date Order. Unless otherwise ordered by the Bankruptcy Court, it is expected that the Administrative Claim Bar Date will be 30 days after the Effective Date.

**Exclusivity**

Under section 1121 of the Bankruptcy Code, a debtor has the exclusive right to (a) file a plan of reorganization during the first 120 days of its chapter 11 case and (b) solicit acceptances of such a plan during the first 180 days of the case. These periods may be extended for "cause." The Bankruptcy Court has granted a total of ten extensions of the periods of exclusivity with respect to the Reorganization Cases, and the Debtors currently have the exclusive right to File a plan or plans of reorganization through September 30, 2005 and have the exclusive right to solicit acceptances of such a plan or plans through November 30, 2005. The Debtors have reserved the right to request further extensions of the periods of exclusivity.

## Curtailment and Sale of Washington Smelters

KACC owned and operated two aluminum smelters in the State of Washington (the "Mead Smelter" and the "Tacoma Smelter") since the 1940's. In 2000, the BPA was supplying approximately half of the electric power for the Mead Smelter and the Tacoma Smelter, with the balance coming from other suppliers. In response to the unprecedented high market prices for power in the Pacific Northwest, during the last half of 2000 KACC permanently curtailed primary aluminum production at the Tacoma Smelter and partially curtailed production at the Mead Smelter. The Mead Smelter was subsequently fully curtailed in early 2001. During this same period, as permitted under the BPA contract, KACC remarketed to the BPA the available power that KACC had under contract through September 30, 2001. As a result of the curtailments, KACC avoided the need to purchase power on a variable market price basis and received cash proceeds sufficient to more than offset the cash impact of the potline curtailments over the period for which the power was sold.

In connection with the development of a plan of reorganization, KACC conducted a study of the long-term competitive position of the Mead Smelter and the Tacoma Smelter and potential options for these facilities. After analyzing the findings of such study and meeting with the USW and other parties, KACC concluded that the Mead Smelter and the Tacoma Smelter were unlikely to be able to compete with the much larger, newer and more efficient smelters generally located outside the United States of America because of unattractive long-term power prices and weak primary aluminum prices — both of which are significant impediments for an older smelter with higher-than-average operating costs — and the Mead Smelter and Tacoma Smelter were indefinitely curtailed in 2001. After receiving Bankruptcy Court approval, KACC sold the Tacoma Smelter and the Mead Smelter, as well as certain related assets, in 2003 and 2004, respectively. See "— Additional Asset Sales."

## Strategic Plan to Sell Commodities Assets

In September 2002, the Original Debtors prepared a strategic plan for their business operations which envisioned the sale of some or all of their commodities assets and reorganization around their fabricated products business. Thereafter, that plan was shared with the Creditors' Committee, the Asbestos Claimants' Committee and the Future Asbestos Claimants' Representative. After these parties completed considerable due diligence, they each indicated that they did not oppose the strategic plan. In furtherance of such plan, the Debtors and the Other Debtors have sold their interests in and related to each Joint Venture other than Anglesey.

### *The Sale of the Alpart Interests and Liquidation of AJI and KJC*

AJI and KJC, each a wholly owned subsidiary of KACC, collectively owned 65% of Alpart, a Delaware partnership formed between AJI, KJC and Hydro Aluminum Jamaica a.s. ("Hydro") for the purpose of mining bauxite in Jamaica, processing the bauxite into alumina and delivering the alumina to its partners. Following an extensive marketing process that spanned more than seven months, in January 2004, certain of the Debtors and the Other Debtors Filed a motion to approve the sale of their respective interests in Alpart to Glencore AG ("Glencore") (or, if Hydro exercised its right of first refusal to purchase the interests in Alpart (the "Hydro RFR") with respect to such proposed sale, to Hydro) for $165 million, subject to certain adjustments. On March 23, 2004, the Open Joint Stock Company Russian Aluminium ("RUSAL") Filed an objection to such motion, stating that it was willing to purchase the interests in Alpart for $215 million. On April 6, 2004, the Bankruptcy Court entered an order (the "Alpart Bidding Procedures Order") authorizing the termination of the purchase agreement with Glencore and approving bidding procedures for an auction of the interests of the Debtors and the Other Debtors in Alpart. The Alpart Bidding Procedures Order included a preservation of Hydro's right to purchase the interests in Alpart subsequent to the auction in accordance with the Hydro RFR. An auction was held pursuant to the Alpart Bidding Procedures Order on April 20, 2004 and Rual Trade Limited, a subsidiary of RUSAL, was selected as the successful bidder with a bid of approximately $332 million, subject to certain adjustments. On May 25, 2004, Hydro exercised the Hydro RFR and simultaneously announced that it intended to re-sell the interests in Alpart to Glencore for the same price that Hydro was paying to exercise the Hydro RFR. RUSAL responded by indicating that it would pay $10 million more than Hydro for the interests in Alpart. On May 26, 2004, the Debtors and the Other Debtors requested that the auction for the interests in and related to Alpart be re-opened or, in the alternative, that the Bankruptcy Court authorize the sale of such interests to Hydro in accordance with the Hydro RFR. On June 4, 2004, the Bankruptcy Court ordered the sale to Hydro of the interests in and related to Alpart. The sale of such interests to Quality Incorporation I Limited, an affiliate of Hydro ("Quality"), for approximately $315 million, subject to certain adjustments, was completed on July 1, 2004, and immediately thereafter Glencore purchased 100% of the equity

interests in Quality for the price Quality paid for Alpart. In addition, pursuant to the purchase price adjustment provisions of the purchase agreement and a letter agreement entered into among the parties on May 9, 2005, Quality paid to AJI and KJC approximately $1.7 million on June 30, 2005.

