approved by the Bankruptcy Court in October 2002. (The Bankruptcy Court also authorized KACC to enter into such agreements with other Insurers in the future.) Certain Insurers had challenged the methodology and conclusions reached, but ultimately stipulated to exhaustion in September 2003, shortly before they would have proceeded to a trial thereon. KACC had received over $200 million from the Insurers, which reimbursed KACC for costs it incurred before the Petition Date for settlement and defense of claims.

The Products Coverage Action is currently in the third phase. In this third phase, Insurers are claiming that KACC expected or intended damage and, therefore, such Insurers should not be liable to pay on claims. In addition, Insurers which issued policies representing approximately half of the $1.46 billion in remaining coverage are asserting that KACC concealed or misrepresented facts in applying for insurance. KACC is vigorously disputing all of these claims.

Since the Petition Date, KACC has entered into several settlements with Insurers and other insurance companies for payment. In April 2003, the Bankruptcy Court approved a settlement agreement between KACC and Employers Surplus Lines Insurance Company, the terms of which were filed under seal with the Bankruptcy Court. In July 2003, the Bankruptcy Court approved a settlement agreement between KACC and National Casualty Company, also filed under seal with the Bankruptcy Court. In July 2003, the Bankruptcy Court approved a settlement agreement between KACC and a group of insolvent insurance companies not party to the Coverage Actions but against which KACC had claims similar to those raised in such actions against the Insolvent Insurers for reimbursement of certain of KACC's asbestos products costs, as well as claims for coverage of present and future asbestos liabilities, that included Kingscroft Insurance Company Limited (formerly Dart Insurance Company Limited, Dart and Kraft Insurance Company Limited and Kraft Insurance Company Limited), Walbrook Insurance Company Limited, El Paso Insurance Company Limited, Lime Street Insurance Company Limited (formerly Louisville Insurance Company), Mutual Reinsurance Company Limited, The Bermuda Fire & Marine Insurance Company Limited, In Liquidation, Bryanston Insurance Company Limited and Southern American Insurance Company, the terms of which were also filed under seal with the Bankruptcy Court. In December 2004, the Bankruptcy Court approved a settlement agreement between KACC and Insurance Company of the West. Under each such settlement agreement as approved by the Bankruptcy Court, funds not allocable to reimbursement of KACC's past costs are being held in escrow for the benefit of holders of Channeled Personal Injury Claims and will be transferred to the Funding Vehicle Trust on the Effective Date pursuant to the Plan (such funds being the Insurance Settlement Escrow Funds which comprise part of the PI Trust Assets). See "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunctions."

On August 22, 2005, KACC and various underwriters at Lloyd's of London reinsured by Equitas entered into a settlement agreement (the "Lloyds Settlement"), whereby the underwriters have agreed to pay $137.0 million in settlement of their obligations under insurance policies with a face value of approximately $170.0 million and certain other coverage. In return for the cash payment, the Lloyds Settlement, if ultimately approved, would release the underwriters from their coverage liabilities, which were part of the litigation described above, and certain other coverage. The $137.0 million payment by the underwriters is required to be made to a settlement agent within 30 days of Bankruptcy Court approval of the Lloyds Settlement. Such amounts will be paid by the settlement agent only to the PI Trusts upon the Effective Date. See "PI Trusts and Distribution Procedures." The Lloyds Settlement is subject to Bankruptcy Court approval and approval of a plan of reorganization for the Debtors (including the Plan), and may be terminated in certain other circumstances, including if certain asbestos-related legislation pending in the United States of America is enacted into law on or before December 31, 2005 (see "New Common Stock — Risk Factors PI Trusts and Distribution Procedures — Certain Risks Associated with the PI Trusts — Certain Pending Legislation, if Enacted, May Impact the Holders of Channeled Personal Injury Claims" and "New Common Stock — Risk Factors — Risks Relating to the Reorganized Debtors' Business and the Industry in which the Reorganized Debtors Will Operate — Pending Asbestos-Related Legislation, if Enacted, May Adversely Effect Results of Operations" for a description of such legislation). The Debtors have filed a motion with the Bankruptcy Court seeking approval of the Lloyds Settlement, and such motion has been set for hearing on September 26, 2005. If the Lloyds Settlement were to be terminated, the funds held by the settlement agent, along with interest earned thereon, would be refunded to the underwriters and coverage litigation could be reinstated against the underwriters.

Settlements with other insurers may occur in the future, although no assurances can be given that any such additional settlements will occur.

**Certain Other Litigation and Settlements During the Reorganization Cases**

*Gramercy Class Action Settlement*

In June 2002, the Bankruptcy Court approved the settlement by KAC and KACC of class action lawsuits stemming from a July 5, 1999 explosion at Gramercy. The settlement resolved over 24,000 claims made by a certified class of local residents and other individuals who alleged property damage and/or personal injury as a result of or otherwise in connection with the event. The settlement was reached in the fall of 2000, but the necessary procedure to finalize the settlement was not finished before the commencement of the Reorganization Cases. The settlement was funded solely with insurance proceeds.

*Australian Tax Office Settlement*

In January 2003, the Bankruptcy Court approved a settlement among KACC, KAAC and the Australian Taxation Office (the "ATO"), which resolved certain Tax liability issues raised during the ATO's audit of KAAC for the years ended December 31, 1988 through December 31, 2001. The terms of the settlement were filed under seal with the Bankruptcy Court, but the effect of the settlement was to: (a) conclude and resolve the audit by the ATO on terms favorable to the Debtors; (b) eliminate the risk and uncertainty of future litigation with the ATO and Australian income tax liabilities in Australia with respect to the matters resolved; and (c) eliminate KAAC's ongoing fees and expenses incurred in connection with the audit.

*Environmental Settlement Agreement*

In October 2003, the Bankruptcy Court approved the Environmental Settlement Agreement, a consent decree settling more than $727 million of environmental Claims Filed by the United States of America (on behalf of the EPA, the United States Department of Interior (the "DOI") and the National Oceanic and Atmospheric Administration (the "NOAA")), the States of California, Rhode Island and Washington and the Puyallup Tribe of Indians. A substantial portion of the environmental Claims related to 132 third-party disposal or treatment sites to which the Debtors may have sent industrial waste containing hazardous substances and, consequently, for which they could be jointly and severally liable under federal, state and tribal laws for response costs and natural resource damages. The Environmental Settlement Agreement allowed KACC to settle, without admitting liability, the Claims of the settling parties relating to 66 such sites. Pursuant to the decree, there are 38 sites for which the settling parties will have no Allowed Claims and, with respect to the remaining 28 sites, the following Claims will be allowed against KACC: (a) a General Unsecured Claim in the aggregate amount of approximately $18 million by the United States of America (on behalf of the EPA); (b) a joint and several General Unsecured Claim in the aggregate amount of $5.5 million by the State of Washington, the Payallup Tribe of Indians and the United States of America (on behalf of the DOI and the NOAA); (c) a General Unsecured Claim in the aggregate amount of approximately $1 million by the State of California Department of Toxic Substances Control; and (d) a General Unsecured Claim in the amount of approximately $16,000 by the State of California Department of Fish and Game. The decree also reserved all rights and defenses with respect to six sites (the "Reserved Sites"), four of which were then Debtor-owned and two of which were then owned by third parties, including the Ravenswood Site (as defined below; see "— Environmental Contract with TRC"), the Mead SPL Site (as defined below; see "— Consent Decree Regarding Mead Smelter"), the Mica Landfill Superfund Site (as defined below; see "— Mica Landfill Superfund Site Settlement"), the Ohiopyle Mine (as defined below; see "— Appeal of Water Discharge Permit for Ohiopyle Mine") and the Upriver Dam Site (as defined below; see "— Upriver Dam Settlement"). The decree also provides that various categories of Claims of the agencies and States relating to property owned by the Debtors after Confirmation of the Plan other than Reserved Sites are not discharged by the Environmental Settlement Agreement, and that such Claims will not be impaired by Confirmation of the Plan. Furthermore, the decree provides that the settling parties may in the future, in the ordinary course of conducting agency enforcement activities, seek a determination of KACC's liability with respect to certain additional non-owned sites not otherwise addressed by the decree. If in the future liability is so determined, the liability with respect to any such additional site will be satisfied the same as it would have been had the liability for such site been liquidated in the Reorganization Cases and treated as an Allowed General Unsecured Claim under a confirmed plan of reorganization for KACC. Accordingly, assuming Confirmation of the Plan, such liability would be satisfied by the distribution of shares of New Common Stock equivalent to the distribution that would have made if such liability had been liquidated in the Reorganization Cases unless, as permitted by the Environmental Settlement Agreement, Cash having a value equal to such shares is

paid instead. See "Distributions Under the Plan — Special ~~Provisions~~Provision Relating to Environmental Settlement Agreement."

In February 2005, the Bankruptcy Court approved a stipulation between KACC and the United States of America, pursuant to which one half of a $1.6 million federal income tax refund that the Debtors had claimed was set off against the General Unsecured Claims of the United States of America on behalf of the EPA, the DOI and the NDAA. (The remaining half of such refund was set off against a $3.5 million General Unsecured Claim of the BPA against KACC for liability arising under a 1998 service contract and a 1978 equipment lease.) The General Unsecured Claims against KACC are subject to treatment in Class 9. For a discussion of the treatment of such Claims, see "Overview of the Plan — Classes and Treatments of Claims and Interests."

The discharge provisions of the Plan (*i.e.*, Section 12.1.b of the Plan; see "General Information Concerning the Plan — Discharge, Termination and Injunction — Discharge of Claims and Termination of Interests") will not limit any rights that the United States of America or the individual States may have under environmental laws to seek to enforce equitable remedies against the Debtors, the Reorganized Debtors or the successors thereto to the extent such equitable remedies are not considered Claims under applicable bankruptcy law and relate to matters that have not been resolved by the Environmental Settlement Agreement or other settlements, except that the Debtors, the Reorganized Debtors or the successors thereto may raise any and all available defenses (including defenses under bankruptcy law) in any action by the United States of America or an individual State to enforce such equitable remedies. Under the Plan, all rights and defenses (including defenses under bankruptcy law) of the Debtors, the Reorganized Debtors and the successors thereto and the United States of America with regard to the Reserved Sites (as such term is defined in the Environmental Settlement Agreement) for which the Debtors and United States of America have not reached settlement as of the Confirmation Date will be preserved. Notwithstanding any provision of the Plan, the rights of the United States of America or the individual States party to the Environmental Settlement Agreement with respect to Debtor-Owned Sites (as such term is defined in the Environmental Settlement Agreement) will be governed by the Environmental Settlement Agreement.

### Environmental Contract with TRC

In September 2004, the Bankruptcy Court authorized KACC to enter into a contract with TRC Companies, Inc. and TRC Environmental Corporation (collectively, "TRC") to resolve certain environmental Claims asserted against KACC associated with real property located in Chalmette, Louisiana (the "Chalmette Landfill"), Baton Rouge, Louisiana (the "East Landfill") and Ravenswood, West Virginia (the "Ravenswood Site"). In an effort to address environmental obligations associated with KACC's discontinued aluminum operations at these three sites, KACC contacted TRC, a company in the business of assuming environmental liabilities and providing fixed-cost remediation solutions, to attempt to negotiate an economic way of satisfying KACC's obligations. In exchange for approximately $15 million, TRC, among other things, (a) took title to the Chalmette Landfill, the East Landfill and the Ravenswood Site, (b) assumed responsibility for all environmental cleanup activities involving the three sites, (c) secured such obligations with environmental insurance, ~~and~~ (d) agreed to indemnify KACC for cleanup costs due to past and future releases of hazardous substances, and (e) signed an administrative order on consent with the EPA to perform the cleanup at the Ravenswood Site. In a related agreement, which is an exhibit to the contract with TRC, KACC obtained a release of unliquidated Claims Filed by Century Aluminum of West Virginia, Inc. and Pechiney Rolled Products LLC, two parties that own or owned portions of the Ravenswood Site and to whom KACC had alleged obligations.

### Consent Decree Regarding Mead Smelter

In September 2004, the Bankruptcy Court approved a consent decree between, KACC, the EPA and the State of Washington relating to a waste site (the "Mead SPL Site") owned by KACC and located near the Mead Smelter, which was formerly owned by KACC. Pursuant to the consent decree, among other things, (a) KACC conveyed the Mead SPL Site to a custodial trust, (b) KACC paid approximately $7 million to fund the custodial trust and purchase an insurance policy to ensure that the trust completes remedial tasks at the Mead SPL Site, (c) the EPA and the State of Washington covenanted not to sue the Debtors with respect to the Mead SPL Site, subject to certain limited reservation of rights, and (d) the portion of the environmental Claims Filed by the United States of America (on behalf of the EPA) and the State of Washington that asserted liabilities with respect to the Mead Smelter and/or the Mead SPL Site, which were each in an amount of $22 million, were deemed withdrawn.

### Environmental Contract Regarding Mulberry Site

In September 2004, the Bankruptcy Court authorized KACC to enter into a contract with Environmental Risk Solutions, LLC ("ERS"), K.C. Industries, LLC ("KC") and K.C. Industries Properties, LLC ("Properties") to resolve certain environmental Claims asserted against KACC associated with real property located in Mulberry, Florida (the "Mulberry Site"). KACC had previously operated a facility at the Mulberry Site that produced florine-based products. KACC sold such facility and other assets to KC in 1999, although KACC retained ownership of the real property associated with the site and agreed to take certain remedial actions and to indemnify KC from certain site-related claims. In an effort to address the obligations of KACC in respect of environmental conditions associated with the Mulberry Site, KACC contacted ERS, a company in the business of assuming environmental liabilities, including remediation of contaminated sites. KACC, ERS, KC and Properties entered into a contract, pursuant to which KACC paid $5 million to ERS in exchange for ERS's assumption of all liabilities with respect to remediation of the Mulberry Site. In addition, among other things, (a) Properties, an affiliate of KC, took title to the Mulberry Site, (b) KC withdrew its previously Filed Claims against KACC and received an Allowed General Unsecured Claim in the amount of approximately $84,000 (see "Overview of the Plan — Classes and Treatment of Claims and Interests"), (c) ERS, KC and Properties released KACC from any losses associated with the Mulberry Site, and (d) ERS, KC and Properties agreed to indemnify KACC from various losses and liabilities.

### Appeal of Water Discharge Permit for Ohiopyle Mine

Post-mining water discharges from KACC's Potato Ridge Mine in Ohiopyle, Pennsylvania (the "Ohiopyle Mine") are covered by National Pollutant Discharge Elimination System Permit No. PA 0202851 (the "Ohiopyle NPDES Permit"). On November 20, 2003, the Pennsylvania Department of Environmental Protection (the "PaDEP") issued a renewal of the Ohiopyle NPDES Permit, effective for the period March 29, 2004 through March 29 2009. On March 10, 2004, the Mountain Watershed Association and Citizens for Pennsylvania's Future (the "Ohiopyle Appellants") filed an appeal of the renewed Ohiopyle NPDES Permit with the Pennsylvania Environmental Hearing Board— (*Mountain Watershed Association and Citizens for Pennsylvania's Future v. Commonwealth of Pennsylvania Department of Environmental Protection and Kaiser Refractories*, EHB Docket No. 2004-102-R). By order dated June 23, 2005, upon the Ohiopyle Appellants' Motion for Partial Summary Judgment, the Environmental Hearing Board revoked the renewed Ohiopyle NPDES Permit and remanded the matter to PaDEP for further action.

