Upon the termination of service of the Silica PI Trustee, the vacancy will be filled by the Bankruptcy Court on application of the Silica PI TAC. If the Silica PI TAC fails to seek the appointment of a successor Silica PI Trustee, the Bankruptcy Court will make the appointment on the application of any party in interest.

The Silica PI Trustee will be entitled to receive compensation from the Silica PI Trust for his or her services (including for his or her services as a Funding Vehicle Trustee) in the amount of (a) $60,000 per annum plus (b) $400 per hour for each hour in which he or she attends a meeting or performs other Silica PI Trust business in excess of eight hours in any fiscal quarter. The Silica PI Trustee will determine the scope and duration of activities that constitute a meeting or other Silica PI Trust business. The per annum compensation payable to the Silica PI Trustee will be reviewed every three years and appropriately adjusted with the consent of the Silica PI TAC. The hourly rate will be adjusted annually to reflect reasonable cost-of-living increases. The Silica PI Trustee will also be entitled to reimbursement from the Silica PI Trust for any out-of-pocket fees and expenses reasonably incurred by him or her in connection with the performance of his or her duties (including those fees and expenses incurred in connection with the performance of his or her duties as a Funding Vehicle Trustee).

The Silica PI Trustee will not be permitted to, during the term of his or her service, (a) hold a financial interest in, or act as attorney or agent or serve as any other professional for, any Reorganized Debtor, (b) act as an attorney for any person who holds a Silica Personal Injury Claim, or (c) serve on the trust advisory committee for any PI Trust.

### The Trust Advisory Committee

The member of the Silica PI TAC will serve in a fiduciary capacity, representing all of the holders of present Silica Personal Injury Claims for the purpose of protecting the rights of such persons. The Silica PI Trustee will be required to consult with the Silica PI TAC on the general implementation and administration of the Silica PI Trust and the Silica Distribution Procedures. Additionally, the Silica PI Trustee will be required to obtain the consent of the Silica PI TAC prior to taking a number of actions, including making certain changes to the Silica Distribution Procedures and terminating the Silica PI Trust Agreement.

The Silica PI TAC will consist of one individual. Pursuant to the Confirmation Order, the Bankruptcy Court will confirm the appointment of the individual selected by the Future Silica and CTPV Claimants' Representative, after consultation with the Debtors, to serve as the initial member of the Silica PI TAC.

The member of the Silica PI TAC will serve until the earliest of his or her death, his or her resignation, his or her removal and the termination of the Silica PI Trust. The member of the Silica PI TAC may resign at any time and may be removed at the recommendation of the Silica PI Trustee with the approval of the Bankruptcy Court in the event that he or she becomes unable to discharge his or her duties or for other good cause.

If the member of the Silica PI TAC dies or resigns and, prior to his or her death or the effectiveness of his or her resignation, he or she has designated in writing an individual to succeed him or her as the member of the Silica PI TAC, such individual will be his or her successor. If the member of the Silica PI TAC dies or resigns and did not so designate an individual to succeed him or her, such member's law firm will be entitled to designate his or her successor. If the member of the Silica PI TAC dies or resigns and did not designate an individual to succeed him or her prior and such member's law firm does not designate his or her successor or he or she is removed, his or her successor will be appointed by the Bankruptcy Court.

The member of the Silica PI TAC will be entitled to receive compensation from the Silica PI Trust for attendance at meetings or other Silica PI Trust business performed in the form of a reasonable hourly rate set by the Silica PI Trustee. In addition, the member of the Silica PI TAC will be entitled to reimbursement from the Silica PI Trust for any out-of-pocket fees and expenses reasonably incurred by him or her in connection with the performance of his or her duties.

### Silica PI Trust Termination Provisions

The Silica PI Trust is irrevocable, but generally will terminate on the date which is 90 days after the first to occur of:

- the date on which the Silica PI Trustee determines to terminate the Silica PI Trust because (a) the Silica PI Trustee deems it unlikely that any new Silica Personal Injury Claim will be filed against the Silica PI Trust, (b) all Silica Personal Injury Claims duly filed with the Silica PI Trust have been liquidated and, to the extent possible based upon the funds available to such trust through the Plan and in accordance with the PI Trust Funding Agreement, paid to the extent provided in the Silica PI Trust Agreement and the Silica Distribution Procedures or disallowed by a final, non-appealable order, and (c) 12 consecutive months have elapsed during which no new Silica Personal Injury Claim has been filed with the Silica PI Trust; and

- if the Silica PI Trustee has procured and has in place irrevocable insurance policies and has established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses (including but not limited to Trust Expenses) of the Silica PI Trust in a manner consistent with the Silica PI Trust Agreement and the Silica Distribution Procedures, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order.

**CTPV PI Trust**

### *Creation and Purpose of the CTPV PI Trust*

On the Effective Date, Reorganized KACC, the CTPV PI Trustee and the member of the CTPV PI TAC will execute the CTPV PI Trust Agreement and the CTPV PI Trust will be created. The purpose of the CTPV PI Trust will be to (a) assume the liabilities of the Reorganized Debtors and their predecessors and successors in interest for all CTPV Personal Injury Claims, (b) preserve, hold, manage and maximize the assets of the CTPV PI Trust for use in paying and otherwise satisfying CTPV Personal Injury Claims and paying the Trust Expenses of the CTPV PI Trust, and (c) direct the processing, liquidation and payment of all CTPV Personal Injury Claims in accordance with the CTPV Distribution Procedures, all in accordance with the Plan, the PI Trust Funding Agreement (see "— PI Trust Funding Agreement") and the CTPV PI Trust Agreement.

### *Assumption of Liabilities and Certain Obligations by the CTPV PI Trust*

The CTPV PI Trust will assume all liability and responsibility for all CTPV Personal Injury Claims and the Trust Expenses of the CTPV PI Trust. The CTPV PI Trust will cooperate with the Reorganized Debtors and use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that the Reorganized Debtors may reasonably consider necessary, appropriate or desirable to effect such assumption.

The CTPV PI Trust will advocate in any and all actions and proceedings brought against any Reorganized Debtor that involve CTPV Personal Injury Claims that such Claims are and have been channeled to the CTPV PI Trust and will cooperate with such Reorganized Debtor in any and all such actions and proceedings.

Except as otherwise provided in the CTPV PI Trust Agreement and the CTPV Distribution Procedures, the CTPV PI Trust will have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights, regarding CTPV Personal Injury Claims that any Reorganized Debtor has under applicable law.

Each Reorganized Debtor and each other Kaiser Company will be entitled to indemnification from the CTPV PI Trust for any fees and expenses (including but not limited to out-of-pocket fees and expenses and attorneys' fees and expenses), judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor or other Kaiser Company on or after the Effective Date in connection with any action, suit or proceeding related to CTPV Personal Injury Claims, whether civil, administrative or arbitrative, including but not limited to indemnification or contribution for such Claims prosecuted against such Reorganized Debtor or other Kaiser Company.

Upon the request of the Funding Vehicle Trust, the CTPV PI Trust will (a) provide to the Funding Vehicle Trust any authorization or assignment of rights from the CTPV PI Trust that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to permit the Funding Vehicle Trust to pursue recovery under any Included PI Trust Insurance Policy in respect of CTPV Personal Injury Claims or Trust Expenses of the

CTPV PI Trust and (b) otherwise cooperate with the Funding Vehicle Trust and use commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to effect such recovery, including providing to the Funding Vehicle Trust information relating to CTPV Personal Injury Claims available to the CTPV PI Trust and required to be provided or otherwise made available by the Funding Vehicle Trust pursuant to any insurance settlement agreement assumed by the Funding Vehicle Trust pursuant to Section 5.1.e of the Plan (which is described above under "— Funding Vehicle Trust — Assumption of Certain Liabilities and Obligations by the Funding Vehicle Trust").

### PI Trust Funding Agreement

The CTPV PI Trustee, on behalf of the CTPV PI Trust, will enforce the rights of the CTPV PI Trust under the PI Trust Funding Agreement and will perform, or cause to be performed, all obligations of the CTPV PI Trust, under the PI Trust Funding Agreement. The CTPV PI Trust will be entitled to receive distributions from the Funding Vehicle Trust in accordance with the PI Trust Funding Agreement. See "— PI Trust Funding Agreement" and "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunction."Injunctions."

### Retention of Certain Counsel

Reorganized KACC will not unreasonably withhold consent to the CTPV PI Trust's retention of the professional services of the counsel retained by the Debtors in connection with matters pertaining to the Channeled Personal Injury Claims, including but not limited to KACC's National Coordinating Counsel, Wharton Levin Ehrmantraut & Klein, P.A.

### Qualified Settlement Fund

The CTPV PI Trust is intended to be treated for U.S. federal income Tax purposes as a "qualified settlement fund" as described within section 1.468B-1 of the Treasury Regulations, as more specifically provided for under the CTPV PI Trust Agreement. Accordingly, for all U.S. federal income Tax purposes the transfer of assets to the CTPV PI Trust will be treated as a transfer to a trust satisfying the requirements of section 1.468B-1(c) of the Treasury Regulations by the Funding Vehicle Trust, as transferor, for distribution to holders of CTPV Personal Injury Claims and in complete settlement of such Claims. Any income on the assets of the CTPV PI Trust will be treated as subject to Tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for Taxes and subject to the withholding and reporting requirements set forth in the Plan and the CTPV PI Trust Agreement.

The CTPV PI Trustee will be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the CTPV PI Trust and will be required by the CTPV PI Trust Agreement to (a) timely file such income Tax and other returns and statements and timely pay all Taxes required to be paid from the assets in the CTPV PI Trust as required by law and in accordance with the provisions of the Plan and the CTPV PI Trust Agreement, (b) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (c) meet all other requirements necessary to qualify and maintain qualification of the CTPV PI Trust as a "qualified settlement fund" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations, and (d) take no action that could cause the CTPV PI Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations. The Reorganized Debtors will have no rights to any refunds or reversion with respect to any assets of the CTPV PI Trust or any earnings thereon.

Following the funding of the CTPV PI Trust (and in no event later than February 15th of the calendar year following the Effective Date), the Funding Vehicle Trust will provide, or cause to be provided, to the CTPV PI Trustee a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations. Following any subsequent transfers of Cash or other property to the CTPV PI Trust, the transferor will provide, or cause to be provided, to the CTPV PI Trustee a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

### The CTPV PI Trustee

The CTPV PI Trustee will be, and will act as, the fiduciary to the CTPV PI Trust in accordance with the provisions of the CTPV PI Trust Agreement, the CTPV Distribution Procedures and the Plan. Subject to the CTPV PI Trust Agreement and the Plan, the CTPV PI Trustee will have the power to take any and all actions that it may consider necessary, appropriate or desirable to fulfill the purpose of the CTPV PI Trust, including receiving and holding the assets of the CTPV PI Trust and exercising all rights and powers with respect thereto, entering into arrangements with third parties and enforcing the rights or fulfilling the obligations of the CTPV PI Trust under the Funding Vehicle Trust Agreement and the PI Trust Funding Agreement. Except as requested by the Funding Vehicle Trust, the CTPV PI Trustee will not have the power to take any action with respect to any PI Insurance Coverage Action or the PI Insurance Assets other than to enforce the rights of the CTPV PI Trust under the Funding Vehicle Trust Agreement and the PI Trust Funding Agreement.

There will be one CTPV PI Trustee. The Future Silica and CTPV Claimants' Representative will serve as the initial CTPV PI Trustee.

The CTPV PI Trustee will serve until the earliest of his or her death, his or her resignation, his or her removal and the termination of the CTPV PI Trust. The CTPV PI Trustee may resign at any time and may be removed by the Bankruptcy Court on application of the CTPV PI TAC in the event that he or she becomes unable to discharge his or her duties or for other good cause.

Upon the termination of service of the CTPV PI Trustee, the vacancy will be filled by the Bankruptcy Court on application of the CTPV PI TAC. If the CTPV PI TAC fails to seek the appointment of a successor CTPV PI Trustee, the Bankruptcy Court will make the appointment on the application of any party in interest.

The CTPV PI Trustee will be entitled to receive compensation from the CTPV PI Trust for his or her services in the amount of $400 per hour for each hour in which he or she attends a meeting or performs other CTPV PI Trust business. The CTPV PI Trustee will determine the scope and duration of activities that constitute a meeting or other CTPV PI Trust business and, if the CTPV PI Trustee elects to provide for payment for activities of less than a full day's duration, may provide for a partial payment of the per diem amount on a proportional basis for such activities. The ~~per diem allowance~~hourly rate will be adjusted annually to reflect reasonable cost-of-living increases. The CTPV PI Trustee will also be entitled to reimbursement from the CTPV PI Trust for any out-of-pocket fees and expenses reasonably incurred by him or her in connection with the performance of his or her duties.

The CTPV PI Trustee will not be permitted to, during the term of his or her service, (a) hold a financial interest in, or act as attorney or agent or serve as any other professional for, any Reorganized Debtor, (b) act as an attorney for any person who holds a CTPV Personal Injury Claim, or (c) serve on the trust advisory committee for any PI Trust.

### The Trust Advisory Committee

The member of the CTPV PI TAC will serve in a fiduciary capacity, representing all of the holders of present CTPV Personal Injury Claims for the purpose of protecting the rights of such persons. The CTPV PI Trustee will be required to consult with the CTPV PI TAC on the general implementation and administration of the CTPV PI Trust and the CTPV Distribution Procedures. Additionally, the CTPV PI Trustee will be required to obtain the consent of the CTPV PI TAC prior to taking a number of actions, including making certain changes to the CTPV Distribution Procedures and terminating the CTPV PI Trust.

The CTPV PI TAC will consist of one individual. Pursuant to the Confirmation Order, the Bankruptcy Court will confirm the appointment of the individual selected jointly by the law firms of LeBlanc & Waddell, LLP and Motley Rice LLC, after consultation with the Debtors, to serve as the initial member of the CTPV PI TAC.

The member of the CTPV PI TAC will serve until the earliest of his or her death, his or her resignation, his or her removal and the termination of the CTPV PI Trust. The member of the CTPV PI TAC may resign at any time and may be removed at the recommendation of the CTPV PI Trustee with the approval of the Bankruptcy Court in the event that he or she becomes unable to discharge his or her duties or for other good cause.

If the member of the CTPV PI TAC dies or resigns and, prior to his or her death or the effectiveness of his or her resignation, he or she has designated in writing an individual to succeed him or her as the member of the CTPV PI TAC, such individual will be his or her successor. If the member of the CTPV PI TAC dies or resigns and did not so designate an individual to succeed him or her, such member's law firm will be entitled to designate his or her successor. If the member of the CTPV PI TAC dies or resigns and did not designate an individual to succeed him or her prior and such member's law firm does not designate his or her successor or he or she is removed, his or her successor will be appointed by the Bankruptcy Court.

