or at any time has owned a financial interest in any Debtor, Other Debtor
or Reorganized Debtor, past or present affiliate of a Debtor, Other Debtor
or Reorganized Debtor or any predecessor in interest of a Debtor, Other
Debtor or Reorganized Debtor;

- other Kaiser Companies, including the Other Debtors; or

- as to Channeled Personal Injury Claims, each Settling Insurance Company.

### *Asbestos PI Channeling Injunction*

The Asbestos PI Channeling Injunction is an order or orders issued or affirmed by the District Court
in accordance with and pursuant to section 524(g) of the Bankruptcy Code, permanently and forever staying,
restraining and enjoining any entity from taking any of the following actions for the purpose of, directly or
indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos Personal Injury
Claims, all of which will be channeled to the Asbestos PI Trust for resolution as set forth in the Asbestos
Distribution Procedures (other than actions brought in conformity and compliance with the provisions of the
Plan to enforce any right or obligation under the Plan, any Exhibits to the Plan or any agreement or
instrument between a Debtor or Reorganized Debtor and the Asbestos PI Trust), including, but not limited
to:

- commencing, conducting or continuing in any manner, directly or indirectly, any suit, action
  or other proceeding (including a judicial, arbitral, administrative or other proceeding) in
  any forum against or affecting any Protected Party or any property or interests in property
  of any Protected Party;

- enforcing, levying, attaching (including through any prejudgment attachment), collecting or
  otherwise recovering by any means or in any manner, whether directly or indirectly, any
  judgment, award, decree or other order against any Protected Party or any property or
  interests in property of any Protected Party;

- creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any
  encumbrance against any Protected Party or any property or interests in property of any
  Protected Party;

- setting off, seeking reimbursement of, contribution from or subrogation against or otherwise
  recouping in any manner, directly or indirectly, any amount against any liability owed to
  any Protected Party or any property or interests in property of any Protected Party; and

- proceeding in any manner in any place with regard to any matter that is subject to
  resolution pursuant to the Asbestos PI Trust, except in conformity and compliance
  therewith.

As of the Effective Date, liability for all Asbestos Personal Injury Claims will automatically and without further act,
deed or court order be assumed by the Asbestos PI Trust in accordance with and to the extent set forth in Article V
of the Plan (the relevant portions of which isare described above under "— TheAsbestos PI Trust"). Each Asbestos
Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the
Asbestos PI Trust Agreement and the Asbestos Distribution Procedures. As further provided in Article V of the
Plan, the sole recourse of the holder of an Asbestos Personal Injury Claim on account of such Claim will be to the
Asbestos PI Trust and such holder will have no right whatsoever at any time to assert its Asbestos Personal Injury
Claim against any Protected Party.

### *Silica PI Channeling Injunction*

The Silica PI Channeling Injunction is an order or orders entered by the Bankruptcy Court in
accordance with and pursuant to section 105(a) of the Bankruptcy Code, permanently and forever staying,

restraining and enjoining any entity from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Silica Personal Injury Claims, all of which will be channeled to the Silica PI Trust for resolution as set forth in the Silica Distribution Procedures (other than actions brought in conformity and compliance with the provisions of the Plan to enforce any right or obligation under the Plan, any Exhibits to the Plan or any agreement or instrument between a Debtor or Reorganized Debtor and the Silica PI Trust), including, but not limited to:

- commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;

- enforcing, levying, attaching (including through any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;

- creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party or any property or interests in property of any Protected Party;

- setting off, seeking reimbursement of, contribution from or subrogation against or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

- proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Silica PI Trust, except in conformity and compliance therewith.

As of the Effective Date, liability for all Silica Personal Injury Claims will automatically and without further act, deed or court order be assumed by the Silica PI Trust in accordance with and to the extent set forth in Article V of the Plan (the relevant portions of which is are described above under "— The Silica PI Trust"). Each Silica Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the Silica PI Trust Agreement and the Silica Distribution Procedures. As further provided in Article V of the Plan, the sole recourse of the holder of a Silica Personal Injury Claim on account of such Claim will be to the Silica PI Trust and such holder will have no right whatsoever at any time to assert its Silica Personal Injury Claim against any Protected Party.

### CTPV PI Channeling Injunction

The CTPV PI Channeling Injunction is an order or orders entered by the Bankruptcy Court in accordance with and pursuant to section 105(a) of the Bankruptcy Code, permanently and forever staying, restraining and enjoining any entity from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any CTPV Personal Injury Claims, all of which will be channeled to the CTPV PI Trust for resolution as set forth in the CTPV Distribution Procedures (other than actions brought in conformity and compliance with the provisions of the Plan to enforce any right or obligation under the Plan, any Exhibits to the Plan or any agreement or instrument between a Debtor or Reorganized Debtor and the CTPV PI Trust), including, but not limited to:

- commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;

- enforcing, levying, attaching (including through any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any

judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;

- creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party or any property or interests in property of any Protected Party;

- setting off, seeking reimbursement of, contribution from or subrogation against or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

- proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the CTPV PI Trust, except in conformity and compliance therewith.

As of the Effective Date, liability for all CTPV Personal Injury Claims will automatically and without further act, deed or court order be assumed by the CTPV PI Trust in accordance with and to the extent set forth in Article V of the Plan (the relevant portions of which isare described above under "— TheCTPV PI Trust"). Each CTPV Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the CTPV PI Trust Agreement and the CTPV Distribution Procedures. As further provided in Article V of the Plan, the sole recourse of the holder of a CTPV Personal Injury Claim on account of such Claim will be to the CTPV PI Trust and such holder will have no right whatsoever at any time to assert its CTPV Personal Injury Claim against any Protected Party.

### NIHL PI Channeling Injunction

The NIHL PI Channeling Injunction is an order or orders entered by the Bankruptcy Court in accordance with and pursuant to section 105(a) of the Bankruptcy Code, permanently and forever staying, restraining and enjoining any entity from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any NIHL Personal Injury Claims, all of which will be channeled to the NIHL PI Trust for resolution as set forth in the NIHL Distribution Procedures (other than actions brought in conformity and compliance with the provisions of the Plan to enforce any right or obligation under the Plan, any Exhibits to the Plan or any agreement or instrument between a Debtor or Reorganized Debtor and the NIHL PI Trust), including, but not limited to:

- commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;

- enforcing, levying, attaching (including through any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;

- creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party or any property or interests in property of any Protected Party;

- setting off, seeking reimbursement of, contribution from or subrogation against or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

- proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the NIHL PI Trust, except in conformity and compliance therewith.

As of the Effective Date, liability for all NIHL Personal Injury Claims will automatically and without further act, deed or court order be assumed by the NIHL PI Trust in accordance with and to the extent set forth in Article V of the Plan (the relevant portions of which is~are~ described above under "— The~NIHL~ PI Trust"). Each NIHL Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the NIHL PI Trust Agreement and the NIHL Distribution Procedures. As further provided in Article V of the Plan, the sole recourse of the holder of an NIHL Personal Injury Claim on account of such Claim will be to the NIHL PI Trust and such holder will have no right whatsoever at any time to assert its NIHL Personal Injury Claim against any Protected Party.

## Channeled PI Insurance Entity Injunction

### *Purpose*

In order to protect the Funding Vehicle Trust and each PI Trust and to preserve the PI Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, the Bankruptcy Court will issue as part of the Confirmation Order the Channeled PI Insurance Entity Injunction, although: (a) the Funding Vehicle PI Trust will have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the Channeled PI Insurance Entity Injunction with respect to any PI Insurance Company upon express written notice to such PI Insurance Company; and (b) the Channeled PI Insurance Entity Injunction is not issued for the benefit of any PI Insurance Company, and no PI Insurance Company is a third-party beneficiary of the Channeled PI Insurance Entity Injunction.

### *Terms*

Subject to the provisions of Plan described above under "— Purpose" (*i.e.*, Section 12.2.c(i) of the Plan), all Entities (excluding, however, the Funding Vehicle Trust, the Asbestos PI Trust, the Silica PI Trust, the CTPV PI Trust, the NIHL PI Trust and the Reorganized Debtors to the extent they are permitted or required to pursue claims relating to any PI Insurance Coverage Action and/or the PI Insurance Assets) that have held or asserted, that hold or assert or that may in the future hold or assert any claim, demand or cause of action (including any Channeled Personal Injury Claim or respecting any Trust Expense) against any PI Insurance Company based upon, attributable to, arising out of or in any way connected with any such Channeled Personal Injury Claim, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, will be stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction or recovery with respect to any such Claim, Demand or cause of action including, but not limited to:

- commencing, conducting or continuing, in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including a judicial, arbitration, administrative or other proceeding) in any forum with respect to any such Claim, Demand or cause of action against any PI Insurance Company, or against the property of any PI Insurance Company, with respect to any such claim, demand, or cause of action;

- enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any PI Insurance Company, with respect to any such claim, demand or cause of action;

- creating, perfecting or enforcing in any manner, directly or indirectly, any encumbrance against any PI Insurance Company, or the property of any PI Insurance Company, with respect to any such claim, demand or cause of action; and

- except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, directly or indirectly, against any obligation of any PI Insurance Company, or against the property of any PI Insurance Company, with respect to any such claim, demand or cause of action,

although: (a) the Channeled PI Insurance Entity Injunction will not impair in any way any actions brought by the Funding Vehicle Trust and/or the Reorganized Debtors against any PI Insurance Company; (b) the Funding Vehicle Trust will have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the Channeled PI Insurance Entity Injunction with respect to any PI Insurance Company upon express written notice to such PI Insurance Company; and (c) the Channeled PI Insurance Entity Injunction is not issued for the benefit of any PI Insurance Company, and no PI Insurance Company is a third-party beneficiary of the Channeled PI Insurance Entity Injunction.

### *Reservations*

Notwithstanding anything to the contrary above, this Channeled PI Insurance Entity Injunction will not enjoin:

- the rights of entities to the treatment accorded them under the Plan, as applicable, including the rights of holders of Channeled Personal Injury Claims to assert such Claims, as applicable, in accordance with the applicable PI Trust Distribution Procedures;

- the rights of entities to assert any claim, debt, obligation, cause of action or liability for payment of Trust Expenses against the Funding Vehicle Trust or a PI Trust;

- the rights of the Funding Vehicle Trust and the Reorganized Debtors (to the extent permitted or required under the Plan) to prosecute any action based on or arising from the Included PI Trust Insurance Policies;

- the rights of the Funding Vehicle Trust and the Reorganized Debtors to assert any claim, debt, obligation, cause of action or liability for payment against a PI Insurance Company based on or arising from the Included PI Trust Insurance Policies; and

- The rights of any PI Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other PI Insurance Company that is not a Protected Party.

## REORGANIZED KAISER

**Restructuring Transactions**

On and after the Effective Date, Reorganized KAC will be the ultimate parent entity in the corporate structure of the Kaiser Companies. Pursuant to the Plan, on the Effective Date, each share of KAC Old Stock issued and outstanding or held in treasury will be cancelled, and the only shares of capital stock of Reorganized KAC outstanding as of the Effective Date will be the shares of New Common Stock issued on the Effective Date pursuant to the Plan.

