**Management**

### *Executive Officers*

As set forth on Exhibit 4.3.b to the Plan, the executive officers of Reorganized KAC following the Effective Date are expected to be the individuals identified below:

| **Name** | **Age** | **Anticipated Position with Reorganized KAC** |
|---|---|---|
| Jack A. Hockema | 58 | President and Chief Executive Officer |
| John Barneson | 54 | Senior Vice President and Chief Administrative Officer |
| John M. Donnan | 44 | Vice President, Secretary and General Counsel |
| Daniel J. Rinkenberger | 46 | Vice President and Treasurer |
| Kerry A. Shiba | 50 | Vice President and Chief Financial Officer |

Each executive officer will hold office until his or her successor is duly elected and qualified or until his or her earlier death, resignation, disqualification or removal. See "General Information Concerning the Plan — Directors and Officers of the Reorganized Debtors."

Certain biographical information relating to each individual who is expected to serve as an executive officer of Reorganized KAC is set forth below.

*Jack A. Hockema* has served as the President, Chief Executive Officer and a member of the Board of Directors of KAC and KACC since October 2001. He was employed by KACC from 1977 to 1982 in production/operations management positions at several KACC locations, working at KACC's Trentwood, Washington facility, serving as plant manager of KACC's former Union City, California can plant and serving as operations manager for Kaiser Extruded Products. In 1982, he left KACC to become Vice President and General Manager of Bohn Extruded Products, a division of Gulf+Western, and later served as a Group Vice President of American Brass Specialty Products until June 1992. From June 1992 until September 1996 he provided consulting and investment advisory services to individuals and companies in the metals industry, including KACC. He was named acting President of Kaiser Engineered Components in 1995, was named President of Kaiser Extruded Products and Engineered Components in 1996, was named President of Kaiser Engineered Products and Vice President of KAC and KACC in 1997 and was named President of Kaiser Fabricated Products and Executive Vice President of KAC and KACC in 2000. Mr. Hockema holds a Master of Science degree in Industrial Management and a Bachelor of Science degree in Civil Engineering, both from Purdue University.

*John Barneson* has served as the Senior Vice President and Chief Administrative Officer of KAC and KACC since August 2001. He joined KACC in 1975 as an industrial engineer and subsequently held a number of staff and operations management positions of increasing responsibility with Kaiser Flat-Rolled Products and Kaiser Engineered Products. He was named Vice President of Planning and Business Development of Kaiser Flat-Rolled Products in 1996, was named Vice President of Planning and Business Development of Kaiser Engineered Products in 1997 and was named Vice President and Chief Administrative Officer of KAC and KACC in 1999. Mr. Barneson holds a Master of Science degree and a Bachelor of Science degree in Industrial Engineering, both from Oregon State University.

*John M. Donnan* has served as the Vice President, Secretary and General Counsel of KAC and KACC since January 2005. He joined KACC in 1993 as Corporate Counsel of KAC and KACC, was named Assistant General Counsel of KAC and KACC in 2000 and was named Deputy General Counsel of KAC and KACC in 2002. Prior to joining KACC, he was an associate in the corporate and securities section of the Houston, Texas office of the law firm of Chamberlain, Hrdlicka, White, Williams & Martin. Mr. Donnan holds a Juris Doctorate degree from the University of Arkansas School of Law and Bachelor of Business Administration degrees in Finance and Accounting from Texas Tech University and is a member of the Texas and California State Bar Associations.

*Daniel J. Rinkenberger* has served as the Vice President and Treasurer of KAC and KACC since January 2005. He joined KACC in 1995 as Assistant Treasurer of KAC and KACC, was named Vice President of Finance

and Business Planning of Kaiser Flat-Rolled Products in 1998, was named Vice President of Planning and Business Development of Kaiser Fabricated Products in 2000 and was named Vice President of Economic Analysis and Planning of KAC and KACC in 2002. Prior to joining KACC, he held a series of positions of increasing responsibility in the treasury department of Pennzoil Corporation. Mr. Rinkenberger holds a Master of Business Administration degree in Finance from the University of Chicago and a Bachelor of Education degree from Illinois State University and is a Chartered Financial Analyst.

*Kerry A. Shiba* has served as the Chief Financial Officer of KAC and KACC since April 2004 and has served as the Vice President of KAC and KACC since February 2002. He joined KACC in 1998 as Vice President and Controller of Kaiser Engineered Products, was named Vice President, Controller and Information Technology Officer of Fabricated Products in 2000 and was named Treasurer of KAC and KACC in 2002. Prior to joining KACC, he was employed by BF Goodrich Company for 16 years, where he held a series of positions of increasing responsibility in finance and planning. Prior to that, he was with Ernst & Young. Mr. Shiba holds a Bachelor of Arts degree from Baldwin Wallace College and he is a Certified Public Accountant.

### Executive Compensation

The discussion of executive compensation contained in this Disclosure Statement has been prepared based on the actual compensation earned during the fiscal year ended December 31, 2004 by the executive officers of KAC who are expected to be executive officers of Reorganized KAC as of the Effective Date. The existing compensatory plans and arrangements of KACC and KAC for such executive officers that are presently expected to be maintained by Reorganized KAC as of the Effective Date, as well as modifications thereto and certain new plans and arrangements that are presently expected to become effective as of the Effective Date, are also described below. Existing compensatory plans and arrangements that are expected to be terminated as of the Effective Date are not described below. See "Item 11 — Executive Compensation" in the KAC 2004 Form 10-K for additional information regarding compensation paid or payable by KACC and KAC for the fiscal year ended December 31, 2004.

*Summary Compensation Table*

The following table sets forth the compensation paid or payable by KACC and KAC for the fiscal year ended December 31, 2004 to the individual who is expected to serve as President and Chief Executive Officer of Reorganized KAC as of the Effective Date and other executive officers of KACC who are expected to serve as executive officers of Reorganized KAC as of the Effective Date (collectively, the "Named Executive Officers"). See "— Existing Plans and Agreements to Be Retained after the Effective Date."

| Name and Principal Position | Annual Compensation | | | | All Other Compensation[4] |
| | Salary | Bonus[1] | Other Annual Compensation[2] | Total Annual Compensation[3] | |
|---|---|---|---|---|---|
| Jack A. Hockema<br>President and<br>Chief Executive Officer | $730,000 | 378,500 | — | $1,108,500 | $199,193[5][6] |
| John Barneson<br>Senior Vice President and<br>Chief Administrative Officer | $275,000 | 94,625 | — | $369,625 | $81,200[5] |
| John M. Donnan<br>Vice President and<br>General Counsel | $200,000 | 45,420 | — | $245,420 | $109,000[5] |
| Daniel J. Rinkenberger<br>Vice President and Treasurer | $180,000 | 41,635 | — | $221,135 | $108,000[5] |
| Kerry A. Shiba<br>Vice President and<br>Chief Financial Officer | $242,500 | 68,130 | — | $310,630 | $115,500[5] |

(1)    Represents amounts paid under the Short-Term Incentive Plan (as defined below).

(2)    Excludes perquisites and other personal benefits which, in the aggregate amount, do not exceed the lesser of $50,000 or 10% of the total of annual salary and bonus reported for the executive.

(3)    Represents total base salary and amounts paid under the Short-Term Incentive Plan (as defined below).

(4)    Includes contributions to the Salaried Savings Plan (as defined below) in the amount of $16,400 for Mr. Hockema, $18,700 for Mr. Barneson, $9,000 for Mr. Donnan, $18,000 for Mr. Rinkenberger and $20,500 for Mr. Shiba. KACC did not contribute amounts to the Kaiser Supplemental Benefits Plan (as defined below) for the executives or any other salaried employees. See "— Existing Plans and Agreements to Be Retained after the Effective Date — The Salaried Plan and Kaiser Supplemental Benefits Plan."

(5)    Includes retention payments made under the KERP in the amount of $182,500 for Mr. Hockema, $62,500 for Mr. Barneson, $100,000 for Mr. Donnan, $90,000 for Mr. Rinkenberger and $95,000 for Mr. Shiba. In addition to such retention amounts, pursuant to the terms of the KERP, KACC has withheld additional retention payments in 2004 for Mr. Hockema in the amount of $273,500 and for Mr. Barneson in the amount of $93,750, payment of which is generally subject to, among other conditions, KACC's emergence from chapter 11 protection and the timing thereof. See "— Existing Plans and ~~Arrangements~~Agreements to Be Retained after the Effective Date — Key Employee Retention Program."

(6)    Includes $293 paid to Mr. Hockema for unused allowances for insurance and similar benefits KACC provides to its employees.

*Existing Plans and Agreements to Be Retained after the Effective Date*

Information regarding the existing employment, compensation and benefit arrangements of the Debtors for executive officers of KAC that are presently expected to be maintained by Reorganized KAC as of the Effective Date for its executive officers are set forth below.

148

The Salaried Plan and Kaiser Supplemental Benefits Plan. KACC previously maintained a qualified, defined-benefit retirement plan (*i.e.*, the Salaried Plan) for salaried employees and retirees of KACC and co-sponsoring subsidiaries who met certain eligibility requirements. Effective December 17, 2003, the PBGC terminated the Salaried Plan and assumed responsibility for payments to the participants in such plan. As a consequence of such termination, all benefit accruals ceased under the Salaried Plan and the benefits available to certain executive officers were significantly reduced as a result of the limitations described below. The table below shows estimated annual retirement benefits which would have otherwise been payable under the terms of the Salaried Plan and the Supplemental Benefits Plan to participants with the indicated years of credited service. These benefits are reflected (a) without reduction for the limitations imposed by Section 401(a)(17) and Section 415 of the IRC on qualified plans and before adjustment for any offset of Social Security benefits; and (b) without reduction for the limitation on benefits payable by the PBGC as a result of the involuntary termination of the Salaried Plan ($43,977.24 annually for retirement at age 65 and $34,742.04 annually for retirement at age 62, the normal retirement age under the Salaried Plan). Accordingly, the table reflects the aggregate benefits payable under the Salaried Plan and the Kaiser Supplemental Benefits Plan (described below) before adjustment for any Social Security benefits and without reduction for the limitation on benefits payable by the PBGC.

| Average Annual Remuneration | Years of Service | | | | |
|---|---|---|---|---|---|
| | 15 | 20 | 25 | 30 | 35 |
| $    250,000 | $    56,250 | $    75,000 | $    93,750 | $    112,500 | $    131,250 |
| 350,000 | 78,750 | 105,000 | 131,250 | 157,500 | 183,750 |
| 450,000 | 101,250 | 135,000 | 168,750 | 202,500 | 236,250 |
| 550,000 | 123,750 | 165,000 | 206,250 | 247,500 | 288,750 |
| 650,000 | 146,250 | 195,000 | 243,750 | 292,500 | 341,250 |
| 750,000 | 168,750 | 225,000 | 281,250 | 337,500 | 393,750 |
| 850,000 | 191,250 | 255,000 | 318,750 | 382,500 | 446,250 |
| 950,000 | 213,750 | 285,000 | 356,250 | 427,500 | 498,750 |
| 1,050,000 | 236,250 | 315,000 | 393,750 | 472,500 | 551,250 |

The estimated annual retirement benefits shown are based upon the assumptions that the provisions of the Salaried Plan prior to its termination by the PBGC and the Kaiser Supplemental Benefits Plan provisions prior to its amendment as of May 1, 2005 are in effect, that the participant retires at age 62 and that the retiree receives payments based on a straight-life annuity for his or her lifetime. Messrs. Hockema, Barneson, Donnan, Rinkenberger and Shiba had 12.9, 29.8, 11.2, 14.0 and 6.5 years of credited service, respectively, on December 31, 2004. Monthly retirement benefits are determined by multiplying years of credited service (not in excess of 40) by the difference between 1.50% of average monthly compensation for the highest base period (of 36, 48 or 60 consecutive months, depending upon compensation level) in the last ten years of employment and 1.25% of monthly primary Social Security benefits. Pension compensation covered by the Salaried Plan and the Kaiser Supplemental Benefits Plan consisted of salary and bonus.

Participants are entitled to retire and receive pension benefits, unreduced for age, upon reaching age 62 or after 30 years of credited service. Full early pension benefits (without adjustment for any offset of Social Security benefits prior to age 62) are payable to participants who are at least 55 years of age and have completed ten or more years of pension service (or whose age and years of pension service total at least 70) and who have been terminated by KACC or an affiliate for reasons of job elimination or partial disability. Participants electing to retire prior to age 62 who are at least 55 years of age and who have completed ten or more years of pension service (or whose age and years of pension service total at least 70) may receive pension benefits, unreduced for age, payable at age 62 or reduced benefits payable earlier. Participants who terminate their employment after five years or more of pension service or after age 55 but prior to age 62 are entitled to pension benefits, unreduced for age, commencing at age 62 or, if they have completed ten or more years of pension service, actuarially reduced benefits payable earlier. For participants with five or more years of pension service or who have reached age 55 and who die, the Salaried Plan provides a pension to their eligible surviving spouses. Upon retirement, participants may elect among several payment alternatives.

