Debtors, their respective Estates and all parties in interest in the Reorganization Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to each such insurance policy or agreement. In accordance with Section 5.1.d(i) of the Plan (which is described above under "PI Trusts and Distribution Procedures — Funding Vehicle Trust — Transfer of ~~Certain Property to the Funding Vehicle Trust — Transfer of Plan Consideration~~Assets and Cooperation with Respect to Insurance Matters"), the rights under the insurance policies and agreements constituting PI Insurance Assets and described in clause (a) of Section 1.1(145) of the Plan (*i.e.*, rights to receive proceeds from Included PI Trust Insurance Policies in respect of Channeled Personal Injury Claims) will, to the extent necessary, be deemed assigned to and assumed by the Funding Vehicle Trust for the benefit of the PI Trusts as of the Effective Date and, pursuant to section 365 of the Bankruptcy Code, no Debtor will have further liability thereunder from and after the Effective Date.

Nothing contained in the Plan will constitute a waiver of any claim, right or cause of action that a Debtor, the Funding Vehicle Trust, any PI Trust or a Reorganized Debtor, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement, except to the extent the insurer is an insurance company listed on Exhibit 1.1(185) to the Plan (as the same may be amended from time to time) and any PI Insurance Company providing coverage under one or more Included PI Trust Insurance Policies that enters into a settlement prior to the conclusion of the Confirmation Hearing that is (a) sufficiently comprehensive in the determination of the Debtors, the Asbestos Claimants' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative to justify treating such company as a Protected Party as to all or certain of the Channeled Personal Injury Claims and (b) approved by the Bankruptcy Court (*i.e.*, a Settling Insurance Company).

### Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan (and subject to Section 4.2 thereof (which is described below under "— Restructuring Transactions")), each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable law. Except as otherwise provided in the Plan (and subject to Section 4.2 thereof), as of the Effective Date, all property of the respective Estates of the Debtors, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in the applicable Reorganized Debtor, free and clear of all Claims, liens, charges, other encumbrances and Interests. On and after the Effective Date, each Reorganized Debtor and any successor thereto may operate its business and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor and any successor thereto may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

### Restructuring Transactions

The Restructuring Transactions will be consummated as contemplated by Exhibit 4.2 to the Plan. See "Reorganized Kaiser — Restructuring Transactions" for a summary of the Restructuring Transactions. In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Debtor or Reorganized Debtor, such surviving, resulting or acquiring corporation will perform or cause to be performed the obligations of the applicable Debtor or Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Debtor or Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition of such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform or cause to be performed such obligations.

### Certificates of Incorporation and Bylaws

#### *Reorganized KAC*

As of the Effective Date, after giving effect to the Restructuring Transactions, the Certificate of Incorporation and the Bylaws of Reorganized KAC will be substantially in the form of Exhibit 4.3.a(i) to the Plan. The Certificate of Incorporation of Reorganized KAC will, among other things, prohibit the issuance of nonvoting

equity securities to the extent required by section 1123(a) of the Bankruptcy Code and will authorize the issuance of New Common Stock in amounts not less than the amounts necessary to permit the distributions thereof required or contemplated by the Plan. After the Effective Date, Reorganized KAC may amend and restate its Certificate of Incorporation or Bylaws as permitted by the DGCL, subject to the terms and conditions of such constituent documents. See "Reorganized Kaiser — Board of Directors," "Reorganized Kaiser — Certain Corporate Governance Matters," ~~and~~ "New Common Stock — General Description of New Common Stock" and "New Common Stock — Restrictions on Transfer — Reorganized KAC's Certificate of Incorporation" for ~~a description~~descriptions of certain provisions of Reorganized KAC's Certificate of Incorporation and Bylaws.

### *Kaiser Trading and Other Reorganized Debtors*

As of the Effective Date, after giving effect to the Restructuring Transactions, the Certificate of Incorporation and the Bylaws of Reorganized Kaiser Trading will be substantially in the form of Exhibit 4.3.a(ii) to the Plan and the Certificate of Incorporation and the Bylaws of each Reorganized Debtor (other than Reorganized KAC and Reorganized Kaiser Trading) will be in such form as the Debtors may determine. The initial Certificates of Incorporation of Reorganized Kaiser Trading and each other Reorganized Debtor will, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code. After the Effective Date or the effective time of any applicable Restructuring Transaction, each such entity may amend and restate its Certificate of Incorporation or Bylaws as permitted by applicable state law, subject to the terms and conditions of such constituent documents.

### Directors and Officers of the Reorganized Debtors

Exhibit 4.3.b of the Plan identifies, for each Reorganized Debtor (other than Reorganized KAC and Reorganized Kaiser Trading), the individuals expected to serve as the initial members of its board of directors, or comparable governing body, and, for each Reorganized Debtor (other than Reorganized Kaiser Trading), the individuals expected to serve as its initial officers. The identity and the initial term of, and such additional information as may be required to be disclosed pursuant to section 1129(a)(5) of the Bankruptcy Code with respect to, the individuals expected to serve as the ten initial members of Reorganized KAC's Board of Directors, one of whom will be the Chief Executive Officer of Reorganized KAC, five of whom will be selected by the Search Committee and four of whom will be designated by the USW, and the identity of the individuals expected to serve as the initial members of the board of directors and initial officers of Reorganized Kaiser Trading, who will be selected jointly by the Asbestos Claimants' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative, will be set forth in a filing with the Bankruptcy Court at least ten days prior to the deadline for filing objections to Confirmation of the Plan to the extent such identities and additional information are then known by the Debtors and, to the extent any such information is not then known by the Debtors, the Debtors will disclose it in a filing with the Bankruptcy Court promptly after it becomes available to the Debtors. Subject to the provisions of the Director Designation Agreement, each member of the board of directors or comparable governing body and officer of each Reorganized Debtor will serve from and after the Effective Date until his or her successor is duly elected and qualified or until his or her earlier death, resignation, disqualification or removal in accordance with the Certificate of Incorporation and Bylaws of such entity and applicable state law. See "Reorganized Kaiser — Board of Directors" and "Reorganized Kaiser — Management" for further information about Reorganized KAC's Board of Directors.

### New Employment, Retirement, Indemnification and Other Related Agreements and Incentive Compensation Programs

As of the Effective Date, the Reorganized Debtors will have authority to: (a) maintain, amend or revise then-existing employment, retirement, welfare, incentive, severance, indemnification and other plans for or agreements with their active and retired directors, officers and employees, subject to the terms and conditions of any such plan or agreement; and (b) enter into new employment, retirement, welfare, incentive, severance, indemnification and other plans for or agreements with active and retired directors, officers and employees, including the Equity Incentive Plan. Exhibit 4.3.c provides a list of the plans for and agreements with active and retired directors, officers and employees that will continue in effect from and after the Effective Date or that will take effect as of the Effective Date. See "Reorganized Kaiser — Management — Executive Compensation" for a description of certain such plans and agreements.

**Transfers of Funds Among the Debtors**

Cash payments to be made pursuant to the Plan will be made by Reorganized KAC, although the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable Reorganized KAC to satisfy its obligations under the Plan.

**Corporate Action**

The following (which will occur and be deemed effective as of the date specified in the documents effectuating the same or, if no date is so specified, the Effective Date) will be deemed authorized and approved in all respects and for all purposes without any requirement of further action by stockholders or directors of any of the Debtors or the Reorganized Debtors or any other person or entity: (i) the implementation of the Restructuring Transactions; (ii) the adoption of new or amended and restated Certificates of Incorporation and Bylaws for the Reorganized Debtors; (iii) the initial selection of the members of the board of directors or comparable governing body and officers for the Reorganized Debtors; (iv) the entry into the Exit Financing Facility; (v) the entry into the Funding Vehicle Trust Agreement, the Asbestos PI Trust Agreement, the CTPV PI Trust Agreement, the NIHL PI Trust Agreement and the Silica PI Trust Agreement; (vi) the distribution of Cash pursuant to the Plan; (vii) the issuance and distribution of New Common Stock pursuant to the Plan; (viii) the issuance or transfer of the PI Trust Assets included in clauses (b) and (d) of Section 1.1(151) of the Plan (*i.e.*, 100% of the equity of Reorganized Kaiser Trading and 75% of the KFC Claim) to the Asbestos PI Trust and the Silica PI Trust in accordance with Sections 5.2 and 5.3 of the Plan, as the case may be (which are described above under "PI Trusts and Distribution Procedures — Asbestos PI Trust — Transfer of Certain Property to the Asbestos PI Trust" and "PI Trusts and Distribution Procedures — Silica PI Trust — Transfer of Certain Property to the Silica PI Trust," respectively); (ix) the transfer of the remaining PI Trust Assets (*i.e.*, the PI Insurance Assets and Cash in the amount of $13 million) to the Funding Vehicle Trust; (x) the adoption, execution, delivery and implementation of all other contracts, leases, instruments, releases and other agreements or documents contemplated by the Plan (including the Director Designation Agreement, the Registration Rights Agreement and Stock Transfer Restriction Agreement); (xi) the adoption, execution and implementation of the plans and agreements described on Exhibit 4.3.c of the Plan, including the Equity Incentive Plan; and (xii) the other matters provided for under the Plan involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by, or required of, any Debtor or Reorganized Debtor.

**Registration Rights Agreement and Stock Transfer Restriction Agreement**

On the Effective Date, Reorganized KAC, the PBGC and the Union VEBA Trust will execute and deliver the Registration Rights Agreement and Stock Transfer Restriction Agreement. See "Applicability of Certain Federal and State Securities Laws — Registration Rights Agreement" and "New Common Stock — Restrictions on Transfer — Stock Transfer Restriction Agreement."

**Cancellation of KAC Old Stock**

On the Effective Date, the KAC Old Stock will be deemed cancelled and of no further force without any further action on the part of any Debtor or Reorganized Debtor.

**Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered or Reinstated in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests or encumbrances of any kind, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns and the former holder thereof will, upon request of any Debtor, execute such documents evidencing such release and discharge as such Debtor may reasonably request.

**Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes**

The Chairman, Chief Executive Officer, President, any Executive Vice President, Chief Financial Officer, Chief Operating Officer, any Senior Vice President or any Vice President of each Debtor or Reorganized Debtor will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements and documents and take such actions as may be necessary, appropriate or desirable to effectuate and implement each provision of the Plan. The Secretary or any Assistant Secretary of each Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146(c) of the Bankruptcy Code, the following will not be subject to a stamp tax, real estate transfer tax, sales or use tax or similar Tax: (a) the issuance, transfer or exchange of New Common Stock and the common stock of Reorganized Kaiser Trading; (b) the creation of any mortgage, deed of trust, lien or other security interest; (c) the making or assignment of any lease or sublease; (d) the execution and delivery of the Exit Financing Facility; (e) any Restructuring Transaction; or (f) the making or delivery of any deed, bill of sale or other instrument of transfer or assignment or any plan of merger, consolidation, liquidation or dissolution under, in furtherance of or in connection with the Plan, including in connection with the funding of the Unsecured Claims Reserve, the Union VEBA Trust or Retired Salaried Employee VEBA Trust, the transfer of the PI Trust Assets to the Funding Vehicle Trust, the Asbestos PI Trust or the Silica PI Trust, as the case may be, or the implementation of any Restructuring Transaction.

**Dissolution of Committees**

Subject to any applicable Bankruptcy Court order, on the Effective Date, the ~~Creditors' Committee, the~~ Asbestos Claimants' Committee and the Retirees' Committee will dissolve, and upon the occurrence of the Effective Date and the effective date with respect to the Alumina Subsidiary Plans, the Creditors' Committee will dissolve, and the members of the Creditors' Committee, the Asbestos Claimants' Committee, and the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative will be released and discharged from all duties and obligations arising from or related to the Reorganization Cases, except that the duties and obligations of the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative will continue after the Effective Date pursuant to any applicable provisions of the PI Trust Agreements and the PI Trust Distribution Procedure, all costs of which will be borne by the applicable PI Trust or the Funding Vehicle Trust. The Professionals retained by the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative, the Future Silica and CTPV Claimants' Representative and the members of such Committees will not be entitled to assert any Professional Fee Claims for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Section 3.1.a(vii)(B)(1) of the Plan (~~which is described above under "Overview of the Plan — Payment of Administrative Claims — Bar Dates for Administrative Claims")~~ and in connection with any appeal of the Confirmation Order. Notwithstanding the foregoing, in the event that appeals in respect of any Contractual Subordination Dispute or the PBGC Settlement Agreement remain pending on the Effective Date, if the Creditors' Committee ~~will~~determines to participate or to continue to participate in either or both appeals post-Effective Date, the Creditors' Committee shall not dissolve until resolution of each such appeal, and the Professionals retained by the Creditors' Committee will be entitled to assert Professional Fee Claims in connection with ~~any~~each such appeal in accordance with the Intercompany Claims Settlement and pursuant to the Plan and the Alumina Subsidiary Plans.

