**EXHIBIT I**

**~~FIRST~~SECOND AMENDED JOINT PLAN OF REORGANIZATION**

See attached.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE | : | Jointly Administered |
| | : | Case No. 02-10429 (JKF) |
| Kaiser Aluminum Corporation, | : | |
| a Delaware corporation, *et al.*, | : | Chapter 11 |
| | : | |
| | : | |
| Debtors. | : | |

| | | |
|---|---|---|
| (Kaiser Aluminum Corporation) | : | (Case No. 02-10429 (JKF)) |
| (Kaiser Aluminum & Chemical Corporation) | : | (Case No. 02-10430 (JKF)) |
| (Akron Holding Corporation) | : | (Case No. 02-10431 (JKF)) |
| (Kaiser Aluminum & Chemical Investment, Inc.) | : | (Case No. 02-10433 (JKF)) |
| (Kaiser Aluminium International, Inc.) | : | (Case No. 02-10434 (JKF)) |
| (Kaiser Aluminum Properties, Inc.) | : | (Case No. 02-10435 (JKF)) |
| (Kaiser Aluminum Technical Services, Inc.) | : | (Case No. 02-10436 (JKF)) |
| (Kaiser Bellwood Corporation) | : | (Case No. 02-10437 (JKF)) |
| (Kaiser Micromill Holdings, LLC) | : | (Case No. 02-10439 (JKF)) |
| (Kaiser Texas Micromill Holdings, LLC) | : | (Case No. 02-10440 (JKF)) |
| (Kaiser Sierra Micromills, LLC) | : | (Case No. 02-10441 (JKF)) |
| (Kaiser Texas Sierra Micromills, LLC) | : | (Case No. 02-10442 (JKF)) |
| (Oxnard Forge Die Company, Inc.) | : | (Case No. 02-10443 (JKF)) |
| (Alwis Leasing, LLC) | : | (Case No. 02-10818 (JKF)) |
| (Kaiser Center, Inc.) | : | (Case No. 02-10819 (JKF)) |
| (KAE Trading, Inc.) | : | (Case No. 03-10145 (JKF)) |
| (Kaiser Aluminum & Chemical Investment | : | (Case No. 03-10146 (JKF)) |
|    Limited (Canada)) | : | |
| (Kaiser Aluminum & Chemical Of Canada | : | (Case No. 03-10147 (JKF)) |
|    Limited (Canada)) | : | |
| (Kaiser Center Properties) | : | (Case No. 03-10149 (JKF)) |
| (Kaiser Export Company) | : | (Case No. 03-10150 (JKF)) |
| (Texada Mines Ltd. (Canada)) | : | (Case No. 03-10152 (JKF)) |
| | : | |
| | : | ~~FIRST~~SECOND AMENDED JOINT PLAN OF |
| | : | REORGANIZATION OF KAISER |
| | : | ALUMINUM CORPORATION, KAISER |
| | : | ALUMINUM & CHEMICAL |
| | : | CORPORATION AND CERTAIN OF |
| | : | THEIR DEBTOR AFFILIATES |

Gregory M. Gordon (TX 08435300)
Henry L. Gompf (TX 08116400)
Troy B. Lewis (TX 12308650)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

Daniel J. DeFranceschi (DE 2732)
Kimberly D. Newmarch (DE 4340)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

Dated: ~~August 24,~~ September 7, 2005

*PI CHANNELING INJUNCTIONS*

*Pursuant to section 105 and section 524(g) of the Bankruptcy Code, this plan of reorganization provides for the issuance of the PI Channeling Injunctions and Channeled PI Insurance Entity Injunction.  See Sections 1.1(36), 1.1(68), 1.1(131), 1.1(188) and 12.2.c.*

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................................... 1
ARTICLE I         DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME ... 1
    1.1           Defined Terms ......................................................................................... 1
    1.2           Rules of Interpretation and Computation of Time ....................................... 21
ARTICLE II        CLASSES OF CLAIMS AND INTERESTS; ALLOWED AMOUNT OF CERTAIN
                  CLAIMS ............................................................................................... 22
    2.1           Class 1 (Unsecured Priority Claims) ........................................................... 22
    2.2           Class 2 (Convenience Claims) .................................................................... 22
    2.3           Class 3 (Secured Claims) ........................................................................... 22
    2.4           Class 4 (Canadian Debtor PBGC Claims) ...................................................... 22
    2.5           Class 5 (Asbestos Personal Injury Claims) .................................................. 2223
    2.6           Class 6 (CTPV Personal Injury Claims) ....................................................... 2223
    2.7           Class 7 (NIHL Personal Injury Claims) ........................................................ 2223
    2.8           Class 8 (Silica Personal Injury Claims) ........................................................ 23
    2.9           Class 9 (General Unsecured Claims) ............................................................ 23
    2.10          Class 10 (Canadian Debtor Claims) ............................................................. 23
    2.11          Class 11 (Intercompany Claims) ................................................................. 23
    2.12          Class 12 (KAC Old Stock Interests) ............................................................. 23
    2.13          Class 13 (Kaiser Trading Old Stock Interests) .............................................. 23
    2.14          Class 14 (KACC Old Stock Interests) ........................................................... 23
    2.15          Class 15 (Other Old Stock Interests) ........................................................... 23
    2.16          Allowed Amount of Certain Claims .............................................................. 2324
ARTICLE III       TREATMENT OF CLAIMS AND INTERESTS ..................................................... 24
    3.1           Unclassified Claims .................................................................................. 24
    3.2           Unimpaired Classes of Claims ................................................................... 26
    3.3           Impaired Classes of Claims and Interests .................................................... 27
    3.4           Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims ... 2829
ARTICLE IV        MEANS FOR IMPLEMENTATION OF THE PLAN ............................................... 29
    4.1           Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors ... 29
    4.2           Restructuring Transactions ........................................................................ 29
    4.3           Corporate Governance, Directors and Officers, Employment-Related Agreements and
                  Compensation Programs ............................................................................ 2930
    4.4           Transfers of Funds Among the Debtors ....................................................... 31
    4.5           Preservation of Rights of Action; Settlement Agreements and Releases ............ 31
    4.6           Cancellation of KAC Old Stock .................................................................. 32

**TABLE OF CONTENTS**
(continued)

Page

4.7     Registration Rights Agreement and Stock Transfer Restriction Agreement ............ 32

4.8     Release of Liens ......................................................... 32**33**

4.9     Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes........ 32**33**

4.10    Canadian Proceeding........................................................33

4.11    Certain Provisions Relating to KAC Old Stock Interests.......................33

**4.12    Effect of Plan on Certain Indentures** ...................................... **33**

ARTICLE V     FUNDING VEHICLE TRUST; PI TRUSTS................................33**34**

5.1     Funding Vehicle Trust.....................................................33**34**

5.2     Asbestos PI Trust..........................................................36**38**

5.3     Silica PI Trust.............................................................38**40**

5.4     CTPV PI Trust.............................................................40**41**

5.5     NIHL PI Trust.............................................................41**43**

5.6     Insurance Neutrality........................................................43**44**

ARTICLE VI    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES............43**45**

6.1     Executory Contracts or Unexpired Leases to Be Assumed or Assumed and Assigned............43**45**

6.2     Payments Related to the Assumption of Executory Contracts and Unexpired Leases.........44**46**

6.3     Executory Contracts and Unexpired Leases to Be Rejected.......................44**46**

6.4     Bar Date for Rejection Damages..............................................44**46**

6.5     Obligations to Indemnify Directors, Officers and Employees.......................45**46**

6.6     Contracts and Leases Entered Into After the Petition Date........................45**47**

6.7     Insurance Policies and Agreements............................................45**47**

6.8     Collective Bargaining Agreements............................................46**47**

ARTICLE VII   PROVISIONS GOVERNING DISTRIBUTIONS.......................46**48**

7.1     Distributions for Claims Allowed as of the Effective Date........................46**48**

7.2     Method of Distributions to Holders of Claims...................................47**48**

7.3     Compensation and Reimbursement for Services Related to Distributions................47**48**

7.4     Provisions Governing the Unsecured Claims Reserve............................47**49**

7.5     Delivery of Distributions and Undeliverable or Unclaimed Distributions................48**49**

7.6     Distribution Record Date....................................................49**51**

7.7     Means of Cash Payments...................................................50**51**

7.8     Timing and Calculation of Amounts to Be Distributed...........................50**52**

7.9     Application of Distributions.................................................51**53**

7.10    Setoffs...................................................................51**53**

7.11    Surrender of Cancelled Securities............................................52**53**

7.12    Special ~~Provision~~**Provisions** Relating to Environmental ~~Settlement Agreement~~............53**Matters 54**

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| ARTICLE VIII | PROCEDURES FOR RESOLVING DISPUTED CLAIMS | 53**55** |
| 8.1 | Prosecution of Objections to Claims | 53**55** |
| 8.2 | Liquidation and Payment of Tort Claims | 53**55** |
| 8.3 | Treatment of Disputed Claims | 54**56** |
| 8.4 | Distributions on Account of Disputed Claims Once Allowed | 54**56** |
| 8.5 | Tax Requirements for Income Generated by Unsecured Claims Reserve | 54**56** |
| ARTICLE IX | SUBSTANTIVE CONSOLIDATION OF CERTAIN DEBTORS | 54**56** |
| 9.1 | Substantive Consolidation | 54**56** |
| 9.2 | Order Granting Substantive Consolidation | 55**57** |
| ARTICLE X | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 55**57** |
| 10.1 | Conditions to Confirmation | 55**57** |
| 10.2 | Conditions to the Effective Date | 57**59** |
| 10.3 | Waiver of Conditions to the Confirmation or Effective Date | 57**60** |
| 10.4 | Effect of Nonoccurrence of Conditions to the Effective Date | 58**60** |
| ARTICLE XI | CRAMDOWN | 58**60** |
| ARTICLE XII | DISCHARGE, TERMINATION AND INJUNCTION | 58**60** |
| 12.1 | Discharge of Claims and Termination of Interests | 58**60** |
| 12.2 | Injunctions | 59**61** |
| ARTICLE XIII | RETENTION OF JURISDICTION | 61**63** |
| ARTICLE XIV | MISCELLANEOUS PROVISIONS | 62**64** |
| 14.1 | Dissolution of Committees | 62**64** |
| 14.2 | Limitation of Liability | 63**65** |
| 14.3 | Modification of the Plan | 63**65** |
| 14.4 | Revocation of the Plan | 63**65** |
| 14.5 | Severability of Plan Provisions | 63**65** |
| 14.6 | Exhibits | 64**66** |
| 14.7 | Successors and Assigns | 64**66** |
| 14.8 | Service of Certain Plan Exhibits and Disclosure Statement Exhibits | 64**66** |
| 14.9 | Service of Documents | 64**66** |

# TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit 1.1(34) | Asbestos Distribution Procedures |
| Exhibit 1.1(39) | Asbestos PI Trust Agreement |
| Exhibit 1.1(66) | CTPV Distribution Procedures |
| Exhibit 1.1(71) | CTPV PI Trust Agreement |
| Exhibit 1.1(79) | Director Designation Agreement |
| Exhibit 1.1(102) | Funding Vehicle Trust Agreement |
| Exhibit 1.1(107) | Included PI Trust Insurance Policies |
| Exhibit 1.1(129) | NIHL Distribution Procedures |
| Exhibit 1.1(134) | NIHL PI Trust Agreement |
| Exhibit 1.1(153) | PI Trust Funding Agreement |
| Exhibit 1.1(167) | Registration Rights Agreement |
| Exhibit 1.1(185) | Settling Insurance Companies |
| Exhibit 1.1(186) | Silica Distribution Procedures |
| Exhibit 1.1(191) | Silica PI Trust Agreement |
| Exhibit 1.1(194) | Stock Transfer Restriction Agreement |
| Exhibit 4.2 | Restructuring Transactions |
| Exhibit 4.3.a(i) | Certificate of Incorporation and Bylaws of Reorganized KAC |
| Exhibit 4.3.a(ii) | Certificates of Incorporation and Bylaws of Reorganized Kaiser Trading |
| Exhibit 4.3.b | Initial Directors and Officers of Certain Reorganized Debtors |
| Exhibit 4.3.c | List of Employment and Other Agreements and Plans that Are in Effect and/or Will Take Effect as of the Effective Date |
| Exhibit 6.1.a | Schedule of Executory Contracts and Unexpired Leases to Be Assumed or Assumed and Assigned |

All Exhibits to the Plan will be Filed with the Clerk of the Bankruptcy Court not later than the earlier of (a) 30 days prior to the commencement of the hearing on Confirmation of the Plan and (b) 15 days prior to the deadline for filing objections to Confirmation of the Plan. Such Exhibits, together with the Plan and the Disclosure Statement, may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court. Such Exhibits, together with the Plan and the Disclosure Statement, will also be available for download from the following website: www.kaiseraluminum.com. Holders of Claims and Interests in the Debtors may also obtain a copy of such Exhibits, once Filed, together with the Plan and the Disclosure Statement, from KAC by a written request sent to the following address:

Kaiser Aluminum Corporation
27422 Portola Parkway, Ste. 350
Foothill Ranch, California 92610-2831
Attn: General Counsel

## INTRODUCTION

Kaiser Aluminum Corporation ("KAC"), Kaiser Aluminum & Chemical Corporation ("KACC"), and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") propose the following joint plan of reorganization for the resolution of the outstanding claims against and equity interests in the Debtors. The Debtors are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, 11 U.S.C. § 1129. Reference is made to the Debtors' Disclosure Statement, Filed contemporaneously with the Plan, for a discussion of the history, businesses, results of operations, historical financial information, projections and properties of the Debtors, and for a summary and analysis of the Plan. There also are other agreements and documents, which are or will be Filed with the Bankruptcy Court, that are referenced in the Plan or the Disclosure Statement and that will be available for review.

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION
## AND COMPUTATION OF TIME

### 1.1    Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

(1)    **"6-1/2% RPC Revenue Bond Claim"** means a claim against KACC under or in respect of one or more 6-1/2% RPC Revenue Bonds or appurtenant coupons and the 6-1/2% RPC Revenue Bond Indenture.

(2)    **"6-1/2% RPC Revenue Bond Indenture"** means the Indenture of Trust, dated as of March 1, 1978, between Jackson County, West Virginia and the 6-1/2% RPC Revenue Bond Indenture Trustee, as the same may have been or may be modified, amended or supplemented, together with all instruments and agreements related thereto.

(3)    **"6-1/2% RPC Revenue Bond Indenture Trustee"** means The Bank of New York, as successor indenture trustee under the 6-1/2% RPC Revenue Bond Indenture or any subsequent successor indenture trustee.

(4)    **"6-1/2% RPC Revenue Bonds"** means the Jackson County, West Virginia, Refunding Pollution Control Revenue Bonds, Series 1978 (Kaiser Aluminum & Chemical Corporation Project) issued pursuant to the 6-1/2% RPC Revenue Bond Indenture in an aggregate outstanding principal amount of $12,400,000.

(5)    **"7-3/4% SWD Revenue Bond Claim"** means a Claim against a Debtor under or in respect of one or more 7-3/4% SWD Revenue Bonds and the 7-3/4% SWD Revenue Bond Indenture.

(6)    **"7-3/4% SWD Revenue Bond Indenture"** means the Trust Indenture, dated as of December 1, 1992, between Parish of St. James, State of Louisiana and the 7-3/4% SWD Revenue Bond Indenture Trustee, as the same may have been or may be modified, amended or supplemented, together with all instruments and agreements related thereto.

(7)    **"7-3/4% SWD Revenue Bond Indenture Trustee"** means J.P. Morgan Trust Company, N.A., as successor indenture trustee under the 7-3/4% SWD Revenue Bond Indenture or any subsequent successor indenture trustee.

(8)    **"7-3/4% SWD Revenue Bonds"** means the Parish of St. James, State of Louisiana, Solid Waste Disposal Revenue Bonds (Kaiser Aluminum Project) Series 1992 issued pursuant to the 7.60% SWD Revenue Bond Indenture in an outstanding principal amount of $20,000,000.

**(9)**      **"7-3/4% SWD Revenue Bond Settlement"** means the settlement relating to the dispute involved in the adversary proceeding filed January 13, 2004, and styled *Paul J. Guillot v. Kaiser Aluminum & Chemical Corporation*, Adv. Pro. No. 04-51165 (JKF) approved pursuant to the order entered by the Bankruptcy Court on June 2, 2005.

**(10)**      **"7.60% SWD Revenue Bond Claim"** means a Claim against KACC under or in respect of one or more 7.60% SWD Revenue Bonds and the 7.60% SWD Revenue Bond Indenture.

**(11)**      **"7.60% SWD Revenue Bond Indenture"** means the Indenture of Trust, dated as of March 1, 1997, by and between The Industrial Development Corporation of Spokane County, Washington and the 7.60% SWD Revenue Bond Indenture Trustee, as the same may have been or may be modified, amended or supplemented, together with all instruments and agreements related thereto.

**(12)**      **"7.60% SWD Revenue Bond Indenture Trustee"** means HSBC Bank USA, as successor indenture trustee under the 7.60% SWD Revenue Bond Indenture or any subsequent successor indenture trustee.

**(13)**      **"7.60% SWD Revenue Bonds"** means The Industrial Development Corporation of Spokane County, Washington, 7.60% Solid Waste Disposal Revenue Bonds (Kaiser Aluminum and Chemical Corporation Project) Series 1997 issued pursuant to the 7.60% SWD Revenue Bond Indenture in an outstanding principal amount of $~~19,000,000.~~**19,000,000 as of the Petition Date.**                                                    |

**(14)**      **"9-7/8% Senior Note Claim"** means a Claim against KACC and the Debtor Guarantors under or in respect of one or more 9-7/8% Senior Notes and the 9-7/8% Senior Note Indenture.

**(15)**      **"9-7/8% Senior Note Indenture"** means the Indenture, dated as of February 17, 1994, by and among KACC, the Debtor Guarantors, the Alumina Subsidiary Debtors and the 9-7/8% Senior Note Indenture Trustee, as the same may have been or may be modified, amended or supplemented, together with all instruments and agreements related thereto.

**(16)**      **"9-7/8% Senior Note Indenture Trustee"** means Deutsche Bank Trust Company, National Association, as successor indenture trustee under the 9-7/8% Senior Note Indenture or any subsequent successor indenture trustee.

**(17)**      **"9-7/8% Senior Notes"** means the 9-7/8% senior notes due 2002, issued by KACC pursuant to the 9-7/8% Senior Note Indenture in an outstanding principal amount of $172,780,000.

**(18)**      **"10-7/8% Senior Note Claim"** means a Claim against KACC and the Debtor Guarantors under or in respect of one or more 10-7/8% Senior Notes and the applicable 10-7/8% Senior Note Indenture.

**(19)**      **"10-7/8% Senior Note Indentures"** means, together, the Indenture, dated as of October 23, 1996, and the Indenture, dated as of December 23, 1996, in each case, by and among KACC, the Debtor Guarantors, the Alumina Subsidiary Debtors and the 10-7/8% Senior Note Indenture Trustee, as the same may have been or may be modified, amended or supplemented, together with all instruments and agreements related thereto.

**(20)**      **"10-7/8% Senior Note Indenture Trustee"** means U.S. Bank National Association, as successor indenture trustee under the 10-7/8% Senior Note Indentures or any subsequent successor indenture trustee.

**(21)**      **"10-7/8% Senior Notes"** means the 10-7/8% Series B senior notes due 2006 and the 10-7/8% Series D senior notes due 2006, issued by KACC pursuant to the 10-7/8% Senior Note Indentures in outstanding principal amounts of $175,000,000 and $50,000,000, respectively.

**(22)**      **"Administrative Claim"** means a Claim for costs and expenses of administration allowed under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of each Debtor, including Claims based on liabilities incurred by such Debtor in the ordinary course of its business and Claims under

the DIP Financing Facility; (b) Professional Fee Claims; (c) US Trustee Fees; (d) Claims for reclamation allowed in accordance with section 546(c)(2) of the Bankruptcy Code and Section 2-702 of the Uniform Commercial Code; and (e) unpaid Administrative Claims of the PBGC allowed pursuant to the PBGC Settlement Agreement; *provided, however*, that except as otherwise provided in the Intercompany Claims Settlement, no Intercompany Claim will constitute an Administrative Claim.

(23)    **"Administrative Claim Bar Date"** means the date by which, except as otherwise provided in the Plan, all requests for payment of Administrative Claims are required to be Filed with the Bankruptcy Court.

(24)    **"Administrative Claim Bar Date Order"** means the order of the Bankruptcy Court (which may be the Confirmation Order) establishing the Administrative Claim Bar Date.

(25)    **"Administrative Trade Claim"** means an Administrative Claim arising from or with respect to the sale of goods or rendition of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, including Administrative Claims of employees for ordinary course wages, expense reimbursement and health and welfare benefits.

(26)    **"AJI"** means Alpart Jamaica Inc.

(27)    **"Allowed Claim"** means:

a.    with respect to a Claim other than a Channeled Personal Injury Claim, a Claim that (i) has been listed by a particular Debtor on its Schedules as other than disputed, contingent or unliquidated and (ii) is not otherwise a Disputed Claim;

b.    with respect to a Claim other than a Channeled Personal Injury Claim, a Claim (i) for which a proof of Claim or request for payment of Administrative Claim has been Filed by the applicable Bar Date or otherwise been deemed timely Filed under applicable law and (ii) that is not otherwise a Disputed Claim; or

c.    with respect to a Claim other than a Channeled Personal Injury Claim, a Claim that is allowed: (i) in any Stipulation of Amount and Nature of Claim executed by the applicable Debtor and Claim holder prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any Stipulation of Amount and Nature of Claim executed by the applicable Reorganized Debtor and Claim holder after the Effective Date; (iii) in any contract, instrument or other agreement or document entered into in connection with the Plan prior to the Effective Date and approved by the Bankruptcy Court; (iv) in a Final Order; or (v) pursuant to the Plan.

(28)    **"Allowed Class . . . Claim"** means an Allowed Claim in the particular Class described. Any reference herein to a particular Allowed Claim includes both the secured and unsecured portions of such Claim.

(29)    **"Allowed Class . . . Interest"** means an Allowed Interest in the particular Class described.

(30)    **"Allowed Interest"** means an Interest: (a) that is registered as of the Distribution Record Date in a stock register that is maintained by or on behalf of the applicable Debtor or evidenced in writing by an instrument, agreement or other document and (b)(i) is not a Disputed Interest or (ii) has been allowed by a Final Order.

(31)    **"Alumina Subsidiary Debtors"** means AJI, KJC, KAAC and KFC.

(32)    **"Alumina Subsidiary Plans"** means the third amended joint plans of liquidation for AJI and KJC and for KAAC and KFC Filed with the Bankruptcy Court on February 25, 2005, as the same may have been or may be amended, modified or supplemented.

(33)    **"Asbestos Claimants' Committee"** means the official asbestos claimants' committee appointed by the US Trustee in the Reorganization Cases on February 25, 2002 pursuant to section 1102 of the Bankruptcy Code as such appointment has been subsequently modified.

(34)    **"Asbestos Distribution Procedures"** means the Asbestos Distribution Procedures in substantially the form of Exhibit 1.1(34).

(35)    **"Asbestos Personal Injury Claim"** means a Claim, remedy, liability or Demand against one or more of the Debtors, now existing or hereafter arising, whether or not such Claim, remedy, liability or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether or not the facts of or legal bases therefore are known or unknown, under any theory of law, equity, admiralty or otherwise, for death, bodily injury, sickness, disease, medical monitoring or other personal injuries (whether physical, emotional or otherwise) to the extent caused or allegedly caused, directly or indirectly, in whole or in part, by the presence of or exposure (whether prior to, on or after the Petition Date) to asbestos or asbestos-containing products, including asbestos or asbestos-containing products that was or were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, replaced or disposed of, or present at any premises owned, leased, occupied or operated, by a Debtor or any entity for which any of the Debtors allegedly has liability, including any Claim, remedy, liability or Demand for compensatory damages (such as loss of consortium, wrongful death, medical monitoring, survivorship, proximate, consequential, general and special damages) and punitive damages and any Claim, remedy, liability, or Demand for reimbursement, indemnification, subrogation or contribution (including but not limited to any Indirect Channeled Personal Injury Claim attributable to asbestos). Asbestos Personal Injury Claims shall include any Claim, remedy, liability or Demand under any settlement entered into by or on behalf of a Debtor prior to the Petition Date based upon or arising out of an Asbestos Personal Injury Claim. A workman's compensation or occupational disability claim brought directly by a past or present employee of a Debtor under an applicable workman's compensation or occupational disability statute against such Debtor will not constitute an Asbestos Personal Injury Claim; *provided, however,* that claims by past and present employees of a Debtor under Louisiana law that include allegations of exposure in the Debtors' facilities in Louisiana, some of which occurred prior to July 16, 1976, and liability allegations against so-called "executive officers" in those Louisiana locations to whom responsibility for plant safety issues allegedly had been delegated will not be deemed to be brought under an applicable workman's compensation or occupational disability statute.

(36)    **"Asbestos PI Channeling Injunction" means an order or orders issued or affirmed by the District Court in accordance with and pursuant to section 524(g) of the Bankruptcy Code, permanently and forever staying, restraining and enjoining any entity from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos Personal Injury Claims, all of which will be channeled to the Asbestos PI Trust for resolution as set forth in the Asbestos PI Trust Distribution Procedures (other than actions brought in conformity and compliance with the provisions hereof to enforce any right or obligation under the Plan, any Exhibits to the Plan or any agreement or instrument between a Debtor or Reorganized Debtor and the Asbestos PI Trust), including, but not limited to:**

   a.    **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;**

   b.    **enforcing, levying, attaching (including through any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;**

   c.    **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party or any property or interests in property of any Protected Party;**

d.      **setting off, seeking reimbursement of, contribution from or subrogation against or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and**

e.      **proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos PI Trust, except in conformity and compliance therewith.**

(37)    **"Asbestos PI TAC"** means the Asbestos PI Trust Advisory Committee established pursuant to the Plan and the Asbestos PI Trust Agreement.

(38)    **"Asbestos PI Trust"** means the trust established in accordance with the Asbestos PI Trust Agreement.

(39)    **"Asbestos PI Trust Agreement"** means the Asbestos PI Trust Agreement to be entered into by Reorganized KACC and the Asbestos PI Trustees in substantially the form of Exhibit 1.1(39).

(40)    **"Asbestos PI Trustees"** means the individuals confirmed by the Bankruptcy Court to serve as the trustees of the Asbestos PI Trust pursuant to the Plan or who subsequently may be appointed to serve as trustees of the Asbestos PI Trust pursuant to the Asbestos PI Trust Agreement.

(41)    **"Ballot"** means the form or forms distributed to each holder of an impaired Claim entitled to vote on the Plan on which the holder indicates acceptance or rejection of the Plan.

(42)    **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as now in effect or hereafter amended, as applicable to the Reorganization Cases.

(43)    **"Bankruptcy Court"** means the District Court and, to the extent of any reference made pursuant to 28 U.S.C. § 157, the bankruptcy unit of such District Court.

(44)    **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Reorganization Cases.

(45)    **"Bar Date"** means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

(46)    **"Bar Date Order"** means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claims in the Reorganization Cases, including the orders entered October 29, 2002, March 17, 2003 and December 16, 2003, as the same may have been or may be amended, modified or supplemented.

(47)    **"Business Day"** means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

(48)    **"Bylaws"** means, with respect to a Reorganized Debtor, the bylaws, regulations or other comparable document of such Reorganized Debtor, to be amended and restated in accordance with Section 4.3 hereof.

(49)    **"Canadian Debtor"** means KACOCL, Kaiser Aluminum & Chemical Canada Investment Limited or Texada Mines Ltd.

(50)    **"Canadian Proceeding"** means the ancillary proceeding filed by the Canadian Debtors, in Canada under Section 18.6 of the Canadian Companies' Creditors Arrangement Act, R.S.C. 1985 c. C-36, as amended, in the Superior Court of Justice for Ontario, Canada.

**(51)**     **"Cash"** means the legal tender of the United States of America.

**(52)**     **"Cash Investment Yield"** means the net yield earned by the applicable Disbursing Agent from the investment of Cash held pending distribution pursuant to the Plan (including any Cash dividends and other Cash distributions on account of New Common Stock), which investment will be in a manner consistent with the Reorganized Debtors' investment and deposit guidelines.

**(53)**     **"Certificate of Incorporation"** means, with respect to any Reorganized Debtor, the articles or certificate of incorporation or other comparable document of such Reorganized Debtor, to be amended and restated in accordance with Section 4.3 hereof.

**(54)**     **"Channeled Personal Injury Claims"** means, collectively, Asbestos Personal Injury Claims, CTPV Personal Injury Claims, NIHL Personal Injury Claims and Silica Personal Injury Claims.

**(55)**     **"Channeled PI Insurance Entity Injunction"** means the injunction set forth in Section 12.2.c.

**(56)**     **"Claim"** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

**(57)**     **"Claims Objection Bar Date"** means, for all Claims, other than Channeled Personal Injury Claims and those Claims allowed in accordance with Section 1.1(27), the latest of: (a) 120 days after the Effective Date; (b) 60 days after the Filing of a proof of Claim for such Claim; and (c) such other period of limitation as may be specifically fixed by the Plan, the Confirmation Order or a Final Order.

**(58)**     **"Class"** means a class of Claims or Interests, as described in Article II.

**(59)**     **"Confirmation"** means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

**(60)**     **"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

**(61)**     **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued from time to time.

**(62)**     **"Confirmation Order"** means the order or orders of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, and establishing, *inter alia*, the PI Channeling Injunctions and the Channeled PI Insurance Entity Injunction.

**(63)**     **"Contractual Subordination Disputes"** means any or all of the following matters pending in the jointly administered Reorganization Cases: (a) the adversary proceeding styled *Paul J. Guillot v. Kaiser Aluminum & Chemical Corporation*, Adv. Pro. No. 04-51165 (JKF); (b) the motion Filed by the Senior Subordinated Note Indenture Trustee to determine the classification of the Senior Subordinated Note Claims under any plans of reorganization Filed by the Debtors or the Other Debtors that guaranteed the Senior Subordinated Notes; and (c) the adversary proceeding styled *U.S. Bank National Association v. Kaiser Aluminum & Chemical Corporation*, Adv. Pro. No. 04-55115 (JKF).

**(64)**     **"Creditors' Committee"** means the official committee of unsecured creditors of the Debtors appointed by the US Trustee in the chapter 11 cases of the Debtors and Other Debtors on February 25, 2002 pursuant to section 1102 of the Bankruptcy Code, as such appointment has been subsequently modified.

**(65)**     **"CTPV"** means coal tar pitch volatiles.

(66)    **"CTPV Distribution Procedures"** means the CTPV Distribution Procedures in substantially in the form of Exhibit 1.1(66).

(67)    **"CTPV Personal Injury Claim"** means a Claim or remedy, liability or Demand against one or more of the Debtors, now existing or hereafter arising, whether or not such Claim, remedy, liability or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether or not the facts of or legal bases therefore are known or unknown, under any theory of law, equity, admiralty or otherwise, for death, bodily injury, sickness, disease, medical monitoring or other personal injuries (whether physical, emotional or otherwise) to the extent caused or allegedly caused, directly or indirectly, in whole or in part, by the presence of or exposure (whether prior to, on or after the Petition Date) to CTPV present in or released into any premises owned, leased, occupied or operated by a Debtor or any entity for which any of the Debtors allegedly has liability, including any Claim, remedy, liability or Demand for compensatory damages (such as loss of consortium, wrongful death, medical monitoring, survivorship, proximate, consequential, general and special damages) and punitive damages and any Claim, remedy, liability or Demand for reimbursement, indemnification, subrogation or contribution (including but not limited to any Indirect Channeled Personal Injury Claim attributable to CTPV). CTPV Personal Injury Claims shall include any Claim, remedy, liability or Demand under any settlement entered into by or on behalf of a Debtor prior to the Petition Date based upon or arising out of a CTPV Personal Injury Claim. A workman's compensation or occupational disability claim brought directly by a past or present employee of a Debtor under an applicable workman's compensation or occupational disability statute against such Debtor will not constitute a CTPV Personal Injury Claim; *provided, however,* that claims by past and present employees of a Debtor under Louisiana law that include allegations of exposure in the Debtors' facilities in Louisiana, some of which occurred prior to July 16, 1976, and liability allegations against so-called "executive officers" in those Louisiana locations to whom responsibility for plant safety issues allegedly had been delegated will not be deemed to be brought under an applicable workman's compensation or occupational disability statute.

(68)    **"CTPV PI Channeling Injunction"** means an order or orders entered by the Bankruptcy Court in accordance with and pursuant to section 105(a) of the Bankruptcy Code, permanently and forever staying, restraining and enjoining any entity from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any CTPV Personal Injury Claims, all of which will be channeled to the CTPV PI Trust for resolution as set forth in the CTPV Distribution Procedures (other than actions brought in conformity and compliance with the provisions hereof to enforce any right or obligation under the Plan, any Exhibits to the Plan or any agreement or instrument between a Debtor or Reorganized Debtor and the CTPV PI Trust), including, but not limited to:

a.    **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;**

b.    **enforcing, levying, attaching (including through any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;**

c.    **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party or any property or interests in property of any Protected Party;**

d.    **setting off, seeking reimbursement of, contribution from or subrogation against or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and**

e.    **proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the CTPV PI Trust, except in conformity and compliance therewith.**

(69)    **"CTPV PI TAC"** means the CTPV PI Trust Advisory Committee established pursuant to the Plan and the CTPV PI Trust Agreement.

(70)    **"CTPV PI Trust"** means the CTPV PI Trust established in accordance with the CTPV PI Trust Agreement.

(71)    **"CTPV PI Trust Agreement"** means the CTPV PI Trust Agreement to be entered into by Reorganized KACC and the CTPV PI Trustees in substantially the form of Exhibit 1.1(71).

(72)    **"CTPV PI Trustee"** means the Future Silica and CTPV Claimants' Representative or the individual who subsequently may be appointed to serve as the trustee of the CTPV PI Trust pursuant to the CTPV PI Trust Agreement, as the case may be.

(73)    **"Cure Amount Claim"** means a Claim based upon a Debtor's defaults pursuant to an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by that Debtor under section 365 of the Bankruptcy Code.

(74)    **"Debtor Guarantors"** means, collectively: Kaiser Bellwood Corporation; Kaiser Micromill Holdings, LLC; Kaiser Texas Micromill Holdings, LLC; Kaiser Sierra Micromills, LLC; and Kaiser Texas Sierra Micromills, LLC.

(75)    **"Debtors"** has the meaning set forth in the introductory paragraph of the Plan.

(76)    **"Demand"** means a demand for payment, present or future, that: (a) was not a Claim during the Reorganization Cases; (b) arises out of the same or similar conduct or events that gave rise to the Claims addressed by the Asbestos PI Channeling Injunction, the CTPV PI Channeling Injunction or the Silica PI Channeling Injunction; and (c) is to be paid by the applicable PI Trust pursuant to the Plan.

(77)    **"DIP Financing Facility"** means, collectively: (a) the Secured Superpriority Debtor In Possession Revolving Credit and Guaranty Agreement, dated as of February 11, 2005, among the Debtors identified as "Borrowers" and the Debtors identified as "Guarantors" thereunder, those entities identified therein as "Lenders" thereunder, JPMorgan Chase Bank, National Association, as "Administrative Agent, Documentation Agent and Collateral Agent" thereunder, J.P. Morgan Securities Inc., as "Lead Arranger, Sole Bookrunner and Syndication Agent" thereunder and The CIT Group/Business Credit, Inc., as "Co-Arranger" thereunder; (b) all amendments thereto and extensions thereof; and (c) all security agreements and instruments related to the documents identified in (a) and (b).

(78)    **"DIP Lender"** means, collectively: JPMorgan Chase Bank, National Association; The CIT Group/Business Credit, Inc.; and each of the other financial institutions from time to time identified as "Lenders" in the DIP Financing Facility and their respective successors and assigns.

(79)    **"Director Designation Agreement"** means the agreement between Reorganized KAC and the USW relating to the designation of directors of Reorganized KAC in substantially the form of Exhibit 1.1(79).

(80)    **"Disbursing Agent"** means Reorganized KAC, in its capacity as a disbursing agent in accordance with the Plan, or any Third Party Disbursing Agent.

(81)    **"Disclosure Statement"** means the disclosure statement that relates to the Plan (including all Exhibits and schedules thereto or referenced therein), as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

(82)    **"Disputed Claim"** means:

a.    if no proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law: (i) a Claim that is listed on a Debtor's Schedules as other than disputed,

contingent or unliquidated, but as to which the applicable Debtor or Reorganized Debtor or, prior to the Confirmation Date, any other party in interest has Filed an objection by the Claims Objection Bar Date and such objection has not been withdrawn or denied by a Final Order; or (ii) a Claim that is listed on a Debtor's Schedules as disputed, contingent or unliquidated;

b.      if a proof of Claim or proof of Administrative Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law: (i) a Claim for which no corresponding Claim is listed on a Debtor's Schedules; (ii) a Claim for which a corresponding Claim is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted in the proof of Claim varies from the nature and amount of such Claim as it is listed on the Schedules; (iii) a Claim for which a corresponding Claim is listed on a Debtor's Schedules as disputed, contingent or unliquidated; (iv) a Claim for which an objection has been Filed by the applicable Debtor or Reorganized Debtor or, prior to the Confirmation Date, any other party in interest by the Claims Objection Bar Date, and such objection has not been withdrawn or denied by a Final Order; (v) a Tort Claim; or (vi) a Channeled Personal Injury Claim, which will be resolved pursuant to the PI Trust Distribution Procedures, in each case, other than an Allowed Claim under Section 1.1(27); or

c.      a Claim for damages in respect of an Executory Contract or Unexpired Lease that has been rejected or is anticipated to be rejected under section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not occurred and such Claim is not otherwise an Allowed Claim.

(83)      **"Disputed Interest"** means an Interest as to which an objection has been timely Filed under applicable law and such has not been withdrawn on or before any date fixed by the Plan or by order of the Bankruptcy Court for Filing such objections and such objection has not been denied by a Final Order.

(84)      **"Distribution Record Date"** means the close of business on the date announced by the Debtors that is not more than five Business Days preceding the then-anticipated Effective Date.

(85)      **"District Court"** means the United States District Court for the District of Delaware having jurisdiction over the Reorganization Cases.

(86)      **"Document Website"** means the Internet site with the address www.kaiseraluminum.com at which the Plan, the Disclosure Statement and all Exhibits and schedules to the Plan and to the Disclosure Statement will be available, without charge, to any party in interest and the public.

(87)      **"Effective Date"** means a day, as determined by the Debtors, that is the Business Day as soon as reasonably practicable after all conditions to the Effective Date have been met or waived.

(88)      **"Environmental Settlement Agreement"** means the consent decree entered by the Bankruptcy Court on October 27, 2003, and agreed to by the United States of America, the States of California, Rhode Island and Washington, the Puyallup Tribe of Indians and KACC, as the same may have been or may be modified, amended or supplemented.

(89)      **"Equity Claim"** means a legal, equitable or contractual Claim arising from any share or other stock ownership interest in a Debtor, whether or not transferable or denominated "stock," or similar security, and any options, warrants, convertible security, liquidation preference or other right to acquire such shares or other ownership interest, including but not limited to Claims arising from rescission of the purchase or sale of such stock ownership interests, for damages arising from the purchase or sale of such stock ownership interest or for reimbursement or contribution on account of such Claim.

(90)      **"Equity Incentive Plan"** means the Equity Incentive Plan to be adopted by Reorganized KAC on the Effective Date listed on Exhibit 4.3.c.

(91)      **"ERISA"** means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301-1461, as now in effect or hereafter amended.

(92)    **"Estate"** means, as to each Debtor, the estate created for that Debtor in its Reorganization Case pursuant to section 541 of the Bankruptcy Code.

(93)    **"Exchange Act"** means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78jj, as now in effect or hereafter amended.

(94)    **"Executory Contract or Unexpired Lease"** means a contract or lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code.

(95)    **"Exit Financing Facility"** means a revolving credit facility in the currently anticipated principal amount of $200,000,000, including a $60,000,000 letter of credit sub-facility and a $17,500,000 swingline loan sub-facility and a term loan in the currently anticipated principal amount of $50,000,000, which will be entered into by Reorganized KAC as "Borrower," certain of the other Reorganized Debtors or their successors as "Borrowers" or as "Guarantors," the JPMorgan Chase Bank, National Association, as "Administrative Agent" and the other financial institutions named therein on the Effective Date.

(96)    **"Exit Financing Facility Agent Bank"** means JPMorgan Chase Bank, National Association, as "Administrative Agent" under the Exit Financing Facility.

(97)    **"Face Amount"** means when used with reference to a Disputed Claim in Class 9: (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law, or if the proof of Claim specified an unliquidated amount, the amount of the Claim (i) acknowledged by the applicable Debtor in any objection Filed to such Claim or in the Schedules as an undisputed, noncontingent and liquidated Claim, (ii) estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (iii) proposed by the applicable Debtor and approved by the Creditors' Committee prior to the Effective Date; or (c) if neither (a) nor (b) above are applicable, an amount estimated by the applicable Debtor so long as such estimated amount is not less than either (i) any amount of such Claim as estimated by the Bankruptcy Court or (ii) the liquidated portion of the amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law.

(98)    **"Fee Order"** means the Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals entered by the Bankruptcy Court on April 22, 2002 as subsequently revised.

(99)    **"File," "Filed" or "Filing"** means file, filed or filing with the Bankruptcy Court or its authorized designee in the Reorganization Cases.

(100)    **"Final Order"** means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, as entered on the docket in any Reorganization Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing has been denied or has resulted in no modification of such order.

(101)    **"Funding Vehicle Trust"** means the trust established in accordance with the Funding Vehicle Trust Agreement.

(102)    **"Funding Vehicle Trust Agreement"** means the Funding Vehicle Trust Agreement to be entered into by Reorganized KACC and the Funding Vehicle Trustees in substantially the form of Exhibit 1.1(102).

(103)    **"Funding Vehicle Trustees"** means the individuals serving from time to time as the Asbestos PI Trustees and the Silica PI Trustee.

(104)    **"Future Asbestos Claimants' Representative"** means Martin J. Murphy, Esq., appointed by order of the Bankruptcy Court on January 27, 2003 as the legal representative for future asbestos-related claimants for the purpose of protecting the interests of persons that may subsequently assert asbestos-related Demands channeled to the Asbestos PI Trust (or any court-appointed successor).

(105)    **"Future Silica and CTPV Claimants' Representative"** means Anne M. Ferazzi, Esq., appointed by order of the Bankruptcy Court on June 22, 2004 as the legal representative for future silica-related and CTPV-related claimants for the purpose of protecting the interests of persons that may subsequently assert silica-related or CTPV-related Demands channeled to the Silica PI Trust or the CTPV PI Trust, as the case may be (or any court-appointed successor).

(106)    **"General Unsecured Claim"** means an Unsecured Claim classified in Class 9.

(107)    **"Included PI Trust Insurance Policies"** means those insurance policies described on Exhibit 1.1(107).

(108)    **"Indenture Trustees"** means, collectively, the 9-7/8% Senior Note Indenture Trustee, the 10-7/8% Senior Note Indenture Trustee, the Senior Subordinated Note Indenture Trustee, the 7-3/4% SWD Revenue Bond Indenture Trustee, the 7.60% SWD Revenue Bond Indenture Trustee and the 6-1/2% RPC Revenue Bond Indenture Trustee or any successor to any of them.

(109)    **"Indirect Channeled Personal Injury Claim"** means any Claim for reimbursement, indemnification, subrogation, contribution or indemnity, whether contractual or implied by law, and any derivative or indirect Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law, equity or admiralty whatsoever, on account of or with respect to a Channeled Personal Injury Claim.

(110)    **"Initial Availability Amount"** means, as calculated as of the Effective Date, the sum of (a) the consolidated cash balance of Reorganized KAC plus (b) the available liquidity under the revolving credit facility component of the Exit Financing Facility, in each case after giving effect to (i) the Initial VEBA Contributions and all other cash payments (including accruals or reserves in respect thereof) required in connection with the Plan, (ii) the initial availability amount required under the revolving credit facility component of the Exit Financing Facility, and (iii) any availability blocks required under the revolving credit facility component of the Exit Financing Facility.

(111)    **"Initial VEBA Contribution"** means (a) 85.5% in the case of the Union VEBA Trust and 14.5% in the case of the Retired Salaried Employee VEBA Trust times (b)(i) the excess of the Initial Availability Amount above $50,000,000, but in no event more than $36,000,000 less (ii) the aggregate of all amounts contributed to the Union VEBA Trust and Retired Salaried Employee VEBA Trust prior to the Effective Date (other than that certain one-time payment of $1,000,000 made to the Union VEBA Trust on or about March 31, 2005).

(112)    **"Insurance Settlement Escrow Funds"** means the funds held in accordance with escrow agreements created to hold funds paid after the Petition Date in respect of insurance settlements for the benefit of holders of any Channeled Personal Injury Claims, including the settlement agreement, dated as of April 9, 2003, between KACC and Employers Surplus Lines Insurance Company, the settlement agreement, dated as of March 14, 2003, between KACC and Kingscroft Insurance Company Limited, Walbrook Insurance Company Limited, El Paso Insurance Company Limited, Lime Street Insurance Company Limited, Mutual Reinsurance Company Limited, The Bermuda Fire & Marine Insurance Company Limited, In Liquidation, Bryanston Insurance Company Limited and Southern American Insurance Company, the settlement agreement, dated as of April 8, 2003, between KACC and National Casualty Company and the settlement agreement, dated as of November 11, 2004, between KACC and Insurance Company of the West.

(113)    **"IRC"** means the Internal Revenue Code of 1986, as now in effect or hereafter amended.

(114)    **"Intercompany Claim"** means any Claim by a Debtor or Other Debtor against any Debtor.

(115)    **"Intercompany Claims Settlement"** means the settlement and release agreement among the Debtors, the Other Debtors and the Creditors' Committee, dated as of October 5, 2004, as the same may have been or may be modified, amended or supplemented.

(116)    **"Intercompany Claims Settlement Order"** means the order entered by the Bankruptcy Court on February 1, 2005, as amended by a further order entered by the Bankruptcy Court on February 15, 2005, and approving the settlement of all claims of the Debtors and Other Debtors against another Debtor or Other Debtor pursuant to the Intercompany Claims Settlement.

(117)    **"Interest"** means:  (a) any share or other ownership interest in a Debtor, whether or not transferable or denominated "stock," or similar security, and any options, warrants, convertible security, liquidation preference or other right to acquire such shares or other ownership interests; and (b) any Equity Claim.

(118)    **"KAAC"** means Kaiser Alumina Australia Corporation.

(119)    **"KACOCL"** means Kaiser Aluminum & Chemical of Canada Limited.

(120)    **"KBC"** means Kaiser Bauxite Company.

(121)    **"Kaiser Companies"** means the Debtors, the Other Debtors and each affiliate (within the meaning of sections 101(2)A and 101(2)B of the Bankruptcy Codes) of any Debtor or Other Debtor.

(122)    **"Kaiser Trading"** means KAE Trading, Inc.

(123)    **"KFC"** means Kaiser Finance Corporation.

(124)    **"KFC Claim"** means the prepetition Claim of KFC against KACC in the amount of $1,106,000,000.

(125)    **"KJC"** means Kaiser Jamaica Corporation.

(126)    **"MAXXAM"** means MAXXAM Inc. and MAXXAM Group Holdings, Inc. and their successors and assigns.

(127)    **"New Common Stock"** means the shares of common stock, par value $0.01 per share, of Reorganized KAC, authorized pursuant to the Certificate of Incorporation of Reorganized KAC.

(128)    **"NIHL"** means noise induced hearing loss.

(129)    **"NIHL Distribution Procedures"** means the NIHL Distribution Procedures in substantially the form of Exhibit 1.1(129).

(130)    **"NIHL Personal Injury Claim"** means a Claim, remedy or liability against one or more of the Debtors, whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether or not the facts of or legal bases therefore are known or unknown, under any theory of law, equity, admiralty or otherwise, for loss, impairment or injury as to hearing (whether physical, emotional or otherwise) to the extent caused or allegedly caused, directly or indirectly, by the presence of or exposure (whether prior to, on or after the Petition Date) to sound, whether or not referred to as noise, at any premises owned, leased or operated by a Debtor or any entity for which any of the Debtors allegedly has liability, including any Claim, remedy or liability for compensatory damages (such as loss of consortium, proximate, consequential, general and special damages) and punitive damages and any

Claim, remedy, liability for reimbursement, indemnification, subrogation or contribution (including but not limited to any Indirect Channeled Person Injury Claim attributable to NIHL). NIHL Personal Injury Claims shall include any Claim, remedy or liability under any settlement entered into by or on behalf of a Debtor prior to the Petition Date based upon or arising out of an NIHL Personal Injury Claim. A workman's compensation or occupational disability claim brought directly by a past or present employee of a Debtor under an applicable workman's compensation or occupational disability statute against such Debtor will not constitute an NIHL Personal Injury Claim; *provided*, *however*, that claims by past and present employees of a Debtor under Louisiana law that include allegations of exposure in the Debtors' facilities in Louisiana, some of which occurred prior to July 16, 1976, and liability allegations against so-called "executive officers" in those Louisiana locations to whom responsibility for plant safety issues allegedly had been delegated will not be deemed to be brought under an applicable workman's compensation or occupational disability statute.

(131)    **"NIHL PI Channeling Injunction" means an order or orders entered by the Bankruptcy Court in accordance with and pursuant to section 105(a) of the Bankruptcy Code, permanently and forever staying, restraining and enjoining any entity from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any NIHL Personal Injury Claims, all of which will be channeled to the NIHL PI Trust for resolution as set forth in the NIHL Distribution Procedures (other than actions brought in conformity and compliance with the provisions hereof to enforce any right or obligation under the Plan, any Exhibits to the Plan or any agreement or instrument between a Debtor or Reorganized Debtor and the NIHL PI Trust), including, but not limited to:**

a.    **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;**

b.    **enforcing, levying, attaching (including through any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;**

c.    **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party or any property or interests in property of any Protected Party;**

d.    **setting off, seeking reimbursement of, contribution from or subrogation against or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and**

e.    **proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the NIHL PI Trust, except in conformity and compliance therewith.**

(132)    **"NIHL PI TAC"** means the NIHL PI Trust Advisory Committee established pursuant to the terms of the Plan and the NIHL PI Trust Agreement.

(133)    **"NIHL PI Trust"** means the trust established in accordance with the NIHL PI Trust Agreement.

(134)    **"NIHL PI Trust Agreement"** means the NIHL PI Trust Agreement to be entered into by Reorganized KAC and the NIHL PI Trustees in substantially the form of Exhibit 1.1(134).

(135)    **"NIHL PI Trustee"** means the individual confirmed by the Bankruptcy Court to serve as the trustee of the NIHL PI Trust pursuant to the terms of the Plan or who subsequently may be appointed to serve as the trustee of the NIHL PI Trust pursuant to the terms of the NIHL PI Trust Agreement.

**(136)**    **"Old Stock of . . ." or " . . . Old Stock"** means, when used with reference to a particular Debtor, the Interests issued by or in respect of such Debtor.

**(137)**    **"Ordinary Course Professionals Order"** means the Order Authorizing Debtors and Debtors in Possession to Retain, Employ and Pay Certain Professionals in the Ordinary Course of Their Businesses entered by the Bankruptcy Court on or about March 19, 2002, as subsequently revised.

**(138)**    **"Other Debtor"** means an Alumina Subsidiary Debtor or KBC, as the case may be.

**(139)**    **"Other Unsecured Claims"** means Unsecured Claims other than Claims classified in Class 4, Subclass 9A or Class 10.

**(140)**    **"PBGC"** means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation and an agency of the United States of America that administers the defined benefit pension plan termination insurance programs under Title IV of ERISA.

**(141)**    **"PBGC Claims"** means the Claims (excluding any Administrative Claims) of the PBGC against the Debtors arising from or related to the pension plans that were or are maintained by the Debtors or Other Debtors and guaranteed by the PBGC, as such Claims are allowed pursuant to the PBGC Settlement Agreement.

**(142)**    **"PBGC Settlement Agreement"** means the agreement among KACC and the PBGC, dated as of October 14, 2004, as the same may have been or may be modified, amended or supplemented.

**(143)**    **"Petition Date"** means as to any Debtor, the date on which the Reorganization Case of such Debtor was commenced.

**(144)**    **"PI Channeling Injunction"** means, as applicable, the Asbestos PI Channeling Injunction, the CTPV PI Channeling Injunction, the NIHL PI Channeling Injunction or the Silica PI Channeling Injunction.

**(145)**    **"PI Insurance Assets"** means: (a) rights to receive proceeds from Included PI Trust Insurance Policies in respect of Channeled Personal Injury Claims; and (b) the Cash paid or to be paid pursuant to settlement agreements with any PI Insurance Company entered into prior to the Effective Date in respect of Included PI Trust Insurance Policies and allocable to payment of Channeled Personal Injury Claims, including the Insurance Settlement Escrow Funds.

**(146)**    **"PI Insurance Company"** means any insurance company, insurance broker or syndicate insurance broker, guaranty association or any other entity that may have liability under an Included PI Trust Insurance Policy, including any reinsurers with respect to claims covered by an Included PI Trust Insurance Policy, *provided, however*, PI Insurance Company shall not include any Protected Party.

**(147)**    **"PI Insurance Coverage Action"** means any claim, cause of action or right of the Debtors or any of them, under the laws of any jurisdiction, against any PI Insurance Company, arising from or related to: (a) any such PI Insurance Company's failure or refusal to provide or pay under an Included PI Trust Insurance Policy in respect of a Channeled Personal Injury Claim; (b) failure or refusal of any PI Insurance Company to compromise and settle any Channeled Personal Injury Claim under or pursuant to any Included PI Trust Insurance Policy; or (c) the interpretation or enforcement of the terms of any Included PI Trust Insurance Policy in respect of a Channeled Personal Injury Claim.

**(148)**    **"PI Insurer Coverage Defenses"** means all defenses at law or in equity that any PI Insurance Company of an Included PI Trust Insurance Policy may have under applicable non-bankruptcy law to provide insurance coverage to or for Channeled Personal Injury Claims or Trust Expenses of the Funding Vehicle Trust or any PI Trust that have been channeled to or assumed by or incurred by the Funding Vehicle Trust or a PI Trust, respectively, pursuant to the Plan, except for (a) any defense that the transfer of the Debtors' rights as to Included PI Trust Insurance Policies pursuant to the Plan is invalid or unenforceable or otherwise breaches the terms of such coverage and (b) any defense that the drafting, proposing, confirmation or consummation of a plan of reorganization

(as opposed to the terms, operation, effect or unreasonableness of any of the Plan or the Exhibits to the Plan) and/or the discharge and/or release of the Debtors from liability for Channeled Personal Injury Claims pursuant to the Plan operates to, or otherwise results in, the elimination of or the reduction in any obligation such insurers may have under such transferred rights as to Included PI Trust Insurance Policies.

(149)   **"PI Trust"** means, as applicable, the Asbestos PI Trust, the CTPV PI Trust, the NIHL PI Trust or the Silica PI Trust.

(150)   **"PI Trust Agreement"** means, as applicable, the Asbestos PI Trust Agreement, the CTPV PI Trust Agreement, the NIHL PI Trust Agreement or the Silica PI Trust Agreement.

(151)   **"PI Trust Assets"** means: (a) the PI Insurance Assets; (b) 100 shares of common stock of Reorganized Kaiser Trading, constituting 100% of the outstanding equity interest of such company; (c) Cash in an amount equal to $13,000,000; and (d) 75% of the KFC Claim to be transferred to the PI Trusts in accordance with Section 4.2.f of the Intercompany Claims Settlement.

(152)   **"PI Trust Distribution Procedures"** means, as applicable, the Asbestos Distribution Procedures, the CTPV Distribution Procedures, the NIHL Distribution Procedures or the Silica Distribution Procedures.

(153)   **"PI Trust Funding Agreement"** means the Tort Claimants Term Sheet**, entered into during September 2005 by the Future Asbestos Claimants' Representative, the Future Silica and CTPV Claimants' Representative, Caplin & Drysdale (counsel for the Asbestos Claimants' Committee), Provost & Umphrey Law Firm, L.L.P. (counsel for certain holders of Silica Personal Injury Claims), Baldwin & Haspel (counsel for certain holders of CTPV Personal Injury Claims and certain holders of NIHL Personal Injury Claims),** attached as Exhibit 1.1(153), as the same may be modified, amended or supplemented.

(154)   **"Plan"** means this joint plan of reorganization for the Debtors, to the extent applicable to any Debtor, and all Exhibits attached hereto or referenced herein, as the same may be amended, modified or supplemented.

(155)   **"Prepetition Indentures"** means, collectively, the 9-7/8% Senior Note Indenture, the 10-7/8% Senior Note Indentures, the Senior Subordinated Note Indenture, the 7-3/4% SWD Revenue Bond Indenture, the 7.60% SWD Revenue Bond Indenture and the 6-1/2% RPC Revenue Bond Indenture.

(156)   **"Priority Claim"** means a Claim against any Debtor that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

(157)   **"Priority Tax Claim"** means a Claim arising under United States federal, state or local Tax laws that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

(158)   **"Professional"** means any professional employed in the Reorganization Cases pursuant to sections 327 or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Reorganization Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

(159)   **"Professional Fee Claims"** mean the Claims of (a) any Professional in the Reorganization Cases pursuant to sections 330 or 1103 of the Bankruptcy Code or (b) any Professional or other entity seeking compensation or reimbursement of expenses in connection with the Reorganization Cases pursuant to sections 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

(160)   **"Pro Rata Share"** means, when used with reference to a distribution to a holder of an Allowed Claim in a Class pursuant to Article III, that share of the property to be distributed on account of all Allowed Claims in such Class so that the ratio of (a)(i) the amount of such property distributed on account of the particular Allowed Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the aggregate amount of such property

distributed on account of all Allowed Claims in such Class to (ii) the aggregate amount of all Allowed Claims in such Class.

   (161)   "Protected Party" means any of the following parties:

      a.      the Debtors;

      b.      the Reorganized Debtors;

      c.      any entity that, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of the Debtors, the Other Debtors, the Reorganized Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust (but only to the extent that liability is asserted to exist as a result of its becoming such a transferee or successor);

      d.      any entity that, pursuant to the Plan or after the Effective Date, makes a loan to any of the Debtors, the Reorganized Debtors, the Other Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust or to a successor to, or transferee of any of the respective assets of, the Debtors, the Other Debtors, the Reorganized Debtors, other Kaiser Companies, the Funding Vehicle Trust or a PI Trust (but only to the extent that liability is asserted to exist by reason of such entity's becoming such a lender or to the extent any pledge of assets made in connection with such a loan is sought to be upset or impaired);

      e.      each entity to the extent he, she or it is alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on any Debtor, Other Debtor, Reorganized Debtor or PI Trust on account of Channeled Personal Injury Claims by reason of one or more of the following:

         (i)      such entity's ownership of a financial interest in any Debtor, Other Debtor, Reorganized Debtor, past or present affiliate of any Debtor, Other Debtor or Reorganized Debtor or predecessor in interest of any Debtor, Other Debtor or Reorganized Debtor;

         (ii)      such entity's involvement in the management of any Debtor, Other Debtor, Reorganized Debtor, past or present affiliate of any Debtor, Other Debtor or Reorganized Debtor or any predecessor in interest of any Debtor, Other Debtor or Reorganized Debtor;

         (iii)      such entity's service as a director, officer, employee, accountant (including an independent certified public accountant), advisor, attorney, investment banker, underwriter, consultant or other agent of any Debtor, Other Debtor, Reorganized Debtor, past or present affiliate of any Debtor, Other Debtor or Reorganized Debtor, any predecessor in interest of any Debtor, Other Debtor or Reorganized Debtor or any entity that owns or at any time has owned a financial interest in any Debtor, Other Debtor or Reorganized Debtor, past or present affiliate of any Debtor, Other Debtor or Reorganized Debtor or predecessor in interest of any Debtor, Other Debtor or Reorganized Debtor;

         (iv)      such entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any Debtor, Other Debtor, Reorganized Debtor, past or present affiliate of any Debtor, Other Debtor or Reorganized Debtor, predecessor in interest of any Debtor, Other Debtor or Reorganized Debtor or any entity that owns or at any time has owned a financial interest in any Debtor, Other Debtor or Reorganized Debtor, past or present affiliate of a Debtor, Other Debtor or Reorganized Debtor or any predecessor in interest of a Debtor, Other Debtor or Reorganized Debtor;

      f.      other Kaiser Companies, including the Other Debtors; or

      g.      as to Channeled Personal Injury Claims, each Settling Insurance Company.

(162)    **"Public Note Claims"** means, collectively, the 6-1/2% RPC Revenue Bond Claims, the 7-3/4% SWD Revenue Bond Claims, the 7.60% SWD Revenue Bond Claims, the 9-7/8% Senior Note Claims, the 10-7/8% Senior Note Claims and the Senior Subordinated Note Claims.

(163)    **"Public Notes"** means, collectively, the 6-1/2% RPC Revenue Bonds, the 7-3/4% SWD Revenue Bonds, the 7.60% SWD Revenue Bonds, the 9-7/8% Senior Notes, the 10-7/8% Senior Notes and the Senior Subordinated Notes.

(164)    **"Qualified Appraisal"** means a "qualified appraisal" within the meaning of Treasury Regulations section 1.468B-3(b).

(165)    **"Quarterly Distribution Date"** means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided, however*, that if the Effective Date is within 45 days of the end of a calendar quarter, the first Quarterly Distribution Date will be the last Business Day of the month following the end of the first calendar quarter after the calendar quarter in which the Effective Date falls.

(166)    **"Recovery Actions"** means, collectively and individually, preference actions, fraudulent conveyance actions, rights of setoff and other claims or causes of action under chapter 5 of the Bankruptcy Code and other bankruptcy or non-bankruptcy law.

(167)    **"Registration Rights Agreement"** means the Registration Rights Agreement among Reorganized KAC, the PBGC and the trustee of the Union VEBA Trust in substantially the form of Exhibit 1.1(167).

(168)    **"Reinstated" or "Reinstatement"** means rendering a Claim or Interest unimpaired within the meaning of section 1124 of the Bankruptcy Code. Unless the Plan specifies a particular method of Reinstatement, when the Plan provides that an Allowed Claim or Allowed Interest will be Reinstated, such Claim or Interest will be Reinstated, at the applicable Reorganized Debtor's sole discretion, in accordance with one of the following:

    a.    The legal, equitable and contractual rights to which such Claim or Interest entitles the holder will be unaltered; or

    b.    Notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:

        (i)    any such default that occurred before, at or after the commencement of the applicable Reorganization Case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, will be cured;

        (ii)    the maturity of such Claim or Interest as such maturity existed before such default will be reinstated;

        (iii)    the holder of such Claim or Interest will be compensated for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

        (iv)    the legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest will not otherwise be altered.

(169)    **"Reorganization Case"** means: (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court; and (b) when used with reference to all Debtors, the chapter 11 cases pending for the Debtors in the Bankruptcy Court.

(170)    **"Reorganized ..."** means, when used in reference to a particular Debtor, such Debtor on and after the Effective Date or the entity which, as a result of the consummation of the Restructuring Transactions, will be a successor to such Debtor.

(171)    **"Reserved Shares"** means the 4,460,000 shares of New Common Stock to be placed in the Unsecured Claims Reserve for distribution to holders of Allowed Claims in Class 9.

(172)    **"Restructuring Transactions"** means transactions to be consummated in connection with the Effective Date in accordance with Section 4.2.

(173)    **"Retired Salaried Employee VEBA Trust"** means the trust established in accordance with the Trust Agreement for the Kaiser Aluminum Salaried Retirees VEBA, entered into as of May 31, 2004, by and among David L. Perry, James B. Hobby and Douglas G. Allen, as the Board of Trustees, and Union Bank of California, N.A., as Corporate Trustee, as the same may have been or may be modified, amended or supplemented, which was established pursuant to the Order Making Effective Final Order Approving Agreements to Modify Collective Bargaining Agreements and Retiree Benefits Pursuant to sections 1113 and 1114 of the Bankruptcy Code entered by the Bankruptcy Court on June 1, 2004.

(174)    **"Retirees' Committee"** means the official committee of retired salaried employees of the Debtors, initially appointed by the Bankruptcy Court by its order dated July 23, 2002, and reappointed by the Bankruptcy Court by its order dated August 26, 2003.

(175)    **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors, as required by section 521 of the Bankruptcy Code, as the same may have been or may be amended, modified or supplemented.

(176)    **"Search Committee"** means a committee comprised of two persons designated by the Debtors, two persons designated by the Creditors' Committee and one person designated jointly by the Asbestos Claimants' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative.

(177)    **"Secondary Liability Claim"** means a Claim other than a Channeled Personal Injury Claim that arises from a Debtor being liable jointly, severally or secondarily liable for any contractual, tort or other obligation of another Debtor based on: (a) vicarious liability; (b) piercing the corporate veil or the doctrine of alter ego liability; or (c) similar legal theories.

(178)    **"Secured Claim"** means a Claim against any Debtor that is secured by a lien on property in which such Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the holder of such Claim's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

(179)    **"Senior Notes"** means, collectively, the 9-7/8% Senior Notes and the 10-7/8% Notes.

(180)    **"Senior Note Claims"** means, collectively, 9-7/8% Senior Note Claims and 10-7/8% Senior Note Claims.

(181)    **"Senior Subordinated Note Claim"** means a Claim against KACC and the Debtor Guarantors under or in respect of one or more Senior Subordinated Notes and the Senior Subordinated Note Indenture.

(182)    **"Senior Subordinated Note Indenture"** means the Indenture, dated as of February 1, 1993, by and among KACC, the Debtor Guarantors, the Alumina Subsidiary Debtors and the Senior Subordinated Note Indenture Trustee, in respect of the Senior Subordinated Notes, as the same may have been or may be modified, amended or supplemented, together with all instruments and agreements related thereto.

**(183)**    **"Senior Subordinated Note Indenture Trustee"** means Law Debenture Trust Company of New York, as successor indenture trustee under the Senior Subordinated Note Indenture or any subsequent successor indenture trustee.

**(184)**    **"Senior Subordinated Notes"** means the 12-3/4% senior subordinated notes due 2003 issued by KACC, pursuant to the Senior Subordinated Note Indenture in the outstanding aggregate principal amount of $400,000,000.

**(185)**    **"Settling Insurance Company"** means each insurance company listed on Exhibit 1.1(185) (as the same may be amended, modified or supplemented) and any PI Insurance Company providing coverage under one or more Included PI Trust Insurance Policies that enters into a settlement prior to the conclusion of the Confirmation Hearing that is (a) sufficiently comprehensive in the determination of the Debtors, the Asbestos Claimants' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative to justify treating such company as a Protected Party as to all or certain of the Channeled Personal Injury Claims and (b) approved by the Bankruptcy Court.

**(186)**    **"Silica Distribution Procedures"** means the Silica Distribution Procedures in substantially the form of Exhibit 1.1(186).

**(187)**    **"Silica Personal Injury Claim"** means a Claim or remedy, liability or Demand against one or more of the Debtors, now existing or hereafter arising, whether or not such Claim, remedy, liability or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether or not the facts of or legal bases therefore are known or unknown, under any theory of law, equity, admiralty or otherwise, for death, bodily injury, sickness, disease, medical monitoring or other personal injuries (whether physical, emotional or otherwise) to the extent caused or allegedly caused, directly or indirectly, in whole or in part, by the presence of or exposure (whether prior to, on or after the Petition Date) to silica or silica-containing products, including silica or silica-containing products that was or were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, replaced, disposed of, or present at any premises owned, leased, occupied or operated, by a Debtor or any entity for which any of the Debtors allegedly has liability, including any Claim, remedy, liability or Demand for compensatory damages (such as loss of consortium, wrongful death, medical monitoring, survivorship, proximate, consequential, general and special damages) and punitive damages and any Claim, remedy, liability or Demand for reimbursement, indemnification, subrogation or contribution (including but not limited to any Indirect Channeled Personal Injury Claim attributable to silica). Silica Personal Injury Claims include any Claim, remedy, liability or Demand under any settlement entered into by or on behalf of a Debtor prior to the Petition Date based upon or arising out of a Silica Personal Injury Claim. A workman's compensation or occupational disability claim brought directly by a past or present employee of a Debtor under an applicable workman's compensation or occupational disability statute against such Debtor will not constitute a Silica Personal Injury Claim; *provided, however,* that claims by past and present employees of a Debtor under Louisiana law that include allegations of exposure in the Debtors' facilities in Louisiana, some of which occurred prior to July 16, 1976, and liability allegations against so-called "executive officers" in those Louisiana locations to whom responsibility for plant safety issues allegedly had been delegated will not be deemed to be brought under an applicable workman's compensation or occupational disability statute.

**(188)**    **"Silica PI Channeling Injunction"** means an order or orders entered by the Bankruptcy Court in accordance with and pursuant to section 105(a) of the Bankruptcy Code, permanently and forever staying, restraining and enjoining any entity from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Silica Personal Injury Claims, all of which will be channeled to the Silica PI Trust for resolution as set forth in the Silica Distribution Procedures (other than actions brought in conformity and compliance with the provisions hereof to enforce any right or obligation under the Plan, any Exhibits to the Plan or any agreement or instrument between a Debtor or Reorganized Debtor and the Silica PI Trust), including, but not limited to:

a.    commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any

19

forum against or affecting any Protected Party or any property or interests in property of any Protected Party;

      b.      **enforcing, levying, attaching (including through any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;**

      c.      **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party or any property or interests in property of any Protected Party;**

      d.      **setting off, seeking reimbursement of, contribution from or subrogation against or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and**

      e.      **proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Silica PI Trust, except in conformity and compliance therewith.**

      **(189)**    **"Silica PI TAC"** means the Silica PI Trust Advisory Committee established pursuant to the terms of the Plan and the Silica PI Trust Agreement.

      **(190)**    **"Silica PI Trust"** means the trust established in accordance with the Silica PI Trust Agreement.

      **(191)**    **"Silica PI Trust Agreement"** means the Silica PI Trust Agreement to be entered into by Reorganized KAC and the Silica PI Trustee in substantially the form of Exhibit 1.1(191).

      **(192)**    **"Silica PI Trustee"** means the Future Silica and CTPV Claimants' Representative or the individual who subsequently may be appointed to serve as the trustee of the Silica PI Trust pursuant to the terms of the Silica PI Trust Agreement, as the case may be.

      **(193)**    **"Stipulation of Amount and Nature of Claim"** means a stipulation or other agreement between the applicable Debtor or Reorganized Debtor and a holder of a Claim or Interest, or an agreed order of the Bankruptcy Court, establishing the amount and nature of a Claim or Interest, including the Environmental Settlement Agreement.

      **(194)**    **"Stock Transfer Restriction Agreement"** means the Stock Transfer Restriction Agreement among Reorganized KAC, the PBGC and the Union VEBA in substantially the form of Exhibit 1.1(194).

      **(195)**    **"Substantively Consolidated Debtors"** means all of the Debtors other than any Canadian Debtor.

      **(196)**    **"Tax"** means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other entity.

      **(197)**    **"Third Party Disbursing Agent"** means, as applicable, an entity designated by Reorganized KAC to act as a Disbursing Agent pursuant to the first sentence of Section 7.2 or, for the purpose of distributions to holders of Public Note Claims, the applicable Indenture Trustee.

      **(198)**    **"Tort Claim"** means any Claim (other than a Channeled Personal Injury Claim or a Claim which is the subject of the Environmental Settlement Agreement) that has not been settled, compromised or otherwise

resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to health, safety, hazardous substances or the environment.

      **(199)** **"Treasury Regulations"** means regulations (including temporary and proposed) promulgated under the IRC.

      **(200)** **"Trust Expenses"** means, as to a PI Trust or the Funding Vehicle Trust, as applicable, all costs, Taxes and expenses of or imposed on such trust, including but not limited to: (a) compensation expenses of such trust; (b) insurance premiums payable by such trust; (c) legal, accounting and other professional fees and expenses of such trust; and (d) other disbursements and expenses relating to the implementation and operation of such trust (including, in the case of the Funding Vehicle Trust, any and all disbursements and expenses in connection with any and all actions to pursue PI Insurance Assets and any and all disbursements and expenses incurred by the Reorganized Debtors in such action or actions to be paid by the Funding Vehicle Trust hereunder).

      **(201)** **"Union VEBA Trust"** means the trust established in accordance with the Trust Agreement, entered into as of June 1, 2004, by and among Thomas Duzak, James Woodward, John Barneson and James McAuliffe, as the then-Board of Trustees, and National City Bank as Trustee, as the same may have been or may be modified, amended or supplemented, which was established pursuant to the Order Making Effective Final Order Approving Agreements to Modify Collective Bargaining Agreements and Retiree Benefits pursuant to Sections 1113 and 1114 of the Bankruptcy Code entered by the Bankruptcy Court on June 1, 2004.

      **(202)** **"Unsecured Claim"** means any Claim that is not an Administrative Claim, a Cure Amount Claim, a Channeled Personal Injury Claim, an Equity Claim, a Priority Claim, a Priority Tax Claim, a Secured Claim or an Intercompany Claim.

      **(203)** **"Unsecured Claims Reserve"** means the reserve of Reserved Shares and/or Cash, if any, established pursuant to Section 7.4.a for Class 9, which reserve will be maintained in trust for holders of Allowed Claims in such Class 9 and will not constitute property of any of the Reorganized Debtors.

      **(204)** **"US Trustee Fees"** means all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

      **(205)** **"USW"** means the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.

      **(206)** **"Variable VEBA Contributions"** means the amounts required to be paid periodically to the Union VEBA Trust and the Retired Salaried Employees VEBA Trust, respectively, in accordance with the agreements with KACC in respect thereof entered into pursuant to section 1114 of the Bankruptcy Code, as the same may have been or may be modified, amended or supplemented.

      **(207)** **"VEBA"** means a voluntary employees beneficiary association within the meaning of section 501(c)(9) of the IRC.

      **(208)** **"Voting Deadline"** means the deadline for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code that is specified in the Disclosure Statement, the Ballots or related solicitation documents approved by the Bankruptcy Court.

      **1.2**     **Rules of Interpretation and Computation of Time**

        **a.**     **Rules of Interpretation**

      For purposes of the Plan, unless otherwise provided herein: (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (ii) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other

agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (iii) any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan or Confirmation Order; (iv) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (v) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (vi) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vii) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (viii) subject to the provisions of any Certificates of Incorporation or Bylaws, or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (ix) the rules of construction set forth in section 102 of the Bankruptcy Code will apply.

       **b.**      **Computation of Time**

      In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

## ARTICLE II

### CLASSES OF CLAIMS AND INTERESTS; ALLOWED AMOUNT OF CERTAIN CLAIMS

      All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the following Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Section 3.1, have not been classified and thus are excluded from the Classes. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

    **2.1**    **Class 1 (Unsecured Priority Claims)**: Priority Claims that are entitled to priority under sections 507(a)(3) or 507(a)(4) of the Bankruptcy Code.

    **2.2**    **Class 2 (Convenience Claims)**:

        **a.**      **Subclass 2A:** (Senior Note and 7-3/4% SWD Revenue Bond Convenience Claims). Subject to the provisions of Section 7.5.a(ii), Senior Note Claims and 7-3/4% SWD Revenue Bond Claims that otherwise would be included in Class 9 except that the stated principal amount of the securities underlying the allowed amount of each such Claim is either equal to or less than $15,000.

        **b.**      **Subclass 2B:** (Other Convenience Claims). Subject to the provisions of Section 7.5.a(ii), Unsecured Claims other than Senior Note Claims, 7-3/4% SWD Revenue Bond Claims, 6-1/2% RPC Revenue Bond Claims and Senior Subordinated Note Claims that otherwise would be included in Class 9 except that (i) as to any 7.60% SWD Revenue Bond Claim, the stated principal amount of the securities underlying the allowed amount of such Claim is either equal to or less than $30,000 and (ii) as to any such Claim other than a 7.60% SWD Revenue Bond Claim, the allowed amount of such Claim is equal to or less than $30,000.

      For purposes of determining eligibility for treatment under Class 2, multiple Claims of a holder in respect of the same series of Public Notes or, as to Claims other than Public Note Claims, arising in a series of similar or related transactions between a Debtor and the original holder of such Claims will be treated as a single Claim and no splitting of Claims will be recognized.

**2.3**     **Class 3 (Secured Claims)**:  Secured Claims.

**2.4**     **Class 4 (Canadian Debtor PBGC Claims)**:  Unsecured PBGC Claims against the Canadian Debtors.

**2.5**     **Class 5 (Asbestos Personal Injury Claims)**:  Asbestos Personal Injury Claims.

**2.6**     **Class 6 (CTPV Personal Injury Claims)**:  CTPV Personal Injury Claims.

**2.7**     **Class 7 (NIHL Personal Injury Claims)**:  NIHL Personal Injury Claims.

**2.8**     **Class 8 (Silica Personal Injury Claims)**:  Silica Personal Injury Claims.

**2.9**     **Class 9 (General Unsecured Claims)**:  Unsecured Claims not otherwise classified under this Article II, subclassified as follows:

      **a.**     **Subclass 9A:**  Senior Subordinated Note Claims.

      **b.**     **Subclass 9B:**  Other Unsecured Claims (including the Senior Note Claims, the 6-1/2% RPC Revenue Bond Claims, the 7-3/4% SWD Revenue Bond Claims, the 7.60% SWD Revenue Bond Claims, the unsecured portion of any Claims, which, if such Claims were fully secured, would have been classified in Class 3 and as to which the applicable Debtor will have elected Option A treatment under Section 3.2.b, Tort Claims, unsecured PBGC Claims against the Substantively Consolidated Debtors and the KFC Claim).

**2.10**     **Class 10 (Canadian Debtor Claims)**:  Claims (excluding Channeled Personal Injury Claims, PBGC Claims and Intercompany Claims) against a Canadian Debtor.

**2.11**     **Class 11 (Intercompany Claims)**:  Intercompany Claims.

**2.12**     **Class 12 (KAC Old Stock Interests)**:  Interests and Claims in respect of the KAC Old Stock.

**2.13**     **Class 13 (Kaiser Trading Old Stock Interests)**:  Interests and Claims in respect of the Old Stock of Kaiser Trading.

**2.14**     **Class 14 (KACC Old Stock Interests)**:  Interests and Claims in respect of the Old Stock of KACC, including Claims relating to shares of the Series 1985 A and Series 1985 B Cumulative Preference Stock of KACC noticed for redemption in 2001 but not tendered for payment prior to the Petition Date.

**2.15**     **Class 15 (Other Old Stock Interests)**:  Interests in any Debtor other than Interests in Class 12, Class 13 or Class 14.

    **2.16**    **Allowed Amount of Certain Claims**:  The following table indicates for each category of Claims listed the aggregate allowed amount of such Claims for purposes of the Plan.

| | Claim | | Aggregate Allowed Amount |
|---|---|---|---|
| a. | **Claims Against KACC and the Debtor Guarantors:** | | |
| | 9-7/8% Senior Note Claims | $ | 181,168,828.96 |
| | 10-7/8% Senior Note Claims (Series B) | | 181,185,156.27 |
| | 10-7/8% Senior Note Claims (Series D) | | 51,767,187.50 |
| | Senior Subordinated Note Claims | | 427,200,000.00 |
| b. | **Claims Against KACC:** | | |
| | 6-1/2% RPC Revenue Bond Claims | $ | 12,760,461.11 |
| | 7-3/4% SWD Revenue Bond Claims | | 20,051,666.67 |
| | 7.60% SWD Revenue Bond Claims | | 18,045,788.89 |
| | KFC Claim | | 1,106,000,000.00 |
| c. | **PBGC Claims Against Each Debtor:** | | |
| | PBGC Claims | $ | 616,000,000.00 |

## ARTICLE III

## TREATMENT OF CLAIMS AND INTERESTS

**3.1**    **Unclassified Claims**

    **a.**    **Payment of Administrative Claims**

    **(i)**    **Administrative Claims in General**

    Except as otherwise provided herein or unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative Claim will receive from Reorganized KAC or the applicable Reorganized Debtor, in full satisfaction of its Administrative Claim, Cash equal to the allowed amount of such Administrative Claim either (A) on the Effective Date or (B) if the Administrative Claim is not allowed as of the Effective Date, within 30 days after the date on which (i) an order allowing such Administrative Claim becomes a Final Order or (ii) a Stipulation of Amount and Nature of Claim is executed by the applicable Reorganized Debtor and the holder of the Administrative Claim.

    **(ii)**    **US Trustee Fees**

    On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid by the applicable Debtor or Reorganized Debtor in Cash equal to the amount of such Administrative Claims.  All fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Reorganized Debtors in accordance therewith until the closing of the Reorganization Cases pursuant to section 350(a) of the Bankruptcy Code.

    **(iii)**    **Ordinary Course Liabilities**

    Allowed Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business (including Administrative Trade Claims, Administrative Claims of governmental units for Taxes, including Tax audit Claims related to tax years commencing after the Petition Date, and Allowed Administrative

Claims arising from those contracts and leases of the kind described in Section 6.6) will be paid by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims.

### (iv)     Claims Under the DIP Financing Facility

Unless otherwise agreed by the DIP Lenders pursuant to the DIP Financing Facility, on or before the Effective Date, Allowed Administrative Claims under or evidenced by the DIP Financing Facility will be paid in full in Cash.

### (v)     PBGC Administrative Claims

To the extent not previously paid, the Administrative Claims of the PBGC allowed pursuant to paragraph 10 of the PBGC Settlement Agreement will be paid in Cash on the Effective Date.

### (vi)     Union VEBA Trust and Retired Salaried Employee VEBA Trust

On the Effective Date, Reorganized KAC will contribute (A) to the Union VEBA Trust, 11,439,900 shares of New Common Stock and Cash in an amount equal to the Initial VEBA Contribution payable to the Union VEBA Trust, if any, and (B) to the Retired Salaried Employee VEBA Trust, 1,940,100 shares of New Common Stock and Cash in an amount equal to the Initial VEBA Contribution payable to the Retired Salaries Employee VEBA Trust, if any. Thereafter, Reorganized KAC will make the applicable Variable VEBA Contributions to the Union VEBA Trust and the Retired Salaried Employee VEBA Trust.

### (vii)     Bar Dates for Administrative Claims

### (A)     General Bar Date Provisions

Except as otherwise provided herein or in the Intercompany Claims Settlement, requests for payment of Administrative Claims must be Filed by the Administrative Claim Bar Date and served pursuant to the procedures specified in the Administrative Claim Bar Date Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by such date will be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or the property of any of them and such Administrative Claims will be deemed waived and released as of the Effective Date. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (1) 90 days after the Effective Date and (2) 30 days after the Filing of the applicable request for payment of Administrative Claims.

### (B)     Bar Dates for Certain Administrative Claims

### (1)     Professional Compensation

Subject to any applicable provisions of the Intercompany Claims Settlement, Professionals or other entities asserting a Professional Fee Claim for services rendered to the Debtors before the Effective Date must File and serve on the Reorganized Debtors and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claims no later than 60 days after the Effective Date; *provided, however*, that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order. Objections to any Professional Fee Claims, including any objections by the US Trustee, must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 90 days after the Effective Date and (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claims. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court, including the

Fee Order, regarding the payment of Professional Fee Claims (other than the Intercompany Claims Settlement Order).

### (2)    Ordinary Course Liabilities

Holders of Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Trade Claims, Administrative Claims of governmental units for Taxes (including Tax audit Claims arising after the Petition Date) and Administrative Claims arising from those contracts and leases of the kind described in Section 6.6, will not be required to File or serve any request for payment of such Administrative Claims. Such Administrative Claims will be satisfied pursuant to Section 3.1.a(iii).

### (3)    Claims Under the DIP Financing Facility

Holders of Administrative Claims under or evidenced by the DIP Financing Facility will not be required to File or serve any request for payment of such Claims. Such Administrative Claims will be satisfied pursuant to Section 3.1.a(iv).

### (4)    PBGC Administrative Claims

The PBGC as the holder of the Administrative Claims of the PBGC will not be required to File or serve any request for payment of such Claims. Such Administrative Claims will be satisfied pursuant to Section 3.1.a(v).

### b.    Payment of Priority Tax Claims

### (i)    Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, deferred Cash payments over a period not exceeding six years from the date of assessment of such Priority Tax Claim. Payments will be made in equal quarterly installments of principal (commencing on the later of the Effective Date and the first Quarterly Distribution Date following the date such Claim becomes an Allowed Claim), plus simple interest accruing from the Effective Date at the rate publicly quoted on the Confirmation Date by The Wall Street Journal as the "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks" on the unpaid portion of each Allowed Priority Tax Claim (or upon such other terms determined by the Bankruptcy Court to provide the holders of Priority Tax Claims with deferred Cash payments having a value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claims). The Reorganized Debtors will have the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Priority Tax Claim, in full at any time on or after the Effective Date, without premium or penalty.

### (ii)    Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section 3.1.b(i), the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty (A) will be subject to treatment in Class 9 and (B) the holder of an Allowed Priority Tax Claim will not be entitled to assess or attempt to collect such penalty from the Reorganized Debtors or their property (other than as the holder of a Class 9 Claim).

### 3.2    Unimpaired Classes of Claims

The following constitute unimpaired Claims, and each holder thereof is conclusively presumed to have accepted the Plan and is not entitled to vote on the Plan.

    a.      **Class 1 (Unsecured Priority Claims)**: On the later of the Effective Date and the date on which the Claim is allowed, each holder of an Allowed Claim in Class 1 will be entitled to receive in satisfaction of its Allowed Class 1 Claim Cash equal to the allowed amount of such Claim against the applicable Debtor.

    b.      **Class 3 (Secured Claims)**: Except as otherwise agreed by the holder of a Class 3 Claim and the applicable Debtor or Reorganized Debtor, on the later of the Effective Date and the date on which the Claim is allowed, each holder of an Allowed Claim in Class 3 will be treated in accordance with Option A or B below, at the election of the applicable Debtor. The applicable Debtor will be deemed to have elected Option B, except with respect to any Allowed Claims as to which the applicable Debtor elects Option A in a certification Filed no later than 15 days prior to the commencement of the Confirmation Hearing.

        Option A: Each holder of an Allowed Claim in Class 3 with respect to which the applicable Debtor or Reorganized Debtor elects Option A will receive in satisfaction of its Allowed Class 3 Claim Cash equal to the allowed amount of such Claim.

        Option B: Each Allowed Claim in Class 3 with respect to which the applicable Debtor or Reorganized Debtor elects or is deemed to have elected Option B will be Reinstated.

    c.      **Class 10 (Canadian Debtor Claims)**: Except as otherwise agreed by the holder of a Class 10 Claim and the applicable Debtor, each Allowed Claim in Class 10, to the extent not paid prior to the Effective Date, will be paid in full in accordance with its terms.

    d.      **Class 15 (Other Old Stock Interests)**: On the Effective Date, subject to the Restructuring Transactions, Allowed Interests in Class 15 will be Reinstated.

**3.3**      **Impaired Classes of Claims and Interests**

    The following constitute impaired Claims and, except as otherwise noted, each holder thereof is entitled to vote on the Plan.

    a.      **Class 2 (Convenience Claims)**: On the later of the Effective Date and the date on which the Claim is allowed: (i) each holder of an Allowed Claim in Subclass 2A will be entitled to receive in satisfaction of its Allowed Subclass 2A Claim Cash equal to 5.8% of the allowed amount of such Claim and (ii) each holder of an Allowed Claim in Subclass 2B will be entitled to receive in satisfaction of its Allowed Subclass 2B Claim Cash equal to 2.9% of the allowed amount of such Claim. Allowed amounts of Public Note Claims include interest accrued but unpaid as of the Petition Date, and distributions on account of Allowed Subclass 2A Claims include amounts payable to the holders of Senior Note Claims and 7-3/4% SWD Revenue Bond Claims in accordance with the contractual subordination provisions of the Senior Subordinated Note Indenture and paragraph 4 of the 7-3/4% SWD Revenue Bond Settlement.

    b.      **Class 4 (Canadian Debtor PBGC Claims)**: On the Effective Date, the PBGC, as the holder of the Allowed Claims in Class 4, will be entitled to receive in satisfaction of all of its Allowed Class 4 Claims against the Canadian Debtors (i) 2,160,000 shares of New Common Stock and (ii) $2,500,000 in Cash.

    c.      **Class 5 (Asbestos Personal Injury Claims)**: As of the Effective Date, liability for all Class 5 Claims shall automatically and without further act, deed or court order be assumed by the Asbestos PI Trust in accordance with and to the extent set forth in Article V. Each Asbestos Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement and the Asbestos Distribution Procedures. As further provided in Article V, the sole recourse of the holder of an Asbestos Personal Injury Claim on account of such Claim will be to the

Asbestos PI Trust and such holder will have no right whatsoever at any time to assert its Asbestos Personal Injury Claim against any Protected Party.

       **d.**        **Class 6 (CTPV Personal Injury Claims)**:  As of the Effective Date, liability for all Class 6 Claims shall automatically and without further act, deed or court order be assumed by the CTPV PI Trust in accordance with and to the extent set forth in Article V.  Each CTPV Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the CTPV PI Trust Agreement and the CTPV Distribution Procedures.  As further provided in Article V, the sole recourse of the holder of a CTPV Personal Injury Claim on account of such Claim will be to the CTPV PI Trust and such holder will have no right whatsoever at any time to assert its CTPV Personal Injury Claim against any Protected Party.

       **e.**        **Class 7 (NIHL Personal Injury Claims)**:  As of the Effective Date, liability for all Class 7 Claims shall automatically and without further act, deed or court order be assumed by the NIHL PI Trust in accordance with and to the extent set forth in Article V.  Each NIHL Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the NIHL PI Trust Agreement and the NIHL Distribution Procedures.  As further provided in Article V, the sole recourse of the holder of a CTPV Personal Injury Claim on account of such Claim will be to the NIHL PI Trust and such holder will have no right whatsoever at any time to assert its NIHL Personal Injury Claim against any Protected Party.

       **f.**        **Class 8 (Silica Personal Injury Claims)**:  As of the Effective Date, liability for all Class 8 Claims shall automatically and without further act, deed or court order be assumed by the Silica PI Trust in accordance with and to the extent set forth in Article V.  Each Silica Personal Injury Claim will be determined and paid in accordance with the terms, provisions and procedures of the Silica PI Trust Agreement and the Silica Distribution Procedures.  As further provided in Article V, the sole recourse of the holder of a Silica Personal Injury Claim on account of such Claim will be to the Silica PI Trust and such holder will have no right whatsoever at any time to assert its Silica Personal Injury Claim against any Protected Party.

       **g.**        **Class 9 (General Unsecured Claims)**:  Unless otherwise agreed by the holder of an Allowed Class 9 Claim and the applicable Debtor and except as otherwise provided in the Environmental Settlement Agreement with respect to Additional Sites (as such term is defined therein), on the later of the Effective Date and the date on which such Claim is allowed, each holder of an Allowed Claim in Class 9 will be entitled to receive in satisfaction of its Allowed Class 9 Claim a Pro Rata Share of the Reserved Shares, together with any Cash or other property pursuant to Section 7.8.c(i), if applicable. Notwithstanding the foregoing, in accordance with contractual subordination provisions of the Senior Subordinated Note Indenture and paragraph 4 of the 7-3/4% SWD Revenue Bond Settlement, the aggregate amount of consideration that would otherwise be payable to the holders of Senior Subordinated Note Claims in the absence of the contractual subordination provisions of the Senior Subordinated Note Indenture will be distributed to holders of Allowed Senior Note Claims and holders of Allowed 7-3/4% SWD Revenue Bond Claims on a pro rata basis, based upon the relative allowed amounts of such Claims against KACC, as set forth in Section 2.16.  For computational purposes, the aggregate allowed amount of Senior Subordinated Note Claims included in Class 9 will be reduced by the aggregate amount of such Claims allocable to Senior Note Claims and 7-3/4% SWD Revenue Bond Claims included in Subclass 2A in order to make distributions in respect thereof in accordance with the contractual subordination provisions of the Senior Subordinated Note Indenture and paragraph 4 of the 7-3/4% SWD Revenue Bond Settlement. Holders of Subclass 9A Claims will be deemed to have rejected the Plan and are not entitled to vote thereon.

       **h.**        **Class 11 (Intercompany Claims)**:  On or before the Effective Date, each holder of an Intercompany Claim will receive the treatment as set forth in the Intercompany Claims Settlement.  In accordance with the Intercompany Settlement Agreement, the KFC Claim will be included in Class 9. Holders of Class 11 Claims will be deemed to have accepted the Plan.

      **i.**      **Class 12 (KAC Old Stock Interests)**: No property will be distributed to or retained by the holders of Allowed Class 12 Interests and Claims. Holders of Class 12 Interests and Claims will be deemed to have rejected the Plan and are not entitled to vote thereon.

      **j.**      **Class 13 (Kaiser Trading Old Stock Interests)**: No property will be distributed to or retained by the holder of Allowed Class 13 Interests and Claims. On the Effective Date, 100 shares of common stock of Reorganized Kaiser Trading, constituting 100% of the issued and outstanding shares of common stock of such company, will be issued to the Asbestos PI Trust and Silica PI Trust in accordance with Sections 5.2.d and 5.3.d, respectively. The holder of Class 13 Interests will be deemed to have accepted the Plan.

      **k.**      **Class 14 (KACC Old Stock Interests)**: Subject to the Restructuring Transactions, no property will be distributed or retained by the holders of Allowed Class 14 Interests and Claims. Holders of Class 14 Interests and Claims (other than KAC) will be deemed to have rejected the Plan and are not entitled to vote thereon. KAC, as the holder of certain Class 14 Interests and Claims, will be deemed to have accepted the Plan.

**3.4**      **Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims**

      The classification and treatment of Allowed Claims under the Plan take into consideration all Secondary Liability Claims and no distributions on account of any Secondary Liability Claims will be made.

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

**4.1**      **Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors**

      Except as otherwise provided herein (and subject to Section 4.2), each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable law. Except as otherwise provided herein (and subject to Section 4.2), as of the Effective Date, all property of the respective Estates of the Debtors, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in the applicable Reorganized Debtor, free and clear of all Claims, liens, charges, other encumbrances and Interests. On and after the Effective Date, each Reorganized Debtor and any successor thereto may operate its business and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor and any successor thereto may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

**4.2**      **Restructuring Transactions**

      The Restructuring Transactions will be consummated as contemplated by Exhibit 4.2. In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Debtor or Reorganized Debtor, such surviving, resulting or acquiring corporation will perform or cause to be performed the obligations of the applicable Debtor or Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Debtor or Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition of such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform or cause to be performed such obligations.

**4.3     Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs**

        **a.     Certificates of Incorporation and Bylaws**

        **(i)     Reorganized KAC**

As of the Effective Date, after giving effect to the Restructuring Transactions, the Certificate of Incorporation and the Bylaws of Reorganized KAC will be substantially in the form of Exhibit 4.3.a(i). The Certificate of Incorporation of Reorganized KAC will, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code and will authorize the issuance of New Common Stock in amounts not less than the amounts necessary to permit the distributions thereof required or contemplated by the Plan. After the Effective Date, Reorganized KAC may amend and restate its Certificate of Incorporation or Bylaws as permitted by the General Corporation Law of the State of Delaware, subject to the terms and conditions of such constituent documents.

        **(ii)     Kaiser Trading and Other Reorganized Debtors**

As of the Effective Date, after giving effect to the Restructuring Transactions, the Certificate of Incorporation and the Bylaws of Reorganized Kaiser Trading will be substantially in the form of Exhibit 4.3.a(ii) and the Certificate of Incorporation and the Bylaws of each Reorganized Debtor (other than Reorganized KAC and Reorganized Kaiser Trading) will be in such form as the Debtors may determine. The Certificates of Incorporation of Reorganized Kaiser Trading and each other Reorganized Debtor will, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code. After the Effective Date or the effective time of any applicable Restructuring Transaction, each such entity may amend and restate its Certificate of Incorporation or Bylaws as permitted by applicable state law, subject to the terms and conditions of such constituent documents.

        **b.     Directors and Officers of the Reorganized Debtors**

Exhibit 4.3.b identifies, for each Reorganized Debtor (other than Reorganized KAC and Reorganized Kaiser Trading), the individuals expected to serve as the initial members of its board of directors, or comparable governing body, and, for each Reorganized Debtor (other than Reorganized Kaiser Trading), the individuals expected to serve as its initial officers. The identity and the initial term of, and such additional information as may be required to be disclosed pursuant to section 1129(a)(5) of the Bankruptcy Code with respect to, the individuals expected to serve as the ten initial members of the board of directors of Reorganized KAC, one of whom will be the Chief Executive Officer of Reorganized KAC, five of whom will be selected by the Search Committee and four of whom will be designated by the USW, in each case as described in the Disclosure Statement, and the identity of the individuals expected to serve as the initial members of the board of directors and initial officers of Reorganized Kaiser Trading, who will be selected jointly by the Asbestos Claimants' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative, will be set forth in a filing with the Bankruptcy Court at least ten days prior to the deadline for filing objections to Confirmation of the Plan **to the extent such identities and additional information are then known by the Debtors and, to the extent any such information is not then known by the Debtors, the Debtors will disclose it in a filing with the Bankruptcy Court promptly after it becomes available to the Debtors.** Subject to the provisions of the Director Designation Agreement, each member of the board of directors or comparable governing body and officer of each Reorganized Debtor will serve from and after the Effective Date until his or her successor is duly elected and qualified or until his or her earlier death, resignation, disqualification or removal in accordance with the Certificate of Incorporation and Bylaws of such entity and applicable state law.

        **c.     New Employment, Retirement, Indemnification and Other Related Agreements and Incentive Compensation Programs**

As of the Effective Date, the Reorganized Debtors will have authority to: (i) maintain, amend or revise then-existing employment, retirement, welfare, incentive, severance, indemnification and other plans for or

agreements with their active and retired directors, officers and employees, subject to the terms and conditions of any such plan or agreement; and (ii) enter into new employment, retirement, welfare, incentive, severance, indemnification and other plans for or agreements with active and retired directors, officers and employees, including the Equity Incentive Plan. Exhibit 4.3.c provides a list of the plans for and agreements with active and retired directors, officers and employees that will continue in effect from and after the Effective Date or that will take effect as of the Effective Date.

### d.    Corporate Action

The following (which will occur and be deemed effective as of the date specified in the documents effectuating the same or, if no date is so specified, the Effective Date) will be deemed authorized and approved in all respects and for all purposes without any requirement of further action by stockholders or directors of any of the Debtors or the Reorganized Debtors or any other person or entity: (i) the implementation of the Restructuring Transactions; (ii) the adoption of new or amended and restated Certificates of Incorporation and Bylaws for the Reorganized Debtors; (iii) the initial selection of the member of the board of directors or comparable governing body and officers for the Reorganized Debtors; (iv) the entry into the Exit Financing Facility; (v) the entry into the Funding Vehicle Trust Agreement, the Asbestos PI Trust Agreement and the CTPV PI Trust Agreement, the NIHL PI Trust Agreement and the Silica PI Trust Agreement; (vi) the distribution of Cash pursuant to the Plan; (vii) the issuance and distribution of New Common Stock pursuant to the Plan; (viii) the issuance or transfer of the PI Trust Assets included in clauses (b) and (d) of Section 1.1(151) to the Asbestos PI Trust and the Silica PI Trust in accordance with Sections 5.2 and 5.3, as the case may be; (ix) the transfer of the remaining PI Trust Assets to the Funding Vehicle Trust; (x) the adoption, execution, delivery and implementation of all other contracts, leases, instruments, releases and other agreements or documents contemplated by the Plan (including the Director Designation Agreement, the Registration Rights Agreement and Stock Transfer Restriction Agreement); (xi) the adoption, execution and implementation of the plans and agreements described on Exhibit 4.3.c, including the Equity Incentive Plan; and (xii) the other matters provided for under the Plan involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by, or required of, any Debtor or Reorganized Debtor.

### 4.4    Transfers of Funds Among the Debtors

Cash payments to be made pursuant to the Plan will be made by Reorganized KAC; *provided, however*, that the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable Reorganized KAC to satisfy its obligations under the Plan.

### 4.5    Preservation of Rights of Action; Settlement Agreements and Releases

### a.    Preservation of Rights of Action by the Debtors and the Reorganized Debtors

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors or their successors will retain and may enforce any claims, demands, rights and causes of action that any Debtor or Estate may hold, including the Recovery Actions, to the extent not expressly released under the Plan. The Reorganized Debtors or their successors may pursue such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successors holding such claims, demands, rights or causes of action. Further, the Reorganized Debtors retain their rights to File and pursue any adversary proceedings against any trade creditor or vendor related to debit balances or deposits owed to any Debtor. Notwithstanding the foregoing, on the Effective Date, the Reorganized Debtors will be deemed to waive and release any claims, rights or causes of action arising under section 547 of the Bankruptcy Code relating to preferential transfers held by any Debtor or Reorganized Debtor against any entity other than Recovery Actions against Seyfarth Shaw LLP, Thelen Reid & Priest LLP, Bryan Cave LLP or Kramer Levin Naftalis & Frankel LLP.