**b.**    **General Releases**

As of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash, New Common Stock and contracts, instruments, releases and other agreements and documents to be entered into or delivered in connection with the Plan, each holder of a Claim, other than a holder of a Channeled Personal Injury Claim, that votes in favor of the Plan will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the right to enforce the Debtors' or the Reorganized Debtors' obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to a Debtor, the Reorganization Cases or the Plan that such entity has, had or may have against any Debtor or other Kaiser Company, the Creditors' Committee or members thereof, the Asbestos Claimants' Committee or members thereof, the Retirees' Committee or members thereof, the Future Asbestos Claimants' Representative, the Future Silica and CTPV Claimants' Representative, any DIP Lender, any Indenture Trustee or any of their respective present or former directors, officers, employees, accountants (including independent certified public accountants), advisors, attorneys, investment bankers, underwriters, consultants or other agents or shareholders, acting in such capacity (which release will be in addition to the discharge of Claims and termination of Interests provided herein and under the Confirmation Order and the Bankruptcy Code), except for those claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities based on: (i) acts or omissions of any such person constituting gross negligence or willful misconduct; (ii) if the holders of the Senior Subordinated Notes are or were determined by the order contemplated by Sections 2.4(c)(i)(B) and 2.4(c)(ii)(B) of either or both of the Alumina Subsidiary Plans to be entitled to a distribution under either or both of the Alumina Subsidiary Plans, acts or omissions of any such person related to or giving rise to the circumstances underlying any of the Contractual Subordination Disputes; or (iii) contractual obligations of, or loans owed by, any such person to a Debtor.  Nothing in this Section 4.5.b will limit in any way the scope or applicability of any PI Channeling Injunction.

    **c.**    **PBGC Release**

As of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash, New Common Stock and contracts, instruments, releases and other agreements and documents to be entered into or delivered in connection with the Plan, the PBGC will be deemed to release each Debtor and each other Kaiser Company from any and all claims of or liabilities to the PBGC arising on or before the Effective Date in respect of any pension plans maintained by the Debtors and terminated on or prior to the Effective Date and any related liens on such Debtor's or Kaiser Company's assets, including claims and liens arising under ERISA or under the IRC as a result of such Debtor's or Kaiser Company's status as a member of KACC's "controlled group" within the meaning of ERISA.  Notwithstanding any other provision in the Plan, nothing herein shall release the claim or claims of PBGC or any pension plan currently or formerly sponsored by KACC against any person (other than any Kaiser Company) for breach of fiduciary duty under ERISA with respect to the pension plans.

    **4.6**    **Cancellation of KAC Old Stock**

On the Effective Date, the KAC Old Stock will be deemed cancelled and of no further force without any further action on the part of any Debtor or Reorganized Debtor.

    **4.7**    **Registration Rights Agreement and Stock Transfer Restriction Agreement**

On the Effective Date, Reorganized KAC, the PBGC and the Union VEBA Trust will execute and deliver the Registration Rights Agreement and Stock Transfer Restriction Agreement.

**4.8    Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered or Reinstated in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens or other security interests or encumbrances of any kind against the property of any Estate will be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns and the former holder thereof will, upon request of any Debtor, execute such documents evidencing such release and discharge as such Debtor may reasonably request.

**4.9    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes**

The Chairman of the Board, Chief Executive Officer, President, any Executive Vice President, Chief Financial Officer, Chief Operating Officer, any Senior Vice President or any Vice President of each Debtor or Reorganized Debtor will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements and documents and take such actions as may be necessary, appropriate or desirable to effectuate and implement each provision of the Plan. The Secretary or any Assistant Secretary of each Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146(c) of the Bankruptcy Code, the following will not be subject to a stamp tax, real estate transfer tax, sales or use tax or similar Tax: (a) the issuance, transfer or exchange of New Common Stock and common stock of Kaiser Trading; (b) the creation of any mortgage, deed of trust, lien or other security interest; (c) the making or assignment of any lease or sublease; (d) the execution and delivery of the Exit Financing Facility; (e) any Restructuring Transaction; or (f) the making or delivery of any deed, bill of sale or other instrument of transfer or assignment or any plan of merger, consolidation, liquidation or dissolution under, in furtherance of or in connection with the Plan, including in connection with the funding of the Unsecured Claims Reserve, the Union VEBA Trust or Retired Salaried Employee VEBA Trust, the transfer of the PI Trust Assets to the Funding Vehicle Trust, the Asbestos PI Trust or the Silica PI Trust, as the case may be, or the implementation of any Restructuring Transaction.

**4.10    Canadian Proceeding**

On or prior to the Effective Date, the Debtors will seek the dismissal or termination of the Canadian Proceeding as to each of the Canadian Debtors.

**4.11    Certain Provisions Relating to KAC Old Stock Interests**

**By operation of Sections 4.6 and 12.1, on the Effective Date, the KAC Old Stock will be cancelled, all rights of equity security holders with respect thereto will be terminated and, as a consequence, the KAC Old Stock will be rendered "worthless" within the meaning of section 165(g)(1) of the IRC. MAXXAM shall therefore only be entitled to claim a loss under section 165(g)(1) of the IRC for their tax year in which the Effective Date occurs, and shall not be entitled to assert, and shall be barred from asserting, such loss for any tax year prior to the beginning of such tax year. Additionally, MAXXAM shall be barred from taking any other action in respect of KAC Old Stock that would impair or jeopardize in any way the ability of any Reorganized Debtor or successor thereto to utilize any Tax attributes of such Reorganized Debtor, its successor or its consolidated group that are in existence as of any loss with respect to the KAC Old Stock for any time prior to the Effective Date. This provision will supersede in all respects the Stipulation and Agreed Order Regarding Motion of Debtors and Debtors-in-Possession for an Order Prohibiting Disposition of Kaiser Aluminum Corporation Stock Without Prior Bankruptcy Court Approval, entered July 23, 2002, which, on the Effective Date, shall be deemed vacated and of no further force or effect.**

**4.12    Effect of Plan on Certain Indentures**

**a.    Senior Note Indentures**

**On the Effective Date, the 9-7/8% Senior Note Indenture and the 10-7/8% Senior Note Indentures shall be deemed cancelled and discharged (A) with respect to all obligations owed to and**

obligations owed by any Debtor and (B) except to the extent provided herein below, with respect to the respective rights and obligations of the Indenture Trustees under such Indentures and the holders of Senior Note Claims. Solely for purposes of clause (B) above, the following rights of each such Indenture Trustee shall remain in effect after the Effective Date: (i) rights as trustee, paying agent and registrar, including but not limited to any rights to payment of fees, expenses and indemnification obligations from property held or obtained by such Indenture Trustee in accordance with the applicable Indenture; (ii) rights relating to distributions to be made to the holders of the Senior Notes by such Indenture Trustee from any source, including distributions under the Plan and the Alumina Subsidiary Plans; (iii) rights relating to representation of the interests of the holders of the Senior Notes by such Indenture Trustee in the Reorganization Cases, the Alumina Subsidiary Debtors' bankruptcy cases, the Contractual Subordination Disputes and any proceedings and appeals related to the Contractual Subordination Disputes, and any claim or cause of action related to any of the foregoing, to the extent not discharged or released by the Plan or the Alumina Subsidiary Plans; and (iv) rights relating to participation by such Indenture Trustee in all proceedings and appeals related to Plan and the Alumina Subsidiary Plans. Notwithstanding the continued effectiveness of such rights after the Effective Date, such Indenture Trustee shall have no obligation to object to Claims against the Debtors or to locate certificated holders of Senior Notes who fail to surrender their Senior Notes in accordance with Section 7.11. Further, nothing in the Plan or the Confirmation Order, including the cancellation and discharge of the 9-7/8% Senior Note Indenture and 10-7/8% Senior Note Indentures as provided above, (i) shall operate to release any claims of the Indenture Trustees under such Prepetition Indentures or the holders of Senior Notes against any person other than the Debtors, except to the extent set forth in Section 4.5.b; (ii) shall affect the relative seniority of the Senior Notes to the Senior Subordinated Notes; or (iii) shall adversely affect, limit or impair any rights that such Indenture Trustees or holders of the Senior Notes have with respect to the Alumina Subsidiary Debtors, including the right to enforce the subordination provisions in such Prepetition Indentures.

   **b.**  **7-3/4% SWD Revenue Bond Indenture**

    Nothing in the Plan or the Confirmation Order (i) shall operate to release any claims of the 7-3/4% SWD Revenue Bond Indenture Trustee or the holders of 7-3/4% SWD Revenue Bonds against any person other than the Debtors, except to the extent set forth in Section 4.5.b, or (ii) shall adversely affect, limit or impair any rights that the 7-3/4% SWD Revenue Bond Indenture Trustee or holders of the 7-3/4% SWD Revenue Bonds have with respect to the 7-3/4% SWD Revenue Bond Settlement or the Contractual Subordination Disputes.

   **c.**  **Additional Reservations**

    Nothing in this Section 4.12 shall affect the Debtors' obligations under the Plan or the obligations and rights of any Indenture Trustee under Sections 7.3 and 7.5.a(ii).

## ARTICLE V

## FUNDING VEHICLE TRUST; PI TRUSTS

 **5.1**  **Funding Vehicle Trust**

   a.  **Creation of the Funding Vehicle Trust**

    (i)  On the Effective Date, Reorganized KACC and the Funding Vehicle Trustees will execute the Funding Vehicle Trust Agreement and the Funding Vehicle Trust will be created. The purpose of the Funding Vehicle Trust will be to, among other things, (A) **handle insurance coverage litigation and settlements, (B)** preserve, hold, manage and maximize the assets of the Funding Vehicle Trust, including the PI Insurance Assets, for the benefit of the PI Trusts, and (B**C**) make ~~payments~~**distributions** to the PI Trusts (for

distribution to the beneficiaries of such trusts), all in accordance with the Plan, the PI Trust Funding Agreement and the Funding Vehicle Trust Agreement.

(ii)    The Funding Vehicle Trust is intended to be treated for U.S. federal income Tax purposes as a "disputed ownership fund" as described within Proposed Treasury Regulations section 1.468B-9(a), as more specifically provided for under the Funding Vehicle Trust Agreement. Accordingly, for all U.S. federal income Tax purposes the transfer of assets to the Funding Vehicle Trust will be treated as a transfer to a disputed ownership fund by the Debtors, as transferors, for subsequent distribution to the PI Trusts in accordance with their claims to the assets held by the Funding Vehicle Trust for the benefit of holders of Channeled Personal Injury Claims, as shall be determined under the Funding Vehicle Trust Agreement, and in complete settlement of the PI Trusts' claims. Any income on the assets of the Funding Vehicle Trust will be treated as subject to Tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for Taxes and subject to the withholding and reporting requirements set forth in the Plan and the Funding Vehicle Trust Agreement.

(iii)    The Funding Vehicle Trustees will be the "administrator" (as defined in Proposed Treasury Regulations section 1.468B-9(b)) of the Funding Vehicle Trust and will be required by the Funding Vehicle Trust Agreement to (A) timely file such income Tax and other returns and statements and timely pay all Taxes required to be paid from the assets in the Funding Vehicle Trust as required by law and in accordance with the provisions of the Plan and the Funding Vehicle Trust Agreement, (B) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (C) meet all other requirements necessary to qualify and maintain qualification of the Funding Vehicle Trust as a disputed ownership fund within the meaning of Proposed Treasury Regulations section 1.468B-9(a), and (D) take no action that could cause the Funding Vehicle Trust to fail to qualify as a disputed ownership fund. The Funding Vehicle Trust Agreement will provide that the Reorganized Debtors will have no rights to any refunds or reversion with respect to any assets of the Funding Vehicle Trust or any earnings thereon.

(iv)    Following the funding of the Funding Vehicle Trust (and in no event later than February 15th of the calendar year following the Effective Date), Reorganized KACC will provide or cause to be provided to the Funding Vehicle Trustees a "§ 1.468B-9(f) Statement" in accordance with Proposed Treasury Regulations section 1.468B-9(f). Following any subsequent transfers of Cash or other property to the Funding Vehicle Trust, the transferor will provide or cause to be provided to the Funding Vehicle Trustees a "§ 1.468B-9(f) Statement" on or before February 15th of the calendar year following the date of each such transfer.

**b.    PI Trust Funding Agreement**

On and after the Effective Date, the Funding Vehicle Trustees, on behalf of the Funding Vehicle Trust, will make or cause to be made all payments required to be made by the Funding Vehicle Trust, and perform or cause to be performed all other obligations of the Funding Vehicle Trust, under the PI Trust Funding Agreement.

**c.    Appointment of Funding Vehicle Trustee**

The individuals from time to time serving as the Asbestos PI Trustees and the Silica PI Trustee will serve as the Funding Vehicle Trustees.

**d.    Transfer of Certain Property to the Funding Vehicle Trust**

**(i)    Transfer of Plan Consideration**

Subject to Sections 5.1.f and 5.1.g, on the Effective Date, the PI Trust Assets referenced in clauses (a) and (c) of Section 1.1(151) will be transferred or caused to be transferred by Reorganized KACC to the Funding Vehicle Trust for the benefit of the PI Trusts and such assets shall be automatically and without further act or deed, vested in and assumed by the Funding Vehicle Trust.

### (ii)    Transfer of Books and Records

On the Effective Date or as soon thereafter as is practicable, in accordance with written instructions provided to Reorganized KACC by the Funding Vehicle Trust, Reorganized KACC will transfer, or cause to be transferred, to the Funding Vehicle Trust the books and records of the Debtors that pertain to Channeled Personal Injury Claims that have been asserted against any Debtor, including books and records concerning the Debtors' settlement before the Petition Date of asbestos-related, silica-related, CTPV-related or NIHL-related personal injury claims or demands. **The Funding Vehicle Trust may re-transfer or supply copies of such books and records to the PI Trusts.** If the Funding Vehicle Trust does not issue written instructions for the transfer of such books and records prior to the first anniversary of the Effective Date, or if the Funding Vehicle Trust so requests, Reorganized KACC may (and will, if the Funding Vehicle Trust so requests, but at the sole cost and expense of the Funding Vehicle Trust) destroy any such books and records, including any in the possession of KACC's former counsel. Until such books and records are so transferred or destroyed, Reorganized KACC will maintain such books and records in the same manner it maintains them as of the Effective Date and will make them available to the Funding Vehicle Trust, at its request, during normal business hours and upon reasonable notice. Notwithstanding any other provision of the Plan, the cost and expense of so maintaining such books and records will be borne by Reorganized KACC; *provided, however,* that any cost or expense incurred by Reorganized KACC in connection with any such request by the Funding Vehicle Trust will be reimbursed by the Funding Vehicle Trust. Additionally, Reorganized KACC will not unreasonably withhold consent to the Funding Vehicle Trust's retention of the professional services of KACC's former counsel, including Heller Ehrman LLP and KACC's National Coordinating Counsel (Wharton Levin Ehrmantraut & Klein, P.A.). The Debtors will request that the Bankruptcy Court, in the Confirmation Order, rule that such transfer of books and records and retention of such professional services does not result in the destruction or waiver of any applicable privileges pertaining to such books, records and professional services. If the Bankruptcy Court does not so rule, at the option of the Funding Vehicle Trust, Reorganized KACC will, at the sole cost and expense of the Funding Vehicle Trust, retain the books and records and enter into arrangements to permit the Funding Vehicle Trust to have access to such books, records and professional services.

### e.    Assumption of Certain Liabilities and Obligations by the Funding Vehicle Trust

### (i)    Channeled Personal Injury Claims and Trust Expenses

On the Effective Date, the Funding Vehicle Trust will assume all liability and responsibility for its Trust Expenses, and the Reorganized Debtors will have no further financial or other responsibility or liability therefor. The Funding Vehicle Trust will also assume all liability of the Debtors, the Reorganized Debtors and the other Kaiser Companies for premiums, deductibles, retrospective premium adjustments, reinsurance, security or collateral arrangements and other charges, costs, fees or expenses (if any) that become due to any insurer in connection with pursuit or recovery of the PI Insurance Assets as a result of (i) Channeled Personal Injury Claims or (ii) Trust Expenses of the Funding Vehicle Trust or of any PI Trust, and neither the Debtors or Reorganized Debtors, nor the other Kaiser Companies, will have any further financial or other responsibility or liability for any of the foregoing. The Funding Vehicle Trust shall advocate in any and all actions and proceedings brought against the Reorganized Debtors that involve Channeled Personal Injury Claims that such Claims are and have been channeled to the applicable PI Trust, and the Funding Vehicle Trust Agreement shall provide that the Funding Vehicle Trust shall cooperate with the Reorganized Debtors in any and all such actions and proceedings. **Each Reorganized Debtor will be entitled to indemnification from the Funding Vehicle Trust for any out-of-pocket fees and expenses and attorneys' fees and expenses, judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor on or after the Effective Date in connection with any action, suit or proceeding related to Channeled Personal Injury Claims, whether civil, administrative or arbitrative, including without limitation any liability for indemnification or contribution for such Claims prosecuted against such Reorganized Debtor.**

### (ii)    Insurance-Related Obligations

**The Funding Vehicle Trust's pursuit of PI Insurance Assets as to Channeled Personal Injury Claims and Trust Expenses of the Funding Vehicle Trust or of any PI Trust, as contemplated by the Plan and**

by the Funding Vehicle Trust Agreement, shall be undertaken by the Funding Vehicle Trust in such a manner so as not to cause the Reorganized Debtors or other Kaiser Companies, including Trochus Insurance Company, to become obligated, whether directly to the PI Insurance Company as to which claim is made by the Funding Vehicle Trust or indirectly through claims made by such PI Insurance Company as against other insurance companies, to pay any amounts in the form of, or pursuant to, self insured retentions, premiums, deductibles, retrospective premium adjustments, reinsurance, security or collateral arrangements or other charges, costs, fees or expenses (if any) (collectively, the "Insurance-Related Claims"). The Funding Vehicle Trust shall defend any Insurance-Related Claim made against the Reorganized Debtors or other Kaiser Companies. To effectuate this obligation of the Funding Vehicle Trust, the Funding Vehicle Trust shall either, at the Funding Vehicle Trustees' option, (a) pay any Insurance-Related Claim adjudicated or determined by binding arbitration on behalf of the Reorganized Debtor or other Kaiser Company or (b) reduce the amount that any PI Insurance Company is adjudicated or determined by binding arbitration to be obligated to pay under an Included PI Trust Insurance Policy that triggers the financial obligations of the Reorganized Debtors or other Kaiser Companies described above, as is necessary to eliminate either a direct right of recovery by that PI Insurance Company or an indirect right of recovery that such PI Insurance Company has been adjudicated or determined by binding arbitration to be entitled to as against the Reorganized Debtors or other Kaiser Companies, including Trochus Insurance Company and pay out of pocket fees and expenses and attorneys' fees and expenses incurred by the Reorganized Debtor or other Kaiser Company including Trochus Insurance Company on or after the Effective Date; *provided, however, that the amount payable under (a) above shall not exceed the amount paid by such PI Insurance Company under that Included PI Trust Insurance Policy to the Funding Vehicle Trust.* Additionally, in consideration for the transfer of the PI Insurance Assets to the Funding Vehicle Trust and in furtherance of the purposes of the Funding Vehicle Trust and the Plan, on the Effective Date the Funding Vehicle Trust will assume all liability and responsibility for obligations under any agreements pursuant to which funds have or will be paid in respect of insurance settlements for the benefit of holders of any Channeled Personal Injury Claims, and any escrow or other agreements entered into in connection therewith, to the full extent contemplated by such settlement agreements, and the Reorganized Debtors will have no further financial or other responsibility or liability therefor. The Funding Vehicle Trust will cooperate with the Reorganized Debtors and use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things that the Reorganized Debtors may reasonably consider necessary, appropriate or desirable to effectuate such assumption. ~~Each Reorganized Debtor and each other Kaiser Company will be entitled to indemnification from the Funding Vehicle Trust for any fees and expenses (including but not limited to out-of-pocket fees and expenses and attorneys' fees and expenses), judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor or other Kaiser Company on or after the Effective Date in connection with any action, suit or proceeding related to Channeled Personal Injury Claims, whether civil, administrative or arbitrative, including without limitation any such liability for which the Funding Vehicle Trust has assumed liability in this Section 5.1.e.~~

      **f.**      **Cooperation with Respect to Insurance Matters**

            The Reorganized Debtors will cooperate with the Funding Vehicle Trust and use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to effectuate the transfer of assets contemplated by Section 5.1.d to the Funding Vehicle Trust. By way of enumeration and not of limitation, the Reorganized Debtors will be obligated: (i) to provide the Funding Vehicle Trust with copies of insurance policies and settlement agreements included within or relating to the PI Insurance Assets; (ii) to provide the Funding Vehicle Trust with other information in the Reorganized Debtors' possession necessary, appropriate or desirable to the Funding Vehicle Trust in connection with its efforts to obtain insurance coverage for Channeled Personal Injury Claims; and (iii) to execute further assignments or allow the Funding Vehicle Trust to pursue claims relating to the PI Insurance Assets in a Reorganized Debtor's name (subject to appropriate disclosure of the fact that the Funding Vehicle Trust is doing so and the reasons why it is doing so), including by means of arbitration, alternative dispute resolution proceedings or litigation, to the extent necessary or helpful to the efforts of the Funding Vehicle Trust to obtain insurance coverage under the PI Insurance Assets for Channeled Personal Injury Claims. To the extent the transfer to the Funding Vehicle Trust of any of the PI Trust Assets within the scope of clause (a) of Section 1.1(151) is determined to be invalid by a court of competent jurisdiction, upon request by the Funding Vehicle Trust and at the cost of the Funding Vehicle Trust, the Reorganized Debtors shall (i) take all reasonable actions with respect to such assets, including prosecution of any PI Insurance Coverage Action, for the benefit of, and to the extent

reasonably requested by, the Funding Vehicle Trust and (ii) immediately transfer any amounts recovered under or on account of any such assets to the Funding Vehicle Trust. The Funding Vehicle Trust will be obligated to compensate the Reorganized Debtors for costs reasonably incurred on or after the Effective Date in connection with providing assistance to the Funding Vehicle Trust pursuant to this Section 5.1.f, including but not limited to out-of-pocket costs and expenses, consultant fees and attorneys' fees. Action taken pursuant to this Section 5.1.f shall not be deemed to waive and shall not be a waiver of any applicable privilege as against any third party.

### g.      PI Insurance Coverage Actions

Any PI Insurance Coverage Action and the claims and causes of action asserted or to be asserted therein shall be preserved for the benefit of the Funding Vehicle Trust for prosecution either by Reorganized KACC or the Funding Vehicle Trustees (as mutually agreed by such parties) subsequent to the Effective Date and in accordance with the Funding Vehicle Trust Agreement. As of the date subsequent to the Effective Date on which the Funding Vehicle Trustees confirm in writing to the Reorganized Debtors that the Funding Vehicle Trust is in a position to assume such responsibility, such actions, along with the rights and obligations of the Debtors and the Reorganized Debtors with respect to Included PI Trust Insurance Policies and claims thereunder, to the extent that such policies and claims relate to Channeled Personal Injury Claims (but not as to any other claims covered thereby) and subject to the transferability without prejudice of such policies and claims, shall be transferred to and vested in the Funding Vehicle Trust, as the representative of the Debtors' Estates, the Funding Vehicle Trust being appointed by the Bankruptcy Court in accordance with section 1123(b)(3) of the Bankruptcy Code without any further action by the Debtors or Reorganized Debtors, the Funding Vehicle Trust or the Bankruptcy Court. Such PI Insurance Coverage Actions shall be so vested free and clear of all liens, security interests and other claims or causes of action, except for PI Insurer Coverage Defenses or as otherwise provided in the Plan. Until such time as the PI Insurance Coverage Actions have become vested in the Funding Vehicle Trust, Reorganized KACC shall be entitled to prosecute any PI Insurance Coverage Action; *provided, however,* that any compromise or settlement of any such action shall require the consent of the Funding Vehicle Trustees and the approval of the Bankruptcy Court. The Funding Vehicle Trust will be obligated to compensate the Reorganized Debtors for costs reasonably incurred in connection with the prosecution of any PI Insurance Coverage Action pursuant to this Section 5.1.g, including but not limited to out-of-pocket costs and expenses, consultant fees and attorneys' fees. Upon vesting in the Trust, the prosecution of the PI Insurance Coverage Actions shall be governed by the Funding Vehicle Trust Agreement. Notwithstanding anything to the contrary herein, the Funding Vehicle Trust shall not compromise or settle insurance coverage under any Included PI Trust Insurance Policy other than with respect to Channeled Personal Injury Claims or Trust Expenses of the Funding Vehicle Trust or of any PI Trust.

### 5.2      Asbestos PI Trust

### a.      Creation of the Asbestos PI Trust

(i)      On the Effective Date, Reorganized KACC, the Asbestos PI Trustees, the members of the Asbestos PI TAC and the Future Asbestos Claimants' Representative will execute the Asbestos PI Trust Agreement and the Asbestos PI Trust will be created. The purpose of the Asbestos PI Trust will be to, among other things, (A) direct the processing, liquidation and payment of all Asbestos Personal Injury Claims in accordance with the Asbestos Distribution Procedures and (B) preserve, hold, manage and maximize the assets of the Asbestos PI Trust for use in paying and satisfying Asbestos Personal Injury Claims, all in accordance with Plan, the PI Trust Funding Agreement and the Asbestos PI Trust Agreement.

(ii)      The Asbestos PI Trust is intended to be treated for U.S. federal income Tax purposes as a "qualified settlement fund" as described within section 1.468B-1 of the Treasury Regulations, as more specifically provided for under the Asbestos PI Trust Agreement. Accordingly, for all U.S. federal income Tax purposes the transfer of assets to the Asbestos PI Trust will be treated as a transfer to a trust satisfying the requirements of section 1.468B-1(c) of the Treasury Regulations by the Debtors and the Funding Vehicle Trust, as transferors, for distribution to holders of Asbestos Personal Injury Claims and in complete settlement of such Claims. Any income on the assets of the Asbestos PI Trust will be treated as subject to Tax on a current basis, and all

distributions pursuant to the Plan will be made net of provision for Taxes and subject to the withholding and reporting requirements set forth in the Plan and the Asbestos PI Trust Agreement.

(iii)       The Asbestos PI Trustees will be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the Asbestos PI Trust and will be required by the Asbestos PI Trust Agreement to (A) timely file such income Tax and other returns and statements and timely pay all Taxes required to be paid from the assets in the Asbestos PI Trust as required by law and in accordance with the provisions of the Plan and the Asbestos PI Trust Agreement, (B) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (C) meet all other requirements necessary to qualify and maintain qualification of the Asbestos PI Trust as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations, and (D) take no action that could cause the Asbestos PI Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations. The Asbestos PI Trust Agreement will provide that the Reorganized Debtors will have no rights to any refunds or reversion with respect to any assets of the Asbestos PI Trust or any earnings thereon.

(iv)       Within 60 days after the Effective Date (but not later than February 14th of the calendar year following such date), Reorganized KACC will obtain a Qualified Appraisal of (A) the fair market value of the common stock of Kaiser Trading transferred to the Asbestos PI Trust pursuant to Section 5.2.d and (B) any New Common Stock theretofore received by the Asbestos PI Trust in respect of the 70.5% of the KFC Claim that is to be transferred on the Effective Date to the Asbestos PI Trust pursuant to Section 4.2.f of the Intercompany Claims Settlement and Section 5.2.d.

(v)        Following the funding of the Asbestos PI Trust and the receipt of such Qualified Appraisal (and in no event later than February 15th of the calendar year following the Effective Date), Reorganized KACC will provide or cause to be provided to the Asbestos PI Trustees a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations. Following any subsequent transfers of Cash or other property to the Asbestos PI Trust, the transferor will provide or cause to be provided to the Asbestos PI Trustees a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

**b.        PI Trust Funding Agreement**

On and after the Effective Date, the Asbestos PI Trustees, on behalf of the Asbestos PI Trust, will perform or cause to be performed all obligations of the Asbestos PI Trust under the PI Trust Funding Agreement.

**c.        Appointment of Asbestos PI Trustees; Asbestos PI TAC**

Pursuant to the Confirmation Order, the Bankruptcy Court will confirm the appointment of the individuals selected as contemplated by the Asbestos PI Trust Agreement to serve as the initial Asbestos PI Trustees and as the initial members of the Asbestos PI TAC effective as of the Effective Date.

**d.        Transfer of Certain Property to the Asbestos PI Trust**

On the Effective Date, (i) 94 shares of Kaiser Trading and (ii) 70.5% of KFC Claim will be issued or transferred or caused to be issued or transferred by Reorganized KAC to the Asbestos PI Trust and such assets shall be automatically and without further act or deed, vested in and assumed by the Asbestos PI Trust. The Asbestos PI Trust will be entitled to receive its Pro Rata Share of the New Common Stock distributable to holders of Claims in Class 9 on account of its 70.5% of the KFC Claim (which is an Allowed General Unsecured Claim in Class 9) and to receive distributions from the Funding Vehicle Trust in accordance with the PI Trust Funding Agreement.

**e.        Assumption of Certain Liabilities and Obligations by the Asbestos PI Trust**

On the Effective Date the Asbestos PI Trust will assume all liability and responsibility for all Asbestos Personal Injury Claims and its Trust Expenses, and the Reorganized Debtors will have no further financial

or other responsibility or liability therefor. The Asbestos PI Trust shall advocate in any and all actions and proceedings brought against the Reorganized Debtors that involve Asbestos Personal Injury Claims that such Claims are and have been channeled to the Asbestos PI Trust, and the Asbestos PI Trust Agreement shall provide that the Asbestos PI Trust shall cooperate with the Reorganized Debtors in any and all such actions and proceedings. The Asbestos PI Trust will cooperate with the Reorganized Debtors and use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things that the Reorganized Debtors may reasonably consider necessary, appropriate or desirable to effectuate such assumption. Each Reorganized Debtor and each other Kaiser Company will be entitled to indemnification from the Asbestos PI Trust for any ~~fees and expenses (including but not limited to out~~-of-pocket fees and expenses and attorneys' fees and expenses~~)~~, judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor or other Kaiser Company on or after the Effective Date in connection with any action, suit or proceeding related to Asbestos Personal Injury Claims, whether civil, administrative or arbitrative, including but not limited to indemnification or contribution for such Claims prosecuted against such Reorganized Debtor or other Kaiser Company. Upon the request of the Funding Vehicle Trust, the Asbestos PI Trust shall (i) provide to the Funding Vehicle Trust any authorization or assignment of rights from the Asbestos PI Trust that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to permit the Funding Vehicle Trust to pursue recovery under any Included PI Trust Insurance Policy in respect of Asbestos Personal Injury Claims or Trust Expenses of the Asbestos PI Trust and (ii) otherwise cooperate with the Funding Vehicle Trust and use commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to effect such recovery, including providing to the Funding Vehicle Trust information relating to Asbestos Personal Injury Claims available to the Asbestos PI Trust and required to be provided or otherwise made available by the Funding Vehicle Trust pursuant to any insurance settlement agreement assumed by the Funding Vehicle Trust pursuant to Section 5.1.e.

### 5.3    Silica PI Trust

#### a.    Creation of the Silica PI Trust

(i)    On the Effective Date, Reorganized KACC, the Silica PI Trustee and the member of the Silica PI TAC will execute the Silica PI Trust Agreement and the Silica PI Trust will be created. The purpose of the and Silica PI Trust will be to, among other things, (A) direct the processing, liquidation and payment of all Silica Personal Injury Claims in accordance with the Silica Distribution Procedures, and (B) preserve, hold, manage and maximize the assets of the Silica PI Trust for use in paying and satisfying Silica Personal Injury Claims, all in accordance with the Plan, the PI Trust Funding Agreement and the Silica PI Trust Agreement.

(ii)    The Silica PI Trust is intended to be treated for U.S. federal income Tax purposes as a "qualified settlement fund" as described within section 1.468B-1 of the Treasury Regulations, as more specifically provided for under the Silica PI Trust Agreement. Accordingly, for all U.S. federal income Tax purposes the transfer of assets to the Silica PI Trust will be treated as a transfer to a trust satisfying the requirements of Treasury Regulations section 1.468B-1(c) by the Debtors and the Funding Vehicle Trust, as transferors, for distribution to holders of Silica Personal Injury Claims and in complete settlement of such Claims. Any income on the assets of the Silica PI Trust will be treated as subject to Tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for Taxes and subject to the withholding and reporting requirements set forth in the Plan and the Silica PI Trust Agreement.

(iii)    The Silica PI Trustee will be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the Silica PI Trust and will be required by the Silica PI Trust Agreement to (A) timely file such income Tax and other returns and statements and timely pay all Taxes required to be paid from the assets in the Silica PI Trust as required by law and in accordance with the provisions of the Plan and the Silica PI Trust Agreement, (B) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (C) meet all other requirements necessary to qualify and maintain qualification of the Silica PI Trust as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations, and (D) take no action that could cause the Silica PI Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of

the Treasury Regulations. The Silica PI Trust Agreement will provide that the Reorganized Debtors will have no rights to any refunds or reversion with respect to any assets of the Silica PI Trust or any earnings thereon.

(iv)    Within 60 days after the Effective Date (but not later than February 14th of the calendar year following such date), Reorganized KACC will obtain a Qualified Appraisal of (A) the fair market value of the common stock of Kaiser Trading transferred to the Silica PI Trust pursuant to Section 5.3.d and (B) any New Common Stock theretofore received by the Silica PI Trust in respect of the 4.5% of the KFC Claim that is to be transferred on the Effective Date to the Silica PI Trust pursuant to Section 4.2.f of the Intercompany Claims Settlement and Section 5.3.d.

(v)    Following the funding of the Silica PI Trust and the receipt of such Qualified Appraisal (and in no event later than February 15th of the calendar year following the Effective Date), Reorganized KACC will provide or cause to be provided to the Silica PI Trustee a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations. Following any subsequent transfers of Cash or other property to the Silica PI Trust, the transferor will provide or cause to be provided to the Silica PI Trustee a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

**b.    PI Trust Funding Agreement**

On and after the Effective Date, the Silica PI Trustee, on behalf of the Silica PI Trust, will perform or cause to be performed all obligations of the Silica PI Trust under the PI Trust Funding Agreement.

**c.    Appointment of Silica PI Trustee; Silica PI TAC**

The Future Silica and CTPV Claimants' Representative will serve as the initial Silica PI Trustee. Pursuant to the Confirmation Order, the Bankruptcy Court will confirm the appointment of the individual selected as contemplated by the Silica PI Trust Agreement to serve as the initial member of the Silica PI TAC effective as of the Effective Date.

**d.    Transfer of Certain Property to the Silica PI Trust**

On the Effective Date, (i) 6 shares of Kaiser Trading and (ii) 4.5% of the KFC Claim will be issued or transferred or caused to be issued or transferred by Reorganized KAC to the Silica PI Trust and such assets shall be automatically and without further act or deed, vested in and assumed by the Silica PI Trust. The Silica PI Trust will be entitled to receive its Pro Rata Share of the New Common Stock distributable to holders of Claims in Class 9 on account of its 4.5% of the KFC Claim (which is an Allowed General Unsecured Claim in Class 9) and to receive distributions from the Funding Vehicle Trust in accordance with the PI Trust Funding Agreement.

**e.    Assumption of Certain Liabilities and Obligations by the Silica PI Trust**

On the Effective Date the Silica PI Trust will assume all liability and responsibility for all Silica Personal Injury Claims and its Trust Expenses, and the Reorganized Debtors will have no further financial or other responsibility or liability therefor. The Silica PI Trust shall advocate in any and all actions and proceedings brought against the Reorganized Debtors that involve Silica Personal Injury Claims that such Claims are and have been channeled to the Silica PI Trust, and the Silica PI Trust Agreement shall provide that the Silica PI Trust shall cooperate with the Reorganized Debtors in any and all such actions and proceedings. The Silica PI Trust will cooperate with the Reorganized Debtors and use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things that the Reorganized Debtors may reasonably consider necessary, appropriate or desirable to effectuate such assumption. Each Reorganized Debtor and each other Kaiser Company will be entitled to indemnification from the Silica PI Trust for any fees and expenses (including but not limited to out-of-pocket fees and expenses and attorneys' fees and expenses), judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor or other Kaiser Company on or after the Effective Date in connection with any action, suit or proceeding related to Silica Personal Injury Claims, whether civil, administrative or arbitrative, including but not limited to indemnification or contribution for such Claims prosecuted against such Reorganized Debtor or other Kaiser Company. Upon the request of the Funding Vehicle

Trust, the Silica PI Trust shall (i) provide to the Funding Vehicle Trust any authorization or assignment of rights from the Silica PI Trust that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to permit the Funding Vehicle Trust to pursue recovery under any Included PI Trust Insurance Policy in respect of Silica Personal Injury Claims or Trust Expenses of the Silica PI Trust and (ii) otherwise cooperate with the Funding Vehicle Trust and use commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to effect such recovery, including providing to the Funding Vehicle Trust information relating to Silica Personal Injury Claims available to the Silica PI Trust and required to be provided or otherwise made available by the Funding Vehicle Trust pursuant **to** any insurance settlement agreement assumed by the Funding Vehicle Trust pursuant to Section 5.1.e.

### 5.4    CTPV PI Trust

#### a.    Creation of the CTPV PI Trust

(i)    On the Effective Date, Reorganized KACC, the CTPV PI Trustee and the member of the CTPV PI TAC will execute the CTPV PI Trust Agreement and the CTPV PI Trust will be created. The purpose of the CTPV PI Trust will be to, among other things, (A) direct the processing, liquidation and payment of all CTPV Personal Injury Claims in accordance with the CTPV Distribution Procedures, and (B) preserve, hold, manage and maximize the assets of the CTPV PI Trust for use in paying and satisfying CTPV Personal Injury Claims, all in accordance with the Plan, the PI Trust Funding Agreement and the CTPV PI Trust Agreement.

(ii)    The CTPV PI Trust is intended to be treated for U.S. federal income Tax purposes as a "qualified settlement fund" as described within section 1.468B-1 of the Treasury Regulations, as more specifically provided for under the CTPV PI Trust Agreement. Accordingly, for all U.S. federal income Tax purposes the transfer of assets to the CTPV PI Trust will be treated as a transfer to a trust satisfying the requirements of Treasury Regulations section 1.468B-1(c) by the Funding Vehicle Trust, as transferor, for distribution to holders of CTPV Personal Injury Claims and in complete settlement of such Claims. Any income on the assets of the CTPV PI Trust will be treated as subject to Tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for Taxes and subject to the withholding and reporting requirements set forth in the Plan and the CTPV PI Trust Agreement.

(iii)    The CTPV PI Trustee will be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the CTPV PI Trust and will be required by the CTPV PI Trust Agreement to (A) timely file such income Tax and other returns and statements and timely pay all Taxes required to be paid from the assets in the CTPV PI Trust as required by law and in accordance with the provisions of the Plan and the CTPV PI Trust Agreement, (B) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (C) meet all other requirements necessary to qualify and maintain qualification of the CTPV PI Trust as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations, and (D) take no action that could cause the CTPV PI Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations. The CTPV PI Trust Agreement will provide that the Reorganized Debtors will have no rights to any refunds or reversion with respect to any assets of the CTPV PI Trust or any earnings thereon.

(iv)    Following the funding of the CTPV PI Trust (and in no event later than February 15th of the calendar year following the Effective Date), the Funding Vehicle Trust will provide or cause to be provided to the CTPV PI Trustee a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations. Following any subsequent transfers of Cash or other property to the CTPV PI Trust, the transferor will provide or cause to be provided to the CTPV PI Trustee a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

### b.    PI Trust Funding Agreement

On and after the Effective Date, the CTPV PI Trustee, on behalf of the CTPV PI Trust, will perform or cause to be performed all obligations of the CTPV PI Trust under the PI Trust Funding Agreement.

### c.    Appointment of CTPV PI Trustee; CTPV PI TAC

The Future Silica and CTPV Claimants' Representative will serve as the initial CTPV PI Trustee. Pursuant to the Confirmation Order, the Bankruptcy Court will confirm the appointment of the individual selected as contemplated by the CTPV PI Trust Agreement to serve as the initial member of the CTPV PI TAC effective as of the Effective Date.

### d.    Assumption of Certain Liabilities and Obligations by the CTPV PI Trust

On the Effective Date the CTPV PI Trust will assume all liability and responsibility for all CTPV Personal Injury Claims and its Trust Expenses, and the Reorganized Debtors will have no further financial or other responsibility or liability therefor. The CTPV PI Trust shall advocate in any and all actions and proceedings brought against the Reorganized Debtors that involve CTPV Personal Injury Claims that such Claims are and have been channeled to the CTPV PI Trust, and the CTPV PI Trust Agreement shall provide that the CTPV PI Trust shall cooperate with the Reorganized Debtors in any and all such actions and proceedings. The CTPV PI Trust will cooperate with the Reorganized Debtors and use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things that the Reorganized Debtors may reasonably consider necessary, appropriate or desirable to effectuate such assumption. Each Reorganized Debtor and each other Kaiser Company will be entitled to indemnification from the CTPV PI Trust for any fees and expenses (including but not limited to out-of-pocket fees and expenses and attorneys' fees and expenses), judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor or other Kaiser Company on or after the Effective Date in connection with any action, suit or proceeding related to CTPV Personal Injury Claims, whether civil, administrative or arbitrative, including but not limited to indemnification or contribution for such Claims prosecuted against such Reorganized Debtor or other Kaiser Company. Upon the request of the Funding Vehicle Trust, the CTPV PI Trust shall (i) provide to the Funding Vehicle Trust any authorization or assignment of rights from the CTPV PI Trust that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to permit the Funding Vehicle Trust to pursue recovery under any Included PI Trust Insurance Policy in respect of CTPV Personal Injury Claims or Trust Expenses of the CTPV PI Trust and (ii) otherwise cooperate with the Funding Vehicle Trust and use commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to effect such recovery, including providing to the Funding Vehicle Trust information relating to CTPV Personal Injury Claims available to the CTPV PI Trust and required to be provided or otherwise made available by the Funding Vehicle Trust pursuant **to** any insurance settlement agreement assumed by the Funding Vehicle Trust pursuant to Section 5.1.e.

### 5.5    NIHL PI Trust

### a.    Creation of the NIHL PI Trust

(i)    On the Effective Date, Reorganized KACC, the NIHL PI Trustee and the member of the NIHL PI TAC will execute the NIHL PI Trust Agreement and the NIHL PI Trust will be created. The purpose of the NIHL PI Trust will be to, among other things, (A) direct the processing, liquidation and payment of all NIHL Personal Injury Claims in accordance with the NIHL Distribution Procedures and (B) preserve, hold, manage and maximize the assets of the NIHL PI Trust for use in paying and satisfying NIHL Personal Injury Claims, all in accordance with the Plan, the PI Trust Funding Agreement and the NIHL PI Trust Agreement.

(ii)    The NIHL PI Trust is intended to be treated for U.S. federal income Tax purposes as a "qualified settlement fund" as described within section 1.468B-1 of the Treasury Regulations, as more specifically provided for under the NIHL PI Trust Agreement. Accordingly, for all U.S. federal income Tax purposes the transfer of assets to the NIHL PI Trust will be treated as a transfer to a trust satisfying the requirements

of Treasury Regulations section 1.468B-1(c) by the Funding Vehicle Trust, as transferor, for distribution to holders of NIHL Personal Injury Claims and in complete settlement of such Claims. Any income on the assets of the NIHL PI Trust will be treated as subject to Tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for Taxes and subject to the withholding and reporting requirements set forth in the Plan and the NIHL PI Trust Agreement.

    (iii)  The NIHL PI Trustee will be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the NIHL PI Trust and will be required by the NIHL PI Trust Agreement to (A) timely file such income Tax and other returns and statements and timely pay all Taxes required to be paid from the assets in the NIHL PI Trust as required by law and in accordance with the provisions of the Plan and the NIHL PI Trust Agreement, (B) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (C) meet all other requirements necessary to qualify and maintain qualification of the NIHL PI Trust as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations, and (D) take no action that could cause the NIHL PI Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations. The NIHL PI Trust Agreement will provide that the Reorganized Debtors will have no rights to any refunds or reversion with respect to any assets of the NIHL PI Trust or any earnings thereon.

    (iv)  Following the funding of the NIHL PI Trust (and in no event later than February 15th of the calendar year following the Effective Date), the Funding Vehicle Trust will provide or cause to be provided to the NIHL PI Trustee a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations. Following any subsequent transfers of Cash or other property to the NIHL PI Trust, the transferor will provide or cause to be provided to the NIHL PI Trustee a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

    **b.**  **PI Trust Funding Agreement**

    On and after the Effective Date, the NIHL PI Trustee, on behalf of the NIHL PI Trust, will perform or cause to be performed all obligations of the Silica PI Trust under the PI Trust Funding Agreement.

    **c.**  **Appointment of NIHL PI Trustee; NIHL PI TAC**

    Pursuant to the Confirmation Order, the Bankruptcy Court will confirm the appointment of the individuals selected as contemplated by the NIHL PI Trust Agreement to serve as the initial NIHL PI Trustee and as the initial member of the NIHL PI TAC effective as of the Effective Date.

    **d.**  **Assumption of Certain Liabilities and Obligations by the NIHL PI Trust**

    On the Effective Date the NIHL PI Trust will assume all liability and responsibility for all NIHL Personal Injury Claims and its Trust Expenses, and the Reorganized Debtors will have no further financial or other responsibility or liability therefor. The NIHL PI Trust shall advocate in any and all actions and proceedings brought against the Reorganized Debtors that involve NIHL Personal Injury Claims that such Claims are and have been channeled to the NIHL PI Trust, and the NIHL PI Trust Agreement shall provide that the NIHL PI Trust shall cooperate with the Reorganized Debtors in any and all such actions and proceedings. The NIHL PI Trust will cooperate with the Reorganized Debtors and use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things that the Reorganized Debtors may reasonably consider necessary, appropriate or desirable to effectuate such assumption. Each Reorganized Debtor and each other Kaiser Company will be entitled to indemnification from the NIHL PI Trust for any fees and expenses (including but not limited to out-of-pocket fees and expenses and attorneys' fees and expenses), judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor or other Kaiser Company on or after the Effective Date in connection with any action, suit or proceeding related to NIHL Personal Injury Claims, whether civil, administrative or arbitrative, including but not limited to indemnification or contribution for such Claims prosecuted against such Reorganized Debtor or other Kaiser Company. Upon the request of the Funding Vehicle Trust, the NIHL PI Trust shall (i) provide to the Funding Vehicle Trust any authorization or assignment of rights from the NIHL PI Trust that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable

to permit the Funding Vehicle Trust to pursue recovery under any Included PI Trust Insurance Policy in respect of NIHL Personal Injury Claims or Trust Expenses of the NIHL PI Trust and (ii) otherwise cooperate with the Funding Vehicle Trust and use commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to effect such recovery, including providing to the Funding Vehicle Trust information relating to NIHL Personal Injury Claims available to the NIHL PI Trust and required to be provided or otherwise made available by the Funding Vehicle Trust pursuant to any insurance settlement agreement assumed by the Funding Vehicle Trust pursuant to Section 5.1.e.

### 5.6    Insurance Neutrality

Nothing in the Plan, any Exhibit to the Plan, the Confirmation Order, any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan, or any order or opinion entered on appeal from the Confirmation Order shall limit the right of any PI Insurance Company, in any PI Insurance Coverage Action, to assert any PI Insurer Coverage Defense; *provided, however,* that (a) the transfer of rights in and under the Included PI Insurance Policies to the Funding Vehicle Trust is valid and enforceable and transfers such rights under the Included PI Trust Insurance Policies as the Debtors may have, and that such transfer shall not affect the liability of any PI Insurance Company, and (b) the discharge and release of the Debtors and Reorganized Debtors from all Claims and the injunctive protection provided to the Debtors, Reorganized Debtors and Protected Parties with respect to Claims as provided herein shall not affect the liability of any PI Insurance Company, except to the extent that any such PI Insurance Company is also a Settling Insurance Company. Notwithstanding anything in this Section 5.6 to the contrary, nothing in this Section 5.6 shall affect or limit, or be construed as affecting or limiting, (i) the binding effect of the Plan and the Confirmation Order on the Debtors, the Reorganized Debtors, the Funding Vehicle Trust, the PI Trusts or the beneficiaries of any such Trusts or (ii) the protection afforded to any Settling Insurance Company by a PI Channeling Injunction and/or the Channeled PI Insurance Entity Injunction. Further, nothing in this Section 5.6 is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any PI Insurance Company with respect to any issue that is actually litigated by such PI Insurance Company as part of its objections to Confirmation of the Plan.

### ARTICLE VI

### TREATMENT OF EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES

### 6.1    Executory Contracts or Unexpired Leases to Be Assumed or Assumed and Assigned

#### a.    Assumption and Assignment Generally

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Debtors will assume or assume and assign, as indicated, each Executory Contract and Unexpired Lease listed on Exhibit 6.1.a; *provided, however,* that the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit 6.1.a to (i) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant to this Section 6.1.a or (ii) add any Executory Contract or Unexpired Lease thereto, thus providing for its assumption or assumption and assignment pursuant to this Section 6.1.a. The Debtors will provide notice of any amendments to Exhibit 6.1.a to the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative, the Future Silica and CTPV Claimants' Representative and the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Reorganization Cases. Each such contract and lease, including those listed on Exhibit 6.1.a, will be assumed only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. Listing a contract or lease on Exhibit 6.1.a will not constitute an admission by a Debtor or Reorganized Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

     **b.**       **Assumptions and Assignments of Executory Contracts or Unexpired Leases**

          Each Executory Contract or Unexpired Lease assumed under Section 6.1.a will include any modifications, amendments, supplements or restatements to such contract or lease, irrespective of whether such modification, amendment, supplement or restatement is listed on Exhibit 6.1.a.

     **c.**       **Assignments Related to the Restructuring Transactions**

          As of the effective time of an applicable Restructuring Transaction, any Executory Contract or Unexpired Lease to be held by any Debtor or another surviving, resulting or acquiring corporation in an applicable Restructuring Transaction will be deemed assigned to the applicable entity pursuant to section 365 of the Bankruptcy Code.

     **d.**       **Approval of Assumptions and Assignments**

          The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions and assignments described in this Section 6.1, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. An order of the Bankruptcy Court entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed or assumed and assigned pursuant to the Plan of: (i) the contract or lease being assumed or assumed and assigned; (ii) the Cure Amount Claim, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; and (iii) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

    **6.2**      **Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

          To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor assuming such contract or lease or the assignee of such Debtor, if any: (a) by payment of the Cure Amount Claim in Cash on the Effective Date; or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding (a) the amount of any Cure Amount Claim; (b) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption or assumption and assignment of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

    **6.3**      **Executory Contracts and Unexpired Leases to Be Rejected**

          On the Effective Date, except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned or rejected by an order of the Bankruptcy Court or that is assumed pursuant to Section 6.1.a, each Executory Contract or Unexpired Lease that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. Without limiting the foregoing, any agreement entered into prior to the Petition Date by or on behalf of a Debtor with respect to the settlement of any Channeled Personal Injury Claim will be deemed rejected as of the Effective Date to the extent such settlement agreement is deemed to be an executory contract within the meaning of section 365(a) of the Bankruptcy Code and any Claims in respect of such rejection will be treated as a Channeled Personal Injury Claim.

    **6.4**      **Bar Date for Rejection Damages**

          Notwithstanding anything to the contrary in the Bar Date Order, if the rejection of an Executory Contract or Unexpired Lease pursuant to Section 6.3 gives rise to a Claim (including any Claims arising from those

indemnification obligations described in Section 6.5.b by the other party or parties to such contract or lease), such Claim will be forever barred and will not be enforceable against the Debtors, the Reorganized Debtors, the successor of any of them or the property of any of them unless a proof of Claim or request for payment of Administrative Claim is Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order, the notice of the entry of the Confirmation Order or another order of the Bankruptcy Court no later than 30 days after the Effective Date.

**6.5      Obligations to Indemnify Directors, Officers and Employees**

**a.      Assumed Indemnity Obligations**

The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees as of February 12, 2002 by reason of such person's prior or future service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation or bylaws, by statutory law or by written agreement, policies or procedures of or with such Debtor, will be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before, on or after the Petition Date. Notwithstanding any other provision of this Section 6.5.a, the indemnity obligations assumed will not include any obligation to indemnify any such person for claims that are excepted from the provisions of the release in Section 4.5.b.

**b.      Rejected Indemnity Obligations**

The obligations of each Debtor or Reorganized Debtor to indemnify any person who, as of February 12, 2002, was no longer serving as a director, officer or employee of such Debtor or Reorganized Debtor, which indemnity obligation arose by reason of such person's prior service in any such capacity or as a director, officer or employee of another corporation, partnership or other legal entity, whether provided in the applicable certificates of incorporation or bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor, will terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise as of the Effective Date; *provided, however*, that, to the extent that such indemnification obligations no longer give rise to contingent Claims that can be disallowed pursuant to section 502(e) of the Bankruptcy Code, such indemnification obligations will be deemed and treated as executory contracts that are rejected by the applicable Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date, and any Claims arising from such indemnification obligations (including any rejection damage claims) will be subject to the bar date provisions of Section 6.4.

**6.6      Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts or Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**6.7      Insurance Policies and Agreements**

**a.      Assumed Insurance Policies and Agreements**

The Debtors do not believe that the insurance policies issued to, or insurance agreements entered into by, any Debtor prior to the Petition Date constitute executory contracts. To the extent that such insurance policies or agreements are considered to be executory contracts, then, notwithstanding anything contained in this Article VI to the contrary, the Plan will constitute a motion to assume such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such

assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, their respective estates and all parties in interest in the Reorganization Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to each such insurance policy or agreement. In accordance with Section 5.1.d(i), the rights under the insurance policies and agreements constituting PI Insurance Assets and described in clause (a) of Section 1.1(145) will, to the extent necessary, be deemed assigned to and assumed by the Funding Vehicle Trust for the benefit of the PI Trusts as of the Effective Date and, pursuant to section 365 of the Bankruptcy Code, no Debtor will have further liability thereunder from and after the Effective Date.

### b.    Reservation of Rights

Nothing contained in the Plan will constitute a waiver of any claim, right or cause of action that a Debtor, the Funding Vehicle Trust, any PI Trust or a Reorganized Debtor, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement, except to the extent the insurer is a Settling Insurance Company.

### 6.8    Collective Bargaining Agreements

The collective bargaining agreements listed on Exhibit 6.1.a, as modified and/or amended from time to time, shall be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Upon assumption, all proofs of claim filed by the Debtors' unions relating to such collective bargaining agreements will be deemed withdrawn, without prejudice to their pursuit in the ordinary course by the unions and/or individuals and payment or satisfaction in the ordinary course by the Reorganized Debtors of obligations under the assumed collective bargaining agreements.

## ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

### 7.1    Distributions for Claims Allowed as of the Effective Date

#### a.    Distributions to Be Made on the Effective Date

Except as otherwise provided in this Article VII, distributions to be made on the Effective Date to holders of Claims, other than Channeled Personal Injury Claims, that are allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as is practicable, but in any event no later than 60 days after the Effective Date unless (i) such Claim is a Cure Amount Claim associated with an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan about which there is dispute, in which case the payment on account of such Claim will be made in accordance with Section 6.2; (ii) such Claim is returned to a Disbursing Agent as undeliverable, in which case the payment on account of such Claim will be made in accordance with Section 7.5.b; or (iii) such Claim arises under a Public Note or a Prepetition Indenture, in which case such Claim will not be paid until the instruments, securities and other documentation evidencing such Claim, to the extent not held in book entry form, are received by the applicable Disbursing Agent in accordance with Section 7.11. Distributions on account of Channeled Personal Injury Claims will be made in accordance with the provisions of the applicable PI Trust Agreement and PI Trust Distribution Procedures.

#### b.    Distributions on the Effective Date in Respect of Class 9 Unsecured Claims

From and after the Effective Date, New Common Stock to be distributed on account of Class 9 Claims (and any Cash or other distributions thereon) (i) will be maintained by and in the name of the applicable Disbursing Agent in the Unsecured Claims Reserve and held in trust pending distribution by the Disbursing Agent for the benefit of the holders of such Claims; (ii) will be accounted for separately; and (iii) will not constitute

property of any of the Reorganized Debtors. New Common Stock to be issued and distributed on account of Class 9 Claims will be deemed issued on the Effective Date, irrespective of the date on which it actually is distributed.

### 7.2    Method of Distributions to Holders of Claims

Other than with respect to Class 5, Class 6, Class 7 and Class 8 Claims, Reorganized KAC, or such Third Party Disbursing Agents as Reorganized KAC may employ in its sole discretion, will make all distributions required under the Plan. Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by the Plan. Distributions on account of Class 5, Class 6, Class 7 and Class 8 will be made by the trustees of such Trust in accordance with the provisions of the applicable PI Trust Agreement and PI Trust Distribution Procedures.

### 7.3    Compensation and Reimbursement for Services Related to Distributions

Each Third Party Disbursing Agent providing services related to distributions pursuant to the Plan will receive from Reorganized KAC, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services. These payments will be made on terms agreed to with Reorganized KAC and will not be deducted from distributions to be made pursuant to the Plan to holders of Allowed Claims (including any distributions of Cash Investment Yield) receiving distributions from a Third Party Disbursing Agent. **Notwithstanding the foregoing, each Indenture Trustee acting as a Third Party Disbursing Agent will retain its rights under any charging lien with respect to any such amounts not agreed to be paid by Reorganized KAC under this Section 7.3.**

### 7.4    Provisions Governing the Unsecured Claims Reserve

#### a.    Funding of the Unsecured Claims Reserve

On the Effective Date, the Reserved Shares will be placed in the Unsecured Claims Reserve by Reorganized KAC for the benefit of holders of Allowed Claims in Class 9.

#### b.    Property Held in Unsecured Claims Reserve

#### (i)    Dividends and Distributions

Any cash distributions on account of New Common Stock held in the Unsecured Claims Reserve will be transferred to the Unsecured Claims Reserve concurrently with the transfer of such distributions to other holders of New Common Stock. Cash held in the Unsecured Claims Reserve as a result of such distributions (A) will be deposited in a segregated bank account in the name of the Disbursing Agent and held in trust pending distribution by the Disbursing Agent for the benefit of holders of Class 9 Claims; (B) will be accounted for separately; and (C) will not constitute property of the Reorganized Debtors. The Disbursing Agent will invest the Cash held in such Unsecured Claims Reserve in a manner consistent with the Reorganized Debtors' investment and deposit guidelines. The Disbursing Agent will also place in such Unsecured Claims Reserve the Cash Investment Yield from such investment of Cash.

#### (ii)    Recourse

Each holder of an Allowed Claim (including a Disputed Claim that ultimately becomes an Allowed Claim) in Class 9 entitled to a distribution in respect thereof under the Plan will have recourse only to the undistributed New Common Stock and/or Cash held in the Unsecured Claims Reserve for satisfaction of the distributions, if any, to which holders of Allowed Class 9 Claims are entitled under the Plan, and not to any Reorganized Debtor, its property or any assets previously distributed on account of any Allowed Claim.

### (iii)     Voting of Undelivered New Common Stock

Pending the distribution of any New Common Stock, the applicable Disbursing Agent will cause all of the New Common Stock held by it in its capacity as Disbursing Agent to be (A) represented in person or by proxy at each meeting of the stockholders of Reorganized KAC; (B) voted in any election of directors of Reorganized KAC for the nominees recommended by the board of directors of Reorganized KAC; and (C) voted with respect to any other matter as recommended by the board of directors of Reorganized KAC.

### 7.5     Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### a.     Delivery of Distributions

#### (i)     Generally

Except as provided in Section 7.5.a(ii), any distribution on account of an Allowed Claim will be made by the applicable Disbursing Agent to the holder of such Claim as of the Distribution Record Date: (A) at the address set forth on the proof of Claim Filed by holder of such Claim; (B) at the address set forth in any written certification of address change delivered to the Disbursing Agent (including pursuant to a letter of transmittal delivered to a Disbursing Agent) after the date of Filing of any related proof of Claim; or (C) at the address reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address.

#### (ii)     Special Provisions for Distributions to Holders of Public Note Claims

Subject to the requirements of Section 7.11, any distribution to a holder of an Allowed Public Note Claim will be made by the applicable Disbursing Agent to the applicable Indenture Trustee for subsequent distribution to the holder of such Public Note Claim as of the Distribution Record Date in accordance with and subject to the applicable Prepetition Indenture, including any terms relating to enforcement of any such Indenture Trustee's charging lien. No later than the Effective Date, each Indenture Trustee (other than the Senior Subordinated Note Indenture Trustee and the 6-1/2% RPC Revenue Bond Indenture Trustee) will deliver to Reorganized KAC a copy of the registry book maintained by such Indenture Trustee listing the record holders of the applicable Public Notes as of the Distribution Record Date and setting forth their respective holdings and contact information, as the same is maintained by such Indenture Trustee in the ordinary course of business. Unless otherwise agreed by Reorganized KAC and the applicable Indenture Trustee, no later than five Business Days following the Effective Date, Reorganized KAC will request from each clearing agency and each broker, dealer or other entity known to hold securities in nominee name that is shown on the registry book furnished by such Indenture Trustee information necessary to determine, as of the Distribution Record Date, the number of beneficial holders, and the aggregate principal amount of applicable Public Note Claims held by each such beneficial holder, qualified for treatment in Class 2, together with appropriate certifications of each participant in such clearing agency and each other appropriate broker, dealer or other entity that holds Public Notes of the applicable series on behalf of a beneficial owner and such other supporting information as Reorganized KAC may reasonably request. As to each series of Public Notes eligible for treatment in Class 2, the holders of Public Note Claims entitled to such treatment will be determined by Reorganized KAC solely based on such information, if any, that is provided to Reorganized KAC by the applicable Indenture Trustees and in response to the requests made in accordance with the immediately preceding sentence on or before the date that is 25 Business Days following the Effective Date; to the extent any such information is not so provided by such date as to any holder of a Public Note the affected holder will be ineligible for Class 2 treatment and will be treated solely as provided in Class 9. Reorganized KAC will promptly furnish to the applicable Indenture Trustee a copy of the information received by Reorganized KAC in response to the requests made in accordance with the second preceding sentence for the applicable series of Public Notes. The Debtors and each Third Party Disbursing Agent, including the applicable Indenture Trustees, shall be entitled to rely conclusively upon information received by Reorganized KAC as contemplated by this Section 7.5a(ii) for all purposes of the Plan. Distributions will be made to the applicable Indenture Trustee as promptly as practicable after the date that is 30 Business Days following the Effective Date. For purposes of making any calculations required under Section 7.8.b(i), prior to the date that is 30 Business Days following the Effective Date, such calculations will assume that all Public Note Claims in respect of the applicable series of Public Notes will be treated as Class 9 Claims. Each

Indenture Trustee (other than the Senior Subordinated Note Indenture Trustee) will be entitled to compensation and reimbursement in its capacity as Third Party Disbursing Agent as contemplated by Section 7.3.

### (iii)    Quarterly Distributions

On each Quarterly Distribution Date or as promptly thereafter as is practicable, the applicable Disbursing Agents will make all distributions that become deliverable to holders of Disputed Claims that have become Allowed Claims during the immediately preceding calendar quarter.

### b.    Undeliverable Distributions Held by Disbursing Agents

### (i)    Holding and Investment

If any distribution to a holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, then unless and until the applicable Disbursing Agent is notified in writing of such holder's then-current address: (A) subject to Section 7.5.b(iii), such undeliverable distributions will remain in the possession of the applicable Disbursing Agent and no further attempt will be made to deliver such distribution; and (B) no attempt will be made to deliver subsequent distributions to such holder and any such distribution that such holder would otherwise be entitled to receive instead will be deemed undeliverable and remain in the possession of the applicable Disbursing Agent. Undeliverable New Common Stock and Cash (including distributions on account of undeliverable New Common Stock) will be held by the applicable Disbursing Agent in a book-entry sub-account, for the benefit of such holder. The applicable Disbursing Agent will invest undeliverable Cash held in any such book-entry sub-account in a manner consistent with the Reorganized Debtors' investment and deposit guidelines, and any Cash Investment Yield generated from such investment activities will be held in such book-entry sub-account for the benefit of such holder. Subject to Section 7.5.b(ii), when such holder notifies the applicable Disbursing Agent in writing of its then-current address, the applicable Disbursing Agent will deliver to such holder all New Common Stock and Cash contained in such book-entry sub-account (net of provision for Taxes).

### (ii)    Forfeiture and Redistribution

Any holder of an Allowed Claim (other than a Channeled Personal Injury Claim) that does not assert a claim for an undeliverable distribution by delivering to the applicable Disbursing Agent a written notice setting forth such holder's then-current address within two years after the later of (A) the Effective Date and (B) the last date on which a distribution was deliverable to such holder will have its claim for such undeliverable distribution discharged and will be forever barred from asserting any such claim against the Reorganized Debtors or the property of any of them, whereupon all New Common Stock and Cash contained in the book-entry sub-account created for the benefit of such holder will be redistributed to holders of Allowed Claims in Class 9. For purposes of any such redistribution, each Allowed Claim in respect of which a claim for an undeliverable distribution has been discharged as contemplated by this Section 7.5.b(ii) will be deemed disallowed in its entirety.

### (iii)    No Requirement to Attempt to Locate Holders

Nothing contained in the Plan will require any Debtor, Reorganized Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim.

### 7.6    Distribution Record Date

a.    A Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the Distribution Record Date.

b.    As of the Distribution Record Date, each transfer register for the Public Notes, as maintained by the Debtors or an Indenture Trustee, will be closed. Neither the applicable Disbursing Agent nor the applicable Indenture Trustee will have any obligation to recognize the transfer or sale of any Public Note Claim that

occurs after the Distribution Record Date and each will be entitled for all purposes herein to recognize and make distributions only to those holders of Public Note Claims who are holders of such Claims as of the Distribution Record Date.

        c.      Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

        d.      The provisions of this Section 7.6 are not applicable to Channeled Personal Injury Claims.

### 7.7    Means of Cash Payments

Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in United States currency by checks drawn on a domestic bank selected by the applicable Debtor or Reorganized Debtor or, at the option of the applicable Debtor or Reorganized Debtor, by wire transfer from a domestic bank; *provided, however,* that Cash payments to foreign holders of Allowed Claims may be made, at the option of the applicable Debtor or Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. If a check included in a distribution to a holder of an Allowed Claim is not cashed within 180 days of the issuance thereof, the Disbursing Agent will void such check and such distribution will be treated as undeliverable in accordance with Section 7.5.b.

### 7.8    Timing and Calculation of Amounts to Be Distributed

#### a.    Allowed Claims in Classes Other Than Classes 5, 6, 7, 8 or 9

Subject to Section 7.1, on the Effective Date, each holder of an Allowed Claim in a Class other than Class 5, Class 6, Class 7, Class 8 or Class 9 will receive the full amount of the distribution to which a holder of an Allowed Claim in the applicable Class is entitled in accordance with Section 3.3. On each Quarterly Distribution Date or as promptly thereafter as is practicable, distributions will be made, pursuant to Section 8.4, to holders of Disputed Claims in any such Class that were allowed during the immediately preceding calendar quarter. Such distributions will also be in the full amount that the Plan provides for Allowed Claims in the applicable Class.

#### b.    Allowed Claims in Class 9

#### (i)    Initial Distributions

On the Effective Date or as promptly thereafter as is practicable, the applicable Disbursing Agent will make distributions to holders of Class 9 Claims allowed as of the Effective Date from the Unsecured Claims Reserve in accordance with Section 3.3.g. The amount of such distributions will be calculated as if each then-unresolved Disputed Claim in Class 9 were an Allowed Claim in its Face Amount.

#### (ii)    Quarterly Distributions

On each Quarterly Distribution Date or as promptly thereafter as practicable, the applicable Disbursing Agent will distribute to each holder of a Claim in Class 9 allowed prior to such Quarterly Distribution Date a distribution from the Unsecured Claims Reserve in an amount equal to: (A) the number of shares of New Common Stock that such holder would have been entitled to receive pursuant to Section 7.8.b(i) if such Claim and each other Claim in Class 9 allowed prior to such Quarterly Distribution Date had been an Allowed Claim as of the Effective Date (with the amount of such distribution to be calculated in the manner described in Section 7.8.b(i) including any additional distribution to a holder of a Senior Note Claim or a holder of a 7¾% SWD Revenue Bond Claim required pursuant to the second sentence of Section 3.3.g) minus (B) the aggregate number of shares of New Common Stock previously distributed on account of such Claim.

c.      **Distributions of New Common Stock**

(i)      **Distributions on New Common Stock**

Each distribution of New Common Stock will include, to the extent applicable, (A) Cash or other distributions previously paid to the Disbursing Agent on account of any New Common Stock included in such distribution and (B) any Cash Investment Yield generated from the investment of such distributions (net of provision for Taxes).

(ii)      **No Fractional Shares**

Notwithstanding any other provision of the Plan, only whole numbers of shares of New Common Stock will be issued and distributed. When any distribution on account of an Allowed Claim would otherwise result in the issuance and distribution of a number of shares of New Common Stock that is not a whole number, the number of shares to be issued and distributed will be rounded to a whole number on an equitable basis to be determined by the applicable Disbursing Agent in order to ensure that all such shares are issued and distributed and are so issued and distributed only in whole numbers. No consideration will be provided in lieu of fractional shares that are rounded down.

d.      **Compliance with Tax Requirements**

To the extent applicable, each Disbursing Agent will comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. Each Disbursing Agent will be authorized to take any actions that it determines, in its reasonable discretion, to be necessary, appropriate or desirable to comply with such withholding and reporting requirements; *provided, however*, that, notwithstanding the foregoing or any other provision of the Plan, each entity receiving a distribution of New Common Stock or Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of such distribution, including withholding obligations. If the Disbursing Agent determines that withholding is required with respect to a distribution of New Common Stock to be made on account of any Claim, the holder of such Claim will have the option of (i) paying to the Disbursing Agent an amount of Cash equal to the amount of such withholding (for remission by the Disbursing Agent to the appropriate taxing authority) or (ii) subject to any applicable restrictions on transfer, entering into arrangements satisfactory to the Disbursing Agent for (A) the sale of that number of shares of New Common Stock otherwise to be distributed to such holder sufficient to generate net Cash proceeds which, together with any Cash otherwise to be distributed to such holder, are sufficient to fund the payment of any such withholding and (B) the payment to the Disbursing Agent of an amount of Cash equal to the amount of such withholding (for remission by the Disbursing Agent to the appropriate taxing authority).

e.      **NLRB Claims**

Distributions pursuant to the Plan on account of any Claim in Class 9 held by the National Labor Relations Board will be distributed in accordance with the provisions of this Article VII and such other procedures as may be agreed by the National Labor Relations Board, the USW and the Debtors.

7.9      **Application of Distributions**

To the extent applicable, all distributions to a holder of an Allowed Claim will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full; any remaining portion of such distribution will then be deemed to apply to any interest accrued on such Claim prior to the Petition Date included in such Claim.

### 7.10    Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Reorganized Debtors or, as instructed by the applicable Reorganized Debtor, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of such Allowed Claim; *provided, however,* that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claims, rights and causes of action that the Debtor or Reorganized Debtor may possess against such a Claim holder, which are preserved under the Plan.

### 7.11    Surrender of Cancelled Securities

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by certificated notes or other certificated securities (other than certificated securities in global form held in the name of CEDE & Co. as nominee for the Depository Trust Company and in the custody of CEDE & Co., the Depository Trust Company or an Indenture Trustee), the holder of such Claim must tender the certificate representing the applicable notes or other securities evidencing such Claim to the applicable Disbursing Agent, together with any letter of transmittal required by such Disbursing Agent. Pending such surrender, any distributions pursuant to the Plan on account of any such Claim will be treated as an undeliverable distribution pursuant to Section 7.5.b.

#### a.    Tender of Public Notes

Except as provided in Section 7.11.b for lost, stolen, mutilated or destroyed Public Note certificates, to the extent such Public Notes are held in certificated form, each holder of a Public Note Claim based on Public Notes must tender the certificate representing the applicable Public Notes (other than certificates representing securities in global form held in the name of CEDE & Co. as nominee for the Depository Trust Company and in the custody of CEDE & Co., the Depository Trust Company or an Indenture Trustee), to the applicable Disbursing Agent in accordance with a letter of transmittal to be provided to such holders by the applicable Indenture Trustee as promptly as practicable following the Effective Date or, in the case of 6-1/2% RPC Revenue Bonds held in unregistered bearer form, in accordance with such procedures as may be determined by the 6-1/2% RPC Revenue Bond Trustee to be appropriate under the 6-1/2% RPC Revenue Bond Indenture. Each such letter of transmittal will include, among other provisions, customary provisions with respect to the authority of the holder of the applicable Public Notes to act and the authenticity of any signatures required thereon. All certificates representing Public Notes so surrendered will be marked as cancelled and delivered to Reorganized KAC.

#### b.    Lost, Stolen, Mutilated or Destroyed Public Notes

Any holder of an Allowed Public Note Claim with respect to which the certificate representing the underlying Public Note has been lost, stolen, mutilated or destroyed must, in lieu of surrendering such Public Note certificate, deliver to the applicable Disbursing Agent: (i) evidence satisfactory to the Disbursing Agent of the loss, theft, mutilation or destruction; and (ii) such security or indemnity as may be required by the Disbursing Agent to hold the Disbursing Agent and the Reorganized Debtors, as applicable, harmless from any damages, liabilities or costs incurred in treating such individual as a holder of a Public Note. Upon compliance with this Section 7.11.b by a holder of an Allowed Public Note Claim, such holder will, for all purposes under the Plan, be deemed to have surrendered the certificate representing the applicable Public Note.

#### c.    Tender of Coupons Appertaining to 6-1/2% RPC Revenue Bonds

Each holder of a Public Note Claim based on coupons appertaining to 6-1/2% RPC Revenue Bonds must tender the applicable coupons to the 6-1/2% RPC Revenue Bond Indenture Trustee in accordance with such procedures as may be determined by the 6-1/2% RPC Revenue Bond Indenture Trustee to be appropriate under

the 6-1/2% RPC Revenue Bond Indenture.  All coupons so surrendered will be marked cancelled and delivered to Reorganized KAC.

### d.    Failure to Surrender Public Notes or Coupons

Any holder of an Allowed Public Note Claim required by this Section 7.11 to surrender a Public Note or a coupon appertaining to a 6-1/2% RPC Revenue Bond that fails to surrender or be deemed to have surrendered the applicable Public Notes or coupons within two years after the Effective Date will have its right to distributions pursuant to the Plan on account of such Public Note Claim discharged and will be forever barred from asserting any such Claim against the Reorganized Debtors or their respective property.  In such case, any Cash or New Common Stock held for distribution on account of such Public Note Claim will be treated in accordance with the provisions set forth in Section 7.5.b(ii).

### 7.12    Special Provisions Relating to Environmental Matters

#### a.    7.12 Special Provision Relating to Environmental Settlement Agreement

Reorganized KAC will make, or cause to be made, any distributions required to be made under the Environmental Settlement Agreement in respect of Additional Sites (as such term is defined therein).

#### b.    Special Provision Relating to Payments and Obligations Under Environmental Laws

Reorganized KAC will guarantee in respect of properties, facilities or sites owned by a Reorganized Debtor as of the Effective Date (i) the payment by each Reorganized Debtor of any amounts that may ultimately be required to be paid by it in respect of claims under Environmental Laws of governmental units and (ii) the performance by each Reorganized Debtor of any obligations that it may ultimately be required to perform by any governmental unit under Environmental Laws.  Governmental units enforcing Environmental Laws shall have the right to enforce Reorganized KAC's guarantees under this Section 7.12(b), which enforcement may be sought in the Bankruptcy Court or in any court with jurisdiction in accordance with applicable non-bankruptcy law.  For purposes of this Section 7.12(b), the term "Environmental Laws" shall mean all laws relating to pollution or protection of human health or the environment, including laws relating to releases or threatened releases of hazardous materials, wastes or substances, pollutants, contaminants, radiological materials or oils or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, release, disposal, transport or handling of hazardous materials, wastes or substances, pollutants, contaminants, radiological materials or oils and including but not limited to laws relating to natural resource damages, decontamination, decommissioning and voluntary remediation programs.

## ARTICLE VIII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### 8.1    Prosecution of Objections to Claims

#### a.    Objections to Claims

All objections to Claims, other than Channeled Personal Injury Claims, which will be resolved pursuant to the terms of the applicable PI Trust Distribution Procedures, must be Filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections will be served on the parties on the then-applicable service list in the Reorganization Cases.  If an objection has not been Filed to a proof of Claim or a scheduled Claim other than Channeled Personal Injury Claims by the Claims Objection Bar Date, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier.  An objection is deemed to have been timely Filed as to all Tort Claims,

thus making each Tort Claim a Disputed Claim as of the Claims Objection Bar Date. Each such Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim in accordance with Section 1.1(27), if ever.

### b.    Authority to Prosecute Objections

After the Confirmation Date, only the Debtors or the Reorganized Debtors will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, other than Channeled Personal Injury Claims, which will be resolved pursuant to the terms of the applicable PI Trust Distribution Procedures, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court. After the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim, other than Channeled Personal Injury Claims, which will be resolved pursuant to the terms of the applicable PI Trust Distribution Procedures, without approval of the Bankruptcy Court. This grant of authority to the Debtors and Reorganized Debtors will not limit the right of the US Trustee or any other party in interest to object to Professional Fee Claims as contemplated by Section 3.1.a(vii)(B)(1).

### 8.2    Liquidation and Payment of Tort Claims

At the Debtors' or, after the Effective Date, the Reorganized Debtors' option, any unliquidated Tort Claim as to which a proof of Claim was timely Filed in the Reorganization Cases will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction. The Debtors and the Reorganized Debtors may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing the holder of such Claim that the Debtor or Reorganized Debtor has exercised such option. Upon the Debtor's service of such notice, the automatic stay provided under section 362 of the Bankruptcy Code will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s). Notwithstanding the foregoing, at all times prior to or after the Effective Date, the Bankruptcy Court will retain jurisdiction relating to Tort Claims, including the Debtors' right to have such Claims determined and/or liquidated in the Bankruptcy Court (or the District Court) pursuant to Section 157(b)(2)(B) of title 28 of the United States Code, as may be applicable). Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section 8.2 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim in Class 9 against the applicable Debtor in such liquidated amount, provided that only the amount of such Allowed Claim that is less than or equal to the Debtor's self-insured retention or deductible in connection with the applicable insurance policy and is not satisfied from proceeds of insurance payable to the holder of such Allowed Claim under the Debtors' insurance policies will be treated as an Allowed Claim for the purposes of distributions under the Plan. In no event will a distribution be made under the Plan to the holder of a Tort Claim on account of any portion of an Allowed Claim in excess of the applicable Debtor's deductible or self-insured retention under any applicable insurance policy. In the event a Tort Claim is determined and liquidated pursuant to a judgment or order that is obtained in accordance with this Section 8.2 and is no longer appealable or subject to review, and applicable non-bankruptcy law provides for no recovery against the applicable Debtor, such Tort Claim will be deemed expunged without the necessity for further Bankruptcy Court approval upon the applicable Debtor's service of a copy of such judgment or order upon the holder of such Tort Claim. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or cause of action that a Debtor may have against any person or entity in connection with or arising out of any Tort Claim, including but not limited to any rights under Section 157(b)(5) of title 28 of the United States Code.

### 8.3    Treatment of Disputed Claims

Notwithstanding any other provision of the Plan, no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever. In lieu of distributions under the Plan to holders of Disputed Claims in Class 9, the Unsecured Claims Reserve will be established on the Effective Date to hold property for the benefit of those Claim holders, as well as holders of Allowed Claims in Class 9 entitled to a distribution in respect thereof.

**8.4    Distributions on Account of Disputed Claims Once Allowed**

On each Quarterly Distribution Date or as promptly thereafter as is practicable, the applicable Disbursing Agent will make all distributions on account of any Disputed Claim that has become an Allowed Claim during the immediately preceding calendar quarter. Such distributions will be made in accordance with the provisions of the Plan governing the applicable Class, including the incremental distribution provisions set forth in Section 7.8.b.

**8.5    Tax Requirements for Income Generated by Unsecured Claims Reserve**

The recovery of holders of Allowed Claims in Class 9 consists of the treatment set forth herein and the post-Effective Date interest on the Cash held in the Unsecured Claims Reserve, if any, at a rate determined by the Cash Investment Yield. Reorganized KAC will include in its Tax returns all items of income, deduction and credit of the Unsecured Claims Reserve; *provided, however,* that no distribution will be made to the applicable Reorganized Debtor out of the Unsecured Claims Reserves as a result of this inclusion. The Disbursing Agent will pay, or cause to be paid, out of the funds held in the applicable Unsecured Claims Reserve, any Tax imposed on the Unsecured Claims Reserve (as opposed to the Reorganized KAC or the holders of Allowed Claims in Class 9) by any governmental unit with respect to income generated by the funds and New Common Stock held in the Unsecured Claims Reserve. The Disbursing Agent will also file or cause to be filed any Tax or information return related to the Unsecured Claims Reserve that is required by any governmental unit.

## ARTICLE IX

## SUBSTANTIVE CONSOLIDATION OF CERTAIN DEBTORS

**9.1    Substantive Consolidation**

In connection with Confirmation, the Debtors will seek Bankruptcy Court approval of the substantive consolidation of the Substantively Consolidated Debtors for the purpose of implementing the Plan, including for purposes of voting, Confirmation and distributions to be made under the Plan. Pursuant to the relevant order of the Bankruptcy Court: (a) all assets and liabilities of the Substantively Consolidated Debtors will be deemed merged; (b) all guarantees by, or co-obligations of, one Substantively Consolidated Debtor in respect of the obligations of any other Substantively Consolidated Debtor will be deemed eliminated so that any Claim against any Substantively Consolidated Debtor and any guarantee by, or co-obligation of, any other Substantively Consolidated Debtor and any joint or several liability of any of the Substantively Consolidated Debtors will be deemed to be one obligation of the consolidated Substantively Consolidated Debtors; and (c) each and every Claim Filed or to be Filed in the Reorganization Case of any of the Substantively Consolidated Debtors will be deemed Filed against the consolidated Substantively Consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Substantively Consolidated Debtors. Such substantive consolidation (other than for the purpose of implementing the Plan) will not affect the legal and corporate structures of the Substantively Consolidated Debtors, nor will such substantive consolidation affect or be deemed to affect any Intercompany Claim in any manner contrary to the Intercompany Claims Settlement, nor will such substantive consolidation be deemed to affect any Other Debtor or Claims against any Other Debtor.

**9.2    Order Granting Substantive Consolidation**

The Plan will serve as a motion seeking entry of an order substantively consolidating the Substantively Consolidated Debtors, as described, and to the limited extent set forth in, Section 9.1. Unless an objection to such substantive consolidation is made in writing by any creditor or claimant affected by the Plan, Filed with the Bankruptcy Court and served on the parties identified in Section 14.9 on or before ┼──────────────┤**,November 14,** 2005, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

## ARTICLE X

### CONDITIONS PRECEDENT TO CONFIRMATION
### AND CONSUMMATION OF THE PLAN

**10.1    Conditions to Confirmation**

The Bankruptcy Court will not enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived pursuant to Section 10.3:

a.    The Confirmation Order shall have been entered on the docket of the Clerk of the Bankruptcy Court in form and substance satisfactory to the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative and each of the following findings shall be contained in all substantial respects in the Confirmation Order:

(i)    The PI Channeling Injunctions are to be implemented in connection with the establishment of the PI Trusts;

(ii)    As of the Petition Date, certain of the Debtors had been named as defendants in personal injury or wrongful death damage actions seeking recovery for damages in respect of Channeled Personal Injury Claims;

(iii)    On the Effective Date, each PI Trust shall assume the liabilities of the Debtors with respect to applicable Channeled Personal Injury Claims;

(iv)    The Asbestos PI Trust will be funded in part by 94% of the common stock of Kaiser Trading, and all rights to receive dividends or other distributions on account of such common stock;

(v)    The Silica PI Trust will be funded in part by 6% of the common stock of Kaiser Trading, and all rights to receive dividends or other distributions on account of such common stock;

(vi)    Each PI Trust will use its assets or income to pay applicable Channeled Personal Injury Claims;

(vii)    The Debtors are likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims, the CTPV Personal Injury Claims and the Silica Personal Injury Claims, that are addressed by the respective PI Channeling Injunctions;

(viii)    The actual amounts, numbers and timing of future Demands cannot be determined;

(ix)    Pursuit of Channeled Personal Injury Claims, including Demands, outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands;

(x)    The terms of the PI Channeling Injunctions, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement;

(xi)    Other than with respect to NIHL Personal Injury Claims, which do not include Demands, pursuant to court orders or otherwise, each PI Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of applicable Channeled Personal Injury Claims or other comparable

mechanisms that provide reasonable assurance that such Trust will value, and be in a financial position to pay, applicable present Channeled Personal Injury Claims and future Channeled Personal Injury Claims and Demands that involve similar Claims in substantially the same manner;

       (xii)    Each of the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the respective PI Channeling Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in such Injunction, and transferred to and assumed by the applicable PI Trust;

       (xiii)    The inclusion of each Debtor or beneficiary within the protection afforded by the respective PI Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against each such Debtor or beneficiary in light of the benefits provided, or to be provided, to the applicable PI Trust on behalf of such Debtor or such beneficiary;

       (xiv)    The Plan complies with section 524(g) of the Bankruptcy Code in all respects;

       (xv)    The transfer of rights to proceeds from the Included PI Trust Insurance Policies to the Funding Vehicle Trust for the benefit of the PI Trusts is valid and enforceable and transfers such rights under the Included PI Trust Insurance Policies as the Debtors may have, subject to any and all PI Insurer Coverage Defenses. The discharge and release of the Debtors and Reorganized Debtors from all Claims, and the injunctive protection provided to the Debtors, Reorganized Debtors and Protected Parties with respect to Demands as provided herein shall not affect the liability of any PI Insurance Company except (A) to the extent that any such insurance company is also a Settling Insurance Company or (B) that all PI Insurer Coverage Defenses are preserved; and

       (xvi)    The PI Channeling Injunctions are essential to the Plan and the Debtors' reorganization efforts.

       b.    The Debtors shall have received a commitment for the Exit Financing Facility from the Exit Financing Facility Agent Bank on terms and conditions satisfactory to (i)the Debtors and (ii) the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative  and such commitment shall then be in effect; *provided, however*, that a person in clause (ii) may object to such terms and conditions only to the extent (x) they differ materially from those contained in the Commitment Letter, dated January 14, 2005, with J.P. Morgan Securities Inc. and The CIT Group/Business Credit, Inc. and (y) they conflict with the terms of the Plan or are materially less favorable to the Debtors than those then generally available to companies that are comparable to the Debtors.

       c.    All Exhibits to the Plan shall be in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative.

### 10.2    Conditions to the Effective Date

       The Effective Date will not occur and the Plan will not be consummated unless and until each of the following conditions have been satisfied or duly waived pursuant to Section 10.3.

       a.    The Confirmation Order shall have become a Final Order.

       b.    The documents effectuating the Exit Financing Facility will have been executed and delivered by Reorganized KAC, the Exit Financing Facility Agent Bank and the financial institutions named therein.

   c.  The shares of New Common Stock to be issued pursuant to the Plan shall have been registered under the Exchange Act.

   d.  The New Common Stock shall have been designated as NASDAQ National Market or NASDAQ SmallCap Market securities by The Nasdaq Stock Market, Inc. or authorized for listing on or accepted for quotation through any exchange registered pursuant to Section 6(a) of the Exchange Act, subject to official notice of issuance.

   e.  The Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order), in form and substance acceptable to the Debtors, approving and authorizing the Debtors and the Reorganized Debtors to take all actions necessary, appropriate or desirable to implement the Plan, including completion of the Restructuring Transactions and the other transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, releases and other agreements or documents to be entered into or delivered in connection with the Plan.

   f.  The Bankruptcy Court and/or the District Court, as required, shall have entered each of the PI Channeling Injunctions (which may be included in the Confirmation Order), with each containing terms satisfactory to the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative.

   g.  The PI Channeling Injunctions shall be in full force and effect.

   h.  The Funding Vehicle Trust Agreement and each PI Trust Agreement shall have been executed by the parties thereto.

   i.  Concurrently with the Effective Date, 70.5% of the KFC Claim shall have been transferred to the Asbestos PI Trust and 4.5% of the KFC Claim shall have been transferred to the Silica PI Trust.

   j.  The Canadian Proceeding shall have been dismissed or terminated.

   k.  All other actions, documents, consents and agreements necessary to implement the Plan will have been effected, obtained and/or executed.

### 10.3  Waiver of Conditions to the Confirmation or Effective Date

   The conditions to Confirmation set forth in Section 10.1 and the conditions to the Effective Date set forth in Section 10.2 may be waived in whole or part by the Debtors at any time and without an order of the Bankruptcy Court with consent of the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative; *provided, however,* that in the event the Retirees' Committee fails to consent and all other such consents have been given, a condition may be waived pursuant to an order of the Bankruptcy Court.

### 10.4  Effect of Nonoccurrence of Conditions to the Effective Date

   If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section 10.3, then upon motion by the Debtors made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; *provided, however,* that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section 10.4: (a) the Plan will be null and void in all respects including with respect to (i) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy Code and (ii) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Sections 6.1 and

6.3; and (b) nothing contained in the Plan will (i) constitute a waiver or release of any claims by or against, or any Interest in, the Debtors or (ii) prejudice in any manner the rights of the Debtors or any other party in interest.

## ARTICLE XI

## CRAMDOWN

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code with respect to: (a) any impaired Class other than Class 5 that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code; and (b) any Class that is deemed to have not accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE XII

## DISCHARGE, TERMINATION AND INJUNCTION

### 12.1    Discharge of Claims and Termination of Interests

a.    Except as provided in the Plan, the Confirmation Order or the Environmental Settlement Agreement, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from the Petition Date. Except as provided in the Plan, in the Confirmation Order or the Environmental Settlement Agreement, Confirmation will, as of the Effective Date: (i) discharge the Debtors from all Claims or other debts and Interests that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (A) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code, or (C) the holder of a Claim based on such debt has accepted the Plan; and (ii) terminate all Interests and other rights of equity security holders in the Debtors.

b.    In accordance with the foregoing, except as provided in the Plan, the Confirmation Order or the Environmental Settlement Agreement, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtors and a termination of all Interests and other rights of equity security holders in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest. The foregoing will not limit any rights that the United States of America or the individual States may have under environmental laws to seek to enforce equitable remedies against the Debtors, the Reorganized Debtors or the successors thereto to the extent such equitable remedies are not considered Claims under applicable bankruptcy law and relate to matters that have not been resolved by the Environmental Settlement Agreement or other settlements; *provided, however,* that the Debtors, the Reorganized Debtors or the successors thereto may raise any and all available defenses (including defenses under bankruptcy law) in any action by the United States of America or an individual State to enforce such equitable remedies. Under the Plan, all rights and defenses (including defenses under bankruptcy law) of the Debtors, the Reorganized Debtors and the successors thereto and the United States of America with regard to the Reserved Sites (as such term is defined in the Environmental Settlement Agreement) for which the Debtors and the United States of America have not reached settlement as of the Confirmation Date will be preserved. Notwithstanding any provision of the Plan, the rights of the United States of America or the individual States party to the Environmental Settlement Agreement with respect to Debtor-Owned Sites (as such term is defined in the Environmental Settlement Agreement) will be governed by the Environmental Settlement Agreement.

### 12.2    Injunctions

a.    **In addition to the injunctions provided in the PI Channeling Injunctions, except as provided in the Plan, the Confirmation Order or the Environmental Settlement Agreement, as of the Effective**

Date, all entities that have held, currently hold or may hold a Claim or other debt or liability of the Debtors, or an Interest or other right of an equity security holder with respect to the Debtors, that is discharged, released, waived, settled or deemed satisfied in accordance with the Plan will be permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, Interests or rights: (i) commencing or continuing in any manner any action or other proceeding against the Debtors, the Reorganized Debtors or the property of any of them, other than to enforce any right pursuant to the Plan to a distribution; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors or the property of any of them, other than as permitted pursuant to (i) above; (iii) creating, perfecting or enforcing any lien or encumbrance of any kind against the Debtors, the Reorganized Debtors or the property of any of them; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan.

      b.      In addition to the injunctions provided in the PI Channeling Injunctions, as of the Effective Date, all entities that have held, currently hold or may hold any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that are released pursuant to the Plan, including pursuant to Section 4.5, will be permanently enjoined from taking any of the following actions against any released entity or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities: (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released entity; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan.

      c.      **Channeled PI Insurance Entity Injunction**

      (i)      **Purpose.** In order to protect the Funding Vehicle Trust and each PI Trust and to preserve the PI Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, the Bankruptcy Court shall issue as part of the Confirmation Order the Channeled PI Insurance Entity Injunction; *provided, however,* that: (A) the Funding Vehicle Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the Channeled PI Insurance Entity Injunction with respect to any PI Insurance Company upon express written notice to such PI Insurance Company; and (B) the Channeled PI Insurance Entity Injunction is not issued for the benefit of any PI Insurance Company, and no PI Insurance Company is a third-party beneficiary of the Channeled PI Insurance Entity Injunction.

      (ii)      **Terms.** Subject to the provision of Section 12.2.c(i) of the Plan, all Entities (excluding, however, the Funding Vehicle Trust, the Asbestos PI Trust, the Silica PI Trust, the CTPV PI Trust, the NIHL PI Trust and the Reorganized Debtors to the extent they are permitted or required to pursue claims relating to any PI Insurance Coverage Action and/or the PI Insurance Assets) that have held or asserted, that hold or assert or that may in the future hold or assert any claim, demand or cause of action (including any Channeled Personal Injury Claim or respecting any Trust Expense) against any PI Insurance Company based upon, attributable to, arising out of or in any way connected with any such Channeled Personal Injury Claim, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction or recovery with respect to any such Claim, Demand or cause of action including, but not limited to:

      (A)      commencing, conducting or continuing, in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including a judicial, arbitration, administrative or other proceeding) in any forum with respect to any such Claim, Demand

or cause of action against any PI Insurance Company, or against the property of any PI Insurance Company, with respect to any such claim, demand or cause of action;

    (B)    enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any PI Insurance Company, with respect to any such claim, demand or cause of action;

    (C)    creating, perfecting or enforcing in any manner, directly or indirectly, any encumbrance against any PI Insurance Company, or the property of any PI Insurance Company, with respect to any such claim, demand or cause of action; and

    (D)    except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, directly or indirectly, against any obligation of any PI Insurance Company, or against the property of any PI Insurance Company, with respect to any such claim, demand or cause of action;

*provided, however*, that: (x) the Channeled PI Insurance Entity Injunction shall not impair in any way any actions brought by the Funding Vehicle Trust and/or the Reorganized Debtors against any PI Insurance Company; (y) the Funding Vehicle Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the Channeled PI Insurance Entity Injunction with respect to any PI Insurance Company upon express written notice to such PI Insurance Company; and (z) the Channeled PI Insurance Entity Injunction is not issued for the benefit of any PI Insurance Company, and no PI Insurance Company is a third-party beneficiary of the Channeled PI Insurance Entity Injunction.

    (iii)    Reservations.  Notwithstanding anything to the contrary above, this Channeled PI Insurance Entity Injunction shall not enjoin:

    (A)    the rights of entities to the treatment accorded them under the Plan, as applicable, including the rights of holders of Channeled Personal Injury Claims to assert such Claims, as applicable, in accordance with the applicable PI Trust Distribution Procedures;

    (B)    the rights of entities to assert any claim, debt, obligation, cause of action or liability for payment of Trust Expenses against the Funding Vehicle Trust or a PI Trust;

    (C)    the rights of the Funding Vehicle Trust and the Reorganized Debtors (to the extent permitted or required under the Plan) to prosecute any action based on or arising from the Included PI Trust Insurance Policies;

    (D)    the rights of the Funding Vehicle Trust and the Reorganized Debtors to assert any claim, debt, obligation, cause of action or liability for payment against a PI Insurance Company based on or arising from the Included PI Trust Insurance Policies; and

    (E)    The rights of any PI Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other PI Insurance Company that is not a Protected Party.

## ARTICLE XIII

### RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Reorganization Cases after the Effective Date as is legally permissible, including jurisdiction to:

a.      Interpret, enforce and administer the Funding Vehicle Trust Agreement, the PI Trust Funding Agreement or a PI Trust Agreement (including all annexes and Exhibits thereto);

b.      Hear and determine any proceeding that involves the validity, application, construction, enforceability or modification of the PI Channeling Injunctions or of the application of section 105 or section 524(g) of the Bankruptcy Code to any of the PI Channeling Injunctions;

c.      Hear and determine all objections to the termination of the Funding Vehicle Trust and any PI Trust;

d.      Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim (other than Channeled Personal Injury Claims) or Interest, including the resolution of any request for payment of any Administrative Claim, the resolution of any objections to the allowance, priority or classification of Claims (other than Channeled Personal Injury Claims) or Interests;

e.      Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

f.      Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

g.      Ensure that distributions to holders of Allowed Claims (other than Channeled Personal Injury Claims) are accomplished pursuant to the Plan;

h.      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date or brought thereafter;

i.      Enter such orders as may be necessary or appropriate to implement or consummate each provision of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

j.      Resolve any cases, controversies, suits or disputes that may arise in connection with the Recovery Actions or the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

k.      Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, any Bankruptcy Court order, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

l.        Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

m.        Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

n.        Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

o.        Enter a final decree closing the Reorganization Cases; and

p.        Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes.

Notwithstanding anything to the contrary in this Article XIII, (i) the allowance of Channeled Personal Injury Claims and the forum in which such allowance will be governed by and in accordance with the applicable PI Trust Agreement and PI Trust Distribution Procedures and (ii) the Bankruptcy Court will have concurrent rather than exclusive jurisdiction with respect to disputes relating to rights under insurance policies included in the PI Insurance Assets.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

### 14.1    Dissolution of Committees

Subject to any applicable Bankruptcy Court order, on the Effective Date, the ~~Creditors' Committee,~~ Asbestos Claimants' Committee and the Retirees' Committee will dissolve**, and upon the occurrence of the Effective Date and the effective date with respect to the Alumina Subsidiary Plans, the Creditors' Committee will dissolve,** and the members of the Creditors' Committee, the Asbestos Claimants' Committee, and the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative will be released and discharged from all duties and obligations arising from or related to the Reorganization Cases; *provided, however,* that the duties and obligations of the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative will continue after the Effective Date pursuant to any applicable provisions of the PI Trust Agreements and the PI Trust Distribution Procedure, all costs of which will be borne by the applicable PI Trust or the Funding Vehicle Trust. The Professionals retained by the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative, the Future Silica and CTPV Claimants' Representative and the members of such Committees will not be entitled to assert any Professional Fee Claims for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Section 3.1.a(vii)(B)(1) and in connection with any appeal of the Confirmation Order. Notwithstanding the foregoing, in the event that appeals in respect of any Contractual Subordination Dispute or the PBGC Settlement Agreement remain pending on the Effective Date, **if the Creditors' Committee determines to participate or to continue to participate in either or both appeals post-Effective Date,** the Creditors' Committee shall not dissolve until resolution of each such appeal, and the Professionals retained by the Creditors' Committee will be entitled to assert Professional Fee Claims in connection with ~~any~~**each** such appeal in accordance with the Intercompany Claims Settlement and pursuant to the Plan and the Alumina Subsidiary Plans.

14.2    **Limitation of Liability**

**The Debtors, the Reorganized Debtors, the DIP Lenders, the Indenture Trustees and their respective directors, officers, employees and professionals, acting in such capacity and the Creditors' Committee or members thereof, the Asbestos Claimants' Committee or members thereof, the Retirees' Committee or members thereof, the Future Asbestos Claimants' Representative, the Future Silica and CTPV Claimants' Representative and their respective Professionals will neither have nor incur any liability to any entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan; *provided, however*, that the foregoing provisions of this Section 14.2 will have no effect on (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (b) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.**

14.3    **Modification of the Plan**

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code the Debtors or the Reorganized Debtors, as the case may be, reserve the right to alter, amend or modify the Plan before its substantial consummation with the consent of the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative; *provided, however*, that in the event the Retirees' Committee fails to consent and all other such consents have been given, such alteration, amendment or modification may be made pursuant to an order of the Bankruptcy Court.

14.4    **Revocation of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date. If the Debtors so revoke or withdraw the Plan as to any or all of the Debtors, or if Confirmation as to a Debtor does not occur, then, with respect to any such Debtor, the Plan will be null and void in all respects, and nothing contained in the Plan will (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or (b) prejudice in any manner the rights of such Debtor or any other party.

14.5    **Severability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted; *provided, however*, that any such alteration or interpretation must be in form and substance acceptable to the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, the Retirees' Committee, the Future Asbestos Claimants' Representative and the Future Silica and CTPV Claimants' Representative. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

14.6    **Exhibits**

All Exhibits to the Plan are incorporated by reference and are intended to be an integral part of this document as though fully set forth in the Plan.

14.7    **Successors and Assigns**

The rights, benefits and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

14.8    **Service of Certain Plan Exhibits and Disclosure Statement Exhibits**

Because the Exhibits to the Plan are voluminous, not all the Exhibits are being served with copies of the Plan and the Disclosure Statement.  Any party in interest may obtain the Plan Exhibits from the Document Website.

14.9    **Service of Documents**

Any pleading, notice or other document required by the Plan or Confirmation Order to be served on or delivered to the Debtors, the Reorganized Debtors or the Creditors' Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

a.    **The Debtors and the Reorganized Debtors:**

John M. Donnan, Esq.
Vice President, Secretary and General Counsel
KAISER ALUMINUM CORPORATION
27422 Portola Parkway, Ste. 350
Foothill Ranch, California  92610-2831
Fax:  (949) 614-1930

Daniel J. DeFranceschi, Esq.
**Kimberly D. Newmarch (DE 4340)**
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware  19899
Fax:  (302) 651-7701

- and -

Gregory M. Gordon, Esq.
Henry L. Gompf, Esq.
Troy B. Lewis, Esq.
Daniel P. Winikka, Esq.
JONES DAY
2727 North Harwood
Dallas, Texas  75201
Fax:  (214) 969-5100

(Counsel to the Debtors and Reorganized Debtors)

b.    **The Creditors' Committee:**

Lisa G. Beckerman, Esq.
AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
590 Madison Avenue
New York, New York  10022
Fax:  (212) 872-8162

- and -

William P. Bowden, Esq.
ASHBY & GEDDES
222 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware 19899
Fax: (302) 654-2067

(Counsel to the Creditors' Committee)

c.      **The Asbestos Claimants' Committee:**

Elihu Inselbuch, Esq.
CAPLIN & DRYSDALE CHARTERED
399 Park Avenue
New York, New York 10022
Fax: (212) 644-6755

- and -

Peter Van N. Lockwood, Esq.
Ronald E. Reinsel, Esq.
CAPLIN & DRYSDALE CHARTERED
One Thomas Circle NW
Washington, D.C. 20005

(Counsel to the Asbestos Claimants' Committee)

d.      **The Retirees' Committee:**

Frederick D. Holden, Jr., Esq.
ORRICK, HERRINGTON & SUTCLIFF LLP
The Orrick Building
405 Howard Street
San Francisco, California 94105-2669
Fax: (415) 773-5759

e.      **The Future Asbestos Claimants' Representative:**

Martin J. Murphy, Esq.
1700 Midland Bldg.
101 Prospect Ave. West
Cleveland, Ohio 44115
Fax: (216) 621-0602

- and -

James L. Patton, Esq.
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street
17th Floor
P.O. Box 391
Wilmington, Delaware 19899
Fax: (302) 571-1233

(Counsel to the Future Asbestos Claimants' Representative)

f.    **The Future Silica and CTPV Claimants' Representative:**

Anne M. Ferazzi, Esq.
11923 Winwood
Houston, Texas 77024
Fax: (713) 953-1107

Sander L. Esserman, Esq.
STUTZMAN, BROMBERG, ESSERMAN & PLIFKA
2323 Bryan Street
Suite 2200
Dallas, Texas 75201
Fax: (214) 969-4999

- and -

Stephen A. Buxbaum, Esq.
HAYNES AND BOONE, LLP
1 Houston Center
1221 McKinney, Suite 2100
Houston, Texas 77010
Fax: (713) 236-5404

(Counsel to the Future Silica and CTPV Claimants' Representative)

g.    **The US Trustee:**

David Klauder, Esq.
OFFICE OF THE UNITED STATES TRUSTEE
844 King Street
Suite 2313
Wilmington, Delaware 19801
Fax: (302) 573-6497

Dated: ~~August 24,~~**September 7,** 2005

Respectfully submitted,

KAISER ALUMINUM CORPORATION

By:_____
Name:__**Edward F. Houff**__
Title:__**Chief Restructuring Officer**__

KAISER ALUMINUM & CHEMICAL CORPORATION, on
its own behalf and on behalf of each direct or indirect
subsidiary Debtor

By:_____
Name:__**Edward F. Houff**__
Title:__**Chief Restructuring Officer**__

COUNSEL:

_____
Daniel J. DeFranceschi (DE 2732)
**Kimberly D. Newmarch (DE 4340)**
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:   (302) 651-7700
Facsimile:   (302) 651-7701

Gregory M. Gordon (TX 08435300)
Henry L. Gompf (TX 08116400)
Troy B. Lewis (TX 12308650)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood
Dallas, Texas 75201
Telephone:   (214) 220-3939
Facsimile:   (214) 969-5100

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION