IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | Jointly Administered Under |
| KAISER ALUMINUM CORPORATION, | : | Bankruptcy Case No. 02-10429 (JKF) |
| a Delaware corporation, *et al.* | : | Chapter 11 |
| | : | |
| | : | |
| KAISER ALUMINUM CORPORATION, *et al.* | : | Case No. 06-mc-41 (JJF) |
| | : | |

**APPENDIX TO OPENING MEMORANDUM OF APPELLANTS, CENTURY
INDEMNITY COMPANY (SUCCESSOR TO CIGNA SPECIALTY INSURANCE
COMPANY, FORMERLY KNOWN AS CALIFORNIA UNION INSURANCE
COMPANY, AND SUCCESSOR TO CCI INSURANCE COMPANY, SUCCESSOR TO
INSURANCE COMPANY OF NORTH AMERICA, AND AS ADMINISTRATIVE
AGENT OF FORMER MEMBERS OF AFIA, INCLUDING ST. PAUL MERCURY
INSURANCE COMPANY); ACE PROPERTY & CASUALTY COMPANY
(FORMERLY KNOWN AS CIGNA PROPERTY & CASUALTY COMPANY,
FORMERLY KNOWN AS AETNA INSURANCE COMPANY); INDUSTRIAL
INDEMNITY COMPANY; INDUSTRIAL UNDERWRITERS INSURANCE
COMPANY; PACIFIC EMPLOYERS INSURANCE COMPANY; AND
CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, BY AND
THROUGH CRAVENS, DARGEN AND COMPANY, MANAGING GENERAL AGENT**

Dated: April 17, 2006

STEVENS & LEE, P.C.

Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 425-3304
Telecopier: (610) 371-8512
E-mail: tgw@stevenslee.com

and

Leonard P. Goldberger
PA I.D. No. 23118
1818 Market Street, 29th Floor
Philadelphia, PA 19103
Telephone: (215) 751-2864
Telecopier: (610) 371-7376
E-mail: lpg@stevenslee.com

*Attorneys for Insurers*

## INDEX

*In re Argonaut Insurance Company v. Ames Department Stores, Inc.,*
1995 WL 311764 (S.D.N.Y.)                                        Tab One

*In re Orion Refining Corporation,* 2004 Bank. LEXIS 188 (Bank. Del. 2004)    Tab Two

*In re Certain Underwriters at Lloyd's, London, et al. v. McDermott*
*International, Inc. and the Babcock and Wilcox Co.,*
2002 U.S. Dist. LEXIS 874 (D. Del. 2002)                        Tab Three

# TAB 1



Not Reported in F.Supp.                                                          Page 1

Not Reported in F.Supp., 1995 WL 311764 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

▷
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
In re AMES DEPARTMENT STORES, INC.,
Eastern Retailers Service Corporation, et al.,
Debtors.
ARGONAUT INSURANCE COMPANY,
Appellant,
v.
AMES DEPARTMENT STORES, INC., Appellee.
No. 93 Civ. 4014 (KMW).

May 18, 1995.

OPINION AND ORDER
KIMBA M. WOOD, District Judge.
**\*1** Argonaut Insurance Company ("Argonaut")
appeals from an order of the Bankruptcy Court for
the Southern District of New York, dated April 12,
1993, in which Judge Francis G. Conrad denied
Argonaut's motion for summary judgment and
granted Ames Department Stores' ("Ames") motion
for summary judgment in the above-captioned
adversary proceeding. For the reasons stated below,
the order of the bankruptcy court is affirmed in all
respects.

I. Background

This action stems from commercial general liability
insurance policies issued by Argonaut to Ames for
the period beginning October 1, 1988 through
September 30, 1989. Coverage was renewed for the
following year, and the policies expired on October
1, 1990. The policies contained a $50,000
deductible provision pursuant to which Ames was
responsible for payment of all defense and
indemnity costs up to $50,000 per occurrence of
bodily injury or property damage.

On April 25, 1990 Ames and its fifty-two affiliates

filed petitions under Chapter 11 of the United States
Bankruptcy Code. The Third Amended Joint Plan
of Reorganization ("the Plan") was confirmed by
the Bankruptcy Court on December 18, 1992.

After the Chapter 11 petitions were filed, Argonaut
was named as a direct defendant in four personal
injury cases arising out of its general liability
coverage of Ames. In two other actions, brought in
states that require the insured to be named as a
defendant, Ames allowed modification of the
automatic stay to allow the claimants to proceed
against Argonaut. According to Argonaut, Ames
has refused to defend any of these actions.

On December 3, 1992, Argonaut commenced this
adversary proceeding seeking declarations (1) that
Argonaut is not responsible for defense,
administration or payment of any personal injury
claim in cases where Ames refuses to accept
responsibility for the first $50,000 in defense costs,
and (2) that Argonaut is not responsible for any
payments within the $50,000 deductible in
connection with claims in which a timely proof of
claim has not been filed.

The parties agreed that there were no factual issues
in dispute, and both moved for summary judgment.
The Bankruptcy Judge found for Ames, ruling (1)
that the bankruptcy court did not have jurisdiction
to determine the obligation of Argonaut to pay
amounts within the deductible in the various
pending state court actions, and (2) that any claim
Argonaut may have as a consequence of its having
to pay amounts within the deductible, including
payment for defense costs, is a pre-petition,
unsecured claim, subject to treatment in accordance
with the Plan.

II. Discussion

On appeal, the district court may affirm, modify, or
reverse a bankruptcy judge's order. Bankruptcy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2

Not Reported in F.Supp., 1995 WL 311764 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Rule 8013. Because only the bankruptcy judge's conclusions of law are in dispute, I review his decision de novo. *In re One Times Square Associates Ltd. Partnership,* 165 B.R. 773 (S.D.N.Y.), *aff'd,* 41 F.3d 1502 (2d Cir. 1994), *rev'd on other grounds,* 115 S. Ct. 1107 (1995).

**\*2** Argonaut raises several objections to the order of the bankruptcy court. Chiefly, Argonaut argues that the bankruptcy judge exceeded his authority by effectively rewriting the contracts of insurance at issue, imposing requirements on Argonaut that were not part of the parties' bargain. Additionally, Argonaut argues that the insurance policies at issue are executory contracts that have been assumed by Ames under 11 U.S.C. § 365, and, in the alternative, that any costs incurred by Argonaut for the defense of claims within the deductible would qualify for administrative expense treatment under 11 U.S.C. § 503(b).

*Rewriting of the contract*

The parties agree that according to their contract, embodied in the insurance policies and the parties' course of dealing, Ames has the responsibility to defend and administer claims within the $50,000 deductible. Argonaut argues that the effect of the bankruptcy court's order was a rewriting of this contract because it imposed on Argonaut the obligation to assume the defense of claims within the deductible. Although Argonaut is correct that a bankruptcy court does not have the power to rewrite contracts, (Br. of Appellant at 14-16 (citing cases)), Argonaut's argument fails because the bankruptcy court did not rewrite the parties' contract in this case.

Argonaut argues that if Ames is allowed to abandon the defense of claims, Argonaut will have no alternative but to assume their defense because it will be liable for amounts over $50,000. Argonaut points out that "[e]ven a $5,000 personal injury claim, if permitted to proceed undefended, can quickly proliferate into a judgment well in excess of the $50,000 deductible." (*Id.* at 11). However, while Argonaut argues persuasively that it may well be in Argonaut's own best interest to defend those claims, the decision of the bankruptcy court does

not suggest that it is Argonaut's duty to do so.

By failing to defend claims within the $50,000 deductible, Ames may be breaching its contract with Argonaut. But, a post-petition breach of a contract executed pre-petition gives rise only to pre-petition liability. *In re Chateaugay Corp.,* 87 B.R. 779, 796 (S.D.N.Y. 1988). The bankruptcy judge therefore was correct in ruling that Argonaut has at best a pre-petition claim for any defense costs it chooses to expend. There is no doubt that a post-petition breach by a debtor may impose a burden on the other party to the contract because the law allows for compensation only in bankruptcy dollars. However, Argonaut's attempt to transform the unpleasant consequences it faces as a result of such a post-petition breach into a rewriting of the contract by the bankruptcy court is unavailing.

The bankruptcy court did not rewrite the contract between the parties or impose extra-contractual obligations on Argonaut. Consequently, I agree with Ames that any claims Argonaut may have against Ames for payment of defense costs within the $50,000 deductible are entitled to full payment only if (i) they arise under executory contracts that have been assumed under 11 U.S.C. § 365; or (ii) they meet the requirements for administrative expense priority under 11 U.S.C. § 503(b).

*Executory Contracts*

**\*3** The generally accepted definition of an executory contract in bankruptcy was given by Professor Countryman: an executory contract within the meaning of the Bankruptcy Act is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy, Part I,* 57 Minn. L. Rev. 439, 460 (1973); *see In re Chateaugay Corp.,* 130 B.R. 162, 164 (S.D.N.Y. 1991) (collecting cases adopting the Countryman definition). Courts considering insurance policies in which the policy periods have expired and the initial premiums have been paid routinely find that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 3

Not Reported in F.Supp., 1995 WL 311764 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

they are not executory contracts despite continuing obligations on the part of the insured. *See In re Texscan Corp.,* 976 F.2d 1269, 1271-73 (9th Cir. 1992); *In re Sudbury, Inc.,* 153 B.R. 776, 778-780 (Bankr. N.D. Ohio 1993); *In re Firearms Import and Export Corp.,* 131 B.R. 1009, 1013-14 (Bankr. S.D. Fla. 1991); *In re Federal Press Co.,* 104 B.R. 56 (Bankr. N.D. Ind. 1989). These courts have reasoned that the failure of the insured to perform those continuing obligations would not excuse the insurer from being required to perform and, consequently, that the Countryman definition of an executory contract would not be satisfied.

Argonaut seeks to distinguish *In re Firearms Import and Export Corp.* and *In re Federal Co.* by asserting that in those cases "the debtor's obligation . .. was limited to *funding* [a] self-insured retention, not in actively undertaking defense and administration of claims." (Reply Br. at 8) Even assuming, *arguendo,* that the distinction urged by Argonaut were relevant to this matter, Argonaut's version of the holding of the cited cases is not accurate. In particular, in *In re Federal Co.,* the court specifically found that by the terms of the policies at issue, the insured *was* required to defend matters brought against it and to pay defense costs up to the amount of its retained limit. 104 B.R. at 62 . Nevertheless, the court found that the failure of the insured to fulfill its obligations did not excuse the insurer from being required to perform.

Argonaut has failed to cite a single case, and the court has found none, in which insurance policies, executed pre-petition, whose policy periods expired prior to the confirmation of the plan of reorganization, were deemed to be executory contracts. Rather, courts have consistently found that such policies were not executory contracts, regardless of the continuing obligations that remained. Argonaut has not shown that a different result should be reached in this case.

*Administrative Expense Priority*

A claim merits administrative expense treatment under section 503(b) if it (1) arises from a transaction between the creditor and the debtor-in-possession, and (2) is beneficial to the debtor-in-possession in the operation of its business. *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 101 (2d Cir. 1986). Argonaut concedes that its obligation to provide insurance coverage arises from pre-petition transactions, but argues that by defending claims within the deductible it would have expanded that coverage post-petition, in a way beneficial to the estate, warranting administrative expense treatment.

*4 Any post-petition expansion of coverage, however, would not be undertaken as a result of a post-petition agreement with Ames for the benefit of the estate, but rather because it would be in Argonaut's own best interest to defend claims. Consequently, Argonaut's costs should not be afforded administrative expense priority. *See In re Firearms Import and Export Corp.,* 131 B.R. at 1015-16 (denying administrative expense treatment for insurer's defense costs when debtor failed to fund self-insured retention). In fact, Argonaut's position has been rejected, by implication, by the Second Circuit Court of Appeals. In *Green v. Welsh,* 956 F.2d 30 (2d Cir. 1992), the court noted with approval the reasoning in *In re Jet Florida Systems, Inc.,* 883 F.2d 970 (11th Cir. 1989), where the court held that a tort claim could survive a permanent injunction pursuant to 11 U.S.C. § 524(a) to allow the claimant to recover from debtor's insurer. The court reasoned that this holding would not conflict with the fresh-start policy embodied in the Bankruptcy Code because "the practical and economic realities compel the *insurance company* to defend the underlying action." 883 F.2d at 976. The court concluded that "the possibility that the debtor will be responsible to pay any amount associated with defending this action is so remote that the fresh-start policy is simply not defeated." *Id.* Implicit in the conclusion that the debtor faced only a "remote" possibility of having to pay for the defense costs is the court's assumption that the insurance company could not claim administrative expense priority for those costs.

III. Conclusion

I have considered Argonaut's other arguments and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 4

Not Reported in F.Supp., 1995 WL 311764 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

found them without merit. For the reasons stated
above, the court affirms the Order of the
Bankruptcy Court dated April 12, 1993. The Clerk
of the Court is directed to close this case.

SO ORDERED.

> FN1. The policies issued for the period of
> October 1, 1988 through September 30,
> 1989 expired prior to the filing of the
> bankruptcy petition. The policies issued
> for the period of October 1, 1989 through
> September 30, 1990 expired after the filing
> of the petition, but prior to the
> confirmation of the Plan. This distinction,
> despite Argonaut's arguments to the
> contrary, is not relevant to the court's
> decision. *See In re Texscan Corp.,* 976
> F.2d at 1271-73.

S.D.N.Y.,1995.
In re Ames Dept. Stores, Inc.
Not Reported in F.Supp., 1995 WL 311764
(S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:93cv04014 (Docket) (Jun. 15, 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Service: **Get by LEXSEE®**
Citation: **2004 Bankr. LEXIS 188**

*2004 Bankr. LEXIS 188, \**

In re: ORION REFINING CORPORATION, Debtor.

Chapter 11, Case No. 03-11483 (CGC)

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

2004 Bankr. LEXIS 188

February 19, 2004, Decided

**DISPOSITION:** Debtor's objection to Merrill Lynch Bond Fund's motion for allowance of postpetition portion of its secured claim sustained. Matter was not ripe for adjudication.

### CASE SUMMARY

**PROCEDURAL POSTURE:** A creditor moved for allowance of the postpetition portion of its secured claim. Objections were filed by the Chapter 11 debtor and another creditor both on substantive grounds and on the grounds that the matter was not ripe for adjudication.

**OVERVIEW:** The creditor sought an order determining the amount of interest due on its claim. It acknowledged that it was entitled to interest only to the extent it was oversecured. The extent of its security was to be determined primarily by the result of the another trial, which had not been concluded. Ruling on the issue now would have been an advisory opinion.

**OUTCOME:** The court agreed that the matter was not ripe for adjudication.

**CORE TERMS:** secured claim, tank farm, valuation, ripe, postpetition, objected

### LexisNexis(R) Headnotes ✦ Hide Headnotes

Civil Procedure > Justiciability > Case or Controversy

*HN1* It is a fundamental principle of jurisprudence that courts should decide actual cases or controversies and not give advisory opinions. More Like This Headnote

**COUNSEL:** **[\*1]** For Orion Refining Corporation: Richard D. Allen, Eric D. Schwartz, Gregory W. Werkheiser, Thomas W. Briggs, Jr., Wilmington, DE.

For Merrill Lynch Bond Fund, Inc. - High Income Portfolio: Lawrence G. McMichael, Peter C. Hughes, D. Sam Anderson, Dilworth Paxson LLP, Philadelphia, PA.

For Credit Suisse First Boston Management X LLC, on behalf its Investment Affiliate Special Situations Holding LLC, Jefferies Group, Inc., Jefferies & Company, Inc., Jefferies Partners Opportunity Fund, Jefferies Partners Opportunity Fund II, LLC, and Jefferies Employees Opportunity Fund, LLC: David J. Baldwin, Laurie Selber Silverstein, Rosalie L. Spelman, Wilmington, DE.

**JUDGES:** Charles G. Case II, United States Bankruptcy Judge.

**OPINIONBY:** Charles G. Case

**OPINION: MEMORANDUM DECISION**

Dated: February 19, 2004

**CASE, J.**

Before this Court is the Motion of Merrill Lynch Bond Fund, Inc. - High Income Portfolio ("Merrill Lynch") for Allowance of Postpetition Portion of its Secured Claim. (Docket No. 997). Objections were filed by Orion Refining Corporation ("Orion") (Docket No. 1036) and Credit Suisse First Boston Management LLC ("CSFB") (Docket No. 1035) both on substantive grounds **[*2]** and on the grounds that the matter is not ripe for adjudication. As set forth below, the Court agrees that the matter is not ripe for adjudication.

**FACTS**

On May 13, 2003 (the "Petition Date"), Orion filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code. Orion continues to manage its business and property as debtor-in-possession.

Also on May 13, 2003, Orion entered into the Purchase and Sale Agreement Among Orion Refining Corporation, Valero Energy Corporation and Valero Refining - New Orleans, L.L.C.

On May 30, 2003, Orion filed a motion seeking determination of the secured status of Merrill Lynch's secured claim to the extent such claim is an allowed secured claim (the "Valuation Motion"). Merrill Lynch objected to the Valuation Motion on June 24, 2003.

A hearing was held on June 26, 2003 to address Orion's proposed sale of all its assets to Valero. This Court approved the sale and the sale was consummated on July 1, 2003.

Pursuant to the sale order, the amount of principal and interest due to Merrill Lynch as of the Petition Date was stipulated to be $ 37,954,285.71. The sale order established a reserve of $ 45,500,000 to satisfy any secured **[*3]** obligation to Merrill Lynch.

On January 30, 2004, Merrill Lynch filed a motion seeking an order allowing the postpetition portion of its secured claim. Specifically seeking certain interest, fees and other charges which have accrued since the Petition Date.

The Court held a hearing that lasted four days with respect to the Valuation Motion. The hearing concluded on February 17, 2004.

**DISCUSSION**

Merrill Lynch seeks an order determining the amount of interest due on its claim. It acknowledges that it is entitled to interest only to the extent it is oversecured. The extent of its security will be determined primarily by the result of the tank farm trial -- the evidence for which has now been concluded. The parties have agreed to conclude briefing in April, after which time the Court will issue a decision.

Orion and CSFB have objected, both on the grounds that the matter is not ripe until the tank farm valuation is fixed, and for substantive reasons.

The Court has reviewed the papers filed by the parties and the arguments made at the

hearing on February 17, 2004 and concludes that the objections are well taken. *HN1*It is a fundamental principle of jurisprudence that courts **[*4]** should decide actual cases or controversies and not give advisory opinions. Ruling on this issue now would be an advisory opinion.

## CONCLUSION

The Court will revisit the issue immediately after ruling on the valuation of the tank farm. It is the Court's intention that the issue of postpetition interest and costs will be decided concurrently with the underlying valuation issues so that both matters will result in simultaneous final orders subject to contemporaneous or consolidated appeals, should any party wish so to proceed.

Charles G. Case II

United States Bankruptcy Judge

Service: **Get by LEXSEE®**
Citation: **2004 Bankr. LEXIS 188**
View: Full
Date/Time: Monday, April 17, 2006 - 10:45 AM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis®    About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# T<small>AB</small> 3

Service: **Get by LEXSEE®**
Citation: **2002 U.S. Dist. LEXIS 874**

*2002 U.S. Dist. LEXIS 874, ***

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, ET AL. VERSUS MCDERMOTT
INTERNATIONAL, INC. AND THE BABCOCK AND WILCOX CO.

CIVIL ACTION NO: 01-912 c/w 01-1187 SECTION: "R"(5)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

2002 U.S. Dist. LEXIS 874

January 4, 2002, Decided
January 4, 2002, Filed, Entered

**DISPOSITION:** **[*1]** Defendants' and intervenor-defendants' motions for judgment on the
pleadings or, in the alternative, for summary judgment., granted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff underwriter filed a declaratory judgment action against
defendant parent company and intervenor-defendant manufacturer (defendants) for an
anticipatory repudiation of a settlement agreement during bankruptcy negotiations.
Defendants moved for judgment on the pleadings under Fed. R. Civ. P. 12(c) or,
alternatively, for summary judgment under Fed. R. Civ. P. 56.

**OVERVIEW:** The underwriters provided liability insurance to the manufacturer under
excess policies for asbestos-related claims by individuals alleging harm caused by asbestos
used in the manufacture's boiler systems. When it appeared that the amount of claims
would exhaust the limits of the underlying policies, the parent company agreed to settle
coverage disputes under the underwriters' policies and entered into a settlement
agreement. The agreement contained a confidentiality provision restricting disclosure to
any person or entity. The manufacturer declared bankruptcy, and during negotiations its
principal creditors received a copy of the settlement agreement. The underwriters sought
a declaratory judgment absolving them of their obligations under the settlement
agreement. The court found that the underwriters claims presented a justiciable
controversy and were ripe for determination. The underwriters failed to present fact issues
as to how the disclosure defeated the parties objective in making the contract. Disclosure
under those circumstances was not a material breach of contract. The record was clear
that confidentiality was not the sine qua non of the settlement agreement.

**OUTCOME:** Defendants' motion for summary judgment was granted.

**CORE TERMS:** claimants, negotiation, settlement, confidentiality, asbestos, coverage,
assign, disclosure, duties, lease, material breach, unequivocal, summary judgment,
disclosing, scenario, debtor in possession, executory contract, insurer, involvement, handling,
nonmoving party, ripe, anticipatory repudiation, coverage issues, negotiating, confirmed,
breached, anticipatory breach of contract, defendants breached, declaratory relief

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard 

*HN1* Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A district court must be satisfied that no reasonable trier of fact can find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor. The moving party bears the burden of establishing that there are no genuine issues of material fact.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof

*HN2* In a summary judgment motion, if the dispositive issue is one on which a nonmoving party will bear the burden of proof at trial, a moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue exists for trial.  More Like This Headnote

Civil Procedure > Remedies > Declaratory Relief

*HN3* The Declaratory Judgment Act, 28 U.S.C.S. §§ 2201, 2202, allows a federal court to issue declaratory relief solely in a case of actual controversy with its jurisdiction. The act's conferral of federal jurisdiction extends to the constitutional limit of cases and controversies set forth in Article III. U.S. Const. art. III, § 2. The difference between an abstract question and a controversy contemplated by the Declaratory Judgment Act is necessarily one of degree, and a precise test to identify the existence of a controversy is difficult to establish. Nevertheless, declaratory relief is appropriate under the act when a substantial controversy of sufficient immediacy and reality exists between parties having adverse legal interests. The controversy must be real and substantial admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law is upon a hypothetical state of facts. A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all. A controversy, to be justiciable, must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional, or based upon the possibility of a factual situation that may never develop.  More Like This Headnote

Contracts Law > Breach > Causes of Action

*HN4* Under New York law, a material breach is a breach that is so substantial as to defeat the purpose of making the contract. For a party to be able to terminate its obligations under a contract, a breach must go to the root of the agreement.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Contracts Law > Breach > Causes of Action

*HN5* In the context of a breach of contract claim, materiality is a question of fact to be determined case by case. Nevertheless, a comparison to analogous cases dealing with the asserted materiality of confidentiality clauses is instructive.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Contracts Law > Breach > Causes of Action

*HN6* In the context of a confidentiality agreement, a plaintiff must present fact issues as to how a disclosure defeats the object of the parties in making the contract. A breach of a confidentiality clause of settlement is not a breach that excuses performance. More Like This Headnote | *Shepardize: Restrict By Headnote*

Contracts Law > Contract Interpretation > Interpretation Generally

*HN7* Under New York law, and traditional contract law, when a contract is clear and unambiguous on its face, its plain meaning governs its interpretation. Further, the parties' interpretation of a contract in practice, prior to litigation, is compelling evidence of the parties' intent. More Like This Headnote

Contracts Law > Breach > Anticipatory Repudiation

*HN8* Under the doctrine of anticipatory repudiation, a repudiation can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that will of itself give the obligee a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach. A switch in performance expectation and burden is readily available, applied and justified when a breaching party's words or deeds are unequivocal. Anticipatory repudiation requires unqualified and clear refusal to perform with respect to the entire contract. There must be a definite and final communication of the intention to forgo performance before the anticipated breach may be the subject of legal action. More Like This Headnote

Bankruptcy Law > Executory Contracts

Contracts Law > Third Parties > Assignment of Rights

*HN9* In general, the Bankruptcy Code allows a debtor in possession to freely assign its executory contracts and unexpired leases. Additionally, § 365(f)(1) of the Bankruptcy Code eliminates transfer restrictive clauses in contracts subject to assumption and assignment by the debtor in possession. On the other hand, the Bankruptcy Code does not provide for an absolute right to assign, as § 365(c) limits the ability of a debtor in possession to assign an executory contract when generally applicable laws restrict or prohibit the transfer of rights or duties under contracts independent of any restriction within the contract itself. New York law prohibits the assignment of duties under a contract that are personal in nature without the consent of the other party. More Like This Headnote

Bankruptcy Law > Executory Contracts

*HN10* See 11 U.S.C.S. § 365(f)(1).

Bankruptcy Law > Executory Contracts

*HN11* See 11 U.S.C.S. § 365(c)(1)(A).

Bankruptcy Law > Chapter 11 (Reorganization) > Plan Process Before Confirmation > Modification

*HN12* See 11 U.S.C.S. § 1127 (a).

**COUNSEL:** For CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, TUREGUM INSURANCE

Case 1:06-mc-00041-JJF    Document 19-4    Filed 04/17/2006    Page 5 of 16

Get a Document - by Citation - 2002 U.S. Dist. LEXIS 874                    Page 4 of 15

COMPANY, plaintiffs (01-CV-912): Stephen Porter Hall, Brent Bennett Barriere, Hansel Mark Harlan, Caroline McSherry Dolan, Phelps Dunbar, LLP, New Orleans, LA.

For CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, TUREGUM INSURANCE COMPANY, plaintiffs (01-CV-912): H. Lee Godfrey, Neal S. Manne, Charles R. Eskridge, III, Cyrus D. Marter, IV, Joseph S. Grinstein, Susman Godfrey, LLP, Houston, TX.

For MCDERMOTT INTERNATIONAL INC, defendant (01-CV-912): Clare Peragine Hunter, Stacie N. Fontana, King, LeBlanc & Bland, LLP, New Orleans, LA.

For MCDERMOTT INTERNATIONAL INC, defendant (01-CV-912): Alex J. Peragine, Peragine & Neill, LLC, Covington, LA.

For TRAVELERS INDEMNITY COMPANY, THE, movant (01-CV-912): Ralph Shelton Hubbard, III, Christopher Todd Caplinger, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, New Orleans, LA.

**JUDGES:** SARAH S. VANCE, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** SARAH S. VANCE

**OPINION: ORDER AND REASONS**

This matter comes before the Court on defendants' and intervenor-defendants' motions **[*2]** for judgment on the pleadings or, in the alternative, for summary judgment. For the reasons stated below, the motions are granted.

**I. Background**

From about February 6, 1950 until at least April 1, 1986, Certain Underwriters at Lloyd's, London and Turegum Insurance Company (collectively "Underwriters") provided liability insurance to The Babcock and Wilcox Company under excess or umbrella policies. The policies provided coverage for asbestos- related claims by individuals alleging harms caused by asbestos used by B&W in boiler systems. When it appeared that the amount of asbestos claims would exhaust the aggregate limits of the underlying primary policies, Underwriters, B&W, and McDermott International Inc. ("MII"), B&W's parent company, agreed to settle certain coverage disputes that had arisen under Underwriters' policies. They entered what they refer to as the "London Settlement Agreement" ("LSA") to resolve their differences about the availability and extent of coverage that Underwriters provided.

The LSA is a coverage-in-place agreement that provides a mechanism for the payment of personal injury claims once the aggregate limits of the underlying primary policies are **[*3]** exhausted. n1 The "Scope of Agreement" provides:

> This agreement sets forth an arrangement among the Parties under the Policies, by which the Insurer Parties shall reimburse B&W/McDermott for amounts paid or to be paid by or on behalf of B&W/McDermott for defense costs and indemnity payments attributable to past, pending and future Claims, as defined herein, subject to all of the terms and conditions, including the applicable limits, of the Policies. Pl.'s Ex. 17 3, at P 1.

The agreement assigns the responsibility for claims management to B&W and MII and provides that the parties will develop a procedure for involving the insurers in claims

Case 1:06-mc-00041-JJF    Document 19-4    Filed 04/17/2006    Page 6 of 16
Get a Document - by Citation - 2002 U.S. Dist. LEXIS 874
Page 5 of 15

handling. The "Management of Claims" provision provides:

> Subject to the terms of the Agreement, B&W/McDermott shall be responsible for
> the management of the Claims. The Parties agree to establish procedures for the
> involvement of the Insurer Parties in the day-to-day management of Claims,
> including selection and supervision of defense counsel, continuation of existing
> settlement agreements with plaintiff's counsel, negotiation of new agreements
> with plaintiff's counsel, settlement authority for Claims not within the scope [*4]
> of said agreements, and all other matters relating to Claims handling. *Id.* at 3, P
> 2.

The agreement also contains a confidentiality provision restricting disclosure of the
agreement.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 The LSA refers to B&W and MII as "B&W/McDermott."

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

To carry out its management responsibilities, B&W hired Worldwide Services Company to
help manage the asbestos claims under the LSA. Worldwide and Underwriters, through
Underwriters' counsel Tom Quinn of the law firm of Mendes and Mount, developed procedures
for informing Underwriters about claims administration. B&W and MII negotiated settlements
with representatives of asbestos claimants, and Worldwide notified Underwriters'
representatives of new settlements and of when special asbestos cases appeared to exceed
designated amounts so that Underwriters' representatives could authorize the settlements.
Underwriters authorized the settlements on forms referred to as "Mendes Memos," which
required the signatures of a Mendes and Mount representative and a B&W or MII
representative. [*5] Additionally, Worldwide informed Underwriters' representatives of
changes in defense counsel who were handling negotiations and of negotiations with any
plaintiff's counsel who had not dealt with B&W before on asbestos claims. Under the claims
handling protocol, Underwriters never directly participated in any settlement negotiations
with asbestos claimants' representatives. In the ten years since the adoption of the LSA,
insurers have reimbursed B&W for claims of over $ 650 million.

On February 22, 2000, B&W filed for relief under Chapter 11 of the Bankruptcy Code. B&W
then entered into discussions with representatives of its creditors, including the Asbestos
Claimants' Committee and the Future Claims Representative, for the purpose of developing a
consensual plan of reorganization. Underwriters' representatives were not invited to the
negotiations between B&W and the claimants, but B&W's counsel notified Underwriters of
developments in the negotiations and held meetings with Underwriters' counsel to discuss
the negotiations.

During the negotiations, the claimants, B&W's principal creditors, asked B&W's counsel to
give them detailed information about B&W's insurance assets. B&W executed [*6] a
Confidentiality Agreement with the claimants before giving them a copy of the LSA in
response to the request for disclosure. The Confidentiality Agreement prohibited the
claimants from disclosing the LSA to any person or entity.

The parties reached an impasse in their negotiations, and B&W filed a motion asking the

bankruptcy court to appoint a mediator. Underwriters petitioned the bankruptcy court to participate in the mediation. The bankruptcy court rejected Underwriters' request, but the court permitted the mediator to communicate with the Underwriters at his discretion. Underwriters' counsel has since met with the mediator. After negotiations between B&W and the claimants reached a standstill, B&W submitted its first Proposed Plan of Reorganization and Disclosure Statement in February 2001, as a means to stimulate further negotiations. The Plan proposed to establish a trust into which asbestos claims would be channeled for administration and payment. Under one Plan scenario, B&W and MII would assign their rights and obligations under the LSA and the underlying policies to the trust, but only so long as the assignment would not be a breach of the LSA. Under an alternative scenario, **[*7]** the "cramdown" option, B&W and MII would retain responsibility for managing the individual asbestos claims, and they would not assign the LSA to the trust. B&W's plan has not been confirmed.

On April 6, 2001, Underwriters filed an adversary proceeding in the bankruptcy court seeking a declaratory judgment absolving them of their obligations under the LSA. One day earlier, Underwriters filed a declaratory judgment action in this Court against MII, seeking essentially the same relief. This Court withdrew the reference on the adversary proceeding and consolidated it with the declaratory judgment action against MII. This Court then granted claimants' motions to intervene.

Underwriters allege that B&W and MII materially breached the LSA by disclosing it to the claimants and by negotiating with the claimants in Underwriters' absence. Underwriters also allege that defendants committed an anticipatory repudiation of the LSA by proposing to assign the management of claims under the LSA to a claims-handling trust in the Plan of Reorganization and by discussing certain settlement options with the claimants. Therefore, allege Underwriters, they are no longer obligated to indemnify B&W and MII **[*8]** under the LSA.

## II. Discussion

### A. Legal Standard

Defendants and intervenor-defendants move for a judgment on the pleadings under Federal Rule of Civil Procedure 12(c) or, in the alternative, for summary judgment under Rule 56. The Court considers the motions as motions for summary judgment under Rule 56 because matters outside of the pleadings have been presented to and not excluded by the Court. *See* FED.R.CIV.P. 12(C).

*HN1* Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56 (c); *Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).* A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 178 (5th Cir. 1990)* (*citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986)).* **[*9]** The moving party bears the burden of establishing that there are no genuine issues of material fact.

*HN2* If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex, 477 U.S. at 325, 106 S. Ct. at 2554; see also Lavespere, 910 F.2d at 178.* The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.

See *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue exists for trial. See *id.* at 325, 106 S. Ct. at 2553-54; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

## B. Justiciable Controversy

*HN3* The Declaratory Judgment Act, 28 U.S.C. § 2201, allows a federal court to issue declaratory relief solely "in a case of actual controversy with [*10] its jurisdiction." The Act's conferral of federal jurisdiction extends to the constitutional limit of "cases and controversies" set forth in Article III. See U.S. CONST. art. III, § 2; *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239, 57 S. Ct. 461, 463, 81 L. Ed. 617 (1937); *Middle South Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986). The Supreme Court has stated that "the difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree," and it has recognized that a precise test to identify the existence of a "controversy" is difficult to establish. *Maryland Casualty Co. v. Pacific Coast Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 512, 85 L. Ed. 826 (1941). Nevertheless, the Court has held that declaratory relief is appropriate under the Act when a substantial controversy of sufficient immediacy and reality exists between parties having adverse legal interests. See *id.* (citing *Aetna*, 300 U.S. at 239-42, 57 S. Ct. at 463); *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000). [*11] The controversy must "be real and substantial...admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna*, 300 U.S. at 240-41, 57 S. Ct. at 464; see also *United States v. Texas*, 523 U.S. 296, 300, 118 S. Ct. 1257, 1259, 140 L. Ed. 2d 406 (1998)("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."). The Fifth Circuit has explained that "[a] controversy, to be justiciable, must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional, or based upon the possibility of a factual situation that may never develop." *Rowan Cos., Inc. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989) (quoting *Brown & Root, Inc. v. Big Rock Corp.*, 383 F.2d 662, 665 (5th Cir. 1967)). The Court finds that Underwriters' claims that defendants breached the LSA by disclosing it to the claimants and by negotiating with claimants present a justiciable controversy because the claims are based on conduct [*12] that has already occurred, and specific relief can be awarded if the claims have merit. Underwriters' claim for anticipatory breach of contract is likewise justiciable because Underwriters rely on conduct that they assert manifests defendants' present intention not to perform the contract. The Court is able to evaluate the challenged conduct under the appropriate legal standard and to award relief if warranted. Accordingly, the Court finds that plaintiffs' claims are ripe for determination.

## 1. Material Breaches of the LSA

Underwriters' ask the Court to declare B&W and MII in material breach of the LSA for disclosing the LSA to the claimants in violation of the LSA's confidentiality provision and for negotiating with the claimants in the their absence. The parties do not dispute that the terms of the LSA are governed by New York law as provided in the agreement. See Pl.'s Ex. 17 at 16, P 23. *HN4* Under New York law, a material breach is a breach that is so substantial as to defeat the purpose of making the contract. *Sinco, Inc. v. Metro-North Commuter Railroad Company*, 133 F. Supp. 2d 308, 311 (S.D.N.Y. 2001)(citing *Babylon Assocs. v. County of Suffolk*, 101 A.D.2d 207, 215, 475 N.Y.S.2d 869 (N.Y. App. Div. 1984); [*13] *Callanan v. Keeseville, A.C. & L.C.R.*, 199 N.Y. 268, 284, 92 N.E. 747 (N.Y. 1910)). For a party to be able to terminate its obligations under a contract, the breach must go to "the root of the agreement." *Id.* (quoting *Septembertide Publishing, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)).

a. Disclosure of the LSA

Case 1:06-mc-00041-JJF    Document 19-4    Filed 04/17/2006    Page 9 of 16

Get a Document - by Citation - 2002 U.S. Dist. LEXIS 874                Page 8 of 15

Underwriters contend that defendants' disclosure of the LSA to the claimants during settlement negotiations violates the confidentiality provision of the LSA. The confidentiality provision provides:

> The Parties hereto agree that the terms of this Agreement and related negotiations shall be kept confidential and will not be disclosed to a non-Party except as required by court order, except that the Insurer Parties reserve the right to disclose the terms of this agreement, as necessary, to their Reinsurers. The Parties do agree that this agreement may be disclosed to any other insurer of or lender to B&W/McDermott (as it deems appropriate) which agrees in writing to preserve the confidentiality of this Agreement. (Pl.'s Ex. 17 at 15, P 11g.

Underwriters assert that the breach is material because they would not have signed **[*14]** the LSA without the confidentiality provision. *See* Pl.'s Consolidated Resp. at 58-60.

*HN5* "Materiality" is a question of fact to be determined case by case. *See Zilkha v. Mutual Life Ins. Co. of New York, 287 A.D.2d 713, 732 N.Y.S.2d 51, 52 (N.Y. App. Div. 2001).* Nevertheless, a comparison to analogous cases dealing with the asserted materiality of confidentiality clauses is instructive. In *FMC Corp. v. Boesky, 825 F. Supp. 623 (S.D.N.Y. 1993),* for example, plaintiff and the investment bank, Goldman Sachs, entered into an arrangement in which Goldman Sachs would handle a plan to restructure the interests of FMC's three groups of shareholders. FMC and Goldman Sachs set out the terms of their arrangement in an engagement letter that included a confidentiality provision protecting all non-public information about FMC, including information regarding Goldman Sachs' work on the plan. *See FMC, 825 F. Supp. at 627.* Before FMC's shareholders approved the plan, and before plaintiff announced the plan to the public, an employee at Goldman Sachs disclosed the existence of the plan to an individual unaffiliated with the project. *See id. at 626.* **[*15]** Ivan Boesky ultimately obtained the information, and he used the information to buy and sell shares of FMC's stock. *See id.*

After the SEC sued Boesky, FMC sued Goldman Sachs for recovery of the fees it paid to Goldman Sachs based on claims of fraudulent inducement and breach of the confidentiality provision in the engagement letter. *See id. at 636.* The court granted Goldman Sachs' summary judgment motion because confidentiality was not the principal objective of the contract:

> There is no material issue of fact that the goal ... of FMC's engagement of Goldman Sachs ... was the successful consummation of the so called recapitalization transaction... . Important as the preservation of confidentiality might have been to FMC's management, there is no doubt that it was ancillary to this principal objective.
> *Id.*

There is likewise no material issue of fact here that the purpose of the LSA was the resolution of disputed coverage issues. *See* Pl.'s Consolidated Resp. at 5. The second page of the LSA provides that "B&W/McDermott and the Insurer Parties wish to reach a negotiated compromise settlement without resort to litigation of the various coverage **[*16]** issues which are within this Agreement." Pl.'s Ex. 17 at 2. The heart of the LSA deals with coverage issues, such as which policies will be covered by the agreement and when coverage for a

claim is "triggered." *See* Pl.'s Ex. 17 at 4, P 3. The confidentiality provision, on the other hand, is buried at the end of the LSA under the "Miscellaneous Provisions" section, along with other boilerplate terms. *See* Pl's Ex. 17 at 15, P llg.

Underwriters fail to $^{HN6}$ present fact issues as to how the disclosure "defeat[s] the object of the parties in making the contract." *Sinco*, 133 F. Supp. 2d at 311; *see also Capital Services of New York, Inc. v. E-Poxy*, 196 F.R.D. 11, 12 (N.D.N.Y. 2000)(breach of confidentiality clause of settlement is not a breach that excuses performance). Although Underwriters may have considered confidentiality important, the need for confidentiality was not the "root" of the agreement. *See Septembertide*, 884 F.2d at 678. Moreover, the confidentiality provision does not contain a statement that a disclosure of the LSA would be considered a material breach. *See Miller v. Whiting Corp.*, 1996 WL 708396, **[*17]** *5 (N.D. Cal. 1996)(settlement agreement contains express provision that confidentiality provision in agreement is material and that breach of the confidentiality provision would be considered a material breach). Instead, it recognizes that litigation could result in disclosure, because it authorizes disclosure pursuant to a court order. *See* Pl.'s Ex. 17 at 15, P 11h. If B&W had not produced the LSA voluntarily, this Court has no doubt that claimants could have obtained a court order requiring its production. Disclosure under these circumstances was not a material breach of contract.

Because the record is clear that confidentiality was not the *sine qua non* of the LSA, the Court finds that B&W and MII did not commit a material breach of the LSA by disclosing it to claimants. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 MII claims that it cannot be liable for a breach of the confidentiality provision because it was not responsible for disclosing the LSA to claimants. *See* MII's Summ. J. Mem. at 10-11. The Court need not determine the validity of MII's contention in light of the foregoing determination that a disclosure of the LSA does not constitute a material breach of the contract.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*18]**

## b. Settlement Negotiations

Underwriters assert that B&W and MII materially breached the LSA by entering into settlement negotiations with the claimants and discussing insurance issues without Underwriters' involvement. *See* Pl.'s Consolidated Resp. at 51. Underwriters allege:

> B&W/McDermott have, in complete disregard of Underwriters' rights, held private meetings with asbestos claimants in which they have wrongfully attempted to expand Underwriters' obligations... B&W/McDermott have deliberately isolated Underwriters, with the apparent hope of effectively forcing the Underwriters to accept whatever ruinous coverage position B&W/McDermott attempt to engineer for them. B&W Complt. at PP 22, 25; MII Complt. at PP 22, 25.

Underwriters maintain that by negotiating in their absence, defendants violated the "Management of Claims" provision of the LSA and the "assistance and cooperation" clauses that are contained in the policies underlying the LSA. n3 *See* Pl.'s Consolidated Resp. at 52-53. Defendants contend that their negotiations with the claimants were consistent with the

course of conduct established between them and Underwriters after they entered into **[\*19]** the LSA. *See* B&W's Summ. J. Mem. at 16-20; MII's Summ. J. Mem. at 14-17.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 The "Assistance and Cooperation" clause provides: The Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured, but Underwriters shall have the right and shall be given the opportunity to associate with Assured or the Assureds' underlying insurers, or both, in the defense and control of any claim, suit, or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve Underwriters, in which event the Assured and Underwriters shall co-operate in all things in the defense of such claim, suit or proceeding. Pl.'s Ex. 24.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

*HN7* Under New York law, and traditional contract law, when a contract is clear and unambiguous on its face, its plain meaning should govern its interpretation. *See 222 Bloomingdale Road Associates v. Nynex Properties Co., 269 A.D.2d 525, 526, 703 N.Y.S.2d 737 (N.Y. App. Div. 2000)* **[\*20]** (citing *Chimart Assoc. v. Paul, 66 N.Y.2d 570, 498 N.Y.S.2d 344, 489 N.E.2d 231 (N.Y. 1986); Mallad Construction Corp. v. County Federal Savings and Loan Assoc., 32 N.Y.2d 285, 344 N.Y.S.2d 925, 298 N.E.2d 96 (N.Y. 1973)).* Further, "the parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent." *Wasserman v. Leigh, 1994 U.S. Dist. LEXIS 8995, 1994 WL 320606, \*5 (S.D.N.Y. 1994)(quoting Ocean Transport Line, Inc. v. American Philippine Fiber Industries, Inc., 743 F.2d 85, 91 (2d Cir. 1984)); see also Tele-Pac, Inc. v. Grainger, 168 A.D.2d 11, 22, 570 N.Y.S.2d 521 (N.Y. App. Div. 1991).*

The Court finds that the language of the "Management of Claims" provision unambiguously demonstrates that the parties intended for B&W and MII to be responsible for managing asbestos claims, and that the parties intended to develop procedures for involving Underwriters in claims management in the future. *See* Pl.'s Ex. 17 at 3, P 2. The parties do not dispute these facts. Further, there is nothing on the face of the LSA setting forth the form or extent of Underwriters' involvement **[\*21]** in settlement negotiations with claimants or prohibiting B&W and MII from initiating settlement negotiations with the claimants without Underwriters' direct involvement.

In addition, contrary to Underwriters' contentions, the parties' course of conduct does not establish that the parties intended for Underwriters or their representatives to be involved directly in settlement negotiations. Underwriters' summary judgment evidence portrays their role as one of authorizing payments *after* settlements had been negotiated by B&W and/or MII. *See* Pl.'s Consolidated Resp. at 15-18; PP 31-33. For example, Underwriters state:

> Mendes & Mount and the Insurer Parties plainly understood that they had established procedures by which their actual authority was required to consummate any settlement for which B&W/McDermott would seek reimbursement under the LSA. Pl.'s Consolidated Resp. at 15; P 31.

Tom Quinn testified that B&W was given "near complete discretion" in handling claims and that Underwriters' representatives never directly participated in settlement discussions with any asbestos claimant's representative. B&W's Ex. 5, Quinn Depo. at 172-73, 182. He also

Case 1:06-mc-00041-JJF    Document 19-4    Filed 04/17/2006    Page 12 of 16

Get a Document - by Citation - 2002 U.S. Dist. LEXIS 874    Page 11 of 15

stated **[\*22]** that a failure by B&W to notify Underwriters' representatives of and obtain notification for settlements of asbestos claims in excess of $ 100,000 would not constitute a breach of the LSA. *Id.* at 182, 208. Therefore, because no settlement between defendants and claimants has been reached in this case, and because no payments to claimants have been made without Underwriters' authorization, Underwriters have not presented a material issue of fact that defendants breached the LSA by entering into settlement negotiations with the claimants. Further, Underwriters claim that B&W and MII violated the "assistance and cooperation" clause in the insurance policies underlying the LSA suffers from the same defects as its claim that defendants breached the management of claims provision of the LSA.

In sum, the Court finds that Underwriters have failed to present genuine fact issues that B&W and MII breached the LSA during settlement negotiations following B&W's Chapter 11 bankruptcy filing.

### c. Anticipatory Repudiation

*HN8* Under the doctrine of anticipatory repudiation, a repudiation can be either "a statement by the obligor to the obligee indicating that the obligor will commit a breach **[\*23]** that would of itself give the obligee a claim for damages for total breach" or "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463, 682 N.Y.S.2d 664, 705 N.E.2d 656 (N.Y. 1998)(*citing* Restatement (Second) of Contracts § 250). "[A] switch in performance expectation and burden is readily available, applied and justified when a breaching party's words or deeds are unequivocal." *Id.; see also De Lorenzo v. BAC Agency Inc.*, 256 A.D.2d 906, 907, 681 N.Y.S.2d 846 (N.Y. App. Div. 1998)(anticipatory repudiation requires "unqualified and clear refusal to perform with respect to the entire contract"); *Rachmani v. 9 East 96th Street Apartment Corp.*, 211 A.D.2d 262, 267, 629 N.Y.S.2d 382 (N.Y. App. Div. 1995)("it is clear that there must be a definite and final communication of the intention to forgo performance before the anticipated breach may be the subject of legal action")(citations omitted).

Underwriters contend that the contents of the Proposed Plan submitted by B&W to the bankruptcy court and B&W's and MII's negotiations **[\*24]** with claimants evidence an expression of unequivocal intent not to perform the LSA. *See* Pl.'s Consolidated Resp. at 45-46. The Court notes with interest that Underwriters' claim of anticipatory breach of contract appears nowhere in its complaint. The claim only surfaced in response to defendants' motion for summary judgment. Underwriters fail, however, to square their new legal theory with the facts. The Court has no trouble granting summary judgment against Underwriters on this claim.

Underwriters assert that the following evidence presents a fact issue as to whether B&W and MII committed an anticipatory breach of the LSA: (1) the Proposed Plan of Reorganization that provides for the assignment of the LSA to a Section 524(g) claims-handling trust and (2) the alleged collusion between defendants and the claimants to "expand" Underwriters' coverage obligations. *See* Pl.'s Consolidated Resp. at 45-46. The essence of Underwriters' argument is that under no circumstances could a trust be established that would fulfill defendants' obligations to Underwriters under the LSA.

The Court finds that the provisions of the Plan do not express defendants' unequivocal intent to cease performance **[\*25]** of the LSA. Quite the contrary. *HN9* In general, the Bankruptcy Code allows a debtor in possession to freely assign its executory contracts and unexpired leases. *See In re Midway Airlines, Inc.*, 6 F.3d 492, 495 (7th Cir. 1993); *see also In re Supernatural Foods, L.L.C.*, 268 B.R. 759, 774 (M.D.La. 2001)(power of debtor in possession to assign debtor's rights in an executory contract is concurrent with power to assume or reject executory contract). Additionally, Section 365(f)(1) of the Bankruptcy Code eliminates

Get a Document - by Citation - 2002 U.S. Dist. LEXIS 874
Case 1:06-mc-00041-JJF    Document 19-4    Filed 04/17/2006    Page 13 of 16
Page 12 of 15

transfer restrictive clauses in contracts subject to assumption and assignment by the debtor in possession. n4 *See In re Supernatural Foods*, 268 B.R. at 774. On the other hand, the Court recognizes that the Bankruptcy Code does not provide for an absolute right to assign, as Section 365(c) limits the ability of a debtor in possession to assign an executory contract when generally applicable laws restrict or prohibit the transfer of rights or duties under contracts independent of any restriction within the contract itself. n5 *See In re Supernatural Foods*, 268 B.R. at 792. Here, the LSA does not prohibit its assignment **[\*26]** and appears to contemplate assignment. *See* Pl.'s Ex. 17 at 13, P 11a ("This agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns"). It is true that New York law prohibits the assignment of duties under a contract that are personal in nature without the consent of the other party. *See Special Products Manufacturing, Inc. v. Douglass*, 159 A.D.2d 847, 849, 553 N.Y.S.2d 506 (N.Y. App. Div. 1990). Nevertheless, the Court finds that no such personal duties are contemplated by the LSA. Defendants have already used an agent, Worldwide, to handle many of their claims management duties since the inception of the LSA. Additionally, Underwriters acknowledge in their brief that defendants could assign their claims management duties to another entity. *See* Pl.'s Consolidated Resp. at 40, n. 13. Proposing an assignment without more, simply does not manifest an intent not to perform.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 <u>Section 365(f)(1) of the Bankruptcy Code</u> provides:

> *HN10*
> Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection ...
> <u>11 U.S.C. § 365</u>(f)(1).

**[\*27]**

n5 <u>Section 365(c) of the Bankruptcy Code</u> provides:

> *HN11*
> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment or rights or delegation of duties, if-(1)(A) applicable law excuses a party, other than the debtor from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment or rights or delegation of duties...
> <u>11 U.S.C. § 365</u>(c)(1)(A).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Furthermore, the Plan does not unequivocally provide for assignment of the LSA to a trust.

Get a Document - by Citation - 2002 U.S. Dist. LEXIS 874

Case 1:06-mc-00041-JJF    Document 19-4    Filed 04/17/2006    Page 14 of 16

Page 13 of 15

One Plan scenario expressly provides that the assignment of the LSA to the trust will not occur if it violates the LSA. *See* Plan at § 8.11.1.7. The inclusion of this provision manifests defendants' intent to make an assignment of the LSA conform to the terms of the agreement. The other Plan scenario, the "cramdown" scenario, does not involve assignment of the LSA and contains no provision relieving defendants **[*28]** of claims management responsibilities. *See* Plan at § 7.3.2.3., 7.3.2.4. n6 Furthermore, Underwriters point to no Plan provision that excludes them from claims management under either scenario.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n6 The "cramdown" provision provides:

> The Debtors [B&W] shall not deliver the Asbestos Insurance Assignment to the Asbestos Settlement Trust upon Confirmation. Rather the Debtors shall manage access to, and, the exercise of, the Asbestos Insurance Rights so as to provide the Asbestos Settlement Trust, on an exclusive and as needed basis, the proceeds of such Asbestos Insurance Rights in order to satisfy Asbestos Settlement Claims. B&W's Ex. 9 at 33, § 7.3.2.3.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Even Tom Quinn, Underwriters' representative responsible for coordination of claims management with Worldwide, testified that an assignment of the LSA under the Plan would not inevitably lead to a breach because it was possible that a trust could be set up that would include the Underwriters in such a way as to not breach the LSA. *See* Quinn Deposition **[*29]** at 312-314. Likewise, Underwriters stress the important role played by Worldwide in claims management under the LSA, thereby undermining their assertion that the claims management duties cannot be undertaken by anyone other than the defendants without resulting in a breach of the LSA. *See* Pl.'s Consolidated Resp. at 10-11.

Underwriters' arguments are not based on any unequivocal conduct or statements of intent by defendants but only on their own predictions of how a trust that has not been agreed upon would operate under a plan that has not been confirmed. There are too many unknowns about operations under the Plan of Reorganization, including the trust, to permit this kind of speculation to rise to the level of a claim for relief. The Plan is the first one submitted by the debtor barely a year after it filed for reorganization. In the *In re Eagle-Picher Industries, Inc.* asbestos bankruptcy reorganization, the final plan was not confirmed until nearly six years after the initial bankruptcy filing, and it was the subject of much negotiation and modification. *See In re Eagle-Picher Industries, Inc.*, 203 B.R. 256 (S.D. Ohio 1996).* The Court also notes that **[*30]** this plan was a unilateral proposal lacking input from the claimants and other key creditors, not to mention the Underwriters, who will ultimately have a say in the final confirmed plan. *See UNR Industries, Inc. v. Continental Casualty Co.*, 942 F.2d 1101, 1106 (7th Cir. 1991)(noting debtor's, insurers', and asbestos claimants' antagonistic interests play a part in shaping reorganization plan).

Underwriters' reliance on *Local 1814 v. N.Y. Shipping Association*, 965 F.2d 1224 (2d Cir. 1992), in which an agreement had been finalized by the parties, is misplaced. In *Local 1814*, the court addressed the issue of whether a dispute between a union and an employers' organization was arbitrable. *See* 965 F.2d at 1232. The district court had ruled that the dispute was not ripe for arbitration because the dispute between the union and the employers' organization arose from a proposed consent judgment between the government

Case 1:06-mc-00041-JJF    Document 19-4    Filed 04/17/2006    Page 15 of 16

Get a Document - by Citation - 2002 U.S. Dist. LEXIS 874                         Page 14 of 15

and the employers' organization that had not been ruled on by a court. *See id.* at 1233. The Second Circuit held that the dispute was ripe for arbitration. The court emphasized that the acts of the employers' **[*31]** organization amounted to an anticipatory breach of the collective bargaining agreement because although the proposed consent judgment did not have judicial approval, the employers' organization had taken "affirmative steps towards becoming bound by a judgment that will require it to do acts which, arguably, would violate the collective bargaining agreement..." *Id.*

Here, B&W and MII have not taken the type of affirmative steps the employers' organization took in *Local 1814* toward being bound by the terms of the Plan because the debtor's plan is not the result of an agreement with the claimants. It is a unilateral proposal that is still subject to negotiation and modification under 11 U.S.C. § 1127. n7 The Plan only addresses the assignment of the LSA, and not the future involvement of either the defendants or the Underwriters in the claims management process. Accordingly, the Court finds that there is no fact issue as to whether B&W and MII unequivocally expressed the intent to breach the LSA by proposing the Plan.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n7 Section 1127 provides in pertinent part:

> **HN12**
>
> (a) The proponent of a plan may modify such plan at any time before confirmation, but may not modify such a plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. 11 U.S.C. § 1127(a).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*32]**

Similarly, the alleged collusion among B&W, MII, and claimants to "expand" Underwriters' coverage obligations does not present a fact issue regarding defendants' unequivocal intent to cease performance under the LSA. Underwriters' complain that defendants believe that Underwriters' coverage obligations are broader than Underwriters interprets them to be and that defendants have discussed these views with the claimants. Defendants cannot unilaterally impose coverage terms on Underwriters, whether or not claimants agree with defendants' views on coverage. The Court fails to see how it is an anticipatory breach of contract for defendants to discuss the scope of their insurance coverage with the claimants. Underwriters do not ask the Court to decide these coverage issues but to relieve them of their obligations under the LSA simply because defendants discussed these issues with the claimants. Discussing coverage possibilities falls short of an expression of unequivocal intent not to perform a contract. *See* Pl.'s Consolidated Resp. at 52. Therefore, the Court finds that B&W and MII did not commit anticipatory repudiations of the LSA.

## C. Count II Claims

In Count II of **[*33]** their complaint, Underwriters seek declaratory relief regarding the extent of their coverage obligations for the 1980-86 Policies. *See* Cmplt. at PP 36-39. Underwriters allege that an actual dispute and controversy exists between them and defendants regarding the extent to which the unexhausted 1980-86 Policies are responsive to asbestos claims. *See id.* at P 21, 38. For example, Underwriters seek relief on the issue of "trigger of coverage," an issue which was resolved by the LSA. *See* Pl.'s Ex. 17, at 4-6, P 3.

Case 1:06-mc-00041-JJF    Document 19-4    Filed 04/17/2006    Page 16 of 16

The Court dismisses the Count II claims because the policies at issue under Count II are expressly covered by the LSA, which the Court finds has not been breached by defendants. Therefore, the parties' obligations under the LSA have not been altered. Indeed Underwriters fail to even address how any of their Count II claims could survive the continued vitality of the LSA.

## III. Conclusion

In sum, the Court finds that plaintiffs present no factual issues regarding breaches of the LSA. Therefore, the Court GRANTS the motions for summary judgment.

New Orleans, Louisiana, this 4th day of January, 2002.

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

Service: **Get by LEXSEE®**
Citation: **2002 U.S. Dist. LEXIS 874**
View: Full
Date/Time: Monday, April 17, 2006 - 10:44 AM EDT

\* Signal Legend:

- Warning: Negative treatment is indicated

[Q] - Questioned: Validity questioned by citing refs

⚠ - Caution: Possible negative treatment

◆ - Positive treatment is indicated

🅐 - Citing Refs. With Analysis Available

ⓘ - Citation information available

\* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis®    About LexisNexis  | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

## CERTIFICATE OF SERVICE

I, Thomas G. Whalen, Jr., hereby certify that, on April 17, 2006, I caused a copy of the foregoing *APPENDIX TO OPENING BRIEF OF APPELLANTS, CENTURY INDEMNITY COMPANY (SUCCESSOR TO CIGNA SPECIALTY INSURANCE COMPANY, FORMERLY KNOWN AS CALIFORNIA UNION INSURANCE COMPANY, AND SUCCESSOR TO CCI INSURANCE COMPANY, SUCCESSOR TO INSURANCE COMPANY OF NORTH AMERICA, AND AS ADMINISTRATIVE AGENT OF FORMER MEMBERS OF AFIA, INCLUDING ST. PAUL MECURY INSURANCE COMPANY); ACE PROPERTY & CASUALTY COMPANY (FORMERLY KNOWN AS CIGNA PROPERTY & CASUALTY COMPANY, FORMERLY KNOWN AS AETNA INSURANCE COMPANY); INDUSTRIAL INDEMNITY COMPANY; INDUSTRIAL UNDERWRITERS INSURANCE COMPANY; PACIFIC EMPLOYERS INSURANCE COMPANY; AND CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, BY AND THROUGH CRAVENS, DARGEN AND COMPANY, MANAGING GENERAL AGENT* to be served on the parties set forth on the attached service list by regular mail.

/s/ Thomas G. Whalen, Jr.
Thomas G. Whalen, Jr.

## SERVICE LIST

Richard W. Riley (DE I.D. 4052)
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801

Mitchell L. Lathrop, Esquire
Bridget K. Moorhead, Esquire
DUANE MORRIS LLP
101 West Broadway Street, 9th Floor
San Diego, CA 92101

Russell W. Roten, Esquire
Jeff D. Kahane, Esquire
DUANE MORRIS LLP
333 South Hope Street
Los Angeles, CA 90071

William P. Bowden, Esquire
ASHBY & GEDDES
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Lisa Beckerman, Esquire
Brian A. Kilmer, Esquire
AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
590 Madison Avenue
New York, NY 10022

Peter Van N. Lockwood, Esquire
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W.
Washington, DC 20005

Edward F. Houff, Esquire
c/o Lynn Stewart & Tammy Nero
KAISER ALUMINUM CORPORATION
5847 San Felipe, Suite 2400
Houston, TX 77057

Daniel J. DeFranceschi, Esquire
Kimberly D. Newmarch, Esquire
RICHARD, LAYTON & FINGER, PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Gregory M. Gordon, Esquire
Daniel P. Winikka, Esquire
Daniel B. Prieto, Esquire
JONES DAY
2727 North Harwood Street
Dallas, TX 75201

Marla R. Eskin, Esquire
Mark T. Hurford, Esquire
CAMPBELL & LEVINE, LLC
800 King Street, Suite 300
Wilmington, DE 19801

Elihu Inselbuch, Esquire
CAPLIN & DRYSDALE, CHARTERED
399 Park Avenue
New York, NY 10022

James L. Patton, Jr., Esquire
Edwin J. Harron, Esquire
Sharon M. Zieg, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR
The Brandywine Bldg., 17th Floor
1000 West Street
P.O. Box 391
Wilmington, DE 19899

Daniel K. Hogan, Esquire
THE HOGAN FIRM
1311 Delaware Avenue
Wilmington, DE 19806


Steven A. Buxbaum, Esquire
HAYNES AND BOONE, LLP
One Houston Center
1221 McKinney, Suite 2100
Houston, TX 77010

Rodney L. Eshelman, Esquire
Alison V. Lippa, Esquire
Raymond J. Tittman, Esquire
CARROLL, BURDICK & McDONOUGH LLP
44 Montgomery Street
San Francisco, CA 94101

Seth W. Wiener, Esquire
LEBOEUF, LAMB, GREENE & MACRAE LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

David M Ross, Esquire
LEBOEUF, LAMB, GREENE & MACRAE LLP
1875 Connecticut Avenue, N.W., Suite 1200
Washington, DC 20009


Anthony Callaghan, Esquire
Evans Wohlforth, Esquire
David N. Crapo, Esquire
GIBBONS, DEL DEO, DOLAN, GRIFFINGER &
VECCHIONE
One River Front Plaza
Newark, NJ 07102

Steven A. Felsenthal, Esquire
Peter C. D'Apice, Esquire
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689

Kevin Gross, Esquire
ROSENTHAL, MONHAIT, GROSS &
    GODDESS, P.A.
919 Market Street, Suite 1401
Wilmington, DE 19801

Lewis S. Rosenbloom, Esquire
David C. Christian, Esquire
Jason J. DeJonker, Esquire
McDERMOTT, WILL & EMERY
227 West Monroe Street
Chicago, IL 60606

Jared M. Katz, Esquire
LEBOEUF, LAMB, GREENE & MACRAE LLP
725 South Figueroa Street, Suite 3100
Los Angeles, CA 90017

David M. Klander, Esquire
Trial Attorney
OFFICE OF THE UNITED STATES TRUSTEE
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801

Elizabeth J. Futrell, Esquire
Aimee M. Quirk, Esquire
JONES, WALKER, WAECHTER, POTTEVENT
    CARRERE & DENEGRE, L.L.P.
201 St. Charles Ave.
New Orleans, LA 70170

Michael B. Joseph, Esquire
Theodore J. Tacconelli, Esquire
FERRY, JOSEPH & PEARCE, P.A.
824 Market St., Suite 904
Wilmington, DE  19899

Karen C. Bifferato, Esquire
Marc J. Phillips, Esquire
CONNOLLY BOVE LODGE & HUTZ, LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE  19801

Carl N. Kunz, III, Esquire
MORRIS, JAMES HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19801

Harold L. Kaplan, Esquire
Mark F. Hebbeln, Esquire
GARDNER CARTON & DOUGLAS LLP
191 North Wacker Drive - Suite 3700
Chicago, IL  60606-1698

Joanne B. Wills, Esquire
JenniferL. Scoliard, Esquire
KLEHR, HARRISON, HARVEY, BRANZBURG &
   ELLERS I.LP
919 Market Street, Suite 1000
Wilmington, DE  19801

Laurie Schenker Polleck, Esquire
JASPAN SCHLESINGER HOFFMAN LLP
913 Market Street
12th Floor
Wilmington, DE  19801

Jason Michael Madron, Esquire
RICHARDS LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

Clark T. Whitmore, Esquire
Alain M. Baudry, Esquire
Christina A. Smith, Esquire
MASLON, EDELMAN, BORMAN &
   BRAND, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-4140

George A. Davis, Esquire
Diane Harvey, Esquire
WELL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153

Christine P. Hsu, Esquire
WELL, GOTSHAL & MANGES LLP
1501 K Street NW - Suite 100
Washington, DC  20005

Kristin K. Going, Esquire
GARDNER CARTON & DOUGLAS LLP
1301 K Street, N.W.
Suite 900, East Tower
Washington, DC  20005

Duane D. Morse, Esquire
James R Wrathall, Esquire
WILMER CUTLER PICKERING
HALE AND DORR LLP
2445 M. Street N.W.
Washington, DC  20037

Michael S. Davis, Esquire
Jantra Van Roy, Esquire
ZEICENER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, NY  10022

Duncan J. McNeil, III
2030 West Spofford
Spokane, WA  99205

Paul J. Dougherty, III, Esquire
GEBHARDT & SMITH LLP
901 Market Street, Suite 451
Wilmington, DE  19801


Carmella P. Keener, Esquire
ROSENTHAL MONHAIT & GODDESS P.A.
919 Market Street, Suite 1401
Wilmington, DE  19801

Frederick D. Holden, Esquire
ORRICK, HERRINOTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105

Harry Lee, Esquire
John F. O'Connor, Esquire
George R. Calhoun, V, Esquire
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC  20036

Brian A. Kilmer, Esquire
AXIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX  75201

Richard W. Riley, Esquire
DUANE MORRIS LLP
1100 North Market Street
Suite 1200
Wilmington, DE  19801