**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | |
| | : | Jointly Administered Under |
| KAISER ALUMINUM CORPORATION, a | : | Bankruptcy Case No. 02-10429 (JKF) |
| Delaware corporation, et al. | : | Chapter 11 |
| | : | |
| | : | |
| KAISER ALUMINUM CORPORATION, et al. | : | Case No. 06-mc-41 (JJF) |
| | : | |

## MEMORANDUM OF APPELLANTS, REPUBLIC INDEMNITY COMPANY AND TRANSPORT INSURANCE COMPANY (f/k/a TRANSPORT INDEMNITY COMPANY)

Richard W. Riley (DE I.D. 4052)
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone:     (302) 657-4900
Facsimile:     (302) 657-4901

Mitchell L. Lathrop, Esquire
Bridget K. Moorhead, Esquire
Duane Morris LLP
101 West Broadway Street, 9th Floor
San Diego, CA 92101
Telephone:     (617) 499-2200
Facsimile:     (619) 744-2201

Russell W. Roten, Esquire
Peter B. Ackerman, Esquire
Jeff D. Kahane, Esquire
Duane Morris LLP
333 South Hope Street
Los Angeles, CA 90071
Telephone:     (213) 229-2939
Facsimile:     (213) 229.2999

Dated: April 17, 2006

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION...................................................................................................1

JURISDICTION AND STANDARD OF REVIEW.............................................3

STATEMENT OF THE CASE..............................................................................4

SUMMARY OF THE ARGUMENT...................................................................11

ARGUMENT.......................................................................................................13

I.    Nothing in the Bankruptcy Code Authorizes an Assignment of Insurance Interests in Violation of Insurers' Contractual Anti-Assignment Rights.......................................................................................................13

    A.    Section 363(l), the Specific Statute Authorizing Debtors To Transfer Estate Property, Does Not Preempt Insurers' Anti-Assignment Rights....13

    B.    The Bankruptcy Code Does Not Allow Debtors To Modify or Assign Non-Executory Contracts..........................................................................16

II.    Section 1123(a)(5) Does Not Override Insurers' Contractual Anti-Assignment Rights.......................................................................................18

    A.    Section 1123(a)(5) Does Not Expand Debtors' Limited Power To Transfer Estate Property...........................................................................18

    B.    Section 1123(a)(5) Does Not Expressly Preempt Insurers' Contractual Anti-Assignment Rights............................................................................20

        1.    The Burden of Proof To Establish Preemption Is Very High.......20

        2.    The Scope of Preemption Under Section 1123(a)(5) Is Limited and Does Not Reach Insurers' Contractual Anti-Assignment Rights..........................................................................................21

            a.    Reading Section 1123(a)(5) Preemption Broadly Would Lead to Absurd Results............................................................21

            b.    Read in Context, the Preemptive Scope of Section 1123(a)(5) Is Narrow....................................................23

            c.    Legislative History Supports a Narrow Reading of Section 1123(a)(5) Preemption..........................................26

d.  Even if Read Broadly To Preempt Any and All
Nonbankruptcy Law, Section 1123(a)(5) Does Not
Preempt Contract Rights........................................................28

III.  There is No "Conflict" Preemption Between Section 524(g) and Insurers'
Contractual Anti-Assignment Rights.......................................................30

1.  Enforcing Insurers' Contractual Anti-Assignment Rights Does
Not Conflict With Section 524(g)..................................................31

2.  Debtors Concoct a False "Conflict" That Does Not Exist............33

IV.  The Bankruptcy Court Exceeded Its Jurisdiction...................................................33

A.  No Property Right To Receive Insurance Proceeds Presently Exists........34

B.  The Bankruptcy Court's *In Rem* Jurisdiction Extends Only to Existing
Property Rights...........................................................................................36

C.  Only Existing Property Rights Can Be Assigned......................................38

CONCLUSION AND STATEMENT OF RELIEF SOUGHT.........................................39

## TABLE OF AUTHORITIES

### CASES

*In re Adelphia Communications Corp.*,
    298 B.R. 49 (S.D.N.Y. 2003)..................................................................................35

*Amatex Cas.& Sur. Co. v. Aetna Cas. & Sur. Co.*,
    97 B.R. 220 (Bankr. E.D. Pa. 1989) ......................................................................31

*American Freight System, Inc. v. I.C.C. (In re American Freight System, Inc.)*,
    179 B.R. 952 (Bankr. D. Kan. 1995) .....................................................................28

*Anchor Resolution Corp. v. State Street Bank & Trust Co.*
*(In re Anchor Resolution Corp.)*,
    221 B.R. 330 (Bankr. D. Del. 1998) ......................................................................34

*Argonaut Ins. Co. v. Ames Dept. Stores, Inc.*,
    No. 93 Civ. 4014 (KMW), 1995 WL 311764 (S.D.N.Y. May 18, 1995)...............16

*BFP v. Resolution Trust Corp.*,
    511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994)........................................21

*Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 North LaSalle St. P'ship*,
    526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999).......................................29

*Barber v. Bettendorf Bank, N.A. (In re Pearson Industries, Inc.)*,
    152 B.R. 546 (Bankr. C.D. Ill. 1993)....................................................................28

*Barnhardt Marine Ins., Inc. v. New England Int'l Sur. of Am., Inc.*,
    961 F.2d 529 (5th Cir. 1992) ................................................................................24

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee*,
    321 B.R. 147 (D.N.J. 2005) ....................................................................................4

*Beloit Liquidating Trust v. United Ins. Co.*,
    287 B.R. 904 (N.D. Ill. 2002) ...............................................................................18

*In re Bolin Oil Co.*,
    51 B.R. 936 (Bankr. N.D. Ohio 1985)...................................................................16

*Burgess v. Sikes (In re Burgess)*,
    438 F.3d 493 (5th Cir. 2006) ................................................................................37

DM1\610273.4

*Burgess v. Sikes (In the Matter of Burgess)*,
    392 F.3d 782 (5th Cir. 2004), *aff'd,* 438 F.3d 493 (*en banc*) .......................................36, 37

*Butner v. United States*,
    440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ............................................................34

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 75 (Bankr. S.D.N.Y. 1990) ..................................................................................25

*Capital National Bank v. McDonald's Corp.*,
    625 F. Supp. 874 (S.D.N.Y. 1986) .....................................................................................38

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ...................................................20

*In re Clarksville Hospitality Corp.*,
    1996 Bankr. LEXIS 340 (Bankr. D. Mass., April 4, 1996) ...............................................25

*Columbia Cas. Co. v. Federal Press Company (In the Matter of Federal Press Co., Inc.)*,
    104 B.R. 56 (Bankr. N.D. Ind. 1989) .................................................................................18

*In re Combustion Engineering, Inc.*,
    391 F.3d 190 (3d Cir. 2004) ...............................................................................17, 19, 33

*Connecticut Nat'l Bank v. Germain*,
    503 U.S. 249, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ...................................................15

*Consolidated Rail Corp. v. Reading Co.*,
    654 F. Supp. 1318, 1326 (Sp.Ct., R.R.R.A., 1987) ...........................................................21

*In re CVA General Contractors*,
    267 B.R. 773 (Bankr. W.D. Tex. 2001) ............................................................................18

*DeBuono v. NYSA-ILA Med. & Clinical Servs. Fund*,
    520 U.S. 806, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997) .....................................................21

*Don King Prods., Inc. v. Thomas*,
    945 F.2d 529 (2d Cir. 1991) ...............................................................................................38

*Donaldson v. Bernstein*,
    104 F.3d 547 (3d Cir. 1997) .................................................................................................4

*In re Doty*,
    129 B.R. 571 (Bankr. N.D. Ind. 1991) ..............................................................................28

iv

*In re EES Lambert Assocs.*,
    62 B.R. 328 (Bankr. N.D. Ill. 1986) ........................................................16

*Eastern Minerals & Chems. Co. v. Mahan*,
    225 F.3d 330 (3d Cir. 2000)................................................................3

*Firearms Import & Export Corp. v. United Capitol Ins. Co.*
*(In re Firearms Import & Export Corp.)*,
    131 B.R. 1009 (Bankr. S.D. Fla. 1991) ........................................18

*First Fidelity Bank v. McAteer*,
    985 F.2d 114 (3d Cir. 1993)................................................16, 17, 36, 37

*Great Western Bank & Trust v. Entz-White Lumber & Supply, Inc.*
*(In re Entz-White Lumber & Supply, Inc.)*,
    850 F.2d 1338 (9th Cir. 1988) ........................................................25

*Green v. Fund Asset Mgmt., L.P.*,
    245 F.3d 214 (3d Cir. 2001)................................................................30

*In re Hanna*,
    912 F.2d 945 (8th Cir. 1990) ........................................................15

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    885 F.2d 1149 (3d Cir. 1989)........................................................18

*Henkel Corp. v. Hartford Accident & Indem. Co.*,
    29 Cal. 4th 934 (2003) ........................................................9

*Hillsborough County v. Automated Medical Laboratories*,
    471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)....................12

*Hoffman v. Conn. Dep't of Income Maint.*,
    492 U.S. 96, 109 S. Ct. 2818, 106 L. Ed. 2d 76 (1989)....................37

*Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*,
    124 F.3d 487 (3d Cir. 1997)................................................17, 21

*Jones v. Rath Packing Co.*,
    430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604........................20

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)................................................31

*Keene Corp. v. United States*,
  508 U.S. 200, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993)....................................................29

*In re Kmart Corp.*,
  59 F.3d 866 (7th Cir. 2004) ........................................................................17

*L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*,
  209 F.3d 291 (3d Cir. 2000)........................................................................15

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001)....................................................21

*M & M Electric, Inc. v. Commercial Union Ins. Co.*,
  241 A.D.2d 58 (N.Y. App. Div. 1998) ...........................................................35

*MacArthur Co. v. Johns-Manville Corp.*,
  837 F.2d 89, 93 (2d Cir. 1988) .....................................................................14

*Maryland v. Louisiana*,
  451 U.S. 725, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981)....................................................31

*Maxwell v. Megliola (In re marchFIRST, Inc.)*,
  288 B.R. 526 (Bankr. N.D. Ill. 2002), aff'd 293 B.R. 443 (N.D. Ill. 2003)......................35

*Mazon v. Camden Fire Ins. Assoc.*,
  182 W.Va. 532 (1990) ...............................................................................34

*Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*,
  114 F.3d 379 (2d Cir. 1997)........................................................................24

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)...............................................23, 24

*Meridian Bank v. Alten*,
  958 F.2d 1226 (3d Cir. 1992)........................................................................4

*Montrose Chem. Corp. v. Admiral Ins. Co.*,
  10 Cal. 4th 645 (1995) ..............................................................................35

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
  514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)....................................................23

*In re Owens Corning*,
  419 F.3d 195 (3d Cir. 2005).........................................................................17

*Pacific Gas & Elec. Co. v. California*,
    350 F.3d 932 (9th Cir. 2003), *cert. denied sub. nom.*,
    543 U.S. 956, 125 S.Ct. 454, 160 L.Ed.2d 318 (2004)...................................12, 21, 26, 27

*In re Pacific Gas & Elect. Co.*,
    273 B.R. 795 (Bankr. N.D. Cal. 2002), *aff'd in part & rev'd*
    *in part sub. nom.*, 350 F.3d 932 (9th Cir. 2003), *cert. denied*
    *sub nom.*, 543 U.S. 956, 125 S.Ct. 454, 160 L.Ed.2d 318 (2004)......................... 22, 24, 25

*Pacific Gas & Elect. Co. v. State Energy Resources Conservation & Dev. Comm.*,
    461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)....................................................... 24

*Penn Dairies v. Milk Control Comm'n*,
    318 U.S. 261, 275, 63 S.Ct. 617, 87 L Ed. 748 (1943) 21)................................................ 21

*Penn Terra Ltd. v. Department of Environmental Resources*,
    733 F.2d 267 (3d Cir. 1984) ............................................................................................... 31

*Price v. Delaware State Police Fed. Credit Union (In re Price)*,
    370 F.3d 362 (3d Cir. 2004) .......................................................................................... 23, 36

*Public Service Co. v. New Hampshire (In re Public Service Co.)*,
    108 B.R. 854 (Bankr. D.N.H. 1989)................................................................................... 25

*In re Railroad Reorganization Estate*,
    133 B.R. 578 (Bankr. D. Del. 1991)................................................................................... 15

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) ................................................. 20

*In re Roach*,
    824  F.2d 1370 (3d Cir. 1987)............................................................................................ 21

*Robinson v. Shell Oil Co.*,
    519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)...................................................... 23

*Rubin v. United States*,
    449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)........................................................ 15

*Stathos v. Murphy*,
    276 N.Y.S.2d 727 (App. Div. 1966) ................................................................................... 38

*Stellwagen v. Clum*,
    245 U.S. 605, 38 S.Ct. 215, 62 L.Ed. 507 (1918)............................................................. 30

*In re Stephen Smith Home for Aged, Inc.*,
    80 B.R. 678 (Bankr. E.D. Pa. 1987) ........................................................36

*In re Stewart Foods, Inc.*,
    64 F.3d 141 (4th Cir. 1995) ....................................................................16

*Tennessee Student Assistance Corp. v. Hood*,
    541 U.S. 440, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004).........................36

*In re Thompson*,
    894 F.2d 1227 (10th Cir. 1990) .............................................................17

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).............................23

*United States v. Bass*,
    404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) ......................20

*United States v. Nordic Village Inc.*,
    503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992).........................37

*Universal Cooperatives v. FCX (In re FCX, Inc.)*,
    853 F.2d 1149 (4th Cir. 1988) ..........................................................25, 27

*In re Vote*,
    276 F.3d 1024 (8th Cir. 2002) ...............................................................37

*Witco Corp. v. Beekhuis*,
    38 F.3d 682 (3d Cir. 1994).....................................................................24

*Woodson v. Scott Paper Co.*,
    109 F.3d 913 (3d Cir. 1997)...................................................................29

## CONSTITUTION

U.S. Const. art. VI, cl. 2.................................................................................20

## STATUTES

11 U.S.C. § 101 ..............................................................................................5

11 U.S.C. § 105 ............................................................................................17

11 U.S.C. § 361 ............................................................................................18

DM1\610273.4

11 U.S.C. § 363.................................................................12, 13, 14, 15, 18, 19, 22, 25, 28, 39

11 U.S.C. § 365.................................................................................................17, 28, 39

11 U.S.C. § 524.........................................................................2, 3, 10, 12, 30, 31, 32, 33, 39

11 U.S.C. § 541.................................................................................................16, 36, 37, 38

11 U.S.C. § 1106.............................................................................................................13

11 U.S.C. § 1107...........................................................................................................5, 14

11 U.S.C. § 1108................................................................................................................5

11 U.S.C. § 1121..............................................................................................................24

11 U.S.C. § 1122..............................................................................................................24

11 U.S.C. § 1123....................................................................2, 10, 12, 13, 18, 19, 20, 21,
22, 23, 24, 25, 26, 27, 28, 29, 30, 38, 39

11 U.S.C. § 1124.........................................................................................................25, 28

11 U.S.C. § 1129.....................................................................................................19, 24, 25

11 U.S.C. § 1142.....................................................................................................26, 27, 28

28 U.S.C. § 158(a)(1)........................................................................................................3

## BANKRUPTCY RULES

Rule 8002(a).....................................................................................................................3

Rule 9033....................................................................................................................3, 4, 10

## OTHER AUTHORITY

3 Norton Bankruptcy Law & Practice § 48:6 (2004) ....................................................31

140 Cong. Rec. H10,765..................................................................................................31

140 Cong. Rec. S4521-01, S4523 (Senator Heflin).......................................................33

## INTRODUCTION

Debtors' Second Amended Plan of Reorganization (the "Plan")[1] includes a forced, non-consensual assignment of "rights to receive [insurance] proceeds" to an asbestos trust controlled by various claimant constituencies. Those claimants seek to gain thereby an improper advantage over insurers in ongoing state court insurance coverage litigation. For the purposes of this appeal, there is no question that the insurance contracts and applicable state law prohibit the assignment. The issue before this Court is whether Debtors and other Plan Proponents may override insurers' contractual "anti-assignment" rights and the applicable state law enforcing those rights.[2]

The Plan does not define exactly what is being assigned. Apparently, Debtors intend to assign, not the entire policies, but rather some "right" thereunder to collect money from insurers. Debtors, however, have no right to collect insurance proceeds at this time. The policies at issue cover liabilities for which the Debtors have been adjudicated liable, but Debtors have not been adjudged liable to the asbestos personal injury claimants making claims in this bankruptcy case. Nor has the state court found any coverage to exist under the policies for asbestos claims. Thus, at present, Debtors have at most a speculative hope of establishing insurance proceeds at some indeterminate time in the future. Such a hope is not a present, assignable property right to collect the proceeds.

---

[1] Unless otherwise noted, capitalized terms herein have the same meanings as defined in the Plan.

[2] Appellants incorporate herein the issues set forth in their Designations of Items for Record on Appeal and Statement of Issues on Appeal. *See* Bankr. Dkt. Nos. 8343 and 8444.

At the confirmation hearing, Debtors argued that sections 1123(a) and 524(g) of the Bankruptcy Code preempt the insurance contracts and state law. The Bankruptcy Court found that it had the power to preempt state contract law and therefore ruled that the assignment is valid as a matter of law notwithstanding any state law to the contrary. However, nothing in the Bankruptcy Code authorizes preemption of state law in this instance. The interpretation of section 1123(a) advanced by Debtors – that it overrides any and all state laws – would turn fundamental principles of Federalism on their head and lead to absurd results. The Bankruptcy Court's jurisdiction is not so expansive as to permit it to preempt all state laws. Nor does section 524(g) require Debtors to fund their Plan with insurance or authorize a non-consensual assignment in violation of insurers' contractual rights. Debtors chose to assign insurance rights, not because of any statutory obligation to do so, but rather to avoid giving up majority control of their business to the asbestos claimants, as is contemplated by section 524(g).

The Bankruptcy Court's validation of the Plan's non-consensual assignment is a clear error of law, and appellants respectfully request that this Court reverse it. Notably, reversing this ruling will not thwart the Debtors' efforts to reorganize, because the Plan does not depend on the assignment. The asbestos claimants voted in favor of the Plan after being clearly informed that any insurance recovery is "uncertain and speculative," and the assignment of insurance rights is merely a condition precedent to confirmation that can be waived. Moreover, pursuant to a stipulation among the parties, the validity of the assignment will be decided by the state courts if state law is not preempted. Thus, if the preemption issue is decided against the Debtors, the rest of the Plan could go forward

2

while the parties return to state court to litigate whether the assignment is valid under state law, an issue that was expressly reserved and not litigated during confirmation.

Accordingly, appellants respectfully request that this Court reverse the Bankruptcy Court's erroneous ruling that the Plan's non-consensual assignment of insurance rights is valid and enforceable, as a matter of law, notwithstanding insurers' contract rights and state law to the contrary.[3]

## <u>JURISDICTION AND STANDARD OF REVIEW</u>

The Court has jurisdiction over this appeal. This appeal is timely.[4] This Court has jurisdiction to hear appeals from "final judgments, orders and decrees" of the Bankruptcy Court. 28 U.S.C. § 158(a)(1). An order confirming a Chapter 11 plan is a final, appealable order. *Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 336 (3d Cir. 2000). Accordingly, this Court has jurisdiction to entertain this appeal under 28 U.S.C. § 158(a)(1).[5]

---

[3]     This appeal is taken from two related orders issued by the Bankruptcy Court on February 6, 2006: (1) the Order Confirming Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum and Chemical Corporation, and Certain of Their Debtor Affiliates, as Modified (Bankr. Dkt. No. 8225) (the "Confirmation Order"), and (2) the Findings of Fact and Conclusions of Law Regarding Confirmation of the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates, as Modified (Bankr. Dkt. No. 8226) (the "Findings of Fact" and "Conclusions of Law").The Bankruptcy Court's Findings of Fact begin on page 7, and Conclusions of Law begin on page 43, of its Findings and Conclusions (Bankr. Dkt. No. 8226).

[4]     Appellants Republic Indemnity Company and Transport Insurance Company (f/k/a Transport Indemnity Company) (collectively, "Appellants") filed notices of appeal from the Confirmation Order on February 15, 2006 (Bankr. Dkt. Nos. 8276, 8277), within the time allowed by Rule 8002(a) of the Federal Rules of Bankruptcy Procedure.

[5]     As part of confirmation the Bankruptcy Court recommended that this Court "issue or affirm" confirmation of the Plan. *See* Confirmation Order at p.9 ¶ I(B), p.53 ¶ XIV; *see also* 11 U.S.C. § 524(g)(3)(A) (requiring that a channeling injunction, to be effective, must be "issued or affirmed by the district court that has jurisdiction over the reorganization case"). On February 16, 2006, these Appellants filed a request pursuant to Bankruptcy Rule 9033 (Bankr. Dkt. No. 8299) for de novo review of the Bankruptcy Court's rulings to the extent they constitute recommendations or proposals to this Court. *See* Fed. R. Bankr. P. 9033(d). Thus, to the extent that the Bankruptcy Court lacked core jurisdiction, this

(Continued…)

This proceeding presents issues of law only. *See* Stipulation and Agreed Order ("Stipulation") at p.4 ¶ 4 (Bankr. Dkt. No. 7718). Evidence introduced at the confirmation hearing on this issue was limited to the insurance policies, the Stipulation, and the Plan and its related documents. *Id.* at p.5 ¶ 8(d).

On appeal, the Bankruptcy Court's conclusions of law are subject to *de novo* review. *Donaldson v. Bernstein*, 104 F.3d 547, 551 (3d Cir. 1997); *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992); *accord*, *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee*, 321 B.R. 147, 157 (D.N.J. 2005) ("Legal conclusions of the bankruptcy court are subject to *de novo* or plenary review by the district court."). The standard of review under Bankruptcy Rule 9033 is also *de novo*. Fed. R. Bankr. R. 9033(d).

## STATEMENT OF THE CASE

The Debtors in this Chapter 11 case are Kaiser Aluminum Corporation and twenty of its subsidiary or affiliated companies. The first thirteen Debtors commenced their respective reorganization cases on February 12, 2002, by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Two additional Debtors commenced their own Chapter 11 cases on March 15, 2002, and nine more filed on January 14, 2003. All of these cases were filed and are pending in the United States Bankruptcy Court for the District of Delaware. The Bankruptcy Court consolidated all these cases for procedural purposes only, and has administered them jointly. The Debtors remain in

---

(Continued…)

proceeding is properly before this Court pursuant to this Court's original jurisdiction under Bankruptcy Rule 9033.

possession of their property and have continued to operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, 11 U.S.C. §§ 1107, 1108.

Prior to filing bankruptcy, certain of the Debtors had been sued by thousands of tort plaintiffs alleging personal injury due to alleged exposure to asbestos from Debtor's products or operations. Debtors listed thousands of such asbestos plaintiffs on Schedule F as the holders of contingent, unliquidated and disputed claims. The Debtors' asbestos-related liabilities allegedly arise primarily from former operations of one Debtor, Kaiser Aluminum and Chemical Corporation ("KACC"). As of KACC's Petition Date, an aggregate of approximately 247,000 asbestos-related personal injury lawsuits had been asserted against KACC since the first such claim in the late 1970's. After elimination of duplicates, approximately 104,000 Asbestos Personal Injury Claims remained unresolved against KACC. *See* Disclosure Statement at 66. These tort claimants are "creditors" of Debtors' estates under 11 U.S.C. § 101(10)(a).

Various insurers defended and/or indemnified Debtors against the asbestos claims. Prior to KACC's Petition Date, approximately 75% of Debtor's asbestos-related defense and settlement costs were paid by insurers. *See* Disclosure Statement at 29. Disputes arose between Debtor and certain of its insurers respecting the existence and scope of coverage for various claims. On May 25, 2000, KACC sought to resolve these disputes by initiating two civil actions against certain insurers in California state court. These actions are captioned *Kaiser Aluminum and Chemical Corp. v. London Market Insurers, et al.,* Case No. 312415, and *Kaiser Aluminum and Chemical Corp. v. Insurance Co. of N. America,* Case No. 322710 (collectively, the "Coverage Litigation").

5

The Coverage Litigation was filed and remains pending in the Superior Court of the State of California, in and for the County of San Francisco.

During the bankruptcy case, Debtors negotiated with counsel for the asbestos claimants to resolve the tort claims. Appellants were not invited or allowed to participate in these negotiations. Ultimately, Debtors, the asbestos claimants' counsel, and certain other creditors reached agreement on the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum and Chemical Corporation, and Certain of Their Debtor Affiliates (the "Plan"). Debtors filed the Plan on September 7, 2005. The Bankruptcy Court approved the Disclosure Statement on September 8, 2005. *See* Order (Bankr. Dkt. No. 7320). The Plan was put to a vote, and the requisite number of asbestos personal injury claimants voted in favor of the Plan.[6]

The Plan provides, in pertinent part, for elimination of all Debtors' asbestos personal injury liabilities. Those liabilities will be "channeled" to the Asbestos PI Trust, and asbestos personal injury claimants will be enjoined from seeking any further relief from Debtors; their sole recourse will be against the Trust. In exchange, Debtors will contribute the following assets to a Funding Vehicle Trust, which will hold and manage them for the benefit of the Asbestos PI Trust and certain other trusts established by the Plan[7]:

---

[6]    *See* Findings of Fact at p.20 ¶ I.C.8 (finding that asbestos claimants (class 5) "overwhelmingly voted to accept the Plan"). In fact, however, most of the asbestos claimants did not personally vote; rather the vast majority of votes were cast by their counsel pursuant to purported powers of attorney. If past experience in other asbestos bankruptcies is any guide, many claimants are not even aware that the vote has taken place.

[7]    The Plan creates three additional trusts for resolution of personal injury tort claims against Debtors for alleged exposure to silica (the Silica PI Trust), coal tar pitch volatiles (the CPTV PI Trust), and noise (the NIHL PI Trust, for noise induced hearing loss claims). The Plan provides some additional funding for these three trusts.

6

- $13,000,000;

- 6% of the common stock of reorganized Debtor Kaiser Aluminum Company ("KAC"), the holding company that will own and control, directly or indirectly, the business of all but one of the reorganized Debtors that emerge from bankruptcy (*see* Disclosure Statement at 20)[8];

- 94% of the common stock of reorganized Debtor KAE Trading, Inc. ("Kaiser Trading"), a small subsidiary whose sole asset is some real estate in Louisiana that is leased to the federal government for storage of bauxite at $50,800 per year (*id.* at 21; Findings of Fact at 26 ¶ I.D.1.c.); and

- Amounts paid or to be paid in settlement by various insurers who have settled the Coverage Litigation[9]; and

- A non-consensual assignment of "rights to receive proceeds" from insurers who have not settled, including these Appellants (*see* Plan §§ 1.1(145), 1.1(151), 5.1(d)(1)).

The Plan's insurance assignment would be accomplished through a combination of several different provisions of the Plan. Section 5.1(d)(1) of the Plan (entitled "Transfer of Plan Consideration") transfers the "PI Trust Assets" to the Funding Vehicle Trust. Section 1.1(151) defines "PI Trust Assets" to include "PI Insurance Assets." Section 1.1(145) defines "PI Insurance Assets" as, *inter alia*, "rights to receive proceeds from Included PI Trust Insurance Policies in respect of Channeled Personal Injury Claims." The Plan does not define the nature or scope of the "right to receive [insurance] proceeds" that it purports to assign. Plainly, however, the Plan does not purport assign the entire policies. Rather, it appears that Debtors intend to assign only some vague,

---

[8]    Debtors project that upon exiting bankruptcy their consolidated equity will total $380 million (consolidated assets of $557 million minus consolidated liabilities of $177 million). *See* Disclosure Statement at 132. Thus, the trust's 6% stake would be worth $22.8 million.

[9]    This includes $14 million already paid by settling insurers, plus a face value of other insurance settlements totaling $375 million. However, much of the latter figure is payable over time and subject to certain termination conditions, and thus would be worth less in present value. *See* Findings of Fact at 37.

7

undefined "right" to sue insurers to collect insurance proceeds – a "right" which, as explained herein, does not exist and is not assignable.

The Plan further provides that the Asbestos PI Trust will resolve asbestos personal injury claims pursuant to Asbestos Distribution Procedures ("ADPs"). The ADPs relax the traditional evidentiary requirements, established in the tort system, of exposure to Debtors' asbestos, medical injury, and causation. The Plan also contemplates that, pursuant to the non-consensual assignment of insurance rights, insurers (including Appellants) will be required to pay asbestos claims according to the lenient ADPs rather than more rigorous evidentiary requirements that would normally apply.

The insurance policies contain provisions, commonly referred to as "anti-assignment" or "consent-to-assignment" clauses, which prohibit any assignment of interest under the policies without consent of the insurers. A typical such provision states: "Assignment of interest under this Policy shall not bind the Company unless and until its consent is endorsed thereon."[10] The parties have stipulated that the anti-assignment clauses are "material provisions of the Insurers' Policies" and that "Insurers have not given their consent to the Assignment." *See* Stipulation at pp. 4-5 ¶¶ 8(a), (c) (Bankr. Dkt. No. 7718). Because they do not consent, various insurers objected to confirmation of the Plan and its forced assignment of insurance rights.

Debtors, various insurers, and asbestos claimants' counsel and representatives agreed to the Stipulation in order to streamline the confirmation process. With respect to the assignment, the parties stipulated to limit discovery and evidence and only to ask the

---

[10]    This provision is in Industrial Indemnity Policy No. IL 809-5942, which is followed by and incorporated into policies issued by these Appellants.

Bankruptcy Court to decide whether the state law and contractual prohibitions on assignment could be preempted by federal law. The specific legal issue that the parties agreed to present was:

> Whether, under the Bankruptcy Code as a matter of law, the Assignment is valid and enforceable against the Insurers notwithstanding the anti-assignment provisions of the Policies and applicable state law ....

Stipulation at p.3 ¶ 3(a).

A further issue is the validity of the Plan's insurance assignment under state law. Contract provisions prohibiting such assignments "are generally valid and enforceable" under applicable state law. *Henkel Corp. v. Hartford Accident & Indem. Co.,* 29 Cal. 4th 934, 943 (2003). The parties, however, stipulated to reserve that state law issue for later resolution in state court, if necessary:

> The Parties agree that none of them will seek adjudication of the validity of the Assignment under applicable state law as part of or related to any Confirmation Hearing on the Plan ....

> In the event that the Bankruptcy Court or a higher court enters a final and nonappealable order sustaining the Insurers' objections based on the issues set forth in section 3(a) hereof [whether the assignment is valid under the Bankruptcy Code notwithstanding the contracts or applicable state law], then the Parties shall present to the State Court for adjudication the issue of whether the Assignment is valid under the terms of the Policies and applicable state law.

Stipulation at p.4 ¶¶ 4, 7.

The Bankruptcy Court entered the parties' Stipulation as an order of the court on November 14, 2005 (Bankr. Dkt. No. 7718).

The Bankruptcy Court held a hearing on confirmation of the Plan on January 9 and 10, 2006. Pursuant to the stipulation, the Bankruptcy Court entertained argument of counsel but took no evidence on the assignment issue other than the insurance contracts and the Plan and related documents. *See* Stipulation at p.5 ¶ 8(d).

9

On February 6, 2006, the Bankruptcy Court issued its Confirmation Order confirming the Plan (Bankr. Dkt. No. 8225) along with its related Findings of Fact and Conclusions of Law (Bankr. Dkt. No. 8226). On the assignment issue, the Bankruptcy Court ruled:

> [T]he Court concludes that the transfer of rights to proceeds from the Included PI Trust Insurance Policies to the Funding Vehicle Trust for the benefit of the PI Trusts is valid and enforceable and transfers such rights under the Included PI Trust Insurance Policies as the Reorganizing Debtors may have, subject to any and all PI Insurers Coverage Defenses.... Section 1123(a)(5) of the Bankruptcy Code expressly permits the transfer of the Reorganizing Debtors' rights to proceeds from the Included PI Trust Insurance Policies under the Plan and preempts any anti-assignment provisions of the Included PI Trust Insurance Policies....

Conclusions of Law at pp. 45-46 ¶ II(G).[11] Accordingly, the Bankruptcy Court overruled insurers' objections. *Id.* The Bankruptcy Court also overruled other parties' objections, confirmed the Plan, and recommended that this Court also "issue or affirm" the Confirmation Order.[12] Confirmation Order at p.9 ¶ I(B), p.53 ¶ XIV.

On February 15, 2005, these Appellants timely filed notices of appeal from the Bankruptcy Court's Confirmation Order and Findings of Fact and Conclusions of Law (Bankr. Dkt. Nos. 8276, 8277). Appellants also timely filed a request pursuant to Bankruptcy Rule 9033 for *de novo* review of the Bankruptcy Court's rulings, to the extent they constitute proposed findings and conclusions (Bankr. Dkt. No. 8299). Other insurers also timely filed or joined appeals and Rule 9033 requests.

---

[11]    In connection with insurers' objection, the Bankruptcy Court also ruled that "the Plan complies with the funding requirements of section 524(g)." Conclusions of Law at p.46 ¶ II(G). Appellants do not seek reversal of that ruling in this appeal.

[12]    Section 524(g) requires that a channeling injunction, to be effective, must be "issued or affirmed by the district court that has jurisdiction over the reorganization case ...." 11 U.S.C. § 524(g)(3)(A).

On March 15, 2006, the insurers' appeals and Rule 9033 requests were transmitted to the District Court. *See* Bankr. Dkt. Nos. 8407, 8408.

On March 17, 2006, Debtors filed a motion in this Court seeking to consolidate the appeals and to waive this Court's mediation requirement (D.I. 5). The motion also sought an expedited hearing on the appeals before April 10, 2006, without any briefing. *Id.* On March 27, 2006, various insurers (including these Appellants) filed a response to that motion (D.I. 7). Insurers' response agreed to consolidation, agreed to waive mediation, agreed to a reasonably shortened appeal schedule, but requested that briefing be allowed in light of the important and complex issues raised by the appeals.

On March 29, 2006, this Court issued an order consolidating the appeals (D.I. 8). On April 3, 2006, the Court entered a further order consolidating the appeals, denying the Debtors' request to preclude further briefing, and finding that "additional submissions by the parties are necessary to a full adjudication of the issues in this Court." D.I. 11 at 2. The Court also declined to proceed on the schedule requested by Debtors, but set a different expedited briefing and hearing schedule. *Id.*

Appellants file this brief in accordance with the Court's scheduling order (D.I. 11).

## SUMMARY OF THE ARGUMENT

Insurers (including Appellants) have the express contractual right to withhold consent to any assignment of interest under their policies. Debtors and other Plan Proponents have stipulated that this is a material term of the policies, and that insurers have not consented to the Plan's assignment of insurance rights. For purposes of this

proceeding, insurers' contractual right to withhold consent to the assignment is enforceable under applicable state law.[13]

Nothing in the Bankruptcy Code requires or authorizes a non-consensual assignment over insurers' objections. Section 524(g) allows insurers to contribute voluntarily to a reorganization plan and thereby gain protection against asbestos claims, but it nowhere authorizes the Court to force insurers to contribute against their will. Nor are insurers' contractual anti-assignment rights preempted by the Bankruptcy Code. The preemptive effect of Section 363(l), the specific provision authorizing transfer of property out of an estate through a Chapter 11 plan of reorganization, is limited to contractual provisions "conditioned on the insolvency or financial condition of the debtor." 11 U.S.C. § 363(l). The only logical interpretation of section 1123(a)(5), upon which Debtors rely, is that it, too, is limited to state law affecting a debtor's financial condition, as the Ninth Circuit recognized in *Pacific Gas & Elec. Co. v. California*, 350 F.3d 932, 947 (9th Cir. 2003), *cert. denied sub. nom.*, 543 U.S. 956, 125 S.Ct. 454, 160 L.Ed.2d 318 (2004). Debtors' interpretation – that section 1123(a)(5) effectively overrides all state and non-bankruptcy laws – would fly in the face of fundamental principles of Federalism and lead to absurd results.

---

[13]    As noted, the parties stipulated not to adjudicate in the Bankruptcy Court the issue of whether the Plan's assignment of insurance rights is valid under state law, and reserved that issue for later adjudication in state court. However, because federal preemption of state law cannot exist unless there is a conflict between state and federal law (*see Hillsborough County v. Automated Medical Laboratories*, 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)), the bankruptcy court's finding of federal preemption necessarily assumes that applicable state law would enforce the insurance contracts' anti-assignment provisions. Thus, for purposes of this appeal, it must be assumed that insurers' contractual anti-assignment rights are enforceable under applicable state law, and that consequently the Plan's non-consensual assignment of insurance rights is invalid under state law.

Since insurers' anti-assignment rights apply irrespective of the Debtors' solvency or financial condition, they are not preempted by the Bankruptcy Code. Therefore, the Bankruptcy Court's finding of preemption is an error of law that should be reversed.

## ARGUMENT

I.    **Nothing in the Bankruptcy Code Authorizes an Assignment of Insurance Interests in Violation of Insurers' Contractual Anti-Assignment Rights.**

Debtors argued, and the Bankruptcy Court found, that the Plan's non-consensual insurance assignment is valid and enforceable because, as a matter of law, section 1123(a)(5) expressly preempts insurers' contractual right under state law to withhold consent to an assignment of rights under the various insurance policies. For the following reasons, that ruling is a reversible error of law.

### A.    Section 363(l), the Specific Statute Authorizing Debtors To Transfer Estate Property, Does Not Preempt Insurers' Anti-Assignment Rights.

As an initial matter, the Bankruptcy Court applied the wrong provision of the Bankruptcy Code. A transfer of estate property out of a Chapter 11 estate is authorized only by section 363(l), not section 1123(a)(5) upon which Debtors and the Bankruptcy Court relied. Debtors may only assign property interests to a third party pursuant to section 363(l). Section 363(l), however, contains no provision overriding insurers' contractual right to withhold consent to such an assignment. Since Debtors have no power under section 363(l) to assign insurance rights without insurers' consent, the Plan's non-consensual assignment of insurance rights is not authorized by the Bankruptcy Code.

A debtor-in-possession has only those powers specified in the Bankruptcy Code. 11 U.S.C. §§ 1106

(a); 1107(a).  Section 363 of the Bankruptcy Code is the only statute which gives a debtor-in-possession the power to alienate property of the estate.  Its title and placement in the Bankruptcy Code demonstrates that section 363 is the enabling statute pertinent here.  It is located in Chapter 3, subchapter IV of the Code, which is entitled "Administrative Powers."  Section 363 is entitled "Use, sale, or lease of property."  And, consistent with its title, it specifically authorizes a debtor-in-possession to "use, sell or lease property."  11 U.S.C. 363(l).[14]

Absent this specific statutory grant of power, Debtors could not transfer any property out of their estates, through a reorganization plan or otherwise.  Debtors' power to transfer property, however, is not without limits.  Rather, it confined by the terms of section 363(l), which does not preempt insurers' contractual anti-assignment rights.  Those rights are enforceable under applicable state law.  Congress, in enacting section 363(l), clearly set forth the limited extent to which a debtor's transfer power would preempt state law.  Section 363(l) thus states, in pertinent part, that a debtor-in-possession

> may use, sell or lease property ..., or a plan under chapter 11 … may provide for the use, sale, or lease of property, *notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor* ….

11 U.S.C. § 363(l) (emphasis added).

---

[14]    Section 363 authorizes a consensual sale and buyback of insurance policies, free and clear of all interests, pursuant to a voluntary settlement between a bankrupt asbestos debtor and its insurers.  *See, e.g., MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988).  In that case, the insurers consented to the sale and settlement.  In this case, in contrast, Debtors have not settled with Appellant insurers.  Rather, Debtors are seeking to force an non-consensual assignment of insurance rights in violation of insurers' contractual right to withhold consent to any assignment.  Section 363 does not authorize that.

Section 363(l)'s preemptive language is unambiguously limited in scope.[15]   It only preempts contract or legal rights that are "conditioned on the insolvency or financial condition of the debtor."  *Id.*  This preemption provision is "directed solely at making so-called *ipso facto* or bankruptcy-default clauses unenforceable."  *In re Hanna*, 912 F.2d 945, 951 n. 8 (8th Cir. 1990).  *Ipso facto* clauses are those contractual provisions that modify a debtor's property rights upon a debtor's insolvency or bankruptcy filing.  *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000).  For example, a lien springing into existence upon bankruptcy has been found to be an *ipso facto* clause.  *In re Railroad Reorganization Estate*, 133 B.R. 578, 583 (Bankr. D. Del. 1991).

The anti-assignment provisions in these insurance contracts are not *ipso facto* clauses preempted by section 363(l).  They are not triggered on insolvency or default; rather, they apply without regard to Debtors' solvency or financial condition.  Thus, section 363(l) – the specific statute empowering Debtors to transfer property out of their estates – does not authorize the Plan's non-consensual assignment of insurance rights.  There is no other authority, statutory or otherwise, allowing Debtors to assign insurance rights out of their estates, before or after confirmation, in violation of insurers' contractual right to withhold consent.

---

[15]     "When the words of a statute are unambiguous, then, this first canon [of statutory construction] is also the last: 'judicial inquiry is complete.'"  *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 118 L.Ed.2d 391 (1992), quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981).  "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Id.* at 253-54.

**B.    The Bankruptcy Code Does Not Allow Debtors To Modify or Assign Non-Executory Contracts.**

Before entering bankruptcy, the only right that Debtors had to assign any interest under their insurance contracts was expressly conditioned on the policies' consent-to-assignment clause.  Thus, before filing bankruptcy, Debtors could not assign any "right to receive insurance proceeds" without insurers' consent.   Having filed bankruptcy, however, Debtors' are now seeking to enlarge their contract rights by using the Bankruptcy Code to strip the anti-assignment provisions from the insurance contracts. Nothing in the Code permits that.

A debtor takes into bankruptcy only the contract and property rights that it possesses immediately before filing for bankruptcy.  Filing a bankruptcy petition does not give the debtor any greater rights  in property than it had pre-petition.  *First Fidelity Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993).  A bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property *as of the commencement of the case*." 11 U.S.C. § 541(a)(1) (emphasis added).  To the extent that a property interest is limited in the hands of Debtors, it is equally limited in the hands of the estate.  *See In re EES Lambert Assocs.*, 62 B.R. 328, 336 (Bankr. N.D. Ill. 1986) ("However expansive the bankruptcy court's power may be to protect the property interests of debtors-in-possession, it does not extend to enlarging the rights of a debtor under a contract or rewriting its terms."); *In re Bolin Oil Co.*, 51 B.R. 936, 938 (Bankr. N.D. Ohio 1985) (holding, with respect to an insurance policy issued to the debtor, that "[t]he Bankruptcy Code does not enlarge the rights of the debtor under a contract"); *Argonaut Ins. Co. v. Ames Dept. Stores, Inc.*, No. 93 Civ. 4014 (KMW), 1995 WL 311764, *2 (S.D.N.Y. May 18, 1995) ("a bankruptcy court does not have the power to rewrite contracts").

16

The Third Circuit has aggressively defended "the fundamental principle that the estate succeeds only to the nature and the rights of the property interest that the debtor possessed pre-petition." *Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 495 (3d Cir. 1997) (holding that purported assignment of tort-based causes of action to purchaser of estate property by chapter 11 trustee was ineffective because it violated applicable New Jersey law); *First Fid. Bank*, 985 F.2d at 117 ("The estate in bankruptcy only includes property to which the debtor would have had a right if the debtor were solvent.").

Certainly, the Bankruptcy Code provides for modification of contracts in certain limited circumstances (*see In re Thompson*, 894 F.2d 1227, 1231 (10th Cir. 1990)) but no such circumstance is present here. Specifically, Congress authorized Bankruptcy Courts to modify only *executory* contracts. *See* 11 U.S.C. § 365. The Code thus authorizes debtors-in-possession, with the approval of a Bankruptcy Court, to cure defaults, assume, and assign executory contracts. 11 U.S.C. §365(a), (b), (f). The Code, however, contains no comparable provisions allowing modification or assignment of *non-executory* contracts, and the Bankruptcy Court's equitable power does not allow it to operate outside the limited authority provided by the Code.[16] In the absence of any specific statutory grant, therefore, nothing in the Code allows Debtors or the Bankruptcy Court to modify or assign non-executory contracts.

---

[16]     *See In re Owens Corning*, 419 F.3d 195, 209 (3d Cir. 2005); *In re Combustion Eng'g,* 391 F.3d 190, 236 (3d Cir. 2004) ("The general grant of equitable power contained in § 105(a). . . must be exercised within the parameters of the Code itself."); *In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004) ("The power conferred by § 105 is one to implement rather than to override.").

Debtors thus remain bound by the terms of their non-executory contracts.  *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989); *In re Stewart Foods, Inc.*, 64 F.3d 141, 145 (4th Cir. 1995).  Debtors characterize their expired insurance contracts at issue here as non-executory (*see* Disclosure Statement at 174) and courts would agree.[17]  Since Congress has not authorized Debtors or the Bankruptcy Court to modify or assign such non-executory contracts through the bankruptcy process, Debtors must abide by the policies' anti-assignment provisions even in bankruptcy.

## II.    Section 1123(a)(5) Does Not Override Insurers' Contractual Anti-Assignment Rights.

### A.    Section 1123(a)(5) Does Not Expand Debtors' Limited Power To Transfer Estate Property.

Debtors eschew the specific statute authorizing them to transfer estate property – section 363(l) – and instead argue that a more general statute, section 1123(a)(5), authorizes the Plan's non-consensual assignment of insurance rights.  This argument implies that section 1123(a)(5) overrides section 363(l), which specifically grants Debtors only limited power to transfer property, and thus greatly expands Debtors' transfer power.  That is simply wrong.  Section 1123(a)(5) grants no additional power to transfer estate property over and above that provided by section 363(l).

Section 1123 is titled "Contents of a plan."  It is in Chapter 11 of the Code, subchapter II, which is titled simply, "The Plan."  Unlike section 363(l), section

---

[17]    Courts generally hold that insurance contracts are non-executory after expiration of the policy period.  *See Beloit Liquidating Trust v. United Ins. Co.*, 287 B.R. 904, 906 (N.D. Ill. 2002); *Firearms Import & Export Corp. v. United Capitol Ins. Co. (In re Firearms Import & Export Corp.)*, 131 B.R. 1009, 1012 (Bankr. S.D. Fla. 1991); *In re CVA General Contractors*, 267 B.R. 773, 778-79 (Bankr. W.D. Tex. 2001); *Columbia Casualty Company v. Federal Press Co. (In the Matter of Federal Press Co.)*, 104 B.R. 56, 65-66 (Bankr. N.D. Ind. 1989).

1123(a)(5) does not expressly grant debtors any specific powers. Rather, it merely directs that a Chapter 11 plan "shall provide adequate means for the plan's implementation" and sets forth a non-exclusive list of such means, "such as" a "transfer of all or any part of the property of the estate to one or more entities." 11 U.S.C. § 1123(a)(5)(B).

This general directive to provide adequate means to implement a plan does not override or expand the specific powers given to a debtor-in-possession by other provisions of the Bankruptcy Code. *See Combustion Eng'g,* 391 F.3d at 237 n.49 (noting the "well-settled maxim that specific statutory provisions prevail over more general provisions"). If it did, it would lead to absurd results. For example, subparagraph (A) of section 1123(a)(5) lists "retention by the debtor of all or any part of the property of the estate" as an example of a means to implement a plan. 11 U.S.C. § 1123(a)(5)(A). This reference cannot be read to mean that a plan may allow a debtor to retain all its property in contravention of its obligations under 11 U.S.C. § 1129 to existing security interests or other claims to the property. Similarly, subparagraph (E) lists "satisfaction or modification of any lien" as another example of a means to implement a plan. 11 U.S.C. § 1123(a)(5)(E). Surely this reference does not authorize a debtor simply to "satisfy" all liens without regard to the contracts or the Code's adequate protection requirements. *See* 11 U.S.C. § 361.

Section 1123(a)(5) thus cannot reasonably be read as expanding Debtors' authority beyond that allowed by other provisions of the Bankruptcy Code. Neither section 363(l) nor 1123(a)(5) empowers Debtor to assign insurance rights without insurers' consent, in violation of insurers' contractual rights.

### B.    Section 1123(a)(5) Does Not Expressly Preempt Insurers' Contractual Anti-Assignment Rights.

Debtors argue that section 1123(a) "expressly preempts" the anti-assignment clauses in the insurance contracts and any state law enforcing those rights.[18]  As shown above, section 1123(a)(5) has no application here because it does not expand Debtors' otherwise limited power to assign estate property and does not override more specific provisions of the Bankruptcy Code.  In any event, the scope of preemption under section 1123(a)(5) is narrow and does not reach insurers' contractual anti-assignment rights.

### 1.    The Burden of Proof To Establish Preemption Is Very High.

The starting point for any preemption analysis is the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2, which provides for preemption of state laws that "interfere with, or are contrary to" federal law.  But considerations of federalism require courts to exercise extreme caution before supplanting state law.  Federal preemption of state law is thus highly disfavored.  There is a strong presumption against preemption, which "provides assurance that 'the federal-state balance' will not be disturbed unintentionally by Congress or unnecessarily by the courts."  *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), and *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971).

"[T]he purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).  "Pre-emption must be either explicit, or compelled due to an unavoidable

---

[18]    *See* Joint Memorandum of Law of Reorganizing Debtors and Official Committee of Asbestos Claimants in Response To Certain Insurers' Objections to Confirmation, etc. (Bankr. Dkt. No. 7966) at 22.

conflict between the state law and the federal law." *Integrated Solutions,* 124 F.3d at 491, quoting *In re Roach*, 824 F.2d 1370, 1373 (3d Cir. 1987); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001). Where a court is uncertain about Congress' intent it should "hesitate to find preemption." *Consolidated Rail Corp. v. Reading Co.*, 654 F. Supp. 1318, 1326 (Sp.Ct., R.R.R.A., 1987), citing *Penn Dairies v. Milk Control Comm'n*, 318 U.S. 261, 275, 63 S.Ct. 617, 87 L Ed. 748 (1943). The party seeking to establish preemption bears a "considerable burden of overcoming the 'starting presumption that Congress does not intend to supplant state law.'" *DeBuono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1997); *accord, Roach*, 824 at 1373.

The "presumption against displacing state law . . . is just as strong in bankruptcy as in other areas of federal legislative power." *PG&E II*, 350 F.3d at 943. "[T]he federal statutory purpose [to preempt state law] must be clear and manifest . . . ." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544-545, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). Otherwise "the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law." *Id.*

Debtors cannot satisfy their heavy burden in this case. Neither the language nor purpose of section 1123(a)(5) supports preemption of insurers' contractual anti-assignment rights.

      **2.**    **The Scope of Preemption Under Section 1123(a)(5) Is Limited and Does Not Reach Insurers' Contractual Anti-Assignment Rights.**

            **a.**    **Reading Section 1123(a)(5) Preemption Broadly Would Lead to Absurd Results.**

The question here is not whether section 1123(a)(5) has any preemptive effect, but rather the scope of its preemption. On its face, section 1123(a)(5) states:

> *Notwithstanding any otherwise applicable non-bankruptcy law*, a plan shall ... provide adequate means for the plan's implementation, such as ... transfer of all or any part of the property of the estate to one or more entities ....

*Id.* (emphasis added).

Debtors urge the Court to read this "notwithstanding" clause broadly, with no limitation, so as to permit them to do whatever they want notwithstanding all contrary laws. The clause cannot be reasonably read that way. For example, section 1123(a)(5) plainly does not authorize a debtor, through a Chapter 11 plan,

> to sell liquor to minors (notwithstanding state laws to the contrary), or trade with foreign enemies (notwithstanding federal statutes to the contrary), or dump toxic wastes (notwithstanding environmental laws and Supreme Court precedent), or merge with competitors to create a monopoly or gain some other competitive advantage (in violation of state or federal antitrust laws).

*In re Pacific Gas & Elect. Co.*, 273 B.R. 795, 805 (Bankr. N.D. Cal. 2002) (*"PG&E I"*), *aff'd in part & rev'd in part sub nom.*, *Pacific Gas & Elect. Co. v. State of California*, 350 F.3d 932 (9th Cir. 2003) ("*PG&E II*"), *cert. denied sub. nom.*, 543 U.S. 956, 125 S.Ct. 454, 160 L.Ed.2d 318 (2004).

Reading section 1123(a)(5) broadly, as Debtors urge here, would lead to such absurd and obviously inappropriate results. During the confirmation hearing, the Bankruptcy Court conceded that section 1123(a)(5) does not have the unlimited scope that Debtors advocate. *See* Tr. of Hr'g. (Jan. 9, 2006) at 88:18-89:18. Nonetheless, having recognized this, the Bankruptcy Court failed to apply any limitation. The limitation that should be applied here is that set forth in section 363(l) – that is, limiting preemption to laws relating to the financial condition of a debtor.

22

b.      **Read in Context, the Preemptive Scope of Section 1123(a)(5) Is Narrow.**

To determine the preemptive scope of section 1123(a)(5), the Court must examine its language in the context of the Bankruptcy Code as a whole. When interpreting statutes, courts first "begin with the text of a provision and, if its meaning is clear, end there." *Price v. Delaware State Police Fed. Credit Union (In re Price)*, 370 F.3d 362, 368 (3d Cir. 2004). "This truism may settle the matter in the run of the mill case, but when the plain meaning of a provision is not self-evident, this prescription is merely a starting point." *Id.* at 369. "As the Supreme Court has often noted, 'statutory construction [] is a holistic endeavor,' and this is especially true of the Bankruptcy Code." *Id.*, quoting *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

Thus, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.,* quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). "Statutory context can suggest the natural reading of a provision that in isolation might yield contestable interpretations." *Id.* Moreover, even where the language of preemption is clear, a court "must nonetheless identify the domain expressly pre-empted by that language." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). The court must "move on, as need be, to the structure and purpose of the Act in which [that provision] occurs." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). Where a preemption provision operates "in a field which the States have traditionally occupied"

23

– such as regulation of contracts[19] and insurance[20] – it receives a "narrow interpretation." *Medtronic*, 518 U.S. at 485.[21]

Read in context with the rest of the Bankruptcy Code, section 1123(a)(5) is simply "a directive to the plan proponent about what must go into the plan.  It does not have to be read as an 'empowering' statute that, under [Debtors'] construction, would permit them to do whatever they wanted – 'such as' but not limited to the statutory examples ...."  *PG&E I*, 273 B.R. at 807.  Rather, section 1123(a)(5) "looks more like a component of Congress' roadmap that heads toward confirmation."  This roadmap includes, *inter alia*, section 1121, which specifies by whom and when plans may be filed; section 1122, which directs how a plan is to position creditors and owners; and section 1123(a), which prescribes what goes into a plan.[22]

---

[19]    Contract rights are governed by state law.  *Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 387 (2d Cir. 1997).

[20]    Insurance is an area that is traditionally governed by state law.  *See Barnhardt Marine Ins., Inc. v. New England Int'l Sur. of Am., Inc.*, 961 F.2d 529, 531 (5th Cir. 1992) (affirming district courts' decision to abstain in insurance broker's action against insurance company, which was subject of state liquidation proceeding).

[21]    *See Pacific Gas & Elect. Co. v. State Energy Resources Conservation & Dev. Comm.*, 461 U.S. 190, 206, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) ("Congress legislated here in a field which the States have traditionally occupied ... so we start with the assumption that the historic police powers of the States were not to be superseded by the federal act unless that was the clear and manifest purpose of Congress").  The strong presumption against federal preemption is enhanced in areas that have traditionally been subject to state regulation.  *Witco Corp. v. Beekhuis*, 38 F.3d 682, 687 (3d Cir. 1994) ("for preemption to occur in a field traditionally occupied by the states, there must be a 'sharp' conflict between state law and federal policy" and "congressional intent to supersede state laws must be 'clear and manifest'").

[22]    *See PG&E I*, 273 B.R. at 805 ("The mandatory rules Congress has established . . . include the designation of classes of claims or interests (Section 1123(a)(1)); the designation of not impaired classes of claims or interests (Section 1123(a)(2)); the treatment of impaired classes of claims or interests (Section 1123(a)(3)); equal treatment of classes, unless members agree otherwise (Section 1123(a)(4)); adequate means for implementation (Section 1123(a)(5)); corporate charter provisions (Section 1123(a)(6)); and provisions consistent with public policy for selection of officers, directors and trustees (Section 1129(a)(7)). A plan that lacks any of these seven components (except where one or more may be inapplicable) is structurally defective because the "shall" directive of Section 1123(a) has not been satisfied.").

DM1\610273.4

Section 1123(a) is thus simply a part of the blueprint that a debtor must follow when formulating a plan, rather than an empowering statute which, under Debtor's interpretation, would permit them to do whatever they want.[23]   Courts, therefore, have applied section 1123(a)(5) only in situations where the contemplated action was substantively authorized elsewhere in the Bankruptcy Code.   *See, e.g., Universal Cooperatives v. FCX (In re FCX, Inc.)*, 853 F.2d 1149, 1159 (4th Cir. 1988) (holding that a proposed surrender of collateral was permissible under section 1123(a)(5) because it was a means of implementing the "indubitable equivalent" standard of section 1129(b)(2)(A)(iii)); *Great Western Bank & Trust v. Entz-White Lumber & Supply, Inc. (In re Entz-White Lumber & Supply, Inc.)*, 850 F.2d 1338, 1341 n.3 (9th Cir. 1988) (relying on section 1124); *In re Buttonwood Partners, Ltd.*, 111 B.R. 75, 59-60 (Bankr. S.D.N.Y. 1990) (relying on section 1129(a)(3)); *Public Service Co. v. New Hampshire (In re Public Service Co.)*, 108 B.R. 854, 887-88 (Bankr. D.N.H. 1989) (relying on section 1129); *In re Clarksville Hospitality Corp.*, 1996 Bankr. LEXIS 340 at *12-*14 (Bankr. D. Mass., April 4, 1996) (relying on secion 1129(b)(2)(A)).

There is no authority elsewhere in the Bankruptcy Code empowering Debtors to assign insurance rights, except section 363(l).   As already discussed, nothing in section 363(l) authorizes Debtors to assign insurance rights without insurers' consent.   Nor does section 1123(a)(5) override insurers' contractual consent-to-assignment rights.

---

[23]       "This construction – interpreting [1123(a)(5)] as directive rather than empowering – does not read the 'notwithstanding' clause out of the statute....  [T]hat clause still serves a useful purpose by preempting any state law that, for example, would prohibit a party from even submitting a plan to the bankruptcy court without first obtaining approval from a debtor's shareholders.  The court can imagine other examples, such as labor laws that might obligate a plan proponent to negotiate in good faith with unions before submitting a plan or corporate laws that would require 'a resolution of the board of directors' before a plan could be proposed." *PG&E I*, 273 B.R. at 806.

25

### c.    Legislative History Supports a Narrow Reading of Section 1123(a)(5) Preemption.

The narrow reach of preemption under section 1123(a)(5) is further illustrated by its legislative history.  Because of the absurd results arising from a literal reading of the statute, such as Debtors urge here, the Ninth Circuit carefully reviewed the legislative history and concluded that section 1123(a)(5) has the same limited preemptive reach as section 1142(a).  Section 1142(a) authorizes a debtor to "carry out" a confirmed plan, and only preempts non-bankruptcy law "relating to financial condition" of the debtor.  11 U.S.C. § 1142(a).  It states:

> Notwithstanding any otherwise applicable non-bankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court.

11 U.S.C. § 1142(a).

The Ninth Circuit considered the scope of preemption under section 1123(a)(5) in the *PG&E II* case.  The Ninth Circuit reasoned that "[i]t makes perfect sense that the express preemptive scope of what must be included in a confirmable plan, specified in § 1123(a), would be the same as the express preemptive scope of what is actually included in a confirmed plan, specified in § 1142(a)."  *PG&E II*, 350 F.3d at 947.  The Ninth Circuit found strong support for this in the legislative history:

> Sections 1123(a) and 1142(a) were enacted at the same time, as part of the 1978 Bankruptcy Code.  Both are directly concerned with the contents and implementation of a reorganization plan under Chapter 11.  Section 1123(a) specifies what a confirmable plan must do.  Among other things, under § 1123(a)(5) it must "provide for adequate means for the plan's implementation."  Section 1142(a) in turn describes the duty of an entity charged with implementing a confirmed plan.  As enacted in 1978, § 1142(a) contained an express preemption clause providing that those charged with implementing a confirmed plan could perform that duty "notwithstanding any otherwise applicable nonbankruptcy law, rule, or

26

regulation relating to financial condition." As enacted in 1978, § 1123(a) contained no such clause.

When the 1984 amendments to the Bankruptcy Code were adopted, there was absolutely no indication that those amendments were intended by Congress to make any important changes to the 1978 Code.... The Committee Report stated specifically with respect to the proposed amendment of § 1123(a), "the amendment makes it clear that the rules governing what is to be contained in the reorganization are those specified in this section; deletes a redundant word; and makes several stylistic changes." ... True to the title it appeared under in 1983, the 1984 amendment to § was purely "technical."

*PG&E II*, 350 F.3d at 947 (citations omitted); *accord*, *Universal Cooperatives*, 853 F.2d at 1154 n.7 ("We do not understand the [1984] amendment to have effected a substantive change in the prior law.").  The Ninth Circuit went on to conclude:

It is thus clear that the addition of the "notwithstanding" clause by amendment in 1984 was not intended by Congress to make any substantial change to the 1978 Code.   In particular, it is clear that the "notwithstanding" clause of § 1123(a) was not intended to change the express preemptive effect of a confirmable reorganization plan.  The 1978 Code had already indicated in § 1142(a) the express preemptive effect of a confirmed reorganization plan:   The plan is to be implemented "notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulating relating to financial condition."   As we read the 1984 amendment to § 1123(a), the newly added "notwithstanding" clause was intended to be coextensive with the already-existing "notwithstanding" clause of § 1142(a).

*Id.* Thus, "a plan proposed in conformity with section 1123(a) could be confirmed, and a confirmed plan would then have the preemptive effect precisely specified in section 1142(a)." *Id.* at 947-48.

Accordingly, the Ninth Circuit held that "the 'notwithstanding' clause of § 1123(a) expressly preempts otherwise applicable nonbankruptcy law, and that *the scope of that express preemption is the same as under the "notwithstanding" clause of § 1142(a)*." *Id.* at 948 (emphasis added).  Section 1142(a) has a narrow preemptive scope.  It only preempts nonbankruptcy law "relating to financial condition" of the debtor.  11

27

U.S.C. § 1142(a). Courts routinely recognize this limitation on section 1142(a) preemption. *See also American Freight System, Inc. v. I.C.C. (In re American Freight System, Inc.)*, 179 B.R. 952, 961 (Bankr. D. Kan. 1995) (holding that section 1142(a) does not preempt the Negotiated Rates Act because it relates to operating condition rather than financial condition); *In re Doty*, 129 B.R. 571, 577 (Bankr. N.D. Ind. 1991) (stating that section 1142(a) would apply if "the debtor cannot comply with net capital or reserve rules which would otherwise serve as cause for regulatory authorities to shut down the business"); *Barber v. Bettendorf Bank, N.A. (In re Pearson Industries, Inc.)*, 152 B.R. 546, 557 (Bankr. C.D. Ill. 1993) (holding 1142(a) applicable to state law requiring a corporation to be solvent to make distributions to shareholders).

As shown, insurers' contractual anti-assignment rights do not relate to Debtors' financial condition. They apply irrespective of financial condition. Accordingly, they are not preempted by section 1123(a)(5), which has the same narrow preemptive scope as 1142(a).

> **d.    Even if Read Broadly To Preempt Any and All Nonbankruptcy Law, Section 1123(a)(5) Does Not Preempt Contract Rights.**

On its face, the language of section 1123(a)(5) does not purport to preempt private contracts. Congress knows how to preempt private contract rights when it wishes. For example, in section 363(l) Congress preempted certain contract rights by stating: "notwithstanding any *provision in a contract,* a lease, or applicable law ...." 11 U.S.C. § 363(l) (emphasis added). Many other provisions of the Bankruptcy Code contain similar language that specifically and clearly preempts contract rights. *See id.* at § 365(e)(1) ("[n]otwithstanding a *provision in an executory contract* or unexpired lease, or in applicable law ..."); § 365(f)(1) ("[n]otwithstanding a *provision in an executory contract*

28

or unexpired lease of the debtor, or in applicable law ...”); 11 U.S.C. § 1124(2) ("notwithstanding any *contractual provision* or applicable law") (emphasis added).  In each instance, Congress chose language that made its intent to reach private contracts abundantly clear.

Those provisions contrast sharply with section 1123(a)(5)'s preemption clause, which conspicuously omits any reference to private contracts or contract provisions. Section 1123(a)(5) says "nothwithstanding any otherwise applicable non-bankruptcy law."  It does not say, as do the other sections quoted above, "notwithstanding any provision in a contract," "notwithstanding any provision in an executory contract," or "notwithstanding any contractual provision."

Congress's choice to use different language in different parts of a statute is presumed purposeful.  *See Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 450, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) ("It is unlikely that the drafters of legislation so long and minutely contemplated as the 1978 Bankruptcy Code would have used two distinctly different forms of words for the same purpose."). This is particularly true where, as here, Congress includes particular language in one section of a statute but omits it in another ..." *Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993).  In that case, "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Id.*; *accord, Woodson v. Scott Paper Co.*, 109 F.3d 913, 934 (3d Cir. 1997).

Congress, by omitting from section 1123(a)(5) language that specifically preempts private contract rights, while including such specific language elsewhere in the Bankruptcy Code, clearly expressed its intent that section 1123(a)(5) would not preempt

private contract rights.  Therefore, section 1123(a)(5) cannot be read to preempt insurers'
contractual anti-assignment rights.

## III. There is No "Conflict" Preemption Between Section 524(g) and Insurers' Contractual Anti-Assignment Rights.

In addition to their argument about express preemption under section 1123(a)(5),
Debtors also argued below that enforcing section 524(g) "impliedly" preempts insurers'
contractual anti-assignment rights.  Debtors asserted that "[b]ecause the Insurers'
interpretation of their contract rights would thwart the purposes of section 524(g), the
Bankruptcy Code also impliedly preempts the anti-assignment provisions in the PI
Insurance Policies."  *See* Joint Memorandum of Law of Reorganizing Debtors and
Official Committee of Asbestos Claimants in Response To Certain Insurers' Objections
to Confirmation, etc. (Bankr. Dkt. No. 7966) at 39-40.  The Bankruptcy Court did not
rule on this argument, and it is without merit.

Technically, this is a "conflict" not an "implied" preemption argument.[24]  To
establish conflict preemption, Debtors must demonstrate that enforcing insurers'
contractual anti-assignment rights stands as an obstacle to the accomplishment of the full
purposes and objectives of the Bankruptcy Code.  *Green*, 245 F.3d at 230.  The obstacle
must be "actual" (*Stellwagen v. Clum*, 245 U.S. 605, 613, 62 L. Ed. 507, 38 S. Ct. 215

---

[24]     *See Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 222 (3d Cir. 2001) ("Federal law preempts,
and thereby displaces, state law in three situations:  (1) 'express preemption,' (2) 'field preemption' (which
is sometimes referred to as 'implied preemption'), and (3) 'conflict preemption.' ... Preemption is express
when there is an explicit statutory command that state law be displaced....  Preemption is 'implied,' and
state law may be displaced, 'if federal law so thoroughly occupies a legislative field as to make reasonable
the inference that Congress left no room for the States to supplement it.' ...  Finally, ... state law may be
displaced under conflict preemption principles if the state law in question presents a conflict with federal
law in one of two situations:  when it is impossible to comply with both the state and federal law, or when
the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives
of Congress.'").  Debtors in this case assert the latter type of "conflict" – state law as an alleged obstacle to
Congressional purpose – for their preemption argument under section 524(g).

(1918)) and "unavoidable." *Penn Terra Ltd. v. Department of Environmental Resources*, 733 F.2d 267, 272 (3d Cir. 1984). The conflict cannot be presumed; to the contrary, the Court must begin with "the basic assumption that Congress did not intend to displace state law." *Id.* at 272-73, citing *Maryland v. Louisiana*, 451 U.S. 725, 101 S. Ct. 2114, 68 L. Ed. 2d 576 (1981).

Debtors' conflict preemption argument fails because section 524(g) does not require insurers to contribute to Debtors' reorganization plan. Thus, contract provisions and state law barring assignment of insurance rights do not conflict with that statute.

### 1.    Enforcing Insurers' Contractual Anti-Assignment Rights Does Not Conflict With Section 524(g).

Congress enacted section 524(g) to provide a means for a debtor to escape its asbestos liabilities by funding a trust to pay current and future asbestos claims. Congress modeled section 524(g) on the trust framework created in connection with the bankruptcy of Johns-Manville Corporation, the world's largest producer of asbestos. *See* 140 Cong. Rec. H10,765 (remarks of Rep. Jack Brooks); 3 Norton Bankruptcy Law & Practice § 48:6 (2004). In the case of Johns-Manville, various parties contributed funds to a trust in exchange for the protection of a channeling injunction. Some insurers voluntarily agreed to contribute; they were not compelled to do so against their will. *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 640 (2d Cir. 1988); *see Amatex Cas.& Sur. Co. v. Aetna Cas. & Sur. Co.*, 97 B.R. 220, 224 (Bankr. E.D. Pa. 1989) (noting that insurers in *Johns-Manville* had voluntarily agreed to contribute). Congress, in drafting section 524(g), followed this lead and included language allowing insurers who voluntarily contribute to obtain the protection of the channeling injunction. *See* 11 U.S.C. § 524(g)(4)(A)(ii)(III). Indeed, several insurers in this case have done just that by settling with Debtors.

31

However, nothing in the language or history of Section 524(g) demonstrates a "clear and manifest" Congressional intention to force insurers to contribute to the trust or otherwise strip them of their pre-petition contractual rights.  In fact, section 524(g) specifically identifies only three assets that must be contributed to the trust, and insurance is not among them.  The assets that must be contributed are:

   i.   the securities of one or more of debtors (11 U.S.C. § 524(g)(2)(B)(i)(II));

   ii.  the obligation of one or more debtors to make future payments to the trust, including dividends (*id.*); and

   iii. rights to own a majority of the voting shares of each debtor, the parent of each debtor, or a subsidiary of each debtor that is also a debtor (*id.* § 524(g)(2)(B)(i)(III)).

Notably, section 524(g) does *not* specify insurance as an asset which, like the three listed above, must be contributed to the trust.

Section 524(g) thus does not require that a trust must be funded with insurance. The language of the statute does not require insurance funding, and Congress clearly contemplated that a trust could be adequately funded with other assets.

Nor is insurance funding essential to this particular Plan.  The asbestos claimants voted overwhelmingly in favor of this Plan even though they were clearly informed, before the vote, that the ultimate value any insurance assigned to the trust "is uncertain and speculative."  Disclosure Statement at 112.  On this point the Disclosure Statement states:

> Because there is uncertainty as to the total value of Channeled Personal Injury Claims and there is uncertainty as to the total amount of the PI Insurance Assets that will be available to pay them, the amount that would ultimately be recovered and paid to any individual claimant on a Channeled Personal Injury Claim is uncertain and speculative.

32

Disclosure Statement at 112.  Moreover, Asbestos Claimants Committee and the Futures Representatives signed a stipulation expressly contemplating that the Plan's assignment of insurance rights may be invalidated, either by the federal courts pursuant to federal law, or by a California state court pursuant to state law.  *See* Stipulation and Agreed Order.  Claimants and their representatives thus agreed to this Plan even though the assignment may be invalid and ultimately result in no additional insurance funding.

> ## 2.    Debtors Concoct a False "Conflict" That Does Not Exist.

Debtors chose to include an assignment of insurance rights in this Plan, not because of any statutory requirement to do so, but rather to satisfy the demands of the asbestos claimants' counsel without giving up majority control of their business, contrary to the intent of sections 524(g)(2)(B)(i)(II) and (III).  Congress contemplated that debtors would give up majority control and make future trust payments in order to ensure "an 'evergreen' funding source for future asbestos claimants."  *Combustion Eng'g*, 391 F.3d at 248.  In that way, "the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims." *Id.*, quoting 140 Cong. Rec. S4521-01, S4523 (Senator Heflin).

This Plan contravenes this clear congressional intent by giving only a small minority of Debtors' collective equity to parties other than the tort claimants.  It is Debtors, not insurers, who are frustrating the will of Congress and obstructing the purpose of Section 524(g).

## IV.    The Bankruptcy Court Exceeded Its Jurisdiction.

The Plan purports to assign to the trust "rights to receive proceeds" of Debtors' insurance policies.  Plan ¶ 1.1(145).  The Plan does not define the scope of that assignment.  It plainly is *not* an assignment of the insurance policies themselves.  Rather,

Debtors apparently intend to assign only some vague "right" under the policies to collect money from insurers. No such right is presently assignable, however. The insurance policies have not been liquidated, and thus no proceeds presently exist. Nor has any court determined that insurers owe Debtors any proceeds under their policies. In the absence of existing proceeds, or a determination that proceeds are in fact owed, Debtors have no present, assignable property right to receive proceeds. At most, they may have some hope of receiving proceeds at some unspecified time in the future, but such a hope does not constitute an presently existing and assignable property right. The Bankruptcy Court's power extends only to existing property, as defined by state law. It does not extend to an inchoate, unripened hope of future proceeds, if they ever materialize.

### A.    No Property Right To Receive Insurance Proceeds Presently Exists.

"Property interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). "Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.* "To the extent an interest is limited in the hands of the debtor, it is equally limited as property of the estate." *Anchor Resolution Corp. v. State Street Bank & Trust Co. (In re Anchor Resolution Corp.)*, 221 B.R. 330, 338 (Bankr. D. Del. 1998). When contractual rights do come into the estate, they come in subject to the terms and conditions of the contract. *Id.*

The "proceeds" of an indemnity or liability insurance policy are simply payments by the insurer to discharge the insured's liability to a third party. *See, e.g., Mazon v. Camden Fire Ins. Assoc.*, 182 W.Va. 532, 534 (1990). Two necessary predicates must occur before a "right to receive proceeds" from an insurer can arise. The first is an

adjudication and judgment of the liability of the insured. *M & M Electric, Inc. v. Commercial Union Ins. Co.*, 241 A.D.2d 58, 60 (N.Y. App. Div. 1998). "In the typical third party liability policy, the carrier assumes a contractual duty to pay judgments the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by the insured." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 663 (1995). The second prerequisite is an adjudication that the insured's liability is actually covered under the insurance policy. "No one has a property interest in the proceeds of the insurance policies unless and until there is a judgment requiring that the insurers issue payment." *Maxwell v. Megliola (In re marchFIRST, Inc.)*, 288 B.R. 526, 530 (Bankr. N.D. Ill. 2002), *aff'd* 293 B.R. 443 (N.D. Ill. 2003). Either or both of these issues could be resolved, without an adjudication, through agreement of the insured, but that is not the case here.

These essential prerequisites have not yet occurred in this case. Debtors have not been adjudicated liable to any of the asbestos claimants, and no court has adjudicated that such liability is covered by any policy of insurance. Accordingly, Debtors presently have no right to receive insurance proceeds. "Any property interest in the proceeds has not yet matured and may never mature." *Id.* "Claiming the debtors now have a property interest in those proceeds makes no sense at this juncture. Such argument would be akin to a car owner with collision coverage claiming he has the right to proceeds from his policy simply because there is a prospective possibility that his car will collide with another tomorrow, or a living person having a death benefit policy, and claiming his beneficiaries have a property interest in the proceeds even though he remains alive." *In re Adelphia Communications Corp.*, 298 B.R. 49, 53 (S.D.N.Y. 2003).

Because Debtors have not been adjudicated liable to any of the asbestos claimants, and no court has adjudicated that such liability is covered by any insurance policy, Debtors have no present property "right" to receive insurance proceeds that they can assign to the trust.

**B.    The Bankruptcy Court's *In Rem* Jurisdiction Extends Only to Existing Property Rights.**

Before deciding an issue on the merits, this Court must satisfy itself of its own jurisdiction. *Price*, 370 F.3d at 379.

Bankruptcy proceedings are *in rem* proceedings. *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 124 S.Ct. 1905, 1910, 158 L.Ed.2d 764 (2004). Bankruptcy courts thus have "exclusive jurisdiction over a debtor's property." *Id.* Congress granted this *in rem* jurisdiction to the Bankruptcy Courts through section 541 (a) of the Bankruptcy Code, which provides that a debtor's bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

Under section 541, *in rem* jurisdiction extends only to a debtor's property as it exists "as of the commencement of the estate." 11 U.S.C. § 541(a)(1). "Implicit within the terms of § 541(c) is that the debtor possess a property interest at the time the bankruptcy petition is filed." *In re Stephen Smith Home for Aged, Inc.*, 80 B.R. 678, 686 (Bankr. E.D. Pa. 1987). Filing for bankruptcy does not give the debtor any greater interest in property than it had pre-petition. *First Fid. Bank*, 985 F.2d at 117. Thus, when a bankruptcy filing pre-dates a right to payment, that right is not property of the estate. *Burgess v. Sikes (In the Matter of Burgess)*, 392 F.3d 782, 786 (5th Cir. 2004), *aff'd*, 438 F.3d 493 (*en banc*).

36

Thus, in *Burgess*, the Fifth Circuit found that certain post-petition crop loss payments "were not property of the estate" because

> at the time the farmer filed for bankruptcy, he "had a mere hope that his losses might generate revenue in the future." ... [A] critical fact was that the bankruptcy filing predated the legislation authorizing the payment.... [B]efore Congress passed the farm bill authorizing the crop disaster payment, the farmer "had no interest of any kind."

*Id.,* quoting *In re Vote*, 276 F.3d 1024, 1026-27 (8th Cir. 2002).  The Fifth Circuit further explained this point *en banc*:

> Section 541(a)(1) defines property in terms of a legal or equitable interest in property that exists at the commencement of the case. 541(a)(1).  For the temporal limitation to have any meaning at all, Burgess must have had a prepetition interest in the disaster-relief payment, not the crop loss. Were Burgess's crop loss itself enough to bring the payment into the estate notwithstanding the postpetition enactment of the 2003 Act, creating Burgess's right to the payment, the "as of the commencement of the case" language would have no force or effect.  "[A] statute must, if possible, be construed in such fashion that every word has some operative effect."

*Burgess v. Sikes (In re Burgess)*, 438 F.3d 493, 503 (5th Cir. 2006) (*en banc*), quoting *United States v. Nordic Village Inc.*, 503 U.S. 30, 36, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992), and *Hoffman v. Conn. Dep't of Income Maint.*, 492 U.S. 96, 103, 109 S. Ct. 2818, 106 L. Ed. 2d 76 (1989).

Appellants do not dispute that, to the extent a debtor has an interest in an insurance policy, the policy itself can be property of the debtor's estate subject to bankruptcy jurisdiction.  *See First Fid. Bank*, 985 F.2d at 116 ("This Court has held that insurance policies are property of the estate 'even though the policy has not matured, has no cash surrender value and is otherwise contingent.").  But the Plan in this case does not assign the policies themselves.  Rather, the Plan purports to assign some "right to receive proceeds" of the policies, and as explained no such "right" exists at this time.  It is not a right but at most a hope or expectation of future proceeds.  An expectation of future

37

proceeds does not constitute present property of the estate subject to the *in rem* jurisdiction of the Bankruptcy Court under section 541(a). *Cf. id.* ("Ownership of a life insurance policy ... does not necessarily entail ownership of the proceeds of that policy.... [I]f the owner of a life insurance policy did not have an interest in its proceeds, the filing of the petition in bankruptcy cannot create one.").

Because no present "right to receive insurance proceeds" exists, but at most only a hope of future proceeds, the Court lacks *in rem* jurisdiction under section 541(a) over any such hope.

### C.    Only Existing Property Rights Can Be Assigned.

Even if *in rem* jurisdiction exists in this case over some inchoate "right to receive insurance proceeds," that "right" cannot be assigned because it has not ripened into an existing property right capable of assignment. Only existing property rights can be assigned. *See Capital National Bank of New York v. McDonald's Corp.*, 625 F. Supp. 874, 879 (S.D.N.Y. 1986) ("the assignment of a truly future claim or interest does not work a present transfer of property. It does not because it cannot; no property yet exists"), citing *Stathos v. Murphy*, 276 N.Y.S.2d 727, 730 (App. Div. 1966); *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 534 (2d Cir. 1991) ("the assignment of a right to receive income contingent upon the occurrence of a future event, does not convey a present interest to the assignee"). Since Debtors have no current property interest in unaccrued insurance proceeds, they have nothing capable of assignment.

Section 1123(a)(5) does not change this analysis. On its face, section 1123(a)(5)(B) refers to a "transfer of all or part of property of the estate." 11 U.S.C. § 1123(a)(5)(B). As shown, a "right to receive insurance proceeds" which have not

accrued and may never accrue is not a present property right under state law, and thus is not "property of the estate" subject to transfer pursuant to section 1123(a)(5).

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The Bankruptcy Court erred in ruling that section 1123(a)(5) preempts insurers' contractual right to withhold consent to any assignment of interest under their policies. The Plan's non-consensual assignment of insurance "rights" is not authorized by section 363(l), 365, 1123(a)(5) or any other provision of the Bankruptcy Code. The scope of preemption under section 1123(a)(5) is narrow and cannot reasonably read to preempt insurers' contractual anti-assignment rights. On its face, section 1123(a)(5) says nothing about preempting contracts. Rather, it says it preempts "otherwise applicable nonbankruptcy law," but this cannot be read as broadly as Debtors urge. To read it broadly would lead to absurd results, allow Debtors to do whatever they want without regard to any other federal or state laws, and violate fundamental principles of Federalism. The only logical interpretation of the scope of section 1123(a)(5)'s preemption provision is that it applies only to nonbankruptcy law relating to the financial condition of a debtor, which is not the case here. Insurers' contractual right to withhold consent to an assignment applies irrespective of Debtors' financial condition, and thus is not preempted by section 1123(a)(5).

Nor does section 524(g) conflict with insurers' anti-assignment rights. Nothing in section 524(g) requires Debtors to fund their Plan with an assignment of insurance rights. Debtors voluntarily chose this assignment approach, not because of any statutory requirement, but rather to avoid giving up majority control of their reorganized business, as contemplated by section 524(g). Thus Debtors, not insurers, are thwarting the intent of section 524(g).

39

Finally, the Bankruptcy Court exceeded its jurisdiction in approving the Plan's assignment provision because Debtors had no "right to receive [insurance] proceeds" upon entering bankruptcy, and still have no such right to this day. A right to receive insurance proceeds could only arise, if ever, when a court of competent jurisdiction adjudicates that Debtors are liable to particular asbestos claimants, and that such liability is in fact covered by the insurance policies at issue. Before then, Debtor possesses no property "right to receive proceeds" over which the Bankruptcy Court can exercise jurisdiction.

Accordingly, Appellants respectfully request this Court to reverse the Bankruptcy Court's ruling that the Plan's assignment provision is valid and enforceable, as a matter of law, notwithstanding the policies' anti-assignment clauses and otherwise applicable state law. Appellants, however, are not requesting reversal of the entire confirmation order. The Plan and the parties contemplate that the Plan can be confirmed without a ruling that the Bankruptcy Code preempts insurers' state law contract rights. If there is no federal preemption, the parties will return to state court to litigate whether the assignment is valid under state law, an issue that was expressly reserved and not litigated during confirmation.

Dated:  April 17, 2006                          Respectfully submitted,
        Wilmington, Delaware

                                                /s/ Richard W. Riley
                                                Richard W. Riley (DE I.D. 4052)
                                                DUANE MORRIS LLP
                                                1100 North Market Street, Suite 1200
                                                Wilmington, DE 19801
                                                Telephone:    (302) 657-4900
                                                Facsimile:    (302) 657-4901

-and-

Mitchell L. Lathrop, Esquire
Bridget K. Moorhead, Esquire
DUANE MORRIS LLP
101 West Broadway Street, 9th Floor
San Diego, CA 92101
Telephone:    (617) 499-2200
Facsimile:    (619) 744-2201

-and-

Russell W. Roten, Esquire
Peter B. Ackerman, Esquire
Jeff D. Kahane, Esquire
DUANE MORRIS LLP
333 South Hope Street
Los Angeles, CA 90071
Telephone:    (213) 229-2939
Facsimile:    (213) 229.2999

*Counsel for Republic Indemnity Company
and Transport Insurance Company (f/k/a
Transport Indemnity Company)*

41

# Unreported Decisions

Westlaw.

Not Reported in F.Supp.                                              Page 1
Not Reported in F.Supp., 1995 WL 311764 (S.D.N.Y.)
**(Cite as: 1995 WL 311764 (S.D.N.Y.))**

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
In re AMES DEPARTMENT STORES, INC.,
Eastern Retailers Service Corporation, et
al., Debtors.
ARGONAUT INSURANCE COMPANY, Appellant,
v.
AMES DEPARTMENT STORES, INC., Appellee.
**No. 93 Civ. 4014 (KMW).**

May 18, 1995.

OPINION AND ORDER

KIMBA M. WOOD, District Judge.

*1 Argonaut Insurance Company ("Argonaut") appeals from an order of the Bankruptcy Court for the Southern District of New York, dated April 12, 1993, in which Judge Francis G. Conrad denied Argonaut's motion for summary judgment and granted Ames Department Stores' ("Ames") motion for summary judgment in the above-captioned adversary proceeding. For the reasons stated below, the order of the bankruptcy court is affirmed in all respects.

I. Background

This action stems from commercial general liability insurance policies issued by Argonaut to Ames for the period beginning October 1, 1988 through September 30, 1989. Coverage was renewed for the following year, and the policies expired on October 1, 1990. The policies contained a $50,000 deductible provision pursuant to which Ames was responsible for payment of all defense and indemnity costs up to $50,000 per occurrence of bodily injury or property damage.

On April 25, 1990 Ames and its fifty-two affiliates filed petitions under Chapter 11 of the United States Bankruptcy Code. The Third Amended Joint Plan of Reorganization ("the Plan") was confirmed by the Bankruptcy Court on December 18, 1992.

After the Chapter 11 petitions were filed, Argonaut was named as a direct defendant in four personal injury cases arising out of its general liability coverage of Ames. In two other actions, brought in states that require the insured to be named as a defendant, Ames allowed modification of the automatic stay to allow the claimants to proceed against Argonaut. According to Argonaut, Ames has refused to defend any of these actions.

On December 3, 1992, Argonaut commenced this adversary proceeding seeking declarations (1) that Argonaut is not responsible for defense, administration or payment of any personal injury claim in cases where Ames refuses to accept responsibility for the first $50,000 in defense costs, and (2) that Argonaut is not responsible for any payments within the $50,000 deductible in connection with claims in which a timely proof of claim has not been filed.

The parties agreed that there were no factual issues in dispute, and both moved for summary judgment. The Bankruptcy Judge found for Ames, ruling (1) that the bankruptcy court did not have jurisdiction to determine the obligation of Argonaut to pay amounts within the deductible in the various pending state court actions, and (2) that any claim Argonaut may have as a consequence of its having to pay amounts within the deductible, including payment for defense costs, is a pre-petition, unsecured claim, subject to treatment in accordance with the Plan.

II. Discussion

On appeal, the district court may affirm, modify, or reverse a bankruptcy judge's order. Bankruptcy Rule 8013. Because only the bankruptcy judge's conclusions of law are in dispute, I review his decision de novo. In re One Times Square Associates Ltd. Partnership, 165 B.R. 773 (S.D.N.Y.), aff'd, 41 F.3d 1502 (2d Cir. 1994), rev'd on other grounds, 115 S. Ct. 1107 (1995).

*2 Argonaut raises several objections to the order of the bankruptcy court. Chiefly, Argonaut argues that the bankruptcy judge exceeded his authority by effectively rewriting the contracts of insurance at issue, imposing requirements on Argonaut that were not part of the parties' bargain. Additionally, Argonaut argues that the insurance policies at issue are executory contracts that have been assumed by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 311764 (S.D.N.Y.)
**(Cite as: 1995 WL 311764 (S.D.N.Y.))**

Ames under 11 U.S.C. § 365, and, in the alternative, that any costs incurred by Argonaut for the defense of claims within the deductible would qualify for administrative expense treatment under 11 U.S.C. § 503(b).

*Rewriting of the contract*

The parties agree that according to their contract, embodied in the insurance policies and the parties' course of dealing, Ames has the responsibility to defend and administer claims within the $50,000 deductible. Argonaut argues that the effect of the bankruptcy court's order was a rewriting of this contract because it imposed on Argonaut the obligation to assume the defense of claims within the deductible. Although Argonaut is correct that a bankruptcy court does not have the power to rewrite contracts, (Br. of Appellant at 14-16 (citing cases)), Argonaut's argument fails because the bankruptcy court did not rewrite the parties' contract in this case.

Argonaut argues that if Ames is allowed to abandon the defense of claims, Argonaut will have no alternative but to assume their defense because it will be liable for amounts over $50,000. Argonaut points out that "[e]ven a $5,000 personal injury claim, if permitted to proceed undefended, can quickly proliferate into a judgment well in excess of the $50,000 deductible." (*Id.* at 11). However, while Argonaut argues persuasively that it may well be in Argonaut's own best interest to defend those claims, the decision of the bankruptcy court does not suggest that it is Argonaut's duty to do so.

By failing to defend claims within the $50,000 deductible, Ames may be breaching its contract with Argonaut. But, a post-petition breach of a contract executed pre-petition gives rise only to pre-petition liability. *In re Chateaugay Corp.,* 87 B.R. 779, 796 (S.D.N.Y. 1988). The bankruptcy judge therefore was correct in ruling that Argonaut has at best a pre-petition claim for any defense costs it chooses to expend. There is no doubt that a post-petition breach by a debtor may impose a burden on the other party to the contract because the law allows for compensation only in bankruptcy dollars. However, Argonaut's attempt to transform the unpleasant consequences it faces as a result of such a post-petition breach into a rewriting of the contract by the bankruptcy court is unavailing.

The bankruptcy court did not rewrite the contract between the parties or impose extra-contractual obligations on Argonaut. Consequently, I agree with

Ames that any claims Argonaut may have against Ames for payment of defense costs within the $50,000 deductible are entitled to full payment only if (i) they arise under executory contracts that have been assumed under 11 U.S.C. § 365; or (ii) they meet the requirements for administrative expense priority under 11 U.S.C. § 503(b).

*Executory Contracts*

**\*3** The generally accepted definition of an executory contract in bankruptcy was given by Professor Countryman: an executory contract within the meaning of the Bankruptcy Act is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy, Part I,* 57 Minn. L. Rev. 439, 460 (1973); *see In re Chateaugay Corp.,* 130 B.R. 162, 164 (S.D.N.Y. 1991) (collecting cases adopting the Countryman definition). Courts considering insurance policies in which the policy periods have expired and the initial premiums have been paid routinely find that they are not executory contracts despite continuing obligations on the part of the insured. *See In re Texscan Corp.,* 976 F.2d 1269, 1271-73 (9th Cir. 1992); *In re Sudbury, Inc.,* 153 B.R. 776, 778-780 (Bankr. N.D. Ohio 1993); *In re Firearms Import and Export Corp.,* 131 B.R. 1009, 1013-14 (Bankr. S.D. Fla. 1991); *In re Federal Press Co.,* 104 B.R. 56 (Bankr. N.D. Ind. 1989). These courts have reasoned that the failure of the insured to perform those continuing obligations would not excuse the insurer from being required to perform and, consequently, that the Countryman definition of an executory contract would not be satisfied.

Argonaut seeks to distinguish *In re Firearms Import and Export Corp.* and *In re Federal Co.* by asserting that in those cases "the debtor's obligation ... was limited to *funding* [a] self-insured retention, not in actively undertaking defense and administration of claims." (Reply Br. at 8) Even assuming, *arguendo,* that the distinction urged by Argonaut were relevant to this matter, Argonaut's version of the holding of the cited cases is not accurate. In particular, in *In re Federal Co.,* the court specifically found that by the terms of the policies at issue, the insured *was* required to defend matters brought against it and to pay defense costs up to the amount of its retained limit. 104 B.R. at 62. Nevertheless, the court found that the failure of the insured to fulfill its obligations did not excuse the insurer from being required to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 311764 (S.D.N.Y.)
**(Cite as: 1995 WL 311764 (S.D.N.Y.))**

perform.

Argonaut has failed to cite a single case, and the court has found none, in which insurance policies, executed pre-petition, whose policy periods expired prior to the confirmation of the plan of reorganization, were deemed to be executory contracts. [FN1] Rather, courts have consistently found that such policies were not executory contracts, regardless of the continuing obligations that remained. Argonaut has not shown that a different result should be reached in this case.

*Administrative Expense Priority*

A claim merits administrative expense treatment under section 503(b) if it   (1) arises from a transaction between the creditor and the debtor-in-possession, and (2) is beneficial to the debtor-in-possession in the operation of its business. *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 101 (2d Cir. 1986).* Argonaut concedes that its obligation to provide insurance coverage arises from pre-petition transactions, but argues that by defending claims within the deductible it would have expanded that coverage post-petition, in a way beneficial to the estate, warranting administrative expense treatment.

**\*4** Any post-petition expansion of coverage, however, would not be undertaken as a result of a post-petition agreement with Ames for the benefit of the estate, but rather because it would be in Argonaut's own best interest to defend claims. Consequently, Argonaut's costs should not be afforded administrative expense priority. *See In re Firearms Import and Export Corp., 131 B.R. at 1015-16* (denying administrative expense treatment for insurer's defense costs when debtor failed to fund self-insured retention). In fact, Argonaut's position has been rejected, by implication, by the Second Circuit Court of Appeals. In *Green v. Welsh, 956 F.2d 30 (2d Cir. 1992)*, the court noted with approval the reasoning in *In re Jet Florida Systems, Inc., 883 F.2d 970 (11th Cir. 1989)*, where the court held that a tort claim could survive a permanent injunction pursuant to 11 U.S.C. § 524(a) to allow the claimant to recover from debtor's insurer. The court reasoned that this holding would not conflict with the fresh-start policy embodied in the Bankruptcy Code because "the practical and economic realities compel the *insurance company* to defend the underlying action." *883 F.2d at 976.* The court concluded that "the possibility that the debtor will be responsible to pay any amount associated with defending this action

is so remote that the fresh-start policy is simply not defeated." *Id.* Implicit in the conclusion that the debtor faced only a "remote" possibility of having to pay for the defense costs is the court's assumption that the insurance company could not claim administrative expense priority for those costs.

III. Conclusion

I have considered Argonaut's other arguments and found them without merit. For the reasons stated above, the court affirms the Order of the Bankruptcy Court dated April 12, 1993. The Clerk of the Court is directed to close this case.

SO ORDERED.

> FN1. The policies issued for the period of October 1, 1988 through September 30, 1989 expired prior to the filing of the bankruptcy petition. The policies issued for the period of October 1, 1989 through September 30, 1990 expired after the filing of the petition, but prior to the confirmation of the Plan. This distinction, despite Argonaut's arguments to the contrary, is not relevant to the court's decision. *See In re Texscan Corp., 976 F.2d at 1271-73.*

Not Reported in F.Supp., 1995 WL 311764 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:93cv04014 (Docket) (Jun. 15, 1993)

END OF DOCUMENT

LEXSEE 1996 BANKR. LEXIS 340

In re CLARKSVILLE HOSPITALITY CORPORATION, Debtor

Chapter 11, Case No. 93-17668-CJK

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
MASSACHUSETTS

*1996 Bankr. LEXIS 340; 35 Collier Bankr. Cas. 2d (MB) 877; 28 Bankr. Ct. Dec.
1131*

April 4, 1996, Date

**DISPOSITION:** [*1] The objection of the State of Tennessee to confirmation of the Debtor's plan of reorganization is hereby overruled, and it is hereby ORDERED that postconfirmation interest on the State's allowed secured claim shall accrue at the variable rate set forth in the plan as proposed.

**COUNSEL:** Donald R. Lassman, Esq., for Debtor.

Jeffrey A. Schreiber, Esq., for State of Tennessee.

**JUDGES:** Carol J. Kenner, United States Bankruptcy Judge

**OPINIONBY:** Carol J. Kenner

**OPINION:**

### MEMORANDUM OF DECISION ON RATE OF POSTCONFIRMATION INTEREST ON SECURED TAX CLAIM

The issue before the Court is whether the Debtor's Chapter 11 plan of reorganization must pay interest to the State of Tennessee on its fully secured tax claim at the eighteen percent rate provided by Tennessee law, or whether the plan need only pay interest at a rate that gives it, over time, the full present value of its claim, pursuant to *§ 1129(b)(2)(A)(i)(II) of the Bankruptcy Code*. The Debtor's plan provides that the fully secured tax claim of the State of Tennessee, in the amount of $ 187,413.66, shall be paid in full in equal monthly installments of principal and interest over a period of five years, with interest on the deferred payments [*2] to accrue at the prime rate (as defined in the plan). The State of Tennessee objects to this treatment of its claim on the limited basis that the proposed rate of interest on its allowed secured claim should instead be the statutory rate of interest on delinquent tax claims as established by

Tennessee law, *T.C.A. § 67-5-2010*. n1 The Court confirmed the plan, subject to later determination of the appropriate rate of interest. n2 The parties have now briefed the issue and submitted it for adjudication.

n1 The State contends that under the statute, it is entitled to interest at the rate of 1.5 percent per month. However, the statute does not provide for interest at that rate. It assesses "a penalty of one half of one percent (.5%) and interest of one percent (1%)" per month. *T.C.A. § 67-5-2010*. Therefore, what the State seeks consists of both interest and penalty.

n2 The Court found that the outcome of this dispute would not affect the feasibility of the plan.

### FACTS

The facts are not [*3] in dispute. The Debtor filed its petition under Chapter 11 of the Bankruptcy Code on August 24, 1993. The State of Tennessee holds a prepetition claim against the Debtor for real estate taxes and other municipal charges in the total amount of $ 187,413.66. The claim was secured by a lien, arising under *T.C.A. § 67-5-2101*, on real estate belonging to the Debtor and located in Clarksville, Tennessee. The State's lien had priority over all other mortgages, liens, and other encumbrances of record. As of the confirmation date, the real estate had a value of $ 1,900,000, such that the State's tax claim was fully secured.

In its First Amended Plan of Reorganization, the Debtor classified the State's tax claim in Class 3, and proposed to pay the Class 3 claims in full in equal

Case 1:06-mc-00041-JJF    Document 22-2    Filed 04/17/2006    Page 6 of 9

Page 2

1996 Bankr. LEXIS 340, *; 35 Collier Bankr. Cas. 2d (MB) 877;
28 Bankr. Ct. Dec. 1131

monthly installments of principal and interest over a period of five years. n3 The Debtor further proposed that interest on the deferred payments would accrue at the prime rate (defined as the rate published in The Wall Street Journal on the last business day of the month), adjusted annually. It is undisputed that under this plan, the State's claim is impaired. It is also undisputed that the rate set forth in the [*4] plan is calculated to ensure that the promised stream of payments on the claim will have a present value ("present" as of the effective date of confirmation) equal to the full allowed amount of the claim, such that it satisfies *11 U.S.C. § 1129*(b)(2)(A)(i)(II).

> n3 The plan does not provide that the State will retain the lien that secures its claim. See *11 U.S.C. § 1141*(c). However, the Court's order confirming the plan recites that the Court has determined that "the Plan does not discriminate unfairly and is fair and equitable with respect to each class of claims that is impaired has not accepted the plan because the holders of claims in those classes retain the liens securing such claims." Order Confirming Plan, P 9. In its memorandum on the present issue, the Debtor clearly believes that Tennessee's claim remains fully secured by a first position lien on the property, relying on this fact to establish that the State it at no risk of nonpayment. Debtor's Memorandum. p. 9.

The plan provides that Class [*5] 5, the class of unsecured creditors, will receive a dividend of only ten percent on their claims. And with respect to the class of the Debtor's equity interest holders, consisting solely of the equity interest of the Debtor's president, Ashiya Dudhia Mahdi, the plan provides that her prepetition interest in the Debtor is extinguished. However, it also provides that Ms. Mahdi will make a new capital contribution of $ 300,000 to fund the plan of reorganization, and that she will be given a new equity interest--the sole equity interest in the Debtor--on account of this contribution.

The State filed a ballot rejecting the plan and also filed a written objection to the plan. Specifically, Tennessee objected to the plan rate of interest and argued that the proper rate of interest was the statutory rate of interest charged on delinquent tax claims, as established by *T.C.A. § 67-5-2010*. Finding that the outcome of this dispute would not affect the feasibility of the plan, the Court confirmed the plan as proposed, subject to later adjudication of the postconfirmation rate of interest on the state's secured tax claim. Resolution of this dispute in favor of the State would increase the monthly [*6] payment to the State (from the present plan rate) by approximately $ 1,100 per month, but it would not affect the amounts of payments due to other classes of creditors under the plan; nor would it impair the Debtor's ability to make such payments. Resolution in favor of the State would affect only the Debtor and its equity holder.

## ARGUMENTS

The State does not deny that, but for the fact that its claim is for taxes and that the Debtor can afford to pay the higher rate, the rate of interest proposed in the plan is such that the stream of payments promised to the State will have a value, as of the effective date of the plan, equal to the full amount of the State's claim, as it must to satisfy *11 U.S.C. § 1129*(b)(2)(A)(i)(II). However, the State argues that the satisfaction of this requirement is only the minimum that the Bankruptcy Code requires. The State takes the position that where (a) the claim at issue is a tax claim, (b) the state tax statute demands a higher rate of interest than that required by § 1129(b)(2)(A)(i)(II), and (c) the Debtor can afford to pay the higher rate without jeopardizing the distributions to other creditors, then there is no conflict between [*7] the Bankruptcy Code and the state statute, and the Bankruptcy Code requires that the Debtor pay the amount prescribed by the state statute. In support of this position, the State argues where the Debtor can afford to pay the rate prescribed by the state statute without diminishing the dividend to unsecured creditors or compromising the feasibility of the plan, it is unfair for the Debtor to have the benefit of the lower rate. It is unfair in two respects. First, it violates the principal of equality among taxpayers, giving the Debtor repayment terms that are more lenient than those afforded to other taxpayers. And second, it permits the Debtor and its equity holders to benefit at the expense of the State and its other taxpayers. Moreover, unlike most other creditors, the State is not a consensual creditor--it did not willfully extend credit to the Debtor; therefore, if the Debtor can afford to pay the statutory rate, it should not be permitted to pay less.

The Debtor responds that under the Bankruptcy Code, the rate of interest on an allowed secured claim need only satisfy § 1129(b)(2)(A)(i)(II), and that this standard preempts state laws as to the proper postconfirmation treatment [*8] of secured tax claims. The standard requires only that the secured creditor receive, over time, the full present value of its secured claim. Accordingly, the interest rate must compensate the creditor for the time value of money and for the risk of nonpayment, nothing more. In this case, where the State's claim is secured many times over by a first position lien on the property, the State bears no risk of nonpayment, so the State need only be compensated for the time value of money. Use of a variable prime rate does just that. The

rate prescribed by the Tennessee statute, eighteen percent per annum, far exceeds the rate needed to accomplish this purpose.

## DISCUSSION

The provisions of Chapter 11 of the Bankruptcy Code preempt state laws with respect to the treatment of secured tax claims, including the appropriate interest rate for the payment of such claims over time. Under the Code, a plan of reorganization must specify a treatment for each class of claims against the Debtor, *11 U.S.C. § 1123*(a)(2) and (3), and the proposed treatment need not leave the claims unimpaired. *11 U.S.C. § 1123*(a)(3) and (b)(1). That is, the plan may alter the legal, equitable, or contractual **[*9]** rights to which a claim entitles its holder. *11 U.S.C. § 1124*(1). A class of impaired claims may reject the plan. However, the court "shall confirm the plan notwithstanding" that class's rejection of it if, in addition to satisfying all the requirements of § 1129(a) other than the requirement that each impaired class have accepted the plan, "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *11 U.S.C. § 1129*(b)(1).

By virtue of these provisions, the Bankruptcy Code explicitly permits the plan proponent to alter the legal, equitable, and contractual rights to which a claim entitles its holder, subject only to two requirements: with respect to any impaired class that rejects the plan, the plan must be fair and equitable, and it must not discriminate unfairly. These are requirements of federal law. If they are satisfied, the court "shall confirm the plan," *11 U.S.C. § 1129*(b)(1) (emphasis added), despite the fact that confirmation impairs the claimants' rights under state law. The requirements thus clearly conflict with and preempt state laws with respect **[*10]** to the validity, enforceability, and amount of the underlying claims. n4 *Summit Investment and Development Corp. v. Leroux, 69 F.3d 608, 610 (1st Cir. 1995)* ("Federal preemption under the Supremacy Clause . . . will be found only if there is 'clear' evidence of a congressional intent to preempt state law, or we are persuaded that the federal and state statutes, by their very terms, cannot coexist."). *Matter of Fi-Hi Pizza, Inc., 40 Bankr. 258, 270 (Bankr.D.Mass. 1984)* (The preemption of state provisions "is the very heart of bankruptcy law, whose raison d'etre is the very abrogation of nonbankruptcy obligations.") Therefore, in determining whether the proposed rate of interest is appropriate, the Court must ultimately determine not whether the interest rate conforms to the state statute, but whether it conforms to the requirements of *11 U.S.C. § 1129*(b)(1): that the treatment of the State's claim be fair and equitable, and that it not discriminate unfairly.

n4 Accordingly, the Code further provides that except as provided in the plan of reorganization, in the order confirming it, and in *11 U.S.C. § 1141*(d), confirmation of the plan discharges the debtor from any debt that arose before the confirmation date. *11 U.S.C. § 1141*(d)(1). In effect, the old claim is exchanged for a new one given in satisfaction of the old. The prior obligation, whether it be under a contract or under a tax statute, is discharged. The basis of the new claim is the plan itself, not the contract or the tax statute.

**[*11]**

But this conclusion does not fully answer the State's argument. The State concedes that § 1129(b)(1) governs. The State argues that pursuant to § 1129(b)(1), the Debtor should pay interest at the full rate prescribed by state law when circumstances permit: when the Debtor can afford the higher rate without affecting the dividend to other classes of creditors or jeopardizing the feasibility of the plan.

The Debtor responds that § 1129(b)(1) is satisfied because § 1129(b)(2)(A) is satisfied. n5 The State does not deny that § 1129(b)(2)(A) is satisfied: the State has retained its lien to the full extent of the allowed amount of its claim, and the proposed interest rate is calculated such that the deferred payments promised under the plan shall total at least the allowed amount of the claim and have a value, as of the effective date of the plan, of at least the value of the State's lien. But the State contends that § 1129(b)(2)(A)(i) is only a minimum requirement and that, in certain circumstances, § 1129(b)(1) may demand more.

n5 In relevant part, § 1129(b)(2)(A) states:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable includes the following requirements:

(A) With respect to a class of secured claims, the plan provides--

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by

Page 4

1996 Bankr. LEXIS 340, *; 35 Collier Bankr. Cas. 2d (MB) 877;
28 Bankr. Ct. Dec. 1131

the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

*11 U.S.C. § 1129(b)(2)(A)(i).*

[*12]

It is true that § 1129(b)(2)(A)(i) is only a minimum requirement and that, in certain respects, § 1129(b)(1) may demand more. *Matter of Sandy Ridge Development Corp., 881 F.2d 1346, 1352 (5th Cir. 1989),* reh'g denied *889 F.2d 663 (1989)* (simple technical compliance with § 1129(b)(2) does not assure that plan is fair and equitable; § 1129(b)(2) "sets minimal standards" and "does not require that every plan not prohibited be approved"). Section 1129(b)(1) requires that in order to confirm a plan over the objection of an impaired class, the plan must be fair and equitable, and not discriminate unfairly, with respect to that class. And § 1129(b)(2)(A) states that the condition that a plan be fair and equitable with respect to a class "includes," with respect to a secured claim, the requirement set forth in § 1129(b)(2)(A)(i). But in the Bankruptcy Code, "includes" is not limiting. *11 U.S.C. § 102(3).* Therefore, § 1129(b)(2)(A)(i) does not exhaust the requirements and meaning of "fair and equitable." Nor does it even purport to define the separate requirement against unfair discrimination.

Nonetheless, the Court holds that the proposed rate, in satisfying § 1129(b)(2)(A)(i), [*13] should be deemed fair and equitable. This conclusion is based on the structure of the reorganization provisions of Chapter 11, under which the confirmation of a plan of reorganization effectively substitutes a new obligation for each of a debtor's existing obligations (except for nondischarge-

able obligations, which are not at issue here). Under these provisions, a secured creditor's claim is finally quantified as of the effective date of the plan. *11 U.S.C. § 1129*(b)(2)(A)(i)(II); *In re Brentwood Outpatient Ltd., 134 Bankr. 267, 274 (Bankr.M.D.Tenn. 1991),* aff'd *152 Bankr. 727 (M.D.Tenn. 1993),* aff'd in part and rev'd in part on other grounds *43 F.3d 256 (6th Cir. 1994)* (interest on oversecured tax claim accrues through the effective date of the plan, at which time the amount of the claim is fixed). On the basis of that quantification, the debtor (or a third-party plan proponent) devises an appropriate treatment for the claim. The treatment must pay the secured creditor the full value of its claim as of the effective date of the plan. *11 U.S.C. § 1129*(b)(2)(A)(i), (ii), and (iii). If this is done over time, as often it must be, the stream of future payments must have [*14] a present value, as of the effective date of the plan, of at least the value of the creditor's secured claim. *11 U.S.C. § 1129*(b)(2)(A)(i)(II); *In re Ropt Ltd. Partnership, 152 Bankr. 406, 408 (Bankr.D.Mass. 1993)* (payments over time must have present value at least equal to amount of secured claim). In effect, the plan gives the secured creditor a new claim in satisfaction of its prepetition claim. Upon confirmation of the plan, the prepetition claim is discharged and becomes unenforceable. *11 U.S.C. § § 1141*(d)(1)(A) and 524(a). From that point forward, the basis of the creditor's claim is the plan itself, not the underlying contract, tax statute, or whatever. n6

n6 The State builds its argument on cases that dealt exclusively with preconfirmation interest, the rate at which a debtor should pay interest on oversecured tax claims while in Chapter 11 but before its plan is confirmed. See *Wasserman v. City of Cambridge, 151 Bankr. 4 (D.Mass. 1993); In re Kelton, 137 Bankr. 18 (Bankr.W.D. Tex. 1992); and In re Russo, 63 Bankr. 335 (Bankr.D.Mass. 1986).* But postconfirmation interest is governed by § 1129(b) and related provisions of Chapter 11 that have no bearing on preconfirmation issues. Consequently, these cases offer no guidance on the treatment of oversecured tax claims in Chapter 11 plans of reorganization.

[*15]

Accordingly, the State's secured tax claim was finally quantified upon confirmation of the plan. Interest on the claim ran at the rate prescribed by Tennessee law until confirmation. Upon confirmation, the amount of the claim became final, and the State became entitled to payment of its claim in full. The Debtor having proposed to make such payment over time, the State was promised a five-year stream of payments whose value as of the effective date of the plan was the full amount of the

State's claim. The function of the postconfirmation rate of interest is only to ensure that this stream of future payments will afford the State the full present value of its claim. n7 The rate prescribed in *T.C.A. § 67-5-2010* does not apply because, upon confirmation, the State's tax claim was liquidated, discharged, and, by substitution of the Debtor's new obligation to the State under the confirmed Chapter 11 plan, satisfied. By virtue of its treatment under the plan, the State will receive payment of its claim in full, with virtually no risk of nonpayment. This is fair and equitable. Nothing in the Code requires the Debtor to pay a creditor, even a tax creditor, more than the value of its claim. **[*16]**

n7 *In re Brentwood Outpatient Ltd., 134 Bankr. at 274* (oversecured tax claim accrues interest until effective date of plan; interest thereafter is to insure payment of present value of allowed secured claim); *In re Young, 61 Bankr. 150, 152 (Bankr.S.D.Ind. 1986)* (function of postconfirmation interest is to compensate secured creditor for time value of money and thus to assure its receipt of the present value of its claim; postconfirmation "present value payments" are distinct from the interest component of a secured claim under *11 U.S.C. § 506*(b)); *In re Gincastro, 48 Bankr. 662, 664 n.3 (Bankr.D.R.I. 1985)* (distinguishing interest allowable as part of secured claim under *11 U.S.C. § 506*(b) from interest payments required in Chapter 13 plan by present value provision in *11 U.S.C. § 1325*(a)(5)); *In re Ropt Ltd. Partnership, 152 Bankr. 406, 408 (Bankr.D.Mass. 1993)* (postconfirmation interest rate on secured claim must compensate secured creditor only for the time-value of money and for risk). In this case, the State has virtually no risk of nonpayment, so the interest rate need not compensate for risk.

**[*17]**

Moreover, the Court finds no unfair discrimination in the treatment of the State's claim, especially where unsecured creditors are receiving dividends of only ten percent on their claims. The State, by comparison, fares quite enviably. Nor is the State being treated unfairly vis-a-vis the Debtor's equity interest holder. It is true, as the State complains, that the Debtor is, by virtue of Chapter 11, obtaining a better interest rate going forward than is available to other taxpayers, and that this better rate will ultimately accrue to the benefit of the Debtor's sole equity interest holder. However, the equity holder retains no equity in the Debtor by virtue of her prepetition interest. The plan extinguished her prepetition interest in the Debtor. She holds her present equity interest by virtue of the $ 300,000 contribution to capital she made in order to fund the plan of reorganization. As equity, her contribution is subject to a substantial risk of loss. Where the state is receiving payment in full without risk of loss, the Court finds no unfair discrimination.

For these reasons, the Court concludes that the rate proposed in the plan satisfies the requirements set forth in § **[*18]** 1129(b)(1) and, therefore, that the State's objection to confirmation should be overruled. A separate order shall enter accordingly.

Date: April 4, 1996

Carol J. Kenner

United States Bankruptcy Judge

**ORDER ON RATE OF POSTCONFIRMATION INTEREST ON SECURED TAX CLAIM**

For the reasons set forth in the separate memorandum of decision issued today, the objection of the State of Tennessee to confirmation of the Debtor's plan of reorganization is hereby overruled, and it is hereby ORDERED that postconfirmation interest on the State's allowed secured claim shall accrue at the variable rate set forth in the plan as proposed.

Date: April 4, 1996

Carol J. Kenner

United States Bankruptcy Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | |
| | : | **Jointly Administered Under** |
| **KAISER ALUMINUM CORPORATION, a** | : | **Bankruptcy Case No. 02-10429 (JKF)** |
| Delaware corporation, <u>et al.</u> | : | **Chapter 11** |
| | : | |
| | : | |
| **KAISER ALUMINUM CORPORATION, <u>et al.</u>** | : | Case No. 06-mc-41 (JJF) |
| | : | |

## CERTIFICATE OF SERVICE

I, Richard W. Riley, certify that I am not less than 18 years of age, and that service of a copy of the **Memorandum of Appellants, Republic Indemnity Company and Transport Insurance Company (f/k/a Transport Indemnity Company)** was made on April 17, 2006 upon the individuals on the attached service list *via* regular mail.

Under penalty of perjury, I declare the foregoing is true and correct.

Dated: April 17, 2006
Wilmington, Delaware

Richard W. Riley (DE I.D. 4052)
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
Telephone:    (302) 657-4900
Facsimile:    (302) 657-4901
E-mail:    rwriley@duanemorris.com

SERVICE LIST

Richard W. Riley (DE I.D. 4052)
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801

Mitchell L. Lathrop, Esquire
Bridget K. Moorhead, Esquire
DUANE MORRIS LLP
101 West Broadway Street, 9th Floor
San Diego, CA 92101

Russell W. Roten, Esquire
Jeff D. Kahane, Esquire
DUANE MORRIS LLP
333 South Hope Street
Los Angeles, CA 90071

William P. Bowden, Esquire
ASHBY & GEDDES
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Lisa Beckerman, Esquire
Brian A. Kilmer, Esquire
AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
590 Madison Avenue
New York, NY 10022

Peter Van N. Lockwood, Esquire
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W.
Washington, DC 20005

Daniel K. Hogan, Esquire
THE HOGAN FIRM
1311 Delaware Avenue
Wilmington, DE 19806

Edward F. Houff, Esquire
c/o Lynn Stewart & Tammy Nero
KAISER ALUMINUM CORPORATION
5847 San Felipe, Suite 2400
Houston, TX 77057

Daniel J. DeFranceschi, Esquire
Kimberly D. Newmarch, Esquire
RICHARD, LAYTON & FINGER, PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Gregory M. Gordon, Esquire
Daniel P. Winikka, Esquire
Daniel B. Prieto, Esquire
JONES DAY
2727 North Harwood Street
Dallas, TX 75201

Marla R. Eskin, Esquire
Mark T. Hurford, Esquire
CAMPBELL & LEVINE, LLC
800 King Street, Suite 300
Wilmington, DE 19801

Elihu Inselbuch, Esquire
CAPLIN & DRYSDALE, CHARTERED
399 Park Avenue
New York, NY 10022

James L. Patton, Jr., Esquire
Edwin J. Harron, Esquire
Sharon M. Zieg, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR
The Brandywine Bldg., 17th Floor
1000 West Street
P.O. Box 391
Wilmington, DE 19899

Steven A. Felsenthal, Esquire
Peter C. D'Apice, Esquire
STUTZMAN, BROMBERG, ESSERMAN & PLIFKA
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689

Steven A. Buxbaum, Esquire
HAYNES AND BOONE, LLP
One Houston Center
1221 McKinney, Suite 2100
Houston, TX 77010

Rodney L. Eshelman, Esquire
Alison V. Lippa, Esquire
Raymond J. Tittman, Esquire
CARROLL, BURDICK & MCDONOUGH LLP
44 Montgomery Street
San Francisco, CA 94101

Thomas G. Whalen, Jr., Esquire
STEVENS & LEE, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801

Seth W. Wiener, Esquire
LEBOEUF, LAMB, GREENE & MACRAE LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

David M. Ross, Esquire
LEBOEUF, LAMB, GREENE & MACRAE LLP
1875 Connecticut Avenue, N.W., Suite 1200
Washington, DC 20009

Anthony Callaghan, Esquire
Evans Wohlforth, Esquire
David N. Crapo, Esquire
GIBBONS, DEL DEO, DOLAN, GRIFFINGER &
VECCHIONE
One River Front Plaza
Newark, NJ 07102

Michael B. Joseph, Esquire
Theodore J. Tacconelli, Esquire
FERRY, JOSEPH & PEARCE, P.A.
824 Market St., Suite 904
Wilmington, DE 19899

Kevin Gross, Esquire
ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.
919 Market Street, Suite 1401
Wilmington, DE 19801

Lewis S. Rosenbloom, Esquire
David C. Christian, Esquire
Jason J. DeJonker, Esquire
MCDERMOTT, WILL & EMERY
227 West Monroe Street
Chicago, IL 60606

Leonard P. Goldberger, Esquire
STEVENS & LEE, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA 19103

Jared M. Katz, Esquire
LEBOEUF, LAMB, GREENE & MACRAE LLP
725 South Figueroa Street, Suite 3100
Los Angeles, CA 90017

David M. Klauder, Esquire
Trial Attorney
OFFICE OF THE UNITED STATES TRUSTEE
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801

Elizabeth J. Futrell, Esquire
Aimee M. Quirk, Esquire
JONES, WALKER, WAECHTER, POITEVENT,
CARRERE & DENEGRE, L.L.P.
201 St. Charles Ave.
New Orleans, LA 70170

Clark T. Whitmore, Esquire
Alain M. Baudry, Esquire
Christina A. Smith, Esquire
MASLON, EDELMAN, BORMAN & BRAND, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140

-2-

Karen C. Bifferato, Esquire
Marc J. Phillips, Esquire
CONNOLLY BOVE LODGE & HUTZ, LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801

Carl N. Kunz, III, Esquire
MORRIS, JAMES HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

Harold L. Kaplan, Esquire
Mark F. Hebbeln, Esquire
GARDNER CARTON & DOUGLAS LLP
191 North Wacker Drive – Suite 3700
Chicago, IL 60606-1698

Joanne B. Wills, Esquire
Jennifer L. Scoliard, Esquire
KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP
919 Market Street, Suite 1000
Wilmington, DE 19801

Laurie Schenker Polleck, Esquire
JASPAN SCHLESINGER HOFFMAN LLP
913 Market Street, 12th Floor
Wilmington, DE 19801

Jason Michael Madron, Esquire
RICHARDS LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Paul J. Dougherty, III, Esquire
GEBHARDT & SMITH LLP
901 Market Street, Suite 451
Wilmington, DE 19801

George A. Davis, Esquire
Diane Harvey, Esquire
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153

Christine P. Hsu, Esquire
WEIL, GOTSHAL & MANGES LLP
1501 K Street NW - Suite 100
Washington, DC 20005

Kristin K. Going, Esquire
GARDNER CARTON & DOUGLAS LLP
1301 K Street, N.W.
Suite 900, East Tower
Washington, DC 20005

Duane D. Morse, Esquire
James R. Wrathall, Esquire
WILMER CUTLER PICKERING
HALE AND DORR LLP
2445 M. Street N.W.
Washington, DC 20037

Michael S. Davis, Esquire
Jantra Van Roy, Esquire
ZEICHNER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, NY 10022

Duncan J. McNeil, III
2030 West Spofford
Spokane, WA 99205

Harry Lee, Esquire
John F. O'Connor, Esquire
George R. Calhoun, V, Esquire
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

Carmella P. Keener, Esquire
ROSENTHAL MONHAIT & GODDESS P.A.
919 Market Street, Suite 1401
Wilmington, DE  19801

Frederick D. Holden, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105

Brian A. Kilmer, Esquire
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX  75201

DM3\355875.1