# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | **Jointly Administered Under** |
| **KAISER ALUMINUM CORPORATION,** | : | **Bankruptcy Case No. 02-10429 (JKF)** |
| a Delaware corporation, <u>et al.</u> | : | **Chapter 11** |

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| | : | **Case No. 06-mc-41 (JJF)** |
| **KAISER ALUMINUM CORPORATION,** | : | |
| <u>et al.</u> | : | |

## JOINT ANSWERING MEMORANDUM OF REORGANIZING DEBTORS AND THEIR PRINCIPAL CREDITOR CONSTITUENCIES

May 1, 2006

Daniel DeFranceschi (DE 2732)
Kimberly Newmarch (DE 4340)
RICHARDS, LAYTON &
FINGER
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Gregory Gordon
Daniel Winikka
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

ATTORNEYS FOR DEBTORS
AND DEBTORS IN
POSSESSION

William Bowden (DE 2553)
Gregory Taylor (DE 4008)
ASHBY & GEDDES
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-1067

-and-

Lisa Beckerman
AKIN GUMP STRAUSS
HAUER & FELD
590 Madison Avenue
New York, NY 10022
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Brian Kilmer
AKIN GUMP STRAUSS
HAUER & FELD
1700 Pacific Ave., Ste. 4100
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

ATTORNEYS FOR THE
OFFICIAL COMMITTEE OF
UNSECURED CREDITORS

Marla Eskin (DE 2989)
Mark Hurford (DE 3299)
CAMPBELL & LEVINE
800 King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900
Facsimile: 302-426-9947

-and-

Elihu Inselbuch
CAPLIN & DRYSDALE
399 Park Avenue
New York, NY 10022
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

-and-

Peter Van N. Lockwood
CAPLIN & DRYSDALE
One Thomas Circle, N.W.
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

ATTORNEYS FOR
OFFICIAL COMMITTEE
OF ASBESTOS
CLAIMANTS

DLI-5993190v6

James Patton Jr. (DE 2202)
Edwin Harron (DE 3396)
Sharon Zieg (DE 4196)
YOUNG CONAWAY
STARGATT &
TAYLOR
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

COUNSEL TO MARTIN J.
MURPHY, THE LEGAL
REPRESENTATIVE FOR
FUTURE ASBESTOS
CLAIMANTS

Laurie Polleck (DE 4300)
JASPAN SCHLESINGER
HOFFMAN
913 Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 351-8000
Facsimile: (302) 351-8010

-and-

Frederick Holden
ORRICK, HERRINGTON &
SUTCLIFFE
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Telephone: (415) 773-5700
Facsimile: (415) 773-5759

COUNSEL TO THE OFFICIAL
COMMITTEE OF RETIRED
SALARIED EMPLOYEES

## TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ........................................................................................ 3

STATEMENT OF FACTS ............................................................................................ 6

    I.    The Insurance Coverage Litigation.................................................................. 6

    II.    The Reorganizing Debtors' Stipulation with the Insurers ...................................... 7

    III.    Confirmation of the Plan.................................................................................. 10

ARGUMENT ................................................................................................................ 12

    I.    Section 1123(a)(5) Expressly Preempts Any Anti-Assignment
        Clauses in the Applicable Insurance Policies or Contrary State Law................ 12

    II.    The Insurers' Arguments Against Express Preemption of the
        Anti-Assignment Provisions in Their Policies Are Meritless............................ 18

        A.    There is no basis to ignore the express preemptive language
            in section 1123(a)............................................................................... 19

        B.    Section 1123(a) preempts provisions of private contracts...................... 22

        C.    Preemption under section 1123(a)(5) is not limited to laws
            "relating to the financial condition" of a debtor................................... 24

        D.    Section 363(1) is not applicable.......................................................... 26

    III.    Contingent Rights to Insurance Proceeds Are Property of the
        Estate............................................................................................................. 30

    IV.    Section 524(g) Impliedly Preempts the Insurance Policy Anti-
        Assignment Provisions..................................................................................... 35

CONCLUSION ............................................................................................................. 37

## TABLE OF AUTHORITIES

### FEDERAL CASES

In re Combustion Engineering, Inc.,
  391 F.3d 190 (3d Cir. 2005)...........................................5, 13, 15, 16, 22, 24, 27, 31

ACandS, Inc. v. Travelers Cas. & Sur. Co. (In re ACandS, Inc.),
  435 F.3d 252 (3d Cir. 2006)..................................................................................31

In re Adelphia Commc'n Corp.,
  298 B.R. 49 (S.D.N.Y. 2003)................................................................................32

Burgess v. Sikes (In re Burgess),
  392 F.3d 782 (5th Cir. 2004) ................................................................................33

In re Buttonwood Partners, Ltd.,
  111 B.R. 57 (Bankr. S.D.N.Y. 1990)....................................................................37

Capital National Bank of New York v. McDonald's Corp.,
  625 F. Supp. 874 (S.D.N.Y. 1986) .......................................................................33

In re Circle K Corp.,
  121 B.R. 257 (Bankr. D. Ariz. 1990).....................................................................32

Cisneros v. Alpine Ridge Group,
  508 U.S. 10 (1993)..........................................................................................21, 24

In re Crownover,
  43 B.R. 22 (Bankr. E.D. Mo. 1984).......................................................................33

Don King Prods., Inc. v. Thomas,
  945 F.2d 529 (2d Cir. 1991)..................................................................................33

Egelhoff v. Egelhoff,
  532 U.S. 141 (2001)...............................................................................................20

Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,
  541 U.S. 246 (2004)...............................................................................................21

Gass v. V.I. Tel. Corp.,
  311 F.3d 237 (3d Cir. 2002)..................................................................................30

Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
  885 F.2d 1149 (3d Cir. 1989)................................................................................29

Page

Health Ctr. v. Ins. Co. of N. Am. (In re St. Clare's Hosp. & Health Ctr.),
    934 F.2d 15 (2d Cir. 1991)...........................................................................32

Holland Am. Ins. Co. v. Succession of Roy,
    777 F.2d 992 (5th Cir. 1985) .......................................................................33

Holywell Corp. v. Smith,
    503 U.S. 47 (1992)......................................................................................16

Homsy v. Floyd (In re Vitek),
    51 F.3d 530 (5th Cir. 1995) ........................................................................32

Integrated Solutions, Inc. v. Service Support Specialties, Inc.,
    124 F.3d 487 (3d Cir. 1997)...................................................................17, 18

Kawaauhau v. Geiger,
    523 U.S. 57 (1998)......................................................................................25

La. World Exposition, Inc. v. Fed. Ins. Co. (In re La. World Exposition, Inc.),
    832 F.2d 1391 (5th Cir. 1987) ................................................................32, 33

Estate of Lellock v. Prudential Ins. Co. of Am.,
    811 F.2d 186 (3d Cir. 1987)...................................................................31, 32

MacArthur Co. v. Johns-Manville Corp.,
    837 F.2d 89 (2d Cir. 1998)..........................................................................27

Maxwell v. Megliola (In re marchFirst, Inc.),
    288 B.R. 526 (Bankr. N. D. Ill. 2002) ........................................................32

Medtronic, Inc. v. Lohr,
    518 U.S. 470 (1996)....................................................................................20

In re Minoco of Cos., Ltd.,
    799 F.2d 517 (9th Cir. 1986) .......................................................................32

In re Moore,
    290 B.R. 851 (Bankr. N.D. Ala. 2003) ........................................................23

Nantucket Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs.),
    61 F.3d 197 (3d Cir. 1995)......................................................................22, 23

Nat'l Union Fire Ins. Co. v. Titan Energy, Inc. (In re Titan Energy, Inc.),
    837 F.2d 325 (8th Cir. 1988) .......................................................................32

**Page**

In re Pac. Gas & Elec. Co.,
    273 B.R. 795 (Bankr. N.D. Cal. 2002) ............................................................25, 26

Pacific Gas & Electric Co. v. California,
    350 F.3d 932 (9th Cir. 2003) ............................................................24, 25

Pub. Serv. Co. v. New Hampshire (In re Pub. Serv. Co.),
    108 B.R. 854 (Bankr. D.N.H. 1989) ............................................................16, 22

In re Sacred Heart Hosp. of Norristown,
    182 B.R. 413 (Bankr. E.D. Pa. 1995) ............................................................32

In re Stewart Foods, Inc.,
    64 F.3d 141 (4th Cir. 1995) ............................................................29

In re Stone & Webster, Inc.,
    286 B.R. 532 (Bankr. D. Del. 2002) ............................................................13, 24

Tate v. NationsBanc Mortgage Corp. (In re Tate),
    253 B.R. 653 (W.D.N.C. 2000) ............................................................37

Tringali v. Hathaway Mach. Co.,
    796 F.2d 553 (1st Cir. 1986) ............................................................32, 33

UNR Industries, Inc. v. Continental Casualty Co.,
    942 F.2d 1101 (7th Cir. 1991) ............................................................9

United States v. Ron Pair Enters., Inc.,
    489 U.S. 235 (1989) ............................................................24

Universal Coops., Inc. v. FCX, Inc. (In re FCX, Inc.),
    853 F.2d 1149 (4th Cir. 1988) ............................................................12, 13, 16, 22, 24

In re W. Asbestos Co.,
    313 B.R. 456 (Bankr. N.D. Cal. 2004) ............................................................16, 22, 24, 27

**STATE CASES**

Fuller-Austin Insulation Co. v. Fireman's Fund Inc. Co., Case No. BC 116835,
    2002 WL 31005090 (Cal. Superior Ct. Aug. 6, 2002) ............................................................9, 10

Henkel Corp. v. Hartford Accident & Indem. Co.,
    29 Cal. 4th 934 (2003) ............................................................34

Javoreck v. Superior Court,
    17 Cal. 3d 629 (Cal. 1976) ............................................................33, 34

Page

Montrose Chemical Corp. v. Admiral Ins. Co.,
    10 Cal. 4th 645 (1995) ......................................................................................33, 34

### DOCKETED CASES

In re The Babcock & Wilcox Co., Case No. 00-10992 (Bankr. E.D. La. Nov. 9,
    2004) ........................................................................................................................16

### FEDERAL STATUTES

11 U.S.C. § 1123(a)(5)(B) ........................................................................... 12, 13, i

11 U.S.C. § 1123(a)(5)(C) ......................................................................................21

11 U.S.C. § 1123(a)(5)(D) ......................................................................................28

11 U.S.C. § 1123(a)(5)(F) .......................................................................................23

11 U.S.C. § 1123(b)(2) ............................................................................................28

11 U.S.C. § 363(1) ..............................................................................................26, 27

11 U.S.C. § 364(d) ...................................................................................................29

11 U.S.C. § 365(c)(3).................................................................................................23

11 U.S.C. § 365(n)(1)(B) .........................................................................................23

11 U.S.C § 1322(c)(1)................................................................................................23

11 U.S.C. § 502(a)(7)................................................................................................29

11 U.S.C. § 506(b) ...................................................................................................29

11 U.S.C. § 510.........................................................................................................29

11 U.S.C. § 524(g)(3)(A)..........................................................................................12

11 U.S.C. §§ 541(a)(2), (6) and (7).........................................................................31

11 U.S.C. § 544.........................................................................................................29

11 U.S.C. § 552(a) ...................................................................................................29

11 U.S.C. § 704(1)....................................................................................................18

Page

11 U.S.C. § 1123(a)(5)(B) ................................................................................. 12, 13, i

**MISCELLANEOUS**

Tr. of July 31, 2003 Hr'g in <u>Combustion Engineering</u>........................................................15

Tr. of Jan. 9, 2006 Hr'g in <u>Kaiser Aluminum Corporation</u>................................................11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**KAISER ALUMINUM CORPORATION,**<br>a Delaware corporation, <u>et al.</u> | :<br>:    **Jointly Administered Under**<br>:    **Bankruptcy Case No. 02-10429 (JKF)**<br>:    **Chapter 11**<br>: |
| In re:<br><br>**KAISER ALUMINUM CORPORATION, <u>et</u><br><u>al.</u>** | :<br>:<br>:    **Case No. 06-mc-41 (JJF)**<br>: |

## JOINT ANSWERING MEMORANDUM OF REORGANIZING
## DEBTORS AND THEIR PRINCIPAL CREDITOR CONSTITUENCIES

Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical

Corporation ("KACC") and certain of their debtor affiliates (collectively, the

"Reorganizing Debtors"),[1] twenty-two of the above-captioned debtors and debtors in

possession (collectively, the "Debtors"), the official committee of unsecured creditors

(the "Creditors' Committee"), the statutory committee of asbestos claimants (the

"Asbestos Committee"), the official committee of retired employees (the "Retirees'

Committee") and Martin J. Murphy as legal representative for future asbestos claimants

---

[1]     In addition to Kaiser Aluminum Corporation and KACC, the Reorganizing
Debtors include the following entities: Akron Holding Corporation; Kaiser
Aluminum & Chemical Investment, Inc.; Kaiser Aluminium International, Inc.;
Kaiser Aluminum Properties, Inc.; Kaiser Aluminum Technical Services, Inc.;
Kaiser Bellwood Corporation; Kaiser Micromill Holdings, LLC; Kaiser Texas
Micromill Holdings, LLC; Kaiser Sierra Micromills, LLC; Kaiser Texas Sierra
Micromills, LLC; Oxnard Forge Die Company, Inc.; Alwis Leasing LLC; Kaiser
Center, Inc.; KAE Trading, Inc.; Kaiser Aluminum & Chemical Investment
Limited (Canada); Kaiser Aluminum & Chemical of Canada Limited (Canada);
Kaiser Bauxite Company; Kaiser Center Properties; Kaiser Export Company; and
Texada Mines Ltd. (Canada).

DLI-5993190v6

(the "Asbestos Representative")[2] hereby file this joint answering memorandum in

response to the memoranda filed by the various appellant insurance companies

(collectively, the "Insurers")[3] in respect of their appeals and motions for de novo review

of the Bankruptcy Court's order confirming the Second Amended Joint Plan of

Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical

Corporation and Certain of Their Debtor Affiliates (as modified, the "Plan")[4] and related

findings of fact and conclusions of law. In support hereof, the Reorganizing Debtors, the

---

[2]    Anne M. Ferazzi, legal representative for future silica and coal tar pitch volatiles
       claimants (together with the Asbestos Representative, the "Legal
       Representatives"), has filed a separate response memorandum.

[3]    The Insurers are comprised of: (1) Columbia Casualty Insurance Company,
       Transcontinental Insurance Company, Harbor Insurance Company and
       Continental Insurance Company (collectively, "Columbia"); (2) First State
       Insurance Company, Hartford Accident & Indemnity Company, New England
       Reinsurance Corporation and Nutmeg Insurance Company (collectively,
       "Hartford"); (3) AIU Insurance Company, Granite State Insurance Company,
       Insurance Company of the State of Pennsylvania, Landmark Insurance Company,
       Lexington Insurance Company, National Union Fire Insurance Company and
       New Hampshire Insurance Company (collectively, "AIG"); (4) ACE Property
       & Casualty Company, Central National Insurance Company of Omaha, Century
       Indemnity Company, Industrial Indemnity Company, Industrial Underwriters
       Insurance Company and Pacific Employers Insurance Company (collectively,
       "ACE"); (5) Republic Indemnity Company ("Republic"); (6) Transport Insurance
       Company (f/k/a Transport Indemnity Company) ("Transport"); and (7) TIG
       Insurance Company (as successor by merger to International Insurance Company)
       ("TIG"). Columbia, joined by TIG, filed an opening memorandum (D.I. 17);
       Republic, joined by Transport, filed an opening memorandum (D.I. 22); and ACE
       filed an opening memorandum (D.I. 18).

       After the Insurers filed their appeals, the Reorganizing Debtors reached settlement
       agreements with both Hartford and AIG that, once approved by the Bankruptcy
       Court, will moot their appeals. Hartford and AIG have filed separate memoranda
       (D.I. 20 and D.I. 24, respectively), indicating that they are relying on the other
       Insurers' briefs to the extent that the Bankruptcy Court does not approve the
       settlement agreements.

[4]    Capitalized terms not otherwise defined herein have the meanings given them in
       the Plan.

---

Creditors' Committee, the Retirees' Committee, the Asbestos Committee and the Asbestos Representative (collectively, the "Plan Proponents") respectfully represent as follows:

SUMMARY OF ARGUMENT

The Reorganizing Debtors have made an extraordinary effort to eliminate any effect the Plan might have on the Insurers. The Plan preserves "all defenses at law or in equity that any [Insurer] may have under applicable non-bankruptcy law" and states that "[n]othing in the Plan, any Exhibit to the Plan, the Confirmation Order, any finding of fact and/or conclusion of law with respect to Confirmation of the Plan, shall limit the right of any [Insurer], in any PI Insurance Coverage Action, to assert any [defense]." (Confirmation Order, Ex. B at ¶¶ 8, 15). The Plan also provides that the order confirming the Plan will not constitute a trial or hearing on the merits, an adjudication or judgment, or be used as evidence to prove, among other things, (1) any liability of the Debtors, the trusts to be established under the Plan[5] or any applicable insurance company for any

---

[5]     The Plan proposes to establish certain trusts (collectively, the "PI Trusts"), including a trust pursuant to section 524(g) of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") that will be used to satisfy asbestos, silica and coal tar pitch volatiles claims and future demands and noise-induced hearing loss claims (collectively, the "Tort Claims"). The PI Trusts will be funded by, among other things, the transfer to a funding vehicle trust (the "Funding Vehicle Trust") of rights to proceeds under third-party liability insurance policies issued to the Debtors and/or settlements reached with the Debtors' third-party liability insurers regarding insurance coverage related to the Tort Claims (collectively, the "PI Insurance Assets"). The Funding Vehicle Trust will preserve, hold, manage and maximize the assets of the Funding Vehicle Trust, including the PI Insurance Assets, for the benefit of the PI Trusts. The PI Insurance Assets constitute the most significant source of potential recovery for the holders of Tort Claims. The Plan provides that the PI Insurance Assets will be transferred to the Funding Vehicle Trust on the effective date of the Plan. In exchange for the treatment of the Tort Claims provided for in the Plan, the Plan proposes channeling injunctions that will protect the Reorganizing Debtors and

individual Tort Claim, (2) the reasonableness of the distribution procedures for the PI Trusts or the settlement of, or value assigned to, any individual Tort Claim pursuant to those distribution procedures, (3) that any applicable insurance company participated in or consented to the negotiation of the Plan or the distribution procedures for the PI Trusts, (4) that any of the Debtors or the PI Trusts have suffered an insured loss with respect to any Tort Claim or (5) the liability, in an aggregate or individual basis, of the Debtors or any of the PI Trusts for Tort Claims. (Id. at ¶ 16.)

Notwithstanding the Plan's numerous provisions preserving the Insurers' defenses and eliminating any conceivable adverse effect confirmation could have on the Insurers, the Insurers' briefs are replete with assertions that the Bankruptcy Court's ruling that the transfer of the Reorganizing Debtors' rights to insurance proceeds to the Funding Vehicle Trust (the "Transfer") is valid and enforceable notwithstanding the anti-assignment provisions of the policies somehow improperly "impos[es] liability against insurers," results in an "improper advantage over insurers," and even "frustrate[s] the will of Congress and obstruct[s] the purpose of Section 524(g)." (Republic Br. at 1, 22; ACE Br. at 6-7).

To the contrary, affirmance of the Transfer ruling will result in no harm to the Insurers. Every single defense that is available to the Insurers today (other than a defense that coverage has been vitiated by the Transfer) will remain available to them following consummation of the Plan.

---

(continued...)

     certain other entities from any further liability with respect to the Tort Claims and permanently channel those claims to the applicable PI Trust.

Nonetheless, the Insurers raise a litany of misguided legal arguments in the hopes of persuading the Court to reverse the Bankruptcy Court's Transfer ruling. Rendering subparts of section 1123(a)(5) and the express preemptive language of section 1123(a) of the Bankruptcy Code completely meaningless, the Insurers argue that section 1123(a)(5) does not expand a debtor's authority beyond what is specifically authorized by other sections of the Bankruptcy Code. The Insurers alternatively contend that, although the preemptive language of section 1123(a) contains no such limitation, it should be interpreted to apply only to laws relating to the financial condition of a debtor or, if it is not so limited, that it should be interpreted as preempting state laws and regulations but not contract provisions.

The Insurers' arguments are all contrary to the express preemptive language of section 1123(a). The plain language of section 1123(a)(5)(B) of the Bankruptcy Code clearly overrides nonbankruptcy law and contractual restrictions on the transfer of property of the estate to another entity as necessary for implementation of a plan. Moreover, as explained below and as the Bankruptcy Court recognized, the Court of Appeals for the Third Circuit addressed this very issue in In re Combustion Engineering, Inc., where the Third Circuit made clear that the transfer of insurance proceeds to a section 524(g) trust notwithstanding any anti-assignment provisions in the subject insurance policies is valid and enforceable pursuant to sections 541 and 1123(a)(5) of the Bankruptcy Code. 391 F.3d 190, 218-219 (3d Cir. 2005).

Recognizing the weakness of their statutory construction arguments, the Insurers also argue that the Bankruptcy Court's ruling on the Transfer should be reversed because the Transfer constitutes an unconstitutional "taking" under the Fifth Amendment

and because there are no existing rights to proceeds to be transferred. In fact, certain of

the Insurers contend that there will never be any rights to proceeds, and they will never

be obligated to pay under their policies, because the Tort Claims are being channeled to

the PI Trusts. These frivolous arguments are nothing more than an obvious attempt by

the Insurers to escape their responsibilities under the applicable insurance policies

without even a trial of their coverage defenses. Contrary to the Insurers' assertions, the

anti-assignment provisions in the subject insurance policies do not operate to eviscerate

coverage simply because the Reorganizing Debtors are seeking to satisfy the

requirements of section 524(g) of the Bankruptcy Code and confirm a plan.

**STATEMENT OF FACTS[6]**

**I.     The Insurance Coverage Litigation**

Following the refusal of the Insurers and certain other insurance

companies to provide liability coverage, in May 2000, KACC instituted companion

insurance coverage actions against certain liability insurers, including the Insurers, in the

Superior Court of California for the County of San Francisco (the "Coverage Action"),

seeking a declaratory judgment that the insurers are obligated to cover the

asbestos-related bodily injury products and premises liability claims that have been

asserted against the Debtors. (Houff Decl. ¶ 10.) When KACC filed its chapter 11 case,

---

[6]     There are no facts in dispute in these appeals, and the issue before this Court is
purely a legal one. Facts presented in this section are provided for context and are
drawn from the Joint Motion of Debtors and Debtors in Possession and Their
Principal Creditor Constituencies for Consolidation of Appeals, for Waiver of
Mediation Requirement and for an Expedited Hearing on Confirmation Findings
and Confirmation Order (D.I. 5) and the Declaration of Edward F. Houff (the
"Houff Declaration"), attached thereto as Exhibit A. For ease of reference, the
citations to the relevant paragraphs of the Houff Declaration are included, where
applicable.

on February 12, 2002, the Coverage Action was expanded to include virtually all of
KACC's insurers with products or premises liability coverage obligations. The Coverage
Action has proceeded during the Debtors' chapter 11 cases. (Id.)

       Recognizing that insurance coverage disputes were being adjudicated in
the California state court, and to attempt to avoid any disputes with the Insurers in the
Bankruptcy Court, the Reorganizing Debtors included certain insurance neutrality
provisions in the Plan filed on September 7, 2005. (Houff Decl. ¶ 11.) In particular, the
Plan, as proposed at that time, preserved every defense to coverage under applicable
nonbankruptcy law that any of the Insurers possessed with the limited exception that the
Insurers could not seek relief from liability under their policies based solely on: (1) the
transfer of the Reorganizing Debtors' rights to proceeds from the insurance policies to the
Funding Vehicle Trust pursuant to the Plan; or (2) the drafting, proposing, confirmation
or consummation of the Plan (as opposed to the terms, operation, effect or
unreasonableness of the Plan or Plan exhibits) or the discharge or release of the
Reorganizing Debtors from liability for the Tort Claims pursuant to the Plan. (Id.) These
insurance neutrality provisions in the Plan left the Insurers free to advance against the
Funding Vehicle Trust, in future coverage litigation, any argument or defense that they
could have advanced against the Reorganizing Debtors if the Reorganizing Debtors had
(1) retained, rather than transferred, their rights to insurance proceeds and (2) not filed a
chapter 11 reorganization.

## II.    The Reorganizing Debtors' Stipulation with the Insurers

       Notwithstanding the retention of all usual defenses to coverage, following
the Bankruptcy Court's approval of the Disclosure Statement, the Insurers served
extensive discovery on each of the Reorganizing Debtors, the Asbestos Committee and

the Legal Representatives covering a broad spectrum of topics that were allegedly related

to confirmation of the Plan. (Houff Decl. ¶ 12.) Additionally, the Insurers filed several

motions seeking a variety of relief purportedly to protect the Insurers' rights and

determine how the Plan would affect such rights.[7]  (Id.)

　　　　Although the Reorganizing Debtors and their principal tort constituencies

believed that these pleadings and the Insurers' requested discovery were insupportable

and grossly overreaching in light of the Plan's broad preservation of the Insurers'

coverage defenses, to resolve the issues raised in all of the Insurers' various pleadings, the

Reorganizing Debtors, the Asbestos Committee and the Legal Representatives negotiated

with the Insurers over several weeks and ultimately entered into a stipulation and agreed

order (the "Stipulation") (Bankr. D.I. 7718), which the Bankruptcy Court approved on

November 14, 2005. Pursuant to the Stipulation, the Reorganizing Debtors agreed to

make modifications to the Plan to provide, inter alia, that (1) the PI Insurer Coverage

Defenses preserved under the Plan include "all defenses at law or in equity that any PI

Insurance Company may have under applicable non-bankruptcy law" (Confirmation

Order, Ex. B at ¶ 8) (emphasis added), and (2) "[n]othing in the Plan, any Exhibit to the

Plan, the Confirmation Order, any finding of fact and/or conclusion of law with respect to

the Confirmation of the Plan, shall limit the right of any PI Insurance Company, in any PI

---

[7]　　　On September 8, 2005, certain of the Insurers filed a motion to access the exhibits
attached to verified Bankruptcy Rule 2019 statements filed in the bankruptcy
cases by various entities and individuals representing more than one tort claimant
(Bankr. D.I. 7329); on September 14, 2005, certain of the Insurers filed a motion
for summary adjudication and supporting memorandum of law in the Coverage
Action; on September 17, 2005, several Insurers filed a motion for more definite
statement regarding the Plan (Bankr. D.I. 7364); and on September 19, 2005,
several Insurers filed an omnibus objection to, and related motion regarding, silica
personal injury claims filed in the bankruptcy cases (Bankr. D.I. 7385).

Insurance Coverage Action, to assert any PI Insurer Coverage Defense." (Id. at ¶ 15.)

Additionally, the modifications specifically addressed the collateral effects of

confirmation and provided that neither the Confirmation Order nor the Bankruptcy

Court's approval of the Plan, the PI Trust Distribution Procedures or the Plan Documents

would, with respect to any PI Insurance Company (including on the basis of UNR

Industries, Inc. v. Continental Casualty Co., 942 F.2d 1101 (7th Cir. 1991) or

Fuller-Austin Insulation Co. v. Fireman's Fund Inc. Co., Case No. BC 116835, 2002 WL

31005090 (Cal. Superior Ct. Aug. 6, 2002)), constitute an adjudication, or be used as

evidence to prove:

> (a)    that any of the Debtors, the PI Trusts, or any PI Insurance Company is liable for, or otherwise obligated to pay with respect to, any individual Tort Claim;
>
> (b)    that the procedures established by the Plan, including the PI Trust Distribution Procedures, for evaluating and paying Tort Claims are reasonable and/or consistent with any procedures that were used to evaluate or settle Tort Claims against the Debtors before the Petition Date;
>
> (c)    that the settlement of, or the value assigned to, any individual Tort Claim pursuant to the PI Trust Distribution Procedures was reasonable and/or otherwise appropriate;
>
> (d)    that any of the PI Insurance Companies participated in and/or consented to the negotiation of the Plan, the PI Trust Distribution Procedures or any of the Plan Documents;
>
> (e)    that any of the Debtors or the PI Trusts have suffered an insured loss with respect to any Tort Claim; or
>
> (f)    as to the liability, or amount thereof on an aggregate basis or for any individual claim, of the Debtors or any of the PI Trusts for Tort Claims.

(Id. at ¶ 16.)  Finally, the modifications provided that nothing in the Plan, the Plan

Documents, the Confirmation Order or any findings of fact and/or conclusions of law

with respect to the confirmation or consummation of the Plan shall limit the right of any PI Insurance Company to assert any PI Insurer Coverage Defense, including by presenting evidence and/or argument with respect to any of the matters specified in clauses (a) through (f) above. (Id.)

Thus, the two limited exceptions to the PI Insurer Coverage Defenses previously preserved under the Plan were eliminated, although the issue of whether the transfer of the Reorganizing Debtors' rights under the Included PI Trust Insurance Policies to the Funding Vehicle Trust is valid under the Bankruptcy Code as a matter of federal law must be determined as part of confirmation in the federal courts. (Stipulation at ¶¶ 3, 4.) Accordingly, the Plan, as amended by the Plan modifications set forth in the Stipulation, is unquestionably insurance neutral.

The Insurers, in turn, agreed pursuant to the Stipulation that their objections, if any, to the Plan would be strictly limited to (1) whether, under the Bankruptcy Code as a matter of law, the proposed transfer of the rights to insurance proceeds to the Funding Vehicle Trust under the applicable provisions of the Plan is valid and enforceable against the Insurers notwithstanding the anti-assignment provisions of the policies and applicable state law and (2) whether the Plan complies with the trust funding requirements of section 524(g) of the Bankruptcy Code, specifically sections 524(g)(2)(B)(i)(II) and (III). (Id.)

## III.    Confirmation of the Plan

On January 9, 2006, the Bankruptcy Court conducted a hearing to consider confirmation of the Plan. (Houff Decl. ¶ 17.) At the confirmation hearing, the Bankruptcy Court fully considered and disposed of the Insurers' arguments regarding the Transfer, noting that, "to the extent that the Combustion Engineering opinion definitely

talked about the fact that the debtor has insurance contract rights on the date of filing and that they can be transferred to a trust, rights to proceeds can be transferred." (Tr. of Jan. 9, 2006 Hr'g at 82.) The Bankruptcy Court went on to state that "1123(a)(5)(B) is clear that estate property can be transferred in whole or in part to one or more entities, whether organized before or after the confirmation of the plan." (Id. at 85.) The Bankruptcy Court then dismissed the Insurers' objections, stating specifically that the argument against the transfer of insurance proceeds was "not well founded." (Id. at 87.)

Thus, in its Findings of Fact and Conclusions of Law Regarding Confirmation of the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates, as Modified (the "Confirmation Findings") (Bankr. D.I. 8226), the Bankruptcy Court concluded that the transfer of rights to proceeds from the applicable insurance policies to the Funding Vehicle Trust for the benefit of the PI Trusts is valid and enforceable and that section 1123(a)(5) of the Bankruptcy Code expressly permits the transfer of the Reorganizing Debtors' rights to proceeds from the applicable insurance policies under the Plan and preempts any anti-assignment provisions of those policies. (Confirmation Findings, Section II.G.1, at 45.) Additionally, the Bankruptcy Court concluded that the Plan complied with the funding requirements of section 524(g). (Id.)

Having overruled the Insurers' objections, which were in essence the only remaining objections to the Plan, on February 6, 2006, the Bankruptcy Court entered the Confirmation Findings and its Order Confirming the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates as Modified (the "Confirmation

Order") (Bankr. D.I. 8225). Because section 524(g) of the Bankruptcy Code requires that "the order confirming the plan of reorganization [be] issued or affirmed by the district court that has jurisdiction over the reorganization case," 11 U.S.C. § 524(g)(3)(A), the Plan cannot be consummated until this Court issues or affirms the Confirmation Order. The Bankruptcy Court thereafter transmitted the Confirmation Findings, the Confirmation Order and certain relevant pleadings to this Court for review.

On February 15 and 16, 2006, the Insurers filed separate notices of appeal of the Confirmation Order (collectively, the "Appeals") as well as separate requests for de novo review of the Confirmation Findings (collectively, the "Requests"). The Insurers' Appeals and Requests are limited to the Bankruptcy Court's Transfer ruling and do not challenge the Bankruptcy Court's ruling that the Plan complied with the section 524(g) funding requirements. On March 8, 2006, this Court entered an order consolidating the Appeals and the Requests (D.I. 8) and on April 3, 2006, entered a scheduling order (D.I. 11). The Insurers filed their opening memoranda on April 17, 2006.

## ARGUMENT

**I.     Section 1123(a)(5) Expressly Preempts Any Anti-Assignment Clauses in the Applicable Insurance Policies or Contrary State Law**

Pursuant to section 1123(a)(5)(B), "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation, such as . . . transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of the plan." 11 U.S.C. § 1123(a)(5)(B). As every court that has considered the issue has found, section 1123 of the Bankruptcy Code expressly preempts nonbankruptcy rights that might otherwise interfere with the implementation of a chapter 11 plan. See, e.g., Universal

Coops., Inc. v. FCX, Inc. (In re FCX, Inc.), 853 F.2d 1149,1155 (4th Cir. 1988) (to the extent that any nonbankruptcy law or contract prohibits debtor from adequately implementing terms of a plan, "the plan may propose such actions notwithstanding nonbankruptcy law or agreements") (quoting 5 COLLIER ON BANKRUPTCY ¶ 1123.01); In re Stone & Webster, Inc., 286 B.R. 532, 543 (Bankr. D. Del. 2002) ("[Section] 1123(a) can be effected without regard to otherwise applicable nonbankruptcy law . . . ."). As the Fourth Circuit has explained, section 1123(a)(5) goes beyond "simply provid[ing] a means to exercise the debtor's pre-bankruptcy rights." FCX, 853 F.2d at 1155. Section 1123(a)(5) "is an empowering statute" that "enlarges those rights, thus enhancing the ability of a trustee or debtor in possession to deal with property of the estate." Id. The plain language of section 1123(a)(5)(B) clearly overrides nonbankruptcy law and contractual restrictions on the transfer of property of the estate to another entity as necessary for implementation of a plan.

The Third Circuit addressed this very issue in Combustion Engineering, where a plan of reorganization provided for the assignment of insurance proceeds to a section 524(g) trust. See Combustion Eng'g, 391 F.3d at 206-07, 207 n.11, 218. In Combustion Engineering, certain insurers appealed the order confirming the debtor's plan and argued that the transfer under the plan impaired their rights under the anti-assignment provisions of their policies. Id. at 218. With respect to the debtor's rights to insurance proceeds, the Third Circuit concluded that "even if the subject insurance policies purported to prohibit assignment of [the debtor's] insurance proceeds, these provisions would not prevent assignment of proceeds to the bankruptcy estate." Id. The Third Circuit explained that "put simply, § 541 prohibits restrictions on the interests of the

debtor, which includes the insurance policies held by [the debtor]," and with respect to property of the estate, section 1123(a)(5)(B) expressly contemplates that the debtor's interest in the policies may be assigned to a trust or other "entity." Id. at 219 n.27.

In the Insurers' briefs to this Court, only Columbia and TIG even address Combustion Engineering, and their attempt to distinguish Combustion Engineering rests upon an insupportably narrow reading that fails to account for the Third Circuit's citation to section 1123(a)(5) of the Bankruptcy Code. According to Columbia and TIG, "all the Third Circuit did in Combustion Engineering was to acknowledge the noncontroversial point that 'the estate is comprised of all legal and equitable interests of the debtor in property as of the commencement of the case.'" (Columbia Br. at 13.) In support of this proposition, Columbia and TIG contend that the applicable insurers in that case (the London Market Insurers) were objecting on the basis that "the bankruptcy court did not have the jurisdiction to channel non-derivative claims against non-debtors to the trust because Lummus and Basic's[8] interest in the insurance policies was not property of the Combustion Engineering bankruptcy estate pursuant to Section 541 of the Bankruptcy Code." (Id. at 12.)[9] According to Columbia and TIG, it was in the context of addressing

---

[8]    Lummus and Basic were non-debtor affiliates of Combustion Engineering.

[9]    In their briefs to the Bankruptcy Court, Columbia and TIG took a different tack in trying to avoid the obvious and controlling import of Combustion Engineering. Specifically, Columbia and TIG tried to distinguish Combustion Engineering by arguing that (i) the debtor in Combustion Engineering proposed only to transfer proceeds from insurance policies instead of all of the rights under the policies and (ii) the insurers in Combustion Engineering had voluntarily relinquished their "rights to control the defense of asbestos claims pursuant to a pre-petition agreement" and, as a result, the trust distribution procedures allegedly did "not change whatever rights the insurers had prepetition regarding payment of claims." (Certain Insurers' Reply (Bankr. D.I. 8058) at 2.) Here, of course, the Plan likewise does not propose to transfer all rights under the policies but, rather, rights

whether the London Market Insurers had appellate standing to raise that issue that the

Third Circuit stated that the anti-assignment provisions "would not prevent the

assignment of proceeds to the bankruptcy estate" and referred to the fact that "[s]ection

541 effectively preempts any contractual provision that purports to limit or restrict the

rights of a debtor to transfer or assign[] its interests in bankruptcy." (Id. at 12.)

Columbia and TIG misconstrue the Third Circuit's holding.  In contrasting

the rights under policies held by the debtor with rights under policies held by the

non-debtors, the Third Circuit expressly stated that it agreed with the district court that

the anti-assignment provisions of the policies would not prohibit assignment of the

debtor's insurance proceeds.  Combustion Eng'g, 391 F.3d at 218-19.  And the very issue

addressed by the district court was the insurers' contention that the assignment of the

right to insurance proceeds "to the personal injury trust . . . violates anti-assignment

provisions in their policies and impermissibly varies their rights under their insurance

policies." (See Tr. of July 31, 2003 Hr'g in Combustion Engineering, at 145).  A copy of

the relevant portion of the July 31, 2003 transcript is attached hereto as Exhibit A and

incorporated herein by reference.

Furthermore, Columbia and TIG fail to offer any explanation for the Third

Circuit's citation to section 1123(a)(5) in footnote 27.  In that footnote, the Third Circuit

_____

(continued...)

    to proceeds similar to the plan in Combustion Engineering.  Similarly, regardless
    of whether the insurers in Combustion Engineering had entered into a prepetition
    agreement to relinquish rights to control the defense, the fact is that those insurers
    challenged the transfer of insurance rights based on the anti-assignment
    provisions in their policies, and the Third Circuit conclusively rejected that
    challenge.  It is telling that Columbia and TIG have now abandoned these
    misguided arguments in favor of a similarly unavailing argument.

explained that the debtor's insurance policies were property of the estate, despite the

anti-assignment provisions in the policies, because "[s]ection 541 effectively preempts

any contractual provision that purports to limit or obstruct the rights of a debtor to

transfer or assign its interest in bankruptcy." Combustion Eng'g, 391 F.3d at 219 n.27.

The Third Circuit then quoted the portion of section 1123(a)(5)(B) of the Bankruptcy

Code that authorizes the transfer of property of the estate to "one or more entities." Id.

The Third Circuit's citation to both sections (rather than to section 541 alone) in footnote

27 of the opinion confirms that the Third Circuit agreed with the district court that a

debtor's right to insurance proceeds is part of its bankruptcy estate and, as property of the

estate, section 1123(a)(5)(B) expressly authorizes the transfer of such right to proceeds to

a section 524(g) trust.[10]

---

[10]    The Third Circuit's holding in Combustion Engineering is supported by virtually
every reported decision interpreting section 1123(a)(5) of the Bankruptcy Code.
See Holywell Corp. v. Smith, 503 U.S. 47, 55 (1992) (finding that section
1123(a)(5)(B) authorizes transfer of estate property to a liquidating trust); FCX,
853 F.2d at 1155 (holding that debtor could release collateral securing claim in
satisfaction of claim despite bylaw provision requiring board approval because
section 1123(a)(5) preempted any restrictions in bylaws regarding surrender); In
re W. Asbestos Co., 313 B.R. 456, 462 (Bankr. N.D. Cal. 2004), aff'd, 2004 WL
1944792 (N.D. Cal. 2004) (holding that insurance assets could be assigned to
section 524(g) trust "pursuant to Bankruptcy Code section 1123(a)(5)(B),
notwithstanding any state law or private contractual provisions to the contrary");
Pub. Serv. Co. v. New Hampshire (In re Pub. Serv. Co.), 108 B.R. 854, 882
(Bankr. D.N.H. 1989) (holding that transfer of electric utility under plan was
proper despite state regulations restricting transfer because section 1123(a)(5)
preempted state regulations); In re The Babcock & Wilcox Co., Case No.
00-10992, Amended Findings of Fact and Conclusions of Law Regarding Core
Matters and Proposed Findings of Fact, Conclusions of Law and
Recommendation to the District Court with Respect to Non Core Matters at 37-38
and 40-41 (Bankr. E.D. La. Nov. 9, 2004) (holding that section 1123(a)
"constitutes an explicit express congressional intent to supersede state law
restrictions on the transfer of property") (the "Babcock Opinion").  A copy of the

In furtherance of their efforts to avoid the Third Circuit's controlling opinion in Combustion Engineering, Columbia and TIG cite to another Third Circuit case, Integrated Solutions, Inc. v. Service Support Specialties, Inc., 124 F.3d 487 (3d Cir. 1997), for the proposition that there is a distinction between "what comes into the bankruptcy estate, on the one hand, and what the bankruptcy estate may do with that interest thereafter, on the other hand." (Columbia Br. at 13.) Columbia and TIG note that, in Integrated Solutions, the Third Circuit concluded that even though a non-assignable interest could come into the estate based on federal preemption under section 541, the assignment of the interest from the bankruptcy estate in contravention of state law was not permitted because section 541 is "not intended to expand the debtor's rights against others beyond what rights existed at the commencement of the case" and the Bankruptcy Code provisions relied upon by the debtor failed to "explicitly express Congress's intent to supersede state law restrictions on the transfer." (Id. at 14.) Columbia and TIG then argue that, based on Integrated Solutions, the Third Circuit in Combustion Engineering could not have adopted an interpretation of section 1123(a)(5) that would preempt the anti-assignment provisions of their insurance policies. (Id. at 15.)

The Integrated Solutions case, however, only further supports the Reorganizing Debtors' interpretation of section 1123(a) and Combustion Engineering. In Integrated Solutions, the purchaser of a bankruptcy estate's prejudgment tort claims sought to prosecute those claims in contravention of applicable state law restricting the assignment of such claims. 124 F.3d at 493. The purchaser argued that it had properly

---

(continued...)

> Babcock Opinion is attached hereto as Exhibit B and incorporated herein by reference.

been assigned those claims notwithstanding applicable state law, which the purchaser

argued was preempted by the Bankruptcy Code. Id. In support of its preemption

argument, the purchaser cited to sections 704(1) and 363(b)(1) of the Bankruptcy Code.[11]

Id. Given that neither of these statutes contains any express preemption language, the

Third Circuit had little problem in finding that "neither § 363(b)(1) nor § 704(1)

authorizes the trustee to sell property in violation of state law transfer restrictions." Id.

More importantly, the Third Circuit contrasted those two sections with other sections of

the Bankruptcy Code that contain express preemption provisions, including section

1123(a), noting that "[t]he clear lack of Congressional intent to preempt state law

restrictions on transferring property of the estate is even more telling given the explicit

language that Congress uses when it intends to displace state nonbankruptcy law in other

provisions of the Bankruptcy Code." Id. (citing as examples of valid preemption

provisions sections 1123(a), 541(c)(1), 728(b) and 363(l) of the Bankruptcy Code).

## II.    The Insurers' Arguments Against Express Preemption of the Anti-Assignment Provisions in Their Policies Are Meritless

In an attempt to overcome the clear language and purpose of section

1123(a)(5), the Insurers make four principal arguments to support their erroneous

assertion that, contrary to the Third Circuit's opinion in Combustion Engineering,

section 1123(a)(5) does not expressly preempt the anti-assignment provisions in their

policies. The Insurers first contend that there is a presumption against preemption and

---

[11]    Section 704 sets forth a chapter 7 trustee's duties, and subsection (1) directs the trustee to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest . . . ." 11 U.S.C. § 704(1). Section 363(b)(1) provides that a "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Id. § 363(b)(1).

that, even though the statute *expressly* provides for preemption, section 1123(a)(5) should

be applied only in situations in which the contemplated action is authorized elsewhere in

the Bankruptcy Code. (Columbia Br. at 7; Republic Br. at 20, 23-24.) Second, relying

on an unsupportable and unworkable reading of the statute, the Insurers claim that

section 1123(a) preempts state laws and regulations but not contract provisions.

(Republic Br. at 28-30; Columbia Br. at 28-30.) Third, relying on a single case that

squarely conflicts with the Third Circuit's opinion in Combustion Engineering and the

holdings of every other court that has interpreted section 1123(a)(5), the Insurers argue

that section 1123(a)(5) should be interpreted to apply only to laws relating to the financial

condition of a debtor. (Columbia Br. at 8-12.) Finally, the Insurers contend that section

363(1), not 1123(a)(5), governs the transfer of the rights to proceeds. (Republic Br. at

13-15, 18-19.) Each of these arguments is meritless.

### A.    There is no basis to ignore the express preemptive language in section 1123(a).

Republic contends that section 1123(a)(5) is simply a general directive to

provide adequate means for implementation of a plan, that it is not an empowering statute

and does not expand a debtor's authority beyond what is specifically authorized by other

sections of the Bankruptcy Code and that courts have applied section 1123(a)(5) only in

situations where the contemplated action was "substantively authorized elsewhere in the

Bankruptcy Code." (Republic Br. at 19, 24-25.) In an effort to bolster this unsupportable

interpretation, which, as explained below, renders the preemptive language of section

1123(a) meaningless, Republic contends that there is a strong presumption against

preemption and that preemption must be narrowly construed when it "operates 'in a field

which the States have traditionally occupied' — such as regulation of contracts and

insurance." (Republic Br. 20-21, 23-24 (quoting <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 474 (1996).)[12]  Columbia likewise contends that section 1123(a) must be narrowly construed because there is a strong presumption against preemption, "particularly in areas of traditional state regulation." (Columbia Br. at 10.)  Columbia even suggests that the preemption of the anti-assignment provisions in the policies "involves an area of long-standing and pervasive state regulation." (<u>Id.</u> at 11.)

Here, the Plan's proposed transfer of insurance rights clearly does not interfere in any way with "historic police powers of the States," including, in particular, any state regulations governing insurance.  Indeed, if state regulation has any bearing at all, it would be to ensure that the Insurers do not somehow escape their obligations to provide coverage for injured persons based solely on the Debtors' bankruptcy filing and their utilization of section 524(g) to resolve asbestos liabilities.  Moreover, presumptions against preemption have no relevance in statutes such as section 1123(a) that explicitly provide for preemption.  See <u>Medtronic</u>, 518 U.S. at 485; <u>Egelhoff v. Egelhoff</u>, 532 U.S. 141, 151 (2001) (noting that presumption against preemption "can be overcome where . . . Congress has made clear its desire for preemption.").  Here, as the Supreme Court has previously noted, it is well-recognized that the term "notwithstanding" as found in section 1123(a) expresses a clear statement of intent "to supersede all other laws."

---

[12]    <u>Medtronic</u> involved the preemptive language in the Medical Devices Amendments of 1976, which proscribes specific state regulations of medical devices such as pacemakers, and whether that language preempts state common law product liability claims relating to defective medical devices.  The Supreme Court held that "the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." <u>Medtronic</u>, 518 U.S. at 485.

DLI-5993190v6                                    -20-

Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993).[13]  There is therefore no basis to
attempt to construe section 1123(a) to neutralize its preemptive effect.

      Furthermore, the Republic's contention that section 1123(a) is not an
empowering statute and does not expand a debtor's authority beyond what is specifically
authorized in other sections of the Bankruptcy Code renders the "notwithstanding any
otherwise applicable non-bankruptcy law" clause meaningless since the basis for any
preemption would apparently have to be found elsewhere in the Bankruptcy Code.
Republic's contention also renders several subparts of section 1123(a)(5) meaningless
because they list potential means for implementation of a plan that are not in fact
authorized anywhere else in the Bankruptcy Code.  See, e.g., 11 U.S.C. § 1123(a)(5)(C)
(merger or consolidation of the debtor); (a)(5)(I) (amendment of charter); (a)(5)(J)
(issuance of securities).  Finally, contrary to Republic's position, courts have not applied

---

[13]    In addition, a recent decision of the Supreme Court makes clear that
section 1123(a)(5) must be interpreted without resort to any "presumption against
preemption."  In Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 541
U.S. 246 (2004), the Supreme Court declined to invoke the "presumption against
preemption" to construe Section 209(a) of the Clean Air Act, 42 U.S.C. § 7543(a),
which prohibits states from "adopt[ing] or attempt[ing] to enforce any standard
relating to the control of emissions from new motor vehicles or . . . engines."
Instead, the Supreme Court emphasized that the construction of the statute "must
begin with the language employed by Congress and the assumption that the
ordinary meaning of that language accurately expresses the legislative purposes."
Id. at 252 (quoting Park'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194
(1985)).  The Supreme Court then rejected the lower courts' holding that Section
209(a) — which it characterized as an "express preemption provision" —
invalidated state restrictions on vehicle sales but did not preempt similar
restrictions on vehicle purchases:  "We decline to read into §209(a) a
purchases/sale distinction that is not to be found in the text of §209(a) or the
structure of the CAA."  Id. at 255.  Here, just as the Supreme Court declined to
apply a "presumption against preemption" in interpreting an express preemption
provision in the Clear Air Act, section 1123(a) of the Bankruptcy Code must be
interpreted without resort to any "presumption against preemption."

section 1123(a)(5) only in situations where the contemplated action was "substantively authorized elsewhere in the Bankruptcy Code."[14] (Republic Br. at 25.) In fact, in two of the cases on which Republic relies, the courts actually contrast the broader, substantive nature of section 1123(a) with that of other sections in the Bankruptcy Code. See FCX, 853 F.2d at 1155; Pub. Serv. Co., 108 B.R. at 887-88.

**B.    Section 1123(a) preempts provisions of private contracts.**

The Insurers argue that "[o]n its face, the language of section 1123(a)(5) does not purport to preempt private contracts." (Republic Br. at 28.) The Insurers cite no case, however, that supports their overly narrow interpretation of section 1123(a)(5) and completely ignore that the Third Circuit and every other court that has considered the issue have held that section 1123(a)(5) preempts the terms of private contracts that would interfere with the adequate implementation of a plan. See, e.g., Combustion Eng'g, 391 F.3d at 218 n.27 (insurance contracts); FCX, 853 F.2d at 1154-55 (bylaws of cooperative); W. Asbestos Co., 313 B.R. at 462 (insurance contract); Babcock Op. at 39-40 (same); see also Nantucket Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs.), 61 F.3d 197, 209 (3d Cir. 1995) (extending maturity date of mortgage pursuant to section 1123(a)(5)).

While the Insurers cite to other provisions in the Bankruptcy Code to support their proposition that Congress could have specifically included the term

---

[14]    For instance, in FCX, which Republic cites, the Court applied section 1123(a)(5)(D) to permit a corporation's redemption of its patronage certificates (i.e., equity interests) held by the debtor, notwithstanding applicable provisions under the corporation's by-laws and state law that restricted such redemption. 853 F.2d at 1154. No other provision of the Bankruptcy Code would have permitted the debtor to transfer its patronage certificates to the corporation in contravention of those non-bankruptcy restrictions.

"contract" in the "notwithstanding" clause, they ignore the fact that their narrow

interpretation renders several subsections of the statute meaningless.[15]  The clause

"[n]otwithstanding any otherwise applicable nonbankruptcy law" modifies each of the

subsections of section 1123(a).  A number of these subsections refer to strictly

contractual matters and would have no meaning if the "notwithstanding" clause were read

to only preempt state laws and regulations.  See 11 U.S.C. § 1123(a)(5)(F) ("cancellation

or modification of any indenture or similar instrument"); (a)(5)(G) ("curing or waiving of

any default"); (a)(5)(H) (modifying certain terms of "outstanding securities");

(a)(6) (modifying certain terms of corporate charter).  For example, if, as the Insurers

contend, the "notwithstanding" clause only provides for the preemption of state laws and

regulations, then, among other provisions, section 1123(a)(5)(H), which authorizes a plan

to modify certain terms of outstanding securities, is meaningless.  Not surprisingly, the

Third Circuit agrees that section 1123(a) applies to private contracts.  See Nantucket

Investors II, 61 F.3d at 209 (citing to section 1123(a)(5)(H) to find that "the plain terms

---

[15]     The Insurers' reference to certain sections of the Bankruptcy Code where the term
        "contract" is specifically used also ignores that under various sections of the
        Bankruptcy Code, the term "applicable nonbankruptcy law" generally includes
        private contract rights, even when there is no explicit use of the term "contract" or
        "agreement."  For example, section 365(c)(3) of the Bankruptcy Code prohibits a
        trustee from assuming a lease that has been "terminated under *applicable
        nonbankruptcy law* prior to the order for relief."  11 U.S.C. § 365(c)(3) (emphasis
        added).  It is clear that the statute would apply to leases that have expired or
        terminated under their own terms as well as leases that somehow are terminated
        pursuant to state law.  See In re Moore, 290 B.R. 851, 879-80 (Bankr. N.D. Ala.
        2003) (noting that section 365(c)(3) encompasses contractual termination or
        expiration of lease).  The use of "applicable nonbankruptcy law" to encompass
        private contract rights is found in other sections of the Bankruptcy Code as well.
        See, e.g., 11 U.S.C. § 365(n)(1)(B) (distinguishing between "exclusivity
        provision . . . of contract" and "any *other* right under applicable nonbankruptcy
        law") (emphasis added); 11 U.S.C § 1322(c)(1) (plan may extend payment date
        on mortgage "notwithstanding . . . applicable nonbankruptcy law").

of the Bankruptcy Code refute the proposition that a plan may not extend the maturity

date of a mortgage.").

### C.    Preemption under section 1123(a)(5) is not limited to laws "relating to the financial condition" of a debtor.

Relying solely on the Ninth Circuit Court of Appeals' holding in Pacific

Gas & Electric Co. v. California, 350 F.3d 932 (9th Cir. 2003), the Insurers also argue

that, if section 1123(a)(5) has preemptive effect, it preempts applicable nonbankruptcy

law only "to the extent such nonbankruptcy law relates to the 'financial condition' of the

debtor." (Columbia Br. at 8.)  In doing so, the Insurers again ignore the plain language of

the statute as well as the fact that the holding in Pacific Gas squarely conflicts with the

holdings of the Third Circuit Court of Appeals and every other court that has considered

the issue.  See, e.g., Combustion Eng'g., 391 F.3d at 219 n.27 (interpreting

section 1123(a)(5) without limiting "applicable nonbankruptcy law" to laws relating to

financial condition); FCX, 853 F.2d at 1154 (same); Stone & Webster, 286 B.R. at 543

(same); W. Asbestos Co., 313 B.R. at 462 (same); Babcock Op. at 39-40 (disagreeing

with Ninth Circuit's analysis in Pacific Gas); see also Cisneros, 508 U.S. at 18 (citing

FCX with approval regarding its interpretation of section 1123(a)(5) as "supersed[ing] all

other laws").

The Ninth Circuit's construction of section 1123(a) in Pacific Gas is

plainly wrong because its importation into section 1123(a)(5) of the words "relating to

financial condition" from section 1142 violates the plain meaning rule of statutory

interpretation.  See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989)

("where . . . the statute's language is plain, 'the sole function of the courts is to enforce it

according to its terms.'") (citation omitted).  This violation is particularly problematic

because the Ninth Circuit's interpretation renders section 1123(a)'s "notwithstanding"

clause meaningless with respect to several subsections of the statute, including

subsections (a)(5)(C) (plan may provide for merger with other entities);

(a)(5)(I) (amendment of debtor's charter); (a)(5)(H) (extension of maturity date or change

in interest rate or other term of outstanding securities); and (a)(6) (mandatory inclusion in

charter of provision restricting issuance of nonvoting equity securities). See Kawaauhau

v. Geiger, 523 U.S. 57, 62 (1998) (noting that courts should be "hesitant to adopt an

interpretation of a congressional enactment which renders superfluous another portion of

that same law.") (citation omitted).[16]

Certain of the Insurers also argue that, if the Court concludes that the

preemptive scope of section 1123(a) is broader than matters relating to financial

condition, "the scope of preemption sought by the Plan Supporters . . . far exceeds the

constitutional scope of the Bankruptcy Court's power."[17]  (Columbia Br. at 17.)

---

[16]    Moreover, the Ninth Circuit's holding that sections 1123(a)(5) and 1142(a) must
be construed to mean the same thing, notwithstanding their very different texts,
was based on a single sentence in which Senator DeConcini indicated that, under
section 1123 as enacted in 1978, "[i]f the plan is confirmed, then any action
proposed in the plan may be taken notwithstanding any otherwise applicable
nonbankruptcy law in accordance with section 1142(a) of title 11." Pacific Gas,
350 F.3d at 942. The Ninth Circuit also pointed to the fact that in 1984, Congress
amended both section 1123(a) and the title of section 1142 to substitute the word
"implementation" for "execution." This amendment is hardly evidence of
legislative intent sufficient to ignore the plain language of the statute and at most
demonstrates that Congress intended the two statutes to serve complementary
roles, not that Congress intended the preemptive effect of section 1123(a)(5) to be
limited by section 1142(a)'s "relating to financial condition" language.

[17]    Similarly, Republic argues that the Debtors' interpretation of section 1123(a)
would "permit them to do whatever they want notwithstanding all contrary laws"
and lead to "absurd and obviously inappropriate results." (Republic Br. at 22.)  In
support of this contention, Republic cites to state laws that section 1123(a) clearly
cannot circumvent, such as laws that do not allow an entity to "sell liquor to

---

Specifically, they allege that "wrenching away Certain Insurers' contract rights in this fashion constitutes an unconstitutional 'taking' under the Fifth Amendment." (Id. at 18.) This contention is absurd. As an initial matter, by transferring the rights to insurance proceeds to the Funding Vehicle Trust while fully preserving the Insurers' ability to raise any coverage defenses under their policies, the Insurers are not even harmed. Moreover, giving effect to the express preemptive language of 1123(a)(5) does not, as the Insurers suggest, grant the Reorganizing Debtors a "roving commission to rewrite contracts and excise applicable nonbankruptcy law from the books." (Id.) Section 1123(a)(5) lists specific actions that may be included in a plan as a means for implementation and those actions, as well as the plan as a whole, must otherwise comply with all other applicable requirements in the Bankruptcy Code. If the Insurers were correct that the Bankruptcy Code's preemption of anti-assignment provisions of their policies in connection with implementation of a plan constitutes a "taking," then the Bankruptcy Code provisions relating to executory contracts and virtually every other Bankruptcy Code provision permitting any restructuring of a debtor/creditor relationship would be unconstitutional.

**D.    Section 363(1) is not applicable.**

Continuing in their unrelenting efforts to persuade the Court to ignore Combustion Engineering and the express preemption language of section 1123(a), the

---

(continued...)

> minors," "trade with foreign enemies," "dump toxic wastes," or "merge with competitors to create a monopoly." (Id.) (citing In re Pac. Gas & Elec. Co., 273 B.R. 795, 805 (Bankr. N.D. Cal. 2002)). Whatever the limits of section 1123(a) may be with respect to plan provisions that are unrelated to objectives of the Bankruptcy Code, those limits certainly would not prevent a debtor from transferring rights to a successor entity whose establishment and purpose are contemplated by a specific section of the Bankruptcy Code; namely, section 524(g).

Insurers argue that "[a] transfer of estate property out of a Chapter 11 estate is authorized only by section 363(l), not section 1123(a)(5) upon which the Debtors and the Bankruptcy Court relied." (Republic Br. at 13; see also Columbia Br. at 16.) There is, however, no authority for this novel contention,[18] and the Insurers continue to ignore that the Third Circuit and every other court that has addressed the issue has applied section 1123(a)(5) to authorize similar types of transfers. See, e.g., Combustion Eng'g, 391 F.3d at 219 n.27 (finding that assignment of insurance proceeds to section 524(g) trust notwithstanding any anti-assignment provisions in subject insurance policies is valid and enforceable pursuant to sections 541 and 1123(a)(5)); W. Asbestos Co., 313 B.R. at 462 (holding that insurance assets could be assigned to section 524(g) trust pursuant to section 1123(a)(5)(B)).

Section 363(1) is simply an anti-forfeiture statute, which serves to prevent the "forfeiture, modification, or termination of the debtor's interest in property" as a result of the debtor's financial condition, the filing of a bankruptcy case or the appointment of a bankruptcy trustee. See 11 U.S.C. § 363(1). Furthermore, it is not even clear that the transfer of the Reorganizing Debtors' insurance rights to the Funding Vehicle Trust is a "use, sale or lease of property" with the meaning of section 363(1). Indeed, section 1123(a) makes a distinction between the *transfer* of interests in estate property and the

---

[18]    The only case the Insurers cite clearly does not support the proposition that the Reorganizing Debtors must rely on section 363(1) for preemption relating to the transfer of insurance rights to a 524(g) trust. See MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 93 (2d Cir. 1998) (finding, outside of the plan context, that sections 363(f) and 105(a) authorize the settlement of insurance coverage disputes between the debtor and its insurers and the use of the insurance settlement proceeds for a settlement fund to which asbestos claims would be channeled).

*sale* of estate property. Compare 11 U.S.C. § 1123(a)(5)(B) (authorizing plan to provide

for "transfer of . . . property of the estate to one or more entities . . . .") with 11 U.S.C.

§ 1123(a)(5)(D) (authorizing plan to provide for "sale of . . . property of the

estate . . . .").[19]

In the alternative, the Insurers argue that neither section 363 nor

section 1123 — nor any other provision in the Bankruptcy Code — authorizes the

Reorganizing Debtors to transfer rights under insurance policies because those policies

are not executory. (Republic Br. at 16-18.) According to the Insurers, irrespective of the

preemption language in section 1123(a) and other provisions of the Bankruptcy Code

(including section 363), the Reorganizing Debtors cannot transfer their rights to receive

insurance proceeds in contravention of the anti-assignment provisions in the respective

insurance policies because a debtor "takes into bankruptcy only the contract and property

rights that it possesses immediately before . . . bankruptcy" and Congress has only

authorized Bankruptcy Courts to modify "executory" contracts. (Republic Br. at 16-17.)

This is plainly wrong.

While it is true that a debtor's estate succeeds only to the property rights

that the debtor possessed prepetition and the debtor generally remains bound by the terms

of a non-executory contract, there are numerous provisions in the Bankruptcy Code that

---

[19] Even if the transfer of the rights to proceeds was a "use, s[ale] or lease [of]
property" within the meaning of section 363(1), there is nothing in the Bankruptcy
Code that subjects the provisions in section 1123(a) to those of section 363(1). In
contrast, Congress added specific language in section 1123(b) that makes certain
provisions therein "subject to" the administrative provisions under chapter 3 of
the Bankruptcy Code. See 11 U.S.C. § 1123(b)(2) (providing that a plan may,
"subject to section 365 of this title," provide for the assumption, rejection, or
assignment of any executory contract or unexpired lease).

allow debtors to restructure their obligations under non-executory contracts.[20] See, e.g., 11 U.S.C. § 510 (allowing equitable subordination of claims or interests); 11 U.S.C. § 544 (allowing avoidance of unperfected liens); 11 U.S.C. § 364(d) (allowing the priming of existing liens); 11 U.S.C. § 552(a) (cutting off floating liens); 11 U.S.C. § 502(a)(7) (limiting claims under employment contracts); 11 U.S.C. § 506(b) (limiting claims for postpetition interest and fees to value of collateral). Here, section 1123(a)(5) expressly permits the transfer of property of the estate to implement a plan notwithstanding any otherwise applicable state law or contract right that would prohibit the transfer. The fact that section 365 of the Bankruptcy Code contains specific provisions relating to executory contracts, including the ability to assign such contracts notwithstanding an anti-assignment clause, in no way leads to the conclusion that, despite the express preemption language in section 1123(a), Congress did not intend to preempt anti-assignment provisions in a non-executory contract in connection with a transfer of property of the estate to a successor entity to implement a plan, especially a successor entity whose establishment and purpose are specifically contemplated by section 524(g).

---

[20]   In each of the cases the Insurers cite for the proposition that a debtor is bound by the terms of non-executory contracts, the court was never asked to consider preemptive provisions under the Bankruptcy Code in determining which terms a debtor's estate was bound by under the non-executory contract at issue. See Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149 (3d Cir. 1989) (in a non-core proceeding, the court found that the debtor was bound by an arbitration clause in an agreement with respect to claims arising from such agreement, but not with respect to core-matters arising from the Bankruptcy Code); In re Stewart Foods, Inc., 64 F.3d 141 (4th Cir. 1995) (court found debtor was not bound to make postpetition payments under a prepetition, non-executory contact). In fact, in the Hays case, relied on by the Insurers, the court even acknowledged that "the text of the Bankruptcy Code embodies the principle that pre-petition contract rights are enforceable in a bankruptcy proceeding except to the extent the Code specifically provides otherwise." 885 F.2d at 1157.

III.    **Contingent Rights to Insurance Proceeds Are Property of the Estate**

      Apparently recognizing the weakness of the plethora of arguments they advance to avoid the express preemptive effect of section 1123(a), certain of the Insurers also argue that the Bankruptcy Court's ruling on the Transfer should be reversed because, purportedly, there is no right to insurance proceeds to be transferred. (Republic Br. at 34, 35; ACE Br. at 4, 5.)[21] ACE even argues that there will never be any insurance proceeds, and it will never be required to pay under their policies, because (1) it is a prerequisite to any obligation to pay that the insured be adjudicated liable and (2) the PI Trusts will have assumed all liability for Channeled Personal Injury Claims and therefore the insured under the policy, i.e., the Reorganizing Debtors, will never be adjudicated liable on those claims.[22] (ACE Br. at 4-5.) These meritless arguments are contrary to the fundamental principles of bankruptcy law and the Third Circuit's opinion in Combustion Engineering.

---

[21]    ACE also argues that a determination of the existence of insurance proceeds can be decided only pursuant to an adversary proceeding. (ACE Br. at 11.) ACE makes this argument for the first time on appeal and despite having agreed in the Stipulation that the validity of the Transfer under federal law would be adjudicated as part of the confirmation hearing on the Plan. Accordingly, ACE has waived, and is estopped from raising, the argument that the Bankruptcy Court could not make the finding on the validity of the Transfer except by adversary proceeding. Gass v. V.I. Tel. Corp., 311 F.3d 237, 246 (3d Cir. 2002) (refusing to consider an argument raised for the first time on appeal because "failure to raise an issue in the [lower] court constitutes a waiver of the argument") (quoting Med. Protective Co. v. Watkins, 198 F.3d 100, 105-06 n.3 (3d Cir. 1999) (internal quotation marks omitted)).

[22]    ACE also asserts that the personal injury claimants voluntarily accepted this risk by voting overwhelmingly to approve the Plan because the Disclosure Statement noted that the value of the insurance assets was uncertain and subject to litigation. (ACE Br. at 4 n.2.) The risk discussed in the Disclosure Statement, however, referred specifically to the "insurance coverage litigation" that is pending in California state court, not some risk that the Plan's channeling of the Debtors' liability for Tort Claims to the PI Trusts somehow "precludes any rights to receive insurance proceeds." (Id. at 4.) Stated another way, the personal injury claimants

As an initial matter, it is black letter law that insurance policies are property of the estate. ACandS, Inc. v. Travelers Cas. & Sur. Co. (In re ACandS, Inc.), 435 F.3d 252, 260 (3d Cir. 2006) ("It has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate."). More importantly, the Third Circuit in Combustion Engineering affirmed that a debtor's right to insurance proceeds is property of the estate under section 541. See Combustion Eng'g, 391 F.3d at 219 n.27 ("[E]ven if the subject insurance policies purported to prohibit the assignment of Combustion Engineering's insurance proceeds, these provisions would not prevent the assignment of proceeds to the bankruptcy estate.").

The fact that there are certain predicates that have not yet occurred and that may have to be met or shown before the Insurers are obligated to pay does not mean, contrary to the Third Circuit's opinion in Combustion Engineering, that the Reorganizing Debtors' right to receive such payments, although contingent, is somehow not property of the estate. Section 541, which defines what is property of the estate, is broad and all encompassing; property of the estate includes "all legal or equitable interests of the debtor in property," "proceeds . . . from property of the estate" and "any interest in property that the estate acquires after the commencement of the case." 11 U.S.C. §§ 541(a)(2), (6) and (7). In fact, the Third Circuit has specifically rejected the argument that proceeds do not exist until the event triggering liability occurs. Estate of Lellock v. Prudential Ins. Co. of Am., 811 F.2d 186, 189 (3d Cir. 1987) (holding that rights to

---

(continued...)

certainly did not assume the risk that, contrary to section 524(e) of the Bankruptcy Code, which provides that the discharge of a debt "does not affect the liability of any other entity on . . . such debt," the Insurers' obligations under the policies would be vitiated by the Transfer.

contingent insurance proceeds were sufficient for attachment of lien). <u>Lellock</u> is consistent with numerous circuit court opinions holding that insurance policies and the contingent right to proceeds are property of the estate. <u>See, e.g., Homsy v. Floyd (In re Vitek)</u>, 51 F.3d 530, 534 (5th Cir. 1995); <u>Health Ctr. v. Ins. Co. of N. Am. (In re St. Clare's Hosp. & Health Ctr.)</u>, 934 F.2d 15, 18-19 (2d Cir. 1991); <u>(Nat'l Union Fire Ins. Co. v. Titan Energy, Inc. (In re Titan Energy, Inc.)</u>, 837 F.2d 325, 329 (8th Cir. 1988); <u>Tringali v. Hathaway Mach. Co.</u>, 796 F.2d 553 (1st Cir. 1986).

      To support their argument that the Reorganizing Debtors do not have rights to insurance proceeds, the Insurers rely on cases involving directors' and officers' liability insurance. (Republic Br. at 35; ACE Br. at 8.) These cases are all inapposite because, unlike directors' and officers' liability insurance, there is no issue as to whether proceeds from general or product liability policies inure to the benefit of the debtor.[23] Indeed, even courts that hold that directors' and officers' liability policies are not property of the estate recognize that, when a policy provides coverage for losses of the debtor, "the

---

[23]    Courts are split on the issue of whether the proceeds of directors' and officers' liability policies are property of the estate. Courts holding that directors' and officers' liability policies are property of the estate have done so on the basis that such policies protect against diminution of the estate. <u>See, e.g., In re Minoco of Cos., Ltd.</u>, 799 F.2d 517 (9th Cir. 1986); <u>In re Sacred Heart Hosp. of Norristown</u>, 182 B.R. 413 (Bankr. E.D. Pa. 1995); <u>In re Circle K Corp.</u>, 121 B.R. 257 (Bankr. D. Ariz. 1990). In contrast, courts finding that directors' and officers' liability policies are not property of the estate base their decision primarily on the fact that the proceeds of such policies do not inure to the benefit of the debtor. <u>See, e.g., La. World Exposition, Inc. v. Fed. Ins. Co. (In re La. World Exposition, Inc.)</u>, 832 F.2d 1391 (5th Cir. 1987); <u>In re Adelphia Commc'n Corp.</u>, 298 B.R. 49 (S.D.N.Y. 2003); <u>Maxwell v. Megliola (In re marchFirst, Inc.)</u>, 288 B.R. 526 (Bankr. N. D. Ill. 2002). There is no similar disagreement as to whether general or product liability policies and their proceeds are property of the estate. <u>See, e.g., In re Vitek</u>, 51 F.3d at 534 ("Virtually every court to have considered the issue has concluded that the policies — and clearly the proceeds of those policies — are part of the debtor's bankruptcy estate.").

estate owns not only the policies, but also the proceeds designated to cover corporate losses or liability." La. World Exposition, Inc., 832 F.2d at 1399-1400 (citing Tringali, 796 F.2d 553 (1st Cir. 1986); Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992 (5th Cir. 1985); In re Crownover, 43 B.R. 22 (Bankr. E.D. Mo. 1984)).

Republic cites to Capital National Bank of New York v. McDonald's Corp., 625 F. Supp. 874 (S.D.N.Y. 1986), and Don King Prods., Inc. v. Thomas, 945 F.2d 529 (2d Cir. 1991), for the proposition that the assignment of a future interest or right to receive income contingent upon a future event does not convey a present interest. (Republic Br. at 38.) Both of those cases are inapplicable, however, because they both involve lien priority and attachment issues. Don King, 945 F.2d at 534-35 (dealing exclusively with "inchoateness" doctrine of federal tax lien law); Capital Nat'l, 625 F. Supp. at 879 (addressing attachment of blanket lien to chose of action).[24]

The California state law cases the Insurers rely upon are equally inapplicable. The Insurers rely on Javoreck v. Superior Court, 17 Cal. 3d 629 (Cal. 1976), and Montrose Chemical Corp. v. Admiral Ins. Co., 10 Cal. 4th 645 (1995), for the general proposition that an insurer has no duty to pay until the insured becomes legally obligated to pay damages. (ACE Br. at 5; Republic Br. at 35.) While this may be true, it in no way establishes that the insured does not have an existing contingent right under the

---

[24]    Republic also cites Burgess v. Sikes (In re Burgess), 392 F.3d 782 (5th Cir. 2004), aff'd, 438 F.3d 493 (en banc), for the proposition that "when a bankruptcy filing pre-dates a right to payment, that right is not property of the estate." (Republic Br. at 36). Burgess, however, was an individual chapter 7 case with no application to a corporate chapter 11 case. Indeed, if that proposition were applied in the Reorganizing Debtors' cases, no assets acquired since February 2002 would be property of the estate. Moreover, the asset or right to payment in Burgess was created by the postpetition enactment of legislation, 428 F.3d at 503, whereas here the right to payment derives from prepetition insurance policies.

policy. In Javoreck, California residents, who had sued Oregon residents for injuries and

a death resulting from an automobile accident in Oregon, but who had not served those

defendants personally, obtained a writ of attachment against the insurers in respect of

their obligation to indemnify and defend. The California Supreme Court held that the

contingent nature of the insurer's obligation to defend and indemnify defendants was

insufficient to be subject to attachment. Javoreck, 17 Cal. 3d at 646. The issue here is

not whether the insurers' obligations, or even the Reorganizing Debtors' contingent rights

to insurance proceeds, have sufficiently accrued to permit attachment under California

law but, simply, whether the Reorganizing Debtors have a contingent right to payment

under the policies, which they clearly do.[25]

        Finally, ACE cites Henkel Corp. v. Hartford Accident & Indem. Co.,

29 Cal. 4th 934 (2003), and argues that the assignment of the proceeds subjects the

Insurers to competing claims because, while the proceeds are assigned to the Funding

Vehicle Trust, the policies remain with the Debtors. (ACE Br. at 10.) In Henkel, a

company had acquired the assets and also assumed the liabilities of another corporation,

and the court was concerned that a contractual assignment of rights to the acquiring

corporation for insurance coverage was not binding on the plaintiff, who might sue both

the acquiring corporation and the original insured on the same claim. 29 Cal. 4th at 941,

---

[25]    Montrose is simply a coverage case that is similarly inapplicable. In Montrose,
which involved progressively deteriorating property damage, the insurer sought to
avoid coverage on the basis that it was not required to indemnify the insured for
losses that were ongoing when the policies were issued. Rejecting the insurers'
coverage argument, the California Supreme Court held that, although the insured's
loss was ongoing at the time the polices were issued, the insured had not yet been
found liable to third-parties, and thus, the contingent nature of the loss was
covered under the insurance policies. 10 Cal. 4th at 690.

942. Here, that situation cannot happen. First, the assignment of the right to proceeds does not establish who is liable; rather, the Plan and the channeling injunctions do. Second, the channeling injunctions that are being issued under the Plan preclude any plaintiff from suing the Reorganizing Debtors on a Tort Claim. The fact that the Reorganizing Debtors may have continuing rights to seek coverage as to claims other than Tort Claims is inherent in the nature of general liability coverage, and does not expose the Insurers to any additional risk. As noted above, the Plan preserves the rights and duties of the Reorganizing Debtors and the Insurers under the policies as those rights and duties existed on the Petition Date. The Plan is insurance neutral; it does not alter the Reorganizing Debtors' or the Insurers' rights under the policies.

## IV. Section 524(g) Impliedly Preempts the Insurance Policy Anti-Assignment Provisions

As the Plan Proponents contended below, because the Insurers' interpretation of their contract rights would thwart the purposes of section 524(g) of the Bankruptcy Code, on the basis of conflict preemption principles, section 524(g) also impliedly preempts the anti-assignment provisions in the Insurers' policies. While acknowledging that Congress (a) "enacted section 524(g) to provide a means for a debtor to escape its asbestos liabilities by funding a trust to pay current and future asbestos claims" and (b) "in drafting section 524(g), followed th[e] lead [of the Johns-Manville case] and included language allowing insurers to obtain the protection of the channeling injunction," Republic argues that contract provisions "barring assignment of insurance rights do not conflict with that statute." (Republic Br. at 31.) According to Republic, section 524(g) "does not require insurance funding, and Congress clearly contemplated that a trust could be adequately funded with other assets." (Republic Br. at 31-32.) It is

ridiculous to suggest, however, that a section 524(g) trust would be created without inclusion of existing insurance that covers asbestos claims; the one asset unavailable to a debtor's other creditors. Moreover, if restrictions on the transfer of insurance proceeds to a section 524(g) trust were recognized under the Bankruptcy Code, it would be exceedingly difficult for a debtor with substantial insurance assets to ever use section 524(g) or otherwise establish a trust without its insurers' consent. Such an outcome would frustrate Congress' intent to permit the creation of a trust to assume a debtor's asbestos liabilities because it could potentially force the debtor either to forego its insurance proceeds as a cost of establishing the trust or agree to the demands of the insurers who are seeking to avoid or minimize coverage.

The Reorganizing Debtors' case presents a perfect example of how the anti-assignment provisions in the Insurers' policies could be used to thwart section 524(g). The Reorganizing Debtors, prior to several recent settlements with certain of their insurers, had in excess of $1 billion in insurance coverage available to pay for losses related to asbestos claims. This insurance coverage and the proceeds therefrom is the principal asset that will fund the PI Trusts, and contrary to Republic's assertion, insurance funding is, in fact, "essential to this particular Plan." (Id. at 32.)[26] Yet notwithstanding that all of their coverage defenses are preserved, the Insurers seek to escape coverage obligations under their policies simply because the rights to proceeds under the policies are being transferred along with the asbestos liabilities to the section 524(g) trust. The Insurers are clearly attempting to use the anti-assignment provisions in the Insurers'

---

[26]    Republic's suggestion that insurance funding is not essential is based solely on the fact that the Insurers are contesting coverage and that asbestos claimants were, therefore, informed that ultimate recoveries were uncertain. (Republic Br. at 32.)

policies to realize a windfall under their policies, in contravention of the objectives of

section 524(g). Implied preemption is warranted. <u>Tate v. NationsBanc Mortgage Corp.</u>

<u>(In re Tate)</u>, 253 B.R. 653, 671 (W.D.N.C. 2000); <u>see also</u> <u>In re Buttonwood Partners,</u>

<u>Ltd.,</u> 111 B.R. 57, 61 (Bankr. S.D.N.Y. 1990) (holding that Bankruptcy Code would

preempt federal thrift regulation to extent that regulation would "interfere with the ability

of the Debtor to reorganize under Chapter 11 and contradict the 'fresh-start' policy which

underlies the Code.").

## CONCLUSION

For all the foregoing reasons, the Bankruptcy Court's ruling should be

affirmed in all respects.

Dated: May 1, 2006                    Respectfully submitted,
Wilmington, Delaware

_Kmtrf D. Newmarl_                    _Lisa Beckerman_ w/p KDN        _Peter Van N. Lockwood_ w/p KSN.
Daniel DeFranceschi (DE 2732)         William Bowden (DE 2553)        Marla Eskin (DE 2989)
Kimberly Newmarch (DE 4340)           Gregory Taylor (DE 4008)        Mark Hurford (DE 3299)
RICHARDS, LAYTON &                    ASHBY & GEDDES                  CAMPBELL & LEVINE
FINGER                                222 Delaware Avenue             800 King Street, Suite 300
One Rodney Square                     P.O. Box 1150                   Wilmington, DE 19801
P.O. Box 551                          Wilmington, DE 19899            Telephone: (302) 426-1900
Wilmington, DE 19899                  Telephone: (302) 654-1888       Facsimile: 302-426-9947
Telephone: (302) 651-7700             Facsimile: (302) 654-1067
Facsimile: (302) 651-7701

       -and-                                 -and-                            -and-

Gregory Gordon                        Lisa Beckerman                  Elihu Inselbuch
Daniel Winikka                        AKIN GUMP STRAUSS               CAPLIN & DRYSDALE
JONES DAY                             HAUER & FELD                    399 Park Avenue
2727 North Harwood Street             590 Madison Avenue              New York, NY 10022
Dallas, Texas 75201                   New York, NY 10022              Telephone: (212) 319-7125
Telephone: (214) 220-3939             Telephone: (212) 872-1000       Facsimile: (212) 644-6755
Facsimile: (214) 969-5100             Facsimile: (212) 872-1002

                                                                             -and-
ATTORNEYS FOR DEBTORS                 Brian Kilmer
AND DEBTORS IN                        AKIN GUMP STRAUSS               Peter Van N. Lockwood
POSSESSION                            HAUER & FELD                    CAPLIN & DRYSDALE
                                      1700 Pacific Ave., Ste. 4100    One Thomas Circle, N.W.
                                      Dallas, TX 75201                Washington, DC 20005
                                      Telephone: (214) 969-2800       Telephone: (202) 862-5000
                                      Facsimile: (214) 969-4343       Facsimile: (202) 429-3301

                                      ATTORNEYS FOR THE               ATTORNEYS FOR
                                      OFFICIAL COMMITTEE OF           OFFICIAL COMMITTEE
                                      UNSECURED CREDITORS             OF ASBESTOS
                                                                      CLAIMANTS

DLI-5993190v6                              -38-

*Sharon Zieg w/p KDN*                    *Frederick Holden w/p KDN*
_____              _____
James Patton Jr. (DE 2202)               Laurie Polleck (DE 4300)
Edwin Harron (DE 3396)                   JASPAN SCHLESINGER
Sharon Zieg (DE 4196)                    HOFFMAN
YOUNG CONAWAY                            913 Market Street, 12th Floor
STARGATT &                               Wilmington, DE 19801
TAYLOR                                   Telephone: (302) 351-8000
The Brandywine Building                  Facsimile: (302) 351-8010
1000 West Street, 17th Floor
Wilmington, DE 19801                              -and-
Telephone: (302) 571-6600
Facsimile: (302) 571-1253                Frederick Holden
                                         ORRICK, HERRINGTON &
                                         SUTCLIFFE
COUNSEL TO MARTIN J.                     The Orrick Building
MURPHY, THE LEGAL                        405 Howard Street
REPRESENTATIVE FOR                       San Francisco, CA 94105
FUTURE ASBESTOS                          Telephone: (415) 773-5700
CLAIMANTS                                Facsimile: (415) 773-5759

                                         COUNSEL TO THE OFFICIAL
                                         COMMITTEE OF RETIRED
                                         SALARIED EMPLOYEES

**EXHIBIT A**

1

1

2                     UNITED STATES DISTRICT COURT
                          DISTRICT OF DELAWARE
3

4

5      - - - - - - - - - -   - - - - - - - - - - - - - -        Chapter 11

       In Re:
6                                               Bankr. Case No. 03-10495 (JKF)

       COMBUSTION ENGINEERING, INC.,
7                                                  CONFIRMATION HEARING
           Debtor.                                  and BENCH OPINION
8      - - - - - - - - - - - - - - - - - - - - - - -  - - - - -

9                                        July 31, 2003
                                         Newark, New Jersey
10

11

12     B E F O R E:

13            HONORABLE ALFRED M. WOLIN, USDJ

14

15

16

       Pursuant to Section 753 Title 28 United States Code, the
17     following transcript is certified to be an accurate record as
       taken stenographically in the above-entitled proceedings.
18

19     JACQUELINE KASHMER
       Official Court Reporter
20

21

22

23                    JACQUELINE KASHMER, C.S.R.
                        OFFICIAL COURT REPORTER
24                          P. O. Box 12
                        Pittstown, NJ 08867
25                         (609) 656-2595

1    Judge Fitzgerald delayed her final order to solicit additional

2    evidence of notice to claimants.

3        This Court has and will continue the course set by

4    Judge Fitzgerald.  The parties have been afforded adequate

5    opportunity to voice their positions, positions that have

6    already been fully developed and presented before the

7    Bankruptcy Court.  But this Court will not aid those who would

8    subvert this plan for their only parochial purposes by causing

9    delay through unnecessary litigiousness.  While the specifics

10   of the issues raised will be dealt with later in this opinion,

11   the Court is satisfied that any objection or appeal based on

12   the proposition that due process has not been afforded is

13   spurious and must be denied.

14       Turning to the specific issues, the Court will first

15   consider the appeals and objections of the insurers.  As

16   noted, the plan assigns the right to any insurance proceeds to

17   the personal injury trust.  The insurers contend that this

18   violates anti-assignment provisions in their policies and

19   impermissibly varies their rights under their insurance

20   policies.

21       The plan proponents contend that the assignment of

22   proceeds does not equal assignment of a policy.  The Court

23   agrees.  Assignment of a right to receive proceeds does not

24   change any risk that was insured against.  Moreover, all

25   substantive rights of the insurers were expressly preserved

146

1    under the plan per the order of Judge Fitzgerald.

2        The fundamentals of bankruptcy require that rights be

3    assignable to new entities created by a reorganization, so

4    long as the bargain struck by the non-debtor is preserved.  An

5    anti-assignment provision in a contract that would bar an

6    assignment to a new entity created by the reorganization of a

7    debtor, but that affects none of the rights of the non-debtor

8    party, would thwart the purposes of the Code.  The Court notes

9    that contractual provisions that provide for a forfeiture of

10   contract rights in the event a bankruptcy petition, if filed,

11   are routinely considered void under Section 541 of the Code

12   and as contrary to public policy.  If the insurers were

13   correct in reading the anti-assignment provisions of

14   Combustion Engineering's insurance policies to bar even a

15   simple assignment of proceeds to a trust fund for claimants

16   created by the reorganization, then these provisions, too,

17   should be considered void.

18       The carriers bitterly complain that the plan does not

19   permit them to object to the allowance of particular claims

20   against the personal injury trust.  They contend that this

21   varies their rights under the policies.  However, the plan

22   specifically provides that payment of claims is subject to the

23   rights of the insurers under their policies or other

24   agreements.  Should the insurers claim that this provision has

25   been violated in the course of the administration of the

**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                          CASE NUMBER:

**THE BABCOCK & WILCOX COMPANY**              **00-10992**

DEBTOR                                       SECTION "B"

Jointly Administered With

DIAMOND POWER INTERNATIONAL, INC.            00-10993
BABCOCK & WILCOX CONSTRUCTION CO., INC.      00-10994
AMERICON, INC.                               00-10995

**AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
CORE MATTERS AND PROPOSED FINDINGS OF FACT,
CONCLUSIONS OF LAW AND RECOMMENDATIONS TO
THE DISTRICT COURT WITH RESPECT TO NON-CORE MATTERS**

Outline

I.      Introduction
II.     Background
        A.  The Debtors
        B.  Description of the Plan
III.    The Court has Jurisdiction to Enter Certain Insurance Related Findings
IV.     The Joint Plan Meets the Requirements of §1129
        A.  The Plan complies with the applicable provisions of title 11, including the
        classification of claims under §1122 and the contents of the Plan under §1123
              1.  Classification and Treatment
              2.  Adequate Means for Implementation
        B.  The Plan meets the requirements of §1129(a)(2), (4), and (5)
        C.  The Plan meets the requirements of §1129(a)(7)-(10)
        D.  The Plan satisfies the requirements of §1129(a)(11)
        E.  Cram Down Requirements of §1129(b) have been satisfied
              1.  Unfair Discrimination
              2.  Fair and Equitable
V.      The Plan has Been Filed in Good Faith, and not by Means Forbidden by Law
        A.  The Plan is a result of extensive negotiations and is not a collusive agreement
        between the Debtors, McDermott and plaintiff's lawyers
        B.  The Insurer's Contractual Rights
              1.  Anti-Assignment Clauses

-1-

2. Anti-Assignment, Management of Claims, Cooperation and Consent Clauses Preemption Under Section 1123(a)(5).

C. Payment of Valid Claims

VI.   The Plan's Discharge and Injunctive Provisions Satisfy the Requirements of the Bankruptcy Code

A. Uncontested Matters

B. Contested Matters

C. Section 105 Injunction
1. Identity of Interest
2. Substantial Contribution
3. Essential to Reorganization
4. Acceptance of the Plan by Impacted Class
5. Substantially Full Payment to Impacted Class
6. Full Payment of Nonsettling Claimants

VII.   Executory Contracts

A. Insurance Policies

B. Coverage in Place Agreements

VIII.   Apollo Parks Issues

A. Background Facts

B. The Plan, as it relates to Apollo/Parks, is Proposed in Good Faith

C. The Plan does not violate the Price Anderson Act

D. The Court's jurisdiction to determine insurance related findings

E. Proposed Findings of Fact and Conclusions of Law that ANI has Forfeited Rights under the Policies, such as the Management of Claims, No Action, and Consent to Settlement Provisions
1. Breach of Duty to Settle
2. Breach of Duty to Defend
3. Denial of Coverage

F. Reasonable Settlement

IX.   Other Objections

A. Lack of Notice

B. Objections Specific to Ace Companies

X.   Conclusion

## I    INTRODUCTION.

This matter came before the court as a hearing on confirmation of the third amended joint

plan of reorganization as of June 25, 2003 with technical modifications as of October 1, 2004

proposed by the Debtors[1], the Asbestos Claimants' Committee, the Future Claimants'

---

[1]  See title for the names of the four debtors.

Representative, and McDermott Incorporated ("Plan"). Objections to the Plan were filed by various entities,[2] and a hearing on confirmation of the Plan was held on September 22 through 26, 2003, October 20 through 24, 2003, December 16 through 18, 2003 and January 5 through 9, 2004. Also heard was the Plan Proponents[3] motion to resolve Executory Contract Assumption Motion in conjunction with other insurance-related plan issues. The Plan Proponents assert that certain asbestos insurance settlement agreements are not executory contracts, and that the Debtors need not assume or reject them, or in the alternative, if they are determined to be executory, that the agreements can be assumed by the Debtors. The matter was heard in conjunction with other insurance-related matters at the hearing on confirmation. Since the hearings on confirmation, various settlements have been entered resolving certain objections and issues.[4]

---

[2]  Objections were filed by a Certain Group of Law Firms; PMAC Ltd; Pulp & Paper of America, LLC; Babcock Wilcox Espanola, S.A.; American Nuclear Insurers and Mutual Atomic Energy Liability Underwriters ("ANI"); TIG and United States Fire Ins. Co.; Travelers Indemnity Co. and Travelers Casualty and Surety ("Travelers"); Maryland Ins. Co.; Ace Companies; Westchester Fire Ins. Co.; Certain Underwriters at Lloyds; as well as joinders in objections filed by Royal Indemnity Company, Maryland Ins. Company, and St. Paul Mercury Ins. Co.

[3]  Plan Proponents are The Babcock & Wilcox Company, Diamond Power International, Inc., Americon, Inc., and Babcock & Wilcox Construction Company, Inc. (collectively ("Debtors"), McDermott Incorporated ("MI"), the Asbestos Claimants' Committee (the "ACC"), and the Future Asbestos-Related Claimants' Representative (the "FCR"). As to A/P Township matters, the Plan Proponents also include the A/P Claimants, the A/P FCR, ARCO, BWXT Services and McDermott International, Inc. ("MII"). A chart showing the corporate structure of MII, the parent of MI and related companies including the debtors appears as Exhibit 32.

[4]  During the confirmation process, various settlements were concluded with CNA/Continental Insurance, p. 5417; and Affiliated/Appalachian, p. 5415. After the confirmation hearings, various settlements were approved with First State, p. 5804; AIG Member Cos., p. 5802; Associated International, p. 5803; Northwestern, p. 5824; Travelers Property Insurance Co., The Travelers Indemnity Co., The Travelers Insurance Co, The Travelers Indemnity Co.of Rhode Island and Travelers Casualty and Surety Co., p. 6065; Royal Indemnity Co, p. 6057; Arkwright, p. 6059; Mount McKinley Ins. Co, p. 6061; Prudential

This case is rapidly approaching the fifth anniversary of its filing date, February 22, 2000.
The asbestos claimants, who for at least three years were strident adversaries of the debtors, are now
in agreement on the joint plan before the court for confirmation. A number of the insurers, most of
which are not creditors, continue to object. Other insurers have settled their differences and
withdrawn, or are willing to withdraw, their objections if their pending motions for compromise are
granted. [5] The Plan Proponents have been urging the court not to enter an opinion at this time, but
instead to grant additional time for them to negotiate settlements with some of the remaining
objecting insurers. Their plea for further delay falls on deaf ears because the court has the distinct
feeling that:

1. This case has already lasted too long;

2. The professional fees and expenses have already been far too costly – $85,666,633 at
   last count, which only included charges through October 2003.[6] Such fees and
   expenses will probably exceed one hundred million dollars before this case is over – a
   far too expensive cost of reorganization.

3. The parties have only reached settlements, filed a joint plan or taken affirmative and
   constructive action among themselves when the court has insisted upon firm

---

Assurance Co., Ltd. and Pearl Assurance plc., p. 6068; Riverstone and The Riverstone Insurers,
p. 6063. No ruling, proceeding or other matter in connection with the Plan or the Chapter 11
Reorganization Cases will impair, affect or modify any of the Plan Proponents' or Settling
Asbestos Insurance Entities' rights or obligations under any Asbestos PI Insurance Settlement
Agreements.

[5] *See* footnotes 2, 4.

[6] *See* Exhibit 2013, which also contains a future estimate of $7,085,000, but that only
forecasted future invoices through March 2004.

deadlines. The clearest example is that Travelers and the Plan Proponents had

advised the court as early as February 2004 that they had a "settlement in

principle", but only filed settlement papers on September 21, 2004, because the court

had set that date as a strict deadline.

The time has come to move this case forward.

This opinion constitutes the court's findings of fact and conclusions of law regarding core

matters and proposed findings of fact and conclusions of law and recommendations to the district

court regarding non-core matters arising in connection with the Plan confirmation. In the

alternative, to the extent that certain insurance-related issues are determined to be non-core, they are

tendered as proposed findings of fact and conclusions of law. The court recommends that the Plan

be confirmed.


II.    **BACKGROUND.**

A.  *The Debtors and other parties.*    The Babcock & Wilcox Company ("B&W") was

initially formed in 1877, as the manufacturer and marketer of water tube steam boilers. In 1978,

J. Ray McDermott & Co, Inc. (now McDermott Incorporated) acquired B&W. [7] B&W and its

subsidiaries design, engineer, manufacture, and service industrial boiler systems.[8] The boilers

contain or are alleged to contain asbestos liners.

---

[7]  Debtors Diamond Power International Inc. and Americon, Inc. are subsidiaries of
B&W. Americon is a holding company for Babcock & Wilcox Construction Company, Inc., the
other debtor. Joint Pre-Trial Order, 2 - 5.

[8]  Joint Pretrial Order, 1-2.

-5-

In the late 1970's, asbestos-related personal injury claims were asserted against B&W.[9] By 1999, the number of claims filed against B&W had reached over 400,000.[10] The Debtors filed for relief under Chapter 11 of the Bankruptcy Code on February 22, 2000.

Following the filing, the official Asbestos Claimants' Committee was formed by the United States Trustee, and the court authorized the appointment of Eric D. Green, Esq. as the legal representative for the future asbestos-related claimants. For well over two years, the ACC and the FCR were for the most part allied but in opposition to the Debtors as to the handling of present and future asbestos claims.

In February, 2001 the court granted the Debtors' request that a mediator be appointed. Mr. Francis McGovern was appointed to mediate with the Debtors, the Debtors' owners or affiliates, the ACC and the FCR regarding the general financial terms of a plan of reorganization. On February 22, 2001, at the court's insistence, the Debtors filed their Disclosure Statement and Plan, which set forth the Debtor's proposal for a consensual plan of reorganization. Both the ACC and FCR initially did not agree to the Debtors' Plan, and it was not set for hearing. The plan was amended at least twice, in May and July, 2002.[11] In May, 2002, this court terminated the Debtors' exclusive period to file a plan of reorganization. Thereafter, in July, 2002, the ACC and the FCR filed their own Disclosure Statement and Plan.[12]

After much negotiation, the ACC, FCR and Debtors were able to resolve many of their

---

[9]   *Id.* at 7.

[10]   *Id.* at 9.

[11]   Pl. 3148, 3316.

[12]   Pl. 3320, 3321.

differences and agree upon a form of plan. On December 19, 2002, the Debtors, MI, ACC and FCR

filed a Substantially Complete Form of Joint Disclosure Statement.  On June 25, 2003, the Plan

Proponents filed the Third Amended Joint Disclosure Statement and the Third Amended Joint Plan

of Reorganization. On August 28, 2003, the Plan Proponents filed the Plan Supplement. Following

approval of the Disclosure Statement, on July 10, 2003, the court entered an order approving the

confirmation hearing notice and solicitation package and the manner of mailing these, as well as the

procedures for voting and tabulation and procedures for allowing claims for voting purposes.

On August 15, 2003 Mr. Uddo was appointed the Apollo FCR, representing the interests of

the Apollo/Parks ("A/P") future interest holders.[13] After his appointment, further negotiations with

the settling parties took place, which resulted in the filing of technical amendments to the Plan and

a revised A/P Settlement Agreement.[14] On November 12, 2003 and January 12, 2004, this Court

approved the First and Second Sets of Technical Modifications to the Plan. Among other things, the

modifications provide for: (1) the elimination of the Asbestos PD Trust and payment of Asbestos

PD Claims and Indirect Asbestos PD Claims by the Reorganized Debtors based on the same

payment percentage as previously contemplated to be paid on the claims by the trust; and (2)

amendments to the Plan and Apollo/Parks related plan documents to reflect the agreement reached

regarding the Apollo/Parks Township Claims  A Third Set of Technical Modifications to the Plan

was approved on June 21, 2004, and a Fourth Set of Technical Modifications was approved on

October 6, 2004.

---

[13]  Exhibit 3240.

[14]  The term sheet for the revised settlement was filed on December 16, 2003. Exhibit
3221.

B. *Description of the Plan.*    A brief summary of the Plan is necessary to adequately discuss classification and other issues that arose in connection with confirmation.  The Plan generally provides for eleven classes of claims, as follows:

| Classification | Description | Voting Status | Vote |
|---|---|---|---|
| Class 1 | Priority | Unimpaired | |
| Class 2 | Non-Priority Secured | Unimpaired | |
| Class 3 | Workers'Compensation | Unimpaired | |
| Class 4 | Unsecured Trade | Unimpaired | |
| Class 5 | General Unsecured | Impaired | Reject |
| Class 6 | Asbestos PI Trust | Impaired | Accept |
| Class 7 | Asbestos PD and Indirect Asbestos PD | Impaired | Accept |
| Class 8A | Apollo/Parks Township | Impaired | Accept |
| Class 8B | ARCO's Apollo/Parks | Impaired | Accept |
| Class 8C | ARCO's Environmental Remediation | Unimpaired | |
| Class 8D | Governmental Unit Environmental Remediation | Unimpaired | |
| Class 9 | Intercompany Claims | Unimpaired | |
| Class 10 | Affiliate Intercompany Claims | Unimpaired | |
| Class 11A | Equity Interests in B&W | Impaired | Accept |
| Class 11B | Equity Interests in Diamond | Unimpaired | |
| Class 11 C | Equity Interests in B&W Const. | Unimpaired | |
| Class 11D | Equity Interests in Americon | Unimpaired | |

The Plan calls for the creation of the Asbestos Personal Injury Trust. All current and future asbestos personal-injury claims will be channeled to the Asbestos PI Trust, which will process the claims and pay all allowed claims pursuant to the Asbestos PI Trust Distribution Procedures ("TDP's"). The Asbestos PI Trust will be funded primarily by the transfer of (a) all the capital stock of B&W (valued at between $400 and $500 million); (b) insurance rights valued at as much as $1.15 billion; (c) 4.75 million shares of the common stock of MII or a related share price guaranty; (d) $92 million in promissory notes from MI; and (e) certain tax benefits.  In exchange, the Debtors and certain of their non-debtor affiliates will be granted the benefit of the Asbestos PI Channeling

-8-

Injunction, under which they will be forever released from liability on account of Asbestos PI Trust Claims.

Following mediation, the claimants in litigation involving the Apollo and Parks Township Facilities,[15] B& W and Arco entered into the Apollo/Parks Township Settlement Agreement ("Settlement"). The Settlement is incorporated into the Plan, which provides for the Apollo/Parks Township Claims to be channeled to the Apollo/Parks Township Trust ("A/P Trust"), and the A/P Trust to process and pay allowed claims. The Settlement and Plan contemplates the following: (a) the claims of the *Hall* claimants will be allowed in the B&W bankruptcy case at $110 million; (b) Arco will make a cash payment to the *Hall* claimants of $27.5 million upon the receipt of releases from the *Hall* claimants, as well as other conditions as set forth in the Settlement; (c) B&W will make a $2.8 million cash payment to the A/P Trust; (d) B&W will assign to the A/P Trust its claims against ANI for reimbursement of prior defense costs incurred and paid by B&W arising from the *Hall* litigation in the amount of $1.44 million; (e) The Apollo/Parks Township Insurance Contributors and the Arco entities will make the Apollo/Parks Township Insurance Rights Assignment to the A/P Trust; (f) The A/P Trust will process and pay the *Hall* claimants claims, and process, adjudicate, settle or pay A/P future demands and the unliquidated A/P present claims pursuant to the Settlement, the A/P Trust Agreement and the A/P Trust Distribution Procedures; and (g) a set aside of $75 million (with a cap of $100 million) will be made for A/P Future Demand Holders.

---

[15] Known as the *Hall* claimants, for the lead plaintiff in the case against B&W, B&W Nuclear Environmental Services, Inc. and Arco pending in the United States District Court for the Western District of Pennsylvania, Civil Action No. 94-0951. Exhibit 3017.

III.    **THE COURT HAS JURISDICTION TO ENTER CERTAIN INSURANCE RELATED FINDINGS.**

The Plan, at §7.14.1, provides that the Court shall make several insurance-related findings

of fact and/or conclusions of law in connection with, and as a condition to, confirmation of the

Plan.[16] Several insurers object that the court lacks jurisdiction to enter a final judgment adjudicating

---

[16]    These findings include the following:

"(p) The terms of this Plan and the Asbestos Insurance Rights Assignment Agreement do not violate any obligation of the Debtors or any Insurance contributor under any consent-to-assignment of any Subject Asbestos Insurance Policy or Subject Asbestos Insurance Settlement Agreement;

(q) The terms of this Plan and the Asbestos Insurance Rights Assignment Agreement do not violate any obligation of the Debtors or any Insurance Contributor under any consent-to-settlement, cooperation, management-of-claims, or no-action provision of any Subject Asbestos Insurance Policy or Subject Asbestos Insurance Settlement Agreement;

(r) The Asbestos PI Insurance Rights Assignment and the Asbestos PD Insurance Rights Assignment do not materially increase any insurers risk of providing coverage for asbestos-related liabilities under the relevant insurance policies as compared to the risk that was otherwise being borne by the insurers prior to the Effective Date;

        * * *

(v) The Asbestos Insurance Entity Injunction, the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, and the Apollo/Parks Township Channeling Injunction are essential to this Plan and the Debtors' reorganization efforts;

        * * *

(z) The duties and obligations of the Asbestos Insurance Entities under the Subject Asbestos Insurance Policies and Subject Asbestos Insurance Settlement Agreements are not diminished, reduced or eliminated by (1) the discharge, release, and extinguishment of all the obligations and liabilities of the Asbestos Protected Parties (other than the Reorganized Debtors respecting Class 7 Claims) for and in respect of all Asbestos PI Trust Claims and Class 7 Claims; (2) the assumption of responsibility and liability for all Asbestos PI Trust Claims and Class 7 Claims; or (3) the assignment of the Asbestos Insurance Rights pursuant to this Plan and the Asbestos Insurance Rights Assignment Agreement;

        * * *

(bb) The Asbestos PI Trust shall have the exclusive authority as of the Effective Date to defend

-10-

the rights of the parties under the policies. They argue that questions regarding the coverage-in-place ("CIP") agreements and the insurance policies are already before the district court in various coverage actions, and that the insurers have requested jury trials in district court on their demands,[17] and by numerous and continuing objections in this court have attempted to reserve and protect their rights to jury trials.[18]

The bankruptcy jurisdiction of the district court is found in 28 U.S.C. §1334(b), which gives the district courts and adjunct bankruptcy courts jurisdiction of proceedings arising under title 11, arising in a case under title 11, or related to a case under title 11. To determine whether such jurisdiction exists, "'it is necessary only to determine whether a matter is at least "related to" the bankruptcy.'"[19] Where bankruptcy jurisdiction is challenged, the result will turn on how broad or narrow "related to" jurisdiction is construed.

A proceeding is "related to" a bankruptcy proceeding if "the outcome of that proceeding

---

all Asbestos PI Trust Claims involving Asbestos PI Insurance Rights; provided, however, that the Asbestos PI Trust may, in its sole discretion, afford any Entity, including any Asbestos Insurance Entity, the opportunity to participate in the resolution of any Asbestos PI Trust Claim;

* * *

(ee) All of the Debtors' insurers who are affording insurance coverage that is the subject of the asbestos PI Insurance Rights Assignment and the Asbestos PD Insurance Rights Assignment, and the Apollo/Parks Township Insurers have been given notice and an opportunity to be heard."

[17] Certain Underwriters at Lloyd's, London and Certain London Market Companies v. McDermott International, Inc., Case No. 03-2203; Certain Underwriters at Lloyd's, London and Certain London Market Companies v. The Babcock & Wilcox Co., Case No. 03-1192 (the "Declaratory Judgment Actions").

[18] As to those insurers who filed proofs of claim, and consented to jurisdiction in the bankruptcy court, see page 15 *infra*.

[19] *In re Walker*, 51 F.3d 562, 569 (5th Cir. 1995)(*quoting In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987).

-11-

could conceivably have any effect on the estate being administered in bankruptcy."[20] Stated another way, "'an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and . . . in any way impacts upon the handling and administration of the bankruptcy estate."[21] Therefore, in order for bankruptcy jurisdiction to attach, the anticipated outcome of the action must (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect upon the administration of the estate.

Matters involving the confirmation of a plan arise under Title 11, and the court has jurisdiction to decide confirmation issues. Even if this confirmation proceeding necessarily involved a coverage issue, as asserted by insurers, suits involving insurance coverage are at least minimally related to a case under Chapter 11, because coverage will increase the estate.[22] At a minimum, the confirmation findings concerning the Debtors' insurance are at least "related to" bankruptcy proceedings, and this court has jurisdiction to hear the matter.

The bankruptcy court's authority to enter final orders in matters before it is found in 28 U.S.C. § 157, which permits the bankruptcy judge to hear and determine "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." Section 157(c)(1) permits a bankruptcy judge to hear a noncore proceeding that is related to a case under title 11, but specifies that the judge shall submit proposed findings of fact and conclusions of law to the district court, and the district judge, after de novo review and after considering the proposed findings and

---

[20] *Id.*

[21] *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999).

[22] *Travelers Indemnity Co. v Babcock and Wilcox, Co.*, Civ. Action 01-3387 (E.D. La. 2002).

-12-

conclusions, shall enter any final order or judgment regarding the matter. On core matters, the bankruptcy court may enter final orders.

A matter is core if it involves a right created by federal bankruptcy law, or is one which would only arise in bankruptcy.[23] Matters that arise under the Bankruptcy Code are also considered core.[24] A matter is non-core if it does not invoke substantive rights created by federal bankruptcy law and is one that could exist outside of bankruptcy.[25]

The Debtors argue that the Plan does not require a determination of the scope of insurance coverage, and that coverage issues will likely be decided in another forum. They argue that the findings are necessary to ensure that confirmation itself does not act to annul the Debtors' policies. In other words, the Debtors argue that sustaining the insurers' objection would make mere compliance with the Code requirements for confirmation a violation of the insurance contracts and relieve the insurers of obligations under the policies.

Other courts have noted, in a similar context, that "because of the significance insurance coverage issues often have in a bankruptcy proceeding, it is proper under certain circumstances for a bankruptcy court to adjudicate such matters."[26] In *Prudential*, a trustee charged with the liquidation of asbestos-related claims under a confirmed plan filed an adversary proceeding seeking a declaratory judgment to determine the trustee's rights under protection and indemnity policies.

---

[23] *In re Wood*, 825 F.2d 90 (5th Cir. 1987)

[24] *Liljeberg Enters. Inc. v. Lifemark Hosps. of La*, 2000 WL 63307, at 3 (E.D. La. Jan. 21, 2000).

[25] *Wood*, 825 F.2d at 97.

[26] *In re Prudential Lines, Inc.*, 170 B.R. 222, 231 (S.D.N.Y. 1994).

-13-

The district court held that a declaratory judgment proceeding to resolve issues concerning coverage and indemnification under insurance policies was a "core" proceeding.[27] Although the determination involved state law issues, that factor was not determinative given §157(b)(3)'s wording that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." Instead, because the policies were property of the debtor's estate in a Chapter 11 proceeding with over 7,000 asbestos claims potentially covered by the policies filed against the estate, the determination of policy provisions was "essential and inextricably tied to the administration of the estate."[28]

The court is not asked to determine a separate suit or adversary proceeding seeking a declaration that coverage is or is not available. Instead, the inquiry concerns whether the Plan is capable of confirmation, a matter at the heart of the Chapter 11 provisions of the Bankruptcy Code. In connection with the Plan, the Debtors seek a declaration that confirmation of the Plan will not impair the ability of the §524(g) trusts to access insurance rights transferred to the trusts. Section 157(b)(2)(L) specifies that core matters include "confirmation of plans." To the extent that a determination need be made of whether the Plan is capable of confirmation, or whether it is incapable of confirmation because its provisions run afoul of certain contractual rights of insurers, that determination is at the very heart of the function of the bankruptcy court, that is to determine whether the Plan is confirmable under the Bankruptcy Code. To the extent that the confirmation

---

[27] *Id.* at 229.

[28] *Id.*; *see also Asbestosis Claimants v. American Steamship Owners Mutual Protection and Indem. Assoc.*, 197 F.3d 632, 638 (2d Cir. 1999)("resolving disputes relating to major insurance contracts are bound to have a significant impact on the administration of the estate" and are core).

involves issues regarding the workings of a §524(g) injunction, that too is a core matter. Similarly, §365 expressly provides for the assumption or rejection of executory contracts, and a determination of whether an agreement is executory is a core bankruptcy function, as it arises under the Bankruptcy Code. Section 1123 governing the contents of a plan, provides that a plan must provide adequate means for its implementation, including but not limited to, curing or waiving of any defaults.[29] In order to determine confirmation, a core matter, the court must necessarily make determinations of whether insurance rights may be transferred to a trust to be established under §524(g), whether the Plan meets the requirements of §524, whether the Bankruptcy Code preempts certain contract provisions and whether the Plan provides adequate means for its implementation under §1123(a)(5).

Various insurers who have objected to confirmation have filed proofs of claim in this bankruptcy proceeding.[30] Generally, the filing of a proof of claim constitutes consent to the jurisdiction of the Bankruptcy Court.[31] Additionally, the filing of a claim invokes the core jurisdiction of the court under §157(b)(2)(B), (C). As to insurers who have filed claims in the bankruptcy proceeding, core jurisdiction exists on issues relating to the insurers claims and objections to the Plan.

This is not a trial on coverage, and the court is not determining whether coverage exists

---

[29]  11 USC 1123(a)(5)(G).

[30]  These insurers include: Continental Company (P. 4491); TIG Insurance (P. 4499); American Home Ins. (P. 4516); Century Indemnity Ins. (P.4518); Westchester Fire Ins. Co. (P. 4519); and Ace USA Companies (P. 4520).

[31]  *In re Baudoin*, 981 F.2d 736 (5th Cir. 1993); *see Katchen v. Landy*, 382 U.S. 323 (1966); *Pan American World Airways, Inc. v. Evergreen Int'l Airlines, Inc.*, 132 B.R. 4 (SDNY 1991).

under any particular policy. It is a trial on the confirmation of the Plan, and whether the Plan can be confirmed and the Debtors can proceed under the Plan. What the insurers argue is that the Plan may not implicate the insurers or policies of insurance, the largest single asset of the estate, without violating terms of the insurance contracts, thereby raising a coverage issue, which this court cannot finally determine. The insurers argue that confirmation of any plan funded by insurance will vitiate the policies and relieve the insurers of any obligation to make payments under the policies. The Debtors are put in a position that they cannot go forward on confirmation, as required by the Bankruptcy Code and Rules, because the act of formulating a plan involving insurance will breach obligations due under the policies. Likewise, they cannot simply wait for the coverage determinations to be made by the district court.[32] The act of going forward with confirmation of the plan cannot, of itself, be restrained by allegations that confirmation involves insurance issues, that cannot be determined in this proceeding. The court finds that it has core jurisdiction to make insurance-related findings. To the extent that the district court may determine that certain issues are non-core, then the findings are made as proposed findings of fact and conclusions of law.

## IV.    THE JOINT PLAN MEETS THE REQUIREMENTS OF §1129.

The court finds that the Plan meets the requirements of confirmation under 11 U.S.C. §1129. On all core matters, the court finds that confirmation is appropriate. On non-core matters, the court

---

[32] The coverage actions were filed in 2003, three years after the filing of the Debtors' Chapter 11. The Bankruptcy Code requires that a plan be filed within 120 days of the petition date in order to maintain the exclusive period. This court has not only terminated exclusivity, but ordered that confirmation proceedings be commenced in September 2004. The Debtors thus lacked the option of simply waiting for the coverage matters to be decided by the district court prior to confirmation.

recommends that the district court enter an order confirming the plan.

A.  The Plan complies with the applicable provisions of title 11, including the classification of claims under §1122 and the contents of the plan under §1123.

The court finds that the Plan adequately designates classes of claims and interests, adequately specifies the classes of claims or interests that are not impaired under the Plan, and specifies the treatment of claims or interests that are impaired under the Plan.

1. *Classification and Treatment.* Certain law firms[33] object to the classification of claims made by the Plan under §1122. They object that their clients settled asbestos-related personal injury tort or wrongful death claims and thus should not be included in Class 6, which also includes disallowed settled claims and unliquidated or contingent claims for personal injury tort and wrongful death claims. The objectors argue that the allowed, settled claims are substantially similar to other non-tort claims in Classes 4 or 5 of the Plan, which will receive payment in full, yet are classified with unliquidated claims in Class 6, which will receive only a partial payment. They make three arguments: (1) settled claims are treated differently from unliquidated claims in the same class, in violation of §§1123(a)(4) and 1129(a)(1); (2) settled claims are not "substantially similar" to other Class 6 claims, and they cannot be classified together; (3) the current Class 6 classification is meant to disenfranchise and discriminate against settled claims, and constitutes improper gerrymandering.

The classification objection made by Certain Law Firms is not new. The arguments regarding separate classification and gerrymandering were raised previously as objections to the

---

[33] The law firms consist of Levy, Phillips & Konigsberg, LLP; Greitzer & Locks, and The Law Offices of Peter G. Angelos, P.C., and represent approximately 1,177 claimants who settled claims for asbestos-related personal injury tort or wrongful death claims with the Debtor prior to the filing of the Debtors' Chapter 11 petition.

-17-

Disclosure Statement, and rejected by the court.[34] Instead, the court found previously, and finds now, that the claims in Class 6 are substantially similar claims. Both the settled claims and the unliquidated personal injury and wrongful death claims are unsecured claims with common priority and rights against the estate, both are based on injuries or death claims stemming from alleged asbestos exposure, both will be paid from the pool of insurance rights.

The *Greystone* case [35] does not mandate separate classification as Certain Law Firms argue. Instead, the case prohibits separate classification of similar claims where a valid business purpose is lacking, or where the separate classification is meant to disenfranchise a dissenting class of creditors.

In this case, the Plan placed unsecured trade claims in Class 4, and unsecured general claims in Class 5. Mr. David Keller, President and COO of B&W, testified at trial regarding the Plan's classification of claims, and testified as to the importance to the company of the ability to pay trade claims. He testified that the Debtors' reputation and future business success depends on the Debtors following through with representations made in this proceeding that the trade claims would be paid in full. Given the small amount of the trade claims, which are approximately $3.5 million, and the large size of the Debtors' contracts, the loss of future contracts would result in a revenue reduction greatly in excess of the amount needed to pay trade claims in full. As such, the court finds that a legitimate business justification exists for paying trade claims in full, and separate classification of Class 4 unsecured trade claims is appropriate.

---

[34] *See* Reasons for Order dated April 4, 2003, Pl. 4101.

[35] *In re Greystone III Joint Venture*, 995 F 2d 1274, 1279 (5th Cir. 1991), *cert. denied*, 506 U.S. 821 (1992).

-18-

The court also rejects the contention that settled claims in Class 6 are treated differently than other claims in the class. The Plan provides that all unsecured claims for personal injury caused by alleged exposure to asbestos in Class 6 will be paid in accordance with the provisions of the TDP. Similar claims will receive similar treatment under the TDPs. The claims will not be paid in full; however, the unrebutted testimony at trial was that as to the Debtors and their customers and suppliers, no business reason exists to pay asbestos personal injury claims in full.[36]

Other objectors have argued that Class 3 claims for workers compensation, as well as Class 4 and Class 5 claims, should not be separately classified. Class 3 consists of workers compensation claims. Mr. Keller testified at trial that these unsecured claims are paid in the ordinary course through the state workers' compensation system. Additionally, business reasons exist for the Debtors to pay its injured employees, justifying separate classification of the workers compensation claims, and payment in full. The court finds that the unsecured workers compensation claims are dissimilar to trade or other unsecured claims,[37] and separate classification of Class 3 claims is appropriate.

Class 5 consists of general unsecured claims. Mr Keller testified that this class included a disputed unsecured claim of the IRS, disputed miscellaneous legal claims, and the disputed claims of excess insurance carriers for recoupment of amounts previously paid to B&W. The claims are all disputed by the Debtors, are speculative in nature, and the Debtors estimate that the amount needed to pay these claims will not exceed $1 million. The Class 5 claims will receive a percentage payment on the allowed claims, similar to the treatment of Classes 6 and 7. The court finds that the

---

[36] Tr. David Keller, September 24, 2003.

[37] *In re U S. Truck Co , Inc ,* 42 B.R. 790, 794 (Bankr. E.D. Mich. 1984).

-19-

separate classification of Class 5 unsecured claims is appropriate.

2. *Adequate Means for Implementation.* Section 1123(a)(5) requires that a plan provide adequate means for its implementation. As discussed above, the Plan provides for creation of the Asbestos PI Trust and the A/P Trust. Both trusts will be funded by, among other things, assignment of rights to the proceeds of B&W's insurance coverage. This insurance coverage is substantial, and is valued as high as $1.15 billion for the Asbestos PI Trust, and for the insurance rights assignment to the A/P Trust. The Plan provides for the creation of Trust Distribution Procedures governing the payment of trust claims. The other implementation procedures described in detail in the Plan are more than adequate to satisfy the requirements of §1123(a)(5).

B. The Plan meets the requirements of §§1129(a)(2), (4), and (5).

No objections have been received that the Plan violates the provisions of §§1129(a)(2), (4) and (5). The court finds that the Plan Proponents have complied with the Code provisions. The Plan describes both impaired and unimpaired classes, and adequately describes their treatment. The Court , on July 10, 2003, approved the confirmation hearing notice, and provided procedures for the mailing of the solicitation packages and approval of the voting agent. Adequate notice was provided to creditors and parties in interest by the notice and procedures requirements approved by this Court. The court further finds that payments made under the Plan are reasonable, and the Plan complies with 1129(a)(4).

The Plan Proponents have made disclosures required by 1129(a)(5). The Plan Proponents have identified the officers and directors who will serve the reorganized Debtors, and the appointment of the officers and directors is consistent with the interests of the creditors, equity security holders and public policy. The Plan Proponents have also identified the individuals who

-20-

will serve as Trustees of the Asbestos PI Trust, as well as their affiliations. Various objectors have questioned whether the Trustees are fair and impartial, citing alleged ties of some of the proposed trustees to the asbestos plaintiffs bar. The court finds that the Trustees have been adequately disclosed, and that appointment of the Trustees is consistent with the requirements of §1129(a)(5). Insiders who will be employed or retained by the Debtors, as well as their compensation, have been disclosed, as required by §1129(a)(5)(B).

Although strong objections to the Plan Proponents refusal to name at this time the trustees of the A/P Trust – even though they had named the trustees of the Asbestos Trust – were raised by certain insurers, the court does not consider that as a bar to confirmation. The court does not read §1129(a)(5) as requiring the names and identity of those individuals and finds nothing in the trust provisions of §524(g)(1)(B) that requires the information.

Section 1129(a)(6) regarding regulatory commissions and rate changes is not applicable to these Debtors.

C.  The Plan meets the requirements of §§1129(a)(7)-(10).

Subsection 1129(a)(7) requires that each holder of an impaired claim or interest either has accepted the Plan, or will receive an amount equal or greater than in a Chapter 7 liquidation. Section 1129(a)(8) provides for each class to accept the Plan or that the class not be impaired under the Plan. All impaired classes have voted on the Plan. All impaired classes, except Class 5, have voted to accept the Plan, by casting votes in favor of the Plan exceeding two-thirds of the amount of voting claims and one-half the number of voting claims in each class required for acceptance under 11 USC 1126(c). Class 11 equity shareholders have approved the Plan by vote exceeding two-thirds of the amount of shares who voted for the Plan, as required by 11 USC 1126(d). The Plan accordingly

meets the requirements of §1129(a)(10), that an impaired non-insider class vote to accept the Plan.

The non-accepting class, Class 5, will receive under the Plan an amount equal to or greater than what would be received in a Chapter 7 liquidation. At the confirmation hearing, the Plan Proponents presented the testimony of Pamela Zilly, an investment banker with the Blackstone Group, L.P. Her testimony was that the total assets available under the Plan for payment of claims are between $1.46 billion and $2.25 billion. After adjustment for allocations for cash or liquidation uses, between $1.2 billion and $1.97 billion in net assets is available for distribution under the Plan. In contrast, the Chapter 7 liquidation value of the Debtors assets was placed at between $584 million and $1 billion.[38] A greater return to creditors under the Plan is possible because of the contributions of various McDermott entities, including the promissory note of $92 million, and 4.75 million shares of McDermott International Inc. stock. The Court finds that under the Plan, each impaired class will receive or retain a claim or interest in property of value that is not less than the amount they would have received or retained in a Chapter 7 liquidation of the Debtors. Instead, it is clear that they will receive more under the Plan than from a liquidation, so the requirements of §1129(a)(7) have been satisfied.

No dispute exists that the Plan meets the requirements of §1129(a)(9).

D. The Plan satisfies the requirements of §1129(a)(11).

Section 1129(a)(11) requires that confirmation of a plan is not likely to be followed by the liquidation, or further financial reorganization, of the debtor, unless such is proposed in the plan. In other words, for a plan to be confirmed, it must be "feasible."[39] The debtor must prove a plan's

---

[38]  Exhibit 17.

[39]  *T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 801 (5th Cir. 1997).

-22-

feasibility by a preponderance of the evidence.[40] A plan is feasible where it offers "'a reasonable probability of success,"[41] and where "the debtor can realistically carry out its plan.'"[42]

In proving a reasonable probability of success, the bankruptcy court "need not require a guarantee of success. . . ., [o]nly a reasonable assurance of commercial viability is required."[43] In *T-H New Orleans Limited Partnership*, feasibility was shown where the debtor demonstrated that it was able to service the debt with an infusion of capital, and presented evidence regarding the past and present earning power of the debtor, the ability of management and the economic picture for similar businesses in the area.[44] Projections of future revenue are appropriate "where the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive."[45]

Mr. Keller testified at confirmation regarding the Debtors' business prospects. Mr. Keller testified that the Debtors have excellent prospects for exit financing with Citibank and Fleet, who have provided term sheets for exit financing. In addition, the ACC has negotiated with other banks for financing. In the post-confirmation period, the Debtors prospects for getting and performing contracts are good. He testified that in the post-petition period, the Debtors' income had

---

[40] *Id.*

[41] *Id, citing In re Landing Assoc., Ltd*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993).

[42] *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989).

[43] *T-H New Orleans*, 116 F.3d at 801 (citations omitted).

[44] *Id.*

[45] *Id., citing In re Lakeside Global II Ltd.*, 116 B.R. 499, 508 n. 20 (Bankr. S.D. Tex. 1989).

increased by 33%, and the Debtors have become financially stronger in comparison to their competitors.    He also testified that the Debtors have made tentative offers of post-confirmation employment to himself and to Richard Rimels, the current head of B&W Canada, and that he has confidence in the future management of Debtors. The Plan also makes provisions for the transition of B&W to a stand-alone company, and contemplates a transition period whereby McDermott will continue to provide critical services pursuant to a transition agreement. Mr. Keller's opinion was that the transition period was adequate, and B&W would be able to function as a stand-alone company at the end of the transition period.

The court finds that B&W has sustained its burden of proving feasibility under §1129(a)(11). Additionally, the Plan satisfies the requirements of §1129(a)(12), in that it provides for all fees payable under 28 USC §1930 to be paid, and all retiree benefits to be satisfied. No objection has been received under §§1129(a)(12) and (13), and the court finds that these sections have been satisfied.

E.    Cram Down Requirements of §1129(b) have been satisfied.

Only Class 5, consisting of general unsecured claims, and an impaired class, has voted against the Plan. The Plan may nonetheless be confirmed if it meets the requirements of §1129(b), that is, that all requirements other than §1129(b)(8) that each impaired class has accepted the plan or is not impaired by the plan, where "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." [46] If these requirements are met, the Plan may be confirmed despite the rejection of an impaired class. Class 5 consists of general unsecured claims, including a disputed tax claim,

---

[46]  11 U.S.C. 1129(b)(1).

insurer's disputed claims for indemnity, and certain disputed claims for damages. Each claim contained in Class 5 has been objected to, and certain of the insurer's claims have been estimated for voting purposes at $1.00 each.

    1. *Unfair Discrimination.*

    Unfair discrimination has been found where similar claims are treated differently without a reasonable basis for the disparate treatment, or if a class of claims receives consideration of a value that is greater than the amount of its allowed claim.[47] A plan that unfairly singles out a claim for nonuniform treatment violates § 1129(b). One court, after making an exhaustive analysis of unfair discrimination, stated a four-part test to determine whether discrimination is fair: (1) whether the discrimination is supported by a reasonable basis; (2) the extent of good faith behind the proposal, (3) the degree to which the debtor can confirm a plan without such discrimination, (4) the treatment of the classes discriminated against.[48]

    Various objections have been made that the Plan unfairly discriminates against Class 5, which will receive a pro rata distribution, and Class 4 (trade creditors), which will receive payment in full. At the confirmation hearing, testimony was heard from Mr. Keller about the importance of paying trade creditors. Not only had the representation been made to the creditors from the inception of the case that they would be paid in full, the vendors are suppliers to the business, ones with claims that are not disputed or suspect. Additionally, the failure to pay trade claims in full may

---

[47] *In re Kennedy,* 158 B.R. 589, 599 (Bankr. D. N. J. 1993); *In re Johns-Manville Corp.,* 68 B.R. at 636.

[48] *In re Aztec Co.,* 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989); *see In re Rochem, Ltd.,* 58 B.R. 641 (Bankr. D. N.J. 1985).

cause the loss of future contracts, contracts in size that could easily eclipse the $3.5 million to be

paid trade creditors. By contrast, Class 5 consists of disputed and unliquidated claims of various

creditors, including the insurers claims to recover sums paid under excess insurance policies under

an indemnity theory, which have been valued at $1.00 for voting purposes, disputed ongoing

lawsuits and a contested tax claim which the Debtors believe has been paid by the McDermott

consolidated tax group. These claims have all been the subject of objections, and in the business

judgment of B&W, have been determined to be lacking in merit. No business justification exists

to pay the highly disputed claims in full. A business justification does exist, however, to pay trade

claims, i.e., the relationships are important to the continued operation of the business and its

reputation.[49] The court finds that a reasonable basis exists for payment in full of trade claims, that

the debtors have satisfied the requirements of §1129(b), and the Plan does not unfairly discriminate.

### 2. *Fair and Equitable.*

"The 'fair and equitable' requirement provides for an absolute rule of priority among

creditors and stockholders in reorganization plans, placing secured creditors' rights first, those of

unsecured next, and subordinating the interests of stockholders."[50] The Code defines treatment that

is fair and equitable to various classes of claims. For unsecured creditors, such as the objecting

Class 5 creditors, fair and equitable means:

> (B) with respect to a class of unsecured claims–
> (i) the plan provides that each holder of a claim of such class receive or retain on account of
> such claim property of a value, as of the effective date of the plan, equal to the allowed

---

[49] *In re Rochem, Ltd*, 58 B.R. 641, 643 (Bankr. D. N.J. 1985)(payment of trade claims in full and only partial payment of disputed tort claims not discriminatory, as reasonable basis existed for the treatment).

[50] *In re Lakeside Global II Ltd*, 116 B.R. 499, 511 (Bankr. S.D. Tex. 1989).

amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.[51]

In other words, in order to confirm a plan over a dissenting class of unsecured creditors, the plan must pay the dissenting unsecured creditors the allowed amount of the claims or leave nothing to junior claimants or interest holders. The Plan does not provide that Class 5 allowed claims be paid in full, therefore, the inquiry becomes whether junior claimants or interest holders will receive or retain any property.

Various class 5 claimants have objected that the plan is not fair and equitable because it does not propose to pay Class 5 claims in full but equity holders in class 11 B -D retain their stock holdings. These objections lack merit. The Plan provides that all of B&W's equity interests will be transferred to the Asbestos PI trust. Notably, Section 7.2.3 provides that on the Plan's effective date, BWICO will cause the Asbestos PI Trust to become the holder of record of all the outstanding shares of the Capital Stock of B&W. B&W will retain its stock in subsidiary corporations, however, the stock will really belong to the Asbestos PI Trust by way of the BWICO transfer. The value of the stock of B& W and its subsidiaries will be used to pay Class 5, 6 and 7 claims. The Court finds that the absolute priority objection is not well taken, because the retention by B&W of its subsidiary's stock is a means to facilitate the ultimate transfer of the value of the stock to the trust, for the benefit of creditors This is not an instance where B&W's owners, or in this case, it's parent corporation, is retaining anything of value. To the contrary, they are giving up not only the stock in B&W (which includes the stock of the B&W subsidiaries), but also a $92 million note, some

---

[51]  11 U.S.C. 1129(b)(2)(B).

stock of MII and/or a stock price guaranty and certain tax benefits.

### V.    THE PLAN HAS BEEN FILED IN GOOD FAITH, AND NOT BY MEANS FORBIDDEN BY LAW.

Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law. Various insurance companies have filed objections to the Plan, ranging from frivolous objections that the trust to resolve radiation claims "will accomplish nothing less than insurance fraud",[52] and that the plan proponents have "made collusive efforts to defraud [insurers]"[53] to the more palatable but serious charge that the Plan provisions are in violation of the rights of insurers under their contracts and settlements with the Debtors, that the Debtors have settled meritless claims, and that the management of the Asbestos Trust is predicated on a conflict of interests.

The good faith requirement is "viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."[54] "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of §1129(a)(3) is satisfied."[55] The debtor bears the burden of proving that the plan was filed in good faith by a preponderance of the evidence.[56] The good faith requirement

---

[52]    Objection of American Nuclear Insurer, Pl. 4716.

[53]    Objection of Travelers, Pl. 4722.

[54]    *T-H New Orleans Ltd Partnership*, 116 F.3d at 802.

[55]    *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

[56]    *In re Briscoe Enter., Ltd., II*, 994 F.2d 1160, 1165 (5th Cir. 1993).

is satisfied even where "the plan may not be one which the creditors would themselves design and indeed may not be confirmable."[57]

The court finds that the Debtors have sustained their burden of proof that the Plan is filed in good faith, and that the Plan was proposed with a legitimate and honest purpose to reorganize and has a reasonable hope of success. Various insurers arguments to the contrary will be addressed in turn.

A    The Plan is a result of extensive negotiations and is not a collusive agreement between the Debtors, McDermott and plaintiff's lawyers.

Various of the Debtors' insurers have objected that the Plan is not filed in good faith because, in essence, it is merely a collusive agreement with plaintiff's attorneys designed to pay meritless claims. The Plan Proponents predictably respond that the Plan is the result of extensive arms-length negotiations and the system of paying claims is actually stricter than the system that existed pre-petition.

The Debtors' bankruptcy case was filed on February 22, 2000. Mr. Nesser, general counsel of B&W and MII, testified that a dual track was followed post-petition, that of settling with various constituencies, while also pursuing the "Litigation Protocol" to contest asbestos personal injury claims. Mr. Nesser testified that in the spring of 2000, the Debtors had settlement discussions with plaintiffs' lawyers. Throughout 2000, the Debtors also pursued discussions with London. In 2001, an adversary proceeding was initiated seeking a declaratory judgment regarding $600 million in assets that had been transferred from B&W to its parent corporations during a 1998 corporate

---

[57] *Id.* at 1167.

restructuring.[58]  About the same time, various insurers, including London, brought insurance-coverage litigation before the district court.[59]

Mr. Nesser testified that negotiations with constituencies began soon after the Debtors' filing, and continued during the course of the transfers litigation and litigation with insurers. In 2001, the Debtors asked that a mediator be appointed, in part because they felt that negotiations were not fruitful.  Eventually, Professor Francis McGovern was appointed as mediator.[60]

In early 2002, several events occurred that helped in the Debtors' negotiation strategy. In January 2002, Judge Vance rendered a decision in favor of B&W in the London declaratory judgment action.  The next month, in February 2002, this court entered a decision denying the transfer complaint.[61]  In May, 2002, this court also entered an order terminating the Debtors' exclusive period to file a plan of reorganization.

In May, 2002, B&W filed a draft plan, but continued to negotiate with constituencies, including London.  Following the termination of exclusivity, the ACC and the FCR filed their own Disclosure Statement and Plan.  By August, 2002, the Debtors announced that an agreement in

---

[58]  Adv. No. 01-1155.

[59]  "London" includes Certain Underwriters at Lloyd's, London and Certain London Market Companies.  Various suits are pending before the United States District Court for the Eastern District of Louisiana by London Market Insurers and Traveler's Insurance Co. including *(i) Traveler's Ins. Co. et. al. v. McDermott Inc., McDermott Int'l, Babcock & Wilcox Co., Diamond Power Int'l, Inc., Babcock & Wilcox Constr. Co., and Americon, Inc*, Nos. 01-3218 c/w 01-3387, United States District Court, Eastern District of Louisiana, (ii) *Certain Underwriters at Lloyd's v. McDermott Int'l, Inc*, Case No. 01-0912 and *(iii) Certain Underwriters at Lloyd's London, et al. v. Babcock & Wilcox Co*, et al, Case No. 01-1187. *See also* footnote 17.

[60]  Pl. 1682.

[61]  *In re Babcock & Wilcox Co.*, 274 B.R. 230 (Bankr. E.D.La. 2002).

-30-

principle had been reached regarding the terms of the ultimate plan. Professor Green testified that concessions made by the FCR and ACC to the amount of the contribution to be made by MII to the Asbestos PI Trust enabled a resolution in principle to be achieved and an amended plan was filed by the Debtors in December 2002. Finally, in June, 2003, the Joint Plan was filed by various constituencies, including the ACC, FCR and McDermott, Inc. [62] Each of the Debtors' plans contained different treatment of asbestos claims, reflecting the negotiations underway at the time of filing. Various insurers object because the Joint Plan contains provisions more generous to claimants than the original plan, and argue that such indicates a lack of good faith.

Rather than indicate that good faith is lacking, the case history indicates that negotiations with constituencies was protracted, extensive and hard fought. A great deal of negotiation and litigation took place before an agreement in principle could be reached with any constituency. Ultimately, the Debtors were able to craft a plan agreeable to the ACC and FCR, which represent the major creditors in the case. Rather than indicate a lack of good faith, the Debtors' actions indicate a dogged determination to settle with its major constituencies on the best terms possible, and under a plan capable of confirmation.

The court finds it significant that prior plans submitted to the court never came on for confirmation. Instead, the plans were modified, amended and/or withdrawn prior to any confirmation hearing. Bankruptcy Code §1127(a) expressly provides for modification of a plan prior to confirmation, so long as it meets the requirements of §§1122-1123. Plans are frequently modified during the confirmation process, including situations where settlements are incorporated into the plan and objections withdrawn. While the Litigation Protocol may have originally formed

---

[62] Pl. No. 1694, 3148, 3320.

the Debtors' strategy in the initial phases of the bankruptcy proceedings, it is not binding on the Debtors for the duration of the case. Instead, the debtor is free to negotiate, and the Code promotes, settlements with creditor bodies. The modifications and amendments to the Plan, and the abandonment by the Debtors of the Litigation Protocol, do not indicate a lack of good faith. Instead, they are the result of the usual negotiations leading to confirmation of a plan in many, if not most, Chapter 11s. In this case, these were hard-fought negotiations with the ACC and FCR, two bodies that vigorously objected to the original plan and the Litigation Protocol.

Insurers also object that the Plan is not filed in good faith because they were deliberately and collusively excluded from the negotiations and formation of the Plan and other agreements. Mr. Nesser testified that negotiations were underway with London from the outset of the case, and continued even after the agreement in principle was announced with the ACC and FCR. There was much argument but no evidence to the contrary.

B.    The Insurer's Contractual Rights

Various insurers object that the Plan may not rewrite the contracts of insurance, without the consent of the parties. They argue that the Plan may not change provisions of the policies, including the claims management function, the anti-assignment clause, reporting requirements, the requirement to pay only meritorious claims, to pay claims only as they come due, and to assist in the defense, investigation and settlement of claims. Stated another way, they object that the Plan Proponents colluded against insurers to formulate a plan designed to force insurers to pay non-meritorious claims, without the insurer's participation and control over defense and settlement of the claims.

-32-

1. <u>Anti-Assignment Clauses.</u>

Insurers argue that the Plan, among other things,  may not require the assignment of insurance rights because the insurance policies and/or settlement agreements with Debtors specify that any assignment must be consented to in writing by the insurer. They also argue that insurance rights are only assignable without the insurer's consent where vested and the amount of loss has been fixed by a settlement of the claim or an adverse judgment which has been paid by the Debtors. The Plan Proponents respond (i) the Plan only assigns insurance rights, and does not implicate any anti-policy-assignment clause; (ii) a substantial portion of the  remaining insurance coverage is subject to settlement agreements that do not contain restrictions on assignment; and (iii) the assignment does not increase the insurers' risk.

The Plan does not purport to assign the insurance policies. Only insurance rights, including rights, interests, claims, demands or entitlements to a policy's proceeds and the right to pursue the proceeds are transferred to the trusts. As a general rule, contracts are freely assignable. An exception exists where the parties provide an express prohibition on an assignment. A general stipulation in a policy prohibiting assignment except with the insurer's consent is valid only as to assignments that occur prior to a loss.[63]   The prohibition of an assignment without the consent of the insurer is not effective as to an assignment of a policy or right under a policy after the event has

---

[63]  *Geddes & Moss Undertaking & Embalming Co. v. Metropolitan Life Ins. Co.*, 167 So.2d 209, 210 (La. Ct. App. 1936)(distinction is made between assignment of policy before and after loss, assignment after loss is permitted); *International Rediscount Corp. v Hartford Acc. and Indemnity Co.*, 425 F. Supp. 669, 673 (D. Del. 1977)(assignment of policy prohibited only assignment of insurance contract before loss); *see also* 3 Couch on Insurance, 35:7 (3rd ed. 1995); 44 Am. Jr. 2d Insurance 787.

occurred by which liability under the policy is fastened upon the insurer.[64]

The anti-assignment clause in the various B&W policies states: "Assignment of interest under this Contract shall not bind the Underwriters until their consent is entered hereon."[65] In construing a nearly identical provision, one court has held that the provision prohibits only the assignment of the insurance contract before loss.[66] The court reasoned that the purpose of a general anti-assignment clause is to protect the insurer against the possibility of increased risks attached to a change in the identity of the insured if the policy were assigned before the insured-against loss had occurred.[67] That rationale is lacking where the assignment only applies to a right to proceed against the insurer after loss. After loss, the assignee simply stands in the shoes of the assignor, subject to valid defenses against the original insured.[68]

Objectors assert that a "loss" does not occur under the policies, and the right to payment for loss may not be assigned, until the happening of the occurrence and a determination of pecuniary injury resulting from the occurrence has fixed the amount of the loss. The weight of authority is otherwise. In *Ocean Acc. & Guarantee Corp. v. Southwestern Bell Tele. Co.*,[69] relied upon by

---

[64]  *Time Fin. Corp. v. Johnson Trucking Co.*, 458 P.2d 873 (Utah 1969).

[65]  Exhibits 34.001 through 34.240. For example, see Exhibit 34.232, Policy No. A&PH-11611, paragraph O, pg. 24.

[66]  *International Rediscount Corp. v. Hartford Acc. and Ind. Co.*, 425 F. Supp. 669, 673 (D. Del. 1977).

[67]  *Id.* at 672.

[68]  *Id.* at 673, *citing Georgia Co-Operative Fire Ass'n v. Borchardt & Co.*, 51 S.E. 429, 430 (Ga. 1905). Withholding consent in order to defeat the claim of an assignee on an assignment made after loss "would be a mere act of caprice or bad faith."

[69]  100 F.2d 441 (8th Cir. 1939).

London, the court held that after a loss occurs, a policy is assignable despite the presence of an anti-assignment clause. In a contract for indemnity against liability, the liability of the insurer arose immediately upon the happening of an accident. In such case, the liability, loss and cause of action arise simultaneously when the accident occurs, and not when judgment is rendered. [70] Rather than supporting London's argument, the case provides that assignment may occur after loss, the loss occurring at the time of the insured-against accident, and not judgment fixing liability.

In the case of *Continental Cas. Co. v. Diversified Industries, Inc.,*[71] the court similarly construed a general prohibition against assignment without consent under Pennsylvania law as applying to assignments before loss only.[72] In *Continental*, the insurance policy contained an anti-assignment clause nearly identical to the one contained in the B& W policies. The court held that because the injury that would potentially place liability upon the insurer, in this case environmental damage from the storage of contaminants, occurred prior to the assignment, the assignment occurred after loss and was valid.[73] The assignment did not increase the amount of risk the insurer would face, but merely changed the name of the party to whom any payment could be made. Rather than measure loss from the time of judgment or other determination of damages for injury, the court

---

[70]  *Id.* at 447.

[71]  884 F. Supp. 937 (E.D. Pa. 1995).

[72]  *Continental*, 884 F. Supp. at 947 (noting that "great weight of authority"holds a general provision prohibiting assignment without consent applies to assignments before loss only.); *see A C and S*, 2004 WL 1354283 (Bankr. D. Del. Jan. 26, 2004)(commercial general liability policies could be assigned in their entirety to asbestos trust under Pennsylvania law, notwithstanding anti-assignment provision, because loss that gave rise to liability had already occurred).

[73]  *Id.* at 948.

looked at whether the assignment occurred after the injury occurred.

As opposed to the policies, nothing contained in the CIPs or settlement agreements with the insurers prohibits an assignment of insurance rights. Most of the settlement agreements contain similar language.[74] Nothing contained within the settlement agreements acts to restrict transfer. Instead, the settlement language that they were made binding upon the parties "and their respective successors and assigns" appears to contemplate assignment.[75] Additionally, B&W utilized an agent, Worldwide, to handle and fulfill its claims management duties prior to filing of the petitions. Delegation of B&W's duties to an agent would also indicate that assignment was contemplated under the agreements.

Accordingly, the court finds that the Plan assigns to the trusts the Insurance Rights, including the right to receive insurance proceeds under various insurance policies and settlement agreements, and not the policies themselves. The Plan does not violate obligations of the Debtors or Insurance Contributor under any consent-to-assignment clause of any Subject Insurance Policy, A/P policy, Subject Asbestos Insurance Settlement Agreement or A/P Township Settlement Agreement. The assignment of the right to collect on B&W's coverage obligations does not materially increase the insurers' risk because the asbestos-related exposures and injuries relevant to asbestos claims have taken place years prior to the assignment.

2. Anti-Assignment, Management of Claims, Cooperation and Consent Clauses.

a) *Preemption under Section 1123(a)(5).* Plan Proponents argue that (i) §1123(a)(5)

---

[74] Exhibits 36.001 to 36.022.

[75] *Certain Underwriters at Lloyds v. McDermott Int'l, Inc.*, 2002 WL 22023 (E.D. La. 2002).

expressly provides for adequate means for a plan's implementation "notwithstanding any otherwise applicable nonbankruptcy law" and preempts nonbankruptcy law to the contrary, such as the anti-assignment clause and other contractual provisions including management of claims, cooperation and consent to settlement provisions, (ii) the interpretation of contract rights the insurers promote would impliedly thwart the purpose of the channeling injunction found in 524(g); and (iii) both bankruptcy and insurance law prohibit the insurers from reaping a windfall if their coverage obligations were lessened by the Plan's implementation of 524(g).

Section 524(g) provides for an injunction to supplement a discharge in asbestos cases where certain requirements are met. Those requirements include that a trust be established and assigned substantial assets for the benefit of asbestos claimants and provide for matrices so that similar present and future claims are treated substantially the same. Plan Proponents argue that the Plan merely complies with the requirements of §524(g). They also argue that the insurers' allegation that the Plan breaches the policies and they no longer have obligations under the policies would permit the insurers to escape payment in any asbestos case where §524(g) is implemented and insurance is a major asset of the estate. In short, they argue that acceptance of the insurers' argument would render §524(g) meaningless.

Plan Proponents cite various cases for the proposition that §1123(a)(5) preempts any nonbankruptcy laws that impair the implementation of a plan. Unlike other provisions in the Code which have been interpreted as merely enabling statutes, the language of §1123(a)(5) that "notwithstanding any otherwise applicable nonbankruptcy law" constitutes an explicit express

Congressional intent to supercede state law restrictions on the transfer of estate property.[76] As the Fourth Circuit has said,

> ". . . §1123(a)(5) is an empowering statute. As stated by Collier: 'The alternatives set forth in §1123(a)(5) are self executing. That is, the plan may propose such actions notwithstanding nonbankruptcy law or agreements.' Section 1123(a)(5)(D) then does not simply provide a means to exercise the debtor's pre-bankruptcy rights; it enlarges the scope of those rights, thus enhancing the ability of a trustee or debtor in possession to deal with property of the estate."[77]

Insurers argue that the scope of the preemption found in §1123(a)(5) is limited only to "otherwise applicable non-bankruptcy laws 'relating to financial condition'" as stated in §1142(a), as the recent case of *Pacific Gas & Elec. Co. v. Cal. ex. rel. Cal. Dept. Of Toxic Substances Control,*[78] has so held. The *PG&E* case acknowledges that §1123(a)(5) provides for express preemption of nonbankruptcy laws, but held that the preemption is narrow in scope, applying only to nonbankruptcy laws relating to financial condition.[79] In so holding, the court noted that §1123 is derived from a similar provision found in §1142 which authorizes the implementation of a plan "notwithstanding any otherwise applicable nonbankruptcy law, rule or regulation relating to financial condition."[80] As noted by one author, it is unclear what, if any, nonbankruptcy laws would be preempted under the narrow ruling of the Ninth Circuit.[81]

---

[76]   *In re FCX, Inc.,* 853 F.2d 1149, 1154 (4th Cir. 1988); *cf. Integrated Solutions v. Service Support,* 124 F.3d 487, 493 (3rd Cir. 1997).

[77]   *FCX,* 853 F.2d at 1155.

[78]   350 F.3d 932 (9th Cir. 2003)

[79]   *Id.* at 937.

[80]   *Id.* at 942.

[81]   23 Am. Bankr. Inst. J. 32, 33 (2004)

This court holds that *PG&E* is distinguishable. *PG&E* involved the transfer of a large public utility under a plan that obviated the need for approval or compliance with the applicable state public utility regulation provisions. The B&W case does not involve the public regulation of a utility, instead it concerns implementation of §§524(g) and 105(a) injunctions in a case involving asbestos and radiation injury claims. Public health and safety issues are not implicated by the preemption, and a presumption against preemption is not present because state police powers are not implicated.[82] Instead, only contractual provisions restricting, among other things, the assignment of insurance, management of claims and consent to settlement are implicated.

Additionally, the weight of authority is in accord that §1123(a)(5) preempts contrary state law or contract provisions if such provisions are necessary to the implementation of a plan.[83] Cases that have considered the issue have uniformly held that §1123(a)(5) expressly preempts nonbankruptcy laws, and *PG&E* is the only case to read the preemption narrowly, to apply only to nonbankruptcy laws relating to financial condition. *PG &E* is in the minority, and reads into §1123(a)(5) a requirement not found in the text of the provision.

This court also disagrees with the Ninth Circuit in *PG&E* in adding the words "relating to

---

[82] *In re Pacific Gas & Elec. Co*, 283 B.R. 41, 47 (N.D. Cal. 2002), *rev'd*, 350 F.3d 932 (9th Cir. 2004)(noting that preemption issues are particularly acute in public utility cases because no other debtor is subject to as much regulation).

[83] *In re FCX, Inc.*, 853 F.2d 1149 (4th Cir. 1988)(1123(a)(5) authorized the release of collateral securing a claim in satisfaction of the claim despite bylaw provision requiring board approval); *In re Entz-White Lumber & Supply Co.*, 850 F.2d 1338 (9th Cir. 1988)(1123(a)(5) permitted cure of default without paying contract default interest); *In re Public Service Co.*, 108 B.R. 854 (D.N.H. 1989)(1123(a)(5) permitted transfer of electric utility despite lack of state regulatory approval); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 61 (Bankr. S.D.N.Y. 1990)("Court finds that its jurisdiction and power over the debtor's estate takes precedence over the authority vested in the OTS under Title 12.")

financial condition" to §1123(a)(5).   The Ninth Circuit's reading into the §1123(a)(5) the words "relating to financial condition" ignored the rules of statutory interpretation found in other cases that where a statute's language is plain, the function of the court is to enforce it in accordance with its terms[84] and that a statute should be read to give effect to the whole, and not render superfluous any other portion of the same law.[85] The "notwithstanding" language appears in the introductory portion of §1123(a) and under any fair reading applies to all subsections thereunder.  Adding the "relating to financial condition" language creates real doubt and confusion as to its limitation applying to subsection (a)(5)(C), (I), (J), and (a)(6) - (7) and would in many instances render these subsections meaningless.

The structure of the Plan contemplates that, among other things,  insurance rights will be assigned to the various trusts, that matrices will be established providing for the payment of allowed claims, and an injunction issued.  The implementation of section 524(g) provides support for the argument that Congress intended to permit the transfers contemplated by the Plan in asbestos cases. This conclusion is buttressed by the provision in each policy of insurance, mandated by state law, that the bankruptcy or insolvency of the Assureds shall not relieve the insurer of the obligation to pay claims under the policy.

---

[84]  *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 103 L.Ed.2d 290 (1989)("...where...the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'").

[85]  *Kawaauhau v. Geiger*, 118 S.Ct. 974, 523 U.S. 57, 140 Led. 2d 90 (1998)(Court is "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law."), *quoting Mackey v. Lanier Collection Agency & Service Inc.*, 486 U.S. 825, 83, 108 S.Ct. 2182, 2189, 100 L.Ed. 2d 836 (1988).

A contrary conclusion would allow insurers an absolute veto of a plan of any reorganization that involved an insured with asbestosis liability because of the anti-assignment clauses found in policies. Such an interpretation would allow insurers to gut the reorganization and channeling injunction provisions specifically provided for in §524(g). No law has been cited by the insurers to support such a proposition. Authority does exist, however, to support the proposition that §524(g) was adopted to foster reorganization.[86] This conclusion is also in accord with the asbestos insurers' practice in this proceeding, as discussed in more detail in the next section, of permitting B&W to oversee the claims management process.

C.   Payment of Valid Claims.

London and other insurers object that the Plan is not filed in good faith because it proposes to pay meritless claims, not within the coverage of the insurers policies. Plan Proponents respond that the insurers must act reasonably with respect to a policyholder's settlement of asbestos-related liabilities, that the TDP's criteria for payment of claims are similar to or more stringent than the pre-petition settlement criteria used to settle over 300,000 claims against B&W from late 1970 to February 2000.

The history of the claims management process is significant and bears describing in detail. Initially, B&W looked to Travelers, its insurer with primary general liability coverage, for defense and indemnity. In the 1970's, B&W began receiving asbestos injury claims, which it tendered to Travelers. In the early 1980's, Travelers and B&W developed a "bulk settlement" strategy to settle

---

[86] The House Report states that section 524(g) was added to establish a procedure for dealing with reorganizations involving future personal injury claims against the debtor based on exposure to asbestos-containing products. The section is modeled on the trust/injunction in the Johns-Manville bankruptcy case and the UNR bankruptcy proceeding. HR Rep. 103-834, 103rd Cong., 2nd Sess 8-12 (Oct. 4, 1994); 140 Cong. Rec. H10765 (Oct. 4, 1994).

the asbestos injury claims asserted against B&W. Mr. McKnight testified that, while he was employed by Travelers, this primary insurer played a key role in developing the strategy and supported the strategy.[87] Under the settlement strategy, protocols were developed to settle claims for a low per-claim amount where the asbestos injury claimant could demonstrate: (a) exposure to asbestos allegedly associated with a B&W boiler and (b) an asbestos-related medical condition. Mr. McKnight testified that if the claimant could provide information sufficient to survive a summary judgment motion, allowing the claim to go to a jury, the claim could be settled under the protocols developed. Claims were settled under the protocols until 1989, when Traveler's informed B&W that the products bodily injury aggregate limits under its post-1937 primary insurance policies were approaching exhaustion.

After 1989, B&W through Worldwide, assumed principal claims-handling responsibility for asbestos injury claims. Mr. McKnight joined Worldwide, a third-party claims administrator, and continued to apply the settlement methodology developed by Travelers to B&W claims until the petition date.

After 1989, B&W looked to its excess insurers to provide coverage in place to fund the asbestos injury claims. On or about April 25, 1990, B&W and London Market Insurers agreed to the London Settlement Agreement ("LSA")[88], which set forth the manner in which the excess insurers' policies would provide coverage-in-place for B&W's asbestos products bodily injury claims. The LSA was the first B&W CIP agreement with excess insurers, and many other CIP's were executed with other excess insurers by B&W in the following years. All the CIP's contained

---

[87] Testimony, September 22, 2003.

[88] Exhibit 37.

similar provisions. The CIP's agreed to a "trigger of coverage," for allocation of coverage, for the management of claims and other provisions.

Under the management of claims provision, B&W was given the responsibility for the defense and management of asbestos claims. B&W, through its agent Worldwide, settled the asbestos claims, and then allocated settlement payments and administrative costs to the excess insurers using the agreed upon allocation method. B&W and Worldwide continued the same settlement strategy that was initiated with Travelers.

Mr. McKnight testified that, while at Worldwide, he employed the same exposure and medical criteria as used while he was at Travelers. He testified that items that a claimant needed to present for a claim to be settled were:

(1) Evidence that the claimant worked in a facility containing a B&W boiler. Exposure documentation included an affidavit from the claimant or a letter from his attorney listing the claimant's places of employment;

(2) Medical documentation of an alleged asbestos-related disease or condition. Generally, a doctor's report stating that the claimant had symptoms "consistent with" an asbestos-related disease or condition was satisfactory. B&W accepted an ILO reading of "1/0" to establish a claim of asbestosis.

The evidence shows that the settlement strategy was communicated to London.[89]
Mr. Quinn, the New York attorney for London, stated that London supported the strategy.[90] Worldwide would keep excess insurers apprised of the claims handling procedures and

---

[89] Exhibit 96.

[90] Testimony, September 24, 2003.

criteria by, among other things, providing memos to London's counsel notifying them of new or revised settlement protocols, [91] and providing Quarterly Reports notifying the excess insurers of settlements reached.[92] The excess insurers also performed periodic audits of Worldwide's claims handling procedures.[93] The results of the audits were acceptable, as Worldwide continued to process claims using the settlement strategy.[94] In 1997, Worldwide paid $200 million in claims, in 1998 it paid $220 million and in 1999 it paid $270 million in claims, none of which were rejected by insurers.

Under the Plan, certain TDPs have been developed by the FCR, the ACC, and the Debtors. Mr. Green, the Asbestos FCR, testified that the TDPs are consistent with, or stricter, than the pre-petition claims settlement criteria employed by Worldwide, and agreed to by their insurers. The court finds it significant that Mr. Green has critically examined the TDPs, because his interest is in assuring the payment of future claimants, and the Plan has only limited resources for paying both present and future claims. In addition, Dr. Florence testified that his analysis of the TDPs shows them to be more stringent than B&W's pre-petition settlement strategy.[95] Also, the testimony at trial shows that the TDPs are consistent with or more stringent than criteria used in other asbestos cases to evaluate claims, including the Celotex Trust, Manville Trust, Eagle Picher Trust and UNR Trust.[96]

---

[91]  Exhibits 123, 124, 135, 143.

[92]  Exhibits 165.27 - 165. 40.

[93]  Exhibits 40, 94, 221.

[94]  Exhibit 47.

[95]  Exhibit 169c.

[96]  Exhibit 169, App. B, 1-12.

Dr. Peterson testified that under the TDPs, the Debtors would pay less than they would had they remained in the tort system.[97]

London and other insurers argue that the TDPs provide for payment of invalid claims because (i) the Debtor has stated such claims were invalid in earlier pleadings, which have now been withdrawn or abandoned by the Debtors, (ii) the TDPs do not follow the American Thoracic Society ("ATS") or ABA Guidelines for criteria in the diagnosis of asbestosis and provide for payment of claims despite the lack of an "asbestos marker."

The Litigation Protocol proposed by the Debtor early in this bankruptcy proceeding was a departure from the Debtors' insurer-approved, prior procedure for handling asbestos injury claims, that of settlement upon meeting certain somewhat loose criteria. The Litigation Protocol represented an aggressive response to asbestos injury claims -- one which the Debtors have since abandoned in favor of the negotiated Plan.[98]  It is not unusual for Debtors to change litigation strategy in connection with a Chapter 11 proceeding. Likewise, if the court were to hold every party to aggressive assertions made in pleadings in advance of litigation, there could never be a settlement of the litigation. Accordingly, the court finds that the Debtors' abandonment of their initial strategy to contest claims does not indicate a lack of good faith.

---

[97]  Exhibit 166, Table 18.

[98]  The Litigation Protocol was a proposal for disposing without jury trials of more than 200,000 asbestos personal injury claims in the district court by obtaining summary judgments in certain prototype cases and applying those rulings (supposedly in Debtors' favor) to all of the claims. The court should note that Debtors' counsel did not freely and willingly abandon this litigation strategy. Instead, after a couple of years this court indicated it was not willing to allow the reorganization to remain pending during the long period of time necessary to carry out the litigation strategy in the district court. See background on page 6 - 7 supra as to this court's insistence that at least an outline or tentative plan be filed in 2001, and the termination of the exclusivity period which ultimately resulted in the filing of a joint plan in July, 2003.

-45-

The TDP's are not as stringent as the insurers would like. They are, however, more stringent than the standards employed by the Debtors, and approved by the insurers, prior to bankruptcy. They are also consistent with standards employed by various other courts in the handling of asbestos injury claims under trust procedures.[99] The insurers have not made a showing that the criteria which they want have been accepted by any other bankruptcy court dealing with an asbestos trust. Rather than providing for the payment of "invalid claims," the Plan is the result of a negotiated settlement proposing to pay claimants in a fashion consistent with past practices approved by insurers, and consistent with practices found reasonable by other courts considering the asbestos liabilities of Debtors. The court finds that the Plan and associated documents satisfy the requirements of §1129(a)(3).

## VI.    THE PLAN'S DISCHARGE AND INJUNCTIVE PROVISIONS SATISFY THE REQUIREMENTS OF THE BANKRUPTCY CODE.

The Plan provides for the Asbestos PI Channeling Injunction and the Asbestos Insurance Entity Injunction to be issued in connection with its Trusts, under §524 and the Asbestos PI Channeling Injunction and Asbestos Insurance Entity Injunction under §105(a). These injunctions, and the related Plan discharge provisions, satisfy the requirements of the Bankruptcy Code.

Section 524 generally provides for the effects of discharge, and 524(g) provides for an injunction to supplement the injunctive effect of a discharge. The Plan has met all requirements of §524(g).

A. Uncontested matters.

---

[99] These include the Celotex Trust, Manville Trust, Eagle Pitcher Trust and UNR Trust. Exhibit 169, App. B, 1-12.

-46-

The parties do not contest that the Plan meets the requirements of several sections, including §§524(g)(2)(B)(i)(I) - (IV),[100] 524(g)(2)(B)(ii)(II)[101], (IV)(aa),[102] and 524(g)(2)(B)(ii)(V).[103] Other provisions of §524(g) are not disputed, although uncontested facts were not entered in connection with these sections. These include 524(g)(2)(B)(ii)(I), that the debtors will be subject to substantial future demands for payment arising from their asbestos-related activities and (III), that the pursuit of the Asbestos PI Trust Claims outside the Plan will threaten the Plan's purpose to deal equitably with asbestos claims and future demands.

Dr. Peterson and Dr. Florence, experts retained by the ACC and FCR, were recognized by the court as experts in valuation. Dr. Peterson estimated the Debtors' present and future claims. His methodology assumed that, absent evidence to the contrary, future claims would broadly follow historical patterns with respect to: (1) claims against B&W relative to the continuing incidence of asbestos-related cancers in the general population; (2) the ratio of non-malignant to malignant claims, and (3) amounts paid to settle claims for different diseases.[104] His methodology also factored in foreseeable changes in factors affected by non-epidemiological influences, including (1) changes in the propensity to file against B&W, (2) the ratio of non-malignant to malignant disease claims, and (3) the amounts paid to settle cases.

Dr. Peterson testified that if B&W had remained in the tort system, its total present and

---

[100] Pretrial Order, Uncontested Facts 31, 32, 34, 35.

[101] Pretrial Order, Uncontested Fact 39.

[102] Pretrial Order, Uncontested Facts 39, 40.

[103] Pretrial Order, Uncontested Facts, 13, 38.

[104] Peterson testimony, October 22, 2003; Exhibit 166.

-47-

future asbestos-related liability would range between $7.099 billion and $9.043 billion.[105]  Dr. Peterson also estimated the number and value of future claims that would be filed against the Asbestos PI Trust. Under the Plan TDPs, he testified that B&W's asbestos-related liabilities would be between $5.2 billion and $7.8 billion.[106]

Dr. Florence testified that utilizing several scenarios, based upon B&W's historical experience, B&W and its insurers would have faced significant asbestos-related personal injury claims had B&W not filed for bankruptcy: (1) $491 million in 2000; (2) between $793 million and $1.44 billion in 2001; (3) between $1.091 billion and $2.259 billion in 2002, and (4) between $1.39 billion and $3.041 billion in 2003.[107]

The expert testimony of John C. Butler was also offered by the ACC as to when B&W's coverage for its remaining products liability policies would have been exhausted had B&W not filed for bankruptcy. Using the liability scenarios offered by Dr. Petersen and Dr. Florence, Mr. Butler testified that B&W's nearly $1.2 billion in remaining products coverage would have been completely exhausted by the end of the year 2004 if B&W had not filed for bankruptcy.[108]

The court finds that the experts are credible,[109] and that Plan Proponents have demonstrated

---

[105]  Exhibit 166, at Table 15.

[106]  Id., Table 18.

[107]  Exhibit 169b.

[108]  Exhibit 188.

[109]  The insurers argue that the testimony of Dr. Peterson and Dr. Florence should not be accepted because this court rejected their testimony in the avoidance action by holding that B&W was not insolvent at the time.  See In re Babcock & Wilcox Co., 274 B.R. 230, 254 (Bankr.

-48-

that the Debtors would be subject to substantial future demands for asbestos related claims.    The Plan Proponents have also demonstrated to the court's satisfaction that the pursuit of such demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with claims and future demands.    The Plan provides a mechanism to channel claims to the trust, have each claim rated in accordance with the TDPs and for claims to be paid in accordance with a proposed schedule.  Absent such a mechanism, claims would be paid on a first come, first serve basis, with the likelihood that insurance coverages would be exhausted within a short time, leaving little or nothing to pay later filed claims.  Additionally, the Court finds that the Plan meets the requirements of the Code on all uncontested matters relating to the §524(g) injunction.

B.  Contested matters.

Certain Insurers have objected that §524(g)(2)(B)(i)(II) requires funding by the contribution of securities and future payments, which the Plan does not clearly do. [110]   The Plan provides for the funding of the Asbestos PI Trust by the transfer of, among other things, all of the capital stock of B&W, which will be accomplished by a transfer from BWICO.  It follows that if the Trust is the holder of all of the shares of B&W it will receive all dividends paid by B&W and its subsidiaries.

---

E.D.La. 2002).  This argument has no validity because:
  1) the evaluations were as of a different time and for a different purpose;
  2) only the figures and not the import of their testimony has changed.  That is, they felt B&W was insolvent in 1998 because of future claims  Now they testify the enormity of the claims is greater and presumably B&W is even more insolvent.

[110] "Certain Insurers" includes a large group of insurers, including TIG, Mt. McKinley Insurance Company and Federal Insurance Company.  B&W contends that this section is uncontested, and that uncontested fact no. 32 covers this provision.

-49-

Thus, claims allowed by the Trust will be paid from the earnings or the proceeds from any sale of those shares.[111] The court finds that the Plan satisfies the requirements of §524(g)(2)(B)(i)(II).

Certain Insurers also object that the 75% majority voting requirements of §524(g)(2)(B)(ii)(IV)(bb) have not been satisfied. Class 6, consisting of the holders of Asbestos PI Trust Claims, voted in favor of the Plan by amounts and numbers sufficient to satisfy the requirements of this section.[112]

Certain Insurers also object that the requirements of §524(g)(2)(B)(ii)(V) are not met because examination of the Trust Documents "[m]ake it impossible to determine whether the Trusts will ever be able to operate through the 'mechanisms' as required" by the section. Additionally, London insurers objects that the Plan violates the provision that present and future claims be treated in substantially the same manner because it proposes to pay meritless claims of present claimants, leaving little for future claimants, and because the Plan will vitiate insurance coverage through its illegal treatment of the insurers' contracts.

The Plan provides, at Section 3.2.6.2 and 5.4 for the Asbestos PI Trust to process and allow or disallow claims in accordance with the provisions of the Asbestos PI Trust Distribution Procedures. A mechanism exists for the trust to process claims and determine the amount, if any, that will be paid. The Asbestos PI Trust will be funded from several sources as discussed, including an assignment of rights to insurance coverage, all of the equity of B&W and additional contributions from McDermott. This funding will provide up to $1.152 billion in insurance rights, and capital

---

[111] It is not at all unlikely that B&W will, in the future, be a profitable company as it is now profitable if asbestos and nuclear claims no longer burden the company.

[112] Class 6 voted in favor of the Plan 89.4% by number and 88.4% by dollar amount.

stock and other assets worth between $680 - $780 million.[113] As discussed elsewhere in this opinion, the Plan and TDP's are more stringent than the settlement strategy previously employed by Worldwide in processing asbestos claims, and are consistent with the provisions approved in other bankruptcy cases. The FCR who is charged with the obligation of protecting the interest of the future claimants, has analyzed the Plan and TDPs, is a joint proponent of the Plan, and testified quite strongly in favor of the Plan. The court will not presume – as the insurers ask the court to do without any evidence – that the FCR has not performed, or will not perform in the future, his fiduciary obligations.

The court finds that the Plan provides sufficient funding to the Asbestos PI Trust, and that the Asbestos PI Trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner. Thus, it satisfies the requirements of §524(g)(2)(B)(ii)(V). The Asbestos PI Trust will operate through mechanisms, such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and value of Asbestos PI Trust Claims, or other comparable mechanisms that provide reasonable assurance that it will value and pay similar claims in substantially the same manner.

In addition to other requirements, §524(g)(4)(B) requires that the court appoint a legal representative to protect the rights of future claim holders and that the court determine that the injunction with respect to future claims is fair and equitable to the future claim holders. As already mentioned, the court has appointed Eric D. Green, Esq. as the legal representative for the future

---

[113] Exhibit 17.

asbestos-related claims holders. Mr. Green is well experienced in these kinds of matters.[114] Mr. Green has engaged in numerous discussions with the Debtors regarding the treatment of future claimants in the Plan, and taken actions needed to protect the rights of future claimants. Among other things, Mr. Green has retained Dr. Thomas Florence and other advisors to examine the availability of insurance to pay claims, to provide claims projection and trust distribution analysis, to examine the Debtors' asbestos-related liabilities and other issues relating to the future claims. All of this expert knowledge supports Mr. Green's informed and experienced opinion to support the Plan as a plan proponent. The court finds that the requirements of §524(g)(4)(B) have been satisfied.

     C.    Section 105 Injunction.

The Plan provides for the Apollo/Parks Township Channeling Injunction, which will enjoin Apollo/Parks claimants from pursuing claims against the Debtors, certain of their affiliates and subsidiaries, the MII Indemnified Parties and ARCO.[115] The Plan Proponents base this provision upon §1123(b)(6), which permits any "appropriate provision" that is not inconsistent with other provisions of the Code, and §105 of the Bankruptcy Code, which permits the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

---

[114] Mr. Green testified that he has served as special master in both federal and state asbestos cases in Massachusetts, as well as in federal asbestos suits in Connecticut. He has also served as consultant to the post-confirmation trustees in the Johns Manville bankruptcy proceeding. He has served as futures representative in several asbestos bankruptcies, including the Fuller Austin case in Delaware, the Federal Mogul case in New Jersey and the Halliburton/Dresser bankruptcy proceedings.

[115] Plan, sections 1.1.9, 1.1 25, 7.10.

Also, §524(g)(1)(A) specifically provides for "an injunction . . . to supplement the injunctive effect of a discharge. . . ."

The Plan Proponents seek issuance of the Asbestos PI Channeling Injunction and Asbestos Insurance Entity Injunction under §105, as well as §524(g). A discussion of the evidence supporting §524(g) appears above, and will not be repeated in this section. To the extent applicable, it is incorporated herein.

Case law has provided several factors for consideration prior to issuance of a third-party injunction, including:

> "(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and ; (7) The bankruptcy court made a record of specific factual findings that support its conclusions."[116]

Each factor will be discussed in turn.

*1.    Identity of Interest.*

A. Asbestos. Plan Proponents seek issuance of the Asbestos PI Channeling Injunction, Asbestos PD Channeling Injunction and Asbestos Insurance Entity Injunction against Debtors and other third parties that are Asbestos Protected Parties. The court finds that an identity of interest

---

[116] *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002), *citing In re A.H Robins Co.*, 880 F.2d 694, 701 - 702 (4th Cir. 1989); *In re Johns-Manville*, 837 F.2d 89, 92-94 (2nd Cir. 1988); *In re Continental Airlines*, 203 F 3d at 214.

exists between Debtors and the Asbestos Protected Parties. The Asbestos Protected Parties include MII, the ultimate parent, MI the parent of B&W, non-debtor subsidiaries of the Debtors and affiliate corporations of the Debtors. Under numerous policies, B&W and all "wholly owned, or financially controlled or affiliated companies" are the named assured.[117] Lawsuits filed also name MII as a party, with claims derivative of B&W's alleged asbestos liability. MI and MII are making substantial contributions to the Plan, and their willingness to do so is dependant upon a final resolution of liability for the derivative asbestos liability claims.

B. Apollo/Parks.   The court finds that an identity of interests exists between the Debtors and third parties, including ARCO, MII and the non-debtor affiliates and subsidiaries to support issuance of the Apollo/Parks Township Channeling Injunction. Mr. Nesser testified that B&W purchased Nuclear Materials and Equipment Corporation ("NUMEC") from ARCO in 1971.[118] NUMEC had operated the Apollo and the Parks facilities from approximately 1957 to 1967,[119] and NUMEC's assets were eventually transferred to a wholly owned subsidiary of ARCO, also named NUMEC. Among other things, ARCO is contractually bound under an assumption of liability and agreement to indemnify B&W which exists in the Stock Purchase and Assumption Agreements related to the transaction.[120]

---

[117] For example, see Exhibits 34.072 - 34.080.

[118] A/P Uncontested Facts, No. 6. Pl. 5356.

[119] A/P Uncontested Facts, No. 2 - 4. Pl. 5356

[120] Exhibit 3015. Agreement between Atlantic Richfield Co. as owner of capital stock of Nuclear Materials and Equipment Corporation and the purchaser, The Babcock & Wilcox Company. A/P Uncontested Facts, No. 7, Pl. 5356

Additionally, ARCO and B&W are both named insureds under the A/P Policies.[121] Because these entities share a pool of insurance related to the A/P claims, their interests are aligned, and an identity of interests exists between the entities. Likewise, the B&W affiliates and subsidiaries, including MII, share an identity of interest. Each may share liability for nuclear hazard risks at the Apollo and Parks facilities, and their interests are aligned. The court finds that an identity of interests exists among the Debtors, the Asbestos Protected Parties, and the Apollo/Parks Township Protected Parties such that a claim asserted against any of the Asbestos Protected Parties or the Apollo/Parks Township Protected Parties gives rise to a claim against the Debtors, including by the operation of the law of indemnity and/or contribution.

2.    *Substantial Contribution.*

A.    <u>Asbestos.</u>   Section 7.2 of the Plan provides for funding of the Asbestos PI Trust, with: (i) BWICO (an indirect wholly owned subsidiary of MII), which now owns the stock of B&W, will cause the trust to become the holder of all outstanding Capital Stock of B&W; (ii) additional McDermott contributions including 4.75 million shares of common stock of MII (the ultimate parent of B&W) and a $92 million promissory note by MI; (iii) assignment of the asbestos insurance rights; and (v) transfer of certain of tax benefits of the Debtors. MI and MII's contributions to the trusts are substantial, and consist of both shares and promissory notes. According to the Blackstone Liquidation Analysis, the various McDermott contributions are in the range of $680 to 780 million. MII and certain of its subsidiaries are also assigning their Asbestos PI Insurance Rights, plus intellectual property rights to the Asbestos PI Trust. The court finds that the contributions of $400-500 million in B&W stock, $123.1 million for the MII stock, McDermott guarantee and promissory

---

[121]   A/P Uncontested Facts, No. 68

notes and $160 million for the tax benefits are substantial contributions to the Plan and the reorganization.[122]

B. Apollo/Parks.    The Plan, at §7.6.5, provides for the funding of the A/P Township Trust. Contributions are made on the Effective Date to the Trust, as follows: (i) Insurance Contributors shall make the A/P Township Insurance Rights Assignment; (ii) the Debtors shall make the A/P Township Payment of $2.8 million and assign $1.4 million of rights to reimbursement of defense costs; and (iii) ARCO shall make a $27.5 million cash contribution and an assignment of insurance rights.    Mr. Nesser testified, in connection with the formation of the Plan and settlement, that ARCO's contribution was to be substantial.    It will be paid directly to the A/P Claimants with the A/P Trust receiving a setoff of the cash payment amount, and forms an integral part of the settlement of the A/P Claims. The Court finds that ARCO's contribution to the Plan, in the form of cash contributions and insurance rights assigned, are substantial assets of the Plan and the reorganization, and will serve to reduce the amount that the A/P Claimants will eventually be paid through the A/P Trust.    The contribution of the Debtors' Apollo/Parks Township Payment and the Debtors' Apollo/Park Township Insurance Rights Assignment are substantial contributions to the reorganization.

3.    *Essential to Reorganization.*

A.    Asbestos.    The testimony at confirmation was that B&W was subject to voluminous personal-injury claims alleging exposure to asbestos from B&W boilers.    During the 1980's and 1990's, B&W carried out a settlement strategy in which it consensually resolved all claims by claimants who made minimal showing of alleged exposure and injury.    A total of more than $1.5

---

[122]   Ms. Zilly expert report, Exhibit 17.

billion was paid to claimants by B&W's insurers, resolving more than 300,000 pre-petition claims. By late 1999, however, there was an increase in both the number and the cost of asbestos claims. By 1999, the number of claims filed against B&W had reached over 400,000.[123] By the claims bar date, approximately 222,000 primary asbestos-related personal injury and 60,000 secondary exposure proofs of claim were filed in this case.[124] The Debtors are likely to be subject to substantial future demands arising out of the same or similar conduct or events that gave rise to the asbestos personal injury trust claims and asbestos property damage claims, addressed by the various asbestos channeling injunctions. Pursuit of these demands outside of the reorganization and procedures set forth in the Plan will threaten the Plan's purpose to deal equitably with asbestos personal injury and property damage claims. The court finds that the Asbestos Insurance Entity Injunction, the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction are essential to the Plan and the reorganization.

B. Apollo/Parks. As will be discussed in more detail in connection with the discussion of the nature of the A/P Claims, the defendants' claims in the *Hall* litigation pending in Pennsylvania present a substantial litigation risk. A "test trial" in the *Hall* litigation involving only eight of the 500 claimants resulted in an adverse jury verdict of $36.7 million.[125] Although the trial court eventually granted a new trial, a substantial risk remains on retrial that a similar result may be found. Resolution of the *Hall* claims and future claims by channeling them to the A/P Trust will result in a resolution of all the claims, and payment of the claims from the A/P Trust, and will permit the

---

[123]  Joint Pre-Trial Order, Uncontested Facts No. 9.

[124]  *Id.* at No. 14.

[125]  A/P Uncontested Facts, No. 96, 97. Pl. 5356.

-57-

Debtor to emerge from bankruptcy free from past and potential future claims relating to the Apollo and Parks facilities, and also free from significant litigation expenses related to the *Hall* claims.[126] Absent the injunction found in the Plan, after more than a decade of litigation the A/P Claims will remain unresolved, with the Debtor facing significant future litigation and its attendant expense. Moreover, a condition to incurrence of the Effective Date of the Plan, and to ARCO's contribution of cash and the insurance rights assignment, is that the A/P Channeling Injunction is in effect. The court finds that the injunction is essential to the Plan and the Debtors' reorganization.

4.    *Acceptance of the Plan by Impacted Class.*

A. Asbestos. The Plan provides for payment of the asbestos personal injury claims as Class 6 claims, and for payment of asbestos property damage and indirect asbestos property damage claims as Class 7 claims. These classes have voted in favor of the Plan. The holders of Class 6 claims voted in favor of the Plan 89.4% by number and 88.4% by dollar value.[127] The holders of Class 7 claims voted 100% in favor of the Plan.[128] The court finds that the requirement of acceptance by the impacted class has been met.

B. Apollo/Parks. The Plan provides for payment of the A/P Claims as Class 8A Claims. Class 8A has voted overwhelmingly in favor of the Plan, with affirmative votes received by over

---

[126] As of November 1, 2003, ANI, through its counsel reported that the total transaction costs expended in the defense of the *Hall* action are $24.02 million. A/P Uncontested Fact No. 120. Defense costs erode the limits of the Facility Form Policies. A/P Uncontested Fact No. 66. That is, for every dollar spent on defense there is one dollar less available for claimants from the applicable insurance.

[127] Exhibit 2006.

[128] Exhibit 16.

99% of the class members.[129]  Moreover, the Apollo Future Claims Representative supports the Apollo/Parks Settlement Agreement. The court finds that the requirement of acceptance of the Plan by the impacted class has been met.

5.    *Substantially Full Payment to Impacted Classes.*

A. Asbestos.  The Plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction. Contributions to the asbestos personal injury trust is discussed above. Like the A/P Trust, trust distribution procedures have been promulgated to govern the trust's operations. Under the Plan, claims will be channeled to the trust, each claim rated in accordance with established TDPs, and paid in accordance with a proposed schedule.

B. Apollo/Parks.  The Plan provides for payment of the A/P Claimants and Future Claimants as Class 8A Claims, and for adoption of Trust Distribution Procedures to govern the workings of the A/P Trust. The A/P Settlement will settle the *Hall* claims, which comprise the bulk of the A/P present claims, in the amount of $110 million. Both ARCO and the Insurance Contributors will make the Apollo/Parks Township Insurance Rights Assignment. The parties have stipulated to the face amounts and limits of various insurance policies applicable to both the Apollo and Parks facilities over time, and these limits are sufficient to cover the *Hall* settlement amount.[130]

In addition, ARCO will make a cash payment to the *Hall* claimants of $27.5 million upon the receipt of releases from the *Hall* claimants, as well as other conditions as set forth in the Settlement. B&W will make a $2.8 million cash payment to the A/P Trust and assign to the A/P

---

[129]    Tabulation of Votes and Affidavit of Michelle Dalsin Zeller.

[130]    A/P Uncontested Facts, Nos. 62, 63. Pl. 5356.

-59-

Trust its claims against ANI for reimbursement of prior defense costs incurred and paid by B&W arising from the *Hall* litigation in the amount of $1.44 million.

The Plan also provides for a set aside of $75 million (with a cap of $100 million) for the A/P Future Demand Holders. Mr. Basil Uddo, the A/P FCR, has exercised extensive due diligence review in the case. For example, he testified that, among other things, he reviewed the Plan and Disclosure Statement, the case record, the record in the *Hall* litigation and studies related to radiation exposure issues, as well as consulted with experts and others before concluding that the set aside was sufficient to satisfy A/P future claims. Although the A/P Trust Distribution Procedures remain to be negotiated between the parties and approved by the Court, based on the provisions of the Plan as amended on October 1, 2004, they will provide for the treatment of Apollo/Parks Township future demands in substantially similar fashion to A/P Present Claims.

6. *Full Payment of Nonsettling Claimants.*

A. <u>Asbestos.</u> No evidence was put forth as to claimants who have not agreed to settle asbestos-related claims, or the payment to be made to these claimants. The Plan proposes to resolve all asbestos-related claims, and to pay those claims in accordance with procedures established under the TDPs. The Settlement Agreement between Debtors, MII, MI, the ACC and FCR proposes to settle disputes concerning the contents of the Plan, set up the asbestos trusts for the benefit of asbestos personal injury claimants and provide a mechanism for payment of the claims. To the extent claims are allowed, they will be paid in accordance with the trust in full.

B. <u>Apollo/Parks.</u> Mr. Nesser testified at the confirmation hearing that the *Hall* Claimants have agreed to settle their claims, and that other non-*Hall* claimants have claims estimated at $3

-60-

million or less. To the extent that the non-*Hall* claims are allowed, they will be paid under the A/P

Trust in full.

In conclusion, the court finds that the requirements for issuance of the Apollo/Parks

Township Channeling Injunction have been met. The Asbestos PI Channeling Injunction, the

Apollo/Parks Channeling Injunction, the Asbestos PD Channeling Injunction and the Asbestos

Insurance Entity Injunction are to be implemented in connection with this Plan, and the various

trusts.[131] Upon confirmation and substantial consummation of the Plan, the Non-Debtor Affiliate

Settlement Agreement and the Non-Debtor Affiliate Release shall be in full force and effect.

## VII.   EXECUTORY CONTRACTS

A.   Insurance Policies

---

[131] The Settling Asbestos Insurance entities, designated on the Plan Proponents'
Schedule of Settling Asbestos Insurance Entities (and subject to the Plan Proponents'
amendment until the Confirmation Date), are entitled to all of the benefits of the Asbestos PI
Channeling Injunction, the Asbestos PD Channeling Injunction, and the Asbestos Insurance
Entity Injunction.   Accordingly, the Asbestos PI Channeling Injunction applies in full to the
Settling Asbestos Insurance Entities with respect to Asbestos PI Trust Claims and the Asbestos
PD Channeling Injunction applies in full to the Settling Asbestos Insurance Entities with respect
to Class 7 Claims.
    Consistent with Sections 7.3 and 7.4 of the Plan, the Asbestos PI Channeling Injunction,
the Asbestos PD Channeling Injunction, and the Asbestos Insurance Entity Injunction apply to
(i) the B&W/AIG Insurer Misconduct Actions (as defined in the Settlement Agreement and
Release between the Babcock Parties the ACC, the FCR and Certain AIG Member Companies,
which was approved by this Court on June 16, 2004) and (ii) subject to this Court's approval of
the Settlement Agreement and Release between the B&W/McDermott Parties, the ACC, the
FCR and Travelers (the "Travelers Settlement Agreement"),which was filed for approval in the
Court and which this Court is scheduled to consider on October 20, 2004, the B&W/Travelers
Insurer Misconduct Actions (as defined in the Travelers Settlement Agreement).
    Consistent with Sections 7.3 and 7.4 of the Plan, none of the Babcock Parties, with
B&W/McDermott Parties, the ACC, the FCR and the Asbestos PI Trust (each as defined in the
Asbestos PI Insurance Settlement Agreements) may seek to terminate, reduce, or limit the scope
of the Asbestos PI Channeling Injunction with respect to any Settling Asbestos Insurance Entity
after the Confirmation Order becomes a Final Order.

        1. *Asbestos*. Section 7.2.6 of the Plan calls for the transfer of the Asbestos PI

Insurance Rights to the Asbestos PI Trust. Section 8.1 of the Plan calls for assumption of all

executory contracts and unexpired leases, not previously rejected. The parties apparently agree that

the insurance policies are not executory contracts.[132] At issue is whether the settlement agreements

with insurers, including the coverage in place agreement with London ("LSA") are executory

contracts capable of assumption. Insurers contend that the settlements are executory contracts that

cannot be assumed or assigned, because the settlements incorporate the terms of the policies,

including anti-assignment provisions, and other provisions with which the Plan does not comply.

The Plan Proponents contend that the settlements are like the policies – not executory.

        Prior to filing, the Debtors had numerous insurance policies with various insurers, many of

which were the subject of coverage-in-place agreements.[133] Prior to filing, the Debtor was current

in its premiums on all policies covering asbestos-related liabilities. On many policies, the coverage

period had already expired.[134] The Debtors' material obligation regarding the policies, i.e. the

payment of premiums, had been satisfied for the policy period covered. Other duties, such as

assistance and cooperation, are ancillary, and not material obligations. The only material obligation

---

    [132] See Plan Proponents Post-Hearing Brief, at pg.25; Certain Underwriters Response
Brief Regarding the Plan Proponents' Motion to Resolve Executory Contract Assumption
Motion, at pg. 20 (LMI concur with the Plan Proponents that the overwhelming weight of
authority establishes the non-executory nature of the Policies.")

    [133] The insurance policies are found at Exhibits 34.001 through 34.240. The settlement
agreements are found at Exhibits 0035, 0036, 36.001 through 36.022, and 0037.

    [134] All applicable coverage periods for the London policies expired on or about April 1,
1987. Objection to Plan, P. 4726 at pg. 17.

of insurers remains the indemnity of the Debtors on the policies. As such, the asbestos policies are not executory contracts which can be assumed or rejected in the bankruptcy proceedings.[135]

       *2. Apollo/Parks*  ANI asserts that its policies governing coverage for nuclear energy hazards, unlike the asbestos related policies, are executory contracts. ANI asserts that the policies are executory because B&W has the continuing obligation to pay premiums and ANI has the continuing obligation to defend claims tendered under the Plan.

    Unexpired insurance policies are generally considered executory.[136] Where a debtor has the continuing obligation to pay premiums, and the insurer has the continuing obligation to provide coverage, a policy is considered to be executory.[137] Premium payments are considered to be bargained for consideration in an insurance policy.[138] Policies where the debtor has paid premiums for coverage periods that have expired are considered to be nonexecutory.[139]

---

[135] *In re Firearms Import and Export Corp.*, 131 B.R. 1009, 1013-14 (Bankr. S.D. Fla. 1991)(insurance policy was not executory where debtor had paid all premiums in full prepetition on coverage periods that had expired); *In re Placid Oil Co.*, 72 B.R. 135, 137-38 (Bankr. N.D. Tex. 1987)(premium agreement not executory because no performance is required by debtor, other than payment of money); *see also Ames Dept. Stores, Inc.*, 1995 WL 311764 at 3 (S.D.N.Y. May 18, 1995)("Courts considering insurance policies in which the policy periods have expired and the initial premiums have been paid routinely find that they are not executory contracts despite continuing obligations on the part of the insured.")(collecting cases).

[136] *In re Gamma Fishing Co.*, 70 B.R. 950, 951 (Bankr. S.D. Cal. 1987).

[137] *Id.*; *Counties Contracting and Const. Corp.*, 855 F.2d 1054, 1060 (3rd Cir. 1988).

[138] *In re Sudbury*, 153 B.R. 776, 779 (Bankr. N.D. Ohio 1993).

[139] *See* footnote 132.

-63-

The parties have stipulated that a total of four policies were issued on the Apollo and Parks Township facilities, and that each policy was effective from the date of its issuance to the present.[140] Although the original policies were issued at various times from March 1958 to March 1975, yearly endorsements to the policies were issued, specifying the effective period for the endorsement.[141] Member companies participating in an ANI syndicate agree to pay a specified portion of insured losses, and receive the commensurate portion of the premiums.[142] ANI provided for each calendar year a premium endorsement specifying the advance, standard and reserve premium for the calendar year that the endorsement is effective, and an endorsement specifying changes in proportionate liability for subscribing companies in each calendar year.[143] The parties have stipulated that all premiums required to be paid under the policies have been paid.[144] The secondary financial protection master policy ANI administers is a retrospective premium program.[145]

The Plan Proponents assert that the ANI policies are not executory because all premiums have already been paid for the insurance, citing four cases for that proposition. The court notes, however, that three of the cases involved policies that had expired prior to the bankruptcy filing.[146]

---

[140]  Joint Pretrial Order on Issues Related to Apollo/Parks Township Matters, P. 5356, nos. 52 - 65.

[141]  Exhibits 3108 - 3111.

[142]  Exhibit 3127; section 2.3.2, page lxxiv.

[143]  For example, *see* Exhibit 3108, pg. 600.

[144]  *Id.* at 67.

[145]  Exhibit 3127, 2.3.3.3, page lxxix.

[146]  *In re CVA General Contractors, Inc.*, 267 B.R. 773, 778 (W.D. Tex. 2001)(when an insurance contract has been terminated prior to the date of the filing of the petition, there remains

Where the coverage period has expired prepetition, there remains no existing contract to assume or

reject. The remaining case relied on by Plan Proponents involved a retrospective insurance policy,

where debtor had paid the minimum premium for the policy year, but on the filing date, had failed to

pay retrospective premiums assessed after the policy year. [147] The court determined that the

existence of a retrospective premium did not render the policy executory. The court does not find

persuasive the cases where the policy at issue expired prepetition, or which considered retrospective

insurance policies where the retrospective premium was unpaid on the petition date. Instead, an

unexpired retrospective insurance policy is executory. [148] In this case, the coverage period of the

ANI policies extends post-petition, and Debtors still owe an obligation to pay standard premiums

for the policies.

Generally, the mere obligation to pay money by one party to the contract is not enough to

render that contract executory, absent some corresponding material obligation that is still owed by

the other party. [149] Here, the Debtors owe the continuing obligation to pay premiums, and ANI owes

_____

no existing contract, executory or otherwise, for the trustee to either assume or reject); *In re Firearms Import and Export Corp*, 131 B.R. 1009, 1013 (Bankr. S.D. Fla. 1991)(where liability coverages were for prepetition periods, on the filing of the petition, no existing contract is present for the debtor to assume and 365 was not applicable); *In re Sudbury*, 153 B.R. 776, 777 (Bankr. N.D. Ohio 1993)(each policy had expired or was terminated prior to the filing of the case; presence of Bankruptcy Clause in policy constituted agreement that indemnity obligation was not conditioned upon payment of retrospective premium, where deposit premium was paid in full).

[147] *Wisconsin Barge Line, Inc.*, 76 B.R. 695 (Bankr. E.D. Mo. 1987)(considering retrospective insurance policy).

[148] *Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 772, 779 (Bankr. W.D. Pa. 1985), *aff'd* 67 B.R. 620 (W.D.Pa. 1986)

[149] *Lubrizol Enters., Inc., v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985).

a continuing obligation to provide coverage and to keep the policy in effect, which would render the policy executory.[150] The failure of the Debtors to pay premiums would permit ANI the right to cancel the policies.[151] The court finds that the ANI policies are executory contracts which the Debtors may assume under the Plan. The policies are continuing, and coverage periods have not expired, which would render the policies executory.[152]

ANI further objects that the policies may only be assumed in their entirety, and the Plan Proponents may not assume the benefits of the policies without also assuming provisions regarding consent to settlement and control of the defense of claims. For reasons put forth in more detail in the following sections dealing with the Apollo/Parks Township issues, this objection is overruled. Debtors may make a reasonable settlement in the Plan of the A/P claims.

B.     Coverage in Place Agreements

The insurers object that various settlement agreements are executory contracts which the Debtors may not assume. At issue are settlement agreements entered into by B&W after the primary policies governing asbestos-related liabilities with Travelers were nearing expiration.

In 1989, Travelers informed B&W that certain limits on primary insurance policies were nearing exhaustion, and that it would no longer handle claims for B&W. B&W then assumed the principal claims-handling responsibility for its asbestos claims, using a newly formed third-party

---

[150] *Counties Contracting and Const. Corp.*, 855 F 2d 1054, 1060 (3rd Cir. 1988); see also M. Ledwin, The Treatment of Retrospectively Rated Insurance Policies in Bankruptcy, 16 Bankr. Dev. J. 11, 29 (1999).

[151] Exhibit 3110, pg. 6 ("in the event of nonpayment of premium . . . this policy may be cancelled by the companies. ..")

[152] Exhibit 3110, Item 2 (Policy Period: Beginning at 12:01 on the 7th day of March, 1975 and continuing through the effective date of the cancellation or termination of this policy).

claims administrator, Worldwide. B&W then looked to its excess insurance carriers to provide coverage in place to fund asbestos claims.[153]  B&W entered into agreements with excess insurers regarding the manner that the excess insurers' policies would provide coverage-in-place for B&W's asbestos products bodily injury claims.

One of the chief CIP documents is the LSA, agreed to on April 25, 1990.[154]  London, and other insurers, argue that the settlement agreement is executory because the major undertaking for Debtors under the agreement is the management of claims and for London is to indemnify pursuant to special criteria established by the CIP, and these obligations are so substantial that a breach of either would defeat the purpose of the transaction.  In addition, they argue that Judge Vance, in a January 4, 2002 opinion, treated the CIP as an executory contract,[155] and that her decision constitutes the law of the case.

Initially, the court notes that Judge Vance's decision of January 4, 2002 does not establish that the CIP is an executory contract.  Instead, she was asked to decide whether the Debtors had anticipatorily repudiated the CIP by proposing to assign the management of claims to a claims-handling trust under the Plan.  She held that "the provisions of the Plan do not express defendants' unequivocal intent to cease performance of the LSA."[156]  Without an analysis of the executory or nonexecutory nature of the CIP, Judge Vance reasoned that the Code does not prohibit assignment

---

[153]  Testimony Mr. McKnight, September 22, 2003; Mr. Quinn, September 24, 2003.

[154]  Exhibit 36.003.

[155]  *Certain Underwriters at Lloyd's, London, et al v. Babcock & Wilcox Co, et al*, C.A. No. 01-1187, 2002 WL 22023 at 8 (E.D. La. Jan. 4, 2002).

[156]  *Id.* at 7.

of executory contracts and unexpired leases, and that the LSA "does not prohibit its assignment and appears to contemplate assignment."[157]  In other words, a hypothetical scenario existed that would permit assignment.  Because the Plan at that time did not provide unequivocally for assignment of the LSA to a trust, or which would exclude the Underwriters from claims management, she found that the defendants had not committed an anticipatory repudiation of the LSA that would absolve the insurers of obligations under the agreement.  In short, Judge Vance was not asked to decide whether the LSA was an executory contract under 11 USC §365.  Instead, she decided only that the Debtors did not commit an anticipatory breach of the LSA.

The Bankruptcy Code, at §365, provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

In determining whether a contract is executory, the relevant inquiry is whether "if at the time of bankruptcy filing the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party."[158]  Only the existence of a material obligation that would excuse the performance of the other party, and not merely ancillary, ministerial or other continuing duties, would render a contract executory.[159]  A contract fully performed on one side prior to bankruptcy is not executory.[160]  If either side has "substantially

---

[157]  *Id.*

[158]  *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62-63 (5th Cir. 1994).

[159]  *In re Sudbury, Inc.*, 153 B.R. 776, 779 (Bankr. N.D. Ohio 1993).

[160]  Resnick, *Bankruptcy Law Manual*, 8:41 (5th ed.).

performed" its side of the bargain, such that the party's failure to perform further would not excuse performance by the other party, then the contract is not executory.[161]

Generally, a material breach is one so substantial as to defeat the purpose of making the contract.[162] The breach must go to "the root of the agreement" for a party to terminate its obligations under the contract.[163]

No decision could be located specifically discussing the executory nature of CIP agreements. Courts generally construe continuing obligations in nonexecutory insurance policies where the coverage period has expired, such as notification and cooperation clauses, as ancillary obligations that are still in effect but which failure to perform would not be material and would not excuse the insurer from liability under the policy.[164]

Under the settlement agreements, B&W is made responsible for the management of claims.[165] The insurer parties agreed to the establishment of a coverage block and to indemnify B&W for claims and defense costs. Plan Proponents argue that the management of claims provision in the CIP is not material, that it was never specifically discussed, and was merely added with other standard

---

[161] *In re Texscan Corp.*, 976 F.2d 1269 (9th Cir. 1992).

[162] *Sinco, Inc. v. Metro-North Commuter Railroad Co.*, 133 F.Supp. 2d 308, 311 (S.D. N.Y. 2001). The LSA provides that it is governed by New York law. Other CIPs either do not contain a choice of law stipulation, or provide that laws of other states shall govern. For example, the CIP with Commercial Union specifies that it shall be governed by the law of Massachusetts. Exhibit 36.006 at pg. 13.

[163] *Id.*

[164] *Firearms,* 131 B.R. 1009, 1013-1014 (citing *In re Federal Press Co., Inc.*, 104 B.R. 56, 66 (Bankr. N.D. Ind. 1989)); *In re Sudbury, Inc.*, 153 B.R. 776, 779 (Bankr. N.D. Ohio 1993)(debtor's duties under cooperation clause is ministerial).

[165] Exhibit 36.003, pg.3. Other settlements contain similar provisions.

provisions in an early draft, and remained in the CIP thereafter. Additionally, they argue that the management of claims provision in the CIP is analogous to assistance and cooperation clauses found in policies, and are not material obligations. This court agrees.

The CIPs were designed to state the manner by which the settling insurers' excess policies would provide coverage-in-place for B&W's asbestos products bodily injury claims. The insurers agreed to pay asbestos claims as they were asserted under a methodology that was to be agreed upon. Eldon Bolton, who acted as lead negotiator for McDermott in the negotiation of the LSA, testified that the negotiations leading up to the LSA centered on the "trigger of coverage", that is, which policies would be used for injuries arising based upon an agreed upon "trigger" of liability. The Debtors objective was to obtain a "triple trigger" and to increase access to coverage. He testified that once the trigger was achieved, he had no objections or comments to the management of claims provision of the agreement.[166] Letters between Mr. Bolton and Mr. Quinn, a New York attorney and London's chief negotiator, discussing the LSA do not contain any mention of this provision.[167] In short, Bolton's testimony was that the trigger of coverage was extensively negotiated; however, the management of claims provision in the settlement was merely inserted without discussion.

Additionally, the course of conduct of the parties indicates that the management of claims provision is not a material provision, such that its breach would excuse the Underwriters' performance. The LSA specifies that "B&W/McDermott shall be responsible for the management

---

[166] Deposition Eldon Bolton, pg. 48-49.

[167] Exhibits 97 - 100, 102 , 104 - 106, 108.

-70-

of the Claims."[168] The testimony established that Worldwide undertook the management of claims

for the Debtors. Worldwide employed among others, David McKnight a former employee of

Travelers, who had handled B&W asbestos claims while at Travelers. The testimony was that

Worldwide was given near complete discretion in handling claims,[169] and that settlement in excess

of given dollar amounts would not constitute a breach.[170]

The conduct of the parties indicates that they never considered the management of claims

clause to be central to their agreement, such that a breach would be material. Moreover, the

management of claims provision in the CIPs merely provides for the parties to agree in the future

to procedures for, among other things, the negotiation of new settlement agreements with plaintiffs'

counsel and other claims handling matters. That the LSA does not set out those procedures was

confirmed by Mr. Quinn's testimony.[171] Therefore, it cannot be said that the management of claims

clause constituted the "root of the agreement" such that Underwriters may terminate the agreement

if the clause were breached. Other than claims management, which is more in the nature of an

incidental continuing obligation, and which was performed by Worldwide pre-petition, no material

obligations are due by Debtors under the CIPs that would constitute a material breach if not

---

[168] Exhibit 36.0003, pg. 3.

[169] Exhibit 121; Thomas Quinn testimony Sept. 24, 2003; Louis Burkart testimony Sept. 23, 2003.

[170] Thomas Quinn testimony, Sept. 24, 2003; *see also Certain Underwriters*, 2002 WL 22023 at 7 (failure of B&W to notify underwriters of settlements in excess of $100,000 would not breach the LSA).

[171] Thomas Quinn testimony, Sept. 24, 2003.

performed. Accordingly, the CIPs are not executory contracts that must be assumed or rejected by the Debtors.

### VIII. APOLLO/PARKS ISSUES

#### A. Background Facts.

The Apollo Facility and the Parks Township Facility are nuclear power facilities located in Pennsylvania. In 1971, B&W purchased from ARCO all of the shares of the companies owning the facilities. Under the purchase agreement with B&W, ARCO agreed to indemnify B&W for certain liabilities, including claims arising out of "all liabilities, obligations and debts" of the predecessor company that predated the sale. The Apollo Facility produced high-enriched uranium ("HEU") from 1957 to 1978, and low-enriched uranium ("LEU") from 1964 to 1983. The Parks Township Facility produced specialty metal products,[172] plutonium-238, plutonium based fuel plates and other products using radioactive materials at various times from 1961 to the mid-1970's. Additionally, from the mid-1960's, the Parks Township Facility stored or disposed of radioactive waste materials and buried solid radioactive wastes in a forty acre area known as the Shallow Landfill Disposal Area.

ANI[173] has provided coverage to B&W and ARCO as insureds for nuclear energy hazards at the Apollo Facility since March, 1958 and at the Parks Township Facility since June 1960, under four policies issued to cover the facilities. As of February 15, 1979, aggregate limits available under

---

[172] These products included hafnium, beryllium, titanium, and zirconium. Uncontested Facts, No. 35. P. 5356.

[173] Formerly known as Nuclear Energy Liability Insurance Association and Mutual Atomic Energy Liability Underwriters.

its policies at both facilities totaled $320 million. The parties have stipulated that defense costs erode the limits of the ANI policies, and that all required premiums have been paid on the policies.[174]

The buildings at the Apollo Facility have been demolished, and the Nuclear Regulatory Commissions ("NRC") released the facility for unrestricted use in the mid-1990's. The buildings at the Parks Township Facility were demolished between the mid-1990's and 2000. The Army Corps of Engineers continues site assessment activity at the Parks Facility, and remediation has not yet been determined.

*The Hall Litigation.*

On June 7, 1994, five individuals and three putative class representatives filed a complaint against B&W and ARCO in the United States District Court for the Western District of Pennsylvania ("*Hall* action").[175] The plaintiffs in the action assert bodily injury and property damage claims as a result of radioactive, hazardous and toxic emissions from both facilities.[176]
The bodily injury claims include a variety of cancer claims, including leukemia, throat cancer, breast cancer, and other cancers, which have led to the death of certain claimants.[177]

---

[174] Uncontested Facts Nos. 66, 67. Pl. 5356.

[175] *Hall v. Babcock & Wilcox Co.*, Civ. Action No. 94-0951, United States District Court, Western District of Pennsylvania. The complaint has been amended, and now includes 500 plaintiffs with 383 claims.

[176] Exhibit 3017.

[177] All but 19 of the 235 wrongful death and personal injury claims involve some form of cancer.

B&W and ARCO tendered the *Hall* action to ANI in June, 1994.[178] ANI accepted the tender with a reservation of rights to deny coverage with respect to, among other things, any punitive damages and liability as a result of injunctive relief for medical monitoring damages.[179] In June, 1994, ANI appointed the law firm of Pepper Hamilton to represent both B&W and ARCO in the *Hall* action.

In August 1998, the federal district court in Pennsylvania held a trial of eight representative "test case" plaintiffs in the *Hall* action. On September 17, the jury in the *Hall* action rendered a verdict in favor of the eight test plaintiffs of compensatory damages in the amount of $33.7 million jointly against B&W and ARCO and $2.8 million solely against B&W.[180] Trial on the punitive damages phase was continued, and B&W entered into an agreement with Baron & Budd, plaintiffs' lawyers, to settle the punitive damage claims of all claimants in the *Hall* action for $8 million.[181] ANI has not paid any part of the punitive damages settlement.

The defendants filed a motion for Judgment NOV, which was denied on June 29, 1999.[182] The court, however, did grant a motion for new trial, based primarily upon the plaintiffs' failure to disclose to defendants two exhibits prior to trial.[183]

_____

[178]   Uncontested Facts 81, 82. Pl. 5356.

[179]   Exhibits 3021, 3168.

[180]   Exhibit 3040.

[181]   Exhibit 3186.

[182]   Exhibit 3072.

[183]   *Id.*

After the jury verdict, multiple suits were filed both by B&W and ANI regarding the *Hall* action. In November 1998, ANI filed a declaratory judgment action against B&W and ARCO in the New York state court, seeking a determination of available policy limits and arguing an "emission" trigger of coverage, one that required identification of the moment when exposure to radioactive material resulted in bodily injury.[184] The New York suit was dismissed on *forum non conveniens* grounds. In the fall of 1999, both B&W and ANI filed coverage actions in the Pennsylvania state court, which were consolidated.[185] In April 2001, the Pennsylvania state court rendered an opinion in the coverage actions that the date of manifestation, and not emission, is the applicable trigger on the ANI policies, and that ANI had the duty to pay for independent defense counsel to represent and defend the separate interests of B&W and ARCO in the *Hall* action.[186] To date, ANI has not paid the costs of B&W's independent counsel.

B.    The Plan, as it relates to Apollo/Parks, is Proposed in Good Faith

ANI objects that the Plan represents a collusive agreement by Debtors and the attorneys for the Apollo/Parks claimants to defraud ANI and guarantee payment of meritless claims. ANI objects that no Apollo/Parks claimant has ever obtained either a judgment or settlement of compensatory damages, after nearly ten years of litigation. They argue that despite the lack of any adverse judgment against ANI's insureds, the Plan provides for payment of over $110 million in policy proceeds, without permitting ANI to control the defense of claims.

---

[184] Exhibit 3055.

[185] *B&W v. ANI*, No. 99-11498, Court of Common Pleas of Allegheny County, PA and *ANI v. B&W and ARCO*, No. 99-16227, Court of Common Pleas of Allegheny County, PA.

[186] Uncontested Facts, Nos. 127 - 129. Pl. 5356; Exhibit 3094.

-75-

Much of the discussion regarding the good faith of the Debtors is made above, and will not be repeated here. Mr. Nesser testified that after the petition was filed, B&W, ARCO and the *Hall* Claimants agreed in March of 2003 to involve a mediator to assist in reaching an agreement on the *Hall* claims, and Mr. McGovern, the court-appointed mediator was engaged. In March 2003, a mediation session was conducted in Washington, D.C., attended by *Hall* claimants counsel, an ANI representative and counsel, and B&W. ANI's counsel included both its bankruptcy counsel, and its attorney from the Pepper Hamilton law firm, who participated in the *Hall* action.[187] The Pepper Hamilton attorney provided an updated valuation analysis of the *Hall* claims, which reflected a value in the range of $76 to $90 million.[188] After negotiation, the *Hall* claimants, B&W and ARCO reached an agreement, memorialized by the Apollo/Parks Township Settlement Agreement, and incorporated into the Plan.

On August 15, 2003 Mr. Uddo was appointed the Apollo FCR, representing the interests of the Apollo/Parks future interest holders.[189] After his appointment, further negotiations with the settling parties took place, which resulted in the filing of technical amendments to the Plan and a revised A/P Settlement Agreement.[190] Mr. Uddo retained experts, including epidemiologists and biostatisticians, as well as other professionals to assist in evaluating the claims of A/P future demand holders, the Debtors' assets and the Plan. As a result, the A/P settlement has been revised to permit

---

[187] Exhibit 3100.

[188] Exhibit 3102.

[189] Exhibit 3240.

[190] The term sheet for the revised settlement was filed on December 16, 2003. Exhibit 3221.

Mr. Uddo to participate in the development of the A/P TDPs and to set aside $75 million, with a cap of $100 million, for the A/P future demand holders. Under the settlement, the A/P Claims are liquidated and allowed.  The eight test claims in the *Hall* action were allowed in the total amount of $13.5 million, an amount less than the jury verdict.[191]  The remaining *Hall* claims were placed into four categories, which were rated based upon certain criteria, including the strength of the evidence regarding the cancer and nuclear exposure, the length and duration of exposure, the claimants' age, special damage characteristics, and whether the claim was within the applicable limitations period.  The Plan provides for a total of up to $210 million to be paid under the A/P Settlement to A/P claimants.

ANI has not produced any credible evidence of collusion.  While ANI complains that the Plan Proponents negotiated the Plan among themselves to the exclusion of ANI, it is undisputed that ANI and its counsel attended at least one mediation session during the bankruptcy proceedings regarding the *Hall* claims.  While ANI ultimately did not settle with the Plan Proponents, and opposes the Plan, that alone is insufficient to deny confirmation on the basis of lack of good faith.

The court finds that the Plan is proposed with the legitimate and honest purpose to reorganize, has a reasonable chance of success, and is made in good faith.  It is not surprising that ANI desires to continue litigating the A/P claims -- the litigation costs erode the coverage limits. The *Hall* action alone has cost over $24 million in attorneys' fees without resulting in resolution of any of the plaintiffs' claims.[192]  Litigation of each claim of the over 500 *Hall* claimants  may cost many times the $24 million in attorneys' fees already spent.  Although the jury verdict in the *Hall*

---

[191]   Exhibit 3186

[192]   Exhibit 3064; Uncontested Fact, 120, Pl. 5356

-77-

action was ultimately vacated, and a new trial granted, the jury verdict was in excess of $36 million in compensatory damages alone for only eight test cases. It seems reasonable that many times that amount of damages may ultimately be awarded by a jury if all or most of the 500 claimants ultimately go to trial.

Rather than a collusive arrangement, the Plan represents a negotiated solution to the expensive and protracted litigation that has been filed against the Debtors. Other than ANI, the A/P portion of the Plan is supported by all major A/P constituencies. The Plan and the A/P settlement were the result of extensive arms-length negotiations. ANI participated in settlement negotiations, however, did not agree to the settlement. The A/P FCR – who has an interest in ensuring that valid claims be paid to preserve limited resources for his claimants, who are at present unknown -- has conducted due diligence and negotiated a satisfactory resolution of the futures claims with the settling parties. The Plan and the A/P settlement are filed in good faith, are not the result of collusion, and are sufficient to satisfy the requirements of §1129(a)(3).

    C.    The Plan does not violate the Price Anderson Act.

ANI objects to confirmation of the Plan because it asserts that the Plan violates provisions of the Price Anderson Act, 42 U.S.C. §2210, *et. seq.* ANI asserts that, under the Act, the exclusive jurisdiction and venue over public liability claims is in the district where the nuclear incident is alleged to have occurred, i.e., the Western District of Pennsylvania. It also asserts that payment of claims under the Plan would undermine the purpose of the Act to provide and preserve financial protection for valid claims.

The Price Anderson Act ("Act") is found at 42 U.S.C. §2210, et. seq. The Act was enacted to meet two basic objectives:

-78-

"(1)    Remove the deterrent to private sector participation in atomic energy presented by
the threat of potentially enormous liability claims in the event of a catastrophic
nuclear accident.

(2)    Ensure that adequate funds are available to the public to satisfy liability claims if
such an accident were to occur."[193]

The Act effectively channels the obligation to pay compensation for damages so that a claimant need
not sue each party involved as owner, designer or engineer of the facility, but can bring the claim
against the reactor licensee.[194]  The Act provides that with respect to any public liability action
arising out of or resulting from a nuclear incident, the United States district court in the district
where the nuclear incident took place shall have original jurisdiction without regard to the
citizenship of any party or the amount in controversy.[195]  Section 2210(n)(2) also permits actions
pending in state court to be removed to the appropriate federal court venue.  It is this section that
ANI asserts provides authority that jurisdiction and venue over all nuclear related claims must be
in the U.S. district court where the reactor is located, and therefore, the Trust structure as contained
in the Plan is proposed by a means forbidden by law and cannot be confirmed.  ANI objects that the
Plan provides that the *Hall* action is to be dismissed in favor of resolution of the claims by the Trust,
and that the Trust will likely settle and pay claims through use of the TDPs, rather than litigate the
claims through the *Hall* action pending in the Western District of Pennsylvania.  It argues that the

---

[193]  Exhibit 3127, Part 1, xii.

[194]  *Id.* at xiii.

[195]  42 U.S.C. 2210(n)(2).

settlement strategy will violate the policy of the Act to provide and preserve financial protection for valid claims.

The Act is construed as creating an exclusive federal cause of action for torts arising out of nuclear incidents.[196] The consequence is that "no state cause of action based upon public liability exists."[197] However, although jurisdiction and venue over public liability actions is now vested in the federal courts, nothing in the Act prohibits confirmation of a Plan under the Bankruptcy Code which provides for the settlement of claims based upon public liability. Likewise, nothing in the Act indicates that Congress intended to preempt bankruptcy law

in cases involving claims based upon public liability. The Act provides for consolidation of public injury cases arising from a nuclear incident in a single federal district court located where the incident occurred. Congress sought, by this provision, to "effect uniformity, equity, and efficiency in the disposition of public liability claims. . . . [and] ensured that all claims resulting from a given nuclear incident would be governed by the same law, provided for the coordination of all phases of litigation and the orderly distribution of funds, and assured the preservation of sufficient funds for victims whose injuries may not become manifest until long after the incident."[198] The purpose of the venue and jurisdiction provisions is to provide uniformity, and to promote efficiency and not, as ANI claims, to preclude the settlement of claims or to ensure that litigation of claims take place in the district where the incident occurred.

---

[196] *Acuna v. Brown & Root, Inc.*, 200 F.3d 335 (5th Cir. 2000), *cert. denied* 522 U.S. 1229.

[197] *In re TMI Litigation Cases Consolidated, II*, 940 F.2d 832, 854 (3d Cir. 1991).

[198] *Id.* at 856, citing H.R. Rep. No. 104, 100th Cong., 1st Sess., pt. 3, at 18 (1987).

The court notes that the ANI policies explicitly recognize that settlement, rather than litigation, of a claim may occur. For instance, section I of the policies permits payments on behalf of the insured and provides that the "companies may make such investigation, negotiation and settlement of any claim or suit as they deem expedient." [199] Nothing in the Act mandates that a Plan involving public liability claims specify that the claims will be litigated subject to the venue provisions of the Act, to the exclusion of the bankruptcy court. ANI's argument that the Plan cannot be confirmed because it violates the "public policy" of the Act is not well taken.

Likewise, nothing in the Act provides that the Plan cannot be confirmed because "it abrogates the applicable federal law regarding *how* the claims must be adjudicated." [200] ANI asserts that the Act required that Third Circuit precedent concerning the elements and standard of proof of a public liability claim be applied, which the Plan fails to do. ANI fails, however, to specifically demonstrate how the Plan does not meet the standard of proof for claims, other than to assert that the Trust, and not the Debtor or ANI, will ultimately handle claims. Other than broad assertions that the Trust mechanism will violate the public policy behind the "compensation scheme" found in the Act, ANI has failed to articulate any specific provision of the Act that has been violated by the Plan. As such, the Court finds that the Plan does not violate the Price Anderson Act.

D.    The Court's jurisdiction to determine the insurance related findings.

---

[199]  Exhibit 3110, pg. 3, section I. The Conditions to the policies provides for a limit of liability where "payments in settlement of claims and in satisfaction of judgements" against the insureds for losses meets certain amounts. Exhibit 3110, pg. 4.

[200]  Post Trial Brief of ANI, p. 13.

ANI objects that the bankruptcy court lacks the jurisdiction to make insurance-related findings

requested by the Plan Proponents.[201]    For the reasons expressed in the previous

---

[201]   ANI asserts that the insurance related findings are found at Plan section 7.14.1, and include:

(s) The terms of this Plan, the Apollo/Parks Township Settlement Agreement, and the Apollo/Parks Township Insurance Rights Assignment Agreement do not violate any obligation of the Insurance Contributors or ARCO under any consent-to-assignment provision of any Apollo/Parks Township Insurance Policy;

(t) The Apollo/Parks Township Insurance Rights Assignment does not materially increase the risk of the Apollo/Parks Township Insurers of providing coverage for liabilities under the Apollo/Parks Township Insurance Policies as compared to the risk that was otherwise being borne by the Apollo/Parks Township Insurers prior to the Effective Date.

(u) The terms of this Plan, the Apollo/Parks Township Settlement Agreement, and the Apollo/Parks Township Insurance Rights Assignment Agreement do not violate any obligation of the Insurance Contributors or ARCO under any consent-to-settlement, cooperation, management-of-claims, or no-action provision of any Apollo/Parks Township Insurance Policy

(v) The Asbestos Insurance Entity Injunction, the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, and the Apollo/Parks Township Channeling Injunction are essential to this Plan and the Debtors' reorganization efforts;

(w) An identity of interests exists among the Debtors, the Asbestos Protected Parties, and the Apollo/Parks Township Protected Parties such that a claim asserted against any of the Asbestos Protected Parties or the Apollo/Parks Township Protected Parties gives rise to a claim against the Debtors, including by the operation of the law of indemnity and/or contribution;

(y) The duties and obligations of the Apollo/Parks Township Insurers under the Apollo/Parks Township Insurance Policies are not diminished, reduced or eliminated by (1) the discharge, release, and extinguishment of all obligations and liabilities of the Debtors, the Reorganized Debtors, and ARCO for and in respect of all Apollo/Parks Township Claims; (2) the assumption of responsibility and liability for all Apollo/Parks Township Claims by the Apollo/Parks Township Trust; or (3) the assignment of the Apollo/Parks Township Settlement Agreement, and the Apollo/Parks Township Insurance Rights Assignment Agreement;

(aa) The contribution of the Debtors' Apollo/Parks Township Payment and the Debtors' Apollo/Parks Township Insurance Rights Assignment, and the contribution of ARCO's Apollo/Parks Township Rights Assignment and the ARCO Release Payment are substantial assets of this Plan and the reorganization;

-82-

discussion of jurisdiction relating to the asbestos-related findings of fact, and except as stated otherwise, this court finds that it has jurisdiction to determine and enter findings and conclusions regarding confirmation of the Plan, including transfers of insurance rights to the trust established pursuant to §105 for radiation related claims, the function of the Apollo/Parks Township Trusts and related injunctions, and whether policies are executory contracts which may be assumed by the Debtors.

At issue also at confirmation was the question of whether the Plan Proponents could enter into a settlement of radiation claims due to the breaches of the policy by ANI in the conduct of the *Hall* and other litigation. Breach of contract actions are based upon state law. A determination that the insurer has breached obligations due under a policy to the insured is at heart a state law breach

---

(dd) The Apollo/Parks Township Trust, as of the Effective Date, will irrevocably assume the liabilities, obligations, and responsibilities of the Debtors and all other Apollo/Parks Township Protected Parties with respect to the Apollo/Parks Township Claims;

(ee) All of the Debtors' insurers who are affording insurance coverage that is the subject of the Asbestos PI Insurance Rights Assignment and the Asbestos PD Insurance Rights Assignment, and the Apollo/Parks Township Insurers have been given notice and an opportunity to be heard;

(ff) Upon confirmation and consummation of the Plan, the Apollo/Parks Township Trust shall have substantially the same rights to indemnity and other rights related to the Apollo/Parks Township Claims and Debtors' Apollo/Parks Township Insurance Rights subject to the Debtors' Apollo/Parks Township Insurance Carveout, as those afforded to the Debtors immediately prior to the Effective Date, and shall have substantially the same rights to indemnity and other rights related to ARCO's Apollo/Parks Township Insurance Rights subject to the ARCO Carveout, as those afforded the ARCO Entities immediately prior to the Effective Date, and such rights shall be deemed to be transferred to the Apollo/Parks Township Trust and deemed vested in the Apollo/Parks Township Trust upon the occurrence of the Apollo/Parks Township Insurance Rights Assignment. With respect to the rights that are transferred to the Apollo/Parks Township Trust, such rights shall be so vested free and clear of all liens, security interests, and other Claims, or cause of action, except as otherwise provided for in this Plan;

-83-

of contract issue. It is not an issue that invokes substantive rights created by federal bankruptcy law. Instead, the issue is one that invokes state law, and could exist outside of bankruptcy. It is thus a non-core matter in which this court may enter proposed findings of fact and conclusions of law. Accordingly, the following section dealing with the propriety of the settlement of radiation claims are made as proposed findings of fact and conclusions of law.

      E.    Proposed Findings of Fact and Conclusions of Law That ANI has Forfeited Rights under the Policies, such as the Management of Claims, No Action or Consent to Settlement Provisions.

B&W contends that because ANI has breached its duty to settle and to defend and has disclaimed coverage for the A/P claims, that B&W may enter into a reasonable settlement of the A/P claims despite language in the policies that would give ANI the right to control the defense and settlement of the claims. Each contention will be discussed.

1. *Breach of Duty to Settle.* Plan Proponents contend that ANI has the duty of good faith and fair dealing under the insurance contracts, accordingly ANI has the affirmative duty to both negotiate and accept reasonable settlement offers. They contend that notwithstanding the $36.7 million adverse test trial verdict, ANI has never initiated settlement discussions, has rejected all settlement offers, has refused to negotiate with claimants and refused to authorize any counterproposal in response to settlement demands.

ANI responds that, under Pennsylvania law, the insurer has no absolute duty to settle a case within policy limits. Instead, because ANI conducted an extensive evaluation of the claims and determined the claims had no scientific or legal merit, it was reasonable for ANI to defend the case

rather than settle. Therefore, it is argued that ANI did not act in bad faith in determining to defend, rather than settle, the *Hall* action.

Generally, insurance law recognizes that the covenant of good faith and fair dealing implied in the insurance contract provides the insurer with a duty to settle within policy limits on objectively reasonable terms.[202]   The duty stems from the insurer's exclusive control over settlement negotiations, "plus the inevitable conflict between the insurer's interest to pay as little as possible and the insured's interest not to suffer an excess judgment."[203]  A strong case against an insured on the issue of damages and liability tends to show the insurer's rejection of an offer to settle was negligent or in bad faith.[204]  Similarly, the insurer's rejection of advice of investigators, adjusters, or legal counsel of an opportunity to settle a claim within the policy limits may constitute evidence of negligence or bad faith in failing to compromise.[205]  The effect of the insurer's good faith refusal to settle is that the liability of the insurer remains measured by the terms of the policy, and the insured is not relieved of compliance with policy provisions.[206]  However, the wrongful refusal by

---

[202]   14 Couch on Insurance, section 203.12, 14 (3d ed. 1999).

[203]   *Id.* at 203.13.

[204]   *Id.* at 203.29; *see also Cowden v. Aetna Cas. & Sur. Co.*, 134 A.2d 223 (Pa. Super. 1957)(where little possibility of verdict or settlement within policy limits, decision not to settle must be based on insurer's bona fide belief predicated upon all circumstances of case, that it has good possibility of winning suit).

[205]   14 Couch on Insurance, section 203.31 (3d ed. 1999).

[206]   *Id.* at 203.34.

the insurer to settle operates to release the insured from all provisions of the policy that otherwise give the control of the matter to the insurer.[207]

Pennsylvania law provides that, under an insurance contract, the insurer undertakes three obligations: (1) to indemnify against liability covered under the policy; (2) to defend all claims that potentially come within coverage of the policy; and (3) a fiduciary responsibility towards the insured and an obligation to act in good faith and with due care in representing the interests of its insured when handling third party claims brought against the insured.[208]   The duty to act in good faith in representing the interests of its insured compels the insurer to accord the insured's interests "the same faithful consideration it gives its own interests."[209]  A decision not to settle involves an objective consideration of all factors bearing on the advisability of a settlement, including consideration of anticipated range of an adverse verdict, strengths and weaknesses of evidence, history of similar cases in the area, the relative appearance of persuasiveness, and the appeal of claimant, witnesses and the insured at trial.[210]  The insurer does not have an absolute duty to settle a claim merely because a judgment against the insured may exceed the policy limits.[211]  By the same token, where there is little possibility of a verdict within policy limits, the decision to litigate must be based on a reasonable assessment of the circumstances of the case and a real and substantial

---

[207]   *Id.* at 203.38.

[208]   *The Birth Center v. St. Paul Cos., Inc.*, 727 A.2d 1144, 1155 (Pa. Super. Ct. 1999)(and cases cited therein).

[209]   *Id.* at 1155.

[210]   *Id.* (*citing Shearer v. Reed*, 428 A.2d 635, 638 (Pa. Super. 1981).

[211]   *Id.* at 1156 (*citing Cowden v. Aetna Cas. & Sur. Co.*, 134 A.2d 223, 229 (Pa. Super. Ct. 1957).

chance of a verdict in favor of the insured.[212]  Therefore, the "insurer's right under the policy to

litigate or settle a claim against the insured is not a right to risk the insured's financial well-being

unless there is both a real and a substantial chance of a finding of nonliability."[213]

Through the course of the *Hall* action, B&W and ARCO have made numerous requests that

ANI settle the matter. The parties have stipulated here that after the jury's verdict in the *Hall* matter,

both B&W and ARCO requested that ANI settle the matter.[214]  The testimony and evidence in this

proceeding indicates that B&W and ARCO requested, before the jury verdict, during jury

deliberations and after the verdict, that ANI settle the matter for amounts within the policy coverage

that plaintiffs had offered as settlement.[215]  ANI did not respond to the settlement demands made

during jury deliberations and did not settle the *Hall* action.  Indeed, McDermott's general counsel

informed ANI that "ANI's refusal to negotiate is unreasonable and in bad faith in view of, among

other things, the nature of plaintiffs' claims, ANI's control of the defense of B&W, and the damages

to which B&W is exposed."[216]

On September 17, 1998, the jury in the *Hall* action rendered a verdict in the amount of $36.7

million for the initial eight test cases.  Mr. Nesser testified that, at that time, B&W was concerned

that it would be exposed to uninsured losses over the policy limits should all the then remaining 100

claims be tried.  Additionally, after the jury verdict, ANI informed the Debtors that its position was

[212]  *Id.*

[213]  *Id.* at 1156.

[214]  Joint Pretrial Order, Pl. 5356, Nos. 102, 107, 108, 113.

[215]  Exhibits 3035, 3036, 3037, 3038, 3043, 3049, 3050, 3051, 3053, 3073, 3082

[216]  Exhibit 3037.

-87-

that the limits of liability remaining in the A/P policies was insufficient to pay the jury award or any future liability.[217]   B&W learned for the first time that ANI took the position that the A/P policy limits were at the lowest limits of liability. Indeed, on November 22, 1998, ANI wrote that the costs of litigation incurred by ANI and assessed against the policies "ha[d] already exhausted the limits available at both facilities for bodily injury and property damage caused by the nuclear energy hazard prior to July 12, 1968."[218]  Given ANI's position, B&W reasonably could assume that it would be exposed to payment of all claims in the *Hall* action.

On November 4, 1998, B&W, ARCO, ANI and the *Hall* claimants' counsel attended a mediation session held before a Judge Gibbons, a retired judge of the federal Third Circuit in an attempt to resolve the *Hall* claims.[219]  ANI did not agree to settle the *Hall* claims, and on November 19, 1998, sent correspondence indicating that it would withdraw from any further mediation before Judge Gibbons because the policy holders would not negotiate the policy limits applicable to the *Hall* claims.[220]

Both the testimony and the evidence reflect that ANI's stated reason for refusal to settle was because settlement in this case would provide incentive for plaintiffs to bring other actions against ANI's insureds.[221]  Case law provides that a refusal to settle based upon a self-serving agenda permits an inference that the insurer has failed to consider all facts and circumstances in considering

---

[217]   Exhibit 3046.

[218]   Exhibit 3064.

[219]   Pretrial Order, P. 5356, Uncontested Facts Nos.103, 105, 106.

[220]   Exhibit 3055.

[221]   Exhibits 3043, 3049.

-88-

a settlement proposal.[222]    ANI contends that its refusal to consider settlement is based upon its understanding that the claims lack scientific merit and that Third Circuit precedent requires evidence of exposure to radiation at least in excess of background levels  Although a new trial was granted in the *Hall* action, it is uncontested that a jury rendered a verdict in favor of the initial test claimants. It is also undisputed that B&W and ARCO made repeated demands of its insurer to settle the claims for amounts within the policy limits, all of which were either not responded to by ANI, or which ANI refused to consider.  At the same time, ANI's initial reaction to the jury verdict was to assert that policy limits had been exhausted and that B&W was exposed to uninsured liability on the claims.  Since that initial assertion, and after litigation, the Pennsylvania court has determined that ANI's theory of coverage is not valid.  To date, any progress in the case, including a determination of the trigger of coverage and whether B&W is entitled to separate counsel, comes only after litigation.

The facts and circumstances of the *Hall* action indicate that ANI's duty to settle has been triggered.  The plaintiffs have made settlement offers within the limits of the policies, and the defendants in the *Hall* action have repeatedly requested that settlement offers be considered, and a settlement be entered in the matter  The *Hall* case involves significant litigation risks.  The record indicates that claimants include those who have died of cancer.  The initial test trial resulted in a jury verdict of $36.7 million in favor of only eight of the over 100 claimants.  Although a new trial has been granted in the action, it remains true that the test trial resulted in a substantial jury verdict in favor of the plaintiffs.  If the verdict amounts were extrapolated over 100 claims, a significant risk

---

[222]  *Birth Center*, 727 A.2d at 1156 (Insurers stated reason in not settling that it tries all bad baby cases "indicates an agenda on the part of the insurer that is self-serving").

-89-

exists that B&W will be exposed to liability in excess of policy limits, especially when attorney's fees and other transaction costs that reduce the policy limits is considered, and that these fees, at the end of 1998, exceeded $12 million, and currently exceed $24 million.[223]  Even after a jury verdict, ANI has not considered any settlement proposals, choosing instead to litigate.

ANI also has taken the position after the test trial that policy limits are exhausted, exposing B&W to significant uninsured liability.  This position ultimately proved to be unavailing; however, B&W has had to expend significant sums in litigating the coverage matter.   ANI argues that no basis exists in Pennsylvania law to strip an insurer of the right to defend claims because it refuses to settle.  Instead, it argues that Pa. Cons. Stat. §8371 provides the exclusive remedy for bad faith conduct by an insurer is damages, and no remedy is found in the statute of the forfeiture of the right to defend.  Section 8371 was promulgated by the Pennsylvania legislature in 1990, and created a new cause of action under state law for "bad faith."[224]  The statute provides that if an insurer has acted in bad faith toward the insured, the court may award interest on the claim, award punitive damages and assess court costs and attorneys' fees.[225]  The courts have consistently held that §8371 creates a separate and independent cause of action.[226]  A "claim brought under §8371 is a cause of action which is separate and distinct from the underlying contract claim."[227]  Because § 8371 was

---

[223]  Exhibit 3064.  The total transaction cost expended in defense of the *Hall* action as of November 1, 2003 is $24.02 million.  Joint Pretrial Order, Uncontested Fact No. 120, Pl. 5356.

[224]  *March v. Paradise Mut. Ins. Co.*, 646 A.2d 1254, 1256 (Pa. Super. Ct. 1994).

[225]  42 Pa. C.S. 8371.

[226]  *March*, 646 A.2d at 1256 (and cases cited therein).

[227]  *Id.*

"promulgated to provide additional relief to insureds and to discourage bad faith practices of insurance companies, we would be reluctant to impose any limitations of claims brought under §8371 which do not appear in the plain language of the statute."[228] The Pennsylvania Supreme Court has interpreted §8371 as an additional remedy that does not preempt common law rights.[229] The statute was not intended to alter prior law, and nothing in the statute prevents the court from granting remedies not mentioned in the statute that it previously had the power to award.[230] Instead, "[t]he statute does not reference the common law, does not explicitly reject it, and the application of the statute is not inconsistent with the common law. Accordingly, the [common law] remedy survives."[231] ANI's argument that §8371 provides an exclusive remedy is not well taken, and is overruled.

In conclusion, this court recommends that the district court find that sufficient evidence has been produced to support the Plan Proponents' allegation that ANI has breached its duty to settle. It further recommends a finding that the settlement of the *Hall* claims contained in the Plan does not violate the ANI policies.

2. *Breach of Duty to Defend.* Plan Proponents contend that ANI has breached its duty to insureds to defend by failing to appoint separate counsel for ARCO and B&W even after it was evident that serious conflicts of interest existed between the two. ANI asserts that the appointment of Pepper Hamilton as joint defense counsel for B&W and ARCO was not in bad faith, that ANI

---

[228] *Id.*

[229] *Birth Center,* 787 A.2d at 402-403.

[230] *Id.* at 404.

[231] *Id.* at 407.

accepted the tender of the defense under a reservation of rights, and that no support exists for the

proposition that an insurer that accepts the tender of claims and appoints defense counsel has

forfeited its right to defend claims.

Generally, policies will contain a provision by which the insurer obligates itself to defend

the insured against all actions covered under the policy. The insurer's unjustified refusal to defend

exposes it to a finding that it has breached its duty to defend, and that it has breached the insurance

contract. The result is that the insurer may be estopped from disputing coverage, may incur liability

and lose its rights under the policy such as to prohibit settlement by the insured, to control the

defense and to require the insureds compliance with other policy provisions.[232] Even then, however,

a settlement reached by the insured, after the insurer's unjustified refusal to defend, must be

reasonable and entered in good faith.[233]

Plan Proponents rely on the case of *Apalucci v. Agora Syndicate, Inc.*,[234]    as support for the

proposition that the insurer's failure to defend results in loss of rights under the policy to protect it

from claims of its insured or third parties injured by the insured. In *Apalucci*, the Third Circuit court

held that an insurer's refusal to defend constituted a breach of contract, and the insured lost its right

to enforce a "no action clause" in the policy despite the lack of an actual trial.    In that case, an

injured minor who was served alcoholic beverages at a club, sued the club for negligence. By the

time the suit was filed, the club had ceased business and its owner could not be found. A default

judgment was eventually entered against the club, and the injured minor made a demand against the

---

[232]  14 Couch on Insurance, 202.4 (4th ed. 1999).

[233]  *Id.* at 202.9

[234]  145 F.3d 630 (3d Cir. 1998).

-92-

club's insurer for payment. The club owner had notified the insurer of the claim, but the insurer was unable to locate the owner and denied coverage based upon the owner's failure to assist and cooperate in the defense of claims, as required by the policy. The insurer responded to the claimant's suit to collect the judgment by denying any obligation and asserted that the claimant lacked standing to sue for bad faith breach of the duty to provide coverage and defense to the club, and the club's breach of the policy by failing to cooperate.

The Third Circuit held that, despite the provision in the policy requiring an "actual trial" prior to bringing suit against the insurer under the policy, the essence of the clause did not require a trial, but "whether the insured suffered a bona fide and fixed money judgment."[235]
Instead, the "actual trial" provision depended upon the insurer defending the insured in good faith, and the insurer had failed to do so in this case. The refusal to defend, "cut at the very root of the mutual obligation, [it] put an end to its right to demand further compliance with the . . . term of the contract."[236] Instead, "when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure."[237] Because the insurer permitted a default to be entered against the insured, it could not complain that the default was not a "trial" to which the "no action" clause would apply, and a third party beneficiary may sue the insurer directly to collect and enforce the default.

---

[235] *Id.* at 633.

[236] *Id. (quoting St. Louis Dressed Beef & Provision Co. v. Maryland Cas. Co.*, 201 U.S. 173, 181 (1906).

[237] *Id.* at 634.

In this case, Plan Proponents argue that while ANI appointed counsel in the *Hall* action, it

nonetheless effectively failed to defend B&W by appointing a joint defense counsel with a conflict

of interest, and by arguing an "emission" theory of coverage that would effectively nullify coverage.

ANI originally appointed the Pepper Hamilton law firm to defend both B&W and ARCO in the *Hall*

action. Both B&W and ARCO expressed a desire to retain separate counsel, notified ANI that the

reservation of rights raised a conflict of interest,[238] and expressed concern regarding the firm's

relationship with ANI. Nevertheless, the litigation proceeded with a single joint defense counsel

which, as it developed, was unable to make certain arguments because of conflicts. For example,

the joint defense counsel was unable to pursue a cross claim that B&W wished to file against ARCO

for indemnity for discharges occurring while ARCO's subsidiary was the licensee of the facilities,

because of the conflict that it would pose.[239] It also became clear during the course of the trial that

Pepper Hamilton could not advise ANI regarding settlement demands because of the "claims

asserted inter se by the insurer and the insured."[240] ANI filed suit seeking, among other things, to

enjoin B&W from retaining independent counsel in the *Hall* action.[241] In fact, the Pennsylvania

federal court, in coverage litigation between ANI and B&W, found that ANI must provide separate

counsel to each insured in the defense of the *Hall* action.[242]

---

[238]  Exhibit 3025, 3026, 3030.

[239]  Exhibit 3043.

[240]  Exhibit 3076.

[241]  Exhibit 3088 ("on their tenth cause of action, enjoining B&W from continuing to retain K&L as counsel in the defense of the *Hall* action.")

[242]  Exhibit 3096, at pg. 38 ("Furthermore, as long as the plaintiffs are raising claims against both B&W and ARCO and the trial court may be using verdict forms which require the

Nonetheless, ANI has refused in the past, and continues to refuse, to pay for the independent

counsel which B&W retained in the litigation.[243] Instead, ANI has expressed to Pepper Hamilton

a desire to restore common counsel.[244]

Pennsylvania law provides that the duty to defend includes the duty to provide independent

counsel when a potential conflict of interest exists between co-defendants.[245] An insurer's denial of

the obligation to defend or indemnify the insured constitutes a breach of the insurer's duty to act in

good faith and a repudiation of the insurance contract, permitting the insured to negotiate a

settlement, so long as it is fair and reasonable.[246]

In conclusion, this court recommends that the district court find that sufficient evidence has

been produced to support the Plan Proponents allegation that ANI has breached the duty to defend.

3. *Denial of Coverage.* Plan Proponents assert that ANI breached its insurance policy by

filing declaratory judgment actions in Pennsylvania and New York, following the adverse jury

verdict against insureds in the *Hall* action, seeking a declaration that the policies carried the lowest

limit of liability based upon its "emission" trigger of coverage. They assert that the legal maneuver

effectively denied coverage for losses under the policies, because ANI asserted that defense costs

---

jury to make separate findings as to the responsibilities of B&W and ARCO for the plaintiffs'
injuries, it is not possible for a single law firm to represent B&W and ARCO."). This decision
was affirmed on appeal in November 2002, and the Pennsylvania Supreme Court denied further
review. Pretrial Order, Uncontested Facts Nos. 128, 129.

[243]  Exhibits 3086, 3087.

[244]  Exhibit 3114.

[245]  *Bituminous Ins. Cos. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 427 F. Supp. 539, 555
(E.D. Pa. 1976).

[246]  *Alfiero v. Berks Mut. Leasing Co.*, 500 A.2d 169, 172 (Pa. 1985).

had eroded the entire value of the coverage.[247]  ANI contends that it did not deny coverage, but instead merely exercised its legal right to adjudicate a legitimate coverage dispute in court.  It contends that the dispute over the trigger of coverage was one of first impression under nuclear energy liability policies.

At the time that ANI put forth its "emission" trigger theory, applicable Pennsylvania law provided that "manifestation" was an applicable trigger of coverage.  In the case of *J.H. France Refractories Co. v. Allstate Ins. Co.*, [248] the Pennsylvania Supreme court held that policy limits in effect when the manifestation of injury occurred were applicable.

Despite knowledge of the *J.H. France* decision,[249] ANI initiated two coverage actions, one in New York and the other in Pennsylvania.  In the Pennsylvania action, filed in October 1999, ANI requested a declaration that "plaintiffs ANI and MAELU are relieved from all liability to B&W under the Facility Form Policies and/or the S&T Form Policies with respect to the *Hall* action,"[250] by reason of B&W's alleged breach of good faith by refusing to authorize joint defense counsel to file a motion to certify an appeal, and by instructing the firm of Kirkpatrick and Lockhart to act on its behalf in the *Hall* action.  The Pennsylvania court ultimately held that B&W was entitled to independent counsel, and that, because the CGL policy in the *J.H. France* case was almost identical

---

[247]  Exhibit 3046, 3054, 3064.

[248]  626 A.2d 502 (Pa. 1993).

[249]  Exhibit 3049.  In a letter to ANI dated Nov. 2, 1998, ARCO writes: "In *J.H. France Refractories Co. v. Van Brunt Co.*, 534 Pa. 29, 626 A.2d 502 (1993), the Pennsylvania Supreme Court decided that bodily injury of this sort triggered all policies in effect during any stage of the pathogenesis, including exposure, progression or manifestation of the disease."

[250]  Exhibit 3088.

to the language in the ANI policies, *J.H. France's* interpretation of the policies would govern interpretation of the ANI policies, making the more expansive manifestation trigger applicable to the *Hall* action.[251]

Generally, once an insurer denies coverage, the insured is released from policy provisions governing cooperation and settlement, as well as other provisions.[252]  Case law also recognizes that a prolonged silence, or refusal to answer an insured's request for coverage or a coverage position may constitute the equivalent of a denial of coverage.[253]  It seems equally clear to this court that an action for a declaration that there is no coverage has the same effect.

This court recommends that the district court make a finding that ANI effectively denied coverage to its insured, thereby releasing the insured from policy provisions that ANI argues prohibits the settlement contained in the Plan.

F.    Reasonable Settlement.

Under Pennsylvania law, once the insurer breaches its contract, an insured may negotiate a reasonable settlement with the injured party "so long as it was done in good faith and the settlement was fair and reasonable."[254]  The good faith of the Plan Proponents is discussed elsewhere in this opinion, and will not be repeated.  The Settlement Agreement provides for settlement of A/P claims for the amount of $110 million, with up to a $100 million set aside for future claimants.  The court

---

[251]  Exhibit 3094, pgs. 17 - 20.

[252]  1 Insurance Claims and Disputes 4th section 3:10 (Sept. 2003).

[253]  *Id.* (citing *Sarnafil, Inc. v. Peerless Ins. Co.,* 636 N.E.2d 247, 253-53 (Mass. 1994); *Best Place v. Penn Am. Ins. Co.,* 920 P. 2d 334, 352-53 (Haw. 1996)).

[254]  *Alfiero,* 500 A.2d at 172.

finds the settlement is fair and reasonable. The settlement is in an amount within the policies'

coverage. Pepper Hamilton, joint defense counsel in the *Hall* action, has prepared a range of

settlement values, and the settlement is not out of line with these figures.[255] Mr. Baron, one of the

leading attorneys representing plaintiffs in this type of case, testified that his estimate of the

potential value in the tort system of all the radiation cases, considering the number of claims and

the jury verdict in the test case, would approach $1 billion.[256] The settlement amount uses figures

for the test claimants that: (i) are significantly lower than the jury verdicts in the test cases, (ii) are

in amounts close to the pre-bankruptcy settlement offers made by plaintiffs counsel, and (iii) are in

line with the *Hall* counsel's settlement figures, which are significantly lower than plaintiffs'

counsels estimate of the potential value of the cases.

At trial, the Plan Proponents provided a detailed explanation for the settlement value and the

amounts paid to claimants. The values for the eight cases where jury verdicts were initially

rendered, were settled for 32% to 42% of the jury verdict. The remaining claims were placed in four

categories, based upon five criteria, including:

> 1. The strength of the evidence regarding the relationship of the type of cancer asserted to the nuclear exposure;
> 2. The location where each person was exposed, the duration of the exposure, and the years of exposure;
> 3. The age of the individual, with the claims of younger cancer victims accorded more value than those of relatively older claimants;

---

[255] Exhibit 3076. In July, 1999, counsel recommended a settlement value of between $38 to $63 million on the personal injury claims, based upon certain assumptions, plus a small amount for the 178 property damage claims and medical monitoring claims. Mr. Nesser testified that this value was subsequently updated, in March 2003, to a range of $70 to $90 million. Exhibit 3102.

[256] Baron testimony, January 5, 2004.

> 4. Special characteristics in the damage claims, such as plaintiffs who had
> sustained significant medical expenses or plaintiffs with large families;
> 5. Whether the particular claim was within the statute of limitations period,
> and if not, the strength of the claimants' arguments regarding tolling.

The court finds that the settlement values are reasonable, based upon fair assumptions for

the reasonable value of claims considering a number of various criteria, and comport with state law

regarding fair and reasonable settlement.

ANI is not prejudiced by the settlement. The settlement will liquidate and allow the *Hall*

claims; however, the Plan Proponents argue that ANI's rights regarding coverage are not

prejudiced by the settlement.[257] Instead, the Plan provides that insurance rights will be transferred

to the A/P Trust, and claimants state that the Trust will take those rights for what they are. If it is

ultimately determined that no coverage exists, then the Trust will not recover. Because ANI retains

its right to contest coverage, it is not prejudiced by the settlement.

The settlement also comports with bankruptcy standards regarding settlement, and will be

approved. Under Bankruptcy Rule 9019 and applicable law, in order for a settlement to be approved

by a bankruptcy court, it must be "fair and equitable and in the best interest of the estate."[258] The

factors a court considers in evaluating whether a settlement is fair and equitable include:

> 1. The probability of success in the litigation, with due consideration for the uncertainty in
> fact and law;
> 2. The complexity and likely duration of the litigation and any attendant expense,
> inconvenience and delay;
> 3. The best interests of the creditors with proper deference to their reasonable views;
> 4. The extent to which the settlement is truly the product of arms-length bargaining, and not
> of fraud or collusion;

---

[257] Trial Brief of the Apollo/Parks Township Releasors, pg. 37. Pl. 5358.

[258] *Matter of Cajun Elec. Power Coop., Inc*, 119 F.3d 349, 355 (5th Cir. 1997).

5. All other factors bearing on the wisdom of the compromise.[259]

1. *Probability of Success.* Under the settlement, the *Hall* action will be dismissed, and the *Hall* claimants will be paid in accordance with a matrix established under the trust. The *Hall* action has been pending since 1994. In that time, defense costs have exceeded $24 million. In 1998, a jury in a test trial of eight claims in the *Hall* action rendered a verdict against B&W and ARCO in the amount of $36.7 million. Although a new trial was ultimately granted, as pointed out by Plan Proponents, a significant risk still exists in the case of an adverse judgment. At the test trial, the *Hall* plaintiffs were permitted to have their experts testify that the plaintiffs' injuries were caused by emissions from the A/P facilities. While defendants sought to have this testimony excluded, the court has stated that sufficient admissible evidence of causation has been presented, and would likely permit the experts' testimony on retrial. ANI asserts that it has a strong case on retrial, that it has retained highly qualified experts who can rebut allegations that claimants' injuries were caused by emissions from the facilities, and that the dose of radiation that plaintiffs' experts estimate the plaintiffs had received is insufficient to increase the risk of disease.[260] Consideration of a settlement does not require the court to conduct a mini-trial to determine the probable outcome of claims compromised.[261] Instead, the court considers relevant facts and law to enable it to make an informed and intelligent decision.[262] Given that a test trial has already resulted in jury verdicts in favor of the test plaintiffs, and that on retrial the trial court may permit plaintiffs' experts to testify regarding

---

[259]  *Id.* at 356.

[260]  ANI Post Trial Brief, pgs. 29-30.

[261]  *Cajun*, 119 F.3d at 356.

[262]  *Id.*

-100-

whether the plaintiffs' injuries were caused by emissions from the A/P facilities, the court finds that this factor weighs in favor of approval of the settlement. In short, there is a substantial probability that the plaintiffs will again be successful in the *Hall* action.

2. *Complexity, Expense and Likely Duration of Litigation*. As recited above, the *Hall* action has been pending for ten years, and not a single claim has been resolved. In that time, the defense costs have exceeded $24 million. There are now over 500 claimants involved in the litigation, and the defense costs are likely to increase exponentially if the litigation continues. The defense costs reduce the policy limits, and if permitted to escalate, will ultimately reduce any recovery in the case.

The likely duration of the litigation is uncertain; however, given the time spent already in the case, it is likely to last for several more years. Any appeal of the *Hall* verdict would add at least a year, and probably more, to the expected duration of the case.

Both parties acknowledge the complexity of the case. It involves issues regarding radiation exposure including highly complex medical and scientific evidence and the effect of the Price Anderson Act. The case involves 500 plaintiffs, personal injury and property damage claims. A trial is likely to be complex, expensive and time consuming. Given the complexity, expense and likely duration of the litigation, settlement is advisable.

3. *The Best Interests of the Creditors*. In considering whether a settlement is fair and equitable, the court must consider the reasonable views of a majority of the creditors.[263] The settlement is supported by all creditors and by the A/P Futures Representative. Over 99% of the present A/P claimants voted in favor of the Plan. ANI is the only party that has objected to the A/P settlement, and ANI is not a creditor of the estate. The A/P Futures Representative, as well as

---

[263] *In re Foster Mortgage Corp.*, 68 F.3d 914, 917 (5th Cir. 1995).

-101-

retained experts and professionals, have conducted due diligence into the reasonableness of the settlement as it affects future claimants, and concluded that the settlement is in the best interests of the future claimants. This factor also favors approval of the settlement.

    *4. Arms-Length Bargaining.* The settlement is the result of extensive negotiations, commencing in November, 1998, with the parties involved in the *Hall* action. In March 2003, after the filing of Debtors' bankruptcy petitions, mediation was again commenced between the *Hall* claimants, B&W and ANI to attempt to resolve the *Hall* claims. Mr. Francis McGovern, the court-appointed mediator, participated in the mediation.[264] ANI was represented by its bankruptcy counsel, as well as by an attorney from Pepper Hamilton, the firm which conducted the joint defense of the *Hall* action. Mr. Nesser testified that, at this time, Pepper Hamilton provided an updated analysis of the settlement value of the *Hall* action, reflecting values between $70 and $90 million.[265] Mr. Baron testified that thousands of hours were spent in negotiations, resulting in the settlement agreement.

    Thereafter, the A/P Futures Representative was appointed, and was given an opportunity to examine the agreement and the fairness of the settlement and the Plan to future claimants. Due diligence was conducted by the A/P Futures Representative, and further negotiations occurred. These negotiations resulted in the filing of an Amended Settlement Agreement, incorporating revisions requested by the Futures Representative. These revisions include granting the FCR the right to participate in the drafting of the A/P Trust Distribution Procedures, and to provide a set aside of $75 million (with a cap of $100 million) for the future claimants.

---

[264]  Exhibit 3099.

[265]  Testimony John Nesser, Jan. 7, 2004; Exhibit 3102.

The court finds that the A/P settlement is not the result of fraud or collusion, but is the result of arms-length bargaining. As such, it will approve the settlement.

### IX.  OTHER OBJECTIONS

A.    Lack of Notice.

Maryland Ins. Co. and Federal Insurance Co. object that they were not provided notice in time for filing objections to the Plan and Disclosure Statement. Plan Proponents assert, and the record reflects, that sufficient notice of the bankruptcy filing was provided to each insurer.   Maryland was informed through its designated agent of the initial petition filed in 2000,[266] had notice of, and actually participated in, discovery prior to the confirmation hearing, and filed an objection to the Plan.[267]  The record reflects that Maryland had notice of, and participated in objections to the confirmation of the Plan.  As such, its objection of lack of notice is not well taken, and is overruled.

Similarly, Federal Insurance objects that it lacked notice of the Plan.  The record reflects a different story.  It shows that Federal, in January 2003, filed two proofs of claim in the bankruptcy proceedings.[268]  Federal knew of the bankruptcy proceedings at least by January 2003.  It certainly knew of the bankruptcy proceedings and plan confirmation when B&W sent it notice of the Plan filing in May, 2003.[269]  Federal's objection of lack of notice is similarly overruled.

B.    Objections Specific to Ace Companies

---

[266]  Exhibit 15.

[267]  Exhibit 4735.

[268]  Proofs of Claim 0350968 and 0350945.

[269]  Exhibit 15, BW 10020012 - 41.  BW 10020036 indicates that on May 22, 2003, B&W notified "Jeff Golden, Federal Insurance Company, c/o Chubb Ins. Group, 2000 W. Loop South, Suite 1800, Houston, TX 77027" of the filing of the Plan.

-103-

Ace contends that its insurance policies are unique, i.e., that its policies are backed by various forms of security and a third party guarantee under a High Deductible Program and/or Captive Program. Ace provided primary general liability, workers' compensation and automobile liability insurance to B&W, MII and their affiliates, backed by forms of security and a third party guaranty by MII, as well as excess policies where no security was required. Additionally, some general liability policies are fronting policies reinsured largely by a wholly owned captive of MII, i.e., by Creole Insurance Co., Ltd. ("Creole"). Ace objects that the Plan cannot eliminate, alter or impair Ace's rights to the collateral, security, reinsurance and guarantee, and that the Plan does so because it: (1) impairs Ace's recourse against the Captive reinsurers and MII to access reinsurance and the third party collateral; (2) provides for the Captive Program to be dismantled and restructured, divides the Third Party Collateral held by Ace and releases the MII guaranty; (3) reassigns fronting policies secured by Creole[270] collateral and channels asbestos claims to the asbestos trust, and enjoins Ace from recourse against the Creole Reinsurance and Creole collateral.

Plan Proponents agree that the collateral posted to the High Deductible Program or to the Captive Program is not property of the estate, but assert that the channeling injunction may protect property of affiliated third parties who make substantial contributions to the trust.

Section 524(g)(1)(A) specifically permits the court to issue an injunction "to supplement the injunctive effect of a discharge under this section." Under §524(g)(4)(A)(i), the injunction is valid and enforceable against all entities that it addresses. Moreover, notwithstanding the provisions of §524(e), which prohibits a discharge from affecting the liability of a third party or third party property, the channeling injunction "may bar any action directed against a third party who is

---

[270] Creole is a captive insurance subsidiary of MII.

-104-

identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor . . . " that arise by its ownership of a financial interest in the debtor, the third party's management of the debtor, the third party's provision of insurance to the debtor or a related party, or the third party's financial transaction or corporate restructuring of the debtor or a related party.

Notwithstanding the general prohibition of a third party's release contained in §524(e) of the Bankruptcy Code, §524(g)(4)(A)(i) relating to asbestos channeling injunctions specifically permits a third party to be the beneficiary of an injunction, so long as the conditions and requirements of the section are met. The Plan provides for the Debtors and the MII Indemnified Parties to be subject to the protections of the channeling injunction.

Plan Proponents agree that certain of Ace's claims, including claims for indemnity against MII Indemnified Parties and Creole Insurance Co. will be channeled to the Asbestos PI Trust, but assert that this is permitted by §524(g). This court agrees. While it is premature at this point to determine the effect of implementation of the channeling injunction, the relief sought by the Plan is likely within the protection found in §524(g). The Plan provides that the Asbestos PI Channeling Injunction will enjoin Ace from proceeding against MII or the collateral pledged by MII under its agreements with Ace. This is permitted by the terms of §524(g)(4)(A)(ii), which permits the channeling injunction to bar actions against an identifiable third party directly or indirectly liable for claims against the debtor.[271] MII is such a party as an owner or ultimate parent of the Debtors.

---

[271] *In re Combustion*, 295 B.R. 459, 482 (Bankr. D. Del. 2003)("To the extent that [nondebtors] are sued as a result of their prior affiliation with Debtor or other relationship with Debtor as provided in 524(g)(4), the channeling injunction is properly applied to them.").

Similarly, Creole as the captive insurer of B&W, is a third party that provided insurance to the Debtor or a related party under the section.

### X.  CONCLUSION

For the reasons expressed in the foregoing opinion, the Court recommends that the Plan be confirmed.   The Plan requires that numerous findings of fact be made in connection with confirmation.  To the extent that findings are required for confirmation, they are adopted.

As to non-core maters and in accordance with Bankruptcy Rule 9033:

Within 10 days after being served with a copy of the proposed findings of fact and conclusions of law a party may serve and file with the clerk written objections which identify the specific proposed findings or conclusions objected to and state the grounds for such objection. A party may respond to another party's objections within 10 days after being served with a copy thereof. A party objecting to the bankruptcy judge's proposed findings or conclusions shall arrange promptly for the transcription of the record, or such portions of it as all parties may agree upon or the bankruptcy judge deems sufficient, unless the district judge orders otherwise.

New Orleans, Louisiana, November 9, 2004.

*J. A. Brown*

Jerry A. Brown
U.S. Bankruptcy Judge

-106-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| KAISER ALUMINUM CORP., et al., | : | Bankruptcy Case 02-10429 (JKF) |
| | : | |
| Debtors. | : | |

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| KAISER ALUMINUM CORP., et al., | : | Misc. Case No. 06-041 (JJF) |
| | : | |
| Debtors. | : | |

**CERTIFICATE OF SERVICE**
**CASE NO. 06-41(JJF)**

I hereby certify that on May 1, 2006, I electronically filed the **Joint Answering**

**Memorandum of Reorganizing Debtors and Their Principal Creditor Constituencies** with

the Clerk of Court using CM/ECF which will send notifications of such filing to the following:

Kimberly D. Newmarch
newmarch@rlf.com rbgroup@rlf.com

Daniel J. DeFranceschi
defranceschi@rlf.com
rbgroup@rlf.com

Jason Michael Madron
madron@rlf.com rbgroup@rlf.com

Daniel K. Hogan
dkhogan@dkhogan.com

Mark Thomas Hurford
mhurford@camlev.com

Sharon Matava Zieg
bank@ycst.com
szieg@ycst.com

Paul J. Dougherty, III
pdoug@gebsmith.com

Thomas Gerard Whalen, Jr.
tgw@stevenslee.com

Carmella P. Keener
CKeener@rmgglaw.com;
jshipley@rmgglaw.com;
rmgg@rmgglaw.com

Richard William Riley
rwriley@duanemorris.com

Jennifer L. Scoliard
JScoliard@klehr.com

I hereby certify that on May 1, 2006, I mailed via the United States Postal Service

the document to the following non-registered participants:

Duncan J. McNeil
Spokane County Jail
MS. Jail CD# 293752
1100 W. Maloon
Spokane, WA 99260

William P. Bowden
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Laurie Schenker Polleck
Jaspan Schlesinger Hoffman LLP
913 North Market Street
12th Floor
Wilmington, DE 19801

Richard H. Cross, Jr.
Richard H. Cross, Jr.
Cross & Simon LLC
913 North Market Street
11th Floor
Wilmington, DE 19801

Michael G. Gallerizzo
Louis J. Ebert
9th Floor, The World Trade Center
401 East Pratt Street
Baltimore, MD 21202

_Kimberly D. Newmarch_

Kimberly D. Newmarch (DE 4340)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19810
302-651-7700
Newmarch@rlf.com