# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| KAISER ALUMINUM CORPORATION, a Delaware corporation, et al. | :<br>:<br>: | Jointly Administered Under Bankruptcy Case No. 02-10429 (JKF) Chapter 11 |
| | : | |
| KAISER ALUMINUM CORPORATION, et al. | :<br>: | Case No. 06-mc-41 (JJF) |

## REPLY OF APPELLANTS REPUBLIC INDEMNITY

## COMPANY AND TRANSPORT INSURANCE COMPANY

## (f/k/a TRANSPORT INDEMNITY COMPANY)

# TABLE OF CONTENTS

Page

I.     Introduction. ..............................................................................................1

II.    Insurers Would Be Harmed by the Plan and Its Assignment of Insurance
       Rights. .....................................................................................................1

III.   *Combustion Engineering* Did Not Decide the § 1123(a)(5) Preemption
       Issue. ........................................................................................................4

IV.    The Weight of Authority Limits Section 1123(a)(5)'s Preemptive Effect. ............6

V.     The PPs' Overbroad Interpretation of § 1123(a)(5) Conflicts With Other
       Provisions of the Bankruptcy Code. .......................................................7

VI.    PPs' Interpretation of § 1123(a)(5) Would Lead to Absurd Results. ......................9

VII.   Interpreting § 1123(a) as "Directive" Rather Than "Empowering" Does
       Not Render § 1123(a) Meaningless, as PPs Incorrectly Assert. ............10

VIII.  Congress Chose Not To Preempt Contracts Under Section 1123(a)(5)(B). ..........14

IX.    Plan Proponents Overreach by Contending there Are Contingent Rights to
       Proceeds For the Debtor to Assign. .......................................................16

X.     The PPs Overreach by Contending Implied Preemption of State Law.................18

XI.    Conclusion ..............................................................................................20

# TABLE OF AUTHORITIES

## CASES

*In re Adelphia Communications Corp.,*
  298 B.R. 49 (S.D.N.Y. 2003)............................................................................17

*Barber v. Bettendorf Bank, N.A. (In re Pearson Industries, Inc.),*
  152 B.R. 546 (Bankr. C.D. Ill. 1993)................................................................15

*Buttonwood Partners, Ltd.,*
  111 B.R. 57 (Bankr. S.D.N.Y. 1990)................................................................20

*Cipollone v. Liggett Group, Inc.,*
  505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)........................................5

*Cisneros v. Alpine Ridge Group,*
  508 U.S. 10, 113 S.Ct. 1898 (1993)..................................................................13

*In re Combustion Engineering, Inc.,*
  391 F.3d 190 (3d Cir. 2004)..........................................................4, 5, 6, 8, 16, 18

*In re Crownover,*
  43 B.R. 22 (Bankr. E.D. Miss. 1984)................................................................18

*Estate of Lellock v. Prudential Insurance Co. of America,*
  811 F.2d 186 (3rd Cir. 1987) ..........................................................................17

*Henkel Corp. v. Hartford Accident & Indem. Co.,*
  29 Cal. 4th 934 (2003) ................................................................................2, 4

*Hillsborough County v. Automated Medical Laboratories,*
  471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)..........................................2

*Holland American Ins. Co. v. Succession of Roy,*
  777 F.2d 992 (5th Cir. 1985) ..........................................................................18

*Homsy v. Floyd (In the Matter of Vitek, Inc.),*
  51 F.3d 530 (5th Cir. 1995) ............................................................................18

*I.N.S. v. Cardoza-Fonseca,*
  480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)........................................14

*Jones v. Rath Packing Co.,*
  430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)............................................5

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988)................................................................................19

*Louisiana World Exposition, Inc. v. Federal Ins. Co. (In re Louisiana World Exposition)*,
  832 F.2d 1391 (5th Cir. 1987) ...........................................................................18

*MacArthur Co. v. Johns-Manville Corp.*,
  837 F.2d 89 (1998)................................................................................................9

*Maxwell v. Megliola (In re marchFIRST, Inc.)*,
  288 B.R. 526 (Bankr. N.D. Ill. 2002), *aff'd* 293 B.R. 443 (N.D. Ill. 2003)...........17

*McCormack Baron Mgmt. Services, Inc. v. American Guar. & Liability Ins. Co.*,
  989 S.W.2d 168 (Mo. 1999) ..................................................................................7

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)..........................................5

*Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assoc's.)*,
  61 F.3d 197 (3d Cir. 1995)...................................................................................16

*National Union Fire Ins. Co. of Pittsburgh, PA., v. Titan Energy, Inc. (In re Titan Energy, Inc.)*,
  837 F.2d 325 (1988)..............................................................................................18

*Ocean Accident & Guar. Corp. v. Southwestern B. Tel Co.*,
  100 F.2d 441 (8th Cir. 1939) ................................................................................7

*Pacific Gas & Elec. Co. v. California*,
  350 F.3d 932 (9th Cir. 2003), *cert. denied sub. nom.*, 543 U.S. 956,
  125 S.Ct. 454, 160 L.Ed.2d 318 (2004)....................................................6, 7, 9, 10

*In re Pacific Gas & Elect. Co.*,
  273 B.R. 795 (Bankr. N.D. Cal. 2002) .........................................................10, 11

*Price v. Delaware State Police Fed. Credit Union (In re Price)*,
  370 F.3d 362 (3d Cir. 2004)............................................................................8, 10

*In re Public Service Co.*,
  108 B.R. 854 (Bankr. D.N.H. 1989) ...................................................................13

*Quemetco, Inc. v. Pacific Auto. Ins. Co.*,
  24 Cal. App. 4th 494 (1994) ..................................................................................2

*St. Clare's Hospital and Health Center v. Insurance Co. of North America (In re St. Clare's Hospital and Health Center,*
 934 F.2d 15 (2nd Cir. 1991)...........................................................................17, 18

*Tate v. NationsBanc Mortg. Corp. (In re Tate),*
 253 B.R. 653 (Bankr. W.D.N.C. 2000),............................................................20

*Tringali v. Hathaway Mach. Co.,*
 796 F.2d 553 (1986)..........................................................................................18

*United States v. Bass,*
 404 U.S. 336 (1971)............................................................................................5

*Universal Cooperatives, Inc. v. FCX, Inc. (In re FCX, Inc.),*
 853 F.2d 1149 (4th Cir. 1988) .............................................................12, 13, 16

*In re Western Asbestos Co.,*
 313 B.R. 456 (Bankr. N.D. Cal. 2004), *aff'd,* 2004 WL 1944792
 (N.D. Cal. 2004).........................................................................................7, 16

## STATUTES

11 U.S.C. § 101(49)(A)(ii)..............................................................................15

11 U.S.C. § 363(f)(1) .....................................................................................15, 16

11 U.S.C. § 363(l)......................................................................................1, 7, 8, 9

11 U.S.C. § 365..............................................................................................15

11 U.S.C. § 365(c)(3)......................................................................................15

11 U.S.C. § 524(g) .....................................................................................18, 19, 20

11 U.S.C. §524(g)(2)(B)(i)(II) .........................................................................19

11 U.S.C. § 524(g)(4)(A)(ii)(III) ................................................................19, 20

11 U.S.C. § 541 .............................................................................................5, 6

11 U.S.C. § 541(a)(6).................................................................................16, 17

11 U.S.C. § 541(c)(1)........................................................................................5

11 U.S.C. § 1123.............................................................................................13

11 U.S.C. § 1123(a) ........................................................................................11, 16

11 U.S.C. § 1123(a)(5)..................................1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16

11 U.S.C. § 1123(a)(6)..............................................................................14

11 U.S.C. § 1129..................................................................................13, 15

11 U.S.C. § 1129(b)(2) ..................................................................11, 12, 13, 16

11 U.S.C. § 1142(a) ........................................................................1, 6, 8, 9, 15

11 U.S.C. § 1145..................................................................................12, 15

## OTHER AUTHORITIES

3 Norton Bankruptcy Law & Practice § 48:6 (2004).........................................19

140 Cong. Rec. H10,765 ..............................................................................19

Appellants Republic Indemnity Co. and Transport Insurance Co. (f/k/a Transport Indemnity Co.) ("Appellants"), in support of the opening memorandum of Appellants, submit this reply to: (i) the answering memoranda filed by the Plan Proponents ("Joint Mem."), and (ii) the Future Silica and CTPV Claimants' Representative.

## I.    Introduction.

The memoranda of the Plan Proponents ("PPs"), rather than elucidating their preemption argument, avoids explaining its inconsistencies and absurdities. Under their interpretation, it would be perfectly acceptable for § 1123(a)(5) to conflict with other provisions of the Bankruptcy Code, rendering §§ 363(l) and 1142(a) superfluous. Section 363(l) controls the transfer of property of a debtor; the PPs' interpretation of § 1123(a)(5) would completely eliminate such restrictions and would effectively read § 363(l) out of existence. The PPs' interpretation of § 1123(a)(5) would allow the confirmation of a plan of reorganization that could not even be implemented under § 1142(a). The PPs have refuted neither of these points. Because the PPs have no answer to these inconsistencies, they simply attempt to divert the Court's attention.

## II.    Insurers Would Be Harmed by the Plan and Its Assignment of Insurance Rights.

The PPs repeatedly argue that their Plan[1] is "insurance neutral" and does not harm insurers. *See, e.g.,* Joint Memorandum at 4. By stipulation, all parties agreed to raise only legal issues in this proceeding. *See* Stipulation and Agreed Order ¶ 3 at 3. Whether insurers are harmed by the Plan is a factual issue beyond the scope of the parties' stipulation, and is not properly before the Court on this appeal.

---

[1]    Terms not otherwise defined herein shall be ascribed the meanings set forth in the Debtors Second Amended Plan of Reorganization.

Even if it were an issue, however, the Court must assume that insurers will be harmed by the Plan because the PPs' preemption argument presupposes such harm. Federal preemption of state law cannot arise unless there is a conflict between state and federal law. *See Hillsborough County v. Automated Medical Laboratories*, 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)). The PPs' preemption argument necessarily assumes that state law would enforce the insurance contracts' "anti-assignment" provisions. Those provisions are material terms of the insurance contracts,[2] and are enforceable under applicable state law where (as here) an assignment would increase the risk to insurers. *See Henkel Corp. v. Hartford Accident & Indem. Co.*, 29 Cal. 4th 934, 945 (2003); *Quemetco, Inc. v. Pacific Auto. Ins. Co.*, 24 Cal. App. 4th 494, 503 (1994) ("The purpose of consent provisions is 'to prevent an increase of risk and hazard of loss by a change of ownership . . . '"). Accordingly, the Court must assume that Appellants are harmed by the Plan's assignment.

Appellants would be harmed in several ways. First, the assignment radically alter the relationships upon which the insurance contracts are based. The policies contain "cooperation" clauses requiring an insured to cooperate in defending against meritless claims. Also, policies imposing a duty to defend on insurers give insurers the right to control the defense and settlement of claims. The insured must provide its insurers with all evidence relevant to the litigation and settle of claims. Insureds often retain some financial responsibility for claims (through, *e.g.*, deductibles, self-insured retentions, limits of liability), which gives insureds an additional direct financial incentive.

---

[2]    The parties stipulated that the anti-assignment clauses are "material provisions of the Insurers' Policies" and that "Insurers have not given their consent to the Assignment." *See* Stipulation and Agreed Order ¶¶ 8(a), (c) at 4-5.

2

The insurance contracts embody the parties' mutual intent of maintaining a cooperative, mutually beneficial. The proposed assignment would turn that relationship on its head. It would substitute for the original insured, a going business concern with a financial incentive to defend against meritless claims, with a Trust that exists only to process and pay claims, regardless of merit, under the lenient evidentiary standards and inflated claim amounts set forth in the Trust Distribution Procedures ("TDPs").

Under the TDPs, the Insurers would have no practical or effective input into the Trust's processing and payment of claims. Under the TDPs, insurers would be barred from seeking discovery and participating in the Trust's process, and would have no right to appeal. Insurers would have to litigate the reasonableness of the TDPs and any payments made thereunder, a burden and risk not contemplated under the policies.

The Trust would have no incentive or ability to cooperate with insurers; instead, it would be heavily influenced by the asbestos plaintiffs bar, *i.e.*, the very lawyers who would be seeking payment from insurers. The operations of the Trust would be overseen by a "Trust Advisory Committee" ("TAC") that would be appointed by the Asbestos Claimants Committee.[3] The TAC would have advisory and even veto power over a host of Trust decisions. *Id.* §§ 2.2. These include, *e.g.*, control over whether the Trustee tightens, *or loosens*, the already lax medical or exposure evidence that the Trust will apply to process and pay claims. *Id.* § 2.2(e)(v) at 8. This could all be done with no oversight from the Bankruptcy Court and no input from the insurers.

---

[3]      *See* KACC Asbestos PI Trust Agmt., art. VI. The "KACC Asbestos PI Trust Agmt" is the Kaiser Aluminum & Chemical Corporation Asbestos Personal Injury Trust Agreement, attached as Exhibit 1.1(39) to the Plan.

Furthermore, Debtors have not attempted to assign the entire insurance contracts; rather, they plan to retain some rights and all of the obligations thereunder, and purport to assign other rights to the Trust. *See* Plan § 1.1(145) at 14 (defining the assigned rights as "rights to receive proceeds from Included PI Trust Insurance Policies in respect of Channeled Personal Injury Claims"). This assignment would create an additional insured that is alone a material increase in risk sufficient to justify enforcement of the anti-assignment clause and make the proposed assignment invalid. *Henkel*, 29 Cal. 4th at 945.

The assignment would harm insurers by eliminating their contractual rights to obtain the cooperation of the insureds and participate in and (where applicable) control the defense, litigation, and settlement of asbestos claims, and increasing the number of insureds under the insurance contracts. It would replace those rights with a lenient administrative process that would exclude insurers, process and pay claims that would never be paid in the tort system, under the influence of the very plaintiff lawyers who are seeking payment on asbestos claims. That is not the risk that Appellants agreed to insure.

**III.    *Combustion Engineering* Did Not Decide the § 1123(a)(5) Preemption Issue.**

The PPs assert, repeatedly and incorrectly, that the Third Circuit previously decided the preemption scope of § 1123(a)(5) in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004) ("*CE*"). For example, the PPs state:

> The plain language of section 1123(a)(5)(B) clearly overrides nonbankruptcy law and contractual restrictions on the transfer of property of the estate to another entity as necessary for implementation of a plan. [¶]    *The Third Circuit addressed this very issue in* <u>*Combustion Engineering*</u> ....

Joint Mem. at 13 (italics added). To the contrary, the Third Circuit neither analyzed nor decided this preemption issue.

4

Section 1123(a)(5) is mentioned only once, buried at the end of a footnote, in the entire 59-page *CE* decision. The Court's discussion concerns whether two non-debtors could assign their insurance contracts. The Court decided that they could not; and then the Court discussed the assignment of proceeds of the ***debtor's*** insurance to the ***estate***:

> With respect to the anti-assignment provisions, we agree with the District Court that even if the subject insurance policies purported to prohibit assignment of Combustion Engineering's insurance proceeds, these provisions would not prevent the assignment of proceeds ***to the bankruptcy estate***.[27]

*CE*, 391 F.3d at 218 (emphasis added).

Footnote 27 contains none of the analysis necessary to a finding of preemption. It does not, for example, examine Congressional,[4] apply the strong presumption against preemption,[5] or attempt to balance competing interests.[6] The passing reference to § 1123(a)(5) in footnote 27 is appended to text concerning the transfer of insurance proceeds *into the bankruptcy estate*, not *out of the estate* to a third party. Footnote 27 notes that the authority to assign proceeds to the estate is found in § 541:

> [27] Section 541 effectively preempts any contractual provision that purports to limit or restrict the rights of a debtor to transfer or assigns its interests in bankruptcy. 11 U.S.C. § 541(c)(1) ("An interest of the debtor in property becomes property ***of the estate*** ... notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law – (A) that restricts or conditions transfer of such interest by the debtor"). The

---

[4]   *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("'the purpose of Congress is the ultimate touchstone' of pre-emption analysis." (citations omitted))

[5]   *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action.").

[6]   *See Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (noting that the presumption against preemption "provides assurance that 'the federal-state balance'," *United States* v. *Bass*, 404 U.S. 336, 349 (1971), will not be disturbed unintentionally by Congress or unnecessarily by the courts.").

> Bankruptcy Code expressly contemplates the inclusion of debtor insurance
> policies *in the bankruptcy estate*.

*Id.* at 219 n.27 (emphasis added). Footnote 27 then concludes by quoting § 1123(a)(5).
*Id.* This fleeting reference, appended in a footnote to a single sentence in the text
discussing a different issue, transfer of insurance *proceeds into the estate*, is not a
reasoned analysis of the issue raised in this case. Based on the above footnote, the PPs'
assertion that the Third Circuit ruled that § 1123(a)(5) preempts contractual provisions
prohibiting the assignment of insurance rights *out of the estate* is overreaching.

## IV.     The Weight of Authority Limits Section 1123(a)(5)'s Preemptive Effect.

The one Circuit case that actually addressed the scope of preemption under
§ 1123(a)(5) is *Pacific Gas & Elec. Co. v. California*, 350 F.3d 932 (9th Cir. 2003), *cert.
denied sub. nom.*, 543 U.S. 956, 125 S.Ct. 454, 160 L.Ed.2d 318 (2004) ("*PG&E*").
Unlike the Third Circuit's fleeting mention of § 1123(a)(5) in *CE*, the Ninth Circuit in
*PG&E* conducted a thorough and reasoned analysis of legislative history and preemption,
and concluded that § 1123(a)(5) preempts only state laws conditioned on the insolvency
or financial condition of the debtor. We discussed the *PG&E* opinion at length in
Appellants' Opening Brief, and respectfully refer the Court to that discussion. We do
emphasize one key point of that decision: § 1123(a)(5) (the contents of plan of
reorganization) must be congruent with § 1142(a) (implementation of a plan). If the two
statutes had different requirements, it would be possible for the Bankruptcy Court to
confirm a plan that could not be implemented. Such an absurd result is precisely what
the PPs are seeking.

The PPs cite two ***Bankruptcy Court*** cases (they cite no appellate decisions) on
assignment; neither is persuasive or sufficient to overcome the Ninth Circuit's decision in

PG&E.  The confirmation order in *In re The Babcock & Wilcox Co.*, No. 00-10992 (Bankr. E.D. La., Oct. 8, 2004) ("*B&W*"), was vacated by the District Court and all of the parties settled.[7]  If the appeal had progressed, the approval of the assignment, at least, would have been overturned, as it relied on Eighth Circuit precedent of dubious vitality.[8]

The court *In re Western Asbestos Co.*, 313 B.R. 456 (Bankr. N.D. Cal. 2004), *aff'd*, 2004 WL 1944792 (N.D. Cal. 2004), relied on § 1123(a)(5)(B) to confirm a reorganization plan containing a non-consensual "transfer" of insurance rights, notwithstanding the insurance contracts' anti-assignment provisions.  *See* 313 B.R. at 462.[9]  *Western Asbestos*, however, was settled before the deeply flawed ruling could be reviewed; there is no doubt that it would have been reversed under *PG&E*.

## V.    The PPs' Overbroad Interpretation of § 1123(a)(5) Conflicts With Other Provisions of the Bankruptcy Code.

Section 363(l) is the specific provision of the Bankruptcy Code that authorizes a debtor to transfer property out of the estate.  It states in pertinent part:

---

[7]    See Ex Parte Order Vacating Bankruptcy Court Order Recommending Confirmation of Plan of Reorganization and Dismissing Appeals and 9033 Objections, Without Prejudice, In re Babcock & Wilcox, Case No. 05-00232, pending in the Eastern District of Louisiana, Dkt. No. 117, entered Dec. 27, 2005.

[8]    *Ocean Accident & Guar. Corp. v. Southwestern B. Tel. Co., 100 F.2d 441, 445-446 (8th Cir. 1939).*  Key to that decision was old Missouri law providing that "under a liability policy … the liability, the loss and the cause of action arise simultaneously with the ... accidental injury." *Id.* at 446.  Under current Missouri law, "[t]he insurer's duty to pay arises only after the suit by the third party is successful.  *McCormack Baron Mgmt. Services, Inc. v. American Guar. & Liability Ins Co.*, 989 S.W.2d 168, 173-74 (Mo. 1999).

[9]    In a subsequent order, the *Western Asbestos* court clarified that it rested its decision, in part, on "constru[ing] the word 'transfer' as used in 11 U.S.C. § 1123(a)(5)(B) to mean something different than 'assignment' as used in the insurance policies." *In re Western Asbestos Co.*, No. 02-46284 T (Bankr. N.D. Cal.), Memorandum of Decision After Confirmation Hearing (Feb. 3, 2004) at 79.  This distinction distorts the common meanings of those words.  *See, e.g.*, Black's Law Dictionary at 108 (5th ed. 1979) ("transfer" is the first definition listed under "assign").  The PPs in this case attempt the same word game by calling the assignment a "transfer."  *See* Plan § 5.1(d)(1) ("Transfer of Plan Consideration").

> [A debtor] may use, sell or lease property ..., or a plan under chapter 11 ...
> may provide for the use, sale, or lease of property, *notwithstanding any*
> *provision in a contract, a lease, or applicable law that is conditioned on*
> *the insolvency or financial condition of the debtor* ....

11 U.S.C. § 363(l) (emphasis added). Section 363(l) does not authorize Debtors in this

case to transfer any insurance rights out of the estate without insurers' consent, because

the provisions barring assignment apply regardless of the Debtors' insolvency or

financial condition.

The PPs' interpretation of § 1123(a)(5) would override and preempt, not just

nonbankruptcy law, but also § 363(l). That cannot be the case. Both provisions must be

read together, giving preference to the more specific provision (§ 363(l)) where the two

may conflict.[10] Doing otherwise would result in reading § 363(l)'s preemption provision

out of the Bankruptcy Code.

The same analysis applies with respect to § 1142(a), which authorizes a debtor to

carry out a confirmed plan. Section 1142(a) states:

> *Notwithstanding any otherwise applicable nonbankruptcy law, rule, or*
> *regulation relating to financial condition,* the debtor and any entity
> organized or to be organized for the purpose of carrying out the plan shall
> carry out the plan and shall comply with any orders of the court.

11 U.S.C. § 1142(a). It would make no sense to read § 1123(a)(5) more broadly than §

1142(a), because that would allow provisions to be included in a plan that could not be

carried out. This is why the Ninth Circuit held that § 1123(a)(5) has a narrow scope:

> It makes perfect sense that the express preemptive scope of what must be
> included in a confirmable plan, specified in § 1123(a), would be the same
> as the express preemptive scope of what is actually included in a

---

[10]    *See CE*, 391 F.3d at 237 n.49 (noting the "well-settled maxim that specific statutory provisions
prevail over more general provisions"); *Price v. Delaware State Police Fed. Credit Union (In re*
*Price)*, 370 F.3d 362, 369 (3d Cir. 2004) (noting that "'statutory construction [] is a holistic
endeavor,' and this is especially true of the Bankruptcy Code").

confirmed plan, specified in § 1142(a).

*PG&E*, 350 F.3d at 947.

The PPs have no answer, other than word play, to the conflicts raised by their overbroad interpretation of § 1123(a)(5). The PPs argue that the Plan's non-consensual "transfer" of insurance rights is not a "use, sale or lease of property" within the meaning of § 363(l). *See* Joint Mem. at 27. But the PPs elsewhere argue that the insurance rights assigned to the Trust are present-day "property," and plainly a "transfer" of property is a "use" thereof. It is also a "sale" in the context of this Plan, since the claimants voted to accept the Plan, including the assignment, in compromise and release of their claims.

The PPs also argue against application of § 363(l) based on *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (1998). *See* Joint Mem. at 27 n.18. That case did not involve a non-consensual assignment of insurance rights, such as Debtors are seeking here. In that case the insurers *voluntarily* settled with the debtor and consented to use of insurance proceeds to fund a settlement trust for payment of asbestos claims. Here, in contrast, Debtors excluded insurers from settlement talks with the asbestos claimants, and the Appellants have not consented to any assignment.

## VI.    PPs' Interpretation of § 1123(a)(5) Would Lead to Absurd Results.

In Appellants' Opening Brief, Appellants demonstrated that to read § 1123(a)(5)'s "notwithstanding" clause broadly, as PPs urge, would allow debtors to disregard all nonbankruptcy laws, without any limitation. This leads to absurd and impermissible results, as the Bankruptcy Court found in *PG&E*. In that case, the Bankruptcy Court "questioned whether under Proponents' reading of Section 1123(a)(5) there would be any limit to what a debtor could do," and:

> whether a plan could provide for a debtor to sell liquor to minors

(notwithstanding state laws to the contrary), or trade with foreign enemies (notwithstanding federal statutes to the contrary), or dump toxic wastes (notwithstanding environmental laws and Supreme Court precedent), or merge with competitors to create a monopoly or gain some other competitive advantage (in violation of state or federal antitrust laws).[11]

The Bankruptcy Court heard "no satisfactory answers" to these questions in *PG&E* (*id.*), and there is none here.

The PPs attempt to avoid this issue by burying their response in a footnote deep in their brief. *See* Joint Mem. at 26 n.17. Even then, they are forced to acknowledge the absurdity of interpreting § 1123(a)(5) so broadly. While recognizing that there must be some limit to the preemptive reach of § 1123(a)(5) (*id.*), the PPs are unable to explain what those limits are. The preemptive reach, as explained in Appellants' Opening Brief and in *PG&E*, is limited to nonbankruptcy laws that are conditioned on the insolvency or financial condition of the debtor.

## VII. Interpreting § 1123(a) as "Directive" Rather Than "Empowering" Does Not Render § 1123(a) Meaningless, as PPs Incorrectly Assert.

The PPs contend that § 1123(a)(5) allows them to take any action, whatsoever, without regard for the requirements of nonbankruptcy *or bankruptcy* statutes, so long as it can be shoehorned into a plan. Such an interpretation is contrary to established law. *Price*, 370 F.3d at 369. Section 1123 is entitled "Contents of a Plan," and it "can be read simply as a directive to the plan proponent about *what must go into the plan*. It does not have to be read as an 'empowering' statute that, under Proponents' construction, would permit them to do whatever they wanted -- 'such as' but not limited to the statutory

---

[11]    *In re Pacific Gas & Elect. Co.*, 273 B.R. 795, 806 (Bankr. N.D. Cal. 2002), aff'd in pertinent part & rev'd in part sub nom., Pacific Gas & Elect. Co. v. California, 350 F.3d 932 (9th Cir. 2003).

examples" listed in subsections (A) through (J) of paragraph (5). *PG&E*, 273 B.R. at 805-806.

In response, the PPs assert that this interpretation would "render[] the 'notwithstanding any otherwise applicable non-bankruptcy law' clause [of 1123(a)] meaningless." *See* Joint Mem. at 21. The Bankruptcy Court rejected that very argument in *PG&E*:

> This construction -- interpreting Paragraph (5) [of 1123(a)] as directive rather than empowering -- does not read the "notwithstanding" clause out of the statute. . . . [It] would prohibit a party from even submitting a plan to the bankruptcy court without first obtaining approval from a debtor's shareholders. The court can imagine other examples, such as labor laws that might obligate a plan proponent to negotiate in good faith with unions before submitting a plan or corporate laws that would require "a resolution of the board of directors" before a plan could be proposed.

*PG&E*, 273 B.R. at 806 (citations omitted).

The PPs argue that interpreting § 1123(a)(5) as directive rather than empowering would "render[ ] several subparts of § 1123(a)(5) meaningless because they list potential means for implementation that are not in fact authorized anywhere else in the Bankruptcy Code." *See* Joint Mem. at 21. That argument is simply incorrect; each of the items listed in those subsections is otherwise authorized. All involve redistribution of a debtor's equity. This could occur, for example, if a debtor reorganizes without fully paying a class of non-consenting unsecured creditors; in that instance, § 1129(b)(2)(B) would require the debtor to cancel its old shares (thereby wiping out its current shareholders) and issue new shares. *See* 11 U.S.C. § 1129(b)(2)(B). Typically, state law requires a corporation's charter to reflect the amounts and classes of shares, and allows charter amendments only by vote of the board of directors. Subsections (I) and (J) of 1123(a)(5) would allow a debtor to comply with the mandatory requirements of § 1129(b)(2)(B) by

11

canceling its old shares, issuing new ones to the non-consenting class, and amending its charter, without regard to such state law.[12]

The PPs' argument about subsection (J) would render § 1145 redundant and superfluous. Section 1145 provides a broad exemption from federal, state and local securities laws. *See* 11 U.S.C. § 1145. This exemption would be unnecessary if, as PPs contend, § 1123(a)(5)(J) authorizes a debtor to issue securities notwithstanding any other nonbankruptcy laws.

On this point the PPs also cite *Universal Cooperatives, Inc. v. FCX, Inc. (In re FCX, Inc.)*, 853 F.2d 1149 (4th Cir. 1988), but that case does not support them. In *FCX*, the debtor (FCX) owed money to a creditor (Universal) for products purchased pre-petition. *Id.* at 1152. This debt was secured by a series of unredeemed "patronage certificates" issued and payable by Universal, as determined by its board of directors. *Id.* Post-confirmation, FCX sought to satisfy the entire debt by abandoning a portion of the certificates back to Universal, setting off the debt against the face value of the certificates. *Id.* Universal objected that its by-laws vested its board with sole and absolute discretion to set off an indebtedness against the certificates. *Id.* The Bankruptcy Court overruled Universal's objection and allowed the setoff at face value. *Id.*

The District Court and Fourth Circuit affirmed. The Fourth Circuit perceived "the real dispute here to be Universal's claim that the valuation of the certificates at face value does not comply with the requirement of § 1129(b)(2)(A)(iii) that Universal receive the 'indubitable equivalent' of its claim in order for the modified plan to be 'crammed down'

---

[12]   The same analysis applies with respect to a merger or consolidation of the debtor (subsection (C)), which is authorized elsewhere in the Code  and likewise requires reissuance of shares and amendment of the charter.

over its objection." *Id.* at 1157. The District Court found that exchanging the certificates for the debt at face value constituted "substantial compliance" with the Code (*id.* at 1153), and the Fourth Circuit held it "meets the 'indubitable equivalent' standard of § 1129(b)(2)(A)(iii.)." *Id.* at 1159. The Fourth Circuit also noted that the setoff was appropriate under § 1123(a)(5)(D) in light of the compliance with § 1129(b)(2)(A)(iii)'s indubitable equivalent requirement. *Id.* *FCX* applied § 1123(a)(5) with respect to an act that was otherwise authorized by another Code provision.

The PPs also cite *In re Public Service Co.*, 108 B.R. 854 (Bankr. D.N.H. 1989), but that case provides them no support. In *Public Service*, the Bankruptcy Court relied on the express statutory authorization of § 1129, in addition to § 1123(a)(5). *See id.* at 887 (noting that the issue before it was more accurately framed "in terms of the question of preemptive effect involved as a result not only of § 1123 but also § 1129 of the Bankruptcy Code"). The Bankruptcy Court prevented a public utility commission from exercising absolute veto power over a bankruptcy restructuring – an action similar to the preemption of an *ipso facto* clause. [13]

Applying § 1123(a)(5) preemption only where the contemplated action is substantively authorized elsewhere in the Bankruptcy Code does not render § 1123(a)(5) meaningless; it merely ensures that a reorganization plan complies with other applicable

---

[13]    The PPs also cite *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 113 S.Ct. 1898; 123 L.Ed.2d 572 (1993), which cites to *FCX*, but that case is simply not on point. *Alpine Ridge* is not a bankruptcy case and did not involve § 1123(a)(5). Rather, it involved a contract provision which, on its face, overrode all other provisions of that one contract. The contract thus provided that "notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government." 508 U.S. at 18. In applying this provision, the Supreme Court cited *FCX* in the middle of a "see also" string cite of seven cases. *Id.* Noting that one contract provision can prevail over the rest of the contract is a far cry from finding that § 1123(a)(5) overrides all nonbankruptcy laws of any sort whatsoever, as the PPs urge.

Code provisions.

## VIII.    Congress Chose Not To Preempt Contracts Under Section 1123(a)(5)(B).

The PPs contend that § 1123(a)(5) must preempt the terms of private contracts. They argue that, if § 1123(a)(5) did not apply to the terms of private contracts, then subsection (F), (G), and (H) would fail, as would § 1123(a)(6). Section 1123(a)(5) refers to contracts in some places, and in other places does not. PPs emphasize the subparts that specifically mention various types of contracts – *e.g.,* subsections (F) (certain changes to an "indenture or similar instrument") and (H) (certain changes to terms of "securities")[14] – but that distinction undermines the PPs' case. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 432, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Congress's reference to contracts in subsections (F) and (H) of § 1123(a)(5) indicates its intent to include contracts within the scope of those subsections. Conversely, Congress chose *not* to refer to contracts in subsection (B), thus indicating its intent not to preempt contract provisions.

Furthermore, this argument fails on its own terms just as the PPs' other "meaningless" arguments fail. Various nonbankruptcy laws related to financial condition apply to each of the actions specified in those provisions, and the nonbankruptcy law could be preempted even if contractual provisions were not. For example, § 1123(a)(5)(H) would allow for "...a change in an ... other term of outstanding

---

[14]    *See* Joint Mem. at 23. PPs also cite subsection G (*id.*), which concerns cure or waiver of "default" but does not specifically mention any type of contract. Presumably, PPs read this as referring to default under a contract of some sort.

14

securities." The term "security" includes shares of stock. 11 U.S.C. § 101(49)(A)(ii). A share of stock usually entitles its holder to dividends paid in accordance with the express terms on the certificate or by-laws. State laws, however, usually limit the payment of dividends by a company to its shareholders if the company fails certain solvency requirements. *Barber v. Bettendorf Bank, N.A. (In re Pearson Industries, Inc.)*, 152 B.R. 546, 557 (Bankr. C.D. Ill. 1993) (quoting Ill. Ann. Stat. ch. 32, para. 9.05(a) and 9.10 (Smith-Hurd 1982)). If a bankruptcy court approved a plan, pursuant to §§ 1129 and 1145, which issued shares with certain dividend rights, and the payment of such dividends would violate state law, then such state law would be preempted by § 1123(a)(5). *Cf. id.* (§ 1142(a) applies to state law requiring a corporation to be solvent to make distributions to shareholders).

The PPs also argue that "the term 'applicable nonbankruptcy law' generally includes private contract rights, even where there is no specific use of the term 'contract' or 'agreement.'" *See* Joint Mem. at 23 n.15. However, the only statute that the PPs cite for this proposition is a Bankruptcy Code provision (11 U.S.C. § 365(c)(3)), which is obviously not "nonbankruptcy law." Moreover, the language of § 365 expressly applies to various contracts, i.e., executory contracts and "unexpired leases, and thus excludes other contracts. Section § 365 demonstrates the fallacy of PPs' preemption argument. In § 363(f)(1), Congress authorized debtors to assign executory contracts, and inserted preemptory notwithstanding language that specifically overrides any anti-assignment provision in such contracts. Section 365(f)(1) states:

> notwithstanding *a provision in an executory contract or unexpired lease of the debtor*, or in applicable law, *that prohibits, restricts, or conditions the assignment of such contract or lease*, the trustee may assign such contract or lease ...."

11 U.S.C. § 365(f)(1) (emphasis added).  Contrast this specific language with the "notwithstanding" clause of § 1123(a), which refers only generally to "otherwise applicable non-bankruptcy law."  *Id.* These contrasting provisions demonstrate that Congress knows how to write both forms of preemption language.  Its omission of any reference to contractual anti-assignment provisions in § 1123(a)(5)(B) was purposeful.

The cases cited by the PPs fall into two categories: the cases either do not support their arguments, *e.g.*, *Combustion Engineering* (not addressing the scope of preemption under § 1123(a)(5), *FCX*, 853 F.2d at 1153 (preempting state law), or they are not persuasive or credible.  *E.g.*, *Western Asbestos* and *Babcock & Wilcox*.  Similarly, in *Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assoc's.)*, 61 F.3d 197, 199 (3d Cir. 1995), the Third Circuit considered whether the holder of a first mortgage could obtain relief from the automatic stay to initiate foreclosure proceedings. It noted, *in passing*, that the District Court had looked to section 1123(a)(5) to implement the debtor's extension of a note's maturity date.  The District Court did so, however, pursuant to the "cram-down" provisions of section 1129(b)(2).  *Id.* at 209.

## IX.    Plan Proponents Overreach by Contending there Are Contingent Rights to Proceeds For the Debtor to Assign.

Despite the PPs' protestations, no insured Debtor currently has any right, albeit contingent or otherwise, to proceeds of the excess insurance contracts issued by Appellants.  The insured Debtors' rights to proceeds of such insurance contracts are governed by the terms of the insurance contracts.  Appellants do not dispute that, to the extent the Debtors had an interest in an insurance contract pre-petition, they retain that interest post-petition.  Appellants do not dispute that, to the extent the insurance contracts have generated proceeds, such proceeds are property of the estate.  *See* 11 U.S.C. §

541(a)(6).  Appellants, however, strongly dispute that any "right to proceeds" currently exists.  [See Appellants' Opening Brief at 34-35].

Under the express terms of the insurance contracts, the Appellants are not liable to an insured Debtor unless and until liability has been imposed through either a judgment or a settlement with the consent of Appellants.  If such a judgment occurs, then, and only then, will an insured Debtor have a right, contingent upon a court determination that such judicially imposed liability comes within the terms of the policies, to proceeds.  *See, e.g., Maxwell v. Megliola (In re marchFIRST, Inc.)*, 288 B.R. 526, 530 (Bankr. N.D. Ill. 2002) ("Any property interest in the proceeds has not yet matured and may never mature."), *aff'd* 293 B.R. 443 (N.D. Ill. 2003); *In re Adelphia Communications Corp.*, 298 B.R. 49, 53 (S.D.N.Y. 2003)  ("Claiming the debtors now have a property interest in those proceeds makes no sense at this juncture.").  None exists herein.

The cases cited by the PPs simply do not support their contention that the proceeds of an indemnity insurance contract that have not yet accrued, and for which a Debtor does not, and may not ever have, a claim, are property of the estate.  To the contrary, none of the cited cases addresses, in any way whatsoever, when proceeds of insurance contracts become property; and none addresses when such proceeds become property of the estate.  *See, e.g., Estate of Lellock v. Prudential Insurance Co. of America*, 811 F.2d 186, 190 (3rd Cir. 1987) (holding that the insured had assigned its rights in the insurance contracts prior to the right to receive proceeds of the insurance contract accruing, and thus had no interest in the proceeds); *St. Clare's Hospital and Health Center v. Insurance Co. of North America (In re St. Clare's Hospital and Health Center*, 934 F.2d 15, 18-19 (2nd Cir. 1991) (concluding, after trial in an adversary

proceeding to determine the debtor's rights under its insurance contracts, that its medical malpractice policies and rights thereunder were property of the estate, and holding that the insurer had a duty to defend and indemnify the insured).[15]   The PPs have offered no authority, whatsoever, supporting their contentions that (a) a contingent right to proceeds exists herein; or (b) that such a right to proceeds has been recognized as property of the estate under relevant case law.

## X.    The PPs Overreach by Contending Implied Preemption of State Law.

The establishment of a trust pursuant to section 524(g) requires that a debtor establish an "an 'evergreen' funding source for future asbestos claimants." *CE,* 391 F.3d at 248.   It is Debtors, not insurers, who are frustrating the will of Congress and obstructing the purpose of Section 524(g).   Yet, the PPs appear to contend that Appellants are committing some wrong by insisting that the Debtors comply with the terms of the insurance contracts.   The Debtors, by attempting to assign certain rights under the insurance contracts, are asking the Court to approve a breach of the insurance contracts. There is nothing in § 524(g) that would mandate or even permit such a result.   Because the PPs themselves have failed to fulfill the express Congressional purpose underlying § 524(g), they cannot argue that Appellants' insistence on compliance with the terms of the insurance contracts frustrates such Congressional purpose.

---

[15] *See also Homsy v. Floyd (In the Matter of Vitek, Inc.),* 51 F.3d 530, 537-38 (5th Cir. 1995) (holding that if the proceeds of the D&O policies were not property of the estate, then the bankruptcy court had no jurisdiction to enjoin suits against the directors and officers); *National Union Fire Ins. Co. of Pittsburgh, PA., v. Titan Energy, Inc. (In re Titan Energy, Inc.),* 837 F.2d 325, 329 (holding that insurance policies were property of the estate); *Tringali v. Hathaway Mach. Co.,* 796 F.2d 553, 560 (holding that an insurance policy, and the post-judgment accrued proceeds of such policy were property of the estate); *Louisiana World Exposition, Inc. v. Federal Ins. Co. (In re Louisiana World Exposition),* 832 F.2d 1391, 1401 (5th Cir. 1987) (holding that ownership of an insurance policy does not give a debtor rights to proceeds that the debtor would not have outside of bankruptcy); *Holland American Ins. Co. v. Succession of Roy,* 777 F.2d 992, 996 (5th Cir. 1985) (holding that proceeds of insurance policies that accrue post-petition become property of the estate); *In re Crownover,* 43 B.R. 22, 23 (Bankr. E.D. Miss. 1984) (same).

Appellants have already shown why enforcing the provisions barring assignment would not frustrate the Congressional purpose underlying § 524(g), and will not reiterate the arguments. *See* Appellants' Opening Brief at 30-33. The PPs' own failure to comply with the requirements of § 524(g) make any argument that Appellants' contractual rights are preempted by § 524(g) ludicrous.

Section 524(g)(2)(B)(i) specifies only three assets that must be contributed to the Trust: the securities of one or more of debtors; the obligation of one or more debtors to make future payments to the trust, including dividends; and rights to own a majority of the voting shares of each debtor, the parent of each debtor, or a subsidiary of each debtor that is also a debtor. Insurance is not required. The Debtors have not contributed the assets that are required.

Here, the asbestos claimants agreed to accept less than § 524(g) entitles them to have. The Debtors estimate that there will $380 million of equity in the Reorganized Debtor post-confirmation. *See* Disclosure Statement at 132. If 50.1% of that equity had been contributed to the Trust, as required by §524(g)(2)(b)(i)(II) the Trust would be entitled to stock worth approximately $190,380,000. In addition, that $190,380,000 would generate annual income for the Trust of approximately $22 million. *See* Disclosure Statement at 136-138.[16]

However, the PPs agreed amongst themselves, without consulting Appellants, that the Debtors would only contribute $13 million in cash, and the Trust would only be

---

[16] The Debtors have also negotiated post-petition voluntary settlements with insurers, as Congress contemplated would happen, see 11 U.S.C. § 524(g)(4)(A)(ii)(III), that now total approximately $1 billion. See also 140 Cong. Rec. H10,765 (remarks of Rep. Jack Brooks); 3 Norton Bankruptcy Law & Practice § 48:6 (2004) (stating that the section 524(g) trust would be modeled on the Johns-Manville Trust); Kane v. Johns-Manville Corp., 843 F.2d 636, 640 (2d Cir. 1988); (noting that insurers in Johns-Manville had voluntarily agreed to contribute).

issued stock in the Reorganized Debtors valued at approximately $22 million. The tort claimants agreed to take $165 million less than they would be entitled to under §524(g). Their voluntary acceptance of less than the law would allow them is not a valid basis for blaming the Appellants for insisting upon their legal, contractual right to consent to assignment. The PPs entered into the Stipulation and Agreed Order knowing that the assignment of rights under the insurance contracts was contested, and that they might not win that contest. After entering into the Stipulation and Agreed Order, they asked the Bankruptcy Court to confirm the Plan. They cannot now claim that the contested assignment of rights was essential to the Plan or frustrates Congress's purpose in enacting §524(g).

The cases cited by the PPs are simply inapposite. In both cases, *Tate v. NationsBanc Mortg. Corp. (In re Tate)*, 253 B.R. 653, 670 (Bankr. W.D.N.C. 2000), and *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 61 (Bankr. S.D.N.Y. 1990), the bankruptcy court determined that its power to adjust a debtor's relationships with a  particular creditor preempted nonbankruptcy laws relating to the collection of debts owned by such debtor. It is again overreaching by the PPs to suggest that such cases support their contention that §524(g) would preempt state law that would prohibit the assignment of rights under the insurance policies issued by Appellants. Section 524(g) contemplates a voluntary assignment of proceeds by insurers, and such voluntary assignment would ***not*** be prohibited by state law. *See* 11 U.S.C. § 524(g)(4)(A)(ii)(III).

## XI.    CONCLUSION

For all of the reasons set forth herein and in Appellants' Opening Brief, Appellants respectfully request that the Court grant the appeal.

Dated: May 8, 2006
Wilmington, Delaware

Respectfully submitted,

_____
Richard W. Riley (DE 4052)
Christopher M. Winter (DE 4163)
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone:    (302) 657-4900
Facsimile:    (302) 657-4901

-and-

Mitchell L. Lathrop
Bridget K. Moorhead
DUANE MORRIS LLP
101 West Broadway Street, 9th Floor
San Diego, CA 92101
Telephone:    (617) 499-2200
Facsimile:    (619) 744-2201

-and-

Russell W. Roten
Peter B. Ackerman
Jeff D. Kahane
DUANE MORRIS LLP
633 W. Fifth Street, Suite 4600
Los Angeles, CA 90071
Telephone:    (213) 689-7400
Facsimile:    (213) 689-7401

*Counsel for Republic Indemnity Company
and Transport Insurance Company (f/k/a
Transport Indemnity Company)*

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | Jointly Administered Under |
| KAISER ALUMINUM CORPORATION, a | : | Bankruptcy Case No. 02-10429 (JKF) |
| Delaware corporation, et al. | : | Chapter 11 |
| | : | |
| | : | |
| KAISER ALUMINUM CORPORATION, et al. | : | Case No. 06-mc-41 (JJF) |
| | : | |

## CERTIFICATE OF SERVICE

I, Christopher M. Winter, certify that I am not less than 18 years of age, and that service

of a copy of the **Reply of Appellants Republic Indemnity Company and Transport**

**Insurance Company (f/k/a Transport Indemnity Company)** was made on May 8, 2006 upon

the individuals on the attached service list *via* e-mail and First Class Mail.

Under penalty of perjury, I declare the foregoing is true and correct.

Dated: May 8, 2006
      Wilmington, Delaware

                        Christopher M. Winter (DE I.D. 4163)
                        Duane Morris LLP
                        1100 North Market Street, Suite 1200
                        Wilmington, Delaware 19801-1246
                        Telephone:    (302) 657-4900
                        Facsimile:    (302) 657-4901
                        E-mail:       rwriley@duanemorris.com

SERVICE LIST

Richard W. Riley (DE I.D. 4052)
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801
rwriley@duanemorris.com

Mitchell L. Lathrop, Esquire
Bridget K. Moorhead, Esquire
DUANE MORRIS LLP
101 West Broadway Street, 9th Floor
San Diego, CA 92101
mllathrop@duanemorris.com
bkmoorhead@duanemorris.com

Russell W. Roten, Esquire
Jeff D. Kahane, Esquire
DUANE MORRIS LLP
333 South Hope Street
Los Angeles, CA 90071
rwroten@duanemorris.com
jkahane@duanemorris.com

William P. Bowden, Esquire
ASHBY & GEDDES
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
wbowden@ashby-geddes.com

Lisa Beckerman, Esquire
Brian A. Kilmer, Esquire
AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
590 Madison Avenue
New York, NY 10022
lbeckerman@akingump.com
bkilmer@akingump.com

Edward F. Houff, Esquire
c/o Lynn Stewart & Tammy Nero
KAISER ALUMINUM CORPORATION
5847 San Felipe, Suite 2400
Houston, TX 77057

Daniel J. DeFranceschi, Esquire
Kimberly D. Newmarch, Esquire
RICHARD, LAYTON & FINGER, PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
defranceschi@rlf.com
newmarch@rlf.com

Gregory M. Gordon, Esquire
Daniel P. Winikka, Esquire
Daniel B. Prieto, Esquire
JONES DAY
2727 North Harwood Street
Dallas, TX 75201
gmgordon@jonesday.com
dpwinnika@jonesday.com
dprieto@jonesday.com

Marla R. Eskin, Esquire
Mark T. Hurford, Esquire
CAMPBELL & LEVINE, LLC
800 King Street, Suite 300
Wilmington, DE 19801
meskin@camlev.com
mhurford@camlev.com

Elihu Inselbuch, Esquire
CAPLIN & DRYSDALE, CHARTERED
399 Park Avenue
New York, NY 10022
ei@capdale.com

Peter Van N. Lockwood, Esquire
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W.
Washington, DC 20005
pvnl@capdale.com

James L. Patton, Jr., Esquire
Edwin J. Harron, Esquire
Sharon M. Zieg, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR
The Brandywine Bldg., 17th Floor
1000 West Street
P.O. Box 391
Wilmington, DE 19899
jpatton@ycst.com
eharron@ycst.com
szieg@ycst.com

Daniel K. Hogan, Esquire
THE HOGAN FIRM
1311 Delaware Avenue
Wilmington, DE 19806
dkhogan@dkhogan.com

Steven A. Felsenthal, Esquire
Peter C. D'Apice, Esquire
STUTZMAN, BROMBERG, ESSERMAN & PLIFKA
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689
felsenthal@sbep-law.com
d'apice@sbep-law.com

Steven A. Buxbaum, Esquire
HAYNES AND BOONE, LLP
One Houston Center
1221 McKinney, Suite 2100
Houston, TX 77010
steven.buxbaum@haynesboone.com

Kevin Gross, Esquire
ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.
919 Market Street, Suite 1401
Wilmington, DE 19801
kgross@rmgglaw.com

Rodney L. Eshelman, Esquire
Alison V. Lippa, Esquire
Raymond J. Tittman, Esquire
CARROLL, BURDICK & McDONOUGH LLP
44 Montgomery Street
San Francisco, CA 94101
reshelman@cbmlaw.com
alipp@cbmlaw.com
rtittman@cbmlaw.com

Lewis S. Rosenbloom, Esquire
David C. Christian, Esquire
Jason J. DeJonker, Esquire
McDERMOTT, WILL & EMERY
227 West Monroe Street
Chicago, IL 60606
lrosenbloom@mwe.com
dchristian@mwe.com
jdejonker@mwe.com

Thomas G. Whalen, Jr., Esquire
STEVENS & LEE, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801
tgw@stevenslee.com

Leonard P. Goldberger, Esquire
STEVENS & LEE, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA 19103
lpg@stevenslee.com

Seth W. Wiener, Esquire
LEBOEUF, LAMB, GREENE & MACRAE LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111
sweiner@llgm.com

David M. Ross, Esquire
LEBOEUF, LAMB, GREENE & MACRAE LLP
1875 Connecticut Avenue, N.W., Suite 1200
Washington, DC 20009
dross@llgm.com

Anthony Callaghan, Esquire
Evans Wohlforth, Esquire
David N. Crapo, Esquire
GIBBONS, DEL DEO, DOLAN, GRIFFINGER &
VECCHIONE
One River Front Plaza
Newark, NJ 07102
acallahan@gibbonslaw.com
ewolford@gibbonslaw.com
dcrapo@gibbonslaw.com

Michael B. Joseph, Esquire
Theodore J. Tacconelli, Esquire
FERRY, JOSEPH & PEARCE, P.A.
824 Market St., Suite 904
Wilmington, DE 19899
mjoseph@ferryjoseph.com
ttacconelli@ferryjoseph.com

Karen C. Bifferato, Esquire
Marc J. Phillips, Esquire
CONNOLLY BOVE LODGE & HUTZ, LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
kbifferato@cblh.com
mphillips@cblh.com

Jared M. Katz, Esquire
LEBOEUF, LAMB, GREENE & MACRAE LLP
725 South Figueroa Street, Suite 3100
Los Angeles, CA 90017
jkatz@llgm.com

David M. Klauder, Esquire
Trial Attorney
OFFICE OF THE UNITED STATES TRUSTEE
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
david.klauder.usdoj.gov

Elizabeth J. Futrell, Esquire
Aimee M. Quirk, Esquire
JONES, WALKER, WAECHTER, POITEVENT,
CARRERE & DENEGRE, L.L.P.
201 St. Charles Ave.
New Orleans, LA 70170
efutrell@joneswalker.com
aquirk@joneswalker.com

Clark T. Whitmore, Esquire
Alain M. Baudry, Esquire
Christina A. Smith, Esquire
MASLON, EDELMAN, BORMAN & BRAND, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
clark.whitmore@maslon.com
alain.baudry@maslon.com
christina.smith@maslon.com

George A. Davis, Esquire
Diane Hárvey, Esquire
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
george.davis@weil.com
diane.harvey@weil.com

Carl N. Kunz, III, Esquire
MORRIS, JAMES HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
ckunz@morrisjames.com

Christine P. Hsu, Esquire
WEIL, GOTSHAL & MANGES LLP
1501 K Street NW - Suite 100
Washington, DC 20005
christine.hsu@weil.com

Harold L. Kaplan, Esquire
Mark F. Hebbeln, Esquire
GARDNER CARTON & DOUGLAS LLP
191 North Wacker Drive – Suite 3700
Chicago, IL 60606-1698
hkaplan@gcd.com
mhebbeln@gcd.com

Kristin K. Going, Esquire
GARDNER CARTON & DOUGLAS LLP
1301 K Street, N.W.
Suite 900, East Tower
Washington, DC 20005
kgoing@gcd.com

Joanne B. Wills, Esquire
Jennifer L. Scoliard, Esquire
KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP
919 Market Street, Suite 1000
Wilmington, DE 19801
jwills@klehr.com
jscoliard@klehr.com

Duane D. Morse, Esquire
James R. Wrathall, Esquire
WILMER CUTLER PICKERING
HALE AND DORR LLP
2445 M. Street N.W.
Washington, DC 20037
duane.morse@wilmerhale.com
james.wrathall@wilmerhale.com

Laurie Schenker Polleck, Esquire
JASPAN SCHLESINGER HOFFMAN LLP
913 Market Street, 12th Floor
Wilmington, DE 19801
lpolleck@jshllp-de.com

Michael S. Davis, Esquire
Jantra Van Roy, Esquire
ZEICHNER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, NY 10022
mdavis@zeklaw.com
jvanroy@zeklaw.com

Jason Michael Madron, Esquire
RICHARDS LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
Madron@RLF.com

Duncan J. McNeil, III
2030 West Spofford
Spokane, WA 99205

-4-

Paul J. Dougherty, III, Esquire
GEBHARDT & SMITH LLP
901 Market Street, Suite 451
Wilmington, DE 19801
pdoug@gebsmith.com

Harry Lee, Esquire
John F. O'Connor, Esquire
George R. Calhoun, V, Esquire
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
hlee@steptoe.com
joconnor@steptoe.com
gcalhoun@steptoe.com

Carmella P. Keener, Esquire
ROSENTHAL MONHAIT & GODDESS P.A.
919 Market Street, Suite 1401
Wilmington, DE 19801
ckeener@rmgglaw.com

Brian A. Kilmer, Esquire
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
bkilmer@akingump.com

Frederick D. Holden, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
fholden@orrick.com

DM3\360966.1