On November 1, 2004, AJI and KJC filed a joint plan of liquidation, together with a corresponding disclosure statement, which proposes to distribute proceeds of the Alpart sale to the creditors of AJI and KJC. The plan and disclosure statement were each amended on February 11, 2005, February 18, 2005 and February 25, 2005. The Bankruptcy Court approved the disclosure statement on February 28, 2005. The Bankruptcy Court held evidentiary hearings on April 13, 2005, April 27, 2005 and May 2, 2005 with respect to AJI and KJC's request for confirmation of their joint plan of liquidation, as well as KAAC and KFC's request for confirmation of the other Alumina Subsidiary Plan and a dispute regarding the relative priority of the guaranties of the Debtor Guarantors and the Alumina Subsidiary Debtors in respect of the Senior Notes and the Senior Subordinated Notes (see "— Guaranty Subordination Dispute"), and established a schedule for the parties to such dispute to submit additional pleadings. All additional pleadings have since been submitted to the Bankruptcy Court. It is anticipated that the Bankruptcy Court will rule on both the requests for confirmation of the Alumina Subsidiary Plans and the guaranty subordination dispute, but no assurance can be given as to when or how the Bankruptcy Court will so rule. For purposes of this Disclosure Statement, it is assumed that the Alumina Subsidiary Plans will be confirmed and become effective immediately prior to the effectiveness of the Plan.

### The Sale of the QAL Interests and Liquidation of KAAC and KFC

KAAC, a wholly owned subsidiary of KACC, owned 20% of the outstanding shares of QAL, an Australian corporation that operates an alumina refinery in Queensland, Australia, that is one of the largest alumina refineries in the world. In addition, KAAC, KACC and Kaiser Aluminium International, Inc. ("KAII") were parties to a variety of contracts related to QAL's operations, including financing, bauxite supply and alumina sales contracts. In June 2004, following an extensive marketing process that included providing notices to Comalco, another stockholder of QAL entitled to a right of first opportunity (the "Comalco RFO") to purchase all or any of part of KAAC's equity stake in QAL, along with KAAC, KACC and KAII's rights and obligations under such contracts (collectively, the "QAL Interests"), if at any time KAAC wished to dispose of its equity stake in QAL, KACC, KAAC and KAII Filed a motion to approve the sale of the QAL Interests pursuant to an auction with a reserve price of $525 million. No bids were received for the QAL Interests and, in August 2004, such motion was withdrawn.

In September 2003, with the approval of the Bankruptcy Court, KACC, KAAC and KAII pursued a two-prong approach to the sale designed to ensure an auction occurred. First, KACC signed a "stalking horse" agreement to sell the QAL Interests to Comalco Aluminium Limited, a subsidiary of Comalco, for a base price of $308 million in Cash, subject to certain working capital adjustments, plus the purchase of certain alumina and bauxite inventories and the assumption of KACC's obligations in respect of approximately $60 million of QAL debt. KACC also agreed to pay a termination fee of $11 million (the "Comalco Termination Fee") to Comalco Aluminium Limited upon the sale of the QAL Interests pursuant to the auction process if Comalco Aluminium Limited was not the ultimate purchaser. Separately, KACC negotiated an agreement with Glencore, whereby Glencore agreed that its wholly owned subsidiary, Pegasus Queensland Acquisition Pty Limited ("Pegasus"), would submit a qualified auction bid for the QAL Interests, with a base price of $400 million in Cash and otherwise on terms and subject to conditions similar to those of the stalking horse agreement described above. KACC agreed to pay to Glencore a fee of approximately $7.7 million (the "Glencore Bidding Fee") upon submission of that qualified bid. On September 28, 2004, the Bankruptcy Court approved the selection of Comalco Aluminium Limited as the stalking horse bidder in an auction for the QAL Interests and both the Comalco Termination Fee and Glencore Bidding Fee.

An auction was held on October 28, 2004. Pegasus timely submitted its bid and received the Glencore Bidding Fee, and Alumina & Bauxite Company Ltd. ("ABC Ltd."), an affiliate of RUSAL Holding Ltd., was selected as the successful bidder, with a bid of a base price of $401 million in Cash and otherwise on terms and subject to conditions similar to those of the stalking horse agreement described above. Following the auction, ABC Ltd., KACC and KAAC entered into a definitive purchase agreement reflecting such bid pursuant to which, among other things, KACC and KAAC agreed to indemnify ABC Ltd. for up to $10 million of any losses it incurs as a result of a breach by KACC or KAAC of any representation or warranty it made in such agreement. Pursuant to the Intercompany Claims Settlement, KAAC must satisfy any such indemnification or other obligations under the QAL Purchase Agreement and, in such event, will have no claim against KACC for contribution.

On November 8, 2004, the Bankruptcy Court approved the purchase agreement with ABC Ltd. and the transactions contemplated thereby, and the closing of the sale of the QAL Interests to ABC Ltd. occurred on April 1, 2005. Net proceeds to KACC and KAAC, after considering certain preliminary purchase price adjustments and the payment of each of the Comalco Termination Fee and the Glencore Bidding Fee, were approximately $393 million. In addition, pursuant to the purchase price adjustment provisions of the purchase agreement, ABC Ltd. paid to KACC and KAAC approximately $575,000 on May 3, 2005.

On November 15, 2004, KAAC and KFC filed a joint plan of liquidation, together with a corresponding disclosure statement, which proposes to distribute proceeds of the QAL sale to the creditors of KAAC and KFC. The plan and disclosure statement were each amended February 11, 2005, February 18, 2005 and February 25, 2005. The Bankruptcy Court approved the disclosure statement on February 28, 2005. The Bankruptcy Court held evidentiary hearings on April 13, 2005, April 27, 2005 and May 2, 2005 with respect to KAAC and KFC's request for confirmation of their joint plan of liquidation, as well as AJI and KJC's request for confirmation of the other Alumina Subsidiary Plan and a dispute regarding the relative priority of the guaranties of the Debtor Guarantors and the Alumina Subsidiary Debtors in respect of the Senior Notes and the Senior Subordinated Notes (see "— Guaranty Subordination Dispute"), and established a schedule for the parties to such dispute to submit additional pleadings. All additional pleadings have since been submitted to the Bankruptcy Court. It is anticipated that the Bankruptcy Court will rule on both the requests for confirmation of the Alumina Subsidiary Plans and the guaranty subordination dispute, but no assurance can be given as to when or how the Bankruptcy Court will so rule. For purposes of this Disclosure Statement, it is assumed that the Alumina Subsidiary Plans will be confirmed and become effective immediately prior to the effectiveness of the Plan.

### The Sale of the KJBC Interests and Gramercy Facility

KBC is a wholly owned subsidiary of KACC and, until September 30, 2004, owned 49% of KJBC, a Jamaican registered partnership between KBC and Jamaica Bauxite Mining Company Ltd., a Government of Jamaica state owned corporation. KJBC owns and operates a bauxite mining operation on land leased by the Government of Jamaica on the north coast of Jamaica, which includes drying, storage and shipping facilities located at Port Rhoades, Discovery Bay. Bauxite mined by KJBC is either refined into alumina at Gramercy or sold to third parties.

In furtherance of the strategic plan, KBC determined to sell its 49% interest in KJBC. As part of the same transaction, KACC decided to sell Gramercy, including associated drying and material handling facilities, a power house for steam and electricity production, a deep water dock and a third party barge loading facility.

On May 17, 2004, following an extensive marketing process, KBC and KACC entered into a purchase agreement for the sale of the their interests in and related to KJBC and Gramercy (the "Combined KJBC/Gramercy Assets") to Gramercy Alumina LLC and St. Ann Bauxite Limited (together, the "KJBC/Gramercy Purchasers"), each of which is 50% indirectly owned by Noranda Aluminum, Inc. and 50% indirectly owned by Century Aluminum Company, for a purchase price of $23 million, subject to certain adjustments. Also on May 17, 2004, KBC and KACC sought the Bankruptcy Court's approval of the sale of the Combined KJBC/Gramercy Assets, either to the KJBC/Gramercy Purchasers or to such other person submitting the highest or best bid at an auction of the Combined KJBC/Gramercy Assets. On June 21, 2004, the Bankruptcy Court entered an order approving bidding procedures for such auction. The bidding procedures order established July 6, 2004 as the deadline for interested parties to submit bids for the Combined KJBC/Gramercy Assets but, as of July 6, 2004, no qualified bids were received. As a consequence, on July 19, 2004 the Bankruptcy Court approved the sale of the Combined KJBC/Gramercy Assets to the KJBC/Gramercy Purchasers in accordance with the purchase agreement, pursuant to which, among other things, KACC and KBC agreed to indemnify the KJBC/Gramercy Purchasers for up to $5 million of any losses they incur as a result of a breach by KACC or KBC of any representation or warranty it made in such agreement. KBC and KACC completed the sale of the Combined KJBC/Gramercy Assets to the KJBC/Gramercy Purchasers on September 30, 2004.

After payment of various amounts in connection with the sale of the Combined KJBC/Gramercy Assets, including, among other things, a payment of $4.1 million to the Government of Jamaica in respect of the settlement of outstanding liabilities related to KBC's 49% interest in KJBC, a $2.5 million deposit to cover the costs of certain environmental remediation at Gramercy, approximately $1.3 million in prepetition property taxes related to Gramercy and approximately $1.2 million in mechanics' lien claims and assigned contract cure amounts related to

the Combined KJBC/Gramercy Assets, the sale resulted in net proceeds of approximately $12.5 million.  Pursuant to the Intercompany Claims Settlement, $4 million of these net proceeds were paid to AJI and KJC and the remaining approximately $8.5 million were paid to KACC.  See "— Intercompany Claims Settlement."  In addition, pursuant to the purchase price adjustment provisions of the purchase agreement, KBC and KACC paid to the purchasers of KJBC/Gramercy approximately $200,000 on March 8, 2005.

In June 2005, the KJBC/Gramercy Purchasers claimed that they are entitled to indemnification for losses as a result of certain alleged breaches of representations and warranties contained in the purchase agreement.  According to the KJBC/Gramercy Purchaser's Claim, their losses exceed the $5 million cap on indemnification described above.  Based on currently available information, KACC does not believe that the KJBC/Gramercy Purchasers are entitled to indemnification in respect of such Claim and intend to vigorously defend against the Claim.  However, no assurance can be given as to the ultimate outcome with respect to such Claim.

### The Sale of the Valco Interests

KACC owned 90% of the equity interests in Valco, a Ghanaian corporation that owns and operates an aluminum smelter located in Tema, Ghana, the remaining 10% of which is owned by Alcoa Inc.  The Valco smelter processes alumina supplied by its owners into primary aluminum under tolling contracts that provided for payment of tolling charges proportionate to each party's equity interest.

In December 2003, KACC entered into a memorandum of understanding with the Government of Ghana ("Ghana") for the sale of KACC's interests in and related to Valco for between $35 to $100 million, subject to due diligence to be performed by Ghana's financial advisors.  Subsequent to reviewing the due diligence report of its financial advisors, in April 2004, Ghana reduced its offered purchase price to $18 million.

On September 20, 2004, KACC and Kaiser Aluminum Technical Services, Inc., a wholly owned subsidiary of KACC that managed the daily operations of Valco, sought approval to sell the interests in and related to Valco to Ghana for $18 million plus the release of certain contractual and Tax obligations to Ghana.  The Bankruptcy Court approved the sale on September 28, 2004, and the transaction closed on October 29, 2004.  Pursuant to the sale agreement, KACC used approximately $10 million of the transaction proceeds to fund certain end of service benefits for Valco's employees upon closing.  After the payment of such benefits and the carrying costs incurred until the closing of the sale, the Debtors did not net any proceeds from the sale.

**Additional Asset Sales**

During the Reorganization Cases, the Debtors have pursued a strategy of selling non-core assets and facilities determined to be unnecessary to the their business.  Certain of the larger sales are described below:

- In 2002, with Bankruptcy Court approval, KACC sold:  (a) its Oxnard, California aluminum forging facility which resulted in net proceeds of approximately $7 million; and (b) certain equipment from a facility in Trentwood, Washington previously associated with the lid and tab stock product lines for total proceeds of approximately $16 million.

- In 2003, with Bankruptcy Court approval, KACC sold:  (a) its interest in a 28-story office building located in Oakland, California, known as the Kaiser Center California and related assets, which resulted in net cash proceeds of approximately $61 million; (b) a reduction facility in Tacoma, Washington, which resulted in gross proceeds of $12 million; and (c) certain surplus real properties located in Mead, Washington, which resulted in approximately $4 million in proceeds.

- In 2004, with Bankruptcy Court approval, KACC sold:  (a) additional surplus real properties located in Mead, Washington, which resulted in approximately $9 million in proceeds; (b) its primary aluminum reduction smelter in Mead, Washington, which has been in curtailment since January 2001, which resulted in net proceeds of approximately $6 million; and (c) certain real property and pipeline assets located in East Baton Rouge, Louisiana, for approximately $2 million.

**Agreements with Labor Regarding Pension and Retiree Medical Benefits**

As of the Petition Date, KACC and Kaiser Center, Inc. ("KCI") sponsored eight defined-benefit pension plans. Seven of the pension plans covered hourly and union employees and retirees (collectively, the "Hourly Plans") and one of the plans provided pension benefits for salaried employees and retirees (the "Salaried Plan").

In addition to the pension obligations, pursuant to certain retiree medical plans maintained by the Debtors as of the Petition Date, KACC and Kaiser Bellwood Corporation were obligated to continue to provide various benefits, including but not limited to medical, surgical, prescription drugs, hospital care, sickness, accident, disability or death and other "retiree benefits" as such term is defined in section 1114 of the Bankruptcy Code (collectively, the "Retiree Benefits"), to (a) retired salaried employees and their spouses, surviving spouses and eligible dependents (collectively, the "Salaried Retirees") and (b) certain retired hourly employees represented by several unions and their spouses, surviving spouses and eligible dependents (collectively, the "Union Retirees"). In the case of the Union Retirees, the Retiree Benefits, like the pension benefits provided pursuant to the Hourly Plans, were provided pursuant to collective bargaining agreements with the USW, the IAM and other unions.

During 2003 and the beginning of 2004, KACC met numerous times with the Retirees' Committee, the USW and the IAM to attempt to reach negotiated agreements restructuring the pension and/or Retiree Benefit obligations to levels that would allow the Debtors to formulate viable plans of reorganization. Although progress was being made in the negotiations, to bring closure to the issues certain of the Debtors Filed motions in January 2004 requesting that the Bankruptcy Court: (a) authorize the termination or substantial modifications of the obligations for Retiree Benefits to retirees represented by the USW, the IAM and the Retirees' Committee; (b) determine that the financial requirements for a distress termination of certain of the Hourly Plans were satisfied, approve a distress termination of each of those plans and authorize implementation of replacement defined-contribution plans for active employees, including employees represented by the unions; and (c) authorize a rejection of certain USW and IAM collective bargaining agreements as necessary to terminate certain Hourly Plans. In the weeks following the Filing of such motions, KACC reached negotiated agreements (*i.e.*, the Legacy Liability Agreements) with the USW, the IAM and the Retirees' Committee and ultimately received interim approval of such agreements on February 5, 2004. Each salaried retiree was at that time notified of an opportunity to elect not to have the Legacy Liability Agreements govern his or her claim, to the extent the claim is based on the termination of Retiree Benefits; however, no salaried retiree made such election.

Pursuant to the Legacy Liability Agreements, Retiree Benefits for the Salaried Retirees and Union Retirees represented by the USW, the IAM and the Retirees' Committee were terminated as of May 31, 2004, and those retirees were provided with an opportunity either (a) to pay premiums for continued medical coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended (*i.e.*, COBRA continuation coverage) or (b) to elect coverage pursuant to the Union VEBA Trust or the Retired Salaried Employee VEBA Trust. The Legacy Liability Agreements also require that, for every calendar month that KACC remains in bankruptcy after June 1, 2004, KACC make certain advances in the aggregate amount of $1.6 million per month for the benefit of the Union VEBA Trust and the Retired Salaried Employee VEBA Trust (collectively, the "Monthly VEBA Advances"), which will be credited against the Initial VEBA Contributions and, to the extent the aggregate amount of Monthly VEBA Advances and any other contributions made to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust prior to the Effective Date exceed the amount of the Initial VEBA Contributions, the Variable VEBA Contributions.

The Legacy Liability Agreements also provided for a termination of the applicable Hourly Plans and the institution of replacement pension plans, although the parties understood that termination required approval of and action by the PBGC and that the replacement plans were subject to the PBGC's review and, to the extent it viewed them as abusive follow-on plans, potential challenge. See "— PBGC Settlement Agreement." Under the Legacy Liability Agreements, KACC's annual contributions to the replacement pension plans that are defined-contribution plans vary depending on the age of each participant in that plan, and KACC's annual contribution to the replacement plan that is a defined-benefit plan varies based on a combination of the age of and the number of hours worked by each participant in such plan.

On March 22, 2004, the Bankruptcy Court entered a Final Order approving the Legacy Liability Agreements. The effectiveness of the Final Order, however, was expressly conditioned upon Bankruptcy Court approval of the anticipated Intercompany Claims Settlement. See "— Intercompany Claims Settlement."

On May 25, 2004, the Bankruptcy Court entered orders approving agreements to modify Retiree Benefits with the International Chemical Workers Union Council — United Food & Commercial Workers (the "ICWU"), the Paper, Allied-Industrial, Chemical and Energy Workers Union (the "PACE"), and the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW"). These agreements were modeled on the Legacy Liability Agreements with the USW, the IAM and the Retirees' Committee. The Bankruptcy Court also entered an order approving certain modifications to the Legacy Liability Agreements (the "VEBA Modifications") that included a requirement that KACC make a one-time payment to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust in the aggregate amount of $1.2 million and an increase of the Monthly VEBA Advances to $1.9 million.

On June 1, 2004, the Bankruptcy Court entered an order making effective both the Legacy Liability Agreements with the USW, the IAM, the ICWU, the PACE, the UAW and the Retirees' Committee and the VEBA Modifications, notwithstanding the fact that the Intercompany Claims Settlement was then still under negotiation, and authorizing the Debtors to proceed with the implementation of those agreements, subject to certain termination rights granted to the Creditor's Committee. Pursuant to such court order, the Retired Salaried Employee VEBA Trust was established as of May 31, 2004 and the Union VEBA Trust was established as of June 1, 2004. In accordance with the Legacy Liability Agreements, KACC made an initial one-time advance for the benefit of the Union VEBA Trust and the Retired Salaried VEBA Trust in the aggregate amount of $1.2 million in June 2004 and has made Monthly VEBA Advances in the amount of $1.9 million per month from June 2004 through the present date.

Contemporaneously with the PBGC Settlement Agreement (which is described below) and the completion of the sale of the Combined KJBC/Gramercy Assets (see "— Strategic Plan to Sell Commodities Assets.— The Sale of the KJBC Interests and the Gramercy Facility"), in September 2004 KACC and the USW agreed to certain modifications of their Legacy Liability Agreement, and on February 1, 2005, the Bankruptcy Court entered an order approving those modifications. Such modifications provided, among other things, for KACC to make a one-time payment in the amount of $1 million to the Union VEBA Trust; on March 31, 2005, KACC made such payment in accordance therewith.

On April 12, 2005, the United Steelworkers of America, AFL-CIO, CLC, merged with the PACE to form the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.

In accordance with the Legacy Liability Agreements, upon the Effective Date, the Union VEBA Trust and the Retired Salaried Employee VEBA Trust will receive their proportional share of: (a) New Common Stock representing 75% of KACC's remaining value after taking into account (i) the satisfaction of Administrative Claims, Priority Tax Claims, Unsecured Priority Claims (Class 1) and Secured Claims (Class 3), (ii) contributions to the PI Trusts and the related Funding Vehicle Trust, (iii) the Equity Incentive Plan, and (iv) the satisfaction of the Canadian Debtor PBGC Claims (Class 4) (i.e., an aggregate of 13,380,000 shares of New Common Stock); and (b) the Initial VEBA Contributions of Cash in the amount by which the Initial Availability Amount, as defined in the agreements, exceeds $50 million (up to $36 million) minus the amount of the one-time advance made for the benefit of the Union VEBA Trust and the Retired Salaried VEBA Trust on June 1, 2004 (i.e., an aggregate of $1.2 million) and the aggregate amount of the Monthly VEBA Advances already paid to each of the Union VEBA Trust and the Retired Salaried Employee VEBA Trust (but not the one-time advance made for the benefit of the Union VEBA Trust on March 31, 2005) (see "Overview of the Plan — Sources and Uses of Cash" for an estimate of such amount). Thereafter, on an annual basis, the Union VEBA Trust (through 2012) and the Retired Salaried Employee VEBA Trust will be entitled to receive Variable VEBA Contributions calculated as 10% of the first $20 million of Reorganized KAC's annual adjusted pre-tax profit ("APTP") plus 20% of Reorganized KAC's annual APTP above $20 million (where annual APTP is calculated in accordance with the Legacy Liability Agreements). Such annual payments will not exceed $20 million per year and will also be limited to the extent that the payments would cause Reorganized KAC's liquidity, as defined in the agreements, to be less than $50 million; the amount by which any annual payment is limited will not carry over to future years. For information regarding projected Variable VEBA Contributions to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust, see "Reorganized KACKaiser — Projected Financial Information." In addition, to the extent Reorganized KAC has certain levels of cash availability and the sum of the Initial VEBA Contributions of Cash and the aggregate Monthly VEBA Advances is less than $36 million, and Reorganized KAC's interests in and related to Anglesey are sold at any time after the Effective Date, a portion of the proceeds of that sale will, in certain circumstances, be contributed to the

Union VEBA Trust and the Retired Salaried Employee VEBA Trust. However, the Debtors do not expect this contingency to arise because they anticipate making the full $36 million contribution to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust on or prior to the Effective Date. All contributions made to such trusts in accordance with the Legacy Liability Agreements are and will continue to be allocated 85.5% to the Union VEBA Trust and 14.5% to the Retired Salaried Employee VEBA Trust. This allocation reflects the approximate proportion of Claims arising under or in respect of the retiree medical plans maintained by the Debtors as of the Petition Date for each retiree group (i.e., the USW, the IAM, the ICWU, the PACE and the UAW on the one hand, and the Retirees' Committee, on the other hand) to all such Claims, after giving effect to the reduction in Retiree Benefits for retired salaried employees announced by KACC shortly before KAC's Petition Date and thereafter implemented on May 1, 2002.

In May 2005, after negotiation, KACC, the USW and the PBGC agreed in principle that, subject to certain conditions, the Canadian Debtor PBGC Claims would be satisfied through the issuance to the PBGC of 10.8% of the shares of New Common Stock issued pursuant to the Plan and the payment to the PBGC of $2.5 million in Cash. See "Overview of the Plan — Classes and Treatment of Claims and Interests" for a description of the treatment of Class 4 Claims.

In August 2005, KACC and the USW executed a term sheet pursuant to which they agreed to (a) the forms of the Stock Transfer Restriction Agreement and the Amended and Restated Certificate of Incorporation of Reorganized KAC (see "Reorganized Kaiser — Board of Directors," "Reorganized Kaiser — Certain Corporate Governance Matters" and "New Common Stock — Restrictions on Transfer"), (b) the principal terms of the Registration Rights Agreement (see "Applicability of Certain Federal and State Securities Laws — Registration Rights Agreement"), (c) the form of the Director Designation Agreement (see "Reorganized Kaiser — Board of Directors — Director Designation Agreement"), and (d) the principal terms of certain Cash advances to be available to the Union VEBA Trust following the Effective Date, which terms are described in the next following paragraph.

In connection with the negotiation of the Stock Transfer Restriction Agreement as it relates to the shares of New Common Stock to be issued to the Union VEBA Trust pursuant to the Plan (see "New Common Stock — Restriction Transfer — Stock Transfer Restriction Agreement"), it was agreed that Reorganized KAC would advance Cash to the Union VEBA Trust under specified circumstances. Generally, if, at any point before the second anniversary of the Effective Date, the Cash held by the Union VEBA Trust is less than an amount equal to three times the average monthly benefits and expenses paid over the immediately preceding three-month period, the Union VEBA Trust may request that Reorganized KAC advance up to that amount of Cash to the Union VEBA Trust. Such advances may not exceed $8.5 million in the aggregate and will bear interest if they remain outstanding beyond certain specified periods. Following any such advance, any Variable VEBA Contribution to which the Union VEBA Trust would otherwise be entitled will be applied to reduce amounts owing in respect of outstanding advances until all such amounts have been recouped by Reorganized KAC. In addition, generally, if, after any such advance, the amount of Cash held by the Union VEBA Trust is ever more than an amount equal to six times the average monthly benefits and expenses paid over the preceding three-month period, the Union VEBA Trust must repay amounts owing in respect of the advances to the extent of such excess amount. At any point on or after the fourth anniversary of the Effective Date, Reorganized KAC may demand repayment of all amounts owing in respect of such advances then-outstanding, which, at Reorganized KAC's option, will be payable in Cash, shares of New Common Stock or a combination thereof.

**PBGC Settlement Agreement**

The PBGC is a wholly owned United States government corporation that administers the defined-benefit pension plan termination insurance program under ERISA. Pursuant to federal statute, KACC and each member of its controlled group are jointly and severally liable to the PBGC on behalf of the eight pension plans that were or are maintained by KACC and KCI and guaranteed in part by the PBGC for amounts that KACC and KCI are or were required to contribute to such plans.

In January 2003, the PBGC Filed Claims against the Original Debtors on behalf of each of the eight Kaiser pension plans, which included: (a) Claims for estimated unfunded benefit liabilities, totaling approximately $620 million; (b) unliquidated Claims for missed statutory insurance premiums; (c) a $17.1 million Claim on behalf of the Salaried Plan for minimum funding contributions; and (d) unliquidated Claims on behalf of the remaining seven Kaiser pension plans for minimum funding contributions.

Although the Bankruptcy Court, in conjunction with the approval of the Legacy Liability Agreements, determined that the financial requirements for a distress termination of certain of the pension plans had been satisfied and authorized the implementation of replacement plans as negotiated in the Legacy Liability Agreements, the termination of the pension plans and implementation of the replacement plans remained subject to the PBGC's determination that the statutory termination requirements had been satisfied. In March 2004, the PBGC appealed the Bankruptcy Court's ruling with respect to certain of the Kaiser pension plans; the PBGC also informed KACC that it believed that the replacement pension plans negotiated in the Legacy Liability Agreements did not comply with the PBGC's policies. See "— Agreements with Labor Regarding Pension and Retiree Medical Benefits."

On October 14, 2004, KACC and the PBGC entered into the PBGC Settlement Agreement and, on January 25, 2005, the Bankruptcy Court entered an order approving the agreement. On February 3, 2005, the Senior Subordinated Note Indenture Trustee Filed a notice of appeal in respect of such order and a notice of appeal of the Bankruptcy Court's order denying its motion for reconsideration of the Bankruptcy Court's stay of the Senior Subordinated Note Indenture Trustee's objection to certain PBGC Claims and, on March 29, 2005, the Senior Subordinated Note Indenture Trustee Filed a motion for stay of the Bankruptcy Court's order approving the PBGC Settlement Agreement pending resolution of such appeal. No rulings have yet been obtained on either the appeal or the motion to date.

Pursuant to the PBGC Settlement Agreement, the PBGC approved the termination of the largest Hourly Plan that had not previously been terminated (the Salaried Plan and one of the Hourly Plans had been terminated by the PBGC prior to that date) and KACC retained, and agreed to continue, the remaining smaller five Hourly Plans. In addition, in accordance with the PBGC Settlement Agreement:

- On January 21, 2005, the PBGC issued a letter indicating that it would not challenge the replacement pension plans;

- On March 29, 2005, KACC paid the approximately $4 million necessary to satisfy the minimum funding requirements under applicable law for the retained pension plans for 2004;

- The administrative claims of the PBGC against the Debtors, KAAC and KFC were allowed in the aggregate amount of $14 million. In accordance with the Intercompany Claims Settlement, such claims are expected to be paid in full by KACC on the earlier of the Effective Date or the effective date of the plan of liquidation for KAAC and KFC. (For purposes of this Disclosure Statement it is assumed that the Alumina Subsidiary Plans will be confirmed and become effective immediately prior to the effectiveness of the Plan and, therefore that KACC will pay $14 million in full satisfaction of such claims on the Effective Date.)

- The unsecured claims of the PBGC against each Debtor and Other Debtor in respect of the unfunded benefit liabilities under the terminated plans and statutory premiums are or were allowed, as the case may be, in the amount of $616 million, although the PBGC's recovery from the estates of each of the Other Debtors on account of such claims was limited to approximately 32% of the net distributable proceeds payable in the aggregate to the PBGC, holders of Senior Subordinated Notes and holders of Senior Notes under each Alumina Subsidiary Plan. The $616 million Claim against the Canadian Debtors is subject to treatment in Class 4 and against the Substantively Consolidated Debtors (*i.e.*, all of the Debtors other than the Canadian Debtors) is subject to treatment in Class 9. See "Overview of the Plan — Classes and Treatment of Claims and Interests."

The PBGC Settlement Agreement also provided that the PBGC would not pursue its appeal of the Bankruptcy Court's determination that the Debtors had met the financial requirements for a distress termination of their pension plans. However, despite the settlement with the PBGC, the District Court proceeded to consider the appeal and issued a memorandum opinion and order dated March 30, 2005, affirming the Bankruptcy Court's decision. On May 25, 2005, the PBGC filed a notice of appeal of the District Court's opinion and order to the United States Court of Appeals for the Third Circuit.

The Debtors and the PBGC have continued to discuss a settlement in this matter. It is possible that revisions to the existing settlement will occur. Pending a final resolution of this matter, the existing settlement

51

remains in full force and effect. The Debtors cannot predict what, if any, impacts may result from the appeal or negotiations, except that they continue to believe that any outcome would not be less favorable to them from a Cash perspective than the terms of the existing settlement.

**Certain Asbestos-Related Insurance Coverage Litigation**

Throughout the Reorganization Cases, the Debtors have been involved in litigation and negotiations concerning the scope of liability insurance coverage available to satisfy the various asbestos-related Claims against the Debtors.

In May 2000, KACC instituted an insurance coverage action against certain liability insurers (collectively, the "Insurers"), styled *Kaiser Aluminum & Chemical Corp. v. Certain Underwriters at Lloyds, London*, Case No. 312415, in the Superior Court of California for the County of San Francisco (the "Products Coverage Action"). In the Products Coverage Action, KACC is seeking a declaratory judgment that the Insurers are obligated to cover all asbestos-related bodily injury claims allegedly resulting from a product manufactured or sold by KACC that have been and will be asserted against KACC. KACC is also seeking damages for breach of contract and breach of the covenant of good faith and fair dealing against several of the Insurers as part of the Products Coverage Action. The lawsuit, if successful, will establish KACC's rights to coverage from the Insurers for products claims asserted against KACC. KACC has also sued a more limited number of Insurers on claims for injury allegedly resulting from exposure from an allegedly hazardous product or condition at a facility owned or operated by KACC in a companion action, styled *Kaiser Aluminum & Chemical Corp. v. Certain Underwriters at Lloyds, London*, Case No. 322710, which is pending before a different judge in the same court (the "Premises Coverage Action"). The Products Coverage Action and the Premises Coverage Action are referred to together herein as the "Coverage Actions."

In October 2001, the trial court heard various motions, principally on issues of policy interpretation. Certain Insurers had argued that they did not have an obligation to pay under certain policies or that they had to pay under more limited circumstances than KACC claimed. The court issued rulings generally interpreting the scope of the Insurers' obligations to pay in a manner consistent with KACC's interpretation of the policies.

Thereafter, the Coverage Actions were litigated in phases, with most activity occurring in the Products Coverage Action. The parties met and conferred and tried to identify policy interpretation issues; they reached agreement on some and identified others as requiring resolution by the trial court.

In the first phase, the parties stipulated to the terms and conditions of policies issued to KACC from 1959 to 1985 under which KACC asserted the Insurers were liable to pay on products claims. There were over 300 policies introduced into evidence, including policies issued by insolvent carriers or carriers which had settled with KACC. The Products Coverage Action has proceeded against the solvent insurance carriers that issued policies during that coverage period and that have not settled with KACC. Those policies are written to cover "occurrences" and have both "per occurrence" and aggregate coverage limits; there is an aggregate of approximately $1.46 billion in product liability coverage available under policies issued by solvent carriers which have not settled with KACC before the court in the Products Coverage Action.

In the second phase, the trial court considered both policy interpretation issues and KACC's claim that it had properly exhausted various first layer policies and underlying self-insured retentions and/or deductibles. The trial court issued policy interpretation decisions as part of the second phase in each of June 2003, February 2004 and April 2004. In these policy interpretation decisions, the trial court's decisions with respect to the insurers' obligation to pay on settlements and judgments was consistent with KACC's interpretation of the provisions. The court also determined, consistent with an earlier October 2001 ruling, that KACC could not recover defense costs on claims that were dismissed without liability but could recover defense costs on claims for which there was settlement or a judgment was entered.

The trial court also issued a decision regarding the exhaustion of certain policies as part of the second phase, which established that actual exhaustion by payment had been established for certain policies and self-insured retentions and deductibles. This decision was based on an earlier settlement reached between KACC and certain Insurers that resolved issues relating to exhaustion of KACC's asbestos insurance coverage and the method of determining what constitutes an asbestos exposure "occurrence" under KACC's insurance coverage, which was