One of the Ohiopyle Appellants' bases for the Motion for Partial Summary Judgment was that certain pollutant discharge limits specified in the renewed Ohiopyle NPDES Permit were not consistent with the "Total Maximum Daily Load" ("TMDL") requirements for the receiving stream. The PaDEP did not dispute the alleged inconsistency between the renewed Ohiopyle NPDES Permit and the TMDL requirements; however, PaDEP asserted that the inconsistency stemmed from errors in the TMDL requirements. In conjunction with remand proceedings on the Ohiopyle NPDES Permit, the PaDEP has proposed a revision of the TMDL requirements for the receiving stream. The proceedings for the revision of the TMDL requirements are pending and are not expected to be completed prior to the Effective Date.

The existing system fails to treat the post-mining water discharges from the Ohiopyle Mine in accordance with KACC's NPDES Permit. KACC has developed a conceptual plan for additional treatment. KACC has not yet prepared or submitted detailed construction plans for the proposed additional treatment for review and approval by PaDEP.

The establishment of final NPDES permit discharge limits applicable to post-mining discharges from the Ohiopyle Mine is dependant, among other things, upon the outcome of the Proposed TMDL Revision process, including approval by EPA. If the Proposed TMDL Revision is accepted in its current form, it is likely that KACC's proposed treatment system will achieve the TMDL-based permit discharge limits. However, no assurance can be given as to whether the Proposed TMDL Revision will be accepted in its current form or, if the Proposed TMDL Revision is rejected or changed as a result of public comment or EPA review, as to the discharge limits that may ultimately be established or the impact thereof on the proposed treatment system, the cost of treating the post-mining discharges from the Ohiopyle Mine or the cost of maintaining financial assurance for long-term operation, maintenance and replacement costs.

*Upriver Dam Settlement*

In June 2001, the Washington State Department of Ecology notified KACC that it was potentially liable for environmental contamination alleged to exist within the Spokane River in Spokane, Washington (the "Upriver Dam Site") as a result of wastewater discharged from KACC's facility in Trentwood. In November 2002, the Bankruptcy Court authorized KACC to enter into an agreement with Avista Development, Inc. ("Avista"), another party potentially liable for environmental contamination at the Upriver Dam Site, to perform a feasibility study to evaluate potential cleanup actions and to share certain costs related thereto. In January 2003, the Washington State Department of Ecology filed a complaint against KACC and Avista in the Superior Court of the State of Washington for Spokane County seeking to compel the defendants to remedy any environmental contamination of the Upriver Dam Site they caused. In addition, the State of Washington Filed a proof of Claim against KACC for approximately $6 million with regard to the alleged obligations to clean up the Upriver Dam Site and Avista Filed a proof of Claim against KACC for shared costs related thereto.

In March 2005, KACC agreed to the terms of a consent decree with the State of Washington and Avista, pursuant to which KACC will pay $1 million to Avista for use in funding the future cleanup costs of the Upriver Dam Site. In exchange, the suit against KACC by the Washington State Department of Ecology will be dismissed and the Debtors will receive a full release and discharge from any and all past and future claims by the State of Washington and Avista relating to the Upriver Dam Site. The Bankruptcy Court approved the consent decree in June 2005 and the consent decree will become effective upon the Spokane Superior Court's approval of a separate, but related, consent decree between Avista and Washington State Department of Ecology.

*Erie Property Transfer*

In April 2005, the Bankruptcy Court authorized KACC to transfer to the Greater Erie Industrial Development Corporation (the "GEIDC"), at no cost, certain real property in Erie, Pennsylvania (the "Erie Property") and certain improvements thereon, including an aluminum forging plant, which, before the transfer, was leased by KACC to Accuride-Erie L.P. ("Accuride-Erie"), an affiliate of Accuride Corporation ("Accuride"). The transfer of the Erie Property occurred on June 22, 2004. In exchange for the transfer and other consideration, the GEIDC and Erie Land Holding, Inc. ("ELH"), another affiliate of Accuride, agreed to, among other things, pay for (a) an environmental assessment of the Erie Property, (b) if necessary, related remediation work on the Erie Property to bring it in compliance with applicable environmental laws and regulations, and (c) a pollution legal liability select insurance policy regarding the Erie Property, with an initial aggregate policy limit of at least $20 million, under which the GEIDC, KACC, Accuride, Accuride-Erie and ELH are named insureds. KACC will be responsible for any remediation work outside of the Erie Property that is required by the Pennsylvania Department of Environmental Protection to the extent (i) such off-site remediation work results from a pollution condition that is migrating or has migrated from a closed former wastewater pond on the Erie Property and (ii) the costs of such off-site remediation work exceed $640,000. KACC also remains responsible for payment of a $50,000 deductible if a valid claim is made under the insurance policy for costs resulting from historic activities of KACC. In connection with this transaction, KACC, Accuride, Accuride-Erie and a related affiliate entered into a settlement agreement resolving and/or releasing mutual claims against one another related to the lease and operations of the forging plant on the Erie Property, including any rejection damages Claim resulting from KACC's rejection of Accuride-Erie's lease of this property.

*Mica Landfill Superfund Site Settlement*

In ~~July~~August 2005, the ~~Debtors Filed a motion to approve~~Bankruptcy Court approved a consent decree settling certain environmental Claims of the United States of America (on behalf of the EPA) and the State of Washington against KACC relating to a solid waste landfill near Spokane, Washington (the "Mica Landfill Superfund Site") and a settlement agreement regarding more than $17 million of environmental Claims of Spokane County, Washington relating to that site. Pursuant to the consent decree, the United States of America (on behalf of the EPA) will be allowed General Unsecured Claim (Class 9) against KACC in the amount of $68,000 in exchange for a covenant by the EPA and the State of Washington not to bring a civil or administrative action against the Debtors or their successors with respect to the Mica Landfill Superfund Site pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and certain other similar federal and state laws. Pursuant to the settlement agreement, Spokane County will be allowed a General Unsecured Claim (Class 9) against KACC in the amount of $3 million in exchange for a full release and discharge from any and all

past and future Claims by Spokane County related to the Mica Landfill Superfund Site. ~~The Bankruptcy Court is scheduled to consider the motion to approve such consent decree and settlement agreement in late August 2005.~~

### Unfair Labor Practice Settlement

In connection with a USW strike and subsequent lock-out by KACC, which was settled in September 2000, the USW filed certain allegations of unfair labor practices with the National Labor Relations Board (the "NLRB"). A trial before an administrative law judge on certain of the allegations concluded in September 2001. In May 2002, the administrative law judge ruled against KACC and recommended that the NLRB award back pay and interest on behalf of workers who were displaced in the lockout. KACC appealed the ruling of the administrative law judge to the NLRB. In January 2004, as part of KACC's settlement with the USW with respect to pension and retiree medical benefits, KACC and the USW agreed to settle the case pending before the NLRB, subject to approval of the General Counsel of the NLRB and the Bankruptcy Court and ratification by the USW's members. The settlement was subsequently ratified by the union members in February 2004 and is pending final approval by the General Counsel of the NLRB. Pursuant to the agreement, upon approval of the settlement by the General Counsel of the NLRB and solely for the purposes of determining distributions under the Plan, the NLRB will be deemed to have an Allowed General Unsecured Claim in Class 9 in the amount of $175 million. For a discussion of the treatment of such Claim, see "Overview of the Plan — Classes and Treatment of Claims and Interests," and for a discussion of distributions in respect of such Claim, see "Distributions Under the Plan — Timing and Calculation of Amounts To Be Distributed — NLRB ~~Claim~~Claims."

### NLRB Erie Claim

The NLRB also Filed a separate Claim against KACC based upon an August 1998 settlement agreement resolving, without the admission of liability, certain unfair labor practice allegations related to the closure of KACC's aluminum extrusion facility located in Erie, Pennsylvania. The settlement agreement provided for payment of certain sums to 48 former KACC employees and a total of 16 employees accepted settlement payments in 1998. The remaining employees elected to postpone receipt of their settlement amounts pending the result of their related civil action against KACC. In November 2002, the civil suit was decided in KACC's favor. The NLRB's Claim asserts that KACC failed to pay approximately $248,000 in settlement funds to the NLRB and that KACC had agreed to hold such funds in escrow for the benefit of the 32 former employees who had not previously accepted settlement payments. The NLRB's Claim reserved the right to assert that the settlement funds alleged to be owed to the NLRB are not property of KACC's Estate. The Debtors anticipate that, unless the parties can agree to the treatment of this Claim, the NLRB will initiate an adversary proceeding in the Bankruptcy Court seeking return of the settlement funds on the theory that such funds are not property of KACC's estate.

### Settlement with National Refractories

In May 2004, the Bankruptcy Court approved a settlement agreement among KACC, National Refractories & Minerals Corporation ("National Refractories") and certain other entities relating to claims resulting from the 1984 sale of certain real and personal property of KACC located in the United States of America, Canada and Mexico. National Refractories and certain affiliates filed for bankruptcy protection in 2001. KACC filed proofs of claim in the National Refractories bankruptcy cases that totaled more than $20 million. National Refractories Filed multiple Claims against KACC for unliquidated amounts related to breach of contract Claims and other alleged damages. In accordance with the settlement agreement, the parties withdrew their respective claims against one another and KACC received $1.25 million.

### Hatch and Lexington Settlement

In November 2004, the Bankruptcy Court approved a settlement agreement among Hatch Associates, Inc. and Hatch Associates Consultants, Inc. (together, "Hatch"), Lexington Insurance Company ("Lexington") and KACC. The comprehensive settlement resolved certain claims and lawsuits between the parties related to the reconstruction of Gramercy, as well as KACC's preference claims against Hatch. Pursuant to the settlement agreement: (a) KACC received $9 million from Lexington and $575,000 from Hatch; and (b) Hatch was granted an Allowed General Unsecured Claim (Class 9) of approximately $5 million. For a discussion of the treatment of such Claim, see "Overview of the Plan — Classes and Treatment of Claims and Interests."

### Settlement of the Value of the Secured Portion of the 7.60% SWD Revenue Bond Claims

In 1997, Spokane County, Washington issued the 7.60% SWD Revenue Bonds and contemporaneously loaned the proceeds to KACC pursuant to a loan agreement dated March 1, 1997. To secure KACC's obligations under such loan agreement, KACC executed a deed of trust granting Spokane County a security interest in certain real and personal property located at the Mead Smelter (the "Spokane Collateral"). Thereafter, Spokane County assigned its rights under such security interest to the 7.60% SWD Revenue Bond Indenture Trustee.

In February 2004, KACC sought Bankruptcy Court approval of bidding procedures for the sale of certain property related to the Mead Smelter. The 7.60% SWD Revenue Bond Indenture Trustee Filed an objection pursuant to which it sought to have allocated to it any sale proceeds attributable to the Spokane Collateral. In May 2004, the Bankruptcy Court approved the sale and the property related to the Mead Smelter was sold for consideration of approximately $7 million. The Bankruptcy Court ordered that $4 million of the sale proceeds be held in escrow as protection until such time as the value of the Spokane Collateral was determined. Appraisals of the value of the Spokane Collateral were subsequently submitted to the Bankruptcy Court by the 7.60% SWD Revenue Bond Indenture Trustee and by KACC and, in February 2004, the parties agreed to a compromise, valuing the Spokane Collateral at $1.6 million. On May 9, 2005, the Bankruptcy Court approved the parties' settlement, pursuant to which (a) the 7.60% SWD Revenue Bond Indenture Trustee received $1.6 million for the benefit of the holders of 7.60% SWD Revenue Bonds, (b) the 7.60% SWD Revenue Bond Indenture Trustee is entitled to File a motion seeking payment of its fees, charges and expenses from KACC, although KACC may oppose such motion and (c) the 7.60% SWD Revenue Bond Claims are to be allowed as General Unsecured Claims (Class 9) in the total amount of approximately $18 million. For a discussion of the treatment of such Claims, see "Overview of the Plan — Classes and Treatment of Claims and Interests."

### Recovery Actions

A number of prepetition transactions occurred that the Debtors believe may have given rise to preference actions under sections 547 and 550 of the Bankruptcy Code. A debtor may seek to avoid and recover certain prepetition payments and other transfers made by the debtor to or for the benefit of a creditor in respect of an antecedent debt, if such transfer (a) was made when the debtor was insolvent and (b) enabled the creditor to receive more than it would receive in a hypothetical liquidation of the debtor in a chapter 7 where the transfer had not been made. Transfers made to a creditor that was not an "insider" of the debtor are generally only subject to these provisions if the payment was made within 90 days prior to the debtor's filing of a petition under chapter 11. Under section 547 of the Bankruptcy Code, certain defenses, in addition to the solvency of the debtor at the time of the transfer and the lack of preferential effect of the transfer, are available to a creditor from which a preference recovery is sought. Among other defenses, a debtor may not recover a payment to the extent such creditor subsequently gave new value to the debtor on account of which the debtor did not, among other things, make an otherwise unavoidable transfer to or for the benefit of the creditor. A debtor may not recover a payment to the extent such payment was part of a substantially contemporaneous exchange between the debtor and the creditor for new value given to the debtor. Further, a debtor may not recover a payment if such payment was made, and the related obligation was incurred, in the ordinary course of business of both the debtor and the creditor. The debtor has the initial burden of proof in demonstrating the existence of all the elements of a preference, including its insolvency, at the time of the payment. The creditor has the initial burden of proof as to the aforementioned defenses.

The Debtors have conducted a review of invoices paid by the Debtors during the 90-day period prior to the Filing of their respective Reorganization Cases and have identified four parties that may have received preferential payments from the Debtors prior to the Petition Date (collectively, the "Preference Action Parties"). The Debtors have executed an agreement with each Preference Action Party to toll the statute of limitations with respect to the payments to such party. Notwithstanding the Debtors' ability to pursue these Recovery Actions, the Debtors are not certain that any payments will ultimately be recovered, and, even if all such payments are successfully recovered in full the cumulative recoveries would be less than $4 million.

### Additional Litigation Matters Involving KACC

KACC is involved in other litigation matters that may result in additional recoveries for the benefit of the Debtors' Estates. Among the pending cases are: (a) federal district court litigation regarding the potential recovery

of insurance premiums from Monument Select Insurance Company, which was recently settled with the remaining defendants for $218,000, and is currently the subject of a motion pending before the Bankruptcy Court; and (b) an adversary proceeding against Transcontinental Insurance Company and National Union Fire Insurance Company of Pittsburgh, P.A. for reimbursement of legal expenses in connection with the litigation that resulted from the 1999 explosion at Gramercy. The Debtors are unable to assure that any recoveries will be made in the aforementioned matters.

**Guaranty Subordination Dispute**

In 1993, KACC issued $400 million of the Senior Subordinated Notes, which were guaranteed by certain of the Debtors and the Alumina Subsidiary Debtors (such guaranty being referred to herein as the "Subsidiary Guaranty"). The Senior Subordinated Note Indenture contains, among other things, a detailed definition of "Senior Indebtedness," debt subordination provisions and guaranty provisions. Under the Senior Subordinated Note Indenture, holders of the Senior Subordinated Notes agreed "that all direct or indirect payments or distributions on or with respect to the Notes…is [sic]…subordinated…to the prior payment in full…of all Senior Indebtedness of [KACC]" and (b) "that all payments pursuant to [the Subsidiary Guaranty] are…subordinated…to the prior payment in full…of all Senior Indebtedness of such [s]ubsidiary [g]uarantor."

On August 16, 2004, the Senior Subordinated Note Indenture Trustee Filed a motion (the "Guaranty Subordination Classification Motion") with the Bankruptcy Court to determine the classification of the Senior Subordinated Note Claims in respect of the Subsidiary Guaranty under any plan or plans of reorganization Filed by the Debtors and Alumina Subsidiary Debtors that made such guaranty. The Guaranty Subordination Classification Motion asserted that the obligations to the holders of 9-7/8% Senior Notes and 10-7/8% Senior Notes in respect of the Subsidiary Guaranty do not constitute "Senior Indebtedness" under the applicable definitions in the Senior Subordinated Note Indenture and that, accordingly, the obligations on the guaranty of the Senior Subordinated Notes (*i.e.*, the Subsidiary Guaranty) and the guaranties of the 9-7/8% Senior Notes and 10-7/8% Senior Notes are entitled to *pari passu* distributions under the plans of reorganization Filed by the Debtors and the Alumina Subsidiary Debtors that made the Subsidiary Guaranty (including the Plan and the Alumina Subsidiary Plans). (The Senior Subordination Note Indenture Trustee did not contest the treatment of the classification of the Senior Note Claims as senior to the Senior Subordinated Note Claims at the KACC level.)

On September 3, 2004, the 9-7/8% Senior Note Indenture Trustee, the 10-7/8% Senior Note Indenture Trustee and an ad hoc group of holders of the Senior Notes (together, the "Senior Note Parties") Filed an adversary proceeding styled *U.S. Bank National Association v. Kaiser Aluminum & Chemical Corporation*, Adv. Pro. No. 04-55115 (JKF) (the "Guaranty Subordination Adversary Proceeding") with the Bankruptcy Court seeking a declaration that any payment rights of the Senior Subordinated Note Claims are subordinate to the Senior Note Claims or, alternatively, a reformation of the Senior Subordinated Note Indenture to provide that the Senior Subordinated Note Claims are junior to the Senior Note Claims. Pursuant to the Bankruptcy Court's order, on October 8, 2004, the Debtors and the Other Debtors Filed their response to the Guaranty Subordination Classification Motion and an answer in the Guaranty Subordination Adversary Proceeding (together with the Guaranty Subordination Motion, the "Guaranty Subordination Dispute") and the Creditors' Committee Filed its response to the Guaranty Subordination Classification Motion. In their respective responses, the Debtors and the Other Debtors and the Creditors' Committee supported the interpretation advanced by the Senior Note Parties. The Senior Note Parties also Filed responses opposing the Guaranty Subordination Classification Motion. Liverpool Limited Partnership, a holder of both 9-7/8% Senior Notes and Senior Subordinated Notes ("Liverpool"), also Filed a response to the Guaranty Subordination Classification Motion, asserting that only $100 million of the obligations to the holders of the 9-7/8% Senior Notes in respect of the Subsidiary Guaranty, plus associated interest and fees, constitute "Senior Indebtedness" under the Senior Subordinated Note Indenture based on the fact that there was a reduction of $100 million in the credit commitment under KACC's senior credit facility at the time the Subsidiary Guaranty was made. Liverpool therefore contended that, other than Claims arising under the Subsidiary Guaranty obligations in respect of $100 million of the principal amount of the 9-7/8% Senior Notes, Claims arising under the Subsidiary Guaranty obligations in respect of the 10-7/8% Senior Notes, the 9-7/8% Senior Notes and the Senior Subordinated Notes are entitled to *pari passu* distributions under the plans of reorganization Filed by the Debtors and the Alumina Subsidiary Debtors that made the Subsidiary Guaranty (including the Plan and the Alumina Subsidiary Plans).

In connection with the Guaranty Subordination Dispute and a dispute relating to the 7-3/4% SWD Revenue Bonds (see "— 7-3/4% SWD Revenue Bond Dispute"), the Senior Subordinated Note Indenture Trustee has asserted that, even if such disputes are ultimately resolved by the Bankruptcy Court in favor of the holders of Senior Note Claims, under the Senior Subordinated Note Indenture, including but not limited to the charging lien provisions thereunder, the Senior Subordinated Note Indenture Trustee will be entitled to the payment of its fees and expenses (including the fees and expenses of the Senior Subordinated Note Indenture Trustee's professionals) from any funds otherwise distributable to the holders of Senior Note Claims pursuant to the subordination provisions of the Senior Subordinated Note Indenture, without prejudice to the Senior Subordinated Note Indenture Trustee's right to assert, inter alia, that its fees and expenses constitute an administrative expense claim within the purview of sections 503 and 507 of the Bankruptcy Code. The Debtors do not agree with that assertion and believe, in such circumstances, that the contractual subordination provisions of the Senior Subordinated Note Indenture require the payment to holders of Senior Note Claims of all amounts that would otherwise be payable to or for the benefit of holders of Senior Subordinated Note Claims absent such provisions and that the Debtors are not required to make any payment in respect of the fees and expenses of the Senior Subordinated Note Indenture Trustee; if, however, the Bankruptcy Court determines that the assertion of the Senior Subordinated Note Indenture Trustee is correct, the ultimate recoveries to holders of Senior Note Claims may be reduced.

On October 25, 2004, the Bankruptcy Court held a status conference on the Guaranty Subordination Dispute and ordered the parties to attempt to consensually resolve the Guaranty Subordination Dispute, as well as the 7-3/4% SWD Revenue Dispute, through mediation. On November 18, 2004, the parties to the 7-3/4% SWD Revenue Bond Dispute participated in a day-long mediation, but the mediation concluded with no settlement having been reached.

On December 2, 2004, the Senior Subordinated Note Indenture Trustee Filed a motion in the Guaranty Subordination Adversary Proceeding requesting that the Bankruptcy Court order the parties to File briefs regarding the Guaranty Subordination Dispute by January 10, 2005 and hold an oral summary judgment argument on January 24, 2005.

On December 10, 2004, the Debtors, the Other Debtors and the Senior Note Parties Filed a joint motion to stay each of the Guaranty Subordination Adversary Proceeding and the 7-3/4% SWD Revenue Bond Dispute pending the completion of the confirmation process for the plans of liquidation for the Alumina Subsidiary Debtors and requesting that the Guaranty Subordination Dispute be adjudicated in connection with confirmation of such plans if the proposed settlement of the dispute to be included in each such plan was not accepted. On the same date, Liverpool requested that the Bankruptcy Court either (a) consolidate litigation concerning the Guaranty Subordination Dispute or (b) permit Liverpool to intervene as a defendant in the Guaranty Subordination Adversary Proceeding.

On January 24, 2005, the Bankruptcy Court stayed the Guaranty Subordination Adversary Proceeding and ruled that both the Guaranty Subordination Dispute and 7-3/4% SWD Revenue Bond Dispute would be adjudicated in connection with the confirmation of the Alumina Subsidiary Plans.

The Alumina Subsidiary Debtors filed the Alumina Subsidiary Plans on February 25, 2005 (see "— Strategic Plan to Sell Commodities Assets — The Sale of the Alpart Interests and Liquidation of AJI and KJC" and "— Strategic Plan to Sell Commodities Assets — The Sale of the QAL Interests and the Liquidation of KAAC and KFC"). The Alumina Subsidiary Plans each contained a proposed settlement of the Guaranty Subordination Dispute as it related to the Alumina Subsidiary Debtors, which provided that payments in the aggregate amount of $16 million would be made to holders of Senior Note Claims and Senior Subordinated Note Claims if both voted to accept both Alumina Subsidiary Plans and such plans were confirmed and consummated. The holders of the Senior Subordinated Note Claims failed to accept either Alumina Subsidiary Plan and, therefore, in accordance with such plans, the Bankruptcy Court will resolve the Guaranty Subordination Dispute with respect to the Alumina Subsidiary Debtors and determine the distributions to be made to the holders of Senior Note Claims and any distributions to be made to holders of Senior Subordinated Note Claims under the Alumina Subsidiary Plans.

Evidentiary hearings on the Alumina Subsidiary Debtors' request for confirmation of the Alumina Subsidiary Plans and the Guaranty Subordination Dispute were held on April 13, 2005, April 27, 2005 and May 2, 2005. During the hearing on April 27, 2005, the Bankruptcy Court, ruling from the bench, ruled against the position asserted by Liverpool and established a schedule for the parties to such dispute to submit additional pleadings

regarding the position asserted by the holders of Senior Subordinated Notes. All additional pleadings have since been submitted to the Bankruptcy Court. It is anticipated that the Bankruptcy Court will rule on both the requests for confirmation of the Alumina Subsidiary Plans and the Guaranty Subordination Dispute, but no assurance can be given as to when or how the Bankruptcy Court will so rule. For purposes of this Disclosure Statement, it is assumed that the Alumina Subsidiary Plans will be confirmed and become effective immediately prior to the effectiveness of the Plan.

There is no dispute as to the relative priorities of the Senior Subordinated Note Claims and the Senior Note Claims against KACC (as opposed to the subsidiary guarantors), as all parties to the Guaranty Subordination Dispute have acknowledged and agreed that the Senior Subordinated Note Claims against KACC are subordinate to the Senior Note Claims against KACC. Confirmation of the Plan will not impair the rights or arguments of any party to the Guaranty Subordination Dispute, and all such rights and arguments will be preserved notwithstanding Confirmation of the Plan.

**7-3/4% SWD Revenue Bond Dispute**

On January 13, 2004, the 7-3/4% SWD Revenue Bond Indenture Trustee and certain holders of the 7-3/4% SWD Revenue Bonds (collectively, the "7-3/4% SWD Revenue Bond Plaintiffs") Filed an adversary proceeding styled *Paul J. Guillot v. Kaiser Aluminum & Chemical Corporation*, Adv. Pro. No. 04-51165 (JKF) (the "7-3/4% SWD Revenue Bond Dispute") against the Senior Subordinated Note Indenture Trustee and KACC. At issue was whether KACC properly designated the 7-3/4% SWD Revenue Bonds as senior indebtedness under the Senior Subordinated Note Indenture or whether the 7-3/4% SWD Revenue Bonds were otherwise entitled to treatment as senior indebtedness vis-à-vis the Senior Subordinated Notes. It was the position of the 7-3/4% SWD Revenue Bond Plaintiffs that the holders of the 7-3/4% SWD Revenue Bonds had subordination claims in respect of any distributions on the Senior Subordinated Notes under the Plan. In response to the complaint, KACC stated that it had not been able to confirm that it provided the Senior Subordinated Note Indenture Trustee with a written designation that the 7-3/4% SWD Revenue Bonds constituted senior indebtedness, which designation would have subordinated the indebtedness under the Senior Subordinated Notes to the indebtedness under the 7-3/4% SWD Revenue Bonds.

On March 26, 2004, the Senior Subordinated Note Indenture Trustee Filed a motion to dismiss the 7-3/4% SWD Revenue Bond Dispute for failure to join necessary parties such as the 9-7/8% Senior Note Indenture Trustee and the 10-7/8% Senior Note Indenture Trustee. On May 4, 2004, the 7-3/4% SWD Revenue Bond Plaintiffs Filed a motion for summary judgment, requesting that the Bankruptcy Court either: (a) declare that KACC be deemed to have submitted the appropriate designation of senior indebtedness; (b) order KACC to designate the 7-3/4% SWD Revenue Bonds as senior indebtedness; or (c) declare that the 7-3/4% SWD Revenue Bonds are senior in terms of payment priority to the Senior Subordinated Notes. Shortly thereafter, the Senior Subordinated Note Trustee Filed a motion to stay all proceedings pending the Bankruptcy Court's decision on the motion to dismiss the 7-3/4% SWD Revenue Bond Dispute. KACC subsequently joined the motion to stay proceedings.

On October 25, 2004, the Bankruptcy Court held a status conference on the 7-3/4% SWD Revenue Bond Dispute and ordered the parties to attempt to consensually resolve such dispute, as well as the Guaranty Subordination Dispute, through mediation. On November 18, 2004, the parties to the 7-3/4% SWD Revenue Bond Dispute participated in a day-long mediation but failed to reach a settlement.

On November 29, 2004, the Bankruptcy Court entered orders permitting each of the 9-7/8% Senior Note Indenture Trustee and the 10-7/8% Senior Note Indenture Trustee to intervene as a defendant in the adversary proceeding and denying the Senior Subordinated Note Indenture Trustee's motion to dismiss the 7-3/4% SWD Revenue Bond Dispute.

On December 10, 2004, the Debtors, the Other Debtors and the Senior Note Parties Filed a joint motion to stay each of the 7-3/4% SWD Revenue Bond Dispute and the Guaranty Subordination Adversary Proceeding pending the completion of the confirmation process for the plans of liquidation for the Alumina Subsidiary Debtors and requesting that the 7-3/4% SWD Revenue Bond Dispute be adjudicated, along with the Guaranty Subordination Dispute if necessary, in connection with the confirmation of such plans.

On December 17, 2004, the Senior Subordinated Note Indenture Trustee ~~filed~~Filed an answer in the 7-3/4% SWD Revenue Bond Dispute that included, among other things: (a) a counterclaim for a declaratory judgment that the 7-3/4% SWD Revenue Bonds are not senior to the Senior Subordinated Notes; (b) a counterclaim against the 7-3/4% SWD Revenue Bond Plaintiffs for reimbursement of legal expenses incurred by the Senior Subordinated Note Indenture Trustee; (c) a cross claim against KACC for indemnification in the amount of any judgment that may be rendered in favor of the 7-3/4% SWD Revenue Bond Plaintiffs against the Senior Subordinated Note Indenture Trustee; and (d) a complaint against certain of the Debtors and Other Debtors for indemnification in the amount of any judgment that may be rendered in favor of the 7-3/4% SWD Revenue Bond Plaintiffs against the Senior Subordinated Note Indenture Trustee.

On January 24, 2005, the Bankruptcy Court stayed the 7-3/4% SWD Revenue Bond Dispute and ruled that the 7-3/4% SWD Revenue Bond Dispute and the Guaranty Subordination Dispute would be adjudicated in connection with the confirmation of the Alumina Subsidiary Plans. In connection with the development and proposal of the Alumina Subsidiary Plans, representatives of certain of the holders of Senior Note Claims and 7-3/4% SWD Revenue Bonds entered into negotiations in an attempt to reach a settlement in respect of the 7-3/4% SWD Revenue Bond Dispute. In early February, such representatives reached an agreement on a proposed settlement of that dispute (*i.e.*, the 7-3/4% SWD Revenue Bond Settlement).

On April 13, 2005, in conjunction with the beginning of the confirmation process for the Alumina Subsidiary Plans, the Bankruptcy Court, from the bench, indicated that it would approve the 7-3/4% SWD Revenue Bond Settlement. On June 2, 2005, the Bankruptcy Court entered an order approving the 7-3/4 SWD Revenue Bond Settlement and dismissing with prejudice the 7-3/4% Revenue Bond Dispute, which order, by its terms, will not become effective until an order is entered confirming the joint plan of liquidation for AJI and KJC and the joint plan of liquidation for KAAC and KFC. Under that order, the dismissal of the 7-3/4% Revenue Bond Dispute is contingent upon consummation of the 7-3/4% SWD Revenue Bond Settlement, which will be deemed to occur on the last to occur of the effective date of each of the Alumina Subsidiary Plans and the Effective Date.

The 7-3/4% SWD Revenue Bond Settlement contemplates that, under any plan of reorganization for KACC (including the Plan), the holders of Claims against KACC in respect of the 7-3/4% SWD Revenue Bonds and the Senior Notes will share pro rata in any recoveries to which either would be entitled pursuant to the contractual subordination provisions of the Senior Subordinated Note Indenture. In accordance therewith, the Plan provides that, notwithstanding any other provision thereof, the aggregate amount of consideration that would be otherwise be payable to the holders of Senior Subordinated Note Claims in the absence of the contractual subordination provisions of the Senior Subordinated Note Indenture will be distributed to holders of Allowed Senior Note Claims and holders of Allowed 7-3/4% SWD Revenue Bond Claims on a pro rata basis, based upon the relative allowed amounts of such Claims against KACC, as set forth in Section 2.16 of the Plan (which is described above under "Overview of the Plan — Classes and Treatment of Claims and Interests — Allowed Amount of Certain Claims").

The 7-3/4% SWD Revenue Bond Settlement also contains a resolution of the 7-3/4% SWD Revenue Bond Dispute as it relates to the Alumina Subsidiary Debtors and, in accordance therewith, because the holders of Senior Note Claims have voted to accept both Alumina Subsidiary Plans, if all holders of Allowed Senior Note Claims are entitled under such plans to identical treatment in respect of contractual subordination claims under the Senior Subordinated Note Indenture or otherwise agree, the aggregate amount of consideration that would otherwise be payable to holders of Senior Subordinated Note Claims in the absence of the subordination provisions of the Senior Subordinated Note Indenture will be distributed to holders of Allowed Senior Note Claims and holders of Allowed 7-3/4% SWD Revenue Bond Claims on a pro rata basis, based upon the relative allowed amounts of such Claims against AJI and KJC or KACC and KFC, as the case may be. Notwithstanding the foregoing, in no event will the aggregate amount so paid to holders of 7-3/4% SWD Revenue Bonds Claims under the Alumina Subsidiary Plans exceed $8 million.

**Intercompany Claims Settlement**

The operations of KAC and its subsidiaries, which included transactions with the Joint Ventures and the use of a centralized cash management system, gave rise to a significant number of intercompany transactions, which were accounted for as intercompany receivables and payables. Because many of the intercompany accounts reflected an aggregate of activity over many years, the account balances for these intercompany receivables and payables in many cases were substantial, in some cases aggregating more than $1 billion. In addition to the complex

nature of the transactions and the significant amounts involved, there were numerous legal theories and arguments that could be advanced to support varying treatments of all or a portion of these intercompany account balances or to apply principles of setoff or recoupment to eliminate or substantially reduce certain of these intercompany account balances. Issues also existed with respect to claims of the Debtors and the Other Debtors against another Debtor or Other Debtor that arose after the Petition Date, including, among other issues: (a) whether to "synchronize" the Petition Dates for all of the Debtors and the Other Debtors or otherwise how to treat such claims that arose after the commencement of the Reorganization Cases of the Original Debtors in 2002 but prior to the commencement of Reorganization Cases of the Additional Debtors in 2003; (b) how certain costs or services funded by KACC but also accruing to the benefit of other Debtors and Other Debtors as well (*e.g.*, professional fees and costs incurred in the chapter 11 cases, overhead costs and the fees associated with the DIP Financing Facility and the prior postpetition financing facility of the Debtors and the Other Debtors) should be allocated among the Debtors and the Other Debtors; and (c) whether the subsidiaries of KAC and KACC should reimburse them for the use of substantial federal income tax attributes, including net operating losses.

On October 5, 2004, the Debtors, the Other Debtors and the Creditors' Committee entered into a settlement and release agreement that resolved all of these issues (*i.e.*, the Intercompany Claims Settlement), thereby eliminating the potential costs, uncertainties and potential delays that could have resulted had each of these issues been left for resolution through litigation. On October 14, 2004, the Debtors, the Other Debtors and the Creditors' Committee jointly Filed a motion to approve the Intercompany Claims Settlement (the "Joint ICS Motion"). Objections to the Joint ICS Motion were Filed by numerous parties, many of which were resolved by a January 27, 2005 amendment to the Intercompany Claims Settlement. The Bankruptcy Court entered an order approving the Intercompany Claims Settlement on February 1, 2005 (*i.e.*, the Intercompany Claims Settlement Order), which was subsequently amended by an order of the Bankruptcy Court entered on February 15, 2005. The terms of Intercompany Claims Settlement became effective on February 28, 2005 and, in accordance therewith, among other things:

- All claims of the Debtors and the Other Debtors against another Debtor or Other Debtor, whether incurred prior to, on or after the Petition Date, except as otherwise described below, were satisfied and resolved, including but not limited to claims: (a) under the Cash Management Order, the Joint Venture Order and the AJI and KJC Stipulation; (b) under or related to intercompany transfers; (c) related to the allocation among the Debtors and the Other Debtors of professional fees and expenses, overhead expenses or costs relating to the DIP Financing Facility and the prior postpetition financing facility of the Debtors and the Other Debtors; (d) for contribution, reimbursement or subrogation against a Debtor or Other Debtor related to or arising out of claims of third parties existing (whether or not affirmatively asserted) against any of the Debtors or the Other Debtors who are or are alleged to be co-obligors as to such claims, whether as a result of equity, contract (including guarantees) or statute, including but not limited to claims arising as a result of being within the same "controlled group" under ERISA; and (e) based upon, relating to or arising from the negotiation, documentation and execution of the terms and conditions contained in the Intercompany Claims Settlement, or any of the documents contemplated by the Intercompany Claims Settlement.

- Upon the closing of the sale of Alpart, KACC received Cash proceeds of approximately $43 million. See "Operations During the Reorganization Cases — Strategic Plan to Sell Commodities Assets — The Sale of the Alpart Interests and Liquidation of AJI and KJC."

- Following the consummation of the joint plan of liquidation for AJI and KJC, it is anticipated that KACC will be entitled to receive $1 million on account of its allowed administrative claims against AJI and KJC. For purposes of this Disclosure Statement, it is assumed that the Alumina Subsidiary Plans will be confirmed and become effective immediately prior to the effectiveness of the Plan. See "Operations During the Reorganization Cases — Strategic Plan to Sell Commodities Assets — The Sale of the Alpart Interests and Liquidation of AJI and KJC."

- Following the consummation of the joint plan of liquidation for KAAC and KFC, it is anticipated that KACC will be entitled to receive $25 million on account of its allowed administrative claim against KAAC. For purposes of this Disclosure Statement, it is assumed that the Alumina Subsidiary Plans will be confirmed and become effective immediately prior to the effectiveness of

the Plan. See "Operations During the Reorganization Cases — Strategic Plan to Sell Commodities Assets — The Sale of the QAL Interests and Liquidation of KAAC and KFC."

- Of the $12.5 million net proceeds realized from KACC and KBC's sale of the Combined KJBC/Gramercy Assets, $8.5 million was retained by KACC, and $4 million was paid to AJI and KJC in satisfaction of their administrative claims against KBC. See "Operations During the Reorganization Cases — Strategic Plan to Sell Commodities Assets — The Sale of the KJBC Interests and Gramercy Facility."

- All the proceeds realized from the sale of KACC's interests in and related to Valco were retained by KACC. See "Operations During the Reorganization Cases — Strategic Plan to Sell Commodities Assets — The Sale of the Valco Interests."

- The KFC Claim will be allowed as a valid, enforceable Unsecured Claim in the amount of $1.106 billion and will receive the same treatment as an Allowed General Unsecured Claim under the Plan, and 75% of the KFC Claim will be assigned to the PI Trusts on the Effective Date. See "Overview of the Plan — Intercompany Claims Settlement."

- KACC is responsible for all costs relating to the administration of all the Debtors' and the Other Debtors' bankruptcy cases, including professional fees and expenses, the fees and expenses associated with the DIP Financing Facility and the prior postpetition financing facility of the Debtors and the Other Debtors and all corporate overhead. Notwithstanding the foregoing, the Other Debtors must pay (or reimburse KACC for the payment of) all third-party costs incurred solely in connection with the administration of their chapter 11 cases that are incurred after June 30, 2004 (excluding any success fees of any financial advisors or any monthly fees creditable against the success fees of the financial advisors of the Debtors and the Creditors' Committee). AJI and KJC remained responsible for payment of all foreign taxes, transfer taxes and recording fees payable by them as a result of the sale of Alpart, and KAAC remained responsible for payment of all foreign taxes, transfer taxes and recording fees payable by it as a result of the sale of the QAL Interests, as well as any alternative minimum tax due from KACC as a result of the sale of AJI's and KJC's interests in and related to Alpart and the sale of the QAL Interests. The Other Debtors must also each pay all foreign taxes payable by such entity, whether for current or prior tax years. On April 7, 2005, the ATO sent a letter to KAAC's Australian tax advisor indicating that (a) with respect to taxable periods through December 31, 2004, KAAC's Australian tax liability has been fully satisfied, and (b) with respect to the taxable period beginning January 1, 2005, no capital gains tax is due on the sale of KAAC's interests in and related to QAL.

- KAAC must also pay portions of the success fees payable to the financial advisors of the Debtors and the Creditors' Committee, if any, in excess of certain threshold amounts.

- On the earlier of the Effective Date or the consummation of the joint plan of liquidation of KAAC and KFC, KACC will pay the allowed administrative claims of the PBGC in the amount of $14 million. See "Overview of the Plan — Payment of Administrative Claims — PBGC Administrative Claims" and "Operations During the Reorganization Cases — PBGC Settlement Agreement." For purposes of this Disclosure Statement, it is assumed that the Alumina Subsidiary Plans will be confirmed and become effective immediately prior to the effectiveness of the Plan and, therefore, that KACC will pay $14 million in full satisfaction of such claims on the Effective Date.

- The past, present or future directors and officers of the Debtors and the Other Debtors were released from those claims arising at any time prior to the effective date of the Intercompany Claims Settlement: (a) under the Cash Management Order, the Joint Venture Order and the AJI and KJC Stipulation; (b) under or related to intercompany transfers; (c) related to the allocation among the Debtors and the Other Debtors of professional fees and expenses, overhead expenses or costs relating to the DIP Financing Facility and the prior postpetition financing facility of the Debtors and the Other Debtors; (d) based upon, relating to or arising from the negotiation,

65

documentation and execution of the terms and conditions contained in the Intercompany Claims Settlement or any of the documents delivered to implement the Intercompany Claims Settlement; and (e) for contribution, reimbursement or subrogation related to or arising out of claims of third parties based upon items (a) through (d) against any of the Debtors or the Other Debtors who are alleged to be co-obligors, whether as a result of equity, contract (including guarantees) or statute, including but not limited to claims arising as a result of being within the same "controlled group" under ERISA.

For a detailed discussion of the Intercompany Claims Settlement, see the Joint ICS Motion, and for a summary thereof, see the supplemental notice regarding the hearing on the Joint ICS Motion, which was served on all parties in interest on December 27-28, 2004. The Joint ICS Motion and such supplemental notice, as well as the January 27, 2005 amendment to the Intercompany Claims Settlement, are available to the public over the Internet on the Document Website (www.kaiseraluminum.com).

The Intercompany Claims Settlement did not affect any claim by any Debtor against any of its non-Debtor affiliates or by any such affiliate against a Debtor. There are four inactive, non-Debtor affiliates with prepetition claims against KACC in an aggregate amount of less than $50,000 and three such affiliates with prepetition claims against other Debtors aggregating less ~~that~~than $1 million. It is anticipated that all such claims other than two claims against Canadian Debtors will be distributed by the non-Debtor affiliates to KACC on or shortly after the Effective Date. Subject to the Restructuring Transactions, the claims against the Canadian Debtors will continue to be outstanding following the Effective Date. In addition, KACC owes approximately $11.5 million to its captive insurance subsidiary, Trochus, which, due to regulatory requirements, will continue as an obligation of Reorganized KACC following the Effective Date. Certain of the Debtors hold claims aggregating about $8 million against nine non-Debtor affiliates. Because these non-Debtor affiliates are inactive and have no substantial assets, no ultimate recovery on these claims from the non-Debtor affiliates is anticipated.

## PI TRUSTS AND DISTRIBUTION PROCEDURES

**Background**

### *Asbestos-Related Liabilities*

The Debtors' asbestos-related liabilities arise from former operations of KACC. As of KACC's Petition Date, an aggregate of approximately 247,000 asbestos-related personal injury lawsuits had been asserted against KACC since receipt of the first such claim in the late 1970's. After elimination of duplicates, approximately 104,000 Asbestos Personal Injury Claims remained unresolved as of KACC's Petition Date, including approximately 11,000 Claims for which KACC had received releases but had not fully satisfied its payment obligations to the claimants. See "— Asbestos Personal Injury Claim Settlement Processing Agreements." No claim for asbestos-related property damage or abatement costs has ever been Filed against any of the Debtors.

The Asbestos Personal Injury Claims fall within three categories:

- "Product Claims" that arise almost exclusively from asbestos-containing products sold by KACC's former division, Kaiser Refractories ("Kaiser Refractories");

- "Premises Claims" of employees or outside contractors who allege exposure to asbestos-containing materials at premises owned by KACC or its subsidiaries; and

- "Ships Claims" that arise from workers' alleged exposure to asbestos-containing materials during the building, repair or management of ships by KACC or its subsidiaries.

### *Product Claims*

Over 97% of the historical asbestos-related personal injury lawsuits against KACC have involved claims based on product liability theories of recovery ("Asbestos-Related Product Claims"). Settlements of Asbestos-Related Product Claims represent approximately 90% of amounts paid by KACC to resolve historical asbestos-related personal injury lawsuits. KACC had only three divisions that ever had any involvement with asbestos containing products, and only one of those, Kaiser Refractories, had any products that resulted in payment on claims.

- <u>Kaiser Refractories' Products</u>: Products made or sold by Kaiser Refractories, a former division of KACC, are the source of nearly all the Asbestos-Related Product Claims. KACC entered the refractories business in 1943, making bricks, mortars and aggregates, the primary function of which was to line the interior of melting and processing furnaces, vessels and kilns of basic industries. The company's early refractories were magnesium-based and did not contain asbestos. In 1959, KACC acquired Mexico Refractories Company by merger. Kaiser Refractories functioned as an unincorporated operating division of KACC until KACC left the refractories business. Neither Mexico Refractories Company nor Kaiser Refractories mined, processed or sold raw asbestos, manufactured asbestos-containing insulation products, or designed, developed or first marketed any asbestos-containing product. Rather, Kaiser Refractories inherited rebranding arrangements from Mexico Refractories Company through which other companies made and supplied to Kaiser Refractories a handful of insulation products that contained a small percentage of asbestos, which Kaiser Refractories sold under its brand name. In later years, Kaiser Refractories made and sold one refractory plastic ramming product containing one percent asbestos and refractory bricks that, in certain applications, utilized asbestos expansion allowances. Kaiser Refractories did not sell any asbestos-containing products after 1978, and KACC sold off its refractories business in December 1984.

- <u>Mirawal Products</u>: Fewer than ten historical Asbestos-Related Product Claims asserted against KACC alleged injury from products once sold by KACC's former Mirawal operation, which KACC began in 1966 when it purchased certain assets of Birdsboro Corporation. The Mirawal operation sold architectural building panels and siding manufactured between 1968 and 1977,

some of which were offered for sale with an optional asbestos cement core sandwiched between the decorative panels that formed the outer surfaces of the product. KACC has never settled any of the handful Asbestos-Related Product Claims attributed to its former Mirawal operation. KACC ceased those operations and sold off the related assets in 1977.

- Kaiser Trading Company Commodities Sales: KACC once had a wholly owned subsidiary known as Kaiser Trading Company, which engaged in international commodities trading. KACC has determined that, in 1978, Kaiser Trading Company imported and sold an aggregate of less than $75,000 worth of chrysotile asbestos fiber to five customers in the United States of America. A later series of internal mergers ultimately resulted in merging what had been Kaiser Trading Company into Kaiser Aluminium International, Inc. (which is a Debtor). After diligent research, KACC has found no evidence of any other transactions involving asbestos to which Kaiser Trading Company or any successor thereto is a party. To the best of the Debtors' knowledge, no Asbestos Personal Injury Claim has ever been filed alleging liability for any sale of asbestos fiber by Kaiser Trading Company or any successor thereto, including Kaiser Aluminium International, Inc.

*Premises Claims*

Approximately 2% of the historical asbestos-related personal injury lawsuits against KACC involved claims alleging exposure to asbestos-containing materials at KACC-owned facilities mainly in the State of Louisiana and the State of West Virginia ("Asbestos-Related Premises Claims"). As of KACC's Petition Date, an aggregate of approximately 5,200 Asbestos-Related Premises Claims had been asserted against KACC, of which fewer than 900 were then still pending. More than three-quarters of the pending Asbestos-Related Premises Claims were filed in Louisiana. The Louisiana Asbestos-Related Premises Claims also included liability allegations against former so-called "executive officers" of KACC to whom responsibility for plant safety issues allegedly had been delegated; KACC defended and indemnified these "executive officers" sued in such cases. The settlement of Louisiana Asbestos-Related Premises Claims represents approximately 95% of all amounts paid by KACC to resolve Asbestos-Related Premises Claims.

In addition to the Asbestos-Related Premises Claims described above, a small number of Asbestos-Related Premises Claims have been filed against KCI, a wholly owned subsidiary of KACC that owned and managed the office facilities in Oakland, California where KACC once was headquartered. These Claims were brought by workers who claimed exposure to asbestos-containing materials allegedly present at these premises. KACC was sometimes sued as a co-defendant in such Asbestos-Related Premises Claims.

*Ships Claims*

Approximately 1% of the historical asbestos-related personal injury lawsuits asserted against KACC involved claims alleging asbestos exposure to persons working on ships built, repaired or managed by KACC ("Asbestos-Related Ships Claims"). As described more fully below, the Asbestos-Related Ships Claims arise principally from KACC's construction and repair of ships in the 1940's, but have also arisen from its management of ships through a former subsidiary known as Hendy International Corporation. All Asbestos-Related Ships Claims combined represent approximately 0.4% of all historical amounts paid by KACC to resolve asbestos-related personal injury lawsuits.

- Richmond, California Shipyards: Most of the Asbestos-Related Ships Claims were filed in the San Francisco Bay area and alleged asbestos exposure of persons who built, repaired or served on Liberty or Victory Ships built at Richmond, California Shipyard Nos. 1 and 2. These shipyards were operated by KACC from 1940, when it was originally incorporated under the name Todd-California Shipbuilding Corporation, until 1946, when the company exited the shipbuilding and repair business and entered the aluminum business.

- Hendy International Corporation: A relatively small number of Asbestos-Related Ships Claims also have been asserted against KACC in connection with the ship management operations of Hendy International Company, which became a wholly owned subsidiary of KACC in 1972. Substantially all of the Hendy International assets were sold to West Coast Shipping in 1977.

The Asbestos Personal Injury Claims will be resolved in accordance with the terms of the Asbestos Distribution Procedures and the Asbestos PI Channeling Injunction to be established as part of the Plan. For a discussion of the Asbestos Distribution Procedures and Asbestos PI Channeling Injunction, see "— PI Trust Distribution Procedures" and "— PI Channeling Injunctions — Asbestos PI Channeling Injunction."

### *Silica-Related Liabilities*

KACC has been named in lawsuits alleging personal injuries from exposure to silica-containing products made or sold by Kaiser Refractories, a former KACC division. Some of the bricks, mortars and aggregates once made or sold by Kaiser Refractories contained crystalline silica as part of the chemical composition of the clays or other ingredients used in the products. Generally, the crystalline silica content ranged from trace amounts to 10% or less by weight, and a relatively small number of such products had a higher content. A handful of products, known as "semi-silica" or "silica" bricks or mortars, had crystalline silica content in excess of 70%; they were designed that way in order to properly function in the applications for which they were intended. One of these high content silica products was discontinued in 1962, and sales of the others declined such that they were phased out entirely between the late 1960's and the early to mid 1970's.

Prior to KACC's Petition Date, an aggregate of 366 silica-related lawsuits had been filed against KACC based on product liability theories of recovery and one suit has been filed against it by a lifelong painter/sandblaster who worked briefly at a KACC premises in Baton Rouge, Louisiana in the mid-1950's based on alleged exposure to silica-containing materials at such facility. As of KACC's Petition Date, the Debtors had not paid any amounts to settle any suit on the basis of alleged exposure to silica from a Kaiser Refractories product or at a KACC premises, other than a single settlement made almost 20 years prior to that date. KACC had settled some "mixed dust" suits that alleged exposure to both asbestos and silica products made or sold by Kaiser Refractories, but those suits were settled on the basis of the asbestos exposure evidence in those cases rather than the silica exposure allegations. The Debtors believe that the releases provided to KACC in connection with such settlements, however, would shield the Debtors from any liability Claim for all pneumoconiosis-related diseases, including but not limited to Claims based on alleged exposure to silica.

In response to a Bar Date Order issued in the Reorganization Cases, the Debtors received approximately 3,900 proofs of Claim alleging Silica Personal Injury Claims. See "Operations During the Reorganization Cases — Claims Process and Bar Dates." The Debtors believe that many of these claimants also have asserted current or past asbestos-related claims. The Debtors further believe that some of the holders of such Silica Personal Injury Claims are persons who previously settled asbestos-related personal injury suits with KACC for malignant or non-malignant diseases and/or death based on a contention that their disease was caused in whole or in part by exposure to asbestos. The Debtors believe that the releases provided to KACC in connection with such settlements would shield the Debtors from any liability Claim for all pneumoconiosis-related diseases, including but not limited to Claims based on alleged exposure to silica.

The Silica Personal Injury Claims will be resolved in accordance with the terms of the Silica Distribution Procedures and the Silica PI Channeling Injunction to be established as part of the Plan. For a discussion of the Silica Distribution Procedures and Silica PI Channeling Injunction, see "— PI Trust Distribution Procedures" and "— PI Channeling Injunctions — Silica PI Channeling Injunction." Based upon a currently ongoing review being conducted by the Future Silica and CTPV Claimants' Representative of the Silica Personal Injury Claims Filed against the Debtors, it currently is anticipated that approximately 1,375 such Claims — which upon completion of the review process will be identified on Attachment A to the Silica Distribution Procedures — will qualify under the criteria of the Silica Distribution Procedures and will be liquidated and processed for payment under the Silica Distribution Procedures, and that the balance of the approximately 3,900 Silica Personal Injury Claims File will not qualify and will be withdrawn.

### *CTPV-Related Liabilities*

Beginning in approximately 1997, KACC was named in a small number of lawsuits filed in the State of Louisiana by employees or outside contractors who alleged exposure to CTPV from their work in certain areas of KACC's aluminum reduction plant in Chalmette, Louisiana. These premises claims also included liability allegations against former so-called "executive officers" of KACC to whom responsibility for plant safety issues

allegedly had been delegated; KACC defended and indemnified these "executive officers" with respect to the CTPV-related lawsuits.

Prior to KACC's Petition Date, an aggregate of 21 CTPV-related personal injury suits had been filed against KACC. Fourteen of those suits involved employees of KACC's aluminum reduction plant in Chalmette, Louisiana who alleged that they developed bladder cancer, in each case caused in whole or in part by exposure to CTPV at that plant. KACC settled and paid 12 of such cases prior to the Petition Date. Other CTPV-related suits were voluntarily dismissed for lack of evidence before KACC's Petition Date, including but not limited to a lack of epidemiologic support for a claimed nexus between exposure to CTPV and the medical condition alleged. As of KACC's Petition Date only five CTPV-related suits remained pending.

In response to a Bar Date Order issued in the Reorganization Cases, the Debtors received 296 proofs of Claim for alleged CTPV Personal Injury Claims. See "Operations During the Reorganization Cases — Claims Process and Bar Dates." According to limited information provided to the Debtors in connection with those proofs of Claim, several of the persons for whom proofs of Claim had been Filed allege bladder cancer, kidney cancer or lung cancer caused in whole or in part by exposure to CTPV at the Chalmette, Louisiana plant. Eleven of the bladder cancer Claims appear to have been completely resolved before KACC's Petition Date (with ten being resolved by settlement and one being resolved by voluntary dismissal). In addition, prior to the Petition Date, 12 of the lung cancer claimants had settled with KACC based on a diagnosis that their lung cancer was caused in whole or in part by asbestos exposure at the Chalmette plant; their CTPV Personal Injury Claims may be offset by amounts received in accordance with those settlements. The Debtors do not anticipate many CTPV Personal Injury Claims to be asserted in the future.

The CTPV Personal Injury Claims will be resolved in accordance with the terms of the CTPV Distribution Procedures and the CTPV PI Channeling Injunction to be established as part of the Plan. For a discussion of the CTPV Distribution Procedures and CTPV PI Channeling Injunction, see "— PI Trust Distribution Procedures" and "— PI Trust Channeling Injunctions — CTPV PI Channeling Injunction."

### *NIHL-Related Liabilities*

Prior to KACC's Petition Date, a cumulative total of 362 NIHL-related lawsuits were filed against KACC, the overwhelming majority of which alleged NIHL from occupational exposure to noise at KACC's Chalmette, Louisiana plant and a small number of which alleged NIHL from occupational exposure to noise at KACC's Gramercy, Louisiana facility (*i.e.*, Gramercy). These premises Claims also included liability allegations against former so-called "executive officers" of KACC to whom responsibility for plant safety issues allegedly had been delegated. KACC defended and indemnified these "executive officers" sued in such suits. No NIHL-related suit had been settled or otherwise resolved before KACC's Petition Date. In response to a Bar Date Order issued in the Reorganization Cases, KACC received approximately 3,400 proofs of Claim for alleged NIHL Personal Injury Claims. See "Operations During the Reorganization Cases — Claims Process and Bar Dates." The Debtors do not anticipate any future NIHL Personal Injury Claims.

The NIHL Personal Injury Claims will be resolved in accordance with the terms of the NIHL Distribution Procedures and the NIHL PI Channeling Injunction to be established as part of the Plan. For a discussion of the NIHL Distribution Procedures and NIHL PI Channeling Injunction, see "— PI Trust Distribution Procedures" and "— PI Trust Channeling Injunctions — NIHL PI Channeling Injunction."

### *Indemnification Claims*

In addition to asserted liability to individual asbestos, silica, CTPV or NIHL claimants, the Debtors or their predecessors were parties to various contracts that provide for indemnification of various third parties for asbestos-related, silica-related, CTPV-related or NIHL-related liabilities. These include provisions in corporate merger and acquisition documents, as well as obligations to defend and indemnify employees sued by such individual claimants. The Plan treats these Claims as Indirect Channeled Personal Injury Claims (*i.e.*, Claims for reimbursement, indemnification, subrogation, contribution or indemnity, whether contractual or implied by law, and any derivative or indirect Claims of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law, equity or admiralty whatsoever, on account of or with respect to a Channeled Personal Injury Claim).

Under the Plan, Indirect Channeled Personal Injury Claims are included in the definition of, and will receive the treatment accorded, Channeled Personal Injury Claims under the Plan and the Asbestos Distribution Procedures, Silica Distribution Procedures, CTPV Distribution Procedures or NIHL Distribution Procedures, as applicable. Such Claims will be channeled to the applicable PI Trust, and holders of such Claims will be permanently enjoined from pursuing such Claims against any Protected Party, unless a Debtor has assumed an underlying obligation after authorization of the Bankruptcy Court. See "— PI Trust Distribution Procedures."

### Unsettled Judgment or Verdict Claims

KACC has one asbestos-related verdict that remains unsettled as of the date of this Disclosure Statement. KACC was one of two defendants against whom a jury returned a $1.7 million verdict in a case that involved an Asbestos-Related Product Claim for which KACC and the other defendant (which is unrelated to KACC but which also filed for protection under chapter 11 of the Bankruptcy Code) were allegedly jointly and severally liable. However, the verdict may have been subject to reduction to the extent of payments made by other defendants that settled with the plaintiffs prior to judgment for an aggregate amount reportedly in excess of $900,000; KACC has not been able to confirm the amount, if any, of these potentially off-setting settlements, and some of those alleged settlements may have been made by companies that filed for protection under chapter 11 of the Bankruptcy Code before they actually paid any amounts owing in accordance with those settlements (which would have stayed such payments). Furthermore, KACC's ultimate liability, if any, for that verdict was never finally adjudicated, and was subject to challenge on post-trial motions and/or appeals, when any further litigation concerning the verdict was automatically stayed due to the Filing of KACC's Reorganization Case. Consequently, KACC's ultimate liability in respect of the Asbestos-Related Product Claim that was the subject of such verdict is difficult to estimate. Any Claim related to that verdict will be channeled to the Asbestos PI Trust in accordance with the terms of the Asbestos Distribution Procedures. For a discussion of the Asbestos Distribution Procedures, see "— PI Trust Distribution Procedures." As of the date of this Disclosure Statement, the Debtors do not have any other unsettled verdict or judgment for alleged asbestos-related, silica-related, CTPV-related or NIHL-related liability.

### Asbestos Personal Injury Claim Settlement Processing Agreements

Prior to the Filing of the Reorganization Cases, KACC had entered into settlement processing agreements ("Administrative Agreements") with dozens of law firms representing persons alleging asbestos-related personal injuries who had not either previously settled with KACC or obtained a verdict or judgment against KACC. Although these Administrative Agreements were negotiated individually with each such law firm, each contained substantially similar material terms, other than with respect to the amounts to be paid under the settlements. These included requirements that each claimant covered by an Administrative Agreement:

- assent to the agreement;

- deliver to KACC claims submission materials, including documentation and medical and exposure criteria, for settlement evaluation by KACC; and

- deliver to KACC a release of claim releasing KACC and related parties of all liability for asbestos or other pneumoconiosis-related claims.

If an asbestos-related personal injury claim was approved by KACC for payment and all other conditions precedent were met, each Administrative Agreement provided for payment of the Claim in an amount specified in such agreement.

Each Administrative Agreement covered asbestos-related personal injury matters that were in the "inventory" of clients of the law firm party thereto as of the effective date of the agreement, and some of the Administrative Agreements also provided for the settlement processing of future clients of the law firm with asbestos-related personal injuries. As of KACC's Petition Date, not all of the then-existing Asbestos Personal Injury Claims eligible for submission under such Administrative Agreements had been submitted to KACC for settlement processing or, if submitted, had been fully processed.

With respect to two of the Administrative Agreements, the Claims submission processes had been completed and the 11,169 claimants whom KACC approved for payment had provided releases to KACC. However, as of KACC's Petition Date, KACC had only paid a portion of the settlement amount that each claimant had been promised under the applicable Administrative Agreement ("Partially Paid Claims"). The unpaid portion of the promised settlement amounts of these 11,169 Partially Paid Claims totals approximately $25 million.

Under the Plan, to the extent an Administrative Agreement is deemed to be an executory contract, each such Administrative Agreement will be deemed rejected pursuant to Section 365 of the Bankruptcy Code and any Claim in respect of such rejection will be treated as an Asbestos Personal Injury Claim.

One of KACC's Administrative Agreements had a security provision pursuant to which KACC periodically paid monies into an interest-earning attorney trust account from which settlement monies were paid for Asbestos Personal Injury Claims submitted to and approved for payment by KACC in accordance with the terms of the agreement. The attorney trust account balance currently contains approximately $4 million. It is currently anticipated that such amount will be refunded to the Debtors and applied to partially fund KACC's $13 million contribution to the Funding Vehicle Trust. See "Reorganized Kaiser — Projected Financial Information — Principal Assumptions."

**Funding Vehicle Trust**

### *Creation and Purpose of the Funding Vehicle Trust*

On the Effective Date, Reorganized KACC and the Funding Vehicle Trustees will execute the Funding Vehicle Trust Agreement and the Funding Vehicle Trust will be created. The purpose of the Funding Vehicle Trust will be to (a) handle insurance coverage litigation and settlements, (b) preserve, hold, manage and maximize the assets of the Funding Vehicle Trust, including the PI Insurance Assets, for the benefit of the PI Trusts, and (b̶c) make payments̶distributions to the PI Trusts (for distribution to the beneficiaries of such trusts), all in accordance with the Plan, the PI Trust Funding Agreement (see "— PI Trust Funding Agreement") and the Funding Vehicle Trust Agreement.

### *Transfer of Assets and Cooperation with Respect to Insurance Matters*

Subject to the other provisions of the Plan and the Funding Vehicle Trust Agreement described below, the PI Trust Assets referenced in clauses (a) and (c) of Section 1.1(151) of the Plan (*i.e.*, the PI Insurance Assets, including but not limited to the Insurance Settlement Escrow Funds, and Cash in an amount equal to $13 million) will be transferred to the Funding Vehicle Trust for the benefit of the PI Trusts free and clear of any liens, security interests and other claims or causes of action. See "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunction."Injunctions."

Each Reorganized Debtor will cooperate with the Funding Vehicle Trust and use commercially reasonable efforts to take, or cause to be taken, and to do, or cause to be done, all things that the Funding Vehicle Trustees may reasonably consider necessary, appropriate or desirable to effectuate the transfer of the PI Insurance Assets and Cash in an amount equal to $13 million to the Funding Vehicle Trust as described in the preceding paragraph and the transfer of books and records as described in the following paragraph and to facilitate the efforts of the Funding Vehicle Trust to obtain insurance coverage under the PI Insurance Assets for Channeled Personal Injury Claims, including but not limited to: (a) providing the Funding Vehicle Trust with copies of insurance policies and settlement agreements included within or relating to the PI Insurance Assets; (b) providing the Funding Vehicle Trust with other information in such Reorganized Debtor's possession relating to insurance coverage for Channeled Personal Injury Claims; and (c) executing further assignments or allowing the Funding Vehicle Trust to pursue claims relating to the PI Insurance Assets in such Reorganized Debtor's name, including but not limited to by means of arbitration, alternative dispute resolution proceedings or litigation (subject to appropriate disclosure of the fact that, and reasons for which, the Funding Vehicle Trust is doing so). To the extent the transfer to the Funding Vehicle Trust of any of the PI Insurance Assets is determined to be invalid by a court of competent jurisdiction, upon request by the Funding Vehicle Trust and at the cost of the Funding Vehicle Trust, the Reorganized Debtors will (a) take all reasonable actions with respect to such assets, including prosecution of any PI Insurance Coverage Action, for the benefit of, and to the extent reasonably requested by, the Funding Vehicle Trust and (b) immediately transfer any amounts recovered under or on account of any such assets to the Funding Vehicle Trust. Upon written

request accompanied by reasonable supporting documentation, the Funding Vehicle Trust must promptly (and in any event within five Business Days) reimburse each Reorganized Debtor any fees and expenses reasonably incurred by or on behalf of it on or after the Effective Date in connection with its provision of such assistance to the Funding Vehicle Trust, including but not limited to out-of-pocket fees and expenses and attorneys' fees and expenses. The provision of such assistance will not be deemed to waive and will not be a waiver of any applicable privilege as against any third party.

On or prior to the first anniversary of the Effective Date, the Funding Vehicle Trustees, on behalf of the Funding Vehicle Trust, may issue written instructions to Reorganized KACC requesting the transfer to the Funding Vehicle Trust of the books and records of the Reorganized Debtors pertaining to Channeled Personal Injury Claims that have been asserted against any Reorganized Debtor, including but not limited to books and records concerning the pre-Petition Date settlement of asbestos-related, silica-related, CTPV-related or NIHL-related personal injury claims or demands by any Debtor, and, as soon thereafter as is practicable, Reorganized KACC will so transfer, or cause to be so transferred, such books and records to the Funding Vehicle Trust in accordance with such instructions and at the sole cost and expense of the Funding Vehicle Trust. The Funding Vehicle Trust may re-transfer or supply copies of such books and records to the PI Trusts. If the Funding Vehicle Trust does not so issue such instructions for the transfer of such books and records or if the Funding Vehicle Trust so requests, Reorganized KACC may (and, if the Funding Vehicle Trust so requests, will) destroy any such books and records, including but not limited to any in the possession of counsel to any Debtor or Reorganized Debtor; any such destruction at the request of the Funding Vehicle Trust will be at its sole cost and expense. Until such books and records are so transferred or destroyed, Reorganized KACC will maintain such books and records in the same manner in which it maintains them as of the Effective Date and will make them available to the Funding Vehicle Trust, at its request, during normal business hours and upon reasonable notice; the cost and expense of so maintaining such books and records will be borne by Reorganized KACC, except that any cost or expense incurred by Reorganized KACC in connection with any such request by the Funding Vehicle Trust will be reimbursed by the Funding Vehicle Trust promptly (and in any event within five Business Days) upon written request accompanied by reasonable supporting documentation. Notwithstanding the foregoing, if the Funding Vehicle Trust has requested the transfer of such books and records but the Bankruptcy Court has failed to rule that such transfer will not result in the destruction or waiver of any applicable privileges pertaining to such books and records, Reorganized KACC will, at the option and sole cost and expense of the Funding Vehicle Trust, retain such books and records and enter into arrangements to permit the Funding Vehicle Trust to have access thereto.

Reorganized KACC will not unreasonably withhold consent to the Funding Vehicle Trust's retention of the professional services of the counsel retained by the Debtors, including but not limited to Heller Ehrman LLP and KACC's National Coordinating Counsel with respect to Channeled Personal Injury Claims, Wharton Levin Ehrmantraut & Klein, P.A. Notwithstanding the foregoing, if the Bankruptcy Court has failed to rule that such retention will not result in the destruction or waiver of any applicable privileges pertaining to such professional services, Reorganized KACC will, at the option and sole cost and expense of the Funding Vehicle Trust, enter into arrangements to permit the Funding Vehicle Trust to have access thereto.

Any PI Insurance Coverage Action – a claim, cause of action or right of the Debtors or any of them, under the laws of any jurisdiction, against any PI Insurance Company (*i.e.*, any insurance company, insurance broker or syndicate insurance broker, guaranty association or any other entity that may have liability under each insurance policy described on Exhibit 1.1(107) to the Plan (*i.e.*, an Included PI Trust Insurance Policy), including any reinsurers with respect to claims covered by an Included PI Trust Insurance Policy, other than a Protected Party), arising from or related to: (a) any such PI Insurance Company's failure or refusal to provide or pay under an Included PI Trust Insurance Policy in respect of a Channeled Personal Injury Claim; (b) failure or refusal of any PI Insurance Company to compromise and settle any Channeled Personal Injury Claim under or pursuant to any Included PI Trust Insurance Policy; or (c) the interpretation or enforcement of the terms of any Included PI Trust Insurance Policy in respect of a Channeled Personal Injury Claim – and the claims and causes of action asserted or to be asserted therein will be preserved for the benefit of the Funding Vehicle Trust for prosecution either by Reorganized KACC or the Funding Vehicle Trustees (as mutually agreed by such parties) subsequent to the Effective Date and in accordance with the Funding Vehicle Trust Agreement. At any point on or after the Effective Date that the Funding Vehicle Trustees determine that the Funding Vehicle Trust is in a position to assume responsibility for the prosecution of the PI Insurance Coverage Actions and any claims or causes of action asserted or to be asserted in respect thereof, the Funding Vehicle Trustees may notify Reorganized KACC in writing and, immediately thereafter, the PI Insurance Coverage Actions and all related claims or causes of action, along with the

rights and obligations of the Reorganized Debtors with respect to each Included PI Trust Insurance Policy and claims thereunder, to the extent that such policies and claims relate to Channeled Personal Injury Claims (but not as to any other claims covered thereby) and subject to the transferability without prejudice of such policies and claims, will be transferred to and vested in the Funding Vehicle Trust, as the representative of the Debtors' Estates, free and clear of all liens, security interests and other claims or causes of action, except for PI Insurer Coverage Defenses or as otherwise provided in the Plan. Until such time as the PI Insurance Coverage Actions have been transferred and become vested in the Funding Vehicle Trust, Reorganized KACC will be entitled to prosecute any PI Insurance Coverage Action or related claim or cause of action, except that any compromise or settlement of any such action will require the consent of the Funding Vehicle Trustees and the approval of the Bankruptcy Court. Upon written request accompanied by reasonable supporting documentation, the Funding Vehicle Trust must promptly (and in any event within five Business Days) reimburse Reorganized KACC for any fees and expenses reasonably incurred by or on behalf of it on or after the Effective Date in connection with any such prosecution of a PI Insurance Coverage Action or related claim or cause of action, including but not limited to out-of-pocket fees and expenses and attorneys' fees and expenses.

### *Assumption of Certain Liabilities and Obligations by the Funding Vehicle Trust*

#### *Channeled Personal Injury Claims and Trust Expenses*

The Funding Vehicle Trust will assume all liability and responsibility for the Trust Expenses of the Funding Vehicle Trust. The Funding Vehicle Trust will ~~also assume all liability of the Debtors, the Reorganized Debtors and the other Kaiser Companies for~~advocate in any and all actions and proceedings brought against any Reorganized Debtor that involve Channeled Personal Injury Claims that such Claims are and have been channeled to the applicable PI Trust and will cooperate with such Reorganized Debtor in any and all such actions and proceedings. Each Reorganized Debtor will be entitled to indemnification from the Funding Vehicle Trust for any out-of-pocket fees and expenses and attorneys' fees and expenses, judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor on or after the Effective Date in connection with any action, suit or proceeding related to Channeled Personal Injury Claims, whether civil, administrative or arbitrative, including without limitation any liability for indemnification or contribution for such Claims prosecuted against such Reorganized Debtor.

#### *Insurance-Related Obligations*

The Funding Vehicle Trust's pursuit of PI Insurance Assets as to Channeled Personal Injury Claims and Trust Expenses of the Funding Vehicle Trust or of any PI Trust, as contemplated by the Plan and by the Funding Vehicle Trust Agreement, will be undertaken by the Funding Vehicle Trust in such a manner so as not to cause the Reorganized Debtors or other Kaiser Companies, including Trochus Insurance Company, to become obligated, whether directly to the PI Insurance Company as to which claim is made by the Funding Vehicle Trust or indirectly through claims made by such PI Insurance Company as against other insurance companies, to pay any amounts in the form of, or pursuant to, self insured retentions, premiums, deductibles, retrospective premium adjustments, reinsurance, security or collateral arrangements and~~or~~ other charges, costs, fees or expenses (if any) ~~that become due to any insurer in connection with pursuit or recovery of the PI Insurance Assets as a result of (a) Channeled Personal Injury Claims or (b) Trust Expenses of the Funding Vehicle Trust or of any PI~~(collectively, the "Insurance-Related Claims"). The Funding Vehicle Trust will defend any Insurance-Related Claim made against the Reorganized Debtors or other Kaiser Companies. To effectuate this obligation of the Funding Vehicle Trust, the Funding Vehicle Trust will either, at the Funding Vehicle Trustees' option, (a) pay any Insurance-Related Claim adjudicated or determined by binding arbitration on behalf of the Reorganized Debtor or other Kaiser Company or (b) reduce the amount that any PI Insurance Company is adjudicated or determined by binding arbitration to be obligated to pay under an Included PI Trust Insurance Policy that triggers the financial obligations of the Reorganized Debtors or other Kaiser Companies described above, as is necessary to eliminate either a direct right of recovery by that PI Insurance Company or an indirect right of recovery that such PI Insurance Company has been adjudicated or determined by binding arbitration to be entitled to as against the Reorganized Debtors or other Kaiser Companies, including Trochus Insurance Company and pay out of pocket fees and expenses and attorneys' fees and expenses incurred by the Reorganized Debtor or other Kaiser Company including Trochus Insurance Company on or after the Effective Date, except that the amount payable as described in (a) above will not exceed the amount paid by such PI Insurance Company under that Included PI Trust Insurance Policy to the Funding Vehicle Trust. Additionally, the Funding Vehicle Trust will assume all liability and responsibility for obligations under any agreements pursuant to

which funds have been or will be paid in respect of insurance settlements for the benefit of holders of any Channeled Personal Injury Claims and any escrow or other agreements entered into in connection therewith, to the full extent contemplated by such settlement agreements. The Funding Vehicle Trust will cooperate with the Reorganized Debtors and use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that the Reorganized Debtors may reasonably consider necessary, appropriate or desirable to effect such assumption.

The Funding Vehicle Trust will advocate in any and all actions and proceedings brought against any Reorganized Debtor that involve Channeled Personal Injury Claims that such Claims are and have been channeled to the applicable PI Trust and will cooperate with such Reorganized Debtor in any and all such actions and proceedings.

Each Reorganized Debtor and each other Kaiser Company will be entitled to indemnification from the Funding Vehicle Trust for any fees and expenses (including but not limited to out-of-pocket fees and expenses and attorneys' fees and expenses), judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor or other Kaiser Company on or after the Effective Date in connection with any action, suit or proceeding related to Channeled Personal Injury Claims, whether civil, administrative or arbitrative, including without limitation any such liability for which the Funding Vehicle Trust has assumed liability in the provisions of the Plan and the Funding Vehicle Trust Agreement described above in the second preceding paragraph.all liabilities or obligations to be assumed by the Funding Vehicle Trust as described in Section 5.1(e) of the Plan (which is described in the two preceding paragraphs).

### PI Trust Funding Agreement

The Funding Vehicle Trustees, on behalf of the Funding Vehicle Trust, will make, or cause to be made, all payments required to be made by the Funding Vehicle Trust, and perform, or cause to be performed, all other obligations of the Funding Vehicle Trust under the PI Trust Funding Agreement, including, as described below, the maintenance of the CTPV Reserve (as defined below; see "— PI Trust Funding Agreement — Allocation of PI Trust Assets Among the PI Trusts — Silica PI Trust").

### Disputed Ownership Fund

The Funding Vehicle Trust is intended to be treated for U.S. federal income Tax purposes as a "disputed ownership fund" as described within Proposed Treasury Regulations section 1.468B-9(a), as more specifically provided for under the Funding Vehicle Trust Agreement. Accordingly, for all U.S. federal income Tax purposes the transfer of assets to the Funding Vehicle Trust will be treated as a transfer to a disputed ownership fund by the Debtors, as transferors, for subsequent distribution to the PI Trusts in accordance with their claims to the assets held by the Funding Vehicle Trust for the benefit of holders of Channeled Personal Injury Claims, as will be determined under the Funding Vehicle Trust Agreement, and in complete settlement of the PI Trusts' claims. Any income on the assets of the Funding Vehicle Trust will be treated as subject to Tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for Taxes and subject to the withholding and reporting requirements set forth in the Plan and the Funding Vehicle Trust Agreement.

The Funding Vehicle Trustees will be the "administrator" (as defined in Proposed Treasury Regulations section 1.468B-9(b)) of the Funding Vehicle Trust and will be required by the Funding Vehicle Trust Agreement to (a) timely file such income Tax and other returns and statements and timely pay all Taxes required to be paid from the assets in the Funding Vehicle Trust as required by law and in accordance with the provisions of the Plan and the Funding Vehicle Trust Agreement, (b) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (c) meet all other requirements necessary to qualify and maintain qualification of the Funding Vehicle Trust as a disputed ownership fund within the meaning of Proposed Treasury Regulations section 1.468B-9(a), and (d) take no action that could cause the Funding Vehicle Trust to fail to qualify as a disputed ownership fund. The Reorganized Debtors will have no rights to any refunds or reversion with respect to any assets of the Funding Vehicle Trust or any earnings thereon.

Following the funding of the Funding Vehicle Trust (and in no event later than February 15th of the calendar year following the Effective Date), Reorganized KACC will provide, or cause to be provided, to the Funding Vehicle Trustees a "§ 1.468B-9(f) Statement" in accordance with Proposed Treasury Regulations section

1.468B-9(f). Following any subsequent transfers of Cash or other property to the Funding Vehicle Trust, the transferor will provide, or cause to be provided, to the Funding Vehicle Trustees a "§ 1.468B-9(f) Statement" on or before February 15th of the calendar year following the date of each such transfer.

### The Funding Vehicle Trustees

The Funding Vehicle Trustees will be, and will act as, fiduciaries to the Funding Vehicle Trust in accordance with the provisions of the Funding Vehicle Trust Agreement, the PI Trust Funding Agreement and the Plan. Subject to the Funding Vehicle Trust Agreement and the Plan, the Funding Vehicle Trustees will have the power to take any and all actions that the Funding Vehicle Trustees may consider necessary, appropriate or desirable to fulfill the purpose of the Funding Vehicle Trust, including receiving and holding the assets of the Funding Vehicle Trust and exercising all rights and powers with respect thereto, entering into arrangements with third parties and enforcing the rights or fulfilling the obligations of the Funding Vehicle Trust under the Funding Vehicle Trust Agreement and the PI Trust Funding Agreement. The Funding Vehicle Trustees will not have the power to take any action with respect to any PI Insurance Coverage Action prior to delivering notice to Reorganized KACC that the Funding Vehicle Trust is in a position to assume responsibility for the prosecution of such actions (see "— Transfer of Assets and Cooperation with ~~respect~~Respect to Insurance Matters"), to compromise or settle insurance coverage under any Included PI Trust Insurance Policy other than with respect to Channeled Personal Injury Claims or Trust Expenses of the Funding Vehicle Trust or of any PI Trust, or to take any action with respect to the processing, liquidation or payment of individual Channeled Personal Injury Claims or any claims or causes of action asserted or to be asserted in respect thereof.

The individuals from time to time serving as the Asbestos PI Trustees in accordance with the Asbestos PI Trust Agreement (see "— Asbestos PI Trust — The Asbestos PI Trustees") and the Silica PI Trustee in accordance with the Silica PI Trust Agreement (see "— Silica PI Trust — The Silica PI Trust") will serve as the Funding Vehicle Trustees.

Each Funding Vehicle Trustee will serve for so long as he or she is an Asbestos PI Trustee or Silica PI Trustee, as the case may be.

No Funding Vehicle Trustee will be entitled to receive any compensation or reimbursement of fees and expenses from the Funding Vehicle Trust. Each Funding Vehicle Trustee will be compensated and reimbursed solely in his or her capacity as an Asbestos PI Trustee or a Silica PI Trustee, as the case may be, in accordance with the applicable PI Trust Agreement.

No Funding Vehicle Trustee will be permitted to, during the term of his or her service, (a) hold a financial interest in, or act as attorney or agent or serve as any other professional for, any Reorganized Debtor or any PI Trust or (b) act as an attorney for, or otherwise represent the interests of, any person who holds a Channeled Personal Injury Claim, including without limitation by serving as a trustee of any PI Trust, a member of the Advisory Committee of any PI Trust, the Future Asbestos Claimants' Representative or the Future Silica and CTPV Claimants' Representative or any successor representative under any PI Trust Agreement, excluding each Funding Vehicle Trustee's service as either an Asbestos PI Trustee or a Silica PI Trustee.

### Funding Vehicle Trust Termination Provisions

The Funding Vehicle Trust is irrevocable, but will generally terminate 90 days after the date on which the Funding Vehicle Trustees determine to terminate the Funding Vehicle Trust because (a) each PI Trust has been terminated in accordance with the terms of the applicable PI Trust Agreement or (b) no Funding Vehicle Assets remain.

## Asbestos PI Trust

### Creation and Purpose of the Asbestos PI Trust

On the Effective Date, Reorganized KACC, the Asbestos PI Trustees, the members of the Asbestos PI TAC and the Future Asbestos Claimants' Representative will execute the Asbestos PI Trust Agreement and the Asbestos PI Trust will be created. The purpose of the Asbestos PI Trust will be to (a) assume the liabilities of the

Reorganized Debtors and their predecessors and successors in interest for all Asbestos Personal Injury Claims, (b) preserve, hold, manage and maximize the assets of the Asbestos PI Trust for use in paying and otherwise satisfying Asbestos Personal Injury Claims and paying the Trust Expenses of the Asbestos PI Trust, (c) direct the processing, liquidation and payment of all Asbestos Personal Injury Claims in accordance with the Asbestos Distribution Procedures, and (d) otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(b) of the Bankruptcy Code, all in accordance with the Plan, the PI Trust Funding Agreement (see "— PI Trust Funding Agreement") and the Asbestos PI Trust Agreement.

### *Transfer of Certain Property to the Asbestos PI Trust*

Pursuant to the Plan, on the Effective Date, 94% of the common stock of Reorganized Kaiser Trading and 70.5% of the KFC Claim will be issued or transferred to the Asbestos PI Trust free and clear of any liens, security interests and other claims or causes of action. The Asbestos PI Trust will be entitled to receive its Pro Rata Share of the New Common Stock distributable under the Plan to holders of Claims in Class 9 on account of its 70.5% of the KFC Claim and to receive distributions from the Funding Vehicle Trust in accordance with the PI Trust Funding Agreement. See "— PI Trust Funding Agreement" and "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling ~~Injunction."~~ "Injunctions."

Reorganized KACC will not unreasonably withhold consent to the Asbestos PI Trust's retention of the professional services of the counsel retained by the Debtors in connection with matters pertaining to the Channeled Personal Injury Claims, including but not limited to KACC's National Coordinating Counsel, Wharton Levin Ehrmantraut & Klein, P.A.

### *Assumption of Liabilities and Certain Obligations by the Asbestos PI Trust*

The Asbestos PI Trust will assume all liability and responsibility for all Asbestos Personal Injury Claims and the Trust Expenses of the Asbestos PI Trust. The Asbestos PI Trust will cooperate with the Reorganized Debtors and use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that the Reorganized Debtors may reasonably consider necessary, appropriate or desirable to effect such assumption.

The Asbestos PI Trust will advocate in any and all actions and proceedings brought against any Reorganized Debtor that involve Asbestos Personal Injury Claims that such Claims are and have been channeled to the Asbestos PI Trust and will cooperate with such Reorganized Debtor in any and all such actions and proceedings.

Except as otherwise provided in the Asbestos PI Trust Agreement and the Asbestos Distribution Procedures, the Asbestos PI Trust will have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights, regarding Asbestos Personal Injury Claims that any Reorganized Debtor has under applicable law.

Each Reorganized Debtor and each other Kaiser Company will be entitled to indemnification from the Asbestos PI Trust for any ~~fees and expenses (including but not limited to~~ out-of-pocket fees and expenses and attorneys' fees and expenses~~)~~, judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor or other Kaiser Company on or after the Effective Date in connection with any action, suit or proceeding related to Asbestos Personal Injury Claims, whether civil, administrative or arbitrative, including but not limited to indemnification or contribution for such Claims prosecuted against such Reorganized Debtor or other Kaiser Company.

Upon the request of the Funding Vehicle Trust, the Asbestos PI Trust will (a) provide to the Funding Vehicle Trust any authorization or assignment of rights from the Asbestos PI Trust that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to permit the Funding Vehicle Trust to pursue recovery under any Included PI Trust Insurance Policy in respect of Asbestos Personal Injury Claims or Trust Expenses of the Asbestos PI Trust and (b) otherwise cooperate with the Funding Vehicle Trust and use commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to effect such recovery, including providing to the Funding Vehicle Trust information relating to Asbestos Personal Injury Claims available to the Asbestos PI Trust and required to be provided or otherwise made available by the Funding Vehicle Trust pursuant to

any insurance settlement agreement assumed by the Funding Vehicle Trust pursuant to Section 5.1.e of the Plan (which is described above under "— Funding Vehicle Trust — Assumption of Certain Liabilities and Obligations by the Funding Vehicle Trust").

### PI Trust Funding Agreement

The Asbestos PI Trustees, on behalf of the Asbestos PI Trust, will enforce the rights of the Asbestos PI Trust under the PI Trust Funding Agreement and will perform, or cause to be performed, all obligations of the Asbestos PI Trust under the PI Trust Funding Agreement. The Asbestos PI Trust will be entitled to receive distributions from the Funding Vehicle Trust in accordance with the PI Trust Funding Agreement. See "— PI Trust Funding Agreement" and "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling ~~Injunction."~~Injunctions."

### Qualified Settlement Fund

The Asbestos PI Trust is intended to be treated for U.S. federal income Tax purposes as a "qualified settlement fund" as described within section 1.468B-1 of the Treasury Regulations, as more specifically provided for under the Asbestos PI Trust Agreement. Accordingly, for all U.S. federal income Tax purposes the transfer of assets to the Asbestos PI Trust will be treated as a transfer to a trust satisfying the requirements of section 1.468B-1(c) of the Treasury Regulations by the Debtors and the Funding Vehicle Trust, as transferors, for distribution to holders of Asbestos Personal Injury Claims and in complete settlement of such Claims. Any income on the assets of the Asbestos PI Trust will be treated as subject to Tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for Taxes and subject to the withholding and reporting requirements set forth in the Plan and the Asbestos PI Trust Agreement.

The Asbestos PI Trustees will be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the Asbestos PI Trust and will be required by the Asbestos PI Trust Agreement to (a) timely file such income Tax and other returns and statements and timely pay all Taxes required to be paid from the assets in the Asbestos PI Trust as required by law and in accordance with the provisions of the Plan and the Asbestos PI Trust Agreement, (b) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (c) meet all other requirements necessary to qualify and maintain qualification of the Asbestos PI Trust as a "qualified settlement fund" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations, and (d) take no action that could cause the Asbestos PI Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations. The Reorganized Debtors will have no rights to any refunds or reversion with respect to any assets of the Asbestos PI Trust or any earnings thereon.

Within 60 days after the Effective Date (but not later than February 14th of the calendar year following such date), Reorganized KACC will obtain a Qualified Appraisal of the fair market value of the common stock of Reorganized Kaiser Trading transferred to the Asbestos PI Trust and any New Common Stock theretofore received by the Asbestos PI Trust in respect of the 70.5% of the KFC Claim transferred to the Asbestos PI Trust. Following the funding of the Asbestos PI Trust and the receipt of such Qualified Appraisal (and in no event later than February 15th of the calendar year following the Effective Date), Reorganized KACC will provide, or cause to be provided, to the Asbestos PI Trustees a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations. Following any subsequent transfers of Cash or other property to the Asbestos PI Trust, the transferor will provide, or cause to be provided, to the Asbestos PI Trustees a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

### The Asbestos PI Trustees

The Asbestos PI Trustees will be, and will act as, the fiduciaries to the Asbestos PI Trust in accordance with the provisions of the Asbestos PI Trust Agreement, the Asbestos Distribution Procedures and the Plan. Subject to the Asbestos PI Trust Agreement and the Plan, the Asbestos PI Trustees will have the power to take any and all actions that they may consider necessary, appropriate or desirable to fulfill the purpose of the Asbestos PI Trust, including receiving and holding the assets of the Asbestos PI Trust and exercising all rights and powers with respect thereto, entering into arrangements with third parties and enforcing the rights or fulfilling the obligations of the Asbestos PI Trust under the Funding Vehicle Trust Agreement and the PI Trust Funding Agreement. Except as

requested by the Funding Vehicle Trust, the Asbestos PI Trustees will not have the power to take any action with respect to any PI Insurance Coverage Action or the PI Insurance Assets other than to enforce the rights of the Asbestos PI Trust under the Funding Vehicle Trust Agreement and the PI Trust Funding Agreement. Each Asbestos PI Trustee will also serve as a Funding Vehicle Trustee. See "—Funding Vehicle Trust — The Funding Vehicle Trustees."

There will be three Asbestos PI Trustees. Pursuant to the Confirmation Order, the Bankruptcy Court will confirm the appointment of the individuals selected jointly by the Asbestos Claimants' Committee and the Future Asbestos Claimants' Representative, after consultation with the Debtors, to serve as the initial Asbestos PI Trustees. The initial Asbestos PI Trustees will be divided into three classes and the initial term of each such trustee will expire on the third, fourth or fifth anniversary of the Effective Date, as the case may be. Thereafter, each term of an Asbestos PI Trustee will expire five years from the date on which the preceding term expired.

Each Asbestos PI Trustee will serve until the earliest of the end of his or her term, his or her death, his or her resignation, his or her removal and the termination of the Asbestos PI Trust. An Asbestos PI Trustee may resign at any time and may be removed by unanimous vote of the other Asbestos PI Trustees with the approval of the Bankruptcy Court in the event that he or she becomes unable to discharge his or her duties or for other good cause.

Upon the termination of service of an Asbestos PI Trustee, the remaining Asbestos PI Trustees will consult with both the Asbestos PI TAC and the Future Asbestos Claimants' Representative concerning appointment of a successor Asbestos PI Trustee and, unless a majority of the members of the Asbestos PI TAC or the Future Asbestos Claimants' Representative vetoes the appointment, the vacancy will be filled by the unanimous vote of the remaining Asbestos PI Trustees. If the remaining Asbestos PI Trustees cannot agree on a successor Asbestos PI Trustee or a majority of the members of the Asbestos PI TAC or the Future Asbestos Claimants' Representative vetoes the appointment of a successor Asbestos PI Trustee, the Bankruptcy Court will make the appointment. Any successor to an Asbestos PI Trustee that has not completed his or her full term will serve the remainder of such term. Asbestos PI Trustees will be eligible to serve successive terms.

Each Asbestos PI Trustee will be entitled to receive compensation from the Asbestos PI Trust for his or her services (including for his or her services as a Funding Vehicle Trustee) in the amount determined from time to time by a majority of the members of the Asbestos PI TAC a specified amount per annum, plus a per diem allowance in a specified amount for meetings attended or other Asbestos PI Trust business performed. The Asbestos PI Trustees will determine the scope and duration of activities that constitute a meeting or other Asbestos PI Trust business and, if the Asbestos PI Trustee elects to provide for payment for activities of less than a full day's duration, may provide for a partial payment of the per diem amount on a proportional basis for such activities. The per annum compensation payable to the Asbestos PI Trustee will be reviewed every three years and appropriately adjusted with the consent of the Asbestos PI TAC. The per diem allowance will be adjusted annually to reflect reasonable cost-of-living increases. Each Asbestos PI Trustee will also be entitled to reimbursement from the Asbestos PI Trust for any out-of-pocket fees and expenses reasonably incurred by him or her in connection with the performance of his or her duties (including those fees and expenses incurred in connection with the performance of his or her duties as a Funding Vehicle Trustee).

No Asbestos PI Trustee will be permitted to, during the term of his or her service, (a) hold a financial interest in, or act as attorney or agent or serve as any other professional for, any Reorganized Debtor, (b) act as an attorney for any person who holds an Asbestos Personal Injury Claim, or (c) serve on the trust advisory committee for any PI Trust created pursuant to the Plan.

### The Trust Advisory Committee

The members of the Asbestos PI TAC will serve in a fiduciary capacity, representing all of the holders of present Asbestos Personal Injury Claims for the purpose of protecting the rights of such persons. The Asbestos PI Trustees will be required to consult with the Asbestos PI TAC on the general implementation and administration of the Asbestos PI Trust and the Asbestos Distribution Procedures. Additionally, the Asbestos PI Trustees will be required to obtain the consent of the Asbestos PI TAC prior to taking a number of actions, including amending the Asbestos PI Trust Agreement, the Asbestos Distribution Procedures or the PI Trust Funding Agreement, terminating the Asbestos PI Trust Agreement or voting the common stock of Reorganized Kaiser Trading or New Common Stock held by the Asbestos PI Trust.

The Asbestos PI TAC will consist of ~~three~~five individuals.  Pursuant to the Confirmation Order, the Bankruptcy Court will approve the appointment of the individuals selected by the Asbestos Claimants' Committee~~, after consultation with the Debtors,~~ to serve as the initial members of the Asbestos PI TAC.  The initial members of the Asbestos PI TAC will serve the three, four or five year terms shown on the signature page of the Asbestos PI Trust Agreement.  Thereafter, each term of a member of the Asbestos PI TAC will expire five years from the date on which the preceding term expired.

Each member of the Asbestos PI TAC will serve until the earliest of the end of his or her term, his or her death, his or her resignation, his or her removal and the termination of the Asbestos PI Trust.  A member of the Asbestos PI TAC may resign at any time and may be removed at the recommendation of the other members of the Asbestos PI TAC with the approval of the Bankruptcy Court in the event that he or she becomes unable to discharge his or her duties due to accident, physical deterioration, mental incompetence, a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member (such as repeated nonattendance of scheduled meetings) or for other good cause.

If, prior to the termination of service of a member of the Asbestos PI TAC ~~dies or resigns and, prior to his or her death or the effectiveness of his or her resignation~~other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the Asbestos PI TAC, such individual will be his or her successor.  ~~I~~In such circumstance, if a member of the Asbestos PI TAC ~~dies or resigns and~~ did not so designate an individual to succeed him or her prior to the termination of service of such member, such member's law firm will be entitled to designate his or her successor.  If a member of the Asbestos PI TAC ~~dies or resigns and~~did not designate an individual to succeed him or her prior to the termination of service of such member and such member's law firm does not designate his or her successor ~~or~~as described above or if he or she is removed, his or her successor will be appointed by a majority of the remaining members of the Asbestos PI TAC or, if such members cannot agree on a successor, the Bankruptcy Court.  Any successor to a member of the Asbestos PI TAC that has not completed his or her full term will serve the remainder of such term.  Members of the Asbestos PI TAC will be eligible to serve successive terms.

Each member of the Asbestos PI TAC will be entitled to receive compensation from the Asbestos PI Trust for attendance at meetings or other Asbestos PI Trust business performed in the form of a reasonable hourly rate set by the Asbestos PI Trustees.  In addition, each member of the Asbestos PI TAC will be entitled to reimbursement from the Asbestos PI Trust for any out-of-pocket fees and expenses reasonably incurred by him or her in connection with the performance of his or her duties.

### The Future Asbestos Claimants' Representative

An individual will serve in a fiduciary capacity, representing the interests of the holders of future Asbestos Personal Injury Claims for the purpose of protecting the rights of such persons (the "Future Asbestos Claimants' Representative").  The Asbestos PI Trustees will be required to consult with the Future Asbestos Claimants' Representative on the general implementation and administration of the Asbestos PI Trust and the Asbestos Distribution Procedures.  Additionally, the Asbestos PI Trustees will be required to obtain the consent of the Future Asbestos Claimants' Representative prior to taking a number of actions, including amending the Asbestos PI Trust Agreement, the Asbestos Distribution Procedures or the PI Trust Funding Agreement, terminating the Asbestos PI Trust or voting the common stock of Reorganized Kaiser Trading or New Common Stock held by the Asbestos PI Trust.

The individual currently serving as the legal representative for future asbestos-related claimants in the Reorganization Cases (*i.e.*, the Future Asbestos Claimants' Representative, as such term is defined in the Plan) will serve as the initial Future Asbestos Claimants' Representative.

Each Future Asbestos Claimants' Representative will serve until the earliest of his or her death, his or her resignation, his or her removal and the termination of the Asbestos PI Trust.  The Future Asbestos Claimants' Representative may resign at any time and may be removed at the request of the Asbestos PI Trustees or the Asbestos PI TAC pursuant to an order of the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties or for other good cause.

If the Future Asbestos Claimants' Representative dies or resigns and, prior to his or her death or the effectiveness of his or her resignation, he or she has designated in writing an individual to succeed him or her as the Future Asbestos Claimants' Representative, subject to approval of the Bankruptcy Court, such individual will be his or her successor. If the Future Asbestos Claimants' Representative is removed, the Asbestos PI Trustees, in consultation with the Asbestos PI TAC and subject to the approval of the Bankruptcy Court, will appoint such Future Asbestos Claimants' Representative's successor. If the Future Asbestos Claimants' Representative dies or resigns and did not designate an individual to succeed him or her prior to such death or resignation as contemplated above or he or she is removed but the Asbestos PI Trustees cannot agree or otherwise do not appoint a successor for such Future Asbestos Claimants' Representative, the Bankruptcy Court will make such appointment.

The Future Asbestos Claimants' Representative will be entitled to receive compensation from the Asbestos PI Trust for attendance at meetings or other Asbestos PI Trust business performed in the form of a reasonable hourly rate set by the Asbestos PI Trustees. In addition, the Future Asbestos Claimants' Representative will be entitled to reimbursement from the Asbestos PI Trust for any out-of-pocket fees and expenses reasonably incurred by him or her in connection with the performance of his or her duties.

### *Asbestos PI Trust Termination Provisions*

The Asbestos PI Trust is irrevocable, but generally will terminate on the date which is 90 days after the first to occur of:

- the date on which the Asbestos PI Trustees determine to terminate the Asbestos PI Trust because (a) the Asbestos PI Trustees deem it unlikely that any new Asbestos Personal Injury Claim will be filed against the Asbestos PI Trust, (b) all Asbestos Personal Injury Claims duly filed with the Asbestos PI Trust have been liquidated and, to the extent possible based upon the funds available to such trust through the Plan and in accordance with the PI Trust Funding Agreement, paid to the extent provided in the Asbestos PI Trust Agreement and the Asbestos Distribution Procedures or disallowed by a final, non-appealable order, and (c) 12 consecutive months have elapsed during which no new Asbestos Personal Injury Claim has been filed with the Asbestos PI Trust; and

- if the Asbestos PI Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses (including but not limited to Trust Expenses) of the Asbestos PI Trust in a manner consistent with the Asbestos PI Trust Agreement and the Asbestos Distribution Procedures, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order.

## Silica PI Trust

### *Creation and Purpose of the Silica PI Trust*

On the Effective Date, Reorganized KACC, the Silica PI Trustee and the member of the Silica PI TAC will execute the Silica PI Trust Agreement and the Silica PI Trust will be created. The purpose of the Silica PI Trust will be to (a) assume the liabilities of the Reorganized Debtors and their predecessors and successors in interest for all Silica Personal Injury Claims, (b) preserve, hold, manage and maximize the assets of the Silica PI Trust for use in paying and otherwise satisfying Silica Personal Injury Claims and paying the Trust Expenses of the Silica PI Trust, and (c) direct the processing, liquidation and payment of all Silica Personal Injury Claims in accordance with the Silica Distribution Procedures, all in accordance with the Plan, the PI Trust Funding Agreement (see "— PI Trust Funding Agreement") and the Silica PI Trust Agreement.

### *Transfer of Certain Property to the Silica PI Trust*

Pursuant to the Plan, on the Effective Date, 6% of the common stock of Reorganized Kaiser Trading and 4.5% of the KFC Claim will be issued or transferred to the Silica PI Trust free and clear of any liens, security interests and other claims or causes of action. The Silica PI Trust will be entitled to receive its Pro Rata Share of the New Common Stock distributable under the Plan to holders of Claims in Class 9 on account of its 4.5% of the KFC

Claim and to receive distributions from the Funding Vehicle Trust in accordance with the PI Trust Funding Agreement. See "— PI Trust Funding Agreement" and "Overview of the Plan — Establishment of the Funding Vehicle Trust and Entry of the PI Channeling ~~Injunction."~~"Injunctions."

Reorganized KACC will not unreasonably withhold consent to the Silica PI Trust's retention of the professional services of the counsel retained by the Debtors in connection with matters pertaining to the Channeled Personal Injury Claims, including but not limited to KACC's National Coordinating Counsel, Wharton Levin Ehrmantraut & Klein, P.A.

### *Assumption of Liabilities and Certain Obligations by the Silica PI Trust*

The Silica PI Trust will assume all liability and responsibility for all Silica Personal Injury Claims and the Trust Expenses of the Silica PI Trust. The Silica PI Trust will cooperate with the Reorganized Debtors and use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that the Reorganized Debtors may reasonably consider necessary, appropriate or desirable to effect such assumption.

The Silica PI Trust will advocate in any and all actions and proceedings brought against any Reorganized Debtor that involve Silica Personal Injury Claims that such Claims are and have been channeled to the Silica PI Trust and will cooperate with such Reorganized Debtor in any and all such actions and proceedings.

Except as otherwise provided in the Silica PI Trust Agreement and the Silica Distribution Procedures, the Silica PI Trust will have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights, regarding Silica Personal Injury Claims that any Reorganized Debtor has under applicable law.

Each Reorganized Debtor and each other Kaiser Company will be entitled to indemnification from the Silica PI Trust for any fees and expenses (including but not limited to out-of-pocket fees and expenses and attorneys' fees and expenses), judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor or other Kaiser Company on or after the Effective Date in connection with any action, suit or proceeding related to Silica Personal Injury Claims, whether civil, administrative or arbitrative, including but not limited to indemnification or contribution for such Claims prosecuted against such Reorganized Debtor or other Kaiser Company.

Upon the request of the Funding Vehicle Trust, the Silica PI Trust will (a) provide to the Funding Vehicle Trust any authorization or assignment of rights from the Silica PI Trust that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to permit the Funding Vehicle Trust to pursue recovery under any Included PI Trust Insurance Policy in respect of Silica Personal Injury Claims or Trust Expenses of the Silica PI Trust and (b) otherwise cooperate with the Funding Vehicle Trust and use commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to effect such recovery, including providing to the Funding Vehicle Trust information relating to Silica Personal Injury Claims available to the Silica PI Trust and required to be provided or otherwise made available by the Funding Vehicle Trust pursuant to any insurance settlement agreement assumed by the Funding Vehicle Trust pursuant to Section 5.1.e of the Plan (which is described above under "— Funding Vehicle Trust — Assumption of Certain Liabilities and Obligations by the Funding Vehicle Trust").

### *PI Trust Funding Agreement*

The Silica PI ~~Trustees~~Trustee, on behalf of the Silica PI Trust, will enforce the rights of the Silica PI Trust under the PI Trust Funding Agreement and will perform, or cause to be performed, all obligations of the Silica PI Trust under the PI Trust Funding Agreement. The Silica PI Trust will be entitled to receive distributions from the Funding Vehicle Trust in accordance with the PI Trust Funding Agreement. See "— PI Trust Funding Agreement" and "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling ~~Injunction~~Injunctions."

*Qualified Settlement Fund*

The Silica PI Trust is intended to be treated for U.S. federal income Tax purposes as a "qualified settlement fund" as described within section 1.468B-1 of the Treasury Regulations, as more specifically provided for under the Silica PI Trust Agreement. Accordingly, for all U.S. federal income Tax purposes the transfer of assets to the Silica PI Trust will be treated as a transfer to a trust satisfying the requirements of section 1.468B-1(c) of the Treasury Regulations by the Debtors and the Funding Vehicle Trust, as transferors, for distribution to holders of Silica Personal Injury Claims and in complete settlement of such Claims. Any income on the assets of the Silica PI Trust will be treated as subject to Tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for Taxes and subject to the withholding and reporting requirements set forth in the Plan and the Silica PI Trust Agreement.

The Silica PI Trustee will be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the Silica PI Trust and will be required by the Silica PI Trust Agreement to (a) timely file such income Tax and other returns and statements and timely pay all Taxes required to be paid from the assets in the Silica PI Trust as required by law and in accordance with the provisions of the Plan and the Silica PI Trust Agreement, (b) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (c) meet all other requirements necessary to qualify and maintain qualification of the Silica PI Trust as a "qualified settlement fund" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations, and (d) take no action that could cause the Silica PI Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations. The Reorganized Debtors will have no rights to any refunds or reversion with respect to any assets of the Silica PI Trust or any earnings thereon.

Within 60 days after the Effective Date (but not later than February 14th of the calendar year following such date), Reorganized KACC will obtain a Qualified Appraisal of the fair market value of the common stock of Reorganized Kaiser Trading transferred to the Silica PI Trust and any New Common Stock theretofore received by the Silica PI Trust in respect of the 4.5% of the KFC Claim transferred to the Silica PI Trust. Following the funding of the Silica PI Trust and the receipt of such Qualified Appraisal (and in no event later than February 15th of the calendar year following the Effective Date), Reorganized KACC will provide, or cause to be provided, to the Silica PI Trustee a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations. Following any subsequent transfers of Cash or other property to the Silica PI Trust, the transferor will provide, or cause to be provided, to the Silica PI Trustee a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

*The Silica PI Trustee*

The Silica PI Trustee will be, and will act as, the fiduciary to the Silica PI Trust in accordance with the provisions of the Silica PI Trust Agreement, the Silica Distribution Procedures and the Plan. Subject to the Silica PI Trust Agreement and the Plan, the Silica PI Trustee will have the power to take any and all actions that it may consider necessary, appropriate or desirable to fulfill the purpose of the Silica PI Trust, including receiving and holding the assets of the Silica PI Trust and exercising all rights and powers with respect thereto, entering into arrangements with third parties and enforcing the rights or fulfilling the obligations of the Silica PI Trust under the Funding Vehicle Trust Agreement and the PI Trust Funding Agreement. Except as requested by the Funding Vehicle Trust, the Silica PI Trustee will not have the power to take any action with respect to any PI Insurance Coverage Action or the PI Insurance Assets other than to enforce the rights of the Silica PI Trust under the Funding Vehicle Trust Agreement and the PI Trust Funding Agreement. The Silica PI Trustee will also serve as a Funding Vehicle Trustee. See "— Funding Vehicle Trust — The Funding Vehicle Trustees."

There will be one Silica PI Trustee. The Future Silica and CTPV Claimants' Representative will serve as the initial Silica PI Trustee.

The Silica PI Trustee will serve until the earliest of his or her death, his or her resignation, his or her removal and the termination of the Silica PI Trust. The Silica PI Trustee may resign at any time and may be removed by the Bankruptcy Court on application of the Silica PI TAC in the event that he or she becomes unable to discharge his or her duties or for other good cause.