The member of the CTPV PI TAC will be entitled to receive compensation from the CTPV PI Trust for attendance at meetings or other CTPV PI Trust business performed in the form of a reasonable hourly rate set by the CTPV PI Trustee. In addition, the member of the CTPV PI TAC will be entitled to reimbursement from the CTPV PI Trust for any out-of-pocket fees and expenses reasonably incurred by him or her in connection with the performance of his or her duties.

### CTPV PI Trust Termination Provisions

The CTPV PI Trust is irrevocable, but generally will terminate on the date which is 90 days after the first to occur of:

- the date on which the CTPV PI Trustee determines to terminate the CTPV PI Trust because (a) the CTPV PI Trustee deems it unlikely that any new CTPV Personal Injury Claim will be filed against the CTPV PI Trust, (b) all CTPV Personal Injury Claims duly filed with the CTPV PI Trust have been liquidated and, to the extent possible based upon the funds available to such trust through the Plan and in accordance with the PI Trust Funding Agreement, paid to the extent provided in the CTPV PI Trust Agreement and the CTPV Distribution Procedures or disallowed by a final, non-appealable order, and (c) 12 consecutive months have elapsed during which no new CTPV Personal Injury Claim has been filed with the CTPV PI Trust; and

- if the CTPV PI Trustee has procured and has in place irrevocable insurance policies and has established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses (including but not limited to Trust Expenses) of the CTPV PI Trust in a manner consistent with the CTPV PI Trust Agreement and the CTPV Distribution Procedures, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order.

On the date of such termination, all assets remaining in the CTPV PI Trust estate after payment of all of the CTPV PI Trust's liabilities (including but not limited to Trust Expenses) will be transferred to the Funding Vehicle Trust.

## NIHL PI Trust

### Creation and Purpose of the NIHL PI Trust

On the Effective Date, Reorganized KACC, the NIHL PI Trustee and the member of the NIHL PI TAC will execute the NIHL PI Trust Agreement and the NIHL PI Trust will be created. The purpose of the NIHL PI Trust will be to (a) assume the liabilities of the Reorganized Debtors and their predecessors and successors in interest for all NIHL Personal Injury Claims, (b) preserve, hold, manage and maximize the assets of the NIHL PI Trust for use in paying and otherwise satisfying NIHL Personal Injury Claims and paying the Trust Expenses of the NIHL PI Trust, and (c) direct the processing, liquidation and payment of all NIHL Personal Injury Claims in accordance with the NIHL Distribution Procedures, all in accordance with the Plan, the PI Trust Funding Agreement (see "— PI Trust Funding Agreement") and the NIHL PI Trust Agreement.

### Assumption of Liabilities and Certain Obligations by the NIHL PI Trust

The NIHL PI Trust will assume all liability and responsibility for all NIHL Personal Injury Claims and the Trust Expenses of the NIHL PI Trust. The NIHL PI Trust will cooperate with the Reorganized Debtors and use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that the Reorganized Debtors may reasonably consider necessary, appropriate or desirable to effect such assumption.

88

The NIHL PI Trust will advocate in any and all actions and proceedings brought against any Reorganized Debtor that involve NIHL Personal Injury Claims that such Claims are and have been channeled to the NIHL PI Trust and will cooperate with such Reorganized Debtor in any and all such actions and proceedings.

Except as otherwise provided in the NIHL PI Trust Agreement and the NIHL Distribution Procedures, the NIHL PI Trust will have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights, regarding NIHL Personal Injury Claims that any Reorganized Debtor has under applicable law.

Each Reorganized Debtor and each other Kaiser Company will be entitled to indemnification from the NIHL PI Trust for any fees and expenses (including but not limited to out-of-pocket fees and expenses and attorneys' fees and expenses), judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor or other Kaiser Company on or after the Effective Date in connection with any action, suit or proceeding related to NIHL Personal Injury Claims, whether civil, administrative or arbitrative, including but not limited to indemnification or contribution for such Claims prosecuted against such Reorganized Debtor or other Kaiser Company.

Upon the request of the Funding Vehicle Trust, the NIHL PI Trust will (a) provide to the Funding Vehicle Trust any authorization or assignment of rights from the NIHL PI Trust that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to permit the Funding Vehicle Trust to pursue recovery under any Included PI Trust Insurance Policy in respect of NIHL Personal Injury Claims or Trust Expenses of the NIHL PI Trust and (b) otherwise cooperate with the Funding Vehicle Trust and use commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to effect such recovery, including providing to the Funding Vehicle Trust information relating to NIHL Personal Injury Claims available to the NIHL PI Trust and required to be provided or otherwise made available by the Funding Vehicle Trust pursuant to any insurance settlement agreement assumed by the Funding Vehicle Trust pursuant to Section 5.1.e of the Plan (which is described above under "— Funding Vehicle Trust — Assumption of Certain Liabilities and Obligations by the Funding Vehicle Trust").

### PI Trust Funding Agreement

The NIHL PI Trustee, on behalf of the NIHL PI Trust, will enforce the rights of the NIHL PI Trust under the PI Trust Funding Agreement and will perform, or cause to be performed, all obligations of the NIHL PI Trust under the PI Trust Funding Agreement. The NIHL PI Trust will be entitled to receive distributions from the Funding Vehicle Trust in accordance with the PI Trust Funding Agreement. See "— PI Trust Funding Agreement" and "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunction."Injunctions."

### Retention of Certain Counsel

Reorganized KACC will not unreasonably withhold consent to the NIHL PI Trust's retention of the professional services of the counsel retained by the Debtors in connection with matters pertaining to the Channeled Personal Injury Claims, including but not limited to KACC's National Coordinating Counsel, Wharton Levin Ehrmantraut & Klein, P.A.

### Qualified Settlement Fund

The NIHL PI Trust is intended to be treated for U.S. federal income Tax purposes as a "qualified settlement fund" as described within section 1.468B-1 of the Treasury Regulations, as more specifically provided for under the NIHL PI Trust Agreement. Accordingly, for all U.S. federal income Tax purposes the transfer of assets to the NIHL PI Trust will be treated as a transfer to a trust satisfying the requirements of section 1.468B-1(c) of the Treasury Regulations by the Funding Vehicle Trust, as transferor, for distribution to holders of NIHL Personal Injury Claims and in complete settlement of such Claims. Any income on the assets of the NIHL PI Trust will be treated as subject to Tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for Taxes and subject to the withholding and reporting requirements set forth in the Plan and the NIHL PI Trust Agreement.

The NIHL PI Trustee will be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the NIHL PI Trust and will be required by the NIHL PI Trust Agreement to (a) timely file such income Tax and other returns and statements and timely pay all Taxes required to be paid from the assets in the NIHL PI Trust as required by law and in accordance with the provisions of the Plan and the NIHL PI Trust Agreement, (b) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (c) meet all other requirements necessary to qualify and maintain qualification of the NIHL PI Trust as a "qualified settlement fund" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations, and (d) take no action that could cause the NIHL PI Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations. The Reorganized Debtors will have no rights to any refunds or reversion with respect to any assets of the NIHL PI Trust or any earnings thereon.

Following the funding of the NIHL PI Trust (and in no event later than February 15th of the calendar year following the Effective Date), the Funding Vehicle Trust will provide, or cause to be provided, to the NIHL PI Trustee a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations. Following any subsequent transfers of Cash or other property to the NIHL PI Trust, the transferor will provide, or cause to be provided, to the NIHL PI Trustee a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

### The NIHL PI Trustee

The NIHL PI Trustee will be, and will act as, the fiduciary to the NIHL PI Trust in accordance with the provisions of the NIHL PI Trust Agreement, the NIHL Distribution Procedures and the Plan. Subject to the NIHL PI Trust Agreement and the Plan, the NIHL PI Trustee will have the power to take any and all actions that it may consider necessary, appropriate or desirable to fulfill the purpose of the NIHL PI Trust, including receiving and holding the assets of the NIHL PI Trust and exercising all rights and powers with respect thereto, entering into arrangements with third parties and enforcing the rights or fulfilling the obligations of the NIHL PI Trust under the Funding Vehicle Trust Agreement and the PI Trust Funding Agreement. Except as requested by the Funding Vehicle Trust, the NIHL PI Trustee will not have the power to take any action with respect to any PI Insurance Coverage Action or the PI Insurance Assets other than to enforce the rights of the NIHL PI Trust under the Funding Vehicle Trust Agreement and the PI Trust Funding Agreement.

There will be one NIHL PI Trustee. Pursuant to the Confirmation Order, the Bankruptcy Court will confirm the appointment of the individual selected jointly by the law firms of LeBlanc & Waddell, LLP and Motley Rice LLC, after consultation with the Debtors, to serve as the initial NIHL PI Trustee.

The NIHL PI Trustee will serve until the earliest of his or her death, his or her resignation, his or her removal and the termination of the NIHL PI Trust. The NIHL PI Trustee may resign at any time and may be removed by the Bankruptcy Court on application of the NIHL PI TAC in the event that he or she becomes unable to discharge his or her duties or for other good cause.

Upon the termination of service of the NIHL PI Trustee, the vacancy will be filled by the Bankruptcy Court on application of the NIHL PI TAC. If the NIHL PI TAC fails to seek the appointment of a successor NIHL PI Trustee, the Bankruptcy Court will make the appointment on the application of any party in interest.

The NIHL PI Trustee will be entitled to receive compensation from the NIHL PI Trust for his or her services in the amount of $60,000 per annum, plus a per diem allowance in the amount of $1,500 for meetings attended or other NIHL PI Trust business performed. The NIHL PI Trustee will determine the scope and duration of activities that constitute a meeting or other NIHL PI Trust business and, if the NIHL PI Trustee elects to provide for payment for activities of less than a full day's duration, may provide for a partial payment of the per diem amount on a proportional basis for such activities. The per annum compensation payable to the NIHL PI Trustee will be reviewed every three years and appropriately adjusted with the consent of the NIHL PI TAC. The per diem allowance will be adjusted annually to reflect reasonable cost-of-living increases. The NIHL PI Trustee will also be entitled to reimbursement from the NIHL PI Trust for any out-of-pocket fees and expenses reasonably incurred by him or her in connection with the performance of his or her duties.

The NIHL PI Trustee will not be permitted to, during the term of his or her service, (a) hold a financial interest in, or act as attorney or agent or serve as any other professional for, any Reorganized Debtor, (b) act as an attorney for any person who holds an NIHL Personal Injury Claim, or (c) serve on the trust advisory committee for any PI Trust.

### *The Trust Advisory Committee*

The member of the NIHL PI TAC will serve in a fiduciary capacity, representing all of the holders of present NIHL Personal Injury Claims for the purpose of protecting the rights of such persons. The NIHL PI Trustee will be required to consult with the NIHL PI TAC on the general implementation and administration of the NIHL PI Trust and the NIHL Distribution Procedures. Additionally, the NIHL PI Trustee will be required to obtain the consent of the NIHL PI TAC prior to taking a number of actions, including making certain changes to the NIHL Distribution procedures and terminating the NIHL PI Trust.

The NIHL PI TAC will consist of one individual. Pursuant to the Confirmation Order, the Bankruptcy Court will confirm the appointment of the individual selected jointly by the law firms of LeBlanc & Waddell, LLP and Motley Rice LLC, after consultation with the Debtors, to serve as the initial member of the NIHL PI TAC.

The member of the NIHL PI TAC will serve until the earliest of his or her death, his or her resignation, his or her removal and the termination of the NIHL PI Trust. The member of the NIHL PI TAC may resign at any time and may be removed at the recommendation of the NIHL PI Trustee with the approval of the Bankruptcy Court in the event that he or she becomes unable to discharge his or her duties or for other good cause.

If the member of the NIHL PI TAC dies or resigns and, prior to his or her death or the effectiveness of his or her resignation, he or she has designated in writing an individual to succeed him or her as the member of the NIHL PI TAC, such individual will be his or her successor. If the member of the NIHL PI TAC dies or resigns and did not so designate an individual to succeed him or her, such member's law firm will be entitled to designate his or her successor. If the member of the NIHL PI TAC dies or resigns and did not designate an individual to succeed him or her prior and such member's law firm does not designate his or her successor or he or she is removed, his or her successor will be appointed by the Bankruptcy Court.

The member of the NIHL PI TAC will be entitled to receive compensation from the NIHL PI Trust for attendance at meetings or other NIHL PI Trust business performed in the form of a reasonable hourly rate set by the NIHL PI Trustee. In addition, the member of the NIHL PI TAC will be entitled to reimbursement from the NIHL PI Trust for any out-of-pocket fees and expenses reasonably incurred by him or her in connection with the performance of his or her duties.

### *NIHL PI Trust Termination Provisions*

The NIHL PI Trust is irrevocable, but generally will terminate on the date which is 90 days after the first to occur of:

- the date on which the NIHL PI Trustee determines to terminate the NIHL PI Trust because (a) the NIHL PI Trustee deems it unlikely that any new NIHL Personal Injury Claim will be filed against the NIHL PI Trust, (b) all NIHL Personal Injury Claims duly filed with the NIHL PI Trust have been liquidated and, to the extent possible based upon the funds available to such trust through the Plan and in accordance with the PI Trust Funding Agreement, paid to the extent provided in the NIHL PI Trust Agreement and the NIHL Distribution Procedures or disallowed by a final, non-appealable order, and (c) 12 consecutive months have elapsed during which no new NIHL Personal Injury Claim has been filed with the NIHL PI Trust; and

- if the NIHL PI Trustee has procured and has in place irrevocable insurance policies and has established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses (including but not limited to Trust Expenses) of the NIHL PI Trust in a manner consistent with the NIHL PI Trust Agreement and the NIHL Distribution Procedures, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order.

On the date of such termination, all assets remaining in the NIHL PI Trust estate after payment of all of the NIHL PI Trust's liabilities (including but not limited to Trust Expenses) will be transferred to the Funding Vehicle Trust.

## PI Trust Funding Agreement

The PI Trust Funding Agreement, which is attached to the Plan as Exhibit 1.1(153), was entered into during August 2005, by the Asbestos Claimants' Committee, September 2005 by the Future Asbestos Claimants' Representative, the Future Silica and CTPV Claimants' Representative, Caplin & Drysdale (counsel for the Asbestos Claimants' Committee), Provost & Umphrey Law Firm, L.L.P. (counsel for certain holders of Silica Personal Injury Claims). LeBlanc & Waddell, LLP, Baldwin & Haspel (counsel for certain holders of CTPV Personal Injury Claims) and LeBlanc & Waddell. LLP (counsel for certain holders of NIHL Personal Injury Claims). The primary purpose of the PI Trust Funding Agreement is to specify how the PI Trust Assets (other than the common stock of Reorganized Kaiser Trading and 75% of the KFC Claim, which are allocated pursuant to the Plan directly to the Asbestos PI Trust and Silica PI Trust) must be allocated by the Funding Vehicle Trust to the four PI Trusts.

### *Transfer of PI Trust Assets to Funding Vehicle Trust*

On the Effective Date, pursuant to the Plan, certain specified amounts of Cash and all rights to receive any future proceeds from the Included PI Trust Insurance Policies in respect of Channeled Personal Injury Claims will be transferred to the Funding Vehicle Trust. See "— Funding Vehicle Trust — Transfer of Assets and Cooperation with Respect to Insurance Matters." The Cash transferred to the Funding Vehicle Trust on the Effective Date will consist of (a) $13 million to be paid by KACC, (b) Cash to be transferred to the Funding Vehicle Trust from the Insurance Escrow Settlement Funds, the aggregate amount of which was approximately $14 million as of the date of this Disclosure Statement, and (c) other Cash in an amount not presently determinable that may be received on or prior to the Effective Date in respect of settlements that may be entered into prior to Effective Date with other Settling Insurance Companies in respect of Included PI Trust Insurance Policies. Thereafter, it is anticipated that the Funding Vehicle Trust will receive additional Cash in respect of Included PI Trust Insurance Policies either through settlements reached with insurers subsequent to the Effective Date or through the successful pursuit of PI Insurance Coverage Actions. The amounts that ultimately may be received are not known. See "— Certain Risks Associated with the PI Trusts."

### *Allocation of PI Trust Assets Among the PI Trusts*

Upon the Funding Vehicle Trust's receipt of the PI Insurance Assets and the $13 million in Cash to which the Funding Vehicle Trust is entitled, it will reserve an amount of Cash it deems sufficient for the payment of its Trust Expenses (which include any and all disbursements and expenses in connection with any and all actions to pursue PI Insurance Assets and any and all disbursements and expenses incurred by the Reorganized Debtors in such action or actions to be paid by the Funding Vehicle Trust pursuant to the Plan). The remainder of the Funding Vehicle Trust's assets will be allocated among the PI Trusts as described below.

#### *Asbestos PI Trust*

The Asbestos PI Trust will be entitled to receive from the Funding Vehicle Trust assets (the "Asbestos PI Trust Assets") consisting of 94% of the Net PI Trust Assets. For purposes of the PI Trust Funding Agreement, the term "Net PI Trust Assets" means the Cash received by the Funding Vehicle Trust reduced by (a) the Trust Expenses of the Funding Vehicle Trust, (b) the Post-1985 Recoveries as described below, which will be paid to the Silica PI Trust, (c) the CTPV Present Claims Settlement Amount as described below, which will be paid to the CTPV PI Trust, and (d) the NIHL Claims Settlement Amount as described below, which will be paid to the NIHL PI Trust. (The Asbestos PI Trust will also be entitled to receive 94% of the common stock of Reorganized Kaiser Trading and 70.5% of the KFC Claim. See "— Asbestos PI Trust — Transfer of Certain Property to the Asbestos PI Trust.")

#### *Silica PI Trust*

The Silica PI Trust will be entitled to receive assets (the "Silica PI Trust Assets") consisting of the Post-1985 Recoveries plus 6% of the Net PI Trust Assets, except that, subject to certain conditions specified in the PI Trust Funding Agreement, 5% of such amounts will be reservedheld by the Funding Vehicle Trust in a(or, if agreed by the Funding Vehicle Trustees, the Silica Trust) in a separate reserve (the "CTPV Reserve") for up to 10

years after the Effective Date to provide for payment of allowed future CTPV Personal Injury Claims, if any, in accordance with the CTPV Distribution Procedures (see "— CTPV PI Trust"). Amounts in the CTPV Reserve not applied to future CTPV Personal Injury Claims will be paid over to the Silica PI Trust. For purposes of the PI Trust Funding Agreement, the term "Post-1985 Recoveries" means recoveries attributable to post-1985 products coverage insurance policies identified in the PI Trust Funding Agreement., as calculated in accordance with the PI Trust Funding Agreement. (The Silica PI Trust will also be entitled to receive 6% of the common stock of Reorganized Kaiser Trading and 4.5% of the KFC Claim. See "— Silica PI Trust — Transfer of Certain Property to the Silica PI Trust.")

### CTPV PI Trust

The CTPV PI Trust will be entitled to receive an amount (the "CTPV Present Claims Settlement Amount") consisting of the lesser of (ia) $4,488,000 or (ii) b) an amount equal to the number of present CTPV Personal Injury Claims allowed in accordance with the CTPV Distribution Procedures times $136,000.multiplied by (i) $136,000 and (ii) any applicable payment percentage set forth in the CTPV Distribution Procedures (see "PI Trust Distribution Procedures — CTPV Distribution Procedures). In addition, the CTPV PI Trust, to the extent future CTPV Personal Injury Claims are allowed under the CTPV Distribution Procedures, will receive additional funds from the CTPV Reserve described above(see "— Silica PI Trust").

### NIHL PI Trust

The NIHL PI Trust will be entitled to receive an amount (the "NIHL claimsClaims Settlement Amount") consisting of an amount equal to $24,000,000$24 million reduced by the CTPV Present Claims Settlement Amount described above. Accordingly, the NIHL Claims Settlement Amount will be at least $19,512,000.

### *Distributions to the PI Trusts*

The Funding Vehicle Trustees will make periodic distributions to each of the four PI Trusts from Available Cash held by the Funding Vehicle Trust in accordance with the Funding Vehicle Trust Agreement. For purposes of the PI Trust Funding Agreement, the term "Available Cash" means the Cash held by the Funding Vehicle Trust from time to time less (a) the amount of Cash then held in the reserve established from time to time by the Funding Vehicle Trustees to provide for the payment of the Trust Expenses of the Funding Vehicle Trust (see "— Allocation of PI Trust Assets Among the PI Trusts") and (b) the Post-1985 Recoveries, all of which are payable to the Silica PI Trust (see "— Allocation of PI Trust Assets Among the PI Trusts — Silica PI Trust"). The PI Trust Funding Agreement provides that the first $400,000,000400 million of Available Cash will be distributed as follows: (i) of the first $15,000,000, $2,500,00015 million, $2.5 million to the CTPV PI Trust and $12,500,00012.5 million to the NIHL PI Trust for the payment of allowed present CTPV Personal Injury Claims and allowed present NIHL Personal Injury Claims in accordance with the applicable PI Trust Distribution ProcedureProcedures and (ii) of the balance, 94% to the Asbestos PI Trust and 6% to the Silica PI Trust, except that, if the initial distribution out of such $400,000,000400 million of Available Cash is less than $100,000,000.100 million, the first $10,000,00010 million of such initial distribution will be as follows, with such disproportionate distributions to be recovered and redistributed ratably out of the balance of distributions of such first $400,000,000400 million:

(A)  $5,000,0005 million to the Asbestos PI Trust as a credit against the Asbestos PI Trust Assets;

(B)  $4,000,0004 million to the Silica PI Trust as a credit against the Silica PI Trust Assets;

(C)  $500,000 to the CTPV PI Trust as a credit against the CTPV Present Claims Settlement Amount; and

(D)  $500,000 to the NIHL PI Trust as a credit against the NIHL Claims Settlement Amount.

All remaining Available Cash after the first $400,000,000 will be distributed as follows: (a) of the first $9,000,000,9 million, a maximum of $1,988,000 to the CTPV PI Trust and the balance to the NIHL PI Trust for the payment of allowed present CTPV Personal Injury Claims and allowed present NIHL Personal Injury Claims in accordance with the applicable PI Trust Distribution ProcedureProcedures and (b) of the balance, 94% to the Asbestos PI Trust and 6% to the Silica PI Trust.

**Insurance Neutrality**

Nothing in the Plan, any Exhibit to the Plan, the Confirmation Order, any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan, or any order or opinion entered on appeal from the Confirmation Order will limit the right of any PI Insurance Company, in any PI Insurance Coverage Action, to assert any PI Insurer Coverage Defense, except that (a) the transfer of rights in and under the Included PI Insurance Policies to the Funding Vehicle Trust is valid and enforceable and transfers such rights under the Included PI Trust Insurance Policies as the Debtors may have, and that such transfer will not affect the liability of any PI Insurance Company, and (b) the discharge and release of the Debtors and Reorganized Debtors from all Claims and the injunctive protection provided to the Debtors, Reorganized Debtors and Protected Parties with respect to Claims as provided in the Plan will not affect the liability of any PI Insurance Company, except to the extent that any such PI Insurance Company is also a Settling Insurance Company. Notwithstanding anything in the provisions of the Plan described in this paragraph (*i.e.*, Section 5.6 of the Plan) to the contrary, nothing in Section 5.6 of the Plan will affect or limit, or be construed as affecting or limiting, (i) the binding effect of the Plan and the Confirmation Order on the Debtors, the Reorganized Debtors, the Funding Vehicle Trust, the PI Trusts or the beneficiaries of any such Trusts or (ii) the protection afforded to any Settling Insurance Company by a PI Channeling Injunction and/or the Channeled PI Insurance Entity Injunction. Further, nothing in Section 5.6 of the Plan is intended to be or will be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any PI Insurance Company with respect to any issue that is actually litigated by such PI Insurance Company as part of its objections to Confirmation of the Plan. For purposes of the Plan, the term "PI Insurer Coverage Defenses" means all defenses at law or in equity that any PI Insurance Company of an Included PI Trust Insurance Policy may have under applicable non-bankruptcy law to provide insurance coverage to or for Channeled Personal Injury Claims or Trust Expenses of the Funding Vehicle Trust or any PI Trust that have been channeled to or assumed by or incurred by the Funding Vehicle Trust or a PI Trust, respectively, pursuant to the Plan, except for (A) any defense that the transfer of the Debtors' rights as to Included PI Trust Insurance Policies pursuant to the Plan is invalid or unenforceable or otherwise breaches the terms of such coverage and (B) any defense that the drafting, proposing, confirmation or consummation of a plan of reorganization (as opposed to the terms, operation, effect or unreasonableness of any of the Plan or the Exhibits to the Plan) and/or the discharge and/or release of the Debtors from liability for Channeled Personal Injury Claims pursuant to the Plan operates to, or otherwise results in, the elimination of or the reduction in any obligation such insurers may have under such transferred rights as to Included PI Trust Insurance Policies.

**PI Trust Distribution Procedures**

### *Asbestos Distribution Procedures*

#### *Asbestos PI Trust Goals*

The Asbestos PI Trustees will implement and administer the Asbestos Distribution Procedures, which are attached to the Plan as Exhibit 1.1(34). The Asbestos Distribution Procedures have been adopted after negotiations between and among the Future Asbestos Claimants' Representative, the Asbestos Claimants' Committee and the Debtors. The goal of the Asbestos PI Trust is to treat all claimants similarly and equitably. The Asbestos Distribution Procedures further that goal by setting forth procedures for processing and paying the Debtors' several shares of the unpaid portion of the liquidated value of Asbestos Personal Injury Claims generally on an impartial, first-in, first-out ("FIFO") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their Claims based on historical values for substantially similar claims in the tort system. To this end, the Asbestos Distribution Procedures establish a schedule of eight asbestos-related diseases ("Asbestos Disease Levels"), seven of which have presumptive medical and exposure requirements ("Asbestos Medical/Exposure Criteria"), specific liquidated values (the "Asbestos Scheduled Values"), anticipated average values ("Asbestos Average Values") and caps on their liquidated values ("Asbestos Maximum Values"). The Asbestos Disease Levels, Asbestos Medical/Exposure Criteria, Asbestos Scheduled Values, Asbestos Average Values and Asbestos Maximum Values have all been selected and derived with the intention of achieving a fair allocation of the PI Trust Assets allocated to the Asbestos PI Trust as among claimants suffering from different disease processes in light of the best available information and taking into consideration the Debtors' history of settling claims and the rights claimants would have in the tort system absent the Reorganization Cases.

*Disease Levels, Scheduled Values and Medical/Exposure Criteria*

The eight Asbestos Disease Levels covered by the Asbestos Distribution Procedures, together with the Asbestos Medical/Exposure Criteria for each and the Asbestos Scheduled Values for the seven Asbestos Disease Levels eligible for expedited review under the Asbestos Distribution Procedures ("Asbestos Expedited Review"), are set forth below. See "— Evidentiary Requirements" for a description of evidentiary requirements for both medical diagnoses and exposure. These Asbestos Disease Levels, Asbestos Scheduled Values and Asbestos Medical/Exposure Criteria will apply to all Asbestos Trust Voting Claims (as defined in the Asbestos Distribution Procedures) filed with the Asbestos PI Trust on or before the date that the Asbestos PI Trust first makes available the Claim forms and other Claims materials required to file a Claim with the Asbestos PI Trust (the "Initial Asbestos Claims Filing Date"). Thereafter, with the consent of the Asbestos PI TAC and the Future Asbestos Claimants' Representative, the Asbestos PI Trustees may (a) add to, change or eliminate Asbestos Disease Levels, Asbestos Scheduled Values or Asbestos Medical/Exposure Criteria, (b) develop subcategories of Asbestos Disease Levels, Asbestos Scheduled Values or Asbestos Medical/Exposure Criteria, or (c) determine that a novel or exceptional Asbestos Personal Injury Claim is compensable even though it does not meet the Asbestos Medical/Exposure Criteria for any of the then-current Asbestos Disease Levels.

| Asbestos Disease Level | Asbestos Scheduled Value | Asbestos Medical/Exposure Criteria |
| --- | --- | --- |
| Level VIII (Mesothelioma) | $70,000 | (a) Diagnosis[1] of mesothelioma and (b) credible evidence of Kaiser Exposure (as defined in the Asbestos Distribution Procedures). |
| Level VII (Lung Cancer 1) | $27,500 | (a) Diagnosis of a primary lung cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease,[2] (b) six months of Kaiser Exposure prior to December 31, 1982, (c) Significant Occupational Exposure (as defined in the Asbestos Distribution Procedures) to asbestos, and (d) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| Level VI (Lung Cancer 2) | None | (a) Diagnosis of a primary lung cancer, (b) Kaiser Exposure prior to December 31, 1982, and (c) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
|  |  | Asbestos Disease Level VI (Lung Cancer 2) Claims are Claims that do not meet the more stringent medical and/or exposure requirements of Asbestos Disease Level VII (Lung Cancer 1) Claims. All Claims in Asbestos Disease Level VI will be individually evaluated. The estimated likely average of the individual evaluation awards for such Claims is $ 7,000, with such awards capped at $20,000, unless the Claim qualifies for Extraordinary Asbestos Claim (as defined below) treatment. |
|  |  | Asbestos Disease Level VI Claims that show no evidence of either an underlying Bilateral Asbestos-Related ~~Non-malignant~~Nonmalignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such Claims will be treated as having any significant value, especially if the claimant is also a smoker.[3] |
| Level V (Other Cancer) | $13,800 | (a) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (b) six months of Kaiser Exposure prior to December 31, 1982, (c) Significant Occupational Exposure to asbestos, and (d) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |

| Asbestos Disease Level | Asbestos Scheduled Value | Asbestos Medical/Exposure Criteria |
|---|---|---|
| Level IV (Severe Asbestosis) | $20,750 | (a) Diagnosis of asbestosis with ILO of 2/1 (*i.e.*, 2/1 on the International Labour Organization scale) or greater or asbestosis determined by pathological evidence of asbestos, plus (i) TLC (*i.e.*, total lung capacity) less than 65% or (ii) FVC (*i.e.*, forced vital capacity) less than 65% and FEV1/FVC ratio (*i.e.*, ratio of forced expiratory volume in the first second of forced expiration to FVC) greater than 65%, (b) six months of Kaiser Exposure prior to December 31, 1982, (c) Significant Occupational Exposure to asbestos, and (d) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Level III (Asbestosis/Pleural Disease) | $4,850 | (a) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease, plus (i) TLC less than 80% or (ii) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, (b) six months of Kaiser Exposure prior to December 31, 1982, (c) Significant Occupational Exposure to asbestos, and (d) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Level II (Asbestosis/Pleural Disease) | $700 | (a) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, (b) six months of Kaiser Exposure prior to December 31, 1982, and (c) five years cumulative occupational exposure to asbestos. |
| Level I (Other Asbestos Disease — Cash Discount Payment) | $200 | (a) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma, and (b) Kaiser Exposure prior to December 31, 1982. |

1   The requirements for a diagnosis of an asbestos-related disease that may be compensated are set forth in the Asbestos Distribution Procedures.

2   Evidence of "Bilateral Asbestos-Related Nonmalignant Disease," for purposes of meeting the criteria for establishing Asbestos Disease Level I, II, III, V and VII, is described in the Asbestos Distribution Procedures as either (a) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO (*i.e.*, International Labour Organization) scale or (b) (i) a chest X-ray read by a qualified B reader, (ii) a CT scan read by a qualified physician, or (iii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Solely for claims filed against a Debtor or another asbestos defendant in the tort system prior to the Petition Date, if an ILO reading is not available, either (A) a chest X-ray or a CT scan read by a qualified physician or (B) pathology, showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening or bilateral pleural calcification consistent with, or compatible with, a diagnosis of asbestos-related disease will be evidence of Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Asbestos Disease Level I, II, III, V or VII. Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).

3   There is no distinction between non-smokers and smokers for either Asbestos Disease Level VII (Lung Cancer 1) or Asbestos Disease Level VI (Lung Cancer 2), although a claimant who meets the more stringent requirements of Asbestos Disease Level VII (Lung Cancer 1) (*i.e.*, evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure) and who is also a non-smoker may wish to have his or her Claim individually evaluated by the Asbestos PI Trust. In such case, absent circumstances that would otherwise reduce the value of the Claim, it is anticipated that the liquidated value of the Claim might well exceed the $27,500 Scheduled Value for Asbestos Disease Level VII (Lung Cancer 1) shown above. For purposes of the Asbestos Distribution Procedures, "non-smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the 12 years immediately prior to the diagnosis of the lung cancer.

*Claims Liquidation Procedures*

Asbestos Personal Injury Claims will be processed based on their place on in a FIFO processing queue (the "Asbestos FIFO Processing Queue") to be established pursuant to the Asbestos Distribution Procedures. The Asbestos PI Trust will take all reasonable steps to resolve Asbestos Personal Injury Claims as efficiently and expeditiously as possible at each stage of Claims processing and arbitration. To this end, the Asbestos PI Trust, in its sole discretion, may conduct settlement discussions with claimants' representatives with respect to more than one Claim at a time, provided that the claimants' respective positions in the Asbestos FIFO Processing Queue are maintained and each Claim is individually evaluated pursuant to the valuation factors set forth in the Asbestos Distribution Procedures. The Asbestos PI Trust will also make every effort to resolve each year at least that number of Asbestos Personal Injury Claims required to exhaust the maximum annual payment ("Maximum Annual Asbestos Payment") and the maximum available payment ("Maximum Available Asbestos Payment") for Category A Asbestos Claims (as defined below) and Category B Asbestos Claims (as defined below) under the Asbestos Distribution Procedures.

The Asbestos PI Trust will liquidate all Asbestos Personal Injury Claims except Foreign Claims (as defined in the Asbestos Distribution Procedures) that meet the presumptive Asbestos Medical/Exposure Criteria of Asbestos Disease Level I (Other Asbestos Disease — Cash Discount Payment), Asbestos Disease Level II (Asbestosis/Pleural Disease), Asbestos Disease Level III (Asbestosis/Pleural Disease), Asbestos Disease Level IV (Severe Asbestosis), Asbestos Disease Level V (Other Cancer), Asbestos Disease Level VII (Lung Cancer 1) and Asbestos Disease Level VIII (Mesothelioma) under the process for Expedited Review. A holder of an Asbestos Personal Injury Claim qualifying for treatment under Asbestos Disease Level IV, V, VI, VII or VIII may, in addition or alternatively, seek to establish a liquidated value for the Claim that is greater than its Asbestos Scheduled Value by electing the process for individual review under the Asbestos Distribution Procedures ("Asbestos Individual Review"). However, the liquidated value of an Asbestos Personal Injury Claim that undergoes Asbestos Individual Review for valuation purposes may be determined to be less than its Asbestos Scheduled Value and, in any event, will not exceed the Asbestos Maximum Value for the relevant Asbestos Disease Level, unless the Claim qualifies as an Extraordinary Asbestos Claim, in which case its liquidated value cannot exceed the Asbestos Maximum Value specified in that provision of the Asbestos Distribution Procedures for such Claims. Claims qualifying for treatment under Asbestos Disease Level VI (Lung Cancer 2) and all Foreign Claims may be liquidated only pursuant to Asbestos Individual Review.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of the Claim will be subject to mandatory *pro bono* evaluation and mediation and then, at the election of the claimant, to binding or non-binding arbitration under procedures that are provided on Attachment A to the Asbestos Distribution Procedures. Asbestos Personal Injury Claims that are the subject of a dispute with the Asbestos PI Trust that cannot be resolved by non-binding arbitration may enter the tort system. However, if and when the holder of such a Claim obtains a judgment in the tort system, the judgment will be payable subject to the applicable payment percentage under the Asbestos Distribution Procedures ("Asbestos Payment Percentage"), the Maximum Available Asbestos Payment and the claims payment ratio under the Asbestos Distribution Procedures (the "Asbestos Claims Payment Ratio").

*Asbestos Payment Percentage*

After the liquidated value of any Asbestos Personal Injury Claim other than a Claim qualifying for treatment under Level I is determined pursuant to the process for Asbestos Expedited Review, pursuant to the process for Asbestos Individual Review, by arbitration or by litigation in the tort system as set forth in Asbestos Distribution Procedures, the holder of such Claim will ultimately receive a pro rata share of that value based on the Asbestos Payment Percentage. The Asbestos Payment Percentage will also apply to all Prepetition Liquidated Asbestos PI Trust Claims (as defined below).

The initial Asbestos Payment Percentage will be set after the Asbestos PI Trust is established by the Asbestos PI Trustees, the Asbestos PI TAC and the Future Asbestos Claimants' Representative. The initial Asbestos Payment Percentage will be calculated on the assumption that the average values under the Asbestos Distribution Procedures ("Asbestos Average Values") will be achieved with respect to existing present Claims and projected future Claims qualifying for treatment under Asbestos Disease Level IV, V, VI, VII or VIII.

The Asbestos Payment Percentage may thereafter be adjusted upwards or downwards from time to time by the Asbestos PI Trustees with the consent of the Asbestos PI TAC and the Future Asbestos Claimants' Representative to reflect then-current estimates of the Asbestos PI Trust's assets and its liabilities, as well as the then-estimated value of pending and future Claims. If the Asbestos Payment Percentage is increased over time, holders of Claims which were liquidated and paid in prior periods under the Asbestos Distribution Procedures will not receive additional payments, except as provided in Section 4.3 of the Asbestos Distribution Procedures, which relates to circumstances in which the Asbestos PI Trust receives a substantial recovery of insurance proceeds. Because there is uncertainty in the prediction of both the number and severity of future Asbestos Personal Injury Claims and the amount of the Asbestos PI Trust's assets, no guarantee can be made of any Asbestos Payment Percentage of an Asbestos Personal Injury Claim's liquidated value.

*Maximum Annual Asbestos Payment and Maximum Available Asbestos Payment*

The Asbestos PI Trust will estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds will be available to treat all present and future claimants as similarly as possible. In each year the Asbestos PI Trust will be empowered to pay out all of the interest earned during the year, together with a portion of its principal, calculated so that the application of Asbestos PI Trust funds over its life will correspond with the needs created by the anticipated flow of Claims (*i.e.*, the Maximum Annual Asbestos Payment), taking into account the Asbestos Payment Percentage provisions of the Asbestos Distribution Procedures. The Asbestos PI Trust's distributions to all claimants for that year will not exceed the Maximum Annual Asbestos Payment determined for that year.

In distributing the Maximum Annual Asbestos Payment, the Asbestos PI Trust will first allocate the available amount to outstanding Prepetition Liquidated Asbestos PI Trust Claims and to liquidated Asbestos Personal Injury Claims qualifying for treatment under Asbestos Disease Level I, in proportion to the aggregate value of each such group of Claims. Any remaining portion of the Maximum Annual Asbestos Payment (*i.e.*, the Maximum Available Asbestos Payment) will then be allocated and used to satisfy all other liquidated Asbestos Personal Injury Claims, subject to the Asbestos Claims Payment Ratio. In the event there are insufficient funds in any year to pay in full the outstanding Prepetition Liquidated Asbestos PI Trust Claims and/or previously liquidated Claims qualifying for treatment under Asbestos Disease Level I, the available funds allocated to that group of Claims will be paid to the maximum extent to claimants in the particular group based on their place in a FIFO payment queue, (the "Asbestos FIFO Payment Queue"). Claims in either group for which there are insufficient funds will be carried over to the next year and placed at the head of their Asbestos FIFO Payment Queue.

*Asbestos Claims Payment Ratio*

Based upon the Debtors' history of claims settlement and analysis of present and future Claims, an Asbestos Claims Payment Ratio has been determined which, as of the Effective Date, has been set at 70% for Asbestos Personal Injury Claims qualifying for treatment under Asbestos Disease Level IV, V, VI, VII or VIII that were unliquidated as of the Petition Date ("Category A Asbestos Claims") and at 30% for Asbestos Personal Injury Claims qualifying for treatment under Asbestos Disease Level II or III that were similarly unliquidated as of the Petition Date ("Category B Asbestos Claims"). The Asbestos Claims Payment Ratio will not apply to any Prepetition Liquidated Asbestos PI Trust Claims or to any Claims qualifying for treatment under Asbestos Disease Level I. In each year, after the determination of the Maximum Available Asbestos Payment, 70% of that amount will be available to pay Category A Asbestos Claims and 30% will be available to pay Category B Asbestos Claims that have been liquidated since the Petition Date.

The 70%/30% Asbestos Claims Payment Ratio will apply to all Asbestos Trust Voting Claims except Prepetition Liquidated Asbestos PI Trust Claims and Claims qualifying for treatment under Asbestos Disease Level I and will not be amended until the fifth anniversary of the Effective Date. Thereafter, the Asbestos Claims Payment Ratio will be continued absent circumstances, such as a significant change in law or medicine, necessitating amendment to avoid a manifest injustice.

No amendment to the Asbestos Claims Payment Ratio may be made without the consent of the Asbestos PI TAC and the Future Asbestos Claimants' Representative. However, the Asbestos PI Trustees, with the consent of the Asbestos PI TAC and the Future Asbestos Claimants' Representative, may offer the option of a reduced Asbestos

Payment Percentage to holders of either Category A Asbestos Claims or Category B Asbestos Claims in return for more prompt payment.

### Indemnity and Contribution Claims

Indirect Channeled Personal Injury Claims relating to asbestos that have not been disallowed, discharged or otherwise resolved by prior order of the Bankruptcy Court will be processed in accordance with the applicable provisions of the Asbestos Distribution Procedures and procedures to be developed and implemented by the Asbestos PI Trustees, which procedures (a) will determine the validity, allowability and enforceability of such Claims and (b) will otherwise provide the same liquidation and payment procedures and rights to the holders of such Claims as the Asbestos PI Trust would have afforded the holders of the underlying valid Asbestos Personal Injury Claims.

### Ordering of Claims

The Asbestos PI Trust will order Asbestos Personal Injury Claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis (*i.e.*, by reference to a claimants' position in the Asbestos FIFO Processing Queue) except as otherwise provided in the Asbestos Distribution Procedures. For all Claims filed on or before the date six months after the Initial Asbestos Claims Filing Date, a claimant's position in the Asbestos FIFO Processing Queue will be determined as of the earlier of (a) the date prior to the Petition Date that the specific Claim was either filed against the Debtors in the tort system or was actually submitted to the Debtors pursuant to an administrative settlement agreement, if any, (b) the date before the Petition Date that a Claim was filed against another defendant in the tort system if at the time the Claim was subject to a tolling agreement with the Debtors, (c) the date after the Petition Date but before the Initial Asbestos Claims Filing Date that the Claim was filed against another defendant in the tort system, if any, (d) the date after the Petition Date but before the Effective Date that a proof of Claim was Filed against the Debtors in the Reorganization Cases, if any, or (e) the date a Ballot was submitted in the Reorganization Cases for purposes of voting on the Plan in accordance with the voting procedures adopted by the Bankruptcy Court.

Following the Initial Asbestos Claims Filing Date, the claimant's position in the Asbestos FIFO Processing Queue will be determined by the date the Claim is filed with the Asbestos PI Trust. If any Claims are filed on the same date, the claimant's position in the Asbestos FIFO Processing Queue will be determined by the date of the diagnosis of the claimant's asbestos-related disease. If any Claims are filed and diagnosed on the same date, the claimant's position in the Asbestos FIFO Processing Queue will be determined by the date of the claimant's birth, with older claimants given priority over younger claimants.

### Payment of Claims

Asbestos Personal Injury Claims that have been liquidated pursuant to the process for Asbestos Expedited Review, pursuant to the process for Asbestos Individual Review, by arbitration or by litigation in the tort system will be paid in FIFO order based on the date their liquidation became final, all such payments being subject to the applicable Asbestos Payment Percentage, the Maximum Available Asbestos Payment and the Asbestos Claims Payment Ratio, except as otherwise provided in the Asbestos Distribution Procedures.

### Resolution of Prepetition Liquidated Asbestos Personal Injury Claims

As soon as practicable after the Effective Date, the Asbestos PI Trust will, upon submission by the claimant of the applicable Claim form (included on Attachment B to the Asbestos Distribution Procedures), together with all documentation required thereunder, pay all Asbestos Personal Injury Claims that were liquidated by (a) a binding settlement agreement for the particular Claim entered into prior to the Petition Date that is judicially enforceable by the claimant, (b) a jury verdict or non-final judgment in the tort system obtained prior to the Petition Date, or (c) by a judgment that became final and non-appealable prior to the Petition Date (collectively, "Prepetition Liquidated Asbestos PI Trust Claims").

The liquidated value of a Prepetition Liquidated Asbestos PI Trust Claim will be the Debtors' share of the unpaid portion of the amount agreed to in the binding settlement agreement, the unpaid portion of the amount awarded by the jury verdict or non-final judgment or the unpaid portion of the amount of the final judgment, as the

99

case may be, plus interest that has accrued on that amount in accordance with the terms of the agreement, if any, or under applicable state law for settlements or judgments as of the Petition Date; however, except as otherwise provided below, the liquidated value of a Prepetition Liquidated Asbestos PI Trust Claim will not include any punitive or exemplary damages. In the absence of a final order of the Bankruptcy Court determining whether a settlement agreement is binding and judicially enforceable, a dispute between the claimant and the Asbestos PI Trust over this issue will be resolved pursuant to the same procedures in the Asbestos Distribution Procedures that are provided for resolving the validity and/or liquidated value of an Asbestos Personal Injury Claim.

Prepetition Liquidated Asbestos PI Trust Claims will be processed and paid in accordance with their order in a separate Asbestos FIFO Processing Queue to be established by the Asbestos PI Trustees based on the date the Asbestos PI Trust received a completed Claim form with all required documentation for the particular Claim, except that the amounts payable with respect to such Claims will not be subject to or taken into account in consideration of the Asbestos Claims Payment Ratio, but will be subject to the Maximum Annual Asbestos Payment and Asbestos Payment Percentage provisions of the Asbestos Distribution Procedures described above. See "— Maximum Annual Asbestos Payment and Maximum Available Asbestos Payment." If any Prepetition Liquidated Asbestos PI Trust Claims were filed on the same date, the respective positions of the holders of such Claims in the Asbestos FIFO Processing Queue for such Claims will be determined by the date on which each Claim was liquidated. If any Prepetition Liquidated Asbestos PI Trust Claims were both filed and liquidated on the same dates, the positions of those claimants in the Asbestos FIFO Processing Queue will be determined by the claimants' dates of birth, with older claimants given priority over younger claimants.

*Resolution of Unliquidated Asbestos Personal Injury Claims*

Within six months after the establishment of the Asbestos PI Trust, the Asbestos PI Trustees with the consent of the Asbestos PI TAC and the Future Asbestos Claimants' Representative will adopt procedures for reviewing and liquidating all unliquidated Asbestos Personal Injury Claims, which will include deadlines for processing such Claims. Such procedures will also require claimants seeking resolution of unliquidated Asbestos Personal Injury Claims to first file a Claim form, together with the required supporting documentation. It is anticipated that the Asbestos PI Trust will provide an initial response to the claimant within six months of receiving the Claim form.

Upon filing of a valid Claim form with the required supporting documentation, the claimant will be placed in the Asbestos FIFO Processing Queue in accordance with the ordering criteria described above. See "—Ordering of Claims." The Asbestos PI Trust will provide the claimant with six months' notice of the date by which it expects to reach the Claim in the Asbestos FIFO Processing Queue, following which the claimant must promptly (a) advise the Asbestos PI Trust whether the Claim should be liquidated pursuant to the process for Asbestos Expedited Review or, in certain circumstances, pursuant to the process for Asbestos Individual Review, (b) provide the Asbestos PI Trust with any additional medical and/or exposure evidence that was not provided with the original Claim submission, and (c) advise the Asbestos PI Trust of any change in the claimant's Asbestos Disease Level. If a claimant fails to respond to the Asbestos PI Trust's notice prior to the reaching of the Claim in the Asbestos FIFO Processing Queue, the Asbestos PI Trust will process and liquidate the Claim pursuant to the process for Asbestos Expedited Review based upon the medical/exposure evidence previously submitted by the claimant, although the claimant will retain the right to request processing and liquidation pursuant to the process for Asbestos Individual Review. See "— Claims Liquidation Procedures."

*Asbestos Expedited Review Process*

The Asbestos PI Trust's process for Asbestos Expedited Review is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all Asbestos Personal Injury Claims (except those Claims qualifying for treatment under Asbestos Disease Level VI and all Foreign Claims, which will be liquidated pursuant to the process for Asbestos Individual Review) where the Claim can easily be verified by the Asbestos PI Trust as meeting the presumptive Asbestos Medical/Exposure Criteria for the relevant Asbestos Disease Level. Asbestos Expedited Review thus provides claimants with a substantially less burdensome process for pursuing Asbestos Personal Injury Claims than does Asbestos Individual Review. Asbestos Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

Claims that undergo Asbestos Expedited Review and meet the presumptive Asbestos Medical/Exposure Criteria for the relevant Asbestos Disease Level will be paid the Asbestos Scheduled Value for such Asbestos Disease Level. However, except for Claims qualifying for treatment under Asbestos Disease Level I, all Claims liquidated pursuant to the Asbestos Expedited Review process will be subject to the applicable Asbestos Payment Percentage, the Maximum Available Asbestos Payment and the Asbestos Claims Payment Ratio. See "— Asbestos Payment Percentage," "— Maximum Annual Asbestos Payment and Maximum Available Asbestos Payment" and "— Asbestos Claims Payment Ratio." Claimants holding Claims that cannot be liquidated by Asbestos Expedited Review because they do not meet the presumptive Asbestos Medical/Exposure Criteria for the relevant Asbestos Disease Level may elect Asbestos Individual Review.

### Claims Processing Under Asbestos Expedited Review

All claimants seeking liquidation of their Asbestos Personal Injury Claims pursuant to the process for Asbestos Expedited Review must file the Claim form provided on Attachment B to the Asbestos Distribution Procedures. As a Claim form is reached in the Asbestos FIFO Processing Queue, the Asbestos PI Trust will determine whether the Claim described therein meets the Asbestos Medical/Exposure Criteria for one of the seven Asbestos Disease Levels eligible for Asbestos Expedited Review and will advise the claimant of its determination. If an Asbestos Disease Level is determined to be applicable to a Claim, the Asbestos PI Trust will tender to the claimant an offer of payment of the Asbestos Scheduled Value for the relevant Asbestos Disease Level multiplied by the applicable Asbestos Payment Percentage, together with a form of release approved by the Asbestos PI Trust. If the claimant accepts the Asbestos Scheduled Value and returns the release properly executed, the Claim will be placed in the Asbestos FIFO Payment Queue, following which the Asbestos PI Trust will disburse payment subject to the limitations of the Maximum Available Asbestos Payment and Asbestos Claims Payment Ratio, if any.

### Asbestos Individual Review Process

The Asbestos PI Trust's process for Asbestos Individual Review provides a claimant with an opportunity for individual consideration and evaluation of an Asbestos Personal Injury Claim that fails to meet the presumptive Asbestos Medical/Exposure Criteria for Asbestos Disease Level I, II, III, IV, V, VII or VIII. In such case, the Asbestos PI Trust will either deny the Claim or, if the Asbestos PI Trust is satisfied that the claimant has presented a Claim that would be cognizable and valid in the tort system, the Asbestos PI Trust can offer the claimant a liquidated value amount up to the Asbestos Scheduled Value for that Asbestos Disease Level, unless the Claim qualifies as an Extraordinary Asbestos Claim (as defined below), in which case its liquidated value cannot exceed the maximum value for such a Claim under the Asbestos Distribution Procedures ("Asbestos Maximum Value").

Claimants holding Claims qualifying for treatment under Asbestos Disease Level IV, V, VII or VIII will also be eligible to seek Asbestos Individual Review of the liquidated value of their Claims, as well as of their medical/exposure evidence. The liquidated value of Claims involving Asbestos Disease Level VI must be determined under Asbestos Individual Review. Asbestos Individual Review is intended to result in payments equal to the full liquidated value for each Claim multiplied by the Asbestos Payment Percentage, except that the liquidated value of any Asbestos Personal Injury Claim that undergoes Asbestos Individual Review may be determined to be less than the Asbestos Scheduled Value the claimant would have received under Asbestos Expedited Review. Moreover, the liquidated value for a Claim qualifying for treatment under Asbestos Disease Level IV, V, VI, VII or VIII will not exceed the Asbestos Maximum Value for the relevant Asbestos Disease Level set forth below, unless the Claim meets the requirements of an Extraordinary Asbestos Claim, in which case its liquidated value cannot exceed the Asbestos Maximum Value set forth in that provision of the Asbestos Distribution Procedures for such Claims. Because the detailed examination and valuation process pursuant to Asbestos Individual Review requires substantial time and effort, claimants electing to undergo the Asbestos Individual Review process will necessarily be paid the liquidated value of their Asbestos Personal Injury Claims later than would have been the case had the claimant elected Asbestos Expedited Review.

### Valuation Factors To Be Considered in Asbestos Individual Review

The Asbestos PI Trust will liquidate the value of each Asbestos Personal Injury Claim that undergoes Asbestos Individual Review based on the historic liquidated values of other similarly situated claims in the tort system for the same Asbestos Disease Level. The Asbestos PI Trust will, thus, take into consideration all of the factors that affect the severity of damages and values within the tort system, including but not limited to (a) the

degree to which the characteristics of a Claim differ from the presumptive Asbestos Medical/Exposure Criteria for the Asbestos Disease Level in question, (b) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages and pain and suffering, (c) evidence that the claimant's damages were (or were not) caused by asbestos exposure, including exposure to an asbestos-containing product for which the Debtors have legal responsibility prior to December 31, 1982 *(e.g.,* alternative causes and the strength of documentation of injuries), (d) the industry of exposure, and (e) settlements, verdicts and the claimant's and other law firms' experience in the Claimant's Jurisdiction (as defined in the Asbestos Distribution Procedures) for similarly situated claims.

### Scheduled, Average and Maximum Values

The Asbestos Scheduled Values, Asbestos Average Values and Asbestos Maximum Values for the Asbestos Disease Levels compensable under the Asbestos Distribution Procedures are the following:

| Asbestos Disease Level | Asbestos Scheduled Value | Asbestos Average Value | Asbestos Maximum Value |
|---|---|---|---|
| Level VIII (Mesothelioma) | $70,000 | $104,000 | $380,000 |
| Level VII (Lung Cancer 1) | $27,500 | $33,000 | $85,000 |
| Level VI (Lung Cancer 2) | None | $7,000 | $20,000 |
| Level V (Other Cancer) | $13,800 | $17,300 | $40,000 |
| Level IV (Severe Asbestosis) | $20,750 | $22,000 | $55,000 |
| Level III (Asbestosis/Pleural Disease) | $4,850 | None | None |
| Level II (Asbestosis/Pleural Disease) | $700 | None | None |
| Level I (Other Asbestos Disease — Cash Discount Payment) | $200 | None | None |

These Asbestos Scheduled Values, Asbestos Average Values and Asbestos Maximum Values will apply to all Asbestos Trust Voting Claims except Prepetition Liquidated Asbestos PI Trust Claims filed with the Asbestos PI Trust on or before the Initial Asbestos Claims Filing Date. Thereafter, the Asbestos PI Trustees, with the consent of the Asbestos PI TAC and the Future Asbestos Claimants' Representative, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.

### Extraordinary and/or Exigent Hardship Asbestos Claims

For purposes of the Asbestos Distribution Procedures, "Extraordinary Asbestos Claim" means an Asbestos Personal Injury Claim that otherwise satisfies the medical criteria for Asbestos Disease Level IV, V, VI, VII or VIII and that is held by a claimant whose exposure to asbestos (a) occurred predominately as the result of working in a manufacturing facility of the Debtors during a period in which the Debtors were manufacturing asbestos-containing products at that facility or (b) was at least 75% the result of exposure to an asbestos-containing product for which the Debtors have legal responsibility and there is little likelihood of a substantial recovery elsewhere. All such Extraordinary Asbestos Claims will be presented for Asbestos Individual Review and, if valid, will be entitled to an award of up to an Asbestos Maximum Value of five times the Asbestos Scheduled Value, for Claims qualifying for treatment under Asbestos Disease Level IV, V, VII or VIII, and five times the Asbestos Average Value, for Claims qualifying for treatment under Asbestos Disease Level VI, in each case multiplied by the applicable Asbestos Payment Percentage.

Any dispute as to Extraordinary Asbestos Claim status will be submitted to a special "Extraordinary Asbestos Claims Panel" established by the Asbestos PI Trustees with the consent of the Asbestos PI TAC and the Future Asbestos Claimants' Representative. All decisions of such panel will be final and not subject to any further

administrative or judicial review. An Extraordinary Asbestos Claim, following its liquidation, will be placed in the Asbestos FIFO Payment Queue ahead of all other Asbestos Personal Injury Claims (except Prepetition Liquidated Asbestos PI Trust Claims, Claims qualifying for treatment under Asbestos Disease Level I and Exigent Hardship Asbestos Claims (as defined below), which will be paid first in that order in such Queue, based on its date of liquidation) and will be subject to the Maximum Available Asbestos Payment and Asbestos Claims Payment Ratio described above. See "— Maximum Annual Asbestos Payment and Maximum Available Asbestos Payment" and "— Asbestos Claims Payment Ratio."

At any time the Asbestos PI Trust may liquidate and pay Asbestos Personal Injury Claims that qualify as Exigent Hardship Asbestos Claims. Such Claims may be considered separately regardless of the order of processing that otherwise would have been under the Asbestos Distribution Procedures. An Exigent Hardship Asbestos Claim, following its liquidation, will be placed first in the Asbestos FIFO Payment Queue ahead of all other liquidated Asbestos Personal Injury Claims (except Prepetition Liquidated Asbestos PI Trust Claims and Claims qualifying for treatment under Asbestos Disease Level I) and will be subject to the Maximum Available Asbestos Payment and Asbestos Claims Payment Ratio described above. For purposes of the Asbestos Distribution Procedures, an "Exigent Hardship Asbestos Claim" means an Asbestos Personal Injury Claim which meets the Asbestos Medical/Exposure Criteria for Asbestos Disease Level IV, V, VI, VII or VIII and the Asbestos PI Trust, in its sole discretion, determines (a) that the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income and (b) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

### Secondary Exposure Claims

If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally-exposed person, such as a family member, the claimant may seek Asbestos Individual Review of his or her Claim. The Claim form contains an additional section for Secondary Exposure Claims (as defined in the Asbestos Distribution Procedures). All other liquidation and payment rights and limitations under the Asbestos Distribution Procedures will be applicable to such Claims.

### Evidentiary Requirements

Medical Evidence. All diagnoses of an Asbestos Disease Level must be accompanied by either (a) a statement by the physician providing the diagnosis that at least ten years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (b) a history of the claimant's exposure sufficient to establish a ten-year latency period. A finding by a physician after the Petition Date that a claimant's disease is "consistent with" or "compatible with" asbestosis will not alone be treated by the Asbestos PI Trust as a diagnosis. All diagnoses of asbestosis/pleural disease (i.e., Asbestos Disease Levels II and III) not based on pathology will be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of mesothelioma (i.e., Asbestos Disease Level VIII) will be presumed to be based on findings that the disease involves a malignancy; however, the Asbestos PI Trust may refute such presumptions.

Except for claims filed against the Debtors or any other asbestos defendant in the tort system prior to the Petition Date, all diagnoses of a non-malignant asbestos-related disease (i.e., Asbestos Disease Level I, II, III or IV) will be based, in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease. All living claimants must also provide (a) for Asbestos Disease Levels I, II or III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (see footnote 2 under "— Disease Levels, Scheduled Values and Medical/Exposure Criteria" above), (b) for Asbestos Disease Level IV, an ILO reading of 2/1 or greater or pathological evidence of asbestosis, and (c) for Asbestos Disease Levels III and IV, pulmonary function testing (i.e., spirometry testing that is in material compliance with the quality criteria established by the American Thoracic Society and is performed on equipment which is in material compliance with the American Thoracic Society standards for technical quality and calibration).

In the case of a claimant who was deceased at the time the Claim was filed, all diagnoses of a non-malignant asbestos-related disease (i.e., Asbestos Disease Levels I, II, III or IV) must be based upon either (a) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, (b) pathological evidence of the non-malignant asbestos-related disease, (c) in the case of Asbestos Disease Levels I, II or III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (see footnote 2 under "— Disease Levels,

Scheduled Values and Medical/Exposure Criteria" above), (d) for Asbestos Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis, and (e) for either Asbestos Disease Level III or IV, pulmonary function testing.

All diagnoses of an asbestos-related malignancy (*i.e.*, Asbestos Disease Levels V, VI, VII or VIII) must be based upon either (a) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease or (b) a diagnosis of such a malignant Asbestos Disease Level by a board-certified pathologist.

If the holder of an Asbestos Personal Injury Claim that was filed against the Debtors or any other defendant in the tort system prior to the Petition Date has not provided the Asbestos PI Trust with a diagnosis of the asbestos-related disease by a physician who conducted a physical examination of the holder, or if the holder has such a diagnosis by an examining physician engaged by the holder, or if the holder filed such a diagnosis with another asbestos-related personal injury settlement trust that requires such evidence, then the holder must provide such diagnosis to the Asbestos PI Trust notwithstanding the exception described above.

Credibility of Medical Evidence. Before making any payment to a claimant, the Asbestos PI Trust must have reasonable confidence that the medical and exposure evidence provided in support of the Claim is credible and consistent with recognized medical standards. The Asbestos PI Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence and may also require that medical evidence submitted complies with recognized medical standards regarding equipment, testing methods and procedures in order to assure that such evidence is reliable. Medical evidence that is (a) of a kind shown to have been received in evidence by a state or federal judge at trial, (b) consistent with evidence submitted to the Debtors to settle for payment similar disease cases prior to the Debtors' bankruptcy, or (c) a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the Asbestos PI Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of the Asbestos Distribution Procedures for payment of an Asbestos Personal Injury Claim will be paid irrespective of the results in any litigation at anytime between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system involving another defendant, other than any findings of fact, a verdict or a judgment, may be introduced by either the claimant or the Asbestos PI Trust in any Asbestos Individual Review proceeding or any Extraordinary Claim proceeding conducted by the Asbestos PI Trust.

Exposure Evidence. To qualify for any Asbestos Disease Level, the claimant must demonstrate a minimum exposure to an asbestos-containing product manufactured or distributed by the Debtors. Claims based on conspiracy theories that involve no exposure to an asbestos-containing product produced by the Debtors are not compensable under the Asbestos Distribution Procedures. To meet the presumptive exposure requirements of Asbestos Expedited Review, the claimant must show (a) for all Asbestos Disease Levels, Kaiser Exposure prior to December 31, 1982, (b) for Asbestos Disease Level II (Asbestosis/Pleural Disease), six months of Kaiser Exposure prior to December 31, 1982, plus five years of cumulative occupational asbestos exposure, and (c) for Asbestos Disease Level III (Asbestosis/Pleural Disease), Asbestos Disease Level IV (Severe Asbestosis), Asbestos Disease Level V (Other Cancer), or Asbestos Disease Level VII (Lung Cancer 1), the claimant must show six months of Kaiser Exposure prior to December 31, 1982, plus Significant Occupational Exposure to asbestos. If the claimant cannot meet the relevant presumptive exposure requirements for an Asbestos Disease Level eligible for Asbestos Expedited Review, the claimant may seek Asbestos Individual Review of his or her Claim based on exposure to an asbestos-containing product manufactured or distributed by the Debtors.

The claimant must demonstrate meaningful and credible exposure, prior to December 31, 1982, to asbestos or asbestos-containing products supplied, specified, manufactured, installed, maintained or repaired by the Debtors and/or any entity, including a contracting unit, for which the Debtors have legal responsibility. That meaningful and credible exposure evidence may be established by (a) an affidavit of the claimant, (b) an affidavit of a co-worker or a family member in the case of a deceased claimant (providing the Asbestos PI Trust finds such evidence reasonably reliable), (c) invoices, employment, construction or similar records, or (d) by other credible evidence. The specific exposure information required by the Asbestos PI Trust to process a Claim under either Asbestos Expedited Review or Asbestos Individual Review is set forth on the applicable Claim form (included on Attachment B to the Asbestos

Distribution Procedures). See "— Asbestos Expedited Review Process" and "— Asbestos Individual Review Process." The Asbestos PI Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

### Second Disease (Malignancy) Claims

The holder of an Asbestos Personal Injury Claim involving a non-–malignant asbestos-related disease (*i.e.*, a Claim qualifying for treatment under Asbestos Disease Level I, II, III or IV) may assert a new Asbestos Personal Injury Claim against the Asbestos PI Trust for a malignant disease (*i.e.*, a Claim qualifying for treatment under Asbestos Disease Level V, VI, VII or VIII) that is subsequently diagnosed.

### Punitive Damages

Except as provided below for Claims asserted under the Alabama Wrongful Death Statute, in determining the value of any liquidated or unliquidated Asbestos Personal Injury Claim, punitive or exemplary damages (*i.e.*, any damages other than compensatory damages) will not be considered or allowed, notwithstanding their availability in the tort system.

### Suits in the Tort System

If the holder of a Claim disagrees with the Asbestos PI Trust's determination regarding the Asbestos Disease Level of the Claim, the claimant's exposure history or the liquidated value of the Claim and, if the holder has first submitted the Claim to non-binding arbitration, the holder may file a lawsuit in the Claimant's Jurisdiction. Any such lawsuit must be filed by the claimant in her or her own right and name and not as a member or representative of a class and no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with respect to the Asbestos PI Trust, all defenses which could have been asserted by the Debtors) will be available to both sides at trial, except that the Asbestos PI Trust may waive any defense and/or concede any issue of fact or law. If the holder of such Claim was alive at the time the initial prepetition complaint was filed or on the date the Claim form was filed with the Asbestos PI Trust, the case will be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the Claim.

### Silica Distribution Procedures

The Silica Distribution Procedures, which are attached as Exhibit 1.1(186) to the Plan, will control liquidation and payment of all Silica Personal Injury Claims treated in Class 8, including Indirect Channeled Personal Injury Claims relating to silica. Silica Personal Injury Claims will be placed in a FIFO processing queue (the "Silica FIFO Processing Queue") to be established pursuant to the Silica Distribution Procedures.

### Dual Claimants

In the event that a claimant asserts separate Claims against the Silica PI Trust and one or both of the Asbestos PI Trust or the CTPV PI Trust, the holder of such Claim (a "Dual Claimant") must present credible evidence of separate disease caused by exposure to silica in order to recover from the Silica PI Trust. The Silica PI Trustee will establish criteria for assessing the credibility of medical evidence submitted by a Dual Claimant. Claimants seeking compensation for mixed-dust pneumoconiosis may not recover from the Silica PI Trust.

Any award to a Dual Claimant for a Claim in respect of lung cancer allowed by the Silica PI Trust will be reduced by the liquidated amount of any award to such claimant for such Claim from the Asbestos PI Trust or the CTPV PI Trust.

### Disease Levels Under the Silica Distribution Procedures

The Silica Distribution Procedures establish a schedule of four silica-related diseases ("Silica Disease Levels"), all of which have presumptive medical criteria, product and industry exposure requirements, specific liquidated values (the "Silica Scheduled Values") and, in the case of certain Claims ("Silica Individual Review Claims"), specific occupational exposure requirements and caps on their liquidated values ("Silica Maximum Values").

In descending order of their seriousness, the Silica Disease Levels and their corresponding Silica Scheduled Values and Silica Maximum Values are as follows:

| Silica Disease Level | Silica Scheduled Value | Silica Maximum Value |
|---|---|---|
| Level IV (Complex Silicosis) | $75,000 | $300,000 |
| Level III (Lung Cancer) | $27,500 | $ 85,000 |
| Level II (Severe Silicosis) | $20,000 | $ 60,000 |
| Level I (Simple Silicosis) | $ 5,000 | $ 20,000 |

The presumptive medical, product and industry exposure criteria for each Silica Disease Level, and the specific occupational exposure requirements for certain Silica Individual Review Claims, are set forth in the Silica Distribution Procedures. Indirect Channeled Personal Injury Claims relating to silica will be subject to the same categorization and review procedures.

*Liquidation of Silica Personal Injury Claims by the Silica PI Trust*

A Silica Personal Injury Claim must be liquidated before any payment can be made on the Claim. Once liquidated, a Silica Personal Injury Claim will be placed in a FIFO payment queue (the "Silica FIFO Payment Queue") to be established pursuant to the Silica Distribution Procedures. See "— Payment of Liquidated Silica Personal Injury Claims by the Silica PI Trust."

Present Silica PI Claims. All Silica Personal Injury Claims for which a proof of Claim was Filed in the Reorganization Cases on or before the Bar Date for silica-related Claims (*i.e.*, the General Bar Date or the Second General Bar Date, as the case may be) have been or currently are being reviewed, pursuant to the criteria of the Silica Distribution Procedures, in negotiations between the Future Silica and CTPV Claimants' Representative and the counsel for the individual claimants during the pendency of the Reorganization Cases with a view toward reaching an agreed liquidated value for each such Claim at a value not to exceed the Silica Scheduled Value (the "Present Silica PI Claims"). If agreed by the claimant, each such Claim will be processed and liquidated in the amount to be described for the Claim on Attachment A to the Silica Distribution Procedures ("Liquidated Present Silica Claims") or will be withdrawn, so that the processing of such Claims by the Silica PI Trust will be streamlined and such claimants will give up their rights to Individual Review, thereby saving administrative costs to the Silica PI Trust in exchange for prompt payment. If not so agreed by the claimant, the holder of any remaining Present Silica PI Claim will need to submit a Claim form to the Silica PI Trust in order to have the claim liquidated in accordance with the Silica Distribution Procedures, and if the claim is liquidated, payment will be subject to the Payment Percentage then in effect.

Claims Other Than Present Silica PI Claims. All silica-related Claims arising before the Petition Date as to which no proof of Claim was filed by the Bar Date are presumptively barred and, unless otherwise allowed by the Bankruptcy Court, will not be processed or liquidated even if a Claim form is submitted to the Silica PI Trust. Any holder of a Silica Personal Injury Claim arising after the Bar Date for silica-related Claims will need to submit a Claim form to the Silica PI Trust in order to have the Claim liquidated. Claims submissions forms will be available from the Silica PI Trust. The Silica Distribution Procedures provide for two types of review processes for liquidating Silica Personal Injury Claims that are not Present Silica PI Claims — expedited review ("Silica Expedited Review") and individual review ("Silica Individual Review").

A filing fee of $100 per Claim must be paid to the Silica PI Trust by all Silica Personal Injury Claims other than Present Silica PI Claims, except that claimants who elect Silica Individual Review must pay a $200 filing fee. The filing fee will be refunded upon allowance of a Claim and, under certain circumstances specified in the Silica Distribution Procedures, the filing fee may be waived by the Silica PI Trust.

Silica Expedited Review. The process for Silica Expedited Review primarily is intended to provide an expeditious, efficient and inexpensive method for liquidating Silica Personal Injury Claims that can be easily

verified by the Silica PI Trust as meeting the presumptive medical, product exposure and industry exposure criteria for the relevant Silica Disease Level. Silica Expedited Review thus provides claimants with a substantially less burdensome process for pursuing their Claims than does the process for Silica Individual Review described below. Silica Expedited Review is also intended to provide qualifying Claims a fixed and certain payment, subject to the applicable payment percentage set forth in the Silica Distribution Procedures ("Silica Payment Percentage"). Claims in the Silica Expedited Review process will be placed in the Silica FIFO Processing Queue and processed in the order of their placement in such queue.

Except as provided above with respect to Liquidated Present Silica PI Claims and below with respect to Foreign Silica Claims (as defined below), any Silica Personal Injury Claim that meets the presumptive medical criteria of any of the four Silica Disease Levels and presents credible evidence of exposure to silica-containing products made or sold by the Debtors (*i.e.*, product exposure) in the industries to which the Debtors sold such products listed on Attachment B to the Silica Distribution Procedures (*i.e.*, industry exposure) will be processed pursuant to the process for Silica Expedited Review, unless the holder of the Claim elects Silica Individual Review in order to seek to establish a liquidated value that is greater than its Silica Scheduled Value.

Silica Expedited Review is also available for Indirect Channeled Personal Injury Claims relating to silica, but only if the holder of such Claim can demonstrate that the Claim meets the criteria for presumptive validity set forth in the Silica Distribution Procedures for Indirect Channeled Personal Injury Claims. In no event will the holder of any Indirect Channeled Personal Injury Claim be entitled to an amount that exceeds the lesser of the Silica Scheduled Value for the applicable Silica Disease Level or the amount actually paid by the holder to the individual to whom the Silica PI Trust otherwise would have had a liability or obligation under the Silica Distribution Procedures (the "Direct Silica Claimant").

If the Silica PI Trust determines that a Silica Personal Injury Claim that undergoes Silica Expedited Review qualifies for treatment under one of the four Silica Disease Levels, the Silica PI Trust will advise the claimant of that determination and offer to liquidate the Claim at the Silica Scheduled Value for the qualifying Silica Disease Level and provide a form of release approved by the Silica PI Trust. In order to accept the offer, the claimant will need to execute and return the release.

Silica Individual Review. Silica Individual Review provides a process for case-specific evaluation of a Silica Personal Injury Claim. Silica Individual Review will be afforded to all Foreign Silica Claims and to all other Silica Personal Injury Claims (other than Present Silica PI Claims) that elect, and are eligible for, Silica Individual Review. Depending on the circumstances as described more fully below, Silica Individual Review may result in the denial of a Claim or in the offer of a liquidated amount up to, greater than or less than the Silica Scheduled Value for the applicable Silica Disease Level.

*Foreign Silica Claims.* The liquidated value for all Foreign Silica Claims must be established only under the process for Silica Individual Review. For purposes of the Silica Distribution Procedures, "Foreign Silica Claims" means Claims for which the claimant's exposure to silica from a product for which KACC has legal responsibility occurred outside of the United States of America and its territories and possessions. The Silica PI Trust will determine the liquidated value of Foreign Silica Claims based on historical settlements and verdicts in the claimant's jurisdiction as well as other valuation factors set forth in the Silica Distribution Procedures. At such time as the Silica PI Trust has sufficient historical settlement, verdict and other valuation data from a particular foreign jurisdiction, with the consent of the Silica PI TAC, the Silica PI Trustee may establish a separate valuation matrix for the jurisdiction based on that data.

*Indirect Channeled Personal Injury Claims Relating to Silica.* Silica Individual Review is also available to holders of Indirect Channeled Personal Injury Claims relating to silica who cannot demonstrate that the Claim meets the criteria for presumptive validity set forth in the Silica Distribution Procedures for Indirect Channeled Personal Injury Claim. In no event may the holder of any Indirect Channeled Personal Injury Claim be entitled to an amount that exceeds the lesser of the Silica Scheduled Value for the applicable Silica Disease Level or the amount actually paid by the holder to the Direct Silica Claimant. Moreover, the liquidated value of any Indirect Channeled Personal Injury Claim paid by the Silica PI Trust will be treated as an offset to or reduction from the full liquidated value of any Silica Personal Injury Claim that the Direct Silica Claimant subsequently might assert against the Silica PI Trust.

*Type 1 Review Silica Claims.* If the claimant so elects, Silica Individual Review will be afforded to the holder of any Silica Personal Injury Claim (other than a Present Silica PI Claim) that meets the presumptive medical criteria and the product exposure criteria but does not qualify for Silica Expedited Review because the Claim does not meet the industry exposure criteria (a "Type 1 Review Silica Claim"). If the Silica PI Trust is satisfied that the holder of a Type 1 Review Silica Claim has provided credible evidence of six months or greater cumulative exposure to high concentrations of respirable silica as a result of handling, installing, using, repairing, tearing out or cleaning out silica-containing refractory products manufactured or distributed by KACC or working on a regular basis in close proximity to workers engaged in such activities, then the Silica PI Trust may offer the claimant a liquidated value up to the Silica Scheduled Value for the applicable Silica Disease Level. Silica Individual Review also may result in denial of the Claim or an offer less than the Silica Scheduled Value for the applicable Silica Disease Level.

*Type 2 Review Silica Claims.* Silica Individual Review also will be available to the holder of any Silica Personal Injury Claim that does qualify for Silica Expedited Review but elects Silica Individual Review instead for the purpose of attempting to establish a liquidated amount that exceeds the Silica Scheduled Value available under Silica Expedited Review (a "Type 2 Review Silica Claim"). Provided that it satisfies certain occupational exposure criteria specified in the Silica Distribution Procedures, a Type 2 Review Silica Claim that undergoes Silica Individual Review may be liquidated in an amount greater than the Silica Scheduled Value for the applicable Silica Disease Level, which amount in any event will not exceed the Silica Maximum Value for that Silica Disease Level. However, a Type 2 Review Silica Claim undergoing Silica Individual Review also may be liquidated for an amount less than the Silica Scheduled Value the claimant would have received under Silica Expedited Review. Type 2 Review Silica Claims will be liquidated in accordance with the various valuation factors specified in the Silica Distribution Procedures.

*"Secondary Exposure" Silica Claims.* Silica Individual Review is required for processing any Silica Personal Injury Claim of a person whose silica exposure allegedly results solely from "secondary exposure" to another person who is occupationally exposed to silica (*e.g.*, from the clothes of an occupationally exposed family member) ("Secondary Exposure Silica Claim"); such Claims are not eligible for Silica Expedited Review. The holder of a Secondary Exposure Silica Claim must demonstrate that its Claim meets all of the criteria established for Secondary Exposure Silica Claims in the Silica Distribution Procedures, including but not limited to showing that the occupationally exposed person would have met all the exposure criteria of the Silica Distribution Procedures if that person had filed his or her own Claim against the Silica PI Trust. If the Silica PI Trust is satisfied that the holder of a Secondary Exposure Silica Claim meets the payment criteria for such Claims under the Silica Distribution Procedures, then the Silica PI Trust may offer the claimant a liquidated value less than, equal to or greater than the Silica Scheduled Value for the applicable Silica Disease Level, which amount in any event will not exceed the Silica Maximum Value for that Silica Disease Level. Silica Individual Review also may result in denial of the Secondary Exposure Silica Claim.

Arbitration. All unresolved disputes over a claimant's medical condition, exposure history, product exposure, industry exposure, occupational exposure and/or the liquidated value of any Silica Personal Injury Claim, including an Indirect Channeled Personal Injury Claim relating to silica, will be subject to binding or non-binding arbitration, at the election of the claimant, under procedures set forth in the Silica Distribution Procedures.

Litigation in the Tort System. Any holder of a Silica Personal Injury Claim, including an Indirect Channeled Personal Injury Claim relating to silica, that is the subject of a dispute with the Silica PI Trust that cannot be resolved by non-binding arbitration may institute a lawsuit in the tort system against the Silica PI Trust, subject to certain conditions, procedures and limitations specified in the Silica Distribution Procedures. If and when the claimant obtains a final judgment in the tort system, the judgment will be payable in installments, without interest, in accordance with the timetable, restrictions and other procedures specified in the Silica Distribution Procedures.

### *Payment of Liquidated Silica Personal Injury Claims by the Silica PI Trust*

The Silica Distribution Procedures also provide procedures for the payment of Silica Personal Injury Claims for which a liquidated value has been determined. Upon such liquidation, a Silica Personal Injury Claim will be placed in the Silica FIFO Payment Queue.

Payment of Liquidated Present Silica PI Claims. The intent of the Silica Distribution Procedures is to pay Liquidated Present Silica PI Claims as soon as practicable, and in any event within 12 months following the establishment of the Silica PI Trust or as soon thereafter as sufficient Cash is available. Payment of the Liquidated Present Silica PI Claims will be made in full for the specified liquidated amounts. This is because (a) the liquidation amounts for the Liquidated Present Silica PI Claims to be specified on Attachment A to the Silica Distribution Procedures take into account expected future insurance recoveries for Silica Personal Injury Claims and a reduction for the anticipated initial Silica Payment Percentage and (b) the claimants with the Liquidated Present Silica PI Claims have waived their right to seek higher recoveries through the Silica Individual Review process or to receive adjusting payments in the event of an increase in the Silica Payment Percentage. Any holder of a Present Silica PI Claim who does not consent to such treatment will need to submit a Claim form to the Silica PI Trust in order to have the Claim liquidated in accordance with the Silica Distribution Procedures, and if the Claim is liquidated, payment will be subject to the Payment Percentage then in effect.

Payment of Claims Other Than Present Silica PI Claims. After a Silica Personal Injury Claim other than a Present Silica PI Claim has had its liquidated value determined pursuant to the process for Silica Expedited Review, pursuant to the process for Silica Individual Review, by arbitration or by litigation in the tort system, the Claim will be paid in FIFO order based on the date its liquidation became final. All such payments, including any payment to an Indirect Channeled Personal Injury Claim relating to silica, will be adjusted by the multiplication of the liquidated amount by the Silica Payment Percentage, which percentage, in accordance with the factors and procedures specified in the Silica Distribution Procedures, the Silica PI Trust periodically will calculate and revise to reflect the Silica PI Trust's then-current and estimated future assets and liabilities.

Exigent Hardship Silica Claims: At any time the Silica PI Trust may liquidate and pay Silica Personal Injury Claims that qualify as "Exigent Hardship Claims" under the Silica Distribution Procedures, no matter what the order of processing otherwise would have been under the Silica Distribution Procedures. Any such Claim will be placed first in the Silica FIFO Payment Queue, ahead of all other liquidated Silica Personal Injury Claims except Liquidated Present Silica PI Claims.

### CTPV Distribution Procedures

The CTPV Distribution Procedures, which are attached as Exhibit 1.1(66) to the Plan, will control liquidation and payment of all CTPV Personal Injury Claims treated in Class 6, including Indirect Channeled Personal Injury Claims relating to CTPV. CTPV Personal Injury Claims will be placed in a FIFO processing queue to be established pursuant to the CTPV Distribution Procedures.

The CTPV Distribution Procedures establish a single liquidated value of $136,000 (the "CTPV Scheduled Value") for Claims involving primary cancer of the lung, bladder or kidney caused by exposure to CTPV and that arose from work while employed by KACC during certain time frames in the pot rooms of KACC's former aluminum reduction plant at Chalmette, Louisiana. The CTPV Distribution Procedures specify the medical criteria, employment criteria and CTPV exposure criteria that the CTPV Personal Injury Claims must meet in order to qualify for payment from the CTPV PI Trust and contemplates that such qualifying Claims will be compensated at values up to the CTPV Scheduled Value.

### Liquidation of CTPV Personal Injury Claims by the CTPV PI Trust

Generally. A CTPV Personal Injury Claim must be liquidated before any payment can be made on the Claim. Once liquidated, a CTPV Personal Injury Claim will be placed in a FIFO payment queue (the "CTPV FIFO Payment Queue") to be established pursuant to the CTPV Distribution Procedures. See "— Payment of Liquidated CTPV Personal Injury Claims by the CTPV PI Trust."

All CTPV-related Claims arising before the Petition Date as to which no proof of Claim was filed by the Bar Date are presumptively barred and, unless otherwise allowed by the Bankruptcy Court, will not be processed or liquidated even if a Claim form is submitted to the CTPV PI Trust. Each holder of a CTPV Personal Injury Claim will need to submit a Claim form to the CTPV PI Trust in order to have the Claim liquidated. Claims submissions forms will be available from the CTPV PI Trust. The CTPV PI Trustee has discretion to determine whether a filing fee will be required for submission of any CTPV Personal Injury Claim to the CTPV PI Trust.

If the CTPV PI Trust determines that a CTPV Personal Injury Claim qualifies for payment, except as provided below with respect to Dual Claimants, the CTPV PI Trust will advise the holder of such Claim of that determination and offer to liquidate the Claim at the CTPV Scheduled Value and provide a form of release approved by the CTPV PI Trust. In order to accept the offer, the claimant will need to execute and return the release.

Dual (Lung Cancer) Claimants. Any award to a Dual Claimant for a Claim in respect of lung cancer allowed by the CTPV PI Trust will be reduced by the liquidated amount of any award to such claimant for such Claim from the Asbestos PI Trust or the Silica PI Trust.

Indirect Channeled Personal Injury Claims Relating to CTPV. Indirect Channeled Personal Injury Claims relating to CTPV that meet certain conditions precedent specified in the CTPV Distribution Procedures will be subject to the same categorization and review procedures as other CTPV Personal Injury Claims. In no event will the holder of any Indirect Channeled Personal Injury Claim relating to CTPV be entitled to an amount that exceeds the lesser of the CTPV Scheduled Value or the amount actually paid by the holder to the individual to whom the CTPV PI Trust otherwise would have had a liability or obligation under the CTPV Distribution Procedures (the "Direct CTPV Claimant"). Moreover, the liquidated value of any such Indirect Channeled Personal Injury Claim paid by the CTPV PI Trust will be treated as an offset to or reduction from the full liquidated value of any CTPV Personal Injury Claim that the Direct CTPV Claimant subsequently might assert against the CTPV PI Trust.

Arbitration. All unresolved disputes over a claimant's medical condition, employment history and/or the liquidated value of any CTPV Personal Injury Claim, including an Indirect Channeled Personal Injury Claim relating to CTPV, will be subject to binding or non-binding arbitration, at the election of the claimant, under procedures set forth in the CTPV Distribution Procedures.

Litigation in the Tort System. Any holder of a CTPV Personal Injury Claim, including an Indirect Channeled Personal Injury Claim relating to CTPV, that is the subject of a dispute with the CTPV PI Trust that cannot be resolved by non-binding arbitration may institute a lawsuit in the tort system against the CTPV PI Trust, subject to certain conditions, procedures and limitations specified in the CTPV Distribution Procedures. If and when the claimant obtains a final judgment in the tort system, the judgment will be payable in installments, without interest, in accordance with the timetable, restrictions and other procedures specified in the CTPV Distribution Procedures.

*Payment of Liquidated CTPV Personal Injury Claims by the CTPV PI Trust*

The CTPV Distribution Procedures provide procedures for the payment of CTPV Personal Injury Claims for which a liquidated value has been determined. After a CTPV Personal Injury Claim has had its liquidated value determined pursuant to the process for review by the CTPV PI Trust, by arbitration or by litigation in the tort system, the Claim will be placed in the CTPV FIFO Payment Queue and paid in FIFO order based on the date its liquidation became final. All such payments, including any payment to an Indirect Channeled Personal Injury Claim relating to CTPV, will be adjusted by the multiplication of the liquidated amount by the payment percentage set forth in the CTPV Distribution Procedures, which percentage, in accordance with the factors and procedures specified in the CTPV Distribution Procedures, the CTPV PI Trust periodically will calculate and revise to reflect the CTPV PI Trust's then-current and estimated future assets and liabilities.

### *NIHL Distribution Procedures*

The NIHL Distribution Procedures, which are attached as Exhibit 1.1(129) to the Plan, will control liquidation and payment of all NIHL Personal Injury Claims treated in Class 7, including Indirect Channeled Personal Injury Claims relating to NIHL. NIHL Personal Injury Claims will be placed in a FIFO processing queue to be established pursuant to the NIHL Distribution Procedures.

The NIHL Distribution Procedures establish a schedule of ten NIHL-related compensation levels (the "NIHL Deciles") that specify liquidated values ranging from $5,000 to $74,500 (the "NIHL Scheduled Values") for Claims that meet certain medical criteria and occupational noise exposure criteria with respect to work at a premises in Louisiana owned, leased, operated or controlled, at the time of the exposure, by KACC or one of its current or former subsidiaries. The NIHL Deciles contemplate that the NIHL Personal Injury Claims that qualify for payment will be compensated at values up to the NIHL Scheduled Value specified for the NIHL Decile into which they fall

after the Claims are ranked according to a formula based on severity of hearing loss and years of occupational noise exposure. The medical criteria and occupational noise exposure criteria, as well as the formula for ranking the Claims that qualify into the payment NIHL Deciles, are set forth in the NIHL Distribution Procedures.

The NIHL Deciles and their corresponding NIHL Scheduled Values are as follows:

| NIHL Decile | NIHL Scheduled Value |
| --- | --- |
| 1 | $74,500.00 |
| 2 | $66,708.33 |
| 3 | $58,916.67 |
| 4 | $51,125.00 |
| 5 | $43,333.33 |
| 6 | $35,541.67 |
| 7 | $27,750.00 |
| 8 | $19,958.33 |
| 9 | $12,166.67 |
| 10 | $5,000.00 |

*Liquidation of NIHL Personal Injury Claims by the NIHL PI Trust*

Generally. An NIHL Personal Injury Claim must be liquidated before any payment can be made on the Claim. Once liquidated, an NIHL Personal Injury Claim will be placed in a FIFO payment queue (the "NIHL FIFO Payment Queue") to be established pursuant to the NIHL Distribution Procedures. See "— Payment of Liquidated NIHL Personal Injury Claims by the NIHL PI Trust."

All NIHL-related Claims arising before the Petition Date as to which no proof of Claim was filed by the Bar Date are presumptively barred and, unless otherwise allowed by the Bankruptcy Court, will not be processed or liquidated even if a Claim form is submitted to the NIHL PI Trust. Each holder of an NIHL Personal Injury Claim will need to submit a Claim form to the NIHL PI Trust in order to have the Claim liquidated. Claims submissions forms will be available from the NIHL PI Trust. The NIHL PI Trustee has discretion to determine whether a filing fee will be required for submission of any NIHL Personal Injury Claim to the NIHL PI Trust.

If the NIHL PI Trust determines that an NIHL Personal Injury Claim that qualifies for treatment under one of the ten NIHL Deciles, the NIHL PI Trust will advise the holder of such Claim of that determination and offer to liquidate the Claim at the NIHL Scheduled Value for the qualifying NIHL Decile and provide a form of release approved by the NIHL PI Trust. In order to accept the offer, the claimant will need to execute and return the release.

Indirect Channeled Personal Injury Claims Relating to NIHL. Indirect Channeled Personal Injury Claims relating to NIHL that meet certain conditions precedent specified in the NIHL Distribution Procedures will be subject to the same categorization and review procedures as other NIHL Personal Injury Claims. In no event will the holder of any Indirect Channeled Personal Injury Claim relating to NIHL be entitled to an amount that exceeds the lesser of the NIHL Scheduled Value for the applicable NIHL Decile or the amount actually paid by the holder to the individual to whom the NIHL PI Trust otherwise would have had a liability or obligation under the NIHL Distribution Procedures (the "Direct NIHL Claimant"). Moreover, the liquidated value of any Indirect Channeled Personal Injury Claim paid by the NIHL PI Trust will be treated as an offset to or reduction from the full liquidated value of any NIHL Personal Injury Claim that the Direct NIHL Claimant subsequently might assert against the NIHL PI Trust.

Arbitration. All unresolved disputes over a claimant's medical condition, employment history and/or the liquidated value of any NIHL Personal Injury Claim, including an Indirect Channeled Personal Injury Claim relating to NIHL, will be subject to binding or non-binding arbitration, at the election of the claimant, under procedures set forth in the NIHL Distribution Procedures.

Litigation in the Tort System. Any holder of an NIHL Personal Injury Claim, including an Indirect Channeled Personal Injury Claim relating to NIHL, that is the subject of a dispute with the NIHL PI Trust that cannot be resolved by non-binding arbitration may institute a lawsuit in the tort system against the NIHL PI Trust, subject to certain conditions, procedures and limitations specified in the NIHL Distribution Procedures. If and when the claimant obtains a final judgment in the tort system, the judgment will be payable in installments, without interest, in accordance with the timetable, restrictions and other procedures specified in the NIHL Distribution Procedures.

*Payment of Liquidated NIHL Personal Injury Claims by the NIHL PI Trust*

The NIHL Distribution Procedures provide procedures for the payment of NIHL Personal Injury Claims for which a liquidated value has been determined. After an NIHL Personal Injury Claim has had its liquidated value determined pursuant to the process for review by the NIHL PI Trust, by arbitration or by litigation in the tort system, the Claim will be placed in the NIHL FIFO Payment Queue and paid in FIFO order based on the date its liquidation became final. All such payments, including any payment to an Indirect Channeled Personal Injury Claim relating to NIHL, will be adjusted by the multiplication of the liquidated amount by the payment percentage set forth in the NIHL Distribution Procedures, which percentage, in accordance with the factors and procedures specified in the NIHL Distribution Procedures, the NIHL PI Trust periodically will calculate and revise to reflect the NIHL PI Trust's then-current and estimated future assets and liabilities.

## Certain Risks Associated with the PI Trusts

### PI Trust Assets May Be Insufficient to Satisfy all Channeled Personal Injury Claims

In exchange for the PI Trust Assets to be transferred to the PI Trusts pursuant to the Plan and the PI Trust Funding Agreement, the PI Trusts will assume all liability and responsibility for Channeled Personal Injury Claims. Holders of Channeled Personal Injury Claims will be permanently enjoined from pursuing their claims against the Reorganized Debtors and other Protected Parties, and the Channeled Personal Injury Claims will be determined and paid in accordance with the terms, provisions and procedures of the applicable PI Trust and PI Trust Distribution Procedures. The only assets available for the payment and satisfaction of Channeled Personal Injury Claims will be the PI Trust Assets and there is a risk that such assets may not be sufficient to pay all Channeled Personal Injury Claims. ~~See "PI Trusts and Distribution Procedures — The PI Trust."~~

### Variances Between Current Estimates of Future Channeled Personal Injury Claims and the Value of the PI Assets and the Actual Amount of Either May Affect the Relative Recoveries of Holders of Present Channeled Personal Injury Claims

Payments that will be made in respect of Channeled Personal Injury Claims will be determined pursuant to the applicable PI Trust Distribution Procedures and will be based upon then-current ~~estimates~~projections of the number, types and values of present and future Channeled Personal Injury Claims, the value of the assets then available to the applicable PI Trust for their payment, all anticipated administrative and legal expenses of the PI Trusts, and any other material matters that are reasonable and likely to affect the sufficiency of funds to pay a comparable percentage of full value to all holders of Channeled Personal Injury Claims. There can be no certainty as to the precise amounts that will be distributed by a PI Trust in any particular time period or when Channeled Personal Injury Claims will be paid by such PI Trust. ~~To the extent that future Channeled Personal Injury Claims are greater than currently anticipated, the relative recovery of the holders of present Channeled Personal Injury Claims will be greater than the relative recovery of the holders of future Channeled Personal Injury Claims, and *vice versa*. Similarly, to the extent that the value of the PI Trust Assets is currently overestimated, the relative recovery of the holders of present Channeled Personal Injury Claims will be greater than the relative recovery of the holders of future Channeled Personal Injury Claims, and *vice versa*.~~

### The Ultimate Value of the PI Insurance Assets Is Uncertain

The Debtors have been in litigation about insurance coverage with the PI Insurance Companies for many years. See "Operations During the Reorganization Cases — Certain Asbestos-Related Insurance Coverage Litigation." Because of the risks involved with respect to the effects of various potential court rulings ~~or an appeal thereof~~and appeals, as well as the uncertainty in the resolution of any present or future actions, the ultimate value of

the PI Insurance Assets, which is expected to represent most of the ultimate value of the PI Trust Assets, is uncertain.   While the Debtors believe that substantial recoveries are probable as a result of the insurance coverage litigation, Insurers continue under a variety of theories to dispute that their policies require them to pay, and claim that they will not be obligated to pay on claims approved for payment by the PI Trusts. The amount of insurance coverage that will ultimately be available is uncertain and will depend upon resolution of the coverage litigation as to various issues and/or settlements with insurers. As of the date of the Disclosure Statement, there was approximately $14 million in previously approved settlement payments that were in escrow and will be paid to the Funding Vehicle Trust (see "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunctions"). In addition, as noted above under "Operations During the Reorganization Cases — Certain Asbestos-Related Insurance Coverage Litigation", a motion is currently pending before the Bankruptcy Court for approval of a settlement that would involve the payment of $137 million by certain underwriters at Lloyd's of London (*i.e.*, the Lloyds Settlement). It is possible that there will be additional settlements approved before Confirmation and that settlements may occur after Confirmation. There is also the possibility that one or more of the PI Insurance Companies becomesmay become insolvent in the future, which may adversely affect the amount that any such insurance company is expected to contribute to the PI Trusts, and thus the value of the PI Trust Assets and the ability of the PI Trusts to pay all. The amount that will ultimately be recovered will depend upon a number of factors that cannot be determined at this time. Because there is uncertainty as to the total value of Channeled Personal Injury Claims and there is uncertainty as to the total amount of the PI Insurance Assets that will be available to pay them, the amount that would ultimately be recovered and paid to any individual claimant on a Channeled Personal Injury Claim is uncertain and speculative.

### *Certain Pending Legislation, if Enacted, May Impact the Holders of Channeled Personal Injury Claims*

The following discussion assumes that legislation entitled "The Fairness in Asbestos Injury Resolution Act of 2005" (the "Fair Act"), which is currently pending before the United States Congress, will be enacted into law as currently proposed; the Fair Act, however, is still the subject of negotiation and Congressional debate and, accordingly, no assurances can be made as to the ultimate provisions of the Fair Act if and when it is enacted into law or how it could ultimately affect the holders of Channeled Personal Injury Claims or how it could ultimately affect the Reorganized Debtors or the value of the New Common Stock.

If enacted as currently proposed, the Fair Act would provide for the establishment of an asbestos disease compensation system as the exclusive method of resolving personal injury claims relating to asbestos. Under the Fair Act, a national asbestos compensation fund would be created and certain corporations that have historically been named as defendants in asbestos personal injury cases, insurers which have outstanding insurance policies that could be available to provide indemnity or defense costs for asbestos-related claims to some or all of such corporations and trusts previously established under section 524(g) of the Bankruptcy Code would be required to make contributions to such fund. Upon enactment of the Fair Act, virtually all pending asbestos actions would be discontinued and the filing of new asbestos lawsuits in the tort system would be enjoined.

If the Fair Act is enacted as currently proposed, all of the PI Trust Assets held by the Asbestos PI Trust would be contributed to the national asbestos compensation fund and the rights of holders of Asbestos Personal Injury Claims on account of such claims would be determined in accordance with the schedules set forth in the Fair Act.

Because the Asbestos PI Trust is intended to pay claimants based on only the Debtors' involvement with the claimant's injury, while the Fair Act is intended to pay claims on a "no fault basis" without regard for any defendant's actual involvement, the recovery that a holder of an Asbestos Personal Injury Claim might receive under the Asbestos PI Trust Agreement and the Asbestos Distribution Procedures will not correspond to the recovery that the same individual might receive under the Fair Act.

### PI Channeling Injunctions

#### *Generally*

The PI Channeling Injunctions will prevent any entity from taking certain actions for the purpose of collecting, recovering or receiving payment of, on or with respect to any Channeled Personal Injury Claims, all of which will be channeled to the PI Trusts for resolution as set forth in the applicable PI Trust Distribution Procedures

(other than actions brought in conformity and compliance with the provisions of the Plan to enforce any right or obligation under the Plan, any Exhibits to the Plan or any agreement or instrument between a Debtor or Reorganized Debtor and the applicable PI Trust), including taking any such action against a Protected Party.

*A Protected Party is:*

- **the Debtors;**

- **the Reorganized Debtors;**

- **any entity that, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of the Debtors, the Other Debtors, the Reorganized Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust (but only to the extent that liability is asserted to exist as a result of its becoming such a transferee or successor);**

- **any entity that, pursuant to the Plan or after the Effective Date, makes a loan to any of the Debtors, the Reorganized Debtors, the Other Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust or to a successor to, or transferee of any of the respective assets of, the Debtors, the Other Debtors, the Reorganized Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust (but only to the extent that liability is asserted to exist by reason of such entity's becoming such a lender or to the extent any pledge of assets made in connection with such a loan is sought to be upset or impaired);**

- **each entity to the extent he, she or it is alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on any Debtor, Other Debtor, Reorganized Debtor or PI Trust on account of Channeled Personal Injury Claims by reason of one or more of the following:**

    - **such entity's ownership of a financial interest in any Debtor, Other Debtor, Reorganized Debtor, past or present affiliate of any Debtor, Other Debtor or Reorganized Debtor or predecessor in interest of any Debtor, Other Debtor or Reorganized Debtor;**

    - **such entity's involvement in the management of any Debtor, Other Debtor, Reorganized Debtor, past or present affiliate of any Debtor, Other Debtor or Reorganized Debtor or any predecessor in interest of any Debtor, Other Debtor or Reorganized Debtor;**

    - **such entity's service as a director, officer, employee, accountant (including an independent certified public accountant), advisor, attorney, investment banker, underwriter, consultant or other agent of any Debtor, Other Debtor, Reorganized Debtor, past or present affiliate of any Debtor, Other Debtor or Reorganized Debtor, any predecessor in interest of any Debtor, Other Debtor or Reorganized Debtor or any entity that owns or at any time has owned a financial interest in any Debtor, Other Debtor or Reorganized Debtor, past or present affiliate of any Debtor, Other Debtor or Reorganized Debtor or predecessor in interest of any Debtor, Other Debtor or Reorganized Debtor;**

    - **such entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any Debtor, Other Debtor, Reorganized Debtor, past or present affiliate of any Debtor, Other Debtor or Reorganized Debtor, predecessor in interest of any Debtor, Other Debtor or Reorganized Debtor or any entity that owns**