Pursuant to the Restructuring Transactions (*i.e.*, the transactions to be consummated in connection with the Effective Date in accordance with Section 4.2 of the Plan, which is described below under "General Information Concerning the Plan — Restructuring Transactions"), among other things:

- On or prior to the Effective Date, the following new entities will be formed: (a) a new Delaware corporation, owned by KAC, to function as an intermediate holding company ("New Kaiser Intermediate Holdco"), (b) a new Delaware limited liability company, initially owned by KACC, to hold the assets associated with its flat-rolled products and engineered products units ("New Kaiser FP LLC"), and (c) a new Delaware limited liability company, owned by New Kaiser Intermediate Holdco, to succeed to the remaining assets and liabilities of KACC ("New Kaiser Remainder LLC");

- On the Effective Date, Texada Mines Ltd. (Canada), Kaiser Aluminum & Chemical Investment Limited (Canada) and KACOCL will be amalgamated to form a new Ontario corporation ("New Kaiser Canada"), 100% of the issued and outstanding shares of capital stock of which will be held by KACC;

- On the Effective Date, (a) KACC will transfer the assets associated with the flat-rolled products and engineered products units and all ownership interest in Kaiser Bellwood Corporation to New Kaiser FP LLC in exchange for 100% of the issued and outstanding membership interests of New Kaiser FP LLC, and (b) Kaiser Bellwood Corporation will be merged with and into New Kaiser FP LLC;

- On the Effective Date following the transactions described above, KACC will transfer all direct and indirect ownership interests in Anglesey, Trochus, Kaiser Aluminium International, Inc., New Kaiser Canada and New Kaiser FP LLC to New Kaiser Intermediate Holdco; and

- On the Effective Date following the transactions described above, KACC will merge with and into New Kaiser Remainder LLC, with New Kaiser Remainder LLC as the surviving entity.

Following the Restructuring Transactions described above, Reorganized KAC will own directly 100% of the issued and outstanding shares of capital stock of New Kaiser Intermediate Holdco, and New Kaiser Intermediate Holdco will own Anglesey, Trochus, Kaiser Aluminium International, Inc. and New Kaiser Canada, and 100% of the issued and outstanding membership interests of each of New Kaiser FP LLC and New Kaiser Remainder LLC. New Kaiser Canada will hold the London, Ontario production facility and New Kaiser FP LLC will hold all other production facilities used by the fabricated products business unit. New Kaiser Remainder LLC, as the successor by merger to KACC, will hold various non-operating properties. See "— Description of Business — Fabricated Products Business Unit."

It is currently anticipated that, on the Effective Date, Reorganized KAC and New Kaiser Remainder LLC will enter into a funding agreement pursuant to which Reorganized KAC will, upon New Kaiser Remainder LLC's request, advance to New Kaiser Remainder LLC cash necessary to enable New Kaiser Remainder LLC to pay any environmental and maintenance costs in connection with specified properties, with the aggregate amount of such advances not to exceed the sum of (a) 125% of an amount to be determined by the Debtors based on the net present value of estimated environmental and maintenance costs of such properties offset by the net present value of estimated rental and other income and sale proceeds, all estimated as of the Effective Date, and (b) any rental or

~~other income or sale proceeds transferred by it to Reorganized KAC after the Effective Date. It is the intent of the Debtors that New Kaiser Remainder LLC not be required to incur legal fees and or other expenses associated with the interpretation, enforcement or defense of New Kaiser Remainder LLC's rights under the funding agreement by litigation or otherwise because the cost and expense thereof would substantially detract from the benefits intended to be extended to New Kaiser Remainder LLC thereunder; accordingly, if it should appear to New Kaiser Remainder LLC that Reorganized KAC has failed to comply with any of its obligations under the funding agreement or in the event that the Reorganized KAC or any other person takes or threatens to take any action to declare the funding agreement void or unenforceable, or institutes any litigation or other action or proceeding designed to deny, or to recover from, New Kaiser Remainder LLC the benefits provided or intended to be provided to New Kaiser Remainder LLC thereunder, New Kaiser Remainder LLC would be authorized from time to time to retain counsel of New Kaiser Remainder LLC's choice, at the expense of Reorganized KAC (with Reorganized KAC's obligation in respect of such legal costs being separate and distinct from its funding obligations described above), to advise and represent New Kaiser Remainder LLC in connection with any such interpretation, enforcement or defense, including without limitation the initiation or defense of any litigation or other legal action in any jurisdiction. The maximum amount of such funding obligation as of the Effective Date will be set forth in a filing with the Bankruptcy Court at least 15 days prior to the deadline for objections to Confirmation of the Plan; however, based on information available to the Debtors as of the date of this Disclosure Statement, it is anticipated that such amount will be approximately $2.6 million. The management of the Debtors believes that, based on its forecasts of expenses and receipts of New Kaiser Remainder LLC (which forecasts reflect data provided by outside environmental consultants and real estate professionals), amounts available to New Kaiser Remainder LLC under the funding agreement, together with rental and other income and sale proceeds, will provide New Kaiser Remainder LLC with sufficient liquidity for the reasonably foreseeable future to satisfy its obligations, including environmental and maintenance costs associated with the properties it owns.~~

Pursuant to additional Restructuring Transactions, before, on or following the Effective Date the other Kaiser Companies will be restructured so as to reduce the number of Kaiser Companies and associated administrative costs to the extent possible. It is contemplated that such Restructuring Transactions will include one or more mergers, consolidations, reorganizations, asset transfers or dissolutions.

The actions to effect the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, reorganization or dissolution containing terms that are consistent with the terms of the Plan and that satisfy any requirements of applicable law and such other terms to which the affected entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the affected entities may agree; (c) the filing of appropriate certificates of merger, consolidation or dissolution or similar instruments with the applicable governmental authorities; and (d) other actions the affected entities determine to be necessary or appropriate, including making other filings or recordings that may be required by applicable law. See "General Information Concerning the Plan — Restructuring Transactions."

The consummation of the Restructuring Transactions is an important part of the Plan, which is intended to: (a) streamline Reorganized KAC's overall capital structure; (b) consolidate and transfer existing business units into separate subsidiary entities; and (c) permit Reorganized KAC greater access to the financial markets by the creation of a more understandable, flexible and financeable corporate structure.

**Description of Business**

Reorganized KAC will continue to operate the business of KAC, KACC and their subsidiaries as they exist as of the Effective Date. As part of the chapter 11 reorganization process, the Debtors have divested their interests in and related to Alpart, KJBC, Gramercy, Valco and QAL. See "Operations During the Reorganization Cases — Strategic Plan to Sell Commodities Assets." As a result of these dispositions, KAC is, and Reorganized KAC will be, focused on the production of fabricated aluminum products, and KAC is not, and Reorganized KAC will not be, involved in the mining of bauxite or the production and marketing of alumina or primary aluminum other than in connection with its interests in and related to Anglesey.

A brief description of the Debtors' business as it currently exists and is expected to exist as of the Effective Date is set forth below. Further information regarding the business and properties of, and other matters relating to,

KAC, KACC and their subsidiaries, including historical consolidated financial statements and other financial information, are contained in the KAC 2004 Form 10-K and the KAC 2005 Q2 Form 10-Q. The information set forth below is qualified in its entirety by reference to such other information.

### *Fabricated Products Business Unit*

#### *Overview*

The Debtors' fabricated products business unit produces rolled, extruded, drawn and forged aluminum products used principally for aerospace and defense, automotive, consumer durables, electrical and machinery and equipment end-use applications. The Debtors' participation is focused generally in specialty niches of these larger product categories. The Debtors' 11 North American fabricated products manufacturing facilities produced and shipped approximately 400 million pounds of fabricated aluminum products in each of 2002, 2003 and 2004. In general, products manufactured by the Debtors are in one of four broad categories: general engineering ("GE"); aerospace and high strength ("Aero/HS"); automotive ("Auto"); or custom industrial ("CI").

A description of the manufacturing processes and category of products at each of the 11 production facilities is shown below:

| Location | Manufacturing Process | Types of Products |
|---|---|---|
| Chandler, Arizona | Drawing | Aero/HS |
| Greenwood, South Carolina | Forging | Auto |
| Jackson, Tennessee | Extrusion and Drawing | Aero/HS and GE |
| London, Ontario | Extrusion and Rod Rolling | Auto and CI |
| Los Angeles, California | Extrusion | GE and CI |
| Newark, Ohio | Extrusion and Rod Rolling | Aero/HS, GE and Conversion Products[1] |
| Richland, Washington | Extrusion | Aero/HS and GE |
| Richmond, Virginia | Extrusion and Drawing | GE, Auto and CI |
| Sherman, Texas | Extrusion | Auto and CI |
| Spokane, Washington | Flat Rolling | Aero/HS and GE |
| Tulsa, Oklahoma | Extrusion | GE |

(1)    Conversion products can undergo one or two additional processing steps before being identified to an end-use application.

As indicated in the table above, many of the Debtors' facilities employ the same basic manufacturing process and produce the same type of products. Over the past several years, given the similar economic and other characteristics at each location, the Debtors have made a significant effort to more tightly integrate the management of the fabricated products business unit across multiple manufacturing locations, product lines and target markets to maximize the efficiency of product flow to customers. Purchasing is centralized for a substantial portion of the fabricated products business unit's primary aluminum requirements in order to maximize price, credit and other benefits. Because many customers purchase a number of different products produced at different plants, there has also been substantial integration of the sales force and its management. The Debtors believe that integration of their operations allows the Debtors to capture efficiencies while allowing the plant locations to remain highly focused.

Industry sales margins for fabricated products fluctuate in response to competitive and market dynamics. However, changes in primary aluminum price typically are passed through to customers and, where fabricated product shipments are based on firm prices (including the primary aluminum content), the Debtors mitigate exposure to metal price fluctuations by employing appropriate hedging techniques.

In a majority of the cases, the Debtors purchase primary aluminum ingot and recycled and scrap aluminum in varying percentages depending on various market factors including price and availability. Primary aluminum purchased for the fabricated products business unit is typically based on the Average Midwest Transaction Price, which typically ranges between $.03 to $.075 per pound above the price traded on the London Metal Exchange ("LME") depending on primary aluminum supply/demand dynamics in North America. Recycled and scrap aluminum may also be utilized and are typically purchased at a modest discount to ingot prices but may require additional processing. In addition, certain of the plants provide others with billet, log or other intermediate materials in lieu of such plants purchasing such items from third party suppliers. For example, a substantial majority of the product from the Richland, Washington location is used as base input at the Chandler, Arizona location; the Sherman, Texas plant supplies billet and logs to the Tulsa, Oklahoma facility; the Richmond, Virginia plant typically receives some portion of its metal supply from either or both of the London, Ontario or Newark, Ohio facilities; and the Newark, Ohio facility also supplies billet and log to the Jackson, Tennessee facility and extruded forge stock to the Greenwood, South Carolina facility.

### Products Produced

General Engineering Products. GE products have a wide range of uses and applications, many of which involve further fabrication of these products for numerous transportation and industrial end uses. Demand growth and cyclicality tends to mirror broad economic patterns and industrial activity in North America. A substantial majority of the Debtors' GE products are sold to large distributors in North America, with orders often representing standard catalog items shipped with a relatively short lead-time. The Debtors service this market with a nationwide sales force focused on GE and Aero/HS products. In recent years, GE shipments have been approximately 50% of the total volume of shipments by the fabricated products business unit.

Aerospace and High Strength Products. Aero/HS products include aerospace, defense and recreational products, a majority of which are sold to distributors with the remainder being sold directly to customers. Sales are made either under contracts (with terms spanning from one year to several years) or on an order-by-order basis. The Debtors serve this market with a sales force focused on GE and Aero/HS products in North America and direct sales representatives in Western Europe. The key demand drivers are commercial aircraft builds (which, in turn, are often reflective of broad economic patterns) and defense spending. In recent years, Aero/HS shipments have been approximately 20% of the total volume of shipments by the fabricated products business unit.

Automotive Extruded and Forged Products. The Debtors supply extruded, drawn and forged aluminum products for applications in the North American automotive industry. The Debtors supply a wide variety of products, including extruded products for anti-lock braking systems, drawn tube for drive shafts and forgings for suspension control arms and drive train yokes. For some products, the Debtors perform limited fabrication. Customers consist primarily of tier-one suppliers to equipment manufacturers. Sales contracts for these products are typically medium to long-term in length. Almost all sales of Auto extruded and forged products occur through direct channels. The key demand drivers are North American light vehicle builds and increased use of aluminum in vehicles as aluminum displaces steel parts to reduce vehicle weight in response to tightening governmental standards for vehicle emissions. In recent years, Auto shipments have been approximately 15% of the total volume of shipments by the fabricated products business unit.

Custom Industrial Products. The Debtors manufacture custom products for many end uses, including consumer durables, electrical, machinery and equipment, and truck trailer applications. A significant portion of the Debtors' CI product sales in recent years has been for water heater anodes, truck trailers and electrical/electronic heat exchangers. The Debtors typically sell custom shapes directly to end-users under medium-term contracts. The Debtors sell these products using a nationwide direct sales force that works closely with the technical sales organization in pre-sale efforts. In recent years, CI shipments have been approximately 15% of the total volume of shipments by the fabricated products business unit.

*Manufacturing Processes Employed*

Rolling. The traditional manufacturing process for aluminum rolled products uses ingot as the starter material. The ingot is processed through a series of rolling operations, both hot and cold. Finishing steps may include heat treatment, annealing, coating, stretching, leveling or slitting to achieve the desired metallurgical, dimensional and performance characteristics. Aluminum rolled products are manufactured using a variety of alloy mixtures, a range of tempers (hardness), gauges (thickness) and widths, and various coatings and finishes. Rolled aluminum semi-finished products are generally either sheet (under .25 inches in thickness) or plate (up to 15 inches in thickness). The vast majority of the North American market for aluminum rolled products uses "common alloy" material for construction and other applications and beverage/food can sheet. However, these are products and markets in which the Debtors have chosen not to participate. Rather, the Debtors have chosen to focus their efforts on "heat treat" products, which may be distinguished from common alloy products by higher strength and other desired product attributes, resulting in higher value added in the market than for most other types of rolled products. The primary end use of heat treat rolled sheet and plate is for Aero/HS and GE products.

Extrusion. The extrusion process typically starts with a cast billet, which is an aluminum cylinder of varying length and diameter. The first step in the process is to heat the billet to an elevated temperature making the metal malleable. The billet is then placed into an extrusion press and pushed, or extruded, through a die that gives the material the desired two-dimensional cross section. To control the material's physical properties, the material is either quenched as it leaves the press or subjected to a post-extrusion heat treatment cycle. The extrusion is then straightened by stretching and cut to length before being hardened in aging ovens. The largest end uses of extruded products are in the construction, transportation (including Auto), CI and GE segments.

Forging. Forging is a manufacturing process in which metal is pressed, pounded or squeezed under great pressure into high strength parts known as forgings, creating unique property characteristics. Forged parts are heat treated before final shipment to the customer. The end uses are primarily in transportation, where high strength to weight product qualities are valued. The Debtors' participation is highly focused on certain types of Auto applications.

124

Drawing. The drawing process involves the reduction of the diameter and thickness of solid and hollow extrusion bloom, improving physical properties and dimension. End uses range widely. The Debtors' participation is focused on Aero/HS and Auto applications.

### Competition

The Debtors market their fabricated aluminum products in the United States of America and abroad. Sales are made both directly and through distributors to a large number of end-use customers. Competition in the sale of fabricated products is based upon quality, availability, price and service, including delivery performance. The Debtors concentrate their fabricating operations on selected products for which they believe they have production capability, technical expertise, high-product quality and other competitive advantages. However, the Debtors compete with numerous domestic and international fabricators in the sale of fabricated aluminum products and many of the Debtors' competitors have greater financial resources than they have.

### Primary Aluminum Business Unit

The Debtors' primary aluminum business unit now contains two primary elements: (a) activities related to the Debtors' interests in and related to Anglesey; and (b) the Debtors' primary aluminum hedging-related activities.

### Anglesey

KACC owns a 49% interest in Anglesey, which owns an aluminum smelter in Holyhead, Wales in the United Kingdom. The Anglesey smelter uses pre-bake technology and produces billet, rolling ingot and sow for the United Kingdom and European marketplace. The smelter has a total annual rated capacity of approximately 143,000 metric tons, of which approximately 70,000 metric tons (i.e., approximately 150 million pounds), or 49%, of the annual rated capacity are available to the Debtors. KACC supplies 49% of Anglesey's alumina requirements and purchases 49% of Anglesey's aluminum output at market-related prices. KACC sells its share of Anglesey's output to third parties. The price received for sales of production from Anglesey typically approximate the LME price. KACC realizes a premium (historically between $.05 and $.12 per pound above LME price depending on the product) for sales of value-added products such as billet and rolling ingot. Anglesey operates under a power agreement that provides sufficient power to sustain its operations at full capacity through September 2009. Rio Tinto Plc owns the remaining 51% ownership interest in Anglesey and, as majority shareholder, has day-to-day operating responsibility for Anglesey, although certain decisions require unanimous approval of the shareholders.

### Hedging

KACC's share of primary aluminum production from Anglesey is approximately 150 million pounds annually. Because KACC purchases alumina for Anglesey at prices linked to primary aluminum prices, only a portion of the Debtors' net revenues associated with Anglesey are exposed to price risk. The Debtors estimate the net portion of their share of Anglesey production exposed to primary aluminum price risk to be approximately 100 million pounds annually.

As indicated above, the Debtors' pricing of fabricated aluminum products is generally intended to lock-in a conversion margin (representing the value added from the fabrication process) and to pass metal price risk on to their customers. However, in certain instances the Debtors do enter into firm price arrangements. In such instances, the Debtors do have price risk on their anticipated primary aluminum purchase in respect of the customer's order. Total fabricated products shipments during 2002, 2003 and 2004 were 376.3, 372.4 and 447.4 (in millions of pounds), respectively, and the shipments for which the Debtors had price risk were (in millions of pounds) 99.0, 97.6 and 119.0, respectively.

During each of 2002, 2003 and 2004, the volume of fabricated products shipments with underlying primary aluminum price risk was roughly the same as the Debtors' net exposure to primary aluminum price risk at Anglesey. As such, the Debtors consider their access to Anglesey production overall to be a "natural hedge" against any fabricated products firm metal-price risk. However, since the volume of fabricated products shipped under firm prices may not match up on a month-to-month basis with expected Anglesey-related primary aluminum shipments, the Debtors may use third party hedging instruments to eliminate any net remaining primary aluminum price exposure existing at any time.

*Employees*

At June 30, 2005, KACC employed approximately 2,300 persons, of which approximately 2,250 were employed in the fabricated products business unit and approximately 40 were employed at the corporate level.

The table below shows each manufacturing location, the primary union affiliation, if any, and the date on which each union contract will expire.

| Location | Union | Contract Expiration Date |
|---|---|---|
| Chandler, Arizona | Non-union | N/A |
| Greenwood, South Carolina | Non-union | N/A |
| Jackson, Tennessee | Non-union | N/A |
| London, Ontario | USW Canada | February 2006 |
| Los Angeles, California | Teamsters | September 2006 |
| Newark, Ohio | USW | September 2010 |
| Richland, Washington | Non-union | N/A |
| Richmond, Virginia | USW | November 2010 |
| | IAM | ~~August~~November 2010 |
| Sherman, Texas | IAM | December 2007 |
| Spokane, Washington | USW | September 2010 |
| Tulsa, Oklahoma | USW | November 2010 |

## Strategic Plan

Following the Effective Date, management of Reorganized KAC is expected to aggressively pursue a strategic plan designed to provide a stable platform for future growth. The key components of the strategic plan will be to: (a) maintain manageable leverage and financial flexibility, while taking advantage of an improved cost structure and competitive strength; (b) execute a vision of market leadership and growth in fabricated products; (c) deliver a broad product offering and leadership in service and quality for its customers and distributors; and (d) continue ownership of KAC's interests in Anglesey, which provides a natural hedge against the fabricated products business unit's needs for primary aluminum.

## Liquidity and Capital Resources

The consummation of the transactions contemplated by the Plan will result in the elimination of all of the Debtors' approximately $850 million of unsecured prepetition indebtedness. It is anticipated that, as a result of the term loan component of the Exit Financing Facility, Reorganized KAC will have approximately $50 million in long-term indebtedness immediately following the Effective Date. Reorganized KAC will also have obligations under an equipment lease characterized as indebtedness. Management of the Debtors believes that, assuming consummation of the Plan in accordance with its terms and achievement of the Debtors' business plan, Reorganized KAC will have sufficient liquidity for the reasonably foreseeable future to service its indebtedness and conduct of its business as contemplated by the Debtors' business plan. It is expected that, on the Effective Date, Reorganized KAC will have available to it approximately $34 million of Cash in excess of the minimum needed to operate in the ordinary course of business. See "Overview of the Plan — Sources and Uses of Cash." Reorganized KAC is also expected to have access to a $200 million revolving credit facility subject to a borrowing base; the Debtors expect that the net availability on the Effective Date under such facility is likely to exceed $100 million. See"— Exit Financing Facility."

## Exit Financing Facility

It is anticipated that, on the Effective Date, Reorganized KAC and certain of the other Reorganized Debtors will enter into a financing facility with JPMorgan Chase Bank, National Association, as the administrative agent (*i.e.*, the Exit Financing Facility Agent Bank), and certain other financial institutions consisting of a secured first lien revolving credit facility component and a secured second lien term loan component (*i.e.*, the Exit Financing Facility). The Debtors have received a commitment for the Exit Financing Facility from the Exit Financing Facility Agent Bank and The CIT Group/Business Credit, Inc., the material terms of which are described below. Such commitment is subject to various conditions, including but not limited to the corporate and capital structure being satisfactory to the Exit Financing Facility Agent Bank and the negotiation of loan documentation satisfactory to all

parties thereto. Accordingly, while it is a condition to Confirmation that a commitment for the Exit Financing Facility be in effect, there can be no assurance as to whether JPMorgan Chase Bank, National Association will be the administrative agent or a lender thereunder or The CIT Group/Business Credit, Inc. will be a lender thereunder, or that the terms of the Exit Financing Facility will not differ significantly from those described below.

### Revolving Credit Facility

The Reorganized Debtors which are "borrowers" under the revolving credit facility will be able borrow up to an aggregate principal amount equal to the lesser of (a) $200 million and (b) a borrowing base relating to eligible accounts receivable, eligible inventory and an amortizing fixed asset component, as reduced by certain reserves, of which $60 million may be in the form of letters of credit and $17.5 million may be swingline loans. The revolving credit facility may also permit the lenders under the revolving credit facility to extend credit to Canadian borrowers. The borrowings under the revolving credit facility will bear interest at a rate per annum, at Reorganized KAC's option, equal to either: (a) a base rate, based on the greater of (i) the Exit Financing Facility Agent Bank's prime rate, and (ii) the federal funds effective rate plus 0.50%, in each case plus 0.50%; or (b) the adjusted London Interbank Offered Rate plus 2.25%. Borrowings under the revolving credit facility will be secured by a first-priority security interest in and lien on substantially all of the borrowers' tangible and intangible, real and personal property (subject to certain permitted liens). All of the obligations of the borrowers under the revolving credit facility will be guaranteed by all of their then-existing and future subsidiaries other than the Other Debtors and certain foreign subsidiaries. The revolving credit facility will contain covenants of the type typically found in revolving credit facilities and will place restrictions on the ability of the Reorganized Debtors and their significant subsidiaries to, among other things, incur debt and liens, make investments, pay dividends, sell assets, undertake transactions with affiliates and enter into unrelated lines of business. The revolving credit facility is also expected to contain a covenant to maintain a minimum fixed charge coverage ratio at certain times. Amounts owing under the revolving credit facility may be accelerated upon the occurrence of certain events of default set forth therein, including but not limited to the failure to make principal or interest payments due thereunder and breaches of certain covenants, representations and warranties set forth therein. The revolving credit facility will terminate on the earlier of February 11, 2010 and the acceleration of the obligations of the Reorganized Debtors under such facility in accordance with its terms.

### Term Loan

The term loan will be in the principal amount of $50 million and will bear interest at the adjusted London Interbank Offered Rate plus 5.50% per annum. The term loan will be secured by a security interest in and lien on the property securing the revolving credit facility junior to the liens securing such revolving credit facility and subject to certain other permitted liens. All of the obligations of the Reorganized Debtors which are "borrowers" under the term loan facility will be guaranteed by all of their then-existing and future subsidiaries other than the Other Debtors and certain foreign subsidiaries. The term loan facility will contain covenants of the type typically found in term loans and place restrictions on the ability of the Reorganized Debtors and their significant subsidiaries to, among other things, incur debt and liens, make investments, pay dividends, sell assets, undertake transactions with affiliates and enter into unrelated lines of business. The term loan facility is also expected to contain a covenant to maintain a minimum fixed charge coverage ratio at certain times. Amounts owing under the term loan facility may be accelerated upon the occurrence of certain events of default set forth therein, including but not limited to the failure to make principal or interest payments due thereunder and breaches of certain covenants, representations and warranties set forth therein. The term loan facility will terminate on earlier of February 11, 2011 and the acceleration of the obligations of the Reorganized Debtors under such facility in accordance with its terms.

**Selected Historical Financial Information**

The following table sets forth selected consolidated financial information for the Debtors as of and for the six months ended June 30, 2005 and 2004 and the fiscal years ended December 31, 2004, 2003 and 2002.

| | Six Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | **2005** | **2004** | **2004** | **2003** | **2002** |
| | | | (Dollars in Millions) | | |
| **Income Statement Information:** | | | | | |
| Net sales | $ 544.3 | $ 440.3 | $ 942.4 | $ 1,365.3 | $ 1,469.6 |
| Total costs and expenses | 527.2 | 454.9 | 1,760.0 | 2,104.2 | 1,875.5 |
| Operating income (loss) | 17.1 | (14.6) | (817.6) | (738.9) | (405.9) |
| Net income (loss) | 370.1 | (39.7) | (746.8) | (788.1) | (768.4) |
| **Balance Sheet Information:** | | | | | |
| Total assets | $ 2,208.7 | $ 1,625.2 | $ 1,882.4 | $ 1,628.7 | $ 2,230.4 |
| Total long-term debt | 1.2 | 2.2 | 2.8 | 24.2 | 42.7 |
| Liabilities subject to compromise | 3,950.4 | 2,833.4 | 3,954.9 | 2820.0 | 2,726.0 |
| Shareholders' equity (deficit) | (2,015.5) | (1,769.3) | (2,384.2) | (1,731.2) | (1,078.3) |

The financial information set forth above should be read in conjunction with the audited and unaudited historical consolidated financial statements of the Debtors, including the notes thereto, included in the KAC 2004 Form 10-K and the KAC 2005 Q2 Form 10-Q. Because the Debtors and the Other Debtors have sold their interests in and related to each Joint Venture other than Anglesey as part of the Debtors' strategic plan to dispose of their commodities assets, (see "Operations During the Reorganization Cases — Strategic Plan to Sell Commodities Assets."), the financial condition and results of operations of Reorganized KAC from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the historical financial statements of KAC, including those set forth in the KAC 2004 Form 10-K and the KAC 2005 Q2 Form 10-Q. See "New Common Stock — Risk Factors — Risks Relating to Certain Financial Information Regarding the Reorganized Debtors — Historical Financial Information Will Not Be Comparable." For unaudited pro forma financial information prepared in connection with such sales, see KAC's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2004 (the "KAC 2004 Q3 Form 10-Q") and KAC's Current Reports on Form 8-K dated July 1, 2004, October 1, 2004, October 29, 2004 and April 7, 2005 (collectively, the "Commodity Sale Form 8-Ks"), which presents certain historical financial information as if the sale of the Debtors' interests in and related to Alpart, KJBC/Gramercy, Valco and QAL, as the case may be, had occurred at the beginning of period indicated therein.

**Projected Financial Information**

*Introduction*

As a condition to confirmation of a plan of reorganization, the Bankruptcy Code requires, among other things, that the bankruptcy court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. See "Voting and Confirmation of the Plan — Confirmation — Feasibility." In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan with sufficient liquidity and capital resources to conduct their business. As a part of such analysis, the Debtors' management developed and prepared certain projections (the "Projections") of the financial performance of the Debtors for the fiscal year ending December 31, 2005 and of the Reorganized Debtors for the fiscal years ending December 31, 2006, 2007 and 2008 (such periods collectively referred to herein as the "Projection Period").

**THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS, BUDGETS OR STRATEGIES, OR MAKE EXTERNAL PROJECTIONS OR FORECASTS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTORS (INCLUDING THE REORGANIZED DEBTORS) DO NOT ANTICIPATE THAT THEY WILL, AND DISCLAIM ANY OBLIGATION TO: (A) FURNISH UPDATED BUSINESS PLANS, BUDGETS, PROJECTIONS OR FORECASTS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS**

**IN THE DEBTORS PRIOR TO THE EFFECTIVE DATE OR TO STOCKHOLDERS OR OTHER STAKEHOLDERS OF THE REORGANIZED DEBTORS AFTER THE EFFECTIVE DATE; (B) TO INCLUDE SUCH INFORMATION IN DOCUMENTS REQUIRED TO BE FILED WITH THE SEC OR ANY SECURITIES EXCHANGE OR ASSOCIATION; OR (C) OTHERWISE MAKE SUCH INFORMATION PUBLICLY AVAILABLE.**

The Projections should be read in conjunction with the assumptions, qualifications and explanations set forth herein, the historical consolidated financial information of the Debtors (including the notes and schedules thereto) included in the KAC 2004 Form 10-K and the KAC 2005 Q2 Form 10-Q and the pro forma financial information of the Debtors (including the notes thereto) included in the KAC 2004 Q3 Form 10-Q and the Commodity Sale Form 8-Ks. See also "New Common Stock — Risk Factors — Risks Relating to Certain Financial Information Regarding the Reorganized Debtors — Historical Financial Information Will Not Be Comparable."

### Principal Assumptions

The Projections are based on, and assume the successful implementation of, the Debtors' business plan. Both the Debtors' business plan and the Projections reflect numerous assumptions, including general business and economic conditions, as well as aluminum industry trends, and other matters that, though considered reasonable by the Debtors in light of current circumstances, may not materialize and are inherently subject to significant business, economic and competitive uncertainties and contingencies which are beyond the Debtors' control. Additionally, the Projections assume the management of the Reorganized Debtors will perform according to certain expectations, which may not occur. **Therefore, although the Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period are likely to vary from the Projections. These variations may be material. Accordingly, no representation can be or is being made with respect to the accuracy of the Projections or the ability of the Reorganized Debtors to achieve the Projections and the Projections may not be relied upon as a guaranty or other assurance with respect to the actual results that will occur.** See "New Common Stock — Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors. The Projections also include assumptions as to the estimated value of the Reorganized Debtors, the fair value of their assets and their actual liabilities as of the Effective Date. Reorganized KAC will be required to make such estimations as of the Effective Date. Such determinations will be based upon the estimated fair values as of that date, which could be materially higher or lower than the values assumed in the estimates contained in the Projections. **In deciding whether to vote to accept or reject the Plan, holders of Claims entitled to vote must make their own determinations as to the reasonableness of the assumptions underlying, and the reliability of, the Projections.** See "New Common Stock — Risk Factors."

The Debtors' independent auditors, Deloitte & Touche LLP, have neither compiled nor examined the Projections to determine the reasonableness thereof and, accordingly, express no opinion or other form of assurance with respect to them, and otherwise assume no responsibility for them. Moreover, the Projections have not been prepared with a view toward compliance with guidelines established with respect to projections by the SEC or the American Institute of Certified Public Accountants ("AICPA"). The principal assumptions used in preparing the Projections are as follows:

(a)     Effective Date; Plan Terms. For purposes of these Projections, Confirmation of the Plan is assumed to occur during the fourth quarter of fiscal 2005 and the Effective Date is assumed to occur on December 31, 2005. The Projections also assume that:

      (i)     the total amount of Allowed Claims in each Class is the actual or estimated aggregate amount thereof set forth in "Overview of the Plan — Classes and Treatment of Claims and Interests";

      (ii)     there are no material cure payments for the assumption of Executory Contracts and Unexpired Leases; and

      (iii)     the total amount of Priority Tax Claims, Administrative Claims, costs associated with the Exit Financing Facility, other reorganization expenses is $61 million and includes, among other things:

(A) legal, accounting, financial advisory and other professional fees associated with implementation of the Plan to be paid after the Effective Date (net of reimbursements from AJI, KJC and KAAC);

(B) the payment of Cash to the Funding Vehicle Trust on the Effective Date (net of amounts released or turned over from escrow);

(C) the Administrative Claims of the PBGC allowed pursuant to the PBGC Settlement Agreement;

(D) Claims of Indenture Trustees to be satisfied after the Effective Date;

(E) payments to be made under the KERP after the Effective Date; and

(F) fees associated with the Exit Financing Facility.

See "Overview of the Plan" for a brief summary of the principal provisions of the Plan.

(b) General Economic Conditions. The Projections were prepared based on assumptions that the overall economy will grow throughout the Projection Period and that there will be no significant downturn in the markets in which the Debtors operate.

(c) General Reorganization Assumptions.

(i) Intercompany Claims Settlement. The Projections assume that the Alumina Subsidiary Plans will be confirmed and become effective immediately prior to the effectiveness of the Plan and that, pursuant to the Intercompany Claims Settlement, the Debtors receive $25 million from KAAC and $1 million from AJI and KJC on the Effective Date, in addition to the approximately $43 million already received upon the sale of Alpart pursuant thereto. See "Overview of the Plan — Intercompany Claims Settlement" and "Operations During the Reorganization Cases — Intercompany Claims Settlement." In addition, the Projections assume that the Debtors receive $9 million from AJI, KJC and KAAC as reimbursement for professional fees incurred in connection with their chapter 11 cases, though the actual amount of such reimbursements remains the subject of discussions among the Debtors and the Creditors' Committee.

(ii) Funding of the Funding Vehicle Trust and PI Trusts. The Projections assume that, on the Effective Date (a) the Debtors contribute (1) the PI Insurance Assets and $13 million in Cash (including $4 million currently held in escrow that is expected to be released to the Debtors) to the Funding Vehicle Trust and (2) all of the issued and outstanding shares of Reorganized Kaiser Trading to the Asbestos PI Trust and the Silica PI Trust and (b) KFC or its successor transfers 75% of the KFC Claim to the Asbestos PI Trust and the Silica PI Trust in accordance with the Intercompany Claims Settlement. See "Overview of the Plan — Establishment of the Funding Vehicle Trust and the PI Trusts and Entry of the PI Channeling Injunctions" and "PI Trusts and Distribution Procedures."

(iii) VEBA Contributions. The Projections assume that (A) there will be no Initial VEBA Contributions as a result of the amount of aggregate advances projected to be made to the Union VEBA Trust and Salaried Employee VEBA Trust through the Effective Date, (B) on the Effective Date, the Debtors contribute an aggregate of 13,380,000 shares of New Common Stock to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust, and (C) after the Effective Date, Reorganized KAC makes Variable VEBA Contributions to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust in Cash according to the terms of the Legacy Liability Agreements. See "Overview of the Plan — Agreements with Labor Regarding Pension and Retiree Medical Benefits" and "Operations During the Reorganization Cases — ~~Agreement~~Agreements with Labor Regarding Pension and Retiree Medical Benefits."

(d)     Principal Operating and Financial Assumptions.

     (i)     Operating Segments.

          (A)     *Fabricated Products.* The Projections assume that the revenues and profitability of the fabricated products business unit generally continue to grow due to volume growth resulting from a general expansion in served markets, notably in the aerospace and, to a lesser extent, automotive sectors. Profit margins are assumed to remain stable or, for a few product lines, decline throughout the Projection Period, and product mix is expected to improve in later years as sales shift to Aero/HS and Auto products, which have higher margins.

               The Projections also reflect modest gains in market share in key product categories by the fabricated products business unit, resulting from product quality and customer service capabilities.

               The Projections assume substantial one-time capital expenditures in 2005, 2006 and 2007 related to new business opportunities. The Projections assume that modest benefits of these expenditures will be realized in 2008 and that a material portion of the benefits from the expenditures will occur in the years beyond the Projection Period.

               The principal elements of cost of goods sold for the fabricated products business unit include aluminum, labor (including pension expenses) and energy. The Projections assume that aluminum and energy expenses will increase in line with the higher production volume assumed in the Projections. Labor and other costs are also assumed to increase, but at a lower rate as further efficiency benefits are assumed to be realized.

          (B)     *Primary Aluminum.* The Projections assume declining revenues and profitability for the primary aluminum business unit over the Projection Period as aluminum prices revert to assumed long-term trend levels of $0.67/lb. In addition, the Projections assume that increasing power and raw material costs will reduce the profitability of the primary aluminum business unit over the Projection Period. Expenses of the primary aluminum business unit also include hedging-related gains and losses for the Projection Period.

     (ii)     Operating Expenses.

          (A)     *Selling, General and Administrative ("SG&A").* SG&A expense includes (1) unallocated operating expenses of the fabricated products business unit, (2) incentive-based compensation, and (3) corporate general and administrative costs. Corporate general and administrative costs include expenses for senior management, accounting, legal, human resources, insurance, tax, treasury, information technology and employee benefit functions and other related items, as well as public company costs. The Projections assume that the costs associated with operating the Reorganized Debtors will be reduced substantially as a result of the sale of the Joint Ventures other than Anglesey and the simplification of the corporate structure to be effected through the Restructuring Transactions. See "~~Reorganized Kaiser~~ Restructuring Transactions."

          (B)     *VEBA Profit Sharing.* The Legacy Liability Agreements require Reorganized KAC to contribute a percentage of profits to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust in the future. The Projections assume profit sharing expenses (*i.e.*, Variable VEBA Contributions) for the Projection Period based on levels of profitability, capital spending and other items forecast in the Projections. See "Overview of the Plan — Agreements with Labor

Regarding Pension and Retiree Medical Benefits" and "Operations During the Reorganization Cases — ~~Agreement~~Agreements with Labor Regarding Pension and Retiree Medical Benefits."

(C)    *Depreciation and Amortization.* The Projections assume that depreciation and amortization do not change materially during the Projection Period.

(D)    *Other.* Other costs include research and development and costs related to discontinued operations (primarily workers' compensation and COBRA expenses), as well as one-time gains and losses.

(iii)    Income Taxes. The Projections assume that the Reorganized Debtors will have substantial net operating loss carryforwards, which will shelter the Reorganized Debtors from cash tax exposure in the United States of America throughout the Projection Period, except for modest alternative minimum tax payments. Other cash taxes of the Reorganized Debtors assumed in the Projections relate to the Reorganized Debtors' operations in Canada. See "Certain Federal Income Tax Consequences of Consummation of the Plan — U.S. Federal Income Tax Consequences to the Debtors."

(iv)    Post-Reorganization Debt and Interest Expense. The Projections assume that, immediately after the Effective Date, Reorganized KAC's debt will include the term loan component of the Exit Financing Facility, with an outstanding principal amount of $50.0 million, and capital leases, with an outstanding principal amount of approximately $3.0 million. The term loan component of the Exit Financing Facility is assumed to remain outstanding throughout the Projection Period and to accrue interest at the adjusted London Interbank Offered Rate plus 5.50%. The Projections assume that the revolving credit facility component of the Exit Financing Facility is used only for letter of credit support and otherwise remains undrawn throughout the Projection Period. See "— Exit Financing Facility."

(v)    Fresh-Start Reporting. The foregoing assumptions and resulting computations were made solely for purposes of preparing the Projections. The AICPA has issued a Statement of Position on Financial Reporting by Entities in Reorganization Under the Bankruptcy Code (the "Reorganization SOP"). Reorganized KAC will be required to determine the amount by which its reorganization value as of the Effective Date exceeds, or is less than, the fair value of its assets as of the Effective Date. Such determination will be based upon the fair values as of that time, which could be materially higher or lower than the values assumed in the foregoing computations, and may be based on a different methodology with respect to the valuation of Reorganized KAC's reorganization value. In all events, such valuation, as well as the determination of the fair value of Reorganized KAC's assets and the determination of its actual liabilities, will be made as of the Effective Date, and the differences between the amounts of any or all of the foregoing items as assumed in the Projections and the actual amounts thereof as of the Effective Date may be material.

The Projections have been prepared to reflect a simplified "fresh-start" presentation as of the Effective Date. The Projections reflect adjustments to goodwill of approximately $59 million, with a corresponding adjustment in equity to a level of approximately $380 million, reflecting the midpoint of the estimated reorganization equity value. See "New Common Stock — Estimated Reorganization Value."

**Projections**

As indicated above, the projected consolidated financial statements of KAC and Reorganized KAC set forth below have been prepared based on the assumption that the Effective Date is December 31, 2005. Although the Debtors presently intend to seek to cause the Effective Date to occur as soon as practicable, there can be no assurance as to when the Effective Date actually will occur.

The projected consolidated financial statements set forth below include:

(a)    A Reorganized KAC Projected Pro Forma Balance Sheet as of December 31, 2005, representing: (i) the projected consolidated financial position of KAC as of December 31, 2005, but prior to the consummation of the transactions which the Plan contemplates will occur on the Effective Date; (ii) the projected adjustments to such projected consolidated financial position required to reflect Confirmation and the consummation of the transactions which the Plan contemplates will occur on the Effective Date (collectively, the "Emergence Adjustments"); and (iii) the projected consolidated financial position of Reorganized KAC as of December 31, 2005, after giving effect to the Emergence Adjustments. The Emergence Adjustments set forth in the columns captioned "Discharge of Liabilities" and "Fresh Start" reflect the assumed effects of the consummation of the transactions contemplated by the Plan. The various Emergence Adjustments are described in greater detail in the notes to the Reorganized KAC Projected Pro Forma Balance Sheet.

(b)    KAC and Reorganized KAC Historical and Projected Pro Forma Consolidated Balance Sheets representing: (i) the historical consolidated financial position of KAC as of each of December 31, 2003 and 2004; (ii) the projected consolidated financial position of KAC as of December 31, 2005, but prior to the consummation of the transactions which the Plan contemplates will occur on the Effective Date; and (iii) the projected consolidated financial position of Reorganized KAC as of December 31, 2005, after giving effect to the consummation of the transactions which the Plan contemplates will occur on the Effective Date, and as of each of December 31, 2006, 2007 and 2008.

(c)    KAC and Reorganized KAC Historical and Projected Pro Forma Consolidated Statements of Operations, representing: (i) the historical consolidated results of operations of KAC for the fiscal years ended December 31, 2003 and 2004; (ii) the projected consolidated results of operations of KAC for the fiscal year ending December 31, 2005, and (iii) the projected consolidated results of operations of Reorganized KAC for the fiscal years ending December 31, 2006, 2007 and 2008.

(d)    Reorganized KAC Projected Pro Forma Consolidated Statements of Cash Flows, representing the projected consolidated cash flows of Reorganized KAC for the fiscal years ending December 31, 2006, 2007 and 2008.

**REORGANIZED KAC**
**PROJECTED PRO FORMA CONSOLIDATED BALANCE SHEET**
**DECEMBER 31, 2005**
(Unaudited)
(Dollars in Millions)

(Amounts may not add to totals due to rounding)

| Reorganized KAC Projected Pro Forma Consolidated Balance Sheet | December 31, 2005 Projected | Emergence Adjustments | | December 31, 2005 Pro Forma |
|---|---|---|---|---|
| | | Discharge of Liabilities | Fresh Start | |
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash | $25 | $12 (a) | $0 | $37 |
| Restricted Cash | 675 | (675) (b) | 0 | 0 |
| Trade Receivables (net of allowances) | 73 | 0 | 0 | 73 |
| Other Receivables | 3 | 0 | 0 | 3 |
| Inventory | 104 | 0 | 0 | 104 |
| Prepaid Expenses and Other Current Assets | 8 | 0 | 0 | 8 |
| Current Assets of Disc. Operations | 0 | 0 | 0 | 0 |
| Total Current Assets | $887 | ($663) | $0 | $224 |
| PP&E, Net | $224 | $0 | $0 | $224 |
| Investments and Advances | 12 | 0 | 0 | 12 |
| Other Assets | 1,001 | (965) (c) | 59 (d) | 96 |
| Long-Term Assets of Disc. Operations | 0 | 0 | 0 | 0 |
| **Total Assets** | $2,125 | ($1,627) | $59 | $557 |
| **LIABILITIES** | | | | |
| Current Liabilities: | | | | |
| Accounts Payable | $35 | ($8) (e) | $0 | $26 |
| Accrued Interest | 1 | 0 | 0 | 1 |
| Accrued Salaries and Wages | 46 | (15) (f) | 0 | 31 |
| Other Accrued Liabilities | 42 | (20) (g) | 0 | 21 |
| Payable to Affiliates | 12 | 0 | 0 | 12 |
| Current Liabilities of Disc. Operations | 0 | 0 | 0 | 0 |
| Total Current Liabilities | $135 | ($43) | $0 | $92 |
| Credit Facility | $0 | $0 | $0 | $0 |
| New Term Loan | 0 | 50 (h) | 0 | 50 |
| Other Debt | 2 | 0 | 0 | 2 |
| Long-Term Liabilities of Disc. Operations | 26 | (26) (i) | 0 | 0 |
| Other Long-Term Liabilities | 52 | (19) (j) | 0 | 33 |
| Liabilities Subject to Compromise | 3,922 | (3,922) (k) | 0 | 0 |
| Total Liabilities | $4,137 | ($3,960) | $0 | $177 |
| Minority Interest | $0 | $0 | $0 | $0 |
| Commitments and Contingencies | 0 | 0 | 0 | 0 |
| SHAREHOLDERS' EQUITY | | | | |
| Common Stock and Paid-in Capital | $539 | ($218) (l) | $59 (l) | $380 (m) |
| Retained Earnings | (2,551) | 2,551 (l) | 0 | 0 |
| Total Equity | ($2,012) | $2,333 | $59 | $380 |
| **Total Liabilities & Equity** | $2,125 | ($1,627) | $59 | $557 |

**THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "— PROJECTED FINANCIAL INFORMATION," THE CONSOLIDATED HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS, INCLUDING THE NOTES THERETO, INCLUDED IN THE KAC 2004 FORM 10-K AND THE KAC 2005 Q2 FORM 10-Q AND THE CONSOLIDATED PRO FORMA FINANCIAL INFORMATION OF THE DEBTORS, INCLUDING THE NOTES THERETO, INCLUDED IN THE KAC 2004 Q3 FORM 10-Q AND THE COMMODITIES SALE FORM 8-KS.**

**NOTES TO REORGANIZED KAC PROJECTED PRO FORMA CONSOLIDATED BALANCE SHEET**

(a)     Cash adjustments include:

    (i)     the following payments:

        (A)     the payment of $3 million on account of Priority Tax Claims;

        (B)     the payment of $1 million on account of Convenience Claims;

        (C)     the payment of $5 million on account of Secured Claims;

        (D)     the payment of $3 million on account of Canadian Debtor PBGC Claims;

        (E)     the payment of $1 million of costs associated with the Exit Financing Facility;

        (F)     the payment of $17 million of legal, accounting, financial advisory and other professional fees associated with implementation of the Plan (reflecting $25 million of such fees less $9 million of reimbursements assumed to be paid to KACC by AJI, KJC and KAAC in respect of professional fees incurred in connection with their chapter 11 cases (see paragraph (c)(i) under "—Principal Assumptions"));

        (G)     the payment of $9 million to the Funding Vehicle Trust (reflecting $13 million to be paid in accordance with the Plan less the expected release of $4 million currently held in escrow to the Debtors);

        (H)     the payment of $14 million on account of the Administrative Claims of the PBGC allowed pursuant to the PBGC Settlement Agreement; and

        (I)     payments of $11 million in the aggregate for other items including (1) Claims of Indenture Trustees and (2) payments under the KERP (see "Overview of the Plan — Sources and Uses of Cash");

    (ii)     receipt of $50 million of proceeds under the term loan component of the Exit Financing Facility (see "— Exit Financing Facility"); and

    (iii)     receipt of $25 million from KAAC and $1 million from AJI and KJC pursuant to the Intercompany Settlement Agreement (see "Operations During the Reorganization Cases — Intercompany Claims Settlement").

(b)     Reflects the distribution under the Alumina Subsidiary Plans of amounts held in escrow at AJI, KJC and KAAC; of such amounts, $26 million is assumed to be paid to Reorganized KAC in accordance with the Intercompany Claims Settlement.

(c)     Reflects the contribution of the PI Insurance Assets to the Funding Vehicle Trust, offset by $1 million of costs associated with the Exit Financing Facility.  See "PI Trusts and Distribution Procedures — Funding Vehicle Trust."

(d)     Represents adjustments to goodwill to reflect the carrying value of assets and liabilities based on the midpoint of the estimated reorganization equity value (approximately $380 million).  See "New Common Stock — Estimated Reorganization Value."

(e)     Reflects the discharge of Secured Claims and Priority Tax Claims.

135

(f)   Reflects retention payments under the KERP and payment of the Administrative Claims of the PBGC allowed pursuant to the PBGC Settlement Agreement. See "— Management — Executive Compensation — Existing Plans and Agreements to beBe Retained after the Executive Date — Key Employee Retention PlanProgram" and "Operations During the Reorganization Cases — PBGC Settlement Agreement."

(g)   Reflects the payment of Indenture Trustee costs, as well as legal, accounting, financial advisory and other professional fees associated with implementation of the Plan. See "Overview of the Plan — Sources and Uses of Cash."

(h)   Reflects the drawdown of the term loan component of the Exit Financing Facility (see "— Exit Financing Facility").

(i)   Reflects the discharge of liabilities subject to compromise related to assets sold by the Debtors prior to the Effective Date.

(j)   Reflects the payment of Cash to the Funding Vehicle Trust, certain payments under the KERP and the payment of Cash to the PBGC in respect of its Class 4 Claim. See "PI Trusts and Distribution Procedures — Funding Vehicle Trust" and "— Management — Executive Compensation — Existing Plans and Agreements to beBe Retained after the Executive Date — Key Employee Retention PlanProgram."

(k)   Reflects cancellation of prepetition liabilities in exchange for the payment of Cash and the issuance of New Common Stock.

(l)   Reflects cancellation of prepetition equity and the issuance of New Common Stock, based on the midpoint of the estimated reorganization equity value excluding the theoretical value of certain anticipated tax attributes of the Reorganized Debtors (approximately $380 million). See "New Common Stock — Estimated Reorganization Value." See note (m) below for additional information regarding estimated reorganization equity value.

(m)   Reflects estimated reorganization equity value, which takes into account estimated debt balances and other obligations as of the assumed Effective Date, of approximately $380 million based upon the midpoint of the range for the estimated reorganization equity value of Reorganized KAC excluding the theoretical value of certain anticipated tax attributes of the Reorganized Debtors. If such value were included in the calculation of the reorganization equity value of Reorganized KAC, such equity value could be higher by as much as $65 to $85 million. The incremental value represents the theoretical present value of estimated tax savings as a result of the anticipated tax attributes of the Reorganized Debtors as of the Effective Date. See "New Common Stock — Estimated Reorganization Value" for a description of the manner in which the estimated reorganization equity value was calculated for purposes of the Plan, including the reasons no value was included in respect of the anticipated tax attributes of the Reorganized Debtors.

## KAC AND REORGANIZED KAC
### HISTORICAL AND PROJECTED PRO FORMA CONSOLIDATED BALANCE SHEETS
(Unaudited)
(Dollars in Millions)

(Amounts may not add to totals due to rounding)

| KAC and Reorganized KAC Historical and Projected Pro Forma Consolidated Balance Sheet | | | | | | |
|---|---|---|---|---|---|---|
| | Existing KAC | | | | Reorganized KAC | |
| | December 31, | | December 31, 2005 | | December 31, | |
| | 2003 | 2004 | Projected | Pro Forma | 2006 | 2007 | 2008 |
| ASSETS | | | | | | | |
| Current Assets: | | | | | | | |
| Cash | $36 | $55 | $25 | $37 | $28 | $56 | $119 |
| Restricted Cash related to Commodity Sales | 0 | 281 | 675 | 0 | 0 | 0 | 0 |
| Trade Receivables (net of allowances) | 61 | 97 | 73 | 73 | 87 | 94 | 98 |
| Other Receivables | 19 | 14 | 3 | 3 | 3 | 3 | 3 |
| Inventory | 93 | 105 | 104 | 104 | 96 | 94 | 94 |
| Prepaid Expenses and Other Current Assets | 24 | 20 | 8 | 8 | 6 | 4 | 5 |
| Current Assets of Disc. Operations | 194 | 31 | 0 | 0 | 0 | 0 | 0 |
| Total Current Assets | $426 | $603 | $887 | $224 | $220 | $251 | $319 |
| PP&E, Net | $230 | $215 | $224 | $224 | $258 | $274 | $265 |
| Investments and Advances | 13 | 17 | 12 | 12 | 13 | 11 | 8 |
| Other Assets | 521 | 1,010 | 1,001 | 96 | 93 | 94 | 94 |
| Long-Term Assets of Disc. Operations | 434 | 39 | 0 | 0 | 0 | 0 | 0 |
| Total Assets | $1,624 | $1,882 | $2,125 | $557 | $584 | $630 | $686 |
| LIABILITIES | | | | | | | |
| Current Liabilities: | | | | | | | |
| Accounts Payable | $36 | $52 | $35 | $26 | $27 | $30 | $32 |
| Accrued Interest | 1 | 1 | 1 | 1 | 1 | 1 | 2 |
| Accrued Salaries and Wages | 64 | 49 | 46 | 31 | 27 | 28 | 28 |
| Other Accrued Liabilities | 30 | 74 | 42 | 21 | 21 | 24 | 32 |
| Payable to Affiliates | 11 | 15 | 12 | 12 | 12 | 11 | 11 |
| Current Liabilities of Disc. Operations | 178 | 58 | 0 | 0 | 0 | 0 | 0 |
| Total Current Liabilities | $320 | $248 | $135 | $92 | $88 | $94 | $104 |
| Credit Facility | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Term Loan | 0 | 0 | 0 | 50 | 50 | 50 | 50 |
| Other Debt | 4 | 4 | 2 | 2 | 2 | 2 | 2 |
| Long-Term Liabilities of Disc. Operations | 209 | 26 | 26 | 0 | 0 | 0 | 0 |
| Other Long-Term Liabilities | 59 | 33 | 52 | 33 | 35 | 37 | 39 |
| Liabilities Subject to Compromise | 2,770 | 3,955 | 3,922 | 0 | 0 | 0 | 0 |
| Total Liabilities | $3,362 | $4,266 | $4,137 | $177 | $175 | $184 | $195 |
| Minority Interest | $1 | $1 | $0 | $0 | $0 | $0 | $0 |
| Commitments and Contingencies | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SHAREHOLDERS' EQUITY | | | | | | | |
| Common Stock and Paid-in Capital | $540 | $539 | $539 | $380 | $380 | $380 | $380 |
| Retained Earnings | (2,279) | (2,923) | (2,551) | 0 | 29 | 66 | 110 |
| Total Equity | ($1,739) | ($2,384) | ($2,012) | $380 | $409 | $446 | $490 |
| Total Liabilities & Equity | $1,624 | $1,882 | $2,125 | $557 | $584 | $630 | $686 |

**THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "— PROJECTED FINANCIAL INFORMATION," THE CONSOLIDATED HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS, INCLUDING THE NOTES THERETO, INCLUDED IN THE KAC 2004 FORM 10-K AND THE 2005 Q2 FORM 10-Q AND THE CONSOLIDATED PRO FORMA FINANCIAL INFORMATION OF THE DEBTORS, INCLUDING THE NOTES THERETO, INCLUDED IN THE KAC 2004 Q3 FORM 10-Q AND COMMODITIES SALE FORM 8-KS.**

**KAC AND REORGANIZED KAC**
**HISTORICAL AND PROJECTED PRO FORMA CONSOLIDATED STATEMENTS OF OPERATIONS**
(Unaudited)
(Dollars in Millions)

(Amounts may not add to totals due to rounding)

| KAC and Reorganized KAC Historical and Projected Pro Forma Consolidated Statement of Operations | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing KAC | | | | | Reorganized KAC | |
| | Fiscal Year Ended December 31, | | Fiscal Year Ended December 31, 2005 | | | Fiscal Year Ended December 31, | |
| | | | | Emergence | | | |
| | 2003 | 2004 | Projected | Adjustments | Pro Forma | 2006 | 2007 | 2008 |
| **Revenues:** | | | | | | | | |
| Fabricated Products | $598 | $809 | $884 | $0 | $884 | $878 | $902 | $951 |
| Primary Aluminum | 112 | 133 | 139 | 0 | 139 | 128 | 119 | 118 |
| Other | (0) | (0) | (1) | 0 | (1) | (0) | (0) | 0 |
| Total | $710 | $942 | $1,022 | $0 | $1,022 | $1,006 | $1,021 | $1,069 |
| **Cost of Sales:** | | | | | | | | |
| Fabricated Products | $577 | $708 | $781 | $0 | $781 | $784 | $794 | $830 |
| Primary Aluminum | 111 | 118 | 122 | 0 | 122 | 116 | 110 | 110 |
| VEBA profit sharing | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 12 |
| Other | (6) | 26 | 5 | 0 | 5 | 0 | 2 | (0) |
| Total | $681 | $852 | $907 | $0 | $907 | $901 | $910 | $951 |
| **Gross Profit** | $29 | $90 | $116 | $0 | $116 | $105 | $111 | $117 |
| **Other Operating Expenses:** | | | | | | | | |
| Depreciation and Amortization | $26 | $22 | $20 | $0 | $20 | $20 | $20 | $21 |
| Selling, General and Administrative | 92 | 92 | 44 | 0 | 44 | 36 | 37 | 38 |
| Other | 142 | 793 | 27 | 0 | 27 | 6 | 5 | 5 |
| Total | $260 | $908 | $90 | $0 | $90 | $62 | $62 | $63 |
| **Operating Income** | ($231) | ($818) | $25 | $0 | $25 | $44 | $49 | $54 |
| Interest Expense (Income) & Def Fin | $9 | $10 | $7 | $0 | $7 | $6 | $6 | $6 |
| Other Expense (Income) & Reorg Items (a) | 32 | 35 | 40 | (2,392) | (2,352) | 2 | (0) | (1) |
| Provision for Income Taxes | (1) | (6) | 5 | 0 | 5 | (6) | (6) | (5) |
| Minority Interest | (0) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net Income from Cont. Operations** | ($274) | ($868) | ($17) | $2,392 | $2,375 | $29 | $37 | $44 |
| Net Income from Disc. Operations | (515) | 121 | 388 | 0 | 388 | 0 | 0 | 0 |
| **Net Income (Loss)** | ($788) | ($747) | $371 | $2,392 | $2,763 | $29 | $37 | $44 |

**THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "— PROJECTED FINANCIAL INFORMATION," THE CONSOLIDATED HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS, INCLUDING THE NOTES THERETO, INCLUDED IN THE KAC 2004 FORM 10-K AND THE KAC 2005 Q2 FORM 10-Q AND THE CONSOLIDATED PRO FORMA FINANCIAL INFORMATION OF THE DEBTORS, INCLUDING THE NOTES THERETO, INCLUDED IN THE KAC 2004 Q3 FORM 10-Q AND THE COMMODITIES SALE FORM 8-KS.**

**NOTES TO KAC AND REORGANIZED KAC HISTORICAL AND
PROJECTED PRO FORMA CONSOLIDATED STATEMENTS OF OPERATIONS**

(a)    Reorganization adjustments reflect $2.3 billion gain on discharge of liabilities, $4 million of reorganization costs and $59 million related to "fresh-start" adjustments.

REORGANIZED KAC
**PROJECTED PRO FORMA CONSOLIDATED STATEMENTS OF CASH FLOWS**
(Unaudited)
(Dollars in Millions)

(Amounts may not add to totals due to rounding)

| Reorganized KAC Projected Pro Forma Statement of Cash Flows | | | |
|---|---|---|---|
| | **Fiscal Year Ended December 31,** | | |
| | **2006** | **2007** | **2008** |
| **Cash from Operations:** | | | |
| Net Income to Common | $29 | $37 | $44 |
| Dividends | 0 | 0 | 0 |
| Depreciation and Amortization | 20 | 20 | 21 |
| Change in Receivables | (14) | (6) | (5) |
| Change in Inventory | 7 | 2 | 1 |
| Change in Other Receivables and | | | |
| Prepaid and Other Current Assets | 2 | 1 | (0) |
| Change in Trade Payables | 1 | 3 | 2 |
| Change in Accrued and Other Liabilities | (4) | 3 | 8 |
| Change in Long-Term Assets & Long-Term Liab. | 5 | 1 | 2 |
| Change in Restricted Cash | 0 | 0 | 0 |
| Cash Provided (Used) by Disc. Operations | 0 | 0 | 0 |
| Equity in (income) loss of Unconsolidated | 0 | 0 | 0 |
| Affiliates, net of Distributions | (0) | 2 | 3 |
| Change in Liabilities Subject to Compromise | 0 | 0 | 0 |
| Minority Interest | 0 | 0 | 0 |
| Other | 0 | 0 | 0 |
| Cash Provided by (Used in) Operations | $46 | $64 | $75 |
| **Cash from Investment** | | | |
| Capital Expenditures | ($54) | ($36) | ($12) |
| Asset Disposition Proceeds | 0 | 0 | 0 |
| Discontinued Operations | 0 | 0 | 0 |
| Cash Provided by (Used in) Investment | ($54) | ($36) | ($12) |
| **Cash From Financing** | | | |
| Issuance (Repayment) of Debt | ($0) | ($0) | ($0) |
| Issuance of Common Equity | 0 | 0 | 0 |
| Financing Fees, net | 0 | 0 | 0 |
| Discontinued Operations | 0 | 0 | 0 |
| Cash Provided by (Used in) Financing | ($0) | ($0) | ($0) |
| **Net Cash Provided (Used)** | **($8)** | **$28** | **$63** |

**THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "— PROJECTED FINANCIAL INFORMATION," THE CONSOLIDATED HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS, INCLUDING THE NOTES THERETO, INCLUDED IN THE KAC 2004 FORM 10-K AND THE KAC 2005 Q2 FORM 10-Q AND THE CONSOLIDATED PRO FORMA FINANCIAL INFORMATION OF THE DEBTORS, INCLUDING THE NOTES THERETO, INCLUDED IN THE KAC 2004 Q3 FORM 10-Q AND THE COMMODITIES SALE FORM 8-KS.**

**Board of Directors**

### *Number of Directors and Director Independence*

Reorganized KAC's Bylaws will provide that the business and affairs of Reorganized KAC will be managed under the direction of Reorganized KAC's Board of Directors. As of the Effective Date, Reorganized KAC's initial Board of Directors will consist of ten members, one of whom will be the Chief Executive Officer of Reorganized KAC, four of whom will be designated by the USW and the remaining five of whom will be selected by a search committee comprised of two persons designated by the Debtors, two persons designated by the Creditors' Committee and one person designated jointly by the Asbestos Claimants' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative (*i.e.*, the Search Committee). See "General Information Concerning the Plan — Directors and Officers of the Reorganized Debtors." The Search Committee ~~will engage~~has engaged a professional search firm ~~and establish~~, Russell Reynolds Associates, and have established the criteria to be considered in evaluating potential candidates. In accordance with KAC's intention to apply to list the New Common Stock on The Nasdaq Stock Market, Inc., at least a majority of the initial Reorganized KAC's Board of Directors will be "independent" as contemplated by the applicable listing requirements of the National Association of Securities Dealers, Inc. (the "NASD"). In addition, the Director Designation Agreement requires that the individuals nominated by the USW for membership on Reorganized KAC's Board of Directors meet the applicable independence criteria contained in the Marketplace Rules or other applicable criteria of the NASD or, if the securities of Reorganized KAC are then principally traded or quoted on a national securities exchange or association or quotation system other than The Nasdaq Stock Market, Inc., such national securities exchange or association or quotation system, in any case, as such rules are interpreted by Reorganized KAC's Board of Directors reasonably and in good faith. See "— Director Designation Agreement with the USW."

The identity and initial term of, and such additional information as may be required to be disclosed pursuant to section 1129(a)(5) of the Bankruptcy Code with respect to, the individuals expected to serve as the initial directors will be set forth in a filing with the Bankruptcy Court ~~as soon as the information is available but in no event later than~~at least ten days prior to the deadline for filing objections to the Confirmation of the Plan to the extent such identities and additional information are then known by the Debtors and, to the extent any such information is not then known by the Debtors, the Debtors will disclose it in a filing with the Bankruptcy Court promptly after it becomes available to the Debtors. See "General Information Concerning the Plan — Directors and Officers of the Reorganized Debtors."

### *Board Committees*

Reorganized KAC's Bylaws will provide that Reorganized KAC's Board of Directors may, by resolution passed by a majority of the directors (assuming no vacancies), designate one or more committees that, except as otherwise provided in such Bylaws or by law, will have and may exercise all the powers and authority of Reorganized KAC's Board of Directors in the direction or the management of the business and affairs of Reorganized KAC.

It is presently contemplated that Reorganized KAC's Board of Directors will establish the following committees on or promptly after the Effective Date:

- Executive Committee. The Executive Committee will manage the business and affairs of Reorganized KAC that require attention prior to the next regular meeting of Reorganized KAC's Board of Directors. However, the Executive Committee will not have the power to (a) approve or adopt, or recommend to the stockholders of Reorganized KAC, any action or matter expressly required by law to be submitted to the stockholders of Reorganized KAC for approval, (b) adopt, amend or repeal any bylaw of Reorganized KAC, or (c) take any other action reserved for action by Reorganized KAC's Board of Directors pursuant to a resolution of Reorganized KAC's Board of Directors or otherwise prohibited to be taken by the Executive Committee by law or pursuant to Reorganized KAC's Certificate of Incorporation or Bylaws. It is anticipated that the members of the Executive Committee will include the Chairman of Reorganized KAC's Board of Directors and at least one of the directors nominated by the USW in accordance with the Director Designation Agreement (so long as at least one such director is qualified to serve thereon). A majority of the members of the Executive Committee must satisfy the general independence criteria contained in

the Marketplace Rules or other applicable criteria of the NASD, as interpreted by Reorganized KAC's Board of Directors reasonably and in good faith (the "General Independence Criteria").

- Audit Committee. The Audit Committee will oversee the accounting and financial reporting practices and processes of Reorganized KAC and the audits of the financial statements of Reorganized KAC on behalf of Reorganized KAC's Board of Directors, including appointing, compensating, retaining and overseeing the work of Reorganized KAC's independent auditors. Other duties and responsibilities of the Audit Committee will include (a) establishing hiring policies for employees or former employees of the independent auditors, (b) reviewing Reorganized KAC's systems of internal accounting controls, (c) discussing risk management policies, (d) approving related party transactions, (e) establishing procedures for complaints regarding financial statements or accounting policies, and (f) performing other duties delegated to the Audit Committee by Reorganized KAC's Board of Directors from time to time. It is anticipated that the members of the Audit Committee will include at least one of the directors nominated by the USW in accordance with the Director Designation Agreement (so long as at least one such director is qualified to serve thereon). Each member of the Audit Committee (a) must satisfy the General Independence Criteria, (b) may not, other than as a member of Reorganized KAC's Board of Directors or a committee thereof, accept any consulting, advisory or other compensatory fee from Reorganized KAC or its subsidiaries (other than fixed amounts of compensation under a retirement plan for prior service, provided such compensation is not contingent on continued service), (c) may not be an affiliated person of Reorganized KAC or any of its subsidiaries, (d) must not have participated in the preparation of the financial statements of Reorganized KAC or its predecessor or any then-current subsidiary thereof at any time during the three years prior to the Effective Date, and (e) must be able to read and understand fundamental financial statements. At least one member of the Audit Committee must have past employment experience in finance or accounting, the requisite professional certification in accounting, or any comparable experience or background that results in such member's financial sophistication.

- Compensation Committee. The Compensation Committee will establish and administer Reorganized KAC's policies, programs and procedures for compensating its senior management, including determining and approving the compensation of Reorganized KAC's executive officers. Other duties and responsibilities of the Compensation Committee will include (a) administering plans adopted by Reorganized KAC's Board of Directors that contemplate administration by the Compensation Committee, including the Equity Incentive Plan, (b) overseeing regulatory compliance with respect to compensation matters, (c) reviewing director compensation, and (d) performing other duties delegated to the Compensation Committee by Reorganized KAC's Board of Directors from time to time. Each member of the Compensation Committee must satisfy the General Independence Criteria, as well as qualify as an "outside director" within the meaning of Section 162(m) of the IRC and as a "non-employee director" within the meaning of Rule 16b-3 of the Exchange Act.

- Nominating and Corporate Governance Committee. The Nominating and Corporate Governance Committee will identify individuals qualified to become members of Reorganized KAC's Board of Directors, recommend candidates to fill vacancies and newly-created positions on Reorganized KAC's Board of Directors, recommend director nominees for the election by stockholders at the annual meetings of stockholders and develop and recommend to Reorganized KAC's Board of Directors corporate governance principles applicable to Reorganized KAC. Other duties and responsibilities of the Nominating and Corporate Governance Committee will include (a) evaluating stockholder recommendations for director nominations, (b) assisting in succession planning, (c) considering possible conflicts of interest of members of Reorganized KAC's Board of Directors and management and making recommendations to prevent, minimize or eliminate such conflicts of interests, (d) making recommendations to Reorganized KAC's Board of Directors regarding the appropriate size of Reorganized KAC's Board of Directors, and (e) performing other duties delegated to the Nominating and Corporate Governance Committee by Reorganized KAC's Board of Directors from time to time. It is anticipated that the members of the Nominating and Corporate Governance Committee will include at least one of the directors nominated by the USW in accordance with the Director Designation Agreement (so long as at least one such director is

qualified to serve thereon). Each member of the Nominating and Governance Committee must satisfy the General Independence Criteria.

### Director Nomination Procedures

#### Nominations in Accordance with Reorganized KAC's Bylaws

Reorganized KAC's Bylaws will provide that the nominations for election of directors by the stockholders will be made either by or at the direction of Reorganized KAC's Board of Directors or a committee thereof, or by any stockholder entitled to vote for the election of directors at the annual meeting at which such nomination is made. Reorganized KAC's Bylaws will require that stockholders intending to nominate candidates for election as directors provide timely notice in writing.

To be timely, a stockholder's notice must be delivered to or mailed and received at Reorganized KAC's principal executive offices not less than 60, nor more than 90, calendar days prior to the first anniversary of the date on which Reorganized KAC first mailed its proxy materials for the prior year's annual meeting of stockholders, except that, if there was no annual meeting during the prior year or if the annual meeting is called for a date that is not within 30 calendar days before or after that anniversary, notice by stockholders to be timely must be delivered not later than the close of business on the later of the 90th calendar day prior to the annual meeting and the 10th calendar day following the day on which public disclosure of the date of such meeting is first made. Reorganized KAC's Bylaws will also specify requirements as to the form and substance of notice. These provisions of Reorganized KAC's Bylaws may preclude stockholders from making nominations of directors.

#### Other Nomination Procedures

The Nominating and Corporate Governance Committee is expected to adopt policies regarding the consideration of candidates for a position on Reorganized KAC's Board of Directors, including the procedures by which stockholders of Reorganized KAC may propose candidates for a position on Reorganized KAC's Board of Directors directly to the Nominating and Corporate Governance Committee for consideration. Such policies, if adopted, will provide an alternative to the rights granted to the stockholders by law and pursuant to Reorganized KAC's Bylaws. These policies are expected to provide that a single stockholder or a group of stockholders that has beneficially owned more than 5% of the then-outstanding New Common Stock for at least one year as of the date of the recommendation of a director candidate will be eligible to propose a director candidate to the Nominating and Corporate Governance Committee for consideration and evaluation by notice thereof to such committee in accordance with such policies, including timely notice. To be timely, a stockholders notice must be received by the Nominating and Corporate Governance Committee not less than 120, nor more than 150, calendar days prior to the first anniversary of the date on which Reorganized KAC first mailed proxy materials for the prior year's annual meeting of stockholders, except that, if there was no annual meeting in the prior year or if the annual meeting is called for a date that is not within 30 calendar days before or after that anniversary, notice must be received by the Nominating and Governance Committee no later than the close of business on the 10th calendar day following the date on which public disclosure of the date of the annual meeting is first made, unless such public disclosure specifies a different date. The policies are also expected to provide that any such candidate must (a) be independent in accordance with General Independence Criteria, (b) may not, other than as a member of Reorganized KAC's Board or a committee thereof, accept any consulting, advisory or other compensatory fee from Reorganized KAC or its subsidiaries (other than the fixed amounts of compensation under a retirement plan for prior service, provided such compensation is not contingent on continued service), and (c) may not be an affiliated person of Reorganized KAC or any of its subsidiaries. It is further expected that these policies will establish criteria to be used by such committee to assess whether a candidate for a position on Reorganized KAC's Board of Directors has appropriate skills and experience. If a candidate for a directorship proposed by an eligible stockholder is ultimately recommended by the Nominating and Corporate Governance Committee to Reorganized KAC's Board of Directors, and approved by Reorganized KAC's Board of Directors, he will be included in Reorganized KAC's recommended slate of director nominees in Reorganized KAC's next proxy statement relating to an annual meeting of stockholders.

In addition, the USW will be able to nominate director candidates in accordance with the Director Designation Agreement. See "— Director Designation Agreement with the USW."

### Director Designation Agreement with the USW

In accordance with the Legacy Liability Agreements, on the Effective Date, Reorganized KAC and the USW will enter into the Director Designation Agreement in the form attached as Exhibit 1.1(79) to the Plan, which will effectuate certain rights of the USW to nominate individuals to serve on Reorganized KAC's Board of Directors and specified committees thereof. The Director Designation Agreement will provide that the USW will have the rights described below until December 31, 2012. The Director Designation Agreement will provide that the USW will have the right, in connection with each annual meeting of Reorganized KAC's stockholders, to nominate as candidates to be submitted to stockholders of Reorganized KAC for election at such annual meeting the minimum number of candidates necessary to ensure that, assuming (a) such candidates are included in the slate of director candidates recommended by Reorganized KAC's Board of Directors in Reorganized KAC's proxy statement relating to such annual meeting and (b) the stockholders of Reorganized KAC elect each candidate so included, at least 40% of the members of Reorganized KAC's Board of Directors immediately following such election are directors who were either designated by the USW pursuant to the Plan or have been nominated by the USW in accordance with the Director Designation Agreement. The Director Designation Agreement will contain requirements as to the timeliness, form and substance of the notice the USW must give to the Nominating and Corporate Governance Committee in order to nominate such candidates. The Nominating and Corporate Governance Committee will determine in good faith whether each candidate properly submitted by the USW satisfies the qualifications set forth in the Director Designation Agreement, and, if the Nominating and Corporate Governance Committee so determines that such candidate satisfies such qualifications, will, unless otherwise required by its fiduciary duties, recommend such candidate to Reorganized KAC's Board of Directors for inclusion in the slate of directors recommended by Reorganized KAC's Board of Directors in Reorganized KAC's proxy statement relating to such annual meeting, and Reorganized KAC's Board of Directors will, unless otherwise required by its fiduciary duties, accept such recommendation and direct that such director candidate be included in such slate of directors.

The Director Designation Agreement will also provide that the USW will have the right to nominate an individual to fill a vacancy on Reorganized KAC's Board of Directors resulting from the death, resignation, disqualification or removal of a director who was either designated by the USW to serve on Reorganized KAC's Board of Directors pursuant to the Plan or has been nominated by the USW in accordance with the Director Designation Agreement. The Director Designation Agreement will further provide that, in the event of newly created directorships resulting from an increase in the number of directors of Reorganized KAC, the USW will have the right to nominate the minimum number of individuals to fill such newly created directorships necessary to ensure that at least 40% of the members of Reorganized KAC's Board of Directors immediately following the filling of such newly created directorships are directors who were either designated by the USW pursuant to the Plan or have been nominated by the USW in accordance with the Director Designation Agreement. In each such case, the USW will be required to deliver proper notice to the Nominating and Corporate Governance Committee in accordance with the Director Designation Agreement, and the Nominating and Corporate Governance Committee will determine in good faith whether each candidate properly submitted by the USW satisfies the qualifications set forth in the Director Designation Agreement, and, if the Nominating and Corporate Governance Committee so determines that such candidate satisfies such qualifications, will, unless otherwise required by its fiduciary duties, recommend to Reorganized KAC's Board of Directors that it fill the vacancy or newly created directorship, as the case may be, with such candidate, and Reorganized KAC's Board of Directors will, unless otherwise required by its fiduciary duties, accept such recommendation and fill the vacancy or newly created directorship, as the case may be, with such candidate.

Each candidate nominated by the USW must satisfy (a) the applicable independence criteria contained in the Marketplace Rules or other applicable criteria of the NASD or, if the securities of Reorganized KAC are then principally traded or quoted on a national securities exchange or association or quotation system other than The Nasdaq Stock Market, Inc., such national securities exchange or association or quotation system, (b) the qualifications to serve as a director of Reorganized KAC as set forth in any applicable corporate governance guidelines adopted by Reorganized KAC's Board of Directors and policies adopted by the Nominating and Corporate Governance Committee establishing criteria to be utilized by it in assessing whether a director candidate has appropriate skills and experience, and (c) any other qualifications to serve as director imposed by applicable law. A candidate nominated by the USW may not be an officer, employee, director or member of the USW or any of its locals or affiliated organizations as of the date of his or her designation as a candidate or election as a director.

Finally, the Director Designation Agreement will provide that, so long as Reorganized KAC's Board of Directors maintains an Audit Committee, Executive Committee or Nominating and Corporate Governance Committee, each such committee will, unless otherwise required by the fiduciary duties of the Reorganized KAC's Board of Directors, include at least one director who was either designated by the USW to serve on Reorganized KAC's Board of Directors pursuant to the Plan or has been nominated by the USW in accordance with the Director Designation Agreement (provided at least one such director is qualified to serve on such committee as determined in good faith by Reorganized KAC's Board of Directors).

### *Voting Power, Election and Terms of Directors*

Each director will be entitled to one vote on all matters submitted to the directors for a vote.  Reorganized KAC's Bylaws will provide that, at all meetings of Reorganized KAC's Board of Directors, a majority of the directors (assuming no vacancies) will constitute a quorum for the transaction of business and, except for actions required by Reorganized KAC's Certificate of Incorporation or Bylaws to be taken by a majority of all of the directors (assuming no vacancies), the act of a majority of the directors present at any meeting at which there is a quorum will be the act of Reorganized KAC's Board of Directors.

Reorganized KAC's Certificate of Incorporation and Bylaws will provide that directors can be elected by stockholders only at an annual meeting of stockholders.  Reorganized KAC's Board of Directors will be divided into three classes serving staggered three-year terms.  Initially two classes will consist of three directors and one class will consist of four directors, with the term of the first class expiring in 2007, the term of the second class expiring in 2008 and the term of the third class expiring in 2009.  Each director will hold office until his or her successor is duly elected and qualified or until his or her earlier death, resignation, disqualification or removal.  See "General Information Concerning the Plan — Directors and Officers of the Reorganized Debtors."

The first annual meeting of stockholders of Reorganized KAC following the Effective Date will be held in 2007, following completion of Reorganized KAC's 2006 fiscal year.

### *Director Compensation*

Subject to further consideration by the Search Committee, it is currently anticipated that, for the year in which the Effective Date occurs, each director of Reorganized KAC who is not an employee of Reorganized KAC or any of its subsidiaries will be paid a base fee of $30,000, plus meeting fees of $1,500 per day for each meeting of Reorganized KAC's Board of Directors attended in person or $750 per day for each such meeting attended by phone and $1,500 per day for committee meetings attended in person or $750 per day for each such meeting attended by phone on a date other than a date on which meetings of Reorganized KAC's Board of Directors are held.  It is further anticipated that the Chairman of the Audit Committee of Reorganized KAC's Board of Directors will receive an additional annual fee of $10,000 and the Chairman of the Compensation Committee of Reorganized KAC's Board of Directors will receive an additional annual fee of $3,000.  In addition, it is contemplated that each non-employee director will receive an annual grant of restricted stock having a value, based on the closing price of the New Common Stock on the day immediately preceding the date of grant, equal to $30,000.  It is currently expected that directors will be reimbursed for travel and other disbursements relating to meetings of Reorganized KAC's Board of Directors and committees thereof, and non-employee directors will be provided accident insurance in respect of company-related business travel.  Furthermore, it is currently anticipated that, subject in each case to the approval of the Chairman of Reorganized KAC's Board of Directors, directors will be eligible to receive ad hoc fees in the amount of $750 per one-half day or $1,500 per day for services other than attending meetings of Reorganized KAC's Board of Directors or a committee thereof that require travel in excess of 100 miles.