As a result of the termination of the Salaried Plan by the PBGC, benefits payable to participants will be reduced to a maximum of $34,742.04 annually for retirement at age 62, lower for retirement prior to age 62, and higher for retirements after age 62 up to $43,977.24 at age 65, and participants will not accrue additional benefits. In addition, the PBGC will not make lump-sum payments to participants. Because of such limitation, the estimated

benefits with respect to the Salaried Plan for Messrs. Hockema and Barneson for retirement at age 62 are significantly reduced.

In the second quarter of 2005, KACC modified the terms of the "Salaried Savings Plan" (as defined below). See "— Salaried Savings Plan and Supplemental Retirement Plan."

KACC maintains an unfunded, non-qualified supplemental benefits plan (the "Kaiser Supplemental Benefits Plan"), the purpose of which is to restore benefits that would otherwise be paid from the Salaried Plan or under KACC's qualified, defined-contribution retirement plan for salaried and non-represented employees and retirees of KACC and co-sponsoring subsidiaries who met certain eligibility requirements (the "Salaried Savings Plan"), were it not for the limitations imposed by Section 401(a)(17) and Section 415 of the IRC. The accrual of benefits under the Kaiser Supplemental Benefits Plan terminated effective as of May 1, 2005 in connection with the modifications to the Salaried Savings Plan. See "— Salaried Savings Plan and Supplemental Retirement Plan." Prior to May 1, 2005, participation in the Kaiser Supplemental Benefits Plan was available to all employees and retirees of KACC and its subsidiaries whose benefits under the Salaried Plan and the Salaried Savings Plan were likely to be affected by such limitations imposed by the IRC. Each eligible participant is entitled to receive an amount equal to the benefits that he or she is prevented from receiving under those plans because of such IRC limitations, so that he or she will receive an aggregate amount equal to the benefits that he or she would have been entitled to received under the Salaried Plan or the Salaried Savings Plan, as the case may be, in the absence of such IRC limitations. The Kaiser Supplemental Benefits Plan will not restore benefits lost with respect to the Salaried Plan because of limitations on benefits payable imposed by the PBGC.

Pursuant to the KERP (discussed below), participants under the Kaiser Supplemental Benefits Plan will forfeit their benefits under the Kaiser Supplemental Benefits Plan if they voluntarily terminate their employment prior to the Effective Date (other than in connection with retirement at or after age 62).

Key Employee Retention Program. On September 3, 2002, the Bankruptcy Court approved a Key Employee Retention Program (i.e., the KERP), consisting of the Retention Plan, Severance Plan, Change in Control Severance Program and Long-Term Incentive Plan discussed below:

- Kaiser Retention Plan and Agreements. Effective September 3, 2002, KACC adopted the Kaiser Aluminum & Chemical Corporation Key Employee Retention Plan (the "Retention Plan") and in connection therewith, entered into retention agreements with certain key employees, including each of the Named Executive Officers.

  In general, awards payable under the Retention Plan to a Named Executive Officer vested, as applicable, on September 30, 2002, March 31, 2003, September 30, 2003 and March 31, 2004 (the "Vesting Dates"). The retention agreement for each Named Executive Officer further provided that, if his employment terminated within 90 days following the payment of any award for any reason other than death, disability, retirement at or after age 62 or termination without "cause" (as defined in the Retention Plan), he would be required to return such payment. Except with respect to payments of the "Withheld Amounts" (as defined below) to Messrs. Hockema and Barneson, such clawback provisions have expired and no further payments are payable to Messrs. Hockema and Barneson.

  For each of Messrs. Hockema and Barneson, the amount vested on each of the Vesting Dates was equal to 62.5% of his base salary at the time of grant. Forty percent of the amount vested on each Vesting Date for each of such persons was paid to him in a lump sum on that date. Except as described below, of the remaining 60% of such amount (the "Withheld Amount"), (a) 33 1/3% of such amount is payable to such participant in a lump sum on the Effective Date if he is employed by KACC on that date, (b) 33 1/3% of such amount is payable to such participant in a lump sum on the first anniversary of the Effective Date if he is employed by Reorganized KAC on that date, (c) 16 2/3% of such amount is payable to such participant on the Effective Date if it occurs on or prior to August 12, 2005 and he is employed by KACC on that date (such amount is forfeited if the Effective Date occurs after August 12, 2005), and (d) 16 2/3% of such amount has been forfeited because the Effective Date did not occur on or prior to August 12, 2004. Notwithstanding the foregoing, if the employment of either of Messrs. Hockema or Barneson is

terminated prior to the payment date for any Withheld Amount as a result of his death, disability, retirement at or after age 62 or the termination of his employment without cause, he or his estate, as the case may be, will be entitled to receive his Withheld Amount (reduced for any amounts forfeited based on the date of KACC's emergence from bankruptcy, as described above). For each of Messrs. Donnan, Rinkenberger and Shiba, the amount that vested on each of the Vesting Dates was equal to 50% of his base salary at the time of grant. One hundred percent of the amount vested by each of Messrs. Donnan, Rinkenberger and Shiba on each such date was paid to him in a lump sum on that date. No further amounts are payable to Messrs. Donnan, Rinkenberger or Shiba under the Retention Plan.

- Kaiser Severance Plan and Agreements. Effective September 3, 2002, KACC adopted the Kaiser Aluminum & Chemical Corporation Severance Plan (the "Severance Plan") in order to provide selected executive officers, including the Named Executive Officers, and other key employees with appropriate protection in the event of certain terminations of employment. In connection therewith, KACC entered into Severance Agreements (the "Severance Agreements") with plan participants. The Severance Plan terminates on the first anniversary of the Effective Date.

  The Severance Plan provides for payment of a severance benefit and continuation of welfare benefits in the event of certain terminations of employment. Participants are eligible for the severance payment in amounts ranging from six months' to three years' salary and continuation of benefits in the event the participant's employment is terminated without "cause" or the participant terminates employment with "good reason" (in each case, as defined in the Severance Plan). The severance payment and continuation of benefits are not available if (a) the participant receives severance compensation or benefit continuation pursuant to a Kaiser Aluminum & Chemical Corporation Change in Control Severance Agreement (as described below), (b) the participant's employment is terminated other than without cause or by the participant for good reason, or (c) the participant declines to sign, or subsequently revokes, a designated form of release. In addition, in consideration for the severance payment and continuation of benefits, a participant will be subject to noncompetition, nonsolicitation and confidentiality restrictions following the participant's termination of employment.

  The severance payment payable under the Severance Plan to each of the Named Executive Officers consists of a lump sum cash payment equal to two times (for Messrs. Hockema and Barneson) or one times (for Messrs. Donnan, Rinkenberger and Shiba) his base salary. Each of the Named Executive Officers also will be entitled to continued medical, dental, vision, life insurance and disability benefits for a period of two years (for Messrs. Hockema and Barneson) or one year (for Messrs. Donnan, Rinkenberger and Shiba) following termination of his employment. Severance payments payable under the Severance Plan are in lieu of any severance or other termination payments provided for under any other plan or agreement.

- Kaiser Change in Control Severance Program. In 2002, KACC entered into Kaiser Aluminum & Chemical Corporation Change in Control Severance Agreements (the "Change in Control Agreements") with certain key executives, including the Named Executive Officers, in order to provide them with appropriate protection in the event of a termination of employment in connection with a "change in control" or, except as noted below, a "significant restructuring" of KACC (in each case, as defined in the Change in Control Agreements). The Change in Control Agreements terminate on the second anniversary of a change in control.

  The Change in Control Agreements provide for severance payments and continuation of benefits in the event of certain terminations of employment. The participants are eligible for severance benefits if their employment terminates or constructively terminates due to a change in control during a period that commences 90 days prior to the change in control and ends on the second anniversary of the change in control. Certain participants (including the Named Executive Officers other than Messrs. Hockema and Barneson) also are eligible for severance benefits if their employment is terminated due to a significant restructuring outside of the period commencing 90 days prior to a change in control and ending on the second anniversary of such change in control. Severance benefits are not available if (a) the participant voluntarily resigns or retires, other than

for "good reason" (as defined in the Change in Control Agreements), (b) the participant is discharged for "cause" (as defined in the Change in Control Agreements), (c) the participant's employment terminates as the result of death or disability, (d) the participant declines to sign, or subsequently revokes, a designated form of release, (e) the participant receives severance compensation or benefit continuation pursuant to the Severance Plan (as described above) or any other prior agreement, or (f) in the case of benefits payable as a result of a significant restructuring, the participant is offered suitable employment in North America in a substantially similar capacity and at his or her current base salary and short-term incentive target, regardless of whether the participant accepts or rejects such offer.  In addition, in consideration for the severance payment and continuation of benefits, a participant will be subject to noncompetition, nonsolicitation and confidentiality restrictions following his or her termination of employment.

Upon a qualifying termination of employment, each of the Named Executive Officers is entitled to receive the following: (a) three times (for Messrs. Hockema and Barneson) or two times (for Messrs. Donnan, Rinkenberger and Shiba) the sum of his base salary and most recent short-term incentive target, (b) a pro-rated portion of his short-term incentive target for the year of termination, and (c) a pro-rated portion of his long-term incentive target in effect for the year of his termination, provided that such target was achieved.  Each of the Named Executive Officers also is entitled to continued medical, dental, vision-related and life insurance, disability benefits and perquisites for a period of three years (for Messrs. Hockema and Barneson) or two years (for Messrs. Donnan, Rinkenberger and Shiba) after termination of employment.  Each of the Named Executive Officers is also entitled to a payment in an amount sufficient, after the payment of taxes, to pay any excise tax due by him under Section 4999 of the IRC or any similar state or local tax.

Severance payments payable under the Change in Control Agreements are in lieu of any severance or other termination payments provided for under any other agreement or plan.

Counsel to the Debtors and counsel to the Creditors' Committee have concluded that, as a result of the transfer of New Common Stock to the Union VEBA Trust, a change in control will occur under the Change in Control Agreements on the Effective Date.

- Long-Term Incentive Plan.  During 2002, KACC adopted a long-term incentive plan under which key management employees, including the Named Executive Officers, became eligible to receive a cash award to the extent KACC sustains cost reductions above a stipulated threshold through the Effective Date.  Under such plan, 15% of such cost reductions above the stipulated threshold are placed in a pool to be shared by each participant based on his or her individual target's percentage of the aggregate target for all participants.  A participant's target percentage may be adjusted upward or downward, within certain limitations, at the discretion of KACC's Chief Executive Officer.

Amounts payable under the plan generally are not determinable until conclusion of the plan.  If a participant's employment is terminated without cause or as a result of death, disability or retirement prior to conclusion of the plan, such participant will be entitled to receive a pro-rated portion of any award earned through the date of his or her termination of employment.  Awards earned under the program are forfeited if the participant voluntarily terminates his or her employment (other than in connection with normal retirement) or is terminated for cause prior to the scheduled payment date.

In general, awards payable under the program are payable in two installments — the first on the Effective Date and the second on the first anniversary of the Effective Date.

The following table and accompanying footnotes further describe the awards that may be earned under such program by the Named Executive Officers.

| Name and Principal Position | Threshold[1] | Estimated Future Payouts Under Non-Stock Price-Based Plans | |
| --- | --- | --- | --- |
| | | Target[1][2] | Maximum[1][2] |
| Jack A. Hockema President and Chief Executive Officer | — | $1,500,000 | $4,500,000 |
| John Barneson Senior Vice President and Chief Administrative Officer | — | 350,000 | 1,050,000 |
| John M. Donnan Vice President and General Counsel | — | 200,000[3] | 600,000[3] |
| Daniel J. Rinkenberger Vice President and Treasurer | — | 75,000[4] | 225,000[5] |
| Kerry A. Shiba Vice President and Chief Financial Officer | — | 258,000[5] | 774,000[5] |

(1)    The amount, if any, that may be paid under the program generally will not be determinable until the end of the performance period.

(2)    The target and maximum payout amounts in the table are per year.

(3)    The initial target and maximum for Mr. Donnan were $90,000 and $270,000 respectively. These amounts were increased to the current levels indicated in the table effective January 2005 in connection with Mr. Donnan's promotion to Vice President and General Counsel.

(4)    The initial target and maximum for Mr. Rinkenberger were $55,000 and $115,000, respectively. These amounts were increased to the current levels indicated in the table effective January 2005 in connection with Mr. Rinkenberger's promotion to Treasurer.

(5)    The initial target and maximum for Mr. Shiba were $90,000 and $270,000, respectively. These amounts were increased to $250,000 and $750,000, respectively, effective April 2004 in connection with Mr. Shiba's promotion to Chief Financial Officer and to the current levels indicated in the table effective January 2005.

Short-Term Incentive Plan. KACC maintains a broad based short-term incentive plan (the "Short-Term Incentive Plan") pursuant to which participants, including the Named Executive Officers, may earn cash awards. Awards are determined on a sliding scale based on KACC's attainment of various levels of financial performance calculated using internal measures of controllable continuing operating results. Depending on the level of financial performance, participants may earn up to three times their annual award target. Except as otherwise indicated, under the plan the target awards for the Named Executive Officers for 2005 are as follows: Jack A. Hockema — $500,000; John Barneson — $125,000; John M. Donnan — $90,000; Daniel J. Rinkenberger — $60,000; and Kerry A. Shiba — $95,000.

Awards under the plan are paid in the year after they are earned. If a participant's employment is terminated prior to the end of a plan year as a result of death, disability or retirement at or after age 62, such participant will be entitled to receive a pro-rated portion of any award earned through the date of his or her termination of employment. Except as may be provided in a separate agreement with a participant, awards earned under the program are forfeited if a participant is terminated for cause prior to payment or a participant's employment is terminated prior to the end of a plan year for any reason other than death, disability or retirement at or after age 62.

Kaiser Termination Payment Policy. Most of KACC's full-time salaried employees are eligible for benefits under an unfunded termination policy if their employment is involuntarily terminated, subject to a number of exclusions. The policy provides for lump-sum payments after termination ranging from one-half month's salary for less than one year of service graduating to eight months' salary for 30 or more years of service. The Named Executive Officers and certain other participants in the Retention Plan waived their rights to any payments under the termination policy in connection with their participation in the Retention Plan.

Salaried Savings Plan and Supplemental Retirement Plan. KACC maintains a qualified, defined-contribution retirement plan for salaried employees and retirees of KACC and adopting employers who have met certain eligibility requirements (*i.e.*, the Salaried Savings Plan), which was amended and restated as of May 1, 2005. As amended, the Salaried Savings Plan will allow participants to make elective pre-tax deferrals of compensation up to the limits set forth in the IRC. Prior to being amended and restated, the plan also permitted participants to make after-tax voluntary contributions. Participants are no longer permitted to make such contributions, but each will, subject to the satisfaction of certain conditions, receive a non-discretionary matching employer contribution in the amount of his or her deferred compensation, up to a maximum of 4% of his or her eligible compensation. In addition, participants will, subject to the satisfaction of certain conditions, receive an employer fixed-rate contribution based on age and service as of January 1, 2004, the rates of which range from 2% to 10% of eligible compensation. The matching contribution and the employer fixed-rate contributions were made retroactively to participants in the Salaried Savings Plan who were employed on both the first and last day of 2004 and who had at least 1,000 hours of service during 2004, and were also made retroactively to participants in the plan for the first four months of 2005 although, in order to receive the employer fixed-rate contribution for 2005, a participant must be employed on the last day of 2005. Participants in the Salaried Savings Plan will be 100% vested at all times in the their elective deferrals and any matching contributions. The fixed-rate contributions will be fully vested when an employee has five years of service.

In addition, in connection with the amendment and restatement of the Salaried Savings Plan, KACC expects to implement a non-qualified supplemental retirement plan pursuant to which an amount equal to the amount of any matching contribution and the fixed-rate contribution on a participant's compensation in excess of IRC limits on the benefits payable under the Salaried Savings Plan (which is $210,000 for 2005) will be set aside in a rabbi trust on such participant's behalf, so that he or she will receive an aggregate amount equal to the benefits that he or she would have been entitled to receive under the Salaried Savings Plan in the absence of such IRC limitations. Pursuant to the KERP, participants in this supplemental retirement plan will forfeit any benefits thereunder if they voluntarily terminate their employment prior to the Effective Date (other than in connection with retirement at or after age 62).

Compliance with Section 409A of the IRC. KACC intends to amend or modify and administer each of the existing employment, compensation and benefits arrangements of the Debtors described above in compliance with Section 409A of the IRC to avoid adverse tax consequences to the participants; however, KACC is not responsible for any such consequences should they occur.

*New Plans and Arrangements to Be Implemented in Connection with the Effective Date*

Equity Incentive Plan. As of the Effective Date, Reorganized KAC will implement the Equity Incentive Plan to attract and retain directors, officers and other key employees following the Effective Date. Thereafter, the Compensation Committee of Reorganized KAC's Board of Directors will determine the awards to be granted under the Equity Incentive Plan. The Equity Incentive Plan will provide for grants of option rights, appreciation rights, restricted stock, restricted stock units, performance shares, performance units and other customary equity incentive awards to the Reorganized Debtors' employees and members of Reorganized KAC's Board of Directors. An

aggregate of 2,222,222 shares of New Common Stock will be available for issuance in satisfaction of any awards under the Equity Incentive Plan.

<u>Compliance with Section 409A of the IRC</u>. The Equity Incentive Plan will be intended to comply with Section 409A of the IRC to avoid adverse tax consequences to the participants; however, KACC is not responsible for any such consequences should they occur.

## Certain Corporate Governance Matters

### *Introduction*

Certain provisions of Reorganized KAC's Certificate of Incorporation and Bylaws, together with applicable Delaware state law, may discourage or make more difficult the acquisition of control of Reorganized KAC by means of a tender offer, open market purchase, proxy fight or otherwise. These provisions are intended to discourage, or may have the effect of discouraging, certain types of coercive takeover practices and inadequate takeover bids and are also intended to encourage a person seeking to acquire control of Reorganized KAC to first negotiate with Reorganized KAC. The management of the Debtors believes that these measures, many of which are substantially similar to the anti-takeover related measures in effect for numerous other publicly-held companies, enhance Reorganized KAC's potential ability to negotiate with the proponent of an unsolicited proposal to acquire or restructure Reorganized KAC, providing benefits that outweigh the disadvantages of discouraging such proposals because, among other things, such negotiation could improve the terms of such a proposal and protect the stockholders from takeover bids that the directors of the company have determined to be inadequate. While there can be no assurances in this regard, the management of the Debtors also believes that these provisions are not likely to have a material impact on the market price for the New Common Stock for a number of reasons, including the existence of generally comparable measures in effect for many publicly held companies and management's belief that market prices will be influenced more significantly by Reorganized KAC's actual results of operations, general market and economic conditions and other traditional determinations of stock market prices. See "New Common Stock — Risk Factors — Risks Relating to the Securities Markets and Ownership of New Common Stock — Certain Provisions Will Have Anti-Takeover Effects."

### *Classified Board of Directors*

Reorganized KAC's Certificate of Incorporation will provide that Reorganized KAC's Board of Directors will be divided into three classes of directors serving staggered three-year terms. See "~~Management and~~ Board of Directors — ~~Reorganized KAC's Board~~Voting Power, Election and Terms of Directors." The existence of a classified board will make it more difficult for a third party to gain control of Reorganized KAC's Board of Directors by preventing such third party from replacing a majority of the directors at any given meeting of stockholders.

### *Removal of Directors and Filling Vacancies in Directorships*

Reorganized KAC's Certificate of Incorporation and Bylaws will provide that directors may be removed by the stockholders, with or without cause, only at a meeting of stockholders and by the affirmative vote of the holders of at least 67% of the stock of Reorganized KAC generally entitled to vote in the election of directors. Reorganized KAC's Certificate of Incorporation and Bylaws will also provide that any vacancy on Reorganized KAC's Board of Directors or newly created directorship may be filled solely by the affirmative vote of a majority of the directors then in office or by a sole remaining director, and that any director so elected will hold office for the remainder of the full term of the class of directors in which the vacancy occurred or the new directorship was created and until such director's successor has been elected and qualified. The limitations on the removal of directors and the filling of vacancies may deter a third party from seeking to remove incumbent directors and simultaneously gaining control of Reorganized KAC's Board of Directors by filling the vacancies created by such removal with its own nominees.

### *Stockholder Action and Meetings of Stockholders*

Reorganized KAC's Certificate of Incorporation and Bylaws will also provide that special meetings of the stockholders may only be called by the Chairman of Reorganized KAC's Board of Directors, the Chief Executive Officer, the President or the Secretary of Reorganized KAC within ten calendar days after the receipt of the written

request of a majority of the total number of directors (assuming no vacancies) and will further provide that, at any special meeting of stockholders, the only business that may be considered or conducted is business that was specified in the notice of such meeting or is otherwise properly brought before the meeting by the presiding officer or by or at the direction of a majority of the directors (assuming no vacancies), effectively precluding the right of the stockholders to raise any business at any special meeting thereof. Reorganized KAC's Certificate of Incorporation will also provide that the stockholders may not act by written consent in lieu of a meeting.

### Advance Notice Requirements for Stockholder Proposals and Director Nominations

Reorganized KAC's Bylaws will provide that a stockholder seeking to bring business before an annual meeting of stockholders or nominate candidates for election as directors provide timely notice in writing to the Secretary. To be timely, a stockholder's notice must be received by Reorganized KAC not less than 60, nor more than 90, calendar days prior to the first anniversary date of the date on which Reorganized KAC first mailed proxy materials for the prior year's annual meeting of stockholders, except that, if there was no annual meeting in the prior year or if the annual meeting is called for a date that is not within 30 calendar days before or after that anniversary, notice must be so delivered not later than the close of business on the later of the 90th calendar day prior to such annual meeting and the 10th calendar day following the date on which public disclosure of the date of the annual meeting is first made. Reorganized KAC's Bylaws will also specify requirements as to the form and substance of notice. These provisions may preclude stockholders from bringing matters before an annual meeting of stockholders or from making nominations for directors. See " ——Management and Board of Directors — Director Nomination Procedures — Nominations in Accordance with Reorganized KAC's Bylaws."

### Authorized But Unissued Shares

Reorganized KAC's Certificate of Incorporation will provide that Reorganized KAC is authorized to issue 50.0 million shares of capital stock, consisting of 45.0 million shares of New Common Stock and 5.0 million shares of preferred stock, par value $0.01 per share (the "New Preferred Stock"). See "New Common Stock — General Description of New Common Stock" for a description of the New Common Stock.

Reorganized KAC's Board of Directors will have the authority, within the limitations and restrictions stated in Reorganized KAC's Certificate of Incorporation, to issue the shares of New Preferred Stock in one or more series, and to fix the number of shares to be included in any such series and the designation, relative powers, preferences, rights and qualifications, limitations or restrictions of such series, including but not limited to any voting powers, redemption provisions, dividend rights, liquidation preferences, conversion rights and preemptive rights.

Authorized but unissued shares of New Common Stock and New Preferred Stock of Reorganized KAC under Reorganized KAC's Certificate of Incorporation will be available for future issuance without stockholder approval, unless otherwise requested pursuant to the rules of any material securities exchange or association on which Reorganized KAC's securities are traded from time to time. These additional shares will give Reorganized KAC's Board of Directors the flexibility to issue shares for a variety of proper corporate purposes, including in connection with future public offerings to raise additional capital or corporate acquisitions, without incurring the time and expense of soliciting a stockholder vote. The existence of authorized but unissued shares of New Common Stock and New Preferred Stock could render more difficult or discourage an attempt to obtain control of Reorganized KAC by means of a proxy contest, tender offer, merger or otherwise. In addition, any future issuance of shares of New Common Stock or New Preferred Stock, whether or not in connection with an anti-takeover measure, could have the effect of diluting the earnings per share, book value per share and voting power of shares held by the stockholders of Reorganized KAC.

### Supermajority Vote Requirements

Delaware law provides generally, that the affirmative vote of the holders of a majority of the shares entitled to vote on any matter will be required to amend a corporation's certificate of incorporation and that the affirmative vote of the holders of a majority of the shares present in person or represented by proxy identified to vote on any matter will be required to amend a corporation's bylaws, unless the corporation's certificate of incorporation or bylaws, as the case may be, require a vote by the holders of a greater number of shares. Reorganized KAC's Certificate of Incorporation and Bylaws will require the affirmative vote of the holders of at least 67% of the stock of Reorganized KAC generally entitled to vote in the election of directors in order to amend, repeal or adopt any

provision inconsistent with certain provisions of such Certificate of Incorporation or Bylaws, as the case may be, relating to (a) the time and place of meetings of the stockholders, (b) the calling of special meetings of stockholders, (c) the conduct or consideration of business at meetings of stockholders, (d) the filling of any vacancies on Reorganized KAC's Board of Directors or newly created directorships; (e) the removal of directors, (f) the nomination and election of directors, (g) the ability of the stockholders to act by written consent in lieu of a meeting; or (h) the number and terms of directors.

### Restrictions on Transfer of New Common Stock

Reorganized KAC's Certificate of Incorporation will contain certain provisions restricting the ability of the holders of securities of Reorganized KAC from transferring such securities. See "New Common Stock — Restrictions on Transfer — Reorganized KAC's Certificate of Incorporation" for a description of such transfer restrictions. In addition, the transfer of the New Common Stock issued to each of the PBGC and the Union VEBA Trust under the Plan will be further restricted in accordance with the Stock Transfer Restriction Agreement. See "New Common Stock — Restrictions on Transfer — Stock Transfer Restriction Agreement." In general, these restrictions have the effect of preventing an individual or group from obtaining an equity interest in Reorganized KAC sufficient to give such individual or group a controlling interest in Reorganized KAC without the consent of Reorganized KAC's Board of Directors.

### Delaware Section 203

Reorganized KAC will be subject to the provisions of Section 203 of the General Corporation Law of the State of Delaware (the "DGCL"). In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a "business combination" with any "interested stockholder" unless the interested stockholder attained that status with the approval of the board of directors or the business combination is approved in a prescribed manner. A "business combination" includes certain mergers, asset sales and other transactions resulting in a financial benefit to the interested stockholder. Subject to certain exceptions, an "interested stockholder" is a person who, along with affiliates and associates owns, or within the prior three years did own, 15% or more of the corporation's voting stock.

### Renunciation of Business Opportunities

Reorganized KAC's Certificate of Incorporation will provide that the Board of Directors of Reorganized KAC may renounce any interest or expectancy of Reorganized KAC in, or in being offered an opportunity to participate in, specified business opportunities or specified classes or categories of business opportunities — by line or type of business, by identity of the originator of any such business opportunity, by identity of the recipient of any such business opportunity, by periods of time, by geographical location or by other criteria — that are presented to Reorganized KAC or one or more of its officers, directors or stockholders.

### Limitation of Liability and Indemnity Arrangements

Reorganized KAC's Certificate of Incorporation will limit the liability of the directors of Reorganized KAC to the fullest extent permitted by the DGCL. The DGCL provides that a ~~director of a~~ corporation ~~will not be personally liable~~ may limit the personal liability of its directors for monetary damages for breach of that individual's fiduciary duties as a director except for liability for any of the following: (a) a breach of the director's duty of loyalty to the corporation or its stockholders; (b) any act or omission not in good faith or that involves intentional misconduct or a knowing violation of the law; (c) certain unlawful payments of dividends or unlawful stock repurchases or redemptions; or (d) any transaction from which the director derived an improper personal benefit. This limitation of liability does not apply to liabilities arising under federal securities laws and does not affect the availability of equitable remedies such as injunctive relief or rescission.

Section 145 of the DGCL generally provides that a corporation may indemnify directors and officers, as well as other employees and individuals, against attorneys' fees and other judgments, fines and amounts paid in settlement actually and reasonably incurred ~~or suffered~~ by such person in connection with any threatened, pending or completed action, suit or proceeding in which such person was or is a party or is threatened to be made a party by reason of such person being or having been a director, officer, employee or agent of the corporation. The DGCL

provides that Section 145 is not exclusive of other rights to which those seeking indemnification may otherwise be entitled under any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise.

Reorganized KAC's Certificate of Incorporation will provide that Reorganized KAC is required to indemnify its directors and officers to the fullest extent permitted or required by the DGCL, although, except with respect to certain actions, suits or proceedings to enforce rights to indemnification, a director or officer will only be indemnified with respect to any action, suit or proceeding such person initiated to the extent such action, suit or proceeding was authorized by Reorganized KAC's Board of Directors. Reorganized KAC's Certificate of Incorporation will also require Reorganized KAC to advance expenses incurred by a director or officer in connection with the defense of any action, suit or proceeding arising out of that person's status or service as director or officer of Reorganized KAC or as director, officer, employee or agent of another enterprise, if serving at Reorganized KAC's request. In addition, Reorganized KAC's Certificate of Incorporation will permit Reorganized KAC to secure insurance to protect itself and any director, officer, employee or agent of Reorganized KAC or any other corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss.

It is anticipated that Reorganized KAC will enter into indemnification agreements with each of its directors and executive officers containing provisions that will obligate Reorganized KAC to, among other things:

- indemnify the director or officer to the fullest extent permitted or required by Delaware law; provided that, except with respect to certain actions, suits or proceedings to enforce certain rights with respect to indemnification and the advancement of expenses or recovery under any directors' and officers' liability insurance policy, the director or officer will be indemnified with respect to any claim such person initiated against Reorganized KAC or any director or officer of Reorganized KAC only if Reorganized KAC as joined in or consented to the initiation of such claim;

- advance all expenses, liabilities and losses incurred in connection with any proceeding against the director or officer as to which the individual could be indemnified; and

- maintain directors' and officers' liability insurance for the benefit of its directors of officers providing coverage that is substantially comparable in scope and amount to that provided by the policies in effect at the time the parties enter into such indemnification agreement.

Such agreements are intended to provide rights to indemnification broader than the rights available under Section 145 of the DGCL and Reorganized KAC's Certificate of Incorporation and to provide all such protection in a manner enforceable by Reorganized KAC's directors and officers irrespective of, among other things, any amendment to Reorganized KAC's Certificate of Incorporation or Bylaws.

The management of the Debtors believes that the provisions of Reorganized KAC's Certificate of Incorporation and Bylaws and indemnification agreements described above serve to advance the dual policies of allowing corporate officials to resist unjustified lawsuits and attracting and retaining qualified persons as directors and officers.

Under the Plan, the obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees as of February 12, 2002 by reason of such person's prior or future service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation or bylaws, by statutory law or by written agreement, policies or procedures of or with such Debtor, will be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before, on or after the Petition Date. These assumed indemnity obligations will not include any obligation to indemnify any such person for claims against such person that are excepted from the provisions of the release in Section 4.5.b of the Plan (which is described below under "General Information Concerning the Plan — Releases — General Releases") (*i.e.*, claims based on: (a) acts or omissions constituting gross negligence or willful misconduct; (b) if the holders of the Senior Subordinated Notes are or were determined by the order contemplated by Sections 2.4(c)(i)(B) and 2.4(c)(ii)(B) of either or both of the Alumina Subsidiary Plans to be entitled to a

distribution under either or both of the Alumina Subsidiary Plans, acts or omissions of any such person related to or giving rise to the circumstances underlying any of the Contractual Subordination Disputes; or (c) contractual obligations of, or loans owed by, any such person to a Debtor). The obligations of each Debtor or Reorganized Debtor to indemnify any person who, as of February 12, 2002, was no longer serving as a director, officer or employee of such Debtor or Reorganized Debtor, which indemnity obligation arose by reason of such person's prior service in any such capacity or as a director, officer or employee of another corporation, partnership or other legal entity, whether provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor, will terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise as of the Effective Date, although, to the extent that such indemnification obligations no longer give rise to contingent Claims that can be disallowed pursuant to section 502(e) of the Bankruptcy Code, such indemnification obligations will be deemed and treated as executory contracts that are rejected by the applicable Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date, and any Claims arising from such indemnification obligations (including any rejection damage claims) will be subject to the bar date provisions of Section 6.4 of the Plan (which is described below under "General Information Concerning the Plan — Executory Contracts and Unexpired Leases").

# NEW COMMON STOCK

**Estimated Reorganization Value**

The Debtors have been advised by their financial advisors and investment bankers, Lazard Frères & Co. LLC ("Lazard"), with respect to the estimated range of hypothetical reorganization values (the "Reorganization Values") of the Reorganized Debtors. Lazard estimated the range of Reorganization Values of the Reorganized Debtors to be approximately $395 million to approximately $470 million, with a midpoint of approximately $430 million. Reorganization Value consists of the theoretical enterprise value of the Reorganized Debtors, plus excess cash and other non-operating cash flows and assets. Lazard has estimated the Reorganization Value as of September 30, 2005, under the assumption that the Reorganization Value will not change materially through the assumed Effective Date of December 31, 2005.

The imputed reorganization equity value (the "Equity Value") of the Reorganized Debtors, which takes into account estimated debt balances and other obligations as of the assumed Effective Date, is estimated to range from approximately $340 million to $415 million, with a midpoint of approximately $380 million. Based on the imputed range of Equity Values set forth above and the issuance of 20 million shares of New Common Stock pursuant to the Plan on the Effective Date, the Equity Value per share of New Common Stock is estimated to be approximately $17.00 to $20.75, with a midpoint of approximately $19.00.

The foregoing estimates of the Reorganization Value of the Reorganized Debtors, and the resulting estimates of Equity Value of the Reorganized Debtors and Equity Value per share, as the case may be, are based on a number of assumptions, including a successful reorganization of the Debtors' business, the implementation and realization of the Reorganized Debtors' business plans, the achievement of the forecasts reflected in management's Projections, market conditions as of June 2005 continuing through the assumed Effective Date of September 30, 2005, and the Plan becoming effective on the assumed Effective Date.

For purposes of this Disclosure Statement, the estimated Reorganizational Values and Equity Values of the Reorganized Debtors exclude the theoretical value of certain anticipated tax attributes of the Reorganized Debtors. Based on the theoretical present value of the estimated tax savings as a result of the anticipated tax attributes of the Reorganized Debtors as of the Effective Date, the Debtors estimate that the Equity Value could be higher than the Equity Value assumed for purposes of this Disclosure Statement by up to approximately $65 million to $85 million, or $3.25 to $4.25 per share of New Common Stock. The Reorganization Values and Equity Values presented in this Disclosure Statement exclude the theoretical value of anticipated tax attributes of the Reorganized Debtors due to the contingent nature of such tax attributes and the uncertainty regarding future developments in applicable tax laws and regulations, as well as the uncertainty regarding the value ascribed to tax attributes by the financial markets.

In preparing its estimate of the Reorganization Value of the Reorganized Debtors, Lazard: (a) reviewed certain historical financial information of the Kaiser Companies for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Kaiser Companies and financial projections relating to their business and prospects, including the Projections; (c) met with certain members of the senior management of the Kaiser Companies to discuss the Kaiser Companies' operations and future prospects; (d) reviewed publicly available financial data and considered the market values of public companies that Lazard deemed generally comparable to those of the Kaiser Companies as a whole or a significant part of their operations; (e) reviewed the financial terms of acquisitions of companies that Lazard believes to be generally comparable to those of the Kaiser Companies as a whole or a significant part of their operations; (f) considered certain economic and industry information relevant to the Kaiser Companies' operations; (g) reviewed certain analyses prepared by other firms retained by the Debtors; and (h) reviewed such other information and conducted such other analyses as Lazard deemed appropriate.

Although Lazard conducted a review and analysis of the Kaiser Companies' businesses, operating assets and liabilities, and business plans, Lazard assumed and relied on the accuracy and completeness of all (a) financial and other information furnished to it by the Debtors and by other firms retained by the Debtors and (b) publicly available information. Lazard did not independently verify any financial projections prepared by management of the Debtors or any other of the Kaiser Companies, including the Projections, in connection with its estimates of the Reorganization Value. Lazard has assumed that such projections, including the Projections, have been prepared reasonably, in good faith and on a basis reflecting the currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Debtors. Such projections, including the Projections,

assume that the Debtors will operate the businesses reflected in the financial forecast and that such businesses will perform as expected in the financial forecast. To the extent that the Debtors operate more or fewer businesses during the Projection Period and to the extent that all or a portion of the businesses perform at levels inconsistent with those expected by management in the financial forecast, such adjustments may have a material impact on the Projections and the valuations as presented herein. No independent valuation or appraisals of the Reorganized Debtors were sought or obtained in connection herewith.

Hypothetical valuation estimates reflect computations of the estimated Equity Value of the Reorganized Debtors through the application of various valuation techniques, including, among others: (a) a comparable company analysis, in which Lazard analyzed the enterprise values of public companies that Lazard deemed generally comparable to the operating businesses of the Kaiser Companies as a multiple of certain financial measures, including but not limited to revenues, earnings before interest, taxes, depreciation and amortization ("EBITDA"), and earnings before interest and taxes ("EBIT"), and then applied multiples derived from such analysis, among other statistics, to the projected revenues, EBITDA and EBIT of the Reorganized Debtors; (b) a discounted cash flow analysis, in which Lazard, using a weighted average cost of capital, computed the present value of free cash flows and the terminal value of the Reorganized Debtors; and (c) a precedent transactions analysis, in which Lazard analyzed the financial terms of certain acquisitions of companies that Lazard believed were comparable to the operating businesses of the Kaiser Companies, and then applied certain financial performance and other metrics provided by such analyses to the relevant metrics of the Reorganized Debtors.

An estimate of Reorganization Value is not entirely mathematical but, rather, involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Lazard made judgments as to the relative significance of each analysis in determining the Reorganized Debtors' Reorganization Value range. Lazard did not consider any one analysis or factor to the exclusion of any other analysis or factor. Lazard's hypothetical valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the Reorganized Debtors' Reorganization Value. With respect to the analysis of comparable companies and the analysis of selected precedent transactions, no company utilized as a comparison is identical to the Reorganized Debtors, and no precedent transaction is identical to the reorganization of the Debtors. Accordingly, an analysis of publicly traded comparable companies and comparable business combinations is not mathematical; rather, it involves complex considerations and judgments concerning the differences in financial and operating characteristics of the companies and other factors that could affect the Reorganization Values or Equity Values, as the case may be, of the Reorganized Debtors and the companies to which they were compared.

The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of Reorganization Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, none of the Kaiser Companies, Lazard or any other person assumes responsibility for their accuracy. Depending on the results of the Debtors' operations or changes in the financial markets, Lazard's valuation estimates as of the Effective Date may differ from those disclosed herein.

The estimates of the Equity Value of the Reorganized Debtors prepared by Lazard assume that the Reorganized Debtors will continue to own the fabricated products business and interests in and related to Anglesey and will operate these businesses and assets in accordance with the Debtors' business plan. See "Reorganized KACKaiser — Description of Business." Estimates of the Equity Value of an entity do not necessarily reflect the values that might be realized if assets of such entity were to be sold, nor do they purport to be appraisals. Such estimates were developed solely for the purposes of formulating and negotiating a plan of reorganization and analyzing implied relative recoveries to creditors thereunder. Such estimates do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of shares of New Common Stock, a value that may be significantly different from the amounts set forth herein.

**THE VALUATION OF NEWLY-ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDING OF PREPETITION CREDITORS, SOME OF**

WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES. ACTUAL MARKET PRICES OF SUCH SECURITIES ALSO MAY BE AFFECTED BY THE ISSUER'S HISTORY IN CHAPTER 11, CONDITIONS AFFECTING COMPETITORS OR THE INDUSTRY IN WHICH THE ISSUER PARTICIPATES GENERALLY, OR BY OTHER FACTORS NOT POSSIBLE TO PREDICT. ACCORDINGLY, THE REORGANIZATION VALUE ESTIMATED BY LAZARD DOES NOT NECESSARILY REFLECT, AND SHOULD NOT BE CONSTRUED AS REFLECTING, VALUES THAT WILL, OR ARE LIKELY TO, BE ATTAINED FOR THE NEW COMMON STOCK IN THE PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE INDICATED IN THIS ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE EQUITY VALUE RANGES ASSOCIATED WITH LAZARD'S VALUATION ANALYSIS. INDEED, THERE CAN BE NO ASSURANCE THAT A TRADING MARKET WILL DEVELOP FOR THE NEW COMMON STOCK, PARTICULARLY SINCE SHARES OF NEW COMMON STOCK WILL BE SUBJECT TO SIGNIFICANT RESTRICTIONS ON TRANSFER. SEE "— RESTRICTIONS ON TRANSFER."

**General Description of New Common Stock**

As of the Effective Date, Reorganized KAC will be authorized to issue 50.0 million shares of New Common Stock, par value $0.01 per share, of which: (a) an aggregate of 20.0 million shares will be distributed to the Union VEBA Trust, the Retired Salaried Employee VEBA Trust and holders of Allowed Claims in Classes 4 and 9; and (b) 2,222,222 shares will be reserved for issuance pursuant to the Equity Incentive Plan. See "Overview of the Plan — Classes and Treatment of Claims and Interests," "Overview of the Plan — Agreements with Labor Regarding Pension and Retiree Medical Benefits" and "Reorganized Kaiser — Management — Executive Compensation — New Plans and Arrangements to Be Implemented in Connection with the Effective Date — Equity Incentive Plan." In addition, the Environmental Settlement Agreement and the Plan contemplate that additional shares of New Common Stock could be issued in the future to satisfy certain environmental liabilities that have not yet been identified and liquidated. See "Operations During the Reorganization Cases — Certain Other Litigation and Settlements During the Reorganization Cases — Environmental Settlement Agreement."

Holders of New Common Stock will be entitled to one vote for each share of New Common Stock held of record on each matter submitted to a vote of stockholders and will not have cumulative voting rights. (Prior to its distribution, the New Common Stock will be voted by the applicable Disbursing Agent in accordance with the Plan, as described below under "Distributions Under the Plan — Unsecured Claims Reserves.") Holders of New Common Stock will be entitled to receive ratably such dividends as may be declared by Reorganized KAC's Board of Directors out of funds legally available for payment of dividends. While there is no current intent that Reorganized KAC pay regular dividends on the New Common Stock, Reorganized KAC may pay such dividends from time to time. The declaration and payment of dividends on the New Common Stock, if any, will be at the discretion of Reorganized KAC's Board of Directors and will be dependent upon Reorganized KAC's results of operations, financial condition, cash requirements, future prospects and other factors deemed relevant by Reorganized KAC's Board of Directors. In addition, the Exit Financing Facility is expected to place restrictions on the ability of Reorganized KAC to pay dividends. See "Reorganized Kaiser — Exit Financing Facility" and "— Risk Factors — Risks Relating to the Securities Markets and Ownership of New Common Stock — Payment of Dividends Is Subject Teto Restriction." There can be no assurance that Reorganized KAC will ever pay any dividends on the New Common Stock or, if it does so, as to the amount or form of such dividends. In the event of a liquidation, dissolution or winding up of Reorganized KAC, holders of New Common Stock will be entitled to share ratably in all assets remaining after payment of liabilities and the liquidation preference of any New Preferred Stock. Holders of New Common Stock will have no preemptive, subscription, redemption or conversion rights.

Reorganized KAC's Certificate of Incorporation will contain a provision restricting certain transfers of New Common Stock. In addition, each of the PBGC and the trustee for the Union VEBA Trust will be further restricted from transferring the New Common Stock issued to the PBGC or the Union VEBA Trust, as the case may be, under the Plan pursuant to the Stock Transfer Restriction Agreement. See "— Restrictions on Transfer" for a description of the transfer restrictions to be contained in Reorganized KAC's Certificate of Incorporation and the Stock Transfer Restriction Agreement.

All of the outstanding shares of New Common Stock to be issued pursuant to the Plan will be, upon such issuance, validly issued, fully paid and nonassessable.

**Restrictions on Transfer**

*Reorganized KAC's Certificate of Incorporation*

In order to reduce the risk that any change in the ownership of Reorganized KAC would jeopardize the preservation of federal income tax attributes of Reorganized KAC, including net operating loss carryovers, for purposes of Sections 382 and 383 of the IRC, Reorganized KAC's Certificate of Incorporation will prohibit certain transfers of equity securities of Reorganized KAC, including New Common Stock, until the earliest of (a) the 10th anniversary of the Effective Date, (b) the repeal, amendment or modification of Section 382 of the IRC in such a way as to render Reorganized KAC and all of its direct or indirect subsidiaries no longer subject to the restrictions imposed by such section, (c) the beginning of a taxable year of Reorganized KAC in which no income tax benefits of Reorganized KAC or any direct or indirect subsidiary thereof in existence as of the Effective Date are currently available or will be available, (d) the determination by Reorganized KAC's Board of Directors that the restrictions will no longer apply, and (e) a determination by Reorganized KAC's Board of Directors or the Internal Revenue Service of the Department of Treasury of the United States of America (the "IRS") that Reorganized KAC is ineligible to use Section 382(l)(5) of the IRC permitting full use of the income tax benefits of Reorganized KAC or any direct or indirect subsidiary thereof existing as of the Effective Date, or (f) an election by Reorganized KAC for Section 382(l)(5) of the IRC not to apply (the "Restriction Release Date"). See "Certain Federal Income Tax Consequences of Consummation of the Plan — U.S. Federal Income Tax Consequences subject to the Debtors — Limitation on NOL Carryforwards" for a description of the specific tax attributes of Reorganized KAC and its subsidiaries at issue. Generally, Reorganized KAC's Certificate of Incorporation will prohibit a transfer of equity securities of Reorganized KAC if either (a) the transferor holds 5% or more of the total fair market value of all issued and outstanding equity securities (such person, a "5% Shareholder") or (b) as a result of such transfer, either (i) any person or group of persons would become a 5% Shareholder or (ii) the percentage stock ownership in Reorganized KAC of any 5% Shareholder would be increased (any such transfer, a "5% Transaction").

The restrictions on transfer will not apply if:

- the transferor or transferee obtains the prior approval of Reorganized KAC's Board of Directors;

- in the case of a 5% Transaction by any holder of equity securities other than the Union VEBA Trust or the PBGC, prior to such transaction, Reorganized KAC's Board of Directors determines in good faith, upon request of the transferor or transferee, that such transfer is a 5% Transaction (x) which, together with any 5% Transactions consummated during the period ending on the date of consummation of such 5% Transaction and beginning on the later of (i) the date three years prior thereto and (ii) the first day after the Effective Date (the "Testing Period"), represent aggregate 5% Transactions involving transfers of less than 45% of the equity securities of Reorganized KAC issued and outstanding at the time of transfer and (y) which, together with any 5% Transactions consummated during such period and all 5% Transactions that the Union VEBA Trust and the PBGC may consummate without breach of the Stock Transfer Restriction Agreement during the three years following the time of transfer, represent, during any period of three consecutive years during the period consisting of the Testing Period and the three years thereafter, aggregate 5% Transactions involving transfers of less than 45% of the equity securities issued and outstanding at the time of transfer; or

- in the case of a 5% Transaction by the Union VEBA Trust or the PBGC, such 5% Transaction does not result in a breach of the Stock Transfer Restriction Agreement; provided that, contemporaneously with the 5% Transaction, the Union VEBA Trust or the PBGC, as the case may be, delivers to Reorganized KAC's Board of Directors a written notice addressed to Reorganized KAC setting forth the number and type of equity securities involved in, and the date of, such 5% Transaction.

Any such approval or determination by Reorganized KAC's Board of Directors will require the affirmative vote of a majority of the directors (assuming no vacancies).

Each certificate representing equity securities of Reorganized KAC issued prior to the Restriction Release Date will contain a legend referring to these restrictions on transfer and any purported transfer of equity securities of Reorganized KAC in violation of such restrictions will be null and void. The purported transferor will remain the owner of such transferred securities and the purported transferee will be required to turn over the transferred securities, together with any distributions that were received by the purported transferee with respect to the transferred securities after the purported transfer, to an agent who is authorized to sell such securities, if it can do so, in arm's-length transactions that do not violate such restrictions. If the purported transferee resold such securities prior to receipt of Reorganized KAC's demand that they be so surrendered, the purported transferee will generally be required to transfer the proceeds from such distribution, together with any distributions that were received by the purported transferee with respect to the transferred securities after the purported transfer, to such agent. Any amounts so held by the agent will be applied first to reimburse the agent for its expenses, then to reimburse the transferee for any payments made by the purported transferee to the transferor, and finally, if any amount remains, to pay the purported transferor. Any resale by the purported transferee will itself be subject to these restrictions on transfer.

### *Stock Transfer Restriction Agreement*

On the Effective Date, Reorganized KAC, the PBGC and the trustee of the Union VEBA Trust in such capacity will enter into the Stock Transfer Restriction Agreement in the form attached as Exhibit 1.1(194) to the Plan pursuant to which, until the Restriction Release Date, each of the PBGC and the trustee of the Union VEBA Trust will be prohibited from transferring or otherwise disposing of more than 15% of the total number of shares of New Common Stock issued pursuant to the Plan to the PBGC or the Union VEBA Trust, as the case may be, in any 12-month period without the prior written approval of Reorganized KAC's Board of Directors in accordance with Reorganized KAC's Certificate of Incorporation.

The PBGC and the trustee of the Union VEBA Trust in such capacity will also each expressly acknowledge and agree to comply with the restrictions on the transfer of the securities of Reorganized KAC contained in Reorganized KAC's Certificate of Incorporation. Additionally, Reorganized KAC's Board of Directors will not approve any transfer by either the PBGC or the Union VEBA Trust of any shares of New Common Stock received by it pursuant to the Plan unless such approval permits transfers by the PBGC and Union VEBA Trust on a proportional basis. See "— Reorganized KAC's Certificate of Incorporation"

## Risk Factors

The New Common Stock to be distributed pursuant to the Plan is subject to a number of material risks, including those enumerated below. The risk factors enumerated below assume Confirmation and the consummation of the Plan and the transactions contemplated thereby, and do not include matters that could prevent the foregoing. See "Answers ~~To~~to Certain Questions About ~~The~~the Plan ~~And~~and Disclosure Statement — What must happen before the Plan can ~~be consummated~~become effective?," "Overview of the Plan — Classes and Treatment of Claims and Interests" and "Voting and Confirmation of the Plan" for discussions of such matters. Prior to voting on the Plan, holders of Claims entitled to vote on the Plan should carefully consider the risk factors enumerated or referred to below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto.

### *Risks Relating to Certain Financial Information Regarding the Reorganized Debtors*

#### *Projections Are Inherently Uncertain*

The fundamental premise of the Plan is the successful implementation of the Reorganized Debtors' business plan, as reflected in the Projections. See "Reorganized Kaiser — Projected Financial Information." The Projections are inherently uncertain and are dependent upon the successful implementation of the business plan and the reliability of the assumptions contained therein, including assumptions about the Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, the overall performance of the industry in which the Reorganized Debtors will operate and general business and economic conditions. Many such assumptions are subject to matters which are beyond the control of Reorganized KAC and some of the assumptions may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement, including unanticipated changes in applicable regulations or

accounting principles generally acceptable in the United States of America, may affect the actual financial condition, results of operations and cash flows of the Reorganized Debtors in the future.

### Historical Financial Information Will Not Be Comparable

As a result of the consummation of the Plan and the transactions contemplated thereby, the Reorganized Debtors will operate the business of the Debtors under a new capital structure. The Reorganized Debtors will also be subject to the "fresh-start" accounting rules. In addition, the consolidated financial statements of the Reorganized Debtors will not reflect the Debtors' interests in and related to the Joint Ventures that have been sold or otherwise disposed of as part of the Debtors' strategic plan to dispose of their commodities assets. See "Reorganized ~~KAC~~Kaiser — Restructuring Transactions," "Reorganized ~~KAC~~Kaiser — Projected Financial Information" and "Operations During the Reorganization Cases — Strategic Plan to Sell Commodities Assets." Accordingly, the financial condition and results of operations of Reorganized KAC from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the historical financial statements of KAC, including those set forth in the KAC 2004 Form 10-K.

### Risks Relating to the Reorganized Debtors' Business and the Industry in which the Reorganized Debtors Will Operate

### The Reorganized Debtors Will Operate in a Highly Competitive Industry

The fabricated products segment of the aluminum industry is highly competitive. Certain of the Reorganized Debtors' competitors will be substantially larger and have greater financial resources than the Reorganized Debtors will have, and may have other strategic advantages, including more efficient technologies or lower raw material and energy costs. Increased competition could cause a reduction in the Reorganized Debtors' shipment volumes and profitability or increase their expenditures, any one of which could have a material adverse effect on the result of operations of the Reorganized Debtors. In addition, aluminum competes with other materials, such as steel, plastics and glass, for various applications, and the willingness of customers to accept substitutions for aluminum and the ability of large customers to exert leverage in the marketplace to reduce the pricing for fabricated aluminum products could affect the Reorganized Debtors' results of operations.

### The Reorganized Debtors' Business Could Be Adversely Affected by the Loss of Specific Customers or Changes in the Business or Financial Condition of Specific Customers

In 2004, the largest of the Debtors' fabricated products business unit accounted for approximately 12% of the unit's third-party net sales, and the largest five customers accounted for approximately 32% of the unit's third-party sales. If existing relationships with significant customers materially deteriorate or are terminated and the Reorganized Debtors are not successful in replacing lost business, the Reorganized Debtors' results of operations could be materially adversely affected. In addition, a significant downturn in the business or financial condition of the Reorganized Debtors' significant customers could materially adversely affect the results of operations of the Reorganized Debtors.

### Revenue from the Reorganized Debtors' Business Will Be Subject to Market Conditions

Changes in global, regional or country-specific economic conditions can have a significant impact on overall demand for aluminum-intensive fabricated products, especially in the transportation, distribution and aerospace markets. Such changes in demand may directly affect the Reorganized Debtors' earnings by impacting the overall volume and mix of such products sold. To the extent that these end-use markets weaken, demand can also diminish for primary aluminum, adversely affecting the financial results of the Reorganized Debtors relating to their interests in Anglesey, which owns and operates an aluminum smelter.

### Foreign Economic, Regulatory and Political Factors May Adversely Affect the Reorganized Debtors' Business

The Reorganized Debtors will import primary aluminum from, and manufacture fabricated products used in foreign countries. The Reorganized Debtors will also own 49% of Anglesey, a company which owns and operates an aluminum smelter in the United Kingdom to which the Reorganized Debtors will supply alumina and from which

the Reorganized Debtors will purchase aluminum for sale to third parties in the United Kingdom and Europe. Factors in the politically and economically diverse countries in which the Reorganized Debtors will operate or have customers or suppliers, including inflation, fluctuations in currency and interest rates, competitive factors, civil unrest and labor problems, could affect the Reorganized Debtors' revenues, expenses and results of operations. The Reorganized Debtors' operations could also be adversely affected by: acts of war, terrorism or the threat of any of these events; government regulation in the countries in which the Reorganized Debtors operate, service customers or purchase raw materials, particularly the implementation of controls on imports, exports and prices, the adoption of new forms of taxation, the imposition of currency restrictions and the nationalization or appropriation of rights or other assets; and trade disputes involving countries in which the Reorganized Debtors operate, service customers or purchase raw materials.

### *Unplanned Business Interruptions May Adversely Impact the Performance of the Reorganized Debtors*

The production of fabricated aluminum products is subject to unplanned events such as explosions, fires, inclement weather, natural disasters, accidents, transportation interruptions and supply interruptions. Operational interruptions at one of the Reorganized Debtors' production facilities could cause substantial losses in the Reorganized Debtors' production capacity. Furthermore, because customers may be dependent on planned deliveries from the Reorganized Debtors, customers that have to reschedule their own production due to delivery delays from the Reorganized Debtors may be able to pursue financial claims against them, and the Reorganized Debtors may incur costs to correct such problems in addition to any liability resulting from such claims. Such interruptions may also harm the reputation of the Reorganized Debtors among actual and potential customers, potentially resulting in a loss of business. To the extent these losses are not covered by insurance, the Reorganized Debtors' cash flows may be adversely impacted by such events.

### *The Reorganized Debtors' Profitability Could Be Adversely Affected by Increases in the Cost of Raw Materials*

The price of primary aluminum has historically been subject to significant cyclical price fluctuations, and the timing of changes in the market price of aluminum is largely unpredictable. Although the Reorganized Debtors' pricing of fabricated aluminum products will generally be intended to lock in a conversion margin (representing the value added from the fabrication process) and pass the risk of price fluctuations on to their customers, the Reorganized Debtors may not be able to pass on the entire cost of such increases to their customers or offset fully the effects of higher costs for other raw materials, which may cause the Reorganized Debtors' profitability to decline. There will also be a potential time lag between increases in prices for raw materials under the Reorganized Debtors' purchase contracts and the point when the Reorganized Debtors can implement a corresponding increase in price under their sales contracts with their customers. As a result, the Reorganized Debtors may be exposed to fluctuations in raw materials prices, including aluminum, since, during the time lag, the Reorganized Debtors may have to bear the additional cost of the price increase under their purchase contracts, which could have a material adverse effect on the Reorganized Debtors' profitability. Furthermore, the Reorganized Debtors will be party to arrangements based on fixed prices that include the primary aluminum price component, so that the Reorganized Debtors will bear the entire risk of rising aluminum prices, which may cause their profitability to decline. In addition, an increase in raw materials prices may cause some of the customers of the Reorganized Debtors to substitute other materials for their products, adversely affecting the Reorganized Debtors' results of operations because of both a decrease in the sales of fabricated products and a decrease in demand for the primary aluminum produced at Anglesey.

### *Rising Energy Costs May Adversely Impact the Reorganized Debtors' Profitability*

The Reorganized Debtors will consume substantial amounts of energy in their operations. A number of factors could increase the cost of energy and, if energy prices rise, the profitability of the Reorganized Debtors could decline.

### *The Reorganized Debtors' Hedging Programs May Adversely Affect Income and Cash Flows*

From time to time in the ordinary course of business, the Reorganized Debtors may enter into hedging transactions to limit exposure resulting from price risks relating to primary aluminum prices, energy prices and foreign currency requirements. To the extent that these hedging transactions fix prices or exchange rates and the

prices for primary aluminum exceed the fixed or ceiling prices established by these hedging transactions or energy costs or foreign exchange rates are below the fixed prices, the Reorganized Debtors' income and cash flow will be lower than they otherwise would have been.

### Expiration of Power Agreement of Anglesey May Adversely Impact the Reorganized Debtors' Cash Flows and Impact the Reorganized Debtors' Hedging Programs

The agreement under which Anglesey receives power expires in September 2009 and the nuclear facility which supplies such power is scheduled to cease operations shortly thereafter. No assurance can be given that Anglesey will be able to obtain sufficient power to sustain its operations on reasonably acceptable terms thereafter. If, as a result, Anglesey's aluminum production is curtailed or its costs are increased, the Reorganized Debtors' cash flows may be adversely affected. In addition, any decrease in Anglesey's production would reduce or eliminate the "natural hedge" against rising primary aluminum prices created by the Reorganized Debtors' access to such aluminum (see "Reorganized Kaiser — Description of Business — Primary Aluminum Business Unit — Anglesey —Hedging") and, accordingly the Reorganized Debtors may deem it appropriate to increase their hedging activity to limit exposure to such price risks, potentially adversely affecting the income and cash flow of the Reorganized Debtors (see "— The Reorganized Debtors' Hedging Programs May Adversely Affect Income and Cash Flows").

### Loss of Key Management and Other Personnel or Inability to Attract Management and Other Personnel May Adversely Impact Performance of the Reorganized Debtors

The Reorganized Debtors will depend on their senior executive officers and other key personnel to run their business. The loss of any of these officers or other key personnel could materially adversely affect the Reorganized Debtors' operations. Competition for qualified employees among companies that rely heavily on engineering and technology is intense, and the loss of qualified employees or an inability to attract, retain and motivate additional highly skilled employees required for the operation and expansion of the business of the Reorganized Debtors could hinder their ability to improve manufacturing operations, conduct research activities successfully and develop marketable products.

### Union Disputes and Other Employee Relations Issues May Adversely Impact Performance of the Reorganized Debtors

A significant number of the Debtors' employees are represented by labor unions under labor contracts with varying durations and expiration dates. The Reorganized Debtors may not be able to satisfactorily renegotiate the labor contracts when they expire, in which case there could potentially be a work stoppage at one or more of the Reorganized Debtors' facilities in the future. Any work stoppage could have a material adverse effect on the income and cash flows of the Reorganized Debtors.

### Pending Asbestos-Related Legislation, if Enacted, May Adversely Effect Results of Operations

The following discussion assumes that legislation entitled "The Fairness in Asbestos Injury Resolution Act of 2005" (i.e., the Fair Act), which is currently pending before the United States Congress, will be enacted into law as currently proposed; the Fair Act, however, is still the subject of negotiation and Congressional debate and, accordingly, no assurances can be made as to the ultimate provisions of the Fair Act if and when it is enacted into law or how it could ultimately affect the holders of Channeled Personal Injury Claims or how it could ultimately affect the Reorganized Debtors or the value of the New Common Stock.

If enacted as currently proposed, the Fair Act would provide for the establishment of an asbestos disease compensation system as the exclusive method of resolving asbestos personal injury claims. Under the Fair Act, a national asbestos compensation fund would be created and certain corporations that have historically been named as defendants in asbestos personal injury cases would be required to make annual contributions thereto in accordance with a complex multi-tiered schedule based upon the amount of the company's prior asbestos expenditures and its annual gross revenues. Upon enactment of the Fair Act, virtually all pending asbestos actions would be discontinued and the filing of new asbestos lawsuits would be enjoined.

Under the Fair Act as currently proposed, if the Debtors have consummated or substantially consummated the Plan by the date the Fair Act is enacted or if the Bankruptcy Court determines that the Debtors are exempt from

certain provisions of the Fair Act in accordance with the terms of the Fair Act, the most likely effect of the Fair Act as it relates to the Reorganized Debtors would be that the PI Trust Assets held by the Asbestos PI Trust and the rights of the Asbestos PI Trust to receive Cash from the Funding Vehicle Trust pursuant to the PI Trust Funding Agreement would be contributed to the national asbestos compensation fund and the rights of holders of Asbestos Personal Injury Claims on account of such claims would be determined in accordance with the schedules set forth in the Fair Act. However, there can be no assurance that the Plan will be consummated or substantially consummated by the enactment of the Fair Act or that the Bankruptcy Court will make the determination that the Reorganized Debtors meet the requirements for exemption from the Fair Act. Accordingly, although the Debtors currently believe that such requirements would be met by the Reorganized Debtors, there can no assurances that, if the Fair Act is enacted as currently proposed, the Reorganized Debtors will not ultimately be required to make annual contributions to the national asbestos compensation fund.

To the extent that the Reorganized Debtors have not consummated or substantially consummated the Plan by the date the Fair Act is enacted and the Bankruptcy Court does not determine that the Debtors are exempt from certain provisions of the Fair Act in accordance with the terms thereof, the Debtors or Reorganized Debtors, as the case may be, would be required to make annual payments of approximately $24.5 million to the national asbestos compensation fund for 30 years, the first of which would be due within 60 days of the date of enactment of the Fair Act. Such payments, if required, could materially adversely affect the Reorganized Debtors' results of operations.

### Compliance with Health and Safety Laws and Regulations May Adversely Affect the Reorganized Debtors' Results of Operations

The operations of the Reorganized Debtors will be regulated by a wide variety of health and safety laws and regulations. Compliance with these laws and regulations may be costly and could have a material adverse effect on the Reorganized Debtors' results of operations. In addition, these laws and regulations are subject to change at any time and there can be no assurance as to the effect that any such changes would have on the Reorganized Debtors' operations or the amount that the Reorganized Debtors would have to spend to comply with such laws and regulations as so changed.

### Environmental Compliance, Clean-Up and Damage Claims May Adversely Affect the Reorganized Debtors' Results of Operations

The Reorganized Debtors will be subject to a wide variety of environmental laws and regulations with respect to, among other things, air and water emissions and discharges, the generation, storage, treatment, transportation and disposal of solid and hazardous waste and the release of hazardous or toxic substances, pollutants and contaminants into the environment. The Debtors are currently and have been subject to all these same laws and regulations. Compliance with these environmental laws is and will be costly. The Debtors have accrued, and the Reorganized Debtors will accrue, for costs reasonably expected to occur under existing laws and regulations. However, it is possible that actual costs may differ, perhaps significantly, from the amounts expected/accrued and such differences could have a material impact on the Reorganized Debtors' financial position, results of operations and/or cash flows. In addition, new laws or regulations or changes to existing laws and regulations may occur and there can be no assurance as to the amount that the Reorganized Debtors would have to spend to comply with such new laws and regulations or any such changed laws or regulations or the effects that they would have on the Reorganized Debtors' financial position, results of operations or cash flows.

The Reorganized Debtors will have ongoing obligations under the Environmental Settlement Agreement (see "Operations During the Reorganization Cases — Certain Other Litigation and Settlements During the Reorganization Cases — Environmental Settlement Agreement"). The current and former operations of the Reorganized Debtors may subject them to fines or penalties for alleged breaches of environmental laws and to other actions seeking additional clean-up or other remedies under these environmental laws. The Reorganized Debtors may also be subject to damages related to alleged injuries to the environment and natural resources, including claims with respect to certain waste disposal sites and the clean-up of sites currently or formerly used by the Reorganized Debtors. Any such clean-up or other remediation, fines or penalties, or damages may be costly and could have a material adverse effect on the Reorganized Debtors' results of operations.

To the extent not sold prior thereto, as of the Effective Date, New Kaiser Remainder LLC will own certain non-operating properties that will require additional environmental clean-up, including properties located in

Ohiopyle, Pennsylvania and Tulsa, Oklahoma. ~~As of the Effective Date, Reorganized KAC and New Kaiser Remainder LLC will enter into a funding agreement obligating Reorganized KAC, if requested by New Kaiser Remainder LLC, to advance amounts necessary to fund those clean-up costs, subject to certain limitations. See "Reorganized Kaiser — Restructuring Transactions."~~

See "Distributions Under the Plan — Special Provisions Relating to Environmental Matters" for a description of certain provisions of the Plan related to environmental matters.

### Other Legal Proceedings or Investigations or Changes in the Laws and Regulations to which the Reorganized Debtors Will Be Subject May Adversely Affect Their Results of Operations

In addition to environmental proceedings and investigations of the types described above, the Reorganized Debtors may from time to time be involved in, or be the subject of, disputes, proceedings and investigations with respect to a variety of matters, including matters related to health and safety, product liability, employees, Taxes and contracts, as well as other disputes and proceedings that arise in the ordinary course of business. It could be costly to defend against any claims against the Reorganized Debtors or any investigations involving any of them, whether meritorious or not, and could divert management's attention as well as operational resources, negatively impacting the Reorganized Debtors' results of operations. It could also be costly to make payments on account of any such claims.

Additionally, as with the environmental laws and regulations to which the Reorganized Debtors will be subject, the other laws and regulations which will govern the business of the Reorganized Debtors are subject to change at any time and there can be no assurance as to the amount that the Reorganized Debtors would have to spend to comply with such laws and regulations as so changed or otherwise as to the effect that any such changes would have on the Reorganized Debtors' operations.

### The Reorganized Debtors May Not Be Able to Successfully Develop and Implement New Technology Initiatives in a Timely Manner

The Debtors have invested in, and are involved with, a number of technology and process initiatives. Several technical aspects of these initiatives are still unproven and the eventual commercial outcome of any of them cannot be assessed with any certainty. Even if these initiatives are successful, the Reorganized Debtors may not be able to deploy them in a timely fashion. If these initiatives are not successful or, even if successful, are not deployed in a timely fashion, the profitability of the Reorganized Debtors could decline. Further, if the Reorganized Debtors' competitors are able to successfully develop and implement new technology initiatives in a timely manner and the Reorganized Debtors are unable to do so, those competitors could have strategic advantages over the Reorganized Debtors.

### The Reorganized Debtors May Not Be Able to Adequately Protect Proprietary Rights to Their Technology

The success of the Reorganized Debtors will depend in part upon their proprietary technology and processes. Although the Reorganized Debtors will attempt to protect their intellectual property through patents, trademarks, trade secrets, copyrights, confidentiality and nondisclosure agreements and other measures, these measures may not be adequate to protect such intellectual property, particularly in foreign countries where the laws may offer significantly less intellectual property protection than is offered by the laws of the United States of America. In addition, any litigation to enforce the Reorganized Debtors' intellectual property rights, even if successful, could result in costly and prolonged litigation, divert management's attention and adversely affect income and cash flows. Failure to adequately protect the Reorganized Debtors' intellectual property may adversely affect their results of operations as the Reorganized Debtors' competitors would be able to utilize such property without having had to incur the costs of developing it, thus potentially reducing the Reorganized Debtors' relative profitability. Furthermore, the Reorganized Debtors may be subject to claims that their technology infringes the intellectual property rights of another. Even if without merit, those claims could result in costly and prolonged litigation, divert management's attention and adversely affect income and cash flows. In addition, the Reorganized Debtors may be required to enter into licensing agreements in order to continue using technology that is important to their business. However, the Reorganized Debtors may be unable to obtain license agreements on acceptable terms, which could negatively impact the Reorganized Debtors' results of operations.

*Risks Relating to the Securities Markets and Ownership of New Common Stock*

### There Is No Established Market for the New Common Stock; Anticipated Small Public Float May Limit Development of a Market for the New Common Stock; Volatility Is Possible

No established market exists for the New Common Stock. Although KAC intends to apply to list the New Common Stock on The Nasdaq Stock Market, Inc., there can be no assurance that, even if the New Common Stock is quoted on the NASDAQ National Market or NASDAQ SmallCap Market, an active market for the New Common Stock will develop or further that, even if any such market does develop, it will continue to exist or as to the degree of price volatility in any such market that does develop. The Stock Transfer Restriction Agreement will generally prohibit each of the PBGC and the Union VEBA Trust from transferring more than 15% of the New Common Stock issued to it pursuant to the Plan in any 12-month period, and transfer restrictions contained in Reorganized KAC's Certificate of Incorporation will generally prevent any person from rapidly acquiring significant amounts of New Common Stock, in each case for up to ten years after the Effective Date. These transfer restrictions could hinder development of an active market for the New Common Stock. See "New Common Stock — Restrictions on Transfer." The New Common Stock will be issued pursuant to the Plan to holders of Allowed Claims in Class 4 and Class 9, as well as the Union VEBA Trust and the Retired Salaried Employee VEBA Trust, and some of these individuals and other entities may prefer to liquidate their investment rather than hold it on a long-term basis. Accordingly, it is anticipated that the market for the New Common Stock will be volatile, at least for an initial period after the Effective Date. Moreover, although the Plan was developed based upon an estimated midpoint reorganization equity value of approximately $19.00 per share of New Common Stock, such valuation is not an estimate of the prices at which the New Common Stock may trade in the market, and the Debtors have not attempted to make any such estimate in connection with the development of the Plan. See "New Common Stock — Estimated Reorganization Value." In addition, the market price of the New Common Stock may be subject to significant fluctuations in response to numerous factors, including variations in the Reorganized Debtors' annual or quarterly financial results or those of their competitors, changes by financial analysts in their estimates of the future earnings of the Reorganized Debtors, conditions in the economy in general or in the fabricated aluminum products industry in particular or unfavorable publicity. The stock market also has, from time to time, experienced significant price and volume fluctuations that have been unrelated to the operating performance of companies with publicly traded securities. No assurance can be made as to the market prices for New Common Stock that will prevail following the Effective Date.

### Payment of Dividends Is Subject to Restriction

It is expected that covenants in the Exit Financing Facility will restrict the ability of Reorganized KAC to pay dividends and may prohibit the payment of certain types of dividends altogether. See "Reorganized Kaiser — Exit Financing Facility." Certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the New Common Stock, which could hinder development of an active market for the New Common Stock.

### Concentration of Ownership; Certain Stockholders May Exert Significant Influence over the Reorganized Debtors

It is anticipated that, immediately following the Effective Date, four stockholders will hold 89.1% of the outstanding New Common Stock as follows: the Union VEBA Trust, 57.2%; the PBGC, 16.2%; the Retired Salaried Employee VEBA Trust, 9.7%; and the Asbestos PI Trust, 6.0%. See "Overview of the Plan — Agreements with Labor Regarding Pension and Retiree Medical Benefits" and "Overview of the Plan — PBGC Settlement Agreement." Accordingly, the Union VEBA Trust will have significant control over matters requiring stockholder approval, including the composition of Reorganized KAC's Board of Directors. Further, to the extent that the Union VEBA Trust and some or all of the other substantial stockholders act in concert, they could control any action taken by the stockholders of Reorganized KAC, including actions subject to a 67% supermajority vote requirement. This concentration of ownership could also facilitate or hinder proxy contests, tender offers, open-market purchase programs, mergers or other purchases of the New Common Stock that might otherwise give stockholders the opportunity to realize a premium over the then-prevailing market price of the New Common Stock or cause the market price of the New Common Stock to decline. There can be no assurance that the interests of Reorganized KAC's major stockholders will not conflict with the interests of the Reorganized Debtors' other stakeholders.

*The USW Has Director Nomination Rights Through Which It May Influence the Reorganized Debtors*

Pursuant to the Legacy Liability Agreements, the USW will enter into the Director Designation Agreement with Reorganized KAC which will generally provide the USW with certain rights to nominate 40% of the candidates to be submitted to stockholders for election to Reorganized KAC's Board of Directors.  See "Reorganized Kaiser — ~~Management and Board of Directors~~ — ~~Reorganized KAC's~~ Board of Directors — Director Designation Agreement with the USW."  As a result, the directors nominated by the USW will have a significant voice in the decisions of Reorganized KAC's Board of Directors.

### Certain Provisions Will Have Anti-Takeover Effects

Certain provisions of Reorganized KAC's Certificate of Incorporation and Bylaws, as well as the DGCL and the Stock Transfer Restriction Agreement, may have the effect of delaying, deferring or preventing a change in control of Reorganized KAC.  Such provisions, including ones providing for the possible issues of New Preferred Stock without stockholder approval, regulating the nomination of directors, classifying Reorganized KAC's Board, eliminating the ability of stockholders to act by written consent in lieu of a meeting and restricting the transfers of New Common Stock, may make it more difficult for anyone to make a tender offer or otherwise acquire substantial amounts of the New Common Stock or to launch other takeover attempts that a stockholder might consider to be in such stockholder's best interest without the approval of Reorganized KAC's Board of Directors.  See "Reorganized ~~KAC~~Kaiser — Certain Corporate Governance Matters" and "New Common Stock — Restrictions on Transfer."

## GENERAL INFORMATION CONCERNING THE PLAN

**Substantive Consolidation**

In connection with Confirmation, the Debtors will seek Bankruptcy Court approval of the substantive consolidation of the Substantively Consolidated Debtors for the purpose of implementing the Plan, including for purposes of voting, Confirmation and distributions to be made under the Plan. Pursuant to relevant order of the Bankruptcy Court: (a) all assets and liabilities of the Substantively Consolidated Debtors will be deemed merged; (b) all guarantees by, or co-obligations of, one Substantively Consolidated Debtor in respect of the obligations of any other Substantively Consolidated Debtor will be deemed eliminated so that any Claim against any Substantively Consolidated Debtor and any guarantee by, or co-obligation of, any other Substantively Consolidated Debtor and any joint or several liability of any of the Substantively Consolidated Debtors will be deemed to be one obligation of the consolidated Substantively Consolidated Debtors; and (c) each and every Claim Filed or to be Filed in the Reorganization Case of any of the Substantively Consolidated Debtors will be deemed Filed against the consolidated Substantively Consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Substantively Consolidated Debtors. Substantive consolidation is being sought solely for administrative convenience. Such substantive consolidation (other than for the purpose of implementing the Plan) will not affect the legal and corporate structures of the Substantively Consolidated Debtors, nor will such substantive consolidation affect or be deemed to affect any Intercompany Claim in any manner contrary to the Intercompany Claims Settlement nor will such substantive consolidation be deemed to affect any Other Debtor or claims against any Other Debtors.

The Plan will serve as a motion seeking entry of an order substantively consolidating the Substantively Consolidated Debtors, as described, and to the limited extent set forth in, the provisions of the Plan described in the immediately preceding paragraph (*i.e.*, Section 9.1 of the Plan). Unless an objection to such substantive consolidation is made in writing by any creditor or claimant affected by the Plan, Filed with the Bankruptcy Court and served on the parties identified in Section 14.9 of the Plan on or before [————],November 14, 2005, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

**Discharge, Termination and Injunction**

### *Discharge of Claims and Termination of Interests*

Except as provided in the Plan, the Confirmation Order or the Environmental Settlement Agreement, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from the Petition Date. Except as provided in the Plan, in the Confirmation Order or the Environmental Settlement Agreement, Confirmation will, as of the Effective Date: (a) discharge the Debtors from all Claims or other debts and Interests that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the holder of a Claim based on such debt has accepted the Plan; and (b) terminate all Interests and other rights of equity security holders in the Debtors.

In accordance with the foregoing, except as provided in the Plan, the Confirmation Order or the Environmental Settlement Agreement, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtors and a termination of all Interests and other rights of equity security holders in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest. The foregoing will not limit any rights that the United States of America or the individual States may have under environmental laws to seek to enforce equitable remedies against the Debtors, the Reorganized Debtors or the successors thereto to the extent such equitable remedies are not considered Claims under applicable bankruptcy law and relate to matters that have not been resolved by the Environmental Settlement Agreement or other settlements, except that the Debtors, the Reorganized

Debtors or the successors thereto may raise any and all available defenses (including defenses under bankruptcy law) in any action by the United States of America or an individual State to enforce such equitable remedies. Under the Plan, all rights and defenses (including defenses under bankruptcy law) of the Debtors, the Reorganized Debtors and the successors thereto and the United States of America with regard to the Reserved Sites (as such term is defined in the Environmental Settlement Agreement) for which the Debtors and the United States of America have not reached settlement as of the Confirmation Date will be preserved. Notwithstanding any provision of the Plan, the rights of the United States of America or the individual States party to the Environmental Settlement Agreement with respect to the Debtor-Owned Sites (as such term is defined in the Environmental Settlement Agreement) will be governed by the Environmental Settlement Agreement.

### *Injunctions*

**In addition to the injunctions provided in the PI Channeling Injunctions, except as provided in the Plan, the Confirmation Order or the Environmental Settlement Agreement, as of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability of the Debtors, or an Interest or other right of an equity security holder with respect to the Debtors, that is discharged, waived, settled or deemed satisfied in accordance with the terms of the Plan will be permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtors, the Reorganized Debtors or the property of any of them, other than to enforce any right pursuant to the Plan to a distribution; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors or the property of any of them, other than as permitted by the Plan as described in (a) above; (c) creating, perfecting or enforcing any lien or encumbrance of any kind against the Debtors, the Reorganized Debtors or the property of any of them; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan.**

**In addition to the injunctions provided in the PI Channeling Injunctions, as of the Effective Date, all entities that have held, currently hold or may hold any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that are released pursuant to the Plan, including pursuant to Section 4.5 thereof (which is described below under "— Preservation of Rights of Action Held by the Debtors and the Reorganized Debtors" and "— Releases"), will be permanently enjoined from taking any of the following actions against any released entity or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities: (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released entity; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan.**

### Preservation of Rights of Action Held by the Debtors and the Reorganized Debtors

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors or their successors will retain and may enforce any claims, demands, rights and causes of action that any Debtor or Estate may hold, including the Recovery Actions, to the extent not expressly released under the Plan. The Reorganized Debtors or their successors may pursue such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successors holding such claims, demands, rights or causes of action. Further, the Reorganized Debtors retain their rights to File and pursue any adversary proceedings against any trade creditor or vendor related to debit balances or deposits owed to any Debtor. Notwithstanding the foregoing, on the Effective Date, the Reorganized Debtors will be deemed to waive and release any claims, rights or causes of action arising under section 547 of the Bankruptcy Code relating to preferential transfers held by any Debtor or Reorganized Debtor against any entity other than Recovery Actions against any Preference Action Party (see Section 4.5.a of the Plan and "Operations During the Reorganization Cases — Certain Other Litigation and Settlements During the Reorganization Cases — Recovery Actions").

**Limitation of Liability**

The Debtors, the Reorganized Debtors, the DIP Lenders, the Indenture Trustees and their respective directors, officers, employees and professionals, acting in such capacity and the Creditors' Committee or members thereof, the Asbestos Claimants' Committee or members thereof, the Retirees' Committee or members thereof, the Future Asbestos Claimants' Representative, the Future Silica and CTPV Claimants' Representative and their respective Professionals will neither have nor incur any liability to any entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, this Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan, although the provisions of the Plan described in this paragraph (*i.e.*, Section 14.2 of the Plan) will have no effect on (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (b) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

**Releases**

*General Releases*

As of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash, New Common Stock and contracts, instruments, releases and other agreements and documents to be entered into or delivered in connection with the Plan, each holder of a Claim, other than a holder of a Channeled Personal Injury Claim, that votes in favor of the Plan will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the right to enforce the Debtors' or the Reorganized Debtors' obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to a Debtor, the Reorganization Cases or the Plan that such entity has, had or may have against any Debtor or other Kaiser Company, the Creditors' Committee or members thereof, the Asbestos Claimants' Committee or members thereof, the Retirees' Committee or members thereof, the Future Asbestos Claimants' Representative, the Future Silica and CTPV Claimants' Representative, any DIP Lender, any Indenture Trustee or any of their respective present or former directors, officers, employees, accountants (including independent certified public accountants), advisors, attorneys, investment bankers, underwriters, consultants or other agents or shareholders, acting in such capacity (which release will be in addition to the discharge of Claims and termination of Interests provided in the Plan and under the Confirmation Order and the Bankruptcy Code), except for those claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities based on: (a) acts or omissions of any such person constituting gross negligence or willful misconduct; (b) if the holders of the Senior Subordinated Notes are or were determined by the order contemplated by Sections 2.4(c)(i)(B) and 2.4(c)(ii)(B) of either or both of the Alumina Subsidiary Plans to be entitled to a distribution under either or both of the Alumina Subsidiary Plans, acts or omissions of any such person related to or giving rise to the circumstances underlying any of the Contractual Subordination Disputes; or (c) contractual obligations of, or loans owed by, any such person to a Debtor. Nothing in provisions of the Plan described in this paragraph (*i.e.*, Section 4.5(b) of the Plan) will limit in any way the scope or applicability of any PI Channeling Injunction. For purposes of the Plan, "Contractual Subordination Dispute" means any or all of the following matters pending in the jointly administered Reorganization Cases: (a) the adversary proceeding styled *Paul J. Guillot v. Kaiser Aluminum & Chemical Corporation*, Adv. Pro. No. 04-51165 (JKF); (b) the motion Filed by the Senior Subordinated Note Indenture Trustee to determine the classification of the Senior Subordinated Note Claims under any plans of reorganization Filed by the Debtors or the Other Debtors that guaranteed the Senior Subordinated Notes; and (c) the adversary proceeding styled *U.S. Bank National Association v. Kaiser Aluminum & Chemical Corporation*, Adv. Pro. No. 04-55115 (JKF). See

"Operations During the Reorganization Cases — Guaranty Subordination Dispute" and "Operations During the Reorganization Cases — 7-3/4% SWD Revenue Bond Dispute."

### *PBGC Release*

**As of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash, New Common Stock and contracts, instruments, releases and other agreements and documents to be entered into or delivered in connection with the Plan, the PBGC will be deemed to release each Debtor and each other Kaiser Company from any and all claims of or liabilities to the PBGC arising on or before the Effective Date in respect of any pension plans maintained by the Debtors and terminated on or prior to the Effective Date and any related liens on such Debtor's or Kaiser Company's assets, including claims and liens arising under ERISA or under the IRC as a result of such Debtor's or Kaiser Company's status as a member of KACC's "controlled group" within the meaning of ERISA. Notwithstanding any other provision in the Plan, nothing in the Plan will release the claim or claims of PBGC or any pension plan currently or formerly sponsored by KACC against any person (other than any Kaiser Company) for breach of fiduciary duty under ERISA with respect to the pension plans.**

## Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Debtors will assume or assume and assign, as indicated, each Executory Contract and Unexpired Lease listed on Exhibit 6.1.a of the Plan, although the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit 6.1.a of the Plan to (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant to Section 6.1.a of the Plan or (b) add any Executory Contract or Unexpired Lease thereto, thus providing for its assumption or assumption and assignment pursuant to Section 6.1.a of the Plan. The Debtors will provide notice of any amendments to Exhibit 6.1.a of the Plan to the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative, the Future Silica and CTPV Claimants' Representative and the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Reorganization Cases. Each such contract and lease, including those listed on Exhibit 6.1.a of the Plan, will be assumed only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. Listing a contract or lease on Exhibit 6.1.a of the Plan will not constitute an admission by a Debtor or Reorganized Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

Each Executory Contract or Unexpired Lease assumed under the provisions of the Plan described in the immediately preceding paragraph (*i.e.*, Section 6.1.a of the Plan) will include any modifications, amendments, supplements or restatements to such contract or lease, irrespective of whether such modification, amendment, supplement or restatement is listed on Exhibit 6.1.a of the Plan.

As of the effective time of an applicable Restructuring Transaction, any Executory Contract or Unexpired Lease to be held by any Debtor or another surviving, resulting or acquiring corporation in an applicable Restructuring Transaction will be deemed assigned to the applicable entity pursuant to section 365 of the Bankruptcy Code.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such assumptions and assignments, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. An order of the Bankruptcy Court entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed or assumed and assigned pursuant to the Plan of: (a) the contract or lease being assumed or assumed and assigned; (b) the Cure Amount Claim, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; and (c) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section

365(b)(1) of the Bankruptcy Code, at the option of the Debtor assuming such contract or lease or the assignee of such Debtor, if any: (a) by payment of the Cure Amount Claim in Cash on the Effective Date; or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding (a) the amount of any Cure Amount Claim; (b) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption or assumption and assignment of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

On the Effective Date, except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned or rejected by an order of the Bankruptcy Court or that is assumed pursuant to the provisions of the Plan described ~~hereinabove~~ in the first paragraph under "— Executory Contracts and Unexpired Leases" (*i.e.*, Section 6.1.a of the Plan), each Executory Contract or Unexpired Lease that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. Without limiting the foregoing, any agreement entered into prior to the Petition Date by or on behalf of a Debtor with respect to the settlement of any Channeled Personal Injury Claim will be deemed rejected as of the Effective Date to the extent such settlement agreement is deemed to be an executory contract within the meaning of section 365(a) of the Bankruptcy Code and any Claims in respect of such rejection will be treated as a Channeled Personal Injury Claim.

Notwithstanding anything to the contrary in the Bar Date Order, if the rejection of an Executory Contract or Unexpired Lease pursuant to the provisions of the Plan described in the immediately preceding paragraph (*i.e.*, Section 6.3 of the Plan) gives rise to a Claim (including any Claims arising from those indemnification obligations described in Section 6.5.b of the Plan (which is described above under "Reorganized Kaiser — Certain Corporate Governance Matters — Limitation of Liability and Indemnity Arrangements")) by the other party or parties to such contract or lease), such Claim will be forever barred and will not be enforceable against the Debtors, the Reorganized Debtors, the successor of any of them or the property of any of them unless a proof of Claim or request for payment of Administrative Claim is Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order, the notice of the entry of the Confirmation Order or another order of the Bankruptcy Court, no later than 30 days after the Effective Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts or Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**Collective Bargaining Agreements**

The collective bargaining agreements listed on Exhibit 6.1.a to the Plan, as modified and/or amended from time to time, will be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Upon assumption, all proofs of claim filed by the Debtors' unions relating to such collective bargaining agreements will be deemed withdrawn, without prejudice to their pursuit in the ordinary course by the unions and/or individuals and payment or satisfaction in the ordinary course by the Reorganized Debtors of obligations under the assumed collective bargaining agreements.

**Insurance Policies and Agreements**

The Debtors do not believe that the insurance policies issued to, or insurance agreements entered into by, any Debtor prior to the Petition Date constitute executory contracts. To the extent that such insurance policies or agreements are considered to be executory contracts, then, notwithstanding anything contained in Article VI of the Plan (which is described ~~herein under "— Insurance Policies and Agreements"~~ in this paragraph, the next following paragraph and above under "— Executory Contracts and Unexpired Leases") to the contrary, the Plan will constitute a motion to assume such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the