**Canadian Proceeding**

On or prior to the Effective Date, the Debtors will seek the dismissal or termination of the Canadian Proceeding as to each of the Canadian Debtors. See "Operations During the Reorganization Cases — The Additional Debtors and the Canadian Proceeding" for a description of the Canadian Proceeding.

**Certain Provisions Relating to KAC Old Stock Interests**

By operation of Sections 4.6 and 12.1 of the Plan (described above under "— Cancellation of KAC Old Stock" and "— Discharge, Termination and Injunction — Discharge of Claims and Termination of Interests," respectively), on the Effective Date, the KAC Old Stock will be cancelled, all rights of equity security holders with respect thereto will be terminated and, as a consequence, the KAC Old Stock will be

rendered "worthless" within the meaning of section 165(g)(1) of the IRC. MAXXAM will therefore only be entitled to claim a loss under section 165(g)(1) of the IRC for their tax year in which the Effective Date occurs, and will not be entitled to assert, and will be barred from asserting, ~~such loss for any tax year prior to the beginning of such tax year. Additionally, MAXXAM will be barred from taking any other action in respect of KAC Old Stock that would impair or jeopardize in any way the ability of any Reorganized Debtor or successor thereto to utilize any Tax attributes of such Reorganized Debtor, its successor or its consolidated group that are in existence as of~~ any loss with respect to the KAC Old Stock for any time prior to the Effective Date. This provision will supersede in all respects the Stipulation and Agreed Order Regarding Motion of Debtors and Debtors-in-Possession for an Order Prohibiting Disposition of Kaiser Aluminum Corporation Stock Without Prior Bankruptcy Court Approval, entered July 23, 2002, which, on the Effective Date, will be deemed vacated and of no further force or effect. See "Operations During the Reorganization Cases — Stipulation and Agreed Order with MAXXAM."

## Effect of Plan on Certain Indentures

On the Effective Date, the 9-7/8% Senior Note Indenture and the 10-7/8% Senior Note Indentures will be deemed cancelled and discharged (a) with respect to all obligations owed to and obligations owed by any Debtor and (b) except to the extent provided herein below, with respect to the respective rights and obligations of the Indenture Trustees under such Indentures and the holders of Senior Note Claims. Solely for purposes of the provision of the Plan described clause (b) above, the following rights of each such Indenture Trustee will remain in effect after the Effective Date: (i) rights as trustee, paying agent and registrar, including but not limited to any rights to payment of fees, expenses and indemnification obligations from property held or obtained by such Indenture Trustee in accordance with the applicable Indenture; (ii) rights relating to distributions to be made to the holders of the Senior Notes by such Indenture Trustee from any source, including distributions under the Plan and the Alumina Subsidiary Plans; (iii) rights relating to representation of the interests of the holders of the Senior Notes by such Indenture Trustee in the Reorganization Cases, the Alumina Subsidiary Debtors' bankruptcy cases, the Contractual Subordination Disputes and any proceedings and appeals related to the Contractual Subordination Disputes (see "Operations During the Reorganization Cases — Guaranty Subordination Dispute" and "Operations During the Reorganization Cases — 7-3/4% SWD Revenue Bond Dispute"), and any claim or cause of action related to any of the foregoing, to the extent not discharged or released by the Plan or the Alumina Subsidiary Plans; and (iv) rights relating to participation by such Indenture Trustee in all proceedings and appeals related to Plan and the Alumina Subsidiary Plans. Notwithstanding the continued effectiveness of such rights after the Effective Date, such Indenture Trustee will have no obligation to object to Claims against the Debtors or to locate certificated holders of Senior Notes who fail to surrender their Senior Notes in accordance with Section 7.11 of the Plan (which is described below under "Distributions Under the Plan — Surrender of Cancelled Instruments"). Further, nothing in the Plan or the Confirmation Order, including the cancellation and discharge of the 9-7/8% Senior Note Indenture and 10-7/8% Senior Note Indentures as provided above, (A) will operate to release any claims of the Indenture Trustees under such Prepetition Indentures or the holders of Senior Notes against any person other than the Debtors, except to the extent set forth in Section 4.5.b of the Plan (which is described above under "— Releases — General Release"); (B) will affect the relative seniority of the Senior Notes to the Senior Subordinated Notes; or (C) will adversely affect, limit or impair any rights that such Indenture Trustees or holders of the Senior Notes have with respect to the Alumina Subsidiary Debtors, including the right to enforce the subordination provisions in such Prepetition Indentures.

Further, nothing in the Plan or the Confirmation Order (a) will operate to release any claims of the 7-3/4% SWD Revenue Bond Indenture Trustee or the holders of 7-3/4% SWD Revenue Bonds against any person other than the Debtors, except to the extent set forth in Section 4.5.b of the Plan (which is described above under "— Releases — General Release"), or (b) will adversely affect, limit or impair any rights that the 7-3/4% SWD Revenue Bond Indenture Trustee or holders of the 7-3/4% SWD Revenue Bonds have with respect to the 7-3/4% SWD Revenue Bond Settlement or the Contractual Subordination Disputes (see "Operations During the Reorganization Cases — Guaranty Subordination Dispute" and "Operations During the Reorganization Cases — 7-3/4% SWD Revenue Bond Dispute").

Nothing in the provisions of the Plan described in this and the two preceding paragraphs (*i.e.*, Section 4.12 of the Plan) will affect the Debtors' obligations under the Plan or the obligations and rights of any Indenture Trustee under Sections 7.3 and 7.5.a(ii) of the Plan (which are described below under "Distributions Under the Plan —

Compensation and Reimbursement for Services Related to Distributions" and "Distributions Under the Plan —
Delivery of Distributions and Undeliverable or Unclaimed Distributions — Delivery of Distributions," respectively).

**Modification or Revocation of the Plan**

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code the Debtors or
the Reorganized Debtors, as the case may be, reserve the right to alter, amend or modify the Plan before its
substantial consummation with the consent of the Creditors' Committee, the Asbestos Claimants' Committee, the
Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants'
Representative. In the event the Retirees' Committee fails to consent and all other such consents have been given,
such alteration, amendment or modification may be made pursuant to an order of the Bankruptcy Court.

The Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the
Confirmation Date. If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if Confirmation as
to a Debtor does not occur, then, with respect to any such Debtor, the Plan will be null and void in all respects, and
nothing contained in the Plan will (a) constitute a waiver or release of any claims by or against, or any Interests in,
such Debtor or (b) prejudice in any manner the rights of such Debtor or any other party.

## DISTRIBUTIONS UNDER THE PLAN

### Distributions for Claims Allowed as of the Effective Date

#### *Distributions to Be Made on the Effective Date*

Except as otherwise provided in Article VII of the Plan (which is described ~~herein~~in this paragraph and below under "— Distributions ~~for Claims Allowed as of~~on the Effective Date in Respect of Class 9 Unsecured Claims"), distributions to be made on the Effective Date to holders of Claims, other than Channeled Personal Injury Claims, that are allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as is practicable, but in any event no later than 60 days after the Effective Date unless (a) such Claim is a Cure Amount Claim associated with an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan about which there is dispute, in which case the payment on account of such Claim will be made in accordance with Section 6.2 of the Plan (which is described above under "General Information Concerning the Plan — Executory Contracts and Unexpired Leases"), (b) such Claim is returned to a Disbursing Agent as undeliverable, in which case the payment on account of such Claim will be made in accordance with Section 7.5.b of the Plan (which is described below under "— Delivery of Distributions and Undeliverable or Unclaimed Distributions — Undeliverable Distributions Held by Disbursing Agents"), or (c) such Claim arises under a Public Note or a Prepetition Indenture, in which case such Claim will not be paid until the instruments, securities and other documentation evidencing such Claim, to the extent not held in book entry form, are received by the applicable Disbursing Agent in accordance with Section 7.11 of the Plan (which is described below under "— Surrender of Cancelled Securities"). Distributions on account of Channeled Personal Injury Claims will be made in accordance with the provisions of the applicable PI Trust Agreement and PI Trust Distribution Procedures. See "PI Trusts and Distribution Procedures — PI Trust Distribution Procedures."

#### *Distributions on the Effective Date in Respect of Class 9 Unsecured Claims*

From and after the Effective Date, New Common Stock to be distributed on account of Class 9 Claims (and any Cash or other distributions thereon) (a) will be maintained by and in the name of the applicable Disbursing Agent in the Unsecured Claims Reserve and held in trust pending distribution by the Disbursing Agent for the benefit of the holders of such Claims, (b) will be accounted for separately, and (c) will not constitute property of any of the Reorganized Debtors. New Common Stock to be issued and distributed on account of Class 9 Claims will be deemed issued on the Effective Date, irrespective of the date on which it actually is distributed.

### Method of Distributions to Holders of Claims

Other than with respect to Class 5, Class 6, Class 7 and Class 8 Claims, Reorganized KAC, or such Third Party Disbursing Agents as Reorganized KAC may employ in its sole discretion, will make all distributions required under the Plan. Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by the Plan. Distributions on account of Class 5, Class 6, Class 7 and Class 8 will be made by the trustees of such trust in accordance with the provisions of the applicable PI Trust Agreement and PI Trust Distribution Procedures. See "PI Trusts and Distribution Procedures — PI Trust Distribution Procedures."

### Compensation and Reimbursement for Services Related to Distributions

Each Third Party Disbursing Agent providing services related to distributions pursuant to the Plan will receive from Reorganized KAC, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services. These payments will be made on terms agreed to with Reorganized KAC and will not be deducted from distributions to be made pursuant to the Plan to holders of Allowed Claims (including any distributions of Cash Investment Yield) receiving distributions from a Third Party Disbursing Agent. Notwithstanding the foregoing, each Indenture Trustee acting as a Third Party Disbursing Agent will retain its rights under any charging lien with respect to any such amounts not agreed to be paid by Reorganized KAC under the provisions of the Plan described in this paragraph (*i.e.*, Section 7.3).

**Unsecured Claims Reserve**

On the Effective Date, the Reserved Shares will be placed in the Unsecured Claims Reserve by Reorganized KAC for the benefit of holders of Allowed Claims in Class 9. See "Overview of the Plan — Classes and Treatment of Claims and Interests" for a description of the number of shares of New Common Stock to be deposited in the Unsecured Claims Reserve.

Any cash distributions on account of New Common Stock held in the Unsecured Claims Reserve will be transferred to the Unsecured Claims Reserve concurrently with the transfer of such distributions to other holders of New Common Stock. Cash held in the Unsecured Claims Reserve as a result of such distributions (a) will be deposited in a segregated bank account in the name of the Disbursing Agent and held in trust pending distribution by the Disbursing Agent for the benefit of holders of Class 9 Claims, (b) will be accounted for separately, and (c) will not constitute property of the Reorganized Debtors. The Disbursing Agent will invest the Cash held in such Unsecured Claims Reserve in a manner consistent with the Reorganized Debtors' investment and deposit guidelines. The Disbursing Agent will also place in such Unsecured Claims Reserve the Cash Investment Yield from such investment of Cash.

Each holder of an Allowed Claim (including a Disputed Claim that ultimately becomes an Allowed Claim) in Class 9 entitled to a distribution in respect thereof under the Plan will have recourse only to the undistributed New Common Stock and/or Cash held in the Unsecured Claims Reserve for satisfaction of the distributions, if any, to which holders of Allowed Class 9 Claims are entitled under the Plan, and not to any Reorganized Debtor, its property or any assets previously distributed on account of any Allowed Claim.

Pending the distribution of any New Common Stock, the applicable Disbursing Agent will cause all of the New Common Stock held by it in its capacity as Disbursing Agent to be (a) represented in person or by proxy at each meeting of the stockholders of Reorganized KAC, (b) voted in any election of directors of Reorganized KAC for the nominees recommended by Reorganized KAC's Board of Directors, and (c) voted with respect to any other matter as recommended by Reorganized KAC's Board of Directors.

**Delivery of Distributions and Undeliverable or Unclaimed Distributions**

*Delivery of Distributions*

Except as provided in the provisions of the Plan described in the next paragraph (*i.e.*, Section 7.5.a(ii) of the Plan), any distribution on account of an Allowed Claim will be made by the applicable Disbursing Agent to the holder of such Claim as of the Distribution Record Date: (a) at the address set forth on the proof of Claim Filed by holder of such Claim; (b) at the address set forth in any written certification of address change delivered to the Disbursing Agent (including pursuant to a letter of transmittal delivered to a Disbursing Agent) after the date of Filing of any related proof of Claim; or (c) at the address reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address.

Subject to the requirements of Section 7.11 of the Plan (which is described below under "— Surrender of Cancelled Securities"), any distribution to a holder of an Allowed Public Note Claim will be made by the applicable Disbursing Agent to the applicable Indenture Trustee for subsequent distribution to the holder of such Public Note Claim as of the Distribution Record Date in accordance with and subject to the applicable Prepetition Indenture, including any terms relating to enforcement of any such Indenture Trustee's charging lien. No later than the Effective Date, each Indenture Trustee (other than the Senior Subordinated Note Indenture Trustee and the 6-1/2% RPC Revenue Bond Indenture Trustee) will deliver to Reorganized KAC a copy of the registry book maintained by such Indenture Trustee listing the record holders of the applicable Public Notes as of the Distribution Record Date and setting forth their respective holdings and contact information, as the same is maintained by such Indenture Trustee in the ordinary course of business. Unless otherwise agreed by Reorganized KAC and the applicable Indenture Trustee, no later than five Business Days following the Effective Date, Reorganized KAC will request from each clearing agency and each broker, dealer or other entity known to hold securities in nominee name that is shown on the registry book furnished by such Indenture Trustee information necessary to determine, as of the Distribution Record Date, the number of beneficial holders, and the aggregate principal amount of applicable Public Note Claims held by each such beneficial holder, qualified for treatment in Class 2, together with appropriate certifications of each participant in such clearing agency and each other appropriate broker, dealer or other entity

that holds Public Notes of the applicable series on behalf of a beneficial owner and such other supporting information as Reorganized KAC may reasonably request. As to each series of Public Notes eligible for treatment in Class 2, the holders of Public Note Claims entitled to such treatment will be determined by Reorganized KAC solely based on such information, if any, that is provided to Reorganized KAC by the applicable Indenture Trustees and in response to the requests made in accordance with the immediately preceding sentence on or before the date that is 25 Business Days following the Effective Date; to the extent any such information is not so provided by such date as to any holder of a Public Note the affected holder will be ineligible for Class 2 treatment and will be treated solely as provided in Class 9. Reorganized KAC will promptly furnish to the applicable Indenture Trustee a copy of the information received by Reorganized KAC in response to the requests made in accordance with the second preceding sentence for the applicable series of Public Notes. The Debtors and each Third Party Disbursing Agent, including the applicable Indenture Trustees, will be entitled to rely conclusively upon information received by Reorganized KAC as contemplated by the provisions of the Plan described in this paragraph (*i.e.,* Section 7.5.a(ii) of the Plan), for all purposes of the Plan. Distributions will be made to the applicable Indenture Trustee as promptly as practicable after the date that is 30 Business Days following the Effective Date. For purposes of making any calculations required under Section 7.8.b(i) of the Plan (which is described below under "— Timing and Calculation of Amounts To Be Distributed — Allowed Claims in Class 9"), prior to the date that is 30 Business Days following the Effective Date, such calculations will assume that all Public Note Claims in respect of the applicable series of Public Notes will be treated as Class 9 Claims. Each Indenture Trustee (other than the Senior Subordinated Note Indenture Trustee) will be entitled to compensation and reimbursement in its capacity as Third Party Disbursing Agent as contemplated by Section 7.3 of the Plan (which is described above under "— Compensation and Reimbursement for Services Related to Distributions").

On each Quarterly Distribution Date or as promptly thereafter as is practicable, the applicable Disbursing Agents will make all distributions that become deliverable to holders of Disputed Claims that have become Allowed Claims during the immediately preceding calendar quarter. Each Quarterly Distribution Date will be on the last Business Day of the month following the end of each calendar quarter after the Effective Date, although, if the Effective Date is within 45 days of the end of a calendar quarter, the first Quarterly Distribution Date will be the last Business Day of the month following the end of the first calendar quarter after the calendar quarter in which the Effective Date falls.

### *Undeliverable Distributions Held by Disbursing Agents*

If any distribution to a holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, then unless and until the applicable Disbursing Agent is notified in writing of such holder's then-current address: (a) subject to the provisions of the Plan described in the second following paragraph (*i.e.,* Section 7.5.b(iii) of the Plan), such undeliverable distributions will remain in the possession of the applicable Disbursing Agent and no further attempt will be made to deliver such distribution; and (b) no attempt will be made to deliver subsequent distributions to such holder and any such distribution that such holder would otherwise be entitled to receive instead will be deemed undeliverable and remain in the possession of the applicable Disbursing Agent. Undeliverable New Common Stock and Cash (including distributions on account of undeliverable New Common Stock) will be held by the applicable Disbursing Agent in a book-entry sub-account, for the benefit of such holder. The applicable Disbursing Agent will invest undeliverable Cash held in any such book-entry sub-account in a manner consistent with the Reorganized Debtors' investment and deposit guidelines, and any Cash Investment Yield generated from such investment activities will be held in such book-entry sub-account for the benefit of such holder. Subject to the provisions of the Plan described in the next following paragraph (*i.e.,* Section 7.5.b(ii) of the Plan), when such holder notifies the applicable Disbursing Agent in writing of its then-current address, the applicable Disbursing Agent will deliver to such holder all New Common Stock and Cash contained in such book-entry sub-account (net of provision for Taxes).

Any holder of an Allowed Claim (other than a Channeled Personal Injury Claim) that does not assert a claim for an undeliverable distribution by delivering to the applicable Disbursing Agent a written notice setting forth such holder's then-current address within two years after the later of (a) the Effective Date and (b) the last date on which a distribution was deliverable to such holder will have its claim for such undeliverable distribution discharged and will be forever barred from asserting any such claim against the Reorganized Debtors or the property of any of them, whereupon all New Common Stock and Cash contained in the book-entry sub-account created for the benefit of such holder will be redistributed to holders of Allowed Claims in Class 9. For purposes of any such

redistribution, each Allowed Claim in respect of which a claim for an undeliverable distribution has been discharged as described in this paragraph will be deemed disallowed in its entirety.

Nothing contained in the Plan will require any Debtor, Reorganized Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim.

**Distribution Record Date**

A Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the Distribution Record Date.

As of the Distribution Record Date, each transfer register for the Public Notes, as maintained by the Debtors or an Indenture Trustee, will be closed. Neither the applicable Disbursing Agent nor the applicable Indenture Trustee will have any obligation to recognize the transfer or sale of any Public Note Claim that occurs after the Distribution Record Date and each will be entitled for all purposes herein to recognize and make distributions only to those holders of Public Note Claims who are holders of such Claims as of the Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

The provisions of the Plan described ~~herein under " — Distribution Record Date"~~ in this and the three preceding paragraphs (*i.e.*, Section 7.6 of the Plan) are not applicable to Channeled Personal Injury Claims."

**Means of Cash Payments**

Except as otherwise specified in the Plan, Cash payments made pursuant to the Plan will be in United States currency by checks drawn on a domestic bank selected by the applicable Debtor or Reorganized Debtor or, at the option of the applicable Debtor or Reorganized Debtor, by wire transfer from a domestic bank, although Cash payments to foreign holders of Allowed Claims may be made, at the option of the applicable Debtor or Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. If a check included in a distribution to a holder of an Allowed Claim is not cashed within 180 days of the issuance thereof, the Disbursing Agent will void such check and such distribution will be treated as undeliverable in accordance with Section 7.5.b of the Plan (which is described above under "— Delivery of Distributions and Undeliverable or Unclaimed Distributions — Undeliverable Distributions Held by Disbursing Agents").

**Timing and Calculation of Amounts To Be Distributed**

### *Allowed Claims in Classes Other Than Classes 5, 6, 7, 8 or 9*

Subject to Section 7.1 of the Plan (which is described above under "— Distributions for Claims Allowed as of the Effective Date"), on the Effective Date, each holder of an Allowed Claim in a Class other than Class 5, Class 6, Class 7, Class 8 or Class 9 will receive the full amount of the distribution to which a holder of an Allowed Claim in the applicable Class is entitled in accordance with Section 3.3 of the Plan (which is described above under "Overview of the Plan — Classes and Treatment of Claims and Interests — Summary Classification and Treatment Table"). On each Quarterly Distribution Date or as promptly thereafter as is practicable, distributions will be made, pursuant to Section 8.4 of the Plan (which is described below under "— Distributions on Account of Disputed Claims Once They Are Allowed"), to holders of Disputed Claims in any such Class that were allowed during the immediately preceding calendar quarter. Such distributions will also be in the full amount that the Plan provides for Allowed Claims in the applicable Class.

### Allowed Claims in Class 9

On the Effective Date or as promptly thereafter as is practicable, the applicable Disbursing Agent will make distributions to holders of Class 9 Claims allowed as of the Effective Date from the Unsecured Claims Reserve in accordance with Section 3.3(g) of the Plan (which is described above under "Overview of the Plan — Classes and Treatment of Claims and Interests — Summary Classification and Treatment Table"). The amount of such distributions will be calculated as if each then-unresolved Disputed Claim in Class 9 were an Allowed Claim in its Face Amount. The Face Amount of any such Disputed Claim is: (i) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (ii) if no proof of Claim has been filed by the Bar Date or has otherwise been deemed timely Filed under applicable law, or if the proof of Claim specified an unliquidated amount, the amount of the Claim (a) acknowledged by the applicable Debtor in any objection Filed to such Claim or in the Schedules as an undisputed, noncontingent and liquidated Claim, (b) estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) proposed by the applicable Debtor and approved by the Creditors' Committee prior to the Effective Date; or (iii) if neither (i) nor (ii) above are applicable, an amount estimated by the applicable Debtor so long as such estimated amount is not less than either (a) any amount of such Claim as estimated by the Bankruptcy Court or (b) the liquidated portion of the amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law.

On each Quarterly Distribution Date or as promptly thereafter as practicable, the applicable Disbursing Agent will distribute to each holder of a Claim in Class 9 allowed prior to such Quarterly Distribution Date a distribution from the Unsecured Claims Reserve in an amount equal to: (a) the number of shares of New Common Stock that such holder would have been entitled to receive pursuant to the provisions of the Plan described ~~herein~~ in the ~~first~~immediately preceding paragraph ~~under " Allowed Claims in Class 9"~~ (*i.e.*, Section 7.8.b(i) of the Plan) if such Claim and each other Claim in Class 9 allowed prior to such Quarterly Distribution Date had been an Allowed Claim as of the Effective Date (with the amount of such distribution to be calculated in the manner described in Section 7.8.b(i) of the Plan including any additional distribution to a holder of a Senior Note Claim or a holder of a 7-3/4% SWD Revenue Bond Claim required pursuant to the second sentence of Section 3.3(g) of the Plan (which is described above in the summary of the treatment of Class 9 Claims contained in the table under "Overview of the Plan — Classes and Treatment of Claims and Interests — Summary Classification and Treatment Table")) minus (b) the aggregate number of shares of New Common Stock previously distributed on account of such Claim.

### Distributions of New Common Stock

Each distribution of New Common Stock will include, to the extent applicable, (a) Cash or other distributions previously paid to the Disbursing Agent on account of any New Common Stock included in such distribution and (b) any Cash Investment Yield generated from the investment of such distributions (net of provision for Taxes).

Notwithstanding any other provision of the Plan, pursuant to the provisions of the Plan described in this paragraph (*i.e.*, Section 7.8.c(ii) thereof) only whole numbers of shares of New Common Stock will be issued and distributed. When any distribution on account of an Allowed Claim would otherwise result in the issuance and distribution of a number of shares of New Common Stock that is not a whole number, the number of shares to be issued and distributed will be rounded to a whole number on an equitable basis to be determined by the applicable Disbursing Agent in order to ensure that all such shares are issued and distributed and are so issued and distributed only in whole numbers. No consideration will be provided in lieu of fractional shares that are rounded down.

### Compliance with Tax Requirements

To the extent applicable, each Disbursing Agent will comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. Each Disbursing Agent will be authorized to take any actions that it determines, in its reasonable discretion, to be necessary, appropriate or desirable to comply with such withholding and reporting requirements, except that, notwithstanding the foregoing or any other provision of the Plan, each entity receiving a distribution of New Common Stock or Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of such distribution, including withholding obligations. If the Disbursing Agent determines that

withholding is required with respect to a distribution of New Common Stock to be made on account of any Claim, the holder of such Claim will have the option of (i) paying to the Disbursing Agent an amount of Cash equal to the amount of such withholding (for remission by the Disbursing Agent to the appropriate taxing authority) or (ii) subject to any applicable restrictions on transfer, entering into arrangements satisfactory to the Disbursing Agent for (a) the sale of that number of shares of New Common Stock otherwise to be distributed to such holder sufficient to generate net Cash proceeds which, together with any Cash otherwise to be distributed to such holder, are sufficient to fund the payment of any such withholding and (b) the payment to the Disbursing Agent of an amount of Cash equal to the amount of such withholding (for remission by the Disbursing Agent to the appropriate taxing authority).

### NLRB Claims

Distributions pursuant to the Plan on account of any Claim in Class 9 held by the NLRB will be distributed in accordance with the provisions of Article VII of the Plan (which is described herein under "Distributions Under the Plan") and such other procedures as may be agreed by the NLRB, the USW and the Debtors. See "Operations During the Reorganization Cases — Certain Other Litigation and Settlements During the Reorganization Cases — Unfair Labor Practice Settlement."

### Application of Distributions

To the extent applicable, all distributions to a holder of an Allowed Claim will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full; any remaining portion of such distribution will then be deemed to apply to any interest accrued on such Claim prior to the Petition Date included in such Claim.

### Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Reorganized Debtors or, as instructed by the applicable Reorganized Debtor, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of such Allowed Claim, although neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claims, rights and causes of action that the Debtor or Reorganized Debtor may possess against such a Claim holder, which are preserved under the Plan.

### Surrender of Cancelled Securities

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by certificated notes or other certificated securities (other than certificated securities in global form held in the name of CEDE & Co. as nominee for the Depository Trust Company and in the custody of CEDE & Co., the Depository Trust Company or an Indenture Trustee), the holder of such Claim must tender the certificate representing the applicable notes or other securities evidencing such Claim to the applicable Disbursing Agent, together with any letter of transmittal required by such Disbursing Agent. Pending such surrender, any distributions pursuant to the Plan on account of any such Claim will be treated as an undeliverable distribution pursuant to Section 7.5.b of the Plan (which is described above under "— Delivery of Distributions and Undeliverable or Unclaimed Distributions — Undeliverable Distributions Held by Disbursing Agents").

Except as provided in the provisions of the Plan described in the following paragraph (*i.e.*, Section 7.11.b of the Plan) for lost, stolen, mutilated or destroyed Public Note certificates, to the extent such Public Notes are held in certificated form, each holder of a Public Note Claim based on Public Notes must tender the certificate representing the applicable Public Notes (other than certificates representing securities in global form held in the name of CEDE & Co. as nominee for the Depository Trust Company and in the custody of CEDE & Co., the Depository Trust Company or an Indenture Trustee), to the applicable Disbursing Agent in accordance with a letter of transmittal to be provided to such holders by the applicable Indenture Trustee as promptly as practicable

following the Effective Date or, in the case of 6-1/2% RPC Revenue Bonds held in unregistered bearer form, in accordance with such procedures as may be determined by the 6-1/2% RPC Revenue Bond Trustee to be appropriate under the 6-1/2% RPC Revenue Bond Indenture. Each such letter of transmittal will include, among other provisions, customary provisions with respect to the authority of the holder of the applicable Public Notes to act and the authenticity of any signatures required thereon. All certificates representing Public Notes so surrendered will be marked as cancelled and delivered to Reorganized KAC.

Any holder of an Allowed Public Note Claim with respect to which the certificate representing the underlying Public Note has been lost, stolen, mutilated or destroyed must, in lieu of surrendering such Public Note certificate, deliver to the applicable Disbursing Agent: (a) evidence satisfactory to the Disbursing Agent of the loss, theft, mutilation or destruction; and (b) such security or indemnity as may be required by the Disbursing Agent to hold the Disbursing Agent and the Reorganized Debtors, as applicable, harmless from any damages, liabilities or costs incurred in treating such individual as a holder of a Public Note. Upon compliance with the provisions of the Plan described in this paragraph (*i.e.*, Section 7.11.b of the Plan) by a holder of an Allowed Public Note Claim, such holder will, for all purposes under the Plan, be deemed to have surrendered the certificate representing the applicable Public Note.

Each holder of a Public Note Claim based on coupons appertaining to 6-1/2% RPC Revenue Bonds must tender the applicable coupons to the 6-1/2% RPC Revenue Bond Indenture Trustee in accordance with such procedures as may be determined by the 6-1/2% RPC Revenue Bond Indenture Trustee to be appropriate under the 6-1/2% RPC Revenue Bond Indenture. All coupons so surrendered will be marked cancelled and delivered to Reorganized KAC.

Any holder of an Allowed Public Note Claim required by the provisions of the Plan described ~~herein under "  Surrender of Cancelled Securities"~~ in this and the four preceding paragraphs (*i.e.*, Section 7.11 of the Plan) to surrender a Public Note or a coupon appertaining to a 6-1/2% RPC Revenue Bond that fails to surrender or be deemed to have surrendered the applicable Public Notes or coupons within two years after the Effective Date will have its right to distributions pursuant to the Plan on account of such Public Note Claim discharged and will be forever barred from asserting any such Claim against the Reorganized Debtors or their respective property. In such case, any Cash or New Common Stock held for distribution on account of such Public Note Claim will be treated in accordance with the provisions set forth in Section 7.5.b(ii) of the Plan (which is described above under "— Delivery of Distributions and Undeliverable or Unclaimed Distributions — Undeliverable Distributions Held by Disbursing Agents").

**Special ~~Provision~~Provisions Relating to Environmental Matters**

### *Special Provisions Relating to Environmental Settlement Agreement*

Reorganized KAC will make, or cause to be made, any distributions required to be made under the Environmental Settlement Agreement in respect of Additional Sites (as such term is defined therein). See "Operations During the Reorganization Cases — Certain Other Litigation and Settlements During the Reorganization Cases — Environmental Settlement Agreement."

### *Special Provision Relating to Payments and Obligations Under Environmental Laws*

Reorganized KAC will guarantee in respect of properties, facilities or sites owned by a Reorganized Debtor as of the Effective Date (a) the payment by each Reorganized Debtor of any amounts that may ultimately be required to be paid by it in respect of claims under Environmental Laws of governmental units and (b) the performance by each Reorganized Debtor of any obligations that it may ultimately be required to perform by any governmental unit under Environmental Laws. Governmental units enforcing Environmental Laws shall have the right to enforce Reorganized KAC's guarantees under the provisions of the Plan described in this paragraph (*i.e.*, Section 7.12(b)), which enforcement may be sought in the Bankruptcy Court or in any court with jurisdiction in accordance with applicable non-bankruptcy law. For purposes of Section 7.12(b) of the Plan, the term "Environmental Laws" shall mean all laws relating to pollution or protection of human health or the environment, including laws relating to releases or threatened releases of hazardous materials, wastes or substances, pollutants, contaminants, radiological materials or oils or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, release, disposal, transport or handling of hazardous materials, wastes or substances, pollutants,

contaminants, radiological materials or oils and including but not limited to laws relating to natural resource damages, decontamination, decommissioning and voluntary remediation programs.

**Prosecution of Objections to Claims**

All objections to Claims, other than Channeled Personal Injury Claims, which will be resolved pursuant to the terms of the applicable PI Trust Distribution Procedures (see "PI Trusts and Distribution Procedures — PI Trust Distribution Procedures"), must be Filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections will be served on the parties on the then-applicable service list in the Reorganization Cases. If an objection has not been Filed to a proof of Claim or a scheduled Claim other than Channeled Personal Injury Claims by the Claims Objection Bar Date, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier. An objection is deemed to have been timely Filed as to all Tort Claims, thus making each Tort Claim a Disputed Claim as of the Claims Objection Bar Date. Each such Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim in accordance with Section 1.1(27) of the Plan, if ever. The Claims Objection Bar Date with respect to any Claim is the latest of: (a) 120 days after the Effective Date; (b) 60 days after the Filing of a proof of Claim for such Claim; and (c) such other period of limitation as may be specifically fixed by the Plan, the Confirmation Order or a Final Order.

After the Confirmation Date, only the Debtors or the Reorganized Debtors will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, other than Channeled Personal Injury Claims, which will be resolved pursuant to the terms of the applicable PI Trust Distribution Procedures (see "PI Trusts and Distribution Procedures — PI Trust Distribution Procedures"), including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court. After the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim, other than Channeled Personal Injury Claims, which will be resolved pursuant to the terms of the applicable PI Trust Distribution Procedures, without approval of the Bankruptcy Court. This grant of authority to the Debtors and Reorganized Debtors will not limit the right of the US Trustee or any other party in interest to object to Professional Fee Claims as contemplated by Section 3.1.a(vii)(B)(1) of the Plan (which is described above under "Overview of the Plan — Payment of Administrative Claims — Bar Dates for Administrative Claims").

**Liquidation and Payment of Tort Claims**

At the Debtors' or, after the Effective Date, the Reorganized Debtors' option, any unliquidated Tort Claim as to which a proof of Claim was timely Filed in the Reorganization Cases will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction. The Debtors and the Reorganized Debtors may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing the holder of such Claim that the Debtor or Reorganized Debtor has exercised such option. Upon the Debtor's service of such notice, the automatic stay provided under section 362 of the Bankruptcy Code will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s). Notwithstanding the foregoing, at all times prior to or after the Effective Date, the Bankruptcy Court will retain jurisdiction relating to Tort Claims, including the Debtors' right to have such Claims determined and/or liquidated in the Bankruptcy Court (or the District Court) pursuant to Section 157(b)(2)(b) of title 28 of the United States Code, as may be applicable). Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with the provisions of the Plan described in this paragraph (*i.e.*, Section 8.2 of the Plan) and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim in Class 9 against the applicable Debtor in such liquidated amount, provided that only the amount of such Allowed Claim that is less than or equal to the Debtor's self-insured retention or deductible in connection with the applicable insurance policy and is not satisfied from proceeds of insurance payable to the holder of such Allowed Claim under the Debtors' insurance policies will be treated as an Allowed Claim for the purposes of distributions under the Plan. In no event will a distribution be made under the Plan to the holder of a Tort Claim on account of any portion of an Allowed Claim in excess of the applicable Debtor's deductible or self-insured retention under any applicable insurance policy. In the event a Tort Claim is determined and liquidated pursuant to a judgment or order that is obtained in accordance with Section 8.2 of the Plan and is no longer appealable or subject to review, and applicable non-bankruptcy law provides for no recovery against the applicable Debtor, such Tort Claim will be deemed

expunged without the necessity for further Bankruptcy Court approval upon the applicable Debtor's service of a copy of such judgment or order upon the holder of such Tort Claim. Nothing contained in the Plan will constitute or be deemed a waiver of any claim, right or cause of action that a Debtor may have against any person or entity in connection with or arising out of any Tort Claim, including but not limited to any rights under Section 157(b)(5) of title 28 of the United States Code.

**Treatment of Disputed Claims**

Notwithstanding any other provision of the Plan, pursuant to the provisions of the Plan described in this paragraph (*i.e.,* Section 8.3 ~~thereof~~of the Plan) no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever. In lieu of distributions under the Plan to holders of Disputed Claims in Class 9, the Unsecured Claims Reserve will be established on the Effective Date to hold property for the benefit of those Claim holders, as well as holders of Allowed Claims in Class 9 entitled to a distribution in respect thereof.

**Distributions on Account of Disputed Claims Once They Are Allowed**

On each Quarterly Distribution Date or as promptly thereafter as is practicable, the applicable Disbursing Agent will make all distributions on account of any Disputed Claim that has become an Allowed Claim during the immediately preceding calendar quarter. Such distributions will be made in accordance with the provisions of the Plan governing the applicable Class, including the incremental distribution provisions set forth in Section 7.8.b of the Plan (which is described above under "— Timing and Calculation of Amounts To Be Distributed — Allowed Claims in Class 9").

**Tax Requirements for Income Generated by Unsecured Claims Reserve**

The recovery of holders of Allowed Claims in Class 9 consists of the treatment set forth in the Plan and the post-Effective Date interest on the Cash held in the Unsecured Claims Reserve, if any, at a rate determined by the Cash Investment Yield. Reorganized KAC will include in its Tax returns all items of income, deduction and credit of the Unsecured Claims Reserve, although no distribution will be made to the applicable Reorganized Debtor out of the Unsecured Claims Reserves as a result of this inclusion. The Disbursing Agent will pay, or cause to be paid, out of the funds held in the applicable Unsecured Claims Reserve, any Tax imposed on the Unsecured Claims Reserve (as opposed to the Reorganized KAC or the holders of Allowed Claims in Class 9) by any governmental unit with respect to income generated by the funds and New Common Stock held in the Unsecured Claims Reserve. The Disbursing Agent will also file or cause to be filed any Tax or information return related to the Unsecured Claims Reserve that is required by any governmental unit.

## VOTING AND CONFIRMATION OF THE PLAN

**General**

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by the requisite votes of creditors and equity interest holders, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code;

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class that have not accepted the Plan (that is, that such creditors will receive at least as much pursuant to the Plan as they would receive or retain in a chapter 7 liquidation);

- the Plan is feasible (that is, there is a reasonable prospect that the Debtors will be able to perform their obligations under the Plan);

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid, or the Plan provides for the payment of such fees on the Effective Date;

- the Plan provides for the continuation after the Effective Date of all Retiree Benefits, at the level established at any time prior to Confirmation pursuant to section 1114(e)(1)(b) or 1114(g) of the Bankruptcy Code, for the duration of the period that the applicable Debtor has obligated itself to provide such benefits; and

- the disclosures required under section 1129(a)(5) of the Bankruptcy Code concerning the identity and affiliations of persons who will serve as officers and directors of the Reorganized Debtors have been made.

**Voting Procedures and Requirements**

Pursuant to the Bankruptcy Code, only classes of claims against, or equity interests in, a debtor that are "impaired" under the terms of that debtor's plan are entitled to vote to accept or reject the plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or equity interests of that class are modified, other than by curing defaults and reinstating maturity. Classes of claims that are not impaired are not entitled to vote on a plan and are conclusively presumed to have accepted that plan. In addition, pursuant to the Plan, to the extent a Claim or Interest is held by a Debtor or Other Debtor, such holders are deemed to have consented to the Plan and, thus, are deemed to have accepted it. Classes of claims or equity interests that receive no distributions under a plan are not entitled to vote on that plan and are deemed to have rejected that plan unless such class otherwise indicates acceptance. Subclass 2A and Subclass 2B are treated as separate classes for the purpose of voting on the Plan, as are 9A and Subclass 9B. Because Classes 1, 4, 10 and 15 are unimpaired, Class 11 and 13 are each deemed to have accepted the Plan, Subclass 9A and Class 12 are each deemed to have rejected the Plan and Class 14 is deemed to have rejected or accepted the Plan, as the case may be, only Subclass 2A, Subclass 2B, Class 4, Class 5, Class 6, Class 7, Class 8 and Subclass 9B may vote on the Plan. For a summary of the classification of Claims and Interests

pursuant to the Plan, together with an indication of whether each Class of Claims or Interests is impaired or unimpaired under the terms of the Plan, see "Overview of the Plan — Classes and Treatment of Claims and Interests."

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for voting or other purposes. By order of the Bankruptcy Court, voting procedures have been established, which include certain vote tabulation rules that temporarily allow or disallow certain Claims for voting purposes only. These voting procedures, including the tabulation rules, are described in the solicitation materials provided with your Ballot and on Exhibit III to this Disclosure Statement.

**THE VOTING PROCEDURES ATTACHED AS EXHIBIT III HERETO SET FORTH DETAILED INSTRUCTIONS CONCERNING THE VOTING OF CHANNELED PERSONAL INJURY CLAIMS IN CLASSES 5, 6, 7 AND 8 AND REQUIRE ATTORNEYS FOR HOLDERS OF SUCH CLAIMS TO NOTIFY THE DEBTORS' VOTING AGENT, LOGAN & COMPANY, IF THEY ARE NOT AUTHORIZED TO VOTE ON THE PLAN ON BEHALF OF THE HOLDERS OF CHANNELED PERSONAL INJURY CLAIMS WHO THEY REPRESENT. PLEASE REFER TO EXHIBIT III FOR MORE INFORMATION REGARDING THE VOTING OF CHANNELED PERSONAL INJURY CLAIMS.**

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT. IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS OF IMPAIRED CLAIMS ENTITLED TO VOTE OR MULTIPLE CLAIMS IN ANY SUCH CLASS, YOU MAY RECEIVE MORE THAN ONE BALLOT. YOU SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE.**

**PLEASE CAREFULLY FOLLOW ALL OF THE INSTRUCTIONS CONTAINED ON THE BALLOT OR BALLOTS PROVIDED TO YOU. ALL BALLOTS MUST BE COMPLETED AND RETURNED IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED.**

**TO BE COUNTED, YOUR BALLOT OR BALLOTS MUST BE ACTUALLY RECEIVED BY 5:00 P.M., EASTERN TIME, ON ~~NOVEMBER 14,~~ 2005 (OR SUCH OTHER TIME AND DATE IDENTIFIED ON YOUR BALLOT OR BALLOTS) AT THE ADDRESS SET FORTH ON THE PREADDRESSED ENVELOPE PROVIDED TO YOU. IT IS OF THE UTMOST IMPORTANCE TO THE DEBTORS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.**

**A HOLDER OF AN ALLOWED PUBLIC NOTE CLAIM HELD IN THE NAME OF A BROKER, DEALER, COMMERCIAL BANK, TRUST COMPANY OR OTHER NOMINEE MUST COMPLETE AND DELIVER TO SUCH NOMINEE THE BALLOT OR BALLOTS PROVIDED TO SUCH HOLDER IN ORDER TO VOTE ON THE PLAN. SUCH HOLDERS ARE URGED TO DELIVER SUCH BALLOT OR BALLOTS TO THEIR RESPECTIVE NOMINEE HOLDERS NO LATER THAN THE DATE IDENTIFIED ON SUCH BALLOT OR BALLOTS IN ORDER TO ENSURE THAT THEIR VOTE WILL BE COUNTED.**

**IF ANY OF THE CLASSES OF HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE (OTHER THAN CLASS 5 (ASBESTOS PERSONAL INJURY CLAIMS)) VOTE TO REJECT THE PLAN, (a) THE DEBTORS MAY SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION OR (b) THE PLAN MAY BE MODIFIED OR WITHDRAWN WITH RESPECT TO A PARTICULAR DEBTOR, WITHOUT AFFECTING THE PLAN AS TO OTHER DEBTORS, OR IN ITS ENTIRETY. See " — Acceptance or Cramdown" and " — Alternatives to Confirmation and Consummation of the Plan."**

Votes cannot be transmitted orally. Accordingly, you are urged to return your signed and completed Ballot promptly.

**IF YOU ARE ENTITLED TO VOTE AND YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT OR LOST YOUR BALLOT, PLEASE CALL THE DEBTORS' VOTING AGENT, LOGAN & COMPANY, AT (973) 509-3190.**

**Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the requirements of section 1129 of the Bankruptcy Code relating to the Confirmation of the Plan. The Confirmation Hearing has been scheduled for [——————].January 9 and 10, 2005 at [9:00 a.m.] each day before the Honorable Judith K. Fitzgerald, Chief United States Bankruptcy Judge for the Western District of Pennsylvania and visiting United States Bankruptcy Judge for the District of Delaware, in the Judge's usual courtroom at the U.S. Bankruptcy Court for the Western District of Delaware, 824 Market Street, Wilmington, Delaware 19801.Pennsylvania, 5490 U.S. Steel Tower, 600 Grant Street, Pittsburgh, Pennsylvania 15219. The Confirmation Hearing may be continued or adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the continued or adjourned date made at the Confirmation Hearing. Any objection to Confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any such objections must be Filed and served upon the persons designated in the notice of the Confirmation Hearing, in the manner and by the deadline described in such notice.

**Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are satisfied. Among the requirements for confirmation of a plan with respect to a debtor are that the plan:

- is accepted by the requisite holders of claims and equity interests in each impaired class of such debtor or, if not so accepted, has been accepted by the requisite holders of at least one impaired class and is "fair and equitable" and "does not discriminate unfairly" as to each nonaccepting class;

- is either accepted by, or is in the "best interests" of, each holder of a claim or equity interest in each impaired class of such debtor;

- is feasible; and

- complies with the other applicable provisions of the Bankruptcy Code.

Subject to the conditions set forth in the Plan, a determination by the Bankruptcy Court that the Plan, as it applies to a particular Estate, is not confirmable pursuant to section 1129 of the Bankruptcy Code will not limit or affect (a) the confirmability of the Plan as it applies to the other Estate or (b) the Debtors' ability to modify the Plan, as it applies to such Estate, to satisfy the provisions of section 1129(b) of the Bankruptcy Code. See "General Information Concerning the Plan — Modification or Revocation of the Plan" for a description of the Debtors' ability to modify the Plan.

In addition, pursuant to section 524(g) of the Bankruptcy Code, the Plan may not be confirmed unless the holders of at least two-thirds in dollar amount and 75% of the number of Claims in Class 5 (Asbestos Personal Injury Claims) that have been temporarily allowed for voting purposes actually voting as such to accept or reject the Plan have voted to accept the Plan.

### *Acceptance or Cramdown*

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims in such class that are allowed or have been temporarily allowed for voting purposes, as the case may be, and that are held by holders of such claims who actually vote to accept or reject such plan vote to accept it. Section 1129(b) of the Bankruptcy Code contains so-called "cramdown" provisions pursuant to which a plan may be confirmed even if it is not accepted by all impaired classes, as long as at least one impaired class of

claims has accepted it and the Bankruptcy Court finds that it is "fair and equitable" and "does not discriminate unfairly" as to each impaired class that does not accept the Plan or is deemed to have rejected it. The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting class of unsecured claims receives full compensation for the aggregate allowed amount of such claims, no holder of an allowed claim in any class junior to such class may receive or retain any property on account of such claim. With respect to a dissenting class of secured claims, the "fair and equitable" standard requires, among other things, that holders of such claims either retain their liens and receive deferred Cash payments with a value as of the date on which such plan is effective, equal to the value of their interest in property of the applicable estate, or receive the indubitable equivalent of their secured claims. The "fair and equitable" standard has also been interpreted to prohibit any class of claims senior to a dissenting class from receiving under a plan more than 100% of the aggregate allowed amount of such claims. The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class of claims must be treated substantially equally with respect to other classes of claims of equal rank. The Debtors do not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan. The Debtors believe that the Plan is "fair and equitable" and "does not discriminate unfairly" as to each impaired Class entitled to vote upon the Plan or deemed to have rejected it. The Debtors will seek Confirmation of the Plan under the "cramdown" provisions with respect to each impaired Class that does not accept the Plan or is deemed to have rejected it other than Class 5, as to which cramdown is not available, including Subclass 9A and Classes 12 and 14, which are each deemed to have rejected the Plan (and have reserved the right to modify the Plan to the extent that Confirmation of the Plan under such provisions requires modification). See "General Information Concerning the Plan — Modification or Revocation of the Plan" for a description of the Debtors' ability to modify the Plan.

### Best Interests Test; Liquidation Analysis

Notwithstanding acceptance of a plan by each impaired class (or satisfaction of the "cramdown" provisions of the Bankruptcy Code in lieu thereof), for a plan to be confirmed, the Bankruptcy Court must determine that the plan is in the best interest of each holder of a claim who is in an impaired class and has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept a plan, the best interests test requires the Bankruptcy Court to find that the plan provides to each member of such impaired class a recovery on account of such class member's claim that has a value, as of the date such plan is consummated, at least equal to the value of the distribution that such class member would receive if the debtors proposing the plan were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what holders of Claims or Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Reorganization Cases were converted to a chapter 7 case under the Bankruptcy Code and each of the Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of each Debtor would consist of the net proceeds from such disposition of such Debtors' assets plus any Cash held by the Debtor.

The information contained in Exhibit II hereto provides a summary of the Liquidation Values of the Debtors' interests in property, on a consolidated basis, assuming a hypothetical chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the Debtors' properties and interests in property. As more fully described in Exhibit II, the liquidation analysis is based on a number of estimates and assumptions that are subject to significant uncertainties, including estimates and assumptions relating to the proceeds of sales of assets, the timing of such sales, the impact of pending liquidations on continuing operations and values and certain Tax matters. While the Debtors believe that these estimates and assumptions are reasonable for the purpose of preparing hypothetical chapter 7 liquidation analyses, no assurance exists that such estimates and assumptions would be valid if the Debtors were, in fact, to be liquidated. Furthermore, as noted below, the Debtors believe that chapter 7 liquidations could result in substantial litigation that could delay the liquidation beyond the periods assumed in Exhibit II. This delay could materially reduce the amount determined on a present value basis available for distribution to creditors. Moreover, the Debtors believe that such litigation and attendant delay could adversely affect the values realizable in the sale of the Debtors' assets to an extent that cannot be estimated at this time.

Based on the liquidation analyses set forth in Exhibit II, the Debtors believe that holders of Claims will receive greater value as of the Effective Date under the Plan than such holders would receive under a chapter 7 liquidation.

In actual liquidations of the Debtors, distributions to holders of Claims may be made substantially later than the Effective Date assumed in connection with the Plan. This delay could materially reduce the amount determined on a present value basis available for distribution to creditors, including holders of Unsecured Claims. The hypothetical chapter 7 liquidations of the Debtors are assumed to commence on December 31, 2005 and to be completed six to twelve months thereafter.

The Liquidation Value available to holders of Unsecured Claims and Interests would be reduced by, among other things: (a) the Claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtor's chapter 7 case; (c) unpaid Administrative Claims of the Reorganization Cases; and (d) Priority Claims and Priority Tax Claims. The Debtors' costs of liquidation in chapter 7 cases would include the compensation of trustees, as well as of counsel and of other professionals retained by such trustees, asset disposition expenses, applicable Taxes, litigation costs, Claims arising from the operation of the Debtors during the pendency of the chapter 7 cases and all unpaid Administrative Claims incurred by the Debtors during the Reorganization Cases that are allowed in the chapter 7 cases. The liquidation itself would trigger certain Priority Claims, such as Claims for severance pay, and would likely accelerate the payment of other Priority Claims and Priority Tax Claims that would otherwise be payable in the ordinary course of business. These Priority Claims and Priority Tax Claims would be paid in full out of the net liquidation proceeds, after payment of Secured Claims, before the balance would be made available to pay Unsecured Claims or to make any distribution on account of Interests. The Debtors believe that the liquidation also would generate a significant increase in Unsecured Claims, such as rejection damage Claims, and Tax and other governmental Claims.

In summary, the Debtors believe that chapter 7 liquidations of the Debtors would result in substantial diminution in the value to be realized by holders of Claims, as compared to the proposed distributions under the Plan, because of, among other factors: (a) the failure to realize the maximum going concern value of the Debtors' assets; (b) the substantial negative impact of conversion to a chapter 7 case and subsequent liquidation on the employees and customers of the Debtors; (c) additional costs and expenses involved in the appointment of trustees, attorneys, accountants and other professionals to assist such trustees in the chapter 7 cases; (d) additional expenses and Claims, some of which would be entitled to priority in payment, that would arise by reason of the liquidation and from the rejection of unexpired real estate leases and other Executory Contracts and Unexpired Leases in connection with a cessation of the Debtors' operations; and (e) the substantial time that would elapse before entities would receive any distribution on account of their Claims. Consequently, the Debtors believe that the Plan will provide a substantially greater ultimate return to holders of Claims than would chapter 7 liquidations.

### Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtors proposing such plan or any successor to such debtors (unless such liquidation or reorganization is proposed in the plan). For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Projections. See "Reorganized Kaiser — Projected Financial Information." Based upon the Projections, the Debtors believe that their reorganization under the Plan satisfies the feasibility requirements of the Bankruptcy Code.

### Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code. The Debtors have considered each of these issues in the development of the Plan and believe that the Plan complies with all provisions of the Bankruptcy Code.

## Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated numerous alternatives to the Plan, including the consummation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, delaying the adoption of any plan of reorganization and the liquidation of the Debtors.

While the Debtors have concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, if the Plan is not confirmed, the Debtors, individually or collectively, could attempt to formulate

and propose a different plan or plans of reorganization. In addition, upon the expiration of the period in which the Debtors have the exclusive right under the Bankruptcy Code to File and solicit acceptances with respect to any plan of reorganization for the Debtors, any other party in interest in the Reorganization Cases could attempt to formulate and propose a different plan or plans of reorganization or liquidation. The Debtors believe that, because the Plan has been negotiated by the Debtors and representatives of certain of the Debtors' most significant creditors, including the Creditors' Committee, the Asbestos Claimants' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative, any alternative plan, whether proposed by the Debtors or any other party in interest in the Reorganization Cases, would result in additional costs to the Debtors relating to the retention of professionals to represent the Debtors and their significant creditors in connection with such negotiations, resulting in a diminution in the value of the Debtors' Estates and, in turn, likely delays in distributions to all creditors who would be entitled to receive a distribution under the Plan (thus reducing the present value of such distributions) and a potential reduction in the Cash available to the Reorganized Debtors (thus potentially reducing the value of the New Common Stock distributed to holders of Claims in Classes 4 and 9, as well as the Union VEBA Trust and the Retired Salaried VEBA Trust).

If no plan of reorganization can be confirmed, the Debtors may be forced to convert the Reorganization Cases to liquidation cases under chapter 7 of the Bankruptcy Code. In a case under chapter 7 of the Bankruptcy Code, a trustee or trustees would be elected or appointed to liquidate the assets of each Debtor and the proceeds of the liquidation would be distributed to the respective creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code. For further discussion of the potential impact on the Debtors and their creditors of the conversion of the Reorganization Cases to chapter 7 liquidations, see " — Best Interests Test; Liquidation Analysis."

**THE DEBTORS, THE CREDITORS' COMMITTEE, THE ASBESTOS CLAIMANTS COMMITTEE, THE FUTURE ASBESTOS CLAIMANTS' REPRESENTATIVE AND THE FUTURE SILICA AND CTPV CLAIMANTS' REPRESENTATIVE EACH BELIEVE THAT THE PLAN AFFORDS GREATER BENEFITS TO CREDITORS THAN EITHER THE CONSUMMATION OF AN ALTERNATIVE PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OR LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

**General**

     A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE IRC, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

     THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN IMPORTANT RESPECTS UNCERTAIN. NO RULING HAS BEEN REQUESTED FROM THE IRS; NO OPINION HAS BEEN REQUESTED FROM DEBTORS' COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

     THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND NON-U.S. TAXPAYERS, NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF INTERESTS IN THE DEBTORS. IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL OR NON-U.S. TAX CONSEQUENCES.

     FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

**U.S. Federal Income Tax Consequences to the Debtors**

     *Cancellation of Debt Income*

     Generally, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("COD") income, which must be included in the debtor's income. However, COD income is not recognized by a taxpayer that is a debtor in a reorganization case if the discharge is granted by the court or pursuant to a plan of reorganization approved by the court. The Plan, if approved, would enable the Debtors to qualify for this bankruptcy exclusion rule with respect to any COD income triggered by the Plan.

     If debt is discharged in a reorganization case, however, certain income tax attributes otherwise available and of value to the debtor are reduced, in most cases by the amount of the indebtedness forgiven. Tax attributes subject to reduction include: (a) net operating losses ("NOLs") and NOL carryforwards; (b) most credit carryforwards, including the general business credit and the minimum tax credit; (c) capital losses and capital loss carryforwards; (d) the tax basis of the debtor's depreciable and nondepreciable assets, but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate of the debtor's liabilities immediately after the discharge; and (e) foreign tax credit carryforwards.

     A debtor may elect to avoid the prescribed order of attribute reduction and instead reduce the basis of certain property first. In the case of affiliated corporations filing a consolidated return (such as KAC and its consolidated subsidiaries), the attribute reduction rules apply first to the separate attributes of or allocable to the particular corporation whose debt is being discharged, and then, if necessary, to certain attributes of other members of the group. Accordingly, COD income of a Debtor would result first in the reduction of any consolidated NOLs

and other attributes, including asset basis, attributable to such Debtor, and then, if necessary, of consolidated NOLs and/or basis attributable to other members of the consolidated group, after use of any such NOLs to determine the consolidated group's taxable income for the tax year in which the debt is discharged.

### Limitation on NOL Carryforwards

#### General

Section 382 of the IRC provides rules limiting the utilization of a corporation's NOLs and other losses, deductions and credits following a more than 50% change in ownership of a corporation's equity (an "ownership change"). An ownership change will occur with respect to the Debtors in connection with the Plan. Therefore, the NOLs of the Reorganized Debtors will be limited by Section 382 of the IRC, unless the Bankruptcy Exception (described below) applies to the transactions contemplated by the Plan. Unless the Bankruptcy Exception applies, the amount of post-ownership change annual taxable income of the Reorganized Debtors that can be offset by the pre-ownership change NOLs of the Debtors generally cannot exceed an amount equal to the product of (a) the applicable federal long-term tax-exempt rate in effect on the date of the ownership change and (b) the value of KAC's stock immediately prior to implementation of the Plan (the "Annual Limitation"). The value of KAC's stock for purposes of this computation would reflect the increase, if any, in value resulting from any surrender or cancellation of any Claims in the Reorganization Cases. For instance, if the equity value of Reorganized KAC were $380 million and the applicable U.S. federal long-term tax-exempt rate in effect on the date of the ownership change were 4.5%, then, unless the Bankruptcy Exception is applicable, the Annual Limitation would be $17.1 million.

Any unused Annual Limitation may be carried forward, thereby increasing the Annual Limitation in the subsequent taxable year. However, if Reorganized KAC does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change (the "Business Continuity Requirement"), the Annual Limitation resulting from the ownership change is zero.

In addition, the Annual Limitation may be increased if KAC has a net unrealized built-in gain at the time of an ownership change. If, however, KAC has a net unrealized built-in loss at the time of an ownership change, the Annual Limitation may apply to such net unrealized built-in loss. Although the issue is not free from doubt, KAC anticipates that it will be in a net unrealized built-in loss position at the time the Plan is implemented.

#### Bankruptcy Exception

Section 382(l)(5) of the IRC (the "Bankruptcy Exception") provides that the Annual Limitation will not apply to limit the utilization of the Reorganized Debtors' NOLs or built-in losses if the New Common Stock owned by those Persons who were stockholders of KAC immediately before the ownership change, together with New Common Stock received by certain holders of Allowed Claims pursuant to the Plan, comprise 50% or more of the value of all of the New Common Stock outstanding immediately after the ownership change. New Common Stock received by such holders will be included in the 50% calculation if, and to the extent that, such holders constitute "qualified creditors." A "qualified creditor" is a holder of an Allowed Claim that (a) was held by such holder since the date that is 18 months before the date on which the Debtors first filed their petition with the Bankruptcy Court or (b) arose in the ordinary course of business and is held by the Person who at all times held the beneficial interest in such Allowed Claim. In determining whether the Bankruptcy Exception applies, certain holders of Allowed Claims that would own a *de minimis* amount of New Common Stock pursuant to the Plan are presumed to have held their Claims since the origination of such Claims. In general, this *de minimis* rule applies to holders of Allowed Claims who would own directly or indirectly less than 5% of the total fair market value of New Common Stock pursuant to the Plan.

If the Bankruptcy Exception applies, a subsequent ownership change with respect to the Reorganized Debtors occurring within two years after the Effective Date will result in the reduction of the Annual Limitation that would otherwise apply to the subsequent ownership change to zero. Thus, an ownership change within two years after the Effective Date would eliminate the ability of the Reorganized Debtors to use NOLs thereafter. However, if the Bankruptcy Exception applies, the Business Continuity Requirement does not apply, although a lesser business continuation requirement may apply under Treasury Regulations. If a change of ownership occurs after the two years following the Effective Date, then the Reorganized Debtors will become subject to limitation in the use of their NOLs based upon the value of the Reorganized Debtors at the time of that subsequent change.

The Reorganized Debtors could elect to not have the Bankruptcy Exception apply, in which event the Annual Limitation would apply. However, the Debtors currently expect that they will qualify for the Bankruptcy Exception and that they will not elect to not have it apply.

Accordingly, in order to avoid subsequent ownership changes, Reorganized KAC will enter into the Stock Transfer Restriction Agreement with the trustee of the Union VEBA and the PBGC in the form attached as Exhibit 1.1(194) to the Plan, under which transfers of "Company Securities" (as defined below) by the PBGC and the Union VEBA will be subject to limitations; and Reorganized KAC's Certificate of Incorporation will contain a "5% Ownership Limit," effective until the Restriction Release Date, pursuant to which certain transfers of Reorganized KAC's equity will be limited. See "New Common Stock — Restrictions on Transfer." The purpose of such limit is to reduce the risk that any change in the ownership of New Common Stock may eliminate or limit the benefits of federal income tax attributes of the Reorganized Debtors.

Although the Annual Limitation will not apply to restrict the deductibility of NOLs if the Bankruptcy Exception applies, NOLs of the Reorganized Debtors will be reduced by the amount of any deduction for any interest paid or accrued by the Debtors during the three taxable years preceding the taxable year in which the ownership change occurs and during the portion of the taxable year of the ownership change preceding the ownership change with respect to all Allowed Claims converted into New Common Stock.

### *Transfers of PI Trust Assets to the Funding Trust and the PI Trusts*

The transfers of PI Trust Assets (other than the 75% of the KFC Claim and Cash) to each of the Funding Vehicle Trust and the PI Trusts will be treated as transfers taxable to the Debtor-transferor resulting in gain or loss recognition to the Debtor-transferor in an amount equal to the difference between the value of the PI Trust Assets and the Debtor-transferor's basis in such assets. Each of the Funding Vehicle Trust and the PI Trusts will take a fair market value basis in such assets. The transfers of PI Trust Assets (other than the 75% of the KFC Claim) to each of the Funding Vehicle Trust and the PI Trusts and the distribution of New Common Stock in respect of the 75% of the KFC Claim to the PI Trusts generally will be expected to be treated as "economic performance" (as required by IRC Section 461(h)) with respect to the Channeled Personal Injury Claims and, accordingly, will be taken into account, to the extent not previously taken into account, by the Debtor-transferor at that time to the extent that the "all events test" (described in IRC Section 461(h)(1)) has otherwise been met. The Funding Vehicle Trust and PI Trusts will not have taxable income on receipt of PI Trust Assets and will not be entitled to deduct payments to claimants as such payments are made.

### *Alternative Minimum Tax*

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation might otherwise be able to offset all of its taxable income for regular federal income tax purposes by available NOL carryforwards, a corporation is generally entitled to offset no more than 90% of its AMTI with NOL carryforwards (as recomputed for AMT purposes). Accordingly, the Reorganized Debtors' use of their NOLs may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

In addition, if a corporation (or a consolidated group) undergoes an ownership change and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets may be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. Accordingly, if the Debtors are in a net unrealized built-in loss position on the Effective Date, for AMT purposes the tax benefits attributable to basis in assets may be reduced.

Any AMT that the corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

### *Other Federal Income Tax Consequences*

The Restructuring Transactions will constitute a "reorganization" of KACC that generally will not be taxable to it or KAC for federal income tax purposes. However, although not currently contemplated by the Debtors, if the stock of New Kaiser Canada were to be disposed of within five years following the Effective Date, the Reorganized Debtors' NOLs could be reduced to the extent the value of such stock on the Effective Date exceeds the tax basis therein on such date. Other federal income tax consequences to the Debtors may result depending on the terms of any additional Restructuring Transactions that occur with respect to the Debtors.

## U.S. Federal Income Tax Consequences to Holders of Claims

The federal income tax consequences of the Plan to a holder of a Claim will depend, in part, on whether the Claim constitutes a "tax security" for federal income tax purposes, what type of consideration was received in exchange for the Claim, whether the holder reports income on the accrual or cash basis, whether the holder has taken a bad debt deduction or worthless security deduction with respect to the Claim and whether the holder receives distributions under the Plan in more than one taxable year.

### *Definition of Securities*

There is no precise definition of the term "security" under the federal income tax law. Rather, all facts and circumstances pertaining to the origin and character of a claim are relevant in determining whether it is a security. Nevertheless, courts generally have held that corporate debt evidenced by a written instrument and having an original maturity of ten years or more will be considered a tax security.

- The 6-1/2% RPC Revenue Bonds (originally issued on March 1, 1978 with an original maturity date of March 1, 2008), the 7-3/4% SWD Revenue Bonds (originally issued on December 1, 1992 with an original maturity date of August 1, 2022) and the 7.60% SWD Revenue Bonds (originally issued on March 1, 1997 with an original maturity date of March 1, 2027) all had original maturities of about 30 years and will be tax securities.

- The Senior Subordinated Notes (originally issued on February 1, 1993 with an original maturity date of February 2, 2003) had an original maturity of ten years and will be tax securities.

- The 10-7/8% Series B Senior Notes (originally issued on October 23, 1996 with an original maturity date of October 15, 2006) and the 10-7/8% Series D Senior Notes (originally issued on December 23, 1996 with an original maturity date of October 15, 2006) both had original maturities of just under 10 years and are likely to be tax securities.

- The 9-7/8% Senior Notes (originally issued on February 17, 1994 with an original maturity date of February 15, 2002) had an original maturity of just under eight years and may be tax securities, although it is not entirely free from doubt.

### *Holders of Claims Constituting Tax Securities Receiving New Common Stock*

Under the Plan, holders of certain Allowed Claims constituting tax securities will receive New Common Stock. A holder of an Allowed Claim constituting a tax security who receives New Common Stock in satisfaction of such holder's Claim should not recognize gain or loss upon the exchange (but will recognize any gain to the extent of any Cash and the fair market value of any consideration received other than New Common Stock); the holder's aggregate tax basis in the New Common Stock (apart from any portion thereof allocable to interest) should equal the holder's basis in its Claim; and the holding period for the New Common Stock (apart from any portion allocable to interest) should include the holding period of the Allowed Claims surrendered. The holder's tax basis in any New Common Stock allocable to interest will equal the fair market value of the New Common Stock on the date of its distribution to the holder by Reorganized KAC and the holding period of such stock will begin on the day after the day of receipt. See "— Certain Other Tax Considerations for Holders of Claims — Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount.

### Holders of Claims Constituting Tax Securities Receiving Cash

Under the Plan, holders of certain Allowed Claims possibly constituting tax securities will receive solely Cash in satisfaction of their Claims. A holder of an Allowed Claim constituting a tax security who receives solely Cash in satisfaction of such holder's Claim generally should recognize gain or loss on the receipt of the Cash equal to the amount of Cash received (except that amounts, if any, allocable to interest on the Claim will be treated as interest income) and the holder's basis in the Claim. Any gain or loss recognized will be capital or ordinary, depending on the status of the Claim in the holder's hands, including whether the Claim constitutes a market discount bond in the holder's hands.

Generally, any gain or loss recognized by a holder of an Allowed Claim will be a long-term capital gain or loss if the Claim is a capital asset in the hands of the holder and the holder has held such Claim for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount with respect to such Claim. See "Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount.

### Holders of Claims Not Constituting Tax Securities

A holder of an Allowed Claim that is not a tax security who receives New Common Stock and/or Cash in exchange for such holder's Claim would recognize gain or loss in an amount equal to the difference between (a) the amount of Cash and/or the fair market value of New Common Stock received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (b) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). For this purpose, holders of Claims in Classes 5 through 8 will not be treated as receiving property with respect to any interest in the PI Trust to which such Claims will be channeled or the PI Trust Assets that they may receive under the Plan.

Generally, any gain or loss recognized by a holder of a Claim not constituting a tax security will be a long-term capital gain if the Claim is a capital asset in the hands of the holder and the holder has held such Claim for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount with respect to such Claim. See "Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount. Such a holder's tax basis for any New Common Stock received under the Plan generally should equal its fair market value on the date of distribution to the holder by Reorganized KAC. The holding period for any New Common Stock received under the Plan by a holder of a Claim not constituting a tax security generally should begin on the day following the day of receipt.

Any payment to be made to a holder of a Channeled Personal Injury Claim from a PI Trust will only be deemed to have been made to the recipient when, and to the extent that, the amount to which the recipient is entitled has been determined and distributed. Any income realized by a PI Trust prior to such time will be reported by the applicable PI Trustee as taxable income of the PI Trust.

## Certain Other Tax Considerations for Holders of Claims

### Pre-Effective Date Interest

In general, a Claim holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest. A Claim holder that was previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that, to the extent applicable, all distributions to a holder of an Allowed Claim will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such distributions, if any, will be deemed to apply to any interest accrued on such Claim prior to the Petition Date. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such holder is properly allocable to prepetition interest. Each holder of a Claim on which interest accrued prior to the Petition Date is urged to consult its tax advisor regarding the tax treatment of its distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purposes.

### Post-Effective Date Cash Distributions

Holders of Claims may receive Cash distributions subsequent to the Effective Date, including distributions out of any PI Trust to holders of Channeled Personal Injury Claims. The imputed interest provisions of the IRC may apply to treat a portion of any Post-Effective Date distribution as imputed interest. Imputed interest may, with respect to certain holders, accrue over time using the constant interest method, in which event the holder may, under some circumstances, be required to include imputed interest in income prior to receipt of a distribution.

In addition, because additional distributions may be made to holders of Claims after the initial distribution, any loss and a portion of any gain realized by a holder may be deferred until the holder has received its final distribution. All holders are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the "installment method" of reporting gain that may be recognized in respect of a Claim.

### Reinstatement of Claims

Holders of Claims that will be Reinstated generally should not recognize gain, loss or other taxable income upon the Reinstatement of their Claims under the Plan. Taxable income, however, may be recognized by those holders if they are considered to receive interest, damages or other income in connection with the Reinstatement or if the Reinstatement is considered for tax purposes to involve a substantial modification of the Claim.

### Bad Debt and/or Worthless Securities Deduction

A holder who, under the Plan, receives on account of a Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction in some amount under Section 166(a) of the IRC. The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### Market Discount

A holder that purchased its Claim from a prior holder with market discount will be subject to the market discount rules of the IRC. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

To the extent that a holder's Claim is exchanged in a transaction in which gain or loss is not recognized for U.S. federal income tax purposes, any accrued market discount not treated as ordinary income upon such exchange should carry over, on an allocable basis, to any New Common Stock received, such that any gain recognized by the holder upon a subsequent disposition of such New Common Stock would be treated as ordinary income to the extent of any accrued market discount not previously included in income.

### Installment Method

A holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of Section 453B of the IRC.

### Information Reporting and Backup Withholding

All distributions under the Plan will be subject to applicable federal income tax reporting and withholding. The IRC imposes "backup withholding" (currently at a rate of 28%) on certain "reportable" payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates

this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS

**General**

No registration statement will be filed under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws, with respect to the offer and distribution under the Plan of New Common Stock. The Debtors believe that the provisions of section 1145(a)(1) of the Bankruptcy Code exempt the offer and distribution of such securities under the Plan from federal and state securities registration requirements.

**Bankruptcy Code Exemptions from Registration Requirements**

### *Initial Offer and Sale*

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state securities laws if three principal requirements are satisfied:

- the securities must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan;

- the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor or an affiliate participating in a joint plan with the debtor; and

- the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or an affiliate participating in a joint plan with the debtor, or principally in such exchange and partly for cash or other property.

The Debtors believe that the offer and sale of the New Common Stock under the Plan satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

### *Subsequent Transfers*

In general, because the New Common Stock issued pursuant to the Plan will be deemed to have been publicly offered, all resales and subsequent transactions in New Common Stock will exempt from registration under the Securities Act pursuant to Section 4(1) thereof, unless the holder thereof is deemed to be an "affiliate" of Reorganized KAC or an "underwriter" with respect to such securities.

Pursuant to section 1145(b) of the Bankruptcy Code, the following persons will considered to be "underwriters" under Section 2(11) of the Securities Act:

- persons who purchase a claim against, an interest in or a claim for administrative expense against a debtor with a view to distributing any security received in exchange for such claim or interest ("accumulators");

- persons who offer to sell securities offered or sold under a plan for the holders of such securities ("distributors");

- persons who offer to buy securities offered or sold under a plan from the holders of such securities, if the offer to buy is both with a view to distributing such securities and under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan; and

- a person who is an "issuer" with respect to the securities, as defined in Section 2(11) of the Securities Act.

Under Section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer. Rule 144 under the Securities Act defines "affiliate" of an issuer as any person directly, or indirectly through one or more intermediaries, controlling, controlled by or under common control with the issuer. Whether or not any particular person would be deemed to be an "underwriter" with respect to any security to be issued pursuant to the Plan or an "affiliate" of Reorganized KAC would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any person would be deemed to be an "underwriter" with respect to any security to be issued pursuant to the Plan or an "affiliate" of Reorganized KAC.

Rule 144 under the Securities Act provides an exemption from registration under the Securities Act for certain limited public resales of unrestricted securities by "affiliates" of the issuer of such securities. Rule 144 allows a holder of unrestricted securities that is an "affiliate" of the issuer of such securities to sell without registration within any three-month period a number of shares of such unrestricted securities that does not exceed the greater of 1% of the number of outstanding securities in question and the average weekly trading volume in the securities in question during the four calendar weeks preceding the date on which notice of such sale was filed pursuant to Rule 144, subject to the satisfaction of certain other requirements of Rule 144 regarding the manner of sale, notice requirements and the availability of current public information regarding the issuer. The Debtors believe that, pursuant to section 1145(c) of the Bankruptcy Code, the New Common Stock to be distributed pursuant to the Plan will not be considered restricted securities for purposes of Rule 144.

In connection with prior bankruptcy cases, the staff of the SEC has taken the position that resales by accumulators and distributors of securities distributed under a plan of reorganization that are not "affiliates" of the issuer are exempt from registration under the Securities Act if effected in "ordinary trading transactions." The staff of the SEC has indicated in this context that a transaction may be considered an "ordinary trading transaction" if it is made on an exchange or in the over-the-counter market and does not involve any of the following factors:

- either concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or concerted action by distributors on behalf of one or more such recipients in connection with such sales;

- the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a bankruptcy court-approved disclosure statement and supplements thereto and documents filed with the SEC pursuant to the Exchange Act; or

- the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arms-length negotiations between a seller and a broker or dealer, each acting unilaterally, and not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

*The Debtors have not sought the views of the SEC on this matter and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above. Any persons intending to rely on such exemption are urged to consult their own counsel as to the applicability thereof to any particular circumstances.*

**GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN "AFFILIATE" OF REORGANIZED KAC OR AN "UNDERWRITER" WITH RESPECT TO THE NEW COMMON STOCK TO BE DISTRIBUTED PURSUANT TO THE PLAN, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE NEW COMMON STOCK AND RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

State securities laws generally provide registration exemptions for subsequent transfers by a *bona fide* owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of New Common Stock.

**Certain Transactions by Stockbrokers**

Under section 1145(a)(4) of the Bankruptcy Code, stockbrokers effecting transactions in New Common Stock prior to the expiration of 40 days after the first date on which such securities were *bona fide* offered to the public by Reorganized KAC or by or through an underwriter are required to deliver to the purchaser of such securities a copy of this Disclosure Statement (and supplements hereto, if any, if ordered by the Bankruptcy Court) at or before the time of delivery of such securities to such purchaser. In connection with prior bankruptcy cases, the staff of the SEC has taken so-called "no-action" positions with respect to noncompliance by stockbrokers with such requirement in circumstances in which the debtor was, and the reorganized debtor was to continue to be, subject to and in compliance with the periodic reporting requirements of the Exchange Act. *The views of the SEC on this matter, however, have not been sought by the Debtors and, therefore, no assurance can be given regarding the possible consequences of noncompliance by stockbrokers with the disclosure statement delivery requirements of section 1145(a)(4). Stockbrokers are urged to consult their own counsel with respect to such requirements.*

**Registration Rights Agreement**

On the Effective Date, Reorganized KAC, the PBGC and the trustee of the Union VEBA Trust in such capacity will enter into the Registration Rights Agreement in the form attached as Exhibit 1.1(167) to the Plan, which will provide each of the PBGC and the Union VEBA Trust with certain rights to register the resale of the shares of New Common Stock issued to it pursuant to the Plan (and any shares of New Common Stock paid, issued or distributed on account of, or in exchange for or in replacement of, such securities) until such securities (a) are disposed of pursuant to an effective registration statement under the Securities Act, (b) are distributed to the public under and in accordance with Rule 144 under the Securities Act, (c) may be freely sold publicly without either registration under the Securities Act or compliance with any restrictions under Rule 144 under the Securities Act, (d) have been transferred to any person, or (e) have ceased to be outstanding (prior to the occurrence of any such event, such securities constituting "Registrable Securities").

Commencing on or about the first date following the Effective Date on which Reorganized KAC will be eligible to file a registration statement on Form S-3 (e.g., April 3, 2006, assuming the Effective Date occurs on December 31, 2005), either holder of the Registrable Securities may (and, in the case of the Union VEBA Trust, if so directed by its independent fiduciary, will) demand that Reorganized KAC file a "shelf" registration statement covering the resale of all Registrable Securities, regardless of whether held by the PBGC or the Union VEBA Trust, on a continuous basis under and in accordance with Rule 415 under the Securities Act. Reorganized KAC will (a) prepare and file the initial shelf registration statement as promptly as practicable following receipt of such request, (b) use commercially reasonable efforts to cause such shelf registration statement to be declared effective under the Securities Act as promptly as practicable after such filing, and (c) use commercially reasonable efforts to cause such shelf registration statement, once effective, to remain continuously effective under the Securities Act until there ceases to be any Registrable Securities. If the initial shelf registration statement or any substitute shelf registration statement (as described below) ceases to be effective for any reason while there are Registrable Securities, Reorganized KAC will use commercially reasonable efforts to obtain the prompt withdrawal of any order suspending the effectiveness thereof. In the event that any such order is not withdrawn by the 45th day following the date of such order, Reorganized KAC will either:

- (a) prepare and file a post-effective amendment to such registration statement as promptly as practicable thereafter, (b) use commercially reasonable effects to cause such registration statement, as so amended, to again be declared effective under the Securities Act as promptly as practicable after such amendment is filed with the SEC, and (c) use commercially reasonable efforts to cause such registration statement, as so amended, once effective, to remain continuously effective until there ceases to be any Registrable Securities; or

- (a) file a separate substitute "shelf" registration statement covering the resale of all Registrable Securities for an offering on a continuous basis under and in accordance with Rule 415 under the Securities Act as promptly as practicable thereafter, (b) use commercially reasonable efforts to cause such substitute shelf registration statement to be declared effective under the Securities Act as promptly as practicable after such substitute shelf registration statement is filed with the SEC, and (c) use commercially reasonable efforts to cause such substitute shelf registration statement, once effective, to remain continuously effective until there ceases to be any Registrable Securities.

Each shelf registration statement will be filed on Form S-3 (except that, if Reorganized KAC is not then eligible to register the Registrable Securities for resale on Form S-3, such registration statement will be filed on any other form Reorganized KAC is then eligible to so use). Any shelf registration statement will cover the disposition of all Registrable Securities in one or more underwritten offerings (subject to the provisions of the Registration Rights Agreement regarding such offerings described below), through block trades, through broker transactions, through at-market transactions and in any other manner as may be reasonably requested by the PBGC or the Union VEBA Trust. Reorganized KAC will have customary rights to impose blackout periods with respect to the filing of the initial shelf registration statement or the filing of a post-effective amendment to any shelf registration statement or a substitute shelf registration statement. If the holder or holders of a majority of the Registrable Securities included in the then-effective shelf registration statement so request, Reorganized KAC will effect an underwritten offering pursuant to such shelf registration statement provided that (a) Reorganized KAC has not so effected an underwritten offering with the 180-day period next preceding such request and (b) the Registrable Securities requested to be included in such underwritten offering have a then-current market value of at least $10 million. Customary priority provisions will apply in the context of such an underwritten offering.

If Reorganized KAC registers equity securities for its own account or the account of any other person (other than (a) in connection with a merger or reorganization, the implementation of an employee benefit plan or an offering made solely to the then-existing stockholders or employees of Reorganized KAC or (b) on a shelf registration statement), the PBGC and the VEBA Trust will each be offered the opportunity to include its Registrable Securities in such registration. Customary priority provisions will apply in the context of an underwritten offering.

The Registration Rights Agreement will contain customary registration procedures and grant Reorganized KAC customary rights to require that, in certain circumstances, the PBGC and the Union VEBA Trust discontinue the disposition of any Registrable Securities covered by any registration statement or prospectus filed pursuant to the Registration Rights Agreement. Reorganized KAC will be required to bear all expenses incurred by it in connection with such registrations, including up to $50,000 for one counsel to represent the PBGC and the Union VEBA Trust.

Reorganized KAC will file all reports required to be filed by it under the Exchange Act and, to the extent required to permit the PBGC or the Union VEBA Trust, as the case may be, to sell its Registrable Securities without registration under the Securities Act in accordance with Rule 144 thereunder, will cooperate with such holder. Notwithstanding the foregoing, Reorganized KAC will not be required to register any securities, or file any reports, under the Exchange Act if such registration or filing is not required thereunder.

Shares of New Common Stock held by the PBGC and the Union VEBA Trust will remain subject to the restrictions on transfer set forth in the Stock Transfer Restriction Agreement and Reorganized KAC's Certificate of Incorporation notwithstanding any registration of such shares for resale as contemplated above. See "New Common Stock — Restrictions on Transfer."

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all holders of Claims in voting Classes to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

Dated: ~~August 24,~~ September 7, 2005

Respectfully submitted,

KAISER ALUMINUM CORPORATION

By: _____
Name:_ Edward F. Houff
Title:_ Chief Restructuring Officer


KAISER ALUMINUM & CHEMICAL
CORPORATION, on its own behalf and on behalf of each
direct or indirect subsidiary Debtor

By: _____
Name:_ Edward F. Houff
Title:_ Chief Restructuring Officer


COUNSEL:

Daniel J. DeFranceschi (DE 2732)
Kimberly D. Newmarch (DE 4340)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701

— and —

Gregory M. Gordon (TX 08435300)
Henry L. Gompf (TX 08116400)
Troy B. Lewis (TX 12308650)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone:      (214) 220-3939
Facsimile:      (214) 969